1  KATHRYN LEE CRAWFORD-BOYD, ESQ. (SBN 189496)
      lboyd@srbr-law.com
2  RAJIKA L. SHAH, ESQ. (SBN 232994)
      rshah@srbr-law.com
3  **SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
   6310 San Vicente Boulevard, Suite 360
4  Los Angeles, California  90048
   Phone: (323) 302-9488
5  Fax: (323) 931-4990

6  TERRI MARSH, ESQ. (*pro hac vice pending*)
      terri.marsh@hrlf.net
7  BRIAN PIERCE, ESQ. (*pro hac vice pending*)
      bjpierce@gmail.com
8  **HUMAN RIGHTS LAW FOUNDATION**
   1615 L Street NW, Suite 1100
9  Washington, D.C.  20036
   Phone: (202) 369-4977
10 Fax: (202) 355-6701

11 Attorneys for PLAINTIFFS

12            **UNITED STATES DISTRICT COURT FOR THE**
13        **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

14 DOE I, DOE II, Ivy HE, DOE III, DOE   | Case No.  CV 11-02449 PSG
   IV, DOE V, DOE VI, ROE VII, Charles
15 LEE, ROE VIII, and LIU Guifu, and those | **CLASS ACTION COMPLAINT FOR:**
   individual similarly situated,          | **1. TORTURE [28 U.S.C. § 1350];**
16                                         | **2. TORTURE [28 U.S.C. § 1350 note];**
17           Plaintiffs,                   | **3. CRUEL, INHUMAN, OR DEGRADING**
                                           | **TREATMENT;**
18    vs.                                  | **4. FORCED LABOR;**
                                           | **5. PROLONGED AND ARBITRARY**
19 CISCO SYSTEMS, INC., John               | **DETENTION;**
   CHAMBERS, Thomas LAM, Owen             | **6. CRIMES AGAINST HUMANITY;**
20 CHAN, and DOES 1-100,                   | **7. EXTRAJUDICIAL KILLING;**
                                           | **8. ENFORCED DISAPPEARANCE;**
21           Defendants.                   | **9. VIOLATION OF 28 U.S.C. § 2512(1);**
22                                         | **10. BATTERY;**
                                           | **11. ASSAULT;**
23                                         | **12. FALSE IMPRISONMENT;**
                                           | **13. WRONGFUL DEATH;**
24                                         | **14. UNFAIR BUSINESS PRACTICES**
25                                         | **DEMAND FOR JURY TRIAL**
26
27
28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles

2    LEE, ROE VIII, and LIU Guifu (collectively, "Plaintiffs") hereby allege as follows:

3    ## NATURE OF THE ACTION

4    1.    Plaintiffs are U.S. and Chinese citizen practitioners of Falun Gong, a peaceful

5    religious practice that is based on the tenets of Zen Shan Ren (Truthfulness, Compassion,

6    and Tolerance). Cisco Systems, Inc. ("Cisco"); its CEO John Chambers; Thomas Lam,

7    Vice-Chairman of Cisco Greater China Theater; and Owen Chan, President and CEO of

8    Cisco Greater China Theater (collectively, "Defendants"), knowingly, purposefully and

9    intentionally designed, supplied, and helped to maintain a censorship and surveillance

10    network known as the Golden Shield in collaboration with the Chinese Communist Party

11    and Chinese Public Security officers, knowing and intending that it would be utilized by

12    members of the Communist Party of China ("CCP") and Chinese Public Security officers

13    to eavesdrop, tap and intercept communications, identify, and track Plaintiffs as Falun

14    Gong members for the specific purpose of subjecting them to gross human rights abuses,

15    including arbitrary arrest and detention, torture, extrajudicial killing, and crimes against

16    humanity, all in violation of international, U.S., and California law.

17    2.    Cisco refers to the Golden Shield system in its internal literature as "Policenet."

18    3.    As a direct result of the Defendants' creation, development, and maintenance of the

19    Golden Shield technology with the Chinese authorities, Plaintiffs, Falun Gong

20    practitioners, have suffered severe and gross abuses, including false imprisonment,

21    torture, cruel assault, battery, and wrongful death, for which judicial relief is warranted in

22    the form of compensatory and punitive damages.

23    ## PARTIES

24    A.    Plaintiffs

25    4.    Many of the individually named plaintiffs and/or their families in China are likely

26    to suffer retaliation and further human rights abuses if their identities become public, and

27    thus are filing anonymously or through next friends. Their petitions to do so are filed

28    concurrently with this Complaint.

- 2 -

5.      Doe I is a resident of China. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, torture, forced labor and public humiliation.

6.      Doe II is a resident of China. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, torture, forced labor and public humiliation.

7.      Ivy He is a resident of Canada. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, torture, forced labor and public humiliation.

8.      Doe III brings this action through his next friend, Roe III. Doe III is currently in prison in China. He was arrested in 2006 for engaging in Falun Gong activities on the Internet. The Golden Shield was the essential means through which he was monitored, tracked, detained and eventually imprisoned, kept in isolation, and subjected to torture including by means of force-feeding.

9.      Doe IV brings this action through his next friend, Roe III, who is also next friend for Doe III. Doe IV was arrested for engaging in Falun Gong religious activities on the Internet. The Golden Shield was the essential means through which he was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, forced conversion, torture.

10.     Doe V is a resident of China. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually imprisoned for three years, following a show trial where she was denied an opportunity to challenge the charges against her, where she was deprived of sleep and subjected to beatings and other forms of torture.

11.     Doe VI is a resident of China. The Golden Shield was the essential means through which he was monitored, tracked, detained and eventually sent to a reeducation through labor camp without trial where he was subjected to torture and forced labor.

12.     Roe VII, a resident of China, brings this action as the representative of Doe VII.

- 3 -

1   Doe VII disappeared in the summer of 2006 while imprisoned as a result of her Falun

2   Gong activities. The Golden Shield was the essential means through which she was

3   monitored, tracked, detained and eventually imprisoned. Both before and during her

4   imprisonment, Doe VII was subjected to torture, including the forcible administration of

5   drugs that left her unable to stand or speak during a sham trial.

6   13.     Charles Lee is a U.S. citizen and resident of New Jersey. He is a Falun Gong

7   practitioner who used the Internet to contact other practitioners in China. In 2003, he went

8   to China to visit with friends and family.  He was apprehended on his arrival at the airport

9   and tortured, force-fed, and detained until 2006. The Golden Shield was the essential

10  means through which he was monitored, tracked, and detained. Charles Lee brings this

11  action under the Torture Victims Protection Act, 28 U.S.C. § 1350, note.

12  14.     Roe VIII, a resident of China, brings this action as the survivor of Doe VIII. Doe

13  VIII was detained as a result of his Falun Gong activities and was tortured to death. The

14  Golden Shield was the essential means through which he was monitored, tracked and

15  eventually tortured to death.

16  15.     Liu GUIFU is a resident of New York. She is a Falun Gong practitioner who was

17  detained in China on multiple occasions and was subjected to arbitrary and prolonged

18  detention and torture. The Golden Shield was one of the means through which she was

19  monitored, tracked and persecuted.

20          B.      Defendants

21  16.     Defendant Cisco Systems, Inc. ("Cisco") is a multinational corporation

22  incorporated in California with its principal place of business in San Jose, California.

23  17.     In 1998, Cisco created Cisco Systems China Network Technology Corporation

24  ("CNTC") as well as a network technology laboratory in Beijing for the purpose of

25  designing, manufacturing, and implementing the Golden Shield.

26  18.     At all relevant times, the China Research and Development Center ("CRDC") was

27  a wholly owned subsidiary to manufacture Cisco's products, including those utilized as

28  part of the Golden Shield in China, and acted as an agent of Cisco over which Cisco had

- 4 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    direct oversight.

2    19.     Cisco maintained an agency relationship over CRDC by prior authorization of all

3    acts and by subsequently ratifying their actions, including by failing to disavow their

4    wrongful conduct and by attempting to cover them up.

5    20.     Cisco is comprised in part of Cisco China Networking Technologies, Ltd.

6    ("CNT"), a wholly owned subsidiary of Cisco, which directly reports to Cisco and

7    operates under the supervision and control of Cisco as the agent of Cisco.  Cisco created

8    CNT for the purpose of increasing its sales presence in the Chinese market, which

9    included Golden Shield development, implementation and maintenance. CNT was created

10   to be the public face of Cisco in China with no clear demarcation between Cisco and

11   CNT. Executives employed by Cisco and its Asia Pacific branch performed supervisory

12   functions at CNT, as is indicated by the role and composition of the China Strategy Board,

13   a division of Cisco.

14   21.     Cisco operated an Asia Pacific branch headquartered in Singapore until 2010. It is

15   not separately incorporated. In 2010, Cisco restructured its Asia Pacific branch, dividing it

16   into three theaters: a Greater China Theater for the People's Republic of China, Hong

17   Kong, and Taiwan; a Japan Theater for Japan; and an Asia Pacific Theater for all

18   remaining countries in the Asia Pacific region. These theaters continue to operate as

19   branches of Cisco's San Jose headquarters and are not separately incorporated.

20   22.     Executive officers in Cisco's Asia Pacific branch reported directly to Senior Vice

21   Presidents based in Cisco's San Jose headquarters and to Defendant John Chambers,

22   Cisco's Chief Executive Officer ("CEO"), until 2010, when the Asia Pacific branch was

23   divided into three theaters, including the Greater China Theater.

24   23.     Cisco's sales and marketing in China was conducted primarily through Asia Pacific

25   branch offices until 2010, when the Asia Pacific branch was divided into three theaters,

26   including the Greater China Theater, while supplemental work is performed by Cisco

27   subsidiaries.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

24.     Employees of Cisco's Asia Pacific branch and Cisco's Chinese subsidiaries worked together directly and share responsibilities and workloads with each other. Employees of Cisco's Greater China Theater continue to work together directly and share responsibilities and workloads with Cisco's Chinese subsidiaries.

25.     Defendant John Chambers ("Chambers") is a resident of California, who is and at all relevant times has been the CEO of Cisco. Chambers directs and supervises Cisco's operations in China.

26.     As Cisco's CEO, Chambers signs or authorizes the signature of all certificates, contracts, and other instruments of Cisco. Significant Cisco sales operations in China are reported to its U.S. headquarters, and major localization efforts in China require executive decisions by Defendant Chambers and others. Under his direction, Cisco's specific intent to meet the requirements of the CCP's purpose to identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to *douzheng* methods was expressed in marketing presentations.

27.     Defendant Chambers also oversees the China Strategy Board ("CSB"), established in 2008 for the purpose of devising Cisco strategy in China. Since then, Cisco's Chinese operations have been controlled primarily by the CSB, which is composed of high-level executives working at Cisco's San Jose headquarters, at its Asia Pacific branch (until 2010, when the Asia Pacific branch was divided into three theaters, including the Greater China Theater), and at its Chinese subsidiaries. It is chaired by Cisco Senior Vice President Jim Sheriff.

28.     Chambers also met with Jiang Zemin – the founder of the persecutory campaign against Falun Gong – during the same month he created the subsidiary CNT and a technical support center in Beijing to facilitate the suppression of Falun Gong and other dissident groups in China. Chambers continued to meet Jiang Zemin during the early design and development phases of the Golden Shield.

29.     At all relevant times, Chambers knew of China's campaign of torture and persecution of Falun Gong practitioners, as outlined in the factual allegations herein, and

- 6 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe 1 et al. v. Cisco Systems, Inc.
COMPLAINT

1    knew that China intended to use the Golden Shield to facilitate and carry out that

2    campaign. As CEO of Cisco, Chambers not only was in a position to prevent Cisco's

3    tortious conduct in relation to the Golden Shield in all factual allegations herein, but also

4    purposefully authorized, participated in, and ratified Cisco's participation in the Golden

5    Shield project as delineated in all factual allegations herein, including especially the

6    specific conduct alleged in sections B.-F. of the Statement of Facts below.

7    30.      Defendant Owen Chan ("Chan") is and at all relevant times has been a top-level

8    executive of Cisco. Upon information and belief, Chan, as a top-level executive for Cisco

9    China, routinely travels to California to conduct business at Cisco's San Jose headquarters

10    relating to Cisco's implementation and sourcing of technology for the Golden Shield.

11    31.      In his various roles as a top-level executive working on Cisco's China operations,

12    Defendant Chan directly participated in, authorized, and controlled Cisco's actions alleged

13    herein, in concert with the other individually named Defendants. Chan acted on behalf of

14    Cisco and worked in concert with Chinese Public Security. The positions Chan filled at

15    Cisco from the late 1990's to the present day required him to be intimately involved, from

16    a position of authority, in Cisco's marketing, design and implementation of the Golden

17    Shield in China. From 1999 to 2002, Chan was Cisco's Vice President in charge of Cisco

18    Business Solutions Consulting and Service Support in the Asia Pacific region. From 2002

19    to 2005, he became Senior Vice President of Asia Operations. Since that time he was

20    promoted to President of Cisco's Asia Pacific Theater and then to President and CEO of

21    the Greater China Theater. The Asia Pacific Theater and subsequently the Greater China

22    Theater are the divisions of Cisco which primarily oversaw the management of operations

23    in China, including and especially all marketing and sales to Chinese Public Security for

24    the design, implementation, and technical support for the Golden Shield. All of the Cisco

25    engineering and marketing teams working with Public Security on the Golden Shield

26    ultimately reported to Chan through a chain of command. Chan authorized or approved

27    the actions of Defendant Lam as alleged in paragraphs 34 and 35 below.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

32.     Defendant Chan exercises supervisory authority and personal direction over all Golden Shield-related marketing and training activities directly or in concert with others. Defendant Chan participated in business development, marketing and customer support in the Asia Pacific region; participated in Cisco's sale of high-level Golden Shield design, training and customer support services to Public Security and 610 officers; facilitated a transition from having the mainland China, Hong Kong and Taiwan markets under the purview of the Asia Pacific branch to having them under a "Greater China" division of the corporation, allowing for a greater focus on China operations, including and especially the Golden Shield; and exercises significant control over the selection, appointment and removal of Cisco management including the Cisco Golden Shield engineers, marketing personnel and Public Security team. Under his direction, Cisco's specific intent to meet the requirements of the CCP's purpose to identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to *douzheng* methods was expressed in marketing presentations. At all relevant times, Chan knew of the campaign of torture and persecution of Falun Gong practitioners in China, was in a position to influence Cisco's tortious conduct during the development of the Golden Shield, and nevertheless purposefully authorized, participated in, and ratified Cisco's participation in the Golden Shield project as delineated in all factual allegations herein, especially the specific facts alleged in sections B-F. of the Statement of Facts. At all relevant times, Chan aided and abetted and conspired with Chinese Public Security by entering into an agreement to commit wrongful and tortious acts contained herein and participated in or committed a wrongful act in furtherance of said conspiracy which resulted in injury to the Plaintiffs.

33.     Defendant Thomas Lam ("Lam") is and at all relevant times has been a top-level executive of Cisco. Upon information and belief, Lam, as a top-level executive for Cisco China, routinely travels to California to conduct business at Cisco's San Jose headquarters relating to Cisco's implementation and sourcing of technology for the Golden Shield.

34.     In his roles as a top-level executive working on Cisco's China operations, Lam directly participated in and controlled Cisco's actions alleged herein, in concert with the

- 8 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    other individually named Defendants. Lam acted on behalf of Cisco and worked in

2    concert with Chinese Public Security. Lam directly authorized much of Cisco's Golden

3    Shield operations, under the authority of Chan and Chambers. Lam is a high level Cisco

4    executive who was and continues to be directly involved in Golden Shield operations in

5    China. From 1998 to 2002, he was Vice President of the Enterprise Line of Business for

6    China. From 2002 to 2005, he was Vice President of the Customer Advocacy

7    Organization in the Asia Pacific branch. From 2005 to 2009, he was President of China

8    Operations, and he currently serves as Vice Chairman of Cisco Greater China. In each of

9    these roles, all major Golden Shield operations in China were authorized by, reported to,

10   and approved by Lam, who reported to Chan for his authorization and approval.

11   35.      Defendant Lam directly oversaw many of the technology infrastructure projects in

12   China. He attended meetings focused specifically on Cisco's "action plan" for the

13   development of Chinese Public Security's information technology infrastructure. Under

14   his direction, Cisco's specific intent to meet the requirements of the CCP's purpose to

15   identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to

16   *douzheng* methods was expressed in marketing presentations. Lam has also played an

17   active role in both CNT and CRDC, authorizing and directing their dealings with Chinese

18   Public Security and working to ensure that the Golden Shield achieved the goal of aiding

19   the persecution of Falun Gong. At all relevant times, Lam knew of the campaign of torture

20   and persecution of Falun Gong practitioners in China, was in a position to influence

21   Cisco's tortious conduct during the development of the Golden Shield, and nevertheless

22   purposefully authorized, participated in, and ratified Cisco's participation in the Golden

23   Shield project as delineated in all factual allegations herein, especially the specific facts

24   alleged in sections B through F of the Statement of Facts. At all relevant times, Lam aided

25   and abetted and conspired with Chinese Public Security by entering into an agreement to

26   commit wrongful and tortious acts contained herein and participated in or committed a

27   wrongful act in furtherance of said conspiracy which resulted in injury to the Plaintiffs.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

36.     The true names and capacities, whether individual, official, corporate, associate, or otherwise, or precise participation of Defendants, DOES 1 through 100, inclusive, are not known to Plaintiffs herein at the time of the filing of this Complaint and, therefore, these Defendants are being sued by such fictitious names, and Cross-Complainant will seek leave to further amend this Complaint to show their true names and/or capacities and precise participation when the same have been ascertained.  Each Defendant designated herein as a DOE was responsible intentionally, negligently, or in some other actionable manner, for the events and happenings referred to herein which directly caused damages and injury to Plaintiffs within this Complaint.

37.     At all relevant times, Cisco, directly and through its agents, knowingly and purposefully aided and abetted and/or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party officers and/or Chinese Public Security officers working for the Public Security Chinese government agency, by bidding for, building, designing, constructing, customizing, installing, and servicing the Golden Shield surveillance system that was used by China to enable Public Security and CCP officers to identify and persecute Falun Gong practitioners, including Plaintiffs, and commit numerous human rights abuses against them, including detention without trial or other forms of arbitrary detention, torture and cruel, inhuman, or degrading treatment, forced labor, crimes against humanity, and extrajudicial killing.

38.     All Defendant named were the agents, servants and/or employees of each and the other, and were at all times acting within the course and scope of such agency, service, and/or employment, and acted as the actual or ostensible agent of each and the other.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over this case pursuant to the Alien Tort Statute, 28 U.S.C. § 1350; the Torture Victims Protection Act, 28 U.S.C. § 1350 note; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity); and 28 U.S.C. § 1367 (supplemental jurisdiction).

1    40.    Venue is proper in this court under 28 U.S.C. § 1391(b), because a substantial part

2    of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Cisco

3    is incorporated in and doing business in this District, and Chambers is the CEO of Cisco

4    in this District. Upon information and belief, Chan and Lam routinely travel to California

5    to conduct business at Cisco's San Jose headquarters in this District.

6                              **STATEMENT OF FACTS**

7         A.    Background of China's Persecution of Falun Gong

8    41.    Falun Gong practitioners, in provinces and regions across China, cannot be

9    distinguished from other Han (ethnic Chinese) apart from their religious activity that

10   occurs almost entirely on the Internet.  Falun Gong practitioners typically utilize the

11   Internet to practice their religion. They regularly access the "Minghui" website due to its

12   central role in the worldwide Falun Gong community and its status as a place of

13   congregation for members of the religion.

14   42.    The Falun Gong religion is based on the tenets of Zen Shan Ren (Truthfulness,

15   Compassion, and Tolerance).  It developed in China in or around 1992. By early 1999, the

16   New York Times and Associated Press estimated that there were 70-100 million people

17   practicing Falun Gong in China.

18   43.    In June of 1999, several leading members of the Chinese Communist Party

19   ("CCP") created a plan to purge China of Falun Gong.

20   44.    The leaders of the CCP authorized the use of various measures to forcibly convert

21   Falun Gong practitioners through reeducation techniques that included brainwashing

22   classes, intense interrogation, and torture.   For those who refused to abandon their

23   religious beliefs, far harsher legal sanctions were leveled including lengthy jail terms,

24   forced labor and torture.

25   45.    "Reeducation Through Labor" is a system of administrative detention in China,

26   which is imposed without judicial review and may be imposed by police officials or an

27   administrative committee.  Persons identified as Falun Gong are typically subject to

28   reeducation through labor as an initial method to force them to abandon their religion.

- 11 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

46.     The Chinese verb *douzheng* is the term of art used by the CCP to mobilize persecutory campaigns against so-called hostile elements, e.g., the intellectual left during the Cultural Revolution and pro-democracy students during the Tiananmen crackdown. By 1999, it had become the term of art used by CCP operatives to mobilize the persecution and suppression of Falun Gong practitioners in China.

47.     The Office 610 was created by the Central Committee of the CCP as a subdivision of the CCP in 1999 to persecute and suppress, i.e., *douzheng,* Falun Gong practitioners in China.

48.     Neither Office 610 nor the CCP has the statutory authority to act on behalf of the state.

49.     Chinese Public Security officers are responsible for the prevention, suppression and investigation of criminal and dissident activities in China.

50.     Public Security officers collaborated with Office 610 party agents to detect the Internet activities of Falun Gong practitioners to suppress Falun Gong.

51.     The ongoing campaign to persecute Falun Gong practitioners in China through use of the Golden Shield has been widely reported in Western media outlets since 1999, and has been documented and universally condemned, beginning in 1999, by the U.S. Department of State, the U.S. Congress, and a number of international human rights organizations.

      B.     Defendants' Marketing of Technology and Design Solutions to Facilitate the Persecution of Falun Gong

52.     During the late 1990s, the CCP's desire to monitor and control the Internet traffic of Falun Gong practitioners and other Chinese dissidents led to plans for the creation of the "Golden Shield," a comprehensive Internet censorship and surveillance system which would be used to identify, track, and target Falun Gong members for the sole purpose of subjecting them to *douzheng* methods of persecution.

53.     When it came to purchases of Internet technology, Chinese buyers were primarily concerned with whether it could stop the Falun Gong, not whether it would increase

- 12 -

1    productivity.

2    54.    As early as 1998, Defendants competed aggressively to win contracts to design and

3    develop the Golden Shield, with full knowledge and purpose that it was to be used for the

4    suppression of the Falun Gong religion and the persecution, arbitrary detention, forced

5    labor and torture of Falun Gong practitioners.

6    55.    Before it entered into contracts to design the Golden Shield, Defendants knew and

7    intended that the products and services Cisco designed for the Golden Shield would be

8    used to commit human rights violations.

9    56.    Defendants marketed several high-level design solutions, e.g., integration of

10   application designs, at trade shows and sales presentations that show Public Security

11   officers and Party agents how to *douzheng*, i.e., isolate and suppress, "hostile elements" in

12   China, and especially Falun Gong.

13   57.    The high-level design solutions marketed by Cisco included a Filter and Security

14   Management System that could log, identify and track Falun Gong Internet behavior

15   across provinces/regions in real time and transfer the tracked information to public

16   security personnel and 610 special agents at central and local levels. This system is also

17   referred to as the log/alert/notification system.

18   58.    These high-level designs also featured a first-of-its-kind integration of the

19   log/alert/notification system with anti-Falun Gong databases to facilitate the storage,

20   analysis and profiling of Falun Gong related behavior, biometric data, and other

21   identifying features to enable their identification, interrogation, apprehension, isolation

22   and suppression.

23   59.    Cisco's Golden Shield designs cemented Cisco's place as one of the top foreign

24   technology providers in the Chinese market.

25       C.    Defendants' Customization of the Golden Shield To Specifically Facilitate

26             the Repression of Falun Gong

27   60.    In collaboration with Chinese authorities, Defendants designed and developed the

28   Golden Shield to incorporate advanced information and communication technologies into

- 13 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   security enforcement with the primary goal of creating a comprehensive online

2   surveillance system specifically geared to enable and facilitate the suppression of

3   dissident activity in China, specifically Falun Gong.

4   61.   Prior to the implementation of the Golden Shield, it was not possible for the CCP

5   or security authorities to detect, identify, or track Falun Gong religious activities online.

6   62.   The Golden Shield was designed and developed by Defendants to operate through

7   a variety of different pieces of specialized hardware and software, all of them acting in

8   conjunction with one another to enable Chinese Public Security officers to monitor and

9   control all Internet activity in China, including especially the Internet activity of

10  practitioners of Falun Gong.

11  63.   Defendants specifically designed and developed the Golden Shield apparatus

12  (including hardware, software) with the scale, complexity and capacity required to enable

13  the Chinese Public Security officers and Office 610 agents to monitor, identify, track, and

14  eventually detain and torture Falun Gong practitioners such as Plaintiffs and persons

15  similarly situated.

16  64.   In particular, Defendants developed the Golden Shield technology with a wider

17  scale, complexity and capacity than any previous network, involving multi-tiered network

18  platforms connecting Public Security and 610 officers to the network from almost

19  anywhere in China, thereby enabling the authorities to catch and suppress the Falun Gong

20  who live across all regions of China and are primarily discernible only on the Internet.

21  65.   Without the far wider scale, complexity and capacity that Defendants designed and

22  developed for the Golden Shield, it would not have been possible for 610 special agent

23  and Public Security officers to obtain sensitive information such as home and work

24  addresses, purchases, contact with other Falun Gong members, past Falun Gong activities,

25  IP addresses, and family information (used for illegal interrogation purposes), from almost

26  anywhere in China, thereby enabling the Chinese authorities to locate, investigate,

27  apprehend, and persecute Falun Gong members without having to search homes, ransack

28  their offices and homes for evidence, or detain and interrogate them for more information.

- 14 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

66.   The Golden Shield required extensive customization from Cisco engineers or engineers Defendants trained and/or charged with implementing the customization necessary to surveil, apprehend and/or in other ways *douzheng* practitioners of the Falun Gong religion in China.

67.   The need for specialized high-capacity hardware and software that is able to handle large amounts of data being transmitted through a small number of entry points was unprecedented. Technology that had the ability to simultaneously block and track information without prohibitively slowing down general Internet traffic required extensive testing and specialized equipment, which Defendants provided.

68.   The need to integrate functionalities that could both censor and surveil, apprehend and in other ways *douzheng* dissidents and especially Falun Gong practitioners was also unprecedented and specifically developed by Defendants directly or in collaboration with Cisco partners to isolate and persecute dissident groups in China and especially Falun Gong.

69.   Defendants played a major and significant role in the implementation of many other solutions in major provinces and regions in China that were customized solely or primarily to achieve the primary purpose of the Golden Shield, i.e., to *douzheng* Falun Gong. These likely included the customization of network and security related software to provide real time monitoring, event correlation and notification based on Falun Gong's Internet traffic patterns, behaviors, and anti-blockage tool usage with Falun Gong triggering thresholds, key word identification, and pattern matching to meet *douzheng* Golden Shield requirements to facilitate the suppression of the religious group; and the integration of all Falun Gong-related designs and software configuration with the high-performance core network and security architecture to facilitate the suppression of the religious group.

70.   The Golden Shield also required post-product maintenance, training and support, which Defendants provided to Public Security and, by information and belief, 610 officers.

- 15 -

71.     All of the Falun Gong features of the Golden Shield relied on Defendants' ongoing support in order to function properly.

72.     Upon information and belief, Cisco sent engineers from its San Jose headquarters to China in connection with the Golden Shield project.

73.     By the end of 2006, Cisco had completed the construction of the Golden Shield in the provinces of Yunnan (completed in 2001), Shaanxi (completed in 2002), Anhui (completed in 2003), Fujian (completed in 2004), Guangdong (completed in 2004), Hainan (completed in 2004), Zhejiang (completed in 2004, and Heilongjiang (completed in 2006), as well as the cities of Beijing (completed in 2002) and Shanghai (completed in 2005).

74.     By 2007, Defendants had played a major role in the high-level design, implementation and post-production support of the Golden Shield in provinces and regions across China. Defendants designed and developed the Golden Shield with solutions specifically tailored to isolate, surveil, and suppress Falun Gong practitioners in China. These included:

> (1)     An international Internet gateway system with a small number of physical entry points into the Chinese network, called "gateways," and the high level of capacity required to keep the Chinese Internet up and running while identifying and tracking Falun Gong behavior across regions in real time and transferring the tracked information to public security personnel and 610 agents to profile, apprehend, isolate and suppress Falun Gong;

> (2)     An internal multi-tiered nationwide network of sufficient scale and sophistication to enable Public Security officers and Office 610 agents to identify and track Falun Gong practitioners who, unlike most other dissident groups, reside in all regions across China;

> (3)     An IP address blocking system that maintains a blacklist of IP addresses frequented by Falun Gong practitioners in China, used to deny or interrupt access and to identify, track, apprehend, interrogate and suppress those Falun Gong

- 16 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd.
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   practitioners who visit blocked Falun gong websites or services;

2   (4)   A Domain Name System hijacking procedure that redirects Internet users by

3   monitoring users' domain name requests and supplying the user with a false reply

4   if their request is for a blocked site, while also identifying and tracking users who

5   attempt to visit these sites, including Falun Gong practitioners engaging in Internet

6   activity related to Falun Gong;

7   (5) National- and provincial-level information centers that host the Falun Gong and

8   other databases and which are embedded in the multi-tiered network to facilitate

9   the storage, analysis and profiling of Falun Gong Internet traffic patterns to enable

10   their detection, apprehension, arrest and persecution;

11   (6) Similar security features to identify and track Falun Gong practitioners through

12   the use of non-Internet surveillance devices such as cell phones and street cameras

13   by integrating voice, video and data systems;

14   (7)   Training and customer service customized to ensure that Public Security

15   officers and Office 610 agents were able to use the Golden Shield effectively and

16   that any technical problems were addressed;

17   (8)   Hardware and software that enabled the encrypted transfer of information

18   between Public Security and Office 610.

19   75.   Because a typical router's default configuration does not have these content

20   filtering and blocking features enabled, Defendants customized them onto the router at the

21   specifications of the Chinese authorities in order to enable the tracking of the Falun Gong

22   practitioners.

23   76.   Because a typical router's default configuration does not have these content

24   filtering and blocking features enabled, Defendants customized them onto the router at the

25   specifications of the Chinese authorities in order to enable the tracking of the Falun Gong

26   practitioners.

27   77.   In addition, most IP addresses are "static" and do not change and are therefore easy

28   to block or track.  But because many Falun Gong practitioners employ "dynamic" IP

- 17 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   addresses to circumvent the IP blocking system described in item (3) of paragraph 74

2   above, the Golden Shield had to be customized, through the use of specialized Cisco

3   technology.

4   78.    By information and belief, Defendants managed the design and implementation

5   phases of the Golden Shield through an "Advanced Service team" which tested and

6   verified all Falun Gong-related features to meet Public Security and CCP officers' intent

7   and specification to suppress Falun Gong.

8          D.    Defendants' Collaboration with CCP and Public Security Officers to

9               Persecute and Suppress Falun Gong

10  79.    Defendants publicly admitted on Cisco's Chinese-language website in 2004 that it

11  constructed the Golden Shield in "full collaboration" and "partnership" with Public

12  Security Bureau officials in the Shanxi province of China. Other statements on Cisco's

13  Chinese-language website from as early as 1999 discuss Defendants' collaboration in

14  constructing the Golden Shield with Public Security Bureau and division officials across

15  China.

16  80.    In 1999, Cisco entered into an agreement with Chinese Public Security officials at

17  the national level to construct the backbone of the Golden Shield.

18  81.    After the development and launch of the Golden Shield in 2000, Defendants

19  entered into a series of further agreements with Public Security officers at regional levels

20  to develop and construct additional features of the Golden Shield.  These included

21  agreements to provide the software, hardware and infrastructure to link major cities and

22  provinces in China to the Golden Shield backbone; agreements to train Chinese Public

23  Security officers in surveillance techniques; and agreements to upgrade Golden Shield

24  infrastructure and to provide information centers to host the central Falun Gong databases

25  (on or around 2006).

26  82.    The CCP Central Committee's Commission for the Comprehensive Management

27  of Social Security, a body which is in charge of monitoring dissident activity, was at least

28  one of the organizers listed at one or more of the web technology trade shows where Cisco

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    displayed and sold its Golden Shield products.

2    83.    In 2003, Huang Ju, a ranking member of the Communist Party's Politburo and

3    Executive Vice Premier, was selected to run the Golden Shield and serve as its chief

4    technical expert.

5    84.    As a result of its marketing and sales efforts, by the early 2000s, Cisco was the

6    main foreign provider of network security technology for the Golden Shield, enabling the

7    CCP's persecution and suppression of Falun Gong.

8        E.    China's Use Of The Golden Shield To Track, Identify, And Persecute Falun

9              Gong

10   85.    Beginning as early as 2001, Public Security officers, CCP officials, and Office 610

11   agents monitored and analyzed information on Falun Gong practitioners gained through

12   the Golden Shield and shared this information with other state agents to facilitate their

13   identification, tracking, detention, torture and suppression.

14   86.    Public Security officers monitored Nanjing train entrances and exits, looking for

15   Falun Gong practitioners attempting to travel to Beijing. The officers were equipped with

16   mobile laptop computers that were connected to the Golden Shield network and which

17   allowed the officers to identify suspected Falun Gong practitioners through the use of

18   Golden Shield databases storing information on Falun Gong practitioners. This type of

19   monitoring in Nanjing was common practice across China.

20   87.    Public Security officers and Office 610 agents used Golden Shield technology sold

21   by Defendants to identify, track, and detain Falun Gong practitioners, and to compile

22   information on Falun Gong practitioners in databases used for information-sharing and

23   profiling purposes.

24   88.    By 2007, Defendants directly and/or through its agents had completed the

25   construction of the Golden Shield in numerous provinces and cities in China.

26   89.    Beginning around 2001 and continuing through at least 2006, Cisco employees

27   trained Public Security officers and, upon information and belief, Communist Party

28   officials to use Cisco equipment to monitor and arrest Falun Gong practitioners and

- 19 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    provided customer service.

2    90.    The scale, capacity, complexity, hardware and "intelligence" of the sophisticated

3    Golden Shield dragnet enabled 610 agents and Public Security officers to monitor, track,

4    locate, apprehend and suppress a group of practitioners because, unlike all other groups in

5    China, their religious practice was tied to their Internet use.

6          F.    Defendants' Intent to Use the Golden Shield to Commit Crimes Against

7                Falun Gong

8    91.    Cisco has admitted publicly that it agreed to meet Public Security's objectives

9    during its work on the Golden Shield, which, as Cisco has noted in its internal documents,

10   include the suppression of Falun Gong.

11   92.    As alleged above, Defendants knew that Public Security officers and CCP officials

12   intended to use the Golden Shield to persecute Falun Gong practitioners, and specifically

13   recommended new technologies to achieve that purpose and designed and developed

14   those technologies.

15   93.    Defendants recommended to Public Security and CCP officials features that could

16   contribute to achieving the Golden Shield's objectives and that were essential to the

17   suppression of Falun Gong.

18   94.    Defendants' expressed willingness to meet the requirements of the CCP's purpose

19   to identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to

20   *douzheng* methods, was intended to and did result in the award to Cisco of the contracts to

21   develop the Golden Shield.

22   95.    Between 2000 and 2003, Defendants participated in several web technology shows

23   in China where it advertised Cisco surveillance products that would enable the CCP to

24   suppress Falun Gong.

25   96.    The sales and marketing programs that Defendants presented at one or more of

26   these technology events included brochures acknowledging that a major purpose of the

27   Golden Shield is to persecute Falun Gong practitioners.

28   97.    At one trade show, a key member of Cisco's sales team in China described the

- 20 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1  features of Cisco surveillance equipment to author Ethan Gutmann, stating that the

2  Golden Shield "Policenet" technology Cisco had developed included the bandwidth,

3  capacity and other technology needed to monitor "suspicious" surfing history and email,

4  and remotely access sensitive information about the suspect's political behavior, family

5  history and "footprints."

6  98.    At the same trade show, the Cisco booth featured high-tech Internet surveillance

7  footage that was accented by sound bites from CEO John Chambers.

8  99.    As early as 2002 and until at least 2006, Defendants provided private training and

9  marketing sessions for Cisco employees in regions and provinces across China with

10  PowerPoint presentations that specifically reference Falun Gong and stated that Cisco's

11  products and services will meet the CCP and Public Security officers' plan to persecute

12  and suppress Falun Gong practitioners in China.

13  100.    During the same time frame, Defendants provided "skill training" and "technical

14  training" to Public Security officers and Office 610 agents to enable them to use the new

15  technologies to eradicate Falun Gong.

16  101.    In 2002, in internal files, Defendants acknowledged that the purpose of the Golden

17  Shield Policenet is to eradicate Falun Gong and described this goal as a lucrative business

18  opportunity for the company.

19  102.    In 2004, Cisco announced on its Chinese website that it had designed and

20  implemented an upgrade to the Golden Shield network in order to improve the capability

21  of Public Security to "fight [] against crime" and "maintain social stability." The latter

22  phrase was understood by Defendants to refer to the suppression of dissident activity in

23  China, including Falun Gong.

24  103.    In 2003, Cisco bragged on its Chinese website that Cisco agreed to meet Public

25  Security's objectives during its work on the Golden Shield, which, as stated by

26  Defendants elsewhere, includes the suppression of Falun Gong.

27  104.    On October 4, 2005, a resolution by Cisco shareholders calling for an investigation

28  of Defendants' complicity in the crimes alleged herein was presented to high-level

- 21 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1  officials, including Defendant Chambers, detailing how Cisco's Golden Shield technology

2  and services were being used in China to facilitate the persecution of Falun Gong. Well

3  after this point, Defendants continued to help CCP and Public Security officers suppress

4  Falun Gong through the Golden Shield Policenet applications and features Defendants had

5  developed to further the alleged crimes.

6  105.   In sum, Defendants internally (a) admitted that a major purpose of the Golden

7  Shield project is to persecute Falun Gong practitioners; (b) featured in training materials

8  information centers hosting Falun Gong and other databases linked to surveillance

9  cameras, mobile phone devices, and police computers, supported by digital voice

10  recognition technology and other network applications; (c) marketed to the Public

11  Security a unique, first-of-its kind network of sufficient scale and capacity to facilitate the

12  blocking, identifying, tracking, and eventual detention and torture of Falun Gong; (d)

13  demonstrated how Cisco's network technology would allow Public Security officers to

14  share information with detention centers in China; (e) made statements describing the

15  persecution of Falun Gong as a lucrative business opportunity for Defendants; (f) pledged

16  to strictly follow the Golden Shield design, a major purpose of which is the persecution of

17  Falun Gong; and (g) described specifications for the Chinese market, such as the gateway

18  entry points into China, national- and regional-level information centers hosting

19  "centralized database suites" with databases specifically designed for Falun Gong, and

20  multiple levels of network platforms in part to accommodate the nationwide widespread

21  activities of Falun Gong practitioners in China.

22         G.    The Golden Shield Facilitation of Persecution of and Abuses Suffered by

23               Plaintiffs

24  106.   The Golden Shield has enabled the persecution of Falun Gong practitioners in all

25  provinces and regions in China where the Golden Shield has been implemented, as the

26  primary means to identify Falun Gong practitioners who use the Internet in practicing

27  their religion.

28  107.   The Golden Shield is the only system in China that performs large-scale content

- 22 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    filtering and surveillance of the Internet.

2    108.    Further, the Golden Shield stores sensitive information about Falun Gong

3    practitioners who have been previously detained and apprehended, thereby enabling

4    Public Security officers and Office 610 agents to monitor and prove cases against

5    practitioners subjected to multiple arrests. Office 610 routinely uses the Falun Gong

6    database to identify Falun Gong practitioners and to assemble evidence of Falun Gong

7    activities to further their persecution.

8    109.    Office 610 officers routinely exchange information with police investigating Falun

9    Gong cases while they track, apprehend, detained, interrogate, torture and in other ways

10   forcibly converted members of the religion in China through network functionalities

11   specifically designed for these purposes by Defendants.

12   110.    Office 610 officers across China had access to at least three Golden Shield Falun

13   Gong databases dedicated to the surveillance of Falun Gong: (1) Falun Gong members at

14   large, (2) notorious Falun Gong practitioners and contact persons, and (3) captured Falun

15   Gong whose identities have been unknown.

16   111.    The Golden Shield was the essential means through which the following plaintiffs

17   were tracked, detained and eventually tortured. Without the information collected and

18   assembled through the Golden Shield, it would not have been possible to carry out the

19   human rights and other violations against them in the same manner, or at all.

20   112.    The 103 Cases.  During 2001 in the city of Tianjin, the 610 Office used the Golden

21   Shield to investigate, apprehend, arrest, detain and torture between sixty and seventy

22   persons with a history of Falun Gong activities.  The 610 Office's internal designation for

23   this incident was the "103 Case."

24   113.    The 610 Office and Public Security officers used the Golden Shield collaboratively

25   to detect, monitor, interrogate and persecute these Falun Gong practitioners.

26   114.    Doe I, Doe II and Ivy He are among the Falun Gong practitioners who were

27   detained and tortured in the 103 Case through the use of the Golden Shield.

28   115.    Doe I.  Doe I was one of the individuals identified for arrest and persecution

- 23 -

1   through use of the Golden Shield by Office 610 officers during the 103 Case.

2   116.   Beginning on July 1, 2001, Doe I and other Falun Gong practitioners frequently

3   met to conduct Falun Gong activities including the downloading and distributing of Falun

4   Gong promotional materials.

5   117.   Doe 1 was arrested and detained along with over 70 other Falun Gong practitioners

6   in November 2001. In their investigations, Office 610 officers identified her as one of

7   several "backbone organizers" of the Case 103.

8   118.   During their interrogation, the police and special 610 agents subjected Doe I to

9   severe torture to force her to denounce and renounce her religious beliefs.

10   119.   In July 2003, Doe I was charged with raising funds for Falun Gong activities,

11   downloading Falun Gong materials from the Minghui website, publishing Falun Gong

12   materials on the Minghui website, and distributing Falun Gong materials. At a purported

13   "trial", the court accepted a statement from the Internet Controlling and Monitoring

14   Division of Tianjin Police Bureau that confirmed some of the Internet-related charges.

15   The police and prosecutors specifically relied on evidence that was collected and analyzed

16   through Golden Shield Internet applications and functionalities.

17   120.   In July 2003, Doe I was sentenced to twelve (12) years of imprisonment and a

18   three-year deprivation of political rights.

19   121.   In prison, Doe I was subjected to severe torture and forced labor.

20   122.   Doe I is currently living in China.

21   123.   She is under the continued threat that the Chinese authorities can track her religious

22   activities and that she will be subject to further abuse.

23   124.   Doe II. Doe II was one of the individuals identified for arrest through use of the

24   Golden Shield by an Office 610 officer.

25   125.   Between August and September 2001, the Golden Shield was used by Chinese

26   authorities to identify, monitor and track her online activity as a Falun Gong practitioner.

27   126.   In November 2001, Doe II was detained for her activities without notice of the

28   charges, formal arrest or other procedures. In detention, she was slapped in the face,

- 24 -

1    kicked and beaten.

2    127.   On December 20, 2001, Doe II was formally arrested and charged.

3    128.   She remained in detention until July 2003, at which point she was put on "trial"

4    along with several other Falun Gong practitioners. At trial, she was not permitted to

5    challenge the legality of the charges against her and was not allowed to submit a plea of

6    "not guilty."

7    129.   The trial court convicted Doe II of "utilizing the cult organization to sabotage law

8    enforcement" and sentenced her to a four-year prison term.

9    130.   In prison, she was subjected to public humiliation, torture that included being

10   severely beaten, and forced to work under harsh conditions that included long hours,

11   intermittent torture and interrogation and public degradation in order to force her to make

12   false statements about her religious belief and practice.

13   131.   Doe II is currently living in China.  She is under continuing threat that the Chinese

14   authorities can identify her, and she will be subject to further abuse.

15   132.   Ivy He. Ivy He was one of the sixty to seventy individuals identified for arrest as a

16   Falun Gong practitioner in the 103 Case through use of the Golden Shield.

17   133.   Ivy He has resided in Canada since December 2006.

18   134.   Throughout 2001, Ivy He downloaded Falun Gong materials from the Minghui

19   Website, communicated by cell phone with other Falun Gong practitioners involved in

20   Internet-related Falun Gong activities, and in other ways supported these activities while

21   living in China.

22   135.   In November of 2001, Public Security officers went to her home and forced her to

23   accompany them to the police station.

24   136.   She was detained without being advised of any charges against her and was refused

25   any opportunity to contact family or legal counsel.

26   137.   At the police station, Public Security officers interrogated her continuously for

27   many hours while they poured ice-cold water over her naked body and forced her to stand

28   in a bucket of ice. She was also kicked and beaten.

- 25 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

138.     Chinese Public Security officers sent her to a detention center. She was subjected to continuous interrogation and physical abuse.

139.     After a month at the first detention center, Public Security officers sent her to a different detention center. She spent about a month in that center without being formally charged or permitted access to family or legal counsel.

140.     In January of 2002, she was sent to a reeducation through labor camp without a hearing or an opportunity to challenge the legality of her detention and treatment.

141.     There, she was beaten so severely that she lost consciousness. At one point she was sent from the labor camp to a hospital, drugged, and was forced to sign a statement denouncing the Falun Gong religion.

142.     After about two years of detention and torture, she was released.

143.     <u>Internet Cases</u>. Between one and five thousand Falun Gong practitioners have been arrested and charged with Falun Gong-related activity through use of the Golden Shield. All of the cases below involved Falun Gong practitioners who had downloaded Falun Gong materials from foreign websites.

144.     <u>Doe III</u>. Doe III is a Falun Gong practitioner filing this action through his next friend, Roe III. Doe III is currently in prison in China and cannot file directly.

145.     Roe III and Doe III became close friends in 1998.

146.     Between 2003 and 2005, Doe III used the Internet to download a significant amount of Falun Gong material from the Minghui website which he printed and distributed to Chinese citizens residing in Shanghai.

147.     In early 2005, after the Golden Shield had been completed by the Defendant in full collaboration with Public Security officers and Party agents and was fully operational in Shanghai, Doe III was taken into custody in Shanghai without being advised of any charges against him.

148.     In detention, he was subjected to forced conversion procedures that included torture.

149.     A month later, he was transferred to the Detention Center of Qingpu District in

- 26 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    Shanghai where political prisoners including but not limited to Falun Gong practitioners

2    are subjected regularly to torture and persecution.

3    150.    In late 2005, Doe III was convicted at a trial for downloading Falun Gong material

4    online over a two-year period. He was not permitted to challenge the legality of the

5    charges against him and was not allowed to submit a formal plea of "not guilty."

6    151.    He was sentenced to a seven and a half year prison term. While in prison, he was

7    and continues to be subjected to torture and persecution.

8    152.    Doe III is currently still in the Tilanqiao Prison in Shanghai that is well known for

9    its brutal treatment of Falun Gong practitioners and other dissident group members.

10   Visitors have reported that Doe III is currently very weak and in poor condition due in

11   part to his subjection to torture and persecution.

12   153.    Doe IV. Doe IV is a Falun Gong practitioner filing this action through his next

13   friend, Roe III, also the next friend for Doe III.  Doe IV is currently in China and cannot

14   file directly.

15   154.    Roe IV communicated with Doe IV and Doe IV's family extensively before,

16   during, and after Doe IV was imprisoned.  He maintains a close relationship with Doe IV

17   and Doe IV's family.  Roe IV procured an attorney to represent Doe IV in China, who

18   represented Doe IV in China until the authorities began to persecute the lawyer.

19   155.    In early 2003, Doe IV began to download information about Falun Gong from the

20   Minghui website. Throughout the year, Doe IV used the Internet to download a significant

21   amount of Falun Gong material from the Minghui website.

22   156.    In October of 2003, a year after the Golden Shield became fully operational in

23   Beijing with the participation of Defendants, Doe IV was taken into custody in Beijing

24   without being advised of any charges against him.

25   157.    In detention, he was subjected to forced conversion procedures that included

26   torture. He was shocked with electric batons on his hands, mouth and face on several

27   occasions, slapped in the face, beaten, deprived of sleep for prolonged periods of time,

28   and subjected to ice water being poured on his body and clothing without any relief.

- 27 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

158.   In 2004, Doe IV was convicted at purported trial for constructing a Falun Gong website, using the Internet to download Falun Gong related material and burning the information onto CDs and sending mass email about the persecution of Falun Gong in China.

159.   He was not permitted to challenge the legality of the charges against him and was not allowed to submit a formal plea of "not guilty."

160.   He was sentenced to seven years in prison and in November 2004 was transferred to Jidong Prison in Tangshan City, Hebei Province.

161.   While in prison, he was subjected to torture and persecution. He was deprived of sleep for weeklong periods of time, beaten, and in other ways injured physically and mentally.

162.   Doe V. Doe V is a resident of China. Doe V used the Internet and telephone to engage in Falun Gong-related activities. Her use of the Internet and telephone was monitored using the Golden Shield.

163.   In 2004, after the core apparatus of the Golden Shield became fully operational with the participation of Defendants, she used the Internet to access the Minghui website. She also used the Internet to download materials about Falun Gong and to produce DVDs about the nature of the religion and its persecution in China.

164.   In spring 2004, Public Security officers from the Xingtai Police Department in Hebei Province entered her residence as she was downloading material from the Minghui website. They seized laptop computers, printers, other personal property, and funds.

165.   On the same day, Public Security officers took her to a hotel for interrogation and torture. They placed her in heavy foot-cuffs and tied her to an iron chair for five days. She was allowed to be removed from the chair only to go to the restroom and was not permitted to sleep. During the interrogation, she was tortured and beaten. As a result of the interrogation, she had severe injuries in the areas in which she had been cuffed and was covered in bruises and cuts.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

166.   Five days later, Doe V was then taken to a detention center in Xingtai where she was formally charged. At the detention center she faced further abuse. She was forced to eat spoiled food and to perform hard labor for long hours in unhealthy conditions. The materials she was forced to work with caused dizziness and vomiting. She was also put in foot-cuffs, a penalty typically reserved for death-row inmates.

167.   She was later taken to the Qiaoxi Municipal Court to stand trial. At trial, she was not permitted to challenge the legality of the charges against her and was not allowed to submit a plea of "not guilty." She was sentenced to a three-year prison term.

168.   While in prison she was subjected to further abuse. She was forced to make clothes for export, often working overnight to complete an order. The work made her dizzy and she vomited at the end of most days. She was deprived of access to essential hygiene products and subjected to other forcible conversion practices that included intense physical abuse.

169.   Since her release, she continues to suffer from an irregular heartbeat, cold sweats, and other severe physical and emotional damage.

170.   <u>Doe VI</u>.  Doe VI is a resident of China.  During 2007, Doe VI used the Internet to download Falun Gong flyers from the Minghui website. He shared the flyers and other information posted on the website with others in China, including Falun Gong practitioners.

171.   In spring 2007, more than five years after the Golden Shield was completed and fully operational in Shandong Province, approximately ten Public Security officers raided his home in Shandong Province and took him into custody without advising him of any charges. At the police station, he was beaten and forced to sleep on the floor with his hands and feet bound with rope and handcuffs.

172.   The next day, Public Security officers took Doe VI to Weifang City detention center. While at the detention center, he was subjected to continuous interrogation and torture to force him to confess to criminal conduct and to abandon the practice of Falun Gong. He was not formally charged until almost a month later.

- 29 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

173.   About a month later, a Public Security administrative committee issued a decision stating that Doe VI had "downloaded, produced, and hid Falun Gong illegal flyers at home."

174.   Based on these facts, the administrative committee sent Doe VI to a reeducation through labor camp for 18 months without a hearing or any other opportunity to challenge the legality of the charges and his term of detention. The committee relied on evidence that Public Security officers and Office 610 agents had collected through use of the Golden Shield.

175.   From spring 2007 until early fall 2008, he was detained at Shandong Province No. 2 Labor Camp, where he was physically abused at the hands of the labor camp officers and made to do forced labor.

176.   <u>Doe VII</u>. Roe VII files as a representative of her daughter, Doe VII. Doe VII has disappeared and is believed dead.

177.   After the Golden Shield had been implemented in the city of Taishin, Doe VII engaged in Falun Gong-related Internet activity that included the downloading of Falun Gong information from the Minghui website.

178.   In the city of Taishan in June 2004, more than two years after the 103 Case had been prosecuted in that city through use of the Golden Shield, Public Security officers apprehended Doe VII and took her blindfolded to a police interrogation room where Public Security officers electrically shocked, beat, and kicked her.

179.   She was held in a detention center where Public Security officers force-fed her and subjected her to additional beatings and interrogation.

180.   In the fall of 2004, after several months of torture, she was injected with a drug that affected her nervous system so severely that she was unable to speak.

181.   A few days later, Public Security officers took her to a court in Taian. The officers had to hold her up by her arms because she was unable to walk or stand unassisted. In this condition, she was forced to stand trial. Due to her physical condition she was unable to speak at trial.

- 30 -

182.    Approximately a week later, the court convicted her for using the Internet to download Falun Gong-related material although her physical condition prevented any participation in the trial. The court relied on evidence of Internet use that was collected and analyzed through use of the Golden Shield. The court sentenced her to more than five years in prison.

183.    Before she was taken to the prison to serve her sentence, Public Security officers injected her again with drugs that affected her central nervous system, rendering her mute, with a hard and numb tongue and constant salivation.

184.    In the subsequent two years, her family, including Roe VII, was permitted occasional prison visits and noted her extremely weak physical condition.

185.    Since the summer of 2006, Doe VII's family has not had contact with her and believes she may have been tortured to death while in custody. Her family has been refused visitation and is unaware of her whereabouts.

186.    <u>Charles Lee.</u>  Charles Lee was born and educated in China.  He later came to the United States and became a U.S. citizen. He now lives in New Jersey.

187.    While in the United States, he joined an email exchange for those interested in the persecution of Falun Gong in China. This e-mail exchange involved extensive correspondence with individuals living in northern China. These e-mails entered China through its Beijing gateway, where the Golden Shield had by that time been completed and was fully operational. These e-mails included correspondence with Falun Gong practitioners in China who had participated in high-profile protest activity. The Golden Shield was used to monitor and track this email.

188.    In 2003, he flew back to China to visit with friends and family after corresponding through e-mail with a small number of friends living in northern China, letting them know he was coming.

189.    Upon his arrival at the airport, Public Security officials placed him under arrest.

190.    One of the officers who arrested him told him that they knew he was coming to China and had been waiting for him.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

191.   At trial, he was convicted of using the Chinese media for Falun Gong-related activity. He was not permitted to challenge the legality of the charges against him and was not allowed to show the evidence or defend himself as "not guilty."

192.   He was sentenced to a prison term of three years, from January 2003 to January 2006, at Nanjing Prison. During this time, he was frequently subjected to attempts at forced conversion.

193.   He was forced to take classes on a daily basis in which he was surrounded by ten to fifteen guards and fellow inmates who subjected him to constant insults and verbal abuse regarding his practice of Falun Gong. He was referred to as mentally imbalanced and his beliefs were called "laughable, insane and poisonous." Lee was called a "traitor" for his U.S. citizenship. He was told "we can make your living worse than death."

194.   Charles Lee was not permitted to interact with other prisoners and oftentimes not permitted to read. He was permitted to see his mother only twice during the last two years of her life and not permitted to attend her funeral.

195.   In addition, he was frequently tortured. He was regularly forced to stand or sit in the same position for hours at a time on a daily basis, sometimes for up to seven weeks in a row. He suffered from severe mental trauma and physical damage to his heart while in prison. He was forced to attend military drills, and when he refused he was dragged across the grounds for hours at a time.

196.   He went on nine hunger strikes over the course of his detention, one for fifty days. Prison authorities force-fed him on four occasions. On one of these occasions, authorities tied him down and placed a tube down his throat for feeding, which was kept there for thirty-three hours.

197.   In January 2006, Charles Lee was released. He returned to the United States and continues to be severely disturbed by the aftermath of the torture in the prison.

198.   Doe VIII.  Roe VIII resides in China and is the surviving family member of a deceased Chinese citizen, Doe VIII, who was born and resided in China. Roe VIII files individually as the survivor of Doe VIII.

- 32 -

199.   Doe VIII accessed the Minghui website on numerous occasions in Shandong Province after the Defendant had implemented the Golden Shield in Shandong Province in full collaboration with Public Security officers and CCP agents.

200.   In the summer of 2002, Public Security officers arrested him and another Falun Gong practitioner at a bus station in Shandong Province, a province where the Golden Shield had been completed and was fully operational.

201.   Following his arrest, he was taken to a detention center where he was interrogated and severely beaten.

202.   Sometime between August 21 and August 30, 2002, Doe VIII was beaten to death at the detention center.

203.   <u>General Surveillance Cases</u>. <u>Liu Guifu</u>. Liu Guifu was born and raised in the People's Republic of China. She currently resides in the state of New York.

204.   Plaintiff Liu Guifu was arrested and persecuted as a result of her participation in Falun Gong Internet activities in the city of Beijing where Defendants had helped to construct the Golden Shield in collaboration with Public Security officers and Office 610 agents. Liu Guifu was subject to multiple arrests. The Golden Shield was used to assemble information about her following her initial arrest. This information enabled subsequent arrests and detentions. The detailed information used in the interrogation of Liu Guifu would not have been accessible to the police without use of the Golden Shield.

205.   In February of 2001, she was taken to the Qing Long Qiao police station where she was detained and subjected to physical and mental forms of torture.

206.   On February 25, 2001, public security officers accused her of "making public statements with others on the Internet" and sent her to a labor camp for a term of eighteen months. She was deprived of her legal right to a hearing and was not permitted to challenge the validity of the charges against her.

207.   At the labor camp, she was kept awake for eighteen days. She was whipped and beaten until she was unable to walk. Eventually she began to have hallucinations, and she often lost consciousness.

- 33 -

208.    Liu Guifu was released on or about August 14, 2002.

209.    In early 2003, she was taken into custody again by Public Security officers in Beijing and was accused of sheltering Falun Gong practitioners.

210.    During her interrogation, the police told her that another practitioner she knew was wanted for using the Internet to engage in Falun Gong activities.  Upon information and belief, Liu Guifu was identified by her connection to this practitioner through use of the Golden Shield. She was detained for three weeks.

211.    In February 2005, Public Security officers again took her into custody. Public Security officers sent her to a labor camp for two and a half years.

212.    Liu Guifu was not permitted to challenge the legal or factual validity of these accusations.

213.    At the labor camp, she was interrogated. The interrogators repeatedly told her that someone in her home had downloaded information from the Minghui website and asked her repeatedly who had used her computer to download the Falun Gong materials.

214.    She was released in the summer of 2007. Soon thereafter, she left the country and came to the United States.

## NO ALTERNATIVE REMEDIES AND CONTINUING VIOLATIONS OF LAW

215.    There is no adequate alternative remedy available in China to Plaintiffs for the claims asserted here.

216.    Chinese attorneys have been disbarred, arrested, and persecuted for their attempts to defend Falun Gong practitioners in Chinese courts. Plaintiffs residing outside of China cannot return to China without danger of serious reprisals, nor can those residing inside China bring suit without danger of serious reprisals.

217.    The Chinese judiciary or legal system does not operate independent of other branches of government and/or of the CCP in China.

218.    Plaintiffs still detained continue to suffer from beatings, sleep and food deprivation, and other forms of torture, cruel, inhuman, or degrading treatment, forced

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1  labor, and crimes against humanity.

2  219.   Technologies and other measures used to suppress Falun Gong practitioners in

3  China make it virtually impossible for plaintiffs to bring cases in China without reprisal

4  and further persecution of them and their families. In addition, it is virtually impossible

5  for detained Falun Gong practitioners to bring cases in any foreign courts.

6  220.   Many Falun Gong practitioners in China have attempted to seek administrative

7  remedies against responsible Chinese CCP or State officers. This has resulted in further

8  retaliation against them, including renewed detention and increased persecution.

9  ## CLASS ALLEGATIONS

10  221.   **Class Definition**. Plaintiffs bring this action on behalf of themselves individually

11  and on behalf of all other similarly situated individuals as a class action. This action may

12  properly be maintained as a class action pursuant to the provisions of Federal Rule of

13  Civil Procedure 23(a) and (b)(3).  The Class which Plaintiffs seek to represent is

14  comprised of, and defined, as follows:

15
16  > All persons who were identified as Falun Gong practitioners through the use
> of the Golden Shield by Chinese authorities and were thereafter subjected to
> detention and/or physical abuse and/or torture for their Falun Gong related
17  > activity, and suffered injury as a result.

18  223.   Upon application by Plaintiffs' counsel for certification of the Class, the

19  Court may be requested after appropriate discovery, to also utilize and certify

20  subclasses in the interests of ascertainability, manageability, justice, and/or judicial

21  economy.

22  224.   **Ascertainability**. This action may be properly brought and maintained as a

23  class action because there is a well-defined community of interest in the litigation

24  and the members of the proposed Class are ascertainable and identifiable.

25  225.   **Numerosity**. The class for whose benefit this action is brought is so

26  numerous that joinder of all class members is impracticable.  Plaintiffs believe that

27  there are many thousands of members of the class as described above, although the

28  number and identities of individual class members are presently unknown.

- 35 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

226.   **Typicality** Plaintiffs' claims are typical of the claims of the other members of the class, since all such claims arise out of Defendants' actions in actively participating in the development of the Golden Shield through which plaintiffs and class members were identified and subjected to detention and torture.  Plaintiffs have no interest antagonistic to the interests of the other members of the class.

227.   **Adequacy**. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel with extensive experience in the prosecution of human rights actions and class actions.  Accordingly, Plaintiffs are adequate representatives of the class and will fairly and adequately protect the interests of the class.

228.   **Commonality and Predominance**. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

a.     Whether Defendants intended to design the Golden Shield to specifically facilitate the persecution of the Plaintiff Class by the Chinese authorities;

b.     Whether Defendants knew or should have known and intended that the Golden Shield would be used to target and persecute the Plaintiff Class;

c.     Whether Defendants gave substantial assistance to the Chinese Public Security and the Chinese Communist Party in the persecution the Plaintiff Class;

d.     Whether Defendants specifically intended to aid the Chinese Public Security and the Chinese Communist Party in the persecution of and commission of other crimes alleged herein against the Plaintiff Class;

e.     Whether Defendants' subsidiaries in China acted as agents of defendant Cisco with regard to the actions which are the subject matter of this complaint;

f.     Whether Defendants unlawfully manufactured, assembled, possessed,

- 36 -

1   and/or sold to CCP the equipment and devices required to create and operate the Golden

2   Shield; and

3       g.      Whether Defendant Cisco violated Section 17200 of the California

4   Business and Professions Code.

5   229.    **Superiority**. A class action is superior to other available methods for the fair and

6   efficient adjudication of this controversy. Individual litigation of the claims of all Class

7   members is impracticable. Even if every member of the Class could afford to pursue

8   individual litigation, the Court system could not. It would be unduly burdensome to the

9   courts in which individual litigation of numerous cases involving highly technical issues

10  would proceed.   Further participation in the lawsuit might expose the would-be plaintiffs

11  to further gross human rights abuses

12  230.    By contrast, the maintenance of this action as a class action, with respect to some

13  or all of the issues presented herein, presents few management difficulties, conserves the

14  resources of the parties and of the court system, and protects the rights of each member of

15  the Class and of Defendants. The same evidence, the same witnesses, and the same legal

16  arguments and explanations will be used to prove that Defendants bear liability for

17  injuries suffered by members of the Class. Numerous fluid recovery methods exist to aid

18  the Court in assessing damages on a Class-wide basis. Plaintiffs know of no difficulty that

19  will be encountered in the management of this litigation that would preclude its

20  maintenance as a class action.

21  231.    Additionally, the expense and burden of individual litigation make it virtually

22  impossible for the Class members individually to seek redress for the unlawful conduct

23  alleged herein. The prosecution of separate actions by individual members of the Class

24  would create a risk of inconsistent or varying adjudications, which would establish

25  incompatible standards of conduct for the Defendants in this action. There is no other

26  litigation that has commenced against Defendants regarding this matter.

27

28

- 37 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    232.    Defendants have engaged in unlawful and unfair business conduct, which has

2    affected the members of the Class, thereby making appropriate compensatory relief with

3    regard to the members of the Class as a whole, as, requested herein.

4                            **FIRST CAUSE OF ACTION**

5                     *(Torture under the Alien Tort Statute (ATS))*

6                        (Plaintiffs Ivy He, Liu Guifu, Does I-VI,

7                 and class members similarly situated, against all Defendants)

8    233.    The allegations set forth in the above paragraphs are re-alleged and reincorporated

9    by reference as if fully set forth below.

10   234.    Plaintiffs suffered from torture inflicted knowingly and purposefully in order to,

11   among other things, punish the victims and/or induce a forced confession and public

12   renunciation of their religious beliefs.

13   235.    Plaintiffs suffered severe mental and physical injuries as a result of the abuse

14   inflicted while in custody.

15   236.    Such conduct was in violation of international law and was contrary to the laws of

16   China.

17   237.    Defendants are liable under the Alien Tort Statute for the harm suffered by

18   plaintiffs Ivy He, Liu Guifu, Does I through VI, and class members similarly situated.

19   Defendants, directly or through their agents, knowingly and purposefully aided and

20   abetted or entered into a conspiracy or joint criminal enterprise with the Chinese

21   Communist Party and/or Chinese Public Security officers in the unlawful conduct that led

22   to the torture they endured as a result of the Golden Shield.

23                          **SECOND CAUSE OF ACTION**

24                          *(Torture under the TVPA)*

25                  (All Plaintiffs, and class members similarly situated,

26                     against Defendants Chambers, Chan, and Lam)

27   238.    The allegations set forth in the above paragraphs are re-alleged and reincorporated

28   by reference as if fully set forth below.

- 38 -

239.   Plaintiff Charles Lee suffered from torture inflicted knowingly and intentionally in order to, among other things, punish him and/or induce a forced confession and public renunciation of his religious beliefs.

240.   Plaintiff Charles Lee suffered severe mental and physical injuries as a result of the abuse inflicted while in custody.

241.   Such conduct was in violation of the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

242.   Defendant John Chambers is liable for the harm suffered by plaintiff Charles Lee, and class members similarly situated, in that Defendant Chambers, directly or through his agents, knowingly and intentionally aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to the torture he endured as a result of the Golden Shield.

### THIRD CAUSE OF ACTION

*(Cruel, Inhuman, or Degrading Treatment under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI,

and class members similarly situated, against all Defendants)

243.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

244.   Plaintiffs suffered severe mental and physical injuries as a result of the abuse inflicted while in custody.

245.   The acts described herein were done with the intent of and had the effect of grossly humiliating and debasing the Plaintiff Class, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

246.   Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.

247.   Such conduct was in violation of international law and was contrary to the laws of China.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

248.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy He, Liu Guifu, Does I through VI, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to the cruel, inhuman and degrading treatment they endured as a result of the Golden Shield.

## FOURTH CAUSE OF ACTION

### (Forced Labor under the ATS)

(Plaintiffs Ivy He, Liu Guifu, Does I-VI,

and class members similarly situated, against all Defendants)

249.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

250.    Plaintiffs Ivy He, Liu Guifu, Doe VI, and class members similarly situated, were sent to reeducation through labor camps, where they were forced to work involuntarily under threat of or as part of a regime of serious harm and physical restraint. At no time were these plaintiffs charged, convicted or sentenced for a violation of a crime.

251.    Plaintiffs Does I, II, III, IV and V, and class members similarly situated, were imprisoned and forced to work involuntarily under threat of or as part of a regime of serious harm and physical restraint. These plaintiffs were or are political prisoners, and the application of physical harm and restraint was more severe than that meted out to the general prison population. In at least some cases, these plaintiffs were segregated into separate areas specifically designed for Falun Gong practitioners.

252.    Such conduct was in violation of international law and was contrary to the laws of China.

253.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy He, Liu Guifu, and Does I, II, III, IV, V and VI, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1 | aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese
2 | Communist Party and/or Chinese Public Security officers in the unlawful conduct that led
3 | to the forced labor they endured as a result of the Golden Shield.

### FIFTH CAUSE OF ACTION

*(Prolonged and Arbitrary Detention under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI,

and class members similarly situated, against all Defendants)

254.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

255.   Plaintiffs Ivy He, Liu Guifu and Doe VI, and class members similarly situated, were detained in reeducation through labor camps without due process because of their practice of Falun Gong, during which they were subjected to torture and denied access to legal counsel. At no point were these plaintiffs convicted for any crime.

256.   Plaintiffs Does I, II, III, IV and V, and class members similarly situated, were detained without due process during the period prior to them being charged and tried for a crime. This pre-trial detention lasted in each case for at least a week and in most cases several weeks or even months.

257.   Plaintiffs were injured by prolonged and arbitrary detention in violation of international law.

258.   Defendants are liable for the harm suffered by plaintiffs Ivy He, Liu Guifu and Does I through VI, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to their prolonged and arbitrary detention.

### SIXTH CAUSE OF ACTION

*(Crimes against Humanity under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI, Roes VII and VIII,

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    and class members similarly situated, against all Defendants)

2    259.    The allegations set forth in the above paragraphs are re-alleged and reincorporated

3    by reference as if fully set forth below.

4    260.    Plaintiffs were injured by crimes against humanity described above, including

5    extrajudicial killings; torture; cruel, inhuman and degrading treatment; arbitrary and

6    prolonged detention; forced exile; forcible transfer; and enforced disappearance.

7    261.    Each single act constitutes a crime against humanity because it was committed

8    within the context of widespread or systematic attacks against a civilian population. These

9    acts were directed against all plaintiffs because they were Falun Gong practitioners.

10   262.    Such conduct was in violation of international law and was contrary to the laws of

11   China.

12   263.    Defendants are liable under the Alien Tort Statute for the harm suffered by

13   plaintiffs Ivy He, Liu Guifu, Does I through VI, Roes VII and VIII, and class members

14   similarly situated, in that Defendants directly or through their agents knowingly and

15   purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise

16   with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful

17   conduct that led to the crimes against humanity they endured as a result of the Golden

18   Shield.

19                          **SEVENTH CAUSE OF ACTION**

20                          *(Extrajudicial Killing under the ATS)*

21                   (Plaintiff Roe VIII, and class members similarly situated,

22                                  against all Defendants)

23   264.    The allegations set forth in the above paragraphs are re-alleged and reincorporated

24   by reference as if fully set forth below.

25   265.    Doe VIII's death by torture was an extrajudicial killing not authorized by a lawful

26   judgment pronounced by a regularly constituted court affording all the judicial guarantees

27   which are recognized as indispensable by civilized peoples.

28   266.    This extrajudicial killing was in violation of international law and was contrary to

- 42 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    the laws of China.

2    267.   Defendants are liable for the harm suffered by Doe VIII's survivor, Roe VIII, and

3    class members similarly situated, in that Defendants either directly or through their agents

4    knowingly and purposefully aided and abetted or entered into a conspiracy or joint

5    criminal enterprise with the Chinese Communist Party and/or Chinese Public Security

6    officers in the unlawful conduct that led to Doe VIII's death.

7                          **EIGHTH CAUSE OF ACTION**

8                          *(Extrajudicial Killing under the TVPA)*

9                    (Plaintiff Roe VIII, and class members similarly situated,

10                          against Defendants Chambers, Chan, and Lam)

11   268.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

12   by reference as if fully set forth below.

13   269.   Doe VIII's death by torture was an extrajudicial killing not authorized by a lawful

14   judgment pronounced by a regularly constituted court affording all the judicial guarantees

15   which are recognized as indispensable by civilized peoples.

16   270.   This extrajudicial killing was in violation of international law and was contrary to

17   the laws of China.

18   271.   Defendants are liable for the harm suffered by Doe VIII's survivor, Roe VIII, and

19   class members similarly situated, in that Defendants either directly or through their agents

20   knowingly and purposefully aided and abetted or entered into a conspiracy or joint

21   criminal enterprise with the Chinese Communist Party and/or Chinese Public Security

22   officers in the unlawful conduct that led to Doe VIII's death.

23                          **NINTH CAUSE OF ACTION**

24                          *(Enforced Disappearance under the ATS)*

25                    (Plaintiff Roe VII, and class members similarly situated,

26                          against all Defendants)

27   272.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

28   by reference as if fully set forth below

                                   - 43 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

273.   Doe VII was forcibly disappeared while in the custody. After being detained and imprisoned, she was not permitted access to any friends or family members, and has not been seen or heard from since 2006. Her whereabouts have not been disclosed, and she is presumed dead by her family.

274.   This disappearance was in violation of international law and was contrary to the laws of China.

275.   Defendants are liable for the harm suffered by Doe VII's representative, Roe VII, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to her enforced disappearance.

### TENTH CAUSE OF ACTION

*Violation of 18 U.S.C. § 2512(1)*

(Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

and class members similarly situated, against all Defendants)

276.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

277.   Defendants manufactured, assembled, possessed, and sold to CCP the equipment and devices required to create and operate the Golden Shield.

278.   Defendants knew of CCP's poor human rights record with respect to Falun Gong practitioners, and knew of CCP's intent to use the Golden Shield for the purpose of identifying and tracking Falun Gong practitioners via the surreptitious interception of their electronic, wire and/or oral communications in order to unlawfully detain, torture, and harass them as described herein.

279.   Defendants knew that Chinese authorities intended to commit such acts on Falun Gong members, and purposefully provided the Golden Shield technology to the Chinese authorities as the only or primary means by which Plaintiffs could be identified as Falun Gong and detained by CCP authorities.

- 44 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    280.   Plaintiffs' electronic, wire and/or oral communications were intercepted, disclosed,

2    and intentionally used by the Chinese authorities to identify, track, and commit human

3    rights abuses against them.

4    281.   As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to

5    suffer, irreparable harm and compensatory and punitive damages in an amount to be

6    proven at trial.

7    282.   As a legal, substantial and direct result of the above-described conduct, Plaintiffs

8    are entitled to reasonable attorneys' fees and other litigation costs pursuant to 28 U.S.C. §

9    2512(1).

10                      **ELEVENTH CAUSE OF ACTION**

11                                  *Battery*

12                 (Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

13            and class members similarly situated, against all Defendants)

14   283.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

15   by reference as if fully set forth below.

16   284.   The CCP and/or Chinese government, through its Public Security officers and

17   police officers, used the Golden Shield technology developed, implemented and

18   maintained by Defendants to track the Internet activity of Falun Gong with other state

19   agents with the intent and as the primary means to facilitate the detention, interrogation,

20   and torture of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and

21   degradation.

22   285.   For example, Doe II lost consciousness while being tortured, was slapped

23   repeatedly, and was forced to stand in a bucket of ice-cold water while ice was poured

24   over her body. Plaintiff Charles Lee was forced to stand or sit in the same position for

25   hours at a time on a daily basis, sometimes for up to two weeks in a row. He was forced to

26   attend military drills, and when he refused he was dragged across the grounds for hours at

27   a time. Prison authorities force-fed him on four occasions; on one of these occasions,

28   authorities tied him down and placed a tube down his throat for feeding, which was kept

- 45 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   there for thirty-three hours. Other Plaintiffs were beaten, slapped, and force-fed.

2   286.   Plaintiffs did not consent to these acts of touching. They were forcibly detained and

3   sent to reeducation through labor camps, where they were interrogated and tortured,

4   without being charged or tried. Further, they were also sent to prison camps following

5   sham trials in which they were not allowed to enter a "not guilty" plea, challenge the

6   legality of the charges against them, or have counsel be present during interrogations. The

7   unwanted touching occurred in these camps.

8   287.   Defendants knew that Chinese authorities intended to commit such acts on Falun

9   Gong members, and conspired with the Chinese authorities to purposefully and

10   intentionally provide the technology of Golden Shield to the Chinese authorities as the

11   only means by which Plaintiffs could be identified as Falun Gong practitioners and

12   detained for such acts to be committed on them.

13   288.   As a result of Defendants' conduct, Plaintiffs suffered injury, damage, loss, and

14   harm as a result of these unlawful acts of touching. In particular, Plaintiffs suffer from

15   severe mental trauma and lingering physical effects such as heart damage and loss of

16   movement.

17   289.   Defendants knew that Chinese government officials intended to use Golden Shield

18   to identify, track, detain, and commit acts constituting battery against Plaintiffs.

19   Defendants gave substantial assistance or encouragement to the CCP in carrying out these

20   acts, and Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

21   290.   As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to

22   suffer, irreparable harm and damages in an amount to be proven at trial.

23   **TWELFTH CAUSE OF ACTION**

24   *Assault*

25   (Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

26   and class members similarly situated, against all Defendants)

27   291.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

28   by reference as if fully set forth below.

- 46 -

292.     Chinese CCP and Public Security officers used the Golden Shield technology, developed, implemented and maintained by Defendants to analyze identities and movements of Falun Gong practitioners and shared information with other state agents with the intent and as the primary means to facilitate the detention, interrogation, and torture of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and degradation.

293.     Chinese Public Security officers and Office 610 officers engaged in such acts. For example, Doe II lost consciousness while being tortured, was slapped repeatedly, and was forced to stand in a bucket of ice-cold water while ice was poured over her body. Plaintiff Charles Lee was forced to stand or sit in the same position for hours at a time on a daily basis, sometimes for up to two weeks in a row. He was forced to attend military drills, and when he refused he was dragged across the grounds for hours at a time. Prison authorities force-fed him on four occasions; on one of these occasions, authorities tied him down and placed a tube down his throat for feeding, which was kept there for thirty-three hours. Other Plaintiffs were beaten, slapped, and force-fed.

294.     Defendants knew that Chinese authorities intended to commit such acts on Falun Gong members who were detained, and Defendants conspired with those authorities and intentionally and purposefully provided the technology of Golden Shield to the Chinese authorities as the only means by which Plaintiffs could be identified as Falun Gong by CCP authorities, who then committed such acts on Plaintiffs. Such acts constituted an unlawful touching with the intent to harm or offend Plaintiffs.

295.     Plaintiffs did not consent to the touching. They were forcibly detained and sent to reeducation through labor camps being charged or tried. Further, they were also sent to prison camps following sham trials in which they were not allowed to enter a "not guilty" plea, challenge the legality of the charges against them, or have counsel be present during interrogations. The unwanted touching occurred in these camps.

296.     Plaintiffs suffered injury, damage, loss, and harm as a result of these unlawful acts of touching. In particular, Plaintiffs suffer from severe mental trauma and lingering

- 47 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   physical effects such as heart damage and loss of movement.

2   297.   Defendants gave substantial assistance or encouragement to the CCP in carrying

3   out these acts, and Defendants' conduct was a substantial factor in causing harm to

4   Plaintiffs.

5   298.   As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to

6   suffer, irreparable harm and damages in an amount to be proven at trial.

7   **THIRTEENTH CAUSE OF ACTION**

8   *False Imprisonment*

9   (Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

10   and class members similarly situated, against all Defendants)

11   299.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

12   by reference as if fully set forth below.

13   300.   The CCP and/or Chinese government, through its Public Security officers and

14   police officers, used the Golden Shield technology, developed, implemented and

15   maintained by Defendants to analyze identities and movements of Falun Gong

16   practitioners and shared information with other state agents with the intent and as the

17   primary means to facilitate the detention, interrogation, and torture of Plaintiffs, and in

18   order to submit Plaintiffs to forced public humiliation and degradation.

19   301.   Plaintiffs were detained in reeducation through labor camps without an arrest,

20   charges, or trial for periods of time ranging from several days to several years.

21   302.   While being held in reeducation through labor camps without any legal process,

22   Plaintiffs were subjected to unlawful treatment including torture, public degradation, and

23   interrogation, and were forced to work long hours in harsh conditions.

24   303.   Plaintiffs suffered injury, damage, loss, and harm as a result of being wrongfully

25   detained without arrest, charges, or trial. In particular, Plaintiffs suffer from severe mental

26   trauma and lingering physical effects such as heart damage and loss of movement.

27   304.   Defendants knew that Chinese authorities intended to commit such acts on Falun

28   Gong members, and conspired with the Chinese authorities to intentionally and

- 48 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   purposefully provide the technology of Golden Shield to the Chinese authorities as the

2   only or primary means by which Plaintiffs could be identified as Falun Gong and detained

3   by CCP authorities.

4   305.   The use of the Golden Shield to track, identify, detain, and torture Falun Gong

5   practitioners, directly caused their false imprisonment.

6   306.   Thus, Defendants knew that Chinese government officials intended to use Golden

7   Shield to identify, track, detain, and commit acts constituting false imprisonment against

8   Plaintiffs. Defendants gave substantial assistance or encouragement to the CCP in

9   carrying out these acts, and Defendants' conduct was a substantial factor in causing harm

10   to Plaintiffs.

11   307.   As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to

12   suffer, irreparable harm and damages in an amount to be proven at trial.

### FOURTEENTH CAUSE OF ACTION

*Wrongful Death*

(Plaintiff Roe VIII, and class members similarly situated,

against all Defendants)

17   308.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

18   by reference as if fully set forth below.

19   309.   The CCP and/or Chinese government, through its Public Security officers and

20   police officers, committed the acts described herein that caused the wrongful death of Doe

21   VIII. Plaintiff Roe VIII is the surviving relative and representative of the estate of Doe

22   VIII.

23   310.   The use of the Golden Shield to track, identify, detain, and torture Doe VIII,

24   directly caused his wrongful death.

25   311.   Thus, Defendants knew that Chinese government officials intended to use Golden

26   Shield to identify, track, detain, and commit acts resulting in the wrongful death of Doe

27   VIII. Defendants conspired with the Chinese government to cause the death of Plaintiff

28   Roe VIII; and gave substantial assistance or encouragement to the CCP in carrying out

- 49 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   these acts.  Defendants' conduct was a substantial factor in causing harm to plaintiff Roe

2   VIII, the surviving relative and representative of the deceased.

3   312.    As a result of Defendants' conduct, Plaintiff Roe VIII, and class members similarly

4   situated, have suffered, and will continue to suffer, irreparable harm and damages in an

5   amount to be proven at trial. Plaintiff Roe VIII, and class members similarly situated, seek

6   damages herein for pecuniary loss resulting from loss of society, comfort, attention,

7   services and support and for the losses suffered by the deceased.

8   **FIFTEENTH CAUSE OF ACTION**

9   *Unfair Business Practices*

10   *(California Business & Professions Code § 17200 et seq.)*

11   (All Plaintiffs, and class members similarly situated,

12   against all Defendants)

13   313.    The allegations set forth in the above paragraphs are re-alleged and reincorporated

14   by reference as if fully set forth below.

15   314.    Plaintiffs allege that by engaging in the above-described acts and practices,

16   Defendants have committed one or more acts of unfair competition within the meaning of

17   California *Business and Professions Code* §17200, et. seq.

18   315.    Defendants' unlawful business acts and/or practices as alleged herein have violated

19   numerous laws and regulations, and said predicate acts are therefore per se violations of §

20   17200, et seq.  As described in more detail above, these predicate unlawful business acts

21   and/or practices include, but are not limited to, Defendants' solicitation of the contract to

22   design, manufacture, build, and supply the Golden Shield system to Chinese government

23   authorities for the specific purpose of assisting the Chinese government in its intent to

24   identify, track, unlawfully detain, and torture Falun Gong practitioners including

25   Plaintiffs; by information and belief, Defendant Chambers' signature or countersignature

26   on Cisco's contracts in California to design, manufacture, build, and supply the Golden

27   Shield system to Chinese government authorities as required by Cisco's corporate bylaws;

28   Cisco's misrepresenting to United States authorities that its manufacture, assembly,

- 50 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1   possession, and sale of the equipment and devices required to create and operate the

2   Golden Shield was lawful; and designing the custom surveillance system to be used in

3   Golden Shield in California.

4   316.   Defendants' actions, as alleged herein, gave Cisco an unfair competitive advantage

5   over its competitors.

6   317.   Plaintiffs allege that as a direct result of Cisco's unlawful conduct alleged herein,

7   Plaintiffs lost income that they could not receive during the period of their detention.

8   Plaintiffs further lost income to the extent they were not able to continue working after

9   their release from detention due to the mental and physical injuries they received while in

10   detention. Plaintiffs are victims of Defendants' unlawful conduct, as herein alleged, and

11   have suffered injury in fact, and have lost money as a result of Cisco's unfair competition.

12   318.   Plaintiffs seek a permanent injunction enjoining Cisco from future unlawful

13   activity.  Plaintiffs allege that the unlawful acts and practices, as fully described herein,

14   present a continuing threat to members of the public to be misled and/or deceived by

15   Defendants as described herein.  Plaintiffs have no other remedy at law that will prevent

16   Defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

17   319.   This litigation will result in the enforcement of an important right affecting the

18   public interest.  Plaintiffs are informed, believe, and thereupon allege that this action

19   confers a significant benefit on the California public who have been misled and/or

20   deceived by the unlawful businesses practices of Cisco.

21   320.   As a legal, substantial and direct result of the above-described pattern of conduct,

22   Plaintiffs are entitled to reasonable attorneys' fees pursuant to California *Code of Civil*

23   *Procedure* § 1021.5.

24

25                    **PRAYER FOR RELIEF**

26   WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as

27   follows:

28            (a)     For certification of a class pursuant to Fed. R. Civ. P. Rule 23 (a) and (b)(3);

- 51 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT

1    (b)    For compensatory damages including general and specific damages;

2    (c)    For punitive damages;

3    (d)    For injunctive relief enjoining Cisco from future unlawful activity;

4    (e)    For costs of suit, including attorney's fees;

5    (f)    For such other and further relief as the Court deems appropriate.

DATED: May 17, 2011    Respectfully submitted,

SCHWARCZ, RIMBERG, BOYD &
RADER, LLP


By: K. Lee Boyd /RLS
K. Lee Crawford-Boyd
Attorney for Plaintiffs (Counsel of Record)

Terri E. Marsh (Lead Counsel)
Attorney for Plaintiffs
To be admitted *pro hac vice*

- 52 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Doe I et al. v. Cisco Systems, Inc.
COMPLAINT