

U.S. DEPARTMENT OF STATE
DIPLOMACY IN ACTION

Home » Under Secretary for Democracy and Global Affairs » Bureau of Democracy, Human Rights, and Labor » Releases »
Human Rights Reports » 2009 Country Reports on Human Rights Practices » East Asia and the Pacific » China Includes
Tibet, Hong Kong, and Macau

Subscribe to Updates

## 2009 Human Rights Report: China (includes Tibet, Hong Kong, and Macau)

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR
**2009 Country Reports on Human Rights Practices**
**March 11, 2010**
(The section for Tibet, the report for Hong Kong, and the report for Macau are appended below.)

The People's Republic of China (PRC), with a population of approximately 1.3 billion, is an authoritarian state in which the Chinese Communist Party (CCP) constitutionally is the paramount source of power. Party members hold almost all top government, police, and military positions. Ultimate authority rests with the 25-member political bureau (Politburo) of the CCP and its nine-member standing committee. Hu Jintao holds the three most powerful positions as CCP general secretary, president, and chairman of the Central Military Commission. Civilian authorities generally maintained effective control of the security forces.

The government's human rights record remained poor and worsened in some areas. During the year the government increased the severe cultural and religious repression of ethnic minorities in the Xinjiang Uighur Autonomous Region (XUAR).Tibetan areas remained under tight government controls. The detention and harassment of human rights activists increased, and public interest lawyers and law firms that took on cases deemed sensitive by the government faced harassment, disbarment and closure. The government limited freedom of speech and controlled the Internet and Internet access. Abuses peaked around high-profile events, such as the 20th anniversary of the Tiananmen Square uprising, the 50th anniversary of the Tibetan uprising, and the 60th anniversary of the founding of the People's Republic of China.

As in previous years, citizens did not have the right to change their government. Other serious human rights abuses included extrajudicial killings, executions without due process, torture and coerced confessions of prisoners, and the use of forced labor, including prison labor. The government continued to monitor, harass, detain, arrest, and imprison journalists, writers, dissidents, activists, petitioners, and defense lawyers and their families, many of whom sought to exercise their rights under the law. A lack of due process and restrictions on lawyers, particularly human rights and public interest lawyers, had serious consequences for defendants who were imprisoned or executed following proceedings that fell short of international standards. The party and state exercised strict political control of courts and judges, conducted closed trials, and continued the use of administrative detention. Prolonged illegal detentions at unofficial holding facilities, known as black jails, were widespread.

Individuals and groups, especially those deemed politically sensitive by the government, continued to face tight restrictions on their freedom to assemble, practice religion, and travel. The government failed to protect refugees and asylum-seekers adequately, and the detention and forced repatriation of North Koreans continued. The government increased pressure on other countries to repatriate citizens back to China, including citizens who were being processed by UNHCR as political refugees. Nongovernmental organizations (NGOs), both local and international, continued to face intense scrutiny and restrictions. The government failed to address serious social conditions that affected human rights, including endemic corruption, trafficking in persons, and discrimination against women, minorities, and persons with disabilities. The government continued its coercive birth limitation policy, in some cases resulting in forced abortion or forced sterilization. Workers cannot choose an independent union to represent them in the workplace, and the law does not protect workers' right to strike.

In April the government unveiled its first National Human Rights Action Plan. The 54-page document outlined human rights goals to be achieved over the next two years and addressed issues such as prisoners' rights and the role of religion in society. However, the plan has not yet been implemented.

On July 5, riots broke out in Urumqi, the provincial capital of Xinjiang, after police used force to break up a demonstration reportedly composed mostly of Uighur university students who protested the killing of Uighur migrant workers by Han co-workers in Guangdong Province. Violence erupted leaving approximately 200 people dead and 1,700 injured. According to official sources, most of the dead were Han Chinese. On July 7 and September 4, groups of Han Chinese engaged in retaliatory violence, resulting in more deaths. At year's end Urumqi remained under a heavy police presence and most Internet and international phone communication remained cut off.

**Exhibit A**
**1**                                                                                              5/6/2011

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

During the year security forces reportedly committed arbitrary or unlawful killings. No official statistics on deaths in custody were available.

In January Lin Guoqiang died suddenly while in custody at the Fuqing Detention Center in Fujian Province. His family claimed that his body was swollen and covered with bruises. At year's end there was no official investigation into the case.

On February 8, Li Qiaoming was reportedly beaten to death in a detention center in Jinning County, Yunnan Province. Prison officials initially claimed he died after accidentally running into a wall during a game of "hide and seek." However, Li's father, who viewed the corpse, reported Li's head was swollen and his body covered with purple abrasions. Following Li's death, public security officials launched a campaign to eliminate "unnatural deaths" in prisons. An investigation determined three inmates were responsible for the death. The inmates, along with two prison guards, were sentenced to prison.

In March Li Wenyan died while in custody in Jiujiang, Jiangxi Province. The Xinhua official press quoted a senior prison official as stating that Li died while having a "nightmare." Official press reports also stated that an autopsy performed by the Jiangxi Provincial Public Security Department in May showed that Li died of various diseases, including an ulcer, an abscess, and heart disease, none of which were discovered until after his death. The same press report stated that an injury on the body was caused by electric shock administered during resuscitation attempts.

Also in March Radio Free Asia (RFA) reported that a Tibetan monk, Phuntsok Rabten, was beaten to death by police in Sichuan Province after urging Tibetans to boycott farming to protest a massive security clampdown.

In April the Supreme People's Procuratorate (SPP) disclosed that at least 15 prisoners died in "unnatural deaths" under unusual circumstances during the year. According to a Chinese press report, seven of the prisoners died of beatings, three were classified as suicides, two were described as accidents, and three remained under investigation.

According to official media reports, 197 persons died and 1,700 were injured during the July 5 rioting in Urumqi. A second wave of riots, on a smaller scale, occurred on July 7. On September 25, charges were brought against 21 of the more than 200 persons facing prosecution in connection with the riots. On November 9, eight Uighurs and one Han were executed without due process for crimes committed during July riots. At year's end 22 persons had been sentenced to death; five others reportedly received suspended death sentences. Of these, one was reported to be ethnically Han Chinese and the rest were Uighurs.

According to RFA reports, police detained Uighur Shohret Tursun in Urumqi during the July 5 riots. In September police returned his disfigured body to family members and ordered them to bury him; the family refused to do so without an explanation of his death from the police. On September 20, the police surrounded the family home and forced the family to bury the body without an autopsy.

During the reporting period no new information became available regarding the deaths of Falun Gong practitioner Yu Zhou, who was arrested in Beijing in January 2008 and died in February 2008; Tibetan protester Paltsal Kyab, detained in April 2008 in Sichuan Province and who died in police custody in May 2008; or a motorcyclist surnamed Ouyang, who died in July 2008 and was allegedly killed by security guards in Guangdong Province.

During the year no new information was available regarding a 2007 incident in which 18 persons were killed and 17 were arrested during a raid at a location in the XUAR that officials called a terrorist training camp.

Defendants in criminal proceedings were executed following convictions that sometimes took place under circumstances involving severe lack of due process and inadequate channels for appeal.

b. Disappearance

On February 4, authorities detained human rights lawyer Gao Zhisheng, who had represented Chinese Christians and Falun Gong practitioners. At year's end his whereabouts remained unconfirmed, although according to NGO reports, in August he reportedly was seen in his hometown under heavy police escort. Before his arrest Gao published a letter detailing his torture during a previous period of detention.

On March 30, underground Catholic bishop Julius Jia Zhiguo of Zhengding, Hebei Province, was arrested; at year's end his whereabouts were unknown. The whereabouts of underground Catholic priests Zhang Li and Zhang Jianlin, from near Zhangjiakou city in Hebei Province, whom authorities detained in May 2008, and Wu Qinjing, the bishop of Zhouzhi, Shaanxi Province, who was detained in 2007, also remained unknown.

In an October report, the NGO Human Rights Watch documented the disappearances of hundreds of Uighur men and boys following the July protests in Urumqi.

At year's end the government had not provided a comprehensive, credible accounting of all those killed, missing, or detained in connection with the violent suppression of the 1989 Tiananmen demonstrations. In October the Dui Hua Foundation estimated that approximately 20 individuals continued to serve sentences for offenses committed during the demonstration.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits the physical abuse of detainees and forbids prison guards from extracting confessions by torture, insulting prisoners' dignity, and beating or encouraging others to beat prisoners. However, during the year there were reports that officials used electric shocks, beatings, shackles, and other forms of abuse.

According to a November Human Rights Watch report, on March 6, An Weifeng was released on bail from Bancheng prison in Chengde City, Henan Province, for medical treatment. His father claimed that An Weifeng's body was swollen and scarred as a result of beatings and the administration of electric shocks.

In 2007, 30 farmers from Chengdu, Sichuan Province, who traveled to Beijing seeking resolution of a land dispute were abducted and taken to a military base, where they were tortured, threatened, and starved. One of them allegedly attempted suicide, "because (the guards) did not allow me to sleep or eat in order to force me to write self-criticisms." According to the same report, a 15-year-old girl who traveled to Beijing to get help for her disabled father was kidnapped and taken back to Gansu Province, where she was beaten and held incommunicado for nearly two months. There were no new developments in this case during the year.

In November 2008 the UN Committee Against Torture (UNCAT) stated its deep concern about the routine and widespread use of torture and mistreatment of suspects in police custody, especially to extract confessions or information used in criminal proceedings. However, UNCAT acknowledged government efforts to address the practice of torture and related problems in the criminal justice system. Many alleged acts of torture occurred in pretrial criminal detention centers or Reeducation Through Labor (RTL) centers. Sexual and physical abuse and extortion occurred in some detention centers.

According to China News Weekly, the country had 22 "ankang" institutions (high-security psychiatric hospitals for the criminally insane) directly administered by the Ministry of Public Security (MPS). Political activists, underground religious believers, persons who repeatedly petitioned the government, members of the banned Chinese Democracy Party (CDP), and Falun Gong adherents were among those housed with mentally ill patients in these institutions. The regulations for committing a person to an ankang facility were not clear, and detainees had no mechanism for objecting to public security officials' determinations of mental illness. Patients in these hospitals reportedly were given medicine against their will and forcibly subjected to electric shock treatment. Activists sentenced to administrative detention also reported they were strapped to beds or other devices for days at a time, beaten, forcibly injected or fed medications, and denied food and use of toilet facilities.

Prison and Detention Center Conditions

Conditions in penal institutions for both political prisoners and common criminals generally were harsh and often degrading. Prisoners and detainees often were kept in overcrowded conditions with poor sanitation. Inadequate prison capacity remained a problem in some areas. Food often was inadequate and of poor quality, and many detainees relied on supplemental food and medicines provided by relatives; some prominent dissidents were not allowed to receive such goods.

On March 2, an inmate at the Danzhou First Detention Center in Hainan was beaten to death by inmates while guards looked on.

Forced labor remained a serious problem in penal institutions. Many prisoners and detainees in penal and RTL facilities were required to work, often with no remuneration. Information about prisons, including associated labor camps and factories, was considered a state secret and was tightly controlled.

In August Vice Minister of Health Huang Jiefu stated that inmates were not a proper source for organ transplants, that prisoners must give written consent for their organs to be taken, and that their rights were protected. In a 2007 interview, Ministry of Health spokesman Mao Qunan stated that most transplanted organs were from executed prisoners.

Adequate, timely medical care for prisoners remained a serious problem, despite official assurances that prisoners have the right to prompt medical treatment. Prison officials often denied privileges, including the ability to purchase outside food, make telephone calls, and receive family visits to those who refused to acknowledge guilt.

Conditions in administrative detention facilities, such as RTL camps, were similar to those in prisons. Beating deaths occurred in administrative detention and RTL facilities. According to NGO reports, conditions in these facilities were similar

to those in prisons, with detainees reporting beatings, sexual assaults, lack of proper food, and no access to medical care.

The law requires juveniles to be held separately from adults, unless facilities are insufficient. In practice children sometimes were held with adult prisoners and required to work. Political prisoners were segregated from each other and placed with common criminals, who sometimes beat political prisoners at the instigation of guards. Newly arrived prisoners or those who refused to acknowledge committing crimes were particularly vulnerable to beatings.

The government generally did not permit independent monitoring of prisons or RTL camps, and prisoners remained inaccessible to local and international human rights organizations, media groups, and the International Committee of the Red Cross (ICRC).

d. Arbitrary Arrest or Detention

Arbitrary arrest and detention remained serious problems. The law permits police and security authorities to detain persons without arresting or charging them. Because the government tightly controlled information, it was impossible to determine accurately the total number of persons subjected to arbitrary arrest or detention.

Role of the Police and Security Apparatus

The security apparatus is made up of the Ministries of State Security and Public Security, the People's Armed Police, the People's Liberation Army (PLA), and the state judicial, procuratorial, and penal systems. The Ministries of State Security and Public Security and the People's Armed Police were responsible for internal security. SPP and Supreme People's Court (SPC) officials admitted that courts and prosecutors often deferred to the security ministries on policy matters and individual cases. The SPP was responsible for the investigation of corruption and duty crimes (crimes committed by public officials or state functionaries, including corruption, crimes of dereliction of duty, and crimes involving violations of a citizen's personal rights). The PLA was responsible for external security but also had some domestic security responsibilities.

The MPS coordinates the country's law enforcement, which is administratively organized into local, county, provincial, and specialized police agencies. Some efforts were made to strengthen historically weak regulation and management of law enforcement agencies; however, judicial oversight was limited, and checks and balances were absent. Corruption at the local level was widespread. Security officials, including "urban management" officials, reportedly took individuals into custody without just cause, arbitrarily collected fees from individuals charged with crimes, and mentally and physically abused victims and perpetrators.

The SPP acknowledged continuing widespread abuse in law enforcement. Domestic news media reported the convictions of public security officials who had beaten to death suspects or prisoners in their custody. On August 12, Dang Hongfei, a police officer in Nanchang, Jiangxi Province, was sentenced to 12 years in prison, and fellow officer Xia Xiangdong was sentenced to one year in prison for beating to death suspect Wang Jianguo during an interrogation in 2006.

Arrest Procedures and Treatment While in Detention

Public security organs do not require court-approved warrants to detain suspects under their administrative detention powers. After detention the procuracy can approve formal arrest without court approval. According to the law, in routine criminal cases police can unilaterally detain persons for up to 37 days before releasing them or formally placing them under arrest. After a suspect is arrested, the law allows police and prosecutors to detain a person for up to seven months while public security organs further investigate the case. Another 45 days of detention are allowed where public security organs refer a case to the procuratorate to decide whether to file charges. If charges are filed, authorities can detain a suspect for an additional 45 days between filing and trial. In practice the police sometimes detained persons beyond the time limits stipulated by law. In some cases investigating security agents or prosecutors sought repeated extensions, resulting in pretrial detention of a year or longer. The criminal procedure law allows detainees access to lawyers before formal charges are filed, although police often limited such access.

The criminal procedure law requires a court to provide a lawyer to a defendant who has not already retained a lawyer; who is blind, deaf, mute, a minor; or who may be sentenced to death. This law applies whether or not the defendant is indigent. Courts may also provide lawyers to other criminal defendants who cannot afford them, although courts often did not appoint counsel in such circumstances.

Detained criminal suspects, defendants, their legal representatives, and close relatives are entitled to apply for bail; however, in practice few suspects were released on bail pending trial.

The government used incommunicado detention. The law requires notification of family members within 24 hours of detention, but individuals often were held without notification for significantly longer periods, especially in politically sensitive cases. Under a sweeping exception, officials were not required to provide notification if doing so would "hinder the investigation" of a case. In some cases police treated those with no immediate family more severely.

There were numerous reports of citizens who were detained with no or severely delayed notice. On July 27, Noor-UI-Islam Sherbaz, a Uighur minor, was detained and accused of participating in the July 5 riot. In contravention of law on the detention of juveniles, Sherbaz's parents had no contact with him after his arrest and were not allowed to be present during police interrogations.

Authorities advised a number of activists in Shanghai and Beijing to remain at home in the days prior to and during U.S. President Obama's November visit to China. Some activists in provinces outside these two cities were told not to travel outside their province.

Citizens who traveled to Beijing to petition the central government for redress of a grievance were frequently subjected to arbitrary detention, often by police from the petitioner's hometown. Some provincial governments operated detention centers in Beijing or in other localities to hold such petitioners without official procedures or right to appeal. The law protects the right to petition the government for resolution of grievances.

In August a guard raped a 20-year-old petitioner at a detention facility operated at a Beijing hotel by officials from Tonbai County in Henan Province. In November the guard pled guilty to raping the woman and in December was convicted and sentenced to eight years in prison. Petitioners frequently were forcibly returned to their hometowns after stays in detention facilities lasting several days to several weeks. According to an *International Herald Tribune* report, Huang Liuhong, a woman from Guizhou Province, was held in a Beijing detention facility for nearly a year.

The law permits nonjudicial panels, called labor reeducation panels, to sentence persons without trial to three years in RTL camps or other administrative detention programs. The labor reeducation committee is authorized to extend a sentence up to one year. Defendants could challenge RTL sentences under the administrative litigation law and appeal for a reduction in, or suspension of, their sentences. However, appeals rarely succeeded. Many other persons were detained in similar forms of administrative detention, known as "custody and education" (for women engaged in prostitution and those soliciting prostitution) and "custody and training" (for minors who committed crimes). Administrative detention was used to intimidate political activists and prevent public demonstrations.

On February 1, Zhu Lijin was arrested for distributing Falun Gong pamphlets. She was sentenced to 15 months in RTL without a trial. Authorities used special reeducation centers to prolong detention of Falun Gong practitioners who had completed terms in RTL.

Authorities arrested persons on allegations of revealing state secrets, subversion, and other crimes as a means to suppress political dissent and social advocacy. Citizens also were also detained under broad and ambiguous state secrets laws for, among other actions, disclosing information on criminal trials, meetings, and government activity.

Human rights activists, journalists, unregistered religious figures, and former political prisoners and their family members were among those targeted for arbitrary detention or arrest.

The government continued to use house arrest as a nonjudicial punishment and control measure against dissidents, former political prisoners, family members of political prisoners, petitioners, underground religious figures, and others it deemed politically sensitive. Numerous dissidents, activists, and petitioners were placed under house arrest during the October 1 National Day holiday period. House arrest encompassed varying degrees of stringency but sometimes included complete isolation in one's home or another location under lock and guard. In some cases house arrest involved constant monitoring, but persons under house arrest were occasionally permitted to leave the home to work or run errands. Sometimes such persons were required to ride in the vehicles of their police monitors when venturing outside. When outside the home, subjects of house arrest were usually, but not always, under surveillance. In some instances security officials assumed invasive positions within the family home rather than monitor from the outside.

On May 31, police at Guiyang Airport apprehended human rights activist Chen Xi as he was attempting to fly to Beijing to commemorate the Tiananmen uprising. He was detained for nine hours without explanation and then sent home, where he remained under house arrest. Chen was again detained on December 7, presumably to prevent him from attending the Guizhou Human Rights Symposium, which he helped organize. In February Shanghai activist Dai Xuezhong was prohibited from leaving his home for approximately one week by local police to prevent a planned meeting with fellow activist Deng Yongliang. In August authorities placed writer Zhao Hun, who blogs under the name of Mo Zhixu, under house arrest for several days.

At year's end Yuan Weijing, wife of imprisoned family-planning activist lawyer Chen Guangcheng, remained under virtual house arrest. According to Reporters Without Borders, when journalism professor Wang Keqin and a student tried to visit Yuan in March in Linyi County, Shandong Province, both were physically and verbally assaulted by five or six plainclothes individuals, who Wang reportedly claimed were hired by the local government to prevent visitors to Chen's family.

Police continued the practice of placing under surveillance, harassing, and detaining citizens around politically sensitive events, including the plenary sessions of the National People's Congress (NPC) and the Chinese People's Political Consultative Conference (CPPCC), the 60th anniversary of the founding of the PRC and the 20th anniversary of the Tiananmen Square student uprising. In early June authorities in Hangzhou placed several dissidents, including Charter 08

signatories Wen Kejian and Zou Wei and CDP activist Zhu Yufu, under house arrest for several days. Published in December 2008, Charter 08 calls for free elections and greater freedom of speech. Coauthored by Liu Xiaobo, who was later imprisoned, the document, originally signed by more than 300 Chinese activists and intellectuals, received more than 7,000 signatories online. Many dissidents in Beijing reported that police prevented them from leaving their houses on June 4, the anniversary of the Tiananmen Square Massacre. Authorities in the XUAR used house arrest and other forms of arbitrary detention against those accused of subscribing to the "three evils" of religious extremism, "splitism," and terrorism. Raids, detentions, arrests, and judicial punishments indiscriminately affected not only those suspected of supporting terrorism but also those who peacefully sought to pursue political goals or worship.

e. Denial of Fair Public Trial

The law states that the courts shall exercise judicial power independently, without interference from administrative organs, social organizations, and individuals. However, in practice the judiciary was not independent. It received policy guidance from both the government and the CCP, whose leaders used a variety of means to direct courts on verdicts and sentences, particularly in politically sensitive cases. At both the central and local levels, the government and CCP frequently interfered in the judicial system and dictated court decisions. Trial judges decided individual cases under the direction of the adjudication committee in each court. In addition, the CCP's law and politics committee, which includes representatives of the police, security services, procuratorate, and courts, had the authority to review and influence court operations at all levels of the judiciary. People's congresses also had authority to alter court decisions, but this happened rarely.

Corruption often influenced judicial decision making, and safeguards against corruption were vague and poorly enforced. Local governments appointed judges at the corresponding level of the judicial structure. Judges received their court finances and salaries from these government bodies and could be replaced by them. Local authorities often exerted undue influence over the judges they appointed and financed. Several high-profile corruption cases involved procuracy officials.

Courts lacked the independence and authority to rule on the constitutionality of laws. The law permits organizations or individuals to question laws and regulations they believe contradict the constitution, but a constitutional challenge first requires consultation with the body drafting the questioned regulation and can be appealed only to the NPC. Accordingly, lawyers had little or no opportunity to use the constitution in litigation.

The SPC is followed in descending order by the higher, intermediate, and basic people's courts. These courts handle criminal, civil, and administrative cases, including appeals of decisions by police and security officials to use RTL and other forms of administrative detention. There were special courts for handling military, maritime, and railway transport cases.

The CCP used a form of discipline known as "shuang gui" for violations of party discipline, but there were reports of its use against nonparty members. Shuang gui is similar to house arrest, can be authorized without judicial involvement or oversight, and requires the CCP member under investigation to submit to questioning at a designated place and time. According to regulations of the Central Discipline Inspection Commission governing shuang gui, corporal punishment is banned, the member's dignity must be respected, and he or she is regarded as a comrade unless violations are proved. Absent any legal oversight, it is unclear how these regulations were enforced in practice.

On August 12, authorities in Chengdu closed the trial of Tan Zuoren, charged with defaming the CCP, from the public (see Political Prisoners section). Tan attempted to collect the names of students who died in the May 2008 Sichuan earthquake. Police blocked persons who tried to attend the proceedings at the courthouse. When contemporary artist and civil society activist Ai Weiwei traveled to Chengdu to participate in the trial and testify on Tan's behalf, security forces beat him and prevented him from leaving his hotel room until the trial had adjourned.

On November 6, 70-year-old Lin Dagang was sentenced to two years in prison for illegally possessing state secrets. According to an NGO report, his wife and son were not allowed to attend his two-hour trial.

On December 25, Liu Xiaobo, a well-known dissident and coauthor of Charter 08, which called for increased political freedoms and human rights in China, was found guilty of the crime of inciting subversion of state power and sentenced to 11 years in prison and two years' deprivation of political rights, in a trial that was believed to contain serious due process violations. At year's end Liu's case was on appeal.

Trial Procedures

Trials took place before a judge, who often was accompanied by "people's assessors," laypersons hired by the court to assist in decision making. According to law, people's assessors had authority similar to judges, but in practice they often deferred to judges and did not exercise an independent jury-like function.

There was no presumption of innocence, and the criminal justice system was biased toward a presumption of guilt, especially in high-profile or politically sensitive cases. The combined conviction rate for first- and second-instance criminal trials was more than 99 percent in 2008; 1,008,677 defendants were tried, and 1,373 were found not guilty. In many

Exhibit A
6

politically sensitive trials, which rarely lasted more than several hours, the courts handed down guilty verdicts immediately following proceedings. Courts often punished defendants who refused to acknowledge guilt with harsher sentences than those who confessed. There was an appeals process, but appeals rarely resulted in reversed verdicts. Appeals processes failed to provide sufficient avenues for review, and there were inadequate remedies for violations of defendants' rights.

SPC regulations require all trials to be open to the public, with certain exceptions, such as cases involving state secrets, privacy, and minors. Authorities used the legal exception for cases involving state secrets to keep politically sensitive proceedings closed to the public and sometimes even to family members, and to withhold access to defense counsel. Under the regulations, foreigners with valid identification are allowed the same access to trials as citizens, but in practice foreigners were permitted to attend court proceedings by invitation only. As in past years, foreign diplomats and journalists sought permission to attend a number of trials only to have court officials reclassify them as "state secret" cases, fill all available seats with security officials, or otherwise close them to the public. For example, foreign diplomats requested but were denied permission to attend human rights advocate Huang Qi's February trial on charges of illegally possessing state secrets. Huang's trial was adjourned without a verdict. Some trials were broadcast, and court proceedings were a regular television feature. A few courts published their verdicts on the Internet.

The law gives most suspects the right to seek legal counsel shortly after their initial detention and interrogation, although police frequently interfered with this right. Individuals who face administrative detention do not have the right to seek legal counsel. Human rights lawyers reported that they were denied the ability to defend certain clients or threatened with punishment if they did.

Both criminal and administrative cases remained eligible for legal aid, although 70 percent or more of criminal defendants went to trial without a lawyer. According to the Ministry of Justice, the number of legal-aid cases reached 546,859 in 2008. The country had 12,778 full-time legal aid personnel, although the number of legal-aid personnel remained inadequate to meet demand. Nonattorney legal advisors provided the only legal-aid options in many areas.

Lawyers often refused to represent defendants in politically sensitive cases, and defendants frequently found it difficult to find an attorney. The government took steps to discourage lawyers from taking sensitive cases. For example, following the July unrest in the XUAR, the Beijing Municipal Judicial Bureau posted a note on its Web site urging justice bureaus, the Beijing Municipal Lawyers Association, and law firms in Beijing to "exercise caution" in representing cases related to the riots. Similar measures were taken with respect to Tibetan defendants. In some cases Beijing-based rights lawyers were told they could not represent jailed Tibetans. Local governments in the XUAR and Tibetan areas imposed arbitrary rules that defendants could be represented only by locally registered attorneys.

When defendants were able to retain counsel in politically sensitive cases, government officials sometimes prevented effective representation of counsel. Officials deployed a wide range of tactics to obstruct the work of lawyers representing sensitive clients, including unlawful detentions, disbarment, intimidation, refusal to allow a case to be tried before a court, and physical abuse. For example, in April Beijing lawyer Cheng Hai was attacked and beaten while on his way to meet with a Falun Gong client in Chengdu. According to Cheng, those responsible for the attack were officials from the Jinyang General Management Office, Wuhou District, Chengdu. In May police officers in Chongqing arrested and beat lawyers Zhang Kai and Li Chunfu when they interviewed the family of a Falun Gong practitioner who allegedly died in police custody.

During its yearly professional evaluation procedures for Beijing attorneys, the Beijing Lawyers Association did not renew the professional licenses of a number of human rights lawyers, effectively barring them from practicing law, including Li Heping, Cheng Hai, Jiang Tianyong, Li Xiongbing, Li Chunfu, Wang Yajun, Tang Jitian, Yang Huimin, Xie Yanyi, Li Dunyong, Wen Haibo, Liu Wei, Zhang Lihui, Peng Jian, Li Jinglin, Lan Zhixue, Zhang Kai, and Liu Xiaoyuan. Two lawyers who practiced outside of Beijing, Wei Liangyue and Yang Zaixin, reported that authorities warned them that their licenses were in jeopardy. Shanghai lawyers Zheng Enchong and Guo Guoting lost their licenses in 2008 in a similar decision and, as a result, were barred from practicing law.

According to the law, defense attorneys can be held responsible if their client commits perjury, and prosecutors and judges have wide discretion to decide what constitutes perjury. In some sensitive cases, lawyers had no pretrial access to their clients, and defendants and lawyers were not allowed to speak during trials. In practice criminal defendants often were not assigned an attorney until a case was brought to court. Even in nonsensitive criminal trials, only one in seven defendants reportedly had legal representation.

The mechanism that allows defendants to confront their accusers was inadequate; the percentage of witnesses who came to court in criminal cases was less than 10 percent and as low as 1 percent in some courts. According to one expert, only 1 to 5 percent of trials involved witnesses. In most criminal trials, prosecutors read witness statements, which neither the defendants nor their lawyers had an opportunity to question. Approximately 95 percent of witnesses in criminal cases did not appear in court to testify, sometimes due to hardship or fear of reprisals. Although the criminal procedure law states that pretrial witness statements cannot serve as the sole basis for conviction, officials relied heavily on such statements to support their cases. Defense attorneys had no authority to compel witnesses to testify or to mandate discovery, although they could apply for access to government-held evidence relevant to their case. In practice pretrial access to information was minimal, and the defense often lacked adequate opportunity to prepare for trial.

Police and prosecutorial officials often ignored the due process provisions of the law, which led to particularly egregious consequences in death penalty cases. By law there are at least 68 capital offenses, including nonviolent financial crimes such as counterfeiting currency, embezzlement, and corruption.

In 2007 the SPC reassumed jurisdiction to conduct final review of death penalty cases handed down for immediate execution (but not death sentences handed down with a two-year reprieve). In most cases the SPC does not have authority to issue a new decision or declare a defendant innocent if it discovers errors in the original judgment; it can only approve or disapprove lower-court decisions. SPC spokesman Ni Shouming stated that since reassuming the death penalty review power in 2007, the SPC had rejected 15 percent of the cases it reviewed due to unclear facts, insufficient evidence, inappropriateness of the death sentence in some cases, and inadequate trial procedures. The SPC remanded these cases to lower courts for further proceedings, although it did not provide underlying statistics or figures. Because official statistics remained a state secret, it was not possible to evaluate independently the implementation and effects of the procedures.

Following the SPC's resumption of death penalty review power, executions were not to be carried out on the date of conviction, but only after final review by the SPC was completed. The government continued to apply the death penalty in a range of cases, including cases of economic crimes. In April a Beijing court upheld the death sentence of Yang Yanming, who was convicted of embezzlement. Yang was executed on December 8. On August 7, Li Peiying, former chairman of the Beijing Capital International Airport, was executed for bribery. On December 29, British citizen Akmal Shaikh was executed for drug-trafficking crimes.

The foreign-based Dui Hua Foundation estimated that approximately 5,000 persons were executed during the year.

Political Prisoners and Detainees

Government officials continued to deny holding any political prisoners, asserting that authorities detained persons not for their political or religious views but because they violated the law; however, the authorities continued to confine citizens for reasons related to politics and religion. Tens of thousands of political prisoners remained incarcerated, some in prisons and others in RTL camps or administrative detention. The government did not grant international humanitarian organizations access to political prisoners.

Foreign NGOs estimated that several hundred persons remained in prison for the crime of "counterrevolution," repealed in 1997, and thousands of others were serving sentences under the state security law, which authorities stated covers crimes similar to counterrevolution. Foreign governments urged the government to review the cases of those charged before 1997 with counterrevolution and to release those who had been jailed for nonviolent offenses under provisions of the criminal law, which were eliminated when the law was revised. At year's end no systematic review had occurred. The government maintained that prisoners serving sentences for counterrevolution and endangering state security were eligible on an equal basis for sentence reduction and parole, but political prisoners benefited from early release at lower rates than those enjoyed by other prisoners. Dozens of persons were believed to remain in prison in connection with their involvement in the 1989 Tiananmen prodemocracy movement. International organizations estimated that at least 10 and as many as 200 Tiananmen activists remained in prison. The exact number was unknown because official statistics have never been made public.

On March 4, labor activist and lawyer Yuan Xianchen was found guilty of "inciting subversion of state power" and sentenced to four years in prison and five years' deprivation of political rights. Yuan was detained in May 2008 after publishing an article in Beijing Spring, a New York-based human rights journal. He was formally arrested in June 2008.

Activist Huang Qi, a long-time campaigner for public recognition of Tiananmen victims, was arrested in June 2008 for possessing state secrets. On August 5, Huang was tried in Sichuan Province on charges of "illegal possession of state secrets," and on November 24, he was sentenced to three years' imprisonment. Also in August activist Tan Zuoren went on trial for defaming the CCP, a charge allegedly linked to his work on social issues perceived by the government as sensitive. At year's end no verdict had been issued in his case.

Zhou Yongjun, a former Tiananmen Square student leader and foreign resident, was detained in September 2008 in Hong Kong while attempting to enter the country on a forged Malaysian passport in order to visit his ailing father. Although cleared by Hong Kong authorities of involvement in bank fraud, he was transferred to mainland authorities, detained in Shenzhen, and transferred to his hometown in Sichuan Province on the same financial charges. Zhou's trial was held November 19, and at year's end the case was awaiting a verdict.

Many political prisoners remained in prison or under other forms of detention at year's end, including rights activists Hu Jia and Wang Bingzhang; Alim and Ablikim Abdureyim, sons of Uighur activist Rebiya Kadeer; journalist Shi Tao; dissident Wang Xiaoning; lawyer and activist Yang Maodong (also known as Guo Feixiong); land-rights activist Yang Chunlin; Internet writer Xu Wei; labor activists Hu Mingjun, Huang Xiangwei, Kong Youping, Ning Xianhua, Li Jianfeng, Li Xintao, Lin Shun'an, Li Wangyang, and She Wanbao; CDP cofounder Qin Yongmin; family-planning whistleblower Chen Guangcheng; Catholic bishop Su Zhimin; Christian activist Zhang Rongliang; Inner Mongolian activist Hada; Uighur activist Dilkex Tiivaldi; and Tibetan Tenzin Deleg.

Exhibit A
8

Political prisoners obtained parole and sentence reduction much less frequently than ordinary prisoners. In January labor activist Yue Tianxiang was released from prison; he was convicted and sentenced to 10 years in 1999. On February 10, Uighur Tohti Tunyaz was released from prison after serving 11 years. Internet writer Yang Zili and labor activist Yao Fuxin were released from prison in March; both served their full sentences. On March 16, labor activist Yao Fuxin was released after serving his seven-year prison term on a conviction of "subversion of state power." According to Human Rights in China, at year's end Yao was under three years of deprivation of political rights, including the freedoms of speech, assembly, and association. On April 22, Tibetan Jigme Gyatso was released from detention.

Criminal punishments continued to include "deprivation of political rights" for a fixed period after release from prison, during which time the individual is denied rights of free speech and association. Former prisoners sometimes found their status in society, ability to find employment, freedom to travel, and access to residence permits and social services severely restricted. Former political prisoners and their families frequently were subjected to police surveillance, telephone wiretaps, searches, and other forms of harassment, and some encountered difficulty obtaining or keeping employment, education, and housing.

Civil Judicial Procedures and Remedies

Courts deciding civil matters suffered from internal and external limitations on judicial independence. The State Compensation Law provides administrative and judicial remedies for deprivations of criminal rights, such as wrongful arrest or conviction, extortion of confession by torture, or unlawful use of force resulting in bodily injury. In civil matters prevailing parties often found it difficult to enforce court orders, and resistance to the enforcement sometimes extended to forcible resistance to court police.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law states that the "freedom and privacy of correspondence of citizens are protected by law"; however, in practice authorities often did not respect the privacy of citizens. Although the law requires warrants before law enforcement officials can search premises, this provision frequently was ignored; moreover, the Public Security Bureau (PSB) and prosecutors can issue search warrants on their own authority without judicial consent, review, or consideration. Cases of forced entry by police officers continued to be reported.

Authorities monitored telephone conversations, fax transmissions, e-mail, text messaging, and Internet communications. Authorities also opened and censored domestic and international mail. Security services routinely monitored and entered residences and offices to gain access to computers, telephones, and fax machines. All major hotels had a sizable internal security presence, and hotel guestrooms sometimes had concealed listening devices and were searched for sensitive or proprietary materials.

Some citizens were under heavy surveillance and routinely had their telephone calls monitored or telephone service disrupted, particularly in the XUAR and Tibetan areas. The authorities frequently warned dissidents and activists, underground religious figures, former political prisoners, and others whom the government considered to be troublemakers not to meet with foreign journalists or diplomats, especially before sensitive anniversaries, at the time of important government or party meetings, and during the visits of high-level foreign officials. Security personnel also harassed and detained the family members of political prisoners, including following them to meetings with foreign reporters and diplomats and urging them to remain silent about the cases of their relatives.

Family members of activists, dissidents, Falun Gong practitioners, journalists, unregistered religious figures, and former political prisoners were targeted for arbitrary arrest, detention, and harassment (see section 1.d.).

Forced relocation because of urban development continued and in some locations increased during the year. Protests over relocation terms or compensation were common, and some protest leaders were prosecuted. In rural areas relocation for infrastructure and commercial development projects resulted in the forced relocation of millions of persons.

The law prohibits the use of physical coercion to compel persons to submit to abortion or sterilization. However, intense pressure to meet birth limitation targets set by government regulations resulted in instances of local birth-planning officials using physical coercion to meet government goals. Such practices required the use of birth-control methods (particularly intrauterine devices and female sterilization, which according to government statistics accounted for more than 80 percent of birth-control methods employed) and the abortion of certain pregnancies.

In February, according to international media reports, three women who were acting as surrogate mothers were reportedly forced to undergo abortions in a hospital in Guangzhou.

In the case of families that already had two children, one parent was often pressured to undergo sterilization. The penalties sometimes left women with little practical choice but to undergo abortion or sterilization.

Laws and regulations forbid the termination of pregnancies based on the sex of the fetus, but because of the intersection of birth limitations with the traditional preference for male children, particularly in rural areas, many families used

**Exhibit/2011**

**9**

ultrasound technology to identify female fetuses and terminate these pregnancies. National Population and Family-planning Commission regulations ban nonmedically necessary determinations of the sex of the fetus and sex-selective abortions, but some experts believed that the penalties for violating the regulations were not severe enough to deter unlawful behavior. According to government estimates released in February 2008, the male-female sex ratio at birth was 120 to 100 at the end of 2007 (compared with norms elsewhere of between 103 and 107 to 100).

Several provinces--Anhui, Hebei, Heilongjiang, Hubei, Hunan, Jilin, Liaoning, and Ningxia--require "termination of pregnancy" if the pregnancy violates provincial family-planning regulations. An additional 10 provinces--Fujian, Guizhou, Guangdong, Gansu, Jiangxi, Qinghai, Sichuan, Shanxi, Shaanxi, and Yunnan--require unspecified "remedial measures" to deal with unauthorized pregnancies.

In July the Shanghai Population and Family-planning Commission announced plans to encourage couples to have a second child if both parents grew up as "only children."

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, although the government generally did not respect these rights in practice. The government interpreted the CCP's "leading role," as mandated in the constitution, as superseding and circumscribing these rights. The government continued to control print, broadcast, and electronic media tightly and used them to propagate government views and CCP ideology. During the year the government increased censorship and manipulation of the press and the Internet during sensitive anniversaries.

Foreign journalists were largely prevented from obtaining permits to travel to Tibet except for highly controlled press visits. While foreign journalists were allowed access to Urumqi during and after the July riots, authorities forced foreign journalists to leave other cities in the XUAR.

Media outlets received regular guidance from the Central Propaganda Department (CPC), which listed topics that should not be covered, including politically sensitive topics. After events such as the July riots or the Sichuan earthquake, media outlets were told to cover the stories using content carried by government-controlled Xinhua and China Central Television. In the period preceding the October celebration of the 60th anniversary of the founding of the PRC, authorities mandated that newspapers, magazines, and other news outlets minimize the reporting of negative stories.

The General Administration of Press and Publication; the State Administration of Radio, Film, and Television, and the CPC remained active in issuing restrictive regulations and decisions constraining the content of broadcast media.

As long as the speaker did not publish views that challenged the CCP or disseminate such views to overseas audiences, the range of permissible topics for private speech continued to expand. Political topics could be discussed privately and in small groups without punishment, and criticisms of the government were common topics of daily speech. However, public speeches, academic discussions, and speeches at meetings or in public forums covered by the media remained circumscribed, as did speeches pertaining to sensitive social topics. On May 10, 19 scholars held an unauthorized academic conference in Beijing to discuss the 1989 Tiananmen crackdown. Some participants later received warnings from their employers to cease their participation in such events. Authorities also frequently intervened to halt public speeches and lectures on sensitive political topics.

In March police detained Zhang Shijun, a former soldier who publicly expressed regret over his involvement in the Tiananmen uprising, for publishing an open letter to President Hu Jintao urging the CCP to reconsider its condemnation of the 1989 demonstrations. At year's end his whereabouts remained unknown.

In March and May, police interrogated and searched the home of Jiang Qisheng, Chinese PEN center vice president, author of a widely cited report on the Tiananmen uprising and an original signer of Charter 08.

The government also frequently monitored gatherings of intellectuals, scholars, and dissidents where political or sensitive issues were discussed. Those who aired views that disagreed with the government's position on controversial topics or disseminated such views to domestic and overseas audiences risked punishment ranging from disciplinary action at government work units to police interrogation and detention. In December 2008, to commemorate human rights day, a group of 303 intellectuals and activists released a petition entitled Charter 08, calling for human rights and democracy. Within one month more than 7,300 persons signed the petition, of whom police questioned at least 100. Many Charter 08 signers reported experiencing harassment during the year, especially around the time of sensitive anniversaries, trials, or official visits.

The CPC continued to list subjects that were off limits to the domestic media, and the government maintained authority to approve all programming. Nearly all print media, broadcast media, and book publishers were owned by, or affiliated with, the CCP or a government agency. There were a small number of privately owned print publications but no privately owned television or radio stations.

Exhibit /2011
10

International media were not allowed to operate freely and faced heavy restrictions. In February two *New York Times* reporters were detained for 20 hours after police stopped their car in a Tibetan area of Gansu Province. Authorities made the two spend the night in Lanzhou, the provincial capital, and eventually forced them to return to Beijing. In April reporters with the Voice of America (VOA) were detained for two hours in Sichuan Province before being told that they could not proceed farther. Local authorities first told them that it was illegal for tourists to visit the area and later told them they could not proceed because of "hazardous road conditions."

In May a *Financial Times* correspondent reporting in Mianzhu on families who lost children during the Sichuan earthquake was followed to an interview and attacked by unknown assailants who tried to take his camera. When police arrived, they also tried to take his video camera by force. Also in May on three separate occasions, foreign reporters were attacked while filming in Sichuan.

Authorities barred foreign journalists from filming in, or entering, Tiananmen Square during the 20th anniversary of the crackdown on prodemocracy demonstrations. On July 10, police detained and departed an Associated Press photographer for taking pictures in Kashgar. In September police broke into the hotel room of three journalists from *Kyodo News* covering a National Day parade rehearsal, beat them, and destroyed their computers. On September 4, antiriot police beat three Hong Kong reporters in Urumqi. Five other Hong Kong reporters were briefly detained the same day in Urumqi to prevent them from filming protests.

In July the Foreign Correspondent's Club of China (FCCC) polled its members about reporting conditions following the 2008 Olympics. FCCC members reported 23 incidents of violence against reporters, sources, or assistants, along with multiple incidents of destruction of photographs or reporting materials, intimidation, and summoning for questioning by authorities. They also reported 100 incidents of being denied access to public spaces by authorities.

The government refused to grant a visa to a foreign journalist who was planning to serve as the newspapers' new bureau chief in Beijing.

Authorities tightened restrictions on citizens working as assistants for foreign news bureaus. In February the government issued a code of conduct for news assistants of foreign correspondents. The code threatens dismissal and loss of accreditation if news assistants engage in "independent reporting" and instructs them to provide their employers with information that projects a good image of the country. The FCCC denounced the code of conduct as part of a government effort to intimidate news assistants.

Officials can be punished for unauthorized contact with journalists. Editors and journalists continued to practice self-censorship as the primary means for the party to limit freedom of the press on a day-to-day basis. Official guidance on permitted speech was often vague, subject to change at the whim of propaganda officials, and retroactively enforced. Propaganda authorities can force newspapers to fire editors and journalists who print articles that conflict with official views and can suspend or close publications. The system of postpublication punishment encourages editors to take a conservative approach, since a publication could face enormous business losses if it were suspended for inadvertently printing forbidden content.

Government officials used criminal prosecution, civil lawsuits, and other punishments, including violence, detention, and other forms of harassment, to intimidate authors and domestic journalists and block controversial writings. In June police arrested writer, former Tiananmen prisoner, and dissident Wu Gaoxing for publishing a letter asserting that former Tiananmen prisoners were facing economic hardships because of their past political troubles.

A domestic journalist can face demotion or job loss for publishing views that challenge the government.

Journalists who remained in prison included Lu Gengsong, Lu Jianhua, Huang Jinqiu, Cheng Yizhong, and Shi Tao. On February 10, Yu Huafeng was released from prison.

Journalists and editors who exposed corruption scandals frequently faced problems with the authorities. In May officials in Hubei physically assaulted two reporters, Kong Pu from the *Beijing Times* and Wei Yi from the *Nangfang People's Weekly*, as they researched a story of a waitress who killed a party official when he attempted to assault her.

According to an official report, during the year authorities confiscated more than 65 million copies of pornographic, pirated, and unauthorized publications. Officials continued to censor, ban, and sanction reporting on labor, health, environmental crises, and industrial accidents. Authorities restricted reporting on stories such as the melamine milk scandal, schools destroyed during the Sichuan earthquake, and the July riots in Urumqi. Authorities also continued to ban books with content they deemed controversial.

The law permits only government-approved publishing houses to print books. The State Press and Publications Administration (PPA) controlled all licenses to publish. No newspaper, periodical, book, audio, video, or electronic publication may be printed or distributed without the PPA and relevant provincial publishing authorities' approval of both the printer and distributor. Individuals who attempted to publish without government approval faced imprisonment, fines, confiscation of their books, and other sanctions. The CCP exerted control over the publishing industry by preemptively

classifying certain topics as off limits.

Many intellectuals and scholars exercised self-censorship, anticipating that books or papers on political topics would be deemed too sensitive to be published. The censorship process for private and government media also increasingly relied on self-censorship and, in a few cases, postpublication sanctions.

According to the PEN American Center, Korash Huseyin, former editor of the Uighur-language *Kashgar Literature Journal*, was released in 2008, but his whereabouts were unknown. Korash Huseyin, who was sentenced in 2004 to three years in prison for publishing a short story that authorities considered critical of CCP rule of Xinjiang, remained in prison serving a 10-year sentence.

The authorities continued to jam, with varying degrees of success, Chinese-, Uighur-, and Tibetan-language broadcasts of the VOA, BBC, and RFA. English-language broadcasts on VOA generally were not jammed. Government jamming of RFA and BBC appeared to be more frequent and effective. Internet distribution of streaming radio news and podcasts from these sources often was blocked. Despite jamming overseas broadcasts, VOA, BBC, RFA, Deutsche Welle, and Radio France International had large audiences, including human rights advocates, ordinary citizens, and government officials.

Television broadcasts of foreign news, which were largely restricted to hotels and foreign residence compounds, were occasionally subject to censorship. Such censorship of foreign broadcasts also occurred around the anniversary of the 1989 crackdown in Tiananmen Square. Individual issues of foreign newspapers and magazines were occasionally banned when they contained articles deemed too sensitive.

Politically sensitive coverage in Chinese, and to a lesser extent in English, was censored more than coverage in other languages. The government prohibited some foreign and domestic films deemed too sensitive.

Internet Freedom

During the year the China Internet Network Information Center reported that the number of Internet users increased to 338 million, 94 percent of whom had broadband access. The government increased its efforts to monitor Internet use, control content, restrict information, block access to foreign and domestic Web sites, encourage self-censorship, and punish those who violated regulations, but these measures were not universally effective.

The MPS, which monitors the Internet under guidance from the CPC, employed thousands of persons at the national, provincial, and local levels to monitor electronic communications. Xinhua News Agency reported that in 2008, authorities closed 14,000 illegal Web sites and deleted more than 490,000 items of "harmful" content from the Internet. In January the government began an "antivulgarity" campaign aimed at cracking down on "unhealthy information" on the Internet. In January official media claimed that the campaign had resulted in the closure of 1,250 Web sites and the deletion of more than 3.2 million items of information. Many Web sites included images of cartoon police officers that warn users to stay away from forbidden content. Operators of Web portals, blog-hosting services, and other content providers engaged in self-censorship to ensure their servers were free from politically sensitive content. Domestic Web sites that refused to self-censor political content were shut down, and many foreign Web sites were blocked.

During the year major news portals, which reportedly were complying with secret government orders, began requiring users to register using their real names and identification numbers to comment on news articles. Individuals using the Internet in public libraries were required to register using their national identity card. Internet usage reportedly was monitored at all terminals in public libraries. Internet cafes were required to install software that allows government officials to monitor customers' Internet usage. Internet users at cafes were often subject to surveillance. Many cafes sporadically enforced regulations requiring patrons to provide identification. In June the Ministry of Industry and Information Technology issued a directive instructing Internet cafes and schools to install "Green Dam" software designed to censor objectionable Internet content based on an updatable central database. The software had been intended for installation in all computers sold in the country; however, objections from industry groups, Internet users, and foreign governments appeared to contribute to the indefinite postponement of enforcement of the directive.

The government consistently blocked access to Web sites it deemed controversial, especially those discussing Taiwan and Tibetan independence, underground religious and spiritual organizations, democracy activists, and the 1989 Tiananmen crackdown. The government also at times blocked access to selected sites operated by major foreign news outlets, health organizations, foreign governments, educational institutions, and social networking sites, as well as search engines, that allow rapid communication or organization of users.

During the year, particularly during periods around sensitive events, authorities maintained tight control over Internet news and information. Access to foreign and domestic social networking sites was limited around the 20th anniversary of the Tiananmen crackdown and immediately following the July unrest in the XUAR, and many sites remained blocked during other major events. In the wake of the deadly July riots in Urumqi, the government asserted that information spread on the Internet contributed to the violence, resulting in the complete shutdown of all Internet access, text messaging, and international telephone calls from the region. At the end of the year, international calls, full Internet access, and text messaging capabilities remained limited.

Authorities employed an array of technical measures to block sensitive Web sites based in foreign countries. The ability of users to access such sensitive sites varied from city to city. The government also automatically censored e-mail and Web chats based on an ever-changing list of sensitive key words, such as "Falun Gong" and "Tibetan Independence." While such censorship was effective in keeping casual users away from sensitive content, it was defeated easily through the use of various technologies. Software for defeating official censorship was readily available inside the country. Despite official monitoring and censorship, during the year dissidents and political activists continued to use the Internet to advocate and call attention to political causes such as prisoner advocacy, political reform, ethnic discrimination, corruption, and foreign policy concerns. Web users spanning the political spectrum complained of censorship. The blogs of a number of prominent activists, artists, scholars, and university professors were periodically blocked during the year.

Given the limitations of technical censorship, self-censorship by Internet companies remained the primary means for authorities to restrict speech online. All Web sites are required to be licensed by, or registered with, the Ministry of Industry and Information Technology, and all Internet content providers faced potential suspension of their licenses for failing to adequately monitor users of e-mail, chat rooms, and instant messaging services. The Internet Society of China, a group composed of private and state-run Internet companies, government offices, and academic institutions, cosponsored a Web site, China Internet Illegal Information Reporting Centre, which invited members of the public to report illegal online activity. Users were able to use the site to report not only crimes such as pornography, fraud, and gambling but also "attacks on the party and government." Self-censorship by blog-hosting services intensified prior to sensitive events.

Authorities continued to jail numerous Internet writers for peaceful expression of political views. In July Wu Baoquan was sentenced to 18 months in prison for posting articles critical of the local government of the northern region of Inner Mongolia. In September the court convicted Wu of libel for publicizing the efforts of farmers who fought local officials over land rights.

Also in July three bloggers—Fan Yanqiong, Wu Huaying, and You Jingyou—were charged with "false allegations with intent to harm" for reporting that a young woman was raped and killed by a group of men that included local officials.

On November 12, authorities sentenced Kunchok Tsephel, literary Web site editor and founder of Chodme (tibetcm.com), to 15 years in prison on a charge of "divulging state secrets" in connection with some of the Web site's content. On November 14, a court in Gansu Province sentenced Kunga Tseyang to five years in prison. Police arrested Tseyang (pen name Snow Sun) on March 17 for articles he posted on a Tibetan Web site.

In November 2008 Chen Daojun, an Internet writer and environmental activist, was sentenced to three years in prison for "inciting subversion of state power." Chen was arrested after he participated in an environmental protest and posted articles online supportive of Tibetan demonstrators. According to Chen's lawyer, three of his articles were submitted as evidence that he had attacked the CCP.

In January blogger Jia Xiaoyin was released from prison after six months in detention. On April 18, authorities released Internet writer Zhu Yufu from prison. In August blogger Guo Baofeng, known online as Amoibt, was released from prison after his announcement of his own arrest on the social networking site Twitter sparked a letter-writing campaign calling for his release.

According to Reporters Without Borders, at year's end there were 30 reporters and 68 cyberdissidents in prison.

Regulations prohibit a broad range of activities that authorities interpret as subversive or slanderous to the state. Internet service providers were instructed to use only domestic media-news postings, to record information useful for tracking users and their viewing habits, to install software capable of copying e-mails, and to end immediately transmission of "subversive material."

Academic Freedom and Cultural Events

The government continued its restrictions on academic or artistic freedom and political and social discourse at colleges, universities, and research institutes.

Authorities canceled university conferences and speaking events involving foreign and domestic academics on short notice when they deemed the topics too sensitive or the timing too close to a sensitive date. Information outreach, educational exchanges, and other cultural and public diplomacy programs organized by foreign governments occasionally were subject to government interference. Foreign experts invited to participate in foreign-government-sponsored programs on certain topics were denied visas. Central or provincial authorities disciplined university administrators for showing the film *Please Vote for Me* by Chen Weijun in May, a film on student elections in a third-grade class in Wuhan.

In September the government denied visa applications from two foreign filmmakers, preventing them from participating in panels and attending the screening of their documentary about the Sichuan earthquake at the Beijing Independent Film Festival. Festival organizers invited the pair as headliners for the festival but delayed publication of the exact location of the screening until only hours before the event in an effort to minimize the possibility of interference from security officials.

Exhibit A
13

During the year the government imposed new restrictions on cultural expression and banned artists it deemed controversial. The government continued to use political attitudes and affiliations as criteria for selecting persons for the few government-sponsored study-abroad programs but did not impose such restrictions on privately sponsored students. The government and the party controlled the appointment of high-level officials at universities. While party membership was not always a requirement to obtain a tenured faculty position, scholars without party affiliation often had fewer chances for promotion.

Researchers residing abroad were subject to sanctions, including denial of visas, when their work did not meet with official approval.

### b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of peaceful assembly; however, the government severely restricted this right in practice. The law stipulates that such activities may not challenge "party leadership" or infringe upon the "interests of the state." Protests against the political system or national leaders were prohibited. Authorities denied permits and quickly suppressed demonstrations involving expression of dissenting political views.

In May parents of Sichuan earthquake victims were told not to gather at the sites of destroyed schools for a memorial service. Those who planned to mark the anniversary of the earthquake were reportedly detained or threatened with detention. In June authorities prevented several Tiananmen mothers, including Ding Zilin, from joining memorial services or otherwise marking the date when their children died; plainclothes officers reportedly followed Ding and her husband to ensure compliance. In September there were several reports of parents being detained or otherwise prevented from gathering to commemorate the anniversary of the melamine milk scandal.

All concerts, sports events, exercise classes, or other meetings of more than 200 persons require approval from public security authorities. Although peaceful protests are legal, in practice police rarely granted approval. Despite restrictions, there were many demonstrations, but those with political or social themes were broken up quickly, sometimes with excessive force. The number of "mass incidents" or violent protests against local government increased during the year. As in past years, the vast majority of demonstrations concerned land disputes; housing issues; industrial, environmental, and labor matters; government corruption; taxation; and other economic and social concerns. Others were provoked by accidents or related to personal petition, administrative litigation, and other legal processes.

The ability of an individual to petition the government is protected by law; however, persons petitioning the government continued to face restrictions on their rights to assemble and raise grievances. Most petitions addressed grievances about land, housing, entitlements, the environment, or corruption. Most petitioners sought to present their complaints at national and provincial "letters and visits" offices. In September three dozen parents reportedly gathered in Beijing to draw attention to their belief that unsafe vaccines sickened their children. Local officials forcibly returned them to their hometowns.

Although regulations banned retaliation against petitioners, reports of retaliation continued. This was partly due to incentives provided to local officials by the central government to prevent petitioners in their regions from raising complaints to higher levels. Incentives included provincial cadre evaluations based in part on the number of petitions from their provinces. This initiative aimed to encourage local and provincial officials to resolve legitimate complaints but also resulted in local officials sending security personnel to Beijing and forcibly returning the petitioners to their home provinces. Such detentions occurred before and after the enactment of the new regulations and often went unrecorded. In August the General Office of the State Council issued new guidelines for handling petitioners. According to the new rules, officials are to be sent from Beijing to the provinces to resolve petition issues locally, thereby reducing the number of petitioners entering Beijing. Other new rules include a mandated 60-day response time for petitions and a regulation instituting a single appeal in each case.

Freedom of Association

The law provides for freedom of association, but the government restricted this right in practice. CCP policy and government regulations require that all professional, social, and economic organizations officially register with, and be approved by, the government. In practice these regulations prevented the formation of truly autonomous political, human rights, religious, spiritual, labor, and other organizations that might challenge government authority.

The government maintained tight controls over civil society organizations. Legal and surveillance efforts aimed at controlling them increased. There were reports that the government maintained a task force aimed at blocking political change advocated by NGOs involved in social, political, and charitable activities, and also by groups dedicated to combating discrimination against women, persons with disabilities, and minorities.

To register, an NGO must find a government agency to serve as its organizational sponsor, have a registered office, and hold a minimum amount of funds. Some organizations with social or educational purposes that previously had been

Exhibit A
14

registered as private or for-profit businesses reportedly were requested to find a government sponsor and reregister as NGOs during the year. Although registered organizations all came under some degree of government control, some NGOs were able to operate with some degree of independence.

The number of NGOs continued to grow, despite tight restrictions and regulations. According to the World Bank, at year's end there were more than 415,000 officially registered civil society organizations. NGOs existed under a variety of formal and informal guises, including national mass organizations created and funded by the CCP.

The lack of legal registration created numerous logistical challenges for NGOs, including difficulty opening bank accounts, hiring workers, and renting office space. NGOs that opted not to partner with government agencies could register as commercial consulting companies, which allowed them to obtain legal recognition at the cost of forgoing tax-free status. Security authorities routinely warned domestic NGOs, regardless of their registration status, not to accept donations from the National Endowment for Democracy and other international organizations deemed sensitive by the government. Authorities supported the growth of some NGOs that focused on social problems, such as poverty alleviation and disaster relief but remained concerned that these organizations might emerge as a source of political opposition. Many NGOs working in the Tibet Autonomous Region (TAR) were forced to leave because their project agreements were not renewed by their local partners following unrest in Lhasa and other Tibetan communities in March 2008.

On July 29, officials arrested Xu Zhiyong, cofounder of the Open Constitution Initiative (OCI, or Gongmeng), a civil society organization and legal research center, on accusations of tax evasion. Media reports suggested he was arrested because of his legal work on behalf of families affected by the melamine-tainted milk scandal. Officials also raided the OCI's offices, seized equipment, and ordered the OCI to close. On August 23, after a public outcry, Xu and an OCI office assistant were released from jail on bail.

No laws or regulations specifically govern the formation of political parties. However, the CDP remained banned, and the government continued to monitor, detain, and imprison current and former CDP members.

c. Freedom of Religion

The constitution and laws provide for freedom of religious belief and the freedom not to believe. The constitution limits protection of religious activities to those the government defined as "normal." The constitution states that religious bodies and affairs are not to be "subject to any foreign domination" and that the individual exercise of rights "may not infringe upon the interests of the state."

The government continued to strictly control religious practice and repress religious activity outside government-sanctioned organizations and registered places of worship. The government controlled the growth and scope of the activity of both registered and unregistered religious groups, including house churches. Government authorities limited proselytizing, particularly by foreigners and unregistered religious groups, but permitted proselytizing in state-approved religious venues and private settings. Throughout the country foreign citizens' participation in religious activities was viewed by the government as highly suspect and, in some cases, led to repercussions against both Chinese citizens and foreign citizens.

Religious groups are regulated by the 2005 Regulations on Religious Affairs, which indicate that the State Administration for Religious Affairs (SARA) or the religious affairs bureaus (RABs) supervise all religious activities. To be considered legal, religious groups must register with a government-affiliated patriotic religious association (PRA) associated with one of the five recognized religions: Buddhism, Taoism, Islam, Protestantism, and Catholicism. Religious groups must register according to the Regulations on Social Organizations (RSO), which specifies that organizations must find a supervisory unit to sponsor their application. Religious groups that register under the RSO need to obtain the sponsorship of SARA or the RABs. The PRAs supervised activities of each religious group and liaised with government religious affairs authorities charged with monitoring religious activity. Government efforts to control and regulate religious groups, particularly unregistered groups, continued. Nonetheless, freedom to participate in religious activities continued to increase in many areas. Religious participation grew not only among the five main religions but also among the Eastern Orthodox Church and folk religions. Because the RSO states no organization may be registered in the same area if another organization is already performing similar work, no religious groups other than the five PRAs have registered at the national level. Unregistered groups reported that local RABs also would not approve registration applications without support from the relevant PRA.

Several large house churches reported increased government interference with their activities in periods preceding sensitive anniversaries. In Beijing the government reportedly pressured landlords to stop renting space to house church groups. During an outdoor worship service, authorities reportedly conducted surveillance, used loudspeakers to warn against unauthorized public gatherings, detained church leaders to prevent them from attending services, and closed public parks to dissuade the groups from gathering.

In September in Shanxi Province, members of the Linfen house church and police were involved in a confrontation over the demolition of a church building. Five church leaders were charged with "disrupting public order" and sentenced to between two and three years of RTL.

Exhibit/2011
15

On March 5, Premier Wen Jiabao delivered a government report stating, "We will fully implement the party's basic principles on work related to religions and enable religious figures and people with religious belief to play a positive role in promoting economic and social development." The work of faith-based organizations became more visible during and after the Sichuan earthquake of May 2008. Nevertheless, leaders of such organizations reported that, due to the continued lack of official registration, they were not allowed to fundraise publicly, hire employees, or open bank accounts.

The government's repression of religious freedom continued in Tibetan areas and intensified in the XUAR. Followers of Tibetan Buddhism, including those in the Inner Mongolian Autonomous Region and most Tibetan autonomous areas, faced more restrictions on their religious practice and ability to organize than Buddhists in other parts of the country. However, Buddhist communities outside of Tibet also faced continued government controls, and unregistered Buddhist temples remained subject to closure or demolition. The Tibetan Buddhist Labrang Monastery, in Gansu Province, was closed to foreign visitors for several months following 2008 unrest in and around the monastery. A heavy security presence remained in this and other Tibetan Buddhist monastery areas.

In the XUAR the government often conflated peaceful religious and political expression with the "three evils" of religious extremism, terrorism, and separatism. Government policies that repressed religious activities included surveillance in mosques, regulation of sermons, and public admonishments against and punishment of individuals engaging in "illegal religious activities."

In August 2008 authorities in Kashgar reportedly issued accountability measures to local officials who were responsible for high-level surveillance of religious activity in the XUAR. Also in August 2008 in Kashgar District, authorities called for "enhancing management" of groups that included religious figures, as part of broader measures of "prevention" and "attack." On December 29, the official XUAR government Web site announced that a new law on "education for ethnic unity in Xinjiang" had been adopted at a local legislature session. The law reportedly bars individuals and organizations from spreading opinions deemed not conducive to national unity and also from gathering, producing, and spreading information to that effect.

XUAR authorities maintained the most severe legal restrictions in the country on children's right to practice religion. Authorities continued to prohibit the teaching of Islam outside the home to elementary- and middle-school-age children in some areas, and children under the age of 18 were prohibited from entering mosques in some areas.

Authorities reserved the right to censor imams' sermons, and imams were urged to emphasize the damage caused to Islam by terrorist acts in the name of the religion. Certain Muslim leaders received particularly harsh treatment. Authorities in some areas conducted monthly political study sessions for religious personnel, which, according to one CCP official who took part in a study session, called for "creatively interpreting and improving" religious doctrine. Authorities also reportedly tried to restrict Muslims' opportunities to study religion overseas. The China Islamic Conference required religious personnel to study "new collected sermons" compiled by the Muslim PRA, the Islamic Association of China, including messages on patriotism and unity aimed at building a "socialist harmonious society." In contrast to the heavy-handed approach to Muslims in the XUAR, officials in Ningxia, Gansu, Qinghai, and Yunnan provinces generally did not interfere heavily in Muslims' activities.

On October 27, a Xinjiang court sentenced Uighur Christian house church leader Alimujiang Yimiti to 15 years in prison on charges of "divulging state secrets." Yimiti was originally accused of engaging in illegal religious activities in the name of business and preaching Christianity to ethnic Uighurs, according to an overseas NGO. At year's end his case was on appeal. In 2008 the Kashgar District Intermediate People's Court tried Yimiti on the charge of endangering national security but eventually returned his case to prosecutors due to insufficient evidence. The UN Working Group on Arbitrary Detention declared Yimiti's arrest and detention arbitrary in 2008.

Harassment of unregistered Catholic bishops, priests, and laypersons continued, including government surveillance and detentions. On March 31, Bishop Jia Zhiguo was arrested again. At year's end his whereabouts were unknown. There was no new information about unregistered Bishop Su Zhimin, who remained unaccounted for since his reported detention in 1997.

The Catholic Patriotic Association (CPA) did not recognize the authority of the Holy See to appoint bishops. However, it allowed the Vatican's discreet input in selecting some bishops.

The distinction between the official Catholic Church, which the government controlled politically, and the unregistered Catholic Church was less distinct than in the past. In some official Catholic churches, clerics led prayers for the pope, and pictures of the pope were displayed. An estimated 90 percent of official Catholic bishops have reconciled with the Vatican. Likewise, the large majority of Catholic bishops appointed by the government have received official approval from the Vatican through "apostolic mandates."

Authorities continued a general crackdown on groups considered to be "cults." These "cults" included not only Falun Gong and various traditional Chinese meditation and exercise groups (known collectively as "qigong" groups) but also religious groups that authorities accused of preaching beliefs outside the bounds of officially approved doctrine.

Public Falun Gong activity in the country remained negligible, and practitioners based abroad reported that the
government's crackdown against the group continued. In the past the mere belief in the discipline (even without any public
practice of its tenets) sometimes was sufficient grounds for practitioners to receive punishments ranging from loss of
employment to imprisonment. Falun Gong sources estimated that since 1999 at least 6,000 Falun Gong practitioners had
been sentenced to prison, more than 100,000 practitioners had been sentenced to RTL, and almost 3,000 had died from
torture while in custody. Some foreign observers estimated that Falun Gong adherents constituted at least half of the
250,000 officially recorded inmates in RTL camps, while Falun Gong sources overseas placed the number even higher.

Falun Gong members identified by the government as "core leaders" were singled out for particularly harsh treatment.
More than a dozen Falun Gong members were sentenced to prison for the crime of "endangering state security," but the
great majority of Falun Gong members convicted by the courts since 1999 were sentenced to prison for "organizing or
using a sect to undermine the implementation of the law," a less serious offense. Most practitioners, however, were
punished administratively. Some practitioners were sentenced to RTL. Others were sent to "legal education" centers
specifically established to "rehabilitate" practitioners who refused to recant their belief in public after their
release from RTL camps. Government officials denied the existence of such "legal education" centers. In addition,
hundreds of Falun Gong practitioners were confined in mental hospitals, according to overseas groups.

Police continued to detain current and former Falun Gong practitioners and used possession of Falun Gong material as a
pretext for arresting political activists. The government continued its use of high-pressure tactics and mandatory anti-Falun
Gong study sessions to force practitioners to renounce Falun Gong. Even practitioners who had not protested or made
other public demonstrations of belief reportedly were forced to attend anti-Falun Gong classes or were sent directly to RTL
camps. These tactics reportedly resulted in large numbers of practitioners signing pledges to renounce the movement.

The government supported atheism in schools. Authorities in many regions barred school-age children from attending
religious services at mosques, temples, or churches and prevented them from receiving religious education outside the
home.

Official religious organizations administered local religious schools, seminaries, and institutes to train priests, ministers,
imams, Islamic scholars, and Buddhist monks. Students who attended these institutes had to demonstrate "political
reliability," and all graduates had to pass an examination on their political, as well as theological, knowledge to qualify for
the clergy. The government permitted registered religions to train clergy and allowed an increasing number of Catholic and
Protestant seminarians, Muslim clerics, and Buddhist clergy to go abroad for additional religious studies, but some religion
students had difficulty getting passports or obtaining approval to study abroad. In most cases foreign organizations
provided funding for such training programs.

The five PRAs published religious literature, and state-run publishing houses published religious materials. However,
printing of the Bible was limited to Amity Press and a few presses affiliated with CPA dioceses that published the
Catholic Bible. Bibles produced through these means could be purchased at Three-Self Patriotic Movement or CPA
churches. The government authorized publishers (other than Amity Press) to publish at least a thousand other Christian
titles. Amity has published more than 50 million Bibles for Chinese readership and distributed them through a network of
70 urban distribution points and a mobile distribution network that traveled to rural areas. Increased demand for Bibles and
other Christian literature was noted by groups that print, buy, and sell Bibles, and members of unregistered churches
reported that the supply and distribution of Bibles was inadequate, particularly in rural locations. Individuals could not order
Bibles directly from publishing houses. Customs officials continued to monitor for the "smuggling" of religious materials
into the country. In recent years individuals were imprisoned for printing and receiving unauthorized Bibles. Authorities in
some areas reportedly confiscated Bibles, Korans, and other religious material. In June Shi Weihan was sentenced to
three years in prison for "illegal business practices" (printing Bibles). The Xinjiang People's Publication House was the only
publisher officially permitted to print Muslim literature.

Societal Abuses and Discrimination

There were no reports of societal abuses of religious practitioners or anti-Semitic acts during the year. The government
does not recognize Judaism as an ethnicity or religion.

For a more detailed discussion, see the 2009 International Religious Freedom Report at
http://www.state.gov/g/drl/rls/irf/.

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of movement within the country, foreign travel, emigration, and repatriation; however, the
government generally did not respect these rights in practice. The government sometimes cooperated with the UNHCR in
providing protection and assistance to refugees, asylum seekers, and other persons of concern.

Authorities heightened restrictions on freedom of movement periodically, particularly to curtail the movement of individuals
deemed politically sensitive before key anniversaries and visits of foreign dignitaries and to forestall demonstrations.
Freedom of movement continued to be extremely limited in the TAR and other Tibetan areas. Police maintained

Exhibit A
17

checkpoints in most counties and on roads leading into many towns, as well as within major cities such as Lhasa.

Although the government maintained restrictions on the freedom to change one's workplace or residence, the national household registration system ("hukou") continued to change, and the ability of most citizens to move within the country to work and live continued to expand. Rural residents continued to migrate to the cities, where the per capita disposable income was more than four times the rural per capita income, but many could not officially change their residence or workplace within the country. Most cities had annual quotas for the number of new temporary residence permits that could be issued, and all workers, including university graduates, had to compete for a limited number of such permits. It was particularly difficult for rural residents to obtain household registration in more-economically developed urban areas.

The household registration system added to the difficulties rural residents faced even after they relocated to urban areas and found employment. The National Bureau of Statistics reported that there were 225 million migrant workers at the end of 2008. These economic migrants lacked official residence status in cities, and it was difficult for them to gain full access to social services, including education, despite laws, regulations, and programs meant to address their needs. Migrant workers had little recourse when subject to abuse by employers and officials. Some major cities maintained programs to provide migrant workers and their children access to public education and other social services free of charge, but migrants in some locations reported that it was difficult to qualify for these benefits in practice.

Under the "staying at prison employment" system applicable to recidivists incarcerated in RTL camps, authorities denied certain persons permission to return to their homes after serving their sentences. Some released or paroled prisoners returned home, but they were not permitted freedom of movement.

The government permitted legal emigration and foreign travel for most citizens. There were reports that some academics and activists continued to face travel restrictions around sensitive anniversaries. Most citizens could obtain passports, although those whom the government deemed threats, including religious leaders, political dissidents, and ethnic minorities, were refused passports or otherwise prevented from traveling overseas. In July Tsering Woeser, a well-known Tibetan writer, filed a lawsuit against the government for denying her a passport for more than three years. At year's end she had not received a passport. In Tibetan regions of Qinghai, Gansu, and Sichuan provinces, in addition to the TAR, ethnic Tibetans experienced great difficult applying for passports. The unwillingness of the PSB in Tibetan areas to issue or renew passports for ethnic Tibetans created, in effect, a ban on foreign travel for a large segment of the Tibetan population. Han residents of Tibetan areas, however, did not experience the same difficulties.

The law neither provides for a citizen's right to repatriate nor otherwise addresses exile. The government continued to refuse reentry to numerous citizens who were considered dissidents, Falun Gong activists, or troublemakers. Although some dissidents living abroad were allowed to return, dissidents released on medical parole and allowed to leave the country often were effectively exiled. Activists residing abroad were imprisoned upon their return to the country.

On December 19, the Royal Government of Cambodia, at the request of PRC authorities, forcibly returned a group of 20 Uighur asylum seekers to the country.

The government continued to try to prevent many Tibetans from leaving and detained many who were apprehended in flight (see Tibet Addendum). By year's end 838 Tibetans had arrived at the UNHCR reception center in Kathmandu. The biggest disparities in arrivals occurred during the heavily trafficked fall and winter months when border security historically was weak. Decreased flows were attributed to tightened security across Tibet, along the border and inland, in the wake of the Lhasa crackdown in March 2008.

Protection of Refugees

Although the country is a party to the 1951 Convention relating to the Status of Refugees and its 1967 protocol, the law does not provide for the granting of refugee or asylum status. The government largely cooperated with the UNHCR when dealing with the resettlement of ethnic Han Chinese or ethnic minorities from Vietnam and Laos resident in the country. During the year the government and the UNHCR continued discussions concerning the granting of citizenship to these residents.

While the government officially acknowledged that 37,000 residents of Kokang, in northeastern Burma, fled across the border into Yunnan during the Burmese army crackdown in August, they were not officially designated as refugees. The government did not respond to a UNHCR request for access to the border areas.

The government continued to consider all North Koreans "economic migrants" rather than refugees, and the UNHCR continued to have limited access to North Korean refugees inside China. The lack of access to UNHCR-supported durable solutions and options, as well as constant fear of forced repatriation by authorities, left North Korean refugees vulnerable to human traffickers. Even refugees under UNHCR care were subjected to harassment and restrictions by authorities. The government continued to deny the UNHCR permission to operate along its northeastern border with North Korea.

In practice the government did not provide protection against the expulsion or return of refugees to countries where their lives or freedom would be threatened on account of their race, religion, nationality, membership in a particular social

group, or political opinion. Some North Koreans were permitted to travel to third countries after they entered diplomatic compounds in the country. The intensified crackdown begun in 2008 against North Korean refugees reportedly extended to harassment of religious communities along the border. The undocumented children of some North Korean asylum seekers and of mixed couples (i.e., one Chinese parent and one North Korean parent) reportedly did not have access to health care, public education, or other social services. The government also arrested and detained individuals who provided food, shelter, transportation, and other assistance to North Koreans. According to reports, some activists or brokers detained for assisting North Koreans were charged with human smuggling, and in some cases the North Koreans were forcibly returned to North Korea. There were also reports that North Korean agents operated clandestinely within the country to forcibly repatriate North Korean citizens.

The government does not grant refugee or asylum status to refugees in China, although it allows the UNHCR more latitude in assisting non-North Korean refugees. At year's end UNHCR Beijing had processed refugee claims for approximately 100 non-North Korean refugees in China (from Pakistan, Iraq, Somalia, and Eritrea). However, because these individuals were not officially recognized refugees, they remained in the country as illegal immigrants unable to work, with no access to education, and deportable by the host government at anytime.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The constitution states that "all power in the People's Republic of China belongs to the people" and that the organs through which the people exercise state power are the NPC and the people's congresses at provincial, district, and local levels. However, the law does not provide citizens with the right to change their government peacefully, and citizens cannot freely choose or change the laws and officials that govern them. The CCP continued to control appointments to positions of political power.

Elections and Political Participation

According to the law, the NPC is the highest organ of state power. Formally, the NPC, composed of 2,987 deputies, elects the president and vice president, the premier and vice premiers, and the chairman of the State Central Military Commission. In practice the NPC Standing Committee, which is composed of 175 members, oversaw these elections and determined the agenda and procedure for the NPC.

The NPC Standing Committee remained under the direct authority of the party, and most legislative decisions require the concurrence of the CCP's nine-member Politburo Standing Committee. Despite its broad authority under the state constitution, the NPC does not set policy independently or remove political leaders without the party's approval.

According to statistics from the Ministry of Civil Affairs, almost all of the country's more than 600,000 villages had implemented direct elections for members of local subgovernment organizations known as village committees. The direct election of officials by ordinary citizens remained narrow in scope and strictly confined to the local level. The government estimated that one-third of all elections had serious procedural flaws. Corruption, vote buying, and interference by township-level and party officials continued to be problems. The law permits each voter to cast proxy votes for up to three other voters.

The election law governs legislative bodies at all levels. Under this law citizens have the opportunity to vote for local people's congress representatives at the county level and below, although in most cases the nomination of candidates in those elections was controlled by higher-level government officials or party cadres. At higher levels legislators selected people's congress delegates from among their ranks. For example, provincial-level people's congresses selected delegates to the NPC. Local CCP secretaries generally served concurrently as the head of the local people's congress, thus strengthening party control over legislatures.

Official statements asserted that "the political party system [that] China has adopted is multiparty cooperation and political consultation under" the CCP leadership. However, the CCP retained a monopoly on political power, and the government forbade the creation of new political parties. The government recognized nine parties founded prior to 1949, and 30 percent of NPC seats were held by parties other than the CCP. The establishment of new parties is functionally prohibited, and activists attempting to support unofficial parties have been arrested, detained, or confined.

On September 15, in Hunan Province, dissident Xie Changfa, who tried to organize a national meeting of the banned China Democratic Party, was sentenced to 13 years in prison. On October 16, after spending nine months in prison, Guo Quan was sentenced to 10 years in prison and 3 years of deprivation of political rights for "subversion of state power." Guo, a former Nanjing University professor and founder of the China New Democracy Party, published articles criticizing the country's one-party system. One of the CDP's founders, Qin Yongmin, who was imprisoned in 1998, remained in prison, as did others connected with a 2002 open letter calling for political reform and reappraisal of the 1989 Tiananmen uprising. More than 30 current or former CDP members reportedly remained imprisoned or held in RTL camps, including Chen Shuqing, Sang Jiancheng, He Depu, Yang Tianshui, and Jiang Lijun. In January CDP member Wang Rongqing was sentenced to six years' imprisonment for "subversion against the state" after publishing articles critical of the political system. In August CDP member Zhang Lin was released from prison.

The government placed no special restrictions on the participation of women or minority groups in the political process. However, women held few positions of significant influence in the CCP or government structure. There was one female member of the CCP's 25-member Politburo, who also concurrently served as one of five state councilors. Women headed three of the country's 27 ministries.

The government encouraged women to exercise their right to vote in village committee elections and to run in those elections, although only a small fraction of elected members were women. In many locations a seat on the village committee was reserved for a woman, usually given responsibility for family planning.

Minorities, who made up approximately 8.4 percent of the population, constituted 13.9 percent of the 10th NPC. All of the country's officially recognized minority groups were represented in the NPC membership. The 17th Communist Party Congress elected 40 members of ethnic minority groups as members or alternates on the Central Committee. The only ministerial-level post held by an ethnic minority member was in the Commission of Ethnic Affairs, headed by Yang Jing, a Mongol from Inner Mongolia. In addition, there was one ethnic minority member, Vice Premier Hui Liangyu, of the Hui ethnic group, on the Politburo. Minorities held few senior party or government positions of significant influence.

Section 4 Official Corruption and Government Transparency

The law provides criminal penalties for official corruption; however, the government did not implement the law effectively, and officials frequently engaged in corrupt practices with impunity. Many cases of corruption involved areas that were heavily regulated by the government and therefore susceptible to fraud, bribery, and kickbacks, such as land usage rights, real estate, and infrastructure development.

In the first six months of the year, the SPP reported that 9,158 corrupt officials were found guilty of offenses including embezzlement, bribery, dereliction of duty, and rights violations. The party's Central Commission for Discipline Inspection (CCDI) reported that 106,000 members had been found guilty of corruption during the year, an increase of 2.5 percent over 2008. Of these, 85,353 received "party discipline" punishment and 29,718 received "administrative punishment."

Party leaders announced new measures to combat corruption at key meetings, such as CCDI's annual conference on corruption in January and the State Council's Second Work Conference on Building a Clean Government in March. In addition, countering corruption, especially monitoring funds spent on earthquake relief and in the massive stimulus package, was a key theme during the NPC's March session. In April the party began running 45 new anticorruption public service announcements in print, radio, and television outlets across the country. For the first time ever, in May more than 2,000 secretaries of county-level discipline organs were summoned to Beijing for a "focused training course" run by the CDIC. The government also set up a Web site to allow the central government to directly receive accounts of corrupt officials.

Numerous leaders of state owned enterprises, who generally also hold high party rank, were investigated for corruption during the year, including China National Nuclear Corporation General Manager Kang Rixin; China Development Bank Vice President Wang Yi, who was expelled from the party; China Mobile Vice Chairman Zhang Chunjiang; and Sinopec former Vice Chairman Chen Tonghai, who was sentenced to death--with a two-year suspension--for corruption. In November 2008 Huang Guangyu, the founder of Gome Electrical Appliance Holding and the country's richest man, was detained on unspecified charges of "economic crimes," along with numerous government officials, including the following: Chen Shaoji, the chairman of the CPPCC's Guangdong Provincial Committee; Wang Huayuan, who was the highest-ranking anticorruption official in Zhejiang Province; Zheng Shaodong, the assistant minister of public security of Guangdong and head of that ministry's economic crimes investigation bureau; and his chief deputy, Xiang Huaizhu. Shenzhen mayor Xu Zongheng was dismissed in relation to this case and remained under investigation.

The Ministry of Supervision and the CCDI are responsible for combating government corruption.

Section 5 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The government sought to maintain control over civil society groups, halt the emergence of independent NGOs, hinder the activities of civil society and rights' activist groups, and prevent what it has called the "westernization" of the country. The government did not permit independent domestic NGOs to monitor openly or to comment on human rights conditions; in addition, domestic NGOs were harassed. The government tended to be suspicious of independent organizations and increased scrutiny of NGOs with financial and other links overseas. Most large NGOs were quasigovernmental, and all official NGOs had to be sponsored by government agencies. Some grassroots NGOs registered as companies to avoid regulations requiring NGOs to have a sponsoring government agency.

An informal network of activists around the country continued to serve as a credible source of information about human rights violations. The information was disseminated through organizations such as the Hong Kong-based Information Center for Human Rights and Democracy, the foreign-based Human Rights in China, and via the Internet. The government remained reluctant to accept criticism of its human rights record by other nations or international organizations. It criticized reports by international human rights monitoring groups, claiming that such reports were

Exhibit A 11
20

inaccurate and interfered with the country's internal affairs. Representatives of some international human rights organizations reported that authorities denied their visa requests or restricted the length of visas issued to them. The government did not have a human rights ombudsman or commission. The government-established China Society for Human Rights is an NGO whose mandate is to defend the government's human rights record. The government maintained that each country's economic, social, cultural, and historical conditions influence its approach to human rights.

The ICRC operated an office in Beijing, but the government did not authorize the ICRC to visit prisons. The government continued unofficial discussions on human rights and prisoner issues with a foreign-based human rights group, although the government's cooperation with the group was not as extensive as in previous years.

The government continued to participate in official diplomatic human-rights dialogues with foreign governments.

Section 6 Discrimination, Societal Abuse, and Trafficking in Persons

There were laws designed to protect women, children, persons with disabilities, and minorities. However, some discrimination based on ethnicity, gender, and disability persisted.

Women

Rape is illegal, and some persons convicted of rape were executed. The law does not recognize expressly or exclude spousal rape. The government has not made available official statistics on rape or sexual assault, leaving the scale of sexual violence difficult to determine. Migrant female workers were particularly vulnerable to sexual violence. Deng Yujiao was found "guilty of intent to harm" but was not sentenced to prison after she stabbed a local official to death when he reportedly attempted to sexually assault her. The All-China Women's Federation (ACWF) advocated for "fair treatment" of Deng during the trials. Deng Yujiao was released after her trial on June 17.

Violence against women remained a significant problem. According to a 2008 survey by the ACWF, domestic violence affected one-third of China's 267 million families. The government supported shelters for victims of domestic violence, and some courts were beginning to provide protections to victims. However, official assistance did not always reach such victims, and public security forces often ignored situations of domestic violence. According to reports, 30 to 37 percent of families suffered from domestic violence, and more than 90 percent of the victims were women. The ACWF reported that it received 50,000 domestic violence complaints annually. Spousal abuse typically went unreported; an ACWF study found that only 7 percent of rural women who suffered domestic violence sought help from police. While domestic violence tended to be more prevalent in rural areas, it also took place among the highly educated urban population. The ACWF reported that approximately one-quarter of the 400,000 divorces registered each year were the result of family violence.

The number of victims' shelters grew. According to ACWF statistics, in 2008 there were 27,000 legal-aid service centers, 12,000 special police booths for domestic violence complaints, 400 shelters for victims of domestic violence, and 350 examination centers for women claiming to be injured by domestic violence nationwide. Most shelters were operated by the government, some with NGO participation.

Both the Marriage Law and the Law on the Protection of Women's Rights and Interests have stipulations that directly prohibit domestic violence; however, some experts complained that the stipulations are too general, fail to define domestic violence, and are difficult to implement. Because of the judicial standard of ruling out "all unreasonable doubt," even if a judge was certain that domestic violence was occurring, he or she could not rule against the abuser without the abuser's confession. Only 10 percent of accused abusers confessed to violent behavior in the family, according to 2009 data from the Institute of Applied Laws, a think tank associated with the court system. Collecting evidence in domestic violence cases remained difficult: the institute reported that 40 to 60 percent of marriage and family cases involved domestic violence; however, less than 30 percent were able to supply indirect evidence, including photographs, hospital records, police records, or children's testimony. Witnesses seldom testified in court.

In April the Hunan High People's Court reportedly issued the first provincial-level guiding opinion concerning domestic violence cases, which was aimed at strengthening protections for female victims during judicial proceedings related to such abuse. In June a district court in Zhejiang Province granted the province's first antidomestic-violence court order to a female victim. Following similar 2008 orders in Jiangsu and Hunan, the order prohibits the abuser from intimidating or beating the spouse and opens the way for security forces to intervene to protect the victim's safety.

Although prostitution is illegal, experts estimated that between 1.7 million and 6 million women were involved in prostitution in the country. According to MPS statistics, police investigated approximately 140,000 cases of prostitution annually. During the year the MPS launched a three-month crackdown on organized prostitution targeting individuals or groups who force, tempt, permit, or introduce women to prostitution; operators of entertainment venues that permit or introduce prostitution; and anyone who conducts illegal activities with minors. July MPS statistics reported that police arrested 3,311 suspects who allegedly forced, abetted, harbored, or introduced women to prostitution and solved 2,503 cases related to prostitution, including 363 cases involving minors. A total of 457 criminal gangs were broken, and another 40 suspects were arrested for underage sex offenses.

Despite official accounts of efforts to crack down on the sex trade, media reports claimed that some local officials were complicit in prostitution, owned prostitution venues, or received proceeds from such businesses. Media reports also claimed prostitution involved organized crime groups and businesspersons as well as the police and military. Social workers reported that high-profile entertainment centers that had powerful, behind-the-scenes supporters were beyond the reach of public security bureaus.

After the Law on the Protection of Women's Rights was amended in 2005 to include a ban on sexual harassment, the number of sexual harassment complaints increased significantly.

The government restricted the rights of parents to choose the number of children they have. The national family-planning authorities shifted their emphasis from lowering fertility rates to maintaining low fertility rates and emphasized quality of care in family-planning practices; however, the country's birth limitation policies retained harshly coercive elements in law and practice. The financial and administrative penalties for unauthorized births are strict. Although some officials suggested that adjustments to the policy were needed to address the problem of an unequal sex ratio at birth, the government continued to affirm the orientation of its family-planning policy at the highest levels. There was no information on whether women and men had equal access to diagnosis and treatment for sexually transmitted infections, including HIV.

The 2002 National Population and Family-planning Law standardizes the implementation of the government's birth limitation policies; however, enforcement varied significantly. The law grants married couples the right to have one birth and allows eligible couples to apply for permission to have a second child if they meet conditions stipulated in local and provincial regulations. The one-child limit was more strictly applied in urban areas, where only couples meeting certain conditions were permitted to have a second child. In most rural areas, the policy was more relaxed, with couples permitted to have a second child in cases where the first child was a girl. Countrywide, 35 percent of families fell under the one-child restrictions, and more than 60 percent of families were eligible to have a second child, either outright or if they met certain criteria. The remaining 5 percent were eligible to have more than two children.

While all provinces eliminated the birth-approval process for a first child, thus allowing parents to choose when to start having children, some provinces continued to regulate the period of time required between births.

The law requires each person in a couple that has an unapproved child to pay a "social compensation fee," which can reach 10 times a person's annual disposable income. The law grants preferential treatment to couples who abide by the birth limits.

Social compensation fees were set and assessed at the local level. The law requires family-planning officials to obtain court approval before taking "forcible" action, such as detaining family members or confiscating and destroying property of families who refuse to pay social compensation fees. However, in practice this requirement was not always followed, and national authorities remained ineffective at reducing abuses by local officials.

The population control policy relied on education, propaganda, and economic incentives, as well as on more-coercive measures. Those who violated the child limit policy by having an unapproved child or helping another do so faced disciplinary measures such as social compensation fees, job loss or demotion, loss of promotion opportunity, expulsion from the party (membership is an unofficial requirement for certain jobs), and other administrative punishments, including in some cases the destruction of private property.

In order to delay childbearing, the law sets the minimum marriage age for women at 20 years and for men at 22 years. It continued to be illegal in almost all provinces for a single woman to have a child. Hunan Province required individuals conceiving children out of wedlock to pay 6 to 8 percent of their income from the previous year in addition to the standard social compensation fee. The law states that family-planning bureaus will conduct pregnancy tests on married women and provide them with unspecified "follow-up" services. Some provinces fined women who did not undergo periodic pregnancy tests. For example, in Hebei Province fines ranged from RMB 200 to RMB 500 (approximately $30 to $70), and in Henan Province fines ranged from RMB 50 to RMB 500 ($7 to $70).

Officials at all levels remained subject to rewards or penalties based on meeting the population goals set by their administrative region. Promotions for local officials depended in part on meeting population targets. Linking job promotion with an official's ability to meet or exceed such targets provided a powerful structural incentive for officials to employ coercive measures to meet population goals.

Although the family-planning law states that officials should not violate citizens' rights in the enforcement of family-planning policy, these rights, as well as penalties for violating them, are not clearly defined. By law citizens may sue officials who exceed their authority in implementing birth-planning policy. However, there exist few protections for whistleblowers against retaliation from local officials. The law provides significant and detailed sanctions for officials who help persons evade the birth limitations.

On October 1, a new set of national family-planning regulations for the migrant population became effective. The new regulations make family-planning services, including reproductive health information and services, contraception devices,

and family-planning technical services, available and free to migrants in their temporary residences. Previously, migrants were often forced to return to the place of their legal household registrations to receive services.

The constitution states that "women enjoy equal rights with men in all spheres of life." The Law on the Protection of Women's Rights and Interests provides for equality in ownership of property, inheritance rights, and access to education. The ACWF was the leading implementer of women's policy for the government, and the State Council's National Working Committee on Children and Women coordinated women's policy. Nonetheless, many activists and observers were concerned that the progress made by women over the past 50 years was eroding. They asserted that the government appeared to have made the pursuit of gender equality a secondary priority as it focused on economic reform and political stability. Women continued to report that discrimination, sexual harassment, unfair dismissal, demotion, and wage discrepancies were significant problems.

Authorities often did not enforce laws protecting the rights of women. According to legal experts, it was difficult to litigate a sex discrimination suit because the vague legal definition made it difficult to quantify damages, so very few cases were brought to court. Some observers noted that the agencies tasked with protecting women's rights tended to focus on maternity-related benefits and wrongful termination during maternity leave rather than on sex discrimination, violence against women, and sexual harassment. Women's rights advocates indicated that in rural areas women often forfeited land and property rights to their husbands in divorce proceedings. In principle rural contract law and laws protecting women's rights stipulate that women enjoy equal rights in cases of land management, but experts argued that in practice this was rarely the case, due to the complexity of the law and difficulties in its implementation.

Many employers preferred to hire men to avoid the expense of maternity leave and child care, and some lowered the effective retirement age for female workers to 40 (the official retirement age for men was 60 and for women 55, with the exception of men and women involved in physically demanding jobs, for which the retirement age was 55 and 45, respectively). In addition, work units were allowed to impose an earlier mandatory retirement age for women than for men. Lower retirement ages also reduced pensions, which generally were based on the number of years worked. Job advertisements sometimes specified height and age requirements for women.

Women had less earning power than men, despite government policies mandating nondiscrimination in employment and occupation. The Ministry of Human Resources and Social Security and the local labor bureaus were responsible for ensuring that enterprises complied with the labor law and the employment promotion law, each of which contains antidiscrimination provisions.

A high female suicide rate continued to be a serious problem. According to the World Bank and the World Health Organization, there were approximately 500 female suicides per day. The Beijing Psychological Crisis Study and Prevention Center reported that the suicide rate for females was three times higher than for males. Many observers believed that violence against women and girls, discrimination in education and employment, the traditional preference for male children, birth-limitation policies, and other societal factors contributed to the high female suicide rate. Women in rural areas, where the suicide rate for women was three to four times higher than for men, were especially vulnerable.

The Law on the Protection of Juveniles forbids infanticide; however, there was evidence that the practice continued. According to the National Population and Family-planning Commission, a handful of doctors have been charged with infanticide under this law. Female infanticide, sex-selective abortions, and the abandonment and neglect of baby girls remained problems due to the traditional preference for sons and the coercive birth limitation policy.

The UN Economic and Social Council reported that less than 2 percent of women between the ages of 15 and 24 were illiterate. According to 2008 official government statistics, women comprised more than 70 percent of all illiterate persons above the age of 15. In some underdeveloped regions, the female literacy rate lagged behind the male literacy rate by 15 percent or more.

While the gap in the education levels of men and women narrowed, differences in educational attainment remained a problem. Men continued to be overrepresented among the relatively small number of persons who received a university-level education. According to Ministry of Education statistics, in 2008 women accounted for 50 percent of undergraduate and college students, 46 percent of postgraduate students, and nearly 35 percent of doctoral students. Women with advanced degrees reported discrimination in the hiring process as the job distribution system became more competitive and market-driven.

Children

Citizenship is derived from the parents. Parents must register their children in compliance with the national household registration system within one month of birth. Children not registered cannot access public services. No data was available on the number of unregistered births.

The law provides for nine years of compulsory education for children. However, in economically disadvantaged rural areas, many children did not attend school for the required period and some never attended at all. Public schools were not allowed to charge tuition; however, faced with insufficient local and central government funding, many schools continued

to charge miscellaneous fees. Such fees and other school-related expenses made it difficult for poorer families and some migrant workers to send their children to school.

The proportion of girls attending school in rural and minority areas was reportedly smaller than in cities; in rural areas 61 percent of boys and 43 percent of girls completed education higher than lower middle school. The government reported that nearly 20 million children of migrant laborers followed their parents to urban areas. Most children of migrant workers who attended school did so at schools that were unlicensed and poorly equipped.

Female babies suffered from a higher mortality rate than male babies, contrary to the worldwide norm. State media reported that infant mortality rates in rural areas were 27 percent higher for girls than boys and that neglect was one factor in their lower survival rate.

Kidnapping and buying and selling children for adoption increased over the past several years, particularly in poor rural areas. There were no reliable estimates of the number of children trafficked; however, according to media reports, as many as 20,000 children were kidnapped every year for illegal adoption. Most children trafficked internally were sold to couples unable to have children, particularly sons. Those convicted of buying an abducted child may be sentenced to three years' imprisonment. In the past most children rescued were boys, but increased demand for children reportedly drove traffickers to focus on girls as well.

By law those who force young girls (under age 14) into prostitution may be sentenced to 10 years or more in prison or given a life sentence, in addition to a fine or confiscation of property. If the case is especially serious, they are to be given a life sentence or sentenced to death, in addition to confiscation of property. Those inducing young girls (under age 14) into prostitution are to be sentenced to five years or more in prison in addition to a fine. Those who visit young girl prostitutes (under age 14) are to be sentenced to five years or more in prison in addition to paying a fine.

According to the law, the minimum age of consensual sex is 14.

Pornography of any kind is illegal, including child pornography. Under the criminal code, those producing, reproducing, publishing, selling, or disseminating obscene materials with the purpose of making a profit may be sentenced up to three years in prison or put under criminal detention or surveillance, in addition to paying a fine. If the case is serious, they are to be sentenced from three to 10 years in prison, in addition to paying a fine. If the case is especially serious, they are to be sentenced to 10 years or more in prison or given a life sentence, in addition to a fine or confiscation of property. Persons found disseminating obscene books, magazines, films, audio or video products, pictures, or other kinds of obscene materials, if the case is serious, may be sentenced up to two years in prison or put under criminal detention or surveillance. Persons organizing the broadcast of obscene motion pictures or other audio or video products may be sentenced up to three years in prison or put under criminal detention or surveillance, in addition to paying a fine. If the case if serious, they are to be sentenced to three to 10 years in prison in addition to paying a fine.

Those broadcasting or showing obscene materials to minors less than 18 years of age are to be severely punished.

There were more than 150,000 urban street children, according to state-run media and the Ministry of Civil Affairs. This number was even higher if the children of migrant workers who spend the day on the streets were included. In August 2008 state media reported that the number of children in rural areas left behind by their migrant worker parents totaled 5.8 million.

The law forbids the mistreatment or abandonment of children. The vast majority of children in orphanages were girls, many of whom were abandoned. Boys in orphanages were usually disabled or in poor health. Medical professionals sometimes advised parents of children with disabilities to put the children into orphanages.

The government denied that children in orphanages were mistreated or refused medical care but acknowledged that the system often was unable to provide adequately for some children, particularly those with serious medical problems. Adopted children were counted under the birth limitation regulations in most locations. As a result, couples that adopted abandoned infant girls were sometimes barred from having additional children.

Trafficking in Persons

The law prohibits trafficking in women and children; however, there were reports that men, women, and children were trafficked to, from, through, and within the country for sexual exploitation and forced labor. Criminal law defines trafficking as purposefully selling women or children to make a profit, through abduction, kidnapping, buying, trading, or transporting.

The government built on past efforts to combat trafficking, modifying countertrafficking regulations to strengthen the government's response to sex and labor trafficking, and conducting significant and new campaigns to prosecute traffickers and rescue trafficking victims. The MPS and 30 other government departments and agencies jointly issued National Plan of Action (NPA) implementation guidelines to restructure government antitrafficking work processes, assign responsibilities, and coordinate intragovernment cooperation. The SPP issued guidelines for prosecuting human trafficking cases. The central government changed local security officials' promotion criteria to include countertrafficking work and

instructed public security bureaus nationwide to immediately investigate missing person or trafficking cases as criminal cases.

In April the MPS initiated a new campaign to combat trafficking in women and children. From April to December, the MPS reported rescuing nearly 3,500 children and 7,400 women trafficking victims, breaking up 1,684 criminal gangs in the process. Through the use of a DNA matching database, the identities of 298 trafficked persons have been confirmed. During the year prosecution and conviction of trafficking offenders increased, mostly focused on those trafficking women and children. Authorities investigated and dismantled criminal networks and organized crime syndicates involved in trafficking and by December had arrested 19 of the country's 20 most-wanted human traffickers; they were awaiting prosecution at year's end. The government recognized the need to do more to provide services to trafficking victims. The government increased antitrafficking cooperation with other countries and international organizations and worked to raise public awareness on trafficking in persons. However, the country's capacity to effectively protect victims and prevent trafficking in persons did not reach international standards.

The country was a source, transit point, and destination for trafficking in persons. The vast majority of trafficking was internal for the purposes of sexual exploitation, forced labor and begging, and forced marriage. Women and children, who made up 90 percent of reported trafficking cases, were often trafficked from poorer, rural areas where they were abducted or lured to urban centers with false promises of employment and then trafficked into prostitution or forced labor. The media and NGOs estimated that between 10,000 and 20,000 were trafficked internally annually.

Domestic and cross-border trafficking continued to be significant problems, although the exact number of persons involved could only be estimated, due in part to an itinerant population of approximately 150 million. The MPS reported 2,500 cross-border trafficking cases in 2008, although experts claimed the number was much higher.

The government reported strengthening its prosecution of trafficking. In April Hebei Provincial Higher People's Court sentenced two persons to death and nine others to various sentences, ranging from four years in prison to the death penalty with a reprieve, for a series of child-trafficking cases involving seven children across Henan, Hebei, and Shandong provinces. Also in April police detained two persons suspected of trying to traffic 300 youths to Costa Rica.

In May Guizhou authorities launched a campaign to crack down on the forced prostitution of girls following a scandal in which 11 Xishui County schoolgirls were forced into the sex trade. The campaign, which lasted until the end of the year, also targeted those who force minors to beg or commit crimes. In June state media reported that police rescued 23 children during a crackdown on child trafficking. State media reported the Wuhan Rail Bureau apprehended 18 suspects in an eight-day campaign targeting trains arriving from Kunming, Yunnan Province. In August the government repatriated six trafficked Burmese women following a joint operation by Chinese and Burmese security forces.

Some experts and NGOs suggested that trafficking of persons was fueled by economic disparity and the effects of population-planning policies and that a shortage of marriageable women increased the demand for abducted women, especially in rural areas. The serious imbalance in the male-female ratio at birth, the tendency for women to leave rural areas to seek employment, and the cost of traditional betrothal gifts all made purchasing a wife attractive to some poor rural men. Some men recruited women from poorer regions, while others sought help from criminal gangs. UN research indicated most women trafficked internally were taken from areas with a very low GDP to areas with a very high GDP. Once in their new "families," these women were "married" and sometimes became victims of forced labor or rape. Some joined their new communities, others struggled and were punished, and a few escaped. Some former trafficking victims became traffickers themselves, lured by the prospect of financial gain.

Most cross-border trafficked women and girls came from Vietnam, Burma, North Korea, Mongolia, and Russia. Others came from Laos and Ukraine. All were trafficked into the country for sexual exploitation, forced marriage, and indentured servitude in domestic service or businesses. Many North Korean women and girls were trafficked into the country to work in the sex industry and for forced marriages and other purposes, including forced labor. Because the government continued to classify all North Korean trafficking victims as economic migrants, they were routinely deported. North Korean women reportedly were sold for RMB 2,900 to RMB 9,700(approximately $425 to $1,420). The UN reported that Chinese citizens were most often trafficked to Malaysia, Thailand, the United Kingdom, and the United States. Second-tier destinations included Australia, European countries, Canada, Japan, Burma, Singapore, South Africa, and Taiwan.

Trafficked persons sometimes became entangled with alien smuggling rings, which often had ties to organized crime and were international in scope. Persons trafficked by alien smugglers paid high prices for their passage to other countries, where they hoped their economic prospects would improve. Some reportedly promised to pay RMB 231,000 to RMB 385,000 (approximately $33,790 to $56,320) for passage. Upon arrival many reportedly were forced to repay traffickers for the smuggling charges or a larger amount at high interest rates, and in some cases in addition to their living expenses by working for a set period of time. Living and working conditions for trafficked persons were poor. Traffickers restricted their victims' movements and confiscated their travel documents. Threats to report trafficking victims to authorities or to retaliate against families made trafficked persons even more vulnerable.

Criminal law prohibited trafficking, kidnapping, and sexual exploitation of minors. Persons convicted of engendering forced prostitution, abduction, or commercial exploitation face criminal sanctions; convictions for trafficking minors carry heavier

Exhibit A
25

sentences, such as a death sentence. Victims and their families can bring civil suits against offenders, but few civil suits made it beyond initial stages. Those that did encountered obstacles claiming compensation.

In April more than 100 parents in Guangdong Province protested the authorities' poor response to the alleged abduction of more than 1,000 children from the area over the past two years. During the year the government began to address child abduction and trafficking through stepped-up investigations and informational campaigns, sponsoring workshops for migrant worker parents on the dangers of child trafficking, meeting with parent and civic groups, and establishing a nation-wide DNA database to reunite rescued children with their families.

NGOs reported an increase in child trafficking and children forced to work as beggars, petty thieves, and prostitutes, especially in rural areas. Some children, including Uighurs, worked in factories, but many ended up under the control of local gangs. Five ministries on the State Council issued regulations during the year imposing obligations on government officials to combat child trafficking, particularly for purposes of forced begging; nevertheless, experts noted that forced child labor and sexual exploitation continued to be serious problems in many cities.

MPS officials stated that repatriated victims of trafficking no longer faced fines or other punishment upon their return. However, authorities acknowledged that some victims continued to be sentenced or fined because of corruption among police, the difficulty in identifying trafficked victims, and provisions allowing for the imposition of fines on persons traveling without proper documentation. Trafficking victims often lacked proper identification, which made it difficult to distinguish them from persons who illegally crossed borders. The MPS trained border officials to spot potential victims of trafficking, and it opened seven border liaison offices on the Burma, Laos, and Vietnam borders to process victims. However, the ACWF reported that ongoing problems required intervention to protect trafficking victims from unjust punishment.

Trafficking victims often were returned to their homes without access to counseling or psychological care; however, in areas where trafficking in persons was prevalent, there was evidence that local and security officials worked with NGOs to provide victims access to medical services and counseling. Some NGOs provided victims with counseling or psychological care. The government's victim assistance efforts across the country remained uncoordinated, underdeveloped, and insufficient, although it took steps to rectify this problem through training and capacity-building programs in conjunction with international NGOs. Trafficking victims returning to China from abroad, for example, rarely received assistance from authorities, who largely were unaware of the victims and their plight. The government did not provide any assistance to Chinese sex-trafficking victims identified in Ghana, who faced threats and retaliation from their traffickers.

The law criminalizing the purchase of women makes abduction and sale separate offenses. There were reports of local officials' complicity in both alien smuggling and in prostitution, which sometimes involved trafficked women. In some cases village leaders sought to prevent police from rescuing women who had been sold to villagers. Authorities did not take sufficient steps to deter or prevent trafficking-related corruption in the country.

The government continued to centralize and institutionalize its antitrafficking work. The 2007 NPA on Combating Trafficking of Women and Children formalized cooperation among government agencies and established a national information and reporting system. However, there were no measures for resources to be allocated to local and provincial governments for implementation. Additionally, the NPA covered only trafficking of female and minor victims and did not address labor trafficking or male victims of sex trafficking. During the year implementation procedures and regulations were formulated by 30 ministries and government entities. While all provinces under the NPA are required to create provincial-level plans to combat trafficking, by the end of the year only a handful of provinces had created and were actively implementing such plans. The government continued to make some progress in strengthening its antitrafficking legal framework; the highest court issued instructions on prosecuting traffickers.

The MPS reported that its primary focus in implementing the NPA was to guarantee that provincial government and local public security bureaus took on antitrafficking work and that the local antitrafficking procedures were correct. The MPS issued regulations to standardize local public security officials' antitrafficking methods and for the first time tied security official's professional advancement to their efforts to assist antitrafficking work. The MPS also launched its sixth special campaign to combat trafficking in women and children. The campaign's mandate was to reduce trafficking in women and children by solving a large number of trafficking cases, rescuing victims, eliminating a large number of trafficking gangs, and apprehending a large number of traffickers.

Principal government agencies responsible for combating trafficking or assisting its victims were the MPS, the State Council's Work Committee for Women and Children, the Ministry of Civil Affairs (MCA), and the ACWF. While the government made increased efforts to assist victims of trafficking, the protection, return, and reintegration of trafficking victims needed greater improvement. Central government policy allows for provision of funds to provincial governments and local police to house victims and return them to their homes, although it remained unknown whether this resource was used. Government-funded women's federation offices and other women's organizations provided some counseling on legal rights, rehabilitation, and other assistance to trafficking victims, although lack of funding reportedly limited services in many areas.

The ACWF assisted some victims in obtaining medical and psychological treatment. Overseas NGOs provided treatment to trafficking victims and conducted educational outreach programs to educate rural youth about the dangers of trafficking.

The government and NGOs also supported centers in communities with large numbers of migrant laborers to train members of at-risk groups to avoid being trafficked and to get out of trafficking situations. The MCA began training staff at the 1,351 MCA relief centers for disadvantaged persons nationwide in identifying and providing services to trafficking victims. However, the country continued to lack comprehensive, countrywide victim protection services. Anecdotal evidence suggested that trafficking victims residing in provinces that lacked a large trafficking problem--and therefore a robust antitrafficking program--had difficulty accessing assistance and services.

The Department of State's annual *Trafficking in Persons Report* can be found at www.state.gov/g/tip.

Persons with Disabilities

The law protects the rights of persons with disabilities and prohibits discrimination; however, conditions for such persons lagged far behind legal dictates, failing to provide persons with disabilities access to programs designed to assist them.

The MCA and the China Disabled Persons Federation, a government-organized civil association, were the main entities responsible for persons with disabilities. In September government officials confirmed that there were 83 million persons with disabilities living in the country. According to government statistics, in 2008 there were 3,731 vocational education and training facilities, which provided training and job-placement services for 774,000 persons with disabilities. More than 4.5 million persons with disabilities were employed in cities and towns; 17.2 million were employed in rural areas. Government statistics stated that 7.4 million persons with disabilities enjoyed the minimum life guarantee; nearly three million had social insurance.

The law prohibits discrimination against minors with disabilities and codifies a variety of judicial protections for juvenile offenders. In 2007 the Ministry of Education reported that nationwide there were 1,618 schools for children with disabilities. According to NGOs, there were approximately 20 million children with disabilities, only 2 percent of whom had access to special education that could meet their needs. In 2008 there were 63,400 new enrollments, bringing the total number of children with disabilities at school to 419,000. NGOs claimed that while the overall school enrollment rate was 99 percent, only 75 percent of children with disabilities were enrolled in school. Nationwide 243,000 school-age children with disabilities did not attend school. Nearly 100,000 organizations existed, mostly in urban areas, to serve those with disabilities and protect their legal rights. The government, at times in conjunction with NGOs, sponsored programs to integrate persons with disabilities into society.

The physical abuse of children can be grounds for criminal prosecution. However, misdiagnosis, inadequate medical care, stigmatization, and abandonment remained common problems. According to reports, doctors frequently persuaded parents of children with disabilities to place their children in large government-run institutions, where care was often inadequate. Those parents who chose to keep children with disabilities at home generally faced difficulty finding adequate medical care, day care, and education for their children. Government statistics showed that almost one-quarter of persons with disabilities lived in extreme poverty.

Unemployment among adults with disabilities remained a serious problem. Under the Employment Promotion Law, local governments were required to offer incentives to enterprises that hired persons with disabilities. Regulations in some parts of the country also required employers to pay into a national fund for the disabled when the employees with disabilities did not make up the statutory minimum percentage of the total workforce.

Standards adopted for making roads and buildings accessible to persons with disabilities were subject to the Law on the Handicapped, which calls for their "gradual" implementation; however, compliance with the law was lax. Students with disabilities were discriminated against in access to education. The law permits universities legally to exclude otherwise qualified candidates from higher education.

The law forbids the marriage of persons with certain acute mental illnesses, such as schizophrenia. If doctors find that a couple is at risk of transmitting disabling congenital defects to their children, the couple may marry only if they agree to use birth control or undergo sterilization. The law stipulates that local governments must employ such practices to raise the percentage of healthy births.

National/Racial/Ethnic Minorities

Most minority groups resided in areas they traditionally inhabited. Government policy calls for members of recognized minorities to receive preferential treatment in birth planning, university admission, access to loans, and employment. However, the substance and implementation of ethnic minority policies remained poor, and discrimination against minorities remained widespread.

Minority groups in border and other regions had less access to education than their Han counterparts, faced job discrimination in favor of Han migrants, and earned incomes well below those in other parts of the country. Government development programs often disrupted traditional living patterns of minority groups and included, in some cases, the forced relocation of persons. Han Chinese benefited disproportionately from government programs and economic growth. As part of its emphasis on building a "harmonious society," the government downplayed racism against minorities, which

remained the source of deep resentment in the XUAR, Inner Mongolia Autonomous Region, and Tibetan areas. In
September the State Council issued a white paper on ethnic policy, common prosperity, and development of all ethnic
groups. The report stated that the country's ethnic policy ensured the equality among all ethnic groups.

According to 2007 government statistics, 36.3 percent of Guangxi Province's cadres were ethnic minorities. In 2008 all five
of the country's ethnic minority autonomous regions had governors from minority groups for the first time in history.
However, the Communist Party secretaries of these five autonomous regions were all Han. Han officials continued to hold
the majority of the most powerful party and government positions in minority autonomous regions, particularly the XUAR.

The government's policy to encourage Han Chinese migration to move into minority areas significantly increased the
population of Han in the XUAR. In recent decades the Han-Uighur ratio in the capital of Urumqi has shifted from 20 to 80
to 80 to 20 and continued to be a deep source of Uighur resentment. Discriminatory hiring practices gave preference to
Han and discouraged job prospects for ethnic minorities. According to 2005 statistics published by XUAR officials, eight
million of the XUAR's 20 million official residents were Han. Hui, Kazakh, Kyrgyz, Uighur, and other ethnic minorities
comprised approximately 12 million XUAR residents. Official statistics understated the Han population, because they did
not count the tens of thousands of Han Chinese who were long-term "temporary workers." While the government
continued to promote Han migration into the XUAR and fill local jobs with migrant labor, overseas human rights
organizations reported that local officials under direction from higher levels of government deceived and pressured young
Uighur women to participate in a government-sponsored labor transfer program.

The XUAR government took measures to dilute expressions of Uighur identity, including measures to reduce education in
ethnic minority languages in XUAR schools and to institute language requirements that disadvantaged ethnic minority
teachers. The government continued to apply policies that prioritized Mandarin Chinese for instruction in school, thereby
reducing or eliminating ethnic-language instruction. Graduates of minority language schools typically needed intensive
Chinese study before they could handle Chinese-language course work at a university. The dominant position of standard
Chinese in government, commerce, and academia put graduates of minority-language schools who lacked standard
Chinese proficiency at a disadvantage.

During the year authorities increased repression in the XUAR and targeted the region's ethnic Uighur population. On July
5, a Uighur demonstration was forcefully suppressed by police, and outbreaks in violence throughout the region following
the crackdown drew an international spotlight on longstanding ethnic tensions in the XUAR and Uighurs' grievances
toward government policies that undermined the protection of their rights. In late 2008 and during the first half of the year,
officials in XUAR reiterated a pledge to crack down on the government-designated "three forces" of religious extremism,
"splittism," and terrorism and outlined efforts to launch a concentrated antiseparatist reeducation campaign.

It was sometimes difficult to determine whether raids, detentions, and judicial punishments directed at individuals or
organizations suspected of promoting the "three forces" were instead actually used to target those peacefully seeking to
express their political or religious views. The government continued to repress Uighurs expressing peaceful political
dissent and independent Muslim religious leaders, often citing counterterrorism as the reason for taking action.

Uighurs were sentenced to long prison terms, and in some cases executed, on charges of separatism. The government
reportedly sought the repatriation of Uighurs living outside the country, where they faced the risk of persecution.

Freedom of assembly was severely limited during the year in the XUAR. On September 8, the government announced it
would demolish three buildings owned by the family of exiled Uighur leader Rebiya Kadeer, president of the World Uighur
Conference. The government blamed Kadeer, a Uighur businesswoman in exile, for orchestrating the July 5 riots in
Urumqi.

Possession of publications or audiovisual materials discussing independence or other sensitive subjects was not
permitted. Uighurs who remained in prison at year's end for their peaceful expression of ideas the government found
objectionable included Mehbube Ablesh, Abdulla Jamal, Tohti Tunyaz, Adduhelil Zunun, Abdulghani Memetemin, and
Nurmuhemmet Yasin.

During the year XUAR officials defended the campaign against separatism and other emergency measures taken as
necessary to maintain public order and continued to use the threat of violence as justification for extreme security
measures directed at the local population and visiting foreigners.

In September state media reported that XUAR authorities approved the Information Promotion Bill, making it a criminal
offense to discuss separatism on the Internet and prohibiting use of the Internet in any way that undermines national unity.
The bill further bans inciting ethnic separatism or harming social stability. The bill requires Internet service providers and
network operators to set up monitoring systems or strengthen existing ones and report transgressions of the law.

Han control of the region's political and economic institutions also contributed to heightened tension. Although government
policies brought economic improvements to the XUAR, Han residents received a disproportionate share of the benefits.

(See also the Tibet addendum.)

Societal Abuses, Discrimination, and Acts of Violence Based on Sexual Orientation and Gender Identity

No laws criminalize private homosexual activity between consenting adults. Homosexuality was decriminalized in 1997 and removed from the official list of mental disorders in 2001. Due to societal discrimination and pressure to conform to family expectations, most gay individuals refrained from publicly discussing their sexual orientation.

On March 30 and April 3, approximately 50 gay men were reportedly detained in Renmin Park in Guangzhou and questioned by police. On August 25, police in Guangzhou tried again to remove a group of gay men from Renmin Park. The men refused, and after a nonviolent standoff, the police desisted.

In June the first gay pride festival took place in Shanghai. Also in June the Beijing Queer Film Festival was held. Police had blocked previous attempts to hold the festival.

Homosexual plotlines and scenes are not allowed on broadcast television. While there is no legal prohibition against the registration of lesbian, gay, bisexual, or transgender student groups, none were allowed to register at any universities.

In July a group of lesbians organized an online petition calling on the government to rescind a 1998 law banning gay persons from donating blood.

Other Societal Violence or Discrimination

The Employment Promotion Law, which went into effect in 2008, improves protection against discrimination in employment, and local governments began modifying their regulations to reflect the new law. Under the law and adopted regulations, employment discrimination against persons carrying an infectious disease is prohibited, and provisions allow such persons to work as civil servants. While the law improves protection against discrimination in employment, it does not address some common types of discrimination in employment, including discrimination based on height, physical appearance, or place of origin.

Despite provisions in the new Employment Promotion Law, discrimination against persons with HIV/AIDS and hepatitis B carriers (including 20 million chronic carriers) remained widespread in many areas. Persons with HIV/AIDS suffered discrimination, and local governments sometimes tried to suppress their activities. At the same time, international involvement in HIV/AIDS prevention, care, and treatment, as well as central government pressure on local governments to respond appropriately, brought improvements in some localities. Some hospitals that previously refused to treat HIV/AIDS patients had active care and treatment programs because domestic and international training programs improved the understanding of local healthcare workers and their managers. In Beijing dozens of local community centers encouraged and facilitated HIV/AIDS support groups.

Some NGOs working with HIV/AIDS patients and their family members continued to report difficulties with local governments, particularly in Henan Province. Henan authorities provided free treatment to persons with HIV/AIDS, but foreign and local observers noted that local governments were reluctant or even hostile toward coordinating efforts with NGOs and preferred to work independently.

**SECTION 7 WORKER RIGHTS**

**a. The Right of Association**

The law does not provide for freedom of association, as workers were not free to organize or join unions of their own choosing. Independent unions are illegal, and the right to strike is not protected in law.
The All-China Federation of Trade Unions (ACFTU), which is controlled by the CCP and chaired by a member of the Politburo, is the sole legal workers' organization. The trade union law gives the ACFTU control over all union organizations and activities, including enterprise-level unions, and requires the ACFTU to "uphold the leadership of the Communist Party." While ACFTU constituent unions were generally unassertive and ineffective in protecting the rights and interests of members, the ACFTU successfully advocated for and positively influenced the implementation of government policies protecting rights and interests of workers.

The ACFTU and its provincial and local branches continued to organize new unions at a rapid pace. According to the latest available ACFTU data, as of September 2008 there were 212 million ACFTU members, a net increase of 72.1 percent from 2003. The ACFTU claimed that 73.7 percent of workers were ACFTU members. The number of ACFTU-affiliated trade union organizations increased to 1.7 million by September 2009, up 9.8 percent over 2007 and up 90.4 percent over 2003. A total of 3.7 million enterprises established trade union organizations, up 15.3 percent over 2007 and up 133.9 percent over 2003. Additionally, the ACFTU continued its campaign to target foreign-invested enterprises and announced that by the end of 2008, the number of trade union members in foreign-invested enterprises across the country (including Hong Kong, Macau, and Taiwan-invested enterprises) had reached 15.9 million and the rate of unionization in such transnational corporations had reached 83 percent.

Twelve Taiwan employees in Xiamen became members of the Xiamen General Labor Union, officially joining the mainland

**Exhibit A**                5/6/2011

29

ACFTU-affiliated labor union. This was the first time the ACFTU accepted Taiwan employees.

Although the law states that trade union officers at each level should be elected, most were appointed by ACFTU-affiliated unions, often in coordination with employers, and were drawn largely from the ranks of management. Direct election by workers of union leaders continued to be rare, occurred only at the enterprise level, and was subject to supervision by higher levels of the union or Communist Party organization. In enterprises where direct election of union officers took place, regional ACFTU offices and local party authorities retained control over the selection and approval of candidates.

While many labor rights NGOs and lawyers were able to operate effectively, authorities continued to monitor labor rights organizations closely. Labor rights organizations reported close surveillance by government security agencies, and in some cases they were warned to stop their activities in support of worker rights. During the year many groups reported an increase in monitoring in advance of sensitive anniversaries.

In some cases authorities interfered with the programs or activities of labor organizations. For example, in June trade union officials in Shaanxi Province reportedly threatened founders of a new workers' rights group. More than 380 workers from approximately 20 enterprises in Shaanxi applied to the provincial party committee and trade union federation to set up the Shaanxi Enterprise Union Rights Defense Representative Congress to supervise existing unions and resolve issues by creating more effective unions. The municipal government of Xi'an formally banned the group, and union officials threatened some of the application signatories.

In August local press reported that Zhao Dongming was arrested for applying to establish a trade union in Xian. In September, following the Tonghua Iron and Steel protests, Ren Fengyu was sentenced to RTL for 18 months for posting a notice at a factory demanding to select worker representatives.

In November labor NGOs reported that in Hubei Province, Yang Huanqing, a laid-off community-operated school teachers' representative, was sentenced to one year of RTL. The RTL notice received by Yang's family claimed that Yang organized teachers to petition, met with other teachers' representatives, and petitioned with other representatives.

Labor activists detained in previous years reportedly remained in detention at year's end, including Wang Sen, Ni Xiafei, Li Xintao, Hu Mingjun, Li Wangyang, Luo Huiquan, Kong Youping, Ning Xianhua, Li Jianfeng, Lin Shun'an, Chen Wei, She Wanbao, and Zhu Fangming.

The right to strike is not protected in law. While work stoppages are not expressly prohibited in law, article 53 of the constitution has been interpreted as a ban on labor strikes by obligating all citizens to "observe labor discipline and public order." Local government interpretations of the law varied, with some jurisdictions showing limited tolerance for strikes while others continued to treat worker protests as illegal demonstrations. Without a clearly defined right to strike, workers had only a limited capacity to influence the negotiation process.

During the year there were many reports of strikes or work stoppages throughout the country, and official media more aggressively publicized cases of worker rights violations and protests. The most publicized of these were three large-scale protests at state-owned enterprise (SOE) steel and coal plants in Jilin, Henan, and Hunan provinces. As a result of planned privatization of these SOEs, workers initiated large-scale strikes involving thousands of workers, one of which, in Jilin, resulted in the death of a manager. The privatization of the two steel SOEs was cancelled.

Official media also more aggressively publicized worker protests other than strikes, involving actual or feared job loss, wage or benefit arrears, dissatisfaction with new contracts offered in enterprise restructuring, failure to honor contract terms, or discontent over substandard conditions of employment. Representative examples of the countless number of worker protest actions that occurred included the following: taxi drivers in northeastern Mudanjiang City staged sit-ins before local party and government office buildings to protest the local government's plan to reform the taxi operating system; more than 400 motorcycle taxi drivers held a rally to protest a government ban on their business in Quanzhou, Fujian Province; hundreds of workers at a holding company of a foreign company in Wuhan City blocked a major road to protest potential job cuts; more than 5,000 taxi drivers in Xining, the capital of Qinghai Province, protested because of news that a new regulation would curtail the duration of their operating licenses; more than 400 workers blocked a road in a protest over unpaid wages in southwest China's Chongqing Municipality; and in Beijing more than 20 construction workers occupied a 17-floor block of apartments and demanded unpaid back wages. In November nearly 3,000 female workers of a German-invested company in Hainan Province went on strike to press their demands on bonuses, pay, and vacations.

On July 13, the SPC announced that labor disputes climbed by 30 percent in the first half of the year, with dramatic increases of 41.6 percent, 50.3 percent, and 159.6 percent in Guangdong, Jiangsu, and Zhejiang, respectively. Much of this increase was due to the continued implementation of the three new labor laws, workers' increased knowledge of their rights under these laws, and workers' increased willingness to pursue their rights by filing claims. An ACFTU official was quoted by the press as reporting that, by the end of November, in Beijing approximately 80,000 workers were involved in disputes with their employers, double the number from 2008. During the year Beijing's arbitration committee received more than 70,000 cases of labor disputes, compared with 49,000 during the same period in 2008 and 26,000 in 2007. In addition, Beijing's Second Intermediate People's Court reported that during the year labor dispute cases doubled

Exhibit A
5/16/2011
30

compared with the previous year.

**b. The Right to Organize and Bargain Collectively**

The labor law permits collective bargaining for workers in all types of enterprises; however, in practice collective bargaining fell short of international standards. Under labor and trade union laws, collective contracts are to be developed through collaboration between the labor union and management and should specify such matters as working conditions, wage scales, and hours of work.

The trade union law specifically addresses unions' responsibility to bargain collectively on behalf of workers' interests. Regulations required the union to gather input from workers prior to consultation with management and to submit collective contracts to workers or their congress for approval. There is no legal obligation for employers to negotiate, and some employers refused to do so.

A key article of the 2008 labor contract law requires employers to consult with labor unions or employee representatives on matters that have a direct bearing on the immediate interests of their workers. Although the central government had not clarified the meaning of this article, some local jurisdictions interpreted it as a mandate for collective bargaining and reflected such an interpretation in local regulations on collective contract negotiations. In 2008 the ACFTU also called on its local organizations to carry out more aggressively their mandate to conclude collective contracts with employers.

The ACFTU reported that by September 2008, 1.1 million collective contracts were signed nationwide (an increase of 13.6 percent from 2007) covering 1.9 million enterprises (up 11.9 percent) and 149.6 million workers (16.6 percent). As of September 2008, 60.2 percent of the workers in enterprises throughout the country were covered by collective contracts. The ACFTU also engaged in a campaign to target transnational enterprises and noted as an example that collective contracts had been signed in Walmart's 108 unionized enterprises in the country.

The law provides for labor dispute resolution through a three-stage process: mediation between the parties, arbitration by officially designated arbitrators, and litigation. The 2008 labor dispute mediation and arbitration law improved workers' access to and streamlined this three-stage process. As noted above, the number of labor disputes nationwide rose significantly, which experts claimed was due in large part to an increase in workers' awareness of the laws and reduction in costs that a worker would incur in the process.

The trade union law provides specific legal remedies against antiunion discrimination and specifies that union representatives may not be transferred or terminated by enterprise management during their term of office. Collective contract regulations provide similar protections for employee representatives during collective consultations.

Workers and their advocates suffered harassment and intimidation from officials and from by criminal elements often hired by employers. For example, in January in Shenzhen Province, local press reported that a developer who owed a contractor a significant amount of money colluded with police to violently attack and prosecute 47 wage-seeking workers, who claimed that they had not received wages for six months. Fifty-two migrant workers protested in Beijing against their employer, demanding unpaid wages. According to press reports, they were severely beaten and then arrested. In February more than 1,000 mostly female workers from a textile factory in Sichuan Province gathered to petition the government to demand legally entitled compensation. Police and security guards were dispatched to disperse the protesters; five workers were injured in the confrontation, and three were detained but later released by the police.

There are no special laws or exemptions from regular labor laws in export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced and compulsory labor and contains provisions relevant to forced labor and trafficking for labor purposes; however, there were reports that such practices occurred. Punishment for forced labor offenses under the criminal code ranged from an administrative fine to a maximum of three years' imprisonment, which was deemed "insufficiently dissuasive" by the International Labor Organization's Committee of Experts on the Application of Standards. In February two persons who admitted imprisoning and beating workers (resulting in the death of an elderly worker) at their illegal brickyard in Shaanxi were sentenced to 18 months and 12 months (suspended for two years), respectively, in prison.

In May a forced labor case at a brick kiln in Anhui Province was exposed. According to local press accounts, police rescued 32 persons with mental disabilities, who had been forced to work as slave laborers, from brick kilns in Zhuanji and Guangwu townships and arrested 10 persons.

Forced labor remained a serious problem in penal institutions. Many prisoners and detainees in RTL facilities were required to work, often with no remuneration. In addition, there were credible allegations that prisoners were forced to work for private production facilities associated with prisons. These facilities often operated under two different names: a prison name and a commercial enterprise name. There was no effective mechanism to prevent the export of goods made under such conditions.

The Ministry of Justice cooperated with international officials to investigate an allegation of exported prison labor goods, allowing visits to a prison facility to investigate allegations that prison-made goods were being exported. Information about prisons, including associated labor camps and factories, was tightly controlled.

There were reports that employers withheld wages, or required unskilled workers to deposit several months' wages, as security against the workers departing early from their labor contracts. These practices often prevented workers from exercising their right to leave their employment and made them vulnerable to forced labor. However, implementation of new labor laws, along with workers' increased knowledge of their rights under these new laws, reportedly reduced these practices.

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children under the age of 16, but child labor remained a problem. The government does not publish statistics on the extent of child labor.

The labor law specifies administrative review, fines, and revocation of business licenses of those businesses that illegally hire minors and provides that underage children found working should be returned to their parents or other custodians in their original place of residence. However, a significant gap remained between legislation and implementation. Workers between the ages of 16 and 18 were referred to as "juvenile workers" and were prohibited from engaging in certain forms of physical work, including labor in mines.

Social compliance auditors working for foreign buyers continued to report some use of child labor in factories producing for export. There were some reports that schools supplied factories with illegal child labor under the pretext of vocational training. The International Trade Union Confederation (ITUC) alleged that the program used forced child labor to make up for school budget shortfalls, including in dangerous and labor-intensive industries such as fireworks manufacturing and cotton harvesting. The ITUC further alleged that teachers and children reported they were pressured to meet daily quotas or faced fines if they failed to meet production targets. Other industries reportedly employing forced child labor include bricks, cotton, electronics, and toys.

On April 6, Liu Pan, a 17-year-old migrant worker from Sichuan Province, was killed in a workplace accident at the Yiuwah Stationary factory in Dongguan, Guangzhou Province. In a follow-up investigation, a local labor NGO reported several labor law violations at the factory, including that underage and child labor were widespread at the factory, with workers as young as 13 being hired in busy seasons. To settle claims related to his death, local press reported that Liu Pan's family accepted a settlement from the factory.

In November one child died and 11 children were critically injured in an explosion at an illegal fireworks shop near Guilin. Two owners of the workshop were in police custody on charges of employing child labor and producing dangerous goods without a license. The children, ages 7 to 15, were local students paid to make firecrackers at the workshop after school.

In June a local blogger posted photographs of child laborers in Wuhan, including two school-age children repairing vehicles outside.

In July 2008 party secretary Ji Bingxuan of Heilongjiang directed local police to rescue Du Xiguang, a 14-year-old migrant child worker in Harbin, and instructed local police to ensure that no business in the city hired children.

On April 1, the government announced a reward system to encourage persons to report the use of child labor, and it continued to react strongly to any publicized cases of child labor. However, many experts believed that child labor could not be eliminated without reform of rural education system and increased rural economic activity.

e. Acceptable Conditions of Work

There was no national minimum wage, but the labor law requires local governments to set their own minimum wage according to standards promulgated by the Ministry of Human Resources and Social Security. These standards include the minimum cost of living for workers and their families, levels of economic development, and employment in the area, as well as the level of social insurance and other benefits contributions paid by the employees themselves. Labor bureaus set these standards to cover basic needs. The regulation states that labor and social security bureaus at or above the county level are responsible for enforcement of the law. It provides that where the ACFTU finds an employer in violation of the regulation, it shall have the power to demand that the relevant labor bureaus deal with the case.

Wage arrears remained a common problem. Governments at various levels continued their efforts to prevent arrears and recover payment of missing wages and insurance contributions. Legal aid lawyers and government sources reported that nonpayment or underpayment of wages accounted for a large portion of labor disputes. The incidence of wage arrears continued to increase early in the year as many of the country's export-oriented manufacturers, facing a sharp decline in orders from overseas, began to lay off large numbers of workers.

The estimated 230 million migrant workers faced numerous other obstacles with regard to working conditions and labor

**Exhibit 2011**
**32**

rights. Many were unable to access public services such as public education or social insurance in the cities where they lived and worked because they were not legally registered urban residents.

The labor law mandates a 40-hour standard workweek, excluding overtime, and a 24-hour weekly rest period. It also prohibits overtime work in excess of three hours per day or 36 hours per month and mandates a required percentage of additional pay for overtime work. However, in practice compliance with the law was weak, and standards were regularly violated, particularly in the private sector and in enterprises that used low-skilled migrant or seasonal labor.

There was inadequate enforcement of wage regulations, and a significant percentage of labor disputes filed by workers were due to insufficient overtime payments. There were reports that companies required workers to sign false contracts and often maintained fraudulent records to deceive government inspectors and factory auditors.

Other illegal practices effectively reduced workers' wages, including arbitrary fines and wage deductions levied by employers for alleged breaches of company rules.

While many labor laws and regulations on worker safety are fully compatible with international standards, implementation and enforcement were generally poor. The Ministry of Human Resource and Social Security reported that in 2008 there were only 23,000 full-time professional inspectors and indicated that there were areas in which a single labor inspector would be responsible for more than 50,000 workers.

Inadequate and poorly enforced occupational health and safety laws and regulations continued to put workers' health and lives at risk. The State Administration for Work Safety (SAWS) sets and enforces occupational health and safety regulations. The work safety law states that employees have the right, after finding an emergency situation that threatens their personal safety, to evacuate the workplace. Employers are forbidden to cancel the labor contracts or reduce the wages or benefits of any employee who takes such action. In practice such protective provisions were poorly enforced at the local level.

Businesses and factories that violate occupational hazard regulations face closure and a maximum penalty of RMB 300,000 (approximately $44,000); they also are required to inform employees about possible occupational hazards and their consequences and provide occupational hazards prevention training. In addition, employers are required to give their workers necessary health checkups and buy protective gear for employees working around hazards. Businesses that violate the provision received a warning from SAWS, ordering them to correct the practice within a time limit. Enterprises that did not correct the problem within the time limit were fined.

The coal industry continued to have a high incidence of accidents and fatalities, but SAWS reported that annual deaths from coalmine accidents dropped 62.4 percent from a peak of 6,995 in 2002 to 2,630 during the year, and the death rate per million tons of mined coal has dropped 84.4 percent from 2000. Independent labor groups stated the actual casualty figures could be much higher, since many accidents were covered up.

The government continued efforts to improve mine safety, which included a policy of consolidating the industry into larger, better-regulated mining companies. In December the government announced that it had closed approximately 1,000 small coal mines during the year, cutting down the total number of coal mines to 15,000 across the country. (This followed a similar number of shutdown mines in 2008). In May the government launched a new nationwide safety inspection program for small coal mines. The campaign, to be jointly carried out by the National Development and Reform Commission, the State Energy Administration, SAWS, and the State Administration of Coal Mine Safety, targeted small mines with an annual production capacity of less than 300,000 tons.

Many workers encountered difficulties in obtaining compensation for work-related injuries. In July migrant miner Zhang Haichao voluntarily underwent surgery to open up his chest to prove he had pneumoconiosis, an occupational lung disease, after repeated attempts to claim compensation for pneumoconiosis failed. After proving the lung disease, Zhang finally received compensation. According to official media reports, more than 100 migrant workers in Shenzhen who claimed compensation due to pneumoconiosis were refused by the local occupational health authority due to their lack of written labor contracts.

The government sought to prosecute some employers responsible for work-related accidents. The most highly publicized was the State Council's decision to impose harsh criminal and disciplinary penalties on 169 persons held responsible for five major accidents in 2007 and 2008. The cases, involving 131 individuals, were handed over to judicial departments for criminal prosecution. The five accidents included a 2007 mine blast in Linfen, Shanxi Province, that killed 105; an April 2008 train collision that claimed 72 lives; and a September 2008 landslide at an unlicensed iron ore tailings facility, also in Linfen, that killed 277 persons.

In addition, in May police detained the manager and four production and management directors of a privately owned mine in Dengfeng after seven persons died of gas poisoning and the managers tried to cover up the accident. In June four construction officials and a driver were arrested for actions that allegedly caused the deaths of 11 miners at the Majialiang coal mine in Shanxi Province, where concentrations of toxic gas were too high. In August police detained 11 individuals for allegedly covering up a coal mine accident that left six persons dead in Shanxi Province. In September authorities

Exhibit/A11
33