# CHINA

The People's Republic of China (PRC), with a population of approximately 1.3 billion, is an authoritarian state in which the Chinese Communist Party (CCP) constitutionally is the paramount authority. Party members hold almost all top government, police, and military positions. Ultimate authority rests with the 25-member Political Bureau (Politburo) of the CCP and its nine-member Standing Committee. Hu Jintao holds the three most powerful positions as CCP general secretary, president, and chairman of the Central Military Commission. Civilian authorities generally maintained effective control of the security forces.

A negative trend in key areas of the country's human rights record continued, as the government took additional steps to rein in civil society, particularly organizations and individuals involved in rights advocacy and public interest issues, and increased attempts to limit freedom of speech and to control the press, the Internet, and Internet access. Efforts to silence political activists and public interest lawyers were stepped up, and increasingly the government resorted to extralegal measures including enforced disappearance, "soft detention," and strict house arrest, including house arrest of family members, to prevent the public voicing of independent opinions. Public interest law firms that took on sensitive cases also continued to face harassment, disbarment of legal staff, and closure.

Individuals and groups, especially those seen as politically sensitive by the government, continued to face tight restrictions on their freedom to assemble, practice religion, and travel. The government continued its severe cultural and religious repression of ethnic minorities in Xinjiang Uighur Autonomous Region (XUAR) and Tibetan areas. Abuses peaked around high-profile events, such as the awarding of the Nobel Peace Prize to democracy activist Liu Xiaobo and sensitive anniversaries.

As in previous years, citizens did not have the right to change their government. Principal human rights problems during the year included: extrajudicial killings, including executions without due process; enforced disappearance and incommunicado detention, including prolonged illegal detentions at unofficial holding facilities known as "black jails"; torture and coerced confessions of prisoners; detention and harassment of journalists, writers, dissidents, petitioners, and others who sought to peacefully exercise their rights under the law; a lack of due process in judicial proceedings, political control of courts and judges; closed trials; the use of administrative detention; restrictions on freedoms to assemble,

practice religion, and travel; failure to protect refugees and asylum-seekers; pressure on other countries to forcibly return citizens to China; intense scrutiny of, and restrictions on, nongovernmental organizations (NGOs); discrimination against women, minorities, and persons with disabilities; a coercive birth limitation policy, which in some cases resulted in forced abortion or forced sterilization; trafficking in persons; prohibitions on independent unions and a lack of protection for workers' right to strike; and the use of forced labor, including prison labor. Corruption remained endemic.

## RESPECT FOR HUMAN RIGHTS

Section 1      Respect for the Integrity of the Person, Including Freedom From:

   a.      Arbitrary or Unlawful Deprivation of Life

During the year security forces reportedly committed arbitrary or unlawful killings. No official statistics on deaths in custody were available. In April 2009 the Supreme People's Procuratorate (SPP) disclosed that at least 15 prisoners died "unnatural deaths" under unusual circumstances as of the 2009 disclosure. According to a Chinese press report, seven of the prisoners died of beatings, three were classified as suicides, two were described as accidents, and three remained under investigation.

On March 8, Zhou Lingguang, a Huazhou, Guangdong Province native died while in detention in Guangzhou. Zhou had been remanded to one year of reeducation through labor (RTL) in 2009 for gambling, but due to space limitations had been transferred to a Juvenile Detention Center. According to prison officials, Zhou's heart "abruptly stopped beating." Family members questioned the official explanation, and demanded an independent autopsy. When the family viewed Zhou's body, they reported his corpse was covered except for the head and that he was enclosed in a glass case. They were not permitted to take photographs. Prison officials refused the family's request to release surveillance footage.

On March 31, Yang Xiuan, an inmate serving a mandatory drug rehabilitation sentence died in a treatment center in Ziyang, Sichuan Province. A center official said he had died of natural causes, but his family doubted the official cause of death claiming that when they saw Yang's body his face was badly bruised.

On May 3, authorities notified Fu Changping's family that he died in an RTL facility in Jixi, Heilongjiang Province. Although facility officials claimed he died

"normally," Fu's family said his body was covered in cuts and bruises. Medical records from when Fu entered the camp weeks earlier noted Fu was in good health. Authorities threatened to withhold compensation for Fu's death if the family continued to suggest Fu was murdered.

On August 8, detainee Ren Aiguo was discovered dead in a detention center located in Heshun County, Jinzhong, Shanxi Province. An inspection team organized by local officials ruled the death a suicide. Ren's family challenged the ruling, claiming inspectors failed to properly investigate the death and ignored critical questions. The family questioned the lack of surveillance footage, although the room in the detention center where Ren was found was equipped with a video camera. The inspection team claimed the monitoring equipment in the facility had been out of service.

There were no known developments in the 2009 deaths in custody of Lin Guojiang, Li Qiaoming, Li Wenyan, all of whom died under suspicious or unexplained circumstances, or regarding the allegation that Tibetan monk, Phuntsok Rabten, was beaten to death by police.

In June Guangxi Litang Prison authorities reported the April 2009 death of He Zhi, a Falun Gong practitioner who was sentenced to eight years' imprisonment in 2005. Authorities at Guangxi Litang Prison, where many Falun Gong practitioners reportedly are imprisoned, stated the cause of death was "falling from bed," but He's brother claimed he found other injuries and bruises on He's body.

According to a media report, Yu Weiping, an inmate at Rushan Detention Center in Weihai, Shandong Province, died in November 2009. His family found small holes in his chest and bruises on his body. Authorities told the family the holes were scars left from pimples; however, an autopsy revealed that sharp objects pierced Yu's chest, rupturing his heart. The family reported the death to the Weihai Public Security Bureau and demanded an investigation. By year's end there was no reported response.

According to official media reports, 197 persons died and 1,700 were injured during the July 2009 rioting in Urumqi. In November 2009 eight ethnic Uighurs and one ethnic Han were executed without due process for crimes committed during the riots. At year's end 26 persons had been sentenced to death; nine others reportedly received suspended death sentences. Of these, three were reportedly ethnic Hans and the rest were Uighurs. In April a Uighur woman became the second woman sentenced to death for involvement in the violence. In December

Uighur journalist Memetjan Abdulla was sentenced to life in prison for transmitting information about the riots because he translated an article from a Chinese-language Web site and posted it on a Uighur-language Web site. *China Daily* reported that, according to the president of the XUAR Supreme People's Court, courts in the XUAR had tried 376 individuals in 2010 for "crimes against national security" and their involvement in the July 2009 violence.

Defendants in criminal proceedings were executed following convictions that sometimes lacked due process and adequate channels for appeal.

    b.    Disappearance

According to a January NGO report and media accounts, Guo Yongfeng, a Shenzhen democracy activist and organizer of the Citizens' Association for Government Oversight, disappeared in September 2009 after being called in to a police station for questioning. Friends of Guo claimed that he had been sentenced to 18 months' detention in an RTL camp; however, security officials would neither confirm nor deny this claim.

In February 2009 authorities detained rights lawyer Gao Zhisheng, who had represented Christians and Falun Gong practitioners. At year's end his whereabouts and legal status remained unknown. According to NGO and media reports, he was seen in his hometown in August 2009 under heavy police escort. Gao was seen briefly in Beijing in March and April, but subsequently disappeared again.

In an October 2009 report, the NGO Human Rights Watch documented the disappearances of hundreds of Uighur men and boys following the July 2009 protests in Urumqi.

On July 7, authorities released underground Catholic bishop Julius Jia Zhiguo of Zhengding, Hebei Province, who had been detained since March 2009.

The whereabouts of underground Catholic priests Zhang Li and Zhang Jianlin, from Zhangjiakou, Hebei Province, whom authorities detained in 2008, remained unknown.

At year's end the government had not provided a comprehensive, credible accounting of all those killed, missing, or detained in connection with the violent suppression of the 1989 Tiananmen demonstrations. In October the Duihua Foundation, an international human rights NGO, estimated that fewer than a dozen

continued to serve sentences for offenses committed during the demonstration, although other estimates were higher. Many activists who were involved in the demonstrations continued to suffer from official harassment.

     c.     Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits the physical abuse of detainees and forbids prison guards from extracting confessions by torture, insulting prisoners' dignity, and beating or encouraging others to beat prisoners. On July 1, new rules went into effect excluding evidence, including confessions, obtained under torture in certain categories of criminal cases. However, during the year there were reports that officials used electric shocks, beatings, shackles, and other forms of abuse.

In July the Ministry of Public Security (MPS) ordered local police officials to cease parading criminal suspects in public and called on local departments to enforce laws in a "rational, calm, and civilized manner." The new regulations were a response to the public outcry over "shame parades," in which individuals suspected of being prostitutes were shackled and paraded in public. According to press reports, in July, prior to the MPS order, police in Dongguan, Guandong Province, forced arrested women in prostitution to parade in the streets barefoot and handcuffed and published their photos on the Internet.

On May 30, the Supreme People's Court, the SPP, the MPS, the Ministry of State Security, and the Ministry of Justice issued regulations regarding the use of evidence in criminal cases. In July the lawyer for Chongqing businessman Fan Qihang revealed evidence that Fan was tortured while in custody in June 2009 on corruption charges. Despite the new regulations that evidence obtained through torture could not be used as a basis for judgment in a criminal case, Fan was executed in September.

Henan activist Liu Shasha stated that on July 16 she was kidnapped outside People's University in Beijing. She identified those responsible as Beijing security officials and officials from Tongbai County, Henan Province, who hooded her and drove her to an unknown location outside Beijing. There, she said, her hands were bound and she was beaten. Liu's cell phone and bank card were taken, and she was dropped off in Ci County, outside Handan, Hebei Province. She returned to Beijing on July 18, and filed a police report regarding the incident.

On July 8, lawyers met with imprisoned activist Guo Feixiong (aka Yang Maodong) in Guangdong Province's Meizhou Prison. During the meeting, Guo presented the lawyers a copy of a document stating his reasons for seeking a review of the judgment, including that he was subjected to torture during the investigation of his case.

According to a July 7 NGO report, democracy activist Xu Wanping, who founded the China Action Party after the 1989 Tiananmen massacre and was serving a 12-year sentence for "inciting subversion of state power," was repeatedly subjected to solitary confinement in Yuzhou Prison, Jiangbei District, Chongqing. The longest period of such confinement reportedly lasted 11 months. Xu's mental and physical health have deteriorated, and he reportedly has not received adequate medical attention while incarcerated. Xu has been denied release on medical parole.

In March lawyer Gao Zhisheng revealed to journalists that he had been tortured during a period of illegal detention beginning in February 2009 (see section 1.b.).

According to an NGO report, Shen Pailan, a Shanghai-based activist and petitioner was tortured and beaten while in detention between March 24 and April 9. On March 24, Shen was kidnapped by employees of the Maqiao municipal government in Minhang District, Shanghai. While detained at a hotel, Shen was tortured and beaten. Shen was later transferred to Zhuanqiao Town Police Station and then to Minhang District Detention Center, where the police announced that she would be subjected to 15 days of administrative detention and fined RMB 500 (approximately $75) for "assault."

According to a November 2009 Human Rights Watch report, in March 2009 An Weifeng was released for medical treatment from Bancheng Prison in Chengde, Henan Province, after being severely beaten and subjected to torture by police.

In November 2008 the UN Committee Against Torture (UN CAT) stated its deep concern about the routine and widespread use in the country of torture and mistreatment of suspects in police custody, especially to extract confessions or information used in criminal proceedings. UN CAT also acknowledged government efforts to address the practice of torture and related problems in the criminal justice system. Many acts of torture allegedly occurred in pretrial criminal detention centers or RTL centers. Sexual and physical abuse and extortion occurred in some detention centers.

There were widespread reports of activists and petitioners being committed to mental health facilities and involuntarily subjected to psychiatric treatment for political reasons. According to *China News Weekly*, the MPS directly administers 22 high-security psychiatric hospitals for the criminally insane (also known as ankang facilities). From 1998 to May 2010, more than 40,000 persons were committed to ankang hospitals. In May an MPS official stated in a media interview that detention in ankang facilities was not appropriate for patients who did not demonstrate criminal behavior. However, political activists, underground religious believers, persons who repeatedly petitioned the government, members of the banned Chinese Democracy Party (CDP), and Falun Gong adherents were among those housed with mentally ill patients in these institutions. Regulations governing security officials' ability to remand a person to an ankang facility were not clear, and detainees had no mechanism for objecting to claims of mental illness by security officials. Patients in these hospitals reportedly were medicated against their will and forcibly subjected to electric shock treatment.

According to a June 29 NGO report, Liao Meizhi was detained in February by individuals allegedly engaged by the Qianjiang Bureau of Health and the Laoxin Town Public Health Clinic while she was in petitioning with family members. She subsequently was committed to a psychiatric hospital. Liao had previously been detained in psychiatric institutions for petitioning. It was not known whether an independent doctor assessed her mental health.

On June 5, a Beijing Chaoyang District Court ruled that China Petroleum and Chemical Corporation (Sinopec) had not violated the rights of former employee Chen Miaocheng, who died after 13 years of detention in a psychiatric institution. Chen, was involuntarily hospitalized in 1995 for "paranoid schizophrenia" but cleared for release in December 1996 by doctors at Beijing's Huilongguan Hospital. However, the hospital refused to discharge Chen unless his employer, Sinopec, agreed to his release. Sinopec refused, and Chen died in the hospital 12 years after being cleared for discharge. It remains unclear why Chen's employer needed to clear his release, or why this was withheld. Chen's widow filed a lawsuit against Sinopec, arguing that by having Chen involuntarily committed to a psychiatric institution, Sinopec had violated Chen's rights to life, liberty, and health. The court ruled that Sinopec had not violated the law when it committed Chen to the hospital and was not liable for his death since Chen died from pneumonia.

According to an NGO report, on March 29, officials in Wuhan, Hubei, illegally detained petitioner Liu Caixia in a psychiatric institution. Liu, a former accountant

at Central China University of Science and Technology in Wuhan, traveled to
Beijing on March 26 to petition the government over losing her job. Liu was
detained in Beijing by officials from the Beijing Liaison Office of the Hongshan
District Government and forcibly returned to Wuhan. Liu reportedly was detained
in the psychiatric ward of the Huashan Town Health Clinic in Hongshan District.

Prison and Detention Center Conditions

Conditions in penal institutions for both political prisoners and criminal offenders
were generally harsh and often degrading. Prisoners and detainees were regularly
housed in overcrowded conditions with poor sanitation. Inadequate prison capacity
remained a problem in some areas. Food often was inadequate and of poor quality,
and many detainees relied on supplemental food and medicines provided by
relatives. Some prominent dissidents were not allowed to receive such goods.
Adequate, timely medical care for prisoners remained a serious problem, despite
official assurances that prisoners have the right to prompt medical treatment.

Article 53 of the Prison Law mandates that a prison shall be ventilated, allow for
natural light, and be clean and warm. However, in many cases there were
inadequate provisions for sanitation, ventilation, heating, lighting, basic and
emergency medical care, and access to potable water.

Forced labor remained a serious problem in penal institutions. Many prisoners and
detainees in penal and RTL facilities were required to work, often with no
remuneration. Information about prisons, including associated labor camps and
factories, was considered a state secret.

In response to claims that the organs of executed prisoners were harvested for
transplant purposes, Vice Minister of Health Huang Jiefu in August 2009 stated
that inmates were not a proper source for human organs and that prisoners must
give written consent for their organs to be removed.

Conditions in administrative detention facilities, such as RTL camps, were similar
to those in prisons. Beating deaths occurred in administrative detention and RTL
facilities. According to NGO reports, conditions in these facilities were similar to
those in prisons, with detainees reporting beatings, sexual assaults, lack of proper
food, and no access to medical care.

Information on the prison population is not made public. In 2004 then minister of
justice Fan Fangping reportedly said there were more than 670 prisons housing

"more than 1.5 million prisoners." According to domestic media reporting, a Ministry of Justice survey estimated that the prison population as of the end of 2005 was 1.56 million. The law requires juveniles be housed separately from adults, unless facilities are insufficient. In practice children were sometimes housed with adult prisoners and required to work. Political prisoners were housed with the general prison population and reported being beaten by other prisoners at the instigation of guards.

Many prisoners and detainees did not have reasonable access to visitors and were not permitted religious observance. Under Article 52 of the Jail Law, "considerations shall be given to the special habits and customs of prisoners of minority ethnic groups." The Detention Center Regulation Article 23 had similar requirements. However, little information was available about the implementation of these regulations.

Prisoners and detainees are legally entitled to submit complaints to judicial authorities without censorship and request investigation of credible allegations of inhumane conditions. Article 47 of the Prison Law further states that letters from a prisoner to higher authorities of the prison or to the judicial organs shall be free from examination. The law further states that a prison "shall set up medical [facilities], living and sanitary facilities, and institute regulations on the life and sanitation of prisoners." It also states that the medical and health care of prisoners shall be put into the public health and epidemic prevention program of the area in which the prison is located. However, authorities did not investigate credible allegations of inhumane conditions nor document the results of such investigations in a publicly accessible manner.

The law requires the government to investigate and monitor prison and detention center conditions, and an official from the Prosecutor's Office is designated responsible for investigating and monitoring prison and detention center conditions.

The government generally did not permit independent monitoring of prisons or RTL camps, and prisoners remained inaccessible to local and international human rights organizations, media groups, and the International Committee of the Red Cross (ICRC).

     d.     Arbitrary Arrest or Detention

## CHINA 10

Arbitrary arrest and detention remained serious problems. The law grants police broad administrative detention powers and the ability to detain individuals for extended periods without formal arrest or criminal charges.

Role of the Police and Security Apparatus

The main domestic security agencies include the Ministry of State Security, the MPS, and the People's Armed Police. The People's Liberation Army was primarily responsible for external security but also had some domestic security responsibilities. Local jurisdictions also frequently used civilian municipal security forces, known as "urban management" officials, to enforce laws.

The MPS coordinates the country's police force, which is organized into specialized police agencies and local, county, and provincial jurisdictions. Judicial oversight of the police was limited, and checks and balances were absent. Corruption at the local level was widespread. Police and urban management officials engaged in extrajudicial detention, extortion, and assault. In 2009 the Supreme People's Procuratorate acknowledged continuing widespread abuse in law enforcement. In 2009 domestic news media reported the convictions of public security officials who had beaten to death suspects or prisoners in their custody.

Arrest Procedures and Treatment While in Detention

The law allows police to detain suspects for up to 37 days before formal arrest. After arrest, police are authorized to detain a suspect for up to an additional seven months while the case is investigated. After the completion of a police investigation, an additional 45 days of detention are allowed for the procuratorate to determine whether to file criminal charges. If charges are filed, authorities can detain a suspect for an additional 45 days before beginning judicial proceedings. As a result, pretrial detention periods of a year or longer are not uncommon. In practice the police sometimes detained persons beyond the period allowed by law. The law stipulates that detainees be allowed to meet with defense counsel before criminal charges are filed. Police often violated this right.

The criminal procedure law requires a court to provide a lawyer to a defendant who has not already retained a lawyer; who is blind, deaf, mute, a minor; or who may be sentenced to death. This law applies whether or not the defendant is indigent. Courts may also provide lawyers to other criminal defendants who cannot afford them, although courts often did not appoint counsel in such circumstances.

Criminal defendants are entitled to apply for bail while awaiting trial. However, in practice few suspects were released on bail.

The law requires notification of family members within 24 hours of detention, but individuals were often held without notification for significantly longer periods, especially in politically sensitive cases. Under a sweeping exception, officials are not required to provide notification if doing so would "hinder the investigation" of a case.

The law protects the right to petition the government for resolution of grievances. However, citizens who traveled to Beijing to petition the central government were frequently subjected to arbitrary detention, often by police dispatched from the petitioner's hometown. Some provincial governments operated facilities in Beijing or in other localities where petitioners from their districts were held in extrajudicial detention. Some local governments took steps to restrict petitioning. According to a May 27 Shanxi provincial government report, the Shanxi Provincial People's Congress adopted regulations that listed eight types of "prohibited" petitioning, including "illegally gathering, encircling or rushing into government offices or important public spaces, stopping cars or hindering public transportation, linking up with others to petition," and similar acts. The regulations also stated that petitioners suspected of "misrepresenting facts to frame others" could be subject to criminal charges.

According to NGO reports, Luan Chuyu of Nantong, Jiangsu Province, a villager facing forced eviction, was detained by police while petitioning in Beijing; she was held in a "black jail" from June 16-18 and then forcibly returned to Nantong, where she was detained illegally in a local black jail for an additional month. Luan was released after local officials pressured her into signing an agreement consenting to the demolition of her home.

On September 5, Liu Yujie a petitioner from Shiyan, Hubei Province, who had been demanding a meeting with Supreme People's Court President Wang Shengjun after losing her home in what she believed to be an unjust court ruling, was detained by police outside the Supreme People's Court in Beijing per a human rights NGO report. Liu was reportedly taken to a black jail in Jiujingzhuang, Beijing. Shiyan municipal officials in Beijing took custody of Liu and moved her to a black jail operated by the Beijing Liaison Office of Tanghe County, Henan Province. At year's end her status remained unclear.

According to NGO reports, on October 6, petitioner Liu Xianzhi of Henan Province, was detained in Beijing and forcibly returned to her hometown of Nancao Township. While in Beijing Liu was reportedly held in a black jail operated by local government officials where she was beaten and sustained head and neck injuries.

In July 2009 Noor-Ul-Islam Sherbaz, a minor, was detained and accused of participating in the July riots in Urumqi. In contravention of the law on the detention of juveniles, Sherbaz's parents had no contact with their son after his arrest and were not allowed to be present during police interrogations. On April 13, Aksu Intermediate People's Court found Sherbaz guilty of murder, at a trial that reportedly lasted 30 minutes, and sentenced him to life imprisonment.

The law permits nonjudicial panels, known as "labor reeducation panels," to remand persons to RTL camps or other administrative detention programs for up to three years without trial. Labor reeducation panels are authorized to extend these administrative sentences for up to one year. Detainees are technically allowed to challenge administrative RTL sentences and appeal for sentence reduction or suspension. However, appeals were rarely successful. Other forms of administrative detention include "custody and education" (for women engaged in prostitution and those soliciting prostitution) and "custody and training" (for minor criminal offenders). The 2008Anti-Drug Law established a system of "compulsory isolation for drug rehabilitation." The minimum stay in such centers is two years and the law states that this treatment can include work. Public security organs authorize detention in these centers and it often is meted out as an administrative rather than criminal measure. Administrative detention was used to intimidate political activists and prevent public demonstrations.

Shanghai housing activist Mao Hengfeng was detained early in the year and sentenced to 18 months of RTL on March 4 for "disturbing social order." Mao's family members and lawyer were prevented from visiting her for extended periods during the year.

On August 6, a district court in Baoding, Hebei Province, heard a suit brought by reporter and activist Xu Yishun (also known by his pen name Kong Fanzhong). Xu challenged a Baoding RTL Management Committee's May 25 decision to sentence him to 18 months RTL for fraud. The hearing ended without issuance of a verdict.

Authorities arrested persons on allegations of revealing state secrets, subversion, and other crimes as a means to suppress political dissent and public advocacy.

**Exhibit B**
**12**

These charges remain ill defined, including what constitutes a state secret. Citizens also were detained under broad and ambiguous state secrets laws for, among other actions, disclosing information on criminal trials, meetings, and government activity.

Human rights activists, journalists, unregistered religious leaders, and former political prisoners and their family members were among those targeted for arbitrary detention or arrest.

The government continued to use extrajudicial house arrest against dissidents, former political prisoners, family members of political prisoners, petitioners, underground religious figures, and others it deemed politically sensitive. Numerous dissidents, activists, and petitioners were placed under house arrest during the October National Day holiday period and at other sensitive times, such as during the Shanghai Expo and the December Nobel Prize ceremony. Conditions faced by those under house arrest varied but sometimes included complete isolation in their homes under police guard. In some instances security officials were stationed inside the homes of subjects under house arrest. Others were occasionally permitted to leave their homes to work or run errands but were required to ride in police vehicles. When permitted to leave their homes, subjects of house arrest were usually under police surveillance.

In March several Beijing dissidents, including Cha Jianguo, Gao Hongming, Li Hai, Xu Yonghai, and Qi Zhiyong, were placed under house arrest to prevent them from commemorating the 1989 Tiananmen massacre.

On April 3, security guards at a Beijing housing compound prevented artist and activist Yan Zhengxue from leaving his residence to attend an arts exhibition. When Yan argued with the guards blocking his exit, they beat him, inflicting multiple injuries. Beijing artist and activist Yang Licai was also placed under house arrest in late March with a police vehicle and five police officers stationed outside his home. Retired Shandong University professor Sun Wenguang was placed under house arrest at his home in Jinan, Shandong.

On September 9, blind human rights lawyer Chen Guangcheng was released after completing a prison sentence of three years and four months on politically motivated charges of "disrupting traffic." Since his release, Chen, his wife, and his mother have been under house arrest and prevented from communicating with others. Chen was not allowed to seek medical attention for a gastrointestinal condition he developed in prison.

## CHINA                                    14

On December 10, ethnic Mongolian activist Hada was released from prison after serving a 15-year prison sentence for espionage and separatism. Hada founded the Southern Mongolia Democracy Alliance, which called for a referendum on the future of the province of Inner Mongolia. At year's end neither he, his wife, nor his son have been seen publicly since his release.

After the announcement of the awarding of the 2010 Nobel Peace Prize to imprisoned writer Liu Xiaobo, his wife, Liu Xia, was placed under extrajudicial house arrest. At year's end she had not seen in public since October, and her electronic and telephone communication ceased in November.

Police surveillance, harassment and detentions of activists increased around politically sensitive events. Shanghai residents experienced more stringent security measures during the Shanghai World Expo from May 1 to October 31. In the period leading up to, and during the Expo, several prominent Shanghai activists, including Feng Zhenghu and Zheng Enchong, were placed under house arrest. Others were prevented from entering the city. Authorities prevented blogger Wen Kejian and artist Ai Weiwei from entering Shanghai on separate occasions during the Expo. Authorities prevented activists from departing China prior to the December 10 Nobel Peace Prize award ceremony, and briefly detained a number of prominent rights activists immediately before and during the Nobel ceremony. The annual plenary session of the National People's Congress (NPC) and the Chinese People's Political Consultative Conference (CPPCC), the anniversary of the Tiananmen massacre, the October announcement of the Nobel Peace Prize triggered similar security responses. Authorities in the XUAR used house arrest and other forms of arbitrary detention against those accused of supporting the "three evils" of religious extremism, "splittism," and terrorism.

    e.      Denial of Fair Public Trial

The law states that the courts shall exercise judicial power independently, without interference from administrative organs, social organizations, and individuals. However, in practice the judiciary was not independent. Legal scholars have interpreted President Hu Jintao's doctrine of the "Three Supremes" as stating that the interests of the Party are above the law. Judges regularly received political guidance on pending cases, including instructions on how to rule, from both the government and the CCP, particularly in politically sensitive cases. The CCP Law and Politics Committee has the authority to review and influence court operations at all levels of the judiciary.

Corruption also influenced court decisions. Safeguards against judicial corruption were vague and poorly enforced. Local governments appoint and pay local court judges and, as a result, often exerted influence over the rulings of judges in their districts.

Courts are not authorized to rule on the constitutionality of legislation. The law permits organizations or individuals to question the constitutionality of laws and regulations, but a constitutional challenge can only be directed to the promulgating legislative body. As a result, lawyers had little or no opportunity to use the constitution in litigation.

On February 9, Tan Zuoren was sentenced to five years in prison and three years' deprivation of political rights for "inciting subversion of state power" in a trial that was closed to the public (see Political Prisoners section). Tan had attempted to collect the names of students who died in the May 2008 Sichuan earthquake. The sentence was upheld by the Sichuan High People's Court on June 9.

On July 23, an Urumqi court sentenced Uighur journalist Gheyret Niyaz to 15 years in prison for "endangering state security." Niyaz, detained since October 2009, was reportedly not allowed access to defense counsel during his trial.

Nobel Peace Prize laureate Liu Xiaobo, coauthor of the Charter 08 manifesto, which called for increased political freedoms and human rights in China, was found guilty of the crime of "inciting subversion of state power" in a December 2009 trial that included serious due process violations. The Beijing High People's Court denied Liu's appeal on February 11.

Trial Procedures

There was no presumption of innocence, and the criminal justice system was biased toward a presumption of guilt, especially in high-profile or politically sensitive cases. According to the *China Law Yearbook*, in 2009 the combined conviction rate for first- and second-instance criminal trials was 99.9 percent. Of 997,872 criminal defendants tried in 2009, 1,206 were acquitted. In many politically sensitive trials, courts handed down guilty verdicts with no deliberation immediately following proceedings. Courts often punished defendants who refused to acknowledge guilt with harsher sentences than those who confessed. The appeals process rarely resulted in overturned convictions. Appeals processes failed

to provide sufficient avenues for review, and there were inadequate remedies for violations of defendants' rights.

Supreme People's Court regulations require all trials to be open to the public, with the exceptions of cases involving state secrets, privacy issues, and minors. Authorities used the state-secrets provision to keep politically sensitive proceedings closed to the public and sometimes even to family members and to withhold access to defense counsel. Court regulations state that foreigners with valid identification should be allowed to observe trials under the same criteria as Chinese citizens. In practice foreigners were permitted to attend court proceedings only by invitation. As in past years, foreign diplomats and journalists unsuccessfully sought permission to attend a number of trials. In some instances the trials were reclassified as "state secret" cases or otherwise closed to the public. Foreign diplomats requested but were denied permission to attend the February 2009 trial of human rights advocate Huang Qi on charges of illegally possessing state secrets. Huang was sentenced in November 2009 to three years' imprisonment. His appeal was denied by the Chengdu Intermediate Court on February 8. According to NGO reports, Huang was not granted a formal appeal hearing before the decision was made. Requests by foreign diplomats to attend the February appeal hearing in the case of Liu Xiaobo were denied. Some trials were broadcast, and court proceedings were a regular television feature. A few courts published their verdicts on the Internet.

The law grants most defendants the right to seek legal counsel upon their initial detention and interrogation, although police frequently violated this right. Individuals who face administrative detention do not have the right to seek legal counsel. Human rights lawyers reported that they were denied the ability to defend certain clients or threatened with punishment if they chose to do so.

Both criminal and administrative defendants were eligible for legal assistance although 70 percent or more of criminal defendants went to trial without a lawyer. According to the *China Law Yearbook*, the number of legal-aid cases in 2009 totaled 542,686, a slight decrease from the previous year. Legal-aid personnel totaled 13,081, a slight increase over 2008, the vast majority of whom majored in law. Despite these slight shifts, the number of legal-aid personnel remained inadequate to meet demand. Non-attorney legal advisors provided the only legal-aid options in many areas.

Some lawyers declined to represent defendants in politically sensitive cases, and such defendants frequently found it difficult to find an attorney. The government

took steps to discourage lawyers from representing defendants in sensitive cases. Following the July 2009 unrest in the XUAR, the Beijing Municipal Judicial Bureau posted a notice on its Web site urging justice bureaus, the Beijing Municipal Lawyers Association, and law firms in Beijing to "exercise caution" in representing defendants facing charges related to the riots. Similar measures were taken with respect to Tibetan defendants. Certain Beijing-based rights lawyers were told they could not represent jailed Tibetans. Tibetan filmmaker Dhondup Wangchen was denied counsel of his choosing as the attorney hired by his family was replaced with a government-appointed lawyer for his 2009 trial and 2010 appeal. Certain local governments in the XUAR and Tibetan areas implemented regulations stipulating that only locally registered attorneys were authorized to represent local defendants.

When defendants were able to retain counsel in politically sensitive cases, government officials sometimes prevented attorneys from organizing an effective defense. Tactics employed by court and government officials included unlawful detentions, disbarment, harassment and physical intimidation and denial of access to evidence.

In August security guards barred lawyer Zhang Kai from entering a courthouse in Linfen County, Shanxi Province, to file an administrative lawsuit on behalf of members appealing the potential destruction of a church building. According to domestic media, on April 7, when two lawyers tried to file a suit at the Heilongjiang High People's Court on behalf of villagers who believed they were unfairly compensated in a land requisition case, court police assaulted them, detaining one of the lawyers for two hours. The lawyers believed the attack was intended to prevent them from filing the lawsuit.

In April 2009 Beijing lawyer Cheng Hai was attacked and beaten while on his way to meet with a Falun Gong client in Chengdu, Sichuan Province. According to Cheng, those responsible for the attack were officials from the Jinyang General Management Office, Wuhou District, Chengdu.

The annual licensing review process was used to withhold licenses, and therefore the ability to practice law, from a number of human rights and public interest lawyers. According to the Beijing Lawyers Association , 95 percent of Beijing attorneys were re-licensed in the 2010 annual review process. However, attorneys whose licenses were not renewed included a number of prominent human rights lawyers including Jiang Tianyong, Teng Biao, Wen Haibo, Zhang Lihui, Tong Chaoping, Yang Huiwen, and Li Jinsong. Shanghai rights lawyers Zheng Enchong

and Guo Guoting were denied the renewal of their licenses as the result of a similar administrative finding in 2008.

On April 30, the Beijing Municipal Bureau of Justice permanently revoked the licenses of lawyers Liu Wei and Tang Jitian who had been active in defending human rights and religious freedom-related cases. On May 4, Liu and Tang filed a criminal complaint claiming that by revoking their licenses the Bureau of Justice Lawyers Management Department had abused its power in retaliation for their activism on behalf of lawyers.

Defense attorneys may legally be held responsible if their client commits perjury, and prosecutors and judges have wide discretion to decide what constitutes perjury. In some sensitive cases, lawyers had no pretrial access to their clients, and defendants and lawyers were not allowed to communicate with one another during trials. In practice criminal defendants were frequently not assigned an attorney until a case was brought to court. Despite a 2008 statement by SPC Vice President Zhang Jun that 37 percent of criminal defendants were represented by lawyers, in 2009 only one in seven criminal defendants reportedly had legal representation.

Mechanisms allowing defendants to confront their accusers were inadequate. Only a small percentage of trials involved witnesses and less than 10 percent of subpoenaed witnesses appeared in court. In most criminal trials, prosecutors read witness statements, which neither the defendants nor their lawyers had an opportunity to rebut. Although the criminal procedure law states that pretrial witness statements cannot serve as the sole basis for conviction, prosecutors relied heavily on such statements to support their cases. Defense attorneys had no authority to compel witnesses to testify or to mandate discovery, although they could apply for access to government-held evidence relevant to their case. Pretrial access to information by defense attorneys was minimal. Denial of due process by police and prosecutors led to particularly egregious consequences in capital cases.

At year's end the Criminal Code contained 68 capital offenses, including nonviolent financial crimes such as counterfeiting currency, embezzlement, and corruption. In August state media reported that a pending amendment to the capital-punishment law would remove 13 nonviolent economic crimes--ranging from smuggling relics and endangered animals to falsifying tax receipts--from the list of capital crimes. Persons above the age of 75 would be eligible for the exemption from the death penalty. There was no public information on how many defendants were either sentenced to the death penalty or executed during the year.

## CHINA                                                    19

In 2007 the Supreme People's Court (SPC) resumed the practice of reviewing all convictions that resulted in death sentences before executions may be carried out; with the exception of death sentences with a two-year reprieve. SPC spokesman Ni Shouming stated that, since reassuming the death penalty reviews, the SPC had returned 15 percent of death sentences to lower courts for further review based on unclear facts, insufficient evidence, inappropriate use of the death penalty, and inadequate trial procedures. Because official statistics remained a state secret, it was not possible to evaluate independently the implementation and effects of the procedures.

An international human rights NGO estimated that approximately 5,000 persons were executed during 2009.

Political Prisoners and Detainees

Government officials continued to deny holding any political prisoners, asserting that authorities detained persons not for their political or religious views but because they violated the law. However, the authorities continued to imprison citizens for reasons related to politics and religion. Tens of thousands of political prisoners remained incarcerated, some in prisons and others in RTL camps or administrative detention. The government did not grant international humanitarian organizations access to political prisoners.

Foreign NGOs estimated that several hundred persons remained in prison for "counterrevolutionary crimes," which were repealed from the criminal code in 1997. Thousands of others were serving sentences under state security statutes. Foreign governments urged the Chinese government to review the cases of those charged before 1997 with counterrevolutionary crimes and to release those who had been jailed for nonviolent offenses under repealed provisions of the criminal law. At year's end no systematic review had occurred. The government maintained that prisoners serving sentences for counterrevolutionary crimes and endangering state security were eligible to apply for sentence reduction and parole. However, political prisoners were granted early release at lower rates than prisoners in other categories. Persons were believed to remain in prison for crimes in connection with their involvement in the 1989 Tiananmen prodemocracy movement. The exact number was unknown because related official statistics were never made public.

On January 15, Zhou Yongjun, a former Tiananmen Square student leader, was sentenced to nine years in prison for "fraud" by a Shehong County, Sichuan Province court, following his November 2009 trial. Zhou had been detained in

2008 in Hong Kong while attempting to enter the country on a forged Malaysian passport in order to visit his ailing father. Although cleared by Hong Kong authorities of involvement in bank fraud, he was transferred to the custody of PRC authorities.

In August 2009 activist Tan Zuoren went on trial for defaming the CCP, the charge resulting from his social advocacy work. On February 9, Tan was sentenced to five years in prison and three years' deprivation of political rights for "inciting subversion of state power."

In July Charter 08 signatory and activist Liu Xianbin was indicted for subversion for an article he wrote following his 2009 release from a previous prison term. At year's end Liu was detained and awaiting trial in Suining, Sichuan Province. Liu was reportedly denied access to his lawyers during his detention.

In March 2009 labor activist and lawyer Yuan Xianchen was convicted of "inciting subversion of state power" and sentenced to four years in prison and five years' deprivation of political rights, on the basis of articles he had written on implementing constitutional democracy.

Many political prisoners remained in prison or under other forms of detention at year's end, including rights activists Hu Jia and Wang Bingzhang; Alim and Ablikim Abdureyim, sons of Uighur activist Rebiya Kadeer; journalist Shi Tao; democratic reform advocate Wang Xiaoning; land rights activist Yang Chunlin; Internet commentator Xu Wei; labor activists Hu Mingjun, Huang Xiangwei, Kong Youping, Ning Xianhua, Li Jianfeng, Li Xintao, Lin Shun'an, Li Wangyang, and She Wanbao; Catholic bishop Su Zhimin; Christian activist Zhang Rongliang; Uighur activist Dilkex Tilivaldi; and Tibetan Tenzin Deleg.

In September rights lawyer Chen Guangcheng was released from prison following the completion of his sentence and was immediately placed under house arrest, along with his wife. In November democracy activist Qin Yongmin was released in Wuhan, after serving a 12-year sentence for "endangering state security." According to media reports, police officers confiscated his prison writings and warned him not to speak to reporters or meet other dissidents. At year's end Zhao Lianhai, who had been indicted on criminal charges for his advocacy on behalf of victims of tainted milk, was released on medical parole, but his whereabouts and welfare remained unconfirmed.

Criminal punishments continued to include "deprivation of political rights" for a fixed period after release from prison, during which time the individual is denied rights of free speech and association. Former prisoners sometimes found their ability to find employment, freedom to travel, access to residence permits and social services severely restricted. Former political prisoners and their families frequently were subjected to police surveillance, telephone wiretaps, searches, and other forms of harassment.

Civil Judicial Procedures and Remedies

Courts deciding civil matters faced the same limitations on judicial independence as in criminal cases. The State Compensation Law provides administrative and judicial remedies for plaintiffs whose rights or interests have been infringed by government agencies or officials, including wrongful arrest or conviction, extortion of confession by torture, unlawful use of force resulting in bodily injury, illegal revocation of a business license, or illegal confiscation or freezing of property. In April the National People's Congress Standing Committee amended the law to allow for compensation for wrongful detention, mental trauma, or physical injuries inflicted by detention center or prison officials. In civil matters successful plaintiffs often found it difficult to enforce court orders.

Companies affected by a July 16 oil spill in Dalian, Liaoning Province, were prevented from filing lawsuits for damages resulting from the spill. City officials visited one company to urge it to drop its claims, according to domestic media. In August police in Beijing intercepted fishermen and other Dalian residents impacted by the spill when they attempted to file a petition seeking compensation.

f.      Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law states that the "freedom and privacy of correspondence of citizens are protected by law"; however, in practice authorities often did not respect the privacy of citizens. Although the law requires warrants before law enforcement officials can search premises, this provision frequently was ignored. The Public Security Bureau (PSB) and prosecutors are authorized to issue search warrants on their own authority without judicial review. Cases of forced entry by police officers continued to be reported.

Authorities monitored telephone conversations, fax transmissions, e-mail, text messaging, and Internet communications. Authorities also opened and censored

domestic and international mail. Security services routinely monitored and entered residences and offices to gain access to computers, telephones, and fax machines.

The monitoring and disruption of telephone and Internet communications were particularly widespread in the XUAR and Tibetan areas. Authorities frequently warned dissidents and activists, underground religious figures and former political prisoners not to meet with foreign journalists or diplomats, especially before sensitive anniversaries, at the time of important government or party meetings, and during the visits of high-level foreign officials. Security personnel also harassed and detained the family members of political prisoners, including following them to meetings with foreign reporters and diplomats and urging them to remain silent about the cases of their relatives.

Family members of activists, dissidents, Falun Gong practitioners, journalists, unregistered religious figures, and former political prisoners were targeted for arbitrary arrest, detention, and harassment (see section 1.d.).

Forced relocation because of urban development continued and in some locations increased during the year. Protests over relocation terms or compensation were common, and some protest leaders were prosecuted. In rural areas relocation for infrastructure and commercial development projects resulted in the forced relocation of millions of persons.

Property-related disputes between citizens and government authorities, which often turned violent, were widespread in both urban and rural areas. These disputes frequently stemmed from local officials colluding with property developers to pay little or no compensation to displaced residents, combined with a lack of effective government oversight or media scrutiny of local officials' involvement in property transactions, as well as a lack of legal remedies or other dispute resolution mechanisms for displaced residents. The problem persisted despite central government efforts to impose stronger controls over illegal land takings and to standardize compensation. International media and other observers have raised doubt whether development of historically or culturally sensitive land, such as the Old City area in Kashgar, XUAR, was carried out in a transparent, fair manner.

In November Chinese media reported that a woman committed suicide by self-immolation in Chengdu, Sichuan Province, after district authorities ordered the house of her ex-husband be forcibly demolished following failed negotiations with the landlord. In December Chinese media reported a case of self-immolation to protest a forced eviction in Beijing. In this case, in an attempt to stop the forced

demolition of his family's house in Beijing's Haidian district, the individual reportedly burned himself, but survived. His mother and his wife were injured during the confrontation with workers carrying out the demolition order. Local media reported that the head of the district where the demolition happened also had an interest in the real estate development company responsible for development of the area.

National law prohibits the use of physical coercion to compel persons to submit to abortion or sterilization. However, intense pressure to meet birth limitation targets set by government regulations resulted in instances of local family-planning officials using physical coercion to meet government goals. Such practices included the mandatory use of birth control and the abortion of unauthorized pregnancies. In the case of families that already had two children, one parent was often pressured to undergo sterilization.

A U.S.-based human rights organization reported that in August, the one-month-old daughter of a mother in Changfeng County, Anhui Province, was detained by local family-planning officials until the woman signed a document consenting to a sterilization procedure.

In April as reported by a regional investigative newspaper affiliated with the newspaper *Southern Daily* and later in the international press, local family-planning officials in Puning, Guangdong Province, initiated an "education campaign" to encourage nearly 9,559 "most serious violators of family-planning policies" to undergo sterilization procedures. Reportedly, 1,300 persons were detained during this process, including family members of couples who had unauthorized births, until at least one member of the couple in violation submitted to a sterilization procedure.

In late-April officials in Pingxiang, Jiangxi Province, levied a RMB 2,000 ($300) fine and threatened to demolish the home of the parents of a migrant worker who failed to submit his family-planning paperwork.

Laws and regulations forbid the termination of pregnancies based on the sex of the fetus, but because of the intersection of birth limitations and a traditional preference for male children, particularly in rural areas, many families used ultrasound technology to identify female fetuses and terminate these pregnancies. National Population and Family Planning Commission (NPFPC) regulations ban non-medically necessary determinations of the sex of the fetus and sex-selective abortions, but some experts believed that the penalties for violating the regulations

were not severe to deter unlawful behavior. According to government estimates released in February, the national average for the male-female sex ratio at birth was 119 to 100 in 2009 (compared with norms elsewhere of between 103 and 107 to 100). The Chinese Academy of Social Sciences estimated that by 2020, there could be as many as 24 million more men than women of marriageable age (ages 19-45) in China. In September Vice Premier Li Keqiang announced that the government would "launch measures to narrow the widening ratio of men and women."

Regulations requiring women who violate family-planning policy to terminate their pregnancies still exist in the 25th, 42nd, and 22nd provisions of the Population and Family Control Regulation of Liaoning, Jilin, and Heilongjiang provinces, respectively. An additional 10 provinces--Fujian, Guizhou, Guangdong, Gansu, Jiangxi, Qinghai, Sichuan, Shanxi, Shaanxi, and Yunnan--require unspecified "remedial measures" to deal with unauthorized pregnancies (see section 6).

Section 2      Respect for Civil Liberties, Including:

a.      Freedom of Speech and Press

The law provides for freedom of speech and of the press, although the government generally did not respect these rights in practice. The government continued to control print, broadcast, and electronic media tightly and used them to propagate government views and CCP ideology. During the year the government increased censorship and manipulation of the press and the Internet during sensitive anniversaries.

Foreign journalists were generally prevented from obtaining permits to travel to Tibet except for highly controlled, government-organized press visits. While foreign journalists were allowed access to Urumqi, XUAR after the July 2009 riots, and during the year, local and provincial authorities continued to strictly control the travel, access, and interviews of foreign journalists, even forcing them to leave cities in parts of the XUAR. Media outlets received regular guidance from the Central Propaganda Department, listing topics that should not be covered. After events such as the July 2009 riots, the 2008 Sichuan earthquake, or the 2010 Yushu earthquake media outlets were told to cover the stories using content carried by government-controlled Xinhua and China Central Television.

**Exhibit B**
**24**