1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
       Kathleen M. Sullivan (CA Bar No. 242261)
2       kathleensullivan@quinnemanuel.com
     555 Twin Dolphin Drive, 5th Floor
3    Redwood City, California 94065
     Telephone:     (650) 801-5000
4    Facsimile:     (650) 801-5100

5      Faith E. Gay (*pro hac vice*)
        faithgay@quinnemanuel.com
6       Isaac Nesser (*pro hac vice*)
        isaacnesser@quinnemanuel.com
7    51 Madison Avenue, 22nd Floor
     New York, New York 10010
8    Telephone:     (212) 849-7000
     Facsimile:     (212) 849-7100
9
     Attorneys for Defendants Cisco Systems, Inc.,
10   John Chambers, Thomas Lam, and Owen Chan

11                      UNITED STATES DISTRICT COURT
12                    NORTHERN DISTRICT OF CALIFORNIA
                            SAN JOSE DIVISION
13

| | |
|---|---|
| 14  Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Liu Guifu, and those individuals similarly situated, | Case No. 5:11-cv-02449-JF |
| 15 | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS** |
| 16                      Plaintiffs, | |
| | Hearing date: December 16, 2011 |
| 17            v. | Time: 10:00 a.m. |
| 18  Cisco Systems, Inc., John Chambers, Thomas Lam, Owen Chan, and Does 1-100, | Action Filed: May 19, 2011 |
| 19 | Judge: Hon. Jeremy Fogel |
| | Dept: Courtroom 3, 5th Floor |
| 20            Defendants. | |

21
22
23
24
25
26
27
28

1

## NOTICE OF MOTION

2      TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3      PLEASE TAKE NOTICE that on December 16, 2011, at 10:00 am, or as soon thereafter as

4  the matter may be heard before the Honorable Judge Fogel, in Courtroom 3 of the United States

5  District Court of the Northern District of California, San Jose Division, located at 280 South 1st

6  Street, San Jose, CA 95113, Defendants Cisco Systems, Inc., John Chambers, Thomas Lam, and

7  Owen Chan will and hereby do move the Court to dismiss Plaintiffs' Complaint in its entirety.

8      The Motion will seek dismissal of the Plaintiffs' Complaint in its entirety on the basis of

9  the political question, act of state, and international comity doctrines, and additionally because for

10  multiple reasons each and every allegation either fails to state a claim on which relief may be

11  granted and/or fails to establish federal subject matter jurisdiction.

12      The motion is made pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and is based on this

13  Notice, the attached Memorandum of Points and Authorities, the accompanying Declaration of

14  John (Hejun) Chu In Support Of Defendants' Motion To Dismiss, the Court's file in this matter,

15  and any other evidence and argument as may be presented at the hearing on the Motion.

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

    A.    The Parties .................................................................................................. 3

    B.    Chinese Law And Falun Gong ............................................................... 4

    C.    Plaintiffs' Alleged Injuries By Officials Of The Chinese Government ................... 4

    D.    The Chinese Government's "Golden Shield" Project ............................... 5

    E.    Alleged Use Of Golden Shield By The Chinese Government ................... 6

    F.    Cisco's Internet Infrastructure Business ............................................... 6

    G.    U.S. Statutory And Regulatory Background Governing Trade With China ............. 7

ARGUMENT ..................................................................................................................... 9

I.    THE COMPLAINT SHOULD BE DISMISSED AS NONJUSTICIABLE ...................... 10

    A.    The Complaint Raises Nonjusticiable Political Questions ..................... 11

    B.    The Complaint Challenges Acts Of A Foreign Government In Violation Of The Act Of State And International Comity Doctrines ............................................ 12

II.    THE ALIEN TORT STATUTE AND TORTURE VICTIM PROTECTION ACT CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM OR ALLEGE SUBJECT MATTER JURISDICTION ................................................................ 16

    A.    The ATS Does Not Provide Jurisdiction Against Corporations ........................... 16

        1.    Corporate Liability Is Not Universally Accepted Under International Law .......... 16

        2.    Corporate Liability Is Displaced By The TVPA ......................... 18

    B.    The ATS Does Not Provide Jurisdiction For Extraterritorial Claims ................... 19

    C.    The ATS And TVPA Claims Do Not Allege Acts By Defendants Acting Under Color Of State Law ................................................................ 21

    D.    The ATS And TVPA Claims Do Not Allege Acts By Defendants Warranting Secondary Liability ................................................................ 23

|  |  | 1. | Aiding And Abetting Liability Is Unavailable Under The TVPA | 23 |
|  |  | 2. | Aiding And Abetting Liability Is Unavailable Under The ATS | 24 |
|  |  | 3. | The Allegations Do Not Support Aiding And Abetting Liability | 25 |
|  |  | 4. | The Conspiracy Claims Fail | 29 |
|  | E. | | Several Of The ATS Claims Are Otherwise Defective | 30 |
| III. | | | THE STATE LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED | 35 |
|  | A. | | California Tort Law Does Not Apply Extraterritorially | 35 |
|  | B. | | The State Law Claims Are Untimely | 36 |
|  | C. | | The Allegations Do Not Support Aiding And Abetting Liability | 40 |
| IV. | | | THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED | 41 |
|  | A. | | The UCL Does Not Apply Extraterritorially | 41 |
|  | B. | | The Allegations Of Lost Income Are Too Attenuated | 42 |
| V. | | | THE ELECTRONIC COMMUNICATIONS PRIVACY ACT CLAIM SHOULD BE DISMISSED | 42 |
|  | A. | | The ECPA Does Not Apply Extraterritorially | 42 |
|  | B. | | There Is No Private Right of Action Under ECPA § 2512 | 44 |
|  | C. | | The Cisco Products Are Not Devices Primarily Useful for Interception | 45 |
|  | D. | | The Allegations Concern Exempted "Normal Course of Business" Activity | 46 |
| VI. | | | PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE CLAIMS AGAINST INDIVIDUAL CISCO EXECUTIVES | 47 |
| CONCLUSION | | | | 48 |

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*A.D. v. Cal. Highway Patrol,*
   No. C 07-05483, 2009 WL 733872 (N.D. Cal. Mar. 17, 2009) ..........................................30, 37

5

*Abagninin v. AMVAC Chem. Corp.,*
   545 F.3d 733 (9th Cir. 2008)........................................................................................25, 32, 33

6

*Abdullahi v. Pfizer, Inc.,*
   562 F.3d 163 (2d Cir. 2009)....................................................................................................22

7

8

*Abecassis v. Wyatt,*
   704 F. Supp. 2d 623 (S.D. Tex. 2010) ....................................................................................25

9

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
   416 F.3d 1242 (11th Cir. 2005)................................................................................................31

10

11

*Aldana v. Fresh Del Monte Produce, Inc.,*
   305 F. Supp. 2d 1285 (S.D. Fla. 2003)....................................................................................32

12

*Alperin v. Vatican Bank,*
   410 F.3d 532 (9th Cir. 2005)..............................................................................................11, 12

13

14

*Am. Elec. Power Co. v. Connecticut,*
   131 S. Ct. 2527 (2011) .............................................................................................................18

15

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40 (1999) ...................................................................................................................22

16

17

*Arabian v. Sony Elec., Inc.,*
   No. 05-cv-1741. 2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ................................................41

18

*Arar v. Ashcroft,*
   585 F.3d 559 (2d Cir. 2009) ....................................................................................................22

19

20

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ........................................................................9, 10, 27, 28, 39, 47, 48

21

*Atwell v. Gabow,*
   Nos. 06-cv-2262, 07-cv-2063, 2008 WL 906105 (D. Colo. Mar. 31, 2008) ...........................48

22

23

*Baker v. Carr,*
   369 U.S. 186 (1962) ..........................................................................................................11, 12

24

*Bao Ge v. Li Peng,*
   201 F. Supp. 2d 14 (D.D.C. 2000) ..........................................................................................32

25

26

*Beagle v. Rite Aid Corp.,*
   No. C 08-1517, 2009 WL 3112098 (N.D. Cal. Sept. 23, 2009)...............................................40

27

28

*Beckett v. MasterCraft Boat Co.,*
    24 Cal. Rptr. 3d 490 (Cal. Ct. App. 2005) ...................................................36

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................9, 10, 27, 28, 39, 47, 48

*Bigio v. Coca-Cola Co.,*
    448 F.3d 176 (2d Cir. 2006) .....................................................................13

*Bigio v. Coca-Cola Co.,*
    239 F.3d 440 (2d Cir. 2000) .....................................................................22

*Blazevska v. Raytheon Aircraft Co.,*
    522 F.3d 948 (9th Cir. 2008) ....................................................................36

*Bowoto v. Chevron Corp.,*
    621 F.3d 1116 (9th Cir. 2010) ..............................................................18, 23

*Bowoto v. Chevron Corp.,*
    557 F. Supp. 2d 1080 (N.D. Cal. 2008) ....................................................31

*Bowoto v. Chevron Corp.,*
    No. C 99-02506, 2007 WL 2349343 (N.D. Cal. Aug. 14, 2007) ...............33

*Bowoto v. Chevron Corp.,*
    No C 99-02506, 2006 WL 2455761 (N.D. Cal. Aug. 22, 2006) ...........30, 33

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001) ..................................................................................22

*Cabello v. Fernandez-Larios,*
    402 F.3d 1148 (11th Cir. 2005) ............................................................30, 33

*Casey v. U.S. Bank Nat'l Ass'n,*
    26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005) ................................................40

*Chen v. China Central Television,*
    No. 06-cv-0414, 2007 WL 2298360 (S.D.N.Y. Aug. 9, 2006) ...................2

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) ..................................................................................24

*In re Chiquita Bananas,*
    No. 08-01916-MD, 2011 WL 2163973 (S.D. Fla. June 3, 2011) .........35-36

*Corrie v. Caterpillar, Inc.,*
    403 F. Supp. 2d 1019 (W.D. Wash. 2005) ...............................11, 19, 18, 22, 26

*Diamond Multimedia Sys. v. Superior Court,*
    80 Cal. Rptr. 2d 828 (1999) ......................................................................36

*Diaz-Barba v. Kismet Acquisition, LLC,*
    Nos. 08-cv-1446 et al., 2010 WL 2079738 (S.D. Cal. May 20, 2010) .......36

*Dichter-Mad Family Partners, LLP v. United States,*
    707 F. Supp. 2d 1016 (C.D. Cal. 2010) ................................................................10

*In re DIRECTV, Inc.,*
    No. C-02-5912, 2004 WL 2645971 (N.D. Cal. July 26, 2004) ...........................4445

*DIRECTV, Inc. v. Nicholas,*
    403 F.3d 223 (4th Cir. 2005) ............................................................................4445

*DIRECTV v. Robson,*
    420 F.3d 532 (5th Cir. 2005) ............................................................................4445

*DIRECTV, Inc. v. Treworgy,*
    373 F.3d 1124 (11th Cir. 2004) ......................................................................44, 45

*Doe v. Exxon Mobil Corp.,*
    --- F.3d ---, 2011 WL 2652384 (D.C. Cir. July 8, 2011) ..................17, 18, 20, 23, 26

*Doe v. Nestle, S.A.,*
    748 F. Supp. 2d 1057 (C.D. Cal. 2010) ....................17, 18, 19, 21, 25, 26, 41

*Doe v. Qi,*
    349 F. Supp. 2d 1258 (N.D. Cal. 2004) ......................................2, 4, 13, 14, 15, 31

*Doe v. Rafael Saravia,*
    348 F. Supp. 2d 1112 (E.D. Cal. 2004) ...............................................................32

*Doe v. State of Israel,*
    400 F. Supp. 2d 86 (D.D.C. 2005) ...................................................................11

*In re Dynamic Random Access Memory Antitrust Litig.,*
    546 F.3d 981 (9th Cir. 2008) ...........................................................................10

*EEOC v. Arabian Am. Oil Co.,*
    499 U.S. 244 (1991) ...................................................................................21

*Enahoro v. Abubakar,*
    408 F.3d 877 (7th Cir. 2005) ...........................................................................19

*In re Estate of Ferdinand Marcos,*
    25 F.3d 1467 (9th Cir. 1994) ...........................................................................14

*Flomo v. Firestone Natural Rubber Co.,*
    --- F.3d ---, 2011 WL 2675924 (7th Cir. July 11, 2011) ...............................17, 18

*Flowers v. Tandy Corp.,*
    773 F.2d 585 (4th Cir. 1985) ...........................................................................45

*Forti v. Suarez-Mason,*
    672 F. Supp. 1531 (N.D. Cal. 1987) ...............................................................31

*Fox v. Cal. Physicians' Serv.,*
    No. A122803, 2009 WL 1163880 (Cal. App. April 30, 2009) ...........................40

*F.T.C. v. Swish Marketing*,
    No. C 09-03814, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) .........................47

*Gantt v. County of Los Angeles*,
    No. CV 08-5979, 2008 WL 5382278 (C.D. Cal. Dec. 23, 2008) ...............................37

*Gerard v. Ross*,
    251 Cal. Rptr. 604, 613 (Cal. Ct. App. 1988) ...........................................................40

*Ginsburg v. Healey Car & Truck Leasing, Inc.*,
    189 F.3d 268 (2d Cir. 1999) ......................................................................................22

*Guinto v. Marcos*,
    654 F. Supp. 276 (S.D. Cal. 1986) ............................................................................14

*Gushi Bros. Co. v. Bank of Guam*,
    28 F.3d 1535 (9th Cir. 1994) .....................................................................................36

*Hilao v. Estate of Marcos*,
    103 F.3d 789 (9th Cir. 1996) .....................................................................................31

*Jane Doe I v. Wal-Mart Stores, Inc.*,
    No. CV 05-7307, 2007 WL 5975664 (C.D. Cal. Mar. 30, 2007) ............................42

*Joo v. Japan*,
    413 F.3d 45 (D.C. Cir. 2005) ....................................................................................11

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995) .............................................................................11, 21, 22

*Khulumani v. Barclay Nat'l Bank Ltd.*,
    504 F.3d 254 (2d Cir. 2007) .............................................................22, 23, 24, 25, 26

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010) ..........................................................................17, 18, 20

*Krishanthi v. Rajaratnam*,
    No. 09-CV-5395, 2010 WL 3429529 (D.N.J. Aug. 26, 2010).................................25

*Lacey v. Maricopa County*,
    --- F.3d ---, 2011 WL 2276198 (9th Cir. June 9, 2011) ............................................9

*Liu Bo Shan v. China Constr. Bank Corp.*,
    2011 WL 1681995 (2d Cir. 2011) ........................................................................27, 30

*Lorenzo v. Qualcomm Inc.*,
    No. 08-cv-2124, 2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) ..............................42

*Maez v. Chevron Texaco Corp.*,
    No. C 04-00790 JSW, 2005 WL 1656908 (N.D. Cal. July 13, 2005).....................36

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
    404 F. Supp. 2d 1214 (E.D. Cal. 2005) .....................................................................41

*Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*,
   177 F.3d 1142 (9th Cir. 1999)...................................................................................12

*Mohamed v. Jeppesen Dataplan, Inc.*,
   614 F.3d 1070 (9th Cir. 2010)...................................................................................30

*Morrison v. National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010)...................................................................................20, 21, 43

*Murphy v. Wells Fargo Bank, N.A.*,
   No. 5:10-cv-05837, 2011 WL 2893069 (N.D. Cal. July 19, 2011)..........................10

*N. Alaska Salmon Co. v. Pillsbury Council, Inc.*,
   162 P. 93 (1914)........................................................................................................36

*Norwest Mort., Inc. v. Superior Court*,
   85 Cal. Rptr. 2d 18 (Cal. Ct. App. 1999) .................................................................41

*Oracle Corp. v. SAP AG*,
   734 F. Supp. 2d 956 (N.D. Cal. 2010) ......................................................................41

*Pasquantino v. United States*,
   544 U.S. 349 (2005)..................................................................................................12

*Piatt v. MacDougall*,
   773 F.2d 1032 (9th Cir. 1985)...................................................................................32

*Plaintiff A v. Deren*,
   349 F. Supp. 2d 1258 (N.D. Cal. 2002) ......................................................................2

*Potter v. Havlicek*,
   3:06-CV-211, 2008 WL 2556723 (S.D. Ohio June 23, 2008) ...........................44, 45

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   582 F.3d 244 (2d Cir. 2009) ..................................................................25, 26, 27, 30

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   226 F.R.D. 456 (S.D.N.Y. 2005)..........................................................................33, 34

*Rayburn ex rel. Rayburn v. Hogue*,
   241 F.3d 1341 (11th Cir. 2001)..................................................................................22

*Robinson v. United States*,
   586 F.3d 683 (9th Cir. 2009).....................................................................................10

*Roe I v. Bridgestone Corp.*,
   492 F. Supp. 2d 988 (S.D. Ind. 2007) .......................................................................36

*Romero v. Drummond Co., Inc.*,
   552 F.3d 1303 (11th Cir. 2008)..................................................................................22

*Romero v. Drummond Co.*,
   No. 03-0575, DE 329, Slip op. (N.D. Ala. Mar. 5, 2007) ........................................36

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ........................................................................................21

*Sarei v. Rio Tinto, PLC*,
    625 F.3d 561 (9th Cir. 2010) ..........................................................................20

*Sarei v. Rio Tinto, PLC*,
    550 F.3d 822 (9th Cir. 2008) ..........................................................................20

*Sarei v. Rio Tinto, PLC*,
    487 F.3d 1193, 1208 (9th Cir. 2007) ......................................................... 12-13

*Sarei v. Rio Tinto, PLC*,
    456 F.3d 1069 (9th Cir. 2006) ........................................................................24

*Sarei v. Rio Tinto, PLC*,
    221 F. Supp. 2d 1116 (C.D. Cal. 2003) .....................................................31, 32

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010) ..........................................................................9

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S. Dist. of Iowa*,
    482 U.S. 522 (1987) ........................................................................................13

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ................................................11, 13, 14, 16, 17, 18, 19, 24, 30, 31

*Trajano v. Marcos*,
    978 F.2d 493 (9th Cir. 1992) ..........................................................................21

*U.S. ex rel. DeCesare v. Americare In Home Nursing*,
    757 F. Supp. 2d 573 (E.D. Va. 2010).............................................................47

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ........................................................................................12

*United States v. Mandel*,
    914 F.2d 1215 (9th Cir. 1990) ........................................................................12

*United States v. Peterson*,
    812 F.2d 486 (9th Cir. 1987) ..........................................................................43

*United States v. Toscanino*,
    500 F.2d 267 (2d Cir. 1974) ...........................................................................43

*Viera v. Eli Lilly & Co.*,
    No. 1:09-cv-0495-RLY-DML, 2011 WL 2144413 (S.D. Ind. May 31, 2011) .........................35

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) ........................................................................................12

*Weixum v. Xilai*,
    568 F. Supp. 2d 35 (D.D.C. Aug. 1, 2008) .......................................................2

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
    493 U.S. 400 (1990) .................................................................................................13

*Ye v. Zemin*,
    383 F.3d 620 (7th Cir. 2004) .....................................................................................2

*Zheng v. Yahoo! Inc.*,
    No. C-08-1068 MMC, 2009 WL 4430297 (N.D. Cal. Dec. 2, 2009) .....................42, 43, 45, 46

### Statutes/Rules

18 U.S.C. § 2511 ............................................................................................. 44-45

18 U.S.C. § 2512 ....................................................................................42, 44, 45, 46

18 U.S.C. § 2520 ..............................................................................................44, 45

28 U.S.C. § 1350 .............................................................................................. *passim*

28 U.S.C. § 1350, note  ...................................................................................... *passim*

42 U.S.C. § 1983 ..............................................................................................21, 22

Pub. L. No. 101-246, 104 Stat 15 (1990) .................................................................7

Pub. L. No. 106-286, 114 Stat. 880 (2000) ..............................................................8

15 CFR Parts 730-774 (2010) ..................................................................................7

15 C.F.R. § 742.7 (2010) ..........................................................................................8

22 CFR Parts 120-130 (2010) ..................................................................................7

Fed. R. Civ. P. 8(a) .................................................................................................10

Fed. R. Civ. P. 44.1 ................................................................................................35

Cal. Bus. and Prof. Code § 17200 .........................................................................41

Cal. Civ. Proc. Code. § 335.1 .................................................................................37

Cal. Civ. Proc. Code. § 340(c) ...............................................................................37

Cal. Civ. Proc. Code § 352.1(a) .............................................................................39

Cal. Civ. Proc. Code § 377.60 ..........................................................................30, 36

### Other Authorities

Restatement (Third) of Foreign Relations Law § 402 (1987) ................................35

Restatement (Third) of Foreign Relations Law § 702 (1986) ................................32

1968 U.S.C.C.A.N. 2178................................................................................................43

1990 U.S.C.C.A.N. 94-1, 94-3 .......................................................................................7

Revisions to the Commerce Control List To Update and Clarify Crime Control License
    Requirements, 75 Fed. Reg. 41078-01 (July 15, 2010)...............................................8

Brief of the United States as Respondent Supporting Petitioner,
    *Sosa v. Alvarez-Machain*,
    No. 03-339 (U.S. January 23, 2004), *available at* 2004 WL 182581 ......................19

Brief of the United States as Amicus Curiae,
    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    No. 07-0016 (2d Cir. May 15, 2007), *available at* 2007 WL 7073754 ...................20

Brief for the United States as Amicus Curiae in Support of Petitioners,
    *Am. Isuzu Motors, Inc. v. Lungisile Ntsebeza*,
    No. 07-919 (U.S. Feb. 11, 2008)................................................................................24

Charlie Savage, U.S. Tries to Make It Easier to Wiretap the Internet, N.Y. Times,
    Sept. 27, 2010, *available at*  http://www.nytimes.com/2010/09/27/us/27wiretap.html.............28

1

**<u>INTRODUCTION</u>**

2        Plaintiffs seek to hold Cisco and three of its executives liable for the alleged brutal and

3  unlawful actions of Chinese police, prosecutors and prison guards toward members of Falun

4  Gong—an organization that is illegal in the People's Republic of China ("PRC") and subject to

5  prescribed penalties.  They do so solely because Cisco sold internet equipment and services—the

6  same goods and services that Cisco sells throughout the world—to Chinese entities in compliance

7  with U.S. laws governing trade with the PRC.  And they do so even though, for nearly twenty

8  years, Cisco has helped deliver the benefits of information technology to millions of individuals in

9  China—information  technology that is essential to the very existence and practice of Falun Gong,

10  whose activity "occurs almost entirely on the internet."  (Compl. ¶ 41 ("Falun Gong practitioners

11  … regularly access the 'Minghui' website due to its central role in the worldwide Falun Gong

12  community and its status as a place of congregation.")).

13        While the injuries the Plaintiffs allegedly suffered at the hands of Chinese authorities are

14  horrific and not to be condoned, Cisco's lawful commercial transactions in China have nothing to

15  do with those injuries and the Complaint should be dismissed in its entirety.  The Complaint

16  nowhere alleges any facts suggesting that Cisco or its employees ever met, interacted with, or

17  otherwise knew about the individual Plaintiffs; that Cisco knew or intended that its technology

18  would be used by Chinese authorities to injure Plaintiffs; or that Cisco knew of, or participated in,

19  Chinese authorities' alleged detention or persecution of Plaintiffs or the "many thousands" of

20  other Falun Gong practitioners located throughout China who the Plaintiffs seek to represent on a

21  classwide basis (Compl. ¶ 225).  The allegations it raises are nonjusticiable and otherwise fail to

22  state a claim or set forth a proper basis for this Court's subject matter jurisdiction.

23        This action is the latest volley in a long-running advocacy campaign seeking to put the

24  Chinese Government's human rights record on trial in a U.S. courthouse.  The first targets of this

25  litigation campaign were high-ranking officers of the Chinese government, who had not personally

26  committed acts of violence but allegedly were liable for policies sanctioning that violence.  These

27  cases were generally withdrawn or dismissed under the Foreign Sovereign Immunity Act

28  ("FSIA"), a statute reflecting the United States' established policy that the acts of foreign

governments ought not to be litigated in U.S. courts.[1]  The next suits were brought against officers and entities associated with Chinese state-owned enterprises—defendants one step further removed from actual incidents of physical harm.  This effort also has been unsuccessful, again generally on FSIA grounds.[2]  As the latest step in this progression, Plaintiffs now assert claims against a U.S. corporation and its executives—pursuing defendants several steps further removed from the Chinese government in order to preclude a sovereign immunity defense, but at the same time stretching alleged liability several steps further from the alleged acts of violence.  This case, like its predecessors, should be dismissed as an improper use of the federal courts.  Specifically:

1.  At the threshold, the Complaint should be dismissed as nonjusticiable.  *First*, the Complaint raises political questions whose judicial resolution would interfere with the foreign policy of the Executive Branch and Congress.  The United States maintains Most Favored Nation ("MFN") trading status with China.  And in response to the Tiananmen Square protests, Congress enacted legislation restricting certain sales to Chinese police agencies—specifically *not* including routers or other standard internet equipment.  Cisco complies with all applicable U.S. laws governing exports to China.  The relief Plaintiffs seek would amount to a judicially imposed trade embargo in conflict with U.S. trade policy as determined by the political branches.  *Second*, under the act of state doctrine and the doctrine of international comity, this Court is an inappropriate forum in which to challenge the sovereign acts of the PRC with respect to Falun Gong.

2.  Even if otherwise justiciable, the Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA") claims should be dismissed for failure to state a claim or allege subject matter jurisdiction.  *First*, corporations may not be sued under these statutes.  *Second*, these statutes cannot provide relief for purely extraterritorial claims.  *Third*, the commercial relationship

---

[1]  *See Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004); *Weixum v. Xilai*, 568 F. Supp. 2d 35 (D.D.C. Aug. 1, 2008); *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2002); *Plaintiff A v. Deren*, 349 F. Supp. 2d 1258 (N.D. Cal. 2002); *Doe v. Xudong*, No. 04-cv-4097 (N.D. Ill. 2004); *Gang v. Zhizhen*, No. 04-cv-1146 (D. Conn. 2004); *Plaintiff A. v. Guangen*, No. 02-cv-0295 (D. Haw. 2002).

[2]  *See Chen v. China Central Television*, No. 06-cv-0414, 2007 WL 2298360 (S.D.N.Y. Aug. 9, 2006).

alleged between Cisco and its Chinese customers is not the close and symbiotic relationship necessary to create the state action required to support these claims. *Fourth*, none of the Defendants may be sued for secondary liability because such relief should be held unavailable under these statutes and because the allegations fail to allege any facts that plausibly suggest that Defendants acted with the knowledge or purpose to facilitate the Chinese authorities' alleged actions. *Fifth*, portions of the Complaint fail to plead actionable international norms.

3.   The personal injury claims asserted under California state law also should be dismissed. *First,* these claims may not be asserted as to purely extraterritorial conduct. *Second*, the claims are barred by applicable statutes of limitations. *Third*, aiding and abetting liability is unavailable as to the claims as alleged.

4.   The Unfair Business Practices claim also should also be dismissed. *First*, the law has no extraterritorial application. *Second*, Defendants' technology lacks any connection to Plaintiffs' alleged lost income.

5.   The Electronic Communications Privacy Act ("ECPA") claim should also be dismissed. *First*, the ECPA has no extraterritorial application. *Second*, the section pleaded here provides no private right of action. *Third*, the claim fails to allege the requisite elements and *fourth,* is in any event defeated by a statutory exception.

6.   The claims against individual Cisco business executives should also be dismissed. There is no factual allegation to support the notion that Cisco's worldwide CEO, or the other high-ranking executives named as Defendants, had specific knowledge of the sales contracts at issue here, much less that these executives acted with the requisite purpose or knowledge.

## FACTUAL BACKGROUND

### A.   The Parties

Plaintiffs are practitioners of Falun Gong, a movement that developed in China around 1992. (Compl. ¶ 42). Falun Gong is viewed by the Chinese Government as a "cult." (*See id.* ¶ 129). By early 1999, an estimated 70-100 million people in China practiced Falun Gong. (*Id.* ¶ 42).

1    Cisco is an American technology company that is in the business of manufacturing the

2    routers, switches, and related hardware that make up the basic "plumbing" of the internet—the

3    standard "tubes" and "pipes" through which data flows.

4    **B.    Chinese Law And Falun Gong**

5    The practice of Falun Gong is illegal under Chinese law.  The PRC has determined that

6    Falun Gong "is not a religious belief or spiritual movement" but instead a "cult that … has

7    seriously disrupted the law and order … by inciting … sabotage and suicide bombings."[3]  Chinese

8    statutes duly promulgated by PRC legal authorities set forth specific Falun Gong activities that are

9    prohibited.  *See* Declaration of John (Hejun) Chu In Support Of Defendants' Motion To Dismiss,

10   dated Aug. 4, 2011 ("Chu Declaration"), ¶¶ 12-21.  Individuals who violate these laws are subject

11   to arrest and defined penalties, including imprisonment for up to specified terms and forced labor.

12   (*Id.* ¶¶ 22-35).  These types of penalties are not unique to Falun Gong but apply to other activities

13   prohibited by Chinese law.  (*Id.* ¶ 34). Chinese law expressly prohibits brutality or torture of

14   individuals by state officials (*id.* ¶¶ 36-39), and the penalties applicable to Falun Gong do not

15   include torture or other forms of police brutality by PRC government officials or law enforcers (*id.*

16   ¶ 7).

17   The Complaint alleges that, beginning in June 1999, leaders of the Chinese Communist

18   Party ("CCP") created a plan to curtail Falun Gong through "reeducation," including

19   brainwashing, interrogation, and torture (Compl. ¶¶ 43-44), and created a subdivision, "Office

20   610," to suppress Falun Gong.  (*Id.* ¶ 47).  Chinese Public Security officers allegedly collaborated

21   with Office 610 to detect the internet activities of Falun Gong practitioners.  (*Id.* ¶¶ 49-50).

22   **C.    Plaintiffs' Alleged Injuries By Officials Of The Chinese Government**

23   Plaintiffs allege that they were arrested by the Chinese police, subjected to sham

24   prosecutions at the hands of Chinese prosecutors and judges, and subjected to physical injury and

25

26   [3]    *Doe v. Qi*, 349 F. Supp. 2d 1258, 1300 (N.D. Cal. 2004) (quoting Statement of the
     government of the PRC advocating deference by U.S. courts to Chinese policy concerning Falun
27   Gong).

28

1   other human rights violations while in the custody of Chinese government institutions as part of a

2   national campaign to eradicate Falun Gong.  Doe I, Doe II, and Ivy He allege that Chinese police,

3   special Office 610 agents, and Public Security officers subjected them to various forms of police

4   brutality, torture, forced labor and other wrongful acts.  (*Id*. ¶¶ 115-142).  Plaintiffs Doe III, Doe

5   IV, Doe V, Doe VI, Doe VII, Charles Lee, and Doe VIII allege that they were detained between

6   2002 and 2007 and subjected to various forms of police brutality and other wrongful acts.  (*Id*.

7   ¶¶ 143-202).  Doe VII's family has not had contact with her since summer 2006 and believes she

8   may have died while in custody.  (*Id*. ¶ 185).  Doe VIII died in August 2002 while in custody at a

9   detention center, allegedly due to beatings.  (*Id*. ¶ 202).  Plaintiff Liu Guifu allegedly was subject

10  to multiple arrests, detentions and mistreatment.  (*Id*. ¶¶ 203-214).  Other Plaintiffs still detained

11  allegedly suffer from physical assaults and deprivations.  (*Id*. ¶ 218).

12          None of these actions—all of which took place at Chinese prisons, labor camps, or

13  detention centers—is alleged to have been planned or perpetrated by the Defendants.

14          **D.      The Chinese Government's "Golden Shield" Project**

15          The "Golden Shield" project was an e-government project initiated by the Chinese

16  government to increase central police efficiency, and is one of a series of e-government projects

17  initiated by the Chinese government and known as "Golden Projects."[4]  Each of these projects was

18  conceived and implemented by Chinese government entities.  There is no factual allegation in the

19  Complaint, as distinct from summary conclusions,[5] suggesting that Cisco was consulted during the

20

---

21          [4]    These projects include the Golden Bridge Project, focused on commercial internet service;
the Golden Card Project, focused on building a national credit card network; the Golden Custom
22  or Golden Gate Project, linking customs points through a national electronic data interchange
system; the Golden Finance Project, to build a clearing house system; the Golden Macro Project,
23  focused on increasing sharing information between government bodies and helping decision
making; and the Golden Tax Project, focused on using information technology to reduce tax
24  evasion.

25          [5]    The Complaint alleges that Defendants helped design the Golden Shield to enable Chinese
26  public security personnel and Office 610 special agents (Compl. ¶¶ 57-58) "to monitor and control
all Internet activity in China, including especially the Internet activity of practitioners of Falun
27  Gong" (*id*. ¶ 62).  While the Complaint sets forth conclusory allegations that Cisco provided
training to Chinese authorities concerning the Golden Shield (*see*, *e.g.*, Compl. ¶¶ 70, 89, 100),
28          (footnote continued)

1   development or design of the Golden Shield project or had any interaction with the Chinese

2   government in connection with that design.

3       **E.      Alleged Use Of Golden Shield By The Chinese Government**

4           The Complaint alleges that, beginning in 2001, "Public Security officers, CCP officials,

5   and Office 610 agents monitored and analyzed information on Falun Gong practitioners gained

6   through the Golden Shield and shared this information with other state agents to facilitate their

7   identification, tracking, detention, torture and suppression." (*Id.* ¶ 85). The Complaint does not

8   allege any facts to suggest that Defendants knew or intended that the Golden Shield would be used

9   for purposes other than the lawful apprehension of individuals suspected of violating Chinese law,

10  or that Defendants knew or intended that Chinese government authorities would engage in any

11  unlawful or brutal acts in the course of apprehending Falun Gong practitioners. Several of the

12  abuses alleged by Plaintiffs occurred years after the Golden Shield was implemented—for

13  example, Doe VI alleges he was taken into custody "more than five years after the Golden Shield

14  was completed and fully operational in Shandong Province." (*Id.* ¶ 171).

15      **F.      Cisco's Internet Infrastructure Business**

16          The Complaint alleges that Defendants' contributions to the Golden Shield enabled

17  authorities to "identify"; "locate"; "log"; "profile"; "track;"; "monitor"; "investigate"; and

18  "surveil" individuals suspected of wrongdoing—standard police activities to help authorities "*fight

19  [] against crime*." (*See, e.g.*, Compl. ¶¶ 52, 56-58, 63, 65, 68, 74, 95-98, 100-02 (emphasis

20  added)). At all times, however, the products Cisco has sold in China have been the same products

21  that are in Cisco's standard product catalogue and that Cisco sells in the United States and

22  elsewhere. These products by necessity include industry-standard network management

23  capabilities that—whether manufactured by Cisco or any of its competitors—enable users to

24  _____

    Cisco does not sell products to end users like the Chinese government agencies named in the

25  Complaint, but rather provides products to intermediaries such as system integrators and resellers.
    As to services, Cisco provides only limited technical support, troubleshooting, and training to such

26  intermediaries relating to the generic functioning and operation of Cisco products—for example, if
    a router will not power up, or is otherwise malfunctioning. Cisco did not sell consulting services

27  directly to end users until at least 2005.

28

identify the internet address from which data is transmitted and to which it is transmitted, together with certain related information that enables the internet to function and without which email and other networking systems could not exist.

### G.   U.S. Statutory And Regulatory Background Governing Trade With China

Congress and the Executive Branch have developed and implemented policies explicitly designed to address human rights considerations in connection with supply of American-origin products to police agencies in China.  These policies regulate the sale of technology products to the Government of China for use in crime control activities.

Following the Tiananmen Square protests of 1989, the U.S. Congress passed the Foreign Relations Authorization Act for Fiscal Years 1990-1991, commonly referred to as the "Tiananmen Square Sanctions Act."  *See* Pub. L. No. 101-246, 104 Stat. 15 (1990).  *First,* the Act recites a series of detailed Congressional "findings" condemning the acts of the Chinese Government and others in connection with the events at Tiananmen Square.  *Id.* § 901(a) at 80.  *Second,* the Act recites several "Statements of Policy," including that "it is essential that the United States speak in a bipartisan and unified voice in response to the events in the People's Republic of China," *id.* § 901(b)(3) at 81, and that the President should "continue to emphasize" human rights in discussions with China.  *Id.* § 901(b)(4) at 81.[6]  *Third*, the statute enacts a series of measures restricting trade with China, including—most relevant here—a ban on the export of specified crime control or detection instruments or equipment to the PRC in the absence of express authorization and licensure.  *Id.* § 902(a)(4) at 83.[7]

The statute sets forth a series of even harsher trade restrictions that were not appropriate in Congress's view, but that would be considered if the PRC's acts of repression were to "deepen[]."

---

[6]   Even this assurance of cooperation between the political branches was insufficient in the view of the President, who noted in a signing statement that the Act's "legislatively mandated sanctions represent an unwise constraint upon the President's ability to conduct foreign policy." 1990 U.S.C.C.A.N. 94-1, 94-3, *available at* 1990 WL 285749, at *3.

[7]   These regulations are additional to a comprehensive U.S. regulatory regime governing the export of high technology products.  *See* Export Administration Regulations, 15 C.F.R. Parts 730-774 (2010); International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 (2010).

*Id.* § 901(c)(3), (4) at 83.  American policy recognizes, however, that it was not inconsistent with those targeted sanctions, applicable to designated products sold to police agencies, also to have a robust economic relationship with China.  To that end, President George H. W. Bush reaffirmed China's MFN trade status just three months after passage of the Tiananmen Square Sanctions Act.  *See* Presidential Determination No. 90-21, 55 Fed Reg. 23183 (1990).  That status was made permanent in legislation that President Clinton signed into law in 2000.  *See* Pub. L. No. 106-286, 114 Stat. 880 (2000).

The list of restricted crime control or detection equipment discussed in the Tiananmen Act is maintained by the Executive Branch acting through the U.S. Commerce Department.  *See* 15 C.F.R. § 742.7 (2010).  The purpose of the list is to "support … U.S. foreign policy to promote the observance of human rights throughout the world."  *Id.* § 742.7(a).  The list focuses on weapons and other instruments of physical crime control to the exclusion of software and technology.  *See*, *e.g.*, *id.* §§ 742.7(a)(2) (shotguns); (a)(1) (police batons, whips, helmets, and shields, *inter alia*, by reference to Export Control Classification Numbers listed in 15 C.F.R. Pt. 774, Supp. 1).  The Commerce Department remarked on this fact in a 2010 rule, which reiterates the list's relationship to human rights, but explicitly indicates that the Department would *not* add software and technology to the list, instead leaving for a

> subsequent proposed rule… *potential expansion* of [the list, including consideration of] … *whether, and, if so, the extent to which* biometric measuring devices, *integrated data systems*, simulators, and *communications equipment should be added* …; [and] the degree to which *software and technology* related to [already listed devices] should [themselves] be listed and how such software and technology should be described….

Revisions to the Commerce Control List To Update and Clarify Crime Control License Requirements, 75 Fed. Reg. 41078-01, 41078 (July 15, 2010) (emphasis added).

In short, the Legislative branch has restricted trade with China in direct response to human rights concerns; has set those trade restrictions at a level that Congress believes will optimally advance United States policy; has explicitly determined *not* to adopt stricter trade limits; and in so doing has explicitly recognized the need for coordination with the Executive branch in effectuating the complex policy interests at issue.  The Executive branch, for its part, has

Case No. 5:11-cv-02449-JF
DEFENDANTS' MOTION TO DISMISS

1    implemented the legislation at issue in a manner that generally excludes technology products for

2    use in crime control; and has at all relevant times with respect to the allegations of this litigation

3    expressly determined *not* to include any products that were allegedly supplied by Cisco, making

4    clear that, at present, sales of internet hardware and related items are entirely permissible.

5         The Complaint nowhere alleges that Cisco has ever acted in violation of the foregoing laws

6    and regulations.  Indeed, Cisco complies with the comprehensive legal and regulatory regime

7    enacted by the political branches, and Cisco's export control team, repeatedly praised by the U.S.

8    Department of Commerce, screens each of Cisco's two million transactions per quarter for

9    compliance with these regulations.[8]

10                                   **ARGUMENT**

11        "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

12   accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.

13   Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also*

14   *Shroyer v. New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1041 (9th Cir. 2010).  "A claim has

15   facial plausibility when the plaintiff pleads factual content that allows the court to draw the

16   reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at

17   1949.  It requires "more than a sheer possibility that a defendant has acted unlawfully," and

18   "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops

19   short of the line between possibility and plausibility of entitlement to relief."  *Id*. (quotation marks

20   and citation omitted).

21        Further, "mere conclusory statements" or "legal conclusions" will not suffice—"they must

22   be supported by factual allegations."  *Id*. at 1949-50; *see also Lacey v. Maricopa County*, --- F.3d -

23   --, 2011 WL 2276198, at *14 (9th Cir. June 9, 2011) (dismissing complaint because allegations

24   were "conclusory and devoid of 'sufficient factual matter,'" and plaintiffs did not provide enough

25   "factual content" to allow court to draw a "reasonable inference" of defendant's alleged

---

[8]    It is the policy of Cisco not to sell security cameras or other possible tools of surveillance
to Chinese governmental entities, even though it would be legal to do so.

knowledge).  In other words, "a court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact contained in the complaint." *Murphy v. Wells Fargo Bank, N.A.*, No. 5:10-cv-05837, 2011 WL 2893069, at *1 (N.D. Cal. July 19, 2011) (Fogel, J.).

"Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction."  *In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008).   The party asserting subject matter jurisdiction bears the burden of establishing jurisdiction on a motion to dismiss.  *See Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).  Further, because a motion to dismiss on jurisdictional grounds is governed by the standard pleading rules of Fed. R. Civ. P. 8(a), "*Twombly* and *Iqbal* therefore state the proper standard for addressing the sufficiency of Plaintiffs' allegations with respect to the Court's subject matter jurisdiction."  *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016, 1025 n.10 (C.D. Cal. 2010).

## I.      THE COMPLAINT SHOULD BE DISMISSED AS NONJUSTICIABLE

While Defendants recognize and do not wish to minimize the gravity of the Plaintiffs' allegations, these allegations do not belong in a U.S. federal court.  A lawsuit challenging internet equipment sales to Chinese entities, made in compliance with U.S. export laws and laws governing sales to China, implicate a political question on which the Legislative and Executive branches have directly spoken in legislation and regulations carefully calibrated to balance the Nation's policy of economic and political engagement with China against considerations regarding China's respect for civil and human rights.  And a lawsuit challenging a set of sovereign acts taken by the Chinese government in response to Falun Gong also unavoidably impinges upon the respect for foreign nations that is essential to international comity.  The Complaint should be dismissed in deference to both these interests.

1   **A.    The Complaint Raises Nonjusticiable Political Questions**

2          Article III and its prudential implications have long been construed to require dismissal as

3   a nonjusticiable political question of any claim that impinges unduly upon the reserved authority

4   of the political branches of the federal government.  The political question doctrine has particular

5   applicability to suits brought under the ATS and the TVPA.  It was explicitly noted by the

6   Supreme Court in *Sosa v. Alvarez-Machain*, which discussed it in the context of "a policy of case-

7   specific deference to the political branches."   542 U.S. 692, 733 n.21 (2004).  *See Alperin v.*

8   *Vatican Bank*, 410 F.3d 532, 556 (9th Cir. 2005); *id.* at 541 & n.4, 561-62 (affirming dismissal on

9   grounds of the political question doctrine, noting that the ATS was one of the bases for the suit);

10  *see also Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (with respect to the political question

11  doctrine in ATS/TVPA cases, the "preferable approach is to weigh carefully the relevant

12  considerations on a case-by-case basis").  Numerous other courts have dismissed ATS cases on

13  political question grounds. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 984 (9th Cir. 2007); *Joo*

14  *v. Japan*, 413 F.3d 45, 46 (D.C. Cir. 2005); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 111-13

15  (D.D.C. 2005).

16         The Complaint here thus implicates several of the classic political question grounds for

17  dismissal noted in *Baker v. Carr*, 369 U.S. 186, 217 (1962).  *First*, the Complaint asks this Court

18  to decide upon matters "touching foreign relations," *id.* at 211—an area ripe for political question

19  dismissal because it poses "the impossibility of deci[ding] without an initial policy determination

20  of a kind clearly for nonjudicial discretion" and "the impossibility of a court's undertaking

21  independent resolution without expressing lack of the respect due coordinate branches of

22  government," *id.* at 217.   Here, as discussed above at pages 7-9, the U.S. Legislative and

23  Executive branches have developed and implemented detailed laws and regulations that govern the

24  circumstances in which, in view of human rights concerns, U.S. corporations may sell crime

25  control technology to the Government of China.  In so doing, the political branches have adopted a

26  balanced approach to Chinese foreign policy by restricting the sale of certain crime control

27

28

technologies to China while permitting the sale of other goods to China without restriction.[9] American companies like Cisco are entitled to rely upon U.S. trade regulations expressly permitting sales to Chinese police agencies of goods like internet infrastructure that Congress and the Commerce Department have chosen not to regulate.

*Second*, in view of these decisions by the political branches, an "about-face" permitting this litigation to proceed would create the "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*

*Third,* there are no "judicially discoverable and manageable standards" for resolving the issues in dispute. *Id.* This is particularly so because the Complaint alleges that the acts of wrongdoing are continuing on an ongoing basis and seeks relief not only on behalf of the ten named plaintiffs, but also on a classwide basis on behalf of every one of the allegedly "many thousands" of Falun Gong practitioners across China who has ever been "persecuted." (Compl. ¶ 225, 228).

Because any one of the *Baker* criteria is independently sufficient to warrant dismissal, *see United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990), this case abundantly merits dismissal in deference to the considered and explicit policy of the political branches.[10]

### B.     The Complaint Challenges Acts Of A Foreign Government In Violation Of The Act Of State And International Comity Doctrines

The act of state doctrine "prevents U.S. courts from inquiring into the validity of the public acts of a recognized sovereign power committed within its own territory." *Sarei v. Rio Tinto,*

---

[9]   *Cf. Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*, 177 F.3d 1142, 1144 (9th Cir. 1999) ("It is axiomatic that 'the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.'" (citation omitted)); *Pasquantino v. United States*, 544 U.S. 349, 369 (2005) ("[i]n our system of government, the Executive is 'the sole organ of the federal government in the field of international relations'" (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936))).

[10]   *See also Alperin*, 410 F.3d at 544 (noting that the Supreme Court had "recently described these criteria as 'six independent tests'" (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality))).

---

*PLC*, 487 F.3d 1193, 1208 (9th Cir. 2007).   It "reflects the concern that the judiciary, by questioning the validity of sovereign acts taken by foreign states, may interfere with the executive's conduct of American foreign policy."  *Id.* (citing *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 404 (1990)).  Under the doctrine, "an action may be barred if (1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act."  *Id.* (quoting *W.S. Kirkpatrick*, 493 U.S. at 405).

Similarly, the international comity doctrine permits courts to "defer to the laws or interests of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted."  *Id.* at 1211 (citing *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 544 n.27 (1987)).  The doctrine asks whether "adjudication of [the] case by a United States court would offend amicable working relationships with [a foreign country]."  *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) (internal quotation marks omitted).  As Justice Breyer noted in concurrence in the U.S. Supreme Court's seminal decision in *Sosa*, it is important for courts to ask "whether the exercise of jurisdiction under the ATS is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement."  542 U.S. at 761.

Here, the Complaint at its core questions the validity of public acts taken by the sovereign state of China within its own territory in its legislative, executive, and judicial response to Falun Gong.  The Complaint challenges the PRC's determination that Falun Gong "is not a religious belief or spiritual movement but an evil cult that seriously endangers the Chinese society and people, and that it has seriously disrupted the law and order, and endangered social stability by inciting lawless and disruptive acts including sabotage and suicide bombings."  *Doe v. Qi*, 349 F. Supp. 2d 1258, 1300 (N.D. Cal. 2004) (quoting Statement of Government of PRC).  Moreover, the

Complaint challenges the PRC's decision to make the practice of Falun Gong illegal;[11] to augment the national internet infrastructure through the Golden Shield, which the Complaint alleges was taken and implemented at high levels of the Chinese government with the aim of facilitating its policy to outlaw Falun Gong; to prosecute Falun Gong practitioners; and to judicially impose penalties on Falun Gong practitioners for their illegal acts.   This Court cannot adjudicate Plaintiffs' allegations without addressing such official state policies.   The act of state doctrine exists to prevent precisely such judicial interference with a sovereign government's ongoing practices and policies as applied to its own citizens.

For just such reasons, this Court dismissed under the act of state doctrine an action brought by Falun Gong practitioners against Chinese government officials under the ATS and TVPA.  In *Doe v. Qi*, this Court held that the acts of the defendant government officials in allegedly persecuting Falun Gong practitioners rose to the level of an act of the PRC as a sovereign state. 349 F. Supp. 2d at 1294.  The Court then assessed the "implications for foreign relations" if the case were permitted to proceed.  *Id.* at 1296-1303.  The Court placed "serious weight," *id.* at 1298 (as suggested by *Sosa*, 542 U.S. at 733 n.21) on a statement of interest submitted by the U.S. Department of State explaining that adjudication of the action would present serious difficulties for the conduct of U.S. foreign policy:

- [A]djudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong] … is not the best way for the United States to advance the cause of human rights in China....

- ... The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.

---

[11]   Although the criminalization of disfavored views is anathema to conceptions of liberty under the U.S. Constitution, it is not uncommon in other nations to regulate dangerous or hateful speech and conduct, such as in connection with Nazi sympathizers in Germany and France.  *See Guinto v. Marcos*, 654 F. Supp. 276, 280 (S.D. Cal. 1986) ("However dearly our country holds First Amendment rights, I must conclude that a violation of the First Amendment right of free speech does not rise to the level of such universally recognized rights and so does not constitute a 'law of nations.'") (cited favorably by *In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994)).

DEFENDANTS' MOTION TO DISMISS

- We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy ...

- ... Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

- ... [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.

349 F. Supp. 2d at 1296-97 (quoting Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 7-8) (emphasis in original)).  The Court similarly considered a letter that the PRC had submitted through the U.S. Department of State, in which the PRC opposed adjudication:

> If the U.S. courts should entertain the "Falun Gong" trumped-up lawsuits, they would send a wrong signal to the "Falun Gong" cult organization and embolden it to initiate more such false, unwarranted lawsuits.  In that case, it would cause immeasurable interferences to the normal exchanges and cooperation between China and the United States in all fields, and severely undermine the common interests of the two countries.

*Id.* at 1300 (quoting PRC letter).  As a final consideration, the court noted that the "continued existence of the accused government" weighed in favor of application of an act of state bar.  *Id.* at 1303-04 (noting that "[v]irtually every case permitting a suit to proceed over the act of state objection advanced by an individual defendant involve [*sic*] former dictators, rulers or officials no longer in power").

Although the Defendants in this case are not government actors, adjudication will necessarily drag this court into assessing the merits of the sovereign acts of the PRC in responding to the threat it perceives from Falun Gong.  The concerns expressed by the U.S. State Department and the PRC are as relevant here as they were in *Qi* and similarly merit dismissal.

II.     **THE ALIEN TORT STATUTE AND TORTURE VICTIM PROTECTION ACT CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM OR ALLEGE SUBJECT MATTER JURISDICTION**

Even if justiciable, the claims under the Alien Tort Statute and Torture Victim Protection Act fail because they are alleged against (a) corporations; (b) extraterritorial conduct; (c) purely private conduct; (d) with no purpose to aid and abet; and (e) under several inapplicable international law norms.  Each of these grounds is independently sufficient to warrant dismissal of the claims. The allegations in the Complaint are serious, and it is understandable that Plaintiffs have repeatedly sought recourse from the Chinese government and its officials—the *actual perpetrators* of the alleged violence—for the injuries at issue.  But the allegations do not support liability against Cisco, which merely engaged in arm's length transactions in the ordinary course of business in China, selling internet routers, switches, and related equipment in compliance with this Nation's laws and regulations governing trade in technology products and, in particular, trade with China in the aftermath of Tiananmen Square.  The equipment sold in China is the same equipment that Cisco sells in the United States and around the world.  The Complaint alleges no facts suggesting that Cisco anticipated that the police officers who purchased such technology to assist in *lawfully* locating and apprehending citizens engaged in illegal Falun Gong practices, would then *unlawfully* subject those same individuals to false charges, false convictions, false imprisonment and heinous physical injuries.  The ATS/TVPA allegations should be dismissed for failure to state a claim or grounds for subject matter jurisdiction.

A.     **The ATS Does Not Provide Jurisdiction Against Corporations**

1.     **Corporate Liability Is Not Universally Accepted Under International Law**

The ATS claims against Cisco should be dismissed because the ATS requires as a jurisdictional prerequisite that the alleged conduct be "committed in violation of the law of nations," 28 U.S.C. § 1350, and there is no "binding customary rule," "accepted by the civilized world," *Sosa*, 542 U.S. at 738, 725, that corporations can be held liable under customary international law.  While there is now a split in the circuits on this question, the correct argument

(and the one the Ninth Circuit should adopt) precludes ATS liability against corporations because only individuals and states are properly subject to international law norms actionable in U.S. courts. As the Second Circuit recently explained in holding that the ATS "does not provide subject matter jurisdiction over claims against corporations," the principle of individual liability for violations of international law "has been limited to natural persons—not 'juridical' persons such as corporations—because the moral responsibility for a crime so heinous and unbounded as to rise to the level of an 'international crime' has rested solely with the individual men and women who have perpetrated it." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149, 119 (2d Cir. 2010). Indeed, "[c]ustomary international law has steadfastly rejected the notion of corporate liability for international crimes, and *no international tribunal has ever held a corporation liable for a violation of the law of nations*." *Id.* at 120 (emphasis added).

A district court in this Circuit reached the same conclusion in *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057 (C.D. Cal. 2010). *Nestle*, now pending on appeal to the Ninth Circuit, held that

> corporations as such may not presently be sued under *Sosa* and the [ATS]. There is no support in the relevant sources of international law for the proposition that corporations are legally responsible for international law violations. International law is silent on this question: no relevant treaties, international practice, or international caselaw provide for corporate liability. Instead, all of the available international law materials apply only to states or natural persons. *Sosa*'s minimum standards of definiteness and consensus have not been satisfied.

*Id.* at 1143-44. Moreover, as *Nestle* made clear, whether corporations should be potentially liable for violating international law is a matter best left for Congress to decide, and "to the extent that Congress has ever addressed the question of corporate liability for violating international law, it has explicitly refrained from extending liability beyond natural persons under the Torture Victim Protection Act." *Id.* at 1144.

Contrary to the holdings in *Kiobel* and *Nestle*, two circuits have recently held that corporations may be sued under the ATS. These decisions are incorrect and unpersuasive. *See Doe v. Exxon Mobil Corp.*, --- F.3d ---, 2011 WL 2652384 (D.C. Cir. July 8, 2011); *Flomo v. Firestone Natural Rubber Co.*, --- F.3d ---, 2011 WL 2675924 (7th Cir. July 11, 2011). *Exxon* concedes that U.S. courts are bound by international law materials defining the *substance* of ATS

claims, but wrongly contends that they may ignore international law materials defining the permissible *targets* of such claims.  As *Kiobel* correctly noted, international law specifies not only the elements of wrongdoing that comprise an ATS claim, but also who may be sued for such a claim.  *See Kiobel*, 621 F.3d at 118-19.  It is inappropriate to utilize "federal law … to fill the gaps [in] international law [where] international law provides sufficiently well-established norms."  *Nestle*, 748 F. Supp. 2d at 1079.

The Seventh Circuit's decision in *Flomo* is likewise incorrect to conclude that corporate ATS liability is available.  *Flomo* never undertakes the analysis required by *Sosa*—namely, whether corporate liability for international law violations "rest[s] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized" such as piracy, safe-conduct violations, and infringements of the rights of ambassadors, 542 U.S. at 725.  It rests instead on ahistorical economic policy reasoning.  Accordingly, *Exxon* and *Flomo* should be rejected in favor of the far better reasoning in *Kiobel* and *Nestle*, which correctly concluded that ATS liability is unavailable against corporations.  The ATS claims should be dismissed as against Cisco.

### 2.        Corporate Liability Is Displaced By The TVPA

Even if corporate liability were otherwise permissible under the ATS, the Complaint should be dismissed as against Cisco insofar as it alleges extrajudicial killing, torture, and cruel, inhuman, and degrading treatment ("CIDT") because any such claims under ATS jurisdiction are displaced by the TVPA.  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speaks directly to the question at issue."  *Am. Elec. Power Co. v. Connecticut,* 131 S. Ct. 2527, 2537 (2011) (quotation marks omitted).  The TVPA speaks directly to the question of whether and when extrajudicial killing and torture claims may be asserted, thereby displacing federal common law otherwise applicable under *Sosa* concerning the availability of such claims.  The TVPA by its terms permits suits only against "individual[s]" who commit torture or extrajudicial killing.  28 U.S.C. § 1350, note.

The Ninth Circuit has held that corporate liability is barred under the TVPA .  *See Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010) ("the [TVPA] does not apply to

1   corporations"). Congress's decision to exclude corporations from liability under the TVPA must

2   similarly operate as a bar against such liability under the ATS. *See Enahoro v. Abubakar*, 408

3   F.3d 877, 884-85 (7th Cir. 2005) (noting that TVPA "occup[ies] the field" and thereby precludes

4   ATS claims for torture and extrajudicial killing unless those claims satisfy the TVPA's

5   requirements); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005), *aff'd*

6   *on other grounds*, 503 F.3d at 977 (relying on *Enahoro* and holding that "[t]he [TVPA] provides

7   the exclusive remedy for plaintiffs who allege extrajudicial killing under color of foreign law").[12]

8   This holding as to torture is equally applicable CIDT claims. *See Nestle,* 748 F. Supp. 2d at 1077

9   (CIDT "is defined as acts … *which fall short of torture.*… The principal difference between

10  torture and [CIDT] is the *intensity* of the suffering…" (quotation marks omitted, emphasis added).

11  Because corporate liability for extrajudicial killing, torture, and CIDT is unavailable under the

12  TVPA, it must also be unavailable under the ATS.

13      **B.      The ATS Does Not Provide Jurisdiction For Extraterritorial Claims**

14          The ATS claims should be dismissed for the independent reason that they concern purely

15  extraterritorial conduct and effects. The Complaint alleges injuries suffered in China, at the hands

16  of the Chinese police and justice system, using routers and other internet hardware located in

17  China, which were allegedly sourced by Cisco employees operating in China. As the Executive

18  Branch of the United States has urged, the ATS should not be applied to such purely

19  extraterritorial conduct. *See* Brief of the United States as Respondent Supporting Petitioner,

20  *Sosa      v.      Alvarez-Machain*,      No.      03-339      (U.S.      January      23,      2004),

21  *available at* 2004 WL 182581, at 8, 46-50 ("No cause of action may be inferred from [the ATS]

22  based on the alleged conduct of aliens in foreign countries."); *id.* at 47 ("Nothing in [the ATS], or

23      [12]   Moreover, the U.S. Senate's ratification of the United Nations Convention Against Torture
24  and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") was made subject to
    numerous qualifications that are incompatible with the maintenance of claims for torture and
25  CIDT under the ATS. These qualifications are reflected in the TVPA, which implements the
    CAT. Congress has therefore spoken concerning the reach of international law as to torture,
26  wrongful death, and CIDT, and the extent to which those claims are actionable in U.S. courts.
    That determination displaces any federal common law remedy that courts have made available
27  through the ATS.

28

1   in its contemporary history, suggests that Congress contemplated that suits would be brought

2   based on conduct against aliens in foreign lands."); Brief of the United States as Amicus Curiae,

3   *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 07-0016, at 5-12 (2d Cir. May 15,

4   2007) ("U.S. Talisman Br."), *available at* 2007 WL 7073754; *id.* at 7-8 ("There is no indication

5   whatsoever that Congress intended the ATS to apply—or to authorize U.S. courts to apply U.S.

6   law—to purely extraterritorial claims, especially to disputes that center on a foreign government's

7   treatment of its own citizens in its own territory. Indeed, the recognition of such claims would

8   directly conflict with Congress' purpose in enacting the ATS, which was to *reduce* diplomatic

9   conflicts.").

10      Two judges of the Ninth Circuit have agreed:  In *Sarei v. Rio Tinto, PLC*, 550 F.3d 822,

11   840 (9th Cir. 2008), Judges Ikuta and Kleinfeld argued that, "in the absence of direction from

12   Congress, we cannot read the ATS as authorizing an extension of jurisdiction to disputes lacking

13   any nexus to United States territory, citizens, or interests."  *Id.* (dissenting from panel's failure to

14   consider this issue).  Likewise, Judge Kleinfeld has argued that "[i]t is risible to think that the first

15   Congress wrote the Alien Tort Statute intending to enable federal courts to adjudicate claims of

16   war crimes committed abroad.  Were it otherwise, a French aristocrat who had escaped the

17   guillotine and fled to Philadelphia could have sued French defendants in our newly organized

18   federal courts, perhaps even Robespierre himself, and obtained an injunction commanding the

19   bloody French revolutionaries to stop immediately."  *Sarei v. Rio Tinto, PLC,* 625 F.3d 561, 564

20   (9th Cir. 2010) (dissenting from panel's failure to consider this issue).  *See also Exxon*, 2011 WL

21   2652384, at *49 (Kavanaugh, J., dissenting) (text, purpose, history, and policy demonstrate that

22   "ATS does not extend to conduct that occurred in foreign lands"); *Kiobel*, 621 F.3d at 142 n.44

23   (leaving question open, but holding that "we very well could conclude that the ATS does *not* apply

24   extraterritorially").

25      The strong presumption against extraterritorial application of U.S. statutes was recently

26   reinforced in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010), which held

27   that, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."

28   Because the text of the ATS "give[s] no clear indication of an extraterritorial application," *id.*; *see*

1   28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an

2   alien for a tort only, committed in violation of the law of nations or a treaty of the United States."),

3   *Morrison* compels the result that the ATS has no extraterritorial application to events like those

4   alleged here, all of which took place in China.[13]

5       Application of this textual presumption is especially warranted here given the statute's

6   necessary impact on foreign affairs and international comity.  *See Sale v. Haitian Ctrs. Council,*

7   *Inc.*, 509 U.S. 155, 188 (1993) (presumption "has special force when we are construing …

8   statutory provisions that may involve foreign and military affairs for which the President has

9   unique responsibility"); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (presumption

10  "serves to protect against unintended clashes between our laws and those of other nations which

11  could result in international discord").

12      The Ninth Circuit should rule that the ATS does not apply to purely extraterritorial

13  conduct.[14]  The ATS claims should be dismissed.

14  **C.    The ATS And TVPA Claims Do Not Allege Acts By Defendants Acting Under**

15  **Color Of State Law**

16      The TVPA provides relief only for wrongful acts committed "under actual or apparent

17  authority, or color of law, of [a] foreign nation." 28 U.S.C. § 1350 note § 2(a).  Likewise the

18  customary international law norms actionable under the ATS are available only for wrongful acts

19

20

21  ───────────────

22  [13]   Tag-along allegations concerning attenuated connections to Cisco's U.S. offices do not
affect the extraterritoriality analysis.  *See Morrison*, 130 S. Ct. at 2884 ("[I]t is a rare case of

23  prohibited extraterritorial application that lacks *all* contact with the territory of the United States.
But the presumption against extraterritorial application would be a craven watchdog indeed if it

24  retreated to its kennel whenever *some* domestic activity is involved in the case.").

25  [14]   The Ninth Circuit's decision in *Trajano v. Marcos*, 978 F.2d 493, 500 (9th Cir. 1992), is
not to the contrary, for it is based on an incorrect pre-*Sosa* understanding of the basis for ATS

26  claims, and pre-dates the Supreme Court's decision in *Morrison*.  To the extent *Trajano* is
construed as having ruled on extraterritoriality, it gets the analysis exactly backward—presuming

27  extraterritoriality from the statute's silence, contrary to the instruction in *Morrison*.

28

1   committed with state action (unless one of several narrow exceptions for "war crimes" and the like

2   applies, allowing application to private action). *See Kadic*, 70 F.3d at 238-41.[15]

3          "In construing the term 'color of law' [in the TVPA context,] courts are instructed to look

4   to jurisprudence under 42 U.S.C. § 1983." *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (en

5   banc) (cited in *Nestle*, 748 F. Supp. 2d at 1118). "Courts have also looked to [§ 1983] cases to

6   analogize from the 'color of law' requirement under [the ATS]." *Corrie*, 403 F. Supp. 2d at 1026

7   (citing *Arnold v. IBM*, 637 F.2d 1350, 1355-56 (9th Cir. 1981)). "Color of law" requires a

8   relationship between the defendant and a state actor that is so close that the defendants' acts can

9   fairly be characterized as being taken jointly with the state, or are so intertwined with the state that

10  the acts of the state can be imputed to the defendant or vice versa. *See*, *e.g., Brentwood Acad. v.*

11  *Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("[S]tate action may be found if,

12  though only if, there is such a close nexus between the State and the challenged action that

13  seemingly private behavior may be fairly treated as that of the State itself." (quotation marks

14  omitted)); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 188 (2d Cir. 2009) ("A private individual will

15  be held liable under the ATS if he 'acted in concert with' the state, i.e., 'under color of law.'"

16  (quoting *Kadic*, 70 F.3d at 245)); *Romero v. Drummond Co., Inc.,* 552 F.3d 1303, 1317 (11th Cir.

17  2008) (private actor and the state must be in a "symbiotic relationship" "that involves the torture

18  or killing alleged in the complaint"); *Rayburn ex rel. Rayburn v. Hogue,* 241 F.3d 1341, 1348

19  (11th Cir. 2001) (A "symbiotic relationship" between a private actor and the government may

20  establish state action, but it must involve the "specific conduct of which the plaintiff complains."

21  (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)). Merely contracting with a

22  state does not in itself create the requisite symbiotic relationship to qualify as state action. *See*

23  *Bigio v. Coca-Cola Co*., 239 F.3d 440, 448-449 (2d Cir. 2000) ("Section 1983 … does not impose

24  civil liability on persons who merely stand to benefit from an assertion of authority under color of

25

26      [15]   Absent acts "committed during war or an armed conflict," even a claim for crimes against
        humanity requires an allegation of state action. *Khulumani v. Barclay Nat'l Bank Ltd*., 504 F.3d
27      254 (2d Cir. 2007) (citing *Kadic*, 70 F.3d at 244).

28

1   law, but only on those who act under color of law." (quoting *Ginsburg v. Healey Car & Truck*

2   *Leasing, Inc.*, 189 F.3d 268, 273 (2d Cir. 1999))).

3       Here, the Complaint fails to allege any "close nexus" or "symbiotic relationship" between

4   Defendants and the Chinese governmental actors who allegedly injured the Plaintiffs, nor any acts

5   by the Defendants "in concert" with or "intertwined with" those of the state.  The most that is (or

6   could be) alleged is a commercial relationship whereby certain Cisco products were sold (through

7   intermediaries) to governmental entities,[16] which then allegedly used those products during the

8   commission of separate acts of wrongdoing some number of months or years later.  None of the

9   Defendants can be said to have acted under color of state law, or as state actors.  The ATS and

10  TVPA claims should therefore be dismissed.

11      **D.     The ATS And TVPA Claims Do Not Allege Acts By Defendants Warranting**

12              **Secondary Liability**

13          **1.      Aiding And Abetting Liability Is Unavailable Under The TVPA**

14      In the Ninth Circuit, aiding and abetting claims may not be asserted under the TVPA:

15  "Plaintiffs [argue] that they may sue … under the TVPA upon a theory of aiding and abetting.

16  Plaintiffs contend that corporations can be found vicariously liable for torture they direct

17  individuals to commit.  The TVPA, however, does not contemplate such liability."  *Bowoto v.*

18  *Chevron Corp.*, 621 F.3d at 1128 (quotations omitted).[17]  Plaintiffs can offer no reason to depart

19

20      [16]   Cisco has never sold products directly to end users in China.  Rather, Cisco sells to

21  independently owned resellers and system integrators, who in turn transact with end users.  In

22  many cases, Cisco transacts with a distributor, which in turn transacts with a reseller, which in turn
    transacts with an end user. In those cases, Cisco is three steps removed from the end user.  It is

23  ordinarily the role of resellers, systems integrators, and distributors, rather than Cisco, to design,
    develop, and implement hardware and software architectures and applications suited to the end

24  user's needs.

25      [17]   *Exxon* reached the same conclusion.  *See Exxon*, 2011 WL 2652384, at *36 ("The

26  authorities that appellants cite, indicating that Congress can provide for aiding and abetting
    liability absent direct liability, do not support the inference that Congress so provided in the

27  TVPA.  Appellants point to no other provision in the TVPA that colorably provides for such
    liability.").

28

1    from that authority.   The Complaint's aiding and abetting claims under the TVPA must be

2    dismissed.

3                    **2.        Aiding And Abetting Liability Is Unavailable Under The ATS**

4          While some courts have held that aiding and abetting liability is available under the ATS,

5    *see*, *e.g.*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007); *Exxon*, 2011

6    WL 2652384, at *5, this Court should dismiss the Complaint's aiding and abetting claims under

7    the ATS in anticipation that the Ninth Circuit will correctly resolve the issue in favor of the

8    contrary view.[18]   The ATS, like the TVPA, does not by its terms provide for aiding and abetting

9    liability.   *See* 28 U.S.C. § 1350.   In *Central Bank of Denver, N.A. v. First Interstate Bank of*

10   *Denver, N.A.*, 511 U.S. 164 (1994), the Court reasoned that private rights of action for aiding and

11   abetting securities violations were impermissible absent express congressional authorization.   *See*

12   *id.* at 182-83 (noting that, in passing a general criminal aiding and abetting statute, 18 U.S.C. § 2,

13   Congress "ha[d] not enacted a general civil aiding and abetting statute"). The reasoning of *Central*

14   *Bank* bars aiding and abetting claims here.

15         Indeed, *Central Bank* has added force in the ATS context, in light of *Sosa*'s admonition

16   that only a "modest number" of claims could be brought under the ATS without legislative

17   authorization, and that any "innovative" interpretations of the Act must be left to the legislative

18   process.   *See Sosa*, 542 U.S. at 720-21.   The Executive Branch has consistently argued that aiding

19   and abetting claims should be precluded on this view.   *See* U.S. Talisman Br. at 12-28 (arguing

20   aiding and abetting liability is unavailable under the ATS); Brief of the United States as Amicus

21   Curiae in Support of Petitioners, *Am. Isuzu Motors, Inc. v. Lungisile Ntsebeza*, No. 07-919, at 10-

22   11 (U.S. Feb. 11, 2008), available at 2008 WL 408389 (same).   That is the correct position under

23   *Sosa* and *Central Bank*.   The aiding and abetting allegations under the ATS should be dismissed.

24

25

---

26         [18]   A panel of the Ninth Circuit has held that aiding and abetting claims are available under
     the ATS, but that decision was vacated by the Ninth Circuit sitting en banc.  *Sarei v. Rio Tinto,*
27   *PLC*, 456 F.3d 1069, 1078 (9th Cir. 2006), *vacated by* 499 F.3d 923 (9th Cir. 2007).

28

3.     **The Allegations Do Not Support Aiding And Abetting Liability**

Even if aiding and abetting liability were generally available under the ATS or TVPA, the Complaint's secondary liability claims would still fail as a matter of law because the factual allegations are insufficient to support such liability here.

The prevailing view among courts to have considered the issue is that, to support a claim for aiding and abetting under international law, a plaintiff must allege that "a person is legally responsible for aiding and abetting a principal's wrongful act when the aider and abettor (1) carries out acts that have a *substantial effect* on the perpetration of a *specific crime* [actus reus], and (2) acts with the *specific intent* (i.e., *for the purpose*) of substantially assisting the commission of *that crime* [mens rea]."  *Nestle*, 748 F. Supp. 2d at 1087-88 (emphasis added).  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (liability when defendant "(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime"); *Khulumani*, 504 F.3d at 277 (Katzman, J., concurring) (same); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 654 (S.D. Tex. 2010) (same); *Krishanthi v. Rajaratnam*, No. 09-CV-5395, 2010 WL 3429529, at *7 (D.N.J. Aug. 26, 2010) (same).  The Ninth Circuit has already adopted a "purpose"—i.e., "specific intent"—standard in the context of genocide claims. *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 738-40 (9th Cir. 2008) (customary international law imposes that standard despite an alternative "knowledge" standard established by one particular treaty).

The actus reus element requires a defendant to "do something more than aiding a criminal generally—the defendant must aid the commission of a specific crime." *Nestle*, 748 F. Supp. 2d at 1080-81 (quotations omitted).  That is, "the aider and abettor must do something more than commit acts that 'in some way' tenuously 'further[] … the common design' of a criminal organization….  [Such] generalized assistance is not enough: the assistance must be 'specifically directed'—i.e., bear a direct causative relationship—to a specific wrongful act, and the assistance must have a substantial effect on that wrongful act." *Id.*  Relying on this standard, *Nestle* dismissed allegations against an international corporation allegedly complicit in human rights

1   violations in the Ivory Coast, reasoning that only such actions as "provid[ing] the guns and whips

2   that were used to threaten and intimidate the Plaintiffs," or "provid[ing] training to the Ivorian

3   farmers about how to use guns and whips," rises to the level of "*conduct that gives rise to aiding

4   and abetting liability under international law*—conduct that has a substantial effect on a particular

5   criminal act." *Id.* at 1101.

6        The mens rea element erects a similarly high bar, requiring that the defendant act with the

7   "*purpose* of facilitating" wrongdoing.  *Id.* at 1082.  A defendant's *knowledge* that his or her

8   conduct might assist in the perpetration of wrongdoing is insufficient: "something more than mere

9   knowledge and assistance are required to hold commercial actors liable for third parties' violations

10  of international law." *Id.* at 1094 (discussing *Talisman*).  This conclusion rests on sound policy

11  principles.  For "if ATS liability could be established by knowledge of … abuses coupled only

12  with such commercial activities as resource development, the statute would act as a vehicle for

13  private parties to impose embargos or international sanctions through civil actions in United States

14  courts.  Such measures are not the province of private parties but are, instead, properly reserved to

15  governments and multinational organizations." *Talisman*, 582 F.3d at 264.

16       Thus, in *Corrie v. Caterpillar*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd on other

17  grounds*, 503 F.3d 974, 977 (9th Cir. 2007), the district court held that a bulldozer manufacturer

18  could not be sued for aiding and abetting the Israeli military in demolishing residences and

19  causing deaths and injuries to the residents.  Even if the defendant knew that the bulldozers would

20  be used to commit illegal acts, "[o]ne who merely sells goods to a buyer is not an aider and abettor

21  of crimes that the buyer might commit, even if the seller knows that the buyer is likely to use the

22  goods unlawfully, because the seller does not share the specific intent to further the buyer's

23  venture." *Id.* at 1027.[19]

---

[19]   The D.C. Circuit's recent departure from the "purpose" standard as to aiding and abetting under the ATS, and holding that "knowledge" is sufficient, is incorrect.  *Exxon*, 2011 WL 2652384 at *18-19.  *Exxon* criticizes *Talisman* for failing to consider certain international law sources that arguably reflect a knowledge standard.  *Id.* at *18.  But *Talisman*, *Nestle*, and other decisions do acknowledge that some international law sources support a knowledge standard while *other* international law sources adopt a purpose standard; they simply conclude that, under *Sosa*,
(footnote continued)

Here, the Complaint fails to allege facts sufficient to suggest that Defendants acted with the purpose to facilitate a specific act of wrongdoing.  At most, the Complaint alleges that Defendants had the purpose of assisting Chinese authorities in locating, apprehending, and even prosecuting Falun Gong practitioners.  (*See*, *e.g.*, Compl. ¶¶ 74, 100).  Yet the mere act of assisting the police in apprehending a subject is insufficient to satisfy the requirement of purpose to aid and abet a human rights violation.  *Liu Bo Shan v. China Constr. Bank Corp.*, 2011 WL 1681995, at *4 (2d Cir. 2011) (summary order) (Plaintiffs "fail[ed] plausibly to allege that [Defendant China Construction] Bank acted with the purpose that [Plaintiff] Liu be subjected to torture, cruel treatment, or prolonged arbitrary detention by the police.").

Here, the Plaintiffs allege no conduct manifesting the Defendants' supposed "purpose" to subject Falun Gong practitioners to alleged human rights violations, or even facts supporting an inference of "knowledge."  As alleged in the Complaint, the Plaintiffs suffered physical injuries perpetrated by CCP officials, Office 610 officials, Chinese Public Security officers, workers at detention centers or prisons, or other Chinese governmental authorities.  (*See*, *e.g.*, Compl. ¶¶ 37, 112-214).  The Complaint does not contain any allegation that Defendants engaged in any of this conduct.  Further, aside from conclusory allegations that Defendants' gave "substantial assistance and encouragement" to Chinese authorities, that Defendants' conduct was a "substantial factor" in causing harm to Plaintiffs, and that Defendants "knew" the Golden Shield would be used to torture, persecute, and otherwise case injury to Plaintiffs, the Complaint does not contain a single, particularized *factual* allegation in support of aiding and abetting liability.  *See Iqbal*, 129 S. Ct. at 1949 (a complaint does not suffice "if it tenders naked assertions devoid of further factual

---

"where there are a variety of formulations, the court should look to the formulation that is agreed upon by all—a lowest common denominator or a common 'core definition' of the norm."  *Nestle*, 748 F. Supp. 2d at 1080 (citing *Khulumani*, 504 F.3d at 277 n.12); *see id.* at 1082 ("The less-stringent 'knowledge' standard, although it has often been invoked, has not obtained universal recognition and acceptance."); *Khulumani,* 504 F.3d at 277 n.12 (so holding); *Talisman*, 582 F.3d at 259 (same).  There is no basis to conclude that international law would *universally* adopt the knowledge standard.  Notably, the *Nestle* decision explicitly addresses each of the international law sources that *Exxon* contends went unacknowledged in *Talisman*.  *See Nestle*, 748 F. Supp. 2d at 1081-90 (discussing the *Ohlendorf, Flick,* and *Tesch* decisions).

enhancements. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (quoting *Twombly*, 550 U.S. at 557, 570) (quotation marks omitted)). The allegation that Defendants assisted in the development and manufacture of components utilized by the Chinese in building the Golden Shield network—which is nothing more than network infrastructure—cannot support a plausible inference under *Iqbal* and *Twombly* that Defendants had the "purpose" or the "knowledge" to assist torture of Falun Gong practitioners in Chinese prisons years later. Plaintiffs rely upon the "sheer possibility" of some connection between Defendants' conduct and Plaintiffs' injury, but "facts that are 'merely consistent with' a defendant's liability … stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557).[20]

To the extent there are any specific factual allegations in the Complaint, those allegations at most suggest that Defendants acted with knowledge that the Golden Shield could be useful in facilitating the *lawful* activities of the Chinese police in suppressing crime of all varieties. The Complaint alleges that the Golden Shield was a surveillance system—a set of technologies that enabled Chinese law enforcement authorities to lawfully locate individuals engaged in illegal activities.[21] Specifically, the Complaint variously alleges that the Golden Shield enabled authorities to "identify"; "locate"; "log"; "profile"; "track;"; "monitor"; "investigate"; "surveil";

---

[20]   Indeed, in *Iqbal*, the plaintiff alleged that the defendants "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy," that Ashcroft was the "principal architect" of this invidious policy and that Mueller was "instrumental" in adopting and executing it. 129 S. Ct. at 1951. The Supreme Court held that these allegations "amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim" and ruled that "the allegations are conclusory and not entitled to be assumed true." *Id.* Plaintiffs' allegations here fare no better.

[21]   Such efforts are not unique to China; even in the United States, federal officials have expressed concern "that their ability to wiretap criminal and terrorism suspects is 'going dark' as people increasingly communicate online instead of by telephone," and have asked Congress "to require all services that enable communications—including encrypted e-mail transmitters… —to be technically capable of complying if served with a wiretap order." Charlie Savage, *U.S. Tries to Make It Easier to Wiretap the Internet*, N.Y. Times, Sept. 27, 2010, *available at* http://www.nytimes.com/2010/09/27/us/27wiretap.html (noting that such a "mandate would include being able to intercept and unscramble encrypted messages").

and thereby "apprehend"; "detain"; and "interrogate" individuals that the police suspect of wrongdoing—all standard police activities that would assist the authorities to legitimately "*fight [] against crime*" and "maintain social stability," including by way of "the suppression of [illegal] dissident activity."   (*See*, *e.g.*, Compl. ¶¶ 52, 56-58, 63, 65, 68, 74, 95-98, 100-02 (emphasis added)).   Nothing in any of these allegations, and no factual allegation anywhere else in the Complaint, supports the factual leap that Plaintiffs urge—from an allegation that Defendants' technology assisted the police in their *lawful* duties, to an allegation that Defendants acted with the knowledge or purpose that Chinese authorities would use this technology for *unlawful* purposes.

Indeed, the Complaint comes close to conceding that the Golden Shield played no role at all in the Plaintiffs' injuries, with its repeated formulaic allegation that authorities used the Golden Shield to "monitor, identify, track, and *eventually* detain and torture" suspects. (*See*, *e.g.*, *id.* ¶ 63 (emphasis added); ¶ 32 (discussing "CCP's purpose to identify, track, *and thereby* abuse and eliminate … practitioners") (emphasis added)).   This is insufficient to support an allegation that Defendants had knowledge or the purpose to facilitate alleged secondary and tertiary downstream effects of the identification and tracking enabled by the Golden Shield.   Nor are allegations concerning the "suppression," "elimination," and "eradication" of the Falun Gong (*see id.* ¶¶ 32, 56, 100) enough to overcome this deficiency, for the suppression, elimination, and eradication of Falun Gong activity was the express policy of the Chinese Government.   The Complaint fails to allege that the Defendants knew that Chinese authorities intended to enforce this policy through unlawful means.

### 4.       The Conspiracy Claims Fail

The Complaint's conclusory allegation that Defendants are liable as co-conspirators must also be rejected, and such claims dismissed.   *First*, conspiracy liability is unavailable under the ATS and TVPA for the reasons discussed above with regard to aiding and abetting.   *Second*, Plaintiffs' conspiracy claims would require the same proof of mens rea as their claims for aiding and abetting (*Talisman*, 582 F.3d at 260) and consequently must be dismissed for the same reason. Third, even "assuming that the conspiracy claims are cognizable, they require proof of an

1    agreement."  *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070 (9th Cir. 2010).[22]  Here, as in

2    *Jeppesen,* there are no factual allegations of such an agreement (setting aside conclusory

3    assertions).  Rather, "Plaintiffs' allegations confirm that their conspiracy claims depend on proof

4    of a covert relationship."[23]

5          **E.      Several Of The ATS Claims Are Otherwise Defective**

6          In addition to the defects discussed above, the Complaint fails to state a claim or establish

7    jurisdiction for its claims under the ATS for cruel, inhuman, and degrading treatment; forced

8    labor; and crimes against humanity.[24]  Plaintiffs' alleged injuries are serious, and Defendants well

9    understand Plaintiffs' desire to seek redress.  But the Supreme Court in *Sosa*, like Congress in the

10

11         [22]   The Ninth Circuit cited *Talisman*, 582 F.3d at 260 (holding that, under either international

12   law or domestic law, conspiracy liability under the ATS would require either an agreement or a

13   criminal intention to participate in a common criminal design) and *Cabello v. Fernandez-Larios*,
     402 F.3d 1148, 1159 (11th Cir. 2005) (conspiracy liability under the ATS requires proof that "two
     or more persons agreed to commit a wrongful act").

14

15         [23]   To the extent the Complaint asserts a conspiracy theory in support of its state law or other

16   claims, such claims must be dismissed for the same reasons identified above—the absence of an
     agreement to engage in a conspiracy.  Moreover, to the extent the Complaint asserts a direct

17   liability theory in support of any claim, such claims must be dismissed because there is no "factual
     allegation demonstrating [Defendants'] personal participation or willful direction" in the physical

18   acts of harm allegedly committed by Chinese authorities against the Plaintiffs.  *See Liu Bo Shan*,
     2011 WL 1681995, at *2 (2d Cir. 2011) (summary order) ("[T]he mere assertion that the Bank

19   acted 'jointly' with the Chinese police is insufficient to establish direct liability for the alleged
     abuses."); *Talisman*, 582 F.3d at 257 (construing allegation that defendant was "complicit in

20   Government's abuses," but not "personally engaged in human rights abuses," as an aiding and
     abetting claim).

21         [24]   In addition, the Complaint's allegation that Roe VIII is a "surviving family member" of

22   Doe VIII (Compl. ¶ 198) is insufficient to demonstrate that Roe VIII has standing to assert ATS or
     TVPA claims for extrajudicial killing.  Defendants reserve the right to seek dismissal on this basis,

23   if necessary, following resolution of Roe VIII and Doe VIII's request to proceed anonymously.
     *See* TVPA § 2(a)(2) (extrajudicial killing claim may only be asserted by "legal representative, or

24   … person who may be a claimant in an action for wrongful death."); *Bowoto v. Chevron Corp.*,
     No C 99-02506, 2006 WL 2455761, at *11 n.15 (N.D. Cal. Aug. 22, 2006) (inferring ATS

25   standing requirement from TVPA, and dismissing ATS/TVPA claims brought by siblings); *A.D. v.
     Cal. Highway Patrol*, No. C 07-05483, 2009 WL 733872, at *4 (N.D. Cal. Mar. 17, 2009) ("Only

26   persons enumerated in California Code of Civil Procedure section 377.60 have standing to bring a

27   wrongful death claim.").

28

1    TVPA, expressed the need to maintain a high bar against recognition of international law norms

2    enforceable by private litigation in U.S. courts.

3         ***Cruel, Inhuman, and Degrading Treatment.***   To be actionable, ATS claims must "rest on

4    a norm of international character accepted by the civilized world and defined with a specificity

5    comparable to the features of the 18th-century paradigms [against violation of safe conducts,

6    infringement of the rights of ambassadors, and piracy]."  *Sosa*, 542 U.S. at 725.  Plaintiffs' claim

7    for cruel, inhuman, and degrading treatment ("CIDT") does not satisfy this demanding standard.

8    Since *Sosa*, the lone federal appellate court to have addressed the issue concluded that CIDT are

9    not actionable under *Sosa*'s "vigilant doorkeeping" standard.  *Aldana v. Del Monte Fresh*

10   *Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (affirming dismissal of claims for cruel,

11   inhuman, and degrading treatment).  Even before *Sosa* limited the availability of ATS actions, at

12   least three district courts in the Ninth Circuit had held that CITD claims were not actionable.  *See*

13   *Hilao v. Estate of Marcos*, 103 F.3d 789, 794 (9th Cir. 1996) ("The district court refused to

14   instruct the jury on … claims for [CIDT] … because it said that [the] standard for such a claim

15   was 'too vague' [i.e.,] … not sufficiently specific such that violations of that norm are actionable

16   under the [ATS].");  *Sarei v. Rio Tinto, PLC*, 221 F. Supp. 2d 1116, 1163 n.190 (C.D. Cal. 2003)

17   ("[P]laintiffs have not demonstrated that prohibitions against [CIDT] … constitute established

18   norms of customary international law"), *reversed in part on other grounds*, 487 F.3d 1193 (9th

19   Cir. 2007);  *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1543 (N.D. Cal. 1987) (CIDT "cannot

20   qualify as a violation of the law of nations" because there is no "universal consensus regarding" its

21   availability and it is "unclear what behavior falls within the proscription"), *motion for*

22   *reconsideration aff'd in part and rev'd in part*, 694 F. Supp. 707 (N.D. Cal. 1988).  Those

23   decisions correctly state the rule.[25]  And even if CIDT were universally accepted or capable of

24

25   _____

         [25]   Although some courts have held that CIDT is actionable under the ATS, many of these
26   decisions recognize that there is no clear definition of any such norm.  *See*, *e.g.*, *Bowoto v.*
     *Chevron Corp.*, 557 F. Supp. 2d 1080, 1093 (N.D. Cal. 2008) ("There is no widespread consensus
27   regarding the elements of cruel, inhuman and degrading treatment.");  *Qi*, 349 F. Supp. 2d at 1321
     ("There does not appear to be a specific standard.").  These cases erroneously failed to recognize
28       (footnote continued)

1    specific definition, such claims would still not be actionable under the ATS because they are

2    displaced by the TVPA.  See Part II.A.2 above.

3        **Forced Labor.**  The ATS claim for forced labor is also defective, because forced labor

4    while in prison—the crux of Plaintiffs' allegations—is not an international law violation.  A

5    Government does not commit an international law violation every time it forces an inmate to work

6    while in prison:  "Although forced prison labor … may be condemnable in its own right, it is …

7    not a state practice proscribed by international law."  *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 22

8    (D.D.C. 2000), *aff'd* 35 Fed. App'x 1 (D.C. Cir. 2002) (unpublished) (citing Restatement (Third)

9    of Foreign Relations Law § 702 (1986)); *see* 1930 Forced Labor Convention of the International

10   Labor Organization, art. 2 (excluding from definition of forced labor "[a]ny work or service

11   exacted from any person as a consequence of a conviction …").  Forced prison labor is also

12   permitted under the Thirteenth Amendment to the U.S. Constitution.  *See Piatt v. MacDougall,*

13   773 F.2d 1032, 1035 (9th Cir. 1985) ("The Thirteenth Amendment does not prohibit involuntary

14   servitude as part of imprisonment for a crime.").

15       Here, of the eight Plaintiffs who allege forced labor claims, five (Does I-V), concede that

16   their labor was performed during service of a sentence of imprisonment.  (Compl. ¶ 251).

17   Although the remaining three (Plaintiffs He, Guifu, and Doe VI) allege that they were sentenced to

18   reeducation in labor camps without charge (*Id.* ¶ 250), *Bao* makes clear that reeducation terms of

19   this nature are permissible administrative decisions governed by specific procedural requirements

20   under Chinese law, none of which is disclaimed by the Complaint.  (Compl. ¶ 1).  *See also* Chu

21   Declaration, ¶¶ 33-35.  Indeed, the Complaint notes that in at least one case the reeducation term

22   was implemented in view of evidence presented by the prosecutors and police.  (Compl. ¶ 119).

23   Forced labor of this sort is not actionable under international law.

24       **Crimes Against Humanity.**  The Complaint fails to establish subject matter jurisdiction

25   under the ATS for the claimed crimes against humanity.  Crimes against humanity are ordinarily

26   _____

27   that this lack of clear definition is fatal under *Sosa*.  *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d
     733, 737-38 (9th Cir. 2008) (courts may not seek to "extend and redefine" norms).

28

reserved "only for the most heinous of crimes, such as murder and extermination, slavery, ethnic cleansing, and torture." *Aldana v. Fresh Del Monte Produce, Inc*., 305 F. Supp. 2d 1285, 1300 (S.D. Fla. 2003), *aff'd in relevant part*, 416 F.3d 1242 (11th Cir. 2005); *see, e.g., Cabello*, 402 F.3d at 1148 ("Caravan of Death," in which a Chilean military unit "traveled to many cities in northern Chile where the military officers engaged in acts of extrajudicial killing, torture, and abuse); *Sarei*, 221 F. Supp. 2d at 1126-51 (government blockade of medicine, clothing, and other essential supplies, resulting in more than 10,000 deaths over seven years); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1157 (E.D. Cal. 2004) (atrocities by military "death squads").

The Ninth Circuit has "assum[ed], without deciding" that a crime against humanity claim requires an allegation of murder, extermination, or other predicate acts, "when committed as part of a widespread or systematic attack" directed against any civilian population, with knowledge of the attack. *See Abagninin*, 545 F.3d at 741 & n.5. The Second Circuit recently assumed that a similar standard applies. *See Talisman*, 582 F.3d at 257 (accepting the following definition as "serviceable": "[c]rimes against humanity include murder, enslavement, deportation or forcible transfer, torture, rape or other inhumane acts, committed as part of a widespread [or] systematic attack directed against a civilian population").[26]

As this Court explained in *Bowoto v. Chevron Corp*., No. C 99-02506, 2007 WL 2349343, at *10 (N.D. Cal. Aug. 14, 2007), which granted summary judgment on claims for crimes against humanity even though they involved "hundreds of deaths and thousands of injuries" to villagers in retribution for protests, *id*. at *10, "widespread" and "systematic" are demanding standards: "The concept of 'widespread' may be defined as massive, frequent, large-scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims." *Id*. at *3

---

[26] Some courts have noted a more demanding standard, which requires an allegation of wrongdoing in the course of armed conflict. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 480 (S.D.N.Y. 2005) (citing Charter of the International Military Tribunal at Nuremberg); *Bowoto*, 2006 WL 2455752, at *3-5 (citing Statute of the International Criminal Tribunal for the Former Yugoslavia). Because the Complaint fails even under the less demanding "widespread or systematic," standard, Defendants address that standard above, *arguendo*. Defendants reserve the right to assert that the "armed conflict" standard applies.

(quotation omitted); *see Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, at 479-80 (S.D.N.Y. 2005) (a widespread attack is one conducted on a large scale against many people). Likewise, "the term 'systematic' requires a high degree of orchestration and methodical planning." *Bowoto*, 2007 WL 2349343, at *4 (quoting Darryl Robinson, *Defining 'Crimes against Humanity' at the Rome Conference*, 93 Am J. Int'l L. 43, 47 (1999)); *see also id.* ("The concept of 'systematic' may be defined as thoroughly organized and *following a regular pattern* on the basis of a common policy involving substantial public or private resources" (quotation omitted, emphasis added)); *see also Talisman*¸ 226 F.R.D. at 479-80 (systematic defined as thoroughly organized action, following a regular pattern of the basis of a common policy; there must be some preconceived policy or plan).

The crimes against humanity claim here fails to meet this standard. *First*, even granting the Complaint's speculative and unsubstantiated allegation of "many thousands" of class members (Compl. ¶ 225), the Complaint fails to allege "massive," "large scale action." Rather it alleges only that a small number of Falun Gong leaders were arrested and subjected to brutality while in police custody and in jail. As compared to the 70 to 100 *million* people who were allegedly practicing Falun Gong across all of China in 1999 (*id.* ¶ 42), the Complaint alleges that 60 to 70 people were injured as part of the so-called "103 cases" (*id.* ¶ 112), and that one to five thousand people were "arrested and charged" in connection with the so-called "Internet Cases" (*id.* ¶ 143) together with an unspecified number of people in connection with the so-called "General Surveillance Cases" (*id.* ¶ 203).

*Second*, the Complaint also fails to allege "systematic" attacks against a civilian population. The Complaint makes no effort to allege individual or class claims on behalf of the 70 to 100 million Falun Gong practitioners purportedly practicing in China in 1999. (*See id.* ¶ 225 (alleging "thousands" of class members)). Rather, the Complaint alleges that certain leaders were apprehended based on their leadership roles—the same type of targeting based on particularized and "individualized suspicion of engaging in certain behavior" held insufficient in *Bowoto*. Moreover, contrary to the requirement of a "regular pattern," the Plaintiffs allege a variety of disparate injuries, some of which were allegedly suffered while in police custody, some while in

penal institutions, and some due to due process violations. While any instance of such police misconduct is profoundly disturbing and should not be condoned, it devalues human rights law to make such allegations against Cisco and its employees, who did nothing but sell internet routers to technology companies in China as permitted by this nation's carefully considered export regulations.

## III.   THE STATE LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED

The Complaint alleges four state law personal injury torts: battery (Count 11); assault (Count 12); false imprisonment (Count 13); and wrongful death (Count 14) (collectively, the "State Law Claims"). Each of these claims should be dismissed with prejudice. *First*, the State Law Claims are all extraterritorial in nature. *Second*, the State Law Claims were not brought within the requisite statute of limitations periods. *Third*, Plaintiffs' allegations do not sufficiently allege aider and abettor liability.

### A.   California Tort Law Does Not Apply Extraterritorially

The State Law Claims allege harms committed in China, not California. It is up to China, not California, to define whether that conduct is actionable as a matter of domestic law. *See* Restatement (Third) of Foreign Relations Law § 402 (1987) (a nation state "has jurisdiction to prescribe law with respect to ... conduct that, wholly or in substantial part, takes place within its territory; [or] … conduct outside its territory that has or is intended to have substantial effect within its territory").[27] For this reason, courts routinely dismiss state law claims against conduct committed entirely abroad. For example, in *In re Chiquita Bananas*, No. 08-01916-MD, 2011 WL 2163973 (S.D. Fla. June 3, 2011), the court dismissed state law claims for assault, battery,

---

[27]   The Court need not determine whether Chinese law would apply to the State-Law Claims. The Complaint does not indicate that Plaintiffs are pursuing their tort claims under Chinese law, nor have Plaintiffs filed a notice of reliance upon foreign law pursuant to Fed. R. Civ. P. 44.1. *See Viera v. Eli Lilly & Co.*, No. 1:09-cv-0495-RLY-DML, 2011 WL 2144413, at *1 (S.D. Ind. May 31, 2011) ("constru[ing] [the Complaint] to present only Indiana common law claims" because the complaint did not indicate plaintiffs were pursuing their tort claims under foreign law and had not filed a Rule 44.1 notice).

negligence and wrongful death against a U.S. corporation for injuries in Colombia by Colombian victims at the hands of Colombian paramilitaries, reasoning that "the civil tort laws of Florida, New Jersey, Ohio, and the District of Columbia do not apply to the extraterritorial conduct," *id.* at *45, and that such state law claims are not "matters of universal concern recognized by the community of nations," *id.* (citing *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1024 (S.D. Ind. 2007); *Romero v. Drummond Co.*, No. 03-0575, DE 329, Slip op. at 2 (N.D. Ala. Mar. 5, 2007)).

Because the State Law Claims assert torts[28] based on extraterritorial acts that have no connection to California, this Court should summarily dismiss them. *See Maez v. Chevron Texaco Corp.*, No. C 04-00790 JSW, 2005 WL 1656908, at *3 (N.D. Cal. July 13, 2005) ("Under California law, there is a presumption against applying state laws extraterritorially to encompass conduct occurring in a foreign jurisdiction." (citing *N. Alaska Salmon Co. v. Pillsbury Council, Inc.*, 162 P. 93, 94 (1914); *Diamond Multimedia Sys. v. Superior Court*, 80 Cal. Rptr. 2d 828, 843 n.20 (1999)); *cf. Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008) ("Uniformly, the cases invoke the presumption [against extraterritoriality] when applying a statute would have the effect of regulating specific conduct occurring abroad.").[29]

### B.     The State Law Claims Are Untimely

Even if this Court were to consider them, it should dismiss the State Law Claims as barred by the applicable statutes of limitations. Under California law, the statute of limitations for the

---

[28]   Assault, battery, and false imprisonment are common law torts, but California has a wrongful death statute. *See* Cal. Civ. Proc. Code § 377.60. California courts have definitively established that this statute does not apply extraterritorially. *See*, *e.g.*, *Beckett v. MasterCraft Boat Co.*, 24 Cal. Rptr. 3d 490, 492-93 (Cal. Ct. App. 2005).

[29]   That Cisco is located in California is not sufficient to defeat the extraterritorial nature of Plaintiffs' claims, as Plaintiffs do not allege that a single act occurred in or had an effect on California in connection with these particular torts. *See Diaz-Barba v. Kismet Acquisition, LLC*, Nos. 08-cv-1446 et al., 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010) ("[A]cts inside the United States that are merely preparatory or incidental to the conduct at issue are, by themselves, insufficient to confer federal jurisdiction." (citing *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538 (9th Cir. 1994))).

1  claims of assault, battery, and wrongful death is two years, Cal. Civ. Proc. Code. § 335.1, and the

2  statute of limitations for a claim of false imprisonment is one year, *id.* § 340(c). The Complaint,

3  which was filed on May 19, 2011, does not satisfy these requirements.

4      ***Wrongful Death***. The only Plaintiff alleging a claim of wrongful death is Roe VIII, on

5  behalf of Doe VIII. Doe VIII, however, is alleged to have died "[s]ometime between August 21

6  and August 30, 2002." (Compl. ¶ 202). Thus, the latest date that the statute of limitations for Roe

7  VIII's wrongful death claim expired was August 30, 2004. The Complaint was filed more than six

8  years after the statute of limitations for this claim terminated. Because no other Plaintiff brings

9  this claim, it must be dismissed.[30]

10      ***False Imprisonment***. A claim of false imprisonment, which has a one-year statute of

11  limitations, accrues when the complainant is no longer detained without legal process. The statute

12  of limitations does not automatically continue through any form of imprisonment until release;

13  rather, the statute of limitations begins to run when legal process is provided. *See*, *e.g.*, *Gantt v.*

14  *County of Los Angeles*, No. CV 08-5979, 2008 WL 5382278, at *6 (C.D. Cal. Dec. 23, 2008) ("A

15  false imprisonment claim accrues when the alleged false imprisonment ends. This does not

16  necessarily mean when a claimant is released from custody, however. False imprisonment ends

17  when legal process is initiated against the claimant. Stated differently, a false imprisonment ends

18  once the victim becomes held pursuant to such process …." (quotation and citations omitted)).

19      Plaintiffs Ivy He, Liu Guifu, Charles Lee, and Does I-VI bring claims for false

20  imprisonment. Because the Complaint was filed on May 19, 2011, a claim of false imprisonment

21  accruing before May 19, 2010 is procedurally barred. According to the Complaint:

---

[30]   Moreover, as discussed in footnote 25 above, the Complaint's allegation that Roe VIII is a "surviving family member" of Doe VIII (Compl. ¶ 198) is insufficient to demonstrate that Roe VIII has standing to assert a claim for wrongful death. Defendants reserve the right to seek dismissal on this basis, if necessary, following resolution of Roe VIII and Doe VIII's request to proceed anonymously. *See A.D. v. Cal. Highway Patrol*, No. C 07-5483, 2009 WL 733872, at *4 (N.D. Cal. Mar. 17, 2009) ("Only persons enumerated in California Code of Civil Procedure section 377.60 have standing to bring a wrongful death claim.").

- *Ivy He* was released from detention in November 2003, and she has resided in Canada since December 2006. (Compl. ¶¶ 133, 135, 142). Thus, the one-year statute of limitations has expired.

- *Liu Guifu* was released from custody in the summer of 2007, and "[s]oon thereafter … left the country and came to the United States." (*Id.* ¶ 214). Thus, the one-year statute of limitations has expired.

- *Charles Lee* was released from detention in January 2006, and he returned to the United States. (*Id.* ¶ 197). Thus, the one-year statute of limitations has expired.

- *Doe II* was tried in July 2003 and sentenced to a four-year prison term. (*Id.* ¶¶ 128-29). Applying a July 2007 release, the one-year statute of limitations has expired.

- *Doe V* was tried and sentenced to a three-year prison term in spring of 2004. (*Id.* ¶¶ 164, 167). Applying a release of spring 2007, the one-year statute of limitations has expired.

- *Doe VI* was detained until early fall 2008. (*Id.* ¶ 175). Thus, the one-year statute of limitations has expired.

The statute of limitations for the wrongful imprisonment claims of Ivy He, Liu Guifu, Charles Lee, Doe II, Doe V, and Doe VI has unquestionably expired. The Complaint further alleges:

- *Doe I* was arrested and detained in November 2001, and charged in July 2003 (*Id.* ¶ 117, 119). While the Complaint alleges that Doe I was sentenced to twelve years of imprisonment in July 2003, the Complaint indicates that Doe I is no longer imprisoned, as it refers to her time in prison in the past tense, states that she "is currently living in China," and that "[s]he is under the continued threat that the Chinese authorities can track her religious activities." (*Id.* ¶¶ 120-23). However, no release date is provided.

- *Doe III* was convicted at a trial in late 2005. (*Id.* ¶¶ 147, 150). He was sentenced to seven and a half years of imprisonment, where he remains today. (*Id.* ¶¶ 151-52).

- *Doe IV* was convicted in 2004, and sentenced to seven years in prison. (*Id.* ¶¶ 158, 160). The Complaint indicates that Doe IV is no longer imprisoned, but no release date is alleged therein.

Because Doe I, Doe III, and Doe IV allege that they were each tried and sentenced, they were each afforded legal process sufficient for their false imprisonment claims to accrue.  Indeed, the allegations for this claim are Plaintiffs' detention "without arrest, charges, or trial."  (*Id.* ¶¶ 301, 303).[31]  Thus, Plaintiffs' claims for false imprisonment should be dismissed.

**_Assault and Battery_**.  Claims of assault and battery, which each carry a two-year statute of limitations, have been brought by Plaintiffs Ivy He, Liu Guifu, Charles Lee, and Does I-VI.  Because the Complaint was filed on May 19, 2011, any claim of assault or battery dating before May 19, 2009 is procedurally barred.  For the reasons articulated above, the claims of Ivy He, Liu Guifu, Charles Lee, and Doe II, Doe V, and Doe VI are barred, as they do not allege any acts of assault and battery occurring after May 19, 2009.

Doe I, Doe III, and Doe IV do not allege that any acts of assault or battery occurred after May 19, 2009; these three Plaintiffs allege to have been sentenced in 2003, 2005, and 2004 respectively, but allege only general, vague statements in support of their assault and battery claims.  (*See* Compl. ¶¶ 121 (Doe I alleges that "[i]n prison, [she] was subjected to severe torture and forced labor"); 151 (Doe III alleges that "[w]hile in prison, he was and continues to be subjected to torture and persecution"); 161 (Doe IV alleges that "[w]hile in prison, he was subjected to torture and persecution.  He was deprived of sleep for weeklong periods of time, beaten, and in other ways injured physically and mentally")).  These claims, on their face, do not sufficiently put Defendants on notice of specific, actionable assaults and/or batteries that are alleged to have occurred—these Plaintiffs provide no dates, descriptions, or anything other than general, conclusory allegations of injury.  *See Iqbal*, 129 S. Ct. at 1949 ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)).  Because these Plaintiffs have not alleged sufficient

---

[31]   Under Cal. Civ. Proc. Code § 352.1(a), this limitations period can be tolled for a maximum of two years due to incarceration.  This statutory tolling would not bring any Plaintiff within the statute of limitations.

1  facts to establish plausible, concrete claims of assault and battery to put Defendants on fair notice,

2  these counts should be dismissed.[32]

3  **C.  The Allegations Do Not Support Aiding And Abetting Liability**

4  Even if this Court were inclined to consider Plaintiffs' State Law Claims, these claims do

5  not allege that Defendants directly engaged in acts of assault, battery, false imprisonment, or

6  wrongful death and fail to allege that Defendants *intended* to aid and abet Chinese police, guards,

7  judges, and other Chinese authorities in committing these torts.  Under California law, a defendant

8  can be held liable for aiding and abetting "only if he or she knew that a tort had been, or was to be,

9  committed, and acted *with the intent of facilitating the commission of that tort*."  *Id.* at 407; *see*

10 *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 407 (Cal. Ct. App. 2005) (citation omitted)

11 (quoting *Gerard v. Ross*, 251 Cal. Rptr. 604, 613 (Cal. Ct. App. 1988)); *see also Fox v. Cal.*

12 *Physicians' Serv.*, No. A122803, 2009 WL 1163880, at *4 (Cal. App. April 30, 2009)

13 (unpublished) ("A civil cause of action for aiding and abetting necessarily requires a defendant to

14 reach a conscious decision to participate in tortious activity for the purpose of assisting another in

15 performing a wrongful act." (quotation omitted)).

16 The Complaint falls far short of this requirement.  It alleges only that Cisco, by providing

17 the Chinese government with technology used in building the Golden Shield, provided

18 "substantial assistance or encouragement to the CCP" in carrying out these acts and that

19 Defendants' conduct was a "substantial factor in causing harm to Plaintiffs."  (Compl. ¶¶ 289, 297,

20 306, 311).  Because Plaintiffs allege only intent to supply technology, and not any intent to

21 facilitate the commission of a specific tort, the State Law Claims warrant dismissal.  Moreover,

22 because there are multiple steps between Cisco's provision of general networking infrastructure to

23 entities selling to the Chinese government and the commission by Chinese police and prison

24

25

26 _____

[32]  Equitable tolling is unavailable because the Complaint does not satisfy "the plaintiff's

27 burden to plead and prove" a toll.  *Beagle v. Rite Aid Corp.*, No. C 08-1517, 2009 WL 3112098, at
*11 (N.D. Cal. Sept. 23, 2009).

28

guards of torts of assault, battery, false imprisonment, and wrongful death, the Complaint fails to allege that Cisco provided "substantial assistance."

## IV.     THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED

The Court should dismiss with prejudice Plaintiffs' claim of unfair business practices, brought under California Business and Professions Code § 17200 *et seq.* (the "UCL").  *First*, the UCL does not apply extraterritorially.  *Second*, the UCL does not extend to the sort of injuries alleged by Plaintiffs.

### A.     The UCL Does Not Apply Extraterritorially

California courts have repeatedly recognized that California's UCL "does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California."  *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (citing *Norwest Mort., Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18, 23 (Cal. Ct. App. 1999); *see also Nestle*, 748 F. Supp. 2d at 1122 ("California courts have consistently held that out-of-state plaintiffs may not bring Unfair Competition Law claims for out-of-state misconduct or injuries."); *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 968 (N.D. Cal. 2010) (dismissing unfair competition claim because "the UCL does not apply to out-of-state conduct that does not cause injury in California"); *Arabian v. Sony Elec., Inc.*, No. 05-cv-1741, 2007 WL 627977, at *9 (S.D. Cal. Feb. 22, 2007) (dismissing UCL claim because "[t]here is a presumption against California law being given extraterritorial effect when the wrongful act as well as the injury occurred outside California").

Here, none of the Plaintiffs is a California resident.  Further, none of the alleged misconduct or injuries is alleged to have occurred in California.  While Plaintiffs allege in passing the presence of certain signatures on contracts in California and that a custom surveillance system was designed in California (Compl. ¶ 315), none of these acts is alleged to have caused Plaintiffs' injuries.  *See Nestle*, 748 F. Supp. 2d at 1122-23 (dismissing UCL claim for failing to "articulate any theory through which the child-laborer Plaintiffs were harmed by Defendants' California-based conduct").  Thus, Plaintiffs' UCL claim should be dismissed with prejudice.

### B.     The Allegations Of Lost Income Are Too Attenuated

Even if the Court were to entertain Plaintiffs' UCL claim, it should be dismissed because the relationship between Plaintiffs' purported injury and Cisco's conduct is far too "remote, attenuated and consequential." *Lorenzo v. Qualcomm Inc.*, No. 08-cv-2124, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (dismissing UCL claim).  Plaintiffs allege that Cisco's sales of internet equipment "gave Cisco an unfair competitive advantage over its competitors" (Compl. ¶ 316) with the result that "Plaintiffs lost income that they could not receive during the period of their detention" (*id.* ¶ 317).  Plaintiffs are not competitors with Cisco, nor do Plaintiffs explain how Defendants' alleged acts may have provided Cisco with any competitive advantage.  Moreover, as the Complaint itself alleges, Plaintiffs lost income as a result of the independent actions of Chinese government actors, negating any UCL claim against Cisco.  *See Jane Doe I v. Wal-Mart Stores, Inc.*, No. CV 05-7307, 2007 WL 5975664, at *6 (C.D. Cal. Mar. 30, 2007) ("Plaintiffs do not allege facts showing that they lost money 'as a result of' Defendant's false or deceptive advertising. Plaintiffs do not even claim to be consumers of Defendant's products. Instead, Plaintiffs claim to have lost money as a result of the independent actions of their employers, who were influenced by Defendant's actions.").  The UCL claims here stretch the notion of unfair competition beyond the bounds of recognition.

## V.     THE ELECTRONIC COMMUNICATIONS PRIVACY ACT CLAIM SHOULD BE DISMISSED

The Court should dismiss Plaintiffs' claim brought under § 2512(1) of the ECPA.  *First*, the ECPA does not apply extraterritorially.  *Second*, § 2512 does not afford a private right of action.  *Third*, the technology at issue is not designed so as to be "primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications," as required by the ECPA.  *Fourth*, Defendants satisfy the exception to ECPA liability afforded by § 2512(2).

### A.     The ECPA Does Not Apply Extraterritorially

The Complaint does not allege that any "surreptitious interception of wire, oral, or electronic communications" took place in the United States; rather, every act of surreptitious

interception associated with Defendants' technology is alleged to have occurred in China, conducted by Chinese authorities. Because the only alleged acts that could give rise to an ECPA claim occurred extraterritorially, Plaintiffs' ECPA claim should be dismissed. As discussed above in Part II.B, there is a strong presumption against the extraterritorial application of statutes absent a "clear indication" of congressional intent. *See Morrison*, 130 S. Ct. at 2877-78.

As this Court found in *Zheng v. Yahoo! Inc.*, No. C-08-1068 MMC, 2009 WL 4430297 (N.D. Cal. Dec. 2, 2009), this strong presumption applies against ECPA, for "no language in the ECPA itself suggests an intent that its provisions apply to interceptions and disclosures occurring in other countries," *id.* at *3, and "the available legislative history not only fails to include any statement indicating Congress intended the ECPA to apply outside the United States, the legislative history, specifically, Senate Report No. 99-541, clearly expresses Congress's intent that the ECPA not apply to interceptions outside the United States," *id.* The court accordingly dismissed with prejudice allegations that Yahoo! disclosed certain information about Chinese Yahoo! users to the Chinese government, which then used that information to injure those users, *id.* at *4. In reaching this conclusion, the court reasoned:

> Although it does not appear that any court has expressly considered whether the ECPA applies outside the United States, the Ninth Circuit, as the Yahoo! Defendants note, has held that the version of the Wiretap Act in existence prior to its amendment by the ECPA had "no extraterritorial effect." *See United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987).… In so holding, the Ninth Circuit cited two Second Circuit decisions, each of which, in turn, cited the reasoning set forth in *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). In finding that the pre-ECPA version of the Wiretap Act had "no application outside of the United States," the Second Circuit, in *Toscanino*, relied on a statement in the legislative history that "[t]he term 'wire communication,' as used in the [Wiretap Act], is intended to refer to communications 'through our Nation's communications network,'" *see id.* at 279 (quoting 1968 U.S.C.C.A.N. 2178), and the fact that the [Wiretap Act], in "prescribing the procedures to be followed in obtaining a wiretap authorization," made "no provision for obtaining authorization for a wiretap in a foreign country." *See id.*

*Id*. *Zheng*'s thorough analysis of the language and history of the ECPA and the Wiretap Act similarly establish that Plaintiffs' ECPA claim cannot apply extraterritorially here, and this Court should dismiss that claim with prejudice.

**B.      There Is No Private Right of Action Under ECPA § 2512**

Plaintiffs' ECPA claim should additionally be dismissed because § 2512 of the ECPA does not provide a private right of action.  Section 2512(1) provides in relevant part:

> [A]ny person who intentionally … (b) manufactures, assembles, possesses, or sells any electronic… or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications … shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. 2512(1)(b).[33]  Further, § 2520(a) of the ECPA provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity … which engaged in *that violation* such relief as may be appropriate." (emphasis added).

Most courts—including every circuit court of appeals to address the issue—agree that the plain language of § 2520 does not afford a private right of action for violation of § 2512 for two reasons.  *First*, civil liability under § 2520 attaches only to the person or entity that engaged in "that violation," *i.e.*, the person or entity that "intercepted, disclosed, or intentionally used" the plaintiff's communication.   Because § 2512(1)(b) is limited to the manufacture, assembly, possession, or sale of a device, but not the actual interception, disclosure, or intentional use of the device, no private right of action against the manufacturer is available.  *Second*, § 2520 closely tracks the criminal offenses set out in § 2511 (*i.e.*, the interception, disclosure, or intentional use of intercepted communications), not those set out in § 2512; thus, § 2520 is intended to provide a private right of action for § 2511 violations, but not § 2512 violations.

The court in *Potter v. Havlicek*, 3:06-CV-211, 2008 WL 2556723 (S.D. Ohio June 23, 2008), examined this issue in detail.  In *Potter*, defendant Deep Software was alleged to have manufactured and sold a software product which, once installed, automatically records and stores all activity on that computer.  *Id.* at *2.  In assessing whether Deep Software could be sued under

---

[33]   Although the Complaint does not specify which subsection of § 2512(1) is at issue, the language of the ECPA allegations track subsection § 2512(1)(b).  Nonetheless, the analysis above is the same under any subsection.

§ 2512 for manufacturing and selling the software, the Court concluded that, "based upon a reading of the current version of the plain language of section 2520," no such private right exists under § 2512. *Id.* at *5. The court adopted the analysis of *DIRECTV, Inc. v. Nicholas*, 403 F.3d 223, 227 (4th Cir. 2005), which held that "[t]he express language of § 2520 is … not susceptible to a construction which would provide a cause of action against one who manufactures or sells a device in violation of § 2512 but does not engage in conduct violative of § 2511" (quoting *Flowers v. Tandy Corp.*, 773 F.2d 585, 588-89 (4th Cir. 1985)).

*Potter* further noted that no circuit had found that a private right of action exists for violation of § 2512. *See id.*, 2008 WL 2556723, at *5-6 (citing *DIRECTV v. Robson*, 420 F.3d 532, 539 (5th Cir. 2005); *DIRECTV, Inc. v. Treworgy*, 373 F.3d 1124, 1127-28 (11th Cir. 2004)). District courts concur that § 2512 does not provide a private right of action. In *In re DIRECTV, Inc.*, No. C-02-5912, 2004 WL 2645971, at *8 (N.D. Cal. July 26, 2004), for example, Judge Ware held that, "[l]ike §2511(1)(a), § 2512(1)(b) is a criminal statute. Unlike § 2511(1)(a), however, there is no parallel statute which provides a private right of action for violations of § 2512(1)(b). … Therefore, the plain language of § 2520(a) does '[not] create a private right of action against a person who possesses a device in violation of § 2512.'" (quoting *Treworgy*, 373 F.3d at 1129). Because no private right of action exists for alleged violations of § 2512, Plaintiffs' ECPA claim should be dismissed with prejudice.

### C. The Cisco Products Are Not Devices Primarily Useful for Interception

Plaintiffs' ECPA claim should be dismissed as well because none of the Cisco products at issue is a "device" that is "primarily useful for the purpose of surreptitious interception" under § 2512(1)(b). Section §2512(1)(b) applies to a person who "manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." Although the Complaint contains conclusory allegations that the Golden Shield technology was used by Chinese authorities to identify Falun Gong practitioners that Defendants supposedly knew that the Golden Shield technology would ultimately be used in this manner, Plaintiffs offer no factual allegations that the technology at

issue itself was *primarily* useful for the purpose of surreptitious interception. To the contrary, as the Complaint itself acknowledges, the technology's primary usefulness was to provide China with fundamental infrastructure "to keep the Chinese internet up and running." (Compl. ¶ 74(1)). Plaintiffs concede as much, alleging, for example, that Defendants created "[a]n international internet gateway system with a small number of physical entry points into the Chinese network, called 'gateways,' and the high level of capacity required to keep the Chinese internet up and running…." (*Id.*). Even if it were true that Chinese authorities used Cisco's technology in part to identify Falun Gong practitioners, the Complaint does not and cannot allege that this was Cisco's primary purpose in selling internet equipment in China.

### D. The Allegations Concern Exempted "Normal Course of Business" Activity

Finally, even if the activities alleged in the Complaint were actionable under ECPA, Defendants fall within the exemption from § 2512(1) liability afforded by § 2512(2). This provision states in relevant part that it shall not be unlawful for "a provider of wire or electronic communication service or an officer, agent, or employee of … such a provider, in the normal course of the business of providing that wire or electronic communication service, … to … manufacture, assemble, possess, or sell any electronic, mechanical, or other device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." 18 U.S.C. § 2512(2)(a). In this case, even if Defendants manufactured, assembled, possessed, or sold a device that was primarily useful for surreptitious interception, Defendants nonetheless provided such electronic communication services in the normal course of their business.[34]

---

[34] As in *Zheng*, 2009 WL 4430297, at *4, if "plaintiffs' [UCL] claim … is based on the theory that defendants violated the ECPA, the [UCL] claim likewise is subject to dismissal with prejudice" for the reasons set forth in Part V.

## VI.   PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE CLAIMS AGAINST INDIVIDUAL CISCO EXECUTIVES

The Court should dismiss Plaintiffs' claims against Cisco's CEO John Chambers and Cisco executives Thomas Lam and Owen Chan, for the Complaint fails to allege a single fact to suggest that any of these high-ranking executives at Cisco had any knowledge of the wrongful acts alleged in the Complaint, much less any purpose to assist them.

For example, the Complaint alleges that Chambers, as Cisco's CEO, directs and supervises Cisco's operations in China (Compl. ¶ 26) and that he met with Jiang Zemin while the Golden Shield was being developed (*id.* ¶ 28).  These allegations, however, do not give rise to a plausible claim that the CEO of Cisco is individually liable for the human rights violations alleged in the Complaint, for the mere fact of a meeting with a particular party establishes nothing about what was said there or done as a result.  *See Iqbal*, 129 S. Ct. at 1950 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown the pleader is entitled to relief); *U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573, 587 (E.D. Va. 2010) (allegations of CEO's position, coupled with authorization to sign documents, "fall far below the threshold for surviving a motion to dismiss"); *F.T.C. v. Swish Marketing*, No. C 09-03814, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) (holding that, under *Iqbal* and *Twombly*, "conclusory assertions of authority—untethered to virtually any supportive facts—do not support an inference of [CEO]'s involvement").  Chambers's alleged actions are so far removed from any plausible claim of liability, that his inclusion as a defendant in this lawsuit is little more than a transparent attempt to garner untoward publicity for Plaintiffs' lawsuit.

The same is true of Plaintiffs' allegations against Chan and Lam.  Chan is alleged to be a top-level executive at Cisco working on Cisco's China operations, who worked with Chinese Public Security in marketing, designing, and implementing the Golden Shield in China.  (Compl. ¶¶ 30-31).  Likewise, Lam is alleged to be a top-level executive at Cisco who authorized Cisco's Golden Shield operations under the authority of Chan and Chambers.  (*Id.* ¶ 34).  However, aside from conclusory assertions of authority, the Complaint is devoid of any supportive facts that give

rise to a plausible claim against Chan or Lam for the unlawful acts alleged to have been conducted by third-party Chinese authorities. *See Atwell v. Gabow*, Nos. 06-cv-2262, 07-cv-2063, 2008 WL 906105, at *9 (D. Colo. Mar. 31, 2008) ("[L]egal conclusions parading as 'facts' … have no place in a Rule 12(b)(6) analysis under *Twombly*.").   In other words, allegations that Chan or Lam helped to design or market the infrastructure of the Golden Shield, without a single factual allegation beyond pure speculation of their participation in acts of persecution and abuse of Falun Gong practitioners, fail to satisfy the plausibility standard articulated in *Iqbal* and *Twombly*.

Accordingly, the claims against Defendants John Chambers, Owen Chan, and Thomas Lam should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety.

DATED:   New York, New York
         August 4, 2011

                                QUINN EMANUEL URQUHART &
                                   SULLIVAN, LLP



                                By:   /s/ Kathleen M. Sullivan
                                   Kathleen M. Sullivan
                                   Faith E. Gay
                                   Isaac Nesser

                                51 Madison Avenue, 22d Floor,
                                New York, New York  10010-1601
                                (212) 849-7000

                                *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's ECF System.

Dated:  August 4, 2011

/s/ Arthur Roberts
Arthur Roberts