1   KATHRYN LEE CRAWFORD-BOYD, ESQ. (SBN 189496)
        lboyd@srbr-law.com
2   RAJIKA L. SHAH, ESQ. (SBN 232994)
        rshah@srbr-law.com
3   **SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
    6310 San Vicente Boulevard, Suite 360
4   Los Angeles, California 90048
    Phone: (323) 302-9488, Fax: (323) 931-4990
5
    TERRI MARSH, ESQ. (*pro hac vice*)
6       terri.marsh@hrlf.net
    BRIAN PIERCE, ESQ. (*pro hac vice*)
7       brianp@hrlf.net
    **HUMAN RIGHTS LAW FOUNDATION**
8   1615 L Street NW, Suite 1100
    Washington, D.C.  20036
9   Phone: (202) 369-4977, Fax: (323) 931-4990

10  JUDITH BROWN CHOMSKY (*pro hac vice pending*)
        jchomsky@igc.org
11  **LAW OFFICES OF JUDITH BROWN CHOMSKY**
    8210 New Second Street
12  Elkins Park, PA 19027
    Phone: (215) 782-8327, Fax: (215)782-8368

13  Attorneys for PLAINTIFFS

14
                    **UNITED STATES DISTRICT COURT FOR THE**
15          **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

16  DOE I, DOE II, Ivy HE, DOE III, DOE          Case No. 5:11-cv-02449-JF-PSGx
    IV, DOE V, DOE VI, ROE VII, Charles
17  LEE, ROE VIII, and LIU Guifu, and            Assigned to the Hon. Jeremy Fogel
    those individual similarly situated,
18                                               **FIRST AMENDED CLASS ACTION
                                                 COMPLAINT [F.R.C.P. 15(a)(1)(B)]
19              Plaintiffs,                       FOR:
                                                 1. TORTURE [28 U.S.C. § 1350];
20        vs.                                     2. TORTURE [28 U.S.C. § 1350 note];
                                                 3. CRUEL, INHUMAN, OR
21                                               DEGRADING TREATMENT;
    CISCO SYSTEMS, INC., John                    4. FORCED LABOR;
22  CHAMBERS, Thomas LAM, Owen                   5. PROLONGED AND ARBITRARY
    CHAN, Fredy CHEUNG, and DOES 1-              DETENTION;
23  100,                                         6. CRIMES AGAINST HUMANITY;
                                                 7. EXTRAJUDICIAL KILLING;
24                                               8. ENFORCED DISAPPEARANCE;
                Defendants.                      9. VIOLATION OF 28 U.S.C. § 2512(1);
25                                               10. BATTERY;
                                                 11. ASSAULT;
26                                               12. FALSE IMPRISONMENT;
                                                 13. WRONGFUL DEATH;
27                                               14. UNFAIR BUSINESS PRACTICES

28                                               DEMAND FOR JURY TRIAL**

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, and LIU Guifu (collectively, "Plaintiffs") hereby allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs are U.S. and Chinese citizen practitioners of Falun Gong, a peaceful religious practice that is based on the tenets of "Zhen", "Shan", and "Ren" (Truthfulness, Compassion, and Tolerance). Cisco Systems, Inc. ("Cisco"); its CEO John Chambers; Thomas Lam, Vice-Chairman of Cisco Greater China Theater; Owen Chan, President and CEO of Cisco Greater China Theater; and Fredy Cheung, Senior Vice President for the Greater China Region for Cisco China Networking Technologies, Ltd. (collectively, "Defendants"), aided and abetted and conspired with the Communist Party of China ("CCP") and Chinese Public Security forces by providing substantial assistance to them, knowing that they would use such assistance in the commission of human rights abuses against Falun Gong, listed below, including torture and crimes against humanity. Defendants knowingly, purposefully and intentionally designed, supplied, and helped to maintain a censorship and surveillance network known as the Golden Shield in collaboration with the Chinese Communist Party and Chinese Public Security officers, knowing and intending that it would be utilized by members of the Communist Party of China and Chinese Public Security officers to eavesdrop, tap and intercept communications, identify, and track Plaintiffs as Falun Gong members for the specific purpose of  subjecting them to gross human rights abuses, including arbitrary arrest and detention, torture, extrajudicial killing, and crimes against humanity, all in violation of international, U.S., and California law.

2.      Cisco refers to the Golden Shield system in its internal literature as "Policenet."

3.      As a direct result of the Defendants' creation, development, and maintenance of the Golden Shield technology with the Chinese authorities, Plaintiffs, Falun Gong practitioners, have suffered severe and gross abuses, including false imprisonment, torture, cruel assault, battery, and wrongful death, for which judicial relief is warranted in the form of compensatory and punitive damages.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

## PARTIES

A.    Plaintiffs

4.    Many of the individually named plaintiffs and/or their families in China are likely to suffer retaliation and further human rights abuses if their identities become public, and thus are filing anonymously or through next friends.

5.    Doe I is a resident of China. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, torture, forced labor and public humiliation.

6.    Doe II is a resident of China. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, torture, forced labor and public humiliation.

7.    Ivy He is a resident of Canada. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, torture, forced labor and public humiliation.

8.    Doe III brings this action through his next friend, Roe III. Doe III is currently in prison in China. He was arrested in 2006 for engaging in Falun Gong activities on the Internet. The Golden Shield was the essential means through which he was monitored, tracked, detained and eventually imprisoned, kept in isolation, and subjected to torture including by means of force-feeding.

9.    Doe IV brings this action through his next friend, Roe III, who is also next friend for Doe III. Doe IV was arrested for engaging in Falun Gong religious activities on the Internet. The Golden Shield was the essential means through which he was monitored, tracked, detained and eventually subjected to arbitrary and prolonged detention, forced conversion, torture.

10.    Doe V is a resident of China. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually imprisoned for three years, following a show trial where she was denied an opportunity to challenge the charges against her, where she was deprived of sleep and subjected to beatings and other forms of

2

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

torture.

11.     Doe VI is a resident of China. The Golden Shield was the essential means through which he was monitored, tracked, detained and eventually sent to a re-education through labor camp without trial where he was subjected to torture and forced labor.

12.     Roe VII, a resident of China, brings this action as the representative of Doe VII. Doe VII disappeared in the summer of 2006 while imprisoned as a result of her Falun Gong activities. The Golden Shield was the essential means through which she was monitored, tracked, detained and eventually imprisoned. Both before and during her imprisonment, Doe VII was subjected to torture, including the forcible administration of drugs that left her unable to stand or speak during a sham trial.

13.     Charles Lee is a U.S. citizen and resident of New Jersey. He is a Falun Gong practitioner who used the Internet to contact other practitioners in China. In 2003, he went to China to visit with friends and family.  He was apprehended on his arrival at the airport and tortured, force-fed, and detained until 2006. The Golden Shield was the essential means through which he was monitored, tracked, and detained. Charles Lee brings this action under the Torture Victims Protection Act, 28 U.S.C. § 1350, note.

14.     Roe VIII, a resident of China, brings this action as the survivor of Doe VIII. Doe VIII was detained as a result of his Falun Gong activities and was tortured to death. The Golden Shield was the essential means through which he was monitored, tracked and eventually tortured to death.

15.     Liu Guifu is a Falun Gong practitioner who was granted refugee status in March 2009 and who now resides in New York. She was detained in China on multiple occasions and was subjected to arbitrary and prolonged detention and torture. The Golden Shield was one of the means through which she was monitored, tracked and persecuted.

        B.      Defendants

16.     Defendant Cisco Systems, Inc. ("Cisco") is a multinational corporation incorporated in California with its principal place of business in San Jose, California.

17.     In 1998, Cisco created Cisco Systems China Network Technology Corporation

3

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

("CNTC") as well as a network technology laboratory in Beijing for the purpose of designing, manufacturing, and implementing the Golden Shield.

18.     At all relevant times, the China Research and Development Center ("CRDC") was a wholly owned subsidiary to manufacture Cisco's products, including those utilized as part of the Golden Shield in China, and acted as an agent of Cisco over which Cisco had direct oversight.

19.     Cisco maintained an agency relationship over CRDC by prior authorization of all acts and by subsequently ratifying their actions, including by failing to disavow their wrongful conduct and by attempting to cover them up.

20.     Cisco China Networking Technologies, Ltd. ("CNT") is a wholly owned subsidiary of Cisco, which directly reports to Cisco and operates under the supervision and control of as the latter's agent. Cisco created CNT for the purpose of increasing its sales presence in the Chinese market, which included Golden Shield development, implementation and maintenance. CNT was created to be the public face of Cisco in China with no clear demarcation between Cisco and CNT. Executives employed by Cisco and its Asia Pacific branch performed supervisory functions at CNT, as is indicated by the role and composition of the China Strategy Board, a division of Cisco.

21.     Cisco operated an Asia Pacific branch headquartered in Singapore until 2010. It is not separately incorporated. In 2010, Cisco restructured its Asia Pacific branch, dividing it into three theaters: a Greater China Theater for the People's Republic of China, Hong Kong, and Taiwan; a Japan Theater for Japan; and an Asia Pacific Theater for all remaining countries in the Asia Pacific region. These theaters continue to operate as branches of Cisco's San Jose headquarters and are not separately incorporated.

22.     Executive officers in Cisco's Asia Pacific branch reported directly to Senior Vice Presidents based in Cisco's San Jose headquarters and to Defendant John Chambers, Cisco's Chief Executive Officer ("CEO"), until 2010, when the Asia Pacific branch was divided into three theaters, including the Greater China Theater.

4

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

23.     Employees of Cisco and Cisco's Chinese subsidiaries worked together directly and shared responsibilities and workloads with each other and worked together on all aspects of the Golden Shield.

24.     Cisco, operating out of its San Jose, California, headquarters, was actively involved in the allegations laid out below, participating directly in the design and development of China's Golden Shield. Cisco's Chinese market was a highly significant component of Cisco's overall operations, warranting the parent corporation's active involvement in Cisco's Chinese activities, as evidenced by Defendant CEO John Chambers and other top-level Cisco officers' frequent visits to China for the purpose of overseeing the Golden Shield project. Cisco also directs and manages the Golden Shield project directly or through its agents such as its Cisco Advanced Service Team ("Advanced Service Team"), which had responsibilities for the design and implementation of the Golden Shield project and interface with the clients.  Cisco developed software and software upgrades designating unique Falun Gong activities that were used to block and track Falun Gong activity as well as standard features and products that were used in the design and implementation of the Golden Shield. Cisco trained employees at CNT and provided them with skills and knowledge developed by the parent corporation. High-level executives and marketing personnel from CNT attended meetings at least twice a year at Cisco's San Jose headquarters with officers of the parent corporation. Additional teleconference meetings also occurred. Until 2008, Cisco's Chinese customer support, including support related to the Golden Shield, was managed by the parent corporation. This activity by Cisco was essential to and had a substantial effect on the abuses suffered by the Plaintiffs.

25.     Defendant John Chambers ("Chambers") is a resident of California, who is and at all relevant times has been the CEO of Cisco. Chambers directs and supervises Cisco's operations in China.

26.     As Cisco's CEO, Chambers signs or authorizes the signature of all certificates, contracts, and other instruments of Cisco. Significant Cisco sales operations in China are reported to its U.S. headquarters, and major localization efforts in China require executive

5

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

decisions by Defendant Chambers and others. Under his direction, Cisco's specific intent to meet the requirements of the CCP's purpose to identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to *douzheng* methods was expressed in marketing presentations.

27.     Defendant Chambers also oversees the China Strategy Board ("CSB"), established in 2008 for the purpose of devising Cisco strategy in China. Since then, Cisco's Chinese operations have been controlled primarily by the CSB, which is composed of high-level executives working at Cisco's San Jose headquarters, at its Asia Pacific branch (until 2010, when the Asia Pacific branch was divided into three theaters, including the Greater China Theater), and at its Chinese subsidiaries. It is chaired by Cisco Senior Vice President Jim Sherriff.

28.     Chambers also met with Jiang Zemin – the founder of the persecutory campaign against Falun Gong – during the same month he created the subsidiary CNT and a technical support center in Beijing to facilitate the suppression of Falun Gong and other dissident groups in China. Chambers continued to meet Jiang Zemin during the early design and development phases of the Golden Shield.

29.     At all relevant times, Chambers knew of China's campaign of torture and persecution of Falun Gong practitioners, as outlined in the factual allegations herein, and knew that China intended to use the Golden Shield to facilitate and carry out that campaign. As CEO of Cisco, Chambers not only was in a position to prevent Cisco's tortious conduct in relation to the Golden Shield in all factual allegations herein, but also purposefully authorized, participated in, and ratified Cisco's participation in the Golden Shield Project as alleged in sections B through F of the Statement of Facts.

30.     Defendant Owen Chan ("Chan") is and at all relevant times has been a top-level executive of Cisco. Upon information and belief, Chan, as a top-level executive for Cisco China, routinely travels to California to conduct business at Cisco's San Jose headquarters relating to Cisco's implementation and sourcing of technology for the Golden Shield.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

31.     In his various roles as a top-level executive working on Cisco's China operations, Defendant Chan directly participated in, authorized, and controlled Cisco's actions alleged herein, in concert with the other individually named Defendants. Chan acted on behalf of Cisco and worked in concert with Chinese Public Security. The positions Chan filled at Cisco from the late 1990's to the present day required him to be intimately involved, from a position of authority, in Cisco's marketing, design and implementation of the Golden Shield in China. From 1999 to 2002, Chan was Cisco's Vice-President in charge of Cisco Business Solutions Consulting and Service Support in the Asia Pacific region. From 2002 to 2005, he became Senior Vice President of Asia Operations. Since that time he was promoted to President of Cisco's Asia Pacific Theater and then to President and CEO of the Greater China Theater. The Asia Pacific Theater and subsequently the Greater China Theater are the divisions of Cisco, which primarily oversaw the management of operations in China, including and especially all marketing and sales to Chinese Public Security for the design, implementation, and technical support for the Golden Shield. All of the Cisco engineering and marketing teams working with Public Security on the Golden Shield ultimately reported to Chan through a chain of command. Chan authorized or approved the actions of Defendant Lam as alleged in paragraphs 34 and 35 below.

32.     Defendant Chan exercises supervisory authority and personal direction over all Golden Shield-related marketing and training activities directly or in concert with others. Defendant Chan participated in business development, marketing and customer support in the Asia Pacific region; participated in Cisco's sale of high-level Golden Shield design, training and customer support services to Public Security and 610 officers; facilitated a transition from having the mainland China, Hong Kong and Taiwan markets under the purview of the Asia Pacific branch to having them under a "Greater China" division of the corporation, allowing for a greater focus on China operations, including and especially the Golden Shield; and exercises significant control over the selection, appointment and removal of Cisco management including the Cisco Golden Shield engineers, marketing personnel and Public Security team. Under his direction, Cisco's specific intent to meet

7

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

the requirements of the CCP's purpose to identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to *douzheng* methods was expressed in marketing presentations. At all relevant times, Chan knew of the campaign of torture and persecution of Falun Gong practitioners in China, was in a position to influence Cisco's tortious conduct during the development of the Golden Shield, and nevertheless purposefully authorized, participated in, and ratified Cisco's participation in the Golden Shield project as delineated in all factual allegations herein, especially the specific facts alleged in sections B through F of the Statement of Facts.

33.     Defendant Thomas Lam ("Lam") is and at all relevant times has been a top-level executive of Cisco. Upon information and belief, Lam, as a top-level executive for Cisco China, routinely travels to California to conduct business at Cisco's San Jose headquarters relating to Cisco's implementation and sourcing of technology for the Golden Shield.

34.     In his roles as a top-level executive working on Cisco's China operations, Lam directly participated in and controlled Cisco's actions alleged herein, in concert with the other individually named Defendants. Lam acted on behalf of Cisco and worked in concert with Chinese Public Security. Lam directly authorized much of Cisco's Golden Shield operations, under the authority of Chan and Chambers. Lam is a high level Cisco executive who was and continues to be directly involved in Golden Shield operations in China. From 1998 to 2002, he was Vice President of the Enterprise Line of Business for China. From 2002 to 2005, he was Vice President of the Customer Advocacy Organization in the Asia Pacific branch. From 2005 to 2009, he was President of China Operations, and he currently serves as Vice Chairman of Cisco Greater China. In each of these roles, all major Golden Shield operations in China were authorized by, reported to, and approved by Lam, who reported to Chan for his authorization and approval.

35.     Defendant Lam directly oversaw many of the technology infrastructure projects in China. He attended meetings focused specifically on Cisco's "action plan" for the development of Chinese Public Security's information technology infrastructure. Under his direction, Cisco's specific intent to meet the requirements of the CCP's purpose to

8

1   identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to

2   *douzheng* methods was expressed in marketing presentations. Lam has also played an

3   active role in both CNT and CRDC, authorizing and directing their dealings with Chinese

4   Public Security and working to ensure that the Golden Shield achieved the goal of aiding

5   the persecution of Falun Gong. At all relevant times, Lam knew of the campaign of torture

6   and persecution of Falun Gong practitioners in China, was in a position to influence

7   Cisco's tortious conduct during the development of the Golden Shield, and nevertheless

8   purposefully authorized, participated in, and ratified Cisco's participation in the Golden

9   Shield project as delineated in all factual allegations herein, especially the specific facts

10  alleged in sections B through F of the Statement of Facts. At all relevant times, Lam aided

11  and abetted and conspired with Chinese Public Security by entering into an agreement to

12  commit wrongful and tortious acts contained herein and participated in or committed a

13  wrongful act in furtherance of said conspiracy, which resulted in injury to the Plaintiffs.

14  36.     Defendant Fredy Cheung, who also goes by his Chinese (Mandarin) name Zhang

15  Sihua, directly oversaw much of Cisco's work on Chinese Public Security-related projects

16  in China, in both a managerial and a strategic role. Cheung joined Cisco in 1999 as

17  Director of Channels in Singapore.  Since 1999, Cheung has held numerous high-level

18  positions at Cisco and at CNT.  By 2000, Cheung was Asia-Pacific Director for Cisco's

19  Commercial Line of Business Division. By 2002, he was Asia-Pacific Core Technology

20  Director for Cisco and Vice President of CNT. In 2006, he became South China Managing

21  Director at CNT and in 2008, he was promoted to the position of Senior Vice President

22  for the Greater China Region. In this role, Cheung continues to manage the sales and

23  service operation plans for the Greater China region and reports directly to Defendant

24  Thomas Lam.

25  37.     Defendant Cheung, who is listed in several online business resources with a Cisco

26  San Jose address, participated in bi-yearly marketing and high-level management

27  meetings at Cisco's San Jose headquarters.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

38.     Defendant Cheung directly managed engineers working on the Golden Shield project. He participated directly in the sales process through personal appearances at dinners, meetings, and other functions intending to procure Public Security contracts and advance Cisco's overall goals in China. He has authored or directly overseen the authors of PowerPoint presentations that specifically describe the persecution of Falun Gong as a primary goal of the Golden Shield project and that state that Cisco worked in full collaboration with Chinese Public Security.

39.     Defendant Cheung directly oversaw much of the coordination of Cisco's Golden Shield-related projects and Cisco's work to meet other Public Security goals, including Cisco's providing its Chinese government customers with "customized solutions" designed to suppress Falun Gong.

40.     At all relevant times, Defendant Cheung knew of the campaign of torture and persecution of Falun Gong practitioners in China, was in a position to influence Cisco's tortious conduct during the development of the Golden Shield, and nevertheless purposefully authorized, participated in, and ratified Cisco's participation in the Golden Shield project as delineated in all factual allegations herein, especially the specific facts alleged in sections B through F of the Statement of Facts. At all relevant times, Defendant Cheung aided and abetted and conspired with Chinese Public Security in the use of the Golden Shield to persecute the Falun Gong.

41.     The true names and capacities, whether individual, official, corporate, associate, or otherwise, or precise participation of Defendants, DOES 1 through 100, inclusive, are not known to Plaintiffs herein at the time of the filing of this Complaint and, therefore, these Defendants are being sued by such fictitious names, and Cross-Complainant will seek leave to further amend this Complaint to show their true names and/or capacities and precise participation when the same have been ascertained.  Each Defendant designated herein as a DOE was responsible intentionally, negligently, or in some other actionable manner, for the events and happenings referred to herein which directly caused damages and injury to Plaintiffs within this Complaint.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

42.     At all relevant times, Cisco, directly and through its agents, knowingly and purposefully aided and abetted and/or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party officers and/or Chinese Public Security officers working for the Public Security Chinese government agency, by bidding for, building, designing, constructing, customizing, installing, and servicing the Golden Shield surveillance system that was used by China to enable Public Security and CCP officers to identify and persecute Falun Gong practitioners, including Plaintiffs, and commit numerous human rights abuses against them, including detention without trial or other forms of arbitrary detention, torture and cruel, inhuman, or degrading treatment, forced labor, crimes against humanity, and extrajudicial killing.

43.     All Defendants named were the agents, servants and/or employees of each and the other, and were at all times acting within the course and scope of such agency, service, and/or employment, and acted as the actual or ostensible agent of each and the other.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over this case pursuant to the Alien Tort Statute, 28 U.S.C. § 1350; the Torture Victims Protection Act, 28 U.S.C. § 1350 note; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity); and 28 U.S.C. § 1367 (supplemental jurisdiction).

45.     Venue is proper in this court under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Cisco is incorporated in and doing business in this District, and Chambers is the CEO of Cisco in this District. Upon information and belief, Chan and Lam and Cheung, routinely travel to California to conduct business at Cisco's San Jose headquarters in this District.

## STATEMENT OF FACTS

    A.     Background of China's Persecution of Falun Gong

46.     Falun Gong practitioners, in provinces and regions across China, cannot be distinguished from other Han (ethnic Chinese) apart from their religious activity that occurs almost entirely on the Internet.  Falun Gong practitioners typically utilize the

11

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

Internet to practice their religion. They regularly access the "Minghui" website due to its central role in the worldwide Falun Gong community and its status as a place of congregation for members of the religion.

47.     The Falun Gong religion developed in China in or around 1992. By early 1999, the New York Times and Associated Press estimated that there were between seventy and one hundred million people practicing Falun Gong in China.

48.     According to several Resolutions by the U.S. House of Representatives, Falun Gong is a "peaceful and non-violent form of spiritual belief and practice with millions of adherents in China and elsewhere."

49.     The State Department estimates that several hundreds of thousands of Falun Gong practitioners have been detained for engaging in Falun Gong practices. The State Department also estimates that a significant percentage and in many cases a majority of Chinese "Reeducation Through Labor" camps are made up of Falun Gong practitioners. A 2005 Human Rights Watch report states that detained Falun Gong practitioners receive the "worst treatment" of any detainees, and a 2006 U.N. Special Rapporteur report states that 66 percent of the reported torture cases in China were comprised of Falun Gong practitioners. In 2009 The New York Times reported that at least two thousand Falun Gong practitioners have been tortured to death in China.

50.     In June of 1999, the CCP published a document calling for "struggle" against the Falun Gong religion until its eradication. Laws and regulations were passed banning "evil cult organizations" or religious activities undertaken in order to "disturb social order", although Falun Gong was not identified or referenced in the legislation.

51.     The leaders of the CCP authorized the use of various measures to forcibly convert Falun Gong adherents through reeducation techniques that included brainwashing classes, intense interrogation, and torture. For those who refused to abandon their religious beliefs, far harsher legal sanctions were leveled including lengthy detentions, forced labor and torture.

12

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

52.     Persons identified as Falun Gong are regularly subjected to "Reeducation Through Labor," a system of administrative detention imposed without judicial review.

53.     The Chinese political term *douzheng*, literally meaning "struggle" in the sense of Marxist "class struggle," has become a term of art in Chinese politics used to designate and implement persecutory campaigns against Party-disfavored intellectuals, jurists, pro-democracy students, religious adherents, and countless others. These campaigns have always been comprised of the twin elements of propaganda and violence.

54.     The Office 610 was created by the Central Committee of the CCP as a subdivision of the CCP in 1999 to persecute and suppress, i.e., *douzheng,* Falun Gong practitioners in China.

55.     Neither Office 610 nor the CCP has the statutory authority to act on behalf of the state.

56.     According to official government documents, the CCP participates in pre-trial discussions with local police, court officers and prosecutors to ensure that there is agreement between CCP representatives and government officials on facts and witnesses, and charges before action is taken by low-level state security or judicial personnel. This is one aspect of a general trend whereby Party and low-level state organs act in concert in order to dispose of individual Falun Gong cases.

57.     Chinese Public Security officers are tasked with the prevention, suppression and investigation of both criminal and "dissident" activities in China. The latter encompasses assisting in the execution of the widespread campaign to *douzheng* Falun Gong.

58.     Public Security officers collaborated with Office 610 party agents to detect, investigate and profile the Internet activities of Falun Gong practitioners to suppress Falun Gong.

59.     The ongoing campaign to persecute Falun Gong practitioners in China through use of the Golden Shield has been widely reported in Western media outlets since 1999, and has been documented and universally condemned, beginning in 1999, by the U.S. Department of State, the U.S. Congress, the United Nations and a number of international

13

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1   human rights organizations, including Amnesty International and Human Rights Watch.

2       B.      Defendants' Marketing, Design, Customization, Training and Customer

3               Support for Golden Shield Technology Used to Facilitate the Persecution of

4               Falun Gong

5   60.     During the late 1990s, the CCP together with Chinese Public Security planned the

6   creation of the Golden Shield, which includes a database-driven remote surveillance

7   system, which could facilitate the surveillance, apprehension, and suppression of Falun

8   Gong, other religious groups and political activists.

9   61.     Prior to the implementation of the Golden Shield, it was impossible for the CCP or

10  security authorities to effectively detect, identify, or track widespread Falun Gong

11  activities online.

12  62.     Chinese security forces turned to Western high-tech companies for assistance to

13  fill-in gaps in technological expertise not available within China.

14  63.     By 2000, Cisco had created a marketing campaign to win contracts to design and

15  develop the Golden Shield knowing that it would be used in China for the surveillance,

16  apprehension, and suppression of Falun Gong practitioners, through the use of torture and

17  other extreme methods. Cisco developed and marketed specifically for the Golden Shield

18  comprehensive technology tailored to that purpose.

19  64.     As part of its sales campaign, Cisco developed and marketed high-level design

20  solutions that demonstrated to Public Security officers and Party agents how they would

21  be able to block, surveil, apprehend and suppress dissident groups in China, and especially

22  Falun Gong.

23  65.     These high level design solutions included a multi-tiered Golden Shield network

24  for identification, tracking and information-sharing; national and provincial "Information

25  Centers" with at least one "centralized database" dedicated specifically to Falun Gong

26  practitioners; integration of the Information Centers and Falun Gong databases with the

27  multi-tiered Golden Shield network and related security features—such as the Intrusion

28  Detection and Prevention Systems (IDS/IPS)—capable of monitoring and tracking Falun

14

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1   Gong practitioners.

2   66.     The high level design solutions provided by Defendants also featured:

3       a.  An Internet Surveillance system designed and developed to facilitate the

4           repression of Falun Gong practitioners.

5       b.  Integration of Information Centers and Falun Gong databases with all Public

6           Security systems, including the Internet Surveillance system and the Domestic

7           Security Bureau housing Office 610, all of which were designed to detect and

8           log Falun Gong activity to alert Public Security and Office 610 officials of such

9           activity;

10      c.  The integration of the Internet Surveillance System and the Falun Gong

11          databases with (i) intelligence and information analysis systems and (ii) a

12          Public Security command center;

13      d.  A national Falun Gong key personnel information system;

14      e.  Security features to identify and track Falun Gong practitioners through non-

15          Internet surveillance devices;

16      f.  Mobile police access to Public Security databases and other security

17          information; and

18      g.  Training and long-term customer support to ensure the continued operation of

19          Golden Shield technology.

20  67.     Many of these features were implemented by Cisco in regions across China,

21  including several cities and regions in China where the plaintiffs and persons situated

22  similarly were detected, apprehended, interrogated and tortured.

23  68.     Defendants also developed, with its agents, antivirus software that were used by

24  Public Security and 610 Office agents to identify, block and track Falun Gong users and

25  their Internet activities.

26  69.     Many of the features, for example, Information Centers featuring Falun Gong

27  databases integrated with an log, alert and notification system developed specifically for

28  the Golden Shield were first-of-their-kind features that Cisco suggested Chinese security

15

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

officers use to facilitate the detection, apprehension and interrogation of Falun Gong, knowing that the interrogation of Falun Gong practitioners included and resulted in their torture and further persecution.

70.     Defendants marketed these features as providing a network that "covers heaven and earth." As one of Defendant's engineers describes, to view each of the technologies in isolation is to understate their importance:

> "[The mobile police technology] didn't capture the full scope of what Cisco had accomplished. We weren't just talking about accessing a suspect's driving record… Cisco provided a secure connection to provincial security databases allowing for thorough cross-checking and movement-tracing…[such that] policemen could remotely access the suspect's work unit, access reports on the individual's political behavior … family history … [f]ingerprints, photographs and other imaging information …. The Chinese police could even check remotely whether the suspect had built or contributed to a Web site in the last three months, access the suspect's surfing history and read his email."

71.     Defendants marketed to Public Security officers that its security software was the "only product capable of recognizing over 90% of Falun Gong pictorial information."

72.     To achieve such a high success rate, Defendants identified and analyzed Internet activity that is unique to Falun Gong practitioners and used this activity to create unique digital Falun Gong "signatures." These Falun Gong-specific signatures were incorporated by Defendants into security software upgrades at regular intervals to ensure Falun Gong activity was identified, blocked and tracked.

73.      In collaboration with Chinese authorities, Defendants designed and developed the Golden Shield to incorporate advanced information and communication technologies into security enforcement with the primary goal of creating a comprehensive online surveillance system specially geared to enable and facilitate the suppression of dissident activity in China, specifically Falun Gong.

74.     Defendants specifically designed and customized the Golden Shield apparatus (including hardware and software) with the scale, complexity and capacity required to enable Chinese Public Security officers and Office 610 to monitor the Chinese population

16

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1  and identify, track, apprehend, interrogate, detain and torture Falun Gong practitioners,

2  including Plaintiffs and persons similarly situated.

3  75.  Without the far wider scale, complexity and capacity that Defendants designed and

4  developed for the Golden Shield, it would not have been possible for Office 610 and

5  Public Security officers to obtain sensitive information such as home and work addresses,

6  purchases, financial information, contact with other Falun Gong members, past Falun

7  Gong activities, IP addresses, and family information (used for interrogation purposes),

8  from almost anywhere in China, thereby enabling the Chinese authorities to coordinate

9  large-scale investigations, locate, track, apprehend, and persecute Falun Gong members

10  from anywhere in China without having to search homes, ransack their offices and homes

11  for evidence, or detain and interrogate them for more information.

12  76.  Cisco managed the design, implementation and optimization of key security

13  features of the Golden Shield directly or through its agents such as its Advanced Service

14  Team or in collaboration with partners or affiliates in order to meet Public Security and

15  610 Office agents' specifications to suppress Falun Gong.

16  77.  The Golden Shield required extensive customization from Cisco engineers or

17  engineers Defendants trained to implement the customization necessary to surveil,

18  apprehend and in other ways persecute practitioners of the Falun Gong religion in China.

19  78.  The need for specialized, high-capacity hardware and software that is able to

20  handle large amounts of data being transmitted through a small number of entry points

21  was unprecedented. Technology that had the ability to simultaneously block and track

22  information without prohibitively slowing down general Internet traffic required extensive

23  testing and specialized equipment, which Defendants provided.

24  79.  Defendants played a major and significant role in the implementation of an

25  international Internet gateway system with a small number of physical entry points into

26  the Chinese network, called "gateways," and specialized software and hardware capable

27  of handling large amounts of data transmission while identifying and tracking Falun Gong

28  behavior across regions in real time and transferring the tracked information to public

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

security personnel and 610 agents to identify, track, locate, apprehend, interrogate, and eventually suppress Falun Gong, without prohibitively slowing down general Internet traffic.

80. Defendants also created routers equipped with blocking and surveillance features that are not typical to a router's default configuration. In addition, the Golden Shield was customized by Cisco created technology to address the use of non-standard, "dynamic" IP addresses by Falun Gong practitioners.

81. By the end of 2006, Defendants had completed the construction and implementation of the multi-tier Golden Shield network in the provinces of Yunnan (2001), Shaanxi (2002), Anhui (2003), Fujian (2004), Guangdong (2004), Hainan (2004), Zhejiang (2004) Heilongjiang (2006), as well as the cities of Beijing (2002) and Shanghai (2005).

82. Cisco's designs cemented Cisco's place as one of the top foreign technology providers in the Chinese market.

      C.     <u>Defendants' Collaboration with CCP and Public Security Officers to Persecute and Suppress Falun Gong</u>

83. Defendants publicly admitted on Cisco's Chinese-language website in 2004 that it constructed the Golden Shield in "full collaboration" and "partnership" with Public Security Bureau officials in the Shanxi province of China. Other statements on Cisco's Chinese-language website from as early as 1999 discuss Defendants' collaboration in constructing the Golden Shield with Public Security Bureau and division officials across China.

84. Cisco executives actively sought to cultivate strong relationships with Communist Party and national and regional security authorities. Defendant Jim Sherriff described Cisco's China strategy as a "grave commitment" to expansion in China, and his view of China as "a very relationship-intensive society". To ensure future business opportunities, Cisco collaborated extensively with authorities in the campaign persecute Falun Gong.

85. In 1999, Cisco entered into an agreement with Chinese Public Security officials at

1    the national level to construct the backbone of the Golden Shield.

2    86.    After the development and launch of the Golden Shield in 2000, Defendants

3    entered into a series of further agreements with Public Security officers at regional levels

4    to develop and construct additional features of the Golden Shield.  These included

5    agreements to provide the software, hardware and infrastructure to link major cities and

6    provinces in China to the Golden Shield backbone; agreements to train Chinese Public

7    Security officers in surveillance techniques; and agreements to upgrade Golden Shield

8    infrastructure and to provide information centers to host the central Falun Gong databases

9    (on or around 2006).

10   87.    The CCP Central Committee's Commission for the Comprehensive Management

11   of Social Security, a body which is in charge of monitoring dissident activity, was at least

12   one of the organizers listed at one or more of the web technology trade shows where Cisco

13   displayed and sold its Golden Shield products.

14   88.    A key component of the success of Cisco's work in China was the degree to which

15   Cisco closely collaborated with government clients such as Public Security.

16   89.    As a result of its marketing and sales efforts, by the early 2000s, Cisco was the

17   main foreign provider of network security technology for the Golden Shield, enabling the

18   CCP's persecution and suppression of Falun Gong.

19        D.    China's Use Of Cisco's Customized Golden Shield To Track, Identify And

20              Persecute Falun Gong

21   90.    Beginning as early as 2001, Public Security officers, CCP officials, and Office 610

22   agents monitored and analyzed information on Falun Gong practitioners gained through

23   the Golden Shield and shared this information with other state agents to facilitate their

24   identification, tracking, detention, torture and suppression.

25   91.    Public Security officers monitored Nanjing train entrances and exits, looking for

26   Falun Gong practitioners attempting to travel to Beijing. The officers were equipped with

27   mobile laptop computers that were connected to the Golden Shield network and which

28   allowed the officers to identify suspected Falun Gong practitioners through the use of

19

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

Golden Shield databases storing information on Falun Gong practitioners. This type of monitoring in Nanjing was common practice across China.

92.     Public Security officers and Office 610 agents used Golden Shield technology sold by Defendants to identify, track and detain Falun Gong practitioners, and to compile information on Falun Gong practitioners in databases used for information-sharing, profiling and interrogation purposes.

93.     By 2007, Defendants directly and/or through its agents had completed the construction of the Golden Shield in numerous provinces and cities in China.

94.     Beginning around 2001 and continuing through at least 2006, Cisco employees trained Public Security officers and, upon information and belief, Communist Party officials to use Cisco equipment to monitor and arrest Falun Gong practitioners and provided customer service.

95.     The scale, capacity, complexity, hardware and "intelligence" of the sophisticated Golden Shield dragnet enabled 610 agents and Public Security officers to monitor, track, locate, apprehend and suppress a group of practitioners because, unlike all other groups in China, their religious practice was tied to their Internet use.

      E.     Before Initiating the Golden Shield Project and Entering Into Subsequent Contracts, Defendants Had Knowledge of the Project's Intended Use to Suppress Falun Gong

96.     Cisco was aware of the campaign against Falun Gong by the Chinese Communist Party and security forces' role in this campaign, as well as their desire to intensify this campaign, and the abuses this would entail.

97.     The scope of the campaign by the CCP and Chinese Security to repress Falun Gong was common knowledge, both inside and outside of China, after the announcements beginning the group's political and ideological suppression in 1999.  The campaign and its abuses received widespread attention from media, foreign governments including that of the United States, and international organizations.

98.     In particular, much early reporting on the crackdown focused on the severity and

20

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

ubiquity of the torture and other forms of severe abuse utilized by Party security forces against Falun Gong.  Such abuse was the subject of Ian Johnson's 2001 Pulitzer Prize-winning coverage for the Wall Street Journal, as well as a host of other prominent reports. The degree to which such reporting made explicit the campaign of human rights abuse against Falun Gong adherents is indicated by the headline of the Washington Post's prominent 2001 article "Torture Is Breaking Falun Gong".

99.   Cisco had been operating extensively in China since 1994, and executives including Defendant Chambers consistently claimed this market as one of the company's key targets for future expansion. Cisco conducted continual assessments of their investments in the Chinese market.

100.   Cisco knew that a purpose of the Golden Shield's Internet Control and Monitor System, i.e., the Surveillance System, was the facilitation and advancement of the persecution of Falun Gong and it routinely included torture.

101.   Cisco knew that the Golden Shield, as a security-focused hardware and software restructuring of China's Internet, was particularly aimed at suppressing all Falun Gong activity in China.  Prior to construction and implementation of the Golden Shield, Falun Gong's continuing Internet-based communications posed a number of technical challenges to existing means of surveillance and suppression.

102.   Before it entered into contracts to design the Golden Shield, Defendants knew that the products and services Cisco designed for the Golden Shield would be used to commit human rights violations against Falun Gong practitioners, particularly those the security forces sought to convert, or as it was officially called, "transform." "Transformation" reports about successfully forcing Falun Gong adherents to abandon their beliefs while in the custody of security forces were broadcast on China's CCP-run television and in newspapers.

103.   The widespread use of extreme forms of torture in the transformation process was also well documented in reports by the U.S. State Department in 2000, and 2001, in human rights reports by U.N. Rapporteurs in 2000, 2001, 2004, 2005, 2007, and 2010, by

21

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1    various human rights organizations, including Amnesty International and Human Rights

2    Watch, as well as survivors' public statements and by through prominent media coverage,

3    from 1999 through today.

4    104.   In October 2002, a Cisco shareholder resolution identified the human rights abuse

5    arising from Cisco's involvement in the Golden Shield project and the role the project

6    played in  the commission of various abuses against Falun Gong practitioners. Similar

7    resolutions introduced in 2005 and 2007 likewise focused on the human rights concerns

8    over Cisco's China operations.

9    105.   At a 2006 Congressional hearing investigating U.S. companies' involvement in

10   Chinese human rights abuses, a number of witnesses testified that Cisco's Golden Shield

11   technology was being used in China to further human rights abuses.

12   106.   In 2008, the Senate Subcommittee on Human Rights and the Law called a similar

13   hearing, attended by Cisco's Senior Vice-President of Legal Affairs, Mark Chandler.

14   Chandler was questioned about a 2002 Cisco pre-sale document indicating that the Golden

15   Shield would be used to "*douzheng* the Falun Gong evil cult and other hostile elements."

16   Chandler testified that this represented the client's goals for the Golden Shield project.

17   107.   In January 2011, a major Cisco shareholder, Boston Common Asset Management,

18   announced that, "after years of campaigning Cisco for greater transparency and

19   accountability on key human rights and business development concerns," it had decided to

20   divest itself of Cisco shares due to the company's failure to address those longstanding

21   human rights concerns, especially in terms of its operations in China.

22        F.     Defendants' Intent to Use the Golden Shield to Commit Crimes Against

23               Falun Gong

24   108.   Cisco has admitted publicly that it agreed to meet Public Security's objectives

25   during its work on the Golden Shield, which, as Cisco has noted in its internal documents,

26   include the suppression of Falun Gong.

27   109.   As alleged above, Defendants knew that Public Security officers and CCP officials

28   intended to use the Golden Shield to persecute Falun Gong practitioners, and specifically

22

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1    recommended new technologies to achieve that purpose and designed and developed

2    those technologies.

3    110.    Defendants recommended to Public Security and CCP officials features that could

4    contribute to achieving the Golden Shield's objectives and that were essential to the

5    suppression of Falun Gong.

6    111.    Defendants' expressed willingness to meet the requirements of the CCP's purpose

7    to identify, track and thereby abuse and eliminate Falun Gong practitioners pursuant to

8    douzheng methods, was intended to and did result in the award to Cisco of the contracts to

9    develop the Golden Shield.

10   112.    Between 2000 and 2003, Defendants participated in several web technology shows

11   in China where it advertised Cisco surveillance products that would enable the CCP to

12   suppress Falun Gong.

13   113.    The sales and marketing programs that Defendants presented at one or more of

14   these technology events included brochures acknowledging that a major purpose of the

15   Golden Shield is to persecute Falun Gong practitioners.

16   114.    At one trade show, a key member of Cisco's sales team in China described the

17   features of Cisco surveillance equipment to author Ethan Gutmann, stating that the

18   Golden Shield "Policenet" technology Cisco had developed included the bandwidth,

19   capacity and other technology needed to monitor "suspicious" surfing history and email,

20   and remotely access sensitive information about the suspect's political behavior, family

21   history and "footprints."

22   115.    At the same trade show, the Cisco booth featured high-tech Internet surveillance

23   footage that was accented by sound bites from CEO John Chambers.

24   116.    As early as 2002 and until at least 2006, Defendants provided private training and

25   marketing sessions for Cisco employees in regions and provinces across China with

26   PowerPoint presentations that specifically reference Falun Gong and stated that Cisco's

27   products and services will meet the CCP and Public Security officers' plan to persecute

28   and suppress Falun Gong practitioners in China.

23

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

117.    During the same time frame, Defendants provided "skill training" and "technical training" to Public Security officers and Office 610 agents to enable them to use the new technologies to eradicate Falun Gong.

118.    In 2002, in internal files, Defendants acknowledged that the purpose of the Golden Shield Policenet is to eradicate Falun Gong and described this goal as a lucrative business opportunity for the company.

119.    In 2003, Cisco bragged on its Chinese website that Cisco agreed to meet Public Security's objectives during its work on the Golden Shield, which, as stated by Defendants elsewhere, includes the suppression of Falun Gong.

120.    In 2004, Cisco announced on its Chinese website that it had designed and implemented an upgrade to the Golden Shield network in order to improve the capability of Public Security to "fight [] against crime" and "maintain social stability." The latter phrase was understood by Defendants to refer to the suppression of dissident activity in China, including Falun Gong.

121.    Golden Shield antivirus software requires the identification of Internet activity unique to Falun Gong practitioners in order to block and track this activity. Cisco upgraded Golden Shield antivirus software to include protection specifically against Falun Gong activity.

122.    On October 4, 2005, a resolution by Cisco shareholders calling for an investigation of Defendants' complicity in the crimes alleged herein was presented to high-level officials, including Defendant Chambers, detailing how Cisco's Golden Shield technology and services were being used in China to facilitate the persecution of Falun Gong. Well after this point, Defendants continued to help CCP and Public Security officers suppress Falun Gong through the Golden Shield Policenet applications and features Defendants had developed to further the alleged crimes.

123.    In sum, Defendants internally (a) admitted that a major purpose of the Golden Shield project is to persecute Falun Gong practitioners; (b) featured in training materials information centers hosting Falun Gong and other databases linked to surveillance

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

cameras, mobile phone devices, and police computers, supported by digital voice recognition technology and other network applications; (c) marketed to the Public Security a unique, first-of-its kind network of sufficient scale and capacity to facilitate the blocking, identifying, tracking, and eventual detention and torture of Falun Gong; (d) demonstrated how Cisco's network technology would allow Public Security officers to share information with detention centers in China; (e) made statements describing the persecution of Falun Gong as a lucrative business opportunity for Defendants; (f) pledged to strictly follow the Golden Shield design, a major purpose of which is the persecution of Falun Gong; and (g) described specifications for the Chinese market, such as the gateway entry points into China, national- and regional-level information centers hosting "centralized database suites" with databases specifically designed for Falun Gong, and multiple levels of network platforms in part to accommodate the nationwide widespread activities of Falun Gong practitioners in China.

G.   The Golden Shield Facilitated Persecution of and Abuses Suffered by Plaintiffs

124.   The Golden Shield has enabled the persecution of Falun Gong practitioners in all provinces and regions in China where the Golden Shield has been implemented, as the primary means to identify Falun Gong practitioners who use the Internet in practicing their religion.

125.   The Golden Shield is the only system in China that performs large-scale content filtering and surveillance of the Internet.

126.   Further, the Golden Shield stores sensitive information about Falun Gong practitioners who have been previously detained and apprehended, thereby enabling Public Security officers and Office 610 agents to use the information to interrogate, forcibly convert and torture practitioners subjected to multiple arrests. Office 610 routinely uses the Falun Gong database to identify Falun Gong practitioners and to assemble evidence of Falun Gong activities to further their persecution.

127.   Office 610 officers routinely exchange information with police investigating Falun

25

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

Gong suspects while they track, apprehend, detained, interrogate, torture and in other ways forcibly converted members of the religion in China through network functionalities specifically designed for these purposes by Defendants.

128.   Office 610 officers across China had access to at least three Golden Shield Falun Gong databases dedicated to the surveillance of Falun Gong: (1) Falun Gong members at large, (2) notorious Falun Gong practitioners and contact persons, and (3) captured Falun Gong whose identities have been unknown.

129.   The Golden Shield was the essential means through which the following plaintiffs were tracked, detained and eventually tortured. Without the information collected and assembled through the Golden Shield, it would not have been possible to carry out the human rights and other violations against them in the same manner, or at all.

130.   All of the Plaintiffs were subjected to interrogation practices that comprised mental and physical torture in order to forcibly elicit false confessions.

131.   All of the Plaintiffs were persecuted based on their use of the Internet to practice their religion. None of the Plaintiffs or persons situated similarly was charged with violent crimes.

132.   The 103 Cases.  During 2001 in the city of Tianjin, the 610 Office used the Golden Shield to investigate, apprehend, arrest, detain and torture between sixty and seventy persons with a history of Falun Gong activities.  The 610 Office's internal designation for this incident was the "103 Case."

133.   The 610 Office and Public Security officers used the Golden Shield collaboratively to detect, monitor, interrogate and persecute these Falun Gong practitioners.

134.   Doe I, Doe II and Ivy He are among the Falun Gong practitioners who were detained and tortured in the 103 Case through the use of the Golden Shield.

135.   Doe I.   Doe I was one of the individuals identified for arrest and persecution through use of the Golden Shield by Office 610 officers during the 103 Case.

136.   Beginning on July 1, 2001, Doe I and other Falun Gong practitioners frequently met to conduct Falun Gong activities including the downloading and distributing of Falun

26

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

Gong promotional materials.

137.    Doe I was arrested and detained along with over 70 other Falun Gong practitioners in November 2001. In their investigations, Office 610 officers identified her as one of several "backbone organizers" of the Case 103.

138.    During their interrogation, the police and special 610 agents subjected Doe I to severe torture to force her to renounce and vilify her Falun Gong religious beliefs.  She was physically tortured with severe beatings, including some administered with the simultaneous use of an electric baton and a steel rod bearing sharp screw threads. Her physical abuse was so severe that it caused visible gashes and bruises to cover a large portion of her body, caused her eyes to swell noticeably, and drew blood. All such torture began over a year before she was made aware of any charges against her.

139.    In July 2003, Doe I was charged with raising funds for Falun Gong activities, downloading Falun Gong materials from the Minghui website, publishing Falun Gong materials on the Minghui website, and distributing Falun Gong materials. At a purported "trial", the court accepted a statement from the Internet Controlling and Monitoring Division of Tianjin Police Bureau that confirmed some of the Internet-related charges. The police and prosecutors specifically relied on evidence that was collected and analyzed through Golden Shield Internet applications and functionalities. She was not permitted to challenge the charges against her.

140.    In July 2003, Doe I was sentenced to twelve (12) years of imprisonment and a three-year deprivation of political rights.

141.    In prison, Doe I was subjected to severe torture and forced labor.

142.    Doe I is currently living in China.

143.    She is under the continued threat that the Chinese authorities can track her Falun Gong religious activities and that she will be subject to further abuse.

144.    <u>Doe II</u>.  Doe II was one of the individuals identified for arrest through use of the Golden Shield by an Office 610 officer.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

145.    Between August and September 2001, the Golden Shield was used by Chinese authorities to identify, monitor and track her online activity as a Falun Gong practitioner.

146.    In November 2001, Doe II was detained for her activities without notice of the charges, formal arrest or other procedures. In detention, she was slapped in the face, kicked and beaten.

147.    During their interrogation of Doe II, the police subjected her to severe mental and physical abuse, so much so that she falsely confessed to crimes she subsequently denied at her trial.

148.    On December 20, 2001, Doe II was formally arrested and charged.

149.    She remained in detention until July 2003, at which point she was put on "trial" along with several other Falun Gong practitioners. At trial, she was not permitted to challenge the legality of the charges against her and was not allowed to submit a plea of "not guilty."

150.    The trial court convicted Doe II of "utilizing the cult organization to sabotage law enforcement" and sent her to prison for four years.

151.    In prison, she was subjected to public humiliation, torture that included being severely beaten, and forced to work under harsh conditions that included long hours, intermittent torture, interrogation and other forms of torture, and public degradation in order to force her to make false statements about her religious belief and practice.

152.    Doe II is currently living in China.  She is under continuing threat that the Chinese authorities can identify her, and she will be subject to further abuse.

153.    <u>Ivy He</u>. Ivy He was one of the sixty to seventy individuals identified for arrest as a Falun Gong practitioner in the 103 Case through use of the Golden Shield.

154.    Ivy He has resided in Canada since December 2006.

155.    Throughout 2001, Ivy He downloaded Falun Gong materials from the Minghui Website, communicated by cell phone with other Falun Gong practitioners involved in Internet-related Falun Gong activities, and in other ways supported these activities while living in China.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

156.    In November of 2001, Public Security officers went to her home and forced her to accompany them to the police station.

157.    She was detained without being advised of any charges against her and was refused any opportunity to contact family or legal counsel.

158.    At the police station, Public Security officers interrogated her continuously for many hours in order to force her to falsely confess to crimes she believed she did not commit. They poured ice-cold water over her naked body and forced her to stand in a bucket of ice. She was also kicked, beaten, insulted and subjected continuously to other forms public humiliation, and mental and physical torture.

159.    Chinese Public Security officers sent her to a detention center. She was subjected to continuous interrogation and physical abuse.

160.    After a month at the first detention center, Public Security officers sent her to a different detention center. She spent about a month in that center without being formally charged or permitted access to family or legal counsel.

161.    In January of 2002, she was sent to a reeducation through labor camp without a hearing or an opportunity to challenge the legality of her detention and treatment.

162.    There, she was beaten so severely that she lost consciousness. At one point she was sent from the labor camp to a hospital, drugged, and was forced to sign a statement denouncing the Falun Gong religion.

163.    After about two years of detention and torture, she was released.

164.    In 2008, Public Security officers visited her at her home in China and informed her that they would be sending her to brainwashing classes again based on her continued practice of the Falun Gong religion. She left China that night and boarded a plane to Canada, where she now resides.

165.    Internet Cases. Between one and five thousand Falun Gong practitioners have been arrested and charged with Falun Gong-related activity through use of the Golden Shield. All of the cases below involved Falun Gong practitioners who had downloaded Falun Gong materials from foreign websites.

29

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

166.   <u>Doe III</u>. Doe III is a Falun Gong practitioner filing this action through his next friend, Roe III. Doe III is currently in prison in China and cannot file directly.

167.   Roe III and Doe III became close friends in 1998.

168.   Between 2003 and 2005, Doe III used the Internet to download a significant amount of Falun Gong material from the Minghui website which he printed and distributed to Chinese citizens residing in Shanghai.

169.   In early 2005, after the Golden Shield had been completed by the Defendant in full collaboration with Public Security officers and Party agents and was fully operational in Shanghai, Doe III was taken into custody in Shanghai without being advised of any charges against him.

170.   In detention, he was subjected to interrogation and forced conversion procedures that included torture.

171.   A month later, he was transferred to the Detention Center of Qingpu District in Shanghai where political prisoners including but not limited to Falun Gong practitioners are subjected regularly to torture and persecution.

172.   In late 2005, Doe III was convicted at a trial for downloading Falun Gong material online over a two-year period. He was not permitted to challenge the legality of the charges against him and was not allowed to submit a formal plea of "not guilty."

173.   He was sentenced to a seven and a half year prison term. While in prison, he was subjected to severe beatings on several occasions and other forms of torture and persecution.

174.   Doe III reside in Tilanqiao Prison in Shanghai that is well known for its brutal treatment of Falun Gong practitioners and other dissident group members. Doe III is currently very weak and in poor condition due to his subjection to torture and persecution.

175.   <u>Doe IV</u>. Doe IV is a Falun Gong practitioner filing this action through his next friend, Roe III, also the next friend for Doe III.  Doe IV is currently in China and cannot file directly.

176.   Roe IV communicated with Doe IV and Doe IV's family extensively before,

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

during, and after Doe IV was imprisoned.  He maintains a close relationship with Doe IV and Doe IV's family.  Roe IV procured an attorney to represent Doe IV in China, who represented Doe IV in China until the authorities began to persecute the lawyer.

177.    In early 2003, Doe IV began to download information about Falun Gong from the Minghui website. Throughout the year, Doe IV used the Internet to download a significant amount of Falun Gong material from the Minghui website.

178.    In October of 2003, a year after the Golden Shield became fully operational in Beijing with the participation of Defendants, Doe IV was taken into custody in Beijing without being advised of any charges against him.

179.    In detention, he was subjected to interrogation and forced conversion procedures that included torture. He was shocked with electric batons on his hands, mouth and face on several occasions, locked in isolation chambers and forced to stand on his feet in sweltering heat for more than seven days on several occasions, slapped in the face, beaten, deprived of sleep for prolonged periods of time, and subjected to ice water being poured on his body and clothing without any relief.

180.    In 2004, Doe IV was convicted at purported trial for constructing a Falun Gong website, using the Internet to download Falun Gong related material and burning the information onto CDs and sending mass email about the persecution of Falun Gong in China.

181.    He was not permitted to challenge the legality of the charges against him and was not allowed to submit a formal plea of "not guilty."

182.    He was sentenced to seven years in prison and in November 2004 was transferred to Jidong Prison in Tangshan City, Hebei Province.

183.    While in prison, he was subjected to torture and persecution. He was deprived of sleep for weeklong periods of time, beaten, and in other ways injured physically and mentally.

184.    <u>Doe V</u>. Doe V is a resident of China. Doe V used the Internet and telephone to engage in Falun Gong-related activities. Her use of the Internet and telephone was

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1    monitored using the Golden Shield.

2    185.   In 2004, after the core apparatus of the Golden Shield became fully operational

3    with the participation of Defendants, she used the Internet to access the Minghui website.

4    She also used the Internet to download materials about Falun Gong and to produce DVDs

5    about the nature of the religion and its persecution in China.

6    186.   In spring 2004, Public Security officers from the Xingtai Police Department in

7    Hebei Province entered her residence as she was downloading material from the Minghui

8    website. They seized laptop computers, printers, other personal property, and funds.

9    187.   On the same day, Public Security officers took her to a hotel for interrogation to

10   force her to denounce and vilify her religion. The interrogation included severe physical

11   and mental forms of torture. They placed her in heavy foot-cuffs and tied her to an iron

12   chair for five days. She was allowed to be removed from the chair only to go to the

13   restroom and was not permitted to sleep. During the interrogation, she was tortured and

14   beaten. As a result of the interrogation, she had severe injuries in the areas in which she

15   had been cuffed and was covered in bruises and cuts.

16   188.   Five days later, Doe V was then taken to a detention center in Xingtai where she

17   was formally charged. At the detention center she faced further abuse. She was forced to

18   eat spoiled food and to perform hard labor for long hours in unhealthy conditions. The

19   materials she was forced to work with caused dizziness and vomiting. She was also put in

20   foot-cuffs, a penalty typically reserved for death-row inmates.

21   189.   She was later taken to the Qiaoxi Municipal Court to stand trial. At trial, she was

22   not permitted to challenge the legality of the charges against her and was not allowed to

23   submit a plea of "not guilty."  She was sentenced to a three-year prison term.

24   190.   While in prison she was subjected to further abuse. She was forced to make clothes

25   for export, often working overnight to complete an order. The work made her dizzy and

26   she vomited at the end of most days. She was deprived of access to essential hygiene

27   products and subjected to other forcible conversion practices that included intense

28   physical abuse.

32

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

191.    Since her release, she continues to suffer from an irregular heartbeat, cold sweats, and other severe physical and emotional damage.

192.    <u>Doe VI</u>.  Doe VI is a resident of China.  During 2007, Doe VI used the Internet to download Falun Gong flyers from the Minghui website. He shared the flyers and other information posted on the website with others in China, including Falun Gong practitioners.

193.    In spring 2007, more than five years after the Golden Shield was completed and fully operational in Shandong Province, approximately ten Public Security officers raided his home in Shandong Province and took him into custody without advising him of any charges. At the police station, he was subjected to interrogation techniques that included torture. He was beaten throughout the interrogation process and forced to sleep on the floor with his hands and feet bound with rope and handcuffs.

194.    The next day, Public Security officers took Doe VI to Weifang City detention center. While at the detention center, he was subjected to continuous interrogation and torture to force him to falsely confess to criminal conduct and to abandon the practice of Falun Gong. He was not formally charged until almost a month later.

195.    About a month later, a Public Security administrative committee issued a decision stating that Doe VI had "downloaded, produced, and hid Falun Gong illegal flyers at home."

196.    Based on these facts, the administrative committee sent Doe VI to a reeducation through labor camp for 18 months without a hearing or any other opportunity to challenge the legality of the charges and his term of detention. The committee relied on evidence that Public Security officers and Office 610 agents had collected through use of the Golden Shield.

197.    From spring 2007 until early fall 2008, he was detained at Shandong Province No. 2 Labor Camp, where he was physically abused at the hands of the labor camp officers and made to do forced labor.

198.    <u>Doe VII</u>.  Roe VII files as a representative of her daughter, Doe VII.  Doe VII has

33

disappeared and is believed dead.

199.    After the Golden Shield had been implemented in the city of Taishin, Shandong Province, Doe VII engaged in Falun Gong-related Internet activity that included the downloading of Falun Gong information from the Minghui website.

200.    In the city of Taishan in June 2004, Public Security officers apprehended Doe VII and took her blindfolded to a police interrogation room where Public Security officers electrically shocked, beat, and kicked her.

201.    She was held in a detention center where Public Security officers force-fed her and subjected her to additional beatings and interrogation.

202.    In the fall of 2004, after several months of torture, she was injected with a drug that affected her nervous system so severely that she was unable to speak.

203.    A few days later, Public Security officers took her to a court in Taian. The officers had to hold her up by her arms because she was unable to walk or stand unassisted. In this condition, she was forced to stand trial. Due to her physical condition she was unable to speak at trial.

204.    Approximately a week later, the court convicted her for using the Internet to download Falun Gong-related material although her physical condition prevented any participation in the trial. The court relied on evidence of Internet use that was collected and analyzed through use of the Golden Shield. The court sentenced her to more than five years in prison.

205.    Before she was taken to the prison to serve her sentence, Public Security officers injected her again with drugs that affected her central nervous system, rendering her mute, with a hard and numb tongue and constant salivation.

206.    In the subsequent two years, her family, including Roe VII, was permitted occasional prison visits and noted her extremely weak physical condition.

207.    Since the summer of 2006, Doe VII's family has not had contact with her despite repeated attempts to do so and believes she may have been tortured to death while in custody. Her family has been refused visitation and is unaware of her whereabouts.

34

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

208.   <u>Charles Lee</u>.  Charles Lee was born and educated in China.  He later came to the United States and became a U.S. citizen. He now lives in New Jersey.

209.   While in the United States, he joined an email exchange for those interested in the persecution of Falun Gong in China. This e-mail exchange involved extensive correspondence with individuals living in northern China. These e-mails entered China through its Beijing gateway, where the Golden Shield had by that time been completed and was fully operational. These e-mails included correspondence with Falun Gong practitioners in China who had participated in high-profile protest activity. The Golden Shield was used to monitor and track this email.

210.   In 2003, he flew back to China to visit with friends and family after corresponding through e-mail with a small number of friends living in northern China, letting them know he was coming.

211.   Upon his arrival at the airport, Public Security officials placed him under arrest.

212.   One of the officers who arrested him told him that they knew he was coming to China and had been waiting for him.

213.   At trial, he was convicted of using the Chinese media for Falun Gong-related activity. He was not permitted to challenge the legality of the charges against him and was not allowed to present evidence or defend himself as "not guilty."

214.   He was sentenced to a prison term of three years, from January 2003 to January 2006, at Nanjing Prison. During this time, he was frequently subjected to interrogation and forced conversion practices

215.   He was forced to take classes on a daily basis in which he was surrounded by ten to fifteen guards and fellow inmates who subjected him to constant insults and verbal abuse regarding his practice of Falun Gong. He was referred to as mentally imbalanced and his beliefs were called "laughable, insane and poisonous." Lee was called a "traitor" for his U.S. citizenship. He was told "we can make your living worse than death."

216.   Charles Lee was not permitted to interact with other prisoners and oftentimes not permitted to read. He was permitted to see his mother only twice during the last two years

35

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

of her life and not permitted to attend her funeral.

217.    In addition, he was frequently tortured. He was regularly forced to stand or sit in the same position for hours at a time on a daily basis, sometimes for up to seven weeks in a row. He suffered from severe mental trauma and physical damage to his heart while in prison. He was forced to attend military drills, and when he refused he was dragged across the grounds for hours at a time.

218.    He went on nine hunger strikes over the course of his detention, one for fifty days. Prison authorities force-fed him on four occasions. On one of these occasions, authorities tied him down and placed a tube down his throat for feeding, which was kept there for thirty-three hours.

219.    In January 2006, Charles Lee was released. He returned to the United States and continues to be severely disturbed by the aftermath of the torture in the prison.

220.    <u>Doe VIII</u>.  Roe VIII resides in China and is the surviving family member of a deceased Chinese citizen, Doe VIII, who was born and resided in China. Roe VIII files individually as the survivor of Doe VIII.

221.    Doe VIII accessed the Minghui website on numerous occasions in Shandong Province after the Defendant had implemented the Golden Shield in Shandong Province in full collaboration with Public Security officers and CCP agents.

222.    In the summer of 2002, Public Security officers arrested him and another Falun Gong practitioner at a bus station in Shandong Province, a province where the Golden Shield had been completed and was fully operational.

223.    Following his arrest, he was taken to a detention center where he was interrogated and severely beaten.

224.    Sometime between August 21 and August 30, 2002, Doe VIII was beaten to death at the detention center.

225.    <u>General Surveillance Cases</u>. <u>Liu Guifu</u>. Liu Guifu was born and raised in the People's Republic of China. She currently resides in the state of New York with asylum status.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

226.    Plaintiff Liu Guifu was arrested and persecuted as a result of her participation in Falun Gong Internet activities in the city of Beijing where Defendants had helped to construct the Golden Shield in collaboration with Public Security officers and Office 610 agents. Liu Guifu was subject to multiple arrests. The Golden Shield was used to assemble information about her following her initial arrest. This information enabled subsequent arrests and detentions. The detailed information used in the interrogation of Liu Guifu would not have been accessible to the police without use of the Golden Shield.

227.    In February of 2001, she was taken to the Qing Long Qiao police station where she was detained and subjected to physical and mental forms of torture.

228.    On February 25, 2001, public security officers accused her of "making public statements with others on the Internet" and sent her to a labor camp for a term of eighteen months. She was deprived of her legal right to a hearing and was not permitted to challenge the validity of the charges against her.

229.    At the labor camp, she was kept awake for eighteen days. She was whipped and beaten until she was unable to walk. Eventually she began to have hallucinations, and she often lost consciousness.

230.    Liu Guifu was released on or about August 14, 2002.

231.    In early 2003, she was taken into custody again by Public Security officers in Beijing and was accused of sheltering Falun Gong practitioners.

232.    During her interrogation, the police told her that another practitioner she knew was wanted for using the Internet to engage in Falun Gong activities.  Upon information and belief, Liu Guifu was identified by her connection to this practitioner through use of the Golden Shield. She was detained for three weeks.

233.    In February 2005, Public Security officers again took her into custody. Public Security officers sent her to a labor camp for two and a half years.

234.    Liu Guifu was not permitted to challenge the legal or factual validity of these accusations.

235.    At the labor camp, she was interrogated. The interrogators repeatedly told her that

37

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

someone in her home had downloaded information from the Minghui website and asked

her repeatedly who had used her computer to download the Falun Gong materials.

She was released from the labor camp in the summer of 2007.  In 2009, she escaped to the

United States and now resides in New York.

**NO ALTERNATIVE REMEDIES AND**

**CONTINUING VIOLATIONS OF LAW**

236.    There is no adequate alternative remedy available in China to Plaintiffs for the

claims asserted here.

237.    Chinese attorneys have been disbarred, arrested, and persecuted for their attempts

to defend Falun Gong practitioners in Chinese courts. Plaintiffs residing outside of China

cannot return to China without danger of serious reprisals, nor can those residing inside

China bring suit without danger of serious reprisals.

238.    The Chinese judiciary or legal system does not operate independent of other

branches of government and/or of the CCP in China.

239.    Plaintiffs still detained continue to suffer from beatings, sleep and food

deprivation, and other forms of torture, cruel, inhuman, or degrading treatment, forced

labor, and crimes against humanity.

240.    Technologies and other measures used to suppress Falun Gong practitioners in

China make it virtually impossible for plaintiffs to bring cases in China without reprisal

and further persecution of them and their families. In addition, it is virtually impossible

for detained Falun Gong practitioners to bring cases in any foreign courts.

241.    Many Falun Gong practitioners in China have attempted to seek administrative

remedies against responsible Chinese CCP or State officers. This has resulted in further

retaliation against them, including renewed detention and increased persecution.

**CLASS ALLEGATIONS**

242.    **Class Definition**. Plaintiffs bring this action on behalf of themselves individually

and on behalf of all other similarly situated individuals as a class action. This action may

properly be maintained as a class action pursuant to the provisions of Federal Rule of

38

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

Civil Procedure 23(a) and (b)(3).  The Class which Plaintiffs seek to represent is comprised of, and defined, as follows:

> All persons who were identified as Falun Gong practitioners through the use of the Golden Shield by Chinese authorities and were thereafter subjected to detention and/or physical abuse and/or torture for their Falun Gong related activity, and suffered injury as a result.

243.    Upon application by Plaintiffs' counsel for certification of the Class, the Court may be requested after appropriate discovery, to also utilize and certify subclasses in the interests of ascertainability, manageability, justice, and/or judicial economy.

244.    **Ascertainability**. This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed Class are ascertainable and identifiable.

245.    **Numerosity**. The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs believe that there are many thousands of members of the class as described above, although the number and identities of individual class members are presently unknown.

246.    **Typicality** Plaintiffs' claims are typical of the claims of the other members of the class, since all such claims arise out of Defendants' actions in actively participating in the development of the Golden Shield through which plaintiffs and class members were identified and subjected to detention and torture.  Plaintiffs have no interest antagonistic to the interests of the other members of the class.

247.    **Adequacy**. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel with extensive experience in the prosecution of human rights actions and class actions.  Accordingly, Plaintiffs are adequate representatives of the class and will fairly and adequately protect the interests of the class.

248.    **Commonality and Predominance**. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting

39

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

individual members of the Class. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

a.      Whether Defendants intended to design the Golden Shield to specifically facilitate the persecution of the Plaintiff Class by the Chinese authorities;

b.      Whether Defendants knew or should have known and intended that the Golden Shield would be used to target and persecute the Plaintiff Class;

c.      Whether Defendants gave substantial assistance to the Chinese Public Security and the Chinese Communist Party in the persecution the Plaintiff Class;

d.      Whether Defendants specifically intended to aid the Chinese Public Security and the Chinese Communist Party in the persecution of and commission of other crimes alleged herein against the Plaintiff Class;

e.      Whether Defendants' subsidiaries in China acted as agents of defendant Cisco with regard to the actions which are the subject matter of this complaint;

f.      Whether Defendants unlawfully manufactured, assembled, possessed, and/or sold to CCP the equipment and devices required to create and operate the Golden Shield; and

g.      Whether Defendant Cisco violated Section 17200 of the California Business and Professions Code.

249.   **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation of the claims of all Class members is impracticable. Even if every member of the Class could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases involving highly technical issues would proceed.   Further participation in the lawsuit might expose the would-be plaintiffs to further gross human rights abuses

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

250. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Class and of Defendants. The same evidence, the same witnesses, and the same legal arguments and explanations will be used to prove that Defendants bear liability for injuries suffered by members of the Class. Numerous fluid recovery methods exist to aid the Court in assessing damages on a Class-wide basis. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

251. Additionally, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the unlawful conduct alleged herein. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action. There is no other litigation that has commenced against Defendants regarding this matter.

252. Defendants have engaged in unlawful and unfair business conduct, which has affected the members of the Class, thereby making appropriate compensatory relief with regard to the members of the Class as a whole, as, requested herein.

## **LEGAL AND EQUITABLE TOLLING**

253. No statute of limitations has begun to run on the Defendants' actions or on the Plaintiffs' legal right to seek remedies for Defendants' knowing, purposeful and intentional design, supply and assistance in maintaining the Golden Shield network in collaboration with the CCP and Chinese Public Security officers with knowledge and intent that such assistance was for the specific purpose of ultimately subjecting Plaintiffs to gross human rights abuses in violation of international and state law.

254. Plaintiffs' claims are equitably tolled due to the extraordinary circumstances outside of their control, including the Chinese regime's pattern of repression, torture and other crimes against humanity that they themselves suffered.

41

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

255.    All plaintiffs, even those residing outside China, justifiably feared retribution against them, their families and friends if they publically criticized the treatment they and other Falun Gong practitioners suffered in China. Even now the Doe plaintiffs and the Roe next friends are fearful of having their identities known to Chinese officials.

256.    The political climate in China also prevented plaintiffs from freely investigating the circumstances of the abuses they suffered.

257.    Lawyers, who represented Falun Gong practitioners, have themselves been persecuted. This year alone, several lawyers, who do not practice Falun Gong yet nonetheless risked their personal safety to represent Falun Gong clients in criminal proceedings, have been disbarred and then themselves arrested, as in the cases of Tang Jitian, Liu Wei, and Teng Biao, or simply imprisoned and tortured without any formal charges, as in the ongoing ordeal suffered by human rights lawyer Gao Zhisheng

258.    In addition to these bases for tolling applicable to all plaintiffs, they have individual and distinct bases for tolling.

       a.    The claims of Doe III are equitably tolled while he remains in prison with limited access to anyone outside.

       b.    The claims of Doe I are equitably tolled while she was imprisoned under isolating conditions that restricted her access to anyone able to present her claims. She was not released from the harsh and isolating conditions of her confinement until 2011.

       c.    The claims of Doe IV are equitably tolled while he was imprisoned under isolating conditions that restricted his access to anyone able to present his claims. He was not released from the harsh and isolating conditions of his confinement until November 2010.

       d.    The claims of Doe VII are equitable tolled while in prison. Her family did not confirm her disappearance until last year, when they made repeated unsuccessful attempts to communicate with her or ascertain her whereabouts.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

e.  The claims of Does II, V and Doe VI are equitably tolled while in prison. Doe II was released in 2005 and Does III, V, and VI were released in 2008. They all continue to live in China in fear of further abuse, including further detention if they sought redress in China or if their accounts of the abuse they suffered were made public. For that reason they sought leave to proceed anonymously. Their claims should be tolled after their release from detention because of the continued threat of persecution.

f.  Charles Lee suffered repeated torture causing mental and physical trauma during his detention and torture. After his release he continued to suffer depression and anxiety to such a degree that tolling was appropriate even after his release.

g.  The claims of Liu Guifu are tolled for the period of her detention and continued while she remain in China for fear of further retribution. She arrived in September 2009 and received permanent resident status in the United States in March 2011. Her claims are tolled until she receives permanent residence status and no longer fears that she might be forced to return to China.

h.  The claims of Ivy He are equitably tolled while she was detained and while she remained in China after her release. She was released from prison in 2004 and arrived in Canada in 2008. Her claims should continue to be tolled because Plaintiff He was concerned that she would be endanger of retaliation from Public Security if she participated in an action critical of the treatment of Falun Gong in China. In 2010 she returned to China to see her family and close her affairs there. After that she was no longer afraid of retaliation for bringing a case, which reflected badly on China's human rights record. The running of the statute is tolled as to her claims until after her trip to China in December 2010.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

259.    On May 20, 2008, the United States Senate Judiciary Committee's Subcommittee on Human Rights and the Law held a hearing during which Cisco's contribution to the design and development of the Golden Shield was made public, enabling plaintiffs to learn of the specific connection between the defendants' contributions to the Golden Shield and the abuses they suffered.

260.    Tolling is further appropriate to ensure that abuses abroad do not thwart the administration of justice in the United States.

## FIRST CAUSE OF ACTION

*(Torture under the Alien Tort Statute (ATS))*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI,

and class members similarly situated, against all Defendants)

261.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

262.    Plaintiffs suffered from torture inflicted knowingly and purposefully in order to, among other things, punish the victims and/or induce a forced confession and public renunciation of their religious beliefs.

263.    Plaintiffs suffered severe mental and physical injuries as a result of the abuse inflicted while in custody.

264.    Such conduct was in violation of international law and was contrary to the laws of China.

265.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy He, Liu Guifu, Does I through VI, and class members similarly situated. Defendants, directly or through their agents, knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to the torture they endured as a result of the Golden Shield.

## SECOND CAUSE OF ACTION

*(Torture under the TVPA)*

44

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

(All Plaintiffs, and class members similarly situated,

against Defendants Chambers, Chan, Lam, and Cheung)

266.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

267.    Plaintiff Charles Lee suffered from torture inflicted knowingly and intentionally in order to, among other things, punish him and/or induce a forced confession and public renunciation of his religious beliefs.

268.    Plaintiff Charles Lee suffered severe mental and physical injuries as a result of the abuse inflicted while in custody.

269.    Such conduct was in violation of the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

270.    Defendants John Chambers, Owen Chan, Thomas Lam, and Fredy Cheung are liable for the harm suffered by plaintiff Charles Lee, and class members similarly situated, in that these Defendants, directly or through their agents, knowingly and intentionally aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to the torture he endured as a result of the Golden Shield.

## **THIRD CAUSE OF ACTION**

*(Cruel, Inhuman, or Degrading Treatment under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI,

and class members similarly situated, against all Defendants)

271.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

272.    Plaintiffs suffered severe mental and physical injuries as a result of the abuse inflicted while in custody.

273.    The acts described herein were done with the intent of and had the effect of grossly humiliating and debasing the Plaintiff Class, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

45

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

274.     Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.

275.     Such conduct was in violation of international law and was contrary to the laws of China.

276.     Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy He, Liu Guifu, Does I through VI, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to the cruel, inhuman and degrading treatment they endured as a result of the Golden Shield.

### **FOURTH CAUSE OF ACTION**

*(Forced Labor under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI,

and class members similarly situated, against all Defendants)

277.     The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

278.     Plaintiffs Ivy He, Liu Guifu, Doe VI, and class members similarly situated, were sent to reeducation through labor camps, where they were forced to work involuntarily under threat of or as part of a regime of serious harm and physical restraint. At no time were these plaintiffs afforded a hearing or a trial, nor were they charged, convicted or sentenced for a violation of a crime.

279.     Plaintiffs Does I, II, III, IV and V, and class members similarly situated, were imprisoned after trials that denied them due process and precluded them from challenging the charges against them and thereafter were forced to work under threat of further abuse harm and physical restraint. Such conduct was in violation of international law and was contrary to the laws of China.

280.     Defendants are liable under the Alien Tort Statute for the harm suffered by

46

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1   plaintiffs Ivy He, Liu Guifu, and Does I, II, III, IV, V and VI, and class members similarly

2   situated, in that Defendants directly or through their agents knowingly and purposefully

3   aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese

4   Communist Party and/or Chinese Public Security officers in the unlawful conduct that led

5   to the forced labor they endured as a result of the Golden Shield.

6   **FIFTH CAUSE OF ACTION**

7   *(Prolonged and Arbitrary Detention under the ATS)*

8   (Plaintiffs Ivy He, Liu Guifu, Does I-VI,

9   and class members similarly situated, against all Defendants)

10   281.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

11   by reference as if fully set forth below.

12   282.   Plaintiffs Ivy He, Liu Guifu and Doe VI, and class members similarly situated,

13   were detained in reeducation through labor camps without due process because of their

14   practice of Falun Gong, during which they were subjected to torture and denied access to

15   legal counsel. At no point were these plaintiffs afforded a hearing or a trial, nor were they

16   charged, convicted or sentenced for a violation of a crime.

17   283.   Plaintiffs Does I, II, III, IV and V, and class members similarly situated, were

18   detained without due process during the period prior to them being charged and tried for a

19   crime. This pre-trial detention lasted in each case for at least a week and in most cases

20   several weeks or even months.

21   284.   Plaintiffs were injured by prolonged and arbitrary detention in violation of

22   international law.

23   285.   Defendants are liable for the harm suffered by plaintiffs Ivy He, Liu Guifu and

24   Does I through VI, and class members similarly situated, in that Defendants directly or

25   through their agents knowingly and purposefully aided and abetted or entered into a

26   conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese

27   Public Security officers in the unlawful conduct that led to their prolonged and arbitrary

28   detention.

47

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

**SIXTH CAUSE OF ACTION**

*(Crimes against Humanity under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI, Roes VII and VIII,

and class members similarly situated, against all Defendants)

286.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

287.    Plaintiffs were injured by crimes against humanity described above, including extrajudicial killings; torture; cruel, inhuman and degrading treatment; arbitrary and prolonged detention; forced exile; forcible transfer; and enforced disappearance.

288.    Each single act constitutes a crime against humanity because it was committed within the context of widespread or systematic attacks against a civilian population. These acts were directed against all plaintiffs because they were Falun Gong practitioners.

289.    Such conduct was in violation of international law and was contrary to the laws of China.

290.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy He, Liu Guifu, Does I through VI, Roes VII and VIII, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to the crimes against humanity they endured as a result of the Golden Shield.

**SEVENTH CAUSE OF ACTION**

*(Extrajudicial Killing under the ATS)*

(Plaintiff Roe VIII, and class members similarly situated,

against all Defendants)

291.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

292.    Doe VIII's death by torture was an extrajudicial killing not authorized by a lawful

48

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1  judgment pronounced by a regularly constituted court affording all the judicial guarantees
2  which are recognized as indispensable by civilized peoples.

3  293.   This extrajudicial killing was in violation of international law and was contrary to
4  the laws of China.

5  294.   Defendants are liable for the harm suffered by Doe VIII's survivor, Roe VIII, and
6  class members similarly situated, in that Defendants either directly or through their agents
7  knowingly and purposefully aided and abetted or entered into a conspiracy or joint
8  criminal enterprise with the Chinese Communist Party and/or Chinese Public Security
9  officers in the unlawful conduct that led to Doe VIII's death.

10  **EIGHTH CAUSE OF ACTION**

11  *(Extrajudicial Killing under the TVPA)*

12  (Plaintiff Roe VIII, and class members similarly situated,

13  against Defendants Chambers, Chan, Lam and Cheung)

14  295.   The allegations set forth in the above paragraphs are re-alleged and reincorporated
15  by reference as if fully set forth below.

16  296.   Doe VIII's death by torture was an extrajudicial killing not authorized by a lawful
17  judgment pronounced by a regularly constituted court affording all the judicial guarantees
18  which are recognized as indispensable by civilized peoples.

19  297.   This extrajudicial killing was in violation of international law and was contrary to
20  the laws of China.

21  298.   Defendants are liable for the harm suffered by Doe VIII's survivor, Roe VIII, and
22  class members similarly situated, in that Defendants either directly or through their agents
23  knowingly and purposefully aided and abetted or entered into a conspiracy or joint
24  criminal enterprise with the Chinese Communist Party and/or Chinese Public Security
25  officers in the unlawful conduct that led to Doe VIII's death.

26  **NINTH CAUSE OF ACTION**

27  *(Enforced Disappearance under the ATS)*

28  (Plaintiff Roe VII, and class members similarly situated,

49

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

against all Defendants)

299.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below

300.    Doe VII was forcibly disappeared while in the custody. After being detained and imprisoned, she was not permitted access to any friends or family members, and has not been seen or heard from since 2006. Her whereabouts have not been disclosed, and she is presumed dead by her family.

301.    This disappearance was in violation of international law and was contrary to the laws of China.

302.    Defendants are liable for the harm suffered by Doe VII's representative, Roe VII, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and/or Chinese Public Security officers in the unlawful conduct that led to her enforced disappearance.

## **TENTH CAUSE OF ACTION**

### *Violation of 18 U.S.C. § 2512(1)*

(Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

and class members similarly situated, against all Defendants)

303.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

304.    Defendants manufactured, assembled, possessed, and sold to Public Security the equipment and devices required to create and operate the Golden Shield.

305.    Defendants knew of China's poor human rights record with respect to Falun Gong practitioners, and knew of intent Public Security and the CCP to use the Golden Shield for the purpose of identifying and tracking Falun Gong practitioners via the surreptitious interception of their electronic, wire and/or oral communications in order to unlawfully detain, torture, and harass them as described herein. Defendants specifically designed and customized the Golden Shield network (including hardware and software) with the scale,

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

complexity and capacity required to enable Chinese Public Security officers and Office 610 to covertly monitor and intercept information from the Chinese population without their consent. The technological tailoring enabled the Public Security Officers to identify, track, apprehend, interrogate, detain and torture Falun Gong practitioners, including Plaintiffs and persons similarly situated. Defendants also implemented, manufactured, assembled, possessed, and sold routers equipped with blocking and surveillance features that are not typical to a router's default configuration in order to more easily track the movement of Falun Gong practitioners, including Plaintiffs.

306.   Defendants knew that Chinese authorities intended to commit such acts on Falun Gong members, and purposefully provided the Golden Shield technology to the Chinese authorities as the only or primary means by which Plaintiffs could be identified as Falun Gong and detained by CCP authorities.

307.   Plaintiffs' electronic, wire and/or oral communications were intercepted, disclosed, and intentionally used by the Chinese authorities to identify, track, and commit human rights abuses against them.

308.   As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, irreparable harm and compensatory and punitive damages in an amount to be proven at trial.

309.   As a legal, substantial and direct result of the above-described conduct, Plaintiffs are entitled to reasonable attorneys' fees and other litigation costs pursuant to 28 U.S.C. § 2512(1).

## **ELEVENTH CAUSE OF ACTION**

### *Battery*

(Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

and class members similarly situated, against all Defendants)

310.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

311.   The CCP and/or Chinese government, through its Public Security officers and

51

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1   police officers, used the Golden Shield technology developed, implemented and

2   maintained by Defendants to the Internet activity of Falun Gong with other state agents

3   with the intent and as the primary means to facilitate the apprehension, detention,

4   interrogation and other forms of torture, forcible conversion and severe physical and

5   mental abuse of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation

6   and degradation.

7   312.   For example, while at a reeducation through labor camp in 2002, Ivy He lost

8   consciousness while being tortured, was slapped repeatedly, and during a police

9   interrogation in November 2001 she was forced to stand in a bucket of ice-cold water

10  while ice was poured over her body. While in prison from 2003-2006, Plaintiff Charles

11  Lee was forced to stand or sit in the same position for hours at a time on a daily basis,

12  sometimes for up to two weeks in a row. He was forced to attend military drills, and when

13  he refused he was dragged across the grounds for hours at a time. Prison authorities force-

14  fed him on four occasions; on one of these occasions, authorities tied him down and

15  placed a tube down his throat for feeding, which was kept there for thirty-three hours.

16  Other Plaintiffs were beaten, slapped, and force-fed.

17  313.   Plaintiffs did not consent to these acts of touching. They were forcibly detained and

18  sent to reeducation through labor camps, where they were interrogated and tortured,

19  without being charged or tried. Further, they were also sent to prison camps following

20  sham trials in which they were not allowed to enter a "not guilty" plea, challenge the

21  legality of the charges against them, or have counsel be present during interrogations. The

22  unwanted touching occurred in these camps.

23  314.   Defendants knew that Chinese authorities intended to commit such acts on Falun

24  Gong members, and conspired with the Chinese authorities to purposefully and

25  intentionally provide the technology of Golden Shield to the Chinese authorities as the

26  only means by which Plaintiffs could be identified as Falun Gong practitioners and

27  detained for such acts to be committed on them.

28  315.   As a result of Defendants' conduct, Plaintiffs suffered injury, damage, loss, and

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

harm as a result of these unlawful acts of touching. In particular, Plaintiffs suffer from severe mental trauma and lingering physical effects such as heart damage and loss of movement.

316.    Defendants knew that Chinese government officials intended to use Golden Shield to identify, track, detain, and commit acts constituting battery against Plaintiffs. Defendants gave substantial assistance or encouragement to the CCP in carrying out these acts, and Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

317.    Cisco, operating out of its San Jose, California, headquarters, was actively involved in the allegations described herein, participating directly in the design and development of China's Golden Shield, which substantially contributed to the commission of battery against Plaintiffs.

318.    As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, irreparable harm and damages in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

*Assault*

(Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

and class members similarly situated, against all Defendants)

319.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

320.    Chinese CCP and Public Security officers used the Golden Shield technology, developed, implemented and maintained by Defendants to analyze identities and movements of Falun Gong practitioners and shared information with other state agents with the intent and as the primary means to facilitate the detention, interrogation and other forms of torture, and severe physical and mental abuse of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and degradation.

321.    Chinese Public Security officers and Office 610 officers engaged in such acts. For example, while at a reeducation through labor camp in 2002 Ivy He lost consciousness while being tortured, was slapped repeatedly, and during a police interrogation in

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

November 2001 she was forced to stand in a bucket of ice-cold water while ice was poured over her body. While in prison from 2003-2006, Plaintiff Charles Lee was forced to stand or sit in the same position for hours at a time on a daily basis, sometimes for up to two weeks in a row. He was forced to attend military drills, and when he refused he was dragged across the grounds for hours at a time. Prison authorities force-fed him on four occasions; on one of these occasions, authorities tied him down and placed a tube down his throat for feeding, which was kept there for thirty-three hours. Other Plaintiffs were beaten, slapped, and force-fed.

322.    Defendants knew that Chinese authorities intended to commit such acts on Falun Gong members who were detained, and Defendants conspired with those authorities and intentionally and purposefully provided the technology of Golden Shield to the Chinese authorities as the only means by which Plaintiffs could be identified as Falun Gong by CCP authorities, who then committed such acts on Plaintiffs. Such acts constituted an unlawful touching with the intent to harm or offend Plaintiffs.

323.    Plaintiffs did not consent to the touching. They were forcibly detained and sent to reeducation through labor camps being charged or tried. Further, they were also sent to prison camps following sham trials in which they were not allowed to enter a "not guilty" plea, challenge the legality of the charges against them, or have counsel be present during interrogations. The unwanted touching occurred in these camps.

324.    Plaintiffs suffered injury, damage, loss, and harm as a result of these unlawful acts of touching. In particular, Plaintiffs suffer from severe mental trauma and lingering physical effects such as heart damage and loss of movement.

325.    Defendants gave substantial assistance or encouragement to the CCP in carrying out these acts, and Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

326.    Cisco, operating out of its San Jose, California, headquarters, was actively involved in the allegations described herein, participating directly in the design and development of China's Golden Shield, which substantially contributed to the commission of assault

54

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

against Plaintiffs.

327.    As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, irreparable harm and damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### *False Imprisonment*

(Plaintiffs Ivy He, Liu Guifu, Charles Lee, Does I-VI,

and class members similarly situated, against all Defendants)

328.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

329.    The CCP and/or Chinese government, through its Public Security officers and police officers, used the Golden Shield technology, developed, implemented and maintained by Defendants to analyze identities and movements of Falun Gong practitioners and shared information with other state agents with the intent and as the primary means to facilitate the detention, interrogation and other forms of torture, and torture of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and degradation.

330.    Plaintiffs were detained in reeducation through labor camps without an arrest, charges, or trial for periods of time ranging from several days to several years.

331.    While being held in reeducation through labor camps without any legal process, Plaintiffs were subjected to unlawful treatment including torture, public degradation, and interrogation and other forms of torture, and were forced to work long hours in harsh conditions.

332.    Plaintiffs suffered injury, damage, loss, and harm as a result of being wrongfully detained without arrest, charges, or trial. In particular, Plaintiffs suffer from severe mental trauma and lingering physical effects such as heart damage and loss of movement.

333.    Defendants knew that Chinese authorities intended to commit such acts on Falun Gong members, and conspired with the Chinese authorities to intentionally and purposefully provide the technology of Golden Shield to the Chinese authorities as the

55

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

only or primary means by which Plaintiffs could be identified as Falun Gong and detained by CCP authorities.

334.    The use of the Golden Shield to track, identify, detain, and torture Falun Gong practitioners, directly caused their false imprisonment.

335.    Thus, Defendants knew that Chinese CCP officials intended to use Golden Shield to identify, track, detain, and commit acts constituting false imprisonment against Plaintiffs. Defendants gave substantial assistance or encouragement to the CCP in carrying out these acts, and Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

336.    Cisco, operating out of its San Jose, California, headquarters, was actively involved in the allegations described herein, participating directly in the design and development of China's Golden Shield, which substantially contributed to the commission of false imprisonment against Plaintiffs.

337.    As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, irreparable harm and damages in an amount to be proven at trial.

## **FOURTEENTH CAUSE OF ACTION**

### *Wrongful Death*

(Plaintiff Roe VIII, and class members similarly situated,

against all Defendants)

338.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

339.    The CCP and/or Chinese government, through its Public Security officers and police officers, committed the acts described herein that caused the wrongful death of Doe VIII. Plaintiff Roe VIII is the surviving relative and representative of the estate of Doe VIII.

340.    The use of the Golden Shield to track, identify, detain, and torture Doe VIII, directly caused his wrongful death.

341.    Thus, Defendants knew that CCP officials intended to use Golden Shield to

56

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1   identify, track, detain, and commit acts resulting in the wrongful death of Doe VIII.

2   Defendants conspired with the CCP to cause the death of Plaintiff Roe VIII; and gave

3   substantial assistance or encouragement to the CCP in carrying out these acts.

4   Defendants' conduct was a substantial factor in causing harm to plaintiff Roe VIII, the

5   surviving relative and representative of the deceased.

6   342.   Cisco, operating out of its San Jose, California, headquarters, was actively involved

7   in the allegations described herein, participating directly in the design and development of

8   China's Golden Shield, which substantially contributed to the death of Doe VIII.

9   343.   As a result of Defendants' conduct, Plaintiff Roe VIII, and class members similarly

10   situated, have suffered, and will continue to suffer, irreparable harm and damages in an

11   amount to be proven at trial. Plaintiff Roe VIII, and class members similarly situated, seek

12   damages herein for pecuniary loss resulting from loss of society, comfort, attention,

13   services and support and for the losses suffered by the deceased.

14   **FIFTEENTH CAUSE OF ACTION**

15   *Unfair Business Practices*

16   *(California Business & Professions Code § 17200 et seq.)*

17   (All Plaintiffs, and class members similarly situated,

18   against all Defendants)

19   344.   The allegations set forth in the above paragraphs are re-alleged and reincorporated

20   by reference as if fully set forth below.

21   345.   Plaintiffs allege that by engaging in the above-described acts and practices,

22   Defendants have committed one or more acts of unfair competition within the meaning of

23   California *Business and Professions Code* §17200, et. seq.

24   346.   Defendants' unlawful business acts and/or practices as alleged herein have violated

25   numerous laws and regulations, and said predicate acts are therefore per se violations of §

26   17200, et seq.  As described in more detail above, these predicate unlawful business acts

27   and/or practices include, but are not limited to, Defendants' solicitation of the contract to

28   design, manufacture, build, and supply the Golden Shield system to Chinese government

57

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx

1  authorities for the specific purpose of assisting the Chinese government in its intent to

2  identify, track, unlawfully detain, and torture Falun Gong practitioners including

3  Plaintiffs; by information and belief, Defendant Chambers' signature or countersignature

4  on Cisco's contracts in California to design, manufacture, build, and supply the Golden

5  Shield system to Chinese government authorities as required by Cisco's corporate bylaws;

6  Cisco's misrepresenting to United States authorities that its manufacture, assembly,

7  possession, and sale of the equipment and devices required to create and operate the

8  Golden Shield was lawful; Cisco's tailoring of its marketing tools to include the specific

9  goal of the equipment, to *douzheng* Falun Gong, and designing the custom surveillance

10  system to be used in Golden Shield in California.

11  347.   Defendants' actions as alleged herein, which include but are not limited to agreeing

12  to meet the goals of the CCP and Public Security Officers to eradicate Falun Gong, gave

13  Cisco an unfair competitive advantage over its competitors, who were also trying to break

14  into the Chinese market.

15  348.   Plaintiffs allege that as a direct result of Cisco's unlawful conduct alleged herein,

16  Plaintiffs lost income that they could not receive during the period of their detention.

17  Plaintiffs further lost income to the extent they were not able to continue working after

18  their release from detention due to the mental and physical injuries they received while in

19  detention. Plaintiffs are victims of Defendants' unlawful conduct, as herein alleged, and

20  have suffered injury in fact, and have lost money as a result of Cisco's unfair competition.

21  349.   Plaintiffs seek a permanent injunction enjoining Cisco from future unlawful

22  activity.  Plaintiffs allege that the unlawful acts and practices, as fully described herein,

23  present a continuing threat to members of the public to be misled and/or deceived by

24  Defendants as described herein.  Plaintiffs have no other remedy at law that will prevent

25  Defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

26  350.   This litigation will result in the enforcement of an important right affecting the

27  public interest.  Plaintiffs are informed, believe, and thereupon allege that this action

28  confers a significant benefit on the California public who have been misled and/or

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1  deceived by the unlawful businesses practices of Cisco.

2  351.    As a legal, substantial and direct result of the above-described pattern of conduct,

3  Plaintiffs are entitled to reasonable attorneys' fees pursuant to California *Code of Civil*

4  *Procedure* § 1021.5.

5

6  **<u>PRAYER FOR RELIEF</u>**

7  WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as

8  follows:

9        (a)    For certification of a class pursuant to Fed. R. Civ. P. Rule 23 (a) and (b)(3);

10        (b)    For compensatory damages including general and specific damages;

11        (c)    For punitive damages;

12        (d)    For injunctive relief enjoining Cisco from future unlawful activity;

13        (e)    For costs of suit, including attorney's fees;

14        (f)    For such other and further relief as the Court deems appropriate.

15

16  DATED: September 2, 2011        Respectfully submitted,

17            SCHWARCZ, RIMBERG, BOYD &

18            RADER, LLP

19

20          By:_____ /s/ K. Lee Crawford-Boyd_____

21            K. Lee Crawford-Boyd, Esq.
          Attorney for Plaintiffs

22            Terri E. Marsh, Esq.

23            HUMAN RIGHTS LEGAL FOUNDATION
          Attorney for Plaintiffs

24

25            Judith Brown Chomsky, Esq.
          LAW OFFICES OF JUDITH BROWN

26            CHOMSKY

27            To be admitted *pro hac vice*
          Attorney for Plaintiffs

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

60

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT
Case No. 5:11-cv-02449-JF-PSGx