1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Kathleen M. Sullivan (CA Bar No. 242261)
2    kathleensullivan@quinnemanuel.com
  555 Twin Dolphin Drive, 5th Floor
3  Redwood City, California 94065
  Telephone:    (650) 801-5000
4  Facsimile:    (650) 801-5100

5    Faith E. Gay (*pro hac vice*)
  faithgay@quinnemanuel.com
6    Isaac Nesser (*pro hac vice*)
  isaacnesser@quinnemanuel.com
7  51 Madison Avenue, 22nd Floor
  New York, New York 10010
8  Telephone:    (212) 849-7000
  Facsimile:    (212) 849-7100
9
  Attorneys for the Defendants
10

11              UNITED STATES DISTRICT COURT
12          NORTHERN DISTRICT OF CALIFORNIA
              SAN JOSE DIVISION
13

| | |
|---|---|
| 14  Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Liu Guifu, and those individuals similarly situated, | Case No. 5:11-cv-02449-JF |
| 15 | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CORRECTED FIRST AMENDED COMPLAINT** |
| 16         Plaintiffs, | |
| 17       v. | Hearing date: Jan. 17, 2012 Time: 10:00 a.m. |
| 18  Cisco Systems, Inc., John Chambers, Thomas Lam, Owen Chan, Fredy Cheung, and Does 1-100, | Action Filed: May 19, 2011 Judge: Hon. Jeremy Fogel Dept: Courtroom 3, 5th Floor |
| 19 | |
| 20         Defendants. | |

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION

2      TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3      PLEASE TAKE NOTICE that on January 17, 2012, at 10:00 am, or as soon thereafter as

4  the matter may be heard before the Honorable Judge Fogel, in Courtroom 3 of the United States

5  District Court of the Northern District of California, San Jose Division, located at 280 South 1st

6  Street, San Jose, CA 95113, Defendants Cisco Systems, Inc., John Chambers, Thomas Lam, Owen

7  Chan, and Fredy Cheung will and hereby do move the Court to dismiss Plaintiffs' Corrected First

8  Amended Complaint in its entirety.

9      The Motion will seek dismissal of the Plaintiffs' Corrected First Amended Complaint in its

10 entirety on the basis of the political question, act of state, and international comity doctrines, and

11 additionally because for multiple reasons each and every allegation either fails to state a claim on

12 which relief may be granted and/or fails to establish federal subject matter jurisdiction.

13     The motion is made pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and is based on this

14 Notice; the attached Memorandum of Points and Authorities; the Declaration of John (Hejun) Chu

15 In Support Of Defendants' Motion To Dismiss, dated August 4, 2011; the Court's file in this

16 matter, and any other evidence and argument as may be presented at the hearing on the Motion.

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 4

    A.    The Parties ................................................................................................ 4

    B.    Chinese Law And Falun Gong ................................................................. 4

    C.    The Complaint's Allegations Of Injuries Caused By The Chinese Government ............................................................................................... 5

    D.    The Complaint's Allegations Concerning The "Golden Shield" Project ................. 5

    E.    Cisco's Full Compliance With U.S. Policy Governing Trade With China ............. 7

ARGUMENT ....................................................................................................................... 9

I.    THE COMPLAINT SHOULD BE DISMISSED AS NONJUSTICIABLE ...................... 11

    A.    The Complaint Raises Nonjusticiable Political Questions ...................................... 11

    B.    The Complaint Challenges Acts Of State And Violates International Comity ....... 13

II.    THE ALIEN TORT STATUTE AND TORTURE VICTIM PROTECTION ACT CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM OR ALLEGE SUBJECT MATTER JURISDICTION ................................................. 16

    A.    The ATS Does Not Provide Jurisdiction Against Corporations ........................... 17

        1.    Corporate Liability Is Not Universally Accepted Under International Law ................................................................................ 17

        2.    Corporate Liability Is Displaced By The TVPA ........................................ 18

    B.    The ATS Does Not Provide Jurisdiction For Extraterritorial Claims ................... 20

    C.    The ATS And TVPA Claims Do Not Allege Acts By Defendants Acting Under Color Of State Law ................................................................ 22

    D.    The ATS And TVPA Claims Do Not Allege Acts By Defendants Warranting Secondary Liability ............................................................. 23

        1.    Aiding And Abetting Liability Is Unavailable Under The TVPA ............. 23

        2.    Aiding And Abetting Liability Is Unavailable Under The ATS ................ 24

3.     The Allegations Do Not Support Aiding And Abetting Liability ............... 25

4.     The Conspiracy Claims Fail ................................................................ 30

E.     Several Of The ATS Claims Are Otherwise Defective ............................................. 31

III.     THE STATE LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED ........... 36

A.     California Tort Law Does Not Apply Extraterritorially ........................................... 36

B.     The State Law Claims Are Untimely ....................................................................... 38

C.     The Allegations Do Not Support Aiding And Abetting Liability ........................... 41

IV.     THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED .............. 42

A.     The UCL Does Not Apply Extraterritorially ........................................................... 42

B.     The Allegations Of Lost Income Are Too Attenuated ............................................. 43

V.     THE ELECTRONIC COMMUNICATIONS PRIVACY ACT CLAIM SHOULD BE DISMISSED ............................................................................................................. 44

A.     The ECPA Does Not Apply Extraterritorially ........................................................ 44

B.     There Is No Private Right of Action Under ECPA § 2512 ...................................... 45

C.     The Cisco Products Are Not Devices Primarily Useful for Interception ................ 47

D.     The Allegations Concern Exempted "Normal Course of Business" Activity ......... 47

VI.     PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE CLAIMS AGAINST INDIVIDUAL CISCO EXECUTIVES ....................................................................... 48

CONCLUSION ...................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page**

### Cases

*A.D. v. Cal. Highway Patrol*,
No. C 07-05483, 2009 WL 733872 (N.D. Cal. Mar. 17, 2009) .......................................31, 38

*Abagninin v. AMVAC Chem. Corp.*,
545 F.3d 733 (9th Cir. 2008)..........................................................................3, 25, 33, 34

*Abdullahi v. Pfizer, Inc.*,
562 F.3d 163 (2d Cir. 2009) ........................................................................................22

*Abecassis v. Wyatt*,
704 F. Supp. 2d 623 (S.D. Tex. 2010) .........................................................................25

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
416 F.3d 1242 (11th Cir. 2005)....................................................................................32

*Aldana v. Fresh Del Monte Produce, Inc.*,
305 F. Supp. 2d 1285 (S.D. Fla. 2003).........................................................................34

*Allen v. City of Beverley Hills*,
911 F.2d 367 (9th Cir. 1990)..........................................................................................3

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005)..................................................................................11, 13

*Am. Elec. Power Co. v. Connecticut*,
131 S. Ct. 2527 (2011) .................................................................................................19

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) .......................................................................................................23

*Arabian v. Sony Elec., Inc.*,
No. 05-cv-1741. 2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ................................ 42-43

*Arar v. Ashcroft*,
585 F.3d 559 (2d Cir. 2009) ........................................................................................22

*Arnold v. IBM*,
637 F.2d 1350 (9th Cir. 1981) .....................................................................................22

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ............................................................10, 28, 29, 39, 48, 49, 50

*Atwell v. Gabow*,
Nos. 06-cv-2262, 07-cv-2063, 2008 WL 906105 (D. Colo. Mar. 31, 2008) ...........................49

*Aziz v. Alcolac*,
--- F.3d ---, 2011 WL 4349356 (4th Cir. Sept. 19, 2011) ................................25, 27, 30

*Baker v. Carr*,
   369 U.S. 186 (1962) .................................................................................................11, 12

*Bao Ge v. Li Peng*,
   201 F. Supp. 2d 14 (D.D.C. 2000) .................................................................................33

*Beagle v. Rite Aid Corp.*,
   *No. C 08-1517*, 2009 WL 3112098 (N.D. Cal. Sept. 23, 2009) ...................................40

*Beckett v. MasterCraft Boat Co.*,
   24 Cal. Rptr. 3d 490 (Cal. Ct. App. 2005) ....................................................................37

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................10, 28, 29, 39, 48, 49, 50

*Bigio v. Coca-Cola Co.*,
   448 F.3d 176 (2d Cir. 2006) ...........................................................................................13

*Bigio v. Coca-Cola Co.*,
   239 F.3d 440 (2d Cir. 2000) ...........................................................................................23

*Blazevska v. Raytheon Aircraft Co.*,
   522 F.3d 948 (9th Cir. 2008) .........................................................................................37

*Bowoto v. Chevron Corp.*,
   621 F.3d 1116 (9th Cir. 2010) ..................................................................................19, 24

*Bowoto v. Chevron Corp.*,
   557 F. Supp. 2d 1080 (N.D. Cal. 2008) .........................................................................32

*Bowoto v. Chevron Corp.*,
   No. C 99-02506, 2007 WL 2349343 (N.D. Cal. Aug. 14, 2007) ........................34, 35, 37

*Bowoto v. Chevron Corp.*,
   No C 99-02506, 2006 WL 2455761 (N.D. Cal. Aug. 22, 2006) .................................31, 34

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) .......................................................................................................22

*Cabello v. Fernandez-Larios*,
   402 F.3d 1148 (11th Cir. 2005) ................................................................................31, 34

*Casey v. U.S. Bank Nat'l Ass'n*,
   26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005) ....................................................................41

*Chen v. China Central Television*,
   No. 06-cv-0414, 2007 WL 2298360 (S.D.N.Y. Aug. 9, 2006) .........................................2

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) .......................................................................................................24

*In re Chiquita Bananas*,
   No. 08-01916-MD, 2011 WL 2163973 (S.D. Fla. June 3, 2011) ...................................37

*Corrie v. Caterpillar, Inc.*,
    403 F. Supp. 2d 1019 (W.D. Wash. 2005) .......................................11, 19, 22, 26, 27

*Diamond Multimedia Sys. v. Superior Court*,
    80 Cal. Rptr. 2d 828 (1999) ..................................................................................37

*Diaz-Barba v. Kismet Acquisition, LLC*,
    Nos. 08-cv-1446 et al., 2010 WL 2079738 (S.D. Cal. May 20, 2010) ....................37

*Dichter-Mad Family Partners, LLP v. United States*,
    707 F. Supp. 2d 1016 (C.D. Cal. 2010) ..................................................................10

*In re DIRECTV, Inc.*,
    No. C-02-5912, 2004 WL 2645971 (N.D. Cal. July 26, 2004) ...........................46-47

*DIRECTV, Inc. v. Nicholas*,
    403 F.3d 223 (4th Cir. 2005) .................................................................................46

*DIRECTV v. Robson*,
    420 F.3d 532 (5th Cir. 2005) .................................................................................44

*DIRECTV, Inc. v. Treworgy*,
    373 F.3d 1124 (11th Cir. 2004) .........................................................................46, 47

*Doe v. Exxon Mobil Corp.*,
    --- F.3d ---, 2011 WL 2652384 (D.C. Cir. July 8, 2011) .................18, 21, 24, 26, 27

*Doe v. Nestle, S.A.*,
    748 F. Supp. 2d 1057 (C.D. Cal. 2010)....................17, 18, 19, 22, 25, 26, 27, 30, 42

*Doe v. Qi*,
    349 F. Supp. 2d 1258 (N.D. Cal. 2004) ...............................................2, 4, 14, 15,16,  32

*Doe v. Rafael Saravia*,
    348 F. Supp. 2d 1112 (E.D. Cal. 2004) ..................................................................34

*Doe v. State of Israel*,
    400 F. Supp. 2d 86 (D.D.C. 2005) .........................................................................11

*In re Dynamic Random Access Memory Antitrust Litig.*,
    546 F.3d 981 (9th Cir. 2008)..................................................................................10

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ..............................................................................................21

*Enahoro v. Abubakar*,
    408 F.3d 877 (7th Cir. 2005)..................................................................................19

*In re Estate of Ferdinand Marcos*,
    25 F.3d 1467 (9th Cir. 1994) .................................................................................14

*Flomo v. Firestone Natural Rubber Co.*,
    643 F.3d 1013, (7th Cir. 2011)...............................................................................18

*Flowers v. Tandy Corp.*,
  773 F.2d 585 (4th Cir. 1985) ............................................................................46

*Forti v. Suarez-Mason*,
  672 F. Supp. 1531 (N.D. Cal. 1987) ..................................................................32

*Fox v. Cal. Physicians' Serv.*,
  No. A122803, 2009 WL 1163880 (Cal. App. April 30, 2009) ...................... 41-42

*F.T.C. v. Swish Marketing*,
  No. C 09-03814, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) ...................48

*Gantt v. County of Los Angeles*,
  No. CV 08-5979, 2008 WL 5382278 (C.D. Cal. Dec. 23, 2008) .........................38

*Gerard v. Ross*,
  251 Cal. Rptr. 604, 613 (Cal. Ct. App. 1988) ....................................................41

*Ginsburg v. Healey Car & Truck Leasing, Inc.*,
  189 F.3d 268 (2d Cir. 1999) ...............................................................................23

*Guinto v. Marcos*,
  654 F. Supp. 276 (S.D. Cal. 1986) .....................................................................14

*Gushi Bros. Co. v. Bank of Guam*,
  28 F.3d 1535 (9th Cir. 1994) ..............................................................................38

*Hilao v. Estate of Marcos*,
  103 F.3d 789 (9th Cir. 1996) ..............................................................................32

*Huynh v. Chase Manhattan Bank*,
  465 F.3d 992 (9th Cir. 2006) ..............................................................................40

*Inlandboatmens Union of Pacific v. Dutra Grp.*,
  279 F.3d 1075, 1083 (9th Cir. 2002) ....................................................................4

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990) .............................................................................................40

*Jane Doe I v. Wal-Mart Stores, Inc.*,
  No. CV 05-7307, 2007 WL 5975664 (C.D. Cal. Mar. 30, 2007) .........................43

*Joo v. Japan*,
  413 F.3d 45 (D.C. Cir. 2005) ..............................................................................11

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995) ...........................................................................11, 22

*Khulumani v. Barclay Nat'l Bank Ltd.*,
  504 F.3d 254 (2d Cir. 2007) ........................................................22, 24, 25, 27

*Kiobel v. Royal Dutch Petroleum Co.*,
  621 F.3d 111 (2d Cir. 2010) .......................................................................17, 18, 21

*Krishanthi v. Rajaratnam*,
    No. 09-CV-5395, 2010 WL 3429529 (D.N.J. Aug. 26, 2010)..................................25

*Lacey v. Maricopa County*,
    --- F.3d ---, 2011 WL 2276198 (9th Cir. June 9, 2011) .........................................10

*Liu Bo Shan v. China Constr. Bank Corp.*,
    2011 WL 1681995 (2d Cir. 2011)...................................................................28, 31

*Lorenzo v. Qualcomm Inc.*,
    No. 08-cv-2124, 2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) .............................43

*Maez v. Chevron Texaco Corp.*,
    No. C 04-00790 JSW, 2005 WL 1656908 (N.D. Cal. July 13, 2005)......................37

*Mamani v. Berzain*,
    --- F.3d ---, 2011 WL 3795468 (11th Cir. 2011)......................................13,35, 36, 49-50

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
    404 F. Supp. 2d 1214 (E.D. Cal. 2005) ................................................................42

*Miles v. Prunty*,
    187 F.3d 1104 (9th Cir. 1999)..............................................................................39

*Miller v. Rosenker*,
    578 F. Supp. 2d 67 (D.D.C. 2008) .......................................................................41

*Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*,
    177 F.3d 1142 (9th Cir. 1999)..............................................................................12

*Mohamed v. Jeppesen Dataplan, Inc.*,
    614 F.3d 1070 (9th Cir. 2010)..............................................................................31

*Montoya v. Regents of Univ. of Cal.*,
    No. 09-cv-1279, 2010 WL 2731767 (S.D. Cal. July 9, 2010) ...............................40

*Morrison v. National Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010)...................................................................................21, 44

*Murphy v. Wells Fargo Bank, N.A.*,
    No. 5:10-cv-05837, 2011 WL 2893069 (N.D. Cal. July 19, 2011)........................10

*N. Alaska Salmon Co. v. Pillsbury Council, Inc.*,
    162 P. 93 (1914) ..................................................................................................37

*Norwest Mort., Inc. v. Superior Court*,
    85 Cal. Rptr. 2d 18 (Cal. Ct. App. 1999) .............................................................42

*Oracle Corp. v. SAP AG*,
    734 F. Supp. 2d 956 (N.D. Cal. 2010) .................................................................42

*Pasquantino v. United States*,
    544 U.S. 349 (2005).............................................................................................12

*Piatt v. MacDougall,*
    773 F.2d 1032 (9th Cir. 1985) ................................................................................33

*Plaintiff A v. Deren,*
    349 F. Supp. 2d 1258 (N.D. Cal. 2002) ....................................................................2

*Potter v. Havlicek,*
    3:06-CV-211, 2008 WL 2556723 (S.D. Ohio June 23, 2008) ..................................46

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    582 F.3d 244 (2d Cir. 2009) .................................................................25, 26, 27, 31, 34

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    226 F.R.D. 456 (S.D.N.Y. 2005)........................................................................34, 35

*Rayburn ex rel. Rayburn v. Hogue,*
    241 F.3d 1341 (11th Cir. 2001)...............................................................................22

*Robinson v. Marshall,*
    No. 07-cv-1606, 2008 WL 2156745 (C.D. Cal. May 18, 2008) ..............................41

*Robinson v. United States,*
    586 F.3d 683 (9th Cir. 2009)...................................................................................10

*Roe I v. Bridgestone Corp.,*
    492 F. Supp. 2d 988 (S.D. Ind. 2007) .....................................................................37

*Romero v. Drummond Co., Inc.,*
    552 F.3d 1303 (11th Cir. 2008)...............................................................................22

*Romero v. Drummond Co., Inc.,*
    No. 03-0575, DE 329, Slip op. (N.D. Ala. Mar. 5, 2007) ........................................37

*Rosenblum v. Yates,*
    No. 09-cv-3302, 2011 WL 590750 (E.D. Cal. Feb. 10, 2011)..................................40

*Sale v. Haitian Ctrs. Council, Inc.,*
    509 U.S. 155 (1993) ................................................................................................21

*Sarei v. Rio Tinto, PLC,*
    625 F.3d 561 (9th Cir. 2010)...................................................................................20

*Sarei v. Rio Tinto, PLC,*
    550 F.3d 822 (9th Cir. 2008)...................................................................................20

*Sarei v. Rio Tinto, PLC,*
    487 F.3d 1193, 1208 (9th Cir. 2007)........................................................................13

*Sarei v. Rio Tinto, PLC,*
    456 F.3d 1069 (9th Cir. 2006)..................................................................................24

*Sarei v. Rio Tinto, PLC,*
    221 F. Supp. 2d 1116 (C.D. Cal. 2003)...................................................................32

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010).................................................................................9

*Smith v. Ratelle*,
    323 F.3d 813 (9th Cir. 2003)................................................................................40

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S. Dist. of Iowa*,
    482 U.S. 522 (1987)..............................................................................................13

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004).........................................11, 13, 15, 17, 18, 19, 24, 27, 32, 33

*Trajano v. Marcos*,
    978 F.2d 493 (9th Cir. 1992)................................................................................21

*U.S. ex rel. DeCesare v. Americare In Home Nursing*,
    757 F. Supp. 2d 573 (E.D. Va. 2010)....................................................................48

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936)..............................................................................................12

*United States v. Mandel*,
    914 F.2d 1215 (9th Cir. 1990)..............................................................................13

*United States v. Peterson*,
    812 F.2d 486 (9th Cir. 1987)................................................................................45

*United States v. Toscanino*,
    500 F.2d 267 (2d Cir. 1974).................................................................................45

*Viera v. Eli Lilly & Co.*,
    No. 1:09-cv-0495-RLY-DML, 2011 WL 2144413 (S.D. Ind. May 31, 2011) .................37

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) .............................................................................................13

*Walker v. Pacific Maritime Assoc.*,
    No. C 07-3100, 2009 WL 1068886 (N.D. Cal. Apr. 29, 2009)....................................39

*Weixum v. Xilai*,
    568 F. Supp. 2d 35 (D.D.C. Aug. 1, 2008) ............................................................2

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
    493 U.S. 400 (1990)..............................................................................................13

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006) ..............................................................................2

*Ye v. Zemin*,
    383 F.3d 620 (7th Cir. 2004)................................................................................2

*Zheng v. Yahoo! Inc.*,
    No. C-08-1068 MMC, 2009 WL 4430297 (N.D. Cal. Dec. 2, 2009) ...................44, 45, 48

**Statutes/Rules**

18 U.S.C. § 2511 .................................................................................................46

18 U.S.C. § 2512 ...............................................................................44, 45, 46, 47, 48

18 U.S.C. § 2520 ...................................................................................45, 46, 47

28 U.S.C. § 1350 ................................................................................... *passim*

28 U.S.C. § 1350, note ............................................................................ *passim*

42 U.S.C. § 1983 ...................................................................................22, 23

Pub. L. No. 101-246, 104 Stat 15 (1990) .................................................................7, 8

Pub. L. No. 106-286, 114 Stat. 880 (2000) ..............................................................9

15 C.F.R. Parts 730-774 (2010) .......................................................................8

15 C.F.R. § 742.7 (2010) ...............................................................................8

22 C.F.R. Parts 120-130 (2010) .......................................................................8

Fed. R. Civ. P. 8(a) ....................................................................................10

Fed. R. Civ. P. 44.1 ...................................................................................37

Cal. Bus. and Prof. Code § 17200 ...................................................................42

Cal. Bus. and Prof. Code § 17208 ...................................................................44

Cal. Civ. Proc. Code. § 335.1 ........................................................................38

Cal. Civ. Proc. Code. § 340(c) .......................................................................38

Cal. Civ. Proc. Code § 352.1(a) ......................................................................41

Cal. Civ. Proc. Code § 377.60 .....................................................................31, 38

**Other Authorities**

Restatement (Third) of Foreign Relations Law § 402 (1987).......................................36

Restatement (Third) of Foreign Relations Law § 702 (1986).......................................36

1968 U.S.C.C.A.N. 2178..............................................................................45

1990 U.S.C.C.A.N. 94-1, 94-3 .......................................................................7

Presidential Determination No. 90-21, 55 Fed. Reg. 23183 (1990)................................8

Revisions to the Commerce Control List To Update and Clarify Crime Control
    License Requirements, 75 Fed. Reg. 41078-01 (July 15, 2010) ................................8

Brief of the United States as Respondent Supporting Petitioner,
    *Sosa v. Alvarez-Machain*,
    No. 03-339 (U.S. Jan. 23, 2004), *available at* 2004 WL 182581 ...............................................20

Brief of the United States as Amicus Curiae,
    *Presbyterian Church of Sudan v. Talisman Energy, Inc*.,
    No. 07-0016 (2d Cir. May 15, 2007), *available at* 2007 WL 7073754 ..............................20, 24

Brief for the United States as Amicus Curiae in Support of Petitioners,
    *Am. Isuzu Motors, Inc. v. Lungisile Ntsebeza*,
    No. 07-919 (U.S. Feb. 11, 2008)........................................................................................24

Charlie Savage, U.S. Tries to Make It Easier to Wiretap the Internet,
    N.Y. Times, Sept. 27, 2010, *available at*
    *http://www.nytimes.com/2010/09/27/us/27wiretap.html*.........................................................29

Global Internet Freedom: Corporate Responsibility and the Rule of Law, Hearing
    Before the Subcomm.  on Human Rights and the Law of the U.S. Sen. Comm.
    on the Judiciary, 110th Cong. (May 20, 2008) (statement of Mark Chandler,
    Senior Vice President and General Counsel, Cisco Systems, Inc.)....................4, 6, 7, 16, 28, 29

# INTRODUCTION

In this action, Plaintiffs allege that they suffered brutal actions at the hands of Chinese police, prosecutors and prison guards by virtue of their participation in the practice of Falun Gong—and seek to attribute those unlawful actions to American technology company Cisco and four of its executives because Cisco sold routers, switches and other networking equipment and services (the same products and services that Cisco sells throughout the world) to entities in China.   Even as amended in the Corrected First Amended Complaint (the "Complaint" or "Compl."), these allegations are legally and factually baseless and should be dismissed.   For nearly twenty years, Cisco has helped deliver the benefits of information technology to millions of individuals in China—including Falun Gong practitioners themselves, whose religious activity "occurs almost entirely on the Internet" (Compl. ¶ 46).   Cisco's commercial transactions in China have been entirely lawful under U.S. trade policy and comply with all relevant export regulations imposed by the U.S. government.   These transactions have nothing to do with the injuries alleged to have been committed by Chinese authorities against Plaintiffs or any of the "many thousands" of other Falun Gong practitioners located throughout China who the Plaintiffs seek to represent on a classwide basis (Compl. ¶ 249).   Plaintiffs should not be permitted through this action to impose a de facto trade embargo on lawful sales in China of Cisco products that are the same as those Cisco sells throughout the world.   To grant the relief Plaintiffs seek would interfere with U.S. foreign policy as set by the Executive Branch and Congress.

This action is the latest volley in a long-running advocacy campaign seeking to put the Chinese Government's human rights record on trial in a U.S. courthouse.   The first targets of this litigation campaign were high-ranking officers of the Chinese government who had not personally committed acts of violence but allegedly were liable for policies sanctioning that violence.   These cases were generally withdrawn or dismissed under the Foreign Sovereign Immunity Act ("FSIA"), a statute reflecting the United States' established policy that the acts of foreign

governments ought not to be litigated in U.S. courts.[1]  The next suits were brought against officers and entities associated with Chinese state-owned enterprises—defendants one step further removed from actual incidents of physical harm.  This effort also has failed, mostly on FSIA grounds.[2]  Plaintiffs now assert claims against a U.S. corporation and its executives—defendants several steps further removed from the Chinese government and any alleged acts of violence.  This case, like its predecessors, should be dismissed as an improper use of the federal courts:

1.  At the threshold, the Complaint should be dismissed as nonjusticiable.  *First*, the Complaint raises political questions whose judicial resolution would interfere with the foreign policy set by the Executive Branch and Congress.  The United States maintains Most Favored Nation ("MFN") trading status with China.  And in response to the Tiananmen Square protests, Congress enacted legislation restricting certain sales to Chinese police agencies—but then and thereafter specifically ***declined*** to include routers or other standard internet equipment.  Cisco complies with all applicable U.S. laws governing exports to China.  This action should not be permitted to effect a judicial override of U.S. trade policy as determined by the political branches.  *Second*, under the act of state and international comity doctrines, this Court is an inappropriate forum in which to challenge the sovereign acts of the PRC.

2.  Even if otherwise justiciable, the Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA") claims should be dismissed for failure to state a claim or allege subject matter jurisdiction, for several independent reasons.  *First*, corporations may not be sued under these statutes.  *Second*, these statutes cannot provide relief for purely extraterritorial claims.  *Third*, the commercial relationship alleged between Cisco and its Chinese customers is not nearly close enough to create the state action required to support these claims.  *Fourth*, none of the Defendants may be sued for secondary liability because such relief should be held unavailable

---

[1]  *See Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004); *Weixum v. Xilai*, 568 F. Supp. 2d 35 (D.D.C. Aug. 1, 2008); *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2002); *Plaintiff A v. Deren*, 349 F. Supp. 2d 1258 (N.D. Cal. 2002); *Doe v. Xudong*, 04-cv-4097 (N.D. Ill. 2004); *Gang v. Zhizhen*, 04-cv-1146 (D. Conn. 2004); *Plaintiff A. v. Guangen*, 02-cv-0295 (D. Haw. 2002).

[2]  *See Chen v. China Cent. Television*, No. 06-cv-0414, 2007 WL 2298360 (S.D.N.Y. Aug. 9, 2006).

under these statutes and because the allegations fail to allege any facts that plausibly suggest that Defendants acted with the knowledge or purpose to facilitate the Chinese authorities' alleged actions. *Fifth*, portions of the Complaint fail to plead actionable international norms.

3.      The personal injury claims asserted under California state law also should be dismissed. *First,* these claims may not be asserted as to purely extraterritorial conduct. *Second*, the claims are barred by applicable statutes of limitations. *Third*, aiding and abetting liability is unavailable as to the claims as alleged.

4.      The Unfair Business Practices claim also should be dismissed. *First*, this body of law has no extraterritorial application. *Second*, Defendants' technology lacks any connection to Plaintiffs' alleged lost income.

5.      The Electronic Communications Privacy Act ("ECPA") claim  also should be dismissed. *First*, the ECPA has no extraterritorial application. *Second*, the section pleaded here provides no private right of action. *Third*, the claim fails to allege the requisite elements and *fourth,* the claim improperly seeks to assert liability for "normal course of business" activity.

6.      The claims against individual Cisco business executives also should be dismissed. There is no factual allegation to support the notion that Cisco's worldwide CEO, or the other high-ranking executives named as Defendants, had specific knowledge of the sales contracts at issue here, much less that these executives acted with the requisite purpose or knowledge.

Because these myriad deficiencies are separately and collectively fatal to the Complaint, they have not been cured by the Plaintiffs' effort at amendment and cannot be cured by any further amendment. Thus the Corrected First Amended Complaint should be dismissed with prejudice. Having already amended their Complaint in response to Defendants' arguments in their motion to dismiss the initial Complaint, the Plaintiffs should not be given yet another bite at the apple. *See Abagninin v. AMVAC Chem. Corp.*, 545 F.2d 733, 742 (9th Cir. 2008) (leave to amend ATS claims properly denied where "previous amendment failed to cure [the] deficiency," rendering further amendment futile); *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (a "district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint").

**FACTUAL BACKGROUND**

**A.     The Parties**

Plaintiffs are practitioners of Falun Gong, a movement that developed in China around 1992. (Compl. ¶ 47). By early 1999, an estimated 70-100 million people in China practiced Falun Gong. (*Id.* ¶ 47). Falun Gong is viewed by the Chinese Government as a "cult." (*See id.* ¶ 50).

Cisco is an American technology company that is in the business of manufacturing the routers, switches, and related hardware that make up the basic "plumbing" of the internet—the standard "pipes" through which data flows. *See Global Internet Freedom: Corporate Responsibility and the Rule of Law, Hearing Before the Subcomm. on Human Rights and the Law of the U.S. Sen. Comm. on the Judiciary*, 110th Cong., written statement at 1 (May 20, 2008) (statement of Mark Chandler, Senior Vice President and General Counsel, Cisco Systems, Inc.).[3]

**B.     Chinese Law And Falun Gong**

The practice of Falun Gong is illegal under Chinese law, and Chinese statutes set forth specific Falun Gong activities that are prohibited, *see* Declaration of John (Hejun) Chu In Support Of Defendants' Motion To Dismiss, dated Aug. 4, 2011 ("Chu Declaration"), ¶¶ 12-21, and specific penalties like imprisonment and forced labor for violations (*id.* ¶¶ 22-35). Such penalties are not unique to Falun Gong. (*Id.* ¶ 34). The PRC adopted these laws and penalties based on the view that Falun Gong "is not a religious belief or spiritual movement" but instead a "cult that … has seriously disrupted the law and order … by inciting … sabotage and suicide bombings."[4]

Although the Complaint alleges various acts of brutality and torture by Chinese government officials and leaders of the Chinese Communist Party ("CCP") (*see* Compl. ¶¶ 50-51,

---

[3]     Mr. Chandler's May 20 written statement is available at 2008 WLNR 9511892; his complete written and oral testimony is available through the U.S. Government Printing Office at *http://www.gpo.gov/fdsys/pkg/CHRG-110shrg45688/pdf/CHRG-110shrg45688.pdf* ("Chandler Testimony"). The testimony is specifically referred to in the Complaint (¶ 106). *See Inlandboatmens Union of Pacific v. Dutra Grp.*, 279 F.3d 1075, 1083 (9th Cir. 2002) (proper to "consider a document outside the complaint when deciding a motion to dismiss if the complaint specifically refers to the document and if its authenticity is not questioned").

[4]     *Doe v. Qi*, 349 F. Supp. 2d 1258, 1300 (N.D. Cal. 2004) (quoting Statement of the PRC Government advocating deference by U.S. courts to Chinese policy concerning Falun Gong).

54, 57-58), any such conduct is illegal under Chinese law (Chu Decl. ¶ 7), and no Chinese laws specific to Falun Gong authorize such conduct (*id.* ¶¶ 36-39).   The Complaint thus seeks a determination that the Chinese government and its law enforcement authorities are not following their own statutes and law enforcement protocols.

**C.     The Complaint's Allegations Of Injuries Caused By The Chinese Government**

Plaintiffs allege that they were arrested by the Chinese police, subjected to sham prosecutions at the hands of Chinese prosecutors and judges, and subjected to physical injury and other human rights violations while in the custody of Chinese government institutions as part of a national campaign to eradicate Falun Gong.   Doe I, Doe II, and Ivy He allege that Chinese police, special "Office 610" agents, and Public Security officers subjected them to various forms of police brutality, torture, forced labor and other wrongful acts.   (Compl. ¶¶ 135-163).   Plaintiffs Doe III, Doe IV, Doe V, Doe VI, Doe VII, Charles Lee, and Doe VIII allege they were detained between 2002 and 2007 and subjected to various forms of police brutality and other wrongful acts.   (*Id.* ¶¶ 165-224).   Doe VII's family has not had contact with her since summer 2006 and believes she may have died while in custody.   (*Id.* ¶ 207).   Doe VIII died in August 2002 while in custody at a detention center, allegedly due to beatings.   (*Id.* ¶ 224).   Plaintiff Liu Guifu alleges he was subject to multiple arrests, detentions and mistreatment.   (*Id.* ¶¶ 225-235).   Other Plaintiffs still detained alleged they suffer from physical assaults and deprivations.   (*Id.* ¶ 239).

None of these actions—all of which took place at Chinese prisons, labor camps, or detention centers—is alleged to have been planned or perpetrated by the Defendants.

**D.     The Complaint's Allegations Concerning The "Golden Shield" Project**

The Complaint alleges that Defendants helped design the "Golden Shield," an e-government project initiated by the Chinese government to increase central police efficiency, in order to enable Chinese public security personnel and Office 610 special agents (*id.* ¶¶ 65-66) "to enable and facilitate the suppression of dissident activity in China, specifically Falun Gong" (*id.* ¶ 73), and that Defendants provided training to Chinese authorities concerning the Golden Shield (*id.* ¶¶ 77, 94, 117).   The Complaint, even as amended, sets forth no particular facts to support the

conclusion that Cisco or its employees were consulted during the development or design of the Golden Shield project or had any interaction with the Chinese government in that process.[5]

The Complaint alleges that, beginning in 2001, "Public Security officers, CCP officials, and Office 610 agents monitored and analyzed information on Falun Gong practitioners gained through the Golden Shield and shared this information with other state agents to facilitate their identification, tracking, detention, torture and suppression."  (*Id.* ¶ 90).  The Complaint, even as amended, does not allege any particular facts to support the conclusion that Defendants knew or intended that the Golden Shield would be used for purposes other than the lawful apprehension of individuals suspected of violating Chinese law, or that Defendants knew or intended that Chinese government authorities would engage in any unlawful or brutal acts in the course of apprehending Falun Gong practitioners.  Several of the abuses alleged by Plaintiffs occurred years after the Golden Shield was implemented—for example, Doe VI alleges he was taken into custody "more than five years after the Golden Shield was completed and fully operational in Shandong Province." (*Id.* ¶ 193).

The Complaint alleges that Defendants' contributions to the Golden Shield enabled authorities to "identify"; "locate"; "log"; "profile"; "track"; "monitor"; "investigate"; and "surveil" individuals suspected of wrongdoing.  (*See*, *e.g.*, *id.* ¶¶ 60, 64-66, 74, 75, 77, 112-15). But the Complaint, even as amended, alleges no particular facts to support the conclusion that these capabilities were anything other than standard police activities to "*fight [] against crime.*" (*Id.* ¶ 120 (emphasis added)).  The testimony of Cisco Senior Vice President Chandler referred to in the Complaint (¶ 106) makes clear that the security and filtering features of Cisco products are generic and not customized for particular users:

---

[5]  Cisco does not sell products to end users like the Chinese government agencies named in the Complaint, but rather provides products to intermediaries such as system integrators and resellers.  As to services, Cisco provides only limited technical support, troubleshooting, and training to such intermediaries relating to the generic functioning and operation of Cisco products—for example, if a router will not power up, or is otherwise malfunctioning.  *See* Chandler Testimony at 17 ("We … provide service for our equipment so that it can be fixed if it is broken, and that is the type of service that we provide….").  Cisco did not sell consulting services directly to end users until at least 2005.

> First, Cisco sells the same products globally, built to global standards, thereby enhancing the free flow of information.
>
> Second, Cisco's routers and switches include basic features that are essential to fundamental operation of the Internet by blocking hackers from interrupting services, protecting networks from viruses.
>
> Third, those same features without which the Internet could not function effectively can, unfortunately, be used by network administrators for political and other purposes.
>
> Fourth, in this regard, Cisco does not customize or develop specialized or unique filtering capabilities in order to enable different regimes to block access to information.
>
> And, fifth, Cisco is not a service or content provider, nor are we a network manager who can determine how those features are used.

Chandler Testimony at 13.  As Mr. Chandler further explained, the technology at issue is the same "basic intrusion protection and site filtering that all Internet routing products contain, such as used by libraries to block pornography."  *Id.* at 14.

### E.    Cisco's Full Compliance With U.S. Policy Governing Trade With China

Recognizing the benefits of increased internet access in China and the need to draw a careful balance between those benefits and human rights concerns, the U.S. Congress and the Executive Branch have determined that the generic routers and other networking products at issue in this action may be sold to police agencies and others in China.  Specifically, following the Tiananmen Square protests of 1989, the Congress passed the Foreign Relations Authorization Act for Fiscal Years 1990-1991 (the "Tiananmen Square Sanctions Act.").  *See* Pub. L. No. 101-246, 104 Stat. 15 (1990).  The Act recites a series of detailed Congressional "findings" condemning the acts of the Chinese Government and others in connection with the events at Tiananmen Square, *id.* § 901(a) at 80; states that "it is essential that the United States speak in a bipartisan and unified voice in response to the events in the People's Republic of China," *id.* § 901(b)(3) at 81, and that the President should "continue to emphasize" human rights in discussions with China, *id.* § 901(b)(4) at 81;[6] and enacts a series of measures restricting trade with China, including—most

---

[6]    Even this assurance of cooperation between the political branches was insufficient in the view of the President, who noted in a signing statement that the Act's "legislatively mandated (footnote continued)

relevant here—a ban on the export of specified crime control or detection instruments or equipment to the PRC in the absence of express authorization and licensure, *id.* § 902(a)(4) at 83.[7]

The list of restricted crime control equipment discussed in the Tiananmen Act is maintained by the Executive Branch acting through the U.S. Commerce Department. *See* 15 C.F.R. § 742.7 (2010). The purpose of the list is to "support … U.S. foreign policy to promote the observance of human rights throughout the world." *Id.* § 742.7(a). The list focuses on weapons and other physical instruments of crime control, and does not include software and technology products. *See*, *e.g.*, *id.* §§ 742.7(a)(2) (shotguns); (a)(1) (police batons, whips, helmets, and shields) (referring to Export Control Classification Numbers listed in 15 C.F.R. Pt. 774, Supp. 1). The Commerce Department expressly remarked in a 2010 rule that it would ***not add software and technology*** products to the list, instead leaving for a

> subsequent proposed rule … potential expansion of [the list, including consideration of] … whether, and, if so, the extent to which biometric measuring devices, integrated data systems, simulators, and communications equipment should be added …; [and] the degree to which software and technology related to [already listed devices] should [themselves] be listed and how such software and technology should be described….

Revisions to the Commerce Control List To Update and Clarify Crime Control License Requirements, 75 Fed. Reg. 41078-01, 41078 (July 15, 2010).

U.S. trade policy further recognized that restrictions on the sale of certain designated products to Chinese entities should not bar a robust economic relationship with China with respect to other products when President George H. W. Bush reaffirmed China's MFN trade status just three months after passage of the Tiananmen Act. *See* Presidential Determination No. 90-21, 55 Fed Reg. 23183 (1990). That status was made permanent in legislation signed into law by

---

sanctions represent an unwise constraint upon the President's ability to conduct foreign policy." 1990 U.S.C.C.A.N. 94-1, 94-3, *available at* 1990 WL 285749, at *3.

[7]   The statute sets forth a series of harsher trade restrictions that Congress believed should be considered if the PRC's acts of repression were to "deepen[]." *Id.* § 901(c)(3), (4) at 83. These regulations are additional to a comprehensive U.S. regulatory regime governing the export of high technology products. *See* Export Administration Regulations, 15 C.F.R. Parts 730-774 (2010); International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 (2010).

1   President Clinton in 2000.  *See* Pub. L. No. 106-286, 114 Stat. 880 (2000).

2        In short, the Legislative branch has restricted trade with China in direct response to human

3   rights concerns; has set those trade restrictions at a level that Congress believes will optimally

4   advance United States policy; has explicitly determined not to adopt stricter trade limits; and in so

5   doing has explicitly recognized the need for coordination with the Executive branch in

6   effectuating the complex policy interests at issue.  The Executive branch, for its part, has

7   implemented the legislation at issue in a manner that generally excludes technology products for

8   use in crime control; and has at all relevant times with respect to the allegations of this litigation

9   expressly determined not to include any products that were allegedly supplied by Cisco, making

10  clear that, at present, sales of internet hardware and related items are entirely permissible.[8]

11       The Complaint nowhere alleges that Cisco has ever acted in violation of the foregoing

12  comprehensive U.S. legal and regulatory scheme enacted and enforced by the U.S. political

13  branches to govern trade with China.

14                                    **ARGUMENT**

15       The Complaint alleges heinous acts of torture and brutality **by the Chinese authorities**

16  toward Falun Gong members.  Defendants have no wish to minimize the seriousness of these

17  allegations, even though they are alleged to have been carried out by third parties wholly unrelated

18  to Cisco and even though the Plaintiffs are for the most part anonymous and unidentified here.

19  But the Complaint comes nowhere near to setting forth a legal or factual basis to link these

20  allegations **to Cisco and its executives** merely because Cisco sold to Chinese entities certain

21  generic, non-customized routers and related networking equipment—the same generic, non-

22  customized products that Cisco sells to entities around the world.  Even as amended, the

23  Complaint contains no factual allegation suggesting that Cisco acted in violation of any U.S. trade

24

25

26  _____
        [8]  Cisco's export control team, repeatedly praised by the U.S. Department of Commerce,
27  screens each of Cisco's two million transactions per quarter for compliance with these regulations.
    It is the policy of Cisco not to sell security cameras or other possible tools of surveillance to
28  Chinese governmental entities, even though it would be legal to do so.

regulation or with any purpose to aid Chinese authorities in engaging in conduct illegal under Chinese law.  The Complaint thus cannot survive a motion to dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  It requires "more than a sheer possibility that a defendant has acted unlawfully," and "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quotation marks and citation omitted).

Further, "mere conclusory statements" or "legal conclusions" do not suffice—"they must be supported by factual allegations."  *Id.* at 1949-50; *see also Lacey v. Maricopa County*, --- F.3d ---, 2011 WL 2276198, at *14 (9th Cir. June 9, 2011) (dismissing allegations that were "conclusory and devoid of 'sufficient factual matter'" and that provided insufficient "factual content" to support a "reasonable inference" of defendant's alleged knowledge).  In other words, "a court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact…."  *Murphy v. Wells Fargo Bank, N.A.*, No. 5:10-cv-05837, 2011 WL 2893069, at *1 (N.D. Cal. July 19, 2011).

"Dismissal for lack of subject matter jurisdiction is appropriate if the complaint … fails to allege facts sufficient to establish [such] jurisdiction."  *In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008).  Plaintiff bears the burden of establishing jurisdiction on this motion to dismiss.  *See Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).  Further, because a motion to dismiss on jurisdictional grounds is governed by the pleading rules of Fed. R. Civ. P. 8(a), "*Twombly* and *Iqbal* … state the proper standard for addressing the sufficiency of Plaintiffs' allegations with respect to … subject matter jurisdiction."  *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016, 1025 n.10 (C.D. Cal. 2010).

1   **I.     THE COMPLAINT SHOULD BE DISMISSED AS NONJUSTICIABLE**

2       Because the Complaint challenges internet equipment sales to Chinese entities that were

3 made in undisputed compliance with U.S. export laws and laws governing sales to China, it should

4 be dismissed at the threshold as implicating a nonjusticiable political question.  The Legislative

5 and Executive branches have enacted legislation and regulations that carefully balance the

6 Nation's policy of economic and political engagement with China against concerns about China's

7 respect for civil and human rights; Plaintiffs should not be permitted to seek a judicially enforced

8 trade embargo in conflict with those trade policies.  Moreover, because it challenges a set of

9 sovereign acts undertaken by the Chinese government in response to Falun Gong as a matter of

10 Chinese domestic policy, the Complaint should be dismissed as nonjusticiable under the act of

11 state and international comity doctrines.

12      **A.     The Complaint Raises Nonjusticiable Political Questions**

13       Article III and its prudential implications have long been construed to require dismissal as

14 a nonjusticiable political question of any claim that impinges unduly upon the reserved authority

15 of the political branches of the U.S. government.  The political question doctrine has particular

16 applicability to suits brought under the ATS and the TVPA.  It was explicitly noted by the

17 Supreme Court in *Sosa v. Alvarez-Machain*, which discussed it in the context of "a policy of case-

18 specific deference to the political branches."  542 U.S. 692, 733 n.21 (2004).  *See Alperin v.*

19 *Vatican Bank*, 410 F.3d 532, 556 (9th Cir. 2005); *id*. at 541 & n.4, 561-62 (affirming dismissal on

20 grounds of the political question doctrine, noting that the ATS was one of the bases for the suit);

21 *see also Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (with respect to the political question

22 doctrine in ATS/TVPA cases, the "preferable approach is to weigh carefully the relevant

23 considerations on a case-by-case basis").  Numerous other courts have dismissed ATS cases on

24 political question grounds.  *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 984 (9th Cir. 2007); *Joo*

25 *v. Japan*, 413 F.3d 45, 46 (D.C. Cir. 2005); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 111-13

26 (D.D.C. 2005).

27       The Complaint here warrants dismissal on several of the classic political question grounds

28 summarized in *Baker v. Carr*, 369 U.S. 186, 217 (1962).  *First*, the Complaint asks this Court to

decide upon matters "touching foreign relations," *id.* at 211—an area ripe for political question dismissal because it poses "the impossibility of deci[ding] without an initial policy determination of a kind clearly for nonjudicial discretion" and "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," *id.* at 217.  Here, the U.S. Legislative and Executive branches have developed and implemented detailed laws and regulations that govern the circumstances in which, in view of human rights concerns, U.S. corporations may sell crime control technology to the Government of China.  In so doing, the political branches have adopted a balanced approach to Chinese foreign policy by restricting the sale of certain crime control technologies to China while permitting the unrestricted sale of other products.[9]  American companies like Cisco are entitled to rely upon U.S. trade regulations expressly permitting sales to Chinese police agencies of internet infrastructure components that Congress and the Commerce Department have expressly chosen not to regulate.

*Second*, in view of these decisions by the political branches, an "about-face" permitting this litigation to proceed would create the "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*

*Third,* there are no "judicially discoverable and manageable standards" for resolving the issues in dispute.   *Id.*   This is particularly so because the Complaint alleges that the acts of wrongdoing are continuing on an ongoing basis and seeks relief on a classwide basis on behalf of every one of the allegedly "many thousands" of Falun Gong practitioners across China who has ever been "persecuted."  (Compl. ¶ 245, 248).

_____

[9]   *Cf. Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*, 177 F.3d 1142, 1144 (9th Cir. 1999) ("It is axiomatic that 'the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.'" (citation omitted)); *Pasquantino v. United States*, 544 U.S. 349, 369 (2005) ("[i]n our system of government, the Executive is 'the sole organ of the federal government in the field of international relations'" (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936))).

1    Because any one of the *Baker* criteria is independently sufficient to warrant dismissal, *see*

2    *United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990), this case merits dismissal as raising

3    nonjusticiable political questions.[10]

4              **B.        The Complaint Challenges Acts Of State And Violates International Comity**

5              The act of state doctrine "prevents U.S. courts from inquiring into the validity of the public

6    acts of a recognized sovereign power committed within its own territory."   *Sarei v. Rio Tinto,*

7    *PLC*, 487 F.3d 1193, 1208 (9th Cir. 2007).   It "reflects the concern that the judiciary, by

8    questioning the validity of sovereign acts taken by foreign states, may interfere with the

9    executive's conduct of American foreign policy."   *Id.* (citing *W.S. Kirkpatrick & Co. v. Envtl.*

10   *Tectonics Corp.*, 493 U.S. 400, 404 (1990)).   Under the doctrine, "an action may be barred if (1)

11   there is an official act of a foreign sovereign performed within its own territory; and (2) the relief

12   sought or the defense interposed [in the action would require] a court in the United States to

13   declare invalid the [foreign sovereign's] official act."   *Id.* (quoting *W.S. Kirkpatrick* at 405).

14             Similarly, the international comity doctrine permits courts to "defer to the laws or interests

15   of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted."   *Id.* at

16   1211 (citing *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S.*

17   *Dist. of Iowa*, 482 U.S. 522, 544 n.27 (1987)).   The doctrine asks whether "adjudication of [the]

18   case by a United States court would offend amicable working relationships with [a foreign

19   country]."   *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) (internal quotation marks

20   omitted).   As Justice Breyer noted in concurrence in *Sosa*, it is important for courts to ask

21   "whether the exercise of jurisdiction under the ATS is consistent with those notions of comity that

22   lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws

23   and their enforcement."   542 U.S. at 761.   *See also Mamani v. Berzain*,--- F.3d ---, 2011 WL

24   3795468, at *2 (11th Cir. 2011) ("We do not look at … ATS cases from a moral perspective, but

25   from a legal one.   We do not decide what constitutes desirable government practices.   We know

26

27        [10]    *See also Alperin*, 410 F.3d at 544 (Supreme Court "recently described these criteria as 'six
     independent tests'" (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality))).

28

1    and worry about the foreign policy implications of civil actions in federal courts against the

2    leaders (even the former ones) of nations.  And we accept that we must exercise particular caution

3    when considering a claim that a former head of state acted unlawfully in governing his country's

4    own citizens.").

5           Here, the Complaint at its core questions the validity of public acts taken by the sovereign

6    state of China within its own territory in its legislative, executive, and judicial response to Falun

7    Gong.  The Complaint challenges the PRC's determination that Falun Gong "is not a religious

8    belief or spiritual movement but an evil cult that seriously endangers the Chinese society and

9    people, and that it has seriously disrupted the law and order, and endangered social stability by

10   inciting lawless and disruptive acts including sabotage and suicide bombings."  *Doe v. Qi*, 349 F.

11   Supp. 2d 1258, 1300 (N.D. Cal. 2004) (quoting Statement of Government of PRC).  Moreover, the

12   Complaint challenges the PRC's decision to make the practice of Falun Gong illegal; to augment

13   the national internet infrastructure through the Golden Shield, which the Complaint alleges was

14   taken and implemented at high levels of the Chinese government with the aim of facilitating its

15   policy to outlaw Falun Gong; to prosecute Falun Gong practitioners; and to judicially impose

16   penalties on Falun Gong practitioners for their illegal acts.[11]   This Court cannot adjudicate

17   Plaintiffs' allegations without addressing such official state policies.  The act of state doctrine

18   exists to prevent precisely such judicial interference with a sovereign government's ongoing

19   practices and policies as applied to its own citizens.

20        [11]   Although the criminalization of disfavored views is anathema to conceptions of liberty
     under the U.S. Constitution, it is not uncommon in other nations to regulate dangerous or hateful
21   speech and conduct, such as in connection with Nazi sympathizers in Germany and France.  *See
     Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1221, 1227 (9th
22   Cir. 2006) (en banc) ("in July 1990 [France] passed [a law] which criminalized speech that denied
     the existence of the Holocaust or that celebrated Nazism," such that "Internet service providers are
23   forbidden to permit French users to have access to [banned] materials … [and] French users… are
     criminally forbidden to obtain such [internet] access") (reversing declaratory judgment that had
24   held unenforceable a French court order directing Yahoo! to remove criminalized speech from the
     internet); *Guinto v. Marcos*, 654 F. Supp. 276, 280 (S.D. Cal. 1986) ("However dearly our country
25   holds First Amendment rights, I must conclude that a violation of the First Amendment right of
     free speech does not rise to the level of such universally recognized rights and so does not
26   constitute a 'law of nations.'") (cited favorably in *In re Estate of Ferdinand Marcos*, 25 F.3d
     1467, 1475 (9th Cir. 1994)).
27

28

For just such reasons, this Court dismissed under the act of state doctrine claims for money damages brought by Falun Gong practitioners against Chinese government officials under the ATS and TVPA.  In *Doe v. Qi*, this Court held that the acts of the defendant government officials in persecuting Falun Gong practitioners rose to the level of an act of the PRC as a sovereign state. 349 F. Supp. 2d at 1294.  The Court then assessed the "implications for foreign relations" if the case were permitted to proceed.  *Id.* at 1296-1303.  The Court placed "serious weight," *id.* at 1298 (as suggested by *Sosa*, 542 U.S. at 733 n.21), on a statement of interest submitted by the U.S. Department of State stating that:

- adjudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong] … is not the best way for the United States to advance the cause of human rights in China....

- ... The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.

- We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy ...

- ... Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

- ... [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.

349 F. Supp. 2d at 1296-97 (quoting Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 7-8) (emphasis in original)).  The Court similarly considered a letter that the PRC had submitted through the U.S. Department of State, opposing adjudication:

> If the U.S. courts should entertain the "Falun Gong" trumped-up lawsuits, they would send a wrong signal to the "Falun Gong" cult organization and embolden it to initiate more such false, unwarranted lawsuits.  In that case, it would cause immeasurable interferences to the normal exchanges and cooperation between China and the United States in all fields, and severely undermine the common interests of the two countries.

*Id.* at 1300 (quoting PRC letter).  The court finally noted that the "continued existence of the accused government" weighed in favor of application of an act of state bar.  *Id.* at 1303-04 (noting

that "[v]irtually every case permitting a suit to proceed over the act of state objection advanced by an individual defendant involve [*sic*] former dictators, rulers or officials no longer in power").

Although the Defendants in this case are not government actors, adjudication will necessarily drag this court into assessing the merits of the sovereign acts of the PRC in responding to the threat it perceives from Falun Gong.  The concerns expressed by the U.S. State Department and the PRC are as relevant here as they were in *Qi* and similarly merit dismissal.

## II.   THE ALIEN TORT STATUTE AND TORTURE VICTIM PROTECTION ACT CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM OR ALLEGE SUBJECT MATTER JURISDICTION

Even if justiciable, the claims under the Alien Tort Statute and Torture Victim Protection Act fail because they are alleged against (a) corporations; (b) extraterritorial conduct; (c) purely private conduct; (d) with no purpose to aid and abet; and (e) under several inapplicable international law norms.  Each of these grounds is independently sufficient to warrant dismissal of the claims. The allegations in the Complaint are serious, and it is understandable that Plaintiffs have repeatedly sought recourse from the Chinese government and its officials—the *actual perpetrators* of the alleged violence—for the injuries at issue.  But the allegations do not support liability against Cisco, which merely engaged in arm's length transactions in the ordinary course of business in China, selling internet routers, switches, and related equipment in compliance with this Nation's laws and regulations governing trade in technology products and, in particular, trade with China in the aftermath of Tiananmen Square.  The equipment sold in China is the same equipment that Cisco sells in the United States and around the world.[12]  The Complaint alleges no facts suggesting that Cisco anticipated that the police officers who purchased such technology to assist in *lawfully* locating and apprehending citizens engaged in illegal Falun Gong practices, would then *unlawfully* subject those same individuals to false charges, false convictions, false

---

[12]   *See* Chandler Testimony, written submission at 3 ("Cisco does not customize, or develop specialized or unique filtering capabilities, in order to enable different regimes to block access to information. Furthermore, Cisco sells the same equipment worldwide.").

1    imprisonment and heinous physical injuries.  The ATS/TVPA allegations should be dismissed for

2    failure to state a claim or grounds for subject matter jurisdiction.

3        **A.      The ATS Does Not Provide Jurisdiction Against Corporations**

4            **1.      Corporate Liability Is Not Universally Accepted Under International**

5                 **Law**

6            The ATS claims against Cisco should be dismissed because the ATS requires as a

7    jurisdictional prerequisite that the alleged conduct be "committed in violation of the law of

8    nations," 28 U.S.C. § 1350, and there is no "binding customary rule," "accepted by the civilized

9    world," *Sosa*, 542 U.S. at 738, 725, that corporations can be held liable under customary

10   international law.  While there is now a split in the circuits on this question, the correct argument

11   (and the one the Ninth Circuit should adopt) precludes ATS liability against corporations because

12   only individuals and states are properly subject to international law norms actionable in U.S.

13   courts.   As the Second Circuit recently explained in holding that the ATS "does not provide

14   subject matter jurisdiction over claims against corporations," the principle of individual liability

15   for violations of international law "has been limited to natural persons—not 'juridical' persons

16   such as corporations—because the moral responsibility for a crime so heinous and unbounded as

17   to rise to the level of an 'international crime' has rested solely with the individual men and women

18   who have perpetrated it."  *Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111, 149, 119 (2d Cir.

19   2010).   Indeed, "[c]ustomary international law has steadfastly rejected the notion of corporate

20   liability for international crimes, and *no international tribunal has ever held a corporation liable*

21   *for a violation of the law of nations*."  *Id.* at 120 (emphasis added).

22           A district court in this Circuit reached the same conclusion in *Doe v. Nestle, S.A.*, 748 F.

23   Supp. 2d 1057 (C.D. Cal. 2010).  *Nestle*, now pending on appeal to the Ninth Circuit, held that

24                 corporations as such may not presently be sued under *Sosa* and the
                  [ATS].  There is no support in the relevant sources of international
25                 law for the proposition that corporations are legally responsible for
                  international law violations.   International law is silent on this
26                 question: no relevant treaties, international practice, or international
                  caselaw provide for corporate liability. Instead, all of the available
27                 international law materials apply only to states or natural persons.
                  *Sosa*'s minimum standards of definiteness and consensus have not
28                 been satisfied.

---

Case No. 5:11-cv-02449-JF
                                        MOTION TO DISMISS AMENDED COMPLAINT

*Id.* at 1143-44.  Moreover, as *Nestle* made clear, whether corporations should be potentially liable for violating international law is a matter best left for Congress to decide, and "to the extent that Congress has ever addressed the question of corporate liability for violating international law, it has explicitly refrained from extending liability beyond natural persons under the Torture Victim Protection Act." *Id.* at 1144.

While contrary to the holdings in *Kiobel* and *Nestle*, two circuits have recently held that corporations may be sued under the ATS, these decisions are incorrect and unpersuasive.  *See Doe v. Exxon Mobil Corp.*, --- F.3d ---, 2011 WL 2652384 (D.C. Cir. July 8, 2011); *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013 (7th Cir. 2011).  *Exxon* concedes that U.S. courts are bound by international law materials defining the *substance* of ATS claims, but wrongly contends that they may ignore international law materials defining the permissible *targets* of such claims.  As *Kiobel* correctly noted, international law specifies not only the elements of wrongdoing that comprise an ATS claim, but also who may be sued for such a claim.  *See Kiobel*, 621 F.3d at 118-19.  It is inappropriate to utilize "federal law … to fill the gaps [in] international law [where] international law provides sufficiently well-established norms."  *Nestle*, 748 F. Supp. 2d at 1079.

The Seventh Circuit's decision in *Flomo* is likewise incorrect to conclude that corporate ATS liability is available.  *Flomo* never undertakes the analysis required by *Sosa*—namely, whether corporate liability for international law violations "rest[s] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized" such as piracy, safe-conduct violations, and infringements of the rights of ambassadors, 542 U.S. at 725.  It rests instead on ahistorical economic policy reasoning.  Accordingly, *Exxon* and *Flomo* should be rejected in favor of the far better reasoning in *Kiobel* and *Nestle*, which correctly concluded that ATS liability is unavailable against corporations.  The ATS claims should be dismissed as against Cisco.

## 2.    Corporate Liability Is Displaced By The TVPA

Even if corporate liability were otherwise permissible under the ATS, the Complaint should be dismissed as against Cisco insofar as it alleges extrajudicial killing, torture, and cruel, inhuman, and degrading treatment ("CIDT") because any such claims under ATS jurisdiction are

displaced by the TVPA.  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speaks directly to the question at issue." *Am. Elec. Power Co. v. Connecticut,* 131 S. Ct. 2527, 2537 (2011) (quotation marks omitted).  The TVPA speaks directly to the question of whether and when extrajudicial killing and torture claims may be asserted, thereby displacing federal common law otherwise applicable under *Sosa* concerning the availability of such claims.  The TVPA by its terms permits suits only against "individual[s]" who commit torture or extrajudicial killing.  28 U.S.C. § 1350, note.

The Ninth Circuit has held that corporate liability is barred under the TVPA.  *See Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010) ("the [TVPA] does not apply to corporations").  Congress's decision to exclude corporations from liability under the TVPA should similarly operate as a bar against such liability under the ATS.  *See Enahoro v. Abubakar*, 408 F.3d 877, 884-85 (7th Cir. 2005) (noting that TVPA "occup[ies] the field" and thereby precludes ATS claims for torture and extrajudicial killing unless those claims satisfy the TVPA's requirements); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005), *aff'd on other grounds*, 503 F.3d at 977 (relying on *Enahoro* and holding that "[t]he [TVPA] provides the exclusive remedy for plaintiffs who allege extrajudicial killing under color of foreign law").[13] This holding as to torture is equally applicable to CIDT claims.  *See Nestle,* 748 F. Supp. 2d at 1077 (CIDT "is defined as acts … *which fall short of torture*…. The principal difference between torture and [CIDT] is the *intensity* of the suffering…" (quotation marks omitted, emphasis added).  Because corporate liability for extrajudicial killing, torture, and CIDT is unavailable under the TVPA, it cannot be imposed by federal common law under the authority of the ATS.

---

[13]   Moreover, the U.S. Senate's ratification of the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") was made subject to numerous qualifications that are incompatible with the maintenance of claims for torture and CIDT under the ATS.  These qualifications are reflected in the TVPA, which implements the CAT.  Congress has therefore spoken concerning the reach of international law as to torture, wrongful death, and CIDT, and the extent to which those claims are actionable in U.S. courts.  That determination displaces any federal common law remedy that courts have made available through the ATS.

**B.    The ATS Does Not Provide Jurisdiction For Extraterritorial Claims**

The ATS claims should be dismissed for the independent reason that they concern purely extraterritorial conduct and effects.  The Complaint alleges injuries suffered in China, at the hands of the Chinese police and justice system, using routers and other internet hardware located in China, which were allegedly sourced by Cisco employees operating in China.  As the Executive Branch of the United States has urged, the ATS should not be applied to such purely extraterritorial conduct.  *See* Br. of the U.S. as Resp. Supporting Pet'r, *Sosa v. Alvarez-Machain*, No. 03-339 (U.S. Jan. 23, 2004), *available at* 2004 WL 182581, at 8, 46-50 ("No cause of action may be inferred from [the ATS] based on the alleged conduct of aliens in foreign countries."); *id.* at 47 ("Nothing in [the ATS], or in its contemporary history, suggests that Congress contemplated that suits would be brought based on conduct against aliens in foreign lands."); Br. of the U.S. as Amicus Curiae, *Presbyterian Church of Sudan v. Talisman Energy, Inc*., No. 07-0016, at 5-12 (2d Cir. May 15, 2007) ("U.S. Talisman Br."), *available at* 2007 WL 7073754; *id.* at 7-8 ("There is no indication whatsoever that Congress intended the ATS to apply—or to authorize U.S. courts to apply U.S. law—to purely extraterritorial claims, especially to disputes that center on a foreign government's treatment of its own citizens in its own territory. Indeed, the recognition of such claims would directly conflict with Congress' purpose in enacting the ATS, which was to *reduce* diplomatic conflicts.").

Two Ninth Circuit judges have agreed:  In *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 840 (9th Cir. 2008), Judges Ikuta and Kleinfeld argued that, "in the absence of direction from Congress, we cannot read the ATS as authorizing an extension of jurisdiction to disputes lacking any nexus to United States territory, citizens, or interests."  *Id.* (dissenting from panel's failure to consider this issue).  Likewise, Judge Kleinfeld has argued that "[i]t is risible to think that the first Congress wrote the Alien Tort Statute intending to enable federal courts to adjudicate claims of war crimes committed abroad.  Were it otherwise, a French aristocrat who had escaped the guillotine and fled to Philadelphia could have sued French defendants in our newly organized federal courts, perhaps even Robespierre himself, and obtained an injunction commanding the bloody French revolutionaries to stop immediately."  *Sarei v. Rio Tinto, PLC,* 625 F.3d 561, 564 (9th Cir. 2010)

(dissenting from panel's failure to consider this issue).  *See also Exxon*, 2011 WL 2652384, at \*49 (Kavanaugh, J., dissenting) (text, purpose, history, and policy demonstrate that "ATS does not extend to conduct that occurred in foreign lands"); *Kiobel*, 621 F.3d at 142 n.44 (leaving question open, but holding "we very well could conclude that the ATS does *not* apply extraterritorially").

The strong presumption against extraterritorial application of U.S. statutes was recently reinforced in *Morrison v. National Australia Bank Ltd*., 130 S. Ct. 2869, 2878 (2010), which held that, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Because the text of the ATS "give[s] no clear indication of an extraterritorial application," *id.*; *see* 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."), *Morrison* compels the result that the ATS has no extraterritorial application to events like those alleged here, all of which took place in China.[14]

Application of this textual presumption is especially warranted here given the ATS's necessary impact on foreign affairs and international comity.  *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (presumption "has special force when we are construing … statutory provisions that may involve foreign and military affairs for which the President has unique responsibility"); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord"). This Court thus should dismiss the ATS claims against Cisco on the further ground that the ATS does not apply to purely extraterritorial conduct.[15]

---

[14]  Tag-along allegations concerning attenuated connections to Cisco's U.S. offices do not affect the extraterritoriality analysis.  *See Morrison*, 130 S. Ct. at 2884 ("[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.").

[15]  The Ninth Circuit's decision in *Trajano v. Marcos*, 978 F.2d 493, 500 (9th Cir. 1992), is not to the contrary, for it is based on an incorrect pre-*Sosa* understanding of the basis for ATS claims, and pre-dates the Supreme Court's decision in *Morrison*.  To the extent *Trajano* is construed as having ruled on extraterritoriality, it gets the analysis exactly backward—presuming extraterritoriality from the statute's silence, contrary to the instruction in *Morrison*.

Case No. 5:11-cv-02449-JF
MOTION TO DISMISS AMENDED COMPLAINT

1

2

**C.     The ATS And TVPA Claims Do Not Allege Acts By Defendants Acting Under
Color Of State Law**

3      The TVPA provides relief only for wrongful acts committed "under actual or apparent

4   authority, or color of law, of [a] foreign nation." 28 U.S.C. § 1350 note § 2(a).   Likewise the

5   customary international law norms actionable under the ATS are available only for wrongful acts

6   committed with state action (unless one of several narrow exceptions for "war crimes" and the like

7   applies, allowing application to private action).  *See Kadic*, 70 F.3d at 238-41.[16]

8      "In construing the term 'color of law' [in the TVPA context,] courts are instructed to look

9   to jurisprudence under 42 U.S.C. § 1983." *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (en

10  banc) (cited in *Nestle*, 748 F. Supp. 2d at 1118).  "Courts have also looked to [§ 1983] cases to

11  analogize from the 'color of law' requirement under [the ATS]." *Corrie*, 403 F. Supp. 2d at 1026

12  (citing *Arnold v. IBM*, 637 F.2d 1350, 1355-56 (9th Cir. 1981)).  "Color of law" requires a

13  relationship between the defendant and a state actor that is so close that the defendants' acts can

14  fairly be characterized as being taken jointly with the state, or are so intertwined with the state that

15  the acts of the state can be imputed to the defendant or vice versa.  *See*, *e.g., Brentwood Acad. v.

16  Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("[S]tate action may be found if,

17  though only if, there is such a close nexus between the State and the challenged action that

18  seemingly private behavior may be fairly treated as that of the State itself." (quotation marks

19  omitted)); *Abdullahi v. Pfizer, Inc*., 562 F.3d 163, 188 (2d Cir. 2009) ("A private individual will

20  be held liable under the ATS if he 'acted in concert with' the state, i.e., 'under color of law.'"

21  (quoting *Kadic*, 70 F.3d at 245)); *Romero v. Drummond Co., Inc.,* 552 F.3d 1303, 1317 (11th Cir.

22  2008) (private actor and the state must be in a "symbiotic relationship" "that involves the torture

23  or killing alleged in the complaint"); *Rayburn ex rel. Rayburn v. Hogue,* 241 F.3d 1341, 1348

24  (11th Cir. 2001) (A "symbiotic relationship" between a private actor and the government may

25  establish state action, but it must involve the "specific conduct of which the plaintiff complains."

26

27      [16]   Absent acts "committed during war or an armed conflict," even a claim for crimes against
humanity requires an allegation of state action.  *Khulumani v. Barclay Nat'l Bank Ltd*., 504 F.3d
254 (2d Cir. 2007) (citing *Kadic*, 70 F.3d at 244).

28

(quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)).  Merely contracting with a state does not in itself create the requisite symbiotic relationship to qualify as state action.  *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 448-449 (2d Cir. 2000) ("Section 1983 … does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law, but only on those who act under color of law." (quoting *Ginsburg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 273 (2d Cir. 1999))).

Here, the Complaint fails to allege any "close nexus" or "symbiotic relationship" between Defendants and the Chinese governmental actors who allegedly injured the Plaintiffs, nor any acts by Defendants "in concert" with or "intertwined with" those of the state.  The most that is (or could be) alleged is a commercial relationship whereby certain Cisco products were sold (through intermediaries) to governmental entities,[17] which then allegedly used those products during the commission of separate acts of wrongdoing some number of months or years later.  None of the Defendants can be said to have acted under color of state law, or as state actors.  The ATS and TVPA claims should therefore be dismissed.

**D.      The ATS And TVPA Claims Do Not Allege Acts By Defendants Warranting Secondary Liability**

**1.      Aiding And Abetting Liability Is Unavailable Under The TVPA**

In the Ninth Circuit, aiding and abetting claims may not be asserted under the TVPA: "Plaintiffs [argue] that they may sue … under the TVPA upon a theory of aiding and abetting. Plaintiffs contend that corporations can be found vicariously liable for torture they direct individuals to commit.  The TVPA, however, does not contemplate such liability."  *Bowoto v.*

---

[17]   Cisco has never sold products directly to end users in China.  Rather, Cisco sells to independently owned resellers and system integrators, who in turn transact with end users.  In many cases, Cisco transacts with a distributor, which in turn transacts with a reseller, which in turn transacts with an end user.  In those cases, Cisco is three steps removed from the end user.  It is ordinarily the role of resellers, systems integrators, and distributors, rather than Cisco, to design, develop, and implement hardware and software architectures and applications suited to the end user's needs.

1   *Chevron Corp.*, 621 F.3d at 1128 (quotations omitted).[18]   Plaintiffs can offer no reason to depart

2   from that authority.   Plaintiffs' aiding and abetting claims under the TVPA must be dismissed.

3                    **2.        Aiding And Abetting Liability Is Unavailable Under The ATS**

4              While some courts have held that aiding and abetting liability is available under the ATS,

5   *see*, *e.g.*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007); *Exxon*, 2011

6   WL 2652384, at *5, this Court should dismiss the Complaint's aiding and abetting claims under

7   the ATS in anticipation that the Ninth Circuit will correctly resolve the issue in favor of the

8   contrary view.[19]   The ATS, like the TVPA, does not by its terms provide for aiding and abetting

9   liability.   *See* 28 U.S.C. § 1350.   In *Central Bank of Denver, N.A. v. First Interstate Bank of*

10  *Denver, N.A.*, 511 U.S. 164 (1994), the Court reasoned that private rights of action for aiding and

11  abetting securities violations were impermissible absent express congressional authorization.   *See*

12  *id.* at 182-83 (noting that, in enacting a general criminal aiding and abetting statute, 18 U.S.C. § 2,

13  Congress "ha[d] not enacted a general civil aiding and abetting statute"). The reasoning of *Central*

14  *Bank* bars aiding and abetting claims here.

15             Indeed, *Central Bank* has added force in the ATS context, in light of *Sosa*'s admonition

16  that only a "modest number" of claims could be brought under the ATS without legislative

17  authorization, and that any "innovative" interpretations of the Act must be left to the legislative

18  process.   *See Sosa*, 542 U.S. at 720-21.   The Executive Branch has consistently argued that aiding

19  and abetting claims should be precluded on this view.   *See* U.S. Talisman Br. at 12-28 (arguing

20  aiding and abetting liability is unavailable under the ATS); Brief of the United States as Amicus

21  Curiae in Support of Petitioners, *Am. Isuzu Motors, Inc. v. Lungisile Ntsebeza*, No. 07-919, at 10-

22

23

---

24         [18]   *Exxon* reached the same conclusion.   *See Exxon*, 2011 WL 2652384, at *36 ("[A]uthorities

25  … indicating that Congress can provide for aiding and abetting liability absent direct liability, do
    not support the inference that Congress so provided in the TVPA.   Appellants point to no other
    provision in the TVPA that colorably provides for such liability.").

26         [19]   A panel of the Ninth Circuit has held that aiding and abetting claims are available under

27  the ATS, but that decision was vacated by the Ninth Circuit sitting en banc.   *Sarei v. Rio Tinto,*
    *PLC*, 456 F.3d 1069, 1078 (9th Cir. 2006), *vacated by* 499 F.3d 923 (9th Cir. 2007).

28

11 (U.S. Feb. 11, 2008), *available at* 2008 WL 408389 (same).  That is the correct position under *Sosa* and *Central Bank*.  The aiding and abetting allegations under the ATS should be dismissed.

### 3.    The Allegations Do Not Support Aiding And Abetting Liability

Even if aiding and abetting liability were generally available under the ATS or TVPA, the Complaint's secondary liability claims would still fail as a matter of law because the factual allegations are insufficient to support such liability here.

The prevailing view among courts to have considered the issue is that, to support a claim for aiding and abetting under international law, a plaintiff must allege that the defendant "(1) carrie[d] out acts that ha[d] a *substantial effect* on the perpetration of a *specific crime* [actus reus], and (2) act[ed] with the *specific intent* (i.e., *for the purpose*) of substantially assisting the commission of *that crime* [mens rea]." *Nestle*, 748 F. Supp. 2d at 1087-88 (emphasis added).  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (liability when defendant "(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime"); *Khulumani*, 504 F.3d at 277 (Katzman, J., concurring) (same); *Aziz v. Alcolac,*--- F.3d ---, 2011 WL 4349356 at *8 (4th Cir. Sept. 19, 2011) ("We [adopt] *Talisman*['s] analysis … as the law of this circuit"); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 654 (S.D. Tex. 2010) (same); *Krishanthi v. Rajaratnam*, No. 09-CV-5395, 2010 WL 3429529, at *7 (D.N.J. Aug. 26, 2010) (same).  The Ninth Circuit has already adopted a "purpose"—*i.e.*, "specific intent"—standard in the context of genocide claims.  *Abagnin v. AMVAC Chem. Corp.*, 545 F.3d 733, 738-40 (9th Cir. 2008) (customary international law imposes that standard despite an alternative "knowledge" standard established by one particular treaty).

The actus reus element requires a defendant to "do something more than aiding a criminal generally—the defendant must aid the commission of a specific crime." *Nestle*, 748 F. Supp. 2d at 1080-81 (quotations omitted).  That is, "the aider and abettor must do something more than commit acts that 'in some way' tenuously 'further[] … the common design' of a criminal organization…. [Such] generalized assistance is not enough: the assistance must be 'specifically directed'—i.e., bear a direct causative relationship—to a specific wrongful act, and the assistance

1  must have a substantial effect on that wrongful act." *Id.*  Relying on this standard, *Nestle*

2  dismissed allegations against an international corporation allegedly complicit in human rights

3  violations in the Ivory Coast, reasoning that only such actions as "provid[ing] the guns and whips

4  that were used to threaten and intimidate the Plaintiffs," or "provid[ing] training to the Ivorian

5  farmers about how to use guns and whips," rises to the level of "*conduct that gives rise to aiding*

6  *and abetting liability under international law*—conduct that has a substantial effect on a particular

7  criminal act." *Id.* at 1101.

8       The mens rea element erects a similarly high bar, requiring that the defendant act with the

9  "*purpose* of facilitating" wrongdoing.  *Id.* at 1082.  A defendant's *knowledge* that his or her

10  conduct might assist in the perpetration of wrongdoing is insufficient: "something more than mere

11  knowledge and assistance are required to hold commercial actors liable for third parties' violations

12  of international law." *Id.* at 1094 (discussing *Talisman*).  This conclusion rests on sound policy

13  principles.  For "if ATS liability could be established by knowledge of … abuses coupled only

14  with such commercial activities as resource development, the statute would act as a vehicle for

15  private parties to impose embargos or international sanctions through civil actions in United States

16  courts.  Such measures are not the province of private parties but are, instead, properly reserved to

17  governments and multinational organizations." *Talisman*, 582 F.3d at 264.

18       Thus, in *Corrie v. Caterpillar*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd on other*

19  *grounds*, 503 F.3d 974, 977 (9th Cir. 2007), the district court held that a bulldozer manufacturer

20  could not be sued for aiding and abetting the Israeli military in demolishing residences and

21  causing deaths and injuries to the residents.  Even if the defendant knew that the bulldozers would

22  be used to commit illegal acts, "[o]ne who merely sells goods to a buyer is not an aider and abettor

23  of crimes that the buyer might commit, even if the seller knows that the buyer is likely to use the

24  goods unlawfully, because the seller does not share the specific intent to further the buyer's

25  venture." *Id*. at 1027.[20]

26

27  _____

[20]   The D.C. Circuit's recent departure from the "purpose" standard as to aiding and abetting
28  under the ATS, and holding that "knowledge" is sufficient, is incorrect.  *Exxon*, 2011 WL
    (footnote continued)

1    The Fourth Circuit ruled similarly in *Aziz*.  There, Defendant allegedly manufactured a

2    chemical used in the production of mustard gas, and sold the chemical to Saddam Hussein's Iraqi

3    regime with the knowledge and purpose that it would used to commit genocide against Iraq's

4    Kurdish population.  *Aziz*, 2011 WL 4349356, at *1.  The Fourth Circuit held that the Complaint

5    failed to satisfy the "purpose" standard.  It did so even though the Complaint alleged that

6    Defendant "was aware that [the chemical] could be used to manufacture mustard gas," had been

7    "specifically warned' by the "U.S. Customs Service and U.S. State Department" that the chemical

8    was subject to export restrictions, and had in fact plead guilty in a prior proceeding to having

9    violated U.S. export regulations by making the specific sales at issue in the Complaint, which

10   involved the delivery of massive quantities of the chemical to Iraq through a known shell

11   corporation under otherwise suspicious circumstances.  *Id.* at *1-2.  Indeed, dismissal was held

12   appropriate even though "the U.N. Secretary General," "the governments of many countries," and

13   the "international news media" had reported on the Iraqi regime's use of mustard gas."  *Id.*

14   If the factual allegations in *Corrie* and *Aziz* were insufficient to satisfy the "purpose"

15   standard, then there can be no question that the much more attenuated allegations here are also

16   deficient.  The Complaint alleges no facts to suggest that Defendants acted with the purpose to

17   facilitate a specific act of wrongdoing.  At most, the Complaint alleges that Defendants had the

18   purpose of assisting Chinese authorities in locating, apprehending, and even prosecuting Falun

19   Gong practitioners.  (*See*, *e.g.*, Compl. ¶¶ 79).  Yet the mere act of assisting the police in

20   _____

21   2652384, at *18-19.  *Exxon* criticizes *Talisman* for failing to consider certain international law

     sources that arguably reflect a knowledge standard.  *Id.* at *18.  But *Talisman*, *Aziz, Nestle*, and

22   other decisions do acknowledge that some international law sources support a knowledge standard

     while *other* international law sources adopt a purpose standard; they simply conclude that, under

23   *Sosa,* "where there are a variety of formulations, the court should look to the formulation that is

     agreed upon by all—a lowest common denominator or a common 'core definition' of the norm."

24   *Nestle*, 748 F. Supp. 2d at 1080 (citing *Khulumani*, 504 F.3d at 277 n.12); *see id.* at 1082 ("The

     less-stringent 'knowledge' standard, although it has often been invoked, has not obtained universal

25   recognition and acceptance."); *Khulumani*, 504 F.3d at 277 n.12 (so holding); *Talisman*, 582 F.3d

26   at 259 (same); *Aziz*, 2011 WL 4349356, at *11 (same).  There is no basis to conclude that

     international law would *universally* adopt the knowledge standard.  Notably, *Nestle* addresses each

27   of the international law sources that *Exxon* contends went unacknowledged in *Talisman*.  *See*

     *Nestle*, 748 F. Supp. 2d at 1081-90 (discussing *Ohlendorf, Flick,* and *Tesch*).

28

1  apprehending a suspect is insufficient to satisfy the requirement of purpose to aid and abet a

2  human rights violation. *See Liu Bo Shan v. China Constr. Bank Corp.*, 2011 WL 1681995, at *4

3  (2d Cir. 2011) (summary order) (Plaintiffs "fail[ed] plausibly to allege that [Defendant China

4  Construction] Bank acted with the purpose that [Plaintiff] Liu be subjected to torture, cruel

5  treatment, or prolonged arbitrary detention by the police.").

6      The Complaint alleges no specific facts manifesting the Defendants' supposed "purpose"

7  to subject Falun Gong practitioners to alleged human rights violations, or even facts supporting an

8  inference of "knowledge."  As alleged in the Complaint, the Plaintiffs suffered physical injuries

9  perpetrated by CCP officials, Office 610 officials, Chinese Public Security officers, workers at

10 detention centers or prisons, or other Chinese governmental authorities.  (*See*, *e.g.*, Compl. ¶¶ 42,

11 132-235).  The Complaint does not contain any allegation that Defendants engaged in any of this

12 conduct.  Further, aside from conclusory allegations that Defendants' gave "substantial assistance

13 and encouragement" to Chinese authorities, that Defendants' conduct was a "substantial factor" in

14 causing harm to Plaintiffs, and that Defendants "knew" the Golden Shield would be used to

15 torture, persecute, and otherwise case injury to Plaintiffs, the Complaint does not contain a single,

16 specific *factual* allegation in support of aiding and abetting liability.  *See Iqbal*, 129 S. Ct. at 1949

17 (a complaint does not suffice "if it tenders naked assertions devoid of further factual

18 enhancements.") (quoting *Twombly*, 550 U.S. at 557, 570).  The allegation that Defendants

19 assisted in the development and manufacture of network infrastructure utilized by the Chinese

20 government in building the Golden Shield network cannot support a plausible inference under

21 *Iqbal* and *Twombly* that Defendants had the "purpose" or the "knowledge" to assist torture of

22 Falun Gong practitioners in Chinese prisons years later.  Nor do the vague allegations that Cisco

23 provided "antivirus software" and "security software."  Compl. ¶¶ 121, 72.[21]  Plaintiffs rely upon

24 _____

25 [21]  It is no accident that the Plaintiffs have made these allegations in vague fashion.  As the
   testimony cited in the Complaint makes clear, there is nothing unusual or surprising about the
26 provision of antivirus or security software:  "[T]he technology that is used to manage and protect
   against hackers or viruses is the same generic technology that filter or control Internet access by
27 children, or the illegal downloading of copyrighted material…  This technology is a customary
   part of network management software of all major suppliers of Internet equipment—Cisco's and
28     (footnote continued)

the "sheer possibility" of some connection between Defendants' conduct and Plaintiffs' injury, but "facts that are 'merely consistent with' a defendant's liability … stop[] short of the line between possibility and plausibility…." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

To the extent there are any specific factual allegations in the Complaint, those allegations at most suggest that Defendants acted with knowledge that the Golden Shield could be useful in facilitating the *lawful* activities of the Chinese police in suppressing crime of all varieties. The Complaint alleges that the Golden Shield was a surveillance system—a set of technologies that enabled Chinese law enforcement authorities to lawfully locate individuals engaged in illegal activities.[22]   Specifically, the Complaint variously alleges that the Golden Shield enabled authorities to "identify"; "locate"; "log"; "profile"; "track"; "monitor"; "investigate"; "surveil"; and thereby "apprehend"; "detain"; and "interrogate" individuals that the police suspect of wrongdoing—all standard police activities that would assist the authorities to legitimately "*fight [] against crime*" and "maintain social stability," including by way of "the suppression of [illegal] dissident activity."  (*See, e.g.*, Compl. ¶¶ 60, 64-66, 74, 75, 77, 112-115, 117-120 (emphasis added)).  Nothing in any of these allegations, and no factual allegation anywhere else in the Complaint, supports the factual leap that Plaintiffs urge—from an allegation that Defendants'

---

[its] competitors'—and is basic to network functionality."   Chandler Testimony, written submission at 2.   Thus, "there is no feasible way to manufacture equipment without these capabilities and it would not be desirable or sensible to do so.  The management of information flow by a customer cannot be prevented by Cisco unless we are to also prevent the originally intended use of this technology, which would expose the Internet to the full risks of inevitable daily attacks.  Networks attached to the Internet would literally stop working."  *See id.* at 3.

22   Such efforts are not unique to China; even in the United States, federal officials have expressed concern "that their ability to wiretap criminal and terrorism suspects is 'going dark' as people increasingly communicate online instead of by telephone," and have asked Congress "to require all services that enable communications—including encrypted e-mail transmitters… —to be technically capable of complying if served with a wiretap order."  Charlie Savage, *U.S. Tries to Make It Easier to Wiretap the Internet*, N.Y. Times, Sept. 27, 2010, *available at* http://www.nytimes.com/2010/09/27/us/27wiretap.html (noting that such a "mandate would include being able to intercept and unscramble encrypted messages").

technology assisted the police in their *lawful* duties, to an allegation that Defendants acted with the knowledge or purpose that Chinese authorities would use this technology for *unlawful* purposes.[23]

Indeed, the Complaint comes close to conceding that the Golden Shield played no role at all in the Plaintiffs' injuries, with its repeated formulaic allegation that authorities used the Golden Shield to "monitor, identify, track, and *eventually* detain and torture" suspects. (*See*, *e.g.*, *id.* ¶ 74 (emphasis added); ¶ 32 (discussing "CCP's purpose to identify, track, *and thereby* abuse and eliminate ... practitioners") (emphasis added)).  This is insufficient to support an allegation that Defendants had knowledge or the purpose to facilitate alleged secondary and tertiary downstream effects of the identification and tracking enabled by the Golden Shield.  Nor are allegations concerning the "suppression," "elimination," and "eradication" of the Falun Gong (*see id.* ¶¶ 32, 64, 117) enough to overcome this deficiency, for the suppression, elimination, and eradication of Falun Gong activity was the express policy of the Chinese Government.  The Complaint fails to allege that the Defendants knew that Chinese authorities intended to enforce this policy through unlawful means.

### 4.    The Conspiracy Claims Fail

The Complaint's conclusory allegation that Defendants are liable as co-conspirators should also be rejected, and such claims dismissed.  *First*, conspiracy liability is unavailable under the

---

[23]    The handful of news reports cited for the first time in the Amended Complaint do not alter this conclusion.  (Compl. ¶¶ 98, 102-103).  Stray news reports with unproven and anecdotal accounts of police misconduct are insufficient to impute to Cisco the purpose or knowledge that its products would be used to commit the specific acts at issue here.  The same is true of the other publications cited in the Amended Complaint.  *Id.*  The "knowledge" requirement would be rendered entirely meaningless if the mere existence of a State Department report were sufficient to make every participant in global commerce liable for aiding and abetting international law.  Any contention to the contrary was rejected in *Nestle,* which followed the majority rule in rejecting the "*specific* crime" at issue and "of the relationship between [the defendant's] conduct and the wrongful acts."  *Nestle*, 748 F. Supp. 2d at 1082-83.  That is, "[i]t is not enough... [to allege knowledge] ... that crimes were being committed," as Plaintiffs attempt to do here.  *Id.*  Instead, there must be knowledge that the Defendants' "acts or omissions *assisted* in the crimes."  *Id.  See also Aziz,* 2011 WL 4349356, at *1-2 (dismissing complaint on "purpose" standard notwithstanding news articles, state department warnings, U.N. reports, and the like).

1   ATS and TVPA for the reasons discussed above with regard to aiding and abetting.  *Second*,

2   Plaintiffs' conspiracy claims would require the same proof of mens rea as their claims for aiding

3   and abetting (*Talisman*, 582 F.3d at 260) and should be dismissed for the same reason.  *Third*,

4   even "assuming that the conspiracy claims are cognizable, they require proof of an agreement."

5   *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1085 n.7 (9th Cir. 2010).[24]   Here, as in

6   *Jeppesen,* there are no particular factual allegations of such an agreement.  Rather, "Plaintiffs'

7   allegations confirm that their conspiracy claims depend on proof of a covert relationship."  *Id.*[25]

8        **E.        Several Of The ATS Claims Are Otherwise Defective**

9        In addition to the defects discussed above, the Complaint fails to state a claim or establish

10   jurisdiction for its claims under the ATS for cruel, inhuman, and degrading treatment; forced

11   labor; and crimes against humanity.[26]  Plaintiffs' alleged injuries are serious, and Defendants well

12

13        [24]   The Ninth Circuit cited *Talisman*, 582 F.3d at 260 (holding that, under either international

14   law or domestic law, conspiracy liability under the ATS would require either an agreement or a
    criminal intention to participate in a common criminal design) and *Cabello v. Fernandez-Larios*,

15   402 F.3d 1148, 1159 (11th Cir. 2005) (conspiracy liability under the ATS requires proof that "two
    or more persons agreed to commit a wrongful act").

16        [25]   To the extent the Complaint asserts a conspiracy theory in support of its state law or other

17   claims, such claims should be dismissed for the same reasons identified above—the absence of an
    agreement to engage in a conspiracy.  Moreover, to the extent the Complaint asserts a direct

18   liability theory in support of any claim, such claims should be dismissed because there is no
    "factual allegation demonstrating [Defendants'] personal participation or willful direction" in the

19   physical acts of harm allegedly committed by Chinese authorities against the Plaintiffs.  *See Liu
    Bo Shan*, 2011 WL 1681995, at *3 (2d Cir. May 5, 2011); *id.* ("mere assertion that the Bank acted

20   'jointly' with the Chinese police is insufficient to establish *direct* liability for the alleged abuses");
    *Talisman*, 582 F.3d at 257 (construing allegation that defendant was "complicit in Government's

21   abuses," but not "personally engaged in human rights abuses," as an aiding and abetting claim).

22        [26]   In addition, the allegation that Roe VIII is a "family member" of Doe VIII (Compl. ¶ 220)

23   does not show that Roe VIII has standing to assert ATS or TVPA claims for extrajudicial killing.
    Defendants reserve the right to seek dismissal on this basis, if necessary, following resolution of

24   Plaintiffs' request to proceed anonymously.  *See* TVPA § 2(a)(2) (extrajudicial killing may only
    be asserted by "legal representative, or … person who may be a claimant in an action for wrongful

25   death."); *Bowoto v. Chevron Corp.*, No C 99-02506, 2006 WL 2455761, at *11 n.15 (N.D. Cal.
    Aug. 22, 2006) (inferring ATS standing requirement from TVPA, and dismissing ATS/TVPA

26   claims by siblings); *A.D. v. Cal. Highway Patrol*, No. C 07-5483, 2009 WL 733872, at *4 (N.D.
    Cal. Mar. 17, 2009) ("Only persons enumerated in [Cal. Civ. Proc. Code § 377.60] have standing

27   to bring a wrongful death claim.").

28

1  understand Plaintiffs' desire to seek redress.  But the Supreme Court in *Sosa*, like Congress in the

2  TVPA, expressed the need to maintain a high bar against recognition of international law norms

3  enforceable by private litigation in U.S. courts.

4         ***Cruel, Inhuman, and Degrading Treatment.***  To be actionable, ATS claims must "rest on

5  a norm of international character accepted by the civilized world and defined with a specificity

6  comparable to the features of the 18th-century paradigms [against violation of safe conducts,

7  infringement of the rights of ambassadors, and piracy]."  *Sosa*, 542 U.S. at 725.  Plaintiffs' claim

8  for cruel, inhuman, and degrading treatment ("CIDT") does not satisfy this demanding standard.

9  Since *Sosa*, the lone federal appellate court to have addressed the issue concluded that CIDT is not

10  actionable under *Sosa*'s "vigilant doorkeeping" standard.  *Aldana v. Del Monte Fresh Produce,*

11  *N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (affirming dismissal of CIDT claims).  Even

12  before *Sosa* limited the availability of ATS actions, at least three district courts in the Ninth

13  Circuit had held that CITD claims were not actionable.  *See Hilao v. Estate of Marcos*, 103 F.3d

14  789, 794 (9th Cir. 1996) ("The district court refused to instruct the jury on … claims for [CIDT]

15  … because it said that [the] standard for such a claim was 'too vague' [i.e.,] … not sufficiently

16  specific such that violations of that norm are actionable under the [ATS]."); *Sarei v. Rio Tinto,*

17  *PLC*, 221 F. Supp. 2d 1116, 1163 n.190 (C.D. Cal. 2003) ("[P]laintiffs have not demonstrated that

18  prohibitions against [CIDT] … constitute established norms of customary international law"),

19  *rev'd in part on other grounds*, 487 F.3d 1193 (9th Cir. 2007); *Forti v. Suarez-Mason*, 672 F.

20  Supp. 1531, 1543 (N.D. Cal. 1987) (CIDT "cannot qualify as a violation of the law of nations"

21  because there is no "universal consensus regarding" its availability and it is "unclear what

22  behavior falls within the proscription"), *reconsideration denied in relevant part*, 694 F. Supp. 707

23  (N.D. Cal. 1988).  Those decisions correctly state the rule.[27]  And even if CIDT were universally

24

25         [27]  Although some courts have held that CIDT is actionable under the ATS, many of these

26  decisions recognize that there is no clear definition of any such norm.  *See*, *e.g.*, *Bowoto v.*
   *Chevron Corp.*, 557 F. Supp. 2d 1080, 1093 (N.D. Cal. 2008) ("There is no widespread consensus

27  regarding the elements of [CIDT]."); *Qi*, 349 F. Supp. 2d at 1321 ("There does not appear to be a
   specific standard.").  These cases erroneously failed to recognize that this lack of clear definition is

28      (footnote continued)

accepted or capable of specific definition, such claims still would  not be actionable under the ATS because they are displaced by the TVPA.  *See* Part II.A.2 above.

*Forced Labor.*  The ATS claim for forced labor is also defective, because forced labor while in prison—the crux of Plaintiffs' allegations—is not an international law violation.  A Government does not commit an international law violation every time it forces an inmate to work while in prison:  "Although forced prison labor … may be condemnable in its own right, it is … not a state practice proscribed by international law."  *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 22 (D.D.C. 2000), *aff'd* 35 Fed. App'x 1 (D.C. Cir. 2002) (unpublished) (citing Restatement (Third) of Foreign Relations Law § 702 (1986)); *see* 1930 Forced Labor Convention of the Int'l Labor Org., art. 2 (excluding from definition of forced labor "[a]ny work or service exacted from any person as a consequence of a conviction ….").  Forced prison labor is also permitted under the Thirteenth Amendment to the U.S. Constitution.  *See Piatt v. MacDougall,* 773 F.2d 1032, 1035 (9th Cir. 1985) ("The Thirteenth Amendment does not prohibit involuntary servitude as part of imprisonment for a crime.").

Here, of the eight Plaintiffs who allege forced labor claims, five (Does I-V), concede that their labor was performed during service of a sentence of imprisonment.  (Compl. ¶ 279).  Although the remaining three (Plaintiffs He, Guifu, and Doe VI) allege that they were sentenced to reeducation in labor camps without charge (*id.* ¶ 278), *Bao* makes clear that reeducation terms of this nature are permissible administrative decisions governed by specific procedural requirements under Chinese law, none of which is disclaimed by the Complaint.  *See Chu Declaration*, ¶¶ 33-35.  Indeed, the Complaint notes that in at least one case the reeducation term was implemented in view of evidence presented by the prosecutors and police.  (Compl. ¶ 139).  Forced labor of this sort is not actionable under international law.

*Crimes Against Humanity.*  The Complaint fails to establish subject matter jurisdiction under the ATS for the claimed crimes against humanity.  Crimes against humanity are ordinarily

---

fatal under *Sosa.  See Abagninin v. AMVAC Chem. Corp*., 545 F.3d 733, 737-38 (9th Cir. 2008) (courts may not seek to "extend and redefine" norms).

reserved "only for the most heinous of crimes, such as murder and extermination, slavery, ethnic cleansing, and torture."  *Aldana v. Fresh Del Monte Produce, Inc*., 305 F. Supp. 2d 1285, 1300 (S.D. Fla. 2003), *aff'd in relevant part*, 416 F.3d 1242 (11th Cir. 2005); *see, e.g., Cabello*, 402 F.3d at 1148 ("Caravan of Death," in which a Chilean military unit "traveled to many cities in northern Chile where the military officers engaged in acts of extrajudicial killing, torture, and abuse"); *Sarei*, 221 F. Supp. 2d at 1126-51 (government blockade of medicine, clothing, and other essential supplies, resulting in more than 10,000 deaths over seven years); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1157 (E.D. Cal. 2004) (atrocities by military "death squads").

The Ninth Circuit has "assum[ed], without deciding" that a crime against humanity claim requires an allegation of murder, extermination, or other predicate acts, "when committed as part of a widespread or systematic attack" directed against any civilian population, with knowledge of the attack.  *See Abagninin*, 545 F.3d at 741 & n.5.  The Second Circuit recently assumed that a similar standard applies.  *See Talisman*, 582 F.3d at 257 (accepting the following definition as "serviceable":  "[c]rimes against humanity include murder, enslavement, deportation or forcible transfer, torture, rape or other inhumane acts, committed as part of a widespread [or] systematic attack directed against a civilian population").[28]

As this Court explained in *Bowoto v. Chevron Corp*., No. C 99-02506, 2007 WL 2349343, at *10 (N.D. Cal. Aug. 14, 2007), which granted summary judgment dismissing claims for crimes against humanity even though they involved "hundreds of deaths and thousands of injuries" to villagers in retribution for protests, *id.* at *10, "widespread" and "systematic" are demanding standards:  "The concept of 'widespread' may be defined as massive, frequent, large-scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims." *Id.* at *3 (quotation omitted); *see Presbyterian Church of Sudan v. Talisman Energy,*

---

[28]   Some courts have noted a more demanding standard, which requires an allegation of wrongdoing in the course of armed conflict.  *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 480 (S.D.N.Y. 2005) (citing Charter of the International Military Tribunal at Nuremberg); *Bowoto*, 2006 WL 2455752, at *3-5 (citing Statute of the International Criminal Tribunal for the Former Yugoslavia).  Because the Complaint fails even under the less demanding "widespread or systematic," standard, Defendants address that standard above, *arguendo*.  Defendants reserve the right to assert that the "armed conflict" standard applies.

1    *Inc.*, 226 F.R.D. 456, at 479-80 (S.D.N.Y. 2005) (a widespread attack is one conducted on a large

2    scale against many people).    Likewise, "the term 'systematic' requires a high degree of

3    orchestration and methodical planning." *Bowoto*, 2007 WL 2349343, at *4 (quoting Darryl

4    Robinson, *Defining 'Crimes against Humanity' at the Rome Conference*, 93 Am J. Int'l L. 43, 47

5    (1999)); *see also id.* ("The concept of 'systematic' may be defined as thoroughly organized and

6    *following a regular pattern* on the basis of a common policy involving substantial public or

7    private resources" (quotation omitted, emphasis added)); *Talisman*¸ 226 F.R.D. at 479-80

8    (systematic defined as thoroughly organized action, following a regular pattern of the basis of a

9    common policy; there must be some preconceived policy or plan).    The analysis properly takes

10   into account the scale of the alleged injuries in comparison to the broader context in which they

11   occurred.    For example, in *Mamani*, 2011 WL 3795468 at *1, 4, where steps were taken by

12   "military and police forces to restore order" in response to a "significant [city-wide] civil

13   disturbance" involving "thousands of people," the allegation that "70 [individuals were] killed and

14   about 400 injured … over about two months" was held insufficient to state a claim for crimes

15   against humanity against high-level military and police officials, notwithstanding allegations that

16   these defendants had "order[ed] … security forces, including military sharpshooters armed with

17   high-powered rifles and soldiers and police wielding machine guns, to attack and kill scores of

18   unarmed civilians."

19        The crimes against humanity claim here fails to meet this standard.    *First*, even granting

20   the Complaint's speculative and unsubstantiated allegation of "many thousands" of class members

21   (Compl. ¶ 245), the Complaint fails to allege "massive," "large scale action."    Rather it alleges

22   only that a small number of Falun Gong leaders were arrested and subjected to brutality while in

23   police custody and in jail.    As compared to the 70 to 100 *million* people who were allegedly

24   practicing Falun Gong across all of China in 1999 (*id.* ¶ 47), the Complaint alleges that 60 to 70

25   people were injured as part of the so-called "103 cases" (*id.* ¶ 132), and that one to five thousand

26   people were "arrested and charged" in connection with the so-called "Internet Cases" (*id.* ¶ 165)

27   together with an unspecified number of people in connection with the so-called "General

28

1    Surveillance Cases" (*id.* ¶ 225).  *Cf. Mamani*, 2011 WL 3795468, at *4-5 (70 deaths and 400

2    injuries insufficient to state a claim in context of police action against "thousands" of protesters).

3         *Second*, the Complaint also fails to allege "systematic" attacks against a civilian

4    population.  The Complaint makes no effort to allege individual or class claims on behalf of the 70

5    to 100 million Falun Gong practitioners purportedly practicing in China in 1999.  (*See id.* ¶ 245

6    (alleging "thousands" of class members)).  Rather, the Complaint alleges the type of targeting

7    based on particularized and "individualized suspicion of engaging in certain behavior" held

8    insufficient in *Bowoto*.  (*See id.* ¶ 51).  Moreover, contrary to the requirement of a "regular

9    pattern," Plaintiffs allege a variety of disparate injuries, some of which were allegedly suffered

10   while in police custody, some while in penal institutions, and some due to due process violations.

11   While any instance of police misconduct is profoundly disturbing and should not be condoned, it

12   devalues human rights law to make such allegations against Cisco and its employees, who did

13   nothing but sell internet routers to technology companies in China as permitted by this nation's

14   carefully considered export regulations.

15

16   **III.    THE STATE LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED**

17        The Complaint alleges four state law personal injury torts: battery (Count 11); assault

18   (Count 12); false imprisonment (Count 13); and wrongful death (Count 14) (collectively, the

19   "State Law Claims").  Each of these claims should be dismissed with prejudice.  *First*, the State

20   Law Claims are all extraterritorial in nature.  *Second*, the State Law Claims were not brought

21   within the requisite statute of limitations periods.  *Third*, Plaintiffs' allegations do not sufficiently

22   allege aider and abettor liability.

23        **A.     California Tort Law Does Not Apply Extraterritorially**

24        The State Law Claims allege harms committed in China, not California.  It is up to China,

25   not California, to define whether that conduct is actionable as a matter of domestic law.  *See*

26   Restatement (Third) of Foreign Relations Law § 402 (1987) (a nation state "has jurisdiction to

27   prescribe law with respect to ... conduct that, wholly or in substantial part, takes place within its

28   territory; [or] … conduct outside its territory that has or is intended to have substantial effect

-36-                                          Case No. 5:11-cv-02449-JF

1   within its territory").[29]  For this reason, courts routinely dismiss state law claims against conduct

2   committed entirely abroad.  For example, in *In re Chiquita Bananas*, No. 08-01916-MD, 2011 WL

3   2163973 (S.D. Fla. June 3, 2011), the court dismissed state law claims for assault, battery,

4   negligence and wrongful death against a U.S. corporation for injuries in Colombia of Colombian

5   victims at the hands of Colombian paramilitaries, reasoning that "the civil tort laws of Florida,

6   New Jersey, Ohio, and the District of Columbia do not apply to the extraterritorial conduct," *id.* at

7   \*45, and are not "matters of universal concern recognized by the community of nations," *id.*

8   (citing *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1024 (S.D. Ind. 2007); *Romero v.*

9   *Drummond Co.*, No. 03-0575, DE 329, Slip op. at 2 (N.D. Ala. Mar. 5, 2007)).

10          Because the State Law Claims assert torts[30] based on extraterritorial acts that have no

11   connection to California, this Court should summarily dismiss them.  *See Maez v. Chevron Texaco*

12   *Corp.*, No. C 04-00790 JSW, 2005 WL 1656908, at \*3 (N.D. Cal. July 13, 2005) ("Under

13   California law, there is a presumption against applying state laws extraterritorially to encompass

14   conduct occurring in a foreign jurisdiction." (citing *N. Alaska Salmon Co. v. Pillsbury Council,*

15   *Inc.*, 162 P. 93, 94 (1914); *Diamond Multimedia Sys. v. Superior Court*, 80 Cal. Rptr. 2d 828, 843

16   n.20 (1999)); *cf. Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008)

17   ("Uniformly, the cases invoke the presumption [against extraterritoriality] when applying a statute

18   would have the effect of regulating specific conduct occurring abroad.").[31]

19   _____

20   [29]   The Court need not determine whether Chinese law applies to the State Law Claims.  The
     Complaint does not indicate that Plaintiffs are pursuing tort claims under Chinese law, and
21   Plaintiffs have not filed a notice of reliance upon foreign law pursuant to Fed. R. Civ. P. 44.1.  *See*
     *Viera v. Eli Lilly & Co.*, No. 1:09-cv-0495-RLY-DML, 2011 WL 2144413, at \*1 (S.D. Ind. May
22   31, 2011) ("constru[ing] [the Complaint] to present only Indiana common law claims" because it
     did not assert tort claims under foreign law and plaintiffs had not filed a Rule 44.1 notice).

23   [30]   Assault, battery, and false imprisonment are common law torts, but California has a
24   wrongful death statute.  *See* Cal. Civ. Proc. Code § 377.60.  California courts have definitively
     established that this statute does not apply extraterritorially.  *See, e.g.*, *Beckett v. MasterCraft Boat*
25   *Co.*, 24 Cal. Rptr. 3d 490, 492-93 (Cal. Ct. App. 2005).

26   [31]   Cisco's presence in California does not alter the extraterritorial nature of Plaintiffs' claims,
27   as Plaintiffs do not allege a single act or effect in California in connection with these particular
     torts.  *See Diaz-Barba v. Kismet Acquisition, LLC*, Nos. 08-cv-1446 et al., 2010 WL 2079738, at
28   \*7 (S.D. Cal. May 20, 2010) ("[A]cts inside the United States that are merely preparatory or
     (footnote continued)

### B.    The State Law Claims Are Untimely

Even if this Court were to consider the State Law Claims, it should dismiss them as barred by applicable statutes of limitation.  Under California law, the statute of limitation is two years for assault, battery, and wrongful death, Cal. Civ. Proc. Code. § 335.1, and one year for false imprisonment, *id.* § 340(c).  The state law claims, filed on May 19, 2011, are untimely.

**Wrongful Death.**  The only Plaintiff alleging a claim of wrongful death is Roe VIII, on behalf of Doe VIII.  Doe VIII, however, is alleged to have died "[s]ometime between August 21 and August 30, 2002."  (Compl. ¶ 244).  Thus, the statute of limitations expired by August 30, 2004.  Because the claim was filed more than six years later, it must be dismissed as untimely.[32]

**False Imprisonment.**  Plaintiffs Ivy He, Liu Guifu, Charles Lee, and Does I-VI bring claims for false imprisonment.  Because false imprisonment has a one-year statute of limitations, a claim of false imprisonment accruing before May 19, 2010 is barred.

The statute of limitations for the false imprisonment claims of He, Guifu, Lee, and Does II, V, and VI unquestionably expired, as each had been released from custody more than one year prior to filing their claims.  (*See* Compl. ¶¶ 156, 163, 219, 235, 258e).  Further, a false imprisonment claim "does not necessarily [accrue] when a claimant is released from custody…. False imprisonment ends when legal process is initiated against the claimant.  Stated differently, a false imprisonment ends once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges." *Gantt v. County of Los Angeles*, No. CV 08-5979, 2008 WL 5382278, at *6 (C.D. Cal. Dec. 23, 2008) (quotation and citations omitted).  The Complaint alleges that Doe I was charged and tried in July 2003 (Compl. ¶ 139), Doe III was convicted at trial in late 2005 (*id.* ¶ 172), and Doe IV was convicted at trial in

---

incidental to the conduct at issue are, by themselves, insufficient to confer federal jurisdiction." (citing *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538 (9th Cir. 1994))).

[32]    Moreover, as discussed above (n.26), the allegation that Roe VIII is a "family member" of Doe VIII (Compl. ¶ 220) does not demonstrate that Roe VIII has standing to sue for wrongful death.  Defendants reserve the right to seek dismissal on this basis, if necessary, following resolution of Roe VIII and Doe VIII's request to proceed anonymously.  *See A.D. v. Cal. Highway Patrol*, No. C 07-5483, 2009 WL 733872, at *4 (N.D. Cal. Mar. 17, 2009) ("Only persons enumerated in [Cal. Civ. Proc. Code § 377.60] have standing to bring a wrongful death claim.").

2004 (*id.* ¶ 180).  Though the Complaint alleges they were either released after May 19, 2010 or not released at all, it also alleges that each was charged, tried, and convicted in a Chinese court of law at least five years before they filed their claims.  Because such legal process accrued prior to May 19, 2010, their false imprisonment claims are facially untimely.

*Assault and Battery.*  Claims of assault and battery carry a two-year statute of limitations.  Because the Complaint was filed on May 19, 2011, any such claim accruing before May 19, 2009 is barred.  For the same reasons articulated above, the claims of He, Guifu, Lee, and Does II, V, and VI are barred, as they do not allege any acts of assault or battery after May 19, 2009.

Likewise, Does I, III, and IV do not allege that any acts of assault or battery occurred after May 19, 2009; rather, they make only general, vague allegations in support of these claims.  (*See* Compl. ¶ 141 ("[i]n prison, [Doe I] was subjected to severe torture and forced labor"); *id.* ¶ 173 ("in prison, [Doe III] was subjected to severe beatings on several occasions and other forms of torture and persecution"); *id.* ¶ 183 ("[I]n prison, [Doe IV] was subjected to torture and persecution.  He was deprived of sleep for weeklong periods of time, beaten, and in other ways injured physically and mentally")).  These claims as plead do not provide notice of specific actionable assaults or batteries—there are no dates, descriptions, or anything other than general, conclusory allegations of injury.  *See Iqbal*, 129 S. Ct. at 1949 ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)).  Because these Plaintiffs have not alleged facts establishing plausible, concrete claims of assault and battery that occurred within the statutes of limitations sufficient to put Defendants on fair notice, these counts should be dismissed.

*Equitable Tolling.*[33]  Contrary to arguments made for the first time in the Amended Complaint, Plaintiff' delay in filing cannot be excused by "equitable tolling."  Equitable tolling "is unavailable in most cases."  *Walker v. Pacific Maritime Assoc.*, No. C 07-3100, 2009 WL 1068886, at *3 (N.D. Cal. Apr. 29, 2009) (quoting *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir.

---

[33]  Plaintiffs allege, without explanation, that "[n]o statute of limitations has begun to run" and make vague reference to "legal" tolling in a heading of the Complaint.  (Compl. ¶ 253).  Such unsupported conclusory statements should be disregarded by the Court.

1   1999)); *see also Smith v. Ratelle*, 323 F.3d 813, 820-21 (9th Cir. 2003) ("[e]quitable tolling is

2   applied 'sparingly'" (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).   As

3   relevant here, for equitable tolling to be available, "the plaintiff bears the burden of establishing

4   (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstances

5   stood in his way and prevented timely filing." *Montoya v. Regents of Univ. of Cal.*, No. 09-cv-

6   1279, 2010 WL 2731767, at *5 (S.D. Cal. July 9, 2010)); *see also Huynh v. Chase Manhattan

7   Bank*, 465 F.3d 992, 1004 (9th Cir. 2006) (plaintiffs must allege that "extraordinary circumstances

8   … made it impossible" to timely file).   This showing must be supported by specific factual

9   allegations in the pleading.  *See Beagle v. Rite Aid Corp.*, No. C 08-1517, 2009 WL 3112098, at

10  *11 (N.D. Cal. Sept. 23, 2009).  Plaintiffs cannot meet this burden for three reasons.

11      *First,* Plaintiffs offer no argument or factual allegation for why timely filing was

12  "impossible."  For example, Plaintiffs allege they feared "retribution against them, their family

13  and friends" (Compl. ¶ 255; *see also id.* ¶ 258e (Does II, V and VI live in China "in fear of further

14  abuse"); *id.* ¶ 258h (Plaintiff He feared "retaliation by Public Security" if she proceeded,

15  notwithstanding that she lived in Canada)), and also cite to concerns about China's "repression,

16  torture and other crimes against humanity" (*id.* ¶ 254), the "political climate in China" (*id.* ¶ 256),

17  and the persecution of Falun Gong lawyers (*id.* ¶ 257).  These are serious concerns.  However,

18  Plaintiffs allege in their Complaint that they continue to have the same fears and concerns today

19  (*id.* ¶ 255, 258), and indeed it is these very fears and concerns that underlie the Plaintiffs' request

20  to litigate this case anonymously and through next friends.  It is difficult to square Plaintiffs'

21  ability to file their Complaint today notwithstanding their concerns, with their contention that the

22  same concerns made it "impossible" to file the Complaint within the limitations period.

23      *Second*, in any event, generalized allegations of fear and concern, such as those here,

24  cannot support equitable tolling.  *See Rosenblum v. Yates*, No. 09-cv-3302, 2011 WL 590750, at

25  *3 (E.D. Cal. Feb. 10, 2011) (plaintiff "has merely made a generalized allegation that his fear of

26  retaliation made him delay in filing the petition, which is insufficient to meet his high burden" of

27  showing extraordinary circumstances).

28

1    *Third*, incarceration is not an "extraordinary circumstance" that justifies equitable tolling.

2    (*Cf.* Compl. ¶ 258a-h).  Under California law, statutes of limitation may be tolled for a maximum

3    of two years during incarceration.  Cal. Civ. Proc. Code § 352.1(a).  To toll such claims any longer

4    as a matter of course would undermine this statutory provision.  As one court observed,

5    "difficulties attendant on prison life" such as solitary confinement and lockdowns are not

6    "extraordinary circumstances," sufficient to indefinitely toll the statute of limitations.  *Robinson v.*

7    *Marshall*, No. 07-cv-1606, 2008 WL 2156745, at *3 (C.D. Cal. May 18, 2008).  Plaintiffs must

8    provide factual allegations for why filing claims while in prison was not only difficult, but

9    "impossible." They have not done so.[34]

10       **C.       The Allegations Do Not Support Aiding And Abetting Liability**

11       Even if this Court were inclined to consider Plaintiffs' State Law Claims, these claims do

12   not allege that Defendants directly engaged in acts of assault, battery, false imprisonment, or

13   wrongful death and fail to allege that Defendants *intended* to aid and abet Chinese police, guards,

14   judges, and other Chinese authorities in committing these torts.  Under California law, a defendant

15   can be held liable for aiding and abetting "only if he or she knew that a tort had been, or was to be,

16   committed, and acted *with the intent of facilitating the commission of that tort*."  *Casey v. U.S.*

17   *Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 407 (Cal. Ct. App. 2005) (citation omitted) (quoting

18   *Gerard v. Ross*, 251 Cal. Rptr. 604, 613 (Cal. Ct. App. 1988)); *see also Fox v. Cal. Physicians'*

19   *Serv.*, No. A122803, 2009 WL 1163880, at *4 (Cal. Ct. App. April 30, 2009) (unpublished)

20

---

21   [34]   Plaintiffs' additional bases for equitable tolling fare no better.  For example, Plaintiffs
     allege that Lee's claims should be tolled because he "continued to suffer depression and anxiety"
22   after his release in 2006.  (Compl. ¶ 258f).  Depression and anxiety, even if truly felt, does not
     warrant equitable tolling.  *Miller v. Rosenker*, 578 F. Supp. 2d 67, 72 (D.D.C. 2008) ("[s]uffering
23   from a 'severe panic disorder and depression' is not evidence of the type of 'total incapacity'
     necessary to warrant equitable tolling").  Nor does Lee explain why he is now able to file.
24   Likewise, Guifu's allegation that her claims should be tolled until she became a permanent
     resident because she feared being forced to return to China (Compl. ¶ 258g) cannot support
25   equitable tolling, as there is no basis in law that only permanent residents may file lawsuits or that
     non-permanent status is "extraordinary."   Finally, Plaintiffs' allegation that a May 20, 2008
26   hearing enabled them to learn of "the specific connection between the defendants' contributions to
     the Golden Shield and the abuses they suffered" (*id.* ¶ 259) does not warrant equitable tolling, as
27   the Complaint was not filed until three full years after that hearing.

28

---

1  ("[C]ivil … aiding and abetting necessarily requires a defendant to reach a conscious decision to

2  participate in tortious activity for the purpose of assisting … a wrongful act." (quotation omitted)).

3  The Complaint falls far short of this requirement.  It alleges only that Cisco, by providing

4  the Chinese government with technology used in building the Golden Shield, provided

5  "substantial assistance or encouragement to the CCP" in carrying out these acts and that

6  Defendants' conduct was a "substantial factor in causing harm to Plaintiffs."  (Compl. ¶¶ 316, 325,

7  335, 341).  Because Plaintiffs allege only intent to supply technology, and not any intent to

8  facilitate the commission of a specific tort, the State Law Claims warrant dismissal.  Moreover,

9  because there are multiple steps between Cisco's provision of general networking infrastructure to

10  entities selling to the Chinese government and the commission by Chinese police and prison

11  guards of torts of assault, battery, false imprisonment, and wrongful death, the Complaint fails to

12  allege that Cisco provided "substantial assistance."

13

14  **IV.    THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED**

15  The Court should dismiss with prejudice Plaintiffs' claim of unfair business practices,

16  brought under California Business and Professions Code § 17200 *et seq.* (the "UCL").  *First*, the

17  UCL does not apply extraterritorially.  *Second*, the UCL does not extend to the sort of injuries

18  alleged by Plaintiffs.

19  **A.    The UCL Does Not Apply Extraterritorially**

20  California courts have repeatedly recognized that California's UCL "does not support

21  claims by non-California residents where none of the alleged misconduct or injuries occurred in

22  California."  *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225

23  (E.D. Cal. 2005) (citing *Norwest Mort., Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18, 23 (Cal. Ct.

24  App. 1999); *see also Nestle*, 748 F. Supp. 2d at 1122 ("California courts have consistently held

25  that out-of-state plaintiffs may not bring Unfair Competition Law claims for out-of-state

26  misconduct or injuries."); *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 968 (N.D. Cal. 2010)

27  (dismissing unfair competition claim because "the UCL does not apply to out-of-state conduct that

28  does not cause injury in California"); *Arabian v. Sony Elec., Inc.*, No. 05-cv-1741, 2007 WL

627977, at *9 (S.D. Cal. Feb. 22, 2007) (dismissing UCL claim because "[t]here is a presumption against California law being given extraterritorial effect when the wrongful act as well as the injury occurred outside California").

Here, none of the Plaintiffs is a California resident.  Further, none of the alleged misconduct or injuries is alleged to have occurred in California.  While Plaintiffs allege in passing the presence of certain signatures on contracts in California and that a custom surveillance system was designed in California (Compl. ¶ 346), none of these acts is alleged to have caused Plaintiffs' injuries.  *See Nestle*, 748 F. Supp. 2d at 1122-23 (dismissing UCL claim for failing to "articulate any theory through which the child-laborer Plaintiffs were harmed by Defendants' California-based conduct").  Thus, Plaintiffs' UCL claim should be dismissed with prejudice.

### B.     The Allegations Of Lost Income Are Too Attenuated

Even if the Court were to entertain Plaintiffs' UCL claim, it should be dismissed because the relationship between Plaintiffs' purported injury and Cisco's conduct is far too "remote, attenuated and consequential."  *Lorenzo v. Qualcomm Inc.*, No. 08-cv-2124, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (dismissing UCL claim).  Plaintiffs allege that Cisco's sales of internet equipment "gave Cisco an unfair competitive advantage over its competitors" (Compl. ¶ 347) with the result that "Plaintiffs lost income that they could not receive during the period of their detention" (*id.* ¶ 348).  Plaintiffs are not competitors with Cisco, nor do Plaintiffs explain how Defendants' alleged acts may have provided Cisco with any competitive advantage.  Moreover, as the Complaint itself alleges, Plaintiffs lost income as a result of the independent actions of Chinese government actors, negating any UCL claim against Cisco.  *See Jane Doe I v. Wal-Mart Stores, Inc.*, No. CV 05-7307, 2007 WL 5975664, at *6 (C.D. Cal. Mar. 30, 2007) ("Plaintiffs do not allege facts showing that they lost money 'as a result of' Defendant's false or deceptive advertising. Plaintiffs do not even claim to be consumers of Defendant's products. Instead, Plaintiffs claim to have lost money as a result of the independent actions of their

1  employers, who were influenced by Defendant's actions."). The UCL claims here stretch the

2  notion of unfair competition beyond the bounds of recognition.[35]

3

4  ## V.    THE ELECTRONIC COMMUNICATIONS PRIVACY ACT CLAIM SHOULD BE

5  ## DISMISSED

6      The Court should dismiss Plaintiffs' claim brought under § 2512(1) of the ECPA. *First*,

7  the ECPA does not apply extraterritorially. *Second*, § 2512 does not afford a private right of

8  action. *Third*, the technology at issue is not designed so as to be "primarily useful for the purpose

9  of the surreptitious interception of wire, oral, or electronic communications," as required by the

10 ECPA. *Fourth*, Defendants satisfy the exception to ECPA liability afforded by § 2512(2).

11     ### A.    The ECPA Does Not Apply Extraterritorially

12     The Complaint does not allege that any "surreptitious interception of wire, oral, or

13 electronic communications" took place in the United States; rather, every act of surreptitious

14 interception associated with Defendants' technology is alleged to have occurred in China,

15 conducted by Chinese authorities. Because the only alleged acts that could give rise to an ECPA

16 claim occurred extraterritorially, Plaintiffs' ECPA claim should be dismissed. As discussed above

17 in Part II.B, there is a strong presumption against the extraterritorial application of statutes absent

18 a "clear indication" of congressional intent. *See Morrison*, 130 S. Ct. at 2877-78.

19     As this Court found in *Zheng v. Yahoo! Inc.*, No. C-08-1068 MMC, 2009 WL 4430297

20 (N.D. Cal. Dec. 2, 2009), this strong presumption applies against ECPA claims, for "no language

21 in the ECPA itself suggests an intent that its provisions apply to interceptions and disclosures

22 occurring in other countries," *id.* at *3, and "the available legislative history not only fails to

23 include any statement indicating Congress intended the ECPA to apply outside the United States,

24 the legislative history, specifically, Senate Report No. 99-541, clearly expresses Congress's intent

25 that the ECPA not apply to interceptions outside the United States," *id.* The court accordingly

26 _____

27 [35]   In addition, the statute of limitations for a UCL claim is four years. *See* California
   Business and Professions Code § 17208. For the reasons set forth in Part III.B, UCL claims that
28 accrued prior to May 19, 2007 are barred.

1   dismissed with prejudice allegations that Yahoo! disclosed certain information about Chinese

2   Yahoo! users to the Chinese government, which then used that information to injure those users.

3   *Id.* at *4.  In reaching this conclusion, the court reasoned:

4             Although it does not appear that any court has expressly considered
          whether the ECPA applies outside the United States, the Ninth
5         Circuit … has held that the version of the Wiretap Act in existence
          prior to its amendment by the ECPA had "no extraterritorial effect."
6         *See United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987)….
          In so holding, the Ninth Circuit cited two Second Circuit decisions,
7         each of which, in turn, cited the reasoning set forth in *United States
          v. Toscanino*, 500 F.2d 267 (2d Cir. 1974).  In finding that the pre-
8         ECPA version of the Wiretap Act had "no application outside of the
          United States," the Second Circuit, in *Toscanino*, relied on a
9         statement in the legislative history that "[t]he term 'wire
          communication,' as used in the [Wiretap Act], is intended to refer to
10        communications 'through our Nation's communications network,'"
          *see id.* at 279 (quoting 1968 U.S.C.C.A.N. 2178), and the fact that
11        the [Wiretap Act], in "prescribing the procedures to be followed in
          obtaining a wiretap authorization," made "no provision for obtaining
12        authorization for a wiretap in a foreign country." *See id.*

13  *Id.*  *Zheng*'s thorough analysis of the language and history of the ECPA and the Wiretap Act

14  similarly establish that Plaintiffs' ECPA claim cannot apply extraterritorially here, and this Court

15  should dismiss that claim with prejudice.

16        **B.        There Is No Private Right of Action Under ECPA § 2512**

17        Plaintiffs' ECPA claim should additionally be dismissed because Section 2512 of the

18  ECPA does not provide a private right of action.  Section 2512(1)(b)[36] provides as follows:

19             [A]ny person who intentionally … (b) manufactures, assembles,
          possesses, or sells any electronic… or other device, knowing or
20        having reason to know that [its] design … renders it primarily useful
          for the purpose of the surreptitious interception of wire, oral, or
21        electronic communications … shall be fined under this title or
          imprisoned not more than five years, or both.
22
23  18 U.S.C. 2512(1)(b).  Further, Section 2520(a) of the ECPA provides that "any person whose

24  wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation

25  of this chapter may in a civil action recover from the person or entity … which engaged in *that*

26  *violation* such relief as may be appropriate" (emphasis added).

27        _____

      [36]   Although the Complaint does not specify which subsection of § 2512(1) is at issue, its
28  allegations track subsection § 2512(1)(b).  The analysis here is the same under any subsection.

1    Most courts—including every Circuit to address the issue—agree that the plain language

2    of § 2520 does not afford a private right of action for violation of § 2512 for two reasons.  *First*,

3    civil liability under § 2520 attaches only to the person or entity that engaged in "that violation,"

4    *i.e.*, the person or entity that "intercepted, disclosed, or intentionally used" the plaintiff's

5    communication.  Because § 2512(1)(b) is limited to the manufacture, assembly, possession, or sale

6    of a device, but not the actual interception, disclosure, or intentional use of the device, no private

7    right of action against the manufacturer is available.  *Second*, § 2520 closely tracks the criminal

8    offenses set out in § 2511 (*i.e.*, the interception, disclosure, or intentional use of intercepted

9    communications), not those set out in § 2512; thus, § 2520 is intended to provide a private right of

10   action for § 2511 violations, but not § 2512 violations.

11   The court in *Potter v. Havlicek*, 3:06-CV-211, 2008 WL 2556723 (S.D. Ohio June 23,

12   2008), examined this issue in detail.  In *Potter*, defendant Deep Software was alleged to have

13   manufactured and sold a software product which, once installed, automatically records and stores

14   all activity on that computer.  *Id.* at *2.  In assessing whether Deep Software could be sued under

15   § 2512 for manufacturing and selling the software, the Court concluded that, "based upon a

16   reading of the current version of the plain language of section 2520," no such private right exists

17   under § 2512.  *Id.* at *5.  The court adopted the analysis of *DIRECTV, Inc. v. Nicholas*, 403 F.3d

18   223, 227 (4th Cir. 2005), which held that "[t]he express language of § 2520 is … not susceptible to

19   a construction which would provide a cause of action against one who manufactures or sells a

20   device in violation of § 2512 but does not engage in conduct violative of § 2511" (quoting

21   *Flowers v. Tandy Corp.*, 773 F.2d 585, 588-89 (4th Cir. 1985)).

22   *Potter* further noted that no circuit had found that a private right of action exists for

23   violation of § 2512.  *See id.*, 2008 WL 2556723, at *5-6 (citing *DIRECTV v. Robson*, 420 F.3d

24   532, 539 (5th Cir. 2005); *DIRECTV, Inc. v. Treworgy*, 373 F.3d 1124, 1127-28 (11th Cir. 2004)).

25   District courts concur that § 2512 does not provide a private right of action.  In *In re DIRECTV*,

26   *Inc.*, No. C-02-5912, 2004 WL 2645971, at *8 (N.D. Cal. July 26, 2004), for example, Judge Ware

27   held that, "[l]ike § 2511(1)(a), § 2512(1)(b) is a criminal statute.  Unlike § 2511(1)(a), however,

28   there is no parallel statute which provides a private right of action for violations of § 2512(1)(b).

1  … Therefore, the plain language of § 2520(a) does '[not] create a private right of action against a

2  person who possesses a device in violation of § 2512.'" (quoting *Treworgy*, 373 F.3d at 1129).

3  Because no private right of action exists for alleged violations of § 2512, Plaintiffs' ECPA claim

4  should be dismissed with prejudice.

5      **C.      The Cisco Products Are Not Devices Primarily Useful for Interception**

6          Plaintiffs' ECPA claim should be dismissed as well because none of the Cisco products at

7  issue is a "device" that is "primarily useful for the purpose of surreptitious interception" under

8  § 2512(1)(b).  Section § 2512(1)(b) applies to a person who "manufactures, assembles, possesses,

9  or sells any electronic, mechanical, or other device, knowing or having reason to know that the

10  design of such device renders it primarily useful for the purpose of the surreptitious interception of

11  wire, oral, or electronic communications."   Although the Complaint contains conclusory

12  allegations that the Golden Shield was used by Chinese authorities to identify Falun Gong

13  practitioners and that Defendants supposedly knew that the Golden Shield would ultimately be

14  used in this manner, Plaintiffs offer no factual allegations that the technology at issue itself was

15  *primarily* useful for the purpose of surreptitious interception.   To the contrary, as the Initial

16  Complaint acknowledged, the technology's primary usefulness was to provide China with

17  fundamental infrastructure "to keep the Chinese internet up and running."   (¶ 74(1)).  Plaintiffs

18  concede as much, alleging, for example, that Defendants created "[a]n international internet

19  gateway system with a small number of physical entry points into the Chinese network, called

20  'gateways,' and the high level of capacity required to keep the Chinese internet up and

21  running…."  (*Id.*).  Even if it were true that Chinese authorities used Cisco's technology in part to

22  identify Falun Gong practitioners, the Complaint does not and cannot allege that this was Cisco's

23  primary purpose in selling internet equipment in China.

24      **D.      The Allegations Concern Exempted "Normal Course of Business" Activity**

25          Finally, even if the allegations were actionable under ECPA, Defendants fall within the

26  exemption afforded by § 2512(2).  This provision states in relevant part that it is not unlawful for

27  "a provider of wire or electronic communication service or [its] … employee … *in the normal*

28  *course of the business*…, [to]sell any … device knowing or having reason to know that [its] design

1   … renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or

2   electronic communications."  18 U.S.C. § 2512(2)(a).  Here, even if Defendants manufactured or

3   sold a device that was primarily useful for surreptitious interception, Defendants nonetheless

4   provided such electronic communication services in the normal course of their business.[37]

5

6   **VI.    PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE CLAIMS AGAINST**

7   **        INDIVIDUAL CISCO EXECUTIVES**

8         The Court should dismiss Plaintiffs' claims against Cisco's CEO John Chambers and

9   Cisco executives Thomas Lam, Owen Chan, and Fredy Cheung, because the Complaint fails to

10  allege a single fact to suggest that any of these high-ranking executives at Cisco had any

11  knowledge of the wrongful acts alleged in the Complaint, much less any purpose to assist them.

12        For example, the Complaint alleges that Chambers, as Cisco's CEO, directs and supervises

13  Cisco's operations in China (Compl. ¶ 26) and that he met with Jiang Zemin while the Golden

14  Shield was being developed (*id.* ¶ 28).  These allegations do not give rise to a plausible claim that

15  the CEO of Cisco is individually liable for the human rights violations alleged in the Complaint, as

16  the mere fact of a meeting with a particular party establishes nothing about what was said there or

17  done as a result.  *See Iqbal*, 129 S. Ct. at 1950 ("where the well-pleaded facts do not permit the

18  court to infer more than the mere possibility of misconduct," the complaint has not shown the

19  pleader is entitled to relief); *U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d

20  573, 587 (E.D. Va. 2010) (allegations of CEO's position, coupled with authorization to sign

21  documents, "fall far below the threshold for surviving a motion to dismiss"); *F.T.C. v. Swish*

22  *Marketing*, No. C 09-03814, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) (under *Iqbal* and

23  *Twombly*, "conclusory assertions of authority—untethered to virtually any supportive facts—do

24  not support an inference of [CEO]'s involvement").  Chambers's alleged actions are so far

25

26  _____

27  [37]   As in *Zheng*, 2009 WL 4430297, at *4, if "plaintiffs' [UCL] claim … is based on the
    theory that defendants violated the ECPA, the [UCL] claim likewise is subject to dismissal with

28  prejudice" for the reasons set forth in Part V.

1    removed from any plausible claim of liability, that his inclusion as a defendant in this lawsuit is

2    little more than a transparent attempt to garner publicity for Plaintiffs' lawsuit.

3        The same is true of Plaintiffs' allegations against Chan, Lam, and Cheung.  Chan is alleged

4    to be a top-level executive at Cisco working on Cisco's China operations, who worked with

5    Chinese Public Security in marketing, designing, and implementing the Golden Shield in China.

6    (Compl. ¶¶ 30-31).  Lam is alleged to be a top-level executive at Cisco who authorized Cisco's

7    Golden Shield operations under the authority of Chan and Chambers.  (*Id.* ¶ 34).  And Cheung is

8    alleged to be a "high level" executive who "directly oversaw much of Cisco's work on Chinese

9    Public Security-related projects in China" (*id.* ¶ 36), and has either "authored or directly overseen

10   the authors"—no more specifics are given—of presentations which recognize the PRC's legal

11   interest in apprehending Falun Gong participants (*id.* ¶ 38).  However, aside from these conclusory

12   assertions of authority and otherwise vague allegations, the Complaint is devoid of any supportive

13   facts that give rise to a plausible claim against Chan, Lam, or Cheung for the unlawful acts alleged

14   to have been conducted by third-party Chinese authorities.  *See Atwell v. Gabow*, Nos. 06-cv-

15   2262, 07-cv-2063, 2008 WL 906105, at *9 (D. Colo. Mar. 31, 2008) ("[L]egal conclusions

16   parading as 'facts' … have no place in a Rule 12(b)(6) analysis under *Twombly*.").

17        Allegations that Chan, Lam, or Cheung helped to design or market the infrastructure of the

18   Golden Shield, without a single factual allegation beyond pure speculation of their participation in

19   acts of persecution and abuse of Falun Gong practitioners, fail to satisfy the plausibility standard

20   articulated in *Iqbal* and *Twombly*.  *See Iqbal*, 129 S.Ct. at 1951 (describing as conclusory and

21   therefore insufficient allegations that "petitioners 'knew of, condoned, and willfully and

22   maliciously agreed to subject [Plaintiff]' to harsh conditions of confinement 'as a matter of policy,

23   solely on account of [his] religion, race, and/or national origin'" and that one defendant was a

24   "principal architect" of and another was "'instrumental' in adopting and executing" the policy at

25   issue (internal citations omitted)). The Eleventh Circuit recently dismissed ATS claims on this

26   basis, holding that plaintiffs had not alleged "true factual allegations" as required by *Iqbal* and

27   *Twombly*, in a suit alleging wrongdoing by government officials, even where the complaint

28   alleged that Defendants "met with military leaders [and] other ministers in the … government to

plan widespread attacks involving the use of high-caliber weapons against protesters" and "knew or reasonably should have known of the pattern and practice of widespread, systematic attacks against the civilian population by subordinates under their command."   *Mamani,* 2011 WL 3795468, at *4-5.

If the allegations in *Mamani* were insufficient to satisfy *Iqbal* and *Twombly*, then the allegations here must be held insufficient as well.  The claims in *Mamani* were dismissed because "national leaders at the top of the long chain of command" (*id.* *5) were too far attenuated from the actual acts of alleged physical violence to support a plausible claim, but here Plaintiffs' proposed chain of liability is even longer—extending not just to "national leaders at the top of the long chain of command," but several steps beyond to a U.S. corporation that allegedly assisted and conspired with those national leaders, and even further to the CEO and other executives of that company.  In short, "Plaintiffs … base their claims on allegations that defendants knew or should have known of wrongful violence taking place and failed in their duty to prevent it.  Easy to say about leaders of nations but *without adequate factual support of more specific acts by these defendants*, these 'bare assertions' are 'not entitled to be assumed true.'"  *Id.* at *4.  The same is even more clearly true of corporate defendants many steps removed from the Chinese government.

Accordingly, the individual claims against Defendants John Chambers, Owen Chan, Thomas Lam, and Fredy Cheung should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Corrected First Amended Complaint should be dismissed with prejudice in its entirety.


DATED:    New York, New York
          September 23, 2011

                    QUINN EMANUEL URQUHART &
                        SULLIVAN, LLP


                    By:   /s/ Kathleen M. Sullivan

1

Kathleen M. Sullivan
Faith E. Gay

2

Isaac Nesser

3

51 Madison Avenue, 22d Floor,
New York, New York  10010-1601

4

(212) 849-7000

5

*Attorneys for the Defendants*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's ECF System.

Dated:  September 23, 2011

    /s/ Todd Anten
    Todd Anten