1  KATHRYN LEE BOYD, ESQ. (SBN 189496)
       lboyd@srbr-law.com
2  RAJIKA L. SHAH, ESQ. (SBN 232994)
       rshah@srbr-law.com
3  **SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
4  6310 San Vicente Boulevard, Suite 360
   Los Angeles, California 90048
5  Phone: (323) 302-9488; Fax: (323) 931-4990

6  TERRI MARSH, ESQ. (*pro hac vice*)
       terri.marsh@hrlf.net
7  JORDAN BERMAN, ESQ. (*pro hac vice*)
       Jordan.Berman.HRLF@gmail.com
8  **HUMAN RIGHTS LAW FOUNDATION**
9  1615 L Street NW, Suite 1100
   Washington, D.C.  20036
10 Phone: (202) 697-3858; Fax: (202) 355-6701
11 Attorneys for PLAINTIFFS

12            **UNITED STATES DISTRICT COURT**
        **FOR THE NORTHERN DISTRICT OF CALIFORNIA,**
13                **SAN JOSE DIVISION**

14

15 |  | Case No. 5:11-cv-02449-EJD-PSGx

16 DOE I, DOE II, Ivy HE, DOE III, DOE IV,     Assigned to the Honorable Edward J. Davila,
   DOE V, DOE VI, ROE VII, Charles LEE,        U.S.D.J.
17 ROE VIII, and LIU Guifu,

18            Plaintiffs,                      **PLAINTIFFS' NOTICE OF MOTION AND**
                                               **MOTION FOR LEAVE TO FILE A**
19       vs.                                   **SECOND AMENDED COMPLAINT;**
                                               **MEMORANDUM OF POINTS AND**
20 CISCO SYSTEMS, INC., John CHAMBERS,         **AUTHORITIES IN SUPPORT THEREOF**
   Thomas LAM, Owen CHAN, Fredy
21 CHEUNG, and DOES 1-100,                     *[[Proposed] Second Amended Complaint filed*
                                               *concurrently herewith as Exhibit A]*
22                                             *[Declaration of Terri Marsh in support thereof filed*
            Defendants.                        *concurrently herewith]*
23

24                                             Action Filed: May 19, 2011
                                               FAC Filed: Sept. 2, 2011
25

26                                             Hearing Date: September 20, 2013
                                               Time: 9:00 a.m.
27                                             Courtroom: 4, 5th Floor

28

                                        1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on September 20, 2013 at 9:00 a.m. or as soon thereafter as the matter may be heard in Courtroom 4 of the United States District Court for the Northern District of California, San Jose Division, located at the Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, California 95113, Plaintiffs Doe 1, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, and Liu Guifu, will and hereby do move this Court for the following:

(1)      An order granting Plaintiffs leave to amend the Corrected First Amended Complaint to add two new plaintiffs, Wang Weiyu and Doe IX;

(2)      An order granting Plaintiff leave to amend the Corrected First Amended Complaint to add newly-ascertained facts directly relating to the new state of the law as reflected in the recent Supreme Court ruling in *Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. ____ (slip op.), 133 S.Ct. 1659 (2013);

(3)      An order accepting the [Proposed] Second Amended Complaint ("SAC") as lodged currently herein as Exhibit A, which reflects the addition of newly ascertained facts and Wang Weiyu and Doe IX as plaintiffs against Defendants Cisco Systems, Inc., John Chambers, and Fredy Cheung; and

(4)      An order that the attached [Proposed] SAC be deemed the amended pleading, and that it be deemed filed and served as of the date the motion is granted.

This motion is made pursuant to the briefing schedule listed in the Court's Case Management Order dated July 16, 2013.

The motion will be based upon this Notice, the attached Memorandum in support, the Declaration of Terri Marsh, the files and records in this action, and any further evidence and argument that the Court may receive at or before the hearing.

///

///

///

///

Dated:  August 1, 2013                Respectfully Submitted,

SCHWARCZ, RIMBERG, BOYD & RADER, LLP

By:          /s/ Kathryn Lee Boyd[1]
                 Kathryn Lee Boyd

HUMAN RIGHTS LAW FOUNDATION

By:      /s/ Terry M. Marsh
             Terri E. Marsh, Esq. (pro hac vice)

Attorneys for Plaintiffs DOE I, DOE II, Ivy HE,
DOE III, DOE IV, DOE V, DOE VI, ROE VII,
Charles LEE, ROE VIII, and LIU Guifu

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] I have obtained the other signatory's concurrence in the filing of this document.

1

2

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  FACTUAL BACKGROUND ........... ................................................................ 2

III. RELEVANT PROCEDURAL BACKGROUND ........... ................................. 3

IV.  ARGUMENT ........... ...................................................................................... 5

   A.   Amendment is Freely Granted and is Warranted Here ...................... 5

   B.   Justice Requires Amendment Because Plaintiffs Have Had No
        Opportunity to Address the New Requirements Outlined in Kiobel .............. 6

        1.   The Kiobel Presumption Regarding Extraterritoriality is a New
             Presumption ................................................................................. 6

        2.   Plaintiffs Did Not Have Notice of Kiobel's Legal Requirements when
             Drafting the Previous Complaint ................................................ 9

   C.   Amendment of the Complaint is Not Futile, as Plaintiffs' New
        Allegations Meet the Touch and Concern Standard of Kiobel ..................... 10

        1.   The Conduct in this Case is Domestic and Does Not Invoke the
             Presumption Against Extraterritoriality........................................ 10

        2.   The ATS Applies to U.S. Defendants, Regardless of Whether the
             Conduct is Domestic or Extraterritorial ...................................... 15

        3.   The Amended Allegations Clarify the Roles of the Main Actors
             Involved in the Commission of the Alleged Human Rights Abuses.............. 16

   D.   Defendants are Not Prejudiced by the Proposed Amendments ....................... 17

   E.   Plaintiffs' Proposed Amendments are Not Brought in Bad Faith  ................. 20

   F.   Granting Leave To Filed the Second Amended Complaint Will
        Not Cause Undue Delay .................................................................... 21

V.   CONCLUSION ........... .................................................................................. 22

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4
*Abels v. JBC Legal Group, P.C.*,
   229 F.R.D. 152 (N.D. Cal. 2005) ……………………..………………………………20

5

6
*Advanced Micro Devices v. Samsung Elecs. Co.*,
   2010 U.S. Dist. LEXIS 24243 (N.D. Cal. Mar. 15, 2010) …………………………..……6

7

8
*Aluminum Bahr. B.S.C. v. Alcoa Inc.*,
   2012 U.S. Dist. LEXIS 80478 (W.D. Pa. June 11, 2012) …………………………..…...13

9
*Bell v. Allstate Life Ins. Co.*,
   160 F.3d 452 (8th Cir. 1998) ……………………………………………………….…18

10

11
*Bowles v. Reade*,
   198 F.3d 752 (9th Cir. 1999) ……………………………………………………...19, 22

12
*Chudacoff v. Univ. Med. Ctr. of S. Nev.*,
   649 F.3d 1143 (9th Cir. 2011) ………………………………………………………….…5

13

14
*Coilcraft, Inc. v. Inductor Warehouse*,
   2000 U.S. Dist. LEXIS 6097 (N.D. Ill. May 1, 2000) …………………………………...21

15
*DCD Programs, Ltd. v. Leighton*,
   833 F.2d 183 (9th Cir. 1987) ………………………………………………….…10, 18, 22

16

17
*Doe v. Exxon Mobil Corp.*,
   654 F.3d 11 (D.C. Cir. 2011) …………………………………………….……………9

18
*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*,
   609 F.Supp.2d 1090 (E.D. Cal. 2009) ……………………………………..……………..6

19

20
*Eminence Capital, LLC. v. Aspeon. Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ……………………………………………………5, 6, 18, 21

21

22
*Environmental Defense Fund. Inc., v. Massey*,
   986 F.2d 528 (D.C. Cir. 1993) ……………………………………………..…………14

23
*European Community v. RJR Nabisco, Inc.*,
   2011 U.S. Dist. LEXIS 23538 (E.D.N.Y. Mar. 8, 2011) ………………..………………13

24

25
*Filártiga v. Peña-Irala*, .
   630 F.2d 876 (2d Cir. 1980) ………………………………..…………………7, 9

26

27
*Flomo v. Firestone Natural Rubber Co.*,
   643 F.3d 1013 (7th Cir. 2011) …………………………………………………………..9

28

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Foman v. Davis*,
   371 U.S. 178 (1962)  ……………………………………….…………...5, 10

*Hip Hop Bev. Corp. v. RIC Representacoes Importacao e Comercio Ltda*,
   220 F.R.D. 614 (C.D. Cal. 2003)  ……………………………….……………9

*In re Marcos Human Rights Litig.*,
   978 F.2d 493 (9th Cir. 1992) …….…………………………………………9

*In re South African Apartheid Litigation*,
   617 F.Supp.2d 228 (S.D.N.Y. 2009)  …………………………………………14

*Interscope Records v. Leadbetter*,
   2006 U.S. Dist. LEXIS 27168 (W.D. Wash. May 8, 2006) ……………………...18

*Johnson v. Buckley*,
   356 F.3d 1067 (9th Cir. 2004)      …………………………………….………5

*Kiobel v. Royal Dutch Petroleum Co.*,
   621 F.3d 111 (2nd Cir. 2010), *cert. granted*, 79 U.S.L.W. 3728 (U.S. Oct. 17, 2011) ..1, 4
   569 U.S. ____, 133 S.Ct. 1659 (2013) …………………………………………*passim*

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
   871 F. Supp. 2d 933 (N.D. Cal. 2012)  …………………………………….………13

*Mohamad v. Palestinian Auth.*,
   132 S. Ct. 1702 (2012) ………………………………………………………..5

*Mohamad v. Rajoub*,
   634 F.3d 604 (D.C. Cir. 2011),
   *cert. granted,* 80 U.S.L.W. 3059 (U.S. Oct. 17, 2011) (No. 11-88) …………….1,4, 5, 18

*Morongo Band of Mission Indians v. Rose*,
   893 F.2d 1074 (9th Cir. 1990)  ……………………………………………………18, 19

*Morrison v. Nat'l Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ………………………………………...………..7, 10, 11, 13, 14

*Moss v. U.S. Secret Serv.*,
   572 F.3d 962 (9th Cir. 2009)  ……………………………………………………6

*Nat'l Steel & Shipbuilding Co. v. Am. Home Assur. Co.*,
   2010 U.S. Dist. LEXIS 73280 (S.D. Cal. July 21, 2010)      ………………….………19

*Paramount Farms, Inc. v. Ventilex B.V.*,
   2010 U.S. Dist. LEXIS 110432 (E.D. Cal. 2010)  ………………………….…………5

iv

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Paulsson Geophysical Services, Inc. v. Sigmar,*
    529 F.3d 303 (5th Cir. 2008) …………………………………………………...…………10

*Poling v. Morgan*,
    829 F.2d 882 (9th Cir. 1987) …………………………………………………………..5

*Reyes-Fuentes v. Shannon Produce Farm, Inc.*,
    671 F. Supp. 2d 1365 (S.D. Ga. 2009) ……………………………………...……..14

*Sarei v. Rio Tinto, PLC*,
    671 F.3d 736 (9th Cir. 2011) ………………………………………………...………9

*Steele v. Bulova Watch Co.*,
    344 U.S. 280 (1952) ………………………………………………………...10, 15

*The Securities and Exchange Commission v. Gruss,*
    859 F.Supp.2d 653 (S.D.N.Y. 2012) ………………………………………….……...11

*United States v. Mandell*,
    2011 U.S. Dist. LEXIS 27064 (S.D.N.Y. Mar 16, 2011) ………………………10-11

*United States v. Webb*,
    655 F.2d 977 (9th Cir. 1981) ………………………………………………………21

STATUTES AND INSTRUMENTS

28 U.S.C. § 1350 …………………………………………………………….…………5

28 U.S.C. § 1350, note  …………………………………………………………..…………5

Fed. R. Civ. P. Rule 15 ……………………………………………………...………*passim*

OTHER AUTHORITIES

Supplemental Brief For The United States As Amicus Curiae In Partial Support Of Affirmance,
    *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (filed June 2012) ……………..……8

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Plaintiffs Doe 1, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, and Liu Guifu, (collectively, "Plaintiffs") bring this Motion for Leave to File a Second Amended Complaint ("Motion to Amend") to add newly-discovered facts, one named plaintiff, Wang Weiyu, and one anonymous plaintiff, Doe IX (both new plaintiffs, the "Proposed Plaintiffs"), to this action against Defendants Cisco Systems, Inc., John Chambers, and Fredy Cheung (collectively, "Defendants") (together, the "Parties"), pursuant to Fed. R. Civ. P. Rule 15.

In May 2011, Plaintiffs filed this case as a putative class action on behalf of tens of thousands of adherents of Falun Gong, a peaceful religious practice based upon the tenets of "Zhen", "Shan," and "Ren" (Truthfulness, Compassion, and Tolerance). Defendants, through the customization, sale, manipulation and maintenance of their state of the art technology, aided and abetted and conspired with the Chinese Communist Party and Public Security officers by providing substantial assistance to them, knowing and intending that they would provide such assistance in the commission of human rights abuses against Falun Gong, including but not limited to torture and crimes against humanity.

Plaintiffs' action seeking justice for the horrific crimes they have endured and in many cases continue to endure came to an abrupt halt less than six months after filing when the Supreme Court granted certiorari on two cases bearing directly on a number of grounds on which Defendants were moving to dismiss the action, *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111 (2nd Cir. 2010), *cert. granted,* 79 U.S.L.W. 3728 (U.S. Oct. 17, 2011) (No. 10-1491) ("*Kiobel"),* and *Mohamad v. Rajoub,* 634 F.3d 604 (D.C. Cir. 2011), *cert. granted,* 80 U.S.L.W. 3059 (U.S. Oct. 17, 2011) (No. 11-88) ("*Mohamad"*). As a result, Plaintiffs' case has effectively been in a holding pattern for the last two years pending the Supreme Court decisions.

Plaintiffs and Proposed Plaintiffs have waited patiently for nearly two years for the Supreme Court to issue its opinion in *Kiobel* so that this case could proceed and now believe it appropriate and timely for Proposed Plaintiffs to request that this Court permit their joinder to the action before the Parties commence substantive briefing and discovery. The Proposed Plaintiffs,

- 1 -

PLAINTIFFS' NOTICE OF MTN. & MTN. FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT; MEM. OF P&A IN SUPPORT THEREOF
Case No. 5:11-cv-02449-EJD-PSGx

1   like the current Plaintiffs in this action, are adherents of Falun Gong who have been subjected to

2   horrific and unspeakable violations of rights at the hands of the Chinese Communist Party whose

3   perpetration of crimes were facilitated by Defendants to this action. Plaintiffs also believe it

4   appropriate to incorporate allegations based on newly-ascertained facts that bear directly on the

5   newly decided law in *Kiobel* into their complaint before substantive briefing commences.

6          Accordingly, Plaintiffs respectfully request the Court grant leave to file the attached

7   [Proposed] Second Amended Complaint ("[Proposed] SAC") which adds relevant newly-

8   discovered facts that support the current state of the law as articulated by the Supreme Court in

9   *Kiobel,* and add Proposed Plaintiffs Wang Weiyu and Doe IX who bring valid claims against

10  Defendants arising out of similar facts and circumstances.

11  **II.     FACTUAL BACKGROUND**

12         Plaintiffs are U.S. and Chinese citizen practitioners of Falun Gong. Cisco Systems, Inc.

13  ("Cisco"), a Silicon Valley-based tech company, its CEO John Chambers and other named

14  Defendants planned, designed, customized, implemented, serviced, and maintained the Golden

15  Shield database-driven surveillance apparatus in full collaboration and consultation with the

16  Chinese Communist Party and Public Security officers, knowing and intending that it would be

17  utilized by them to identify, track, surveil, isolate, confine, ideologically convert, torture, and

18  injure Plaintiffs and similarly situated Falun Gong practitioners, all in violation of international,

19  U.S., and California law.  Defendants planned, designed, customized, constructed, serviced,

20  managed, and maintained anti-Falun Gong features and other components of the network from

21  their offices in the United States, where they also made all major corporate marketing and other

22  decisions relevant to this action.

23         As a direct result of the Defendants' conduct, which occurred largely in the United States,

24  Plaintiffs were subjected to egregious violations of the law of nations, U.S. and California state

25  law, including false imprisonment, torture, cruel assault, battery and wrongful death, for which

26  judicial relief is warranted in the form of compensatory and punitive damages.

27         Characterizations of Cisco-designed routers, filtering and/or security systems as generic

28  products sold everywhere misrepresents the intensive process of customization entailed in

assembling and integrating the anti-Falun Gong features of the Golden Shield with neutral or dual purpose components.  The generic components were necessary to achieve its effectiveness in suppressing Falun Gong, but they were not sufficient. The effectiveness of the overall system depended on the Defendants' integration of the highly customized features noted in this section with all other components.

The human rights abuses carried out by Chinese Communist Party and Public Security officers in China through and as a result of the Defendants' conduct comprise *ultra vires* acts that do not implicate the Government of China.

As the Proposed Second Amended Complaint further establishes, Cisco's San Jose headquarters ("San Jose") substantially assisted in the perpetration of the alleged crimes through conduct that was essential to and specifically directed to the use of the Golden Shield to target and torture Falun Gong.  For example, the [Proposed] SAC alleges that San Jose was the sole location where all Cisco core advanced technology, such as the Golden Shield, was developed, at least until 2008 (*see* ¶ 95).  The [Proposed] SAC additionally alleges that Defendants in San Jose designed the apparatus to make available information to Chinese security including Falun Gong's continuously updated geographical locations, Internet usage patterns, profiles of prior dissident activities, and other sensitive information stored in the databases such as biometric data and susceptibility to interrogation and ideological conversion (*see, e.g.,* ¶ 131), and that San Jose high level executives adopted a strategy to cultivate reciprocal-benefit relationships ("*guanxi*") with allies in the Chinese Communist Party though meetings and continued contact, in order to provide support for the repressive, anti-Falun goals of the Party and win further contracts (*see, e.g.,* ¶ 133).

III.   **RELEVANT PROCEDURAL BACKGROUND**

On May 19, 2011, Plaintiffs filed suit in the United States District Court for the Northern District of California, San Jose Division against Cisco, John Chambers, Thomas Lam, and Owen Chan. *See* Docket Entry ("DE") 1, Complaint.[2]

---

[2] The [Proposed] SAC has dismissed Defendants Lam and Chan, due in part to the U.S. Supreme Court decision in *Kiobel*, requiring a greater nexus between the defendants' conduct and the United States.  *See Kiobel*, slip op. at 14.

1    Concurrently with the filing of the Complaint, Plaintiffs filed motions to Proceed

2    Anonymously, *see* DE 2, and Through Next Friends, *see* DE 5 (together, the "Anonymity

3    Motions"). Pursuant to a stipulation between the Parties, the Court took the Anonymity Motions

4    off calendar and ordered that Plaintiffs "shall proceed anonymously and through next friends for

5    the limited period through to the date this Court enters a decision and order resolving Defendants'

6    forthcoming Motion to Dismiss the Complaint . . . and until the Court can then act upon any

7    request for Plaintiffs to proceed anonymously and through next friends or until the Court

8    otherwise rules." *See* DE 45, Stipulation and Order Regarding Plaintiffs' Motions to Proceed

9    Anonymously and Through Next Friend, at 2:26-3:2.[3]  On August 4, 2011, Defendants filed a

10   Motion to Dismiss Plaintiffs' Complaint. *See* DE 49, Motion to Dismiss.

11   Pursuant to Fed. R. Civ. P. Rule 15(a)(1)(B), Plaintiffs elected to file a First Amended

12   Complaint as a matter of course on September 2, 2011.  *See* DE 62-1, Corrected First Amended

13   Complaint. On September 23, 2011, Defendants filed a Motion to Dismiss Plaintiffs' First

14   Amended Complaint. *See* DE 67, Motion to Dismiss First Amended Complaint.

15   On October 17, 2010, while Plaintiffs were preparing their opposition briefing to

16   Defendants' Motion to Dismiss the First Amended Complaint, the Supreme Court granted

17   certiorari on the cases *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111 (2nd Cir. 2010), *cert.*

18   *granted,* 79 U.S.L.W. 3728 (U.S. Oct. 17, 2011) (No. 10-1491), and *Mohamad v. Rajoub,* 634

19   F.3d 604 (D.C. Cir. 2011), *cert. granted,* 80 U.S.L.W. 3059 (U.S. Oct. 17, 2011) (No. 11-88),

20   which had the potential to directly impact a number of grounds upon which Defendants had based

21   their Motion to Dismiss the First Amended Complaint. Upon notifying the Court that the

22   Supreme Court had granted certiorari in the aforementioned cases, the Court terminated

23   Defendants' Motion to Dismiss until such time as the Supreme Court issued its opinion in *Kiobel*

24   and *Mohamad. See* DE 79, Order Denying Plaintiffs' Motion to Reschedule Briefing. The issues

25   considered by the Supreme Court in *Kiobel* included "whether and under what circumstances

26

27   [3] Plaintiffs rely on the limited grant of anonymity from the Court's Order on the Anonymity
     Motions to add Proposed Plaintiff Doe IX in the Proposed SAC. Plaintiffs understand that if the

28   Court grants leave to file the [Proposed] SAC, the new Doe plaintiff will be allowed to proceed
     anonymously to the same extent as all original Plaintiffs.

courts may recognize a cause of action under the Alien Tort Statute (28 U.S.C. § 1350) ("ATS"), for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Kiobel,* 569 U.S. ____ , at 1. The issue considered by the Supreme Court in *Mohamad* was whether the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA"), when authorizing a cause of action against an "individual" for acts of torture and judicial killing committed under authority or color of law of any foreign nation, extended liability only to natural persons. *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1705 (2012).

The Supreme Court issued its decision in *Mohamad* on April 18, 2012 but did not issue a decision *Kiobel* until one year later, on April 17, 2013.

As of the date of this Motion, the Court has not had the occasion to issue an opinion on any motion to dismiss, no discovery has been taken by the Parties, and it was only on July 16, 2013, that a Case Management Order was issued in this action.

## IV.   ARGUMENT

### A.   Amendment is Freely Granted and is Warranted Here

Pursuant to Fed. R. Civ. Proc. Rule 15(a)(2), a party may amend its pleading with leave of the Court.  Rule 15(a)(2) provides that leave to amend a pleading shall be freely given when justice so requires. This is a "mandate . . . to be heeded." *Foman v. Davis,* 371 U.S. 178 (1962). There is an established policy favoring amendment such that amendment should be granted with "extreme liberality." *Eminence Capital, LLC. v. Aspeon. Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  In fact, the denial of a motion for leave to amend "must be strictly reviewed in light of the strong policy in favor of permitting amendment." *Poling v. Morgan*, 829 F.2d 882, 886 (9th Cir. 1987); *see also Paramount Farms, Inc. v. Ventilex B.V.,* 2010 U.S. Dist. LEXIS 110432, *20 (E.D. Cal. 2010) ("justifying reasons must be apparent for denial of a motion to amend").

Leave to amend should be granted unless amendment: (1) would cause prejudice to the opposing party, (2) is sought in bad faith, (3) creates undue delay, (4) or is futile. *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1153 (9th Cir. 2011) (citing *Foman,* 371 U.S. at 182).[4]

---

[4] Courts sometimes add a 5th factor: whether the complaint was previously amended. *See Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (citation omitted).

1  Prejudice is the "touchstone of the inquiry" as to whether a motion to amend should be granted

2  under Rule 15(a). *See Eminence Capital*, 316 F.3d at 1052. Absent prejudice or a strong showing

3  of any of the remaining Rule 15(a) factors, there exists a presumption under Rule 15(a) in favor

4  of granting leave to amend. *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 609 F.Supp.2d 1090,

5  1092 (E.D. Cal. 2009).

6         In the Ninth Circuit, the *non-moving party bears the burden* of demonstrating why leave

7  to amend should be denied. *See, e.g., Eminence Capital*, 316 F.3d at 1052 (absent prejudice

8  "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend") (emphasis in

9  original).  Defendants cannot meet their burden as leave to amend is freely granted and

10 appropriate here where there has been an intervening change in law as well as newly discovered

11 evidence, and therefore none of the factors identified above are present.

12        Accordingly, Plaintiffs' Motion to Amend should be granted and the [Proposed] SAC

13 deemed filed as of the date of the Court's order.

14    **B.**    **Justice Requires Amendment Because Plaintiffs Have Had No Opportunity to**

15             **Address the New Requirements Outlined in *Kiobel***

16        Because the recent Supreme Court decisions in *Kiobel* clarified the law with respect to

17 ATS claims brought against corporations, Plaintiffs "deserve a chance to supplement their

18 complaint with factual content in the manner that [*Kiobel*] require[s]." *Advanced Micro Devices*

19 *v. Samsung Elecs. Co*., 2010 U.S. Dist. LEXIS 24243 at *39 (N.D. Cal. Mar. 15, 2010) (quoting

20 *Moss v. U.S. Secret Serv*., 572 F.3d 962, 972 (9th Cir. 2009)) (allowing amendment following a

21 Federal Circuit decision that heightened the pleading standard for plaintiff's patent claims).

22 Indeed, the Court noted that "equity and precedent require" that a plaintiff be granted to leave to

23 amend when the claim is filed "without the benefit" of such "teachings." *Id*. at *41.

24        **1.**    **The *Kiobel* Presumption Regarding Extraterritoriality is a New**

25               **Presumption**

26        The majority opinion in *Kiobel* held that federal courts are constrained in recognizing

27 certain extraterritorial causes of action under the ATS. *Kiobel,* slip op. at 6.  However, the Court

28 made clear that the ATS still extends to claims with respect to conduct abroad that "touch and

concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.* at 14 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)).  *Kiobel*'s holding was narrow, applying only in the context of a paradigmatic "foreign-cubed" case—foreign defendant, foreign plaintiff, and exclusively foreign conduct—lacking any connection to the United States beyond the "mere corporate presence" of the defendants.  *Id.* The *Kiobel* defendants' only connection to the United States was that they were listed on the New York Stock Exchange and maintained an investor servicing office owned by a separate corporate affiliate. *Id.* at 14 (Breyer J., concurring). The Court explicitly left unresolved how other claims may "touch and concern" the United States with "sufficient force" to displace the presumption in other factual contexts, such as claims involving a U.S. defendant or U.S. conduct.

Kiobel does not apply the usual presumption against extraterritoriality, because that presumption (1) ordinarily applies only to substantive law enacted by Congress; (2) either applies to the statute or not so that (unlike in *Kiobel*) application on the high seas defeats the presumption; (3) does not apply to jurisdictional statutes; and (4) is not ordinarily applied on a case-by-case basis. Instead, in *Kiobel,* the majority opinion applied the "principles" underlying the presumption in what Chief Justice Roberts conceded is an atypical application of the usual presumption against the extraterritorial application of U.S. statutes.  *Id.* at 5 (Roberts, C.J.).

Thus, the manner in which these principles apply in other ATS settings, outside the "mere corporate presence" cases, is still to be determined. Because the new rule in *Kiobel* is a merits question – *i.e.*, whether the facts of the case sufficiently "touch and concern" the United States in order to "displace" the presumption – it is not amenable to a bright line rule; it necessarily mandates a case-by-case analysis.[5]

---

[5] The Supreme Court essentially adopted the U.S. government's position in *Kiobel*:

> There is no need in this case to resolve across the board the circumstances under which a federal common-law cause of action might be created by a court exercising jurisdiction under the ATS for conduct occurring in a foreign country. In particular, the Court should not articulate a categorical rule foreclosing any such application of the ATS. *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980), for example, involved a suit by Paraguayan plaintiffs against a Paraguayan defendant based on alleged torture committed in Paraguay. The individual torturer was found

1    Accordingly, Plaintiffs have added and/or expanded allegations in the complaint to show

2    that the claims in this case are domestic or touch and concern the United States with sufficient

3    force, far greater than mere corporate presence.  These amendments include further allegations of

4    design and implementation activity by Cisco San Jose that more directly ties San Jose to making

5    the Golden Shield capable of identifying, tracking, ideologically converting, capturing and

6    isolating Falun Gong and that ties Cisco and its San Jose headquarters more directly with the

7    related alleged human rights abuses.  These new and expanded allegations clarify how all

8    decision making central to the project was orchestrated in San Jose, with headquarters exercising

9    full control. *See, e.g*., [Proposed] SAC, Ex. A, ¶¶ 108**,** 126-135.  Expanded allegations also make

10   clear that Defendants in San Jose handled all aspects of the high-level design phases, which they

11   specifically and purposely created to facilitate forcible conversion through torture and other

12   violations. *See, e.g*., *id.*, ¶¶ 75, 79-80, 95.  Because technical details at the heart of this case will

13   determine some of the key issues in this litigation, including San Jose's role, it is necessary for

14   the Court to have a complaint that more fully alleges the technical structure of the Golden Shield

15   apparatus and its use in forcible conversion and other abuses against Plaintiffs and similarly

16   situated Falun Gong believers. Obfuscatory language used by Defendants, such as "generic" in

17   reference to the Golden Shield (DE 98 at 4), fails to address the technical facts underlying

18   Plaintiffs' allegations.

19   As discussed below, ATS claims touch and concern the United States with a U.S. citizen

20   or corporation defendant or relevant U.S. conduct, and certainly when both factors are met.  After

21   *Kiobel*, allegations connecting the claims against Cisco to the United States have increased

22   relevance, and Plaintiffs seek the opportunity to amend in order to address this new legal regime.

23   ///

---

25   residing in the United States, circumstances that could give rise to the prospect that
     this country would be perceived as harboring the perpetrator....*Other claims based*

26   *on conduct in a foreign country should be considered in light of the circumstances*
     *in which they arise*.

27   Supplemental Brief For The United States As Amicus Curiae In Partial Support Of Affirmance, at
     4-5, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (filed June 2012) (emphasis added)

28   ("U.S. Suppl. *Kiobel* Br.").

**2.      Plaintiffs Did Not Have Notice of *Kiobel*'s Legal Requirements when**

**Drafting the Previous Complaint**

Plaintiffs drafted the previous complaint (First Amended Complaint) on September 2, 2011 (DE 62-1), before the Supreme Court granted the petition for a writ of certiorari in *Kiobel* on October 17, 2011.  Plaintiffs drafted the First Amended Complaint in accordance with pre-*Kiobel* doctrine and have not had an opportunity to allege facts showing that the conduct in question was domestic and/or touches and concerns the United States with sufficient force.

Plaintiffs did not subscribe to the argument in Defendants' Motion to Dismiss (DE 49) interpreting the ATS *Sosa* regime as not allowing extraterritorial application.  Their argument was against the weight of case law at the time, in particular the Ninth Circuit's en banc decision in *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 747 (9th Cir. 2011) (en banc) ("We therefore conclude that the ATS is not limited to conduct occurring within the United States or to conduct committed by United States citizens."), since vacated in light of *Kiobel*. There were no controlling ATS decisions restricting the ATS to claims arising within U.S. territory or on the high seas.  Every circuit to consider the issue at the time had rejected the argument that the ATS does not apply extraterritorially.  *See Filartiga v. Peña-Irala*, 630 F.2d at 885; *In re Marcos Human Rights Litig.*, 978 F.2d 493, 499-501 (9th Cir. 1992); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 20-28 (D.C. Cir. 2011); *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1025 (7th Cir. 2011). That Defendants' argument went against controlling case law was particularly apparent in light of their almost exclusive reliance on amicus briefs, dissenting opinions (including in *Sarei*), and non-ATS decisions.  *See* DE 49 at 31-33.  Though Defendants at the time encouraged a different conclusion about extraterritoriality, such an argument in no way provided notice to Plaintiffs of a need to meet a newly established regime under *Kiobel*.

Accordingly, justice requires that Plaintiffs be granted leave to amend in light of the Supreme Court's newly issued teachings regarding corporate liability under the ATS.

///

///

///

C.    **Amendment of the Complaint is Not Futile, as Plaintiffs' New Allegations Meet the Touch and Concern Standard of *Kiobel***

"An amendment is 'futile' only if it would clearly be subject to dismissal." *Hip Hop Bev. Corp. v. RIC Representacoes Importacao e Comercio Ltda,* 220 F.R.D. 614, 622-623 (C.D. Cal. 2003) at 622-623 (citing *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 188 (9th Cir. 1987)). Thus, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

1.    **The Conduct in this Case is Domestic and Does Not Invoke the Presumption Against Extraterritoriality**

Amendment would not be futile because Plaintiffs' new or expanded allegations highlight the domestic conduct in this case, which either renders any presumption against extraterritoriality inapplicable or at least touches and concerns the United States.  The Court in *Kiobel* affirmed dismissal of plaintiffs' claims in that case because "all" of the "relevant" conduct took place outside the United States. *Kiobel,* slip. op. at 14. The Court left open the door to displacing the presumption when such "relevant" conduct takes place in the United States.  While "touch and concern" is a new standard, the Supreme Court approved similar application of the Lanham Act to trademark infringement cases against U.S. defendants even when the violation occurred abroad, particularly when essential steps occurred in the United States.   As the Court noted, "We do not deem material . . . that his purchases in the United States when viewed in isolation do not violate any of our laws.  They were essential steps in the course of business consummated abroad; acts in themselves legal lose that character when they become part of an unlawful scheme." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 287 (1952); *see Paulsson Geophysical Services, Inc. v. Sigmar,* 529 F.3d 303, 309 (5th Cir. 2008) (same).  And although case law applying the separate, bright-line presumption against extraterritoriality under *Morrison* does not discuss "touch and concern," the cases nonetheless make clear that the presumption against extraterritoriality does not apply to illegal schemes directed or furthered from the U.S.  *See United States v. Mandell*, 2011 U.S. Dist. LEXIS 27064 at \*12 (S.D.N.Y. Mar 16, 2011) (noting that the Supreme Court's

- 10 -

1    rationale in *Morrison* restricted cases that had "only *de minimis* contact with the United States

2    and no contact with a United States exchange").  *Mandell* involved companies organized in the

3    U.S. and the money was controlled from the U.S. *See id.* at *9. Thus, the presumption was

4    overcome because the alleged conduct that was "central to implementing the [illegal] scheme"

5    was "orchestrated from" the United States and "the transactions which occurred abroad [we]re the

6    last step to give effect to the crime charged." *See id.* at *13-16; *see also The Securities and

7    *Exchange Commission v. Gruss*, 859 F.Supp.2d 653 (S.D.N.Y. 2012) (noting that *Morrison* was

8    "narrowly" decided on the "foreign-cubed facts").

9            In light of the new requirements of *Kiobel*, the expanded allegations in the attached

10   [Proposed] SAC similarly describe how Cisco orchestrated the planning and preparation,

11   marketing, design, implementation, operation and optimization phases of the Golden Shield from

12   its San Jose Headquarters ("San Jose"). According to the new and expanded allegations, during

13   all phases, San Jose engaged in a step-by-step process to establish customer specifications and

14   objectives related to all major aspects of design, implementation and optimization phases that

15   include those enabling the *douzheng* of Falun Gong.  *See, e.g.,* [Proposed] SAC, ¶ 126 (Cisco

16   orchestrated the planning and preparation, marketing, design, implementation, operation and

17   optimization phases from San Jose.); *see also id.* at ¶¶ 75, 79-80, 95, 102, 108, 127, 128, 129.  As

18   stated in the [Proposed] SAC, all of the high-level designs provided by Cisco to its Chinese

19   security to suppress Falun Gong were developed by engineers with corporate management in San

20   Jose.  *See id.,* ¶¶ 75, 95. In order to meet these persecutory objectives of their Chinese

21   client, these designs include, for example, a multi-tiered network comprising: a library of

22   "signatures," i.e., carefully analyzed patterns of Falun Gong Internet activity to enable the

23   intelligent identification and tracking of individual Falun Gong Internet users; log/alert systems

24   that provides real time monitoring, event correlation and notification based on Falun Gong

25   Internet traffic patterns and behaviors; national and provincial "Information Centers" with

26   "centralized databases" dedicated specifically to Falun Gong practitioners; a "National

27   Information System for Falun Gong Contact Persons," a Falun Gong "Web Notification Server"

28   to enable comprehensive surveillance and tracking of Falun Gong coordinators and other

- 11 -

suspects; and integration of the Information Centers and Falun Gong databases with networked security features—such as the Intrusion Detection and Prevention Systems (IDS/IPS)—capable of monitoring and tracking Falun Gong practitioners. *See id.* ¶¶ 80, 83, 84.  In addition, the decision making central to the success of the implementation processes that include construction, testing, verification, optimization, and servicing were approved by and enacted and orchestrated in San Jose. *See id.* ¶ 108.  These decisions included, for example, the integration of databases with applications designed to enable security at police stations, police detention centers, black jails, public security mental hospitals, rehabilitation clinics, "love and care" rehabilitation centers, labor camps, and other facilities to successfully interrogate, ideologically convert and transform Falun Gong suspects. *See id.* ¶ 97.  The technical requirements tailored to and essential for such use required Defendants' purposeful involvement from the San Jose headquarters at all stages of the Golden Shield project.  *See, e.g., id.* ¶¶ 125 ff.

As in the above cases, the proposed amendments to the complaint illustrate how Cisco's role was central to implementing the violation of the law of nations.  As new allegations further make clear, Cisco could not have met the repressive objectives of the Golden Shield without the close collaboration among and decision making by San Jose divisions comprised of dozens of engineers, marketing, operational specialists, Golden Shield decision-makers and high-level management and its high-level executive officers. *See, e.g., id.,* ¶ 135.  From initial planning of the Golden Shield project all the way through post-sales maintenance and servicing, their domestic conduct comprised the essential steps underlying the entire unlawful scheme. *See, e.g., id.,* ¶¶ 75, 95, 108.

While Plaintiffs' injuries themselves occurred abroad, Defendants in San Jose provided the means through which the alleged violations were carried out.  *See, e.g., id.,* ¶ 225.  Defendants in San Jose provided the "means by which" the actual violations were committed, including the design and implementation of the apparatus through which Chinese security routinely identified, tracked, surveiled and in other ways suppressed Falun Gong believers in China. *See, e.g., id.* ¶¶ 112, 115, 120, 225.  The information stored in and made accessible to Chinese security in regions across China was also used directly by security to subject Plaintiffs

1   and persons similarly situated to mental torture and more general ideological conversion

2   practices. *See also id.* ¶¶ 111, 113, 114-120.

3       Racketeer Influenced and Corrupt Organizations Act ("RICO") cases, particularly those

4   decided after the Supreme Court's presumption against extraterritoriality discussion in *Morrison*,

5   are also instructive as to the relevance of Cisco's San Jose headquarters' involvement in the

6   alleged unlawful scheme to violate Plaintiffs' rights. Under a "nerve center" analysis, courts focus

7   on the RICO enterprise's "brains" as opposed to its "brawn," that is, on "the decisions

8   effectuating the relationships and common interest of its members, and how those decisions are

9   made," as compared to the location where the consequences of those decisions transpire.

10  *European Community v. RJR Nabisco, Inc.*, 2011 U.S. Dist. LEXIS 23538, at *20 (E.D.N.Y. Mar.

11  8, 2011); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 942 (N.D.

12  Cal. 2012) (applying "nerve center" test in determining whether case required extraterritorial

13  application of RICO, finding the fact that all three moving Defendants are U.S. corporations

14  "tends to show, however, that the decision making necessary to effectuate the alleged association-

15  in-fact enterprise's common purpose occurred substantially within the territory of the United

16  States");  *see also Aluminum Bahr. B.S.C. v. Alcoa Inc.*, 2012 U.S. Dist. LEXIS 80478 (W.D. Pa.

17  June 11, 2012) (finding sufficient domestic activity even where the tortious conduct was the

18  payment of bribes to officials of Bahraini oil company and in the Bahraini government because

19  "the decision-making vital to the sustainability of the enterprise, came from Pittsburgh").

20      Based on the new and expanded allegations, there is no question that San Jose, as the

21  nerve center, directed the design, implementation and optimization of the anti-Falun Gong

22  apparatuses of the Golden Shield.  As was referenced in the First Amended Complaint,

23  defendants from San Jose directly participated in the design and development of the Golden

24  Shield. DE 62 at 1:6.  The [Proposed] SAC spells out in greater detail how San Jose's decision-

25  making was vital to integrating Falun Gong specific components with all other features of the

26  apparatus to provide Chinese security with the profiled information they needed to forcibly

27  convert believers in addition to isolating and suppressing them.  *See, e.g.,* [Proposed] SAC, ¶¶ 86,

28  95, 97.  As the Golden Shield nerve center, San Jose [same] exercised direct control over the

- 13 -

Golden Shield project, including even the actions taken by its alter egos and subsidiaries. *See, e.g.,* [Proposed] SAC, ¶¶139, 141-4.

Even before *Morrison*, the presumption was no bar to decision-making that occurred in the United States, even when effects were felt abroad. *Environmental Defense Fund. Inc., v. Massey*, 986 F.2d 528, 536-37 (D.C. Cir. 1993) (finding no support for the "proposition that conduct occurring within the United States is rendered exempt from otherwise applicable statutes merely because the effects . . . would be felt [abroad]"); *Reyes-Fuentes v. Shannon Produce Farm, Inc.*, 671 F. Supp. 2d 1365, 1371-72 (S.D. Ga. 2009), (Fair Labor Standards Act (FLSA) claim, in which alleged retaliatory conduct occurring in Mexico, was not barred by the presumption against extraterritoriality because the actual retaliatory act, i.e., the decision not to rehire, was made in the U.S.) That the harm occurred in China does not make the allegations against the Defendants extraterritorial, particularly when relevant decisions and conduct by Defendants occurred within the United States: designing, marketing, implementing, and optimizing the Golden Shield to perpetrate human rights abuses against the Plaintiffs and similarly situated Falun Gong believers.  *See, e.g.,* [Proposed] SAC, ¶¶ 127, 129-132, .

Importantly, the attached complaint is not futile, because it clarifies how Defendants' domestic conduct is itself sufficient to meet the standards for substantial assistance, as required for aiding and abetting liability. *See, e.g., In re South African Apartheid Litigation*, 617 F.Supp.2d 228, 301 (S.D.N.Y. 2009).  In particular, Defendants in San Jose "specifically designed" and integrated Falun Gong specific and generic features after careful study of Chinese security's persecutory apparatus to meet the requirements for human rights abuses including, for example, identifying, tracking, and ideologically converting Falun Gong believers (*see, e.g.*, [Proposed] SAC, ¶¶ 85, 91, 94, 116, 125, 179 ff.); Defendants' assistance was "essential" to the suppression, in that they provided sophisticated and integrated solutions that made it possible for Chinese Security to obtain sensitive information from almost anywhere in China in order to ideologically convert and in other ways suppress Falun Gong (*see e.g., id.,* ¶¶ 115, 117, 123, 129, 135, 181, 225); and as discussed above, the Golden Shield apparatus provided the "means by which" the actual violations were committed, by, e.g., enabling Chinese security to collect, store and access

1    the kinds of information needed to identify, track, capture, ideologically convert through torture,

2    and in other ways suppress Plaintiffs and similarly situated Falun Gong believers.

3        Amending therefore would not be futile, as the presumption against extraterritoriality

4    either is not implicated – or if it is, Defendants' domestic conduct touches and concerns the

5    United States with sufficient force to displace the presumption.

6            **2.    The ATS Applies to U.S. Defendants, Regardless of Whether the**

7                **Conduct is Domestic or Extraterritorial**

8        In *Kiobel*, the Court was concerned that the defendants were foreign corporate entities

9    with only a minimal presence in the United States, and signaled that U.S. individuals or

10   corporations are differently situated. For example, the Court found that the 1795 opinion by the

11   then-U.S. Attorney General William Bradford "deals with *U.S. citizens*, who by participating in

12   an attack taking place both on the high seas and on a foreign shore, violated a treaty between the

13   United States and Great Britain." *Kiobel,* slip op. at 12 (emphasis added).   In addition, when a

14   nation applies its laws to its own citizens and entities, there is minimal risk of "diplomatic strife".

15   *Id.* at 13.  Even the amicus brief filed by the United Kingdom and Netherlands governments in

16   *Kiobel*, which supported their corporate citizens, emphasized that there would be no issue under

17   international law for the United States to apply the ATS extraterritorially to its own citizens.  *See*

18   *also Steele*, 344 U.S. at 285-86 (applying the presumption to claims brought under the Lanham

19   Act for extraterritorial violations, and allowing the claim to proceed against a U.S. citizen

20   defendant because the U.S. could "govern the conduct of its own citizens upon the high seas or

21   even in foreign countries when the rights of other nations or their nationals are not infringed")

22   (internal citations omitted).

23       Plaintiffs seek to hold a U.S. corporation and individuals accountable for their role in the

24   campaign against Falun Gong practitioners in China and the resultant harms suffered by

25   Plaintiffs.  There is no dispute that the company is based in San Jose, California, or that the

26   individual Defendants include U.S. citizens.

27       The new allegations clarify the integral role played by these U.S. Defendants in

28   controlling the design, marketing, implementation, optimization and other aspects of the Golden

- 15 -

Shield project, which was the essential means by which Chinese security was able to perpetrate ideological conversion through torture and other human rights abuses.  For example, the newly proposed allegations elaborate on the extent to which Cisco, a U.S. corporation, and its executives in San Jose cultivated relationships with highly influential Party officials ([Proposed] SAC, ¶¶ 58, 59), used Party language in materials located in San Jose to describe the persecutory goals of the apparatus (*id.*, ¶67), and designed sophisticated specifications for the "anti-cult information system" and other anti-Falun Gong features as reflected in internal power point presentations (*id.*, ¶ 97) emanating from San Jose.  The new allegations also provide further support of Cisco's awareness of the customer's anti-Falun Gong goals for the Golden Shield and the means for achieving those goals (*id.* ¶¶ II. E.).  Further, these allegations describe the technical aspects necessary to understand San Jose's essential contribution to the *douzheng* campaign against Falun Gong, including the integration of Golden Shield features necessary to facilitate forced conversion through torture. *Id.*, ¶¶ 98 (h), 127, 129. New allegations further explain how Cisco carried the Golden Shield project from its "nerve center" headquarters from the initial sale all the way through implementation, which required specific technical features including the integration of Golden Shield components in such a way as to facilitate the human rights abuses against Falun Gong believers on a nationwide scale, and maintenance of a dynamic information management system that follows for life the actions and social and psychological circumstances of Plaintiffs and similarly situated Falun Gong believers.  *Id.*, ¶¶ 99-101. These features were essential to the forced ideological conversion through torture and other abuses alleged in the Complaint.

> **3.      The Amended Allegations Clarify the Roles of the Main Actors Involved in the Commission of the Alleged Human Rights Abuses**

New allegations in the attached Complaint address the division of roles and responsibilities before and during the Golden Shield project of Cisco, its San Jose headquarters, and also its Chinese security clients and the Chinese Communist Party. These allegations indicate the extent to which San Jose and Cisco as a whole were responsible for and did take specific actions to proactively facilitate the commission of the alleged claims, including torture, arbitrary detention, and crimes against humanity. See, aforementioned references to (Proposed) SAC.

The new allegations also further clarify the division of roles between the Chinese Communist Party and low-level PRC state actors involved in the Golden Shield project. Cisco primarily collaborated with Chinese Communist Party officials to ascertain and fulfill requirements regarding the anti-Falun Gong features of the Golden Shield, which reflect the Chinese Communist Party's objective to eradicate Falun Gong.  Newly-discovered evidence and related information regarding the extent and concrete incidents of Defendants' collaboration with Chinese Communist Party actors is relevant. *See* Declaration of Terri Marsh ("Marsh Decl."), ¶¶ 4-12.

Such amendments indicate both Defendants' active role in orchestrating the abuses committed against Plaintiffs and similarly-situated victims, and also indicate the degree to which these abuses were committed as part of a Party-run extralegal campaign rather than as isolated and unconnected incidents of ultra vires human rights abuse by low-level state officers. As the allegations indicate, Defendants did not intervene in PRC state policy, but rather participated in repression conducted by the Party using extralegal powers and without state oversight.  *Id.,* ¶¶ 4-12 (referring to new evidence obtained from Guanghong Jin, a former professor of Political Science and human rights attorney with two decades of academic and professional experience in China; Charles Yu, a Chinese technology expert with direct experience with the Golden Shield project; Peng Yongfeng, a Chinese human rights lawyer who obtained asylum in the United States due to his discovery of the threat of imminent detention based on his representation of Falun Gong adherents; and Dr. Can Sun, J.D., Ph.D. with expertise in technology and Chinese implementation of high-tech systems).  The overall direction and networking of such ultra vires abuse was spearheaded not by PRC state officials but solely by Party officials, and the attached amended Complaint makes more clear Defendants' direct and deliberate role in helping to constitute that spearhead.

### D.   Defendants are Not Prejudiced by the Proposed Amendments

Although the Ninth Circuit uses a number of factors to determine whether leave to amend should be granted – such as bad faith, undue delay, futility of amendment, and repeated failures to cure deficiencies by amendment – prejudice resulting from grant of leave to amend "is the

1   touchstone of the inquiry under [Federal R]ule 15(a)." *Eminence Capital*, 316 F.3d at 1052.

2   Indeed, absent prejudice "there exists a *presumption* under Rule 15(a) in favor of granting leave

3   to amend." *Id*. (emphasis in original).

4          Where prejudice is the reason for denial, the prejudice must be substantial. *See Morongo*

5   *Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). When considering

6   prejudice as cause for denial, the court must weigh the prejudice that will be suffered by the

7   moving party by not allowing the proposed amendment. *See Bell v. Allstate Life Ins. Co*., 160

8   F.3d 452, 454 (8th Cir. 1998). Plaintiffs' addition of facts to meet the new standard articulated

9   under *Kiobel*, and to add newly discovered facts and the Proposed Plaintiffs whose claims are

10  substantially similar to the existing Plaintiffs, simply do not unduly prejudice Defendants. *See*

11  *e.g., Interscope Records v. Leadbetter,* 2006 U.S. Dist. LEXIS 27168 (W.D. Wash. May 8, 2006)

12  (court granted "Motion for Leave to Amend Complaint Based on Newly Discovered Evidence" in

13  copyright action based upon "strong policy of allowing amendment" after "considering four

14  factors: bad faith, undue delay, prejudice to the opposing party, and the futility of the

15  amendment") (citations omitted); *see also M/V American Queen v. San Diego Marine Constr.*

16  *Corp.,* 708 F.2d 1483 (9th Cir. 1983) ("[F]acts, newly discovered in t[he period between when the

17  complaint was filed and when the motion to amend was filed]" were properly considered by the

18  Court when granting or denying a motion to amend).

19         First, courts have consistently held that there is no prejudice when a party seeks to amend

20  the complaint in the early stages of litigation, as is the case here. *See DCD Programs, Ltd.,* 833

21  F.2d at 188 (finding abuse of discretion to deny leave to file fourth amended complaint when

22  "case is still at the discovery stage with no trial date pending"). Here, this action is in the very

23  early stages of litigation, despite the fact that it was filed in 2011. The Court has not even had the

24  opportunity to rule on a single motion to dismiss in this action. On October 17, 2011, while the

25  Parties were briefing Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, the

26  Supreme Court granted cert in *Kiobel* and *Mohamad* (the "Supreme Court Decisions")*,* on issues

27  that directly related to Plaintiffs' complaint, to the extent Plaintiffs' relied on the ATS for

28  jurisdiction. The Court ordered "postpone[d]" a decision on the Motion to Dismiss pending the

- 18 -

1    outcome of the Supreme Court Decisions, *see* DE 79, Order Denying Plaintiffs' Motion to

2    Reschedule Briefing, effectively halting this action until late spring 2013. Now that the Supreme

3    Court has expressed its views on corporate liability for claims brought pursuant to the ATS, all

4    Parties and the Court have further direction as to the standards that must be met in order to

5    proceed with the ATS claims in this action.[6]

6           Second, the passage of time since Plaintiffs' initial filing of the complaint does not

7    prejudice Defendants as no discovery has been conducted and Defendants refuse to cooperate to

8    develop a discovery plan. Indeed, until the Court ordered the Parties to discuss proposed dates

9    for, *inter alia,* discovery cutoff and designation of experts, *see* DE 97, Order Continuing Case

10   Management Conference, Defendants have been adamant that initial disclosures under Fed. R.

11   Civ. P. Rule 26 be suspended until the resolution of the motion to dismiss. *See* DE 98, Joint Case

12   Management Statement, at 8:20-28; *see also Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999)

13   (holding that "undue delay by itself . . . is insufficient to justify denying a motion to amend" and

14   reversing the district court's denial because it "did not make any specific findings of prejudice,

15   bad faith, or futility"); *see also Nat'l Steel & Shipbuilding Co. v. Am. Home Assur. Co.*, 2010 U.S.

16   Dist. LEXIS 73280 at *9 (S.D. Cal. July 21, 2010) (reasoning that "the concern that the motion

17   was made in bad faith or would cause prejudice is greatly mitigated by the fact that the ostensible

18   delay has ended before discovery has even begun," and therefore holding "any delay present in

19   this case is insufficient to justify denial of leave to amend").

20          Third, and most importantly, Plaintiff does not seek to allege any new causes of action or

21   new defendants. *Cf. Morongo Band of Mission Indian,* 893 F.2d at 1079 (affirming denial of

22   motion for leave to amend to add claim under Racketeer Influenced and Corrupt Organizations

23   Act). Plaintiff's proposed amendments simply allege facts that either relate to the change in

24   controlling law under *Kiobel*, *see supra* section C and/or are newly discovered facts largely

25   relevant to the domestic conduct of the Defendants.  During this inquiry new evidence regarding

26   Defendants' role in and liability for existing claims was also discovered. *See* Marsh Decl., ¶¶ 4-

27   _____

28   [6] The Court's Order also denied Plaintiffs' request to continue litigating their state-law claims,
     which would not be affected by the Supreme Court's decisions in *Kiobel* and *Mohamad*,
     preferring to consider all the issues raised in the Motion to Dismiss at one time. *See id.* at 2:3-6.

12.  These facts could not have been obtained earlier because they were not relevant, could not be discovered without expert personnel newly hired, or came from sources completely inaccessible prior to the period of stay. These new facts are referenced in the attached declaration. *See generally id.* As all of these facts relate to the existing claims and Defendants, Plaintiff's proposed amendments would not "greatly alter[ ] the nature of the litigation." *Id.*

Finally, denial of leave to amend would not serve the interests of justice or judicial efficiency. Plaintiffs and the Proposed Plaintiffs have faced enormous difficulties in order to be able to file this lawsuit, and remain at great risk by participating in this lawsuit. Failure to allow amendment at this time would also impede their ability to be heard.

Accordingly, Plaintiffs' Motion for Leave to Amend does not prejudice Defendants and should be granted.

### E.      Plaintiffs' Proposed Amendments are Not Brought in Bad Faith

Plaintiffs "acted quickly" to identify new facts following the Supreme Court's decision in *Kiobel*, *see Abels v. JBC Legal Group, P.C.*, 229 F.R.D. 152, 156 (N.D. Cal. 2005), and have consistently notified Defendants and the Court of their intent to seek leave to amend at the first opportunity.  Both prior to and shortly after the Supreme Court's decision in *Kiobel* was issued, Plaintiffs notified Defendants that they intended to seek leave from the Court to file an amended complaint in light of the newly articulated legal standards from the *Kiobel* decision, to add newly-discovered facts that support Plaintiffs' causes of action and which were unavailable until 2012 while *Kiobel* was pending before the Supreme Court, and to add additional similarly-situated plaintiffs to this putative class action. *See, e.g.,* DE 96, Joint Case Management Statement, July 3, 2013, at 2:27-3:4 ("Plaintiffs will move the Court to file a second amended complaint based on the changes in controlling law in *Kiobel*, as well as newly discovered evidence"); DE 85, Joint Administrative Motion to Continue Case Management Conference, September 14, 2012, at 1:20-22 (Plaintiffs "will seek leave to file a second amended complaint"); DE 82, Joint Case Management Statement, March 16, 2012, at 2:17-19 ("Plaintiffs have newly discovered evidence and, at an appropriate time, will seek leave to amend their complaint to include new averments of fact"); and DE 80, Joint Case Management Statement, February 8, 2012, at 3:2-6 ("Plaintiffs may

- 20 -

1   file a motion for leave to amend the Complaint, if needed, based upon the Supreme Court's

2   decision in *Kiobel* and *Mohamad* as well as any newly discovered evidence relevant to said

3   decisions"). The Court's recently issued Case Management Order takes into account the fact that

4   Plaintiffs are seeking to amend and sets forth additional dates regarding discovery and all

5   expected motions up to the point of trial. *See* DE 100.

6     Moreover, as described above, Plaintiffs' newly alleged facts are relevant to the existing

7   claims and were discovered through reasonable inquiry in light of the new requirements of

8   *Kiobel.   See Coilcraft, Inc. v. Inductor Warehouse*, 2000 U.S. Dist. LEXIS 6097 *8-9 (N.D. Ill.

9   May 1, 2000) (no bad faith where plaintiff made "reasonable inquiry" into facts supporting new

10  claim, introduced relevant evidence, and "has never mischaracterized the nature of the lawsuit").

11  These newly alleged facts include, *inter alia,* the role of the Chinese Communist Party in dealing

12  directly with Cisco headquarters in San Jose to plan and carry out the Golden Shield Project

13  (Marsh Decl., ¶ 11), the specific course of dealing by which Cisco San Jose and Chinese

14  Communist Party leaders planned and carried out the Golden Shield project (*id.*), the audiences

15  for Cisco marketing materials used for or in relation to the Golden Shield project (*id.*), the degree

16  to which technical requirements of the Golden Shield's anti-Falun Gong features depended upon

17  specific, purposeful design to meet such objectives (*id.*), and greater detail of the specific features

18  developed by Cisco in San Jose, which facilitated identification, tracking, capture, detention, and

19  ideological conversion through torture of Falun Gong adherents (*id.,* ¶ 8). Accordingly, Plaintiffs'

20  motion is not brought in bad faith.

21    **F.**  <u>**Granting Leave To Filed the Second Amended Complaint Will Not Cause**</u>

22      <u>**Undue Delay**</u>

23    While the prospect of undue delay is one of the factors considered by courts in the Ninth

24  Circuit, the factors are "not of equal weight." *United States v. Webb*, 655 F.2d 977, 980 (9th Cir.

25  1981); *see also Eminence Capital, LLC,* 316 F.3d 1048, 1052 (same). In particular, "delay alone

26  no matter how lengthy is an insufficient ground for denial of leave to amend." *Webb*, 655 F.2d at

27  980. Only if the delay results in some form of prejudice to defendants, or bad faith on the part of

28  plaintiffs can be shown – neither of which exists here – will leave to amend a pleading be denied.

*Id.* The Ninth Circuit has previously reversed the denial of a motion for leave to amend where the district court did not provide a contemporanous specific finding of prejudice to the opposing party, bad faith by the moving party, or futility of the amendment. *See Bowles,* 198 F.3d at 758.

As described above, *see supra*, Sec. C-E, amending the complaint would not be prejudicial, in bad faith, or futile. In addition, leave to amend the complaint will not result in any delay in the proceedings. No discovery has been propounded or produced in this case. *See supra* Sec. D. The Court has not even had the opportunity to rule on a single motion to dismiss in this action. Thus "there is no evidence that [Defendants] would be prejudiced by the timing of the proposed amendment." *DCD Programs, Ltd.,* 833 F.2d at 188 (Ninth Circuit reversed district court and allowed fourth amended complaint to be filed).

Accordingly, given that Plaintiffs are entitled to amend based on the recent clarifications in applicable law discussed in *Kiobel*, it is entirely in the furtherance of justice to grant Plaintiffs' motion for leave to amend to add facts that address *Kiobel*, add newly discovered facts, and add additional plaintiffs to ensure a speedy and just resolution for Proposed Plaintiffs whose claims echo those of the existing Plaintiffs.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully submit that the Motion for Leave to File a Second Amended Complaint should be granted, and that the Second Amended Complaint should be deemed filed as of the date of the Order granting the Motion.

Dated:  August 1, 2013

Respectfully Submitted,
SCHWARCZ, RIMBERG, BOYD & RADER, LLP

By:  _____/s/ Kathryn Lee Boyd[7]_____
         Kathryn Lee Boyd

HUMAN RIGHTS LAW FOUNDATION

By:  _____/s/ Terry M. Marsh_____
         Terri E. Marsh, Esq. (pro hac vice)

Attorneys for Plaintiffs DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, and LIU Guifu

---

[7] I have obtained the other signatory's concurrence in the filing of this document.

- 22 -

PLAINTIFFS' NOTICE OF MTN. & MTN. FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT; MEM. OF P&A IN SUPPORT THEREOF
Case No. 5:11-cv-02449-EJD-PSGx