# EXHIBIT A

KATHRYN LEE CRAWFORD-BOYD, ESQ. (SBN 189496)
    lboyd@srbr-law.com
RAJIKA L. SHAH, ESQ. (SBN 232994)
    rshah@srbr-law.com
**SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
6310 San Vicente Boulevard, Suite 360
Los Angeles, California  90048
Phone: (323) 302-9488, Fax: (323) 931-4990

TERRI MARSH, ESQ. (*pro hac vice*)
    terri.marsh@hrlf.net
JORDAN S. BERMAN, ESQ. (*pro hac vice*)
    jsberman@gmail.com
**HUMAN RIGHTS LAW FOUNDATION**
1615 L Street NW, Suite 1100
Washington, D.C.  20036
Phone: (202) 697-3858, Fax: (323) 931-4990

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, DOE IX, LIU Guifu, WANG Weiyu, and those individual similarly situated,<br><br>                Plaintiffs,<br><br>        vs.<br><br>CISCO SYSTEMS, INC., John CHAMBERS, Fredy CHEUNG, and DOES 1-100,<br><br>                Defendants. | Case No. 5:11-cv-02449-EJD-PSGx<br><br>Assigned to the Hon.  Edward J. Davila, U.S.D.J.<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT [F.R.C.P. 15(a)(1)(B)] FOR:**<br>**1. TORTURE [28 U.S.C. § 1350];**<br>**2. TORTURE [28 U.S.C. § 1350 note];**<br>**3. CRUEL, INHUMAN, OR DEGRADING TREATMENT;**<br>**4. FORCED LABOR;**<br>**5. PROLONGED AND ARBITRARY DETENTION;**<br>**6. CRIMES AGAINST HUMANITY;**<br>**7. EXTRAJUDICIAL KILLING;**<br>**8. ENFORCED DISAPPEARANCE;**<br>**9. VIOLATION OF 28 U.S.C. § 2512(1);**<br>**10. BATTERY;**<br>**11. ASSAULT;**<br>**12. FALSE IMPRISONMENT;**<br>**13. UNFAIR BUSINESS PRACTICES**<br><br>**DEMAND FOR JURY TRIAL** |

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:11-cv-02449-EJD-PSGx

1    DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE,

2    ROE VIII, DOE IX, LIU Guifu and WANG Weiyu (collectively, "Plaintiffs") hereby allege as

3    follows:

4                                    **NATURE OF THE ACTION**

5    1.      Plaintiffs are U.S. and Chinese citizens and practitioners of Falun Gong, a peaceful

6    religious practice that is based on the tenets of "Zhen", "Shan", and "Ren" (Truthfulness,

7    Compassion, and Tolerance). Defendant Cisco Systems, Inc. ("Cisco Systems") and its alter ego

8    or agent, Cisco China Networking Technologies, Ltd. ("Cisco China") aided and abetted and

9    conspired with the Chinese Communist Party ("the Party") and Public Security officers by

10   providing substantial assistance to them, knowing and intending that they would use such

11   assistance in the commission of human rights abuses against Falun Gong, listed below, including

12   torture and crimes against humanity. "Cisco" refers to Cisco Systems acting by, through or with

13   its alter egos and agents.  Cisco knowingly, purposefully and intentionally designed, implemented

14   and helped to maintain a surveillance and internal security network known as the Golden Shield

15   in collaboration with the Party and Public Security officers in regions across China. Cisco knew

16   and intended that the apparatus would be utilized by Party and Public Security officers to

17   eavesdrop, tap and intercept the communications of Falun Gong believers; surveil, detect, monitor

18   and track their online communication; apprehend, interrogate, ideologically convert and in other

19   ways torture, arbitrarily arrest and detain them because of their religious beliefs, with the specific

20   purpose of suppressing Falun Gong believers through the perpetration of these and other human

21   rights abuses against them, all in violation of international, U.S., and California law. John

22   Chambers, CEO of Cisco Systems and, Fredy Cheung, Senior Vice President for the Greater

23   China Region directly participated in the alleged violations with both knowledge and intent as

24   alleged below.

25   2.      The Golden Shield apparatus is not an ordinary crime control apparatus. While it does

26   perform some standard crime control police functions, the Golden Shield differs exponentially

27   from all previous crime control initiatives in scale, complexity, intelligence, and technological

28   sophistication – all of which are directly related to its major purpose or functionality, i.e., to find,

                                              1

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   track, and suppress Falun Gong believers wherever found.

2   3.      Because Falun Gong believers reside in all regions across China, the Party and Public

3   Security officers in China required a vast and multi-tiered surveillance system of a scale and

4   capacity that could surveil the entire country's Internet use for all Falun Gong believers.

5   Tracking, identifying, profiling, and suppressing Falun Gong required not only an increase in

6   scale and capacity, but also an exponential increase in complexity and adaptive intelligence. In

7   addition, the effort to pro-actively eliminate Falun Gong believers required that Defendant Cisco

8   develop "*solutions*" specially tailored in design, technology, implementation, post-product

9   support and verification which were unique in and of themselves and/or uniquely integrated. The

10  scale, complexity, hardware, and "intelligence" of the Golden Shield enabled 610 agents and

11  other Chinese security officers' violations against Falun Gong adherents, because, unlike all other

12  religious groups in China, their religion is tied specifically to Internet use, including visiting

13  specific websites, downloading material, and disseminating that religious material both in person

14  and online.

15  4.      "Solutions" is a term of art used by Cisco to describe a comprehensive, well-integrated set

16  of products and services designed specifically to eliminate their customers' specific "problem."

17  For prospective Golden Shield customers, i.e., Chinese security, the main problem was Falun

18  Gong. Thus, even individual Cisco products—even, for example, routers—are not generic.

19  Rather, they are advanced and highly customizable special-purpose computers typically

20  comprising features that are differently integrated and configured to meet the very different needs

21  of the customer problem.  The routers and other individual products Cisco designed and

22  developed for the Golden Shield are similarly not stand-alone generic components, but are

23  integrated hardware and software systems, i.e., "solutions," designed for specific purposes, which

24  necessarily requires a high degree of customization.

25  5.      The Golden Shield was not only designed, implemented and customized differently than

26  all others in use in the early 2000s, but also comprises a uniquely targeted gargantuan system of

27  Falun Gong specific features integrated with the network as a whole in order to isolate and

28  suppress the religious group.  Security used the apparatus to suppress Falun Gong in segregated

2

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    zones of extra-legal human rights abuse. This anti-Falun Gong apparatus has been described as an

2    Orwellian totalitarian social control system.

3    6.      As a direct result of Cisco's design, implementation, and maintenance of the Golden

4    Shield technology for the Party and Public Security officers at national and regional levels,

5    Plaintiffs and similarly situated Falun Gong believers have suffered severe and gross abuses,

6    including false imprisonment, torture, cruel assault, and battery, for which judicial relief is

7    warranted in the form of compensatory and punitive damages.

8    7.      "Falun Gong" refers to individual believers and the religion they practice.

9                                     **PARTIES**

10          **A.    Plaintiffs**

11   8.      Many of the individually named plaintiffs and/or their families in China are likely to

12   suffer retaliation and further human rights abuses if their identities become public, and thus are

13   filing anonymously or through next friends.

14   9.      Doe I is a resident of China. Doe I was targeted for engaging in Falun Gong religious

15   activities online in Tianjin City, China. The Golden Shield was the essential means through which

16   she was monitored, tracked and identified as a Falun Gong believer, apprehended, detained, and

17   subjected to forced conversion practices that included mental torture. Without the Golden Shield

18   apparatus, Chinese security officers could not have conducted online surveillance to identify

19   specific online Falun Gong articles written or downloaded by Doe I, which were used to target

20   her for detention and other forms of abuse. In addition, without the Golden Shield apparatus, it

21   would have been virtually impossible for Chinese security officers to subject her and similarly

22   situated Falun Gong believers to these and other abuses including physical torture, forced labor

23   and intense public humiliation.

24   10.     Doe II is a resident of China. Doe II was targeted for engaging in Falun Gong religious

25   activities online in Tianjin City, China. The Golden Shield was the essential means through which

26   she was monitored, tracked, and identified, apprehended, detained, interrogated, and mentally

27   tortured. Without the Golden Shield apparatus, it would have been virtually impossible for

28   Chinese security officers to subject her and similarly situated Falun Gong believers to these and

3

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   other abuses in the form of physical torture, forced labor and public humiliation.

2   11.     Ivy He is a resident of Canada. The Golden Shield was the essential means through which

3   she was identified as a Falun Gong believer, apprehended, detained, interrogated, and mentally

4   tortured. Without the Golden Shield apparatus, it would have been virtually impossible for

5   Chinese security officers to subject her to these and other abuses in the form of physical torture,

6   forced labor and public humiliation

7   12.     Doe III brings this action through his next friend, Roe III. Doe III is currently in prison in

8   China. He was arrested in 2006 for engaging in Falun Gong activities on the Internet. The Golden

9   Shield was the essential means through which he was monitored, tracked, identified, detained,

10   interrogated and mentally tortured.  Without the Golden Shield apparatus, it would have been

11   virtually impossible for Chinese security officers to subject him and other similarly situated

12   individuals to these and other persecutory acts including debilitating bouts of enforced isolation,

13   physical torture and forced labor.

14   13.     Doe IV brings this action through his next friend, Roe III, who is also next friend for Doe

15   III. Doe IV was arrested for engaging in Falun Gong religious activities on the Internet. The

16   Golden Shield was the essential means through which he was monitored, tracked, identified,

17   apprehended, detained, interrogated, and mentally tortured. Without the Golden Shield apparatus,

18   it would have been virtually impossible for Chinese security officers to subject him similarly

19   situated class members to these and other persecution in the form of physical torture, forced labor

20   and public humiliation.

21   14.     Doe V is a resident of China. Doe V was targeted for engaging in Falun Gong religious

22   activities online. The Golden Shield was the essential means through which she was monitored,

23   tracked, identified, apprehended, detained, interrogated and mentally tortured. Without the

24   Golden Shield it would have been virtually impossible to subject her to these abuses in addition to

25   false imprisonment for three years, following a show trial where she was denied an opportunity to

26   challenge the charges against her, where she was deprived of sleep and subjected to beatings and

27   other forms of torture.

28   15.     Doe VI is a resident of China. The Golden Shield was the essential means through which

4

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

he was monitored, tracked, identified, apprehended, detained, and mentally tortured. Without the Golden Shield it would have been virtually impossible to subject him and other similarly situated class members to these abuses in addition to his detention in a re-education through labor camp without trial where he was subjected to torture and forced labor.

16.    Roe VII, a resident of China, brings this action as the representative of Doe VII. Doe VII disappeared in the summer of 2006 while imprisoned as a result of her Falun Gong activities. The Golden Shield apparatus was the essential means through which she was monitored, tracked, identified, apprehended, interrogated, and mentally tortured. Without the Golden Shield apparatus, it would have been virtually impossible for Chinese security officers to subject him and other similarly situated class members to these and other abuses including torture. Both before and during her imprisonment, Doe VII was subjected to torture, including the forcible administration of drugs that left her unable to stand or speak during a sham trial.

17.    Charles Lee is a U.S. citizen and resident of New Jersey. He is a Falun Gong practitioner who used the Internet to contact other practitioners in China. In 2003, he went to China to visit with friends and family.  He was apprehended on his arrival at the airport and tortured, force-fed, and detained until 2006. The Golden Shield was the essential means through which he was monitored, tracked, identified, and detained. Charles Lee brings this action against Defendants John Chambers and Fredy Cheung under the Torture Victims Protection Act, 28 U.S.C. § 1350, note.

18.    Roe VIII, a resident of China, brings this action as the survivor of Doe VIII. Doe VIII was detained as a result of his Falun Gong activities online and was tortured to death. The Golden Shield was the essential means through which he was monitored, tracked, identified, apprehended, detained, interrogated and mentally tortured. Without the Golden Shield, it would have been virtually impossible for Chinese security officers to subject him and similarly situated class members to these and other persecution including physical torture and extrajudicial killing.

19.    Doe IX is a resident of China. Doe IX was targeted for engaging in Falun Gong religious activities online in Shijiazhuang, Hebei Province, China. The Golden Shield was the essential means through which she was monitored, tracked and identified as a Falun Gong believer,

5

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   apprehended, detained, and subjected to forced conversion practices that included mental torture.

2   Without the Golden Shield apparatus, it would have been virtually impossible for Chinese

3   security officers to subject her and similarly situated class members to these and other abuses

4   including physical torture, forced labor, and intense public humiliation.

5   20.     Liu Guifu is a Falun Gong practitioner who was granted refugee status in March 2009 and

6   who now resides in New York. She was detained in China on multiple occasions and was

7   subjected to arbitrary and prolonged detention and torture. The Golden Shield was one of the

8   essential means through which she was monitored, tracked, apprehended, detained and mentally

9   tortured.  Without the Golden Shield apparatus, it would have been virtually impossible to subject

10   her to these and other abuses including physical torture.

11   21.     Wang Weiyu is a Falun Gong believer who arrived in the United States from China in

12   July 2013. He was detained on multiple occasions and subjected to arbitrary and prolonged

13   isolation and torture.  The Golden Shield was the essential means through which he was

14   monitored, tracked, captured, detained and mentally tortured. Without the apparatus, it would

15   have been virtually impossible to subject him and persons similarly situated to these and other

16   abuses including physical torture.

17           **B.     Defendants**

18   22.     Defendant Cisco Systems, Inc. ("Cisco") is a multinational corporation incorporated in

19   California with its principal place of business in San Jose, California, and with directly supervised

20   branch offices in, e.g., the Asia-Pacific, Latin America, and East Europe. During the entire period

21   relevant to this complaint, Cisco participated in the alleged violations directly and through agents

22   and/or alter egos and in collaboration with Party and Public Security officers, affiliates and

23   partners. Cisco tailored its Golden Project and related projects and activities in China to enable

24   Chinese security to suppress Falun Gong via the specific forms of human rights abuse alleged in

25   this Complaint.

26   23.     Defendant John Chambers ("Chambers") is a resident of California, who is and at all

27   relevant times has been the Chief Executive Officer of Cisco. Chambers directs and supervises

28   Cisco's operations in China, and has played an essential role in establishing Cisco's presence in

6

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

China. As Cisco's CEO, Chambers signs or authorizes the signature of all certificates, contracts, and other instruments of Cisco. Significant Cisco sales operations in China are reported to its U.S. headquarters, and major localization efforts in China require executive decisions by Defendant Chambers and others.  Chambers personally initiated or ratified the Golden Shield project through his close connections with Party leaders, and his personal involvement in managing Cisco's activities in China.

24.     Defendant Fredy Cheung, who also goes by his Chinese (Mandarin) name Zhang Sihua, directly oversaw much of Cisco's work on Public Security-related projects in China, as the Vice-President of Cisco China and in other managerial and strategic roles.  Cheung has held numerous high-level positions at Cisco and at Cisco China. In all of these capacities, Cheung has played a major role in the marketing of the persecutory features of the Golden Shield in China.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this case pursuant to the Alien Tort Statute, 28 U.S.C. § 1350; the Torture Victims Protection Act, 28 U.S.C. § 1350 note; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity); and 28 U.S.C. § 1367 (supplemental jurisdiction).

26.     Venue is proper in this court under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Cisco is incorporated in and doing business in this District, and Chambers is the CEO of Cisco in this District. Upon information and belief, Cheung, routinely travelled to California to conduct business at Cisco's San Jose headquarters in this District. In addition, Defendant Cheung maintained an ongoing presence and role in San Jose through frequent use of Cisco's flagship videoconferencing technology.

## STATEMENT OF FACTS

### A.  Background on the Persecution of Falun Gong Practitioners in China.

27.     The Falun Gong religion developed in China in or around 1992. By early 1999, the New York Times and Associated Press estimated that there were between seventy and one hundred million people practicing Falun Gong in China.

7

28.     According to several resolutions passed by the U.S. House of Representatives, Falun Gong is a "peaceful and non-violent form of spiritual belief and practice with millions of adherents in China and elsewhere." Absolute non-violence and compassion are two of the religion's core defining tenets.

29.     Since the late 1990s, Falun Gong believers have been subjected to human rights abuses by the Party in China.

30.     The Party was established in 1921 as a political organization which was then, and which remains now, organizationally and operationally distinct from the Chinese State. In 1949, the People's Republic of China was founded at the conclusion of the Chinese Civil War. The Party assumed a dominant political role among China's nine recognized political parties, but has remained distinct from the PRC state.

31.     By the early 1930s, Party had adopted the practice of periodically launching "rectification campaigns", purges/crackdowns, or "*douzheng*" (violent struggle) campaigns against internal and external enemies. These movements were conducted outside of the authority of the state and without the constraint of legal due process or any form of objective hearing or state regulation. Instead, they relied on Party orders and officers to identify targets, ban targets and their activities, initiate their condemnation in the Party's official mouthpieces, and then subject them to violent persecution either through direct action by Party personnel or via low-level state officers coerced into participation.

32.     Targets are subjected to demonization/humiliation, beatings, ideological conversion and other forms of torture in ad hoc non-state run detention facilities, including psychiatric facilities ("Ankang"), "black jails," (unofficial detention facilities run directly by the Party), "re-education through labor," a system of administrative detention imposed without judicial review.

33.     The demonization of these groups as state enemies, anti-humanity, anti-society, dangerous criminals and other dehumanizing comparisons has been used by the Party (and other persecutory regimes) to instigate, incite and justify the human rights abuses carried out against successive target groups, including reformist intellectuals, Tibetan Buddhist Dalai Lama supporters, and pro-democracy advocates.

8

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

34.     A small sample of these "*douzheng*" campaigns includes: The "Attack the Anti-Bolshevist Group" Campaign (1930-31), the Yan'an Rectification Movement (1941-45), the Withdraw from the Sects Movements (anti "evil cult" extralegal campaigns, 1951-53), the Great Proletarian Cultural Revolution (1966-76), the Anti-Spiritual Pollution Campaign (1983-84), the Party Rectification Campaign of (1983-87), the Anti-Bourgeois Liberalization Campaign (including the Tiananmen massacre and subsequent arbitrary detentions  1986-92), the various "Strike Hard Campaigns" of the 1990s, and the crackdown against Falun Gong (1999-present).

35.     By broad consensus of scholars of Chinese law and politics, the legal status of these extra-legal bans could not be openly discussed or questioned in China without severe retaliation. While international criticism by Chinese legal experts and international observers has called for the abolishment of extra-legal campaigns in their entirety, and their replacement with rule of law procedures, there have not been major substantive changes to the Party's brutal treatment of, and control over, all targeted dissident groups in China.

36.     In 1997, then Party Chairman Jiang Zemin and Luo Gan, then Vice Chair of the Party's Political and Legal Affairs Committee, ordered national level Public Security officers to investigate the operation of the Falun Gong religion in China in order to justify a ban of the religion and suppression of its adherents.  After two full years of investigation, public security officers were still unable to find a legitimate basis for the ban.

37.     Without any genuine justification, in June of 1999, the Party published a document calling for the implementation of a widespread persecutory "*douzheng*" campaign against Falun Gong in China to ideologically convert through torture, murder and in other ways suppress Falun Gong believers in China based solely on their spiritual or religious belief.

38.     Like previous campaigns which occurred throughout the Party's history, the anti-Falun Gong campaign was similarly framed and implemented in largely extralegal terms, e.g. "as a 'severe political struggle' [*douzheng*] rather than as an ordinary activity of the criminal justice system. As such, involved Party agents and low-level security officers under their control have operated and continue to operate ultra vires, i.e., outside of and beyond the constraints of statutory law or precedent or government regulations.

9

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

39.     China is an outlier when it comes to the treatment of political and religious dissidents including practitioners of Falun Gong. Like Tibetan Buddhists and other Chinese minority groups, Falun Gong adherents are free to associate and practice their religion without fear of systematic persecutory reprisal anywhere but in Mainland China.

40.     At the campaign's higher level of organization, officials of the Party's security apparatus, i.e., the Political and Legal Affairs Committee, along with other Party officers set policy for and implemented the campaign to purge China of Falun Gong.

41.     "Office 610" was created as a subdivision of the Party in June 1999 by Jiang Zemin and the Party to micromanage the persecution and elimination of the religious group.

42.     Chinese security, a designation that includes 610 officers, other Party agents and Public Security officers, work in close collaboration with one another to target and persecute Falun Gong practitioners, including the Plaintiffs.

43.     Like the targets of earlier "*douzheng*" campaigns in China, persons identified as Falun Gong are demonized as "party enemies," "hostile elements,"  "anti-humanity," "anti-society," viruses and other dehumanizing imagery to legitimize their regular subjection to human rights abuses. After the increased global focus on terrorism in 2001, persons identified as Falun Gong were additionally labeled as "terrorists."

44.     In one representative incident, the China Anti-Cult association, another Party-run organization closely tied to the persecution of Falun Gong, published and adopted comments explicitly acknowledging the strategy of demonizing Falun Gong in order to justify their elimination ("I say that we first define it as terrorist so that any necessary measures are justified").

45.     As in earlier *douzheng* campaigns, Party agents have isolated Falun Gong believers without legal basis in detention facilities including "psychiatric" facilities, Public Security "hospitals" "black jails," and "re-education through labor" in addition to acts of torture and forced labor as a means of coercing them into renouncing their religious beliefs.  Security in detention facility units devoted solely to the suppression of Falun Gong routinely play a role in the persecution of the Plaintiffs to the extent alleged below.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

46.    For those who refused to abandon their religious beliefs, even harsher sanctions were leveled including indefinite detentions and more severe torture and extrajudicial killing.

47.    Following the 2012 rise to power of a new generation of leaders, the Party has begun to discuss plans to reform or abolish some of the above-mentioned forms of extra-legal detention. These initiatives have been paired with preliminary investigations of the serious and only-recently acknowledged human rights abuses perpetrated against detainees. Notwithstanding these reforms, members of groups targeted as part of *douzheng* campaigns including Tibetan Buddhists and Falun Gong, are still systematically targeted for human rights abuse and unable to obtain any form of legal redress.

48.    The State Department estimated as early as 2001 that several hundreds of thousands of Falun Gong practitioners have been persecuted as a result of the campaign waged against Falun Gong believers in China. The State Department also estimates that a significant percentage and in many cases a majority of Chinese "Reeducation Through Labor" camps are made up of Falun Gong practitioners. The State Department Country Report on Human Rights Practices for 2011 describes widespread accounts of Falun Gong adherents being committed to mental health facilities and involuntarily subjected to psychiatric treatment (including forcible medication and electric-shock treatment) for political reasons.  Family members of Falun Gong adherents were also targeted for arbitrary arrest, detention, and harassment.  According to the U.S. Commission on International Religious Freedom's 2012 Annual Report, Falun Gong adherents constitute at least half of the 250,000 officially recorded inmates in re-education through labor centers.

49.    A 2005 Human Rights Watch report states that detained Falun Gong practitioners receive the "worst treatment" of any detainees, a 2006 U.N. Special Rapporteur report states that 66 percent of the reported torture cases in China were comprised of Falun Gong practitioners.  The Congressional-Executive Commission on China (CECC) 2012 Annual Report states that China is currently in the midst of an "extensive, systematic" campaign to use mental and physical torture to force Falun Gong adherents to renounce their beliefs. Amnesty International, Freedom House and the Falun Dafa Information Center have documented the severity of the persecution and torture of Falun Gong believers in China.

50.     In 2009 the New York Times reported that at least two thousand Falun Gong practitioners have been tortured to death in China. Since then, there have been credible reports of additional Falun Gong deaths while in custody as well as many other forms of human rights abuse.

51.     The use of the Golden Shield apparatus to further the persecutory campaign against Falun Gong (and other dissidents in China) has also been reported widely in western media outlets since 1999, and has been documented and universally condemned, beginning in 1999, by the U.S. Department of State, the United Nations, and a number of international human rights organizations including Amnesty International and Freedom House.

52.     The above described widespread human rights abuse against Falun Gong adherents and its ongoing nature were well known to Cisco at the time that they began to market their technology for the Golden Shield project in China. The use of the Golden Shield technology to assist in this abuse and other aspects of the persecution of Falun Gong and other dissidents was equally well known to Cisco and its officers at all times relevant to this Complaint.

**B.      Cisco's Marketing, Planning, Design, and Implementation of Golden Shield Technology Used to Persecute Falun Gong Practitioners**

53.     In the mid-late 1990s, in the People's Republic of China, Chinese security and Party officials proposed creating a "Golden Shield" to ensure the suppression of Chinese citizens who appeared to threaten Party influence and ideological control.

54.     The success of the project depended on a wide range of technologies that did not exist in China at the time of its inception.

55.     Since Chinese engineers did not have the expertise to develop these technologies, the Party in concert with Chinese security sought the assistance of Western technology companies, including Cisco, who in turn vied with one another to gain a stronghold in the lucrative security technology market in China.

56.     According to several high-tech engineers doing business in China at the time, all of the Western high-tech companies seeking entry into the Chinese security market, including Cisco, knew that the most important goal of the Golden Shield apparatus was to "stop" Falun Gong, and

12

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   that gaining a stronghold in the Chinese security market required the design, development, and

2   promotion of technology specifically tailored for this purpose.

3   57.     Thus, when it came to purchases of Internet technology, Chinese buyers associated with

4   the Communist Party were primarily concerned with whether the technology could eliminate

5   Falun Gong adherents and activity, not whether it would increase productivity.  This concern was

6   communicated to potential technology vendors, including to Cisco.

7                   **(1)**     **Marketing**

8   58.     Cisco's effort to establish the superiority of the Cisco brand across China required the

9   intensive investigation of, coupled with promises to meet, the specific goals and objectives of the

10  client. These efforts were directed from Cisco's headquarters in San Jose, California, in

11  communication with Cisco subsidiaries in China.  Cisco's plans for expansion in China also

12  required the development of reciprocal-benefit relationships ("*guanxi*") with highly influential

13  Party leaders, public security officers, Chinese engineers, system integrators, experts, and others

14  who could help Cisco develop and maintain a stronghold in the lucrative security technology

15  market in China. All of the above methods of gaining an advantage in competing for business in

16  China required accumulating a high level of familiarity with, and providing extensive support to,

17  the persecutory purpose of the Golden Shield apparatus. The anti-Falun Gong purpose of the

18  apparatus, known to Defendants in San Jose, played a significant role in Cisco's marketing of

19  Golden Shield designs and products in China.

20  59.     Cisco executives frequently met with Party leaders and even set up a special Cisco Public

21  Security marketing team specifically to ascertain and help Cisco meet Chinese security

22  objectives. They even hired consulting agencies to provide regular updates and compilations of

23  news articles, among other sources of information that describe the persecutory goals of the

24  apparatus. These sources made clear that those goals included torture and other human rights

25  abuses.

26  60.     Cisco's website is used for all business purposes including China-related business. The

27  website, Cisco.com, included "success stories" demonstrating the company's familiarity with and

28  deliberate attempts to further the repressive purposes of the apparatus. In one website entry, for

13

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   example, Cisco touts the company's enhancement of multi-tiered networked features, designed to

2   enhance "social stability" and so-called "Strike Hard campaigns," that are described in Cisco

3   literature, Chinese law expert reports (and elsewhere) as a key component of the Chinese

4   persecutory crackdown against Falun Gong.

5   61.     Cisco internal files similarly include reports that acknowledge and pledge to satisfy the

6   repressive anti-Falun Gong purposes of the Golden Shield apparatus. These include numerous

7   invocations of the term "*douzheng,*" the term of art used to describe persecutory campaigns

8   comprising persecution and torture. See, *supra* at sec. II. A.

9   62.     The term *douzheng* was used by Cisco in internal power point presentation files to define

10  a key purpose of the Golden Shield project as a whole, and in defining "opportunities" Cisco was

11  pursuing in the fields of Design, Construction, Training, Security, and Maintenance. This

12  statement of the purposes of the Golden Shield was also echoed in Cisco reports referring to the

13  "Strike Hard" campaign against "evil cults," which the Golden Shield assisted in furthering, as

14  equivalent to and connected to the *douzheng* of Falun Gong. All of these materials were identified

15  as emanating from Cisco San Jose.

16  63.     In one Cisco report posted on Cisco's United States-based website, Cisco.com, Defendant

17  Cheung characterized as a major selling point of the Golden Shield apparatus its capacity to

18  ensure "social stability" which Chinese security uses as a code word for suppressing groups like

19  Falun Gong.

20  64.     At a technology trade show in Beijing in the early 2000s, Cisco booth brochures similarly

21  marketed the Cisco's services as being in line with the major concern of the Party by claiming

22  that that its technology could be used to *douzheng* Falun Gong. The offered services appeared to

23  be ratified by Defendants in San Jose.

24  65.     In the company's internal marketing literature, a high-level Cisco engineer reiterated

25  Cisco's commitment to customize all of their products to meet security's objectives, which the

26  same engineer described elsewhere as inclusive of – indeed devoted to – the *douzheng* of Falun

27  Gong and other dissident groups in China. This engineer reports to Defendant Chambers through

28  intermediary senior executives at Cisco China and Cisco's Asian branch office.

14

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

66.     The characterization of Falun Gong believers as "viruses" or "despicable" during an online training session posted by Cisco on pages of its website, which were accessible from the United States until August 2012, similarly mirrors Party propaganda that describes Falun Gong believers as pestilence, viruses, diseases, and sub-human.

67.     Invoking the Party's use of *douzheng* and similar rhetoric has been central to Cisco's intent to curry favor with Communist Party leaders by displaying the ideological orthodoxy needed to maintain insider status in Party dealings.

68.     At a trade show in Shanghai also in the early 2000s, where many foreign companies offered technology specifically designed to "stop Falun Gong," a key member of Cisco's sales team at the Cisco booth, approved and authorized by Defendants in San Jose, similarly described the features of Cisco surveillance equipment to author Gutmann, stating that the Golden Shield "Policenet" technology Cisco developed for China could do far more than the technology Cisco provided to security in the US.  The technology they had developed for China provided a secure connection to provincial security databases, allowing for thorough cross-checking of names, affiliations, political behavior, family history, and "footprints." It even included the capacity and technology needed to read the content of email, figure out if someone had uploaded a new website, and monitor the Internet surfing history and email of designated persons whom Cisco describes elsewhere as dissidents and especially Falun Gong.

69.     The ability to cultivate strong relationships with the Party and Public Security officials was especially crucial to San Jose-based Defendants' well-planned marketing campaign. Cisco Senior Vice President Jim Sherriff described a key component of the company's marketing strategy as the development of relationships to ensure future business opportunities. Elsewhere Cisco characterizes its strong relationships with Public Security customers as one of its greatest marketing advantages in China.

70.     Defendant Cisco demonstrated in its marketing materials handed out, for example, at Trade shows across China their intention to meet the persecutory objectives of the apparatus to ensure Chinese security that the company would be a reliable partner for security contracts that would otherwise go to domestic Chinese firms.

15

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

71.     Cisco's Public Security team played a major role in communicating the persecutory goals of the apparatus to the company. Members of this important team included the well-connected Cisco systems engineer Mao Wanding who promised to tailor the apparatus to meet all client's objectives, which he elsewhere described as including, as a major purpose, the *douzheng* of the peaceful religious group.

72.     By 2000, Cisco had created a marketing campaign to win contracts to design and develop the Golden Shield knowing that it would be used in China for the surveillance, apprehension, and suppression of Falun Gong practitioners, through the use of torture and other extreme methods. Cisco developed and marketed specifically for the Golden Shield comprehensive technology tailored to that purpose.

73.     As early as August 2001, after Public Security officers had initiated Requests for Proposals, Cisco was selected to submit the high-level design for the "National Public Security Network Engineering Design Proposal."  By October 2001, after numerous design reviews and discussions with Public Security officers that included mention of the anti-Falun Gong features and purposes of the apparatus, Cisco completed the high-level design.

74.     Based on an overwhelmingly effective marketing campaign managed largely from San Jose, Cisco was selected on successive occasions to design and implement many Golden Shield components marketed as part of the Cisco "life cycle", which as indicated below, include the integration of several anti-Falun Gong features with the larger network and illustrate Cisco's willingness to carry out its promises to help Party and Public Security officers persecute and suppress Falun Gong.

### (2)     Design Phase

75.     Cisco's design and implementation of the Golden Shield, under the direction and control of Defendants in San Jose, occurred in at least two phases. During phase one, Cisco provided high-level design for and implementation of the Golden Shield database-driven surveillance system that could be accessed digitally by national, provincial and major municipal security across China. Beginning in 2006, Cisco began the second phase, devoted to geographical extension and technology upgrade.

16

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

76.     Many of the design features that Cisco developed, were first-of-their-kind features or integrated systems developed specifically to aid Chinese security officers in the detection, apprehension and interrogation of Falun Gong, as well as in subsequent torture and further persecution. Cisco recommended the use of many of these first-of-a-kind features, which Party officers could not have envisioned based on their lack of expertise; even technical experts in China lacked the experience, training, or resources to develop these cutting edge innovative solutions.

77.     Understanding the nature, needs and objectives of the Golden Shield, in particular its repressive uses were a fundamental part of the design (and implementation) phases. The need to understand clearly customer objectives is even greater in network and database driven systems such as the Golden Shield, where the nature of the data and how it will be used, i.e., applications, are essential to the design, optimization and use of the network.

78.     Phase one required careful study of the persecutory apparatus of the Party including the role of the Political and Legal Affairs committee (see *supra* at ¶ 40), that is directly responsible for implementing many aspects of persecutory campaigns carried out by the Party in China. Even the Falun Gong specific 610 Office is listed in several internal files along with repeated mention of the vast system of detention centers, such as re-education through labor camps, public security hospitals and even mental hospitals, jails and ad hoc detention facilities devoted to ideological conversion through torture and other egregious human rights abuses.

79.     For phase one of the Golden Shield project, Cisco and especially Defendants in San Jose had to further conduct a careful study of all purposes and objectives of the specific applications and systems required by Party and security officers. These included applications that would facilitate the identification of Internet users including Falun Gong, their location and apprehension, interrogation, forced conversion and coerced confessions, movement throughout the system, from entry into the database system through arrest, confessions, detention, release and so on.

80.     In order for Cisco San Jose to meet the persecutory objectives of their client, Cisco's first phase designs featured a multi-tiered network comprising: a library of "signatures," i.e., carefully

17

analyzed patterns of Falun Gong Internet activity to enable the intelligent identification of individual Falun Gong Internet users; log/alert systems that provides real time monitoring, event correlation and notification based on Falun Gong Internet traffic patterns and behaviors; national and provincial "Information Centers" with "centralized databases" dedicated specifically to Falun Gong practitioners; a "National Information System for Falun Gong Contact Persons," a Falun Gong "Web Notification Server" to enable comprehensive surveillance and tracking of Falun Gong coordinators and other suspects; integration of the Information Centers and Falun Gong databases with networked security features—such as the Intrusion Detection and Prevention Systems (IDS/IPS)—capable of monitoring and tracking Falun Gong practitioners.

81.     Defendant Cisco's Golden Shield designs comprise individual features designed specifically to suppress Falun Gong integrated with dual or multi-purpose features specifically to enable the suppression of the religious group. Cisco-designed routers, filtering and/or security systems are subjected to an intensive process of customization entailed in assembling and integrating the anti-Falun Gong features of the Golden Shield with neutral or dual-purpose components.  The non-Falun Gong specific components were necessary to achieve its effectiveness in suppressing Falun Gong, but they were not sufficient. The effectiveness of the overall system depends on the integration provided by Cisco at the direction of Defendants in San Jose of the highly customized features noted in this section with all other components.

82.     At the very forefront of Cisco's first phase high-level designs is the highly advanced "Internet Surveillance System," which as the eyes and ears of the apparatus comprises Internet traffic snoopers, highly advanced image/video analyzers, and innovative network security features capable of detecting, tracking and identifying Falun Gong believers online.

83.     Designed primarily to *"douzheng"* all Falun Gong believers in China, it is integrated with an array of systems in Cisco designs to facilitate at minimum the following elements of the *"douzheng"* campaign: the identification, tracking, locating, isolating and forced conversion of Falun Gong. These include:

    a.   Detection systems.

    b.   Log/Alert/Notification Systems.

18

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

c.  Tracking systems.

d.  Information Centers with databases dedicated solely to Falun Gong.

e.  Web announcement interface.

f.  National Information System for Falun Gong Key Personnel.

g.  A combined video surveillance and tracking system.

h.  Training and long-term customer support.

84.     To enable Chinese security to subject Falun Gong believers to ideological conversion through torture, Golden Shield components and integrated systems were designed specifically for this purpose.  In fact, the technical requirements of the apparatus required Cisco to tailor each step of the design process for this purpose.

85.     For example, Cisco designs integrate the Falun Gong Databases, the National Falun Gong Information System for Key Personnel, and the Falun Gong Web Notification System with Cisco security software systems not only to enable the identification and tracking of Falun Gong, but also and specifically to give Chinese security access to the sensitive information to facilitate the *zhuanhua* (forced conversion through torture) of Falun Gong believers based on their individual social and economic circumstances, and the amount of leverage that can be exercised against them through threats against family members, fellow adherents, and others.

86.     Other prominent Cisco design features enable Chinese security at public security psychiatric hospitals, public security hospitals, 610 office locations, to access the profiled information stored in the apparatus and use it to forcibly convert and in other ways persecute Falun Gong.

87.     The Golden Shield could not be designed without a deep understanding of such specifications as how the anti-Falun Gong information would be collected, who could access the information, how much may be transmitted, whether to create backup copies, how it would interface with the larger Public Security confidential security systems. Cisco could not design these systems without an equally intimate knowledge of the repressive purposes of the databases, i.e., that Public Security agents and others would subject targeted individuals to various forms of arbitrary detention, interrogation via torture and other forms of human rights abuse.

19

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

88.     The anti-Falun Gong objectives communicated to Cisco were not only outlined in Cisco internal reports and files, upon information and belief kept in San Jose, but they were also stated in hundreds of reports or announcements publicly and conspicuously displayed by Communist Party agents throughout China. Such reports include notices by official Communist Party media, as well as announcements on local government websites by regional public security authorities, reiterating Communist Party orders to use the Golden Shield to suppress Falun Gong. Many of these reports specifically emphasized the need to develop features that would facilitate serious human rights violations of Falun Gong adherents. Prominent among such features was the stated need for Falun Gong databases, which would enable the categorization of Falun Gong believers according to their susceptibility to forced conversion tactics and thus to "solve the problem of [their] forced conversion [*zhuanhua*] easily" (See, e.g. Anhui 2001 Party/Public Security Report).

89.     One typical report outlines that "Falun Gong [are] categorized into 3 types: Type A (fully transformed), Type B (basically transformed) and Type C (obsessed and stubbornly refuses to transform). All 3 types of people are dynamically managed using a database, and different "re-education and *zhuanhua*" methods are used for different types of people." "Falun Gong [are] categorized into 3 types: Type A (fully transformed), Type B (basically transformed) and Type C (obsessed and stubbornly refuses to transform). All 3 types of people are dynamically managed using a database, and different "re-education and zhuanhua" methods are used for different types of people. Over the past few years, through in-depth investigations and meetings, the family composition, contact information, information of their sons and daughters, where they live etc. of targets of transformation (*zhuanhua*) have all been input into the database, creating a detailed, highly-effectively, flexible and free-flowing information database. . . . So we are able to . . . solve the problem [of transformation] easily." See, "Significant Progress Seen in Education and Zhuanhua Work in Zhijiang County, Hunan Provice," at URL: http://www.cnfxj.org/Html/ xgflgtbbd/2010-5/28/005052934_3.html.

90.     Another similarly typical report urges the creation of Golden Shield databases because Falun Gong believers often returned to the practice of their religion after having been subjected to forced conversion practices: such practices thus needed an efficiency boost. Yet another public

20

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    notice, from the city of Tianjin (a major market for Cisco), expressed the local public security

2    authority's need for further technology to establish "perfect compatibility" between mobile

3    surveillance systems and the Falun Gong database system.

4    91.    According to one or more experts, Cisco's Public Security Sales team was tasked with

5    accessing and sharing with company superiors all public security information about the Golden

6    Shield, including public security related reports emphasizing the "*zhuanhua*" purpose of the

7    databases, the need for other anti-cult/anti-Falun Gong confidential/secret information systems,

8    an anti-cult/anti-Falun Gong network, and other specifications geared to surveil, torture and in

9    other ways suppress Falun Gong.

10   92.    During phase two, the practical application of the system to the torture and suppression of

11   Falun Gong was undertaken in an even more thorough and comprehensive manner by Cisco.

12   Existing practices were carefully analyzed and made more efficient as well as increased in scope

13   by Cisco engineers in San Jose.

14   93.    Phase two enhancements of the capability of the Golden Shield to target all Falun Gong

15   adherents are best illustrated by the "Ironport" product that Cisco incorporated into the Golden

16   Shield beginning by at latest 2007. This product demonstrates Cisco's key design and

17   implementation practice of customizing its technology specifically and deliberately to target

18   Falun Gong web activity as distinct from other web users. See *infra* at ¶ 97.

19   94.    Importantly, the second phase indicates even more explicitly Cisco's compliance with

20   Communist Party ideological objectives including the suppression of Falun Gong. To this end,

21   second phase high-level designs reflected the objective to eliminate every instance of Falun Gong

22   activity occurring in China including upgraded integration of Falun Gong databases with the

23   network to "catch" Falun Gong believers who were themselves using ever more advanced

24   methods to escape detection and persecution.

25   95.    All of the high level designs provided by Cisco to its Chinese customers were developed

26   by engineers with corporate management in San Jose, the sole location where Cisco cutting edge

27   integrated systems and components were researched and developed at least through 2008.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**(3)** **Implementation**

96.    Cisco implemented many if not all of the features and applications described above including those customized to 1) identify, 2) apprehend and detain, 3) interrogate and transform through torture, and 4) maintain a constantly updated "lifetime" information profile for every Falun Gong adherent.

97.    Various technologically sophisticated Golden Shield solutions were implemented to facilitate the identification of Falun Gong believers. These include:

(a)    Log/alert Systems enabled on Cisco routers. As indicated above, this feature includes "logging" of all detected Falun Gong adherent activity with algorithms programmed into the system to profile Falun Gong in order to detect communications likely sent by them, e.g., an attempt by a Chinese Internet user to connect to the Falun Gong digital Temple that is based in the United States. The logged information related to the event, e.g. IP address, website visited, date/time of access, etc., will be sent to Chinese security as an alert, notifying them of the suspicious activity.

(b)    Cisco Security Software System. Similar to the log/alert Systems, but more technically complex and effective in detecting and alerting security forces of Falun Gong activity. This system incorporates Cisco's IDS/IPS security software through which it detects algorithms and other information associated with computer or network use, then compares and matches the information to Falun Gong computer usage profiles (which Cisco also had to create and maintain). Cisco staff, with express or implied authority from Defendants in San Jose, specifically recommended this software, e.g. on online Question and Answer forum, to deal with ("despicable") Falun Gong adherents and their activity. Cisco also had contracts with Public Security officers specifically for this security software, highly customized to suppress Falun Gong.

(c)    Ironport, an email and website blocking system that Cisco marketed in China, also included at least one new product marketed as the "only product capable of recognizing over 90% of Falun Gong pictorial information." This software product was marketed by Cisco as able to identify Falun Gong online email communication (as distinct from other

22

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

communication about Falun Gong) to facilitate the identification and apprehension of Falun Gong believers who typically sent and forwarded pictorial Falun Gong images to others in China. To create these unique Falun Gong "signatures" required Cisco's extensive and long-term identification and analysis of Internet activity unique to Falun Gong practitioners. In addition, with the approval of Defendants in San Jose, Cisco intentionally incorporated the Falun Gong-specific signatures into security software upgrades at regular intervals to ensure Falun Gong activities and individuals were identified, blocked, tracked and suppressed.

(d)     Service Control Engine. This system detects and blocks Falun Gong web content, including personal emails, and logs the data about such web presence similar to the systems above. Cisco marketing materials associated with this system include specific warnings about four "Current Threats" online – all of which were Falun Gong-related. This system, like those above, facilitated the arrest, detention, and torture of Falun Gong adherents it identified via their web presence.

(e)     Video Surveillance.  By at the very latest 2006, Cisco was actively helping Chinese security forces build a nationwide, networked video surveillance system. Touted in marketing "success stories" on the company's website describing projects in Qinghai, Yunnan and Beijing, this video surveillance has been a primary means by which Falun Gong adherents are identified while protesting or practicing their religion, and are then taken into the custody where they are subjected to human rights abuse.

(f)     Integration of the Falun Gong databases. The Falun Gong databases created by Cisco had to be integrated with all of the surveillance and identification Golden Shield technology. Without this integration, the data entering the system could not be matched instantaneously with existing profiles of Falun Gong adherents, web usage profiles, or "signatures" of visual or computer data, to allow instant identification. This complex and unique feature was crucial for the overall project's effectiveness in identifying Falun Gong adherents better than could any alternative.

98.     Cisco implemented additional features to facilitate the apprehension, detention, interrogation and forced conversion of Falun Gong believers. These included:

23

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

(g)     The integration of Falun Gong databases with public security command and dispatch centers, intelligence and information analysis centers, mobile and front line police technology to facilitate the apprehension of Falun Gong suspects from anywhere in China.

(h)     The integration of databases with applications designed to enable security at police stations, police detention centers, black jails, public security mental hospitals, rehabilitation clinics, "love and care" rehabilitation centers, labor camps, and other facilities many converted from existing structures into ad hoc detention centers facilities to successfully interrogate, ideologically convert and transform Falun Gong suspects. Courts in their official verdicts regularly rely on forced confessions elicited through these sessions.

(i)     The storing of forced conversion sessions in information systems readily available for continual use and reuse against the same individual in case he or she refuses to permanently relinquish their religious beliefs and practice.

(j)     The sharing of effective forced conversion sessions with other security to enable them to learn how best to force the Falun Gong adherent to renounce his religious belief.

(k)     All of the above required first-of-a-kind integration and customization of features developed solely or primarily to suppress Falun Gong or dual purpose features integrated solely for this purpose.

99.    The *zhuanhua* forced ideological conversion practices were carried out at Public Security detention facilities (including unofficial holding centers illegal under Chinese law) via the first phase Golden Shield designs in two primary ways. First through the surveillance-intelligence analysis systems and secondly through a Public Security command center. Individualized conversion procedures were used especially to convert "hard core" Falun Gong practitioners who refused to renounce their belief in compassion, truthfulness and the other tenets of the religion. Residing in all regions across China, the ideological conversion of millions of ("hard core") Falun Gong believers could not have been carried out in China without the database driven network of the scale and capacity of the apparatus designed and developed by Defendants in San Jose.

100.    The goal of permanent forced ideological conversion required maintenance of a dynamic information management system, that could keep up with the believers' changes in life style,

thoughts, moods, susceptibility to threats, and other factors which had to be recorded meticulously in order to ensure successful *zhuanhua*. This need for the Golden Shield to constantly obtain, update, and cross-reference information about individual Falun Gong adherents throughout this entire "lifetime" in the system was closely and conspicuously tied to many forms of human rights abuses, including those suffered by Plaintiffs in this case.

101.    To maintain a constantly updated "lifetime" information profile for every Falun Gong adherent required the integration of their initial identification, and every subsequent piece of data associated with them. This included each and every interrogation, each and every forced confession, torture/forced conversion, and further incarceration, release, medical "treatment" (often a euphemism for forced detention in converted medical facilities dedicated to the torture of dissidents), death resulting from torture and other abuses, notes of security officers handling their case, and a wealth of other information.

102.    The Golden Shield also required post-product maintenance, testing and verification, training and support, as well as "Advanced Services", which Cisco provided to Public Security and, by information and belief, 610 officers. All of the above required intensive and ongoing involvement by Cisco employees in San Jose

103.    Beginning around 2001 and continuing through at least 2008, Cisco employees tested and verified the operability of the Golden Shield system they made available to Party and Public Security officers in China.

104.    During the same period, Cisco employees trained Chinese security officers to use Cisco equipment to monitor and arrest Falun Gong practitioners. They also provided maintenance and other customer services to such officers and officials when they needed assistance with the technology.

105.    Prior to the implementation of the Golden Shield, it was not possible for the Party or security officers to detect, identify, or track Falun Gong religious activities online.

106.    Without Cisco's networked technology (with first-of-their-kind features) and the Golden Shield's far wider scale, complexity and capacity, Public Security and Office 610 officers would not have been able to obtain sensitive information from almost anywhere in China such as home

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   and work addresses, purchases, financial information, contact with other Falun Gong members,

2   past Falun Gong activities, IP addresses, and family information (used for interrogation and

3   forced conversion practices/purposes). Nor would it have been possible for security officers to

4   coordinate large-scale investigations, locate, track, apprehend, interrogate, torture and persecute

5   Falun Gong members from anywhere in China without having to search each and every home and

6   office for evidence.

7   107.    By 2007, Cisco completed the construction and implementation of a three-tiered Golden

8   Shield network in the provinces of Yunnan in 2001, Shaanxi in 2002, Anhui in 2003, Fujian in

9   2004, Guangdong in 2004, Hainan in 2004, Zhejiang in 2004, Heilongjiang in 2006, as well as the

10  provincial-level municipalities of Beijing in 2002 and Shanghai in 2005.

11  108.    Cisco's design solutions and security features, geared explicitly to help Chinese security

12  *douzheng* Falun Gong, cemented Cisco's place as one of the top foreign technology providers in

13  the Chinese market and further incentivized Cisco to provide more and more effective solutions.

14  The decision making central to the success of the implementation processes that include

15  construction, testing, verification, optimization, and servicing were approved by and enacted and

16  orchestrated in San Jose.  As noted above, San Jose's procedures required that headquarters

17  controlled all decision-making and related management over the project.

18          **C.      Chinese Security's Use of Cisco's Customized Golden Shield to Track,**

19                  **Identify, and Persecute Falun Gong Believers**

20  109.    As early as 2001, Chinese security were encouraged to use and were praised and

21  rewarded by their Party superiors for their use of the tiered Golden Shield apparatus to suppress

22  Falun Gong believers in regions across China.

23  110.    Cisco designed and implemented the Golden Shield for Public Security officers and Party

24  agents to conduct the suppression of dissident groups, and other specific objectives in ensuring

25  "social stability". Cisco had built a national database system, with real time updating and mobile-

26  ready capabilities by 2001. According to Chinese sources, as of June 2003 it was installed and

27  operational in every province of China except Sichuan. It has since become operational in

28  Sichuan as well.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

111.    Public Security officers, Party officials, and Office 610 security agents routinely profiled, analyzed, and shared information on Falun Gong practitioners acquired through the Golden Shield, developed and implemented by Cisco, in order to facilitate their identification, tracking, detention, and ideological conversion and related forms of torture beginning as early as 2001 and continuing through 2012, if not later. The Golden Shield also stores sensitive information about Falun Gong practitioners who have been previously detained and/or apprehended, thereby enabling Chinese security officers to use the information to interrogate, forcibly convert and torture practitioners in part based on their previous encounters with Chinese security. These previous episodes and other assembled evidence were used to further their persecution.

112.    Cisco website reports and internal literature confirm the use of the Golden Shield by Chinese security at the national level as early as 1999.  China's mainland provincial and provincial-level municipality Public Security officers were able to digitally access the apparatus by 2001. These reports further confirm that local security officers stationed outside of big cities used the Golden Shield as the means to identify, capture and forcibly convert Falun Gong adherents between 2001 and 2012, with the date of such implementation varying by location.

113.    Public Security reports further confirm that Public Security officers monitored Nanjing train entrances and exits, looking for Falun Gong practitioners attempting to travel to Beijing. These officers were equipped with mobile laptop computers that were connected to the Golden Shield network and which allowed the officers to identify "suspected" Falun Gong practitioners through the use of Golden Shield databases storing information on Falun Gong practitioners. The specific type of mobile police monitoring used by security in Nanjing was first promoted in Cisco sales and marketing presentations and continues to be common practice across China.

114.    According to a former Office 610 security agent, 610 agents in Tianjin were tasked with the analysis and categorization of information stored in the Falun Gong database(s). These agents routinely instructed or ordered other Chinese security officers to interrogate and forcibly convert Falun Gong adherents through their relevant personal information collected via the Golden Shield apparatus that Cisco designed, developed and implemented.

27

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

115.     According to the same agent, he and other Office 610 security agents used the Golden Shield Information Management and Database System – that Cisco provided to Chinese security across China – as the essential means to manage, analyze and categorize information about Does I-III and instruct public security officers to apprehend, detain and forcibly convert them.

116.     As early as 2001, numerous Party and Chinese security reports and documents further describe the use of Golden Shield databases to "manage" and "stop" Falun Gong in regions where Cisco specifically directed and tailored the Golden Shield apparatus to meet the security requirements and objectives of its Chinese clientele.

117.     A report published in Anhui province in 2001, where the Cisco Public Security team collaborated with provincial security to design, develop and implement the apparatus, describes the construction of Falun Gong databases as an essential part of the anti-Falun Gong information management system used to "deepen the *douzheng* against Falun Gong… to unearth all Falun Gong online information to firmly control [Falun Gong] … and when necessary to implement compulsory ideological conversion measures to prevent a return to their practice of their religion."

118.     Several other Anhui reports confirm the completion and use of the Falun Gong personnel Information System for Key Personnel in Anhui Province. Defendant Fredy Cheung, Vice President of Cisco (Greater China Region), boasted that Defendants had successfully constructed the Public Security information systems that include Falun information systems, to meet the specified needs of the customer.

119.     A report from Guangdong describes the use of a Golden Shield Falun Gong database "constantly updated with information related to practitioners" to facilitate forced conversion practices in re-education through labor camps in Shenzhen City, Guangdong Province.

120.     Reports from Sichuan, Tianjin City, Shandong, Henan, and other locations in China, similarly describe the use of databases of Falun Gong believers as the means to administer the crackdown against them and/or their forcible conversion.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

121.     An Anhui Province Public Security report emphasizes the "positive" role the Golden Shield apparatus has played in the arrest and "*douzheng*" of Falun Gong believers in that province.

122.     Multiple Public Security monitoring log and alert reports further confirm that the Golden Shield has become a fully integrated system that Chinese security are still using to identify Falun Gong adherents, to follow up such identification with "on-site investigations" of Falun Gong religious activities, and to locate and apprehend individual adherents.  These reports also make clear that the Falun Gong databases, designed and developed by Cisco, made available to security forces detailed sensitive information about individual Falun Gong believers, leading to their identification, investigation, and detention. This recorded information includes: online ID numbers; physical locations; history of engagement in Falun Gong activities or association with the religion; history of detention and efforts at forced conversion through torture; and "surveillance levels", indicating the degree of difficulty likely to be involved in the forced conversion process, with advice as to how to convert Falun Gong believers based on this and other typologies.

123.     These reports further reveal how the Golden Shield facilitates the nationwide suppression of Falun Gong by enabling Public Security to discover, e.g., connections between an Internet user in Sichuan Province and another user in Shandong Province. Such connections and similar data were essential to the identification and arrest/detention of either or both users in such cases, and their subsequent interrogation and forced conversion in the custody of Chinese security forces.

124.     These and other reports make clear that Public Security officers and Office 610 security agents used the Golden Shield to facilitate the identification, tracking, detention, interrogation and ideological conversion through torture of Falun Gong adherents. They did this by making use of features that Cisco specifically designed, marketed, implemented, and suggested for these purposes.

///

///

29

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

### D.   Cisco Participated in the Alleged Violations Directly and through Agents and/or Alter Egos and in Collaboration with the Party, Public Security Officers and other affiliates or partners

125.   In collaboration with Party and Security officers, Cisco designed and developed the Golden Shield to incorporate advanced information and communication technologies into security enforcement with the primary goal of creating a comprehensive online surveillance system specifically directed to enable and facilitate the suppression of dissident activity in China, specifically that of Falun Gong.  Cisco helped its public security clients to achieve their goals, in part via Cisco's affiliates, partners, and/or alter egos.

### (1)   San Jose Headquarters Office

126.   The company's success in the highly competitive and lucrative Golden Shield market was due to the considerable and essential involvement of its San Jose headquarters office ("San Jose"). Cisco orchestrated the planning and preparation, marketing, design, implementation, operation and optimization phases from San Jose. By information and belief, San Jose manufactured key components of the Golden Shield in the United States, such as Integrated circuit chips that function in the same manner as the Central Processing Unit of a computer, i.e., its "brain."

127.   As noted above, all decision-making essential to the project was orchestrated in San Jose, with headquarters exercising full control.  In addition, the Defendants, from their San Jose headquarters, handled all aspects of the high-level design phases including those enabling the *douzheng* of Falun Gong via their identification, high-level tracking, capture, interrogation, prolonged confinement without due process, and forced conversion through torture.  This required the integration of Falun Gong specific components with all other features of the apparatus to provide Chinese security with the profiled information they needed to forcibly convert believers in addition to isolating and suppressing them.

128.   Prior to initiating the Golden Shield project, the Defendants, from their headquarters in San Jose, planned in minute detail their market strategy for China. This required close collaboration among different San Jose departments, e.g., operational, marketing and engineering,

30

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

and careful evaluation of Golden Shield project objectives and careful strategizing to accomplish those objectives as regarding the suppression of dissidents, above all Falun Gong.

129.    Cisco orchestrated the marketing, design, implementation and optimization phases, as set forth above, see *supra* at, section II.B, from San Jose, as the sole location where all Cisco core advanced technology was developed, at least until 2008. During each of these phases, Cisco headquarters planned and engaged in a step-by-step process essential to establishing successful use of the Golden Shield to enact "*douzheng*" of Falun Gong. This required establishing all project specifications, objectives, and strategy, encompassing, inter alia, the development of new security software, painstaking programming of specialized applications and integration of components with a network they tailored to meet relevant project objectives.  Throughout this process, Defendants from Cisco headquarters initiated communication with Party leadership and Public Security officers; conducted due diligence analyses related to shareholder inquiries about the persecutory uses of the apparatus; supervised and directed a marketing strategy to run the Golden Shield project in China; developed high level Golden Shield designs with (*inter alia*) the scale, capacity, complexity and adaptive intelligence required to isolate and suppress Falun Gong; created a plan of implementation in light of the customer geographical and scheduling requirements; and conducted careful review of types of Internet and other activity the Golden Shield was developed to identify and repress, including Falun Gong specific components and features.

130.    This process required careful study and analysis of all customer objectives and concerns by San Jose engineering, marketing, and operations departments with top-level leadership in San Jose.

131.    During Request for Proposal, high-level design and/or other phases of the project, Defendants, from the San Jose headquarters, ensured that the apparatus could handle the exact types of data that the Golden Shield would compile, store and make available to Chinese security, including, e.g., Falun Gong's continuously updated geographical locations, Internet usage patterns, profiles of prior dissident activities, and other sensitive information stored in the databases such as biometric data and susceptibility to interrogation and ideological conversion.

31

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

132.     During Request for Proposal, high level design and/or other phases, the Defendants in San Jose described sophisticated technical specification linked to the above functions of the Golden Shield, including specifications related to the "anti-cult information system," e.g., who can access information, how the information is transmitted, transmission speeds, data storage location and capacity.

133.     Defendants, in San Jose, were also especially involved in the process of obtaining the Golden Shield project line of business and in the various processes entailed in securing the deal. This required Cisco to adopt a coherent strategy targeting individual officials for the cultivation of "*guanxi*" contacts and to serve as allies within the Party, and to a lesser extent in government offices. This entailed identifying powerful potential allies, arranging meetings, and developing relationships. Cisco developed *guanxi* with an agenda of personal visits by high-level executives, reaching all the way up to Defendant John Chambers himself with his three personal meetings with Jiang Zemin. Below Chambers, high-level executives from San Jose and from Cisco China sought out national, provincial, and city-level Communist Party leaders who were and remain factionally tied to Jiang.

134.     The project additionally required providing customer service and network maintenance to ensure fulfillment of client objectives and providing training materials and management of the training process, which similarly required extensive/intensive participation by San Jose and their engineering, marketing, operational specialists, and high-level executives exercising decision-making authority necessary to effectuate the persecutory and other goals of the Golden Shield.

135.     Without the close collaboration among and decision making by San Jose divisions comprised of dozens of engineers, marketing, operational specialists, Golden Shield decision-makers and high-level management and its high-level executive officers, Defendant Cisco could not have won successive contracts to design, implement and optimize the Golden Shield in the late 1990s and the first decade of the 21st century.  Defendants in San Jose's involvement was pervasive, essential to success, and dispositive of the major decisions in the ongoing Golden Shield project in China.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

### (2)    Alter Egos and Agents

136.    In addition to these and other direct participation, Cisco furthered the Golden Shield project through Cisco China and other agents and/or alter-egos. The unity of interest and ownership between Cisco Systems and Cisco China and other affiliates, agents and/or alter egos comprises high level of control over day-to-day operations and Cisco China acting as a mere proxy for Cisco System's operations in China. In addition, all claims raised herein arose within the scope of Cisco System's control over Cisco China and other Cisco operations in China.

137.    Defendants in San Jose created Cisco China on September 22, 1998, soon after Communist Party Officers at the Public Security Party Committee meeting initiated the Golden Shield project in China. Cisco had to create an alter ego for the purpose of conforming to China's regulations restricting domestic activities of foreign corporations, introducing the Cisco brand across China, and accumulating social capital for the U.S. company through their well-established relationships with high-ranking members of the Party. Essential to this process was the promise to meet the anti-Falun Gong objectives of the Golden Shield project.

138.    During the period relevant to this complaint, Defendants in San Jose directly oversaw the operations of Cisco China, shared the same management structure, with internal reporting charts indicating a clear chain of command in which all operations in China were reported to and major decisions were directed by executives in San Jose. Cisco maintains an agency or alter ego relationship over Cisco China by prior authorization of all acts and by subsequently ratifying their actions, including by failing to disavow their wrongful conduct or attempting to cover it up.

139.    As the public face of Cisco in China with no clear corporate demarcation between Cisco and Cisco China, Cisco China operated primarily as a satellite marketing office for Defendant Cisco with executives reporting directly to Cisco's Asia Pacific branch executives, who reported directly to Defendants in San Jose.  San Jose Defendants exercised unusual control over Cisco China's day-to-day and other operations.  Many of the high-ranking Cisco China executives held equally high-level sales and marketing positions in Defendant Cisco's San Jose headquarters and/or Cisco's Asia Pacific division. For example, Jim Sheriff, who served as a high-ranking

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

executive in Cisco San Jose, was then appointed CEO of Cisco China. Thomas Lam, who

similarly served as a high-ranking Cisco executive, was then appointed President of Cisco China.

140.    Defendant Cisco trained Cisco China employees and provided them with skills and

knowledge developed by the parent corporation.  High-level executives and marketing personnel

from Cisco China attended meetings at least twice a year at Defendants' San Jose headquarters

with officers of the parent corporation. Additional teleconference meetings involving defendants

also occurred on a regular basis.

141.    Cisco employees regularly use the generic term "Cisco" to refer to Defendants' operations

in China, represent themselves as acting on behalf of Cisco Systems in all public materials and

disclosures, and in other ways do not distinguish their own actions from those carried out by

Cisco Systems. For example, Golden Shield "success stories" that are posted on Cisco's website

routinely describe Cisco the parent company and all subsidiaries as "Cisco."

142.    Cisco's marketing and other offices in the Asia-Pacific region did not function as an

independent contact for Cisco's customers in that region, but rather operated with and under the

close supervision of the San Jose executives.

143.    Cisco's Chinese customer support, including support related to the Golden Shield, was

managed by the parent corporation from San Jose at least through 2008.

144.    According to Cisco's internal documentation, the Cisco parent corporation follows a

decision-making rubric in order to determine whether to maintain sole control over a project,

outsource it, or form a partnership. For projects like the Golden Shield that required the most

advanced technology and custom integration and implicated both competitive advantage and risk,

Cisco's internal policy is for company headquarters to maintain sole control throughout the

entirety of the project.

145.    For technologically advanced important overseas projects like the Golden Shield,

Defendants operating out of San Jose routinely assigns its own engineering resources to design

and implement the project in its entirety and in particular through its Advanced Services Team

("Advanced Services Team"), a specialized service offered by San Jose Defendants that employs

34

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

experts and engineers in network technology for large-scale overseas projects or important clients.

146.     Cisco Advanced Services Team's approach comprises four steps: (1) *assessments and planning*, which includes assessments of a network's internal security, external security, wireless security, and dialup security; (2) *design*, an intensive process in which Cisco "build[s] a scalable, adaptable, and easy-to-use security solution" involving many rounds of high-level planning and customization (3) *implementation* by integrating security solutions into the network infrastructure for Cisco clients; and (4) *optimization*, which Cisco describes as including "continually identify[ing] and mitigat[ing] risk" among other forms of continuing customization. This is the same approach Defendant Cheung describes as provided by Defendant Cisco for the Golden Shield in China.

147.     To further consolidate its role in China, Defendants in San Jose established the China Research and Development Center ("CRDC"), which played a major role in the implementation of Cisco projects in China including the Golden Shield. Cisco maintains an agency or alter ego relationship over CRDC by prior authorization of all acts and by subsequently ratifying their actions, including by failing to disavow their wrongful conduct or attempting to cover it up.

148.     The CRDC approves China growth strategy and decides what (technology) should go to China. All actions carried out by the China Development Office (in China) are reported to the CRDC. At the top of the CRDC's reporting structure are Defendant Cisco's executives.

149.     Defendants in San Jose created the China Strategy Board (CSB) in 2008 to initiate a new phase in its control and management of Cisco projects in China including the Golden Shield.  The CSB, composed mostly of Cisco executives, develops and drives the vision and strategy for China, and has veto power over the decisions of Defendant Cisco's subsidiaries in China. Of the eleven members on the CSB, eight of them hold positions at Cisco's headquarters in San Jose.  In 2008, the CSB sent a delegation to meet Dalian mayor Xia Deren to discuss goals and strategies for ongoing and future projects.  Xia is both Jiang Zemin's nephew and a key figure in the crackdown on Falun Gong. He was subject to declaratory judgment for torture, cruel, inhuman

35

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

and degrading treatment and arbitrary detention against Falun Gong in 2002 in *Doe v Qi*, F. Supp. 2d, 1258, 1285-87 (N.D.Cal. 2004).

### (3)   Collaborative Efforts

150.   Not only did Defendants in San Jose maintain direct and close control over its subsidiaries, partners, affiliates and alter egos in China, but they deliberately entered into collaboration with Party and Public Security officials to accomplish the clients' most important goal: the effective suppression of Falun Gong.

151.   As early as 1999, Defendants in San Jose through employees in China entered into an agreement with Public Security officials to construct the core network of the Golden Shield. This network provided central Public Security officers at national levels with digital access to the Golden Shield surveillance and database network by 1999.  By that time, Cisco had created a public security sales team, with sales representatives working directly and collaboratively with Public Security officers in regions across China, and like other Cisco China employees, reporting directly to Cisco's Asia Pacific branch and San Jose (at least until 2010).  Cisco's public security marketing and sales team's collaboration with Public Security officers played a key role in securing Golden Shield contracts for Cisco in China.

152.   Defendant Cisco, at the behest of its co-Defendants, entered into further agreements with Public Security officials at regional levels to develop and construct additional features of the Golden Shield.  These included: agreements to provide the software, hardware, and infrastructure to link security at local regions, major municipalities and provinces in China to the Golden Shield backbone; agreements to provide information centers to host central Falun Gong databases; agreements to train Chinese security officers in the use of surveillance technology; and agreements, made between 2004 and 2006, to geographically expand and upgrade Golden Shield infrastructure.

153.   Cisco acknowledged on its website that Cisco constructed the Golden Shield in "full collaboration" and "partnership" with Public Security officials in the Shanxi province of China. Numerous other statements on Cisco's website from as early as 1999 discuss Cisco's collaboration in constructing the Golden Shield in partnership with Chinese security officers in

36

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

regions across China including all regions where Plaintiffs and similarly situated persons were identified, apprehended and persecuted.

154.   Defendants acknowledged on Cisco's U.S. based website that its Golden Shield designs are specifically tailored to meet the specified needs and requests of Chinese security. Moreover, the designs depicted in other Cisco internal files reflect such direct collaboration.

155.    Defendant Cisco participated in technology trade shows and conferences where Cisco showed Chinese Public Security and Party officers and agents how its technology could "stop" Falun Gong.  At least one or more of these web technology trade shows, where Cisco marketed and sold its Golden Shield products, were organized in part by the Party Central Committee's Commission for the Comprehensive Management of Social Security, a body which is in charge of monitoring dissident activity.

156.   The Party not only oversaw trade shows, but was the entity ultimately responsible for engaging with Cisco at all stages of the Golden Shield project.  From John Chambers' initial meeting with Jiang Zemin, Secretary General, in 1998, to the Golden Shield's official launch chaired by Politburo Standing Committee member Huang Ju in 2003 and afterwards, the Party was intimately involved with Cisco's managing and directing of the Golden Shield project.

157.   The Party appears to have an office within Cisco China with a website that was accessible to all Cisco employees in China. By information and belief, this office had authority to define objectives and set important policy for significant projects like the Golden Shield. Such offices routinely operate as the eyes and ears of the Party within foreign companies, evaluating the extent to which they are fulfilling Party goals and ensuring they do not violate Party interests, e.g. by hiring Falun Gong adherents.

**E.**   **Before Initiating and During the Golden Shield Project, Cisco Had Knowledge of the Project's Intended Use to Suppress Falun Gong**

158.   Cisco was aware of the widespread persecutory campaign against Falun Gong by the Party and their security forces, as well as the desire to intensify this campaign and the abuses that this would entail.

159.   The scope of the campaign by the Party to persecute Falun Gong was common

37

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   knowledge, both inside and outside of China, after the announcements initiating the campaign

2   against Falun Gong in 1999. The campaign and its abuses received widespread attention from

3   media, foreign governments including that of the United States, and international organizations.

4   160.    In particular, much early reporting on the crackdown focused on the severity and ubiquity

5   of the torture and other forms of severe abuse employed against Falun Gong. Such abuse was the

6   subject of Ian Johnson's 2001 Pulitzer Prize-winning coverage for the Wall Street Journal, as well

7   as a host of other prominent reports. The degree to which such reporting made explicit the

8   campaign of widespread human rights abuses against Falun Gong practitioners is indicated by the

9   headline of the Washington Post's prominent 2001 article, "Torture Is Breaking Falun Gong."

10  The following news coverage was also prominent during the period in which Cisco was

11  evaluating and planning the Golden Shield project:

12  161.    Several *Associated Press* reports covered the Chinese policy of detaining and torturing

13  Falun Gong believers in 1999;

14  162.    An article by Elisabeth Rosenthal of the *New York Times* in 1999, reporting that over

15  35,000 Falun Gong practitioners had been detained that year, and that few of these were going to

16  be afforded a trial;

17  163.    Further reports from the *Los Angeles Times*, *Agence France Presse*, *Reuters*, and *Fox

18  News*, in 1999 and afterward, all of which would have made Cisco aware of their inevitable

19  involvement in human rights abuse by going forward with the Golden Shield project.

20  164.    Each year from 1999 to present, the U.S. State Department's Country Reports on Human

21  Rights Practices and its International Religious Freedom reports, which are submitted to Congress

22  each year, has documented the persecution of Falun Gong practitioners in China.

23  165.    Reports documenting the persecution of Falun Gong practitioners in China have been

24  issued by the Special Rapporteur of the United Nations Human Rights Council from 1999

25  through the present, Amnesty International periodically since 1999, Human Rights Watch

26  periodically since 2002, and the European Parliament in 2006.

27  166.    As early as 2002, Defendant Cisco's shareholders had, in public meetings and open

28  letters, accused Cisco of aiding and abetting human rights abuses perpetrated in China via the

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Golden Shield project. These shareholders demanded investigation into the issues they complained of.

167.    From 2003-2004, in San Jose and Northern California more generally, there were newspaper reports about the ongoing lawsuit in the Northern District of California against former Beijing mayor Liu Qi, who was found liable for the torture of several Falun Gong plaintiffs in that case. In addition, beginning in this period, physical demonstrations, including exhibitions depicting how Falun Gong believers were subjected to torture in China, were conducted outside of Cisco's offices in San Jose by members of the United States Falun Gong community.

168.    With direct oversight from Defendants in San Jose, Cisco had been operating extensively in China since 1994, and executives including Defendant Chambers consistently claimed this market as one of the company's key targets for future expansion. San Jose Defendants conducted continual assessments of their investments in the Chinese market. Even apart from shareholder queries and other information detailing the use of Cisco technology to further human rights abuses in China, San Jose Defendants knew based on their due diligence reports the intended and actual use of Cisco technology in China.

169.    Based on all of the above, and on the technical requirements of the project itself, Defendants knew that a central purpose of the Golden Shield's Internet Control and Monitor System was the facilitation and advancement of the persecution of Falun Gong, and that this persecution routinely included widespread acts of torture.

170.    For the same reasons, Cisco knew that the Golden Shield was particularly aimed at suppressing all Falun Gong activity in China. Prior to the construction and implementation of the Golden Shield, Falun Gong's continuing Internet-based communications posed a number of technical challenges to existing means of surveillance and suppression.

171.    Before Cisco entered into contracts to design the Golden Shield, Defendants also knew that the products and services Defendant Cisco designed for the Golden Shield would be used to commit widespread human rights violations against Falun Gong practitioners, particularly those whom security forces sought to convert, or as it was officially called, "transform" (*zhuanhua*).

172.    "Transformation" reports about the successful coercion of Falun Gong practitioners to

39

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   abandon their beliefs while in custody were widely disseminated in Party-run media outlets,

2   including China Central Television and the People's Daily newspaper.

3   173.    The widespread use of extreme forms of torture in the transformation process was also

4   well documented in reports by the U.S. State Department in 2000 and 2001, in human rights

5   reports by U.N. Special Rapporteurs in 2000, 2001, 2004, 2005, 2007, and 2010, by various

6   human rights organizations, including Amnesty International and Human Rights Watch, as well

7   as by survivors' public statements and prominent media coverage, from 1999 through the present

8   day.

9   174.    In October 2002 and September of 2003, 2005, 2006, 2007, 2008, and 2010, Cisco

10  shareholder resolutions identified concerns regarding potential human rights abuses arising from

11  Cisco network technology solutions provided to foreign countries, including and especially

12  China, and called for investigation into Defendant Cisco's complicity in these abuses. These

13  resolutions were presented to the Cisco Board of Directors, including Defendant Chambers, and

14  in each instance, the Board of Directors issued a statement recommending that shareholders reject

15  the proposal. Well after this point, Defendant Cisco continued to help the Party and Public

16  Security officers to suppress Falun Gong through use of the Golden Shield.

17  175.    Cisco's Golden Shield files include several court and prosecutorial reports identifying the

18  *douzheng* of Falun Gong and other "hostile elements" as one of the five tasks of the Strike Hard

19  campaign created to suppress Falun Gong with the Chinese for the term "element" designating

20  targets of persecutory campaigns in the PRC.

21  176.    Cisco's marketing materials in China repeatedly boasted that Cisco's technology solutions

22  could guard against Falun Gong, block and track Falun Gong, monitor and profile Falun Gong,

23  and in other ways persecute Falun Gong.

24  177.    Cisco's Golden Shield high-level designs further demonstrated how Cisco's stand-alone

25  technology and integrated networks could monitor, track, apprehend, detain, convert and in other

26  ways suppress Falun Gong. In September of 2005, Senior Director of Corporate Communications

27  at Cisco, Terry Alberstein, wrote a letter published in the *Taipei Times* responding to allegations

28  of Cisco's contributions to human rights abuses in China.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

178.    In January 2011, a major Cisco shareholder, Boston Common Asset Management, announced that, "after years of campaigning Cisco for greater transparency and accountability on key human rights and business development concerns," it had decided to divest itself of Cisco shares due to the company's failure to address those longstanding human rights concerns, especially those related to its operations in China.

### F.    Cisco's Intent to Specifically Tailor the Golden Shield to Further the Persecution of Falun Gong

179.    As is alleged above, Cisco has admitted publicly that they agreed to meet Chinese security's stated objectives during its work on the Golden Shield, which, as Cisco notes repeatedly in its internal documents, include as a major objective, the persecution of Falun Gong. See, e.g. ¶¶ 75-79 (noting instances in which Cisco restated the purpose of the Golden Shield to crackdown against or *douzheng* Falun Gong).

180.    Cisco San Jose and its executives knew that Chinese Security officers intended to use the Golden Shield to persecute Falun Gong believers, and specifically developed new technologies to achieve that purpose, and designed and implemented those technologies.

181.    Defendant Cisco also recommended to Chinese security more advanced features for the Golden Shield that could significantly and uniquely further the Golden Shield's objectives and that were essential to the suppression of Falun Gong. These included high-level Golden Shield designs illustrating networked apparatus tasked with identification, profiling, high-level tracking, interrogating and forcibly converting through torture all Falun Gong believers in China. See, e.g. ¶¶ 94-97 (listing some key features of the Golden Shield specifically tailored to target Falun Gong and suggested by Cisco).

182.    In order to successfully *initiate* client contact at trade technology shows in China, Cisco had to manifest its intent to assist in eliminating Falun Gong. However, given the company's long-term strategy of cultivating close contacts and mutual understanding with Party leaders (see, e.g. *supra* at ¶¶ 58, 133), Cisco was already aware long before attending these shows that eliminating Falun Gong was the primary concern of its desired clients.

183.    The sales and marketing materials that Defendants in San Jose, through employees in

41

China presented at one or more of these technology shows also included brochures not only acknowledging that a major purpose of the Golden Shield is to persecute Falun Gong practitioners, but also that Cisco solutions were developed for this purpose.

184.    Similarly Defendant Cisco booths featured high-tech Internet surveillance footage that was paired with sound bites from Defendant John Chambers indicating the importance of Cisco's security projects and its ability to meet client objectives.

185.    As early as 2002 and until at least 2006, Cisco provided private training and marketing sessions for Cisco high-level management and employees in regions and provinces across China with PowerPoint presentations that specifically reference the ongoing crackdown or *douzheng* against Falun Gong and illustrate how Cisco's products are tailored to meet the stated goal of persecuting and suppressing Falun Gong practitioners in China.

186.    During the same time frame, Cisco provided "skill training" and "technical training" to Public Security officers and to enable them to use the customized technologies to suppress Falun Gong. Upon information and belief Office 610 security agents also participated in the "skill" and "technical" training Cisco offered.

187.    In 2002, in internal files Cisco acknowledged that the purpose of the Golden Shield was to *douzheng* Falun Gong and described this goal as a lucrative business opportunity for the company.

188.    In 2003, Defendant Cisco stated on its website that Cisco agreed to meet Public Security's objectives during its work on the Golden Shield, which, as stated in Cisco documents elsewhere, includes the persecution and suppression of Falun Gong.

189.    In the same year, Defendant Cisco constructed the structure for a national database system that was implemented in every province of China except Sichuan.

190.    In 2004, Defendant Cisco provided an upgrade to the Golden Shield that connected security from all of China's provinces and municipalities to the Golden Shield. By the admission of Defendant Cisco including Cisco China the upgrade "improve[d] Public Security's ability to fight [] against crime and "maintain social stability." The latter phrase is defined in a Cisco internal file as including the "*douzheng* of Falun Gong."

42

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

191.    Golden Shield antivirus software requires the identification of Internet activity unique to Falun Gong practitioners in order to block, track and identify Falun Gong Internet users. Defendant Cisco upgraded Golden Shield antivirus software to include protection specifically against Falun Gong activity.

192.    Cisco went to great lengths to incorporate features solely devoted to the suppression of Falun Gong believers in its marketing and sales materials including its announcement that only Cisco software can recognize 90% of Falun Gong software signatures. See ¶ 112.

193.    Defendant Cisco including Cisco China expressed willingness to meet the stated purpose of the Golden Shield apparatus, i.e., to *douzheng* Falun Gong through identification, tracking, interrogation and ideological conversion, in a manner intended to and which did result in Cisco being awarded Golden Shield contracts.

194.    As indicated above, in an online training session for Internet Users in China, San Jose Defendant's employees in China offered Cisco-developed software to facilitate the suppression of Falun Gong believers, describing Falun Gong believers as "despicable."

195.    Defendants' actions and statements emphasize their intent to meet Chinese Security's objective to torture and suppress Falun Gong.

### G.    Cisco Executive Defendants Furthered and Facilitated Alleged Abuses with Knowledge and Intent

196.    The planning, design, training and implementation of the Golden Shield project in China were carried out under the direction of the named Defendant Cisco executives. Cisco's Chinese market was a highly significant component of its overall operations, warranting the parent corporation's active involvement in Cisco's Chinese activities, as extensively documented by Cisco's internal documents including workflow charts, and also evidenced by Defendant CEO John Chambers and other top-level Cisco officers' frequent visits to China for the purpose of overseeing Cisco's work on the Golden Shield project.

197.    Defendant Chambers, Chief Executive Officer of Cisco, cultivated a personal relationship with Jiang Zemin, former Party General Secretary and President of China, who founded the persecutory campaign against Falun Gong in the former capacity by issuing extralegal orders

43

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

within the Communist Party hierarchy. Defendant Chambers has maintained his personal

relationship with Jiang through various face-to-face meetings beginning in September 1998,

where he explained how Cisco could help Jiang control the Internet through advanced

information security networks and technology.  Jiang held such meetings with the heads of

especially favored foreign corporations investing in China to discuss strategic goals, as well as the

Party's political conditions for Cisco's presence in China.

198.    Defendant Chambers met with Jiang Zemin during the same month he created the

subsidiary Cisco China and a Beijing technical support center (TAC) to facilitate the control of

the Internet in China including the suppression of "hostile" elements like Falun Gong.

199.    Defendant Chambers continued to meet Jiang Zemin and other Communist Party officials

during the design and development phases of the Golden Shield. According to several experts,

Jiang Zemin was well aware that Defendant Chamber's company was developing technology

specifically to help suppress Falun Gong. According to at least one expert, the *douzheng* objective

of the Golden Shield apparatus was discussed at these meetings.

200.    In addition to meeting with Jiang Zemin, Defendant Chambers also formed strong

partnerships with other Chinese decision makers, donated 30 buildings for Cisco Network Tech

Institutes in West China, and directed strategy for Cisco's China operations.

201.    By information and belief, Defendant Chambers played a major role in the design and

planning of the Cisco booth at the Shanghai Trade Show where Defendant Cisco and other

foreign companies showed Public Security and Party officers how advanced information security

networks and technology could "stop" Falun Gong.

202.    Defendant Chambers also met with many high-ranking Party officials to deepen Cisco's

ties to Jiang's faction of the Party in China that was and continues to be directly involved in the

Falun Gong crackdown.  Under his direction, other Cisco employees working on China sales

actively sought out meetings with influential Communist Party officials.  Relationship building

was a foundation of Cisco's approach to the Chinese market.  For example, in preparation for one

of Defendant Chambers' trips to China in 2008, Cisco maintained a wish list of officials to meet

44

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1  in Shanghai and Beijing, including Yu Zhengsheng, then Party Secretary of Shanghai and close

2  affiliate of Jiang Zemin.

3  203.   According to one or more experts, Defendant Chambers' discussions of the objectives of

4  the Golden Shield apparatus with Cisco high-level management, Party officers and others in

5  China included Chambers explicit support of the Golden Shield's *douzheng* objectives and goals.

6  204.   But for Defendant Chambers' agreement to meet the anti-Falun Gong persecutory

7  objectives, Cisco would not have been award the Golden Shield project.

8  205.   Defendant Chambers authorized the creation of the China Research and Development

9  Center ("CRDC") in China, established in 2004 to manufacture Cisco products in China including

10  Golden Shield parts and other technology used to "*douzheng*" Falun Gong in China to avoid US

11  export controls and gain a more competitive edge in the Chinese technology market.

12  206.   Defendant Chambers also oversees the China Strategy Board ("CSB"), established in

13  2008 for the purpose of devising Cisco strategy, including China growth strategy and technology

14  expert decisions, and approving Cisco projects in China. Since then, Cisco's Chinese operations

15  have been controlled primarily by the CSB, which is composed of high-level executives working

16  at San Jose and at its Asia Pacific branch (until 2010, when the Asia Pacific branch was divided

17  into three theaters, including the Greater China Theater), and at its Chinese subsidiaries.

18  207.   At all relevant times, Defendant Chambers was well aware of the widespread campaign of

19  torture and persecution of Falun Gong practitioners in China, as outlined in the factual allegations

20  herein, and knew and intended that Party and Public Security officials would and did use the

21  Golden Shield to facilitate and carry out that campaign.

22  208.   As CEO of Cisco, Chambers not only was in a position to prevent Cisco's tortious

23  conduct in relation to the Golden Shield in all factual allegations herein, but also purposefully

24  authorized, participated in, and ratified Cisco's participation in the Golden Shield Project as

25  alleged in sections B through F of the Statement of Facts.

26  209.   Under Chamber's direction, Defendant Cisco's specific intent to meet the requirements of

27  the Party's objectives to identify, track and thereby abuse and eliminate Falun Gong practitioners

28  pursuant to "*douzheng*" persecutory methods was expressed in marketing/design summary

45

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

presentations. Under his direction, Cisco China's public security team was established, pairing Cisco employees with their regional counterparts across China.

210.     Defendant Fredy Cheung, as Vice President of Cisco China and in other capacities, directly managed engineers working on the Golden Shield project.  He participated directly in the sales process through personal appearances at Golden Shield Power Point presentation dinners, meetings, and other functions intending to procure Public Security contracts and advance Cisco's overall goals in China.  He was one of the Cisco China executives who received reports and heard Power Point presentations including the one that specifically describes the persecution of Falun Gong as a primary goal of the Golden Shield project and that state that Cisco worked in full collaboration with Public Security officers.

211.     Defendant Cheung continues to manage the sales and service operation plans for the Greater China region and reports directly to senior executives at San Jose including Defendant Chambers through intermediaries at Cisco China and Cisco's branch office in Asia. Defendant Cheung, who is listed in several online business resources with a Cisco San Jose address, participated in bi-yearly marketing and high-level management meetings at San Jose.

212.     Defendant Cheung directly oversaw much of the coordination of Cisco's Golden Shield-related projects and Cisco's work to meet other Public Security goals, including Cisco's providing its Public Security customers with "customized solutions" designed to *douzheng* Falun Gong. According to one or more experts, Defendant Cheung discussed *douzheng* objectives of the Golden Shield with several high-level executives from Cisco's San Jose office and its branch office in Asia.

213.     Defendant Cheung would not have been promoted to the rank of Vice President of Cisco China if he had not agreed to promote and further the Party's anti-Falun Gong persecutory Golden Shield objectives.

214.     While Vice President of Cisco China, Cheung noted Cisco's successful construction of the "Golden Shield Project" with Public Security officers in Yunnan province, the city of Beijing, the Futian district of Shenzhen province, Zhiangjiagang city, and the public security in Shanghai.

215.     According to Cheung, Cisco's major selling point is the company's customization of the

46

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Golden Shield technology it designs and sells in China, which as he also notes, "serves as an important guarantee for the maintenance of social stability," a phrase whose repressive connotations are known to all familiar with political repression in China.

216.    Defendant Fredy Cheung and other high-level executives at Cisco received reports and Power-Point presentations from Mao Wanding and other Cisco China sales engineers throughout Phases I and II. The *douzheng* purpose of the Golden Shield network was clearly stated in at least one of these presentations by author Mao Wanding as an opportunity for Cisco in design, construction, training and maintenance. In related reports and/or presentations, the same author includes the client's requirements for the Golden Shield and Defendant Cisco's promise to strictly follow the Golden Shield project overall design.

217.    Upon information and belief, Defendant Cheung was aware of the concerns of Cisco shareholders as expressed in shareholder resolutions described *supra,* e.g., ¶¶166, 174, 178 and participated with the other named defendants in Cisco's efforts to conceal the use of Cisco technology from Cisco shareholders to perpetrate human rights abuses against dissident groups in China.

218.    Upon information and belief, Defendant Cheung and his agents, or employees acting under his direction, attended several technology trade shows and conferences where Cisco and other companies showed mid-level security officers how to "stop" Falun Gong.

219.    At all relevant times, Defendant Cheung knew of the campaign of torture and persecution of Falun Gong practitioners in China, was in a position to influence Cisco's tortious conduct during the development of the Golden Shield, and nevertheless purposefully authorized, participated in, and ratified Cisco's participation in the Golden Shield project as delineated in all factual allegations herein, especially the specific facts alleged in sections B through F of the Statement of Facts. Defendant Cheung's position and responsibilities required him to work with public security officers specifically to advance the Golden Shield, one of Cisco's most important projects under his supervision.  Defendant directly supervised Cisco employees and was tasked with having detailed knowledge of the strategies employed and degrees of success in carrying out Cisco's contracts with public security. As the Asia-Pacific Core Technology Director from 2002,

47

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Defendant Cheung was also tasked with managing the technological requirements and capabilities of Cisco's projects in the region, which required a detailed knowledge of the client's goals. Defendant Cheung intended to cater to the demands of public security, thereby assisting the client in achieving its goals against dissident groups in China.

220.    As discussed just above, John Chambers and Fredy Cheung are on the CSB.

221.    The true names and capacities, whether individual, official, corporate, associate, or otherwise, or precise participation of Defendants, DOES 1 through 100, inclusive, are not known to Plaintiffs herein at the time of the filing of this Complaint and, therefore, these Defendants are being sued by such fictitious names, and Cross-Complainant will seek leave to further amend this Complaint to show their true names and/or capacities and precise participation when the same have been ascertained.  Each Defendant designated herein as a DOE was responsible intentionally, negligently, or in some other actionable manner, for the events and happenings referred to herein which directly caused damages and injury to Plaintiffs within this Complaint.

222.    All Defendants named were mutually engaged as agents, alter egos, co-conspirators and/or employees of each and the other, and were at all times acting within the course and scope of such agency, service, conspiracy and/or employment.

**H.**    **The Golden Shield Facilitated the Persecution of and Abuses Suffered by the Plaintiffs**

223.    The Golden Shield is the only system in China that performs large-scale content filtering and surveillance of the Internet. It is the sole system used by Public Security in regions in China where Plaintiffs and similarly situated individuals were isolated and suppressed.

224.    Office 610 security agents across China had access to at least three Golden Shield Falun Gong databases dedicated to the surveillance of Falun Gong: (1) Falun Gong members at large, (2) notorious Falun Gong practitioners and contact persons, and (3) captured Falun Gong whose identities are unknown.

225.    The Golden Shield provided the essential means by which the Plaintiffs and similarly situated persons were tracked, detained, and tortured. Without the information collected and assembled through the Golden Shield, it would not have been possible to carry out the human

48

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

rights and other violations against them in the same manner, or at all.

226.    All of the Plaintiffs were persecuted through the Golden Shield apparatus. None of the Plaintiffs or persons situated similarly were charged with violent crimes or the use of violence to carry out otherwise nonviolent crimes. All of their activities are perfectly legal outside of China.

227.    The 103 Case.  During 2001 in the city of Tianjin, Office 610 security agents used the Golden Shield to investigate, apprehend, arrest, detain, and torture between sixty and seventy persons with a history of Falun Gong activities.  Office 610's internal designation for this incident was the "103 Case."

228.    Office 610 security agents and Public Security officers used the Golden Shield collaboratively to detect, monitor, interrogate, and persecute these Falun Gong practitioners.

229.    Plaintiffs Doe I, Doe II, and Ivy He are among the Falun Gong practitioners who were detained and tortured in the 103 Case through the use of the Golden Shield.

230.    Doe I.   Doe I was one of the individuals identified for arrest and persecution through use of the Golden Shield by Office 610 security agents and Public Security officers in the 103 Case.

231.    Beginning on July 1, 2001, Doe I and other Falun Gong practitioners frequently met to conduct Falun Gong activities including the downloading and distribution of Falun Gong promotional materials.

232.    Doe I was arrested and detained along with over 70 other Falun Gong practitioners in November 2001. In their investigations, Office 610 security agents identified her as one of several "backbone organizers" of the peaceful religious or protest practices upon which the charges were based.

233.     During their interrogation, Office 610 security agents and Public Security officers subjected Doe I to severe mental and physical torture in order to force her to renounce and vilify her Falun Gong religious beliefs. Doe I was subjected to ideological conversion through torture practices based on information stored about her and profiled in the Falun Gong database system that was integrated with the apparatus as described above.

234.    Doe I was additionally physically tortured with severe beatings, including some administered with the simultaneous use of an electric baton and a steel rod bearing sharp screw

49

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

threads. Her physical abuse was so severe that it caused visible gashes and bruises to cover a large portion of her body, caused her eyes to swell noticeably, and drew blood. All such torture began over a year before she was made aware of any charges against her.

235.    In July 2003, Doe I was charged with raising funds for Falun Gong activities, downloading Falun Gong materials from the Minghui website, publishing Falun Gong materials on the Minghui website, and distributing Falun Gong materials. At a purported "trial," the court accepted a statement from the Internet Controlling and Monitoring Division of the Tianjin Police Bureau that confirmed some of the Internet-related charges. Public Security officers and prosecutors specifically relied on evidence that was collected and analyzed through the Golden Shield. Doe I was not permitted to challenge the charges against her.

236.    As a prisoner of conscience, Doe I was sent to a Chinese prison in July 2003 for a term of twelve (12) years.

237.    In prison, Doe I was subjected to severe mental and physical torture and forced labor. Sensitive information from the Golden Shield databases played a significant role in her mental torture.

238.    Doe I is currently living in China.

239.    She is under the continued threat of Chinese security forces tracking her Falun Gong religious activities and subjecting her to further abuse.

240.    <u>Doe II</u>.  Doe II was one of the individuals identified for arrest through use of the Golden Shield by an Office 610 security agent.

241.    Between August and September 2001, the Golden Shield was used by Chinese security officers to identify, monitor, and track her online activity as a Falun Gong practitioner.

242.    In November 2001, Doe II was detained for her activities without notice of the charges, formal arrest, or other procedures. In detention, she was verbally abused, slapped repeatedly in the face, kicked, and beaten.

243.    During their interrogation of Doe II, security officers subjected her to severe mental and physical abuse, so much so that she confessed to crimes she did not commit and subsequently denied at trial. Security officers used the sensitive information gathered, stored, profiled and

50

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

accessed through the Golden Shield apparatus to subject Doe II to mental torture and other forms of ideological conversion though torture.

244.    On December 20, 2001, Doe II was formally arrested and charged.

245.    She remained in detention until July 2003, at which point she was put on "trial" along with several other Falun Gong practitioners. At trial, she was not permitted to challenge the legality of the charges against her and was not allowed to submit a plea of "not guilty."

246.    After a sham trial, the trial court convicted Doe II of "utilizing the cult organization to sabotage law enforcement." Based on her so-called conviction, she was detained as a prisoner of conscience for a term of four years.

247.    In prison, she was subjected to public humiliation and physical torture that included frequent interrogation and severe beatings. She was also forced to work under harsh conditions that included long hours, intermittent torture, and interrogation and public degradation in order to force her to make false statements about her religious belief and practice. The sensitive information used by Chinese security to interrogate and (mentally) torture Doe II was collected, profiled, categorized and made accessible to Chinese security through the Golden Shield apparatus.

248.    Doe II is currently living in China.

249.    She is under the continued threat of Chinese security forces tracking her Falun Gong religious activities and subjecting her to further abuse.

250.    Ivy He. Ivy He was one of the sixty to seventy individuals identified for arrest as a Falun Gong practitioner in the 103 Case through use of the Golden Shield.

251.    Ivy He has resided in Canada since December 2006.

252.    Throughout 2001, Plaintiff He downloaded Falun Gong materials from the Minghui website, communicated by cell phone with other Falun Gong believers involved in Internet-related Falun Gong activities, and in other ways supported these activities while living in China.

253.    In November of 2001, Public Security officers went to her home and forced to accompany them to the police station.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

254.    She was detained without being advised of any charges against her and was refused any opportunity to contact family or legal counsel.

255.    At the police station, Public Security officers interrogated her continuously for many hours in order to force her to confess to crimes she did not commit. They poured ice-cold water over her naked body and forced her to stand in a bucket of ice. She was also kicked, beaten, insulted and subjected continuously to other forms public humiliation, and mental and physical torture. Some of these abuses were carried out in front of her very young son to coerce Plaintiff He to confess to crimes she did not commit.

256.    The sensitive information Chinese security used to interrogate Ms. He was gathered, stored, profiled, and made accessible to security through the Golden Shield apparatus.

257.    Public Security officers sent her to a detention center. She was subjected to continuous interrogation and physical abuse.

258.    After a month at the first detention center, Public Security officers sent her to a different detention center. She spent about a month in that center without being formally charged or permitted access to family or legal counsel.

259.    In January of 2002, she was sent to a re-education through labor camp without a hearing or an opportunity to challenge the legality of her detention and treatment.

260.    There, she was beaten so severely that she lost consciousness. At one point she was sent from the labor camp to a hospital, was drugged, and was forced to sign a statement denouncing the Falun Gong religion.  She was subject to ideological conversion through torture at the labor camp, based on information stored about her in the Falun Gong database system that was integrated with the Golden Shield.

261.    After about two years of detention and torture, she was released.

262.    After residing abroad for several years, Ms. He returned to her home in China.

263.    In 2008, Public Security officers visited her at her home in China and informed her that they would be sending her to brainwashing classes again based on her continued practice of the Falun Gong religion. She left China that night and boarded a plane to Canada, where she now resides.

52

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

264.   Internet Cases. All of the cases below involved Falun Gong practitioners who had downloaded Falun Gong materials from foreign Falun Gong websites.

265.   Doe III. Doe III is a Falun Gong practitioner filing this action through his next friend, Roe III. Doe III is currently in prison in China and cannot file directly.

266.   Roe III and Doe III became close friends in 1998. Since 1998, they have remained in close contact until 2005 when Doe III was arrested, detained and persecuted based on his use of the Internet to peacefully practice his religion and protest its persecution in China.

267.   Between 2003 and 2005, Doe III used the Internet to download a significant amount of Falun Gong material from the Minghui website that he printed and distributed to Chinese citizens residing in Shanghai.

268.   In early 2005, after Cisco's Golden Shield work had been completed in full collaboration with Public Security officers and Office 610 security agents and was fully operational in Shanghai, Doe III's Internet use and identity were detected by Chinese security through the Golden Shield, and as a result, he was taken into custody in Shanghai without being advised of any charges against him.

269.   In detention, security officers subjected him to interrogation that included ideological conversion through mental and physical torture to force him to denounce and vilify his religious beliefs. The sensitive information used by Chinese security to mentally torture Doe III was routinely collected, stored, profiled and made accessible to security through the Golden Shield apparatus.

270.   A month later, Doe III was transferred to the Detention Center of Qingpu District in Shanghai where political prisoners including but not limited to Falun Gong practitioners are subjected regularly to torture and persecution.

271.   In late 2005, at trial, Doe III was not permitted to challenge the legality of the charges against him and was not allowed to submit a formal plea of "not guilty."

272.   After a sham trial, Doe III was pronounced guilty of downloading Falun Gong material online over a two-year period.

273.   He was "sentenced" to a seven and a half year prison term. While in prison, he was

53

subjected to severe beatings on several occasions, interrogation, and ideological conversion through mental torture and other forms of torture and persecution. The sensitive information used by Chinese security to mentally torture Doe III was routinely collected, stored, profiled and/or made accessible to security through the Golden Shield apparatus.

274.    Doe III resides in Tilanqiao Prison in Shanghai that is well known for its brutal treatment of Falun Gong practitioners and other dissident group members. Doe III is currently very weak and in poor condition due to his subjection to torture and persecution.

275.    <u>Doe IV</u>. Doe IV is a Falun Gong practitioner filing this action through his next friend, Roe III, also the next friend for Doe III.  Doe IV is currently in China and cannot file directly.

276.    Roe III communicated with Doe IV and Doe IV's family extensively before, during, and after Doe IV was imprisoned.  He maintains a close relationship with Doe IV and Doe IV's family. Roe III procured an attorney to represent Doe IV in China, who represented Doe IV in China until officials began to persecute the lawyer.

277.    In early 2003, Doe IV began to download information about Falun Gong from the Minghui website. Throughout the year, Doe IV used the Internet to download a significant amount of Falun Gong material from the Minghui website.

278.    In October of 2003, a year after the Golden Shield was identifying Internet users as Falun Gong in Beijing with the participation of Cisco, Doe IV was taken into custody in Beijing and not advised of any charges against him.

279.    In detention, he was subjected to interrogation and forced conversion procedures that included mental and physical torture to force him to denounce his religious beliefs. He was shocked with electric batons on his hands, mouth and face on several occasions, locked in isolation chambers and forced to stand on his feet in sweltering heat for more than seven days on several occasions, slapped in the face, beaten, deprived of sleep for prolonged periods of time, and subjected to ice water being poured on his body and clothing without any relief. Security used the sensitive information routinely collected, stored, profiled and made accessible to them and other security through the Golden Shield to mentally abuse and torture Doe IV, in order to force him to betray his beliefs and confess to crimes he did not commit.

54

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

280.     Specific information used in Doe IV's torture included his anonymous creation of a website on which he posted Falun Gong-related content, as well as the contents of his private emails and text messages related to Falun Gong. Doe IV was interrogated about and forced to admit these specific activities during his above-described torture. He was also tortured in order to force him to divulge names of other Falun Gong adherents. Although Chinese security officers clearly already had access to information regarding the identities of all of his Falun Gong contacts, they still threatened him in order to force him to divulge such information and help implicate those contacts.

281.     In addition to the torture noted above, Chinese security officers threatened Doe IV with reprisals against his brother, including firing from his job and forced removal from Beijing, if he failed to comply with their interrogation and forced conversion demands. Chinese security used detailed information about his brother's personal circumstances, derived from the Golden Shield, in order to make such threats.

282.     In 2004, after a sham trial, Doe IV was pronounced guilty of constructing a Falun Gong website, using the Internet to download Falun Gong related material and burning the information onto CDs and sending mass email about the persecution of Falun Gong in China.

283.     He was not permitted to challenge the legality of the charges against him and was not allowed to submit a formal plea of "not guilty."

284.     He was "sentenced" to seven years in prison and in November 2004 was transferred to Jidong Prison in Tangshan City, Hebei Province.

285.     While in prison, he was subjected to torture and persecution. He was deprived of sleep for weeklong periods of time, beaten, and in other ways injured physically and mentally.

286.     Doe V. Doe V is a resident of China. Doe V used the Internet and telephone to engage in Falun Gong-related activities. Her use of the Internet and telephone was monitored using the Golden Shield.

287.     In 2004, after the core apparatus of the Golden Shield became fully operational with the participation of Cisco, she used the Internet to access the Minghui website. She also used the Internet to download materials about Falun Gong and to produce DVDs about the nature of the

55

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    religion and its persecution in China.

2    288.    In spring 2004, Public Security officers from the Xingta Police Department in Hebei

3    Province entered her residence as she was downloading material from the Minghui website. They

4    seized laptop computers, printers, other personal property, and funds.

5    289.    On the same day, Public Security officers took her to a hotel for interrogation to force her

6    to denounce and vilify her religion. The interrogation included severe physical and mental forms

7    of torture. They placed her in heavy foot-cuffs and tied her to an iron chair for six days and five

8    nights. She was allowed to be removed from the chair only to go to the restroom and was not

9    permitted to sleep. During the interrogation, she was mentally tortured and beaten. The sensitive

10    information used to subject Doe V to mental torture was routinely collected, gathered, profiled

11    and made accessible to security through the Golden Shield. Officers repeatedly threatened her,

12    slapped her and pulled her in handcuffs into excruciating positions. As a result of the

13    interrogation, she was traumatized mentally with severe injuries in the areas in which she had

14    been cuffed and was covered in bruises and cuts.

15    290.    Five days later, Doe V was then taken to a detention center in Xingtai where she was

16    formally charged. At the detention center she faced further abuse. She was forced to eat spoiled

17    food and to perform hard labor for long hours in unhealthy conditions. The materials she was

18    forced to work with caused dizziness and vomiting. She was also put in foot-cuffs, a penalty

19    typically reserved for death-row inmates.

20    291.    She was later taken to the Qiaoxi Municipal Court where she was subjected to a mock

21    trail.  At no time during the "trial" was she permitted to challenge the legality of the charges

22    against her; nor was she allowed to submit a plea of "not guilty."  She was "sentenced" to a three-

23    year term of detention in a Chinese prison as a prisoner of conscience.

24    292.    While in prison she was subjected to the excessive forms of abuse perpetrated against

25    Falun Gong and other prisoners of conscience. She was forced to make clothes for export, often

26    working overnight to complete an order. The work made her dizzy and she vomited at the end of

27    most days. She was deprived of access to essential hygiene products and subjected to other

28    forcible conversion practices that included intense physical abuse and mental torture, using the

56

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

sensitive information routinely collected, stored, profiled and made accessible to Chinese security through the Golden Shield.

293.    Since her release, she continues to suffer from an irregular heartbeat, cold sweats, and other severe physical and emotional damage.

294.    <u>Doe VI</u>.  Doe VI is a resident of China.  During 2007, Doe VI used the Internet to download Falun Gong flyers from the Minghui website. He shared the flyers and other information posted on the website with others in China, including Falun Gong practitioners.

295.    In spring 2007, more than five years after the Golden Shield was identifying Internet users as Falun Gong, and tracking and monitoring them in Shandong Province, approximately ten Public Security officers raided his home in Shandong Province and took him into custody without advising him of any charges. At the police station, he was subjected to interrogation techniques that included torture. He was beaten throughout the interrogation process and forced to sleep on the floor with his hands and feet bound with rope and handcuffs. The information used to subject Doe VI to interrogation and mental torture was routinely collected, gathered, profiled and made accessible to security through the Golden Shield.

296.    The next day, Public Security officers took Doe VI to Weifang City detention center. While at the detention center, he was subjected to continuous interrogation and torture to force him to confess to criminal conduct and to abandon the practice of Falun Gong. He was not formally charged until almost a month later.

297.    About a month later, a Public Security administrative committee issued a decision stating that Doe VI had "downloaded, produced, and hid Falun Gong illegal flyers at home."

298.    Based on these facts, the administrative committee sent Doe VI to a re-education through labor camp for 18 months without a hearing or any other opportunity to challenge the legality of the charges and his term of detention. The committee relied on evidence that Public Security officers and Office 610 security agents routinely collect through use of the Golden Shield.

299.    From spring 2007 until early fall 2008, he was detained at Shandong Province No. 2 Labor Camp, where he was subjected to forced conversion practices perpetrated against Falun Gong and other prisoners of conscience, including physical and mental abuse at the hands of the

57

labor camp officers. The forced conversion techniques used against Doe VI used information routinely collected, gathered, profiled and made accessible to security through the Golden Shield. He was also required to work without pay under conditions that included torture.

300.     <u>Doe VII</u>.  Roe VII files as a representative of her daughter, Doe VII.  Doe VII has disappeared and is believed dead.

301.     After the Golden Shield had been identifying Internet users as Falun Gong and tracking and monitoring them in the city of Taishan, Doe VII engaged in Falun Gong-related Internet activity for several years that included the downloading of Falun Gong information from the Minghui website.

302.     In the city of Taishan in June 2004, Public Security officers apprehended Doe VII and took her blindfolded to a police interrogation room where Public Security officers interrogated, electrically shocked, beat, and kicked her. The officers subjected Doe VII to forced conversion practices, including mental torture, using information routinely collected, gathered, profiled and/or made accessible to security through the Golden Shield.

303.     She was held in a detention center where Public Security officers force-fed her and subjected her to additional beatings and interrogation.

304.     In the fall of 2004, after several months of torture, she was injected with a drug that affected her nervous system so severely that she was unable to speak.

305.     A few days later, Public Security officers took her to a court in Taishan District of Taian city. The officers had to hold her up by her arms because she was unable to walk or stand unassisted. In this condition, she was forced to stand trial. Due to her physical condition she was unable to speak at trial.

306.     Approximately a week later, the court convicted her for using the Internet to download Falun Gong-related material although her physical condition prevented any participation in the trial. The court relied on evidence of Internet use that was routinely collected and analyzed through use of the Golden Shield. The court sentenced her to more than eight years in prison.

307.     Before she was taken to the prison to serve her sentence, Public Security officers injected her again with drugs that affected her central nervous system, rendering her mute, with a hard and

58

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

numb tongue and constant salivation.

308.    In the subsequent two years, her family, including Roe VII, was permitted occasional prison visits and noted her extremely weak physical condition.

309.    Since the summer of 2006, Doe VII's family has not had contact with her despite repeated attempts to do so and believes she may have been tortured to death while in custody. Her family has been refused visitation and is unaware of her whereabouts.

310.    <u>Doe VIII</u>.  Roe VIII resides in China and is the surviving family member of a deceased Chinese citizen, Doe VIII, who was born and resided in China. Roe VIII files individually as the survivor of Doe VIII.

311.    Doe VIII accessed the Minghui website on numerous occasions in Shandong Province after the Defendant had implemented the Golden Shield in Shandong Province and Chinese security were using it to identify Internet users as Falun Gong, and track and monitor them.

312.    In the summer of 2002, Public Security officers arrested him and another Falun Gong practitioner at a bus station in Shandong Province, a province where the Golden Shield had been completed and was fully operational.

313.    Following his arrest, he was taken to a detention center where he was interrogated, severely beaten, and subject to ideological conversion practices, including mental torture. The sensitive information used by security to interrogate, ideologically convert, and mentally torture Doe VIII was routinely collected, stored, profiled and made accessible to security through the Golden Shield apparatus.

314.    Sometime between August 21 and August 30, 2002, Doe VIII was beaten to death at the detention center.

315.    <u>Doe IX</u>.  Doe IX is a resident of China. Doe IX was targeted for engaging in Falun Gong religious activities online in Shijiazhuang, Hebei Province, China. The Golden Shield was the essential means through which she was monitored, tracked and identified as a Falun Gong believer, apprehended, detained, and subjected to forced conversion practices that included mental torture. Without the Golden Shield apparatus, it would have been virtually impossible for

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Chinese security officers to subject her to these and other abuses including physical torture, forced labor, and intense public humiliation.

316.    While working as an elementary school teacher, Doe IX was previously detained by Chinese security officers in 2000 and 2002 based on her peaceful Falun Gong religious activities. Between April 19 and August 2002, Doe IX was physically battered and restrained, including, e.g., a period of six days being bound to a metal chair while Chinese security officers beat her, deprived her of sleep, and attempted to force her to renounce her belief in Falun Gong. She was also force-fed hard liquor and had a menthol-based liquid poured into her eyes, causing extreme pain and lasting damage. In August 2002, she was released

317.    In 2004, Doe IX was sent to Division 5 of the Shijiazhuang Reeducation Through Labor Facility, to be detained for the next three years. During her period of Reeducation Through Labor, Doe IX was subjected to sleep deprivation, physical torture via battery and extended periods of physical restraint, e.g. being forced to sit cross-legged and still for 18 hours at a time, and violent force-feeding after she tried to protest her treatment via a hunger strike. During Doe IX's force-feeding, chopsticks were shoved down her throat, as was a feeding tube which guards intentionally twisted so as to lacerate her sinus cavities, drawing blood. During her detention in the Reeducation Through Labor system, Doe IX was handcuffed, bound and injected with large quantities of unknown drugs that caused extreme physical pain and swelling.

318.    Doe IX was subjected to forced conversion via torture (*zhuanhua*), whereby she was continually physically abused for sessions lasting many hours, while Chinese security personnel demanded that she renounce her Falun Gong religious faith. During these *zhuanhua* sessions, she was also physically tortured via the insertion of needles under her fingernails, sleep deprivation for up to ten days, and the other above-noted forms of physical battery and restraint. Doe IX's friends, acquaintances, and family members were also threatened.

319.    In 2008 and 2009, Doe IX was again detained based on her Falun Gong activities online, including posts on forums, downloading Falun Gong materials, and allegedly maintaining an online blog which included peaceful advocacy of Falun Gong religious freedom. Documents related to Doe IX's detention indicate that Chinese security utilized the Golden Shield to monitor

60

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

her use of the software Dongtaiwang, which allows users to evade normal Internet controls. The documents also indicate that Doe IX's IP address was tracked such that even her anonymous Internet activity was logged, requiring high-level Golden Shield functionalities. Doe IX's Internet use at her workplace, including the use of multiple, unconnected devices, was also tracked to her specific identity. Similarly, her website visits were tracked in extreme detail, to the level of every individual "click" online. Finally, Chinese security "matched" files from their own databases with those on Doe IX's computer hard disk, using detailed and specific information to prove the "match." This detailed "matching" of data to confirm Doe IX's identity, as well as the other forms of tracking and surveillance above, was only possible via the advanced anti-Falun Gong features of the Golden Shield. Chinese security officers also utilized the Golden Shield to forcibly convert Doe IX through torture. During her current and previous periods of detention, she was been subjected to the same or highly similar forms of physical and mental abuse as those described in the paragraphs above, including threats to her friends and family members.

320.    General Surveillance Cases.

321.    Charles Lee.  Charles Lee was born and educated in China.  He later came to the United States and became a U.S. citizen. He now lives in New Jersey.

322.    While in the United States, he joined an email exchange for those interested in the persecution of Falun Gong in China. This e-mail exchange involved extensive correspondence with individuals living in northern China. These e-mails entered China through its Beijing gateway, where the Golden Shield had by that time been completed and was fully operational. These e-mails included correspondence with Falun Gong practitioners in China who had participated in high-profile protest activity. The Golden Shield was used to monitor and track this email.

323.    In 2003, he flew back to China to visit with friends and family after corresponding through e-mail with a small number of friends living in northern China, letting them know he was coming.

324.    Upon his arrival at the airport, Public Security officers placed him under arrest.

325.    One of the officers who arrested him told him that they knew he was coming to China and

61

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1  had been waiting for him.

2  326.    At trial, he was convicted of using the Chinese media for Falun Gong-related activity. He

3  was not permitted to challenge the legality of the charges against him and was not allowed to

4  present evidence or defend himself as "not guilty."

5  327.    He was sentenced to a prison term of three years, from January 2003 to January 2006, at

6  Nanjing Prison. During this time, he was frequently subjected to interrogation and forced

7  conversion practices, using information stored about him in the Falun Gong database system that

8  was integrated with the Golden Shield.

9  328.    He was forced to take classes on a daily basis in which he was surrounded by ten to fifteen

10  guards and fellow inmates who subjected him to constant insults and verbal abuse regarding his

11  practice of Falun Gong. He was referred to as mentally imbalanced and his beliefs were called

12  "laughable, insane and poisonous." Lee was called a "traitor" for his U.S. citizenship. He was told

13  "we can make your living worse than death."

14  329.    Charles Lee was not permitted to interact with other prisoners and oftentimes not

15  permitted to read. He was permitted to see his mother only twice during the last two years of her

16  life and not permitted to attend her funeral.

17  330.    In addition, he was frequently tortured. He was regularly forced to stand or sit in the same

18  position for hours at a time on a daily basis, sometimes for up to seven weeks in a row. He

19  suffered from severe mental trauma and physical damage to his heart while in prison. He was

20  forced to attend military drills, and when he refused he was dragged across the grounds for hours

21  at a time.

22  331.    He went on nine hunger strikes over the course of his detention, one for fifty days.

23  Chinese security officers force-fed him on four occasions. On one of these occasions, security

24  officers tied him down and placed a tube down his throat for feeding, which was kept there for

25  thirty-three hours.

26  332.    In January 2006, Charles Lee was released. He returned to the United States and continues

27  to be severely disturbed by the aftermath of the torture in the prison.

28  333.    Liu Guifu. Liu Guifu was born and raised in the People's Republic of China. She currently

1   resides in the state of New York with asylum status.

2   334.    Plaintiff Liu Guifu was arrested and persecuted as a result of her participation in Falun

3   Gong Internet activities in the city of Beijing where Cisco had helped to construct the Golden

4   Shield in collaboration with Public Security officers and Office 610 security agents. Liu Guifu

5   was subject to multiple arrests. The Golden Shield was used to assemble information about her

6   following her initial arrest. This information enabled subsequent arrests and detentions. The

7   detailed information used in the interrogation of Liu Guifu would not have been accessible to

8   security officers without use of the Golden Shield.

9   335.    In February of 2001, she was taken to the Qing Long Qiao police station where she was

10  detained and subjected to physical and mental forms of torture.

11  336.    On February 25, 2001, Public Security officers accused her of "making public statements

12  with others on the Internet" and sent her to a labor camp for a term of eighteen months. She was

13  deprived of her legal right to a hearing and was not permitted to challenge the validity of the

14  charges against her.

15  337.    At the labor camp, she was kept awake for eighteen days. She was whipped and beaten

16  until she was unable to walk. Eventually she began to have hallucinations, and she often lost

17  consciousness.

18  338.    Liu Guifu was released on or about August 14, 2002.

19  339.    In early 2003, she was taken into custody again by Public Security officers in Beijing and

20  was accused of sheltering Falun Gong practitioners.

21  340.    During her interrogation, the police told her that another practitioner she knew was

22  wanted for using the Internet to engage in Falun Gong activities.  Upon information and belief,

23  Liu Guifu was identified by her connection to this practitioner through use of the Golden Shield.

24  She was detained for three weeks.

25  341.    In February 2005, Public Security officers again took her into custody. Public Security

26  officers sent her to a labor camp for two and a half years.

27  342.    Liu Guifu was not permitted to challenge the legal or factual validity of any accusations.

28  343.    At the labor camp, she was interrogated and subject to forced conversion practices. The

63

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

interrogators repeatedly told her that someone in her home had downloaded information from the Minghui website and asked her repeatedly who had used her computer to download the Falun Gong materials. The information security used to interrogate Liu Guifu is routinely collected, stored, profiled, and made accessible to security through the Golden Shield apparatus.

344.    She was released from the labor camp in the summer of 2007.  In 2009, she escaped to the United States and now resides in New York.

345.    Wang Weiyu.  Wang Weiyu was born and educated in China. He graduated from Tsinghua University where he studied optical engineering. He left China and arrived in the United States in July 2013. He currently resides in the United States.

346.    Plaintiff Wang was detained in police stations and detention facilities on several occasions between July 20, 1999 and July 2000 for his practice of his religious beliefs in China and his protest of the persecution of his religion.

347.    Plaintiff Wang was seized, detained and interrogated by Chinese security in connection to articles he published on the Minghui website from May 2001 through August 2002. These articles discussed specifically the persecution of other Tsinghua University graduates in China.

348.    During his interrogation, Chinese security told him that they had been monitoring his Internet activity for a while.  They specifically told him that they knew he had sent encrypted materials to the Minghui website.  They knew his online anonymous pseudonym. They were aware of his anonymous Internet communications with another Minghui contributor. They were even aware of the titles of some of these articles.

349.    Mr. Wang did not sign his name to or in any other way indicate his authorship of any of these articles.

350.    Although another Falun Gong believer verified Mr. Wang's authorship of Minghui related publications, she made these statements to security four months after Chinese security told Mr. Wang of their awareness of his Falun Gong related Internet activity.

351.    Mr. Wang was identified as the author of these articles through Golden Shield surveillance. His encrypted Internet communication with the Minghui website and other Minghui

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

contributors were also identified through surveillance and monitoring facilitated through the Golden Shield apparatus Cisco designed, implemented, serviced and maintained.

352.    Plaintiff Wang was detained from August 12, 2002 through February 21, 2003 in the Legal Training Center in Beijing without a trial, hearing, and access to legal counsel or any other due process rights guaranteed to Chinese citizens under the Chinese constitution.

353.    In the detention center, he was beaten with electrical batons for over eleven hours on successive occasions. Security from the Domestic Security Bureau electrocuted his entire body including each and every fingertip in addition to piercing his back with electrodes. They grinned as they beat his head and shouted (we will) "scorch every inch of your skin." He was not permitted to bathe, wash, and engage in other basic hygiene necessities. He was kept in total isolation without contact with other persons for a full six months.

354.    At a sham trial where he was not permitted to enter a plea of "not guilty," Plaintiff Wang was found "guilty" of uploading information on to the Minghui website and sent to Qianjin Prison and detained there as a prisoner of conscience until February 20, 2011.

355.    The torture Plaintiff Wang was subjected to in Qianjin prison was so severe as to cause severe medical ailments such as tendon avulsion.  In spite of the cold weather and his infirmities, he was forced to participate outdoors in unpaid labor that aggravated his already frail condition. He was repeatedly refused medical attention in spite of requests by Plaintiff Wang and his family. After he was finally examined in a medical hospital, he was denied access to any information regarding his infirmities. After he was released from the medical hospital, he was subjected to additional bouts of torture and forced labor. These included severe beatings by other inmates at the provocation of Chinese security at the detention facility.

356.    During the period of his detention, information about his wife and especially her anonymous Internet communication with overseas Falun Gong believers, were used to force Plaintiff Wang to confess as to her whereabouts and renounce his own belief in the Falun Gong religion. Security made threats against him and his wife.  Their information was collected, profiled and accessed by security via the Golden Shield.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

## NO ALTERNATIVE REMEDIES AND
## CONTINUING VIOLATIONS OF LAW

357.    There is no adequate alternative remedy available in China to Plaintiffs for the claims asserted here.

358.    Attorneys in China have been disbarred, arrested, and persecuted for their attempts to defend Falun Gong practitioners in Chinese courts. Plaintiffs residing outside of China cannot return to China without danger of serious reprisals, nor can those residing inside China bring suit without danger of serious reprisals.

359.    Plaintiffs still detained continue to suffer from beatings, sleep and food deprivation, and other forms of torture, cruel, inhuman, or degrading treatment, forced labor, and crimes against humanity.

360.    Technologies and other measures used to suppress Falun Gong practitioners in China make it virtually impossible for plaintiffs to bring cases in China without reprisal and further persecution of them and their families. In addition, it is virtually impossible for detained Falun Gong practitioners to bring cases in any foreign courts.

361.    Many Falun Gong practitioners in China have attempted to seek administrative remedies against responsible Party officials or Public Security officers. This has resulted in further retaliation against them, including renewed detention and increased persecution. In fact, a commonplace ground for arrest and persecution is the use of the Appeal Office in Beijing to formally (and legally) file an administrative appeal at the appeal office in Beijing.

## CLASS ALLEGATIONS

362.    **Class Definition**. Plaintiffs bring this action on behalf of themselves individually and on behalf of all other similarly situated individuals as a class action. This action may properly be maintained as a class action pursuant to the provisions of Federal Rule of Civil Procedure 23(a) and (b)(3).  The Class which Plaintiffs seek to represent is comprised of, and defined, as follows:

363.    All persons who were subjected to ideological conversion through torture and other human rights abuses through the use of information provided by Golden Shield apparatus. The information collected, profiled and stored in the apparatus was used by Chinese security to

66

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

identify Internet users as Falun Gong, track, capture, isolate and torture them, and they suffered injury as a result.

364.    Upon application by Plaintiffs' counsel for certification of the Class, the Court may be requested after appropriate discovery, to also utilize and certify subclasses in the interests of ascertainability, manageability, justice, and/or judicial economy.

365.    **Ascertainability**. This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed Class are ascertainable and identifiable.

366.    **Numerosity**. The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs believe that there are many thousands of members of the class as described above, although the number and identities of individual class members are presently unknown.

367.    **Typicality** Plaintiffs' claims are typical of the claims of the other members of the class, since all such claims arise out of Defendants' actions in actively participating in the development of the Golden Shield through which plaintiffs and class members were identified and subjected to detention and torture.  Plaintiffs have no interest antagonistic to the interests of the other members of the class.

368.    **Adequacy**. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel with extensive experience in the prosecution of human rights actions and class actions.  Accordingly, Plaintiffs are adequate representatives of the class and will fairly and adequately protect the interests of the class.

369.    **Commonality and Predominance**. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

a. Whether Cisco and the individual Defendants intended to design the Golden Shield to specifically facilitate the online identification of the Plaintiff Class by Party and Public Security officers;

b. Whether Cisco and the individual Defendants intended to design the Golden Shield to specifically facilitate the prolonged detention of the Plaintiffs Class by Party and Public Security officers;

c. Whether Cisco and the individual Defendants intended to design the Golden Shield to specifically facilitate the ideological conversion and related abuses;

d. Whether Cisco and/or the individual Defendants knew or should have known that the Golden Shield would be used to target and persecute the Plaintiff Class;

e. Whether Cisco and the individual Defendants intended that the Golden Shield be used to target and persecute the Plaintiff Class;

f. Whether Defendants gave substantial assistance to Public Security and the Party officers in the persecution the Plaintiff Class;

f. Whether Cisco and the individual Defendants specifically intended to aid Public Security and Party officers in the persecution of and commission of other crimes alleged herein against the Plaintiff Class;

g. Whether Cisco and the individual Defendants' subsidiaries in China acted as alter egos or agents of defendant Cisco with regard to the actions that are the subject matter of this complaint;

h. Whether Cisco and the individual Defendants unlawfully designed, implemented, optimized, serviced, possessed, tested, verified and/or provided to Party and Security officers the components, training and integrated systems required to create and operate the Golden Shield; and

i. Whether Cisco and the individual Defendants violated Section 17200 of the California Business and Professions Code.

370.   **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation of the claims of all Class members is

68

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

impracticable. Even if every member of the Class could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases involving highly technical issues would proceed.   Further participation in the lawsuit might expose the would-be plaintiffs to further gross human rights abuses

371.    By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Class and of Defendants. The same evidence, the same witnesses, and the same legal arguments and explanations will be used to prove that Defendants bear liability for injuries suffered by members of the Class. Numerous fluid recovery methods exist to aid the Court in assessing damages on a Class-wide basis. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

372.    Additionally, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the unlawful conduct alleged herein. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action. There is no other litigation that has commenced against Defendants regarding this matter.

373.    Cisco and the individual Defendants have engaged in unlawful and unfair business conduct, which has affected the members of the Class, thereby making appropriate compensatory relief with regard to the members of the Class as a whole, as, requested herein.

## **LEGAL AND EQUITABLE TOLLING**

374.    No statute of limitations has begun to run on the Defendants' actions or on the Plaintiffs' legal right to seek remedies for Defendants' knowing, purposeful and intentional design, supply and assistance in maintaining the Golden Shield network in collaboration with the Party and Public Security officers with knowledge and intent that such assistance was for the specific

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   purpose of ultimately subjecting Plaintiffs to gross human rights abuses in violation of

2   international and state law.

3   375.   Plaintiffs' claims are equitably tolled due to the extraordinary circumstances outside of

4   their control, including the Party's pattern of repression, torture, and other crimes against

5   humanity that they themselves suffered.

6   376.   All plaintiffs, even those residing outside China, justifiably feared retribution against

7   them, their families and friends if they publically criticized the treatment they and other Falun

8   Gong practitioners suffered in China. Even now the Doe plaintiffs and the Roe next friends are

9   fearful of having their identities known to Chinese officials.

10   377.   The political climate in China also prevented plaintiffs from freely investigating the

11   circumstances of the abuses they suffered.

12   378.   Lawyers, who represented Falun Gong practitioners, have themselves been persecuted.

13   This year alone, several lawyers, who do not practice Falun Gong yet nonetheless risked their

14   personal safety to represent Falun Gong clients in criminal proceedings, have been disbarred and

15   then themselves arrested, as in the cases of Tang Jitian, Liu Wei, and Teng Biao, or simply

16   imprisoned and tortured without any formal charges, as in the ongoing ordeal suffered by human

17   rights lawyer Gao Zhisheng.

18   379.   In addition to these bases for tolling applicable to all plaintiffs, they have individual and

19   distinct bases for tolling.

20   a.   The claims of Doe III and Doe IX are equitably tolled while they remain in prison

21   with limited access to anyone outside.

22   b.   The claims of Doe I are equitably tolled while she was imprisoned under isolating

23   conditions that restricted her access to anyone able to present her claims. She was not

24   released from the harsh and isolating conditions of her confinement until 2011.

25   c.   The claims of Doe IV are equitably tolled while he was imprisoned under isolating

26   conditions that restricted his access to anyone able to present his claims. He was not

27   released from the harsh and isolating conditions of his confinement until November

28   2010.

70

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

d.  The claims of Doe VII are equitable tolled while in prison. Her family did not confirm her disappearance until last year, when they made repeated unsuccessful attempts to communicate with her or ascertain her whereabouts.

e.  The claims of Does II, V and Doe VI are equitably tolled while in prison. Doe II was released in 2005 and Does III, V, and VI were released in 2008. They all continue to live in China in fear of further abuse, including further detention if they sought redress in China or if their accounts of the abuse they suffered were made public. For that reason they sought leave to proceed anonymously. Their claims should be tolled after their release from detention because of the continued threat of persecution.

f.  Charles Lee suffered repeated torture causing mental and physical trauma during his detention and torture. After his release he continued to suffer depression and anxiety to such a degree that tolling was appropriate even after his release.

g.  The claims of Liu Guifu are tolled for the period of her detention and continued while she remained in China for fear of further retribution. She arrived in September 2009 and received permanent resident status in the United States in March 2011. Her claims are tolled until she receives permanent residence status and no longer fears that she might be forced to return to China.

h.  The claims of Ivy He are equitably tolled while she was detained and while she remained in China after her release. She was released from prison in 2004 and arrived in Canada in 2008. Her claims should continue to be tolled because Plaintiff He was concerned that she would be in danger of retaliation from the Party if she participated in an action critical of the treatment of Falun Gong in China. In 2010 she returned to China to see her family and close her affairs there. After that she was no longer afraid of retaliation for bringing a case, which reflected badly on China's human rights record. The running of the statute is tolled as to her claims until after her trip to China in December 2010.

i.  The claims of Wang Weiyu are equitably tolled while he was detained and while he remained in China under security surveillance and close monitoring. Plaintiff Wang

71

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1      was released from detention on February 20, 2011. He was not able to leave China

2      until July 2013.

3    380.    Tolling is further appropriate to ensure that abuses abroad do not thwart the administration

4    of justice in the United States.

5

### FIRST CAUSE OF ACTION

6

*(Torture under the Alien Tort Statute (ATS))*

7

(Plaintiffs Ivy He, Liu Guifu, Does I-VI, Roe VII, Roe VIII, Doe IX, Wang Weiyu

8

and class members similarly situated, against all Defendants)

9    381.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by

10   reference as if fully set forth below.

11   382.    Plaintiffs Ivy He, Liu Guifu, Does I-VI, Doe IX, and Wang Weiyu suffered from torture

12   inflicted knowingly and purposefully in order to, among other things, punish the victims and/or

13   induce a forced confession and public renunciation of their religious beliefs. Plaintiffs Roe VII

14   and Roe VIII, personal representatives of Does VII and VIII, are injured in that the individuals

15   they represent were victims of torture.

16   383.    Plaintiffs Plaintiffs Ivy He, Liu Guifu, Does I-VI, Doe IX, and Wang Weiyu suffered

17   severe mental and physical injuries as a result of the abuse inflicted while in custody. Plaintiffs

18   Roe VII and Roe VIII, personal representatives of Does VII and VIII, are injured in that the

19   individuals they represent suffered severe mental and physical injuries as a result of the abuses

20   inflicted while in custody.

21   384.    Such conduct was in violation of international law and was contrary to the laws of China.

22   385.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy

23   He, Liu Guifu, Does I through VI, Roes VII and VIII, Doe IX, and Wang Weiyu and class

24   members similarly situated. Defendants, directly or through their agents, knowingly and

25   purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the

26   Party and Public Security officers in the unlawful conduct that led to the torture they or those they

27   represent endured as a result of the Golden Shield.

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**SECOND CAUSE OF ACTION**

*(Torture under the TVPA)*

(Charles Lee and class members similarly situated,

against Defendants Chambers and Cheung)

386.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

387.    Plaintiff Charles Lee suffered from torture inflicted knowingly and intentionally in order to, among other things, retaliate against him and induce a forced confession and public renunciation of his religious beliefs.

388.    Plaintiff Charles Lee suffered severe mental and physical injuries as a result of the abuse inflicted while in custody.

389.    Such conduct was in violation of the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

390.    Defendants John Chamber and Fredy Cheung are liable for the harm suffered by plaintiff Charles Lee, and class members similarly situated, in that these Defendants, directly or through their agents, knowingly and intentionally aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and Public Security officers in the unlawful conduct that led to the torture he endured as a result of the Golden Shield.

**THIRD CAUSE OF ACTION**

*(Cruel, Inhuman, or Degrading Treatment under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Does I-VI, Roes VII-VIII, Doe IX, Wang Weiyu

and class members similarly situated, against all Defendants)

391.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

392.    Plaintiffs Ivy He, Liu Guifu, Does I-VI, Doe IX, and Wang Weiyu suffered severe mental and physical injuries as a result of the abuse inflicted while in custody. Plaintiffs Roe VII and Roe VIII, personal representatives of Does VII and VIII, are injured in that the individuals they represent suffered severe mental and physical injuries as a result of the abuses inflicted while in

73

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    custody.

2    393.    The acts described herein were done with the intent of and had the effect of grossly

3    humiliating and debasing the Plaintiff Class, forcing them to act against their will and conscience,

4    inciting fear and anguish, and/or breaking their physical or moral resistance.

5    394.    Plaintiffs Ivy He, Liu Guifu, Does I-VI, Doe IX, and Wang Weiyu were placed in great

6    fear for their lives and forced to suffer severe physical and psychological abuse and agony.

7    Plaintiffs Roe VII and Roe VIII, personal representatives of Does VII and VIII, are injured in that

8    the individuals they represent were placed in great fear for their lives and forced to suffer severe

9    physical and psychological abuse and agony.

10   395.    Such conduct was in violation of international law and was contrary to the laws of China.

11   396.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy

12   He, Liu Guifu, Does I through VI, Doe IX, Roes VII and VIII, Wang Weiyu and class members

13   similarly situated, in that Defendants directly or through their agents knowingly and purposefully

14   aided and abetted or entered into a conspiracy or joint criminal enterprise with the Party and

15   Public Security officers in the unlawful conduct that led to the cruel, inhuman and degrading

16   treatment they or those they represent endured as a result of the Golden Shield.

17                                        **FOURTH CAUSE OF ACTION**

18                                        *(Forced Labor under the ATS)*

19                                    (Plaintiffs Ivy He, Liu Guifu, Doe VI

20                         and class members similarly situated, against all Defendants)

21   397.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by

22   reference as if fully set forth below.

23   398.    Plaintiffs Ivy He, Liu Guifu, Doe VI and class members similarly situated were sent to

24   reeducation through labor camps, where they were forced to work involuntarily under threat of or

25   as part of a regime of serious harm and physical restraint. At no time were these plaintiffs

26   charged, convicted or sentenced for a violation of a crime.

27   399.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy

28   He, Liu Guifu, and Doe VI and class members similarly situated, in that Defendants directly or

                                                    74

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and Public Security officers in the unlawful conduct that led to the forced labor they endured as a result of the Golden Shield.

**FIFTH CAUSE OF ACTION**

*(Prolonged and Arbitrary Detention under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Doe VI, and class members similarly situated, against all Defendants)

400.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

401.   Plaintiffs Ivy He, Liu Guifu and Doe VI, and class members similarly situated, were detained in reeducation through labor camps without due process because of their practice of Falun Gong, during which they were subjected to torture and denied access to legal counsel. At no point were these plaintiffs convicted for any crime.

402.   Plaintiffs Ivy He, Liu Guifu, and Doe VI were injured by prolonged and arbitrary detention in violation of international law.

403.   Defendants are liable for the harm suffered by plaintiffs Ivy He, Liu Guifu and Doe VI, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Party and Public Security officers in the unlawful conduct that led to their prolonged and arbitrary detention, or the prolonged and arbitrary detention of those they represent.

**SIXTH CAUSE OF ACTION**

*(Crimes against Humanity under the ATS)*

(Plaintiffs Ivy He, Liu Guifu, Wang Weiyu, Does I-VI, Roes VII and VIII, Doe IX, and class members similarly situated, against all Defendants)

404.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

405.   Plaintiffs Ivy He, Liu Guifu, Does I-VI, Doe IX, and Wang Weiyu were injured by crimes

75

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

against humanity described above, including extrajudicial killings; torture; cruel, inhuman and degrading treatment; arbitrary and prolonged detention; forced exile; forcible transfer; enforced disappearance; and persecution. Plaintiffs Roes VII-VIII, personal representatives of Does VII and VIII, are injured in that the individuals they represent were injured by these crimes against humanity.

406.    Each single act constitutes a crime against humanity because it was committed within the context of widespread or systematic attacks against a civilian population. These acts were directed against plaintiffs Ivy He, Liu Guifu, Does I-VI, Doe IX, Wang Weiyu and Does VII-VIII because they were Falun Gong practitioners.

407.    Such conduct was in violation of international law and was contrary to the laws of China.

408.    Defendants are liable under the Alien Tort Statute for the harm suffered by plaintiffs Ivy He, Liu Guifu, Wang Weiyu, Does I through VI, Roes VII and VIII, Doe IX, and class members similarly situated, in that Defendants directly or through their agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with the Party and Public Security officers in the unlawful conduct that led to the crimes against humanity they or those they represent endured as a result of the Golden Shield.

## SEVENTH CAUSE OF ACTION

*(Extrajudicial Killing under the ATS)*

(Plaintiff Roe VIII, and class members similarly situated,

against all Defendants)

409.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

410.    Doe VIII's death by torture was an extrajudicial killing not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

411.    This extrajudicial killing was in violation of international law and was contrary to the laws of China.

412.    Defendants are liable for the harm suffered by Doe VIII's survivor, Roe VIII, and class

76

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1   members similarly situated, in that Defendants either directly or through their agents knowingly

2   and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with

3   the Party and Public Security officers in the unlawful conduct that led to Doe VIII's death.

4                                **EIGHTH CAUSE OF ACTION**

5                           *(Enforced Disappearance under the ATS)*

6                       (Plaintiff Roe VII, and class members similarly situated,

7                                    against all Defendants)

8   413.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by

9   reference as if fully set forth below

10  414.    Doe VII was forcibly disappeared while in the custody. After being detained and

11  imprisoned, she was not permitted access to any friends or family members, and has not been

12  seen or heard from since 2006. Her whereabouts have not been disclosed, and she is presumed

13  dead by her family.

14  415.    This disappearance was in violation of international law and was contrary to the laws of

15  China.

16  416.    Defendants are liable for the harm suffered by Doe VII's representative, Roe VII, and

17  class members similarly situated, in that Defendants directly or through their agents knowingly

18  and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with

19  the Party and Public Security officers in the unlawful conduct that led to her enforced

20  disappearance.

21                                **NINTH CAUSE OF ACTION**

22                              *Violation of 18 U.S.C. § 2512(1)*

23              (Plaintiffs Ivy He, Liu Guifu, Wang Weiyu, Does I-VI, Roes VII and VIII, Doe IX,

24                   and class members similarly situated, against all Defendants)

25  417.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by

26  reference as if fully set forth below.

27  418.    Defendants designed, implemented, optimized, serviced, and made available to Public

28  Security and Party officers the components and integrated systems required to create and operate

                                              77

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   the Golden Shield.

2   419.   Defendants knew of China's poor human rights record with respect to Falun Gong

3   practitioners, and knew of Public Security and Party officers' intent to use the Golden Shield for

4   the purpose of identifying and tracking Falun Gong practitioners via the surreptitious interception

5   of their electronic, wire and/or oral communications in order to unlawfully detain, torture, and

6   harass them as described herein. Defendants specifically designed and customized the Golden

7   Shield network (including hardware and software) with the scale, complexity and capacity

8   required to enable Public Security officers and Office 610 security agents to covertly monitor and

9   intercept information from the Chinese population without their consent. The technological

10  tailoring enabled Public Security officers and Office 610 security agents to identify, track,

11  apprehend, interrogate, detain and torture Falun Gong practitioners, including Plaintiffs and

12  persons similarly situated. Defendants also designed, implemented, optimized, integrated,

13  possessed, and provided routers programmed with blocking and surveillance features that are not

14  typical to a router's default configuration in order to more easily track the movement of Falun

15  Gong practitioners, including Plaintiffs.

16  420.   Defendants knew that Public Security officers and Office 610 security agents intended to

17  commit such acts on Falun Gong members, and purposefully provided the Golden Shield

18  technology to them as the sole or essential means by which Plaintiffs could be identified as Falun

19  Gong and detained by Party officials.

20  421.   Plaintiffs' electronic, wire and/or oral communications were intercepted, disclosed, and

21  intentionally used by Public Security officers and Office 610 security agents to identify, track,

22  and commit human rights abuses against them.

23  422.   As a result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer,

24  irreparable harm and compensatory and punitive damages in an amount to be proven at trial.

25  423.   As a legal, substantial and direct result of the above-described conduct, Plaintiffs are

26  entitled to reasonable attorneys' fees and other litigation costs pursuant to 28 U.S.C. § 2512(1).

27  ///

28  ///

78

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

**TENTH CAUSE OF ACTION**

*Battery*

(Plaintiffs Ivy He, Liu Guifu, Wang Weiyu, Does I-VI, Roes VII and VIII, Doe IX, and class members similarly situated, against all Defendants)

424.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

425.    The Party, through its agents in Public Security and Office 610 officers, used the Golden Shield technology, implemented and maintained by Defendants to surveil the Internet activity of Falun Gong, in collaboration with other security agents, with the intent and as the sole or essential means to facilitate the apprehension, detention, interrogation, forcible conversion and severe physical and mental abuse of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and degradation.

426.    For example, while at a reeducation through labor camp in 2002, Ivy He lost consciousness while being tortured, was slapped repeatedly, and during an interrogation in November 2001 she was forced to stand in a bucket of ice-cold water while ice was poured over her body. While in prison from 2003-2006, Plaintiff Charles Lee was forced to stand or sit in the same position for hours at a time on a daily basis, sometimes for up to two weeks in a row. He was forced to attend military drills, and when he refused he was dragged across the grounds for hours at a time. Chinese security officers force-fed him on four occasions; on one of these occasions, they tied him down and placed a tube down his throat for feeding, which was kept there for thirty-three hours. Other Plaintiffs were beaten, slapped, and force-fed.

427.    Plaintiffs did not consent to these acts of touching. They were forcibly detained and sent to re-education through labor camps, where they were interrogated and tortured, without being charged or tried. Further, they were also sent to prison camps following sham trials in which they were not allowed to enter a "not guilty" plea, challenge the legality of the charges against them, or have counsel be present during interrogations. The unwanted touching occurred in these camps.

428.    Defendants knew that security officials intended to commit such acts on Falun Gong

79

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   members, and conspired with the Party and Public Security officers to purposefully and

2   intentionally provide Golden Shield technology as the sole or essential means by which Plaintiffs

3   could be identified as Falun Gong practitioners and detained for such acts to be committed on

4   them.

5   429.    As a result of Defendants' conduct, Plaintiffs suffered injury, damage, loss, and harm as a

6   result of these unlawful acts of touching. In particular, Plaintiffs suffer from severe mental trauma

7   and lingering physical effects such as heart damage and loss of movement.

8   430.    Defendants knew that the Party and Public Security officers intended to use Golden Shield

9   to identify, track, detain, and commit acts constituting battery against Plaintiffs. Defendants gave

10   substantial assistance or encouragement to the Chinese Communist Party and Public Security

11   officers in carrying out these acts, and Defendants' conduct was a substantial factor in causing

12   harm to Plaintiffs.

13   431.    Defendants' marketing schemes and creation of a custom surveillance system for the

14   Golden Shield network were developed and tailored in California in order to meet Party and

15   Public Security officers' requirements to "*douzheng*" Falun Gong members, which resulted in the

16   commission of battery against Plaintiffs.

17   432.    As a result of Defendants' conduct, Plaintiffs or those they represent have suffered, and

18   will continue to suffer, irreparable harm and damages in an amount to be proven at trial.

19   ## ELEVENTH CAUSE OF ACTION

20   *Assault*

21   (Plaintiffs Ivy He, Liu Guifu, Wang Weiyu, Does I-VI, Roes VII and VIII, Doe IX,

22   and class members similarly situated, against all Defendants)

23   433.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by

24   reference as if fully set forth below.

25   434.    Public Security officers and Office 610 security agents intentionally used Golden Shield

26   technology to analyze and share information on Falun Gong practitioners as the sole or essential

27   means of facilitating the detention, interrogation, and severe physical and mental torture of

28   Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and degradation.

80

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

435.    Public Security officers, Office 610 security agents, and other security officers committed widespread acts of torture. For example, while at a re-education through labor camp in 2002, Ivy He lost consciousness while being tortured and slapped repeatedly. During a police interrogation in November 2001, she was forced to stand in a bucket of ice-cold water while ice was poured over her body. While in prison from 2003 to 2006, Plaintiff Charles Lee was forced to stand or sit in the same position for hours at a time on a daily basis, sometimes for up to two weeks in a row. He was forced to attend military drills, and when he refused he was dragged across the grounds for hours at a time. Chinese security officers force-fed him on four occasions; on one of these occasions, they tied him down and placed a tube down his throat for feeding, which was kept there for thirty-three hours. Other Plaintiffs were beaten, slapped, and force-fed.

436.    Defendants knew that security officers intended to commit such acts against Falun Gong members who were detained, and Defendants conspired with them and intentionally and purposefully provided the technology of Golden Shield to them as the sole or essential means by which Plaintiffs could be identified as Falun Gong by security officers, who then committed such acts against Plaintiffs. Such acts constituted an unlawful touching with the intent to harm or offend Plaintiffs.

437.    Plaintiffs did not consent to the touching. They were forcibly detained and sent to reeducation through labor camps being charged or tried. Further, they were also sent to prison camps following sham trials in which they were not allowed to enter a "not guilty" plea, challenge the legality of the charges against them, or have counsel be present during interrogations. The unwanted touching occurred in these camps.

438.    Plaintiffs suffered injury, damage, loss, and harm as a result of these unlawful acts of touching. In particular, Plaintiffs suffer from severe mental trauma and lingering physical effects such as heart damage and loss of movement.

439.    Defendants gave substantial assistance or encouragement to the Party and Public Security officers in carrying out these acts, and Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

440.    Defendants' marketing schemes and creation of a custom surveillance system for the

81

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Golden Shield network were developed and tailored in California in order to meet the Party and Public Security officers' requirements to "*douzheng*" Falun Gong members, which resulted in the commission of assault against Plaintiffs.

441.    As a result of Defendants' conduct, Plaintiffs or those they represent have suffered, and will continue to suffer, irreparable harm and damages in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### *False Imprisonment*

(Plaintiffs Ivy He, Liu Guifu, Doe VI, and class members similarly situated, against all Defendants)

442.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

443.    Public Security officers and Office 610 security agents intentionally used Golden Shield technology to analyze and share information on Falun Gong practitioners as the sole or essential means of facilitating the detention, interrogation, and severe physical and mental torture of Plaintiffs, and in order to submit Plaintiffs to forced public humiliation and degradation.

444.    Plaintiffs were detained in reeducation through labor camps without an arrest, charges, or trial for periods of time ranging from several days to several years.

445.    While being held in re-education through labor camps without any legal process, Plaintiffs were subjected to unlawful treatment including torture, public degradation, and interrogation, and were forced to work long hours in harsh conditions.

446.    Plaintiffs suffered injury, damage, loss, and harm as a result of being wrongfully detained without arrest, charges, or trial. In particular, Plaintiffs suffer from severe mental trauma and lingering physical effects such as heart damage and loss of movement.

447.    Defendants knew that security officers intended to commit such acts against Falun Gong members, and conspired with the Party and Public Security officers to intentionally and purposefully provide Golden Shield technology as the sole or essential means by which Plaintiffs could be identified as Falun Gong and detained and tortured by security officers.

448.    The use of the Golden Shield to track, identify, detain, and torture Falun Gong

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1    practitioners, directly caused their false imprisonment.

2    449.    Thus, Defendants knew that Party and Public Security officers intended to use Golden

3    Shield to identify, track, detain, and commit acts constituting false imprisonment against

4    Plaintiffs. Defendants gave substantial assistance and encouragement to the Party and Public

5    Security officers in carrying out these acts, and Defendants' conduct was a substantial factor in

6    causing harm to Plaintiffs.

7    450.    Defendants' marketing schemes and creation of a custom surveillance system for the

8    Golden Shield network were developed and tailored in California in order to meet Party and

9    Public Security officers' requirements to "*douzheng*" Falun Gong members, which resulted in the

10   false imprisonment of Plaintiffs.

11   451.    As a result of Defendants' conduct, Plaintiffs or those they represent have suffered, and

12   will continue to suffer, irreparable harm and damages in an amount to be proven at trial.

13                               **THIRTEENTH CAUSE OF ACTION**

14                                   *Unfair Business Practices*

15                       *(California Business & Professions Code § 17200 et seq.)*

16                           (All Plaintiffs, and class members similarly situated,

17                                       against all Defendants)

18   452.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by

19   reference as if fully set forth below.

20   453.    Plaintiffs allege that by engaging in the above-described acts and practices, Defendants

21   have committed one or more acts of unfair competition within the meaning of California *Business*

22   *and Professions Code* §17200, et. seq.

23   454.    Defendants' unlawful and/or unfair business acts and/or practices as alleged herein have

24   violated numerous laws and regulations, and said predicate acts are therefore per se violations of

25   § 17200, et seq.  As described in more detail above, these predicate unlawful and/or unfair

26   business acts and/or practices include, but are not limited to, Defendants' solicitation of the

27   contract to design, implement, optimize, service and maintain the Golden Shield system to Party

28   and Public Security officials for the specific purpose of furthering their intent to identify, track,

                                                  83

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    unlawfully detain, and torture Falun Gong practitioners including Plaintiffs; by information and

2    belief, Defendant Chambers' signature or countersignature on Cisco's contracts in California to

3    design, manufacture, build, and supply Golden Shield technology to Party and Public Security

4    officials as required by Cisco's corporate bylaws; Cisco's misrepresenting to United States

5    authorities that its design, implementation, optimization, assembly, possession, and /or provision

6    of the components and integrated systems required to create and operate the Golden Shield was

7    lawful or fair; Cisco's tailoring of Golden Shield components and integrated systems to include

8    the specific goal of the  "*douzheng*" of Falun Gong, and designing the custom surveillance system

9    to be used in Golden Shield in California.

10   455.    Defendants' actions as alleged herein, which include but are not limited to agreeing to

11   meet the goals of Party and Public Security officials to suppress Falun Gong believers, gave

12   Cisco an unfair competitive advantage over its competitors, who were also trying to break into the

13   Chinese market.

14   456.    Plaintiffs allege that as a direct result of Cisco's unlawful conduct alleged herein,

15   Plaintiffs lost income that they could not receive during the period of their detention. Plaintiffs

16   further lost income to the extent they were not able to continue working after their release from

17   detention due to the mental and physical injuries they received while in detention. Plaintiffs are

18   victims of Defendants' unlawful conduct, as herein alleged, and have suffered injury in fact, and

19   have lost money as a result of Cisco's unfair competition.

20   457.    Plaintiffs seek a permanent injunction enjoining Cisco from future unlawful activity.

21   Plaintiffs allege that the unlawful acts and practices, as fully described herein, present a

22   continuing threat to members of the public to be misled and/or deceived by Defendants as

23   described herein.  Plaintiffs have no other remedy at law that will prevent Defendants'

24   misconduct, as alleged herein, from occurring and/or recurring in the future.

25   458.    This litigation will result in the enforcement of an important right affecting the public

26   interest.  Plaintiffs are informed, believe, and thereupon allege that this action confers a

27   significant benefit on the California public who have been misled and/or deceived by the

28   unlawful businesses practices of Cisco.

459.    As a legal, substantial and direct result of the above-described pattern of conduct, Plaintiffs are entitled to reasonable attorneys' fees pursuant to California *Code of Civil Procedure* § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as follows:

    (a)    For certification of a class pursuant to Fed. R. Civ. P. Rule 23 (a) and (b)(3);

    (b)    For compensatory damages including general and specific damages;

    (c)    For punitive damages;

    (d)    For injunctive relief enjoining Cisco from future unlawful activity;

    (e)    For costs of suit, including attorney's fees;

    (f)    For such other and further relief as the Court deems appropriate.


DATED: August 1, 2013                    Respectfully submitted,



By:    /s/ Terri E. Marsh
    Terri E. Marsh (Lead Counsel)
    HUMAN RIGHTS LAW FOUNDATION
    Attorney for Plaintiffs


By:    /s/ K. Lee Crawford-Boyd[1]
    K. Lee Crawford-Boyd
    SCHWARCZ, RIMBERG, BOYD &
    RADER, LLP
    Attorney for Plaintiffs

---

[1] I have obtained the other signatory's concurrence in the filing of this document.

85

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury herein.


Dated:  August 1, 2013                    Respectfully submitted,


                                          By:____/s/ Terri E. Marsh_____
                                              Terri E. Marsh (Lead Counsel)
                                              HUMAN RIGHTS LAW FOUNDATION
                                              Attorney for Plaintiffs


                                          By:___/s/ K. Lee Crawford-Boyd[2]___
                                              K. Lee Crawford-Boyd
                                              SCHWARCZ, RIMBERG, BOYD &
                                              RADER, LLP
                                              Attorney for Plaintiffs

---

[2] I have obtained the other signatory's concurrence in the filing of this document.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx