1   KATHRYN LEE BOYD, ESQ. (SBN 189496)
        lboyd@srbr-law.com
2   RAJIKA L. SHAH, ESQ. (SBN 232994)
        rshah@srbr-law.com
3   **SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
4   6310 San Vicente Boulevard, Suite 360
    Los Angeles, California 90048
5   Phone: (323) 302-9488; Fax: (323) 931-4990

6   TERRI MARSH, ESQ. (*pro hac vice*)
        terri.marsh@hrlf.net
7   JORDAN BERMAN, ESQ. (*pro hac vice*)
        Jordan.Berman.HRLF@gmail.com
8   **HUMAN RIGHTS LAW FOUNDATION**
9   1615 L Street NW, Suite 1100
    Washington, D.C.  20036
10  Phone: (202) 697-3858; Fax: (202) 355-6701
11  Attorneys for PLAINTIFFS

12              **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA,**
13                     **SAN JOSE DIVISION**

14

15                                          Case No. 5:11-cv-02449-EJD-PSGx

16  DOE I, DOE II, Ivy HE, DOE III, DOE IV,     Assigned to the Honorable Edward J. Davila,
    DOE V, DOE VI, ROE VII, Charles LEE,        U.S.D.J.
17  ROE VIII, and LIU Guifu,

18          Plaintiffs,                         **PLAINTIFFS' REPLY IN SUPPORT OF
                                                MOTION FOR LEAVE TO FILE A**
19      vs.                                     **SECOND AMENDED COMPLAINT;
                                                MEMORANDUM OF POINTS AND**
20  CISCO SYSTEMS, INC., John CHAMBERS,         **AUTHORITIES IN SUPPORT THEREOF**
    Thomas LAM, Owen CHAN, Fredy
21  CHEUNG, and DOES 1-100,

22                                              Action Filed: May 19, 2011
                                                FAC Filed: Sept. 2, 2011
23          Defendants.
                                                Hearing Date: September 20, 2013
24                                              Time: 9:00 a.m.
                                                Courtroom: 4, 5th Floor
25

26

27

28

                                    1

# TABLE OF CONTENTS

I.     **INTRODUCTION** .................................................................................................... 1

II.    **ARGUMENT** ………….................................................................................... 2

     A.    **The Proposed SAC Plausibly Links Plaintiffs' Claims to the U.S. Under Several Legal Standards.** ......................................................................... 2

     B.    **The Proposed SAC Sufficiently Alleges Facts Linking the Defendants to Plaintiffs' Injuries.** ..................................................................... 6

        1.    The Proposed SAC Links the Defendants to Plaintiffs' Injuries Through Aiding and Abetting and Other Liability Theories ....................................... 6

        2.    The Proposed SAC Alleges that the Defendants' Apparatus Furthered the Alleged Misconduct Through the Sophisticated Integration and Customization of Falun Gong Specific and Generic Features. ..................... 11

     C.    **Defendants Have Not Demonstrated Bad Faith, Prejudice, or Undue Delay** ............................................................................................................ 12

     D.    **Defendants' Attempt To Strike Newspaper Articles and Other Third-Party Reports Is Without Merit** ............................................................ 14

III. **CONCLUSION** …………................................................................................ 15

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' REPLY IN SUPPORT OF MTN. FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT; MEM. OF P&A IN SUPPORT THEREOF
Case No. 2:10-CV-09596-DMG-(SSx)

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Arei II Cases*,
  216 Cal.App.4th 1004 (2013) …………………………………………………..……10

5

6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ……………………………………………….…...6, 7, 12

7

8

*Balintulo v. Daimler AG*,
  --- F.3d ----, 2013 WL 4437057 (2nd Cir. 2013) ………………………...….………6

9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ………………………………………………………..7

10

11

*Chipman v. Nelson*,
  2013 U.S. Dist. LEXIS 85640 (E.D. Cal. June 18, 2013) …………………………...13-14

12

*Colaprico v. Sun Microsystems, Inc.*,
  758 F. Supp. 1335 (N.D. Cal. 1991) …………………………………………..……...14

13

14

*Cuevas v. City of Campbell*,
  2012 U.S. Dist. LEXIS 150415 (N.D. Cal. Oct. 18, 2012)   ……………………….…..12, 13

15

16

*DCD Programs, Ltd. v. Leighton*,
  833 F.2d 183 (9th Cir. 1987) …………………………………………………….……12

17

18

*Doe v. Nestle, S.A.*,
  748 F.Supp.2d 1057 (C.D. Cal. 2010) ……………………………….…………...………7

19

*Giraldo v. Drummond Co., Inc.*,
  Slip Copy, 2013 WL 3873960 (N.D. Ala. 2013) …….………………………..………….4

20

21

*Hughes v. Vanderbilt Univ.*,
  215 F.3d 543 (6th Cir. 2000) ……………………………………….…...…………14

22

23

*In re South African Apartheid Litigation*,
  617 F.Supp.2d 228 (S.D.N.Y. 2009)  ……………………………………….………7

24

25

*Jian Zhang v. Baidu.com Inc.*,
  --- F.R.D. ----, 2013 WL 2458834 (S.D.N.Y. 2013)  ………………………….………3

26

27

*Jones v. City and County of San Francisco*,
  976 F.Supp. 896 (N.D. Cal. 1997) …………………………………..…………...…14

28

iii

PLAINTIFFS' REPLY IN SUPPORT OF MTN. FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT; MEM. OF P&A IN SUPPORT THEREOF
Case No. 5:11-cv-02449-EJD-PSGx

*Kiobel v. Royal Dutch Petroleum Co.,*
    569 U.S. ____, 133 S.Ct. 1659 (2013) ……………………………………………………..2

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*McAfee v. Francis*,
    2011 U.S. Dist. LEXIS 83878 (N.D. Cal. Aug. 1, 2011) …………………………………..12

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
    871 F. Supp. 2d 933 (N.D. Cal. 2012) ………..………………………..………………..5

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009)   ………………………………………………………….13

*Mwani v. Bin Laden,*
    --- F.Supp.2d ----, 2013 WL 2325166 (D.D.C., 2013) …………………………………3

*Naton v. Bank of California,*
    72 F.R.D. 550 (N.D. Cal. 1976) …………………………………………………………14

*Paulsson Geophysical Services, Inc. v. Sigmar,*
    529 F.3d 303 (5th Cir. 2008)   …………………………………………..………………4

*Sarei v. Rio Tinto, PLC*,
    221 F.Supp.2d 1116, 1121 (C.D. Cal. 2002) ……………………………………..………3-4

*Sexual Minorities Uganda v. Lively*,
    --- F.Supp.2d ----, 2013 WL 4130756 (D. Mass. Aug. 14, 2013) ……………....…2, 3, 5, 6

*Steele v. Bulova Watch Co.*,
    344 U.S. 280 (1952)  …………………………………………………………………...4

*United States v. Mandell*,
    2011 U.S. Dist. LEXIS 27064 (S.D.N.Y. Mar 16, 2011)  ……..……………………………4

*Wang v. OCZ Tech. Grp., Inc.,*
    276 F.R.D. 618 (N.D. Cal. 2011)  ………………………………………………………14

STATUTES AND INSTRUMENTS

Fed. R. Civ. P. Rule 56  ……………………………………………………...……………4

iv

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' REPLY IN SUPPORT OF MTN. FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT; MEM. OF P&A IN SUPPORT THEREOF
Case No. 2:10-CV-09596-DMG-(SSx)

1

**PLAINTIFFS' REPLY MEMORANDUM**

2

**I.      INTRODUCTION**

3

Defendants' presentation of the case bears little resemblance to the case Plaintiffs filed.

4

Plaintiffs do not allege, for example, that Cisco Systems Inc. ("Cisco") should be held liable for

5

selling equipment or services to Chinese public agencies in support of the enforcement of Chinese

6

law.  *See, e.g.*, Docket ("Dkt.") 102 at 6:12-13. Rather, Plaintiffs allege that Cisco (including

7

Defendants in San Jose) directly engaged in every important aspect of the Golden Shield project

8

including marketing, design and implementation efforts specifically tailored to give rise to the

9

precise misconduct perpetrated against Plaintiffs and persons similarly situated in China (*see,*

10

*e.g.*, Proposed SAC Section II D); that a substantial portion of this conduct was orchestrated from

11

or carried out in the United States; that Chinese security used the apparatus Cisco developed to

12

track, identify, ideologically convert through torture and repress Falun Gong believers in China,

13

including Plaintiffs; that before and during the Golden Shield project, Cisco knew and intended

14

that the Golden Shield apparatus be used for these repressive purposes; and that Cisco's Golden

15

Shield apparatus facilitated the injuries and abuses suffered by Plaintiffs.  Plaintiffs additionally

16

allege that Cisco participated in and furthered the alleged misconduct directly, through agents

17

and/or alter egos and in collaboration with Party, Public Security officers and other affiliates.

18

Plaintiffs allege that the abuses committed against plaintiffs were part of an extra-legal

19

(ultra vires) repressive campaign which was widely reported and was virtually identical to earlier

20

campaigns carried out by the Party (as distinct from the State) against other minority religious

21

groups: groups of dissident intellectuals and artists, activist lawyers and jurists, Tibetan Buddhist

22

supporters of the Dalai Lama, individuals with "bad class backgrounds", people with "decadent"

23

lifestyles (including homosexuals and other social minorities), Vatican-aligned Catholics, and

24

others. To the extent that state officers are alleged to have participated in this campaign, the

25

Proposed SAC makes clear that they did so without regard for and in violation of China's anti-

26

torture and other related regulations and commitments.

27

Plaintiffs' specific factual allegations concerning these and other matters are

28

mischaracterized, distorted and/or ignored throughout Defendants' Opposition Brief.

- 1 -

1

2

## II.    ARGUMENT

### A.    The Proposed SAC Plausibly Links Plaintiffs' Claims to the U.S. Under Several Legal Standards.

3

4

Contrary to Defendant's assertions, Plaintiffs' amendment would not be futile because

Plaintiffs' claims touch and concern the United States with sufficient force.  In *Sexual Minorities*

5

*Uganda v. Lively*, --- F.Supp.2d ----, 2013 WL 4130756 (D. Mass. Aug. 14, 2013), decided after

6

Plaintiffs submitted their Motion to Amend, the district court denied the motion to dismiss ATS

7

claims for injuries against foreign plaintiffs for injuries occurring abroad, concluding, "[a]n

8

exercise of jurisdiction under the ATS over claims against an American citizen who has allegedly

9

violated the law of nations in large part through actions committed within this country fits

10

comfortably within the limits described in *Kiobel*."  *Id.* at *14.   The district court noted that Chief

11

Justice Roberts, in *Kiobel*, "emphasized that the Court's holding applied to a factual scenario

12

where 'all the relevant conduct took place outside the United States.'"  *Id.* at *13 (quoting *Kiobel*

13

*v. Royal Dutch Petroleum Co.,* 569 U.S. ____,133 S. Ct. 1659, 1669 (2013)).  The district court

14

therefore allowed claims to proceed against the defendant, a U.S. pastor who travelled between

15

Uganda and the U.S. while fomenting an atmosphere of repression against LGBT people in

16

Uganda.  The fact that Plaintiffs' injuries occurred abroad did not deprive plaintiffs of a claim:

17

"Defendant's alleged actions in planning and managing a campaign of repression in Uganda from

18

the United States are analogous to a terrorist designing and manufacturing a bomb in this country,

19

which he then mails to Uganda with the intent that it explode there."  *Id.*

20

In light of the decision in *Sexual Minorities Uganda*, 2013 WL 4130756 at *14, Plaintiffs'

21

arguments in their Motion to Amend all the more-so meet the standards for touch and concern:

22

claims in this case 1) are against American defendants domiciled on American soil, 2) who

23

masterminded, designed and in other ways furthered in the United States the violation of

24

Plaintiffs' basic human rights by tailoring its well-integrated "solutions" for the specific purpose

25

of surveiling, ideologically converting and in other ways injuring Plaintiffs in violation of the law

26

of nations.  As described in Section C.2 of the Motion to Amend, the newly proposed allegations

27

elaborate on the extent to which Cisco and its executives in San Jose, for example, cultivated

28

- 2 -

PLAINTIFFS' REPLY IN SUPPORT OF MTN. FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT; MEM. OF P&A IN SUPPORT THEREOF
Case No. 5:11-cv-02449-EJD-PSGx

1 relationships with highly influential Party officials (Proposed SAC ¶¶ 58, 59), used Party

2 language in materials located in San Jose to describe the persecutory goals of the apparatus (*id*. ¶

3 67), and designed sophisticated specifications for the "anti-cult information system" and other

4 anti-Falun Gong features as reflected in internal power point presentations (*id*. ¶ 97) emanating

5 from San Jose. Further, these allegations describe the technical aspects necessary to understand

6 San Jose's essential contribution to the *douzheng* campaign against Falun Gong, including the

7 integration of Golden Shield features necessary to facilitate forced conversion through torture. *Id*.

8 ¶¶ 98 (h), 127, 129. Just as the defendant in *Sexual Minorities Uganda* allegedly directed his

9 persecutory campaign in large part from the United States, so too does the Proposed Second

10 Amended Complaint emphasize allegations that Defendants' violative acts were committed

11 within this country. (*See* Motion to Amend Section C.1).

12       Although Defendants' assert that "every court" has rejected efforts to use U.S.

13 connections to overcome the presumption against extraterritoriality (Dkt. 102 at 6:19-22), cases

14 such as *Sexual Minorities Uganda* have in fact upheld ATS claims post-*Kiobel* for injuries

15 occurring to aliens abroad. In *Mwani v. Bin Laden*, for example, the court found that claims

16 resulting from the deaths of Kenyan citizens in the bombing of the U.S. embassy in Kenya

17 touched and concerned the United States with sufficient force. --- F.Supp.2d ----, 2013 WL

18 2325166, at *4 (D.D.C., 2013) ("Surely, if any circumstances were to fit the Court's framework of

19 'touching and concerning the United States with sufficient force,' it would be a terrorist attack

20 that 1) was plotted in part within the United States, and 2) was directed at a United States

21 Embassy and its employees."); *see also Jian Zhang v. Baidu.com Inc.*, --- F.R.D. ----, 2013 WL

22 2458834 *5 (S.D.N.Y. 2013) (holding that characterizing a *Kiobel* extraterritoriality argument as

23 one of subject matter jurisdiction, rather than merits, was "frivolous," and in any event that

24 "Plaintiffs' claims are not premised entirely on conduct abroad").

25       Several cases cited by Defendants, in support of their bright-line rejection of touch and

26 concern tests, are inapplicable here. *Sarei v. Rio Tinto PLC.,* for example, was a suit against

27 British and Australian companies, and did not allege that any part of the conduct relevant to the

28 claim occurred within the United States. 221 F.Supp.2d 1116, 1121 (C.D. Cal. 2002) (laying out

1    the facts of the case).  Defendants also cite from a section of the opinion in *Giraldo v. Drummond*

2    *Co., Inc.*, rejecting Plaintiffs' ATS claims on a motion for summary judgment on the ground that

3    their evidence is inadmissible "no matter how one interprets the "touch and concern" test

4    mentioned in *Kiobel*."  Slip Copy, 2013 WL 3873960 at *8 (N.D. Ala. 2013).  The discussion of

5    defendant's Rule 56 motion has little bearing on the 12(b)(6) motion in this case where

6    allegations must be accepted as true.

7          While Defendants misconstrue Plaintiffs' position as alleging conduct that takes place

8    solely abroad (Dkt. 102 at 6:18-19), Section C.1 of Plaintiffs' Motion to Amend not only lays out

9    the domestic conduct contained in the Proposed Second Amended Complaint but also places the

10   conduct in the context of numerous tests previously used to measure U.S. connection to claims in

11   other cases.  The Supreme Court construed the Lanham Act (trademark infringement), for

12   example, to apply to claims against U.S. defendants even when the violation occurred abroad,

13   particularly when "essential steps" occurred in the United States. *Steele v. Bulova Watch Co.*, 344

14   U.S. 280, 287 (1952); *Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir.

15   2008).  As the new allegations make clear, Cisco could not have met the repressive objectives of

16   the Golden Shield without the close collaboration among and decision making by San Jose

17   divisions comprised of dozens of engineers, marketing, operational specialists, Golden Shield

18   decision-makers and high-level management and its high-level executive officers. *See, e.g.,*

19   Proposed SAC ¶ 135. From initial planning of the Golden Shield project all the way through post-

20   sales maintenance and servicing, their domestic conduct comprised the essential steps underlying

21   the entire unlawful scheme. *See, e.g.*, *id.* ¶¶ 75, 95, 108.

22         Plaintiffs' allegations also meet the standard of post-*Morrison* cases that discuss the

23   presumption of extraterritoriality, holding that the presumption does not apply to claims where

24   the alleged conduct that was "central to implementing the [illegal] scheme" was "orchestrated

25   from" the United States and "the transactions which occurred abroad [we]re the last step to give

26   effect to the crime charged." *See United States v. Mandell*, 2011 U.S. Dist. LEXIS 27064 at *12

27   (S.D.N.Y. Mar. 16, 2011). The new and expanded allegations in the Proposed Second Amended

28   Complaint clarify how all decision-making central to the project was orchestrated in San Jose,

- 4 -

1    including those enabling the *douzheng* of Falun Gong, with headquarters exercising full control.

2    *See, e.g.,* Proposed SAC ¶ 126 (Cisco orchestrated the planning and preparation, marketing,

3    design, implementation, operation and optimization phases from San Jose.); *see also id*. ¶¶ 75,

4    79-80, 95, 102, 108, 127, 128, 129.

5         Plaintiffs' claims are also domestic under a "nerve center" test used for claims in

6    Racketeer Influenced and Corrupt Organizations Act ("RICO") cases.  A "nerve center" test holds

7    that claims are domestic when allegations tend to show "that the decision making necessary to

8    effectuate the alleged association-in-fact enterprise's common purpose occurred substantially

9    within the territory of the United States[.]"  *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,

10   871 F. Supp. 2d 933, 942 (N.D. Cal. 2012).  The new and expanded allegations make clear that

11   San Jose, as the nerve center, exercised direct control over the Golden Shield project, including

12   even the actions carried out by its alter egos and subsidiaries. *See, e.g.,* Proposed SAC ¶¶ 139,

13   141-4.  San Jose designed the apparatus.  San Jose additionally directed and controlled the

14   implementation and optimization of the anti-Falun Gong apparatuses of the Golden Shield,

15   including the integration of Falun Gong specific components with all other features of the

16   apparatus to provide Chinese security with the profiled information they needed to forcibly

17   convert believers in addition to isolating and suppressing them. *See, e.g.,* Proposed SAC ¶¶ 86,

18   95, 97.

19        Defendants characterize their U.S. connection as "mere corporate presence," but there is a

20   strong distinction between foreign corporate defendants susceptible to suit in their home

21   jurisdictions and a U.S.-based corporation whose offices and nerve center are based in San Jose,

22   California.[1]  *Sexual Minorities Uganda* recognized the relevance of this distinction in several

23   ways in its touch and concern analyses, noting for example, that the presumption against

24   extraterritoriality is based on foreign policy concerns that "tend to arise when domestic statutes

25   are applied to foreign nationals engaging in conduct in foreign countries. . . .  Indeed, the failure

26

27   [1] Unlike the foreign corporate defendant that would have to demonstrate contacts that "touch and concern" the forum sufficiently to satisfy personal jurisdiction standards, U.S. courts have personal jurisdiction over U.S. corporations like Cisco based solely on their physical presence

28   within the forum.

- 5 -

1    of the United States to make its courts available for claims against its citizens for actions taken

2    within this country that injure persons abroad would itself create the potential for just the sort of

3    foreign policy complications that the limitations on federal common law claims recognized under

4    the ATS are aimed at avoiding." *Sexual Minorities Uganda*, 2013 WL 4130756, at *14.[2]

5         Plaintiffs' SAC allegations more than satisfy the touch and concern test set forth in *Sexual

6    Minorities Uganda.*  Under this and the other tests referenced above, Plaintiffs' SAC is not futile.

7
          **B.      The Proposed SAC Sufficiently Alleges Facts Linking the Defendants to
8                   Plaintiffs' Injuries.**

9         Defendants' contention that the Proposed SAC fails to allege facts linking the Defendants

10   or their conduct to Plaintiffs' injuries mischaracterizes Plaintiffs' factually specific allegations as

11   conclusory and defective, distorts material facts so as to minimize or obscure their legal

12   relevance, and, in so doing, fails to treat the well-pled allegations as true, as required by *Ashcroft*

13   *v. Iqbal*, 556 U.S. 662 (2009).[3]

14        **1.      The Proposed SAC Links the Defendants to Plaintiffs' Injuries
                    Through Aiding and Abetting and Other Liability Theories.**
15

16        Defendants' Opposition seriously misconstrues specific allegations in the Proposed SAC

17   that plead with specificity the precise course of conduct taken by the Defendants, especially but

18   not only in the U.S., which caused the harms suffered by Plaintiffs, including both physical and

19   mental harms caused by extralegal torture.

20        Plaintiffs' allegations linking the Defendant to the alleged injuries are neither conclusory

21   nor defective. *See, e.g.,* Dkt. 102 at 5:28-7:12.  In fact, the proposed SAC allegations directly link

22   _____

     [2] In its narrowly focused denial of a request for mandamus in *Balintulo v. Daimler AG*, --- F.3d --
     --, 2013 WL 4437057 (2nd Cir. 2013), the Second Circuit interprets *Kiobel* as barring claims
23   where "*all* the relevant conduct" (emphasis in original) occurred outside of the US and having
     "no reason to explore, much less explain, how courts should proceed when *some* of the relevant
24   conduct occurs in the United States." *Id*. at 7 (emphasis in original).  The court does not once base
     extraterritoriality on the site of the injuries. Rather, it bars allegations that base liability solely on
25   extraterritorial acts of defendants' foreign subsidiaries and do not in any way tie the alleged
     abuses "to actions taken within the United States." *Id.* at 8.  The court's holding is narrowly
26   limited to allegations premised *solely* on vicarious liability, and does not address allegations
     premised in part on domestic aiding and abetting or conspiracy liability.  *Id.* at fn. 28.
27   Accordingly the Second Circuit does not address a case such as Plaintiffs', where substantial
     relevant conduct occurs in the U.S.. *Id.* at fn. 26 (declining to address "how much conduct must
28   occur in the United States").
     [3] *See* Dkt. 102 at 5:28-6:9.

1   Defendants to all of Plaintiffs' injuries through aiding and abetting, conspiracy/joint criminal

2   enterprise, and other liability theories with far more than "formulaic recitation[s] of the elements

3   of [each] cause of action" (*see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007)) thereby

4   allowing the court "to draw the reasonable inference that the [D]efendant[s] [are] liable for the

5   misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal citations omitted) (emphasis added).

6        *Aiding and Abetting*

7        The Proposed SAC alleges conduct particularly relevant to aiding and abetting liability:

8   conduct that is "specifically designed" to further the alleged misconduct, *see, e.g., Doe v. Nestle,*

9   *S.A.*, 748 F.Supp.2d 1057, 1008 (C.D. Cal. 2010) (internal citation omitted)*, In re South African*

10  *Apartheid Litig.,* 617 F.Supp.2d 228, 258 (S.D.N.Y. 2009); conduct that provides the means by

11  which the violations were carried out, *In re South African Apartheid Litig.,* 617 F.Supp.2d at 258;

12  and conduct that is "essential" or "indispensable" to the commission of the alleged abuses, *id.* at

13  268.

14       First, the Proposed SAC alleges that Defendants in Cisco's San Jose headquarters' ("San

15  Jose") engaged in conduct "specifically designed" or directed to facilitate and further the

16  campaign of human rights abuses, including ideological conversion through torture, against Falun

17  Gong practitioners throughout the marketing, design and implementation phases of the Golden

18  Shield project. These include allegations that San Jose's marketing effort to establish the

19  superiority of the Cisco brand across China required the intensive investigation of and promises

20  to meet the repressive goals and objectives of the Golden Shield apparatus including the

21  persecution of disfavored groups like Falun Gong, *see e.g.* Proposed SAC ¶¶ 58 – 61; that San

22  Jose's high-level designs comprise anti-Falun Gong features developed solely and specifically to

23  repress Falun Gong, *see, e.g., id.* ¶¶ 80-82; that San Jose designs routinely *integrate* these and

24  other Golden Shield components specifically to meet Party and Public Security officers' goals of

25  persecuting Falun Gong, see e.g., Section II B of the Proposed SAC. In particular, the Proposed

26  SAC alleges at ¶¶ 82-83 that Cisco designs integrate the Internet Surveillance System, which San

27  Jose developed specifically to *douzheng* all Falun Gong believers, with other components to

28  facilitate the identification, tracking, locating, isolating and forced conversion of Falun Gong. *See*

- 7 -

1   *also* ¶¶ 84 -86 of the Proposed SAC (discussing Cisco designs that integrate the Web Notification

2   System with Cisco security systems specifically to give Chinese security access to sensitive

3   information to facilitate the ideological conversion through torture ("*zhuanhua*") of Falun Gong

4   believers in China, thereby enabling "Chinese security at public security hospitals, psychiatric

5   hospitals and 610 office locations to access the profiled information and use it to forcibly convert

6   Falun Gong.").  The Proposed SAC further alleges that San Jose, directly and in concert with

7   affiliates and/or partners, implemented many if not all of these features and applications,

8   specifically for the purposes of identification, isolation, ideological conversion through torture

9   and other persecutory measures. *See* Proposed SAC ¶¶ 96-108.

10          Second, the Proposed SAC alleges that Defendants' conduct provided the "means by

11  which" the alleged misconduct was carried out. *See, e.g.,* Proposed SAC ¶ 97 (listing six Golden

12  Shield solutions implemented by Cisco to facilitate the identification of Falun Gong believers)

13  and ¶ 98 (listing five Golden Shield features implemented by Cisco to facilitate the apprehension,

14  detention, interrogation, and forced conversion of Falun Gong believers). Most notably, forced

15  ideological conversion practices [*zhuanhua*] were carried out by Chinese security via

16  individualized conversion procedures, customized by the Golden Shield according to the unique

17  circumstances of each individual based on "lifetime" profile information compiled by the Golden

18  Shield for every Falun Gong adherent. *Id.* ¶¶ 99-101.

19          Third, the Proposed SAC illustrates how the Defendants' conduct was "essential" or

20  "indispensable" to the perpetration of the violations. San Jose designed and developed many first-

21  of-their-kind features and integrated these and other features specifically to aid Chinese security

22  officers in the persecution of Falun Gong, *see, e.g.,* Proposed SAC ¶ 76; San Jose recommended

23  the use of many of these first-of-a-kind features, which Party officers could not have envisioned

24  based on their lack of expertise; and even technical experts in China lacked the experience,

25  training and resources to develop these cutting edge innovative solutions. *See id.* Without Cisco's

26  technology and the Golden Shield's unprecedented scale, complexity, and capacity, it would not

27  have been possible for Chinese security to obtain sensitive personal information and coordinate

28  large-scale investigations, tracking, apprehension, interrogation, torture and persecution of Falun

- 8 -

1    Gong adherents from anywhere in China. *See, e.g.*, *id.* ¶ 106. Indeed, as is stated elsewhere, a

2    former Office 610 agent who used the Golden Shield to persecute Does I-III admitted that Cisco's

3    technology was the essential means by which plaintiffs were managed, analyzed, categorized,

4    apprehended, detained and forcibly converted. *See, e.g.*, *id.* ¶¶ 114-15.

5         Defendants make the broad and unsupported statement that the Proposed SAC does not

6    allege "how Defendants manifested any of the requisite *mens rea* to facilitate those injuries." Dkt.

7    102 at 6:8-9.  This statement is somewhat puzzling, because three entire sections of the Proposed

8    SAC are largely devoted to this issue. *See* Proposed SAC ¶¶ 158-222. The Proposed SAC alleges

9    that Cisco internal files acknowledged that the purpose of the Golden Shield was to *douzheng*

10   Falun Gong and described this goal as a lucrative business opportunity for the company. *Id.*

11   ¶ 187.  Several other Cisco reports identify the torture and unlawful imprisonment of

12   ("*douzheng*") or "strike hard" against  ("*yanda*") Falun Gong as major purposes of the Golden

13   Shield apparatus. *Id.* ¶¶ 60-62. Cisco's board of directors, including Defendant Chambers, have

14   also been notified, by Cisco shareholders, of human rights abuses arising out of Cisco's sale of

15   technology to China on at least seven occasions since 2002. *Id.* ¶¶ 166, 174, 178. Furthermore,

16   "[the Golden Shield's p]hase one required careful study of the persecutory apparatus of the Party

17   … Even the Falun Gong specific 610 Office is listed in several internal files along with repeated

18   mention of the vast system of detention centers, … devoted to ideological conversion through

19   torture and other egregious human rights abuses." *Id.* ¶ 78.

20        The Proposed SAC alleges that Defendants not only knew of the abuses, but that they

21   (including Defendants in San Jose) also repeatedly manifested and affirmed to Chinese security

22   forces their purpose and intent to aid in the perpetration of the alleged abuses against Falun Gong

23   adherents. *See id.* ¶¶ 179-222. Defendants' internal power-point materials included numerous,

24   specific references to their role in the Party's campaign to eliminate Falun Gong via extralegal

25   human rights abuses.  *See, e.g., id.* ¶¶ 187-190. Cisco also recommended numerous advanced

26   features for the Golden Shield that significantly and uniquely enhanced the Golden Shield's

27   ability to suppress Falun Gong. These ranged from Cisco "signatures" or security software

28   targeted towards Falun Gong, to high-level Golden Shield designs illustrating a networked

1   apparatus tasked with identification, profiling, high-level tracking, interrogating and forcibly

2   converting through torture all Falun Gong practitioners in China. *Id.* ¶¶ 78, 80, 181. Defendants in

3   San Jose went to great lengths to incorporate features solely devoted to the suppression of Falun

4   Gong believers in its marketing and sales materials including boasting that only Cisco software

5   can recognize over 90% of Falun Gong signatures. *Id.* ¶ 192.  Along the same lines, "Cisco staff,

6   with express or implied authority from Defendants in San Jose, specifically recommended this

7   software, e.g. on online Question and Answer forum, to deal with ('despicable') Falun Gong

8   adherents and their activity." *Id.* ¶ 97.

9       *Conspiracy*

10      Under California law, civil conspiracy requires allegation that each member of a

11   conspiracy acted in concert and came to a mutual understanding to accomplish a common and

12   unlawful plan, and that one or more of them committed an overt act to further it. *Arei II Cases*,

13   216 Cal.App.4th 1004, 1022 (2013).  The conspirators must not only know of an intended

14   wrongful act, they must agree – expressly or tacitly – to achieve it.  *Id.*  The Proposed SAC

15   provides numerous allegations that Defendants acted in concert and came to a mutual

16   understanding with the Chinese Communist Party, Public Security officers and other affiliates or

17   partners, including Cisco China, in order to meet the client's goal of the effective repression of

18   Falun Gong.  As alleged in  ¶¶ 150-57, Defendants entered into an agreement with Public

19   Security officers as early at 1999, created a public security marketing and sales team to

20   collaborate directly with the officers, and even acknowledge such collaboration on their website.

21   Defendants entered into regional agreements as well, including agreements to host Falun Gong

22   databases and to train Public Security officers in the use of the surveillance technology.  *Id.* ¶ 152.

23   Not only did the conspirators commit countless overt acts in furtherance of the plan to repress

24   Falun Gong (*see* Proposed SAC Section II C, discussing the use of the Golden Shield by Chinese

25   Security), Defendants agreed to achieve it.  Defendants expressed willingness to meet the stated

26   purpose of the Golden Shield apparatus, i.e. to *douzheng* Falun Gong through identification,

27   tracking, interrogation and ideological conversion, in order to be awarded Golden Shield

28   Contracts.  *Id*. ¶ 193. At trade shows where Defendants marketed and sold their Golden Shield

- 10 -

1    technology, Defendants showed Chinese Public Security and Party officers and agents how its

2    technology could "stop" Falun Gong.  *Id.* ¶ 155.  Defendants, with Cisco China, admitted that

3    their 2004 upgrade to the Golden Shield improved Public Security's ability to "maintain social

4    stability," defined in a Cisco internal file as including the "*douzheng* of Falun Gong."  *Id*. ¶ 190.

5
6    **2.      The Proposed SAC Alleges that the Defendants' Apparatus Furthered
             the Alleged Misconduct Through the Sophisticated Integration and
             Customization of Falun Gong Specific and Generic Features.**

7            In addition, Defendants modify and amend material facts to minimize or obscure their

8    legal relevance. For example, Defendants assert that the Proposed SAC does not show "how *the*

9    *products* that Defendants sold in China" were the cause of Plaintiffs' "physical" injuries. *See* Dkt.

10   102 at 6:7-8 (emphasis added).[4]  At no point in the Proposed SAC, or in any other briefing, do

11   Plaintiffs indicate that their claims arise from the sale of "products"; rather, it is only through the

12   Defendants' sophisticated technical integration of Falun Gong-specific and generic features,

13   throughout all phases of the Golden Shield project, that the apparatus furthered the commission of

14   the alleged violations. *See* Proposed SAC ¶¶ 53-108.  Defendants' statements about generic

15   products simplify and distort the intensive process of customization entailed in assembling and

16   integrating the anti-Falun Gong features of the Golden Shield with all other components. *See*

17   Joint Statement, Dkt. 98 at 2-3. The effectiveness of the overall system, and its role in causing

18   Plaintiffs' injuries, depends on precisely this customization process, which is also one of Cisco's

19   self-admitted main "selling points." *See* Proposed SAC ¶¶ 3-6, 63, 215.

20           Defendants' characterization of the Proposed SAC as comprising "many paragraphs of

21   redundant and irrelevant technical detail concerning the alleged architecture of the Golden Shield"

22   obscures the legal relevance of technical details in a similar fashion. *See* Dkt. 102 at 6:10-11.

23   Allegations related to "highly technical detail" comprise material facts that give rise to Plaintiffs'

24   claims.  These include facts making clear that Cisco routers and other "products" did not per se

25   cause or give rise to Plaintiffs' injuries. On the contrary, the relevant conduct was carried out

26

27   _____
     [4] Defendants sweeping statements that Plaintiffs' allegations are futile because of an asserted
     distance from "physical injuries" (Dkt. 102 at 6) ignore what the Proposed SAC (and earlier
28   complaints) state. Plaintiffs' claims do not arise solely out of "physical injuries." *See*, *e.g.*
     Proposed SAC ¶¶ 10-21, 381-408.

- 11 -

1   through the well-integrated architecture and "solutions" that Cisco marketed, designed,

2   implemented and serviced to *douzheng* and in other ways suppress Falun Gong believers in

3   China.  The architecture of the multi-tiered Golden Shield network was "indispensable" and

4   "essential" to perpetration of these and other alleged violations. *See* Proposed SAC ¶¶ 81-85.

5           As a result of these and other errors, Defendants fail to treat the well-pled allegations as

6   true, as required by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The Proposed SAC alleges more than

7   is required by *Iqbal* by presenting several theories through which the court may reasonably

8   determine that the defendants are liable for the misconduct alleged, including those referenced

9   above.

10          **C.          Defendants Have Not Demonstrated Bad Faith, Prejudice, or Undue Delay.**

11          Defendants have not met their burden of showing that any of the other factors relevant to

12   the Rule 15 amendment inquiry are met. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187

13   (9th Cir. 1987) (party opposing amendment "bears the heavy burden of overcoming the

14   presumption in favor of amendment") (citation omitted). Defendants do not address at all, and

15   essentially concede, that Plaintiffs have not acted in bad faith by requesting leave to amend at this

16   stage of the case, following the two-year delay occasioned by the Supreme Court's deliberations

17   in *Kiobel*. *See McAfee v. Francis*, 2011 U.S. Dist. LEXIS 83878 at *4-5 (N.D. Cal. Aug. 1, 2011)

18   (party failing to oppose essentially concedes). The prejudice claimed by Defendants, should

19   Plaintiffs' Motion be granted, is that they will then be "require[d]" to move to dismiss the SAC

20   (then no longer "proposed"), on allegations that they assert, without legal support, could have

21   been brought "two years ago" and thus were "unduly delayed."[5] *See* Dkt. 102 at 7-8. These thin

22   protestations do not rise anywhere near the level required to meet Defendants' burden of showing

23   prejudice – the "critical factor in deciding a motion to amend." *Cuevas v. City of Campbell*, 2012

24   U.S. Dist. LEXIS 150415 at *3 (N.D. Cal. Oct. 18, 2012).

25          Defendants repeated mention of the ostensible burden of filing a third motion to dismiss

26

27   [5] Defendants' additional half-hearted attempt to paint Plaintiffs as having delayed "three and a
     half months" after *Kiobel* before filing this Motion is soundly refuted by the long history of
28   Plaintiffs' notification to Defendants and the Court that they expected to move for leave to amend
     following the decision in *Kiobel*. *See* Motion to Amend at 20:13-21:5.

1  ignores the procedural history relevant to Plaintiffs' request to file a SAC. Plaintiffs notified

2  Defendants of their intent to exercise their Rule 15 right to amend as a matter of course shortly

3  after Defendants filed their first motion to dismiss, and the parties stipulated to a filing schedule.

4  *See* Dkt. 59. "That an amended complaint would essentially moot Defendants' pending Motion to

5  Dismiss . . . simply does not constitute undue prejudice." *Cuevas*, 2012 U.S. Dist. LEXIS 150415

6  at *4. Then, as Defendants admit, the Supreme Court granted certiorari in *Kiobel* before Plaintiffs

7  even had an opportunity to file their opposition to Defendants' second motion to dismiss. *See* Dkt.

8  102 at 3. At that point, it was *Plaintiffs* who sought to have three dispositive issues raised in the

9  motion to dismiss adjudicated to a decision. *See* Pls.' Mot. to Reschedule Briefing, Dkt, 76 at

10  1:10-16. Defendants requested that a decision on their entire motion to dismiss be stayed so that

11  their "motion to dismiss [could] be considered once." *See* Defs.' Partial Opp. to Mot., Dkt at 78:3.

12  Third, and most crucially, the Proposed SAC differs substantially from the FAC and

13  responds directly to the new legal standards set forth in *Kiobel*, of which Plaintiffs had no prior

14  notice. *See* Motion to Amend at 6-9; *see also Moss v. United States Secret Serv*., 572 F.3d 962,

15  972 (9th Cir. 2009) (allowing plaintiffs to amend when intervening Supreme Court decisions

16  effected "a significant change, with broad-reaching implications"). Defendants do not – because

17  they cannot – contradict Plaintiffs' assertion that *Kiobel* changed and clarified the applicable law

18  in ways that Plaintiffs are entitled to address in an amended complaint; their only support for their

19  argument that is that their previous motion to dismiss raised extraterritoriality as an issue (in two

20  pages) – implying that Plaintiffs somehow should have been able to predict how the Supreme

21  Court would eventually rule on an issue it had never considered. *See* Dkt. 102 at 7. Yet even

22  assuming *arguendo* that nothing in the Proposed SAC would change Defendants' analysis of

23  Plaintiffs' claims, there is no burden to Defendants because they would be "free to move to

24  dismiss the . . . amended complaint on similar grounds" to their previous motion to dismiss with

25  "little or no work that would be disturbed by granting plaintiff leave" to amend. *Chipman v.*

26  *Nelson*, 2013 U.S. Dist. LEXIS 85640 at *5-6 (E.D. Cal. June 18, 2013) (finding no prejudice

27  although defendants had already filed multiple motions to dismiss a previously amended

28  complaint).

- 13 -

1

2

3

Accordingly, Defendants have not met their burden of demonstrating that amendment would be futile, would cause prejudice or undue delay, or is requested in bad faith, and Plaintiffs should be granted leave to file the Proposed SAC.

4

5

**D.      Defendants' Attempt To Strike Newspaper Articles and Other Third-Party Reports Is Without Merit.**

6

7

8

9

10

11

12

13

14

15

16

Defendants' request to strike all references to journalistic and third party reports regarding the harms committed against Plaintiffs and similarly situated individuals is without merit. A motion to strike "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.,* 758 F. Supp. 1335, 1339 (N.D. Cal. 1991); *see Wang v. OCZ Tech. Grp., Inc.,* 276 F.R.D. 618, 632 (N.D. Cal. 2011) ("Material should not be stricken from the pleadings, particularly before discovery has afforded the parties the opportunity to determine the material's relevance to claims or defenses, if there is a possibility that it may have bearing on the litigation."); *Naton v. Bank of California,* 72 F.R.D. 550, 552 n. 4 (N.D. Cal. 1976) (motions to strike are designed to eliminate from consideration issues that "can have no possible bearing on the subject matter of the litigation.").

17

18

19

20

21

22

23

24

25

26

27

28

In particular, this Court has permitted the use of newspaper and third party reports to allege Defendants' notice and knowledge of material facts.  *See Jones v. City and County of San Francisco*, 976 F.Supp. 896, 906 (N.D. Cal. 1997) ("Defendants had actual and constructive knowledge of every significant deficiency in Jail No. 3 since 1990, as evinced by newspaper accounts, grand jury reports, defendants' own written correspondence, and the repeated proposal of bond measures to finance improvements."); *see also Hughes v. Vanderbilt Univ.,* 215 F.3d 543, 548 (6th Cir. 2000) (front-page stories in two local newspapers and a major television network gave rise to constructive knowledge, even though party said she did not see the coverage). Plaintiffs' allegations concerning Defendants' exposure to and making use of various "newspapers and other third party reports," in addition to and in conjunction with the manifestations of *mens rea* noted above in the Proposed SAC, show Defendants' knowledge of and subsequent intention to further the commission of the abuses alleged in the Proposed SAC.

- 14 -

1   (Defendants cite the newspaper sections quoted in Proposed SAC Section II E: "Before Initiating

2   and During the Golden Shield Project, Cisco Had Knowledge of the Project's Intended Use to

3   Suppress Falun Gong".) As would any major investor in a foreign market (and indeed as required

4   by its duties to its shareholders), Cisco researched details of the nature, risks, and implications of

5   its envisioned projects, such as the Golden Shield, as part of a routine due diligence assessment.

6   *See* Proposed SAC ¶ 168. The materials are not being "cited" as though their contents were in

7   some way authoritative or had any dispositive legal meaning with regards to the Court's

8   determination of this case. Rather, they are included to show Defendants' knowledge (or

9   constructive knowledge) of the persecutory extralegal campaign waged in China against Falun

10  Gong.

11  **III.    CONCLUSION**

12          For the foregoing reasons, Plaintiffs respectfully submit that the Motion for Leave to File

13  a Second Amended Complaint should be granted, and that the Second Amended Complaint

14  should be deemed filed as of the date of the Order granting the Motion.

15

16  Dated:  August 29, 2013                Respectfully Submitted,

17                                         SCHWARCZ, RIMBERG, BOYD & RADER, LLP

18                                         By:       /s/ Kathryn Lee Boyd[6]
                                                        Kathryn Lee Boyd
19

20                                         HUMAN RIGHTS LAW FOUNDATION

21                                         By:       /s/ Terry M. Marsh
                                                        Terri E. Marsh, Esq. (pro hac vice)
22

23                                         Attorneys for Plaintiffs DOE I, DOE II, Ivy HE,
                                           DOE III, DOE IV, DOE V, DOE VI, ROE VII,
24                                         Charles LEE, ROE VIII, and LIU Guifu

25

26

27

28  [6] I have obtained the consent of the other signatory to electronically sign this document on her
    behalf.