1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Kathleen M. Sullivan (CA Bar No. 242261)
2    kathleensullivan@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
3  Redwood City, California 94065
   Telephone:     (650) 801-5000
4  Facsimile:     (650) 801-5100

5    Faith E. Gay (*pro hac vice*)
     faithgay@quinnemanuel.com
6    Isaac Nesser (*pro hac vice*)
     isaacnesser@quinnemanuel.com
7  51 Madison Avenue, 22nd Floor
   New York, New York 10010
8  Telephone:     (212) 849-7000
   Facsimile:     (212) 849-7100

9
   Attorneys for the Defendants
10

11                    UNITED STATES DISTRICT COURT
12                   NORTHERN DISTRICT OF CALIFORNIA
                            SAN JOSE DIVISION
13

14  Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V,    Case No. 5:11-cv-02449-EJD
    Doe VI, Roe VII, Charles Lee, Roe VIII, Doe
15  IX, Liu Guifu, Wang Weiyu, and those             **DEFENDANTS' NOTICE OF MOTION**
    individuals similarly situated,                  **AND MOTION TO DISMISS**
16                                                    **PLAINTIFFS' SECOND AMENDED**
                  Plaintiffs,                         **COMPLAINT UNDER FED. R. CIV. P.**
17                                                    **12(b)(1) AND 12(b)(6)**
            v.
18                                                    Hearing date: February 21, 2014
    Cisco Systems, Inc., John Chambers, Fredy
19  Cheung, and Does 1-100,                           Time: 9:00 a.m.

20                Defendants.                         Action Filed: May 19, 2011
                                                      Judge: Hon. Edward J. Davila
21                                                    Dept: Courtroom 4, 5th Floor

22

23

24

25

26

27

28

1

## **NOTICE OF MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that on February 21, at 9:00 am, or as soon thereafter as the

4 matter may be heard before the Honorable Judge Davila, in Courtroom 4 of the United States

5 District Court of the Northern District of California, San Jose Division, located at 280 South 1st

6 Street, San Jose, CA 95113, Defendants Cisco Systems, Inc., John Chambers, and Fredy Cheung

7 will and hereby do move the Court to dismiss Plaintiffs' Second Amended Complaint in its

8 entirety.

9

The Motion will seek dismissal of the Plaintiffs' Second Amended Complaint in its

10 entirety because (1) for multiple reasons, each and every allegation either fails to state a claim on

11 which relief may be granted and/or fails to establish federal subject matter jurisdiction; and (2)

12 additionally, on the basis of the political question, act of state, and international comity, and

13 foreign affairs preemption doctrines.

14

The motion is made pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and is based on this

15 Notice; the attached Memorandum of Points and Authorities; the Declaration of John (Hejun) Chu

16 In Support Of Defendants' Motion To Dismiss, dated August 4, 2011; the Court's file in this

17 matter, and any other evidence and argument as may be presented at the hearing on the Motion.

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    The Parties ................................................................................................. 3

    B.    Chinese Law And Falun Gong ................................................................... 4

    C.    The Allegations Of Injuries Caused By Chinese Authorities ................... 4

    D.    The Allegations Concerning The "Golden Shield" Project ....................... 5

    E.    Cisco's Full Compliance With U.S. Policy Governing Trade With China ............... 6

ARGUMENT ........................................................................................................................... 8

I.     THE ATS AND TVPA CLAIMS SHOULD BE DISMISSED ........................................... 9

    A.    The ATS Claims Allege Purely Extraterritorial Conduct ........................ 9

    B.    The ATS And TVPA Claims Do Not Support Aiding And Abetting Liability ........................................................................................ 18

        1.    Aiding And Abetting Liability Is Unavailable Under The TVPA .............. 18

        2.    Aiding And Abetting Liability Is Unavailable Under The ATS ................ 18

        3.    The Allegations Do Not Support Aiding and Abetting Liability ............... 19

        4.    The Allegations Do Not Support Any Other Form Of Secondary Liability ...................................................................................... 24

    C.    The ATS Does Not Provide A Basis For Liability Against Corporations ............. 25

    D.    The Claims Do Not Allege Acts By Cisco Under Color Of State Law .................. 27

    E.    Several Of The ATS Claims Are Otherwise Defective ........................... 28

II.    THE STATE-LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED ........... 31

    A.    The State-Law Claims Should Be Dismissed For Lack Of Federal Jurisdiction ................................................................................... 31

    B.    California Tort Law Does Not Apply Extraterritorially ........................... 31

    C.    The State-Law Claims Are Untimely ....................................................... 33

    D.    The State-Law Allegations Do Not Support Aiding And Abetting Liability ........... 36

    E.    The State-Law Claims Fail To Allege Causation ..................................... 37

III.   THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED ............... 38

    A.   The UCL Does Not Apply Extraterritorially................................................ 38

    B.   The Allegations Of Lost Income Are Too Attenuated ............................................ 38

IV.   THE ECPA CLAIM SHOULD BE DISMISSED........................................................ 39

    A.   The ECPA Does Not Apply Extraterritorially ........................................................ 39

    B.   There Is No Private Right of Action Under ECPA § 2512 ...................................... 40

    C.   The Allegations Concern Exempted "Normal Course of Business" Activity......... 42

V.   THE CLAIMS AGAINST CISCO EXECUTIVES SHOULD BE DISMISSED............... 42

VI.   THE SAC SHOULD BE DISMISSED AS NONJUSTICIABLE ..................................... 44

    A.   The SAC Should Be Dismissed Under The Political Question Doctrine ............... 44

    B.   The SAC Should Be Dismissed Under The Act Of State Doctrine ....................... 46

    C.   The SAC Should Be Dismissed Under The International Comity Doctrine........... 48

    D.   The State-Law Claims Are Barred By Foreign Affairs Preemption ....................... 49

CONCLUSION ................................................................................................................ 50

# <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

## <u>Cases</u>

*Abagninin v. AMVAC Chem. Corp.*,
    545 F.3d 733 (9th Cir. 2008)............................................................................3, 20, 29, 30

*Abdullahi v. Pfizer, Inc.*,
    562 F.3d 163 (2d Cir. 2009) .............................................................................................28

*Abecassis v. Wyatt*,
    704 F. Supp. 2d 623 (S.D. Tex. 2010) .............................................................................19

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ...............................................................................................16

*A.D. v. Cal. Highway Patrol*,
    No. 07-cv-5483, 2009 WL 733872 (N.D. Cal. Mar. 17, 2009).........................................28

*Adhikari v. Daoud & Partners*,
    No. 09-cv-1237, 2013 WL 4511354 (S.D. Tex. Aug. 23, 2013) ......................................11

*Ahmed-Al-Khalifa v. Minister of Interior, Fed. Republic of Nigeria*,
    No. 13-cv-172, 2013 WL 3991961(N.D. Fla. Aug. 2, 2013) ............................................11

*Ahmed-Al-Khalifa v. Trayers*,
    No. 13-cv-869, 2013 WL 3326212 (D. Conn. July 1, 2013) ............................................11

*Al Shimari v. CACI Int'l, Inc.*,
    No. 08-cv-827, 2013 WL 3229720 (E.D. Va. June 25, 2013) .....................................13, 14, 15
    679 F.3d 250 (4th Cir. 2012).......................................................................................32, 50

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
    416 F.3d 1242 (11th Cir. 2005)...................................................................................28, 29
    305 F. Supp. 2d 1285 (S.D. Fla. 2003)............................................................................29

*Allen v. City of Beverly Hills*,
    911 F.2d 367 (9th Cir. 1990)..............................................................................................3

*Alperin v. Vatican Bank*,
    410 F.3d 532 (9th Cir. 2005).....................................................................................44, 46

*Am. Elec. Power Co. v. Connecticut*,
    131 S. Ct. 2527 (2011) .....................................................................................................27

*Am. Ins. Ass'n. v. Garamendi*,
    539 U.S. 396 (2003) .........................................................................................................49

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ...........................................................................................................28

*Arabian v. Sony Elec., Inc.*,
    No. 05-cv-1741, 2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ........................................38

*Arar v. Ashcroft,*
   585 F.3d 559 (2d Cir. 2009)................................................................27

*Archut v. Ross Univ. Sch. of Veterinary Med.,*
   No. 10-cv-1681, 2012 WL 5867148 (D.N.J. Nov. 19, 2012) ................17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .........................................8, 9, 22, 23, 43, 44

*Ashley Creek Phosphate Co. v. Norton,*
   420 F.3d 934 (9th Cir. 2005)...............................................................33

*Atwell v. Gabow,*
   Nos. 06-cv-2262, 07-cv-2063, 2008 WL 906105 (D. Colo. Mar. 31, 2008) ............43

*Aziz v. Alcolac,*
   658 F.3d 388 (4th Cir. 2011)...............................................19, 20, 21, 24

*Baker v. Carr,*
   369 U.S. 186 (1962) ................................................................44, 45, 46

*Balintulo v. Daimler AG,*
   727 F.3d 174 (2d Cir. 2013) ...............................11, 12, 13, 15, 26

*In re Banco Santander Secs. Optimal Litig.,*
   732 F. Supp. 2d 1305 (S.D. Fla. 2010)................................................17

*Bao Ge  v. Li Peng,*
   201 F. Supp. 2d 14 (D.D.C. 2000) ......................................................29

*Bautista v. Pan Am. World Airlines, Inc.,*
   828 F.2d 546 (9th Cir. 1987)...............................................................31

*Beagle v. Rite Aid Corp.,*
   No. 08-cv-1517, 2009 WL 3112098 (N.D. Cal. Sept. 23, 2009) ..........35

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................8, 9, 23, 43

*Bigio v. Coca-Cola Co.,*
   448 F.3d 176 (2d Cir. 2006) ...............................................................49
   239 F.3d 440 (2d Cir. 2000) ...............................................................27

*Blazevska v. Raytheon Aircraft Co.,*
   522 F.3d 948 (9th Cir. 2008)...............................................................32

*Bowoto v. Chevron Corp.,*
   621 F.3d 1116 (9th Cir. 2010)..............................................................18
   557 F. Supp. 2d 1080 (N.D. Cal. 2008) ..............................................29
   No. 99-cv-2506, 2007 WL 2349343 (N.D. Cal. Aug. 14, 2007) ..........30
   No. 99-cv-2506, 2006 WL 2455761 (N.D. Cal. Aug. 22, 2006) ..........28, 30

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001) ............................................................................27

*Brown v. Ransweiler*,
    89 Cal. Rptr. 3d 801 (Cal. Ct. App. 2009) ..................................................37

*Casey v. U.S. Bank Nat'l Ass'n*,
    26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005) ..................................................36

*Cabello v. Fernandez-Larios*,
    402 F.3d 1148 (11th Cir. 2005) ..................................................................25

*Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.*,
    No. 08-cv-01381, 2011 WL 1211511 (D. Colo. Mar. 31, 2011) ...........17

*Cedeño v. Intech Grp., Inc.*,
    733 F. Supp. 2d 471 (S.D.N.Y. 2010) .......................................................17

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ...................................................................................18

*Chen Gang v. Zhao Zhizhen*,
    No. 04-cv-1146, 2013 WL 5313411 (D. Conn. Sept. 20, 2013) .........14, 15

*In re Chiquita Brands Int'l, Inc.*,
    792 F. Supp. 2d 1301 (S.D. Fla. 2011) ......................................................32

*Corrie v. Caterpillar*,
    503 F.3d 974 (9th Cir. 2007) ......................................................21, 44, 45
    403 F. Supp. 2d 1019 (W.D. Wash. 2005) .........................................21, 27

*Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*,
    130 F.3d 1342 (9th Cir. 1997) ...................................................................46

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000) .............................................................................49, 50

*In re DIRECTV, Inc.*,
    No. 02-cv-5912, 2004 WL 2645971 (N.D. Cal. July 26, 2004) ...............41

*DIRECTV, Inc. v. Nicholas*,
    403 F.3d 223 (4th Cir. 2005) .....................................................................41

*DIRECTV, Inc. v. Treworgy*,
    373 F.3d 1124 (11th Cir. 2004) ................................................................41

*Diamond Multimedia Sys. v. Superior Court*,
    968 P.2d 539 (Cal. 1999) ...........................................................................32

*Dichter-Mad Family Partners, LLP v. United States*,
    707 F. Supp. 2d 1016 (C.D. Cal. 2010) ......................................................9

*Doe I v. Nestle, S.A.*,
    748 F. Supp. 2d 1057 (C.D. Cal. 2010) ...............................19, 20, 24, 26, 27, 38

*Doe I. v. State of Israel*,
    400 F. Supp. 2d 86 (D.D.C. 2005) ............................................................44

*Doe VIII v. Exxon Mobil Corp.*,
   No. 09-cv-7125, 2013 WL 3970103 (D.C. Cir. July 26, 2013) ............................................11
   654 F.3d 11 (D.C. Cir. 2011) ........................................................................................18, 26

*Doe v. Qi*,
   349 F. Supp. 2d 1258 (N.D. Cal. 2004) ...................................................................4, 29, 47

*Doe v. Saravia*,
   348 F. Supp. 2d 1112 (E.D. Cal. 2004) ..........................................................................29

*Doe I v. Wal-Mart Stores, Inc.*,
   No. 05-cv-7307, 2007 WL 5975664 (C.D. Cal. Mar. 30, 2007) ...................................39

*In re Dynamic Random Access Memory Antitrust Litig.*,
   546 F.3d 981 (9th Cir. 2008) ..........................................................................................9

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991) ......................................................................................................44

*Enahoro v. Abubakar*,
   408 F.3d 877 (7th Cir. 2005) ..........................................................................................27

*F.T.C. v. Swish Marketing*,
   No. 09-cv-03814, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ...................................42

*Facebook, Inc. v. MaxBounty, Inc.*,
   274 F.R.D. 279 (N.D. Cal. 2011) ....................................................................................36

*Flomo v. Firestone Natural Rubber Co.*,
   643 F.3d 1013 (7th Cir. 2011) ........................................................................................26

*Flowers v. Tandy Corp.*,
   773 F.2d 585 (4th Cir. 1985) ..........................................................................................41

*Giraldo v. Drummond Co., Inc.*,
   No. 09-cv-1041, 2013 WL 3873960 (N.D. Ala. July 25, 2013) ...................................11
   No. 09-cv-1041, 2013 WL 3873965 (N.D. Ala. July 25, 2013) ......................21, 22, 44
   No. 09-cv-1041, 2013 WL 3873978 (N.D. Ala. July 25, 2013) ............................21, 44

*Glen* v. *Club Médditerranée, S.A.*,
   450 F.3d 1251 (11th Cir. 2006) ......................................................................................48

*Guinto v. Marcos*,
   654 F. Supp. 276 (S.D. Cal. 1986) ................................................................................47

*Hua Chen v. Honghui Shi*,
   No. 09-cv-8920, 2013 WL 3963735 (S.D.N.Y. Aug. 1, 2013) ...................................15

*Huynh v. Chase Manhattan  Bank*,
   465 F.3d 992 (9th Cir. 2006) ..........................................................................................35

*Inlandboatmens Union of Pac. v. Dutra Grp.*,
   279 F.3d 1075 (9th Cir. 2002)..........................................................................................3

*Joo v. Japan*,
    413 F.3d 45 (D.C. Cir. 2005) ...................................................................................44

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995)................................................................................27, 28

*Kaplan v. Cent. Bank of Islamic Republic of Iran*,
    No. 10-cv-483, 2013 WL 4427943 (D.D.C. Aug. 20, 2013) ....................................11

*Kelley v. Mortg. Elec. Registration Sys., Inc.*,
    642 F. Supp. 2d 1048 (N.D. Cal. 2009) ...................................................................9

*Khulumani v. Barclay Nat'l Bank Ltd.*,
    504 F.3d 254 (2d Cir. 2007)................................................................................18, 19

*Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659 (2013) ................................................................................... *passim*
    621 F.3d 111 (2d Cir. 2010)....................................................................................25

*Krishanthi v. Rajaratnam*,
    No. 09-cv-5395, 2010 WL 3429529 (D.N.J. Aug. 26, 2010) ....................................19

*Lizarbe v. Rondon*,
    642 F. Supp. 2d 473 (D. Md. 2009) ........................................................................45

*Liu Bo Shan v. China Constr. Bank Corp.*,
    2011 WL 1681995 (2d Cir. 2011)........................................................................22, 25

*Loginovskaya v. Batratchenko*,
    No. 12-cv-336, 2013 WL 1285421 (S.D.N.Y. Mar. 29, 2013) ...............................17

*Lomita Land Water Co. v. Robinson*,
    97 P. 10 (1908)........................................................................................................36

*Lorenzo v. Qualcomm Inc.*,
    No. 08-cv-2124, 2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) ...............................38

*Luis v. Zang*,
    No. 11-cv-884, 2013 WL 811816 (S.D. Ohio Mar. 5, 2013)....................................42

*Maez v. Chevron Texaco Corp.*,
    No. 04-cv-790, 2005 WL 1656908 (N.D. Cal. July 13, 2005)..................................32

*Mamani v. Berzain*,
    654 F.3d 1148 (11th Cir. 2011)..........................................................................30, 43

*McCann v. Foster Wheeler LLC*,
    225 P.3d 516 (Cal. 2010) ........................................................................................33

*McRee v. Goldman*,
    No. 11-cv-991, 2012 WL 929825 (N.D. Cal. Mar. 19, 2012)....................................36

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
    404 F. Supp. 2d 1214 (E.D. Cal. 2005)....................................................................38

*Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs. SARL*,
No. 10-cv-12257, 2012 WL 748304 (E.D. Mich. Mar. 6, 2012) ............................32

*Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*,
177 F.3d 1142 (9th Cir. 1999) ...........................................................................45

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
871 F. Supp. 2d 933 (N.D. Cal. 2012) ..............................................................17

*Mohamad v. Palestinian Authority*,
132 S. Ct. 1702 (2012) .....................................................................................27

*Mohamed v. Jeppesen Dataplan, Inc.*,
614 F.3d 1070 (9th Cir. 2010) ...........................................................................25

*Mohammadi v. Islamic Republic of Iran*,
No. 09-cv-1289, 2013 WL 2370594 (D.D.C. May 31, 2013) ...........................11

*Montoya v. Regents of Univ. of Cal.*,
No. 09-cv-1279, 2010 WL 2731767 (S.D. Cal. July 9, 2010) ...........................35

*Morrison v. Nat'l Australia Bank Ltd.*,
130 S. Ct. 2869 (2010) ..............................................................10, 16, 17, 39

*Mujica v. Occidental Petroleum Corp.*,
381 F. Supp. 2d 1164 (C.D. Cal. 2005) .............................................................32

*In re Nazi Era Cases Against German Defendants Litig.*,
196 F. App'x 93 (3d Cir. 2006) .........................................................................45

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) ...............................................................................17

*Norwest Mort., Inc. v. Superior Court*,
85 Cal. Rptr. 2d 18 (Cal. Ct. App. 1999) ..........................................................38

*Oracle Corp. v. SAP AG*,
734 F. Supp. 2d 956 (N.D. Cal. 2010) ..............................................................38

*Pasquantino v. United States*,
544 U.S. 349 (2005) .........................................................................................45

*In re Philippine Nat'l. Bank*,
397 F.3d 768 (9th Cir. 2005) .............................................................................47

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
753 F. Supp. 2d 166 (S.D.N.Y. 2010) ...............................................................17

*Potter v. Havlicek*,
06-c 2008 WL 2556723 (S.D. Ohio June 23, 2008) .........................................41

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
582 F.3d 244 (2d Cir. 2009) .............................................................................19
226 F.R.D. 456 (S.D.N.Y. 2005) .......................................................................30

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*,
   582 F.3d 1083 (9th Cir. 2009)...........................................................................46

*Rayburn ex rel. Rayburn v. Hogue*,
   241 F.3d 1341 (11th Cir. 2001)..........................................................................28

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r of Internal Revenue Serv.*,
   163 F.3d 1363 (D.C. Cir. 1999)..........................................................................48

*Robinson v. Marshall*,
   No. 07-cv-1606, 2008 WL 2156745 (C.D. Cal. May 18, 2008) ........................36

*Robinson v. United States*,
   586 F.3d 683 (9th Cir. 2009)...............................................................................9

*Roe I v. Bridgestone Corp.*,
   492 F. Supp. 2d 988 (S.D. Ind. 2007) ...........................................................32, 33

*Roe III v. Unocal Corp.*,
   70 F. Supp. 2d 1073 (C.D. Cal. 1999).................................................................48

*Romero v. Drummond Co., Inc.*,
   552 F.3d 1303 (11th Cir. 2008)......................................................................28, 32

*Rosenbaum v. Syntex Corp.*,
   95 F.3d 922 (9th Cir. 1996)................................................................................34

*Rosenblum v. Yates*,
   No. 09-cv-3302, 2011 WL 590750 (E.D. Cal. Feb. 10, 2011)...........................35

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ...........................................................................................44

*Sanchez v. Poole*,
   79 F. App'x 254 (9th Cir. 2003)..........................................................................34

*Sarei v. Rio Tinto, PLC*,
   722 F.3d 1109 (9th Cir. 2013)........................................................................11, 26
   133 S. Ct. 1995 (2013) (Mem.) ..........................................................................10
   671 F.3d 736 (9th Cir. 2011)..........................................................................10, 26
   499 F.3d 923 (9th Cir. 2007)...............................................................................18
   456 F.3d 1069 (9th Cir. 2006).............................................................................18

*Shoyoye v. Cnty. of Los Angeles*,
   137 Cal. Rptr. 3d 839 (Cal. Ct. App. 2012) ......................................................37

*Shroyer v. New Cingular Wireless Servs., Inc.*,
   622 F.3d 1035 (9th Cir. 2010)..............................................................................8

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*,
   482 U.S. 522 (1987) ...........................................................................................49

*Sorota v. Sosa*,
   842 F. Supp. 2d 1345 (S.D. Fla. 2012)................................................................17

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) ..................................................................19, 26, 28, 44, 47, 49

*Starshinova v. Batratchenko,*
    No. 11-cv-9498, 2013 WL 1104288 (S.D.N.Y. Mar. 15, 2013) ...............................17

*Talisman Energy Inc. v. Republic of the Sudan,*
    582 F.3d 244 (2d Cir. 2009) .....................................................................................19

*Taylor v. Kellogg Brown & Root Servs., Inc.,*
    658 F.3d 402 (4th Cir. 2011)....................................................................................45

*Tymoshenko v. Firtash,*
    No. 11-cv-2794, 2013 WL 4564646 (S.D.N.Y. Aug. 28, 2013) ..............................11

*Ungaro-Benages v. Dresdner Bank AG,*
    379 F.3d 1227 (11th Cir. 2004).................................................................................49

*United Mine Workers of Am. v. Gibbs,*
    383 U.S. 715 (1966) ..................................................................................................31

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936) ..................................................................................................46

*United States v. Mandel,*
    914 F.2d 1215 (9th Cir. 1990)...................................................................................46

*United States v. Toscanino,*
    500 F.2d 267 (2d Cir. 1974) ......................................................................................40

*Viera v. Eli Lilly & Co.,*
    No. 09-cv-0495, 2011 WL 2144413 (S.D. Ind. May 31, 2011) ...............................33

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004) ..................................................................................................46

*In re Vivendi Universal, S.A. Secs. Litig.,*
    284 F.R.D. 144 (S.D.N.Y. 2012)...............................................................................17

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.,*
    493 U.S. 400 (1990) .............................................................................................46, 47

*Walker v. Pacific Maritime Assoc.,*
    No. 07-cv-3100, 2009 WL 1068886 (N.D. Cal. Apr. 29, 2009) ..............................34

*Wild Fish Conservancy v. Jewell,*
    730 F.3d 791 (9th Cir. 2013).....................................................................................33

*Wilson v. Hewlett-Packard Co.,*
    668 F.3d 1136 (9th Cir. 2012).....................................................................................8

*In re World War II Era Japanese Forced Labor Litig.,*
    164 F. Supp. 2d 1160 (N.D. Cal. 2001) ....................................................................33

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006) ........................................................................47

*Yung Hee So v. Sook Ja Shin*,
    151 Cal. Rptr. 3d 257, 269 (Cal. Ct. App. 2013) ..........................................37

*Zheng v. Yahoo! Inc.*,
    No. 08-cv-1068, 2009 WL 4430297 (N.D. Cal. Dec. 2, 2009) ...............39, 40, 42

*Zschernig v. Miller*,
    389 U.S. 429 (1968) ........................................................................................49

### <u>Statutes</u>

18 U.S.C. § 2 ...........................................................................................................18

18 U.S.C. § 2512 ...............................................................................................39, 40, 41, 42

18 U.S.C. § 2520(a) ...........................................................................................40, 41, 42

28 U.S.C. § 1332(a)(2) ..........................................................................................31

28 U.S.C. § 1350 ...............................................................................................1, 8, 18, 27

28 U.S.C. § 1367(c)(3) ..........................................................................................31

42 U.S.C. § 1983 ...................................................................................................27

Fed. R. Civ. P. 44.1 ...............................................................................................33

Cal. Bus. & Prof. Code § 17200 ..........................................................................38

Cal. Bus. & Prof. Code § 17208 ..........................................................................39

Cal. Civ. Proc. Code § 335.1 ...............................................................................33

Cal. Civ. Proc. Code § 361 ..................................................................................33

Cal. Civ. Proc. Code § 377.60 .............................................................................28

Securities Exchange Act of 1934, § 10(b) ...........................................................16

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## <u>INTRODUCTION</u>

3   This is an action alleging injuries suffered in the People's Republic of China ("PRC"), at

4 the hands of the Chinese police, Chinese detention authorities, and the Chinese justice system.

5 While Cisco has no wish to minimize the heinous acts that Plaintiffs allege unidentified Chinese

6 officials inflicted upon them, their allegations have no plausible connection to Cisco, its

7 executives, or the United States, and may not properly be litigated in a U.S. district court.  As the

8 U.S. Supreme Court recently ruled decisively in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct.

9 1659 (2013), the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, which is at the core of Plaintiffs'

10 claims here, does not permit claims "seeking relief for violations of the law of nations occurring

11 outside the United States," 133 S. Ct. at 1669.  And this is particularly so where, as here, the

12 allegations that a U.S. corporation and its executives supposedly aided and abetted heinous acts by

13 a foreign government would enlist a U.S. court in adjudicating the conduct of a foreign sovereign

14 within its own borders.  The same principles also foreclose the state-law allegations here.

15   This is the third motion to dismiss the Defendants have been compelled to brief and file in

16 this case. Plaintiffs filed an initial Complaint (Dkt. 1) on May 19, 2011, then filed a First

17 Amended Complaint (Dkt. 61 ("FAC")) on September 2, 2011, and then sought leave to amend

18 their First Amended Complaint yet again in an effort to survive dismissal under *Kiobel* (Dkt. 101),

19 which this Court granted (Dkt. 112), resulting in the filing of the Second Amended Complaint

20 (Dkt. 113 ("SAC")) on September 18, 2013.  The Court should now dismiss the SAC with

21 prejudice.   Even as amended yet again, the SAC fails to state a cognizable ATS (or state-law)

22 claim against Cisco for the sale of routers and other internet hardware *in China*, allegedly obtained

23 through Cisco employees who sold such equipment *in China*.  For twenty years, Cisco has helped

24 deliver the benefits of information technology to millions of people in China, and Plaintiffs set

25 forth no legal or factual basis to hold Cisco, its CEO or the other high-ranking executive named

26 here liable for sales to Chinese government entities of the same products Cisco sells to

27 telecommunications service providers and other entities around the world in accordance with U.S.

28 law.  Specifically:

1.     The ATS and Torture Victim Protection Act ("TVPA") claims should be dismissed for failure to allege subject matter jurisdiction or state a claim.  *First*, the ATS does not provide relief for purely extraterritorial claims.  *Second*, none of the Defendants may be sued for aiding and abetting liability because such relief should be held unavailable under these statutes and because the allegations fail to allege any facts that plausibly suggest that Defendants acted with the knowledge or purpose to facilitate the Chinese authorities' alleged actions.  *Third*, corporations may not be sued under these statutes.  *Fourth,* the commercial relationship alleged between Cisco and its Chinese customers is not nearly close enough to create the state action required to support these claims.  *Fifth*, portions of the SAC fail to plead actionable international norms.

2.     The personal injury claims asserted under California state law also should be dismissed.  These claims may not be asserted as to purely extraterritorial conduct; are barred by applicable statutes of limitations; do not adequately allege facts supporting aiding and abetting liability; and do not adequately allege facts demonstrating causation.  There will also be no basis for federal jurisdiction once the SAC's federal claims are dismissed.

3.     The California Unfair Business Practices claim also should be dismissed.  *First*, this body of law has no extraterritorial application.  *Second*, Defendants' technology lacks any connection to Plaintiffs' alleged lost income.

4.     The Electronic Communications Privacy Act ("ECPA") claim also should be dismissed.  *First*, ECPA has no extraterritorial application.  *Second*, the section pleaded here provides no private right of action.  *Third*, the claim improperly seeks to assert liability for "normal course of business" activity.

5.     The claims against individual Cisco business executives also should be dismissed. There is no factual allegation to support the notion that Cisco's worldwide CEO, or the other high-ranking executive named as a Defendant, had specific knowledge of the sales contracts at issue here, much less that these executives acted with the requisite purpose or knowledge.

6.     The entire SAC should be dismissed in any event as nonjusticiable.  *First*, the SAC raises political questions whose judicial resolution would interfere with the foreign policy set by the Executive Branch and Congress.  This action should not be permitted to effect a judicial

override of U.S. trade policy as determined by the political branches.  *Second*, under the act of state and international comity doctrines, this Court is an inappropriate forum in which to challenge the sovereign acts of the PRC.  *Third*, the doctrine of foreign affairs preemption also mandates dismissal of the state-law claims.

Having already amended their Complaint twice in response to Defendants' two motions to dismiss, Plaintiffs should not be given yet another bite at the apple.  *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) (leave to amend ATS claims properly denied where "previous amendment failed to cure [the] deficiency," rendering further amendment futile); *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (a "district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint") (quotation marks and citation omitted).  The SAC should be dismissed with prejudice.

## **FACTUAL BACKGROUND**

### A.    The Parties

Plaintiffs are practitioners of Falun Gong, a movement that developed in China around 1992.  (SAC ¶ 27).  By early 1999, an estimated 70-100 million people in China practiced Falun Gong.  (*Id.*).  Falun Gong is viewed by the Chinese Government as a "cult."  (*See id.* ¶ 44).  All but one of the Plaintiffs is a Chinese citizen and all but two reside in China.

Cisco is a U.S. technology company that is in the business of manufacturing the routers, switches, and related hardware that comprise the basic architecture of internet networking.  *See Global Internet Freedom: Corp. Resp. & the Rule of Law, Hearing Before the Subcomm. on Human Rights & the Law of the U.S. Sen. Comm. on the Judiciary*, 110th Cong., written statement at 1 (May 20, 2008) (statement of Mark Chandler, Sr. V.P. and Gen. Counsel, Cisco Sys., Inc.).[1]

---

[1]   Mr. Chandler's May 20 written statement is available at 2008 WLNR 9511892; his complete written and oral testimony is available through the U.S. Government Printing Office at *http://www.gpo.gov/fdsys/pkg/CHRG-110shrg45688/pdf/CHRG-110shrg45688.pdf*      ("Chandler Testimony").  The testimony was specifically referred to in the FAC (¶ 106).  *See Inlandboatmens Union of Pac. v. Dutra Grp.*, 279 F.3d 1075, 1083 (9th Cir. 2002) (proper to "consider a document outside the complaint when deciding a motion to dismiss if the complaint specifically refers to the document and if its authenticity is not questioned").

### B.    Chinese Law And Falun Gong

The practice of Falun Gong is illegal under Chinese law, and Chinese statutes specify the particular Falun Gong activities that are prohibited.  (*See* Decl. of John (Hejun) Chu In Supp. Of Defs.' Mot. To Dismiss, Aug. 4, 2011 ("Chu Decl."), ¶¶ 12-21.)   Chinese law also specifies penalties for violations of these laws, like imprisonment and forced labor.  (*Id.* ¶¶ 22-35.)  Such penalties are not unique to Falun Gong.  (*Id.* ¶ 34.)  The PRC adopted these laws and penalties based on the view that Falun Gong "is not a religious belief or spiritual movement" but a "'cult that' … has 'seriously disrupted the law and order' … by inciting … sabotage and suicide bombings."[2]

Although the SAC alleges various acts of brutality and torture by Chinese authorities (*see*, *e.g.*, SAC ¶¶ 37-42, 45, 46), any such conduct is illegal under Chinese law (Chu Decl. ¶ 7) and no Chinese laws specific to Falun Gong authorize such conduct (*id.* ¶¶ 36-39).  The SAC thus seeks a determination that the Chinese government and its law enforcement authorities are not following their own statutes and law enforcement protocols.

### C.    The Allegations Of Injuries Caused By Chinese Authorities

Plaintiffs allege that they were arrested by the Chinese police, subjected to sham prosecutions at the hands of Chinese prosecutors and judges, and subjected to physical injury and other human rights violations while in the custody of Chinese government institutions as part of a national campaign to eradicate Falun Gong.  Doe I, Doe II, and Ivy He allege that Chinese police and other authorities subjected them to police brutality, torture, forced labor and other wrongful acts.  (SAC ¶¶ 230-261.)  Does III-IX and Charles Lee allege they were detained between 2000 and 2009 and subjected to police brutality and other wrongful acts.  (*Id.* ¶¶ 264-332.)  Doe VII's family has not had contact with her since summer 2006 and believes she may have died while in custody.  (*Id.* ¶ 309.)  Doe VIII died in August 2002 while in custody at a detention center, allegedly due to beatings.  (*Id.* ¶ 314.)  Liu Guifu and Wang Weiyu allege they were subject to arrests, detentions and mistreatment.  (*Id.* ¶¶ 333-356.)  Other Plaintiffs still detained allege they

_____

[2]   *Doe v. Qi*, 349 F. Supp. 2d 1258, 1300 (N.D. Cal. 2004) (quoting Statement of the PRC Government advocating deference by U.S. courts to Chinese policy concerning Falun Gong).

1    suffer from physical assaults and deprivations.  (*Id*. ¶ 359.)

2        None of these actions—all of which took place at Chinese prisons, labor camps, or

3    detention centers—is alleged to have been known to, planned, or directed by the Defendants.

4        **D.    The Allegations Concerning The "Golden Shield" Project**

5        The SAC alleges that Defendants helped design the "Golden Shield," an e-government

6    project initiated by the Chinese government to increase central police efficiency, in order to enable

7    Chinese public security personnel and Office 610 special agents (*id*. ¶¶ 75, 81-83) "to enable

8    Chinese security to subject Falun Gong believers to ideological conversion through torture" (*id*.

9    ¶ 84), and that Defendants provided training to Chinese authorities concerning the Golden Shield

10   (*id*. ¶¶ 104, 140, 152).

11       The SAC alleges that, beginning in 2001, "Public Security officers, Party officials, and

12   Office 610 agents routinely profiled, analyzed, and shared information on Falun Gong

13   practitioners acquired through the Golden Shield, developed and implemented by Cisco, in order

14   to facilitate their identification, tracking, detention, and ideological conversion and related forms

15   of torture."  (*Id*. ¶ 111).  The SAC, even as amended, does not allege any particular facts to

16   support the conclusion that Defendants knew or intended that the Golden Shield would be used for

17   purposes other than the lawful apprehension of individuals suspected of violating Chinese law, or

18   that Defendants knew or intended that Chinese government authorities would engage in any

19   unlawful or brutal acts in the course of apprehending Falun Gong practitioners.[3]

20       The SAC characterizes the Golden Shield as a "surveillance and internal security network"

21   (*id*. ¶ 1) that "perform[s] … standard crime control police functions" (*id*. ¶ 2), and serves "Chinese

22   security objectives" (*id*. ¶ 59), by among other things "integrat[ing] … public security command

23   and dispatch centers, intelligence and information analysis centers, mobile and front line police

24   technology" (*id*. ¶ 97(g)), in order to enable authorities to "identify"; "locate"; "log"; "profile";

25   "track"; "monitor"; "investigate"; and "surveil" individuals suspected of wrongdoing.  (*See, e.g.*,

---

26   [3]   Several of the alleged abuses occurred years after the Golden Shield was implemented—for
     example, Doe VI alleges he was taken into custody "more than five years after the Golden Shield
27   identifying Internet users as Falun Gong, and tracking and monitoring them in Shandong
     Province."  (*Id*. ¶ 294).
28

*id.* ¶¶ 72, 79, 82, 83, 85, 91, 97, 111-113, 124).    But the SAC, even as amended, alleges no

particular facts to support the conclusion that these capabilities were anything other than standard

police activities to "'*fight [] against crime.*'" (*Id.* ¶ 190 (emphasis added).)   The testimony of

Cisco Senior Vice President Chandler referred to in the FAC (¶ 106), though deleted from the

SAC, makes clear that the security and filtering features of Cisco products are generic and not

customized for particular users:

> First, Cisco sells the same products globally, built to global standards, thereby enhancing the free flow of information.
>
> Second, Cisco's routers and switches include basic features that are essential to fundamental operation of the Internet by blocking hackers from interrupting services, protecting networks from viruses.
>
> Third, those same features without which the Internet could not function effectively can, unfortunately, be used … for political and other purposes.
>
> Fourth, … Cisco does not customize or develop specialized or unique filtering capabilities in order to enable different regimes to block access to information.
>
> And, fifth, Cisco is not a service or content provider, nor are we a network manager who can determine how those features are used.

Chandler Testimony at 13.  The technology is the "basic intrusion protection and site filtering that

all Internet routing products contain, such as used by libraries to block pornography." *Id.* at 14.

**E.     Cisco's Full Compliance With U.S. Policy Governing Trade With China**

Congress and the Executive Branch have enacted foreign trade policy measures that

balance the benefits of increased internet access in China with human rights concerns.  That policy

expressly permits Cisco to sell to police agencies and others in China the generic routers, switches

and other hardware that makes up the foundation of the internet.  Specifically, following the

Tiananmen Square protests of 1989, Congress passed the Foreign Relations Authorization Act for

Fiscal Years 1990-1991 (the "Tiananmen Act.").  *See* Pub. L. No. 101-246, 104 Stat. 15 (1990).

The Act recites detailed Congressional "findings" condemning the Chinese Government and

others in connection with the events at Tiananmen Square, *id.* § 901(a) at 80; states that "it is

essential that the United States speak in a bipartisan and unified voice in response to the events in

the [PRC]," *id.* § 901(b)(3) at 81, and that the President should "continue to emphasize" human

rights in discussions with China, *id.* § 901(b)(4) at 81;[4] and restricts trade with China, including—

most relevant here—by banning the export of specified crime control or detection instruments or

equipment to the PRC in the absence of an express report by the President to the Congress stating

either that the PRC had made progress on political reform or that the ban was operating against the

United States' national interest, *id.* § 902(a)(4) at 83.[5]

The list of restricted crime control equipment discussed in the Tiananmen Act is

maintained by the Executive Branch acting through the U.S. Commerce Department. *See* 15

C.F.R. § 742.7 (2010). The purpose of the list is to "support … U.S. foreign policy to promote the

observance of human rights throughout the world." *Id.* § 742.7(a). The list focuses on weapons

and other physical instruments of crime control, and does not include software and technology

products. *See*, *e.g.*, *id.* §§ 742.7(a)(2) (shotguns); (a)(1) (police batons, whips, helmets, and

shields) (referring to Export Control Classification Numbers in 15 C.F.R. Pt. 774, Supp. 1). The

Commerce Department expressly remarked in a 2010 rule that it would *not add software and*

*technology* products to the list, instead leaving for a

> subsequent proposed rule … potential expansion of [the list, including
> consideration of] … whether, and, if so, the extent to which biometric measuring
> devices, integrated data systems, simulators, and communications equipment
> should be added …; [and] the degree to which software and technology related to
> [already listed devices] should [themselves] be listed and how such software and
> technology should be described….

Revisions to the Commerce Control List, 75 Fed. Reg. 41078-01, 41078 (July 15, 2010).

U.S. trade policy further recognized that restrictions on the sale of certain products to

Chinese entities should not bar a robust economic relationship with China as to other products

when President George H. W. Bush reaffirmed China's most-favored nation ("MFN") trade status

---

[4]  Even this assurance of cooperation between the political branches was insufficient in the view of the President, who noted in a signing statement that the Act's "legislatively mandated sanctions represent an unwise constraint upon the President's ability to conduct foreign policy." 1990 U.S.C.C.A.N. 94-1, 94-3, *available at* 1990 WL 285749, at *3.

[5]  The statute sets forth a series of harsher trade restrictions that Congress believed should be considered if the PRC's acts of repression were to "deepen[]." *Id.* § 901(c)(3), (4) at 83. These regulations are additional to a comprehensive U.S. regulatory regime governing the export of high technology products. *See* Export Administration Regulations, 15 C.F.R. Parts 730-774 (2010); International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 (2010).

1   just three months after passage of the Tiananmen Act.  *See* Presidential Determination No. 90-21,

2   55 Fed. Reg. 23,183 (June 7, 1990).  That status was made permanent in legislation signed into

3   law by President Clinton in 2000.  *See* Pub. L. No. 106-286, 114 Stat. 880 (2000).[6]  The SAC

4   nowhere alleges that Cisco has ever acted in violation of the comprehensive legal and regulatory

5   scheme enacted and enforced by the political branches to govern trade with China.

6   <u>**ARGUMENT**</u>

7   The SAC should be dismissed with prejudice, *first*, under Fed. R. Civ. P. 12(b)(1) because

8   it fails to allege subject matter jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, or on

9   any of the state-law grounds pleaded; and *second*, under Fed. R. Civ. P. 12(b)(6) because as to all

10  of its allegations, it fails to state a claim as a matter of law and because the factual allegations in

11  the FAC are not sufficiently plausible under Fed. R. Civ. P. 8(a)(2).

12  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

13  accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

14  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also*

15  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).  "A claim has

16  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

17  reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

18  678.  It requires "more than a sheer possibility that a defendant has acted unlawfully," and

19  "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops

20  short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quotation marks

21  and citation omitted).  "[M]ere conclusory statements" or "legal conclusions" do not suffice—

22  "they must be supported by factual allegations."  *Id.* at 678-79; *see also Wilson v. Hewlett-*

23  *Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012) (dismissing allegations where "[p]laintiffs

24  make a generalized assertion [concerning a defect] but reference neither the specific defect alleged

25  in the complaint nor [defendant's] knowledge of that defect").  In other words, a "court is not

---

26  [6]   Cisco's export control team, repeatedly praised by the U.S. Department of Commerce, screens

27  each of Cisco's two million transactions per quarter for compliance with these regulations.  It is
    the policy of Cisco not to sell security cameras or other possible tools of surveillance to Chinese

28  governmental entities, even though it would be legal to do so.

1  required to accept as true allegations that are merely conclusory, unwarranted deductions of fact,

2  or unreasonable inferences."  *Kelley v. Mortg. Elec. Registration Sys., Inc.*, 642 F. Supp. 2d 1048,

3  1052 (N.D. Cal. 2009)  (quotation marks and citation omitted).

4       "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint … fails to

5  allege facts sufficient to establish [such] jurisdiction."  *In re Dynamic Random Access Memory*

6  *Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008).  It is Plaintiffs' burden to establish

7  jurisdiction on this motion to dismiss.  *See Robinson v. United States*, 586 F.3d 683, 685 (9th Cir.

8  2009).  Because a motion to dismiss on jurisdictional grounds is governed by FRCP 8(a),

9  "*Twombly* and *Iqbal* … state the proper standard for addressing the sufficiency of Plaintiffs'

10  allegations [as] to … subject matter jurisdiction."  *Dichter-Mad Family Partners, LLP v. United*

11  *States*, 707 F. Supp. 2d 1016, 1025 n.10 (C.D. Cal. 2010), *aff'd* 709 F.3d 749 (9th Cir. 2013).

12  **I.     THE ATS AND TVPA CLAIMS SHOULD BE DISMISSED**

13       The asserted claims against Cisco and its executives Mr. Chambers and Mr. Cheung under

14  the ATS (*see* SAC ¶¶ 381-85, 391-96, 397-99, 400-03, 404-08, 409-12, 413-16) and against Mr.

15  Chambers and Mr. Cheung under the TVPA (*see id.* ¶¶ 386-90) warrant dismissal because (a) the

16  ATS claims   assert solely extraterritorial violations of international law; the ATS and TVPA

17  claims (b) fail to allege actionable aiding and abetting or other forms of secondary liability; (c) are

18  impermissible against a corporation; and (d) fail to alleged acts as required under color of state

19  law; and some of the ATS claims (e) fail to allege actionable international law norms.  Each of

20  these grounds independently warrants dismissal of the SAC for failure to state a claim and/or

21  establish subject matter jurisdiction.

22       **A.     The ATS Claims Allege Purely Extraterritorial Conduct**

23       The SAC alleges injuries suffered in China, at the hands of the Chinese police, Chinese

24  detention authorities, and the Chinese justice system through conduct taking place in China, using

25  routers and other networking hardware and software allegedly obtained from Cisco employees

26  operating in China.  The ATS, however, does not apply to such purely extraterritorial conduct, as

27  the U.S. Supreme Court held in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

28  *Kiobel* held that the longstanding "presumption against extraterritoriality applies to claims under

the ATS," *id.* at 1669 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010)), that nothing in the text, history, or purpose of the ATS, "rebuts that presumption," *id.*, and therefore that the ATS does not allow for suits "seeking relief for violations of the law of nations occurring outside the United States," *id.*  The claims in *Kiobel* were asserted by Nigerian nationals against English and Dutch companies alleged to have aided and abetted human rights violation by the Nigerian government against its own citizens in Nigeria.  Accordingly, *Kiobel* held the claims precluded because the international-law violations at issue "occur[ed] outside the United States." *Id.*  Moreover, the Court explained, "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* (citing *Morrison*, 130 S. Ct. at 2883-88).  "[M]ere corporate presence" does not "suffice[]" to displace that presumption. *Id.*

Straightforward application of *Kiobel* requires dismissal of the ATS allegations here. Here, as in *Kiobel*, "all the relevant conduct took place outside the United States." *Id.*  All of the violations underlying the ATS claims in the SAC are alleged to have been perpetrated by Chinese government officials upon Chinese citizens in China.  (*See* SAC ¶¶ 227-356).  Just as *Kiobel* upheld dismissal of ATS claims brought by Nigerian plaintiffs against Dutch and English corporations alleged to have "aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria," 133 S. Ct. at 1662, so this Court should dismiss ATS claims brought by Chinese citizens against a U.S. corporation (and its executives) alleged to have aided and abetted the Chinese government in committing violations of the law of nations in China.

Such dismissal would be in keeping with the decisions of every court considering similar ATS allegations since *Kiobel*, each of which has dismissed ATS claims premised on alleged international law violations committed abroad.  For example, after the Supreme Court granted certiorari and summarily vacated and remanded the Ninth Circuit's en banc decision in *Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir. 2011) (en banc), *cert. granted and judgment vacated*, 133 S. Ct. 1995 (2013) (Mem.), the Ninth Circuit on remand summarily affirmed the district court's dismissal with prejudice of ATS claims that had been pending for over a decade because they were based on alleged international law violations that took place in Papua New Guinea.  722 F.3d

1    1109, 1110 (9th Cir. 2013).  It did so even though the defendant had "substantial operations in [the

2    United States]," including "assets of nearly $13 billion—47% of which are located in North

3    America."  *Id.*, 971 F.3d at 744.  The D.C. Circuit did much the same in *Doe VIII v. Exxon Mobil*

4    *Corp.*, Nos. 09-7125 *et al.*, 2013 WL 3970103, at *1 (D.C. Cir. July 26, 2013), by vacating its

5    prior judgment sustaining ATS claims against a U.S.-based defendant and remanding for further

6    proceedings in light of *Kiobel*.

7            Indeed, in the nearly seven months since *Kiobel* was decided, at least thirteen court

8    decisions have dismissed or undercut ATS claims on grounds of extraterritoriality—a rate of

9    almost one dismissal every two weeks.[7]   Three such decisions are particularly instructive in

10   confirming that it is the location of the *tortious conduct* (here, China) that matters under *Kiobel*:

11           **1.      *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013).**  In *Balintulo*, which

12   involved ATS claims strikingly similar to those here, the U.S. Court of Appeals for the Second

13   Circuit held that *Kiobel* "provides an adequate ground for dismissing all [of the plaintiffs']

14   claims," and remanded to the district court for proceedings on that basis.  *Id.* at 194.  The

15   complaints in *Balintulo* asserted putative class action claims under the ATS against a number of

16   defendants, including U.S. corporations, for supposedly aiding and abetting "the decades-long

---

17   [7]   *See, e.g., Tymoshenko v. Firtash*, No. 11-cv-2794, 2013 WL 4564646, at *4 (S.D.N.Y. Aug. 28,
18   2013) (dismissing ATS claims where "Plaintiffs [were] citizens of a foreign country, [defendant
     was] a foreign corporation, and the tortious conduct at issue—arbitrary arrest and detention—took
19   place on foreign soil," notwithstanding defendant's "use of New York bank accounts"); *Adhikari
     v. Daoud & Partners*, No. 09-cv-1237, 2013 WL 4511354, at *7 (S.D. Tex. Aug. 23, 2013)
20   (dismissing ATS claims because "the conduct underlying [the] claim is entirely foreign," even
     though defendant corporation was "a U.S. national"); *Kaplan v. Cent. Bank of Islamic Republic of
21   Iran*, No. 10-cv-483, 2013 WL 4427943, at *16 (D.D.C. Aug. 20, 2013) (dismissing ATS claims
     based on "attacks … allegedly funded by Iran, launched from Lebanon, and [that] targeted Israel"
22   even though "some of the individuals affected by the attacks [were] American"); *Ahmed-Al-
     Khalifa v. Minister of Interior, Fed. Republic of Nigeria,* No. 13-cv-172, 2013 WL 3991961, at *2
23   (N.D. Fla. Aug. 2, 2013) (dismissing ATS claims "because the violations at issue occurred outside
     the United States"); *Ahmed-Al-Khalifa v. Trayers*, No. 13-cv-869, 2013 WL 3326212, at *2 (D.
24   Conn. July 1, 2013) (no ATS jurisdiction "over conduct committed outside of the United States");
     *Mohammadi v. Islamic Republic of Iran,* No. 09-cv-1289, 2013 WL 2370594, at *15 (D.D.C. May
25   31, 2013) (dismissing ATS claims for "conduct that occurred entirely within the sovereign
     territory of Iran"); *Giraldo v. Drummond Co.,* No. 09-cv-1041, 2013 WL 3873960, at *8 (N.D.
26   Ala. July 25, 2013) (no ATS jurisdiction because "where a complaint alleges activity in both
     foreign and domestic spheres, an extraterritorial application of a statute arises *only* if the event on
27   which the statute *focuses* did not occur abroad.  Of course, the ATS *focuses* on the torts of
     extrajudicial killings and war crimes … [and] the tort at issue occurred abroad ….") (emphasis in
28   original, internal citations omitted).

South African legal regime known as 'apartheid,'" asserting that "the South African subsidiary companies of the named corporate defendants—Daimler, Ford, and IBM … —aided and abetted violations of customary international law committed by the South African government" by selling "cars and computers to the South African government, thus facilitating the apartheid regime's innumerable race-based depredations and injustices, including rape, torture, and extrajudicial killings." *Id.* at 179-80.  The allegations as to IBM, in terms nearly identical to those asserted by Plaintiffs here, asserted that "the technology defendants aided and abetted violations of the law of nations by providing the computer systems necessary to restrict black South Africans' movements, track dissidents, and target particular individuals for repressive acts." *Id.* at 183.  The Second Circuit there rejected the plaintiffs' argument that *Kiobel* "does not preclude suits under the ATS based on foreign conduct when the defendants are American nationals, or where the defendants' conduct affronts significant American interests identified by the plaintiffs." *Id.* at 189.  *First*, it held that the U.S. nationality of a defendant is "irrelevant" where all of the relevant conduct in violation of the law of nations occurs abroad:

> [T]he plaintiffs argue that whether the relevant conduct occurred abroad is simply one prong of a multi-factor test, and the ATS still reaches extraterritorial conduct when the defendant is an American national.
>
> We disagree.  *The Supreme Court expressly held that claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States*.  *Kiobel*, 133 S. Ct. at 1662, 1668-69.  The majority framed the question presented in these terms no fewer than three times; it repeated the same language, focusing solely on the location of the relevant "conduct" or "violation," at least eight more times in other parts of its eight-page opinion; and it affirmed our judgment dismissing the plaintiffs' claims because "all the relevant conduct took place outside the United States," *id.* at 1669.  Lower courts are bound by that rule and they are without authority to "reinterpret" the Court's binding precedent in light of irrelevant factual distinctions, such as the citizenship of the defendants.  Accordingly, if all the relevant conduct occurred abroad, that is simply the end of the matter under *Kiobel*.

*Id.* at 189-90 (emphasis added, footnotes and citations omitted).  That analysis is fully applicable here, and disposes of any argument that Cisco's status as a U.S. corporation is sufficient to displace *Kiobel*'s presumption against extraterritorial application of the ATS.

*Second*, the Second Circuit rejected the argument that the *Kiobel* presumption may be displaced on a case-specific basis by "compelling American interests" such as "supporting the

1    struggle against apartheid in South Africa," *id.* at 191, explaining:

2           the presumption against extraterritoriality applies to the *statute* …. In order "to
            rebut the presumption, the ATS [*i.e., the statute*] would need to evince a clear
3           indication of extraterritoriality." [*Kiobel*, 133 S. Ct.] at 1665 (quotation marks
            omitted)). Applying this approach in *Kiobel*, the Supreme Court held as a matter of
4           statutory interpretation that the implicit authority to engage in common-law
            development under the ATS does not include the power to recognize causes of
5           action based solely on conduct occurring within the territory of another sovereign.
            *In all cases, therefore, the ATS does not permit claims based on illegal conduct that*
6           *occurred entirely in the territory of another sovereign.* In other words, a common-
            law cause of action brought under the ATS cannot have extraterritorial reach
7           simply because some judges, in some cases, conclude that it should.

8    *Id.* at 191-92 (last emphasis added, footnote omitted). That reasoning is equally applicable here.

9           *Finally*, the Second Circuit considered and rejected the argument that *Kiobel* did not

10   mandate dismissal because the defendants "took affirmative steps in this country to circumvent the

11   sanctions regime," 2013 WL 4437057, at *8, explaining:

12          Because the defendants' putative agents did not commit any relevant conduct
            within the United States giving rise to a violation of customary international law—
13          that is, because the asserted "violation[s] of the law of nations occurr[ed] outside
            the United States," *Kiobel*, 133 S. Ct. at 1669—the defendants cannot be
14          *vicariously liable* for that conduct under the ATS.

15   *Id.* (emphasis and modifications in original). *Balintulo*'s reasoning is equally applicable here.

16          **2.      *Al Shimari v. CACI Int'l, Inc.*, No. 08-cv-827, 2013 WL 3229720 (E.D. Va. June**

17   **25, 2013).** In *Al Shimari*, as in *Balintulo*, the Court held that ATS claims must be dismissed where

18   they are based on violations of the law of nations abroad. Specifically, the court dismissed the

19   ATS claims of the plaintiffs, all Iraqi citizens, concerning alleged wrongdoing by a U.S.

20   corporation acting as a military contractor in Iraq at the Abu Ghraib prison, holding that "*Kiobel*

21   compels the conclusion that Plaintiffs' ATS claims are barred." *Id.* at *15. The Court explained:

22          Here, as in *Kiobel*, Plaintiffs are barred from asserting ATS jurisdiction because *the*
            *alleged conduct giving rise to their claims occurred exclusively on foreign soil.*
23          Plaintiffs allege that torture and war crimes occurred during their detention in Abu
            Ghraib, a location external to United States territory. Additionally, Plaintiffs' ATS
24          claims do not allege that any violations occurred in the United States or any of its
            territories.
25
     *Id.* at *7 (emphasis added). The Court's emphasis on the actual location of the alleged "torture"
26
     and "war crimes" confirms, as in *Balintulo*, that alleged preparatory acts committed in the United
27
     States cannot support ATS jurisdiction after *Kiobel*. *Al Shimari* likewise held that only legislative
28

1   action can displace the *Kiobel* presumption and "the facts of a case [cannot] inform a court's

2   judgment about whether the presumption is sufficiently rebutted and thus displaced." *Id.* at *8.

3   Thus, as *Al Shimari* recognized, ATS claims based on extraterritorial law violations may not be

4   adjudicated in the federal courts unless Congress changes the statute.

5          **3.**    ***Chen Gang v. Zhao Zhizhen*, No. 04-cv-1146, 2013 WL 5313411 (D. Conn. Sept.**

6   **20, 2013).**   In another case bearing even greater similarity to the present case, a district court

7   dismissed an action brought by Falun Gong adherents who alleged that they had been "subjected

8   to persecution and human rights abuses [in China] due to their adherence to Falun Gong," *id.* at

9   *1, on the ground that "the alleged abuses occurred in China and do not sufficiently 'touch and

10  concern' the United States," *id.* at *4.  The plaintiffs in *Chen Gang*, represented by lead counsel

11  Terri Marsh (also Plaintiffs' lead counsel here), asserted ATS claims against a defendant who

12  allegedly "produced, scripted or aired anti-Falun Gong television shows and news reports [in

13  China] inciting, encouraging, and supporting acts of torture and other major human rights abuses

14  against the Plaintiffs." *Id.* at *1.  As here, the *Chen Gang* plaintiffs alleged that the defendant (a

15  Chinese resident) was secondarily liable under the ATS because he had "called for 'douzheng'

16  against Falun Gong." *Id.*

17        The court in *Chen Gang* rejected several arguments that plaintiffs may raise here.  *First*, it

18  rejected the plaintiffs' attempt to convert a plainly extraterritorial action, involving plaintiffs who

19  were allegedly injured by Chinese individuals in China, into one with U.S. connections, deeming

20  it immaterial that the "defendant 'specifically directed' his propaganda campaign toward United

21  States citizens and residents." *Id.* at *3.  That analysis is equally applicable to the claims at issue

22  here, which, notwithstanding allegedly attenuated connections to activities in the United States,

23  likewise involves solely injuries allegedly inflicted on Falun Gong adherents in China at the hands

24  of Chinese governmental authorities in the context of the Chinese government's alleged campaign

25  against Falun Gong.  *Second*, "[e]ven assuming the presumption against extraterritorial application

26  could be displaced by 'specifically directing' tortious conduct toward the United States," the court

27  in *Chen Gang* held that plaintiffs' claims would still fail under *Kiobel* because "*the tortious*

28  *conduct relevant to the plaintiffs' ATS claims occurred in China* and was directed toward people

1   there." *Id.* at *4. (emphasis added).  In focusing on the location of the "tortious conduct" rather

2   than the location of preparatory or resulting events, the court joined and expressly cited *Balintulo*,

3   *Al-Shimari*, and several other post-*Kiobel* decisions that have reached the same conclusion.  *Id.* at

4   *3.  *Finally*, *Chen Gang* rejected plaintiffs' argument that their claims should survive *Kiobel* due

5   to "the necessity of providing redress for international law violations" and plaintiffs' "prediction

6   concerning the risk of international discord associated with this case." *Id.* at *4.

7       The court in *Hua Chen v. Honghui Shi*, No. 09-cv-8920, 2013 WL 3963735 (S.D.N.Y.

8   Aug. 1, 2013), similarly found no jurisdiction under the ATS over torture and other international

9   law claims brought by "members of the Falun Gong movement who currently reside in the United

10  States," because "*Plaintiffs' alleged detention, torture, and abuse took place entirely abroad*." *Id.*

11  at *1, *7 (emphasis added).  That analysis, like the analysis in *Chen Gang*, *Balintulo, Al Shimari*,

12  and the other cases cited above, is equally applicable here.

13      Nor does the SAC allege any *domestic* conduct that "touch[es] and concern[s] the territory

14  of the United States … with sufficient force to displace the presumption against extraterritorial

15  application."    *Kiobel*, 133 S. Ct. at 1669.    Each Plaintiff here was allegedly identified,

16  apprehended, and injured by Chinese authorities located in China, in connection with his or her

17  admitted engagement in practices that violate Chinese law.  Plaintiffs have alleged a number of

18  generic management, supervision, marketing and planning activities alleged to have taken place in

19  Cisco headquarters in San Jose, California.  But any such argument would ignore the *Chinese*

20  locus of the alleged international law violations themselves and in any event contradict the SAC's

21  allegation that the Golden Shield was marketed, designed, and implemented by Cisco employees

22  located  *in  China*.  (*See*  SAC  ¶ 117  (Chinese  employees  "design[ed],  develop[ed],  and

23  implement[ed] the apparatus"); *id.* ¶ 151 ("As early as 1999, Defendants in San Jose *through*

24  *employees in China* entered into an agreement with Public Security officials to construct the core

25  network of the Golden Shield."); *id.* (Cisco's China-based "marketing and sales team," worked

26  "directly … with Public Security officers in regions across China"); *id.* ¶ 205 (Cisco manufactured

27  "Golden Shield parts and other technology … in China"); *id.* ¶ 65 (alleging statements made by

28  Cisco "high-level" engineer in China).)

1    The alleged U.S. conduct, by contrast, consists largely of generic allegations concerning

2    San Jose's "direction and control" of Chinese operations (SAC ¶ 75); its "express or implied

3    authority" over Chinese employees (*id.* ¶ 97(b)); its "orchestrat[ion]"    (*id.* ¶¶ 126, 128),

4    "supervi[sion]" (*id.* ¶ 129) and "approval" (*id.* ¶ 97(c)) of the acts and of Chinese affiliates; its

5    efforts to "plan[] ... market strategy for China" (*id.* ¶ 128); its "development of relationships to

6    ensure future business opportunities" in China (*id.* ¶ 69); its "study" of Chinese government

7    objectives (*id.* ¶ 79); and its "research[] and development activities," which the SAC characterizes

8    as "high-level design" (*id.* ¶ 95).   These allegations fail to overcome the presumption against

9    extraterritoriality and fail to plead U.S.-based conduct with the particularity required to survive

10   dismissal.

11    *A fortiori*, nothing in the SAC suggests that any of the alleged *law of nations violations*

12   occurred within the United States—and that is the necessary focus of any actionable ATS claim

13   post-*Kiobel*.   *Kiobel* relied heavily upon *Morrison*, where the Court applied the presumption

14   against extraterritorial application of U.S. law to § 10(b) of the Securities Exchange Act of 1934.

15   In *Morrison*, the Court made clear that the question is not whether *any* conduct took place in the

16   United States, but rather whether the conduct that was the "*focus of congressional concern*" in

17   drafting the relevant statute took place in the United States. 130 S. Ct. at 2884 (emphasis added,

18   quotation marks omitted).  The corporate defendant in *Morrison* was headquartered in Florida and

19   its officers were alleged to have committed fraudulent and misleading statements in Florida, but

20   the Court nonetheless required dismissal under the presumption against extraterritoriality because

21   all the relevant *securities transactions* occurred abroad.  The Court noted that "the presumption

22   against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel

23   whenever some domestic activity is involved in the case," and that "the focus of the Exchange Act

24   is not upon the place where the deception originated, but upon purchases and sales of securities."

25   *Id.*[8]  Similarly, in *Kiobel*, the Court made clear that the focus of the ATS is on the alleged

---

[8]  Post-*Morrison* decisions are in accord.  In the context of § 10(b) of the Securities Exchange
Act, see, *e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012)
(rejecting application of § 10(b) to purchases and sales of securities not listed on domestic
***(footnote continued)***

*violations of the law of nations*, and thus the "claims" of international law violations *themselves* must "touch and concern the territory of the United States." 133 S. Ct. at 1669 (citing *Morrison*, 130 S. Ct. at 2883-88); s*ee id.* at 1670 (Alito, J. concurring) (observing that an ATS action is barred "unless the domestic conduct is sufficient to violate an international law norm").

---

exchange unless "irrevocable liability is incurred or title passes within the United States"); *In re Vivendi Universal, S.A. Secs. Litig.*, 284 F.R.D. 144, 151-52 (S.D.N.Y. 2012) (rejecting application of § 10(b) where irrevocable liability was incurred extraterritorially, even though the shares were designated for U.S. persons); *Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.*, No. 08-cv-01381, 2011 WL 1211511, at *6 (D. Colo. Mar. 31, 2011) (domestic investor's purchases of foreign stocks on foreign exchanges not "domestic transactions" for purposes of § 10(b), even where investment was solicited in United States); *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178-79 (S.D.N.Y. 2010) (rejecting application of § 10(b), even though decision to invest took place in United States, the orders were placed and executed in the United States, and harm to plaintiff took place in United States); *In re Banco Santander Secs. Optimal Litig.*, 732 F. Supp. 2d 1305, 1317-18 (S.D. Fla. 2010) (rejecting application of § 10(b), even though purpose of foreign purchase was to invest with domestic firm that held securities listed on U.S. stock exchanges).

Post-*Morrison* courts have also applied these principles to other statutes. In the context of RICO claims, see*, e.g.*, *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (per curiam) (rejecting application of RICO, despite allegations of some domestic conduct, because "slim contacts with the United States … are insufficient" to extend extraterritorial application); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 938 (N.D. Cal. 2012) ("Post-*Morrison* courts have had no difficulty concluding that far-flung foreign schemes conducted by foreign actors and implicating only incidental U.S. conduct are fundamentally extraterritorial and thus beyond the reach of RICO."); *Sorota v. Sosa*, 842 F. Supp. 2d 1345, 1350-51 (S.D. Fla. 2012) (dismissing RICO claim where "the entire enterprise operated in Peru, with its only connection to the United States being that the funds it possessed originated from (and possibly returned to) a Florida bank account"); *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 474 (S.D.N.Y. 2010) ("RICO does not apply where, as here, the alleged enterprise and the impact of the predicate activity upon it are entirely foreign," even though funds were moved into and out of U.S.-based bank accounts), *aff'd sub nom.*, *Cedeño v. Castillo*, 457 F. App'x 35, 37-38 (2d Cir. 2012) (finding that "the complaint here alleges inadequate conduct in the United States to state a domestic RICO claim" and that, in any event, plaintiff "fails to allege that the domestic predicate acts proximately caused his injuries"). In the context of the Commodities Exchange Act ("CEA"), see*, e.g.*, *Starshinova v. Batratchenko*, No. 11-cv-9498, 2013 WL 1104288, at *5-8 (S.D.N.Y. Mar. 15, 2013) (rejecting CEA claims where irrevocable liability occurred outside of the United States, even though defendant's parent company had its principal place of business in U.S., defendant attended meetings in the U.S., and the funds invested money in U.S. real estate); *Loginovskaya v. Batratchenko*, No. 12-cv-336, 2013 WL 1285421, *13-18 (S.D.N.Y. Mar. 29, 2013) (rejecting CEA claims where irrevocable liability arose extraterritorially, even though plaintiff received accounting statements created in U.S. and alleged real estate fraud occurred in the U.S.). In the context of the Rehabilitation Act, see *Archut v. Ross Univ. Sch. of Veterinary Med.*, No. 10-cv-1681, 2012 WL 5867148, at *5 (D.N.J. Nov. 19, 2012) (dismissing extraterritorial claims brought under the Rehabilitation Act, even though defendant received federal financial assistance and had a corporate parent in the United States).

**B.     The ATS And TVPA Claims Do Not Support Aiding And Abetting Liability**

**1.     Aiding And Abetting Liability Is Unavailable Under The TVPA**

It is the law of this Circuit that aiding and abetting claims may not be asserted under the TVPA: "Plaintiffs [argue] that they may sue … under the TVPA upon a theory of aiding and abetting. …   The TVPA, however, does not contemplate such liability." *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010) (quotations omitted).[9]   The SAC's aiding and abetting claims under the TVPA must therefore be dismissed.

**2.     Aiding And Abetting Liability Is Unavailable Under The ATS**

While some courts have held that aiding and abetting liability is available under the ATS, *see*, *e.g.*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007); *Exxon*, 654 F.3d at 19-20, this Court should dismiss the SAC's aiding and abetting claims under the ATS in anticipation that the Ninth Circuit will correctly resolve the issue in favor of the contrary view.[10] The ATS, like the TVPA, does not by its terms provide for aiding and abetting liability.  *See* 28 U.S.C. § 1350.  In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Court reasoned that private rights of action for aiding and abetting securities violations were impermissible absent express congressional authorization.  *See id.* at 182 (noting that, in enacting a general criminal aiding and abetting statute, 18 U.S.C. § 2, Congress "ha[d] not enacted a general civil aiding and abetting statute").  The reasoning of *Central Bank* bars aiding and abetting claims here.

Indeed, *Central Bank* has added force in the ATS context, in light of *Sosa*'s admonition, reinforced by *Kiobel*, that only a "modest number" of claims could be brought under the ATS without legislative authorization, and that any "innovative" interpretations of the Act must be left

---

[9]   *Doe VIII v. Exxon Mobil Corp.* reached the same conclusion.  *See* 654 F.3d 11, 58 (D.C. Cir. 2011) ("[A]uthorities … indicating that Congress can provide for aiding and abetting liability absent direct liability, do not support the inference that Congress so provided in the TVPA. Appellants point to no other provision in the TVPA that colorably provides for such liability.").

[10]  A panel of the Ninth Circuit has held that aiding and abetting claims are available under the ATS, but that decision was vacated by the Ninth Circuit sitting en banc.  *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069, 1078 (9th Cir. 2006), *vacated by* 499 F.3d 923 (9th Cir. 2007).  The Ninth Circuit's 2011 en banc decision in *Sarei*, has likewise been vacated.  *See supra* at § I.A.

1  to the legislative process.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 720-21 (2004).  The

2  Executive Branch has consistently argued that aiding and abetting claims should be precluded on

3  this view.  *See* Br. for U.S. as Amicus Curiae at 12-28, *Talisman Energy Inc. v. Republic of the*

4  *Sudan*, 582 F.3d 244 (2d Cir. 2009) (arguing aiding and abetting liability is unavailable under the

5  ATS); Br. of U.S. as Amicus Curiae in Support of Petitioners, *Am. Isuzu Motors, Inc. v. Lungisile*

6  *Ntsebeza*, No. 07-919, at 10-11 (U.S. Feb. 11, 2008), *available at* 2008 WL 408389 (same).  The

7  aiding and abetting allegations under the ATS should be dismissed.

8  ### 3.      The Allegations Do Not Support Aiding and Abetting Liability

9        Even if aiding and abetting liability were generally available under the ATS, the SAC's

10  aiding and abetting claims would still fail as a matter of law because the factual allegations are

11  insufficient to support such liability here. The SAC alleges no facts suggesting that Cisco or its

12  executives knew or intended that the Chinese authorities who purchased police-related security

13  technology to assist in *lawfully* locating and apprehending citizens engaged in crime, including

14  illegal Falun Gong practices, would then *unlawfully* subject those individuals to false charges and

15  convictions, false imprisonment, or heinous physical injury.

16        The prevailing view among courts to have considered the issue is that, to support a claim

17  for aiding and abetting under international law, a plaintiff must allege that the defendant "(1)

18  carrie[d] out acts that ha[d] a *substantial effect* on the perpetration of a *specific crime* [actus reus],

19  and (2) act[ed] with the *specific intent* (i.e., *for the purpose*) of substantially assisting the

20  commission of *that crime* [mens rea]."  *Doe I v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1087-88 (C.D.

21  Cal. 2010) (emphasis added).  *See Presbyterian Church of Sudan v. Talisman Energy, Inc*., 582

22  F.3d 244, 259 (2d Cir. 2009) (ruling that, under governing international law, ATS aiding and

23  abetting liability may obtain only where defendant "(1) provides practical assistance to the

24  principal which has a substantial effect on the perpetration of the crime, and (2) does so with the

25  purpose of facilitating the commission of that crime"); *Khulumani*, 504 F.3d at 277 (Katzmann, J.,

26  concurring) (same); *Aziz v. Alcolac*, 658 F.3d 388, 398 (4th Cir. 2011) ("We [adopt] *Talisman*['s]

27  analysis … as the law of this circuit"); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 654 (S.D. Tex.

28  2010) (same); *Krishanthi v. Rajaratnam*, No. 09-cv-5395, 2010 WL 3429529, at *7 (D.N.J. Aug.

1   26, 2010) (same).  The Ninth Circuit has already adopted a "purpose"—*i.e.*, "specific intent"—

2   standard in the context of genocide claims.  *Abagninin*, 545 F.3d at 738-40 (customary

3   international law imposes that standard despite an alternative "knowledge" standard established by

4   one particular treaty).

5          The actus reus element requires a defendant to "do something more than aiding a criminal

6   generally—the defendant must aid the commission of a specific crime."  *Nestle*, 748 F. Supp. 2d at

7   1080-81 (quotations omitted).  That is, "the aider and abettor must do something more than

8   commit acts that 'in some way' tenuously 'further[] … the common design' of a criminal

9   organization…. [Such] generalized assistance is not enough:  the assistance must be 'specifically

10  directed'—i.e., bear a direct causative relationship—to a specific wrongful act, and the assistance

11  must have a substantial effect on that wrongful act."  *Id*.

12         The mens rea element erects a similarly high bar, requiring that the defendant act with the

13  "*purpose* of facilitating" wrongdoing.  *Id*. at 1082.  A defendant's *knowledge* that his or her

14  conduct might assist in the perpetration of wrongdoing is insufficient:  "something more than mere

15  knowledge and assistance are required to hold commercial actors liable for third parties' violations

16  of international law."  *Id*. at 1094 (discussing *Talisman*).  This conclusion rests on sound policy

17  principles.  For "if ATS liability could be established by knowledge of … abuses coupled only

18  with such commercial activities as resource development, the statute would act as a vehicle for

19  private parties to impose embargos or international sanctions through civil actions in United States

20  courts.  Such measures are not the province of private parties but are, instead, properly reserved to

21  governments and multinational organizations."  *Talisman*, 582 F.3d at 264.

22         In *Aziz*, the Fourth Circuit held that ATS claims failed to satisfy this "purpose" standard

23  where they alleged that the defendant had aided and abetted genocide against Iraq's Kurdish

24  population by manufacturing a chemical used in the production of mustard gas and selling it to

25  Saddam Hussein's Iraqi regime.  *Id*. at 389.  Reasoning that mere knowledge is insufficient to

26  make out the purpose required, the Court held dismissal appropriate even though "the U.N.

27  Secretary General," "the governments of many countries," and the "international news media" had

28  all investigated and publicized "the Iraqi regime's large-scale use of mustard gas," and the

-20-                                    Case No. 5:11-cv-02449-EJD

1    complaint had alleged that the defendant "was aware that [the chemical] could be used to

2    manufacture mustard gas" and had pled guilty in a prior proceeding to having violated U.S. export

3    regulations by making the specific sales at issue in the complaint. *Id.* at 390-91. The allegations

4    of supposed aiding and abetting similarly fall far short here of any purpose to aid and abet the

5    human rights violations alleged to have been committed by Chinese authorities in China. *See also*

6    *Corrie v. Caterpillar*, 403 F. Supp. 2d 1019, 1027 (W.D. Wash. 2005), *aff'd on other grounds*,

7    503 F.3d 974, 977 (9th Cir. 2007) ("One who merely sells goods to a buyer is not an aider and

8    abettor of crimes that the buyer might commit, even if the seller knows that the buyer is likely to

9    use the goods unlawfully, because the seller does not share the specific intent to further the

10   buyer's venture.").

11         Similar claims against U.S. corporation Drummond, its domestic CEO, and its Colombia-

12   based security supervisor were likewise dismissed for insufficient "evidence of intent" in a case

13   involving alleged injuries inflicted by Colombian paramilitaries. *See Giraldo v. Drummond Co.,*

14   *Inc.*, No. 09-cv-1041, 2013 WL 3873965, at *4-6 (N.D. Ala. July 25, 2013) ("*Giraldo I*"); *id.*,

15   2013 WL 3873978, at *5-7 (N.D. Ala. July 25, 2013) ("*Giraldo II*"). The court there dismissed

16   the claims despite allegations that Drummond's CEO and security supervisor "approved (or at

17   least ratified) [a] partnership" with paramilitaries who inflicted physical injuries on Drummond's

18   Colombian railway lines; that they "formed," "implemented," and "maintained an active role in

19   Colombian security decisions" that Drummond paid for and benefited from and that purportedly

20   resulted in the physical injuries at issue; that they "approved payments to the Colombian military

21   after [being] notified that the military was controlling and supporting paramilitary groups in the

22   area"; and that they "knew" that Drummond's contractors had "connections to," "collaborated

23   with," and were "paying paramilitaries" who engaged in the violence at issue. *Giraldo I*, 2013

24   WL 3873965, at *4-5. Plaintiffs there alleged connections between Drummond, its CEO, its

25   security chief, and the Colombian paramilitaries who inflicted the alleged injuries that are deeper

26   than any alleged connection between Cisco and the Chinese authorities at issue here, but the court

27   nonetheless held that they did not suffice to show "intent to have noncombatants murdered along

28   Drummond's rail lines," as necessary to satisfy the "purpose" standard for mens rea. *Id.* at *5.

1    The court so held despite plaintiffs' argument that "a defendant intends all the natural and

2    probable consequences of [the] act knowingly done," such that the defendants must have

3    "intended that noncombatants be murdered because such was the natural consequence of …

4    knowing of the [paramilitaries'] presence around the mine and … Drummond's connection to

5    certain paramilitaries." *Id.*  (internal quotation marks omitted).

6         If the factual allegations in *Giraldo I* were insufficient to satisfy the "purpose" standard,

7    then there can be no question that the much more attenuated allegations here are also deficient.

8    The SAC alleges no facts to suggest that Defendants acted with the purpose to facilitate a specific

9    act of wrongdoing.   At most, the SAC alleges that Defendants had the purpose of assisting

10   Chinese authorities in locating, apprehending, and even prosecuting Falun Gong practitioners.

11   (*See*, *e.g.*, SAC ¶ 2.)   The mere act of assisting the police in apprehending a suspect is insufficient

12   to satisfy the requirement of purpose to aid and abet a human rights violation in the subsequent

13   treatment of that suspect.   *See Liu Bo Shan v. China Constr. Bank Corp.*, 2011 WL 1681995, at *4

14   (2d Cir. 2011) (summary order) (Plaintiffs "fail[ed] plausibly to allege that [Defendant China

15   Construction] Bank acted with the purpose that [Plaintiff] Liu be subjected to torture, cruel

16   treatment, or prolonged arbitrary detention by the police.").

17        The SAC alleges no specific facts manifesting the Defendants' supposed "purpose" to

18   subject Falun Gong practitioners to alleged human rights violations, or even facts supporting an

19   inference of "knowledge" of such likely results even if knowledge were the correct standard

20   (which it is  not).   As alleged in the SAC, the Plaintiffs suffered physical injuries perpetrated by

21   Chinese authorities.  (*See*, *e.g.*, SAC ¶¶ 230-261).   The SAC does not contain any allegation that

22   Defendants engaged in any of this conduct.   Further, aside from conclusory allegations that

23   Defendants' gave "substantial assistance and encouragement" to Chinese authorities, that

24   Defendants' conduct was a "substantial factor" in causing harm to Plaintiffs, and that Defendants

25   "knew" the Golden Shield would be used to torture, persecute, and otherwise case injury to

26   Plaintiffs (*id.* ¶¶ 1, 430, 439, 449), the SAC does not contain a single, specific *factual* allegation

27   particularizing any basis for these assertions or otherwise supporting aiding and abetting liability.

28   *See Iqbal*, 129 S. Ct. at 1949 (a complaint does not suffice "if it tenders naked assertions devoid of

1   further factual enhancements.") (quoting *Twombly*, 550 U.S. at 557, 570).  The allegation that

2   Defendants assisted in the development and manufacture of network infrastructure utilized by the

3   Chinese government in building the Golden Shield network cannot support a plausible inference

4   under *Iqbal* and *Twombly* that Defendants had the "purpose" or the "knowledge" to assist torture

5   of Falun Gong practitioners in Chinese prisons years later.  Nor do the vague allegations that

6   Cisco provided "antivirus software," "security software," or the like.  (SAC ¶¶ 191, 185).[11]

7          To the extent there are any specific factual allegations in the SAC, those allegations at

8   most suggest that Defendants acted with knowledge that the Golden Shield could be useful in

9   facilitating the *lawful* activities of the Chinese police in suppressing crime of all varieties.  The

10  SAC alleges that the Golden Shield was a surveillance system—a set of technologies that enabled

11  Chinese law enforcement authorities to lawfully locate individuals engaged in illegal activities.

12  Specifically, the SAC variously alleges that the Golden Shield enabled authorities to "identify";

13  "locate"; "log"; "profile"; "track"; "monitor"; "investigate"; "surveil"; and thereby "apprehend";

14  "detain"; and "interrogate" individuals that the police suspect of wrongdoing (*see, e.g.*, *id.* ¶¶ 1,

15  72, 79, 82, 83, 85, 91, 96, 97, 111-13, 124, 177)—all standard police activities that would assist

16  the authorities to legitimately "*fight [] against crime*" and "maintain social stability," including by

17  way of "the suppression of [illegal] dissident activity," (*id.* ¶¶ 125, 190) (emphasis added).[12]

18  Particularly because the practice of Falun Gong is allegedly "tied specifically to Internet use"

19

---

20  [11]  It is no accident that the Plaintiffs have made these allegations in vague fashion.  As the
    testimony cited in the FAC makes clear, there is nothing unusual or surprising about the provision

21  of antivirus or security software:  "[T]he technology that is used to manage and protect against
    hackers or viruses is the same generic technology that filter or control Internet access by children,

22  or the illegal downloading of copyrighted material …   This technology is a customary part of
    network management software of all major suppliers of Internet equipment—Cisco's and [its]

23  competitors'—and is basic to network functionality."  Chandler Testimony, written submission at
    2.  Thus, "there is no feasible way to manufacture equipment without these capabilities and it

24  would not be desirable or sensible to do so.  The management of information flow by a customer
    cannot be prevented by Cisco unless we are to also prevent the originally intended use of this

25  technology, which would expose the Internet to the full risks of inevitable daily attacks.  Networks
    attached to the Internet would literally stop working."  *See id.* at 3.

26  [12]  Because the practice of Falun Gong is illegal in China, it is similarly difficult to understand the
    relevance of the SAC's allegations that Cisco "set up a special Cisco Public Security marketing

27  team specifically to ascertain and help Cisco meet Chinese security objectives" (SAC ¶ 56),
    including to "'stop' Falun Gong" (*id.* ¶ 59).

28

(SAC ¶ 3), nothing in any of the SAC's allegations, and no factual allegation anywhere else in the SAC, supports the factual leap that Plaintiffs urge—from an allegation that Defendants' technology assisted the police in their *lawful* duties, to an allegation that Defendants acted with the knowledge or purpose that Chinese authorities would use this technology for *unlawful* purposes.[13]

The 87-page SAC, which reflects plaintiffs' third attempt to piece together an actionable claim in response to Cisco's motions to dismiss, has made Plaintiffs' pleading failures even clearer than before.  Rather than allege facts plausibly suggesting Cisco's purpose or knowledge to engage in wrongdoing, Plaintiffs have instead added pages of irrelevant technical detail concerning the specific features of the Golden Shield that allegedly "facilitate[d] [Chinese authorities'] *identification* of Falun Gong believers" (SAC ¶ 97), and which amount to a laundry list of ordinary crime control technologies:  Systems to "detect," "block[]," and "log" suspected unlawful communications using "algorithms" and "usage profiles"; to assist in "networked video surveillance"; to "integrat[e] the data entering the system" with systems maintained by "mobile and front line police" and other authorities; to "alert" authorities of suspected wrongdoing; and the like.  (SAC ¶ 97-98; *see also id.* ¶¶ 80, 83.)  None of that comes close to plausible evidence of human rights abuse by Cisco.

### 4.    The Allegations Do Not Support Any Other Form Of Secondary Liability

The SAC's conclusory allegations (SAC ¶¶ 385, 390, 396, 399, 403, 408, 412, 416) that

---

[13]  The handful of news reports cited in the SAC do not alter this conclusion.  (*See* SAC ¶¶ 160-163).  Stray news reports with unproven and anecdotal accounts of police misconduct are insufficient to impute to Cisco the purpose or knowledge that its products would be used to commit the specific acts at issue here.  The same is true of the other publications cited in the SAC. *Id.*  Any "knowledge" requirement, even if it were legally applicable (which it is not), would be rendered entirely meaningless if the mere existence of a State Department report were sufficient to make every participant in global commerce liable for aiding and abetting international law.  Any contention to the contrary was rejected in *Nestle*, which followed the majority rule in rejecting the "knowledge" standard, but explained that even on that standard there must be knowledge of the "*specific* crime" at issue and "of the relationship between [the defendant's] conduct and the wrongful acts."  *Nestle*, 748 F. Supp. 2d at 1082-83.  That is, "[i]t is not enough… [to allege knowledge] … that crimes were being committed," as Plaintiffs attempt to do here.  *Id.*  Instead, there must be knowledge that the Defendants' "acts or omissions *assisted* in the crimes."  *Id. See also Aziz,* 2011 WL 4349356, at *1-2 (dismissing complaint on "purpose" standard notwithstanding news articles, state department warnings, U.N. reports, and the like).

1   Defendants are liable on a conspiracy or criminal enterprise theory should also be rejected, and

2   such claims dismissed.  *First*, those forms of liability are unavailable under the ATS or TVPA for

3   the reasons discussed above with regard to aiding and abetting.  *Second*, they would require the

4   same proof of mens rea as the claims for aiding and abetting, *see Talisman*, 582 F.3d at 260, and

5   should be dismissed for the same reason.  *Third*, even "assuming that the conspiracy claims are

6   cognizable, they require proof of an agreement."  *Mohamed v. Jeppesen Dataplan, Inc*., 614 F.3d

7   1070, 1085 n.7 (9th Cir. 2010).[14]  Here, as in *Jeppesen,* there are no particular factual allegations

8   of such an agreement.  Rather, "Plaintiffs' allegations confirm that their conspiracy claims depend

9   on proof of a covert relationship."  *Id.*[15]

10   ## C.   The ATS Does Not Provide A Basis For Liability Against Corporations

11   As an independent basis for dismissal, the ATS claims against Cisco fail because, as the

12   Second Circuit has explained, the ATS does not provide subject matter jurisdiction over or a

13   federal common law cause of action against corporations as opposed to natural persons.  *Kiobel v.*

14   *Royal Dutch Petroleum Co*., 621 F.3d 111, 149 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct.

15   1659 (2013).   Only individuals and states are properly subject to international law norms

16   actionable in U.S. courts; the principle of individual liability for violations of international law

17   "has been limited to natural persons—not 'juridical' persons such as corporations—because the

18   moral responsibility for a crime so heinous and unbounded as to rise to the level of an

19   'international crime' has rested solely with the individual men and women who have perpetrated

---

14   The Ninth Circuit cited *Talisman*, 582 F.3d at 260 (holding that, under either international law or domestic law, conspiracy liability under the ATS would require either an agreement or a criminal intention to participate in a common criminal design) and *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) (conspiracy liability under the ATS requires proof that "two or more persons agreed to commit a wrongful act").

15   To the extent the SAC asserts a conspiracy theory in support of its state-law or other claims, such claims should be dismissed for the same reasons identified above—the absence of an agreement to engage in a conspiracy.  Moreover, to the extent the SAC asserts a direct liability theory in support of any claim, such claims should be dismissed because there is no "factual allegation demonstrating [Defendants'] personal participation or willful direction" in the physical acts of harm allegedly committed by Chinese authorities against the Plaintiffs.  *See Liu Bo Shan*, 2011 WL 1681995, at *3 (2d Cir. May 5, 2011); *id.* ("mere assertion that the Bank acted 'jointly' with the Chinese police is insufficient to establish *direct* liability for the alleged abuses"); *Talisman*, 582 F.3d at 257 (construing allegation that defendant was "complicit in Government's abuses," but not "personally engaged in human rights abuses," as an aiding and abetting claim).

1    it." *Id.* at 119.   Indeed, "customary international law has steadfastly rejected the notion of

2    corporate liability for international crimes, and no international tribunal has ever held *a*

3    *corporation* liable for a violation of the law of nations." *Id.* at 120 (emphasis added).   There is

4    thus no "binding customary rule," accepted by the nations of the world with sufficient definiteness

5    and universality as to satisfy the "high bar" set forth in *Sosa v. Alvarez-Machain*, 542 U.S. 692,

6    727 (2004), that corporations are liable for the specific international law violations alleged as

7    against Cisco in the ATS counts of the SAC.

8        A district court in this Circuit reached the same conclusion in *Doe v. Nestle, S.A.*, 748 F.

9    Supp. 2d 1057 (C.D. Cal. 2010).   *Nestle*, now pending on appeal to the Ninth Circuit, held that

10           corporations as such may not presently be sued under *Sosa* and the [ATS].   There is
             no support in the relevant sources of international law for the proposition that
11           corporations are legally responsible for international law violations.   International
             law is silent on this question: no relevant treaties, international practice, or
12           international caselaw provide for corporate liability. Instead, all of the available
             international law materials apply only to states or natural persons. *Sosa*'s minimum
13           standards of definiteness and consensus have not been satisfied.

14    *Id.* at 1143-44.   Moreover, as *Nestle* made clear, whether corporations should be subject to

15    international law liability is a matter best left to Congress, and "to the extent that Congress has

16    ever addressed the question of corporate liability for violating international law, it has explicitly

17    refrained from extending liability beyond natural persons under the [TVPA]." *Id.* at 1144.

18        Although the Supreme Court affirmed *Kiobel* on the alternative ground that the ATS does

19    not apply to extraterritorial conduct, it did not disturb the Second Circuit's reasoning as to

20    corporate ATS liability.   *See Balintulo*, 2013 WL 4437057, at *7 n.26 (reiterating that "[t]he law

21    of this Circuit already provides …. that corporations are not proper defendants under the ATS").

22    And while several other circuits have held, contrary to the Second Circuit's ruling in *Kiobel*, that

23    corporations may be liable under the ATS, *see Exxon*,  654 F.3d at 57; *Flomo v. Firestone Natural*

24    *Rubber Co.,* 643 F.3d 1013, 1021 (7th Cir. 2011); *Sarei*, 671 F.3d at 761, *dismissed on remand,*

25    No. 02-56256, 2013 WL 3357740 (9th Cir. June 28, 2013), the D.C. and Ninth Circuit decisions

26    have now been vacated.   For this reason, this Court should dismiss the ATS claims as inapplicable

27    to Cisco if they are not dismissed on other grounds.

28

1     Moreover, even if corporate liability were otherwise permissible, the ATS claims against

2   Cisco should be dismissed as displaced by the TVPA insofar as they allege torture and cruel,

3   inhuman, and degrading treatment ("CIDT").   "The test for whether congressional legislation

4   excludes the declaration of federal common law is simply whether the statute speaks directly to

5   the question at issue."  *Am. Elec. Power Co. v. Connecticut,* 131 S. Ct. 2527, 2537 (2011)

6   (quotation marks and alterations in original omitted).   The TVPA does speak directly to liability

7   for torture and extrajudicial killing, and thus "occup[ies] the field" and precludes ATS claims for

8   torture unless those claims satisfy the TVPA's requirements.  *See Enahoro v. Abubakar*, 408 F.3d

9   877, 884-85 (7th Cir. 2005).  Furthermore,  the U.S. Supreme Court recently made clear that the

10   TVPA permits suits only against "individual[s]" who commit torture or extrajudicial killing, 28

11   U.S.C. § 1350, note § 2(a), and thus bars corporate liability.  *See Mohamad v. Palestinian*

12   *Authority*, 132 S. Ct. 1702, 1705 (2012).   Because corporate liability for torture and CIDT is

13   unavailable under the TVPA, it should not be imposed by federal common law under the ATS.

14                **D.       The Claims Do Not Allege Acts By Cisco Under Color Of State Law**

15     The TVPA provides relief only for wrongful acts committed "under actual or apparent

16   authority, or color of law, of [a] foreign nation." 28 U.S.C. § 1350 note § 2(a).  Likewise, the

17   customary international law norms actionable under the ATS are available only for wrongful acts

18   committed with state action (unless one of several narrow exceptions for "war crimes" and the like

19   applies, allowing application to private action).  *See Kadic*, 70 F.3d at 238-41.  "In construing the

20   term 'color of law' [in the TVPA context,] courts are instructed to look to jurisprudence under 42

21   U.S.C. § 1983."  *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (en banc) (cited in *Nestle*, 748

22   F. Supp. 2d at 1118); *see also Corrie*, 403 F. Supp. 2d at 1026 (citing *Arnold v. IBM*, 637 F.2d

23   1350, 1355-56 (9th Cir. 1981)).  "Color of law" requires a relationship between the defendant and

24   a state actor that is so close that the defendants' acts can fairly be characterized as being taken

25   jointly with the state, or are so intertwined with the state that the acts of the state can be imputed to

26   the defendant or vice versa; a mere contractual relationship is not enough.  *See*, *e.g., Brentwood*

27   *Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Bigio v. Coca-Cola Co.*,

28

1   239 F.3d 440, 448-49 (2d Cir. 2000)).[16]

2          Here, the SAC fails to allege any "close nexus" or "symbiotic relationship" between

3   Defendants and the Chinese authorities who allegedly injured the Plaintiffs, nor any acts by

4   Defendants "in concert" with or "intertwined with" those of the foreign government.  The most

5   that is (or could be) alleged is a commercial relationship whereby certain Cisco products were sold

6   (through intermediaries) to governmental entities, which then allegedly used those products during

7   the commission of separate acts of wrongdoing some number of months or years later.  The ATS

8   and TVPA claims should therefore be dismissed.

9          **E.      Several Of The ATS Claims Are Otherwise Defective**

10          To be actionable, ATS claims must "rest on a norm of international character accepted by

11   the civilized world and defined with a specificity comparable to the features of the 18th-century

12   paradigms [against violation of safe conducts, infringement of the rights of ambassadors, and

13   piracy]."  *Sosa*, 542 U.S. at 725.  In addition to the defects discussed above, the SAC's claims as

14   to CIDT, forced labor, and crimes against humanity fail this test.[17]

15          ***Cruel, Inhuman, and Degrading Treatment.***  Since *Sosa*, the lone federal appellate court

16   to have addressed the issue concluded that CIDT is not actionable under *Sosa*'s "vigilant

17   doorkeeping" standard.  *See  Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247

---

18   [16]  *See also Abdullahi v. Pfizer, Inc*., 562 F.3d 163, 188 (2d Cir. 2009) ("A private individual will
19   be held liable under the ATS if he 'acted in concert with' the state, i.e., 'under color of law.'")
     (quoting *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995)); *Romero v. Drummond Co., Inc.*,
20   552 F.3d 1303, 1317 (11th Cir. 2008) (private actor and the state must be in a "symbiotic
     relationship" "that involves the torture or killing alleged in the complaint"); *Rayburn ex rel.*
21   *Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (a "symbiotic relationship" between a
     private actor and the government may establish state action, but it must involve the "specific
22   conduct of which the plaintiff complains") (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S.
     40, 51 (1999)).

23   [17]  In addition, the allegation that Roe VIII is a "family member" of Doe VIII (SAC ¶ 310) does
24   not show that Roe VIII has standing to assert his ATS claim for extrajudicial killing.  Defendants
     reserve the right to seek dismissal on this basis, if necessary, following resolution of Plaintiffs'
25   request to proceed anonymously.  *See Bowoto v. Chevron Corp.*, No. 99-cv-2506, 2006 WL
     2455761, at *11 n.15 (N.D. Cal. Aug. 22, 2006) (inferring ATS standing requirement from TVPA,
26   and dismissing ATS/TVPA claims by siblings); TVPA § 2(a)(2) (extrajudicial killing may only be
     asserted by "legal representative, or … person who may be a claimant in an action for wrongful
27   death"); *A.D. v. Cal. Highway Patrol*, No. 07-cv-5483, 2009 WL 733872, at *4 (N.D. Cal. Mar.
     17, 2009) ("Only persons enumerated in [Cal. Civ. Proc. Code § 377.60] have standing to bring a
28   wrongful death claim.").

1   (11th Cir. 2005) (affirming dismissal of CIDT claims).[18]   And even if CIDT were universally

2   accepted or capable of specific definition, such claims still would   not be actionable under the

3   ATS because they are displaced by the TVPA.  *See* Part I.C above.

4        ***Forced Labor.***  The ATS claim for forced labor is also defective, because forced labor

5   while in prison is not an international law violation:  "Although forced prison labor … may be

6   condemnable in its own right, it is … not a state practice proscribed by international law."  *Bao Ge*

7   *v. Li Peng*, 201 F. Supp. 2d 14, 22 (D.D.C. 2000), *aff'd* 35 F. App'x 1 (D.C. Cir. 2002)

8   (unpublished) (citing Restatement (Third) of Foreign Relations Law § 702 (1986)); *see* 1930

9   Forced Labor Convention of the Int'l Labor Org., art. 2 (excluding from definition of forced labor

10  "[a]ny work or service exacted from any person as a consequence of a conviction").  And the

11  Thirteenth Amendment allows for "involuntary servitude … as a punishment for crime."  U.S.

12  Const., amend. XII, § 1.

13       Here, the three Plaintiffs who assert forced labor claims (He, Guifu, and Doe VI) allege

14  that they were sentenced to reeducation in labor camps (SAC ¶ 398), and *Bao* makes clear that

15  reeducation terms of this nature are permissible administrative decisions governed by specific

16  procedural requirements under Chinese law.  *See* Chu Decl. ¶¶ 33-35.

17       ***Crimes Against Humanity.***  The SAC fails to establish subject matter jurisdiction under

18  the ATS for the claimed crimes against humanity.  Crimes against humanity are reserved "only for

19  the most heinous of crimes, such as murder and extermination, slavery, ethnic cleansing, and

20  torture."  *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1300 (S.D. Fla. 2003),

21  *aff'd in relevant part*, 416 F.3d 1242 (11th Cir. 2005); *Doe v. Rafael Saravia*, 348 F. Supp. 2d

22  1112, 1157 (E.D. Cal. 2004). The Ninth Circuit has "assum[ed], without deciding" that a crime

23  against humanity claim requires an allegation of murder, extermination, or other predicate acts,

24

25  [18] Although some courts have held that CIDT is actionable under the ATS, many of these
    decisions recognize that there is no clear definition of any such norm.  *See*, *e.g.*, *Bowoto v.*
26  *Chevron Corp.*, 557 F. Supp. 2d 1080, 1093 (N.D. Cal. 2008) ("There is no widespread consensus
    regarding the elements of [CIDT]."); *Qi*, 349 F. Supp. 2d at 1321 ("There does not appear to be a
27  specific standard."). These cases erroneously failed to recognize that this lack of clear definition is
    fatal under *Sosa*.  *See Abagninin*, 545 F.3d at 737-38 (courts may not seek to "extend and
28  redefine" norms).

1    "when committed as part of a widespread or systematic attack" directed against any civilian

2    population, with knowledge of the attack.  *See Abagninin*, 545 F.3d at 741 & n.5.  The Second

3    Circuit recently assumed that a similar standard applies.  *See Talisman*, 582 F.3d at 257.[19]  As this

4    Court explained in *Bowoto v. Chevron Corp.*, No. 99-cv-2506, 2007 WL 2349343, at *10 (N.D.

5    Cal. Aug. 14, 2007), in granting summary judgment dismissing claims for crimes against

6    humanity even though they involved "hundreds of deaths and thousands of injuries" to villagers in

7    retribution for protests, *id.* at *10, "widespread" and "systematic" require  direction "against a

8    multiplicity of victims," *id.* at *3, and "a high degree of orchestration and methodical planning."

9    *Bowoto*, *id.* at *4.

10         The crimes against humanity claim here fails to meet this standard.  *First*, as compared to

11   the 70 to 100 million people who were allegedly practicing Falun Gong across all of China in

12   1999 (SAC ¶ 27), the SAC's speculative and unsubstantiated allegations specify, at most, "many

13   thousands" of class members (*id.* ¶ 366).  *Cf. Mamani v. Berzain*, 654 F.3d 1148, 1156 (11th Cir.

14   2011) (70 deaths and 400 injuries insufficient to state a claim in context of police action against

15   "thousands" of protesters).

16         *Second*, the SAC also fails to allege "systematic" attacks against a civilian population.  The

17   SAC makes no effort to allege individual or class claims on behalf of the 70 to 100 million Falun

18   Gong practitioners purportedly practicing in China in 1999.  (*See id.* ¶ 245 (alleging "thousands"

19   of class members)).  Rather, the SAC alleges the type of targeting based on particularized and

20   "individualized suspicion of engaging in certain behavior" held insufficient in *Bowoto*.  (*See id.*

21   ¶ 51).  Moreover, contrary to the requirement of a "regular pattern," Plaintiffs allege a variety of

22   disparate injuries, some of which were allegedly suffered while in police custody, some while in

23   penal institutions, and some due to due process violations.   While any instance of police

---

[19] Some courts have noted a more demanding standard, which requires an allegation of
wrongdoing in the course of armed conflict.  *See, e.g., Presbyterian Church of Sudan v. Talisman
Energy, Inc.*, 226 F.R.D. 456, 480 (S.D.N.Y. 2005) (citing Charter of the International Military
Tribunal at Nuremberg); *Bowoto*, 2006 WL 2455752, at *3-5 (citing Statute of the International
Criminal Tribunal for the Former Yugoslavia).   Because the SAC fails even under the less
demanding "widespread or systematic" standard, Defendants address that standard above,
*arguendo*.  Defendants reserve the right to assert that the "armed conflict" standard applies.

1    misconduct is profoundly disturbing and should not be condoned, it devalues human rights law to

2    make such allegations against Cisco and its employees, who did nothing but sell internet routers in

3    China as permitted by this nation's carefully considered export regulations.

4    **II.    THE STATE-LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED**

5         The SAC alleges state-law battery (Count 10); assault (Count 11); and false imprisonment

6    (Count 12) (collectively, the "state-law claims").  Each should be dismissed with prejudice: (a)

7    for lack of federal jurisdiction; (b) because California tort law does not apply extraterritorially; (c)

8    for untimeliness; and (d) for failure to sufficiently allege aider and abettor liability.

9         **A.    The State-Law Claims Should Be Dismissed For Lack Of Federal Jurisdiction**

10        As an initial matter, because the SAC does not allege original jurisdiction or facts

11   demonstrating complete diversity,[20] and because each of the federal claims resting on federal

12   question jurisdiction should be dismissed for the reasons stated in Parts I and IV herein, no basis

13   remains for this Court's exercise of supplemental jurisdiction over the state-law claims, which

14   should therefore be dismissed.  *See* 28 U.S.C. § 1367(c)(3) ("district court[] may decline to

15   exercise supplemental jurisdiction … [if it] has dismissed all claims over which it has original

16   jurisdiction"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal

17   claims are dismissed ... state claims should be dismissed as well").

18        **B.    California Tort Law Does Not Apply Extraterritorially**

19        The state-law claims should also be dismissed because they allege harms committed in

20   China, and the state tort law of California does not apply extraterritorially.  "[G]iven that the

21   Constitution entrusts foreign affairs to the federal political branches, limits state power over

22

23   [20] Specifically, the SAC asserts claims against Cisco, a California resident, on behalf of plaintiff
     Wang Weiyu, who may also be a California resident.  (*See* SAC ¶ 345 (alleging that Weiyu
24   "currently resides in the United States" without specifying his state of residence)); 28 U.S.C.
     § 1332(a)(2) (no diversity in "an action between citizens of a State and citizens or subjects of a
     foreign state who are lawfully admitted for permanent residence in the United States and are
25   domiciled in the same State"); *Bautista v. Pan Am. World Airlines, Inc*., 828 F.2d 546, 552 (9th
     Cir. 1987) (holding that "[t]he essential elements of diversity jurisdiction, including the diverse
26   residence of all parties, must be affirmatively alleged in the pleadings" and remanding because
     although "the complaint [did] allege that [defendant's] corporate citizenship is in 'a State other
27   than California,' nowhere does it allege that the plaintiffs are all citizens of California") (quoting
     *In re Mexico City Aircrash*, 708 F.2d 400, 404 n.4 (9th Cir. 1983)).

28

-31-                                      Case No. 5:11-cv-02449-EJD

foreign affairs, and establishes the supremacy of federal enactments over state law, *the presumption against extraterritorial application is even stronger in the context of state tort law.*" *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 250, 231 (4th Cir. 2012) (Wilkinson, J., dissenting on other grounds) (emphasis added) (citations omitted); *see also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1188 (C.D. Cal. 2005) (dismissing state-law tort claims under the foreign affairs doctrine because "strong federal policy interests outweigh the weak state interests involved").

Courts have thus held that California statutes do not apply extraterritorially, barring an express legislative pronouncement.  *See Maez v. Chevron Texaco Corp.*, No. 04-cv-790, 2005 WL 1656908, at *3 (N.D. Cal. July 13, 2005) ("Under California law, there is a presumption against applying state laws extraterritorially to encompass conduct occurring in a foreign jurisdiction.") (citing *N. Alaska Salmon Co. v. Pillsbury Council, Inc.*, 162 P. 93, 94 (Cal. 1914)); *Diamond Multimedia Sys. v. Superior Court*, 968 P.2d 539, 554 n.20 (Cal. 1999)); *cf. Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008) ("Uniformly, the cases invoke the presumption [against extraterritoriality] when applying a statute would have the effect of regulating specific conduct occurring abroad.") (collecting cases).  It follows that the California common law of torts has no application to injury that took place entirely overseas.  *Cf. Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs. SARL*, No. 10-cv-12257, 2012 WL 748304, at *8 (E.D. Mich. Mar. 6, 2012) ("common law claims …, which only allege conduct abroad, must be dismissed").

For similar reasons, courts in other U.S. jurisdictions routinely dismiss state-law claims alleging conduct committed entirely abroad.  One such example is *In re Chiquita Brands International, Inc.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011), in which the court dismissed state-law claims for assault, battery, intentional infliction of emotional distress, and negligence against a U.S. corporation for injuries in Colombia of Colombian victims at the hands of Colombian paramilitaries, reasoning that "the civil tort laws of Florida, New Jersey, Ohio, and the District of Columbia do not apply to the extraterritorial conduct," *id.* at 1355, and are not "matters of universal concern recognized by the community of nations," *id.* (citing *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1024 (S.D. Ind. 2007)).  *See also Romero*, 552 F.3d at 1318 (in ATS case,

1  affirming dismissal of "plaintiffs' claims, under Alabama law, for assault, intentional infliction of

2  emotional distress, negligent supervision, false imprisonment, and negligent infliction of

3  emotional distress because Alabama law does not apply to injuries that occurred outside the

4  state"); *Bridgestone*, 492 F. Supp. 2d at 1024 (in ATS case, dismissing state tort law claims

5  because "[p]laintiffs have not yet articulated a viable basis for applying California law or Indiana

6  law to [conduct] in Liberia").[21]

7         Even if California common law were applicable to the purely extraterritorial allegations at

8  issue here, the state-law claims should still be dismissed for lack of prudential standing.  The

9  prudential standing inquiry generally requires that "the interest sought to be protected by the

10 complainant arguably [must be] within the zone of interests to be protected or regulated by the

11 statute ... in question."  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939-40 (9th Cir.

12 2005); *see also Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 797 n.5 (9th Cir. 2013) (that

13 plaintiff's claims "fall within the zone of interests of … state law" is a "necessary" condition to

14 establishing prudential standing).  Chinese nationals asserting injuries that took place in China are

15 not within the zone of interests protected by California state law.

16     **C.     The State-Law Claims Are Untimely**

17        Even if this Court were to consider the state-law claims, it should dismiss them as barred

18 by applicable statutes of limitation.  The applicable statute of limitation is two years for assault

19 and battery, Cal. Civ. Proc. Code § 335.1, and one year for false imprisonment, *id.* § 340(c).[22]

20

21 [21]  The Court need not determine whether Chinese law applies to the state-law claims.  The SAC
   does not indicate that Plaintiffs are pursuing tort claims under Chinese law, and Plaintiffs have not
22 filed a notice of reliance upon foreign law pursuant to Fed. R. Civ. P. 44.1.  *See Viera v. Eli Lilly
   & Co.*, No. 09-cv-0495, 2011 WL 2144413, at *1 (S.D. Ind. May 31, 2011) ("constru[ing] [the
23 Complaint] to present only Indiana common law claims" because it did not assert tort claims under
   foreign law and plaintiffs had not filed a Rule 44.1 notice).

24 [22]  Alternatively, Plaintiffs' claims should be dismissed because they are untimely under Chinese
25 law.  Under Cal. Civ. Proc. Code § 361, "when a cause of action has arisen in another jurisdiction
   but cannot be maintained against a particular defendant in that jurisdiction because of the lapse of
26 time, the action cannot be maintained against that defendant in a California court," except in
   circumstances not applicable here when the action is brought by a California citizen.  *McCann v.
27 Foster Wheeler LLC*, 225 P.3d 516, 525 (Cal. 2010).  Because Plaintiffs' causes of action arose
   when they sustained their injuries in China and because, "[u]nder the law of China, the longest
28 applicable statute of limitations is two years for civil suits," *In re World War II Era Japanese*
                                                                              ***(footnote continued)***

**False Imprisonment.** Plaintiffs Ivy He, Liu Guifu, and Doe VI bring claims for false imprisonment. The one-year limitations period as to those claims expired long ago. (*See* SAC ¶ 261 (He was released in 2004); *id.* ¶ 344 (Guifu was released in 2007); *id.* ¶ 299 (Doe VI was released in 2008).) These claims should therefore be dismissed.

**Assault and Battery.** Claims of assault and battery carry a two-year statute of limitations. The claims of He, Guifu, and Doe VI are barred by this limitations period for the same reasons discussed above. The same is true for Plaintiffs Lee, Doe II Doe V, and Weiyu. (*See* SAC ¶ 332 (Lee was released in 2006); *id.* ¶ 379(e) (Doe II was released in 2005); *id.* (Doe V was released in 2008); *id.* ¶ 354 (Weiyu released in February 2011, more than two years before August 15, 2013 when he was added as a new plaintiff in the SAC).)[23] Does I, III, IV and IX do not allege that any acts of assault or battery occurred during the limitations period; rather, they make only general, vague allegations that do not provide notice of specific actionable assaults or batteries—there are no dates, descriptions, or anything other than general, conclusory allegations of injury.[24] Because these Plaintiffs have not alleged facts establishing plausible, concrete, and timely claims of assault and battery sufficient to put Defendants on fair notice, these counts should be dismissed.

**Equitable Tolling.** Plaintiffs' delay in filing cannot be excused by "equitable tolling," which "is unavailable in most cases." *Walker v. Pacific Maritime Assoc.*, No. 07-cv-3100, 2009 WL 1068886, at *3 (N.D. Cal. Apr. 29, 2009) (quotation marks omitted); *see also Sanchez v. Poole*, 79 F. App'x 254, 255 (9th Cir. 2003) ("[T]he threshold necessary to trigger equitable

---

*Forced Labor Litig.*, 164 F. Supp. 2d 1160, 1182 (N.D. Cal. 2001), *aff'd sub nom. Deutsch v. Turner Corp.*, 324 F.3d 692, 716-17 (9th Cir. 2003), the state-law claims are time-barred.

[23] Mr. Weiyu's claims do not relate back to the date of the initial complaint. *See Rosenbaum v. Syntex Corp.*, 95 F.3d 922, 935 (9th Cir. 1996) ("An amendment adding a party plaintiff relates back to the date of the original pleading only when: 1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff.").

[24] *See* SAC ¶ 237 ("[i]n prison, [Doe I] was subjected to severe torture and forced labor"); *id.* ¶ 273 ("in prison, [Doe III] was subjected to severe beatings on several occasions and other forms of torture and persecution"); *id.* ¶ 285 ("[I]n prison, [Doe IV] was subjected to torture and persecution. He was deprived of sleep for weeklong periods of time, beaten, and in other ways injured physically and mentally"); *id.* ¶ 319 ("During her current and previous periods of detention, [Doe IX] [h]as been subjected to the same or highly similar forms of physical and mental abuse as those described in the paragraphs above.").

---

1    tolling is very high, lest the exceptions swallow the rule." (internal quotation marks omitted)).  As

2    relevant here, for equitable tolling to be available, "the plaintiff bears the burden of establishing

3    (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstances

4    stood in his way and prevented timely filing." *Montoya v. Regents of Univ. of Cal.*, No. 09-cv-

5    1279, 2010 WL 2731767, at *5 (S.D. Cal. July 9, 2010)); *see also Huynh v. Chase Manhattan*

6    *Bank*, 465 F.3d 992, 1004 (9th Cir. 2006) (plaintiffs must allege that "extraordinary circumstances

7    … made it impossible" to timely file).   This showing must be supported by specific factual

8    allegations in the pleading.  *See Beagle v. Rite Aid Corp.*, No. 08-cv-1517, 2009 WL 3112098, at

9    *11 (N.D. Cal. Sept. 23, 2009).  Plaintiffs here cannot meet this burden for three reasons:

10         *First,* Plaintiffs offer no argument or factual allegation for why timely filing was

11   "impossible."   For example, Plaintiffs allege they feared "retribution against them, their family

12   and friends" (SAC ¶ 376; *see also id.* ¶ 379(e) (Does II, III, V and VI live in China "in fear of

13   further abuse"); *id.* ¶ 379(d) (He feared "retaliation from the Party" if she proceeded,

14   notwithstanding that she lived in Canada)), and also cite to concerns about China's "repression,

15   torture and other crimes against humanity" (*id.* ¶ 375), the "political climate in China" (*id.* ¶ 377),

16   and the persecution of Falun Gong lawyers (*id.* ¶ 378).  .   However serious these concerns,

17   Plaintiffs allege in their SAC that they continue to have the same fears and concerns today (*id.*

18   ¶¶ 376, 378-79), and indeed it is these very fears and concerns that underlie the Plaintiffs' request

19   to litigate this case anonymously and through next friends.   It is difficult to square Plaintiffs'

20   ability to file their Complaint today notwithstanding their concerns with their contention that the

21   same concerns made it "impossible" to file the Complaint within the limitations period.

22         *Second*, in any event, generalized allegations of fear and concern, such as those here,

23   cannot support equitable tolling.  *See Rosenblum v. Yates*, No. 09-cv-3302, 2011 WL 590750, at

24   *3 (E.D. Cal. Feb. 10, 2011) (plaintiff "has merely made a generalized allegation that his fear of

25   retaliation made him delay in filing the petition, which is insufficient to meet his high burden" of

26   showing extraordinary circumstances).

27         *Third*, incarceration is not an "extraordinary circumstance" that justifies equitable tolling.

28   (*Cf.* SAC ¶ 379).  Under California law, statutes of limitation may be tolled for a maximum of two

1   years during incarceration.  Cal. Civ. Proc. Code § 352.1(a).  To toll such claims any longer as a

2   matter of course would undermine this statutory provision.  As one court observed, "difficulties

3   attendant on prison life" such as solitary confinement and lockdowns are not "extraordinary

4   circumstances," sufficient to indefinitely toll the statute of limitations.  *Robinson v. Marshall*, No.

5   07-cv-1606, 2008 WL 2156745, at *3 (C.D. Cal. May 18, 2008) (internal quotation marks

6   omitted).  Plaintiffs must provide factual allegations for why filing claims while in prison was not

7   only difficult, but "impossible."  They have not done so.[25]

8          **D.     The State-Law Allegations Do Not Support Aiding And Abetting Liability**

9          Even if this Court were inclined to consider Plaintiffs' state-law claims, these claims do

10  not allege that Defendants directly engaged in acts of assault, battery, or false imprisonment and

11  fail to allege that Defendants *intended* to aid and abet Chinese police, guards, judges, and other

12  Chinese authorities in committing these torts.  Under California law, a defendant can be held liable

13  for aiding and abetting "only if he or she knew that a tort had been, or was to be, committed, and

14  acted *with the intent of facilitating the commission of that tort*."  *Casey v. U.S. Bank Nat'l Ass'n*,

15  26 Cal. Rptr. 3d 401, 407 (Cal. Ct. App. 2005) (citation omitted); *see also id.* at 406 ("California

16  courts have long held that liability for aiding and abetting depends on proof the defendant had

17  actual knowledge of the specific primary wrong the defendant substantially assisted.") (citing *In*

18  *Lomita Land Water Co. v. Robinson*, 97 P. 10, 15 (1908)); *Facebook, Inc. v. MaxBounty, Inc.*, 274

19  F.R.D. 279, 285 (N.D. Cal. 2011) (under California law, allegations that defendant "aids and abets

20  [unlawful activity] by providing technical support, suggestions … , and financial incentives to

21  affiliates … merely provide a formulaic recitation of a cause of action and lack factual support")

22  ---

    [25] Plaintiffs' additional bases for equitable tolling fare no better.  For example, Plaintiffs allege

23  that Lee's claims should be tolled because he "continued to suffer depression and anxiety" after
    his release in 2006.  (SAC ¶ 379(f)).  Depression and anxiety, even if truly felt, do not warrant

24  equitable tolling.  *McRee v. Goldman*, No. 11-cv-991, 2012 WL 929825, at *7 (N.D. Cal. Mar. 19,
    2012) (allegations of "frustration, anxiety, cancer and recuperation … fall short of establishing

25  that this is the extreme and rare case where  equitable tolling is warranted").  Nor does Lee explain
    why he is now able to file.  Likewise, Guifu's allegation that her claims should be tolled until she

26  became a permanent resident because she feared being forced to return to China (SAC ¶ 379(g))
    cannot support equitable tolling, as there is no basis in law that only permanent residents may file

27  lawsuits or that non-permanent status is "extraordinary."  Weiyu's request for tolling "while he
    was detained and [even afterward] while he remained in China under security surveillance and

28  close monitoring" is similarly unavailing.  *Id.* ¶ 379(i).

1    (quotation marks and citations omitted).

2          The SAC falls far short of this requirement.  It alleges only that Cisco, by providing the

3    Chinese government with technology used in building the Golden Shield, provided "substantial

4    assistance or encouragement to the [CCP] and Public Security officers" in carrying out these acts

5    and that Defendants' conduct was a "substantial factor in causing harm to Plaintiffs."  (SAC

6    ¶¶ 430, 439, 449.)  Because Plaintiffs allege intent only to supply technology, and not any "actual

7    knowledge" of the specific tort to be committed or intent to facilitate the commission of the

8    specific tort, the state-law claims warrant dismissal.  Moreover, because there are multiple steps

9    between Cisco's provision of general networking infrastructure to entities selling to the Chinese

10   government and the commission by Chinese police and prison guards of torts of assault, battery,

11   and false imprisonment, the SAC fails to allege that Cisco provided "substantial assistance."

12         **E.      The State-Law Claims Fail To Allege Causation**

13         Likewise, Plaintiffs' state-law claims fail to allege actual or proximate causation—a

14   necessary element under California law for each of the torts alleged.[26]  Beyond alleging that the

15   Golden Shield was used to *identify* individuals who were practicing Falun Gong in violation of

16   Chinese law, the SAC does not and could not allege specific facts suggesting that the Golden

17   Shield was ever used to physically *injure* or otherwise mistreat the Plaintiffs.  For example, the

18   SAC alleges that the Golden Shield was "the sole or essential means by which Plaintiffs could be

19   identified as Falun Gong by security officers," and is explicit that it was only later that the officers

20   allegedly "committed [wrongful] acts against Plaintiffs."  (SAC ¶ 436; *see also*, *e.g.*, *id.* ¶ 9

21   ("Without the Golden Shield apparatus, Chinese security officers *could not have conducted online*

22   *surveillance* to identify specific online Falun Gong articles written or downloaded by Doe I, which

23   were used to target her for detention and other forms of abuse.") (emphasis added).)  Such

24   allegations fall far short of any allegation that Defendants' alleged sale of networking equipment

25   in China was either a "but for" or proximate cause of the alleged injuries.  Conclusory allegations,

26

27   _____

     [26]  *See Brown v. Ransweiler*, 89 Cal. Rptr. 3d 801, 811 (Cal. Ct. App. 2009) (battery); *Yung Hee*
     *So v. Sook Ja Shin*, 151 Cal. Rptr. 3d 257, 269 (Cal. Ct. App. 2013) (assault); *Shoyoye v. Cnty. of*
28   *Los Angeles*, 137 Cal. Rptr. 3d 839, 851 (Cal. Ct. App. 2012) (false imprisonment).

1  such as that "without the Golden Shield apparatus, it would have been virtually impossible for

2  Chinese security officers to [commit] … abuses" (*id.* ¶ 9) are thus irrelevant and insufficient.

3  **III.     THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED**

4         The Court should dismiss with prejudice Plaintiffs' claim of unfair business practices,

5  brought under California Business and Professions Code § 17200 *et seq.* (the "UCL"), because the

6  UCL does not apply extraterritorially or extend to the sort of injuries alleged by Plaintiffs.

7         **A.     The UCL Does Not Apply Extraterritorially**

8         California courts have repeatedly recognized that the UCL "does not support claims by

9  non-California residents where none of the alleged misconduct or injuries occurred in California."

10 *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal.

11 2005) (citing *Norwest Mort., Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18, 23 (Cal. Ct. App.

12 1999)).[27]  Here, none of the Plaintiffs is alleged to be a California resident.  Further, none of the

13 alleged misconduct or injuries is alleged to have occurred in California, as discussed in Part I.A

14 above.  *See Nestle*, 748 F. Supp. 2d at 1122-23 (dismissing UCL claim for failing to "articulate

15 any theory through which the child-laborer Plaintiffs were harmed by Defendants' California-

16 based conduct").  Thus, Plaintiffs' UCL claim should be dismissed with prejudice.

17        **B.     The Allegations Of Lost Income Are Too Attenuated**

18        Even if the Court were to entertain Plaintiffs' UCL claim, it should be dismissed because

19 the relationship between Plaintiffs' purported injury and Cisco's conduct is far too "remote,

20 attenuated and consequential."  *Lorenzo v. Qualcomm Inc.*, No. 08-cv-2124, 2009 WL 2448375, at

21 *6 (S.D. Cal. Aug. 10, 2009) (dismissing UCL claim).  Plaintiffs allege that Cisco's sales of

22 internet equipment "gave Cisco an unfair competitive advantage over its competitors" (SAC

23 ¶ 455) with the result that "Plaintiffs lost income that they could not receive during the period of

24

---

25 [27]  *See also Nestle*, 748 F. Supp. 2d at 1122 ("California courts have consistently held that out-of-state plaintiffs may not bring [UCL] claims for out-of-state misconduct or injuries."); *Oracle*

26 *Corp. v. SAP AG*, 734 F. Supp. 2d 956, 968 (N.D. Cal. 2010) (dismissing unfair competition claim because "the UCL does not apply to out-of-state conduct that does not cause injury in California");

27 *Arabian v. Sony Elec., Inc.*, No. 05-cv-1741, 2007 WL 627977, at *9 (S.D. Cal. Feb. 22, 2007) (dismissing UCL claim because "[t]here is a presumption against California law being given

28 extraterritorial effect when the wrongful act as well as the injury occurred outside California").

their detention" (*id.* ¶ 456) and, in some cases, "after their release from detention," (*id.*).  Plaintiffs

are not competitors with Cisco, nor do they explain how Cisco's alleged acts may have provided it

with any competitive advantage.  Moreover, as the SAC alleges, Plaintiffs lost income as a result

of the independent actions of Chinese authorities, negating any UCL claim against Cisco.  *See*

*Jane Doe I v. Wal-Mart Stores, Inc.*, No. 05-cv-7307, 2007 WL 5975664, at *6 (C.D. Cal. Mar.

30, 2007) ("Plaintiffs do not allege facts showing that they lost money 'as a result of' Defendant's

false or deceptive advertising.  Plaintiffs do not even claim to be consumers of Defendant's

products.  Instead, Plaintiffs claim to have lost money as a result of the independent actions of

their employers, who were influenced by Defendant's actions.").  The UCL claims here stretch the

notion of unfair competition beyond the bounds of recognition.[28]

## IV.    THE ECPA CLAIM SHOULD BE DISMISSED

The Court should dismiss Plaintiffs' claim (Count Nine) brought under § 2512(1) of the

ECPA because (a) the ECPA does not apply extraterritorially; (b) § 2512 does not afford a private

right of action and (c) Defendants satisfy the exception to ECPA liability afforded by § 2512(2).

### A.    The ECPA Does Not Apply Extraterritorially

The SAC does not allege that any "surreptitious interception of their electronic

communication, wire and/or oral communications" (SAC ¶ 419) took place in the United States;

rather, every act of surreptitious interception associated with Defendants' technology is alleged to

have occurred in China, conducted by Chinese authorities.  Because the only alleged acts that

could give rise to an ECPA claim occurred extraterritorially, Plaintiffs' ECPA claim should be

dismissed.    As discussed above in Part I.A, there is a strong presumption against the

extraterritorial application of statutes absent a "clear indication" of congressional intent.  *See*

*Morrison*, 130 S. Ct. at 2877-78.

As this Court found in *Zheng v. Yahoo! Inc.*, No. 08-cv-1068, 2009 WL 4430297 (N.D.

Cal. Dec. 2, 2009), this strong presumption applies against ECPA claims, for "no language in the

---

[28]  In addition, the statute of limitations for a UCL claim is four years.  *See* Cal. Bus. & Prof. Code
§ 17208.  For the reasons set forth in Part II.C, UCL claims that accrued before May 19, 2007 (or
September 18, 2009 as to newly-added Plaintiffs Weiyu and Doe IX), are time-barred.

1    ECPA itself suggests an intent that its provisions apply to interceptions and disclosures occurring

2    in other countries," *id.* at *3, and "the available legislative history not only fails to include any

3    statement indicating Congress intended the ECPA to apply outside the United States, the

4    legislative history, specifically, Senate Report No. 99-541, clearly expresses Congress's intent that

5    the ECPA not apply to interceptions outside the United States," *id.*   The court accordingly

6    dismissed with prejudice allegations that Yahoo! disclosed certain information about Chinese

7    Yahoo! users to the Chinese government, which then used that information to injure those users.

8    *Id.* at *4.   In reaching this conclusion, the court reasoned:

> Although it does not appear that any court has expressly considered whether the
> ECPA applies outside the United States, the Ninth Circuit … has held that the
> version of the Wiretap Act in existence prior to its amendment by the ECPA had
> "no extraterritorial effect." …   In so holding, the Ninth Circuit cited two Second
> Circuit decisions, each of which, in turn, cited the reasoning set forth in *United
> States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974).   In finding that the pre-ECPA
> version of the Wiretap Act had "no application outside of the United States," the
> Second Circuit, in *Toscanino*, relied on a statement in the legislative history that
> "[t]he term 'wire communication,' as used in the [Wiretap Act], is intended to refer
> to communications 'through our Nation's communications network,'" *see id.* at 279
> (quoting 1968 U.S.C.C.A.N. 2178), and the fact that the [Wiretap Act], in
> "prescribing the procedures to be followed in obtaining a wiretap authorization,"
> made "no provision for obtaining authorization for a wiretap in a foreign country."

16   *Id.* (certain internal citations omitted).   *Zheng*'s analysis of the ECPA and Wiretap Act similarly

17   establish that Plaintiffs' ECPA claim cannot apply extraterritorially here, and should be dismissed.

18   **B.      There Is No Private Right of Action Under ECPA § 2512**

19   Plaintiffs' ECPA claim should also be dismissed because § 2512 of the ECPA does not

20   provide a private right of action.   Section 2512(1)(b)[29] provides as follows:

> [A]ny person who intentionally … (b) manufactures, assembles, possesses, or sells
> any electronic… or other device, knowing or having reason to know that [its]
> design … renders it primarily useful for the purpose of the surreptitious
> interception of wire, oral, or electronic communications … shall be fined under this
> title or imprisoned not more than five years, or both.

24   18 U.S.C. § 2512(1)(b).   Further, § 2520(a) of the ECPA provides that "any person whose wire,

25   oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of

26   this chapter may in a civil action recover from the person or entity … which engaged in *that*

_____

[29] Although the SAC does not specify which subsection of § 2512(1) is at issue, its allegations
track subsection § 2512(1)(b).   The analysis here is the same under any subsection.

1   *violation* such relief as may be appropriate" (emphasis added).

2       Most courts—including every Circuit to address the issue—agree that the plain language

3   of § 2520 does not afford a private right of action for violation of § 2512 for two reasons. *First*,

4   civil liability under § 2520 attaches only to the person or entity that engaged in "that violation,"

5   *i.e.*, the person or entity that "intercepted, disclosed, or intentionally used" the plaintiff's

6   communication. Because § 2512(1)(b) is limited to the manufacture, assembly, possession, or sale

7   of a device, but not the actual interception, disclosure, or intentional use of the device, no private

8   right of action against the manufacturer is available. *Second*, § 2520 closely tracks the criminal

9   offenses set out in § 2511 (*i.e.*, the interception, disclosure, or intentional use of intercepted

10   communications), not those set out in § 2512; thus, § 2520 is intended to provide a private right of

11   action for § 2511 violations, but not § 2512 violations.

12       The court in *Potter v. Havlicek*, 06-cv-211, 2008 WL 2556723 (S.D. Ohio June 23, 2008),

13   examined this issue in detail. In *Potter*, defendant Deep Software was alleged to have

14   manufactured and sold a software product which, once installed, automatically records and stores

15   all activity on that computer. *Id.* at *2. In assessing whether Deep Software could be sued under

16   § 2512 for manufacturing and selling the software, the Court concluded that, "based upon a

17   reading of the current version of the plain language of section 2520," no such private right exists

18   under § 2512. *Id.* at *5-7. The court adopted the analysis of *DIRECTV, Inc. v. Nicholas*, 403 F.3d

19   223, 227 (4th Cir. 2005), which held that "[t]he express language of § 2520 is … not susceptible to

20   a construction which would provide a cause of action against one who manufactures or sells a

21   device in violation of § 2512 but does not engage in conduct violative of § 2511" (quoting

22   *Flowers v. Tandy Corp.*, 773 F.2d 585, 588-89 (4th Cir. 1985)).

23       *Potter* further noted that no court of appeals had found that a private right of action exists

24   for violation of § 2512. *See* 2008 WL 2556723, at *5-6 (citing *DIRECTV v. Robson*, 420 F.3d

25   532, 539 (5th Cir. 2005); *DIRECTV, Inc. v. Treworgy*, 373 F.3d 1124, 1127-28 (11th Cir. 2004)).

26   District courts concur that § 2512 does not provide a private right of action. In *In re DIRECTV,*

27   *Inc.*, No. 02-cv-5912, 2004 WL 2645971, at *8 (N.D. Cal. July 26, 2004), for example, Judge

28   Ware held that, "[l]ike § 2511(1)(a), § 2512(1)(b) is a criminal statute. Unlike § 2511(1)(a),

1   however, there is no parallel statute which provides a private right of action for violations of

2   Section 2512(1)(b). … Therefore, the plain language of § 2520(a) does '[not] create a private right

3   of action against a person who possesses a device in violation of § 2512.'" (quoting *Treworgy*, 373

4   F.3d at 1129).  *See also Luis v. Zang*, No. 11-cv-884, 2013 WL 811816 (S.D. Ohio Mar. 5, 2013)

5   ("[C]ourts in the Sixth Circuit universally have held that 18 U.S.C. § 2520(a) does not provide a

6   private right of action for criminal violations of 18 U.S.C. § 2512.").  Because no private right of

7   action exists for violations of § 2512, Plaintiffs' ECPA claim should be dismissed with prejudice.

8           **C.      The Allegations Concern Exempted "Normal Course of Business" Activity**

9           Finally, even if the allegations were actionable under ECPA, Defendants fall within the

10  exemption afforded by § 2512(2).  This provision states in relevant part that it is not unlawful for

11  "a provider of wire or electronic communication service or [its] … employee … *in the normal*

12  *course of the business*…, [to]sell any … device knowing or having reason to know that [its] design

13  … renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or

14  electronic communications."  18 U.S.C. § 2512(2)(a).  Here, the SAC's allegations admit that all

15  of Cisco's alleged actions were taken in the normal course of business.[30]

16  **V.     THE CLAIMS AGAINST CISCO EXECUTIVES SHOULD BE DISMISSED**

17          The Court should independently dismiss Plaintiffs' claims against Cisco CEO John

18  Chambers and executive Fredy Cheung, because the SAC fails to allege a single fact to suggest

19  that they knew of the wrongful acts alleged in the SAC, much less had any purpose to assist them.

20          For example, the SAC alleges that Mr. Chambers, as Cisco's CEO, directs and supervises

21  Cisco's operations in China (SAC ¶ 25) and that he met with Jiang Zemin while the Golden Shield

22  was being developed (*id.* ¶ 198).  These allegations do not give rise to a plausible claim that the

23  CEO of Cisco is individually liable for the human rights violations alleged in the SAC.  *See F.T.C.*

24  *v. Swish Marketing*, No. 09-cv-03814, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010)

25  ("conclusory assertions of authority—untethered to virtually any supportive facts—do not support

26
_____

27  [30] As in *Zheng*, 2009 WL 4430297, at *4, if "[P]laintiffs' [UCL] claim … is based on the theory
    that defendants violated the ECPA, the [UCL] claim likewise is subject to dismissal with
28  prejudice" for the reasons set forth in Part III.

1    an inference of [CEO]'s involvement").  Mr. Chambers's alleged actions are so far removed from

2    any plausible claim of liability, that his inclusion as a defendant in this lawsuit is little more than a

3    transparent attempt to garner publicity for Plaintiffs' lawsuit.

4            The same is true of Plaintiffs' allegations against Mr. Cheung, who is alleged to be a "high

5    level" executive who "directly oversaw much of Cisco's work on Chinese Public Security-related

6    projects in China," "continues to manage the sales and service operation plans for the Greater

7    China region," and in those capacities participated in the "sales process … intending to procure

8    Public Security contracts and advance Cisco's overall goals in China," "oversaw much of the

9    coordination of Cisco's Golden Shield-related projects and Cisco's work to meet other Public

10   Security goals," and "directly managed engineers working on the Golden Shield project."  (SAC

11   ¶¶ 24, 210, 212.)   Aside from these conclusory assertions of authority and otherwise vague

12   allegations, the SAC is devoid of facts that give rise to a plausible claim against Mr. Cheung for

13   the unlawful acts alleged to have been conducted by third-party Chinese authorities.  *See Atwell v.*

14   *Gabow*, Nos. 06-cv-2262, 07-cv-2063, 2008 WL 906105, at *9 (D. Colo. Mar. 31, 2008) ("[L]egal

15   conclusions parading as 'facts' … have no place in a Rule 12(b)(6) analysis under *Twombly*.").

16           Generic allegations that Mr. Chambers and Mr. Cheung helped to design or market the

17   infrastructure of the Golden Shield, without a single factual allegation particularizing their

18   supposed participation in acts of persecution and abuse of Falun Gong practitioners, are

19   insufficient because they "do not permit the court to infer more than the mere possibility of

20   misconduct."  *Iqbal*, 556 U.S. at 679.  Indeed, the Eleventh Circuit has required dismissal of ATS

21   claims that were premised on "oversight" allegations even more detailed than those here.  *See*

22   *Mamani*, 654 F.3d at 1153.  The court there held that the plaintiffs had not alleged "true factual

23   allegations" as required by *Iqbal* and *Twombly*, in a suit alleging wrongdoing by government

24   officials, even where the complaint alleged that the defendants had "met with military leaders

25   [and] other ministers in the … government to plan widespread attacks involving the use of high-

26   caliber weapons against protesters" and "knew or reasonably should have known of the pattern

27   and practice of widespread, systematic attacks against the civilian population by subordinates

28   under their command," concluding that, "without adequate factual support of more specific acts by

*these* defendants, these 'bare assertions' are 'not entitled to be assumed true.'" *Id.* at 1153-54 (quoting *Iqbal*, 556 U.S. at 681). Similar evidence was also deemed insufficient as to a corporate CEO in *Giraldo I*, 2013 WL 3873965, at *4-6, and a senior corporate executive in *Giraldo II*, 2013 WL 3873978, at *5-7. *A fortiori*, the allegations against Mr. Chambers and Mr. Cheung here must be dismissed.

## VI.   THE SAC SHOULD BE DISMISSED AS NONJUSTICIABLE

If there remained any doubt that the SAC should be dismissed on the grounds set forth above, it should nonetheless be dismissed as nonjusticiable. In *Kiobel,* the Supreme Court recognized that one reason to apply the presumption against extraterritorial application of U.S. law to ATS suits is that such suits necessarily intrude upon the political branches' conduct of foreign affairs and on considerations of international comity. 133 S. Ct. at 1664.[31] The same caution properly extends to all the claims in the SAC, for several reasons.

### A.   The SAC Should Be Dismissed Under The Political Question Doctrine

Court have long treated as nonjusticiable political questions those matters that trench upon "the respect due coordinate branches of government" and the need for the Nation to speak with one voice in "foreign relations." *Baker v. Carr*, 369 U.S. 186, 217, 211 (1962). Here, the Legislative and Executive branches have expressly enacted U.S. export laws and laws governing sales to China designed to strike a balance between the Nation's policy of economic and political engagement with China and concerns about China's respect for civil and human rights.[32] U.S.

---

[31] *See also Sosa*, 542 U.S. at 727-28; *id.* at 748-79 (Scalia, J., concurring in part and concurring in the judgment); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (presumption against extraterritorial application of U.S. law "has special force when we are construing … statutory provisions that may involve foreign and military affairs for which the President has unique responsibility"); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord"). For such reasons, several courts prior to *Kiobel* had specifically dismissed ATS cases on political question grounds. *See Corrie*, 503 F.3d at 984; *Joo v. Japan*, 413 F.3d 45, 46 (D.C. Cir. 2005); *Doe I. v. State of Israel*, 400 F. Supp. 2d 86, 111-14 (D.D.C. 2005); *Alperin v. Vatican Bank*, 410 F.3d 532, 541 & n.4, 556, 561-62 (9th Cir. 2005).

[32] *See* Tiananmen Square Sanctions Act, § 901(b)(3) at 81 ("it is essential that the United States speak in a bipartisan and unified voice in response to the events in the People's Republic of China"); *id.* § 902(a)(4) at 83 (ban on export of specified crime control or detection instruments or equipment to China in absence of an express report by the President to the Congress stating either

***(footnote continued)***

---

1    companies like Cisco are entitled to rely upon U.S. trade regulations expressly permitting sales to

2    Chinese police agencies of internet infrastructure components that Congress and the Commerce

3    Department have chosen not to regulate.[33]

4            The SAC here warrants dismissal on several of the classic political question grounds

5    summarized in *Baker v. Carr*.  *First*, the SAC asks this Court to decide upon matters not only

6    "touching foreign relations," *id.* at 211, but also matters posing "the impossibility of deciding

7    without an initial policy determination of a kind clearly for nonjudicial discretion" and "the

8    impossibility of a court's undertaking independent resolution without expressing lack of the

9    respect due coordinate branches of government," *id.* at 217.  Here, the U.S. Legislative and

10   Executive branches have developed and implemented detailed laws and regulations that govern the

11   circumstances in which, in view of human rights concerns, U.S. corporations may sell crime

12   control technology to the Government of China.  In so doing, the political branches have adopted a

13   balanced approach to Chinese foreign policy by restricting the sale of certain crime control

14   technologies to China while permitting the unrestricted sale of other products.[34]  American

15

16   _____

16   that the PRC had made progress on political reform or that the ban was operating against the

17   United States' national interest); Revisions to the Commerce Control List to Update and Clarify
     Crime Control License Requirements, 75 Fed. Reg. 41078-01, 41078 (July 15, 2010) (executive

18   branch expressly determining that it would not add software and technology to list of banned
     export items).

19   [33]  *See, e.g.*, *Corrie*, 503 F.3d at 983 ("Plaintiffs' claims can succeed only if a court ultimately

20   decides that Caterpillar should not have sold its bulldozers to the IDF[; however,] that foreign
     policy decision is committed under the Constitution to the legislative and executive branches.");

21   *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 411 (4th Cir. 2011) (dismissing
     negligence claim as nonjusticiable because a "decision on the merits … would require the

22   judiciary to question actual, sensitive judgments made by the military"); *In re Nazi Era Cases
     Against German Defendants Litig.*, 196 F. App'x 93, 98 (3d Cir. 2006) (dismissing tort claims as

23   nonjusticiable because "the adjudication … by United States federal courts would express a lack
     of respect for the Executive Branch").  Cases such as *Lizarbe v. Rondon*, which denied a Peruvian

24   lieutenant's motion to dismiss ATS claims stemming from the Peruvian civil war on
     nonjusticiability grounds, are distinguishable because, in those cases, "there is no basis for

25   connecting [the defendant's conduct] to any policy decision of the U.S." 642 F. Supp. 2d 473, 487
     (D. Md. 2009), *aff'd in part, appeal dismissed in part*, 402 F. App'x 834 (4th Cir. 2010).

26   [34]  *Cf. Mingtai Fire & Marine Ins. Co., Ltd. v. United Parcel Serv.*, 177 F.3d 1142, 1144 (9th Cir.

27   1999) ("It is axiomatic that 'the conduct of foreign relations is committed by the Constitution to
     the political departments of the Federal Government; [and] that the propriety of the exercise of

28   that power is not open to judicial review.'" (citation omitted)); *Pasquantino v. United States*, 544
     U.S. 349, 369 (2005) ("[i]n our system of government, the Executive is 'the sole organ of the
     **(footnote continued)**

1  companies like Cisco are entitled to rely upon U.S. trade regulations expressly permitting sales to

2  Chinese police agencies of internet infrastructure components that Congress and the Commerce

3  Department have expressly chosen not to regulate.

4      *Second*, in view of these decisions by the political branches, an "about-face" permitting

5  this litigation to proceed would create the "potentiality of embarrassment from multifarious

6  pronouncements by various departments on one question." *Id.*. at 217.

7      *Third,* there are no "judicially discoverable and manageable standards" for resolving the

8  issues in dispute.  *Id.*  This is particularly so because the SAC alleges ongoing wrongdoing and

9  seeks relief on a classwide basis on behalf of each of the allegedly "many thousands" of Falun

10  Gong practitioners across China who has ever been "persecuted."  (SAC ¶¶ 366, 369.)

11      Because any one of the *Baker* criteria is independently sufficient to warrant dismissal, *see*

12  *United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990), this case merits dismissal as raising

13  nonjusticiable political questions.[35]

14      **B.      The SAC Should Be Dismissed Under The Act Of State Doctrine**

15      The act of state doctrine "precludes courts from evaluating the validity of actions that a

16  foreign government has taken within its own borders."  *Provincial Gov't of Marinduque v. Placer*

17  *Dome, Inc.*, 582 F.3d 1083, 1088 (9th Cir. 2009) (citing *W.S. Kirkpatrick & Co. v. Envtl. Tectonics*

18  *Corp.*, 493 U.S. 400, 409 (1990)).  It "reflects the concern that the judiciary, by questioning the

19  validity of sovereign acts taken by foreign states, may interfere with the executive branch's

20  conduct of American foreign policy."  *Id.* at 1089 (citing *W.S. Kirkpatrick & Co.*, 493 U.S. at

21  404).   Under the doctrine, an action may be barred if "(1) there is an official act of a foreign

22  sovereign performed within its own territory; and (2) the relief sought or the defense interposed in

23  the action would require a court in the United States to declare invalid the foreign sovereign's

24  official act." *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*, 130 F.3d 1342, 1346 (9th

25

26  _____

federal government in the field of international relations'" (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936))).

27  [35]  *See also Alperin*, 410 F.3d at 544 (Supreme Court "recently described these criteria as 'six independent tests'") (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality)).

28

1    Cir. 1997) (quoting *W.S. Kirkpatrick*, 493 U.S. at 405); *see also In re Philippine Nat'l. Bank*, 397

2    F.3d 768, 773 (9th Cir. 2005) ("The act of state doctrine is to be applied pragmatically and

3    flexibly, with reference to its underlying considerations.") (alterations omitted).

4          Here, the SAC at its core questions the validity of public acts taken by the sovereign state

5    of China within its own territory in its legislative, executive, and judicial response to Falun Gong.

6    It challenges the PRC's decision to make the practice of Falun Gong illegal; to augment the

7    national internet infrastructure through the Golden Shield, which the SAC alleges was taken and

8    implemented at high levels of the Chinese government with the aim of facilitating its policy to

9    outlaw Falun Gong; to prosecute Falun Gong practitioners; and to judicially impose penalties on

10   Falun Gong practitioners for their illegal acts.[36]   This Court cannot adjudicate Plaintiffs'

11   allegations without addressing such official state policies.   The act of state doctrine exists to

12   prevent precisely such judicial interference with a sovereign government's ongoing practices and

13   policies as applied to its own citizens.

14         For just such reasons, this Court dismissed under the act of state doctrine claims for money

15   damages brought by Falun Gong practitioners against Chinese government officials under the

16   ATS and TVPA.  In *Doe v. Qi*, this Court held that the acts of the defendant government officials

17   toward Falun Gong practitioners rose to the level of an act of the PRC as a sovereign state.  349 F.

18   Supp. 2d at 1294-95.  The Court then assessed the "implications for foreign relations" if the case

19   were permitted to proceed.  *Id.* at 1296-1303.  The Court placed "serious weight," *id.* at 1298 (as

20   suggested by *Sosa*, 542 U.S. at 733 n.21), on a statement of interest submitted by the U.S.

21   Department of State stating that:

22   ─────────────────────

     [36]  Although the criminalization of disfavored views is anathema to conceptions of liberty under

23   the U.S. Constitution, it is not uncommon in other nations.  *See Yahoo! Inc. v. La Ligue Contre Le
     Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1221, 1227 (9th Cir. 2006) (en banc) ("in July 1990

24   [France] passed [a law] which criminalized speech that denied the existence of the Holocaust or
     that celebrated Nazism," such that "Internet service providers are forbidden to permit French users

25   to have access to [banned] materials … [and] French users … are criminally forbidden to obtain
     such [internet] access") (reversing declaratory judgment that had held unenforceable a French

26   court order directing Yahoo! to remove criminalized speech from the internet); *Guinto v. Marcos*,
     654 F. Supp. 276, 280 (S.D. Cal. 1986) ("However dearly our country holds First Amendment

27   rights . . . a violation of the First Amendment right of free speech does not rise to the level of such
     universally recognized rights and so does not constitute a 'law of nations.'") (cited favorably in *In*

28   *re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994)).

- adjudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong] … is not the best way for the United States to advance the cause of human rights in China. …

- … The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.

- We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy …

- … Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

- … [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.

349 F. Supp. 2d at 1296-97 (quoting Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 7-8) (emphasis in original).  The Court similarly considered a letter that the PRC had submitted through the U.S. Department of State, opposing adjudication:

> If the U.S. courts should entertain the "Falun Gong" trumped-up lawsuits, they would send a wrong signal to the "Falun Gong" cult organization and embolden it to initiate more such false, unwarranted lawsuits.  In that case, it would cause immeasurable interferences to the normal exchanges and cooperation between China and the United States in all fields, and severely undermine the common interests of the two countries.

*Id.* at 1300 (quoting Statement of PRC).  *See also Roe III* v. *Unocal Corp.*, 70 F. Supp. 2d 1073, 1078 (C.D. Cal. 1999) (act of state doctrine applies where defendant's liability was "premised on the acts of its alleged joint venturer or implied partner," the Burmese military, which was itself protected from suit by the Foreign Sovereign Immunities Act).  Although the Defendants here are not government actors, adjudication will necessarily drag this court into assessing the merits of the sovereign acts of the PRC in responding to Falun Gong.  *See Glen* v. *Club Médditerranée, S.A.*, 450 F.3d 1251, 1256-57 (11th Cir. 2006) (applying act of state doctrine even where government actor was not a party); *Riggs Nat'l Corp. & Subsidiaries* v. *Comm'r of Internal Revenue Serv.*, 163 F.3d 1363, 1368 (D.C. Cir. 1999) (same).

### C.     The SAC Should Be Dismissed Under The International Comity Doctrine

For similar reasons, the SAC warrants dismissal under the international comity doctrine, which applies where "[a] federal court has jurisdiction but defers to the judgment of an alternative

1    forum" to avoid getting "entangled in international relations."  *Ungaro-Benages v. Dresdner Bank*

2    *AG*, 379 F.3d 1227, 1237 (11th Cir. 2004) (internal quotation marks omitted); *see also Société*

3    *Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543

4    n.27 (1987) ("[c]omity refers to the spirit of cooperation in which a domestic tribunal approaches

5    the resolution of cases touching the laws and interests of other sovereign[s]").  The doctrine asks

6    whether "adjudication of [the] case by a United States court would offend amicable working

7    relationships with [a foreign country]."  *Bigio v. Coca-Cola Co*., 448 F.3d at 178   (internal

8    quotation marks omitted).  As Justice Breyer noted in concurrence in *Sosa* and *Kiobel*, 133 S. Ct.

9    at 1671, it is important for courts to ask "whether the exercise of jurisdiction under the ATS is

10   consistent with those notions of comity that lead each nation to respect the sovereign rights of

11   other nations by limiting the reach of its laws and their enforcement."  *Sosa*, 542 U.S. at 761

12   (Breyer, J., concurring in part and concurring in the judgment).

13          **D.      The State-Law Claims Are Barred By Foreign Affairs Preemption**

14          Even if the state-law claims are not dismissed on other grounds, they are nonetheless

15   preempted by the federal government's foreign affairs powers.   The Supreme Court has

16   recognized that state laws may not be applied so as to interfere with federal objectives in foreign

17   relations.  In *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), for example, the

18   Supreme Court invalidated a Massachusetts statute that restricted state agencies from doing

19   business with Burma because it interfered with a federal law that provided a different approach to

20   doing business with Burma.  *Id.* at 373-74.  The Court concluded that the statute "compromise[d]

21   the very capacity of the President to speak for the Nation with one voice in dealing with other

22   governments."  *Id.* at 381.  *See also*, *e.g.*, *Am. Ins. Ass'n. v. Garamendi*, 539 U.S. 396, 401 (2003)

23   (invalidating California statute requiring insurers to disclose information about Holocaust-era

24   insurance policies because the federal government had a policy touching on the issue and the

25   statute thus "interferes with the National Government's conduct of foreign relations"); *Zschernig*

26   *v. Miller*, 389 U.S. 429, 435, 440 (1968) (invalidating Oregon statute as applied, barring non-

27   resident alien from taking property because it resulted in "minute inquiries concerning the actual

28   administration of foreign law" that could "affec[t] international relations in a persistent and subtle

1   way"); *see also Al Shimari*, 679 F.3d at 234-35 (Wilkinson, J., dissenting) ("even if Virginia

2   wanted to extend its tort law … overseas … it cannot create an 'obstacle to the accomplishment of

3   Congress's full objectives' under federal law) (quoting *Crosby*, 530 U.S. at 373).

4          The same principles apply here.  The U.S. Legislative and Executive Branches have

5   restricted the sale of some crime control and detection technology to China but have determined

6   that the generic routers, switches and other hardware that help comprise the internet architecture

7   may be sold to police agencies and others in China.  Any application of California's state tort law

8   that would interfere with these federal policies would wrongly inject these states into the conduct

9   of international relations reserved exclusively for the federal government.

10                              **<u>CONCLUSION</u>**

11          For the foregoing reasons, the Second Amended Complaint should be dismissed with

12   prejudice in its entirety.

13   DATED:   New York, New York              QUINN EMANUEL URQUHART &
                   November 4, 2013                   SULLIVAN, LLP
14

15
                                             By:  /s/ Kathleen M. Sullivan
16                                                Kathleen M. Sullivan
                                                  Faith E. Gay
17                                                Isaac Nesser

18                                           51 Madison Avenue, 22d Floor,
                                             New York, New York  10010-1601
19                                           (212) 849-7000

20                                           *Attorneys for the Defendants*

21

22

23

24

25

26

27

28

MOTION TO DISMISS SECOND AMENDED COMPLAINT

1

**CERTIFICATE OF SERVICE**

2        The undersigned hereby certifies that all counsel of record who are deemed to

3   have consented to electronic service are being served with a copy of this document via

4   the Court's ECF System.

5   Dated:  November 4, 2013

                                                            /s/ Todd Anten
6                                                          Todd Anten

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28