SARAH P. ALEXANDER – 291080
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:         spalexander@rbgg.com

TYLER R. GIANNINI
INTERNATIONAL HUMAN
RIGHTS CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Third Floor
Cambridge, Massachusetts 02138
Telephone:     (617) 496-7368
Email:         giannini@law.harvard.edu

Attorneys for *Amici Curiae* Professors of Legal
History

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, DOE IX, LIU Guifu, WANG Weiyu, and those individual similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>CISCO SYSTEMS, INC., John CHAMBERS, Fredy CHEUNG, and DOES 1-100,<br><br>                    Defendant. | Case No. 5:11-cv-02449-EJD-PSGx<br><br>**BRIEF OF AMICI CURIAE PROFESSORS OF LEGAL HISTORY WILLIAM R. CASTO, MARTIN S. FLAHERTY, NASSER HUSSAIN, STANLEY N. KATZ, AND JENNY S. MARTINEZ IN SUPPORT OF PLAINTIFFS**<br><br>Judge:   Hon. Hon. Edward J. Davila,<br>Date:    December 23, 2013 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

STATEMENT OF INTEREST ......................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................................ 1

ARGUMENT ..................................................................................................................................... 3

    I.    BY ENACTING THE ALIEN TORT STATUTE, THE UNITED STATES
        CREATED A FEDERAL FORUM TO FULFILL ITS RESPONSIBILITY TO
        ADDRESS ITS SUBJECTS' WRONGS, WHEREVER THEY OCCURRED ..... 3

          A.    Under the Law of Nations, Sovereigns Were Responsible for Redressing
               Their Subjects' Wrongs; Otherwise, the Sovereign Would be Viewed as an
               Accomplice in the Wrongs ........................................................................ 4

          B.    The United States Created the ATS as One Mechanism Among Others to
               Enforce the Law of Nations and Meet Its International Obligations .......... 7

    II.    SINCE AT LEAST THE SEVENTEENTH CENTURY, JURISPRUDENCE HAS
        CONTINUALLY RECOGNIZED THAT SOVEREIGNS ARE RESPONSIBLE
        FOR, AND ARE EXPECTED TO PROVIDE REDRESS FOR, CONDUCT OF
        THEIR SUBJECTS ABROAD .......................................................................... 10

          A.    Prior to the Formation of the United States, English Courts Provided Civil
               Redress for Wrongs by English Subjects No Matter Where the Wrongs
               Occurred .................................................................................................. 10

          B.    U.S. Courts and Jurists Followed the Established Rule of Providing Civil
               Liability for U.S. Subjects' Wrongs Committed Abroad .......................... 13

               1. Breaches of Neutrality and Territorial Rights ...................................... 13

               2. Piracy, Slave Trade, and Great Crimes Such as Murder ...................... 16

CONCLUSION .................................................................................................................................. 20

ADDENDA

    A.  List of *Amici Curiae* ........................................................................................................ a

    B.  Memorial of Zachary Macaulay and John Tilley (Nov. 28, 1794) .................................. c

    C.  Letter from George Hammond (June 25, 1795) ............................................................... e

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793) ........................................................ 8
*Dutton v. Howell*, [1693] 1 Eng. Rep. 17 (H.L.), 1 Show. P.C. 24 ................................. 12
*Eachus v. Trustees of the Illinois & Michigan Canal*, 17 Ill. 534 (1856) .............. 11, 13
*Gardner v. Thomas*, 14 Johns. 134 (N.Y. Sup. Ct. 1817) ............................................. 13
*Henfield's Case*, 11 F. Cas. 1099 (C.C.D. Pa. 1793) (No. 6360) ........................... 5, 10
*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ........................... 1, 2, 11
*Mostyn v. Fabrigas*, [1774] 98 Eng. Rep. 1021 (K.B.), 1 Cowp 160 ......................... 12
*Nicol v. Verelst*, [1779] 96 Eng. Rep. 751 (K.B.), 2 Black. W. 1277 .................... 12, 13
*Rafael v. Verelst*, [1775] 96 Eng. Rep. 579 (K.B.), 2 Black. W. 983 ......................... 13
*Respublica v. De Longchamps*,
1 U.S. (1 Dall.) 111 (Pa. O. & T. Oct. 1784) . .............................................................. 9
*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..................................................... 1, 7, 10
*Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795) ............................................................. 14
*The Antelope*, 23 U.S. (10 Wheat.) 66 (1825) .............................................................. 19
*The Case of Thomas Skinner, Merchant v. The East India Company*,
(1666) 6 State Trials 710 (H.L.) .......................................................................... 11, 13
*The Malek Adhel*, 43 U.S. (2 How.) 210 (1844) .......................................................... 18
*The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812) ......................... 4, 8
*United States v. Furlong, alias Hobson*, 18 U.S. (5 Wheat.) 184 (1820) ............... 7, 18
*United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818) ............................................. 18
*United States v. Robins*, 27 F. Cas. 825 (D.S.C. 1799) (No. 16,175) .................. 5, 7, 17
*United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820) ................................................ 18
*United States v. The La Jeune Eugenie*, 26 F. Cas. 832 (1822) ................................... 19

**Statutes**

28 U.S.C. § 1350 ........................................................................................................ 1, 2, 4
An Act for the Punishment of Certain Crimes Against the United States,
ch. 9, § 8, 1 Stat. 112 (1790). ....................................................................................... 18
An Act in Addition to the Act for the Punishment of Certain Crimes Against the United States, ch. 50, §§ 1-4, 1 Stat. 381 (1794) ...................................................................................... 14
An Act to Establish the Judicial Courts of the United States,
ch. 20, § 9, 1 Stat. 73 (1789) ................................................................................... 2, 10
An Act to Protect the Commerce of the United States, and Punish the Crime of Piracy, ch. 77, § 5, 3 Stat. 510 (1819) ..................................................................................................... 18

**Other Authorities**

*Breach of Neutrality*, 1 U.S. Op. Att'y Gen. 57 (1795) ..................................... 3, 14, 15
*Territorial Rights—Florida*, 1 U.S. Op. Att'y Gen. 68 (1797) ........................ 3, 14, 16
21 Journals of the Continental Congress 1774-1789 (G. Hunt ed., 1912) ..................... 8
27 Journals of the Continental Congress 1774-1789 (G. Hunt ed., 1912) ..................... 9
Anne-Marie Burley [Slaughter], *The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor*, 83 Am. J. Int'l L. 461 (1989) ........................................................................... 7
Brief of *Amici Curiae* Professors of Legal History in Support of Petitioners, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) ........................................... 11
James Madison, Speech in Convention of Virginia, in *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 583 (J. Elliot ed., 1836) ................. 8
Proclamation No. 3 (1793), *reprinted in* 11 Stat. 753 (1859) ...................................... 14
The Federalist No. 42 (James Madison) (McLean's ed., 1788) ....................................... 8
The Federalist No. 80 (Alexander Hamilton) (McLean's ed., 1788) ......................... 5, 8
*Trial of M. Longchamps*, *The Pennsylvania Packet*, Monday, September 27, 1784 ..................... 9
William R. Casto, *The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations*,
18 Conn. L. Rev. 467 (1986) .............................................................. 8, 9, 10, 14

William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists,"* 19 Hastings Int'l & Comp. L. Rev. 221 (1996) ..................................................... 8

**Treatises**
1 James Kent, *Commentaries on American Law* 171 (1826) ........................................................ 11
1 Joseph Chitty, *A Practical Treatise on Pleading, and on the Parties to Actions, and the Forms of Action* (1809) ............................................................................................................................. 6
1 William Blackstone, *Commentaries* ........................................................................................... 4
4 William Blackstone, *Commentaries* ...................................................................................... 7, 8
Emmerich de Vattel, *Law of Nations* (1758)....................................................... 3, 4, 5, 6, 7, 13
T. Rutherforth, *Institutes of Natural Law* (1832) .................................................................. 4, 5, 6

**Constitutional Provisions**
U.S. Const. Art. III, § 2 .............................................................................................................. 10

## STATEMENT OF INTEREST

*Amici curiae* respectfully submit this brief in support of Plaintiffs.[1]  *Amici* (listed in Addendum A) are professors of legal history interested in the proper understanding and interpretation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Supreme Court's decisions in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), and *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  The Supreme Court has indicated that historical evidence is pertinent to the interpretation of the ATS.  *See Sosa*, 542 U.S at 714.  *Amici* believe that history also provides meaningful guidance in applying *Kiobel*'s directive that ATS claims must "touch and concern the territory of the United States."  *Kiobel*, 133 S. Ct. at 1669.  The instant case involves a U.S. defendant, and *amici* respectfully urge this court to recognize liability under the ATS for wrongs by U.S. actors.  Any other interpretation would be anathema to the Founders' intent in enacting the ATS to address international comity concerns and avoid conflicts with other nations.  *Kiobel* articulated the very same historical interest in comity.  *See* 133 S. Ct. at 1664. Thus, recognizing ATS claims against U.S. actors is consistent with both *Kiobel* and the history and purpose of the statute.

## SUMMARY OF ARGUMENT

The law of nations developed in part to address the needs of the international community, which included enforcing universally accepted prohibitions on heinous acts.  In joining the community of nations after independence, the United States became responsible for enforcing the law of nations.  This required sovereigns to provide redress for law of nations violations in at least three circumstances:  when the violation occurred on the sovereign's territory; when a sovereign's

---

[1] The Plaintiffs have consented to the filing of this brief and the Defendants have not yet responded to a request for their permission.  No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No persons other than the *amici* or their counsel made a monetary contribution to this brief's preparation or submission.

subject committed the violation; and when a perpetrator used the sovereign's territory as a safe harbor to avoid punishment for having committed great wrongs.  Although the Founders would not have included "touch and concern the territory," *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013), in a jurisdictional statute like the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, well-established obligations from the Founders' era and before indicate that jurists and courts would have viewed all three circumstances as touching and concerning the United States.[2] To address these various circumstances, the First Congress used multiple mechanisms—both criminal and civil—to enforce the law of nations; the ATS was one such mechanism created to provide civil redress.[3]

Under the law of nations, if a sovereign did not remedy wrongs committed by its subjects, it risked becoming an accomplice in the wrongs, which could lead to international discord and strife.  Centuries of English and American jurisprudence and laws, including the ATS, demonstrate unbroken commitment to upholding this rule.[4]  For example, in 1795, when faced with potential conflict with Britain, Attorney General William Bradford clearly identified the ATS as a mechanism for foreigners to sue U.S. subjects for breaching neutrality (in violation of the law of

---

[2] The instant case involves U.S. corporations that are alleged to have aided and abetted human rights violations in China.   The plaintiffs also allege that significant conduct by the U.S. defendant took place on U.S. territory that led to the human rights violations.

[3] The ATS was originally enacted as part of An Act to Establish the Judicial Courts of the United States, ch. 20, § 9, 1 Stat. 73, 77 (1789).  The text has not meaningfully changed, and any changes do not affect this brief's analysis.

[4] In a case involving foreign defendants, *Kiobel* noted "that the ATS was [not] passed to make the United States a uniquely hospitable forum for the enforcement of international norms," especially for a "fledgling Republic[,] struggling to receive international recognition."  133 S. Ct. at 1668.  For claims against its own subjects, however, the young nation would have been *expected* to provide a forum for redress to align U.S. practice with that of the community of nations.

nations) on foreign territory.  *See Breach of Neutrality*, 1 U.S. Op. Att'y Gen. 57 (1795).

Similarly, in 1797, Attorney General Charles Lee presumed that the United States could provide a

remedy in U.S. courts after its subjects violated territorial rights in Spanish Florida.  *See*

*Territorial Rights—Florida*, 1 U.S. Op. Att'y Gen. 68 (1797).  These opinions as well as cases,

including ones dating to the 1600s in England, show the United States and other sovereigns

consistently felt obligated to offer remedies when their sovereign subjects committed law of

nations violations such as piracy, breaches of neutrality or territorial rights, and, eventually, slave-

trading.  To interpret the ATS not to apply when a U.S. defendant commits torts in violation of the

law of nations would thus contravene centuries of jurisprudence and undermine the statute's

original intent and purpose.

## ARGUMENT

**I.    BY ENACTING THE ALIEN TORT STATUTE, THE UNITED STATES CREATED A FEDERAL FORUM TO FULFILL ITS RESPONSIBILITY TO ADDRESS ITS SUBJECTS' WRONGS, WHEREVER THEY OCCURRED**

Like any legal regime, the law of nations developed multiple, concurrent, and overlapping

jurisdictional schemes to deal with different problems.  Sovereign states had jurisdiction to

adjudicate both their own municipal laws[5] and the universally applicable law of nations.  Indeed,

at the time of the Founders, the law of nations was part of the common law, which was, in turn,

incorporated into U.S. municipal law.

Relatedly, a well-established principle provided that sovereigns not only had the

jurisdiction, but also the responsibility, to adjudicate any violations committed by their subjects[6]

---

[5] "Municipal law" includes all domestic laws, including federal and state laws.

[6] In this brief, the term "subjects" includes citizens, residents, or inhabitants.  *See* Emmerich de Vattel, *Law of Nations*, bk. 1, ch. 19, §§ 212-13 (Joseph Chitty, trans. and ed., T. & J. W. Johnson (footnote continued)

wherever the violations occurred; all matters involving safe harbor (by either sending persons back to the place of the wrong or providing redress); and any violations within their territory.  These sovereign obligations overlapped:  For example, if the United States provided safe harbor to U.S. subjects, it incurred multiple obligations to act under the law of nations.

> **A.** **Under the Law of Nations, Sovereigns Were Responsible for Redressing Their Subjects' Wrongs; Otherwise, the Sovereign Would be Viewed as an Accomplice in the Wrongs**

When the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, was enacted, the law of nations undisputedly required sovereigns to provide remedies for law of nations violations committed by their subjects.  In the treatise *Law of Nations*, which laid the foundations of modern international law, Emmerich de Vattel stated the rule clearly:

> [The sovereign] ought not to suffer his subjects to molest the subjects of other states, or to do them an injury, much less to give open, audacious offence to foreign powers, he ought to compel the transgressor to make reparation for the damage or injury, if possible, or to inflict on him an exemplary punishment; or finally, according to the nature and circumstances of the case, to deliver him up to the offended state, to be there brought to justice.[7]

Vattel, *supra*, at bk. 2, ch. 6, § 76; *see also* Rutherforth, *supra*, at bk. 2, ch. 5, § 6 (civil jurisdiction applies to sovereign subjects "whether they are within its territories or not"); 1 William Blackstone, *Commentaries* *359 (discussing "natural allegiance," duty of "universal and

---

& Co. 1867) (1758).  "Temporary subjects" are persons who owe temporary allegiance to the sovereign because they are present within the sovereign's territory, such as foreigners seeking safe harbor for abuses.  T. Rutherforth, *Institutes of Natural Law*, bk. 2, ch. 9, § 12 (1832); *see also id.* at bk. 2, ch. 5, § 6 (discussing state's civil jurisdiction based on "temporary civil union" and "temporary subjects" who agree to "conform to its laws, whilst they are there"); Vattel, *supra*, at bk. 2, ch. 8, § 101 (foreigner "tacitly submits to [the general laws of the sovereign] as soon as he enters the country"); *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812).

[7] The rule could include both civil and criminal approaches, and sovereigns deployed various mechanisms to meet their obligations.

permanent" allegiance owed to one's sovereign's law that engenders reciprocal obligation by sovereign "to protect his natural-born subjects, at all times and in all countries").  John Marshall (before his appointment to the Supreme Court) explained, "The principle is, that the jurisdiction of a nation extends to the whole of its territory, *and to its own citizens in every part of the world. The laws of a nation are rightfully obligatory on its own citizens in every situation . . . ."* *United States v. Robins*, 27 F. Cas. 825, 861 (D.S.C. 1799) (No. 16,175) (summary of speech by John Marshall) (emphasis added).[8]

Vattel explained that this rule was necessary because "[t]he sovereign who refuses to cause a reparation to be made of the damage caused by his subject, or punish the guilty, or in short, to deliver him up, renders himself in some measure an accomplice in the injury, and becomes responsible for it."  Vattel, *supra*, at bk. 2, ch. 6, § 77; *see also* Rutherforth, *supra*, at bk. 2, ch. 9, § 12 (sovereign becomes accessory "by protecting those who have done the injury, against the just demands of those who have suffered it").  The Founders knew well the potential consequences of not providing redress.  Hamilton, for example, counseled that "the denial or perversion of justice by the sentences of courts, as well as in any other manner, is with reason classed among the just causes of war . . . ."  The Federalist No. 80 (Alexander Hamilton) (McLean's ed., 1788); *see also Henfield's Case*, 11 F. Cas. 1099 (C.C.D. Pa. 1793) (No. 6360) (quoting Vattel).[9]

---

[8] Marshall explained that the principle of jurisdiction over a nation's subjects "is supported everywhere by public opinion, and is recognized by writers on the law of nations."  *Robins*, 27 F. Cas. at 861 (summary of speech by John Marshall).

[9] Vattel predicted that if a state "let[s] loose the reins to [its] subjects against foreign nations . . . we shall see nothing but one vast and dreadful scene of plunder between nation and nation."  Vattel, *supra*, at bk. 2, ch. 6, § 72.

A defendant was subject to concurrent jurisdiction based on either where an act occurred or where the defendant was a subject.  That is, if "the offended state has in her power the individual who has done the injury, she may without scruple bring him to justice and punish him.  If he has escaped and returned to his own country, she ought to apply to his sovereign to have justice done in the case."  Vattel, *supra*, at bk. 2, ch. 6, § 75; Rutherforth, *supra*, at bk. 2, ch. 9, § 12 (discussing "nation's jurisdiction" arising when "offender is one of its own subjects; or, at least, was within its territories when the injury was done").

Embedded within these law of nations rules governing subjects was the principle that sovereigns should prevent safe harbor for wrongdoers.  The law of nations prohibited sovereigns from providing safe harbor to its subjects (as well as temporary subjects).  A sovereign not only risked reprisal by failing to respond to law of nations violations by its own subjects, but also became responsible for the wrongs by providing safe harbor:

> But by granting protection to an offender, it may become a party, not only in such injuries as are committed by *its own proper subjects*, or by foreigners, who by being resident within its territories, make themselves temporary subjects, but in such, likewise, as are committed abroad, either by its own subjects, or by foreigners, who afterwards take refuge in its territories.

Rutherforth, *supra*, at bk. 2, ch. 9, § 12; *see also* Vattel, *supra*, at bk. 2, ch. 6, §§ 75-77.[10]  U.S. courts followed this safe harbor principle well into the nineteenth century, and specifically applied it to U.S. citizens as well as foreigners:  "[I]n the case of murder committed by an American in a foreign ship . . . it never could have been the intention of Congress that such an

---

[10] Jurists did not envisage that defendants would ever escape punishment for egregious harms. *See, e.g.*, 1 Joseph Chitty, *A Practical Treatise on Pleading, and on the Parties to Actions, and the Forms of Action* *427 (1809) (discussing need for English forum because no other existed).

offender should find this country a secure assylum [sic] to him."  *United States v. Furlong, alias Hobson*, 18 U.S. (5 Wheat.) 184, 199 (1820).

Finally, a sovereign's responsibility for, and jurisdiction over, its subjects included great crimes as well as violations of the law of nations, including breaches of neutrality, violations of territorial rights, and piracy.  Blackstone articulated three paradigmatic law of nations violations— safe-conduct violations, assaults on ambassadors, and piracy.  4 William Blackstone, *Commentaries* *68; *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004).  However, a sovereign's responsibility included other law of nations violations as well as egregious wrongs.  *See* Vattel, *supra*, at bk. 4, ch. 4, § 52 (discussing "acts of hostility" that "may be capable of annulling a treaty of the peace"); *id*. at bk. 2, ch. 6, § 76 (discussing "great crimes, which are equally contrary to the laws and safety of all nations.  Assassins, incendiaries, and robbers, are seized everywhere . . . ."); *see also Robins*, 27 F. Cas. at 832 (discussing crimes of murder and forgery); *infra* Part II.B (discussing array of law of nations violations for which U.S. subjects could be held responsible).[11]

## B.    The United States Created the ATS as One Mechanism Among Others to Enforce the Law of Nations and Meet Its International Obligations

The First Congress enacted the ATS as one of several federal enforcement mechanisms meant to meet U.S. obligations under the law of nations.  As the Founders recognized, the fledgling nation had to conform to the law of nations to "take its place" in the international system, and to signal that the country was "prepared to play by the rules governing its fellow sovereigns."  Anne-Marie Burley [Slaughter], *The Alien Tort Statute and the Judiciary Act of*

---

[11] Other law of nations violations emerged later.  *See, e.g.*, *infra* Part II.B.2 (discussing evolution of norm against slave trade).

BRIEF OF AMICI CURIAE PROFESSORS OF LEGAL HISTORY IN SUPPORT OF PLAINTIFFS

*1789: A Badge of Honor*, 83 Am. J. Int'l L. 461, 484 (1989).  The Founders took seriously Blackstone's observation that the "peace of the world" could be endangered when "individuals of any state violate[d] this general law [of nations]."   4 Blackstone, *supra*, at *68; *see also* The Federalist No. 80, *supra* (Alexander Hamilton) ("The Union will undoubtedly be answerable to foreign powers for the conduct of its members.").[12]

Given these dire consequences, the founding generation was frustrated by the limited federal powers afforded by the Articles of Confederation to address these wrongs.   James Madison, for example, complained that the Articles "contain[ed] no provision for the case of offenses against the law of nations; and consequently [left] it in the power of any indiscreet member to embroil the Confederacy with foreign nations."   The Federalist No. 42 (James Madison) (McLean's ed., 1788).  Because individual states proved unwilling or unable to reliably adjudicate these kinds of claims, a national response was necessary.  *See, e.g.*, James Madison, Speech in Convention of Virginia, *in The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 583 (J. Elliot ed., 1836) ("We well know, sir, that foreigners cannot get justice done them in these [state] courts . . . .").   In 1781, the Continental Congress tried to remedy this state inaction by passing a resolution recommending that the states provide punishment, including suits for damages, for violations of the law of nations and treaties to which the United States was a party.[13]  *See* 21 Journals of the Continental Congress 1136-37 (G. Hunt

---

[12] In its early cases, the Supreme Court recognized this crucial link between respecting the law of nations and membership in the community of nations.  *See, e.g.*, *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 474 (1793); *The Schooner Exch.*, 11 U.S. (7 Cranch) at 137.

[13] Only Connecticut heeded this call.  William S. Dodge, *The Historical Origins of the Alien Tort Statute:  A Response to the "Originalists,"* 19 Hastings Int'l & Comp. L. Rev. 221, 228 (1996).  The 1781 resolution was the direct precursor of the ATS.  *See* William R. Casto, *The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations*, 18 Conn. (footnote continued)

ed., 1912).

The so-called "Marbois incident" further emphasized the national government's inability to enforce the law of nations under the Articles.  A Pennsylvania state court convicted Frenchman Chevalier De Longchamps of "unlawfully and violently threatening and menacing bodily harm and violence" to French diplomat Francis Barbe de Marbois in the French Minister Plenipotentiary's residence.[14]  *Republica v. De Longchamps*, 1 U.S. (1 Dall.) 111, 115 (Pa. O. & T. Oct. 1784).  The state court deemed these actions a violation of the laws of nations.  *Id.* at 116.  Under the Articles, the remedies for such actions could only occur on a state-by-state basis.  The national government remained effectively powerless in the face of a potential international crisis: The Continental Congress could only pass a resolution "highly approv[ing]" the state case.  Casto, *supra*, at 492 (citing 27 Journals of the Continental Congress 502-04 (G. Hunt ed., 1912)).[15]

These demonstrations of national impotence were fresh in the Founders' minds at the 1787 Constitutional Convention.  Casto, *supra*, at 493.[16]  To better control foreign affairs, the new

---

L. Rev. 467, 490-91, 495 (1986).

[14] Chief Justice M'Kean said that the residence was a "Foreign Domicil [sic]" and not part of U.S. sovereign territory, but nevertheless adjudicated the claims arising from this foreign territory.  *De Longchamps*, 1 U.S. (1 Dall.) at 114.

[15] The Marbois incident exemplified the concurrent jurisdiction that existed over a defendant: Both Pennsylvania and France had jurisdiction over the French subject.  France requested Longchamps "be delivered . . . as a Frenchman . . . to France," as the country expected to take responsibility for its subjects' actions no matter where they occurred.  *De Longchamps*, 1 U.S. (1 Dall.) at 115.  William Bradford, who later became U.S. Attorney General, supported the extradition request because Longchamps "is [the French king's] subject; he is his servant."  *Trial of M. Longchamps*, *The Pennsylvania Packet*, Sept. 27, 1784, at 2.

[16] During the Constitution's ratification, another incident reaffirmed the necessity of a national remedy for law of nations violations.  New York police arrested a servant in the Dutch ambassador's household.  The Dutch government sought relief from the U.S. Foreign Affairs Secretary, who could only recommend that Congress pass a resolution urging New York to (footnote continued)

Constitution and the First Judiciary Act endowed the federal government with several mechanisms.[17]  The ATS was one such mechanism:  By expressly providing a federal remedy for aggrieved foreign parties seeking redress for tortious violations of the law of nations, the ATS helped the Founders honor U.S. obligations.[18]  An Act to Establish the Judicial Courts of the United States, ch. 20, § 9, 1 Stat. 73, 77 (1789).  As the law of nations mandated that a sovereign address grievances against its own subjects, the Founders would have understood the ATS to provide jurisdiction over a subject's violations wherever they occurred.

II.    **SINCE AT LEAST THE SEVENTEENTH CENTURY, JURISPRUDENCE HAS CONTINUALLY RECOGNIZED THAT SOVEREIGNS ARE RESPONSIBLE FOR, AND ARE EXPECTED TO PROVIDE REDRESS FOR, CONDUCT OF THEIR SUBJECTS ABROAD**

    A.    **Prior to the Formation of the United States, English Courts Provided Civil Redress for Wrongs by English Subjects No Matter Where the Wrongs Occurred**

English courts have long heard cases concerning extraterritorial trespasses and other

institute judicial proceedings.  *See* Casto, *supra*, at 494 n.151.

[17] For example, the Constitution vested the Supreme Court with original jurisdiction over "all cases affecting Ambassadors, other public Ministers and Consuls."  U.S. Const. Art. III, § 2.  The Judiciary Act of 1789 "gave the Supreme Court original jurisdiction over suits brought by diplomats, created alienage jurisdiction, and of course, included the ATS." *Sosa*, 542 U.S. at 717 (internal citations omitted); *see also Henfield's Case*, 11 F. Cas. at 1117 (Prosecution's speech, to which Attorney General Edward Randolph joins) ("[T]he law of nations is enforced by the judiciary.").

[18] A holding that federal courts lack ATS jurisdiction over suits against U.S. subjects would not preclude litigation in state courts.  However, given the importance of ATS litigation for U.S. foreign relations, forbidding plaintiffs from suing U.S. subjects in federal court would contradict the statute's purpose.

wrongs committed by English subjects.  Throughout the seventeenth and eighteenth centuries, English courts repeatedly admitted suits brought by both foreigners and Englishmen against English companies, colonial governors, and individuals for law of nations violations and other wrongs committed outside England and its territories.

As English commerce and settlement expanded beyond the Crown's territory in the seventeenth century, English subjects remained liable in English courts for their actions abroad.  In 1666, Thomas Skinner sued the East India Company in London for "robbing him of a ship and goods of great value, . . . assaulting his person to the danger of his life, and several other injuries done to him."  *The Case of Thomas Skinner, Merchant v. The East India Company,* (1666) 6 State Trials 710, 711 (H.L.).  Skinner's claims were based, in part, on law of nations violations.  *Id.* at 719 (including "the taking of his ship, a robbery committed *super altum mare*").[19]  The House of Lords feared that failure to remedy acts "odious and punishable by all laws of God and man" would constitute a "failure of justice."  *Id.* at 745.[20]  The Lords thus found the Company liable and granted Skinner damages.  *Id.* at 724-25.[21]

English courts provided redress not only for wrongs committed by English subjects on the

_____

[19] In the founding era and before, the taking of a ship on the high seas (*super altum mare*) was considered piracy, a law of nations violation.  *See* 1 James Kent, *Commentaries on American Law* 171 (1826).

[20] A U.S. court later summarized this conclusion to mean that "the courts could give relief" for wrongs committed by the Company (including law of nations violations), "notwithstanding these were done beyond the seas."  *Eachus v. Trustees of the Illinois & Michigan Canal*, 17 Ill. 534, 536 (1856).

[21] *Skinner* exemplifies that courts did not exempt corporations from liability under the law of nations.  This general rule continued throughout English and American jurisprudence.  *See generally* Brief of *Amici Curiae* Professors of Legal History in Support of Petitioners, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491).

high seas, but also for those committed in English settlements abroad, lands characterized as "uninhabited," or foreign territory.  In a 1693 suit against the English Governor of Barbados for false imprisonment and trespass (claims arising in Barbados), the House of Lords held that "the Laws of the Country to which they did originally, and still do belong," govern "Subjects of England, [who] by Consent of their Prince, go and possess an uninhabited desert Country." *Dutton v. Howell*, [1693] 1 Eng. Rep. 17, 22 (H.L.), 1 Show. P.C. 24, 32.[22]  The Lords found "no Reason why the English Laws should not follow the Persons of Englishmen." *Id.* at 22.  Since subjects' allegiance remained constant whether at home, at sea, or outside English territory, English law applied equally to English settlers in "uninhabited" lands or on ships.  *See id.* at 22 (stating that wherever English subjects traveled, "they no more abandoned English laws, than they did their Natural Allegiance").  Thus, the Lords determined that the same law applied "if the Imprisonment had been in England or on Shipboard." *Id.* at 23.  Moreover, the Lords deemed the suit properly brought in London, even though the violation occurred in Barbados.  *Id.* at 21 ("[A] Man may as well be sued in England for a Trespass done beyond Sea, as in Barbadoes [sic], or the like Place.").

Eighteenth-century English courts continued to adjudicate similar claims against English defendants.  In *Mostyn v. Fabrigas*, [1774] 98 Eng. Rep. 1021 (K.B.), 1 Cowp. 160, the court upheld a verdict against Minorca's governor, an English citizen, for assault and other wrongs done to a Minorcan.  *Id.* at 1021-22, 1032; *see also Rafael v. Verelst*, [1775] 96 Eng. Rep. 579, 579 (K.B.), 2 Black. W. 983, 983 (Armenian merchants sued Verelst, English Governor of Bengal and

---

[22] Barbados was "a new Settlement of Englishmen by the King's Consent in an uninhabited Country." *Dutton*, 1 Eng. Rep. at 21.  The settlers "submitted to take a Grant of the King" and thus became a "Subordinate Dominion," "tho' not within the Territorial Realm" of England.  *Id.* at 22-23.

1   official of the East India Company, for trespass, assault, and false imprisonment on foreign

2   territory); *Nicol v. Verelst*, [1779] 96 Eng. Rep. 751, 751 (K.B.), 2 Black. W. 1277, 1277 (same

3   cause of action, but English plaintiff).[23]  English jurisprudence thus affirms that the responsibility

4   to provide civil remedies for wrongs by subjects no matter where they occurred was a fundamental

5   principle of the law of nations.[24]

6

7       **B.      U.S. Courts and Jurists Followed the Established Rule of Providing Civil
               Liability for U.S. Subjects' Wrongs Committed Abroad**

8           American jurists followed English practice by enforcing these principles, including in their

9   interpretations of the ATS.  A 1795 opinion by Attorney General William Bradford found the ATS

10  to be a valid means by which foreigners could sue U.S. subjects for torts committed on foreign

11  territory in violation of the law of nations.   This opinion provides the best contemporaneous

12  evidence of how the First Congress understood the ATS and its application to U.S. subjects

13  abroad.  Additionally, through the common law and other statutes, U.S. jurisprudence consistently

14  held its subjects responsible for extraterritorial law of nations violations such as breaches of

15  neutrality, breaches of territorial rights, piracy, and, later, the slave trade.

16

17          **1.   Breaches of Neutrality and Territorial Rights**

18          The young United States was concerned about its subjects' law of nations violations

19  because individual acts of hostility, failure to provide remedies, and harboring of wrongdoers

20  could lead to international conflict.  *See* Vattel, *supra*, at bk. 4, ch. 4, § 52 (discussing "acts of

21  hostility" leading to breach of international peace).   Such violations included breaches of

22

23  ───────────────────

24  [23] These cases against Verelst demonstrate that English courts permitted suits against English
    subjects regardless of the plaintiffs' nationality.

25

26  [24] These cases were well known to nineteenth-century U.S. courts.  *See, e.g.*, *Eachus*, 17 Ill. at
    535-36 (citing *Mostyn*, 98 Eng. Rep. 1021, and *Skinner*, 6 State Trials 710); *Gardner v. Thomas*,
27  14 Johns. 134, 135 (N.Y. Sup. Ct. 1817) (citing *Rafael*, 96 Eng. Rep. 579).

28

neutrality, *see Breach of Neutrality*, 1 U.S. Op. Att'y Gen. 57 (1795), and breaches of territorial

rights, *see Territorial Rights—Florida*, 1 U.S. Op. Att'y Gen. 68 (1797).

In the 1790s, the U.S. government proclaimed its neutrality in the war between France and

Great Britain, despite many Americans' enthusiastic support of the French cause.  *See* Casto,

*supra*, at 501.  While the President and Congress implemented criminal mechanisms to enforce

this neutrality,[25] the Bradford Opinion demonstrates that U.S. officials also understood civil

redress to be available under the ATS in cases of breach.  In September 1794, U.S. citizens David

Newell and Peter William Mariner joined a French fleet's attack on the British colony at Sierra

Leone, thereby breaching the declared neutrality of the United States and consequently violating

the law of nations.  *See* Addendum B (Transcription from Original Memorial of Zachary

Macaulay and John Tilley (Nov. 28, 1794)).  The Americans led the French raiding party in the

sacking of two British colonial outposts, Freetown and Bance Island, spending two weeks

assaulting British colonial subjects and destroying property.  *Id.*  Witnesses heard Newell

"declar[e] aloud that it was now an American war" and saw him storm the governor's residence at

Freetown "at the head of a party of French soldiers."  *Id.*  Mariner, they stated, was "exceedingly

active in promoting the pillage of the place" and "more eager in his endeavors to injure the

persons and property of British subjects than the French themselves."  *Id.*

The British insisted that the United States account for its subjects' law of nations

_____

[25] Breaching neutrality by committing, aiding, or abetting hostilities constituted a law of nations violation.  Because nations codified their neutrality through treaties, neutrality breaches usually violated both the law of nations and a treaty.  *See Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 155 (1795).  To that end, President Washington issued a Proclamation of Neutrality in 1793, reiterating that U.S. courts would punish such breaches.  *See* Proclamation No. 3 (1793), *reprinted in* 11 Stat. 753 (1859).  In June 1794, Congress enacted a statute to make such breaches federal crimes.  *See* An Act in Addition to the Act for the Punishment of Certain Crimes Against the United States, ch. 50, §§ 1-4, 1 Stat. 381, 381-83 (1794).

violations, even though they occurred on foreign soil.  British Minister Plenipotentiary George

Hammond demanded redress from the U.S. government, stating that "acts of hostility" like the

Sierra Leone attack invited upon the United States "measures of severity . . . justified by the

indisputable Laws of Nations."  Addendum C (Transcription from Original Memorial of George

Hammond (June 25, 1795)).  Hammond intimated that continued peace between the nations

depended on the United States fulfilling its obligations to punish the violators, remunerate the

economic losses they had caused, and deter U.S. subjects from committing similar acts in the

future.  *See id.*

The Secretary of State forwarded Hammond's letter to Attorney General Bradford to

evaluate its legal demands.  *See Breach of Neutrality*, 1 U.S. Op. Att'y Gen. at 57.  Although

Bradford appears to have been uncertain about whether the United States could prosecute the

perpetrators criminally, *id.* at 58-59, he was confident that the injured parties could seek a civil

remedy, *id.* at 59.[26]  Bradford emphasized:

> [T]here can be no doubt that the company or individuals who have
> been injured by these acts of hostility have a remedy by a *civil* suit
> in the courts of the United States; jurisdiction being expressly given
> to these courts in all cases where an alien sues for a tort only, in
> violation of the laws of nations . . . .

*Id.* at 59 (emphasis in original).  By quoting the ATS directly, Bradford clearly indicated that he

viewed the ATS as one way for foreigners to sue U.S. nationals in U.S. courts for extraterritorial

law of nations violations.

---

[26] Bradford determined that because the violations "took place in a foreign country, they
[were] not within the cognizance" of U.S. courts for the purposes of *criminal* prosecution
or punishment, as criminal law was understood to be limited to local actions.  *Breach of
Neutrality*, 1 U.S. Op. Att'y Gen. at 58.  However, there was "some doubt" as to whether
the "crimes committed on the high seas," were judiciable under the 1794 criminal statute.
*Id.* at 58-59.

In 1797, Attorney General Charles Lee reinforced the rule that the United States must provide redress for law of nations violations committed by U.S. subjects on foreign soil. *Territorial Rights—Florida*, 1 U.S. Op. Att'y Gen. at 69.  A group from Georgia, led by William Jones (a foreigner) and including U.S. citizens, had illegally entered Spanish Florida to pursue runaway slaves.  *Id.* at 68-69.  Lee determined that such "a violation of territorial rights"—rights that, by definition, could only be violated on foreign land—constituted "an offence against the law of nations."  *Id.* at 69.  Despite having the "express" power to do so, Congress had passed no law criminalizing such hostile acts.  *Id.*  Lee nonetheless assured the Spanish that the marauders could "be prosecuted in our courts at common law for the misdemeanor[,] and if convicted, to be fined and imprisoned," as the common law had "adopted the law of nations in its fullest extent, and made it a part of the law of the land."  *Id.*  Thus, Lee concluded that the common law of the United States provided a remedy for extraterritorial misconduct by U.S. subjects.  Finally, Lee's opinion also reinforced the concern that without a proper remedy, Spain would have a "just cause for war."[27]  *Id.* at 70.

### 2.  Piracy, Slave Trade, and Great Crimes Such as Murder

Throughout the nineteenth century, the United States consistently adjudicated actions against its subjects for egregious wrongs, such as murder, piracy, and participation in the slave trade.  The frequent interplay among these extraterritorial wrongs produced concurrent and overlapping jurisdictions in U.S. courts.  However, U.S. courts never deviated from the universal principle that the United States bore responsibility when its own subjects committed these wrongs or when violators sought safe harbor in the United States, no matter where the violations occurred.

---

[27] In line with international obligations, Lee's opinion also indicated his concern with safe-harboring "Jones, a subject and a fugitive from justice, or any of our own citizens." *Territorial Rights—Florida*, 1 U.S. Op. Att'y Gen. at 69.

1    The *Robins* case demonstrated how courts dealt with wrongdoers and the interplay

2    between overlapping jurisdictions in the context of great crimes.  *See* 27 F. Cas. at 831.  In *United*

3    *States v. Robins*, a mutiny aboard the British ship *Hermione* led to murder charges in a U.S. court

4    against a seaman of disputed nationality.  *See id.* at 831.  The seaman claimed to be a U.S. citizen,

5    but was allegedly an Irishman.  *See id.* at 841.  The district court determined that the United States

6    and Britain could claim concurrent jurisdiction over the defendant:  the former because Robins

7    was within U.S. territory, and thus within U.S. jurisdiction to adjudicate cases arising under "the

8    general law of nations"; and the latter because the murder had taken place on British territory (i.e.,

9    on a British ship).  *Id.* at 832-33.  Ultimately, the court held that a treaty provision[28] decided the

10   outcome, and the defendant was sent to England.  *Id.* at 833.  The United States thus fulfilled its

11   law of nations obligation by sending the wrongdoer to England.  However, if the court had instead

12   taken cognizance over the defendant and adjudicated the case, it would have also met its

13   international obligation to deny safe harbor.

14

15   For law of nations violations like piracy, a sovereign's courts had jurisdiction to hear

16   claims no matter where those acts occurred.  Yet even in the context of this universal wrong, U.S.

17   courts still considered the nationality of the defendant as an antecedent matter.  A defendant's

18   nationality determined whether U.S. municipal law, as well as the law of nations, would apply to

19   the case.  U.S. defendants were always subject to both legal regimes in U.S. courts, regardless of

20   the location of their wrong.

21

22

23   _____

24   [28]  Because crimes like murder and forgery were "reprobated in all countries" and
     "dangerous to trade and commerce," nations already had treaties prohibiting the safe

25   harbor of perpetrators, regardless of whether they were "citizens, subjects, or foreigners."
     *Robins*, 27 F. Cas. at 832.  Without such agreements, "culprits would otherwise escape

26   punishment; no prosecution would lie against them in a foreign country; and if it did, it

27   would be difficult to procure evidence to convict or acquit."  *Id.*

28

In addition to the ATS, which provided civil jurisdiction over piracy, the First Congress also passed a statute making piracy a felony and prescribing severe criminal penalties for specific kinds of piratical conduct.  *See* An Act for the Punishment of Certain Crimes Against the United States, ch. 9, § 8, 1 Stat. 112, 113-14 (1790).  The Supreme Court later held that because this criminal statute did not define piracy by the universal law of nations, its application presumptively required some nexus between the offender and the United States, such as territorial presence or citizenship.  *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 631 (1818) ("In describing those who may commit misprision of treason or felony, the words used are 'any person or persons;' yet these words are necessarily confined to any person or persons owing permanent or temporary allegiance to the United States.").  *Cf. Furlong*, 18 U.S. (5 Wheat.) at 197-99 ("[I]t never could have been the intention of Congress that such an offender [an American murderer abroad] should find this country a secure assylum [sic] to him.").  That is, the Court presumed that—even when foreigners could not be tried for the same offenses—subjects could always be held liable for law of nations violations in U.S. courts, no matter where those violations occurred.

Congress responded to *Palmer* in 1819 by extending criminal jurisdiction and penalties to "any person or persons whatsoever" who committed piracy "as defined by the law of nations."  An Act to Protect the Commerce of the United States, and Punish the Crime of Piracy, ch. 77, § 5, 3 Stat. 510, 513-14 (1819).  In *United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820), the first case decided under the new statute, Justice Story interpreted this reference to the "law of nations" to incorporate the "general practice of all nations" in punishing pirates, regardless of the nationality of the ship or offender.  *Id.* at 162.  Similarly, in *Furlong*, the Court again reasoned that a pirate was "equally punishable under [the statute], whatever may be his national character, or whatever may have been that of the vessel in which he sailed, or of the vessel attacked."  18 U.S. (5 Wheat.) at 193; *see also The Malek Adhel*, 43 U.S. (2 How.) 210 (1844) (subjecting American-owned ship

to forfeiture for piratical acts off coast of Brazil, despite owners' ignorance of captain's actions).

The evolution of international prohibitions on slave trading similarly demonstrates that sovereigns understood jurisdiction for certain wrongs to follow their subjects everywhere. The law of nations originally permitted the slave trade, but the United States and other countries outlawed it through municipal laws. During this period, then, the United States had jurisdiction to enforce its criminal prohibitions on the slave trade if the violators were subjects or if they committed violations within U.S. territory. In *The Antelope*, 23 U.S. (10 Wheat.) 66 (1825), Chief Justice Marshall conceded that because slave trading remained legal under the law of nations, the slaves onboard a Spanish-owned ship captured by the U.S. Navy had to be returned to their Spanish owners. *Id.* at 122, 132-33. Without a pervasive law of nations norm, Marshall found that "the legality of the capture of a vessel engaged in the slave trade[ ] depends on the law of the country to which the vessel belongs." *Id.* at 118. Because only municipal laws applied, Spain was responsible for punishing its subjects, just as the United States would punish its subjects.

Subsequently, in the mid-nineteenth century, the law of nations evolved to prohibit slave trading. This evolution had no effect on the sovereign's responsibility to address its subjects' wrongs. Indeed, courts responded by exercising jurisdiction over slave traders. For subjects in particular, who owed allegiance to a court's respective sovereign, the court would apply both the law of nations and municipal law. For example, after Americans seized *La Jeune Eugenie*—a slave trading ship allegedly owned by French citizens and flying the French flag—off the coast of Africa, they brought it to the United States to be tried for violating two sources of law: U.S. penal statutes and the law of nations. *See United States v. The La Jeune Eugenie*, 26 F. Cas. 832, 840 (1822). As in the Marbois incident, the French government asked to transfer the case to French jurisdiction, as it was "a French vessel, owned by French subjects." *Id.* at 840. The U.S. Executive Branch agreed, requesting that the U.S. court transfer the case to "the domestic forum of

the sovereign of the owners."  *Id.* at 851.  Justice Story, sitting as a circuit judge, noted that "American courts of judicature are not hungry after jurisdiction in foreign causes," but found that he nonetheless had jurisdiction to hear the case.  *Id.*  First, U.S. admiralty jurisdiction allowed the court to determine if the ship was properly searched and taken under the law of nations.  Additionally, although the ship flew the French flag, it had been built and previously registered in the United States.  *Id.* at 841.  Justice Story refused to credit the ship's alleged French nationality, finding instead that:

> [E]very nation has a right to seize the property of its own offending subjects on the high seas, whenever it has become subject to forfeiture; and it cannot for a moment, be admitted, that the fact, that the property is disguised under a foreign flag, or foreign papers, interposes a just bar to the exercise of that right.

*Id.* at 843.  Given this accepted principle, and because the slave trade was "admitted by almost all commercial nations as incurably unjust and inhuman," *id.* at 847, Justice Story held that the ship violated the law of nations, as well as U.S. and French penal laws prohibiting the slave trade, *id.* at 848.  However, to appease the French government, Justice Story turned the seized ship and property over to the French consul for final judgment and declined to declare the ship forfeit.  *Id.* at 851.

## CONCLUSION

To interpret the ATS to not apply to U.S. subjects would go against the well-established rule that if a country did not redress the wrongs of its subjects, it was an accessory to their wrongs. The Founders understood this established rule and enacted the ATS in its context.  *Amici* thus urge the court to recognize that the ATS applies to U.S. defendants, as adopting a different rule would contravene the history and purpose of the statute.

DATED: December 23, 2013          Respectfully submitted,

                                  ROSEN BIEN GALVAN & GRUNFELD LLP


                                  By:  */s/ Sarah Alexander*
                                        Sarah P. Alexander



                                  SARAH P. ALEXANDER – 291080
                                  ROSEN BIEN GALVAN & GRUNFELD LLP
                                  315 Montgomery Street, Tenth Floor
                                  San Francisco, California 94104-1823
                                  Telephone:     (415) 433-6830
                                  Facsimile:     (415) 433-7104
                                  Email:         spalexander@rbgg.com

                                  TYLER R. GIANNINI
                                  INTERNATIONAL HUMAN RIGHTS CLINIC
                                  HARVARD LAW SCHOOL
                                  6 Everett Street, Third Floor
                                  Cambridge, Massachusetts 02138
                                  Telephone:     (617) 496-7368
                                  Email:         giannini@law.harvard.edu

                                  Attorneys for *Amici Curiae* Professors of Legal History


                                  On the brief:

                                        Betsey Boutelle (Harvard Law School '14)
                                        Avery Halfon (Harvard Law School '15)
                                        Lynnette Miner (Harvard Law School '14)
                                        Ariel Nelson (Harvard Law School '15)
                                        Oded Oren (Harvard Law School '15)

**ADDENDUM A**

**LIST OF *AMICI CURIAE*[29]**

**William R. Casto**
Paul Whitfield Horn University Professor
Texas Tech University School of Law
1802 Hartford Avenue
Lubbock, TX 79409

William R. Casto is a Paul Whitfield Horn University Professor, which is the highest honor that Texas Tech University may bestow on members of its faculty.  He has written three well-received books:  *The Supreme Court in the Early Republic* (1995), *Oliver Ellsworth and the Creation of the Federal Republic* (1997), and *Foreign Affairs and the Constitution in the Age of Fighting Sail* (2006).  He has also written numerous articles on judicial review, foreign policy, and the relationship between religion and public life in the Founding Era.  He is a member of the American Law Institute.  The U.S. Supreme Court has cited his works many times.

**Martin S. Flaherty**
Leitner Family Professor of International Human Rights
Fordham Law School
33 West 60th Street
New York, NY 10023

Martin S. Flaherty is the Leitner Family Professor of Law and Co-Founding Director of the Leitner Center for International Law and Justice at Fordham Law School.  He is also a Visiting Professor at the Woodrow Wilson School of Public and International Affairs at Princeton University, where he was a Fellow in the Program in Law and Public Affairs, and is currently an Adjunct Professor at Columbia Law School.  Flaherty's publications focus on constitutional law and history, foreign affairs, and international human rights and have appeared in such journals as the *Columbia Law Review*, the *Yale Law Journal*, the *Michigan Law Review*, and the *University of Chicago Law Review*.  Formerly chair of the New York City Bar Association's International Human Rights Committee, he is also a member of the Council on Foreign Relations.

**Nasser Hussain**
Professor of Law, Jurisprudence, and Social Thought
Amherst College
106 Clark House
Amherst, MA 01002

Nasser Hussain teaches at Amherst College in the Department of Law, Jurisprudence, and Social Thought.  Previously he was a member of the Society of Fellows at Harvard University.  He is the author of *The Jurisprudence of Emergency:  Colonialism and the Rule of Law* (2003).  His articles have appeared in a variety of journals, including *Law and Society Review*, *Boston Review*, and *Stanford Law Review*.

---

[29] Affiliations are provided for identification purposes only.

1

**Stanley N. Katz**
Lecturer with Rank of Professor in Public and International Affairs
Woodrow Wilson School of Public and International Affairs
Princeton University
428 Robertson Hall
Princeton, NJ 08544

2

3

4

Stanley Katz is President Emeritus of the American Council of Learned Societies, the national
humanities organization in the United States.  His recent research focuses upon the relationship of
civil society and constitutionalism to democracy, and upon the relationship of the United States to
the international human rights regime.  He is the Editor-in-Chief of the recently published *Oxford
International Encyclopedia of Legal History*, and the Editor of the *Oliver Wendell Holmes Devise
History of the United States Supreme Court*.  Formerly Class of 1921 Bicentennial Professor of the
History of American Law and Liberty at Princeton University, Katz is a specialist on American
legal and constitutional history.  The author and editor of numerous books and articles, Katz has
served as President of the Organization of American Historians and the American Society for
Legal History and as Vice President of the Research Division of the American Historical
Association.  Katz is a Fellow of the American Society for Legal History, the American Academy
of Arts and Sciences, and the Society of American Historians.  He received the National
Humanities Medal (awarded by President Obama) in 2011.

5

6

7

8

9

10

11

12

**Jenny S. Martinez**
Professor of Law and Warren Christopher Professor in the Practice of International Law and
Diplomacy
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305

13

14

15

16

Jenny S. Martinez is a leading expert on international courts and tribunals, international human
rights, national security, constitutional law, and the laws of war.  Her research focuses on the role
of courts and tribunals in advancing and protecting human rights, ranging from her work on the
all-but-forgotten nineteenth-century international tribunals involved in the suppression of the
trans-Atlantic slave trade through her work on contemporary institutions like the International
Criminal Court and the role of courts in policing human rights abuses in connection with anti-
terrorism policies.  She has also written extensively on national security law and the constitutional
separation of powers.  She is the author of *The Slave Trade and the Origins of International
Human Rights Law* (Oxford University Press 2012) and numerous articles in leading academic
journals.

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI CURIAE PROFESSORS OF LEGAL HISTORY IN SUPPORT OF PLAINTIFFS

**ADDENDUM B**

**MEMORIAL OF ZACHARY MACAULAY AND JOHN TILLEY (NOV. 28, 1794)**
Transcription from Original

This 1794 Memorial is from Zachary Macaulay, Acting Governor of the Sierra Leone Company, and John Tilley, the Agent of the Andersons, Merchants in London who owned Bance Island in British Sierra Leone.  Memorial of Zachary Macaulay, Acting Governor of the Honorable the Sierra Leone Co.'s Colony at Sierra Leone, and John Tilley, Agent of Messrs John and Alexander Anderson to the Right Honorable Lord Grenville, One of His Majesty's Principal Sec'ys of State (Nov. 28, 1794) (on file with U.S. National Archives in Boston, MA, Microfilm M-50, Roll 2, Record Group RG-59); *see also* Memorial of Zachary Macaulay, Acting Governor of the Honorable the Sierra Leone Co.'s Colony at Sierra Leone, and John Tilley, Agent of Messrs John and Alexander Anderson to the Right Honorable Lord Grenville, One of His Majesty's Principal Sec'ys of State (Nov. 28, 1794) (on file with British National Archives in Kew, United Kingdom, Microfilm "America" 1794-95 FO 5/9 17-20).  This Memorial accompanied the Letter from George Hammond to Edmund Randolph.  Addendum C; *see also* Letter from George Hammond, Minister Plenipotentiary of His Britannic Majesty, to Edmund Randolph, Sec'y of State, United States of Am. (April 15, 1795) (on file with British National Archives in Kew, United Kingdom, Microfilm "America" 1794-95 FO 5/9 11-16) (showing Macaulay and Tilley Memorial delivered to Mr. Hammond in April 1795).  The Memorial is also referenced in the Bradford Opinion.  *See Breach of Neutrality*, 1 Op. Att'y Gen. 57, 58 (1795).

[Page 1]

To the Right Hon[ble] Lord Grenville one of his Majesty's principal Secretary's of State.
The Memorial of Zachary Macaulay acting Governor of the Hon[ble] the Sierra Leone Company's Colony of Sierra Leone, on the coast of Africa, and of John Tilley Agent of Mess[rs] John and Alexander Anderson, Merchants in London, and proprietors of Bance Island an establishment, on the said coast, Sheweth
That on the 28th of September last a french fleet consisting of, one fifty gun ship, two frigates, two armed brigs, with several armed prizes, did enter the river Sierra Leone, and did take the Hon[ble] the Sierra Leone Company's chief establishment of Freetown, and also Bance Island the establishment as is stated above of Mess[rs] John and Alexander Anderson's
That contrary to the existing neutrality between the British and American Governments, certain American subjects trading

[Page 2]

to this coast, did voluntarily join themselves to the French fleet, and were aiding and abeting [sic] in attacking and destroying the property of British subjects at the above named places and elsewhere, as your memorialists will take the liberty of stating more particularly to your Lordship.
That an American subject of the name of David Newell, commanding a schooner called the Massachusetts belonging to Boston in the state of Massachusetts, the property as your memorialists believe of Daniel Macniel a Citizen of Boston in the said state of Massachusetts, did with the consent and concurrence of the said Daniel Macniel who was then and there present, voluntarily assist in piloting the said french fleet from the Isle de Loss to the river Sierra Leone.
That when the French had taken Freetown, the said David Newell, did land there with arms in his hands and at the head

[Page 3]

of a party of French soldiers, whom he conducted to the house of the acting Governor one of your memorialists
That the said David Newell did make use of violent and threatening language towards your

said memorialists and others, declaring aloud that it was now an American war, and he was resolved to do all the injury in his power to the persons and property of the inhabitants of Freetown.

That the said David Newell was active in exciting the French soldiery to the commission of excesses, and was aiding and abetting in plundering of their property the Hon<sup>ble</sup> the Sierra Leone Company and other individuals British subjects.

That on the same day, namely the 28th day of Sept<sup>r</sup> last the said David Newell, did assist in piloting a French frigate up the River Sierra Leone to Bance Island, which place was attacked by the said frigate and two other vessels, and on the 30th day of September was taken and destroyed

[Page 4]

That as a reward to the said Daniel Macniel and to the said David Newell for their services, the French Commodore did deliver to the said David Newell on board the Schooner commanded by him called the Massachusetts a considerable quantity of goods, which had been the property of British subjects.

That another American subject of the name of Peter William Mariner, who during the last war had acted has [sic] a Lieutenant on board of one of his Majesty's ships but now commanding a Schooner, belonging to New-York called the ___ the joint property as your memorialists believe, of Geo Bolland late of the Island of Bananas, on the coast of Africa, a British subject and ___ Rich a citizen of New-York did in like manner voluntarily assist in conducting the said French fleet from the Isle de Loss to the river Sierra Leone.

That the said Peter W<sup>m</sup> Mariner did also land at Freetown in company of the French with arms in his hands and was

[Page 5]

exceedingly active in promoting the pillage of the place.

That the said Peter W<sup>m</sup> Mariner was more eager in his endeavors to injure the persons and property of British subjects than the French themselves, whom he the said Peter W<sup>m</sup> Mariner instigated to the commission of enormities by every mean [sic] in his power, often declaring that his heart's desire was to wring his hands in the blood of Englishmen.

That on the 29th day of Sept<sup>r</sup> last the said Peter W<sup>m</sup> Mariner did voluntarily go in a sloop commanded by him, and carrying American colours in pursuit of a sloop belonging the said Mess<sup>rs</sup> John and Alexander Anderson of London, which had taken refuge in Pirat[e]'s bay, in the River Sierra Leone. That on the same day, the said Peter W<sup>m</sup> Mariner did seize the said sloop and did deliver her up as a prize to the French Commodore.

That the said Peter W<sup>m</sup> Mariner did receive from the French Commodore as a reward for his exertions a Cutter which had been the property

[Page 6]

of the Hon<sup>ble</sup> the Sierra Leone Company called the Thornton together with a considerable quantity of goods, which had been the property of British subjects.

That the said Peter W<sup>m</sup> Mariner did also carry off from Freetown and apply to his own use a great variety of articles the property of British subjects; particularly a library of books belonging to the Hon<sup>ble</sup> the Sierra Leone Company, which there is reason to believe would not have been carried off by the French.

That on the 7th day of Oct<sup>r</sup> last the said Peter W<sup>m</sup> Mariner did receive on board the said Cutter Thornton commanded by him, a number of armed Frenchmen, with whom and in company of a French armed brig, he did voluntarily go in pursuit of a ship in the offing, which proved to be the Duke of Bucclugh of London John Maclean Master.  That by the orders of the said Peter W<sup>m</sup> Mariner, a boat belonging to the said Duke of Bucclugh was seized, and the chief mate of the said Duke of Bucclugh who was on board the boat made prisoner.

[Page 7]

That the said Peter W<sup>m</sup> Mariner did hail the said Duke of Bucclugh and did desire the said John Maclean to strike his colours, and to surrender to the said Cutter Thornton which he the said Peter W<sup>m</sup> Mariner commanded.  That on the said John Maclean refusing to strike the said Peter W<sup>m</sup> Mariner did fire a four pound shot at the said Duke of Bucclugh.

That on the 9th day of Oct<sup>r</sup> last, the said Peter W<sup>m</sup> Mariner did in the said Cutter Thornton commanded by him voluntarily accompany three French vessels in pursuit of the Ship Harpy of London Daniel Telford Master, which ship they captured.

That the said Peter F Mariner did shew himself on all occasions the determined and inveterate enemy of British subjects, and was a cause together with the beforementioned [sic] persons Daniel Macniel and David Newell of considerably more injury being done to British property on this coast, than without their aid could have been done.

That your memorialists

[Page 8]

are ready to produce legal evidence of [the] above facts, which they submit to your Lordship's judgment in the confidence that they will be taken into serious consideration both that the parties concerned may obtain such redress as is to be had and that such wanton aggressions on the part of subjects of a neutral government may meet their due punishment

That in confirmation of the above your memorialists do affix to these presents which are contained on this and the nine preceding pages their hands and seals at Freetown this 28th day of Nov<sup>r</sup> 1794

Signed Zachary Macaulay (LS)
John Tilley (LS)

## ADDENDUM C

### LETTER FROM GEORGE HAMMOND (JUNE 25, 1795)
Transcription from Original

This letter, dated June 25, 1795, was addressed to Edmund Randolph, the U.S. Secretary of State, from George Hammond, the British Minister Plenipotentiary.   Letter from George Hammond, Minister Plenipotentiary of His Britannic Majesty, to Edmund Randolph, Sec'y of State, United States of Am. (June 25, 1795) (on file with U.S. National Archives in Boston, MA, Microfilm M-50, Roll 2, Record Group RG-59); *see also* Letter from George Hammond, Minister Plenipotentiary of His Britannic Majesty, to Edmund Randolph, Sec'y of State, United States of Am. (April 15, 1795) (on file with British National Archives in Kew, United Kingdom, Microfilm "America" 1794-95 FO 5/9 11-16) (draft letter).   Mr. Randolph then delivered the letter to Attorney General William Bradford, requesting an opinion on the matter.   Letter from Edmund Randolph, Sec'y of State, United States of Am. to William Bradford, Att'y Gen., United States of Am. (June 30, 1795) (on file with U.S. National Archives in Boston, MA, Microfilm M-40, Roll 8, Record Group RG-59).   Attorney General Bradford referenced the letter from Mr. Hammond in his opinion on the Sierra Leone incident.   *See Breach of Neutrality*, 1 Op. Att'y Gen. 57, 58 (1795).

[Page 1]

The Undersigned Minister Plenipotentiary of His Britannic Majesty has received instructions to lay before the Government of the United States the inclosed memorial[s?] from the acting Governor of the British Colony of Sierra Leone on the coast of Africa, and from the Agent of Mess<sup>rs</sup> John and Alexander Anderson, Proprietors of Bance Island on the same Coast.

The Undersigned in communicating this Paper to the Secretary of State does not think it necessary to dwell either on the nature or the importance of the particular transactions which are there stated.

1    He would not however do Justice to the friendly dispositions of his Court, or to the
2    principles upon which the present political relations of the two Countries are established, if upon
     an occasion of so serious, and in its extent of

3    [Page 2]

4    of so unprecedented a nature, he were not to remark that the line of forbearance hitherto pursued
     by His Majesty under the circumstances of similar though less aggravated offences cannot be
5    considered as applicable to the present case.
6        The Citizens of the United States mentioned in the inclosed paper[s?], if they were not
     originally the authors of the expedition against the Settlements at Sierra Leone, have taken so
     decided and leading a part in the business, that the French crews and vessels employed on the
7    same occasion, appear rather in the light of Instruments of hostility in their hands than as
     Principals in an enterprise undertaken against the Colony of a Power with whom France only was
8    at war.
9        The forbearance hitherto shewn by the British government towards those citizens of the
     United States who

10   [Page 3]

11   who have been found in the actual commission of acts of hostility against His Majesty's subjects
     has proceeded partly from an unwillingness to carry to their full extent against the Individuals of a
12   friendly Nation measures of severity which would however have been justified by the indisputable
     Laws of Nations, and partly from the persuasion that these acts however frequent have arisen at
13   least in some degree from an ignorance on the part of the persons concerned, with respect to the
     extent of the crime which they were committing, and of the consequences to which they were
14   making themselves liable.  But even the circumstance of that forbearance entitles His Majesty to
     expect that more attention will be paid to His representations on the occasion of a transaction of
15   the nature and extent of that complained of in this memorial.  It might be stated with truth that
     under all the circumstances of the Case these proceedings

16
     [Page 4]
17
     proceedings could hardly have been justified even by any state of hostility between two countries
18   who had felt a common interest in the cause of humanity and in the general welfare of mankind:
     How much more reason is there then for complaint when these acts are committed by the Citizens
19   of a Power with whom His Majesty is living on terms of perfect Amity, and towards whom He had
     been anxious to shew every degree of attention and friendship.  On all these grounds this case
20   must be felt to be of a nature, which calls for the most serious attention of both governments; and
     the rather, because it appears by other accounts which have been received by the British
21   government, that similar practices are daily multiplying in the West Indies and elsewhere.  The
     King is confident that the United States will feel the necessity of adopting the most vigorous
22   measures with a view to restrain in future such illegal and piratical aggressions which must

23   [Page 5]

24   must be as repugnant to the wishes and intentions of the American government as they are
     contrary to all the principles of Justice and all the established rules of neutrality.  And His Majesty
25   trusts on the present occasion, that to the ample indemnification of the parties aggrieved will be
     added such exemplary punishment of the offenders as may satisfy the just claims of the British
26   government, and secure to the two Countries the uninterrupted enjoyment of that intercourse of
     friendship and good understanding, which proceedings of the nature complained of have so
27   obvious a tendency to disturb.

28                                                Geo. Hammond.

Philadelphia
25 June 1795.

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I am causing this brief to be filed electronically via this Court's CM/ECF system, which will automatically serve the following counsels of record:

Kathleen Sullivan, Esq.
Faith Gay, Esq.
Isaac Nesser, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Kathryn Lee Boyd, Esq.
Rajika Lynn Shah, Esq.
Schwarcz, Rimberg, Boyd and Rader
6310 San Vicente Blvd.
Suite 360
Los Angeles, CA 90048

Terri Marsh, Esq.
Jordan Samuel Berman, Esq.
Human Rights Law Foundation
1615 L Street NW
Suite 1100
Washington, DC 20036


DATED: December 23, 2013                 Respectfully submitted,

                                         ROSEN BIEN GALVAN & GRUNFELD LLP


                                         By:   */s/ Sarah Alexander*
                                               Sarah P. Alexander


                                         SARAH P. ALEXANDER – 291080
                                         ROSEN BIEN GALVAN & GRUNFELD LLP
                                         315 Montgomery Street, Tenth Floor
                                         San Francisco, California 94104-1823
                                         Telephone:    (415) 433-6830
                                         Facsimile:    (415) 433-7104
                                         Email:        spalexander@rbgg.com

                                         TYLER R. GIANNINI
                                         INTERNATIONAL HUMAN RIGHTS CLINIC
                                         HARVARD LAW SCHOOL
                                         6 Everett Street, Third Floor
                                         Cambridge, Massachusetts 02138

Telephone:     (617) 496-7368
Email:         giannini@law.harvard.edu

Attorneys for *Amici Curiae* Professors of Legal
History

Case No. 5:11-cv-02449-EJD-PSGx
BRIEF OF AMICI CURIAE PROFESSORS OF LEGAL HISTORY IN SUPPORT OF PLAINTIFFS