1   KATHRYN LEE CRAWFORD-BOYD, ESQ. (SBN 189496)
        lboyd@srbr-law.com
2   RAJIKA L. SHAH, ESQ. (SBN 232994)
        rshah@srbr-law.com
3   **SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
4   6310 San Vicente Boulevard, Suite 360
    Los Angeles, California 90048
5   Phone: (323) 302-9488, Fax: (323) 931-4990

6   TERRI MARSH, ESQ. (*pro hac vice*)
        terri.marsh@hrlf.net
7   JORDAN S. BERMAN, ESQ. (*pro hac vice*)
        jsberman@gmail.com
8   **HUMAN RIGHTS LAW FOUNDATION**
9   1615 L Street NW, Suite 1100
    Washington, D.C.  20036
10  Phone: (202) 697-3858, Fax: (323) 931-4990

11

12

13           **UNITED STATES DISTRICT COURT FOR THE**
        **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

14

15  DOE I, DOE II, Ivy HE, DOE III, DOE IV,      Case No. 5:11-cv-02449-EJD-PSGx
    DOE V, DOE VI, ROE VII, Charles LEE,         Assigned to the Hon. Edward J. Davila, U.S.D.J.
    ROE VIII, DOE IX, LIU Guifu,  WANG
16  Weiyu, and those individual similarly situated,

                                                 **PLAINTIFFS' OPPOSITION TO**
17                                               **DEFENDANTS' MOTION TO DISMISS**
                                                 **SECOND AMENDED COMPLAINT**
18              Plaintiffs,
                                                 Action Filed: May 19, 2011
19      vs.                                      FAC Filed: Sept. 2, 2011
                                                 SAC Filed: Sept. 18, 2013
20  CISCO SYSTEMS, INC., John CHAMBERS,
    Fredy CHEUNG, and DOES 1-100,                Hearing Date: February 21, 2014
21                                               Time: 9:00 a.m.
                                                 Dept: Courtroom 4, 5th Floor
22              Defendants.

23

24

25

26

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:11-cv-02449-EJD-PSGx

# TABLE OF CONTENTS

**Page**

INTRODUCTION …………………………………………………………………………….1

STATEMENT OF FACTS …………………………………………………………………...1

I.  The Parties ……………………………………………………………………………….1

II.  Defendants Customized the Golden Shield Largely in San Jose to Facilitate the Ideological Conversion and Suppression of Falun Gong ……………………………..2

III.  San Jose Knowingly and Purposefully Customized the Golden Shield Specifically to Persecute Falun Gong ……………………………………………………………………4

ARGUMENT ………………………………………………………………………………..6

I.  Cisco's Unsupported Allegations Should Be Ignored …………………………………6

II.  Plaintiffs' ATS Claims Are Not Barred by *Kiobel* …………………………….......7

    A.  ATS Claims Against U.S. Defendants Are Proper …………………………………8

    B.  The Presumption Does Not Apply Where Defendants' Domestic Conduct Was Central to the Alleged Crimes ……………………………………………………..10

    C.  Defendants' Representations of Post-Kiobel Cases Are Inaccurate ………………12

    D.  The Touch and Concern Standards Reflect a Broader Paradigm …………………...14

    E.  The SAC Alleges "Relevant" Domestic Conduct ………………………………..15

        1.  Defendants Mischaracterize U.S. Conduct as Preparatory or Normal Commercial Transactions ………………………………………………………15

        2.  Plaintiffs' Claims Fall Within the "Focus" of Legislative Concern ………….16

III.  Defendants Are Secondarily Liable For The Alleged Abuses ………………………...17

    A.  Aiding and Abetting Liability Exists Under the ATS and TVPA ……………………17

        1.  The *Mens Rea* Standard for Aiding and Abetting Under the ATS ……………18

        2.  Actus Reus ………………………………………………………………………19

        3.  Plaintiffs Have Plausibly Alleged *Mens Rea* Under Any Standard …………….20

        4.  Plaintiffs Sufficiently Allege *Actus Reus*……………………………………22

    B.  Conspiracy/JCE Is Available Under the ATS and TVPA …………………………24

i

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**TABLE OF CONTENTS (cont.)**

Page

C.   Ratification and Agency Liability .........................................................25

D.   Plaintiffs Do Not Allege Ordinary Commercial Conduct.................................25

E.   Plaintiffs Allege Violations of Norms Actionable Under the ATS ......................26

    1.   Cruel, Inhuman and Degrading Treatment ......................................26

    2.   Forced Labor ......................................................................27

    3.   Crimes Against Humanity .........................................................27

F.   Corporations May Be Held Liable for Claims Brought Under the ATS ..................28

G.   Corporate Liability Under the ATS Is Not Displaced by the TVPA .....................28

H.   Defendants Acted Under Color of Law .....................................................28

IV.   **The State Law Claims Should Stand** .........................................................30

A.   The Presumption Against Extraterritoriality Does Not Apply ...........................30

B.   The State-Law Claims Are Timely .........................................................31

    1.   Determination of California or Chinese Law Is Premature ......................31

    2.   California Tolling Principles Make Plaintiffs' Claims Timely ...................33

C.   Aiding and Abetting Liability Under State Law is Sufficiently Plead .....................34

D.   Plaintiffs Have Sufficiently Pled Causation for the State Law Claims ...................35

V.   **Plaintiffs' Claim for Unfair Business Practices under California Law Is Properly Pled** ...36

A.   Plaintiffs' UCL Claim Is Not Defeated by Extraterritorial Components ................36

B.   The UCL Claim Is Closely Linked to Cisco's Misconduct ..............................36

VI.   **Plaintiffs' ECPA Claim Should Stand** .......................................................37

A.   Plaintiffs' ECPA Claim Does Not Allege Extraterritorial Activity........................37

B.   The ECPA Authorizes a Private Right of Action .........................................37

C.   Defendants' Customization of Their Products to Commit Human Rights Abuses

    is Not a Legitimate Normal Course of Business Activity.................................38

VII.   **The Individual Defendants Are Liable For Plaintiffs' Claims** .............................38

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

**TABLE OF CONTENTS (cont.)**

2

**Page**

3   **VIII.   The Case Is Justiciable** ……………………………………………………..40

4       A.   The Act of State Doctrine Does Not Bar Adjudication of This Suit ……………..40

5           1.   This Case Does Not Require Judgment On An Official Act Of State ……….40

6           2.   *Sabbatino* Does Not Require Dismissal On Act Of State Grounds ………….41

7       B.   This Case Presents No Political Question and is Properly Before the Court ………..43

8           1.   Plaintiffs' Claims are Constitutionally Committed to the Judiciary …………..45

9           2.   Ample Standards Exist to Adjudicate ATS Claims and Transnational

10          Torts ………………………………………………………………………45

11          3.   No Initial Policy Determination Regarding Trade with the PRC Is

12          Implicated …………………………………………………………………46

13          4.   The Claims Do Not Affect the Nation's Unified Voice in Foreign

14          Affairs …………………………………………………………........47

15      C.   Foreign Affairs Preemption Does Not Apply …………………………………48

16      D.   International Comity Does Not Militate in Favor of Dismissal ………………………50

17  **CONCLUSION** …………………………………………………………………50

18

19

20

21

22

23

24

25

26

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Abagninin v. AMAC Chem. Corp.*,
    545 F.3d 733 (9th Cir. 2008) …………………………………………………………19, 28

*Abdullahi v. Pfizer, Inc.*,
    562 F.3d 163 (2d Cir. 2009)…………………………………………………………………29

*Adra v. Clift*,
    195 F. Supp. 857 (D. Md. 1961) …………………………………………………………14

*Ahmed v. Magan*,
    Slip Op., 2013 WL 4479077 (S.D. Ohio 2013) …………………………………………..8, 13

*Al Shimari v. CACI International, Inc.*,
    2013 WL 3229720 (E.D. Va. June 25, 2013) …………………………………………..13

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
    416 F.3d 1242 (11th Cir. 2005) ……………………………………………17, 24, 29

*Almog v. Arab Bank, PLC*,
    471 F.Supp.2d 257 (E.D.N.Y.2007)   ………………………………………………21, 26

*Alperin v. Vatican Bank*,
    410 F.3d 532 (9th Cir. 2005) .................................................................. 45, 46, 48

*Aluminum Bahr. B.S.C. v. Alcoa Inc.*,
    2012 WL 2093997 (W.D. Pa. June 11, 2012) …………………………………………..12

*Am. Ins. Ass'n. v. Garamendi*,
    539 U.S. 396 (2003).................................................................................................. 49

*Anunziato v. eMachines,* Inc.,
    402 F. Supp. 2d 1133 (C.D. Cal. 2005) .................................................................... 37

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) …………………………………………………………………….6

*Ashley Creek Phosphate Co. v. Norton*,
    420 F.3d 934 (9th Cir. 2005) …………………………………………………………..31

*Aziz v. Alcolac, Inc.*,
    658 F.3d 388 (4th Cir. 2011) …………………………………………………………17, 22

iv

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Baker v. Carr*,
    369 U.S. 186 (1962)...........................................................................................................44, 45, 46

*Balintulo v. Daimler AG*,
    727 F.3d 174 (2d Cir. 2013) ………………………………………………………13

*Banco Nacional de Cuba v. Sabbatino*
    376 U.S. 398 (1964) …………………………………………………………..40, 41

*Bao Ge v. Li Peng*,
    201 F.Supp.2d 14 (D.D.C. 2000) …………………………………………………30

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) …………………………………………………………….6

*Berger v. Hanlon*,
    129 F.3d 505 (9th Cir. 1997), *rev'd on other grounds*, 526 U.S. 808 (1999),
    (per curiam), *opinion reinstated* 188 F.3d 1155 (9th Cir. 1999) …………………………………29

*Bigio v. Coca-Cola Co.*,
    448 F.3d 176  …………………………………………………………………50
    239 F.3d 440 (2d Cir. 2000) ……………………………………………………29, 42

*Blazveska v. Raytheon Aircraft Co.*,
    522 F.3d 948 (9th Cir. 2008) …………………………………………………..30

*Bolchos v. Darrell*,
    3 F. Cas. 810 (D.S.C 1795) …………………………………………………14

*Bowoto v. Chevron Corp.*,
    621 F.3d 1116 (9th Cir. 2010) …………………………………………………17
    557 F.Supp.2d 1080 (N.D. Cal. 2008)  ……………………………………………27, 28
    2007 WL 2349345 (N.D. Cal. 2007)......................................................................... 41
    2006 WL 2455752 (N.D. Cal. Aug. 22, 2006)  …………………………………17, 18, 20
    312 F.Supp.2d 1229, 1247 (N.D. Cal. 2004)  …………………………………………18

*Brentwood Acad. v. Tennessee Secondary School Athletic Ass'n*,
    531 U.S. 288 (2001)  ……………………………………………………..29

*Burton v. Wilmington Parking Authority*,
    365 U.S. 715 (1961)……………………………………………………………29

v

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1

2

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

3

*Cabello v. Fernandez-Larios,*
402 F.3d 1148 (11th Cir. 2005) ……………………………………………………passim

4

5

*Central Bank of Denver v. First Interstate Bank of Denver,*
511 U.S. 164 (1994) ……………………………………………………………..17

6

7

*Cervantes v. City of San Diego,*
5 F. 3d 1273 (9th Cir. 1993) ……………………………………………………...34

8

*Chen Gang v. Zhao Zhizhen,*
2013 WL 5313411 (D. Conn. Sept. 20, 2013) ……………………………………...12

9

10

*Collins v. Womancare,*
878 F.2d 1145 (9th Cir. 1989) ……………………………………………………29

11

12

*Colo. River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976)...........................................................................................44

13

14

*Corrie v. Caterpillar, Inc.,*
503 F.3d 974 (9th Cir. 2007) ……………………………………………………45
403 F.Supp.2d 1019 (W.D.Wash. 2005) ……………………………………19, 26

15

16

*Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.,*
130 F.3d 1342 (9th Cir. 1997) .........................................................................40

17

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000)...........................................................................................49

18

19

*Daniels-Hall v. National Educ. Ass'n,*
629 F.3d 992 (9th Cir. 2010) ……………………………………………………6, 7

20

21

*Dennis v. Sparks,*
449 U.S. 24 (1980) ……………………………………………………………29

22

23

*Direct Sales Co. v. U.S.,*
319 U.S. 703 (1943)……………………………………………………………22

24

*DIRECTV, Inc. v. Gallagher,*
2004 U.S. Dist. LEXIS 28008, (D.N.J. Apr. 29, 2004) ......................................38

25

26

*DIRECTV Inc. v. Robson,*
420 F.3d 532 (5th Cir. 2005) .............................................................................38

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**TABLE OF AUTHORITIES (cont.)**

Page(s)

*DirecTV, Inc. v. Treworgy,*
373 F.3d 1124 (11th Cir. 2004) .................................................................................. 38

*Doe v. Exxon Mobil Corp.,*
527 Fed. App'x 7 (D.C. Cir. 2013) ...........................................................................13
654 F.3d 11, 28 (D.C. Cir. 2011), *vacated on other grounds* ........................17, 20, 28

*Doe v. Nestle, S.A.,*
748 F.Supp.2d 1057 (C.D.Cal. 2010) ..............................................19, 21, 27, 28
No. 10-56739, slip op. (9th Cir. Dec. 19, 2013) ...............................................passim

*Doe v. Qi,*
349 F.Supp.2d 1258 (N.D. Cal. 2004) ...............................................................passim

*Doe v. Saravia,*
348 F.Supp.2d 1112 (E.D. Cal. 2004)................................................18, 27, 33, 34

*Doe v. Unocal,*
395 F.3d 932, 951 (9th Cir. 2002), *vacated by* 395 F.3d 978 (9th Cir. 2003) ...................passim

*Doe I v. Gap, Inc.,*
2002 WL 1000068 (D.N. Mar. I, 2002) ...............................................................24

*Donahue v. Apple, Inc.,*
871 F.Supp.2d 913 (N.D.Cal.2012) ......................................................................32

*Dunhill v. Republic of Cuba*
425 U.S. 682 (1976).............................................................................................. 40

*Environmental Defense Fund. Inc., v. Massey,*
986 F.2d 528 (D.C. Cir. 1993).............................................................................12

*European Community v. RJR Nabisco, Inc.,*
2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) .......................................................11

*Filártiga v. Pena-Irala,*
630 F.2d 876 (2d Cir. 1980) ..............................................................................8, 41

*Flomo v. Firestone,*
643 F.3d 1013 (7th Cir. 2011) ..............................................................................28

*Flowers v. Tandy Corp.,*
773 F.2d 585 (4th Cir. 1985) ..........................................................................37, 38

*F.T.C. v. Swish Marketing,*
2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ...................................................... 39

vii

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**TABLE OF AUTHORITIES (cont.)**

Page(s)

*Galu v. Swissair: Swiss Air Transport Co.*,
    873 F.2d 650 (2nd Cir. 1989) ........................................................................... 41

*Giraldo v. Drummond Co., Inc.*,
    2013 WL 3873965 (N.D. Ala. July 25, 2013) ……………………………………..22

*Godina v. Caltrans*,
    2013 U.S. Dist. LEXIS 86424 (E.D. Cal. June 18, 2013) …………………………………30

*Gushi Brothers Co. v. Bank of Guam*,
    28 F.3d 1535 (9th Cir. 1994) ……………………………………………………31

*Halberstam v. Welch*,
    705 F.2d 472, 481 (D.C. Cir. 1983) …………………………………………24

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ……………………………………………………………..24

*Hartford Fire Inc. Co. v. California*,
    509 U.S. 764 (1993) ........................................................................................... 50

*Henfeild's Case*,
    11 F. Cas. 1099 (C.C.D. Pa. 1793) ……………………………………………17

*Hilao v. Estate of Marcos*,
    103 F.3d 767 (9th Cir. 1996) ……………………………………………………passim

*Hilton v. Guyot*,
    159 U.S. 113 (1895) ……………………………………………………………..14

*Hollander v. Brown*,
    457 F. 3d 688 (7th Cir. 2006) ……………………………………………………33

*Howerton v. Bagica*,
    708 F.2d 380 (9th Cir. 1983) ……………………………………………………29

*Hua Chen v. Honghui Shi*,
    2013 WL 3963735 (S.D.N.Y. Aug. 1, 2013)…………………………………………14

*In re Agent Orange Product Liability Litigation*,
    373 F. Supp. 2d 7 (E.D.N.Y. 2005) ……………………………………………27

*In re Chiquita Bananas Brand Int'l*,
    2011 U.S. Dist. LEXIS 59393 (S.D. Ind. June 3, 2011)……………………………31

viii

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

**TABLE OF AUTHORITIES (CONT'D)**

2

Page(s)

3   *In re Clorox Consumer Litigation,*
        894 F.Supp.2d 1224 (N. D.Cal.2012) ……………………………………………………32

4

5   *In re DIRECTV, Inc.,*
        2004 U.S. Dist. LEXIS 24263, (N.D. Cal. July 26, 2004)....................................37, 38

6

7   *In re Estate of Marcos Human Rights Litig.,*
        25 F.3d 1467 (9th Cir. 1994) …………………………………………………..8, 40
        978 F.2d 493 (9th Cir. 1992) ....................................................................................40, 41

8

9   *In re First Alliance Mortg. Co.,*
        471 F.3d 977 (9th Cir. 2006)  …………………………………………………….34

10

11  *In re: Google Inc. Gmail Litigation,*
        2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ................................................... 38

12  *In re Nazi Era Cases Against German Defendants Litig.,*
        196 F. App'x 93 (3d Cir. 2006) ................................................................. 45

13

14  *In Re Pizza Time Theatre Sec. Litigation,*
        112 F.R.D. 15 (N.D. Cal. 1986) …………………………………………………..30

15  *In re South African Apartheid Litigation,*
16      617 F.Supp.2d 228 (S.D.N.Y. 2009) …………………………………………….passim

17  *In re World War II ERA Japanese Forced Labor Litigation,*
        164 F. Supp. 2d 1160 (N.D. Cal. 2001) …………………………………………27, 32, 40

18

19  *Jackson* v. *Metropolitan Edison Co.,*
        419 U.S. 345 (1974)  …………………………………………………………...29

20

21  *Janson v. The Vrow Christina Magdelena,*
        13 F. Cas. 356 (D.S.C. 1794)  …………………………………………………..17

22  *Jian Zhang v. Baidu.com Inc.,*
23      2013 WL 2458834 (S.D.N.Y. June 7, 2013)………………………………………11, 13

24  *Johnson v. Knowles,*
        113 F.3d 1114 (9th Cir. 1997) ………………………………………………….29

25

26  *Jones v. Blanas,*
        393 F. 3d 918 (9th Cir. 2004)…………………………………………………33, 34

27  *Jones v. City and County of San Francisco,*
        976 F.Supp. 896 (N.D. Cal. 1997)...................................................................... 39

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

**TABLE OF AUTHORITIES (cont.)**

2
Page(s)

3   *Kadic v. Karadzic,*
       70 F.3d 232 (2d Cir. 1995) ……………………………………………………28, 29, 40, 41
4

5   *Khulumani v. Barclay Nat'l Bank Ltd.,*
       504 F.3d 254 (2d Cir. 2007) ……………………………………………………………17, 20

6   *Kiobel v. Royal Dutch Petroleum Co.,*
7      133 S. Ct. 1659 (2013) ……………………………………………………………………passim

8   *Kumho Tire Co. v. Carmichael,*
       119 S.Ct. 1167 (1999) ……………………………………………………………………..7
9

10  *Lake-Allen v. Johnson & Johnson, L.P.,*
       2009 U.S. Dist. LEXIS 64860 (D. Ut. July 29, 2009)...........................................44

11  *Laster v. T-Mobile USA, Inc.,*
12     407 F. Supp. 2d 1181 (S.D. Cal. 2005). ……………………………………………………37

13  *Ledesma v. Jack Stewart Produce, Inc.,*
       816 F.2d 482 (9th Cir. 1987) …………………………………………………………...32
14

15  *Lee v. Katz,*
       276 F.3d 550 (9th Cir. 2002)………………………………………………………………29

16  *Lev v. Arab Bank, PLC,*
17     2010 WL 623636 (E.D.N.Y. Jan. 29, 2010)……………………………………………19, 21

18  *Liberal v. Estrada,*
       632 F.3d 1064 (9th Cir. 2011).......................................................................38
19

20  *Linde v. Arab Bank, PLC,*
       384 F. Supp. 2d 571 (E.D.N.Y. 2005) ……………………………………………………21

21  *Liu Bo Shan v. China Const. Bank Corp.,*
22     421 Fed. Appx. 89 (2d Cir. 2011)………………………………………………………22

23  *Liu v. Republic of China,*
       892 F.2d 1419 (9th Cir. 1989).......................................................................41, 42
24

25  *Luis v. Zang,*
       2013 U.S. Dist. LEXIS 29288 (S.D. Ohio Mar. 5, 2013)...................................38

26  *Lizarbe v. Rondon,*
27     642 F. Supp. 2d 473 (D. Md. 2009)...............................................................41, 45
       402 F. App'x 834 (4th Cir. 2010).......................................................................41
28

x

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

<u>**TABLE OF AUTHORITIES (cont.)**</u>

**Page(s)**

*Lugar v. Edmonson Oil* Company, Inc.,
    457 U.S. 922 (1982)……………………………………………………………………….29

*Mamani v. Berzain,*
    654 F.3d 1148 (11th Cir. 2011) ……………………………………………………… 39

*McMahon v. General Dynamics Corp.,*
    933 F. Supp. 2d 682 (D.N.J. 2013) ……………………………………………… 44

*Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs. SARL,*
    2012 WL 748304 (E.D. Mich. Mar. 6, 2012) ………………………………………31

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.,*
    871 F. Supp. 2d 933 (N.D. Cal. 2012) …………………………………………….12

*Mohammed v. Jeppensen Dataplan, Inc.,*
    614 F.3d 1070 (9th Cir 2010) …………………………………………………………..24

*Monaco v. Bear Stearns,*
    2011 U.S. Dist. LEXIS 105471 (C.D. Cal. Sept. 12, 2011) …………………………...34

*Morrison v. Nat'l Australia Bank Ltd.,*
    130 S. Ct. 2869 (2010) ……………………………………………………….. ………………*passim*

*Mujica v. Occidental Petroleum Corp.,*
    381 F.Supp.2d 1164 (C.D. Cal. 2005) ……………………………………………17, 27, 28

*Murray v. The Schooner Charming Betsy,*
    6 U.S. 64 (1804) ………………………………………………………………………….47

*Mwani v. Bin Laden,*
    2013 WL 2325166 (D.D.C. 2013) ………………………………………………………13

*Northrop Corp. v. McDonnell Douglas Corp.,*
    705 F.2d 1030 (9th Cir. 1983)............................................................................44, 45

*Oluwashina Kazeem Ahmed–Al–Khalifa v. Queen Elizabeth II,*
    2013 WL 2242459 (N.D.Fla. May 21, 2013) …………………………………………...14

*The Paquete Habana,*
    175 U.S. 677 (1900)...........................................................................................46

*Parks v. Eastwood Ins. Services, Inc.,*
    2002 U.S. Dist. LEXIS 28249 (C.D. Cal. July 29, 2002) ....................................... 36

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

<u>**TABLE OF AUTHORITIES (cont.)**</u>

**Page(s)**

2

3

*Paulsson Geophysical Services, Inc. v. Sigmar,*
   529 F.3d 303 (5th Cir. 2008)   …………………………………………………………….11

4

5

*Presbyterian Church Of Sudan v. Talisman Energy, Inc.,*
   582 F.3d 244 (2d Cir. 2009)   …………………………………………..17, 19, 21, 26

6

*Psimenos v. E. F. Hutton & Co., Inc.,*
   722 F.2d 1041 (2d Cir. 1983)   …………………………………………………………15

7

8

*Republic of Austria v. Altmann,*
   541 U.S. 677 (2004).......................................................................................................... 48

9

*Reyes-Fuentes v. Shannon Produce Farm, Inc.,*
   671 F. Supp. 2d 1365 (S.D. Ga. 2009)   …………………………………………………12

10

11

*Roe I v. Bridgestone,*
   492 F. Supp. 2d 988 (S.D. Ind. 2007)   ……………………………………………….34

12

13

*Romero v. Drummond Co.,*
   552 F.3d 1303 (11th Cir. 2008)   ………………………………………………….28, 31

14

*Rubio v. Capital One Bank,*
   613 F.3d 1195 (9th Cir. 2010)   ................................................................................... 37

15

16

*Santa Maria v. Pacific Bell,*
   202 F.3d 1170 (9th Cir. 2000)   ……………………………………………………….33

17

18

*Sarei v. Rio Tinto, PLC,*
   671 F.3d 736 (9th Cir. 2011) (en banc)
      *cert. granted and judgment vacated,* 133 S.Ct. 1995 (2013)   ……………………13, 19, 20, 40

19

20

*SEC v. United Financial Group, Inc.,*
   474 F.2d 354 (9th Cir. 1973)   ……………………………………………………….34

21

22

*Sexual Minorities Uganda v. Lively,*
   2013 WL 4130756 (D. Mass. Aug. 14, 2013)   …………………………………..10, 13, 16

23

24

*Siderman de Blake v. the Republic of Argentina,*
   865 F.2d 699 (9th Cir. 1992)........................................................................................ 40

25

26

*Sinaltrainal v. Coca-Cola Co.,*
   578 F.3d 1252 (11th Cir. 2009)   ……………………………………………………..17

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

## <u>TABLE OF AUTHORITIES (cont.)</u>

2
<u>Page(s)</u>

3 *Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ……………………………………………. ………*passim*

4

5 *Steele v. Bulova Watch Co.,*
   344 U.S. 280 (1952)  …………………………………………………………..11

6 *Stutz Motor Car of Am. v. Reebok Int'l,*
   909 F. Supp. 1353 (C.D. Cal. 1995)........................................................ .37

7

8 *Talbot v. Janson,*
   3 U.S. (3 Dalll.) 133 (1795)………………………………………………17

9

10 *Taylor v. Kellogg Brown & Root Servs., Inc.,*
   658 F.3d 402 (4th Cir. 2011) ............................................................. 45

11 *Trajano v. Marcos,*
   878 F.2d 1438 (9th Cir. 1989)............................................................ 41

12

13 *Ungaro-Benages v. Dresdner Bank AG,*
   379 F.3d 1227 (11th Cir. 2004)............................................................ 50

14

15 *United States v. Mandel,*
   914 F.2d 1215 (9th Cir. 1990) ........................................................... 45

16

17 *U.S. v. Ritchie,*
   342 F.3d 903 (9th Cir. 2003) ……………………………………………7

18 *U.S. v. Smith,*
   5 Wheat. 153 (1820)  ………………………………………………..27

19

20 *United States v. Spawr Optical Research Inc.,*
   864 F.2d 1467 (9th Cir. 1988) ………………………………………….45

21 *U.S. v. Wiga,*
   662 F.2d 1325 (9th Cir. 1981) ………………………………………….25

22

23 *Viera v. Eli Lilly & Co.,*
   2010 WL 3893791 (S.D. Ind. Sept. 30, 2010) ……………………………..32

24

25 *Vieth v. Jubelirer,*
   541 U.S. 267 (2004)........................................................44, 45, 46, 48

26

27 *Wade v. Danek Medical Inc.,*
   182 F. 3d 281 (4th Cir. 2001) ……………………………………………33

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Wang v. Masaitis,*
    416 F.3d 992 (9th Cir. 2005) ................................................................. 48

*Wiwa v. Royal Dutch Petroleum Co.*
    2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ........................................... 42

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Intern.,*
    493 U.S. 400 (1990) ........................................................................ 40, 42

*Zheng v. Yahoo! Inc.,*
    2009 U.S. Dist. LEXIS 111886 (N.D. Cal. Dec. 2, 2009) ...................... 37

*Zschernig v. Miller,*
    389 U.S. 429 (1968) ............................................................................... 49

**FEDERAL STATUTES**

15 C.F.R. 742.7 ...................................................................................... 47

18 U.S.C. § 2511 .................................................................................... 37

18 U.S.C. § 2512 .................................................................................... 37

18 U.S.C. § 2512(1) ............................................................................... 37

18 U.S.C. § 2512(2) ............................................................................... 38

18 U.S.C. § 2520 ............................................................................... 37, 38

22 U.S.C. § 6461(a) ............................................................................... 47

28 U.S.C. § 1367  ………………………………………………...…………………….30

42 U.S.C. § 1983  ………………………………………………...……………….29

50 U.S.C. Appx § 2405 .......................................................................... 47

Pub. L. No. 101-246, 104 Stat. 15 (1990) ("Tiananmen Act") ............... 49

Pub. L. No. 106-286, 114 Stat. 880 (2000) (22 U.S.C. § 6901) ………………………………………… 44

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

<u>**TABLE OF AUTHORITIES (cont.)**</u>

2

**Page(s)**

3

**OTHER FEDERAL MATERIALS**

4

Brief of David J. Scheffer as *Amicus Curiae* in Support of Appellants and Reversal, *Doe v. Nestle*, No. 10-56739, at 13 (9th Cir. July 5, 2011) ………………………………………………..………19

5

6

Br. of the Kingdom of the Neth. and the U.K. of Gr. Brit. and N. Ir. as Amici Curiae in Support of Neither Party, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491), 2012 WL 2312825………………………………………………………………………………9

7

8

Memorandum for the United States as Amicus Curiae, *Filartiga v. Pena-Irala* (2d Cir. 1980), reprinted in 19 Int'l Leg. Mats. 585 (1980)…………………………………………………………………..16

9

Supp. Br. for the United States as *Amicus Curiae* in Partial Support of Affirmance, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (filed June 2012) ……………………………………………9

10

11

Supplemental Brief of Amici Curiae Professors of Legal History in Support of Plaintiffs-Appellants, *Al Shimari v. CACI Intern., Inc.*, Nos. 13-1937, 13-2162 Dkt. No. 44-1(Nov. 5, 2013) ……....………..…….…9

12

13

Motion of *Amici Curie* International Law Scholars, Nos. 02-56256, *Sarei v. Rio Tinto* Dkt. No. 308-1 (9th Cir. January 29, 2010)…………………………………………………………………..18

14

15

**STATE CASES**

16

*Ashcraft v. King,*
    228 Cal.App.3d 604 (1991).........................................................................................46

17

*Bockrath v. Aldrich Chemical Co.,*
    21 Cal. 4th 71 (Cal. 1999)..........................................................................................35

18

19

*Casey v. U.S. Bank Nat. Assn.,*
    127 Cal. App. 4th 1138 (2005)……………………………………………………35

20

*Cel-Tech Communications, Inc. v. L.A. Cellular Tel.,*
    20 Cal. 4th 163 (1999).................................................................................................36

21

22

*Clothesrigger, Inc., v. GTE Corp.,*
    191 Cal. App. 3d 605 (1987)......................................................................................36

23

24

*Diamond Multimedia Sys. v. Superior Court,*
    19 Cal. 4th 1036 (1999) ………………………………………………………30, 32

25

*Eachus v. Trustees of the Illinois & Michigan Canal,*
    17 Ill. 534 (1856) ………………………………………………………...………..14

26

27

*Fox v. Ethnicon Endo-Surgery, Inc.,*
    35 Cal. 4th 797 (2005)………………………………………………………………32

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**TABLE OF AUTHORITIES (cont.)**</u>

<u>Page(s)</u>

*Kearney v. Salomon Smith Barney, Inc.,*
    39 Cal. 4th 95 (2006) ……………………………………………………………………..30

*Lomita Land & Water Co. v. Robinson,*
    154 Cal. 36 (1908) ………………………………………………………...…………………35

*Lowry v. Standard Oil Co. of California,*
    63 Cal.App.2d 1 (1944) …………………………………………………………………….46

*McCann v Foster Wheeler LLC,*
    48 Cal. 4th 68 (2010) ……………………………………………………………………..32

*Paulus v. Bob Lynch Ford, Inc.*
    139 Cal. App. 4th 659 (2006) ....................................................................................... 36

*Rutherford v. Owens-Illinois, Inc.,*
    16 Cal. 4th 953 (Cal. 1997) ....................................................................................35, 36

*Schulz v. Neovi Data Corp.,*
    152 Cal. App. 4th 86 (2007) …………………………………………………………34, 35

*Wershba v. Apple Computer, Inc.,*
    91 Cal. App. 4th 224 (1999) ....................................................................................... 36

**STATE STATUTES**

Cal. *Bus. & Prof.* Code § 17200.............................................................................................. 36

Cal. Code Civ. Proc § 335.1 …………………………………………………...……………..34

Cal. Code Civ. Proc § 352.1 ………………………………………………………..………...34

Cal. Code Civ. Proc. § 361 …………………………………………………………………...33

**OTHER STATE MATERIALS**

CACI No. 1400 ……………………………………………………………………………...46

1

**TABLE OF AUTHORITIES (cont.)**

2                                                                              **Page(s)**

3                              **NON-U.S. CASES**

4   *The Hechingen Case,*
5       7 J. Int'l Crim. Just. 131(2009) ………………………………..…………..18

6   Neptune (Cumberlege),
        166 E.R. 354, High Court of Admiralty, 1834-02-07 ………………………….……….14

7
8   *Prosecutor v. Akayesu,*
        Case No. ICTR-96-4-T, Judgment of Trial Chamber I, 12 (Sept. 2, 1998) …………..…..19, 28

9   *Prosecutor v. Aleksovski,*
10      Case No. IT-95-14/1, Judgment of Trial Chamber (May 7, 2000) …………………………19

11  *Prosecutor v. Bagilishema,*
        Case No. ICTR-95-1A-T, Judgment of Trial Chamber I (June 7, 2001) ……………...……19
12
13  *Prosecutor v. Blaškić,*
        Case No. IT-95-14-A, Appeals Chamber Judgment (July 20, 2004) ………………...……..21

14  *Prosecutor v. Furundžija,*
15      Case No. IT-95-17/1-T, Judgment, ICTY (Dec. 10, 1998) ………………………….……20

16  *Prosecutor v. Milutinović,*
        Case No. IT-99-37-AR72 Decision on Dragoljub Ojdanić's Motion Challenging
17          Jurisdiction - Joint Criminal Enterprise (May 21, 2003) ………………………….……….24

18  *Prosecutor v. Musema,*
19      Case No. ICTR-96-13-T, Judgment (Jan. 27, 2000) ………………………………………20

20  *Prosecutor v. Ojadnic,*
        Case No. IT-05-87-A, Appeals Chamber Judgment (Feb. 12, 2010) ………………….…..19
21
22  *Prosecutor v. Rutaganda,*
        ICTR-96-3-T, Judgment (Dec. 6, 1999) …………………………………………….……17

23  *Prosecutor v. Rwamakuba,*
24      Case No. ICTR-98-44-AR72.4 (Oct. 22, 2004)………………………………………….24

25  *Prosecutor v. Tadić,*
        Case No. IT-94-1-A, Appeals Chamber Judgment (July 15, 1999) ………………..……24, 25
26      Case No. IT-94-1-T, Judgment of Trial Chamber (May 7, 1997) ………………….....…….18

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Prosecutor v. Taylor,*
　Case No. SCSL-03-01-A, Appeals Chamber Judgment (Sept. 26, 2013) ......................18, 19
　SCSL-2003-01-I, Amended Indictment (Mar. 16, 2006) ...........................................24

*Prosecutor v. Vasiljevic,*
　Case No. IT-98-32-A, Appeals Chamber Judgment (Feb 25. 2004) ..............................18

*The Case of Thomas Skinner, Merchant v. The East India Company*
　(1666) 6 State Trials 710 (H.L.) ...................................................................14

*U.S. v. Flick,*
　6 Trial of War Criminals Before
　　the Nuremberg Military Tribunals (T.W.C.) 1217 (1952) ........................18, 39, 40

*U.S. v. Krauch,*
　8 Trial of War Criminals Before
　　the Nuremberg Military Tribunals (T.W.C.) 1169 (1948) ........................19, 47

*U.S. v. Ohlendorf,*
　4 Trial of War Criminals Before
　　the Nuremberg Military Tribunals(T.W.C.) 1 (1949) ...........................................18

*In re Tesch (The Zyklon B Case),*
　1 Law Reports of Trial of War Criminals (L.R.T.W.C.) 93 (1947) ........................18, 22, 26

**NON-U.S. INSTRUMENTS**

Civil Law of China, Article 137 ...........................................................................32

Civil Law of China, Article 139 ...........................................................................32

Abolition of Forced Labour Convention, June 25, 1957, 320 U.N.T.S. 291 ...............................27

Forced Labour Convention of the Int'l Labour Organisation, June 28, 1930, 39 U.N.T.S. 55 ..........27

Rome Statute of the International Criminal Court arts 25, 30, July 17, 1998, 2187 U.N.T.S. 90 ........19

**SECONDARY SOURCES**

4 William Blackstone, *Commentaries* ...................................................................9, 14

Curtis Bradley, *Agora: Kiobel, Attorney General Bradford's Opinion and the Alien Tort Statute,*
　106 Am. J. Int'l L. 510 (2012) ........................................................................9

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

## **TABLE OF AUTHORITIES (cont.)**

2
**Page(s)**

3   *Businesses and Transnational Corporations Have a Responsibility to Respect Human Rights,*
      Gen. Statement by Daniel Baer, Dep'y Assistant Sec. of State for Democracy, Human Rts. and
4     Labor and text of Res. 17/4 (June 16, 2011), *available at*
      http://geneva.usmission.gov/2011/06/16/humanrightsandtransnationalcorps/ ...................... 48

5
    Businessweek, *Helping Big Brother Go High Tech,.*
6       Sept. 17, 2006, *available at* http://www.businessweek.com/stories/ 2006-09-17/helping-big-
7       brother-go-high-tech ....................................................................................................................... 47

8   Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations,*
      6 Nw. J. Int'l Hum. Rts. 304 (2008) ........................................................................................... 19
9
    China's Third Periodic Report to the UN Committee Against Torture,
10     Addendum, CAT/C/39/Add.2, arts. 4, 10, 11 (Jan. 5, 2000) ....................................................... 41

11  Edwin Dickinson, *The Law of Nations as Part of the National Law of the United States,*
      101 U. Pa. L. Rev. 26 (1952) ...........................................................................................9, 10
12

13  Friedrich K. Juenger, *The Lex Mercatoria and Private International Law,*
      60 La. L. Rev. (2000) ..........................................................................................................14
14
    Bih-Jaw Lin, *The Aftermath of the 1989 Tiananmen Crisis in Mainland China*
15     (Westview Press, 1992)................................................................................................................... 42

16  Michael S. Duke, *Blooming and Contending: Chinese Literature in the Post-Mao Era,*
17     (Indiana University Press, 1985)................................................................................................... 42

18  FINANCIAL TIMES, *Net closes on former China security chief,*
        October 11, 2013 ...................................................................................................................... 43
19
    *Global Internet Freedom: Corporate Responsibility and the Rule of Law,*
20     Hearing Before the Subcomm. on Human Rights and the Law of the U.S. Sen. Comm. on the
21     Judiciary, 110th Cong., S. Hrg. 110-643 (May 20, 2008) ....................................................... 48

22  GLOBAL TIMES, *Reeducation without labor,*
23     December 4, 2013, *available at* http://www.globaltimes.cn/content/829904.shtml ................... 43

24  Jenny S. Martinez, *The Slave Trade and the Origins of International Human Rights Law* (2012) ..............10

25  Remarks on Internet Freedom by Hillary Rodham Clinton,
      Sec. of State (Jan. 21, 2010), *available at*
26     http://www.state.gov/secretary/rm/2010/01/135519.htm............................................................. 48

27  Restatement (Third) of Foreign Relations Law of the United States
      § 702 cmt. n ............................................................................................................................... 40
28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

**TABLE OF AUTHORITIES (cont.)**

2
<u>Page(s)</u>

3
T. Rutherforth, *Institutes of Natural Law* (1832)  …………………………………………..…………9

4
David Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance,*
        29 Berkeley J. Int'l L. 334 (2011)…………………………………………………………………19

5

6
SNAP-R V1.2 Exporter User Manual,
        U.S. Dept. of Commerce, Bureau of Industry and Security,
        Office of the Chief Information Officer ................................................................................. 47

7

8
SOUTH CHINA MORNING POST, *Former security chief Zhou Yongkang under house arrest,*
        December 11, 2013………………….. ................................................................................... 43

9

10
THE DIPLOMAT, *China's New State Security Committee,*
        November 25, 2013 ………………. ...................................................................................... 43

11

12
THE NATION, *Is China relaxing its stance on Tibet and Falungong?,*
        October 9, 2013 ………………............................................................................................. 43

13
Emmerich de Vattel, *Law of Nations* (1758) (Joseph Chitty, trans. and ed.,
        T. & J. W. Johnson & Co. 1867) (1758)  …………………………………..………………9

14

15
Wright & Miller, Federal Practice and Procedure § 4520 (2d ed. West Supplement 2011) ……………33

16
2010 Report on Foreign Policy-Based Export Controls,
        U.S. Department of Commerce Bureau of Industry and Industry ..................................... 47

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1

**INTRODUCTION**

2   Defendants, including a U.S. corporation, Cisco Systems, Inc., operating largely from the United

3   States, committed torts central to a decade-long campaign of violent repression against members of the

4   spiritual peaceful practice of the religion of Falun Gong.  Through their design, development and

5   customization of the Orwellian surveillance network known as the Golden Shield, Defendants supported

6   and facilitated the torture and persecution of Falun Gong believers in China. Despite their knowledge of

7   the abusive purposes of the network, Defendants recommended first-of-a-kind essential anti-Falun Gong-

8   specific features. Falun Gong's special status in China as the most recent target of Stalinist-style violent

9   purges was well known within the foreign technology community in China, as was the peaceful character

10  of the religious practice. Nonetheless, Defendants designed and developed applications, system

11  "solutions," and a sophisticated webbed architecture – all customized to provide access to Chinese security

12  agents implementing the alleged abuses at various torture sites across China. Defendants' implementation,

13  testing, verification, training, customer support and maintenance of these and other repressive features

14  demonstrate their purposive complicity in the alleged violations.

15  *Kiobel* does not present an extraterritorial bar to consideration of this case brought against U.S.

16  Defendants whose U.S. conduct was central to the commission of the crimes.  U.S. trade law does not

17  obviate the obligation to refrain from committing torts in violation of the law of nations.  For the reasons

18  set forth below, the Motion to Dismiss the Second Amended Complaint should be denied.

**STATEMENT OF FACTS**

19

**I.     The Parties**

20

21  Defendants are Cisco Systems, Inc. ("Cisco"), its agents and/or alter egos, and several of its

22  corporate officers, specifically including CEO John Chambers and Fredy Cheung, Senior Vice President

23  for the Greater China Region, former Vice President for Cisco China Networking Technologies, Ltd.

24  Second Amended Complaint ("SAC") ¶1.

25  Plaintiffs are practitioners of Falun Gong, a peaceful religious practice with millions of adherents in

26  the People's Republic of China ("PRC" or "China") and elsewhere. *Id.* ¶28. Falun Gong is the target of a

27  widespread persecutory campaign in the PRC by the Chinese Communist Party ("CCP") through, *inter alia*,

28  "Office 610," a subdivision of the CCP, created to persecute and eradicate Falun Gong. *Id.* ¶41.

1

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Plaintiffs reside or have resided in the PRC, and their Falun Gong religious activity occurs primarily on the Internet. *Id.* ¶3. The CCP and Public Security officials subject Plaintiffs to ideological conversion through torture and other forms of persecution through the Golden Shield apparatus Defendants designed, developed and helped implement, service and maintain for that purpose. CCP and Public Security officials' ability to identify, track, apprehend, interrogate and torture Plaintiffs for the purpose of their forced conversion or eradication is a direct result of the "Golden Shield" technology developed by Cisco, and includes various human rights abuses such as physical torture; cruel, inhuman and degrading treatment; crimes against humanity; arbitrary detention; forced labor; enforced disappearance; and extrajudicial killing. *Id.* ¶¶1-6, 9-21, 223-356.

Defendants not only seek to deflect attention away from their role in the development, deployment, and consequences of the Golden Shield, but also go so far as to demonize Plaintiffs and their peaceful spiritual practice as a "cult" responsible for "sabotage and suicide bombings". Motion to Dismiss ("MtD"), Dkt. No. 119-1 at 3, 4, 48. Though Plaintiffs engage in a purely peaceful religious practice that emphasizes benevolence and tolerance, Plaintiffs were subjected to unconscionable forms of torture and brutality as a chief goal of the Golden Shield technology specifically developed by Cisco for that purpose. *See infra* Statement of Facts ("SOF") § II; SAC § H. The ideological conversion practices facilitated by Defendants also featured acts of physical torture carried out by various means, *see* SAC ¶¶233, 279 (lethal batons); *id.* ¶234 (sharp screw threads); *id.* ¶¶255, 279 (buckets of ice); *id.* ¶289 (iron chair); *id.* ¶¶304, 307 (psychotropic drugs); *id.* ¶¶279, 289 (sleep deprivation); *id.* ¶¶317, 331 (forced-feeding); and *id.* ¶¶243, 334 (mental torture). Doe VII is believed dead by torture, *id.* ¶309, and Doe VIII was beaten to death. *Id.* ¶314. In addition, Plaintiffs were paraded through show trials, *see, e.g., id.* ¶¶235, 245, and coerced into false confessions, *see, e.g. id.* ¶243. Doe IV's attorney himself was subsequently targeted for persecution. *Id.* ¶276. Plaintiffs could not have reasonably expected any solicitude from the Chinese judiciary had they gone to it with complaints about their treatment. This case, in short, is their best opportunity for justice.

## II. Defendants Customized the Golden Shield Largely in San Jose to Facilitate the Ideological Conversion and Suppression of Falun Gong

Cisco specializes in the design and development of "solutions," *i.e.*, well-integrated highly sophisticated systems that operate intelligently to meet the specific objectives of its customers. *Id.* ¶¶4-6.

2

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    Accordingly, and notwithstanding the peaceful nature of the Falun Gong religion, Cisco provided its

2    Chinese Golden Shield customers with several well-integrated, highly sophisticated, intelligent Golden

3    Shield systems to achieve the specifically repressive goals of the Golden Shield, including the ideological

4    conversion through torture of Falun Gong believers. *Id.*

5          Like any cutting edge unprecedented high-technology project, the Golden Shield required careful,

6    extremely detailed, integrated designs by a team of highly qualified experts responsible for the entire

7    project. *See* SAC § B.2.  In this case, these experts were in San Jose. *Id.* ¶¶95, 144-46; § D.1.  Similar to the

8    blueprint/plan of an architect hired to design an entire city, the high-level designs developed by Cisco's top

9    technical experts served as the indispensable "brain" or "Geist" of the project. *See id.* ¶¶75-79. The

10   persecutory functions and objectives of the Golden Shield to *douzheng* Falun Gong were a fundamental —

11   brain level —feature. *Id.*  Defendants in San Jose, California ("San Jose") designed, recommended and

12   thereafter provided Chinese security with an unprecedented arsenal of methods and directives specifically

13   to identify, catch, isolate and carry out widespread forced conversion and repression of Falun Gong in

14   China. *Id.; see also Surveillance State 2.0: Beta-Tested in China, Coming Soon To …?, Yale J.L. & Tech. Blog* (Dec.

15   19, 2013), *http://yjolt.org/blog/ 2013/12/19/surveillance-state-20-beta-tested-china-coming-soon.*

16         The Golden Shield could not be designed without a deep understanding of its overall purpose and

17   intended usage. SAC ¶87. Accordingly, San Jose custom-designed the Golden Shield specifically to enable

18   the categorization of Falun Gong believers according to their carefully analyzed patterns of online activity,

19   *i.e.,* "signatures" (*id.* ¶80); and developed a dynamic information management system to constantly obtain,

20   update and cross-reference information about individual Falun Gong targets of forced conversion

21   practices throughout their lives (*id.* ¶100). Through their development of the above/related features, they

22   facilitated the creation of individualized forced conversion programs based on the cross-referenced

23   information comprising each and every interrogation, forced confession, record of personal/ social

24   interactions, history of involvement in pro-democracy and other value-based movements in China (*id.*

25   ¶101), and reactions to subjection to torture, threats, and re-education "classes" (*id.* ¶263).[1] Through the

26   customized integration of information systems with security-enabling applications at, *e.g.,* black jails, and

27

28   ──────────────────
     [1] The specific features enabling forced conversion, summary detention practices, restriction of personal
     freedom and other abuses alleged are set forth throughout the SAC. *See, e.g., id.* ¶ 80-86; 96-98, 114-15.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

other facilities, Defendants purposively enabled forced ideological conversion of Falun Gong (*id.* ¶¶85-87, 98-99, 114-15) and as a necessary complement, related persecutory practices (*id.* ¶¶ 1, 6, 22, 61-62, 83, 108).

Through the ever-expanding customized development and integration of anti-Falun Gong features and systems with other dual or multi-purpose components, San Jose designed, recommended and provided security software, database systems, and integration of anti-Falun Gong features with the apparatus to serve all requirements of the torture-facilitating practices, including identification, apprehension, and summary detention. *See id.* ¶¶80-86, 96-98.

In addition to developing the designs to help Chinese security ideologically convert and violently suppress Falun Gong believers in San Jose, San Jose experts serviced the Golden Shield entirely from California at least until 2008; and implemented the designs through the direct acts of San Jose's Advanced Services Team as well as through the acts of other Cisco employees operating under the direct management, supervision, planning and control of San Jose. *Id.* §§ B.3, D.1.

## III. San Jose Knowingly and Purposefully Customized the Golden Shield Specifically to Persecute Falun Gong

Contrary to Defendants' contention that San Jose provided no more than generic, ordinary, or banal commercial assistance, San Jose's assistance was specifically directed and developed to facilitate the commission of the alleged crimes.

Defendants actively solicited and promised to meet Chinese security's objectives to violently suppress Falun Gong. Defendants created a hugely successful marketing campaign based on Cisco's promises to meet the repressive goals of the Golden Shield, including in particular the persecution of Falun Gong. *Id.* ¶¶58-61. By regularly invoking the term "*douzheng*" to define the repressive purpose of the Golden Shield, and referring to Falun Gong as "threats," "viruses," "despicable," (and even as inciters of "sabotage and suicide bombings" in the MtD itself at 4), Defendants have actively aligned themselves with the CCP's political campaign to eradicate Falun Gong through widespread torture and persecution. *Id.* ¶¶43, 66-67, 97(d), 194. Only a month after a Chinese consulting firm provided Cisco with several articles describing the persecutory goals of the CCP to "Strike Hard," "crackdown" and in other ways *douzheng* Falun Gong (*id.* ¶¶37, 38, 59, 61), a Cisco internal document explicitly referred to the *douzheng* of Falun Gong as a major opportunity for the company and pledged to satisfy the goal to *douzheng* Falun Gong. *Id.*

4

¶¶60-63, 65, 78, 187.  Cisco distributed similar marketing materials directly to the Chinese Public Security at a trade show held in Shanghai in the same month. *Id.* ¶¶64, 68, 70, 183.  Defendants also provided similar marketing materials to high-level Cisco management employees, specifically illustrating how its products were tailored to meet the stated *douzheng* goal of suppressing Falun Gong in China. *Id.* ¶185.  Further, Defendant continued to boast on its website and in other materials of its contribution to enhancing social stability and Strike Hard campaigns, describing, *inter alia,* the crackdown of Falun Gong. *Id.* ¶¶60, 188, 190.

The SAC details how Defendants aligned themselves with the suppressive goals of the CCP by not only designing, but also recommending advanced features specifically to further the *douzheng* of Falun Gong.  Defendants' characterization of these allegations as "irrelevant technical detail" of "ordinary crime control technologies," MtD at 24, ignores allegations that emphasize Defendants' recommendation of first-of-a-kind repressive features, customized designs, and collaborative implementation of all features essential to effectuate the *douzheng* campaign, including tools designed specifically to directly enable the torture and ideological conversion of Falun Gong believers. SAC ¶¶75-87, 96-101.  These anti-Falun Gong features allowed Chinese security agents to access—from black jails, labor camps, public security psychiatric hospitals and other sites of torture—detailed profile information of adherents stored in the databases such as political views, forced confession and coerced confessions, and social and economic circumstances so as to forcibly convert and in other ways persecute Falun Gong. *Id.* ¶¶85-86, 99-101.[2] Cisco's national database system with real-time updating and mobile capabilities was installed and operational in every province of China except Sichuan by 2003. *Id.* ¶110. Cisco further tested the Golden Shield to verify that it fulfilled the anti-Falun Gong purposes (*id.* ¶103), trained security officers to use customized anti-Falun Gong technologies (*id.* ¶186), and provided long-term customer support (*id.* ¶¶58, 83(h), 102).

Additional allegations also support Cisco's customization of the Golden Shield fully aware of its intended use. *See* SAC § E. As would any major investor in a foreign market (and indeed as required by its duties to its shareholders), Cisco researched details of the nature, risks, and implications of its envisioned multi-billion dollar projects, such as the Golden Shield, as part of routine due diligence assessments. *Id.* ¶168. Indeed, they could not design the apparatus without intimate knowledge of its repressive purposes.

---

[2] Anhui Chinese security called for the construction of databases systems in 2001. Cisco customized and constructed them by 2003. *See, e.g., id.* ¶¶88, 107, 212.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

*Id.* ¶87.  The brutal, extralegal persecution campaign against peaceful Falun Gong adherents was also common knowledge both inside and outside of China as a result of widespread media, NGO, and U.S. governmental attention since 1999.  *Id.* ¶¶159-165, 167, 172.  Moreover, Cisco's Public Security Sales team accessed and shared CCP reports outlining the forced conversion ("*zhuanhua*") purpose of the database systems, the need for other anti-Falun Gong confidential/secret information systems, an anti-Falun Gong network and other specifications geared to torture and in other ways suppress Falun Gong. *Id.* ¶¶88-91,173. Yet, as early as 2002, Cisco has attempted to cover up its involvement in the abuses alleged, including statements to Congress, to its own shareholders in response to numerous shareholder proposals raising human rights concerns, in newspaper articles and even in their MtD at 6. *Id.* ¶¶166, 174, 177-78.

## ARGUMENT

### I.     Cisco's Unsupported Allegations Should Be Ignored

On a motion to dismiss, the court "accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010). The SAC need only plead enough facts to "nudge [Plaintiffs'] claims across the line from conceivable to plausible," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 552-55, 572-73 (2007); *i.e.,* permit a "reasonable inference" that defendant is liable. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). *Iqbal* explicitly held that "[t]he plausibility standard is not akin to a 'probability requirement.'" *Id.* at 678. "[W]hen there are well-pleaded factual allegations, a court should assume their veracity." *Id.*

Defendants boldly assert as fact in their Motion to Dismiss without citation to the SAC that the technology at issue in this case is without exception generic and no different from the products they sell globally. *See* MtD at 6. However, Plaintiffs allege throughout the SAC that Defendants designed, developed and provided the Golden Shield as an integrated customized tool to suppress Falun Gong believers, including through specifically anti-Falun Gong features. Moreover, even what Defendants characterize as dual use products were marketed by them specifically as tools to suppress Falun Gong. *See, e.g.,* SAC ¶97(c), (d).  Because the SAC allegations must be accepted as true, Defendants' alternate factual narrative should be ignored. *See Daniels-Hall,* 629 F.3d at 998.

Further, "generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint." *Id.* Defendants boldly assert several unsupported "facts" in their Motion, including that

6

"[t]he testimony of Cisco Senior Vice President Chandler referred to in the FAC (¶ 106)," though deleted from the SAC, contends "that the security and filtering features of Cisco products are generic and not customized for particular users" (MtD at 6). Because Chandler's Congressional testimony is not mentioned in the SAC—as Defendants admit—it is wholly inappropriate for them to introduce and rely on it throughout their motion. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Daniels-Hall*, 629 F.3d at 998 (a document may only be incorporated if the complaint "necessarily relies" on it and the document is "central to the plaintiff's claim"). As Chandler's statements do not have authority in the SAC, they are inappropriate at this stage and cannot form the basis of dismissal.

Defendants have submitted an <u>irrelevant</u> 2011 affidavit by a Chinese lawyer without an expertise in Chinese legal history, criminal procedure, or public international law, as reflected by his resume and numerous errors.[3] Although there is widespread consensus among China experts as to the intensive judicial reforms under the current regime, the "expert" has ignored these developments in addition to mischaracterizing the religion of Falun Gong as an "organization under the control of the Falun Dafa Research Society." Declaration of John (Hejun) Chu, Exhibit A ("Chu Decl."). Thus, this novice submission should be disregarded until he is formally qualified. *See, e.g., Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (experts must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")

## II.   <u>Plaintiffs' ATS Claims Are Not Barred by *Kiobel*</u>

Defendants' view of the *Kiobel* presumption against extraterritoriality is not persuasive, accurate, or fully presented. MtD at 9-13. Contrary to Defendants' arguments, *Kiobel* does not eliminate Alien Tort Statute ("ATS") jurisdiction for conduct and/or harm comprising violations of the law of nations occurring outside of the United States.[4] *Id.* at 10. Rather, the Court established a fact-sensitive test of whether "the claims touch and concern the territory of the United States." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659, 1669 (2013). As with the case-specific analysis in *Sosa v. Alvarez-Machain,* 542 U.S. 692,

---

[3] According to Dr. Chu-cheng Ming, professor and former chairman of the Political Science Department of National Taiwan University and an acclaimed expert in PRC politics and foreign policy, the *douzheng* campaign against dissidents in China including Falun Gong is a "political" struggle rather than any form of law enforcement or legitimate state activity. Dr. Ming is available to testify to these facts.
[4] Even if that standard were correct, it would not foreclose claims against Defendants for conduct occurring largely in San Jose.

725 (2004), *Kiobel* set out a test to apply to the facts of an ATS claim arising out of ostensibly extraterritorial

acts. Even if the concurrences disagreed on what standard should govern extraterritorial ATS claims, all

nine justices agreed that the existence of a presumption does not end the judicial inquiry. *See Kiobel*, 133 S.

Ct. at 1669 (articulating the "touch and concern" standard); *id.* at 1669 (Kennedy, J., concurring) ("The

opinion […] is careful to leave open a number of significant questions regarding the reach and

interpretation of the Alien Tort Statute."); *id.* (Alito, J., concurring) (the Court's "formulation obviously

leaves much unanswered"); *id.* at 1673 (Breyer, J., concurring) (the majority "leaves for another day the

determination of just when the presumption [ ] might be 'overcome'").  Justice Kennedy—the fifth vote

for what would otherwise have been at most a plurality—emphasized that *Kiobel* is not limited to domestic

claims but leaves open the application of the ATS for "human rights abuses committed abroad" in cases

outside the "reasoning and holding" of *Kiobel*. *Id.* at 1669.

　　　*Kiobel*'s holding was narrow, applying in the context of a paradigmatic "foreign-cubed" case—

foreign defendant, foreign plaintiff, and exclusively foreign conduct—lacking any connection to the United

States beyond defendants' "mere corporate presence." *Id.*[5] Accordingly, the Court explicitly left open how

the presumption would apply to a case against a U.S. defendant or where some of the conduct occurs in

the United States and some abroad.[6]  *Id.*

### A.　　ATS Claims against U.S. Defendants Are Proper

　　　Claims against U.S. nationals like Cisco, complicit in serious international law violations, displace

the presumption. *See Ahmed v. Magan*, Slip Copy, 2013 WL 4479077 (S.D. Ohio 2013) (where Defendant is

"a permanent resident of the United States, the presumption against extraterritoriality has been overcome").

Such violations give rise to U.S. international obligations, and failure to remedy would undermine a central

purpose for which Congress enacted the ATS.  *Sosa*, 542 U.S. at 717. Dismissal here would raise the

specter of impunity for U.S. defendants engaging in egregious violations of international law—an outcome

---

[5] The *Kiobel* defendants' only connection to the U.S. was that they were listed on a U.S. stock exchange and maintained an investor servicing office owned by a separate affiliate. *Id.* at 1677 (Breyer J., concurring).
[6] The *Kiobel* majority never questioned the continuing viability of *Sosa*, 542 U.S. 692, and foundational cases upon which *Sosa* relied, where at least some of the relevant conduct occurred outside of the U.S. *See* 133 S. Ct. at 1663-65; *see also Sosa*, 542 U.S. at 732 (endorsing *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980), which recognized ATS claims against a defendant who had committed torts in Paraguay); *id.* (endorsing *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994), which recognized ATS claim for torts committed in the Philippines); *see also Kiobel*, 133 S. Ct. at 1665 (citing *Estate of Marcos*).

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1    *Kiobel* nowhere countenances.

2         The *Kiobel* decision tracks closely the recommendation of the United States, which distinguishes

3    "other circumstances, such as where the defendant is a U.S. national or corporation," from the facts in

4    *Kiobel*.[7] The United States advised against application of the ATS in *Kiobel*, because in that case "the United

5    States cannot be thought responsible in the eyes of the international community" for British and Dutch

6    defendants who could be subject to "more appropriate means of redress … in other forums, such as the

7    principal place of business or country of incorporation." Supp. Br. for the U.S. as *Amicus Curiae* in Partial

8    Support of Affirmance, at 5, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (filed June 2012). Such reasoning

9    cannot apply to claims against the U.S. Defendants here.[8]

10        The historical context of the ATS likewise supports its application to U.S. citizens, even where

11   committing violations on foreign soil. The ATS was enacted to address "the inadequate vindication of the

12   law of nations," *Sosa*, 542 U.S. at 717, including the obligation that nations "ought not to suffer their

13   citizens to do an injury to the subjects of another state." *See* Supp. Br. of *Amici Curiae* Professors of Legal

14   History in Support of Plaintiffs-Appellants, *Al Shimari v. CACI Intern.,Inc.*, Nos. 13-1937, 13-2162 (Nov. 5,

15   2013) ("Legal History Br.") (citing Emmerich de Vattel, *Law of Nations*, bk. 2, ch. 6, §76).[9]  In support of this

16   obligation, Attorney General Bradford in 1795 found the ATS a valid means for foreigners to sue U.S.

17   subjects for extraterritorial violations. *Id.* at 18-21.  *Kiobel* distinguished Bradford by noting that events there

18   involved U.S. citizens and (possible) treaty violations. 133 S. Ct. at 1668. Scholars have noted that the

19   Bradford opinion "provides support for the extraterritorial application of the ATS to the conduct of U.S.

20   citizens." Curtis Bradley, *Agora: Kiobel, Attorney General Bradford's Opinion and the Alien Tort Statute*, 106 Am. J.

21   Int'l L. 510 (2012).  Failure to hold U.S. defendants accountable for violations of the law of nations would

22

23   [7] Supp. Br. for the United States as *Amicus Curiae* in Partial Support of Affirmance, at 21, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (filed June 2012).

24   [8] Even *amici* in *Kiobel* supporting dismissal agreed: "[T]he extraterritorial application of the ATS to acts committed by American individuals, corporations, and other U.S. entities in foreign sovereign territory, would be consistent with international law." Br. of the Kingdom of the Neth. and the U.K. of Gr. Brit. and

25   N. Ir. as *Amici Curiae* in Support of Neither Party, at *15, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (2013)..

26   [9] *See* Legal History Br. at 10-11 (a sovereign who failed to provide redress for citizens' acts in violation of the law of nations was considered an abettor) (citing 4 Blackstone's Commentaries *67-68); *id.* at 8-9 (the law of

27   nations prohibited sovereigns from providing safe harbor to its subjects for extra-territorial violations of international law) (citing Vattel, *supra*, T. Rutherforth, *Institutes of Natural Law* bk. 2, ch. 9, §12 (1832)). The

28   authors of the Legal History Brief plan to submit an updated version as a proposed *amicus curiae* submission in support of this Opposition brief.

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

be anathema to the Founders' intent. Legal History Br. at 1.[10]

### B.    The Presumption Does Not Apply Where Defendants' Domestic Conduct Was Central to the Alleged Crimes

Although U.S. conduct is unnecessary where, as here, Defendants are U.S. nationals, the "touch and concern" test is also satisfied because their domestic conduct not only in large part furthered the violations at issue, but also emanated from the corporate nerve center, and was central to the harms alleged. This differs from *Kiobel*, where <u>all</u> relevant conduct took place abroad. 133 S. Ct at 1669.

Cisco does not deny that San Jose played a role in marketing, designing, and managing the implementation, training, servicing and maintenance of the Golden Shield from the United States as alleged.[11] Plaintiffs submit that this conduct is sufficient to displace the presumption. Cisco argues that because the injuries and some conduct that Defendants directed and controlled occurred in China, the Court should discount that significant conduct took place in the United States. MtD at 15.   *Kiobel* does not support this unfounded assumption.

Several post-*Kiobel* cases are instructive. In *Sexual Minorities Uganda v. Lively*, 2013 WL 4130756 (D. Mass. Aug. 14, 2013), for example, the court declined to dismiss ATS claims for injuries occurring abroad against foreign plaintiffs, concluding, "[a]n exercise of jurisdiction under the ATS over claims against an American citizen who has allegedly violated the law of nations in large part through actions committed within this country fits comfortably within the limits described in *Kiobel*." *Id.* at *14.  The court noted that *Kiobel* "emphasized that [its] holding applied to a factual scenario where 'all the relevant conduct took place outside the United States.'" *Id.* at *13 (quoting *Kiobel*, 133 S. Ct. at 1669).  The court therefore allowed claims to proceed against the U.S. defendant, who had travelled between Uganda and the United States while fomenting repression against LGBT people in Uganda.  Just as in this case—where, similarly, U.S. Defendants direct torts abroad—the fact that plaintiffs' injuries occurred abroad did not deprive them of a

---

[10] State prosecution of individual nationals for violations of the law of nations, even where occurring on foreign soil against foreign victims, has long been recognized as an important state obligation. Edwin Dickinson, *The Law of Nations as Part of the National Law of the United States*, 101 U. Pa. L. Rev. 26, 26-27 (1952) ("[T]he Law of Nations in the eighteenth century […] was concerned somewhat indiscriminately with matters […] between individuals and states…"); Jenny S. Martinez, *The Slave Trade and the Origins of International Human Rights Law* 120 (2012) ("[N]ations were mostly in the habit of [e.g.] punishing pirates who were their citizens, who sailed under their flag [and who attacked foreign or domestic ships].")
[11] *See* SAC § D.1 (role of San Jose); § B (marketing, design and implementation carried out in large part by San Jose); § C (alleged abuses caused by Defendants' apparatus); *see also supra* SOF § II, III.

10

claim: "Defendant's alleged actions in planning and managing a campaign of repression in Uganda from the United States are analogous to a terrorist designing and manufacturing a bomb in this country, which he then mails to Uganda with the intent that it explode there."[12] *Id.; see also Jian Zhang v. Baidu.com Inc.*, 2013 WL 2458834 at *5 (S.D.N.Y. June 7, 2013) (web censorship in the United States sufficed to show that the "[ATS] claims are not premised entirely on conduct abroad").[13]

In similar contexts where extraterritorial injuries were caused by substantial conduct in the United States, the Supreme Court has found the conduct had a sufficient nexus with the United States  For example, the Supreme Court approved application of the Lanham Act to trademark cases against U.S. defendants even when the injuries occurred abroad, particularly when essential steps occurred here. As the Court noted, "We do not deem material . . . that his purchases in the United States when viewed in isolation do not violate any of our laws.  They were essential steps in the course of business consummated abroad; acts in themselves legal lose that character when they become part of an unlawful scheme." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 287 (1952); *see Paulsson Geophysical Services, Inc. v. Sigmar,* 529 F.3d 303, 309 (5th Cir. 2008) (same).  According to the SAC, during all phases, San Jose engaged in a step-by-step process to establish customer specifications and objectives related to all major aspects of design, implementation and optimization phases that include those enabling the *douzheng* of Falun Gong.  SAC ¶126; *see also id.* ¶¶75, 79-80, 95, 102, 108, 127, 128, 129.  In addition, all of the high-level designs provided by Cisco to its Chinese security to suppress Falun Gong were developed by engineers with corporate management in San Jose.  *See id.*. ¶¶75, 95. In order to meet these persecutory objectives, these designs include the multi-tiered network features delineated *supra* at SOF § II. In addition, the decision-making central to the success of the implementation processes was approved by and enacted and orchestrated in San Jose. *See, e.g., id.* ¶¶80-87, 96-101, 108.

Racketeer Influenced and Corrupt Organizations Act ("RICO") cases, particularly those decided after *Morrison v. Nat'l Australia Bank Ltd.,* 130 S. Ct. 2869 (2010*)*, are also instructive. Under a "nerve center" analysis, courts focus on the location of the RICO enterprise's "decisions effectuating the relationships and

---

[12] Cisco similarly custom designed a "bomb" (*i.e.*, the Golden Shield) to target Falun Gong with the capacity, functionality and potency required to identify and violently suppress the peaceful spiritual group.

[13] As indicated *infra* at § II.E.1, the SAC sufficiently alleges that Defendants' conduct in San Jose proximately caused the alleged harm.  For this reason as well, the claims touch and concern the U.S. with sufficient force. *See also* SAC §§ B & C; and references in n.11.

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

common interest of its members, and how those decisions are made," rather than where consequences transpire. *European Community v. RJR Nabisco, Inc.*, 2011 WL 843957 at *6 (E.D.N.Y. Mar. 8, 2011); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F.Supp.2d 933, 942 (N.D. Cal. 2012) (applying "nerve center" test and finding the fact that all moving Defendants are U.S. corporations "tends to show [] that the decision making necessary to effectuate the alleged association-in-fact enterprise's common purpose occurred substantially within the territory of the United States"); *see also Aluminum Bahr. B.S.C. v. Alcoa Inc.*, 2012 WL 2093997 (W.D. Pa. June 11, 2012) (finding sufficient domestic activity where tortious conduct was the payment of bribes to officials of Bahraini oil company and government, because "the decision-making vital to the sustainability of the enterprise, came from Pittsburgh").  Here, San Jose conducted essential steps in the course of business consummated abroad, and, as the nerve center, directed the design, implementation and optimization of the anti-Falun Gong components of the Golden Shield including those required for forced conversion, isolation and persecution. *See, e.g.,* SAC ¶¶95, 126-35.  As the Golden Shield nerve center, San Jose exercised direct control over the project, including actions by its employees/alter egos/agents while in China. *See, e.g., id.* ¶¶136-39, 141-44.[14]

### C. Defendants' Representations of Post-*Kiobel* Cases Are Inaccurate

First, the dismissal of ATS claims in *Doe v. Nestle*, 748 F. Supp. 2d 1057, 1122 (C.D. Cal. 2010), heavily relied upon by Defendants, has been vacated and remanded by the Ninth Circuit.  *Doe v. Nestle*, No. 10-56739, Slip Op. at 4-5 (9th Cir. Dec. 19, 2013).[15]

Contrary to Defendants' assertion, in *Chen Gang v. Zhao Zhizhen*, 2013 WL 5313411 (D. Conn. Sept. 20, 2013), the district court did not define the *Kiobel* presumption. Rather, the judge granted plaintiffs leave to file a post-*Kiobel* motion to amend, and accordingly, dismissed the previous complaint. The parties are now filing related submissions. Defendants' contention that the allegations here are similar is equally

---

[14] Even before *Morrison*, the presumption was no bar to decision-making that occurred in the United States, even when effects were felt abroad. *Environmental Defense Fund. Inc., v. Massey*, 986 F.2d 528, 536-37 (D.C. Cir. 1993) (no support for the "proposition that conduct occurring within the United States is rendered exempt from otherwise applicable statutes merely because the effects . . . would be felt [abroad]"); *see also Reyes-Fuentes v. Shannon Produce Farm, Inc.*, 671 F.Supp.2d 1365, 1371-72 (S.D. Ga. 2009). That the harm occurred in China does not make the allegations against Defendants extraterritorial, particularly when relevant decisions and conduct by Defendants occurred within the United States. *See, e.g.,* SAC ¶¶127, 129-132. *See also* Pl. Motion to Amend, Dkt. No.101, § IV. C. 1.

[15] Although Plaintiffs have incorporated discussion of the decisions into this Opposition brief, Plaintiffs respectfully request the opportunity to submit supplemental briefing or a sur-reply on issues relating to the decision because it was issued on the same day this brief is being filed,

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

inaccurate: in *Zhizhen*, the defendant initiated and orchestrated violations in China with injuries taking place both there and in the United States.  Thus, arguments by plaintiffs in that case—whether defendant specifically directed his activities from China toward the United States—cited at length in Defendants' Motion—have no applicability here.[16]

Defendants also ignore post-*Kiobel* cases allowing ATS claims that touch and concern the United States to proceed. *See, e.g., Sexual Minorities Uganda*, 2013 WL 4130756 at *14 (discussed *supra*); *Mwani v. Bin Laden*, 2013 WL 2325166 at *4 (D.D.C. 2013) (holding that the complaint against foreign defendants for injuring foreign plaintiffs in foreign territory "touches and concerns the United States with sufficient force in that it falls within the narrow category of cases for which the presumption against extraterritorial application of the ATS is displaced"); *Jian Zhang v. Baidu.com Inc.*, 2013 WL 2458834 at *5 (S.D.N.Y. 2013); *Ahmed*, 2013 WL 4479077.

Furthermore, Defendants rely on cases that provide no precedential authority and are in fact inapposite.  Defendants spend three pages discussing *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013), without noting that the decision is a denial of mandamus, and any *Kiobel* discussion is dicta.[17]  Defendants assert that the court "rejected the argument that *Kiobel* did not mandate dismissal because the defendants 'took affirmative steps in this country'" (MtD at 13), but in fact the court noted only that any affirmative steps were not sufficiently alleged. *Id.* at 192 (complaint alleges only vicarious liability for "actions taken within South Africa by their South African subsidiaries").  Plaintiffs in this case allege, *inter alia,* aiding and abetting from U.S. soil—affirmative U.S. conduct—in addition to furthering the alleged crimes in China directly and through employees/agents/alter egos.  The mandamus decision in *Balintulo*, even while mischaracterizing "touch and concern" as *dicta*, explicitly declines to address the post-*Kiobel* viability of such claims. *Id.* at 191 (noting that "the [*Kiobel*] Court had no reason to explore, much less explain, how courts should proceed when *some* of the relevant conduct occurs in the United States") (emphasis original).  *Al Shimari v. CACI International, Inc.*, 2013 WL 3229720 (E.D. Va. June 25, 2013), an ATS case, likewise does not support Defendants' position. In *Al Shimari,* the Court barred the ATS claims because "the alleged

---

[16] Contrary to Defendants' assertions, the court in no way found it "immaterial" (MtD at 14), that defendant "specifically directed" his campaign towards the U.S.; rather, it found that plaintiffs' pre-*Kiobel* complaint did not provide sufficient allegations to support that argument.  *See Zhizhen*, 2013 WL 5313411 at *4-5.

[17] Asserting that the court lacked jurisdiction to issue an advisory opinion and challenging the court's conclusions on *Kiobel*, appellees filed a petition on September 18, 2013 for rehearing.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

conduct … occurred exclusively on foreign soil." *Id.* at *7. Plaintiffs there made the unique argument, rejected by the Court, that Iraq, the place where the violations occurred, was equivalent to U.S. territory. *Id.* Defendants' Motion also relies on cases such as *Sarei v. Rio Tinto, PLC,* 671 F.3d 736 (9th Cir. 2011) (en banc), *cert. granted and judgment vacated*, 133 S.Ct. 1995 (2013)—cases without a U.S. defendant or any U.S. conduct.[18]  All but two of the cases listed in Defendants' footnote 7 are against foreign defendants (as is *Hua Chen v. Honghui Shi*, 2013 WL 3963735 (S.D.N.Y. Aug. 1, 2013)),[19] and none allege U.S. conduct. Accordingly, Plaintiffs claims survive under existing post-*Kiobel* precedent.

> **D.** **The Touch and Concern Standards Reflect a Broader Paradigm**

The founding-era law of nations obliged sovereigns to provide causes of action in cases where, as here, there is relevant cross-border activity.  The law of nations incorporated not only three principal offenses but also the transnational law merchant (*lex mercatoria*). 4 William Blackstone, *Commentaries*, 68; *see also* Neptune (Cumberlege), 166 E.R. 354, High Court of Admiralty, 1834-02-07 (reversed on other grounds) ("[T]he law of nations, of which the *lex mercatoria* is a branch, forms part of the common law."). The *lex mercatoria* has long provided law of nations claims for cross-border activity taking place only partly in the forum state, yet sufficiently touching and concerning it.[20] The ATS incorporates these principles.

The first case to make reference to the ATS, *Bolchos v. Darrell*, 3 F. Cas. 810 (D.S.C. 1795), explained that the ATS covered acts committed on either side of this nation's borders or while crossing them. Although the defendant's violation was consummated in the United States, "as the original [course of activity] arose at sea, every thing dependent on it is triable [...] Besides, as [the ATS] gives this court concurrent jurisdiction […] I dismiss all doubt upon this point." *Id.* at 810.[21] The history of the ATS has

---

[18] Defendants also seem to rely on the order for remand in *Doe v. Exxon Mobil Corp.*, 527 Fed. App'x 7 (D.C. Cir. 2013), even though no court has addressed the merits of the case post-*Kiobel*.
[19] While Defendants note at least thirteen cases dismissed at least in part on *Kiobel* extraterritorial grounds, they fail to mention that one plaintiff brought at least seven cases, filing in various forums against the Queen of England and dozens of other celebrities.  *See, e.g., Oluwashina Kazeem Ahmed–Al–Khalifa v. Queen Elizabeth II,* 2013 WL 2242459 at *2 (N.D.Fla. May 21, 2013) ("[Plaintiff] seems to be seeking a forum that will allow these frivolous and meritless complaints to go forward. Success in that regard appears unlikely.") (compiling cases).
[20] *See* Friedrich K. Juenger, *The Lex Mercatoria and Private International Law*, 60 La. L. Rev. (2000) (the law merchant is "a legal order specifically designed for transfrontier transactions.")
[21] Similarly, *Adra v. Clift*, 195 F. Supp. 857 (D. Md. 1961), held that ATS jurisdiction "do[es] not necessarily disappear when [a violator of international law] enters the territory of his own or of any other State", and that "there is some intertwining of the branches" of "the law of nations and private international law"— including terms of jurisdiction over transnational conduct violating the law of nations. *Id.* (quoting in part *Hilton v. Guyot*, 159 U.S. 113).

not since challenged this basic jurisdictional doctrine.[22]

### E.      The SAC Alleges "Relevant" Domestic Conduct

Defendants contend that the SAC does not allege any "relevant" domestic conduct through their mischaracterization of U.S. conduct as "preparatory" or "generic" or banal commercial activity; and through their mischaracterization of relevant conduct as outside the focus of the ATS. MtD at 13, 15.

#### 1.      Defendants Mischaracterize U.S. Conduct as Preparatory or Normal Commercial Transactions

The Defendants' U.S. conduct proximately caused the human rights abuses alleged. Section B of the SOF establishes San Jose's pivotal and intimate role in the design and implementation of the Golden Shield customized specifically to bring about the alleged harms. Section C establishes that Plaintiffs' harms resulted from the application and use of Golden Shield features developed by Defendants for this purpose. Defendants' contentions ignore these and related allegations that the U.S. conduct directly caused the injuries. MtD at 13. Therefore this conduct cannot qualify as "mere preparatory" conduct, as asserted by Defendants. *Psimenos v. E. F. Hutton & Co., Inc.*, 722 F.2d 1041, 1046 (2d Cir. 1983) (distinguishing preparatory activities from U.S. conduct that "directly caused" the alleged harm).

Defendants mischaracterize all U.S. conduct as "generic management, supervision, marketing and planning activities." MtD at 15.  However, their conduct was not ordinary, banal commercial conduct or arms-length business transactions; nor can they make it so just by quoting words like "supervision" or "approval" from the SAC without reference to the context in which these words are used. For a detailed discussion of this point, *see infra* at § III.D.

#### 2.      Plaintiffs' Claims Fall Within the "Focus" of Legislative Concern

Relying on *Morrison*, 130 S. Ct. 2869, Defendants further argue that Plaintiffs' claims do not meet the *Kiobel* "touch and concern" standard because the domestic conduct does not fall within the "focus" of

---

[22] *Kiobel*'s "touch and concern" requirement should be read in light of the underlying principle that claims under either of the "intertwin[ed] branches" of private and public international law (*see Adra v. Clift* in the previous footnote) concern a forum state when they involve significant activity crossing its borders in either direction. Founding era understanding of the law of nations similarly encompasses this case, with conduct committed partly abroad by U.S. nationals. Plaintiffs could bring law of nations claims for acts carried out partly across borders (*e.g.*, to seize property abroad). *See The Case of Thomas Skinner, Merchant v. The East India Company* (1666) 6 State Trials 710, 711 (H.L.). "Courts could give relief," for such wrongs, "notwithstanding [parts of] these were done beyond the seas." *Eachus v. Trustees of the Illinois & Michigan Canal*, 17 Ill. 534, 546 (1856) (citing *Skinner* supra). Accordingly, Cisco's substantial cross-border activity in violation of the law of nations touches and concerns the forum state. *See Kiobel*, 133 S. Ct. at 1669.

15

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   legislative concern. This argument fails for several reasons.

2       First, Defendants mistakenly assume that the extraterritoriality analysis under *Kiobel* is identical to

3   that in *Morrison*.  However, *Kiobel* does not apply the *Morrison* presumption that (1) ordinarily applies only to

4   conduct-regulating statutes; (2) does not distinguish between the high seas and foreign sovereign territory;

5   (3) does not apply to jurisdictional statutes such as the ATS; (4) asks judges to determine the Congressional

6   intent; (5) does not involve the recognition of federal common law causes of action based on international

7   law; and (6) is not ordinarily overcome on a case-by-case basis. Instead, *Kiobel* applied the "principles"

8   underlying the presumption in what it conceded is an atypical application. 133 S.Ct. at 1664.  Thus, the

9   manner in which these principles apply in other ATS settings, outside of "mere corporate presence" cases,

10  is still to be determined. Because the new rule in *Kiobel* is a merits question—*i.e.*, whether facts sufficiently

11  "touch and concern" the United States to "displace" the presumption—it is not amenable to a bright line

12  rule and mandates case-by-case analysis.

13      Second, by referencing the "focus" test, Defendants adopt the view of Justice Alito, whose two-

14  person concurrence is the only part of *Kiobel* to mention such a test, which in his view required "domestic

15  conduct [] sufficient to violate an international law norm." 133 S. Ct. at 1170. *Kiobel* cites *Morrison*

16  ascertain whether the presumption applies to a statute in the first place, but does not quote *Morrison* to

17  discern whether a particular claim displaces the presumption.  Rather, *Kiobel* provides a new test: whether

18  "the claims touch and concern the territory of the United States […] with sufficient force to displace the

19  presumption against extraterritorial application." *Id.* at 1669.  Moreover, Justice Alito's view conflicts with

20  *Sosa*, 542 U.S. at 754, 763 (relying on *Filartiga* and other extraterritorial cases); yet nothing in *Kiobel* purports

21  to narrow *Sosa*. In any event, Justice Alito's minority test is no bar: Defendants' acts of aiding and abetting

22  the alleged abuses, which originated in the United States, are themselves torts in violation of international

23  law norms and cannot be artificially separated from the harms Plaintiffs suffered in China.[23] *See infra* § III.A

24  (aiding and abetting liability exists under the ATS).

25      Even if Justice Alito's test were useful for a "touch and concern" analysis, Congress's focus in

26  passing the ATS was to fulfill U.S. obligations under the law of nations, including providing redress when

[23] *See also Sexual Minorities Uganda*, 2013 WL 4130756 at *14 (to assess the extraterritoriality of ATS aiding and abetting claims, "[t]he relevant question […] is whether Plaintiff has alleged that substantial 'practical assistance' was afforded to the commission of the crime against humanity from the United States.").

16

U.S. persons committed violations. *Sosa,* 542 U.S. at 722 n.15.[24]

Finally, Cisco cites no authority for its conclusion that Congress meant to provide a safe haven by excluding from its "focus" those who aid and abet atrocities from within the United States.  MtD at 16-17. This Circuit has always recognized that secondary liability falls within the ambit of the ATS.  *See, e.g., infra* at § III.A.  Indeed, U.S. courts have always placed aiding and abetting at the center of the civil liability regime for violations of customary international law. *See, e.g., Talbot v. Janson*, 3 U.S. (3 Dalll.) 133, 167-68 (1795); *Henfeild's Case*, 11 F. Cas. 1099, 1103 (C.C.D. Pa. 1793) (noting liability "under the law of nations, [for] committing, aiding and abetting hostilities"). In *Talbot*, the defendant "armed and equipped" the principal's vessel "within the jurisdiction of the United States, and thus aided in making him an illegal cruiser." 3 U.S. at 157.  The court recognized that the plaintiff could bring an ATS suit against the defendant for assisting in the capture of plaintiff's ship near Cuba. *Janson v. The Vrow Christina Magdelena*, 13 F. Cas. 356 (D.S.C. 1794) (No. 7,216).  Based on his conduct in the United States, Talbot was found liable under international law. *Talbot*, 3 U.S. at 157.[25] In this case, the fact that some parts of Defendants' assistance occurred abroad does not limit Defendants' liability when their conduct took place largely in the United States.

## III.    Defendants Are Secondarily Liable for the Alleged Abuses

### A.    Aiding and Abetting Liability Exists under the ATS and TVPA

Aiding and abetting liability under the ATS has been accepted by every circuit court that has considered the issue.[26] Defendants' attempt to limit aiding and abetting liability by applying the principles of *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994), to the ATS has also been rejected by every circuit to consider it, as well as by this very Court.[27] Aiding and abetting liability under the

---

[24] *See* Legal History Br. and related sources *supra*, § II.A; n.9. *See also* Memorandum for the U.S. as *Amicus Curiae, Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), reprinted in 19 Int'l Leg. Mats. 585, 601-04 (1980) ("a refusal to recognize a private cause of action [against a non-U.S. citizen seeking safe haven in the U.S.] might seriously damage the credibility of our nation's commitment to the protection of human rights"). In contrast, the "focus" cases cited by Defendants do not implicate international law violations.
[25] *See also, e.g., Prosecutor v. Rutaganda,* ICTR-96-3-T, Judgment ¶43 (Dec. 6, 1999) (assistance may be geographically unconnected to the commission of the offense).
[26] *See Hilao v. Estate of Marcos,* 103 F.3d 767, 776-77 (9th Cir. 1996) (hereafter "*Marcos*"); *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1248 (11th Cir. 2005); *Cabello v. Fernandez-Larios,* 402 F.3d 1148, 1157 (11th Cir. 2005); *Presbyterian Church Of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 259 (2d Cir. 2009) (hereafter "*Talisman*"); *Khulumani v. Barclay Nat'l Bank Ltd.,* 504 F.3d 254 (2d Cir. 2007) (per curiam).
[27] *Bowoto v. Chevron Corp.,* 2006 WL 2455752 at *4 (N.D. Cal. August 22, 2006); *see also Aziz v. Alcolac, Inc.,* 658 F.3d 388, 396 (4th Cir. 2011); *Exxon,* 654 F.3d 11, 28 (D.C. Cir. 2011), *vacated on other grounds in* 527 Fed.Appx. 7 (D.C. Cir. 2013); *Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring).

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

TVPA is similarly well established.[28]  Defendants' reliance on *Bowoto* is misplaced; in that case, the Court is ruling against corporate liability, not aiding and abetting, under the TVPA.[29]

### 1.  The *Mens Rea* Standard for Aiding and Abetting under the ATS

The *mens rea* standard for aiding and abetting is not as Defendants characterize it, specific intent, *i.e.*, the same standard as required for the principal actor. *Nestle*, Slip Op. at 4-5 (reversible error to require "specific intent"). Rather it is knowledge or, at most, purposive action in furtherance of the crime.

In 2002, the Ninth Circuit expressed its preference for a knowledge standard for aiding and abetting. *Doe v. Unocal*, 395 F.3d 932, 951 (9th Cir. 2002), *vacated by* 395 F.3d 978 (9th Cir. 2003). This Court, moreover, has consistently held that knowledge is the only *mens rea* required for aiding and abetting. *Bowoto*, 2006 WL 2455752 at *4 ("In order to be held liable, plaintiffs must show . . . that defendants knew that the Nigerian military intended to commit the crime"); *see also Bowoto v. Chevron Texaco Corp.*, 312 F.Supp.2d 1229, 1247 (N.D. Cal. 2004) (allowing plaintiffs to proceed on aiding and abetting claims accusing defendants of "knowingly providing substantial assistance"); *Doe v. Qi*, 349 F.Supp.2d 1258, 1268 (N.D. Cal. 2004) ("Liu knew or reasonably should have known that Beijing police and other security forces were engaged in a pattern and practice of severe human rights abuses against Falun Gong practitioners"). The Northern District is not alone in this Circuit in its preference for a "knowledge" standard.  *See, e.g., Doe v. Saravia*, 348 F.Supp.2d 1112, 1148-49 (E.D. Cal. 2004) (allowing aiding and abetting in ATS cases where defendants "know[ ] that [their] actions will assist the perpetrator in the commission of the crime").

The proper *mens rea* standard for aiding and abetting under customary international law is similarly knowledge.  As described in the Motion of *Amici Curie* International Law Scholars, at 4-15, Nos. 02-56256, *Sarei v. Rio Tinto* (9th Cir. Jan. 29, 2010), the Nuremberg Tribunals,[30] ICTY, and ICTR[31] have required the

---

[28] *See, e.g., Aldana*, 416 F.3d at 1248 ("[T]he Torture Victim Protection Act reaches those who ordered, abetted, or assisted in the wrongful act."); *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1258 n.5 (11th Cir. 2009) ("the TVPA permits aiding and abetting liability") (overruled on other grounds); *Mujica v. Occidental Petroleum Corp.*, 381 F.Supp.2d 1164, 1172-74 (C.D. Cal. 2005) ("[T]he Court holds that the TVPA does provide for aiding and abetting liability.").
[29] *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010) (explaining that "[e]ven assuming the TVPA permits some form of vicarious liability, the text limits such liability to individuals, meaning in this statute, natural persons.").
[30] *United States v. Ohlendorf*, 4 Trial of War Criminals Before the Nuremberg Military Tribunals ("T.W.C.") 1, 569 (1949) (conviction for providing lists because defendant "was aware that the people listed would be executed when found"); *U.S. v. Flick*, 6 T.W.C. 1217, 1222 (1952) (convicting defendant for "knowingly" contributing money to offending organization).  In the corporate context, the court convicted industrialists for selling poison gas with knowledge that it would be used to kill. *In re Tesch (The Zyklon B Case)*, 1 Law Reports of Trials of War Criminals ("L.R.T.W.C.") 93, 101 (1947); *cf. United States v. Krauch*, 8 T.W.C. 1117

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

*mens rea* of knowledge in aiding and abetting cases. A recent decision by the Special Court for Sierra Leone, after a review of post-WWII jurisprudence, is in accord. *Prosecutor v. Taylor*, Case No. SCSL-03-01-A, Appeals Chamber Judgment, ¶483 (Sept. 26, 2013) ("knowledge of the consequence of his acts or conduct – that is, an accused's 'knowing participation' in the crimes – is a culpable *mens rea*").

      The Rome Statute of the ICC, although not regarded as a source for general principles of customary international law,[32] supports a knowledge standard, or at most requires that an aider or abettor purposely act in a manner that has the consequence of "facilitating the commission of a crime," without "fram[ing] the intent of the aider or abettor with respect to that consequence." *Sarei*, 671 F.3d at 767 (vacated on other grounds) (quoting David Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance,* 29 Berkeley J. Int'l L. 334, 355 (2011)). Indeed, Article 30(2)(b) of the Rome Statute defines "intent" as where a person "means to engage in the conduct" or "means to cause that consequence *or is aware that it will occur in the ordinary course of events*" (emphasis added).[33] "Purpose" can be "inferred from knowledge of the likely consequences" of an act, but engaging in it anyway, *e.g.*, for financial gain. Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations,* 6 Nw. J. Int'l Hum. Rts., 304, 312–13 (2008)); *see also In re South African Apartheid Litigation*, 617 F.Supp.2d at 261.[34] The Ninth Circuit, before *vacatur*, cited these sources to come to the same conclusion, that knowledge or purposive action is sufficient. *Sarei*, 671 F.3d at 767.[35]

    **2.**   ***Actus Reus***

(1948) (acquitting industrialists who didn't "knowingly participate"). Even the *Hechingen* case that "compelled" *Nestle* (vacated) to use the purpose standard, overturned the convictions due to defendants' lack of "an awareness of the illegality." *The Hechingen Case*, 7 J. Int'l Crim. Just. 131, 150 (2009).
[31] Both the ICTY and the ICTR have consistently used the "knowledge" standard. *See, e.g., Prosecutor v. Vasiljevic*, Case No. IT-98-32-A, Appeals Chamber Judgment (Feb 25. 2004); *Prosecutor v. Tadic*, Case No. IT-94-1-T, Judgment of Trial Chamber (May 7, 1997); *Prosecutor v. Aleksovski*, Case No. IT-95-14/1, Judgment of Trial Chamber (May 7, 2000); *Prosecutor v. Ojadnic*, Case No. IT-05-87-A, Appeals Chamber Judgment (Feb. 12, 2010); *Prosecutor v. Bagilishema*, Case No. ICTR-95-1A-T, Judgment of Trial Chamber I, 32 (June 7, 2001); *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgment of Trial Chamber I, 12 (Sept. 2, 1998).
[32] *See* Brief of David J. Scheffer as *Amicus Curiae* in Support of Appellants and Reversal, at 13, *Doe v. Nestle*, No. 10-56739 (9th Cir. July 5, 2011) (U.S. negotiator of Statute).
[33] *See also In re South African Apartheid*, 617 F.Supp.2d at 262 ("Under the Rome Statute—and under customary international law—there is no difference between amorality and immorality. One who substantially assists a violator of the law of nations is equally liable if he or she desires the crime to occur or if he or she knows it will occur and simply does not care.")
[34] Defendants cite two district court cases using a specific intent standard. The decision in one case, *Doe v. Nestle, S.A.*, 748 F.Supp.2d 1057 (C.D. Cal. 2010), has been vacated for requiring a specific intent standard. *Nestle*, Slip Op. at 4-5. The relevant part of the decision in the other case, *Corrie v. Caterpillar, Inc.*, 403 F.Supp.2d 1019, 1027 (W.D.Wash. 2005), has therefore been superceded. Defendants also point to a "purpose" standard for genocide, a specific intent crime, which is irrelevant to this case. *See Abagninin v. AMAC Chem. Corp.*, 545 F.3d 733, 738-40 (9th Cir. 2008).
[35] Defendants rely on *Talisman*'s "purpose" standard, which some courts read to include secondary purpose. *See, e.g., Lev v. Arab Bank, PLC*, No. 08 CV 3251, 2010 WL 623636 at *2 (E.D.N.Y. Jan. 29, 2010).

International courts define *actus reus* as "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime."[36]   The Ninth Circuit has ordered district courts to define *actus reus* in light of recent international case law. *Nestle,* Slip Op. at 5; *Prosecutor v. Charles Ghankay Taylor*, Case No. SCSL-03-01-A Judgment, at ¶475 (SCSL Sept. 26, 2013) ("[T]he *actus reus* of aiding and abetting liability is established by assistance that has a substantial effect on the crimes, not the particular manner in which such assistance is provided."); *Prosecutor v. Perisic*, Case No. IT-04-81-A Judgment, at ¶ 36 & n.97 (ICTY Feb. 28, 2013) (holding that "specific direction remains an element of the *actus reus* of aiding and abetting," but noting that "specific direction may be addressed implicitly in the context of analysing substantial contribution"). The Ninth Circuit has twice invoked a similar *actus reus* standard for aiding and abetting under the ATS, in two opinions later vacated on other grounds. *Doe v. Unocal,* 395 F.3d at 947 (vacated on other grounds) (setting the standard as "knowing practical assistance or encouragement that has a substantial effect on the perpetration of the crime"); *Sarei,* 671 F.3d at 765 (*en banc*) (vacated on other grounds) (not questioning the standard of "substantial assistance" or "practical assistance to the principal which has a substantial effect"). This Court has cited with approval an essentially identical standard: "practical assistance, encouragement, or moral support which ha[d] a substantial effect on the perpetration of the crime," *Bowoto,* 2006 WL 2455752 at *4.[37]

Accordingly, the prevalent aiding and abetting standard for ATS claims is knowledge and practical assistance that has a substantial effect on the perpetration of the crime. *See also Cabello,* 402 F.3d at 1158; *Exxon,* 654 F.3d at 39 (vacated on other grounds); *Khulumani,* 504 F.3d at 288-89 (Hall, J., concurring).

### 3.     Plaintiffs Have Plausibly Alleged *Mens Rea* under Any Standard

Regardless of whether the standard is knowledge or something more, such as the "purposive action in furtherance of a [crime]" referenced in *Sarei*, Plaintiffs offer sufficient allegations to support the requisite *mens rea* under *Twombly* and *Iqbal.*

Defendants make the broad and unsupported statement that "[t]he SAC alleges no facts suggesting

---

[36] *See, e.g., Prosecutor v. FurundŽija*, Case No. IT-95-17/1-T, Judgment, ICTY ¶235 (Dec. 10, 1998); *Prosecutor v. Musema*, Case No. ICTR-96-13-T, Judgment ¶126 (Jan. 27, 2000) (*actus reus* is "all acts of assistance" that "substantially contributes to the commission of the crime").
[37] Defendants cite *Nestle*, 748 F. Supp. at 1080-81 as requiring a "specifically directed" *actus reus*. As indicated above, the Ninth Circuit holds that any specific direction "may be addressed implicitly in the context of analyzing substantial contribution. *Nestle*, Slip Op. at 5.

20

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

that [Defendants] knew or intended that the Chinese authorities who purchased police-related security technology to assist in *lawfully* locating and apprehending citizens engaged in crime, including illegal Falun Gong practices, would then *unlawfully* subject those individuals to false charges and convictions, false imprisonment, or heinous physical injury." MtD at 19.  This statement is somewhat puzzling, because entire sections of the SAC are largely devoted to this issue. *See, e.g.,* SAC §§ B.2-3, D-G. Apart from Defendants' characterization of the hunting down of members of a peaceful religion as a "lawful," the allegations address how Defendants customized, marketed, designed, tested, and implemented the Golden Shield knowing and intending that it be used for the unlawful ideological conversion through torture and other human rights abuses against Falun Gong practitioners.[38]  Defendants attempt to selectively quote the SAC to avoid references to the ideological conversion through torture and <u>violent</u> suppression of Falun Gong via the Golden Shield, and then refer to the rest of the SAC as "ordinary crime control." MtD at 24. But the SAC alleges that Defendants not only knew of the abuses, but that they also repeatedly aligned themselves with and affirmed to Chinese security forces their purpose and intent to aid in the perpetration of the ideological conversion through torture and other alleged abuses against Falun Gong. *See* SAC ¶¶41, 57, 66-7, 182.[39] *See also infra* § III.D (Defendants' acts cannot be squared with ordinary commercial activity).

Here, the allegations surpass those found to meet the *Talisman* "purpose" standard in *Almog v. Arab Bank, PLC,* 471 F.Supp.2d 257 (E.D.N.Y. 2007), where the defendant provided financial services to organizations knowing that they were terrorist groups and solicited, collected and disbursed funds facilitating terrorist campaigns. *See Lev v. Arab Bank, PLC,* 2010 WL 623636 at *2; *see also Nestle,* 748 F.Supp.2d at 1097. While the defendant argued that these actions were merely "routine banking services," the court noted that "it is sufficient that [defendant] acted intentionally and with knowledge that its conduct would . . . facilitate the underlying violations." *Almog,* 471 F.Supp.2d at 290-91. Here, by actively soliciting and promising to meet CCP objectives to *douzheng* Falun Gong, and custom designing and

---

[38] Cisco's repeated reliance on anti-Falun Gong accusations from an *ex parte* submission in *Doe v. Qi,* 349 F.Supp.2d 1258 (2004), fails to mention that the court gave no credence to the statement and found defendants liable for torture of Falun Gong.  Moreover, the Western technology community in China was well aware of the peaceful nature of Falun Gong.  *See supra* at 1.

[39] Aiding and abetting does not require that Defendant knew of the exact injuries that would result from its participation. *See, e.g., Linde v. Arab Bank, PLC,* 384 F.Supp.2d 571, 586 (E.D.N.Y. 2005); nor is it required under customary international law. *Prosecutor v. Blaškić,* Case No. IT-95-14-A, Appeals Chamber Judgment ¶50 (July 20, 2004).  In any event, the SAC alleges in extensive detail Defendants' planning and knowledge of, involvement in and purpose to enable the *douzheng* abuses alleged. *See, e.g.,* SAC §§ B, E, F.

21

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

implementing all aspects from individual components to the integration of the entire Golden Shield, Defendants' intentional acts went beyond the provision of routine business services and aligned with the CCP's objective. *See also In re South African Apartheid Litigation*, 617 F.Supp.2d at 265, 268 (finding that defendant IBM's "willful blindness" and provision of "programming expertise as well as the hardware" supported a plausible inference of *mens rea*).

Insofar as Plaintiffs' allegations of Defendants' *mens rea* are at least as strong as those used to convict Defendants of being accessories to murder in the *Zyklon B Case* at Nuremburg, cited with approval in *Nestle,* they are more than sufficient to support a plausible inference of knowledge and/or purpose here. In that case, the evidence showed not only that defendants provided the German government with gas, training, and tools to use the gas to carry out genocide, but also that defendants had suggested the use of the gas in the first place. 1 L.R.T.W.C. 93, 95 (1947).  In this case, Cisco's alignment with the CCP's repressive goals includes and goes far beyond the suggested use of a preexisting product and instead involves Cisco's creating a tailored and unprecedented means of facilitating the abuses.  As laid out above, Defendants in this case not only provided training and recommendations, but also developed a first-of-a-kind system that was designed with the fundamental objective of facilitating every stage of the alleged human rights abuses from identification to torture of members of a religious group.  *See supra,* SOF §II.

Indeed, Cisco's "prolonged cooperation" with the CCP's *douzheng* of Falun Gong removes any doubt of its intent; this is true even if Cisco's alignment was monetarily motivated. *Direct Sales Co. v. U.S.*, 319 U.S. 703, 713 (1943) ("[Defendant's] stake here was in making the profits which it knew could come only from its encouragement of [others'] illicit operations."). In light of the CCP's well-known aim to *douzheng* Falun Gong, "by the sale [Cisco] intends to further, promote and cooperate in" the violent suppression. *Id.* at 711-12 (additional facts available to the aider and abettor of the principle's "illegal object and enterprise" belie claims of "innocuous" business activities).[40]

---

[40] Defendants' attempt to analogize the "evidence of intent" in *Giraldo v. Drummond Co., Inc.*, 2013 WL 3873965 (N.D. Ala. July 25, 2013), fails. That decision focused on sufficient evidence to survive summary judgment, not whether sufficient claims were plead. *Id.* at *5. Regardless of the *mens rea* standard used, the court dismissed the case due to "the absence of any evidence of [defendant's] knowledge that the [paramilitary group] was allegedly being paid by [defendant]." *Id.* (finding, in fact, that defendant "directed his acts to *prevent* any violation") (emphasis added). Defendants' references to *Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed.Appx. 89, 94 (2d Cir. 2011) and *Aziz*, 658 F.3d at 401 are similarly unavailing, as both failed to allege that defendants acted with "purpose" in circuits with a "purpose" standard. This case, in contrast, specifically alleges both knowledge and purpose in a Circuit that has never required the latter.

22

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

**4.    Plaintiffs Sufficiently Allege *Actus Reus***

The SAC alleges sufficient conduct to meet the *actus reus* for aiding and abetting liability. In *In re South African Apartheid Litig.*, the court found sufficient plaintiffs' allegations that the technology defendants 1) supplied "specially-designed, computerized population registry," including "the software and database design as well as the hardware to run the system"; 2) "developed an automated database of information on South Africa's Black population" that formed the "means by which" the government carried out both racial segregation and discrimination; 3) and that this system "was used to track racial classification and movement for security purposes" and was essential in "implementing and enforcing the racial pass laws and other structural underpinnings of the apartheid system." 617 F.Supp.2d at 268. Here, Plaintiffs also allege acts specifically designed to further the misconduct, providing the means by which the violations were carried out and essential to the commission of the alleged abuses.[41]

First, Cisco engaged in marketing, planning, design and implementation "specifically directed" to enable the alleged abuses, including ideological conversion through torture, of Falun Gong practitioners. *See, e.g.*, SAC §§ B.1. (marketing), B.2. (design), B.3. (implementation), D., F.[42]

Second, the SAC alleges that Defendants' conduct provided the "means by which" the alleged misconduct was carried out. *See, e.g.*, SAC ¶97 (listing six Golden Shield solutions implemented by Cisco to facilitate the identification of Falun Gong believers) and ¶98 (listing five Golden Shield features implemented by Cisco to facilitate apprehension, detention, interrogation, and forced conversion of Falun

---

[41] *Nestle*, 748 F.Supp.2d at 1101, relied upon by Defendants, differentiates "general assistance" from specifically directed conduct. The Ninth Circuit vacated the decision, noting that the ICTY finds specific direction "addressed implicitly in the context of analyzing substantial contribution." *Nestle*, Slip Op. at 5 (internal citation omitted) – *i.e.*, Defendants' substantial contribution to the alleged harms against Plaintiffs including apprehending, isolating, and forcibly converting/torturing them.

[42] The SAC alleges that San Jose's marketing effort to establish the superiority of the Cisco brand across China required the intensive investigation of and promises to meet the repressive goals and objectives of the Golden Shield apparatus including the persecution of disfavored groups like Falun Gong, *see, e.g.*, SAC ¶¶58-61; that San Jose's high-level designs comprise anti-Falun Gong features developed solely and specifically to repress Falun Gong, *see, e.g., id.* ¶¶80-82; that San Jose designs routinely integrate these and other Golden Shield components specifically to meet CCP and Public Security officers' goals of persecuting Falun Gong, *see, e.g., id.* § B. In particular, the SAC alleges at ¶¶82-83 that Cisco designs integrate the Internet Surveillance System, which San Jose developed specifically to *douzheng* all Falun Gong believers, with other components to facilitate the identification, tracking, locating, isolating and forced conversion of Falun Gong. *See also id.* ¶¶84-86 (discussing Cisco designs that integrate the Web Notification System with Cisco security systems specifically to enable "Chinese security at public security hospitals, psychiatric hospitals and 610 office locations to access the profiled information and use it to forcibly convert Falun Gong."). The SAC further alleges that San Jose, directly and in concert with affiliates and/or partners, implemented many if not all of these features and applications, specifically for the purposes of identification, isolation, ideological conversion through torture and other persecutory measures. *See id.* ¶¶96-108.

23

Gong). Most notably, forced ideological conversion practices [*zhuanhua*] were carried out by Chinese security via individualized conversion procedures based on "lifetime" profile information compiled and stored in Falun Gong data base systems Defendants customized for these and related purposes. *Id.* ¶¶68, 80, 99-101. *See In re South African Apartheid Litigation,* 617 F.Supp.26 at 259 ("[I]n the context of commercial services, provision of the means by which a violation of the law is carried out is sufficient to meet the *actus reus* requirement of aiding and abetting liability under customary international law.").

Third, the SAC pleads facts regarding how Defendants' conduct was "essential" or "indispensable" to the perpetration of the violations. San Jose designed and developed many first-of-their-kind features and integrated these and other features specifically to aid Chinese security officers in the persecution of Falun Gong (*see, e.g.,* SAC ¶76); San Jose recommended the use of many of these features, which CCP officers could not have envisioned based on their lack of expertise; and even technical experts in China lacked the experience, training and resources to develop these cutting edge innovative solutions. *See id.* Without Cisco's technology and the Golden Shield's unprecedented scale, complexity, and capacity, it would not have been possible for Chinese security to obtain sensitive personal information and coordinate large-scale investigations, tracking, apprehension, interrogation, torture and persecution of Falun Gong adherents from anywhere in China. *See, e.g., id.* ¶106. Indeed, a former Office 610 agent who used the Golden Shield to persecute Does I-III admitted that Cisco's technology was the essential means by which Plaintiffs were categorized, apprehended, detained and forcibly converted. *Id.* ¶¶114-15.

**B.    Conspiracy/JCE Is Available under the ATS and TVPA**

Contrary to Defendants' claims, *see* MtD at 25, the Ninth Circuit has held that conspiracy liability is indeed available under the ATS. *See Marcos,* 103 F.3d at 776.  This holding is supported in other circuits and under international law.[43] Joint Criminal Enterprise ("JCE") liability arises when the accused intends to "participate in and further" a common criminal design. *Tadić* at ¶ 228.  Under the definition of conspiracy cited by Defendants, conspiracy liability would require *either* an "agreement" or "'a criminal intention to

_____

[43] *See, e.g., Aldana,* 416 F.3d at 1248 (holding that the ATS "'reaches conspiracies and accomplice liability'") (quoting *Cabello,* 402 F.3d at 1157).  Under international law, Plaintiffs have alleged that Defendants participated in a JCE.. *See, e.g.,* SAC ¶¶385, 390, 396; *Hamdan v. Rumsfeld,* 548 U.S. 557, 611, n.40 (2006) (recognizing "joint criminal enterprise" as a "species of liability for the substantive offense under international law"); *see also Prosecutor v. Tadić,* Case No. IT-94-1-A, Appeals Chamber Judgment (July 15, 1999); *Prosecutor v. Milutinović,* Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction - Joint Criminal Enterprise (May 21, 2003); *Prosecutor v. Rwamakuba,* Case No. ICTR-98-44-AR72.4 (Oct. 22, 2004); *Prosecutor v. Taylor,* SCSL-2003-01-I, Amended Indictment (Mar. 16, 2006).

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

participate in a common criminal design.'" *Mohammed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1085 n.7 (9th Cir 2010) (internal citations omitted).[44]

The SAC plausibly alleges that Defendants intended to "participate in and further" the common criminal design to repress Falun Gong, including via ideological conversion/torture.[45] Contrary to Defendants' assertion, Plaintiffs do not "depend on proof of a covert relationship", MtD at 25. The SAC in fact provides facts alleging an overt agreement. SAC ¶¶151-52 (Cisco entered into agreements to provide information centers to host Falun Gong databases, to train Chinese security officers in the use of surveillance technology); *see also id.* ¶153 (Cisco constructed the Golden Shield in full collaboration and partnership with Chinese security officers in regions across China.); *id.* ¶¶60, 190, 215; *see further* ¶188 (Defendants "agreed to meet Public Security's objectives during its work on the Golden Shield, which, as stated by Defendants elsewhere, include the suppression of Falun Gong."). Plaintiffs further allege that Cisco agreed to construct the Golden Shield with Chinese security officers to "maintain social stability" or further "strike hard" campaigns, which Cisco acknowledges include the *douzheng* of Falun Gong. *See, e.g., id.* ¶¶60, 190. Based on these and other SAC allegations, Defendants agreed to participate in an unlawful act by agreeing to further the CCP's persecutory campaign against Falun Gong.

Defendants together with CCP and Chinese security officers carried out numerous overt acts in furtherance of this unlawful agreement. *See, e.g.,* SAC ¶¶80-86, 97-102 (describing how Defendants designed, implemented, and provided training and verification for the Golden Shield to facilitate the persecution of Falun Gong practitioners, including ideological conversion through torture and other abuses). These overt acts proximately caused Plaintiffs' injuries. *See, e.g., id.* ¶¶5, 6, 109-24. *See supra,* n.11.

## C.    Ratification and Agency Liability

Since Defendants do not contest agency liability or ratification, they concede these points. *See, e.g., United States v. Wiga*, 662 F.2d 1325, 1334 n.13 (9th Cir. 1981) (where a party fails to argue a point, it concedes that point and its contestations are not considered).

---

[44] Similarly, conspiracy under federal common law requires: an agreement between two or more persons; to participate in an unlawful act, or a lawful act in an unlawful manner; an injury caused by an unlawful overt act performed by one of the parties to the agreement; which overt act was done pursuant to and in furtherance of the common scheme. *See Doe I v. Gap, Inc.*, 2002 WL 1000068 (D.N. Mar. 1, 2002) (citing *Halberstam v. Welch*, 705 F.2d 472, 481, 487 (D.C. Cir. 1983)); *Cabello*, 402 F.3d at 1159 (same).

[45] In fact, under customary international law, conspiracy requires only "knowledge of [a] system of ill-treatment" and "intent to further this [system]." *Tadić* at ¶228. As discussed in the aiding and abetting section *supra* at § III.A.3, Plaintiffs more than meet this standard.

### D.      Plaintiffs Do Not Allege Ordinary Commercial Conduct

Plaintiffs' allegations cannot be squared with any "ordinary commercial conduct," or with Defendants' assertion that it was simply helping China legally target "illegal" dissident activity. Indeed, Defendants' acts are squarely within the type of commercial activity found culpable by international and U.S. courts since World War II:[46]

- San Jose researched the persecutory purposes of the Golden Shield and created a marketing campaign that regularly invoked persecutory CCP rhetoric and promised to meet Chinese security's demands to further the *ultra vires* abuse of peaceful Falun Gong believers. *See* SAC ¶¶56-62, 64-68, 97(d), 187, 194.
- San Jose recommended first-of-a-kind technology specifically to bring about harms alleged in SAC, including Information Centers featuring confidential Falun Gong databases with secure connections to the extralegal Office 610. *See id.* ¶¶80-86, 97-101.[47]
- Exercising control over the design, implementation, maintenance and upgrade of the Golden Shield, San Jose Defendants created and customized a well-integrated set of Golden Shield "*solutions*" specially tailored and unique in and of themselves and/or uniquely integrated, *id.* ¶2, and incorporating numerous specifically anti-Falun Gong features to facilitate the persecutory goals of the apparatus. *See supra,* SOF § II on Customization; *see also* SAC ¶144.
- The purportedly "dual purpose" features were marketed as anti-Falun Gong tools. SAC ¶¶ 62, 80, 97.
- San Jose provided expert personnel to test and verify that the Golden Shield successfully achieve its anti-Falun Gong purposes. *Id.* ¶¶58, 83(h), 102-03.
- San Jose trained Chinese security to use the apparatus to persecute Falun Gong. *Id.* ¶186.
- San Jose provided 24/7 customer support through its Technical Assistance Center.

Unlike in *Corrie*, Cisco did not "merely sell[] goods," *Corrie*, 403 F.Supp.2d at 1027; Cisco never had a "legitimate need" to facilitate the persecution of Falun Gong; nor did Cisco discourage or express frustration over the violations. *Talisman*, 582 F.3d at 263. Defendants knowingly and intentionally solicited and aligned themselves with the persecutory goals of the CCP. *See* SOF § III; *see also* SAC § F.

### E.      Plaintiffs Allege Violations of Norms Actionable under the ATS

---

[46] *See, e.g., The Zyklon B Case,* 1 L.R.T.W.C. 93 (1947) (defendants suggested the use of gas, provided expert technicians and personnel training); *In re South African Apartheid,* 617 F.Supp.2d 228 (S.D.N.Y. 2009) (defendants sold "specialized vehicles" and "customized computerized systems" specifically designed to aid and abet human rights abuses); *Almog v. Arab Bank,* 471 F.Supp.2d 257 (E.D.N.Y. 2007) (Defendant knew of bank accounts being used to fund terrorist activities, yet continued to solicit funds for clients).
[47] Falun Gong also posed unique challenges to Golden Shield designers: they lack visible indicia, reside in all regions across China, number between 70 to 100 million and are technologically sophisticated in their use of anti-surveillance tools. Instead of ordinary criminal justice measures such as incarceration, Chinese security agents were interested in ideologically converting them. These tasks required a careful study of the *douzheng* objectives in the development of unique Golden Shield features. SAC ¶¶77-79; *see, e.g., id.* ¶3 (a vast, multi-tiered surveillance system that could scour the entire country's Internet use for Falun Gong activity); ¶¶5, 80 (integrating Falun Gong-specific features into the gargantuan multi-level network); ¶84 (unique Falun Gong databases for ideological conversion); ¶97 (development of technologically sophisticated tools).

26

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Each ATS claim alleged "rest[s] on a norm of international character accepted by the civilized world and defined with a specificity comparable to [ ] 18th-century paradigms." *Sosa,* 542 U.S. at 725.

### 1.   Cruel, Inhuman and Degrading Treatment

In *Doe v. Qi*, 349 F. Supp.2d at 1323-24, the court conducted an intensive review of customary international law and concluded that claims for cruel, inhuman and degrading treatment are actionable under the ATS.  *See also Nestle,* 748 F.Supp.2d at 1077; *Bowoto v. Chevron Corp.,* 557 F.Supp.2d 1080, 1094-95 (N.D. Cal. 2008); *Mujica,* 381 F.Supp.2d at 1181.[48]

### 2.   Forced Labor

Forced labor is actionable under the ATS. *See In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001); *see also Doe v. Unocal*, 395 F.3d at 945 (vacated on other grounds).[49]  The *Abolition of Forced Labour Convention* (1957), ratified by 169 member States including the United States, specifically prohibits forced labor "as a means of political coercion or education or as a punishment for holding or expressing political views or views ideologically opposed to the established political, social or economic system" or "as a means of racial, social, national or religious discrimination." Here, several Plaintiffs "were sent to reeducation through labor camps, where they were forced to work involuntarily under threat of or as part of a regime of serious harm and physical restraint." SAC ¶398. These plaintiffs received no hearing, and were never "charged, convicted or sentenced for a violation of a crime." *Id.* Defendants cite to the *Forced Labour Convention* (1930), which excludes from the definition of forced labor "[a]ny work or service exacted from any person as a consequence of a conviction . . . ." *See* MtD at 29.  However, Defendants leave off the end of the sentence: "as a consequence of a conviction *in a court of law*." *Id.* (emphasis added).  It would make little sense to apply that exception to this case, where Plaintiffs were arbitrarily detained without a hearing of any kind.  In fact, this Court has recognized prolonged arbitrary detention as an independent violation, *see Doe v. Qi*, 349 F. Supp. 2d at 1325-26, and Cisco does not challenge the existence of that norm.

---

[48] Even if, as Defendants contend, there is diversity in the definition of cruel, inhuman and degrading treatment, the norm is universally condemned and actionable under *Sosa*. *See, e.g., U.S. v. Smith,* 5 Wheat. 153, 161 (1820) (piracy is actionable even with multiple definitions: "whatever may be the diversity of definitions, ... all writers concur […] that robbery or forcible depredations upon the sea ... is piracy.").
[49] Although the *Unocal* decision was later vacated, "That the opinion was later vacated does not deprive its reasoning of persuasive power." *See In re Agent Orange Product Liability Litigation*, 373 F.Supp.2d 7, 83 (E.D.N.Y. 2005).

27

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

### 3.    Crimes Against Humanity

As Defendants recognize, claims based on crimes against humanity are cognizable under the ATS. *See Doe v. Saravia,* 348 F.Supp. 2d 1112, 1156-57 (E.D. Cal 2004). Defendants argue that Plaintiffs' claims for crimes against humanity fail to allege conduct that was "widespread" or "systematic." MtD at 29-31, citing *Abagninin v. AMVAC Chem. Corp.,* 545 F.3d 733, 741 (9th Cir. 2008). But the SAC is replete with factual allegations that support the widespread nature of the repressive campaign.[50] *See* SAC ¶¶405-06. For example, SAC ¶48 cites a U.S. State Department report estimating that as early as 2001, several hundred thousand Falun Gong practitioners were detained, describes their treatment in Chinese "Reeducation Through Labor" camps and notes that "at least two thousand Falun Gong practitioners have been tortured to death in China." Defendants argue that the conduct alleged in the SAC is not sufficiently "widespread" because the "many thousands" harmed (as described in the Plaintiff class) is speculative and insufficiently massive in relation to 70 to 100 million alleged to be Falun Gong practitioners. MtD at 30. The notion that the scale alleged must be measured in the number of plaintiffs, particularly in ratio to the total population of a particular group, is contrary to case law. *See, e.g., Cabello,* 402 F. 3d at 1161 (allowing crimes against humanity claim for a single decedent killed as part of politically motivated attack).

### F.    Corporations May Be Held Liable for Claims Brought Under the ATS

According to the Ninth Circuit, "corporations can face liability for claims brought under the Alien Tort Statute." *Nestle*, Slip Op. at 4. Every circuit outside of the Second Circuit to directly consider the issue has also concluded that corporations may be held liable under the ATS. *Id*; *Flomo v. Firestone,* 643 F.3d 1013, 1017-1021 (7th Cir. 2011); *Doe v. Exxon,* 654 F.3d at 39-57 (vacated on other grounds); *Romero v. Drummond Co.,* 552 F.3d 1303, 1315 (11th Cir. 2008).

### G.    Corporate Liability under the ATS Is Not Displaced by the TVPA

Defendants ignore cases holding that the Torture Victims Protection Act ("TVPA") was meant to enhance the remedies available under the ATS. *See Sosa,* 542 U.S. at 728; *Nestle,* 748 F.Supp.2d at 1115; *Bowoto,* 557 F.Supp.2d at 1084-86; *Mujica,* 381 F.Supp.2d at 1179 n. 13 (collecting authorities); *see also Marcos,* 103 F.3d at 778.   Even *Nestle,* relied upon by Defendants, rejected Defendants' position. 748 F.Supp.2d at 1114-15.  Therefore, the remedies or limitations under the TVPA are irrelevant to the reach of the ATS.

---

[50] Crimes against humanity requires either a widespread or a systematic attack, but not both.  *Prosecutor v. Akayesu,* No. ICTR-96-4-T, ¶579 and n.144 (1998).

28

**H.    Defendants Acted under Color of Law**

Only a limited number of Plaintiffs' claims requires state action as an element.[51]  For these claims, Defendants are secondarily liable under the ATS and the TVPA for acting with Public Security officers and agents as state actors. *Aldana,* 416 F.3d at 1248 (citing *Cabello,* 402 F.3d at 1157). *See also supra* § III.A, III.B (relating to liability as an aider or abettor or a co-conspirator).

In construing state action, courts look to agency law and to cases under 42 U.S.C. §1983. *Aldana,* 416 F.3d at 1247 (citing *Kadic v. Karadzic,* 70 F.3d 232, 245 (2d Cir. 1995)).  As summarized in *Johnson v. Knowles,* 113 F.3d 1114 (9th Cir. 1997), the Supreme Court has articulated four tests for when private acts amount to state action. *Id.; see also Collins v. Womancare,* 878 F.2d 1145, 1148-1149 (9th Cir. 1989).  As applied here, two of these tests clearly satisfy state action: (1) the *joint action test* and (2) the *governmental nexus test.* Any one of these tests is sufficient for state action. *See Brentwood Acad. v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 303 (2001); *Lee v. Katz,* 276 F.3d 550, 554 (9th Cir. 2002).

Under the *joint action test,* private actors who act in concert with the government or its agents can be considered state actors. *Dennis v. Sparks,* 449 U.S. 24, 27 (1980); *Kadic,* 70 F.3d at 245.  A private party's participation with state officials in the conduct complained of is sufficient to qualify that party as a state actor, even if the private party's conduct is not the ultimate cause of the injury alleged. *Lugar v. Edmonson Oil Company, Inc.,* 457 U.S. 922 (1982); *Brentwood Acad.,* 531 U.S. at 296 (many factors bear on fairly attributable state action).[52]  In the *governmental nexus test,* a private party is a government actor where it enters into an agreement with the state or its agents that confers mutually derived and interdependent benefits. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715 (1961); *Berger v. Hanlon,* 129 F.3d 505 (9th Cir. 1997), *rev'd on other grounds,* 526 U.S. 808 (1999) (per curiam), *opinion reinstated* 188 F.3d 1155 (9th Cir. 1999).[53]  *See also Jackson* v. *Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974). Both are relevant here. *See, e.g.,* ¶¶151-52.[54]

The SAC alleges Defendants acted jointly with and in collaboration with Chinese security forces, thus engaging in state conduct resulting in harms to Plaintiffs.[55] Defendants, acting jointly with Public

---

[51] Plaintiffs' claims that require state action (under both the ATS and the TVPA) include torture and extrajudicial killing, *Kadic v. Karadzic,* 70 F.3d at 243, but not, for example, crimes against humanity, *id.* at 236.
[52] In *Lugar,* 457 U.S. 922, the Supreme Court held that the defendant acted under color of law in filing an *ex parte* application for injunction which the sheriff executed in violation of plaintiff's due process rights.
[53] The state action tests are not mutually exclusive and often overlap. *See also Berger,* 129 F.3d 505; *Brentwood Acad.,* 531 U.S. 288.
[54] Whether a private actor has acted under color of law is a factual inquiry. *Howerton v. Bagica,* 708 F.2d 380, 383 (9th Cir. 1983).
[55] As stated in the SAC ¶¶1, Defendants, in cooperation with Public Security officers, designed and developed products for the Golden Shield. (*id.* ¶¶75-79, 96-99), including identifying Internet activity unique to Falun Gong; creating "'centralized database" systems specifically on Falun Gong for use by security forces, among others (*id.* ¶80); and even providing training and maintenance to them (*id.* ¶102). *See also* SOF §§ II, III.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Security officers, suggested the means by which the Golden Shield would be implemented and provided products to meet those goals effectively and efficiently. [56] *See Berger*, 129 F.3d at 515 (government's active involvement with defendants' media news gathering and the mutually-derived benefits, is more than enough for state action); *Bao Ge v. Li Peng*, 201 F.Supp.2d 14, 21-22 (D.D.C. 2000) (state action in ATS cases is met where there has been substantial cooperation between private actors and the government).

Defendants participated with these state actors to develop and implement technological solutions that were tailored for the Golden Shield (which explicitly included Falun Gong's eradication as one of its goals), far exceeding a merely "commercial relationship". MtD at 28. This close collaboration in planning and executing the campaign against the Falun Gong clearly manifests a nexus between defendants and these entities and officials that served their mutual benefit to satisfy the governmental nexus test.

## IV.   The State Law Claims Should Stand[57]

### A.   The Presumption against Extraterritoriality Does Not Apply

Defendants' characterization of California law as incorporating "a presumption against applying laws extraterritorially to encompass conduct occurring in a foreign jurisdiction," MtD at 32, is incorrect and, at best, a red herring. In fact, California law holds that "[t]he presumption [against extraterritorial application] applied in *North Alaska Salmon* to a workers' compensation statute has never been applied to an injured person's right to recover damages suffered <u>as a result of an unlawful act or omission committed in California.</u>" *Diamond Multimedia Sys. v. Superior Court,* 19 Cal.4th 1036, 1059 (1999) (emphasis added). "Simply because a case's factual background involves some conduct occurring abroad does not mean that every statute governing the matter is subject to the presumption against extraterritoriality." *Blazevska v. Raytheon Aircraft Co.,* 522 F.3d 948, 952 (9th Cir. 2008) (declining to apply a presumption against extraterritoriality to tort injury suffered in Macedonia). Rather, "individual states may adopt distinct policies

---

[56] Defendants rely on cases involving conduct by private parties allegedly imputed to the state or state officials, which are inapposite. MtD at 27-28. Rather, Defendants were complicit in the acts of state actors. *See Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 187 (2d Cir. 2009) (state action where private corporation "acted together with state officials or with significant state aid") (citations omitted). *Cf. Bigio v. Coca-Cola Co.,* 239 F.3d 440, 448 (2d Cir. 2000) (dismissal because plaintiff did "not allege that [defendant] acted together with state officials").

[57] Plaintiffs sufficiently allege federal question jurisdiction. *See infra* § VI (ECPA) and *supra* §§ II-III (ATS, TVPA). Even if the Court were to dismiss Plaintiffs' federal question claims and find that the SAC did not sufficiently allege diversity jurisdiction (to which Plaintiffs should be given an opportunity to amend to make such diversity facts unequivocal), *see* MtD at 31 n.20, it is in the Court's <u>discretion</u> to maintain jurisdiction over state law claims, *see* 28 U.S.C. § 1367(c), and if the Court were to dismiss the federal claims with leave to amend, it should retain jurisdiction over the state law claims pled in an amended complaint. *See Godina v. Caltrans,* 2013 U.S. Dist. LEXIS 86424, *11-12 (E.D. Cal. June 18, 2013).

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state." *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal.4th 95 (2006).[58]

Defendants omit any discussion of the SAC's specific allegations of their California-based conduct, *e.g.,* SAC §§ B-D, avoiding the concrete acts complained of, which <u>tie the tortious conduct to California</u>. *See, e.g., id.* ¶¶62, 74, 79-80, 108, 126, 127, 129, 180-181, 183. Thus, Defendants' general assertions that California or any state's law has no application where the "alleg[ed] conduct [was] committed entirely abroad" and reliance on an out-of-circuit district court case for the same proposition, *Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs. SARL,* 2012 WL 748304 (E.D. Mich. Mar. 6, 2012), *see* MtD at 32, miss the point. The SAC alleges <u>California-based conduct</u> that was and continues to be integral to the CCP and Public Security Bureau's ability to commit torts against Plaintiffs, including that San Jose: (1) recommended first-of-a-kind features to meet the apparatus' persecutory functions; (2) conducted extensive marketing and planning to meet the CCP's anti-Falun Gong objectives; (3) designed, maintained and supported the persecutory and other features of the Golden Shield; (4) made key strategic decisions that were integral to the commission of the torts; and (5) helped implement, test, verify, and optimize the above features. *See supra,* SOF §§ II-III. That California activity justifies the application of the state's tort law to Defendants' actions. *See, e.g., SEC v. United Financial Group, Inc.,* 474 F.2d 354, 356-357 (9th Cir. 1973) ("focus should be upon appellants' activities within the United States and the impact of those activities upon American investors").[59] Defendants' tenuous line of cases, such as out of circuit district court decisions including *In re Chiquita Bananas Brand Int'l,* 2011 U.S. Dist. LEXIS 59393 (S.D. Ind. June 3, 2011), and the cases cited by *Chiquita,* cannot support dismissal of Plaintiffs' state law claims as they do not provide the Court with any guidance or reasoning for such dismissal. *See, e.g., Roe I v. Bridgestone,* 492 F.Supp.2d 988, 1024 (S.D. Ind. 2007); *Romero v. Drummond Co.,* 552 F.3d 1303, 1318 (11th Cir. 2008) (relying on Alabama's *lex loci delicti* choice of law principle; California applies a governmental interest test).

---

[58] *See also In Re Pizza Time Theatre Sec. Litigation,* 112 F.R.D. 15, 18 (N.D. Cal. 1986) (California has a strong interest in ensuring that corporations doing business within its borders do not engage in tortious conduct). California's strong interest in monitoring or regulating companies doing business in this state to prevent tortious conduct is undoubtedly within the "zone of interest" protected by California law. *See id.* (citing *Ashley Creek Phosphate Co. v. Norton,* 420 F.3d 934, 939-40 (9th Cir. 2005). As a result, Cisco's contention of lack of prudential standing, *see* MtD at 33, is without merit.

[59] *Cf. Gushi Brothers Co. v. Bank of Guam,* 28 F.3d 1535, 1538-1539 (9th Cir. 1994) (sending of a letter from Guam requesting plaintiff to close its local bank account was incidental to allegedly actionable conduct).

**B.      The State-Law Claims Are Timely**

       **1.      Determination of California or Chinese Law Is Premature**

Defendants' efforts to bootstrap choice of law and statute of limitations arguments to shore up their extraterritoriality and timeliness sections in two footnotes, *see* MtD at 33 n.21-22, are unavailing. Neither choice of law principles nor statute of limitations considerations factor into the question of extraterritoriality, and Defendants cite no authority to the contrary. *See, e.g., Diamond Multimedia Sys.,* 19 Cal.4th at 1059. The question of whether California tort law applies to Defendants' alleged conduct is altogether separate from whether the state law claims are barred by the statute of limitations and what law (California or Chinese) applies to those claims. Further, it is premature to consider limitations issues at this stage, because Plaintiffs have pled timeliness on the face of the SAC. *See infra* § IV.B.2; *see also Fox v. Ethnicon Endo-Surgery, Inc.,* 35 Cal.4th 797, 810 (2005); *Ledesma v. Jack Stewart Produce, Inc.,* 816 F.2d 482, 484 n.1 (9th Cir. 1987). The detailed choice of law analysis Defendants allude to "is not appropriate at this stage of the litigation. Rather, such a fact-heavy inquiry should occur during the class certification stage, after discovery." *Donahue v. Apple, Inc.,* 871 F.Supp.2d 913, 922 (N.D. Cal. 2012); *see also In re Clorox Consumer Litigation,* 894 F.Supp.2d 1224, 1237 (N.D. Cal. 2012).

Even if Chinese law (over California law) were to apply to the state law claims,[60] they are timely.[61] Defendants rely on *In re World War II Era Japanese Forced Labor Litig.* 164 F.Supp.2d 1160, 1182 (N.D. Cal. 2001), which references Articles 135-137 of the Civil Law of China, and assert China's statute of limitations for all civil suits is two years and therefore Plaintiffs' claims are barred. Yet the analysis in that case inapposite, because the court there acknowledged that the "Chinese plaintiffs d[id] not contend that these statutes of limitations ha[d] been tolled". *Id.* It is also incomplete, because Articles 137 and 139 of the Civil Law of China specifically contemplate tolling statutes of limitation. *See* Declaration of Terri Marsh filed concurrently herewith, Ex. A (General Principles of the Civil Law (China)), at Article 137 ("<u>Under special

---

[60] Plaintiffs in no way concede at this time that Chinese law governs the state law claims because the proper application of the governmental interest analysis articulated in *McCann v Foster Wheeler LLC,* 48 Cal.4th 68, 84 (2010)—the possible subject of future briefing because Defendants did not raise the issue in the current MtD—would mandate application of California law to Plaintiffs' state law claims.

[61] Even though the SAC alleges that Plaintiffs' claims are timely, should the Court believe further briefing is required on whether Chinese law applies, Plaintiffs request an opportunity to submit briefing on the issue prior to the Court's decision. *See, e.g., Viera v. Eli Lilly & Co.,* 2010 WL 3893791 (S.D. Ind. Sept. 30, 2010) ("While a party's failure to timely provide notice of reliance on foreign law may result in a waiver of that law's application, the failure alone is not a basis for a dispositive ruling.").

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

circumstances, the people's court may extend the limitation of action." (emphasis added)), at Article 139 ("A limitation of action shall be suspended during the last six months of the limitation if the plaintiff cannot exercise his right of claim because of force majeure or other obstacles." (emphasis added)). Accordingly, here where (1) Plaintiffs do allege tolling, and (2) Chinese law permits tolling under the circumstances pled in the SAC, the claims would be timely under California (or Chinese) law when considered in connection with the circumstances giving rise to tolling described below.[62]

### 2.      California Tolling Principles Make Plaintiffs' Claims Timely[63]

"The purpose of California's equitable tolling doctrine is to soften the harsh impact of technical rules." *Jones v. Blanas*, 393 F. 3d 918, 928 (9th Cir. 2004). Moreover, the relevant inquiry for tolling under California law "requires balancing of the injustice to the plaintiff occasioned by the bar of his claim against the effect upon the … policy expressed by the limitations of the statue." *Id.* First, in light of the uninterrupted and unrelenting persecution that Falun Gong practitioners in China—Plaintiffs included— face, which makes seeking redress either dangerous or futile, *see* SAC ¶¶27-35, 43-52, failing to toll the statute of limitations would result in a profound injustice. Equitable tolling is routinely applied where failure to do so would ignore that Plaintiffs have been prevented from bringing claims out of fear of torture and reprisals. *See id.* ¶¶ 375, 379; *see also, e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 772 (9th Cir. 1996); *Doe v. Saravia*, 348 F. Supp. 1112, 1148 (E.D. Cal. 2004). Second, failing to toll the statute of limitations for Plaintiffs remaining in China (Does I–VI, IX and Roes VII and VIII) would work an injustice by depriving them of a forum in which to bring their claims. Lack of meaningful access to courts has been found sufficient to toll the statute of limitations. *Hilao*, 103 F. 3d 767 at 772; *Saravia*, 348 F. Supp. 2d at 1147. Unfortunately, lack of meaningful access to courts has been an inevitable outcome of the *douzheng* campaigns against dissidents, including Falun Gong. *See, e.g.,* SAC ¶¶31, 38, 235, 246, 291. Plaintiffs have no reasonable expectation that claims brought in such a justice system will result in fair

---

[62] In addition, because Chinese law contemplates tolling, Cal. Code Civ. Proc. § 361 (the "borrowing statute") does not serve to bar Plaintiffs' state law claims.

[63] Defendants' reliance on federal tolling rules, the majority of which have been developed in the context of federal habeas petitions, are inapplicable in this action.  California state law claims are at issue here, and thus, state law equitable tolling rules and state statute of limitations govern the timeliness of these claims. *See, e.g., Wade v. Danek Medical Inc.*, 182 F.3d 281, 289 (4th Cir. 2001) (holding state equitable tolling rules apply when a federal court is applying a state statute of limitation); *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006). California equitable tolling rules apply whether the basis of jurisdiction for the state law claims is conceptualized as diversity or supplemental jurisdiction. Wright & Miller, § 4520 (2d ed. West Supp. 2011).

33

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1   relief. Even if they had such an expectation, non-state appointed lawyers representing Falun Gong are

2   targeted for persecution. *Id.* ¶378. <u>Third</u>, failing to toll the statute of limitations would work an injustice to

3   Plaintiffs due to the difficulty in gathering evidence related to the their claims. *See Santa Maria v. Pacific Bell*,

4   202 F.3d 1170, 1177 (9th Cir. 2000). The cruel treatment of Falun Gong practitioners, combined with the

5   fear of reprisal, and the difficulty Plaintiffs outside of China have had in accessing information about the

6   Golden Shield, has precluded plaintiffs from bringing their claims up until the filing of this action. SAC

7   ¶¶374-80. Each Plaintiff is entitled to tolling on this ground.

8       Defendants also have yet to express a policy interest that staunch adherence to the statute of

9   limitations serves in this case, and it is difficult to imagine the expression of such a policy outside of a

10  "generic public policy interest in ensuring prompt resolution of legal claims." *Jones*, 393 F.3d at 928. Finally,

11  Defendants' remaining arguments against tolling are similarly unavailing. The factual nature of questions

12  related to equitable tolling is a question best left to summary judgment. *See Cervantes v. City of San Diego*, 5

13  F.3d 1273, 1275 (9th Cir. 1993).[64] Thus, as set forth above, Plaintiffs' claims are timely.[65]

14      **C.    Aiding and Abetting Liability under State Law Is Sufficiently Plead**

15      Defendants do not specify the actual test for "intent" to aid and abet, yet apparently are arguing a

16  specific intent standard.  MtD at 36-37.  However, well-settled legal elements of aiding and abetting include

17  only that: (1) defendant <u>knew</u> that a tort was being committed against plaintiff; (2) defendant gave

18  <u>substantial assistance</u> or encouragement; and (3) defendant's conduct was a substantial factor in causing

19

20  [64] *Saravia* best answers Defendants' position that it is "difficult to square" the inability of Plaintiffs' to file this
    case in the past with their ability to file it now, albeit under pseudonym, MtD at 35. Confronted with the
21  identical situation, the *Saravia* court found: "Due to [plaintiff's] … fear of violent reprisals, plaintiff was
    unable to bring this claim in a U.S. Court [sic] earlier. Although plaintiff has now brought this case, it is only
22  with the protection of filing under the pseudonym J. Doe." *Saravia*, 348 F.Supp. 2d at 1147-48. That Charles
    Lee, Liu Guifu and Wang Weiyu litigate this case under their own names, and Ivy He under her English
23  name, is an act of courage that should not be fashioned into a procedural bar. Finally, Defendants suggest
    that "generalized allegations of fear and concern" and "incarceration" do not qualify Plaintiffs for equitable
24  tolling. MtD at 35. While these rules are perhaps germane to habeas corpus petitioners in U.S. federal courts,
    they simply do not describe the sorts of extraordinary circumstances confronted by Falun Gong.
25  [65] Multiple Plaintiffs are also entitled to tolling for at least some of their claims based on statutory grounds.
    California tolls the statute of limitations for those imprisoned for two years. Cal. Code Civ. Proc. § 352.1(a).
    The statute of limitations for assault and battery is two years. *Id.*. § 335.1. Does III and IX remain
26  imprisoned. SAC ¶379(a). Thus, their assault and battery claims are tolled for assault and battery claims
    subsequent to May 11, 2007 (August 4, 2013 when Doe IX joined the suit). Doe IV was imprisoned in
27  2004, *id.* ¶282, and released in November 2010. *Id.* ¶379(c). His claims for assault and battery are thus tolled
    for these torts subsequent to May 11, 2007. Finally, Doe I was imprisoned in July 2003, *id.* ¶236, and
28  released only in 2011. *Id.* ¶379(b). Her claims for these torts are thus tolled for assault and battery
    subsequent to May 11, 2011.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

harm to plaintiff. *Schulz v. Neovi Data Corp.*, 152 Cal.App.4th 86, 95 (2007); *see also In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) ("aiding and abetting liability under California law . . . requires a finding of actual knowledge, not specific intent").[66] Even cases cited by Defendants reiterate the proper standard of "actual knowledge." *Casey v. U.S. Bank Nat. Assn.*, 127 Cal.App.4th 1138, 1145-1146 (2005) (discussing *Lomita Land & Water Co. v. Robinson*, 154 Cal.36 (1908)). As discussed *supra* at § III.A.3, the SAC plausibly alleges Defendants knowingly and intentionally aligned themselves with the persecutory goals of the CCP. Plaintiffs also meet the *actus reus* standard for state law aiding and abetting.[67] Plaintiffs describe *supra* at § III.A.4 how Defendants' acts were "specifically directed" towards bringing about, the "means by which," and "essential to" the harms alleged.  Even ordinary business transactions can satisfy substantial assistance, if the defendant knew the transactions were assisting the commission of the alleged violations. *See Casey,* 127 Cal.App.4th at 1145.[68] Finally, Plaintiffs sufficiently plead causation, as discussed *infra.*

> **D.      Plaintiffs Have Sufficiently Pled Causation for the State Law Claims**

Defendants' argument that the SAC does not sufficiently plead causation for Plaintiffs' state law claims is misplaced and fails to identify the correct standards. As the California Supreme Court has stated, "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 968-969 (Cal. 1997) (citations omitted).  The substantial factor standard includes claims "involving independent or concurrent causes in fact." *Id.* at 969. California is a comparative fault state that recognizes multiple tortfeasors, each of whom may bear some liability. *See Bockrath v. Aldrich Chemical Co.*, 21 Cal.4th 71, 79 (Cal. 1999) (citations omitted) ("The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."). Therefore, Plaintiffs need not allege that the Golden Shield was the sole means of actual injury to Plaintiffs.  However, the Golden Shield was the sole

---

[66] Evidence need not be overwhelming for a plausible claim of aiding and abetting. *Monaco v. Bear Stearns,* 2011 U.S. Dist. LEXIS 105471 *51 (C.D. Cal. Sept. 12, 2011).
[67] Defendants' unsubstantiated suggestion that the multiple steps between Cisco's actions and the commission of assault, battery, false imprisonment, and wrongful death somehow fail to show substantial assistance is not supported by any facts set forth in the SAC.  The SAC alleges in detail the ways in which Defendants' conduct proximately caused the harm. *See supra* n.11.
[68] *See also Schulz,* 152 Cal. App.4th at 94 (substantial assistance sufficiently alleged when defendants allowed their logos to appear on website even though they knew the sites were illegal and continued to participate because it resulted in more revenue).

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

(or essential) means by which all but three Plaintiffs were identified,[69] while for all Plaintiffs it was indispensable to the infliction of subsequent harms including, battery, assault, and false imprisonment. *See, e.g., id.* ¶¶427, 429-431, 434-435, 443-448.  Accordingly, "Defendants' conduct was a substantial factor in causing harm to Plaintiffs." *Rutherford*, 16 Cal.4th at 968-969.

**V.      Plaintiffs' Claim for Unfair Business Practices under California Law Is Properly Pled**

**A.      Plaintiffs' UCL Claim Is Not Defeated by Extraterritorial Components**

Contrary to Defendants' assertion that Plaintiffs' Cal. Bus. & Prof. Code § 17200 *et seq.,* Unfair Competition Law ("UCL") claim is impermissibly extraterritorial, *see* MtD at 38-39, the SAC alleges that Defendants' acts of unfair competition took place <u>within</u> California. *See, e.g.,* SAC ¶¶126, 453- 454 (marketing materials to design, build and supply the Golden Shield were developed in California, the Golden Shield was designed, managed, and overseen from California, the implementation was controlled from San Jose, and, by information and belief, formation and signing of relevant contracts occurred there). The law is well-settled that a UCL claim may proceed by non-residents regardless of where the injury occurred, so long as <u>some</u> of the challenged action occurred in California or some benefit of the challenged action accrued to a California defendant. *See, e.g., Wershba v. Apple Computer, Inc.,* 91 Cal.App.4th 224, 243 (1999).[70] Defendants downplay the extent of their California involvement in the alleged unfair business practices. MtD at 38. Unlike the *Nestle* case where the plaintiffs failed to explain how Malian child laborers were harmed by false statements made by Nestle in California, *see Doe v. Nestle,* 748 F.Supp.2d 1057, 1122 (C.D. Cal. 2010), the SAC here articulates multiple concrete instances where <u>California-based activities</u> were the linchpin for Cisco's UCL violations. *See, e.g.,* SAC ¶¶58, 62, 64, 68, 74, 75, 79-81, 92, 95, 99, 102, 108, 126-136, 143, 145, 183, 454.

**B.      The UCL Claim Is Closely Linked to Cisco's Misconduct**

Defendants also attempt to characterize Plaintiffs' financial injuries as "too attenuated" from Cisco's conduct. MtD at 38 (relying on *Lorenzo v. Qualcomm Inc.,* 2009 WL 2448375 (S.D. Cal. Aug. 10,

---

[69] The SAC distinguishes as "surveillance cases," three plaintiffs who were identified via the Golden Shield. All other Plaintiffs were identified solely (or essentially) via the Golden Shield. SAC ¶320.
[70] *See also Parks v. Eastwood Ins. Services, Inc.,* 2002 U.S. Dist. LEXIS 28249 at *8-9 (C.D. Cal. July 29, 2002) (UCL proceeded by non-California resident plaintiffs because defendant maintained corporate headquarters and offices in California, where the policy at issue was alleged to have originated); *Clothesrigger, Inc., v. GTE Corp.,* 191 Cal.App.3d 605, 614-615 (1987) (non-resident plaintiffs permitted to bring UCL claim against defendants headquartered in California because the alleged unfair practices "emanated from California").

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

2009) (dismissal of UCL claim for failure to allege how plaintiffs' injuries were a result of defendant's conduct)).  As described *supra* at § IV.D., Plaintiffs have sufficiently alleged that the Golden Shield was a substantial contributing factor to Plaintiffs' harm. Moreover, it is well-settled that the UCL "covers a wide range of conduct." *Paulus v. Bob Lynch Ford, Inc.* 139 Cal.App.4th 659, 667 (2006); *see also Cel-Tech Communications, Inc. v. L.A. Cellular Tel.,* 20 Cal.4th 163, 180 (1999).  As a direct result of Cisco's <u>California actions</u>, Plaintiffs allege lost income from while they were detained, and also lost income from after their release from detention as a result of the injuries received. SAC ¶456; *see also id.* ¶¶65, 81, 454. Cisco's marketing strategy was based on promises to facilitate the *douzheng* of Falun Gong, and gave Defendants an unfair competitive advantage over their competitors in the Chinese market. *Id.* ¶455. Plaintiffs have standing based on having lost money as a direct result of Defendants' conduct. *Id.* ¶454; *see also Rubio v. Capital One Bank,* 613 F.3d 1195, 1204 (9th Cir. 2010). Plaintiffs do not have to show that they personally relied on false or misleading statements to have standing. *Anunziato v. eMachines,* Inc., 402 F.Supp.2d 1133, 1138-39 (C.D. Cal. 2005); *cf. Laster v. T-Mobile USA, Inc.*, 407 F.Supp.2d 1181, 1194 (S.D. Cal. 2005).[71]

**VI.    <u>Plaintiffs' ECPA Claim Should Stand</u>**

    **A.      Plaintiffs' ECPA Claim Does Not Allege Extraterritorial Activity**

        Plaintiffs do not plead in the SAC the Electronic Communications Privacy Act ("ECPA") claim of interception (governed by 18 U.S.C. § 2511) that Defendants confusingly address.  MtD at 39 (citing *Zheng v. Yahoo! Inc.*, No. 08-cv-1068, 2009 U.S. Dist. LEXIS 111886 at *5 (N.D. Cal. Dec. 2, 2009) (involving §2511 claims). Rather, the ECPA claim is based on Section 2512(1). SAC ¶¶417-23. The prohibited activity is either the sending through the mail or interstate commerce of, or the manufacture, assembly, possession, or sale of, particular devices – *not* the "surreptitious interception" of communications. *See* 18 U.S.C. § 2512(1)(a) and (b). Contrary to Defendants' extraterritoriality argument, Plaintiffs allege relevant marketing, design and some manufacturing occurred in California. *See* SAC § B.1.-B.3., ¶¶126-35.

    **B.      The ECPA Authorizes a Private Right of Action**

        In arguing that the ECPA contains no private right of action for violations of Section 2512, Defendants omit the broad language of Section 2520 (providing for a private right of action for the entire

---

[71] As discussed *supra* at § IV.B.2, Plaintiffs' claims, including UCL, are equitably tolled. *See Stutz Motor Car of Am. v. Reebok Int'l,* 909 F.Supp.1353, 1364 (C.D. Cal. 1995).

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

chapter), and overlook the multiple decisions finding a private right of action for violations of Section

2512. Though Defendants fail to acknowledge it, there is substantial disagreement—even among district

courts of this Circuit—as to whether Section 2520 applies to alleged violations of Section 2512.[72]  The

Ninth Circuit has never ruled on the question. All of the cases cited by Defendants rely, either directly or

indirectly, on an out-of-circuit decision, *Flowers v. Tandy Corp.*, 773 F.2d 585 (4th Cir. 1985), which

represented the previous majority view until only about 2003. *See* MtD at 41.[73]  However, *Flowers* is no

longer the majority view; instead, "the recently developed majority view of § 2520(a) is that the statute . . .

confers standing on plaintiffs for violations of the ECPA" rather than limiting the class of defendants. *See*

*Gallagher*, 2004 U.S. Dist. LEXIS 28008 at *17 (citation omitted). Thus, "[a]nyone who violates a provision

of the ECPA is a potential civil defendant." *Id.* at *18. As Plaintiffs are entitled to bring a civil cause of

action for violation of Section 2512 of the ECPA, the claim must stand.[74]

**C.     Defendants' Customization of Their Products to Commit Human Rights Abuses is Not a Legitimate Normal Course of Business Activity**

Finally, Defendants assert that they fall within the exception of Section 2512(2), for acts "in the

normal course of the business." *See* 18 U.S.C. § 2512(2). Incredibly, Defendants argue—without citation to

the SAC—that Plaintiffs "admit that all of Cisco's alleged actions were taken in the normal course of

business."  MtD at 42. The SAC admits no such thing, nor do Plaintiffs here. *See supra* § III.D.[75]  Rather,

---

[72] *Compare DIRECTV, Inc., v. EQ Stuff, Inc.*, 207 F.Supp.2d 1077, 1084 (C.D. Cal. 2002) (finding persuasive the rationale that §2520 "confers a private cause of action upon persons when the action is brought against parties that have violated the provision[s] of § 2510-21," *with In re DIRECTV, Inc.*, 2004 U.S. Dist. LEXIS 24263, *25-26 (N.D. Cal. July 26, 2004) (no private right of action); *see also DIRECTV, Inc. v. Gallagher*, 2004 U.S. Dist. LEXIS 28008, *16-18 (D.N.J. Apr. 29, 2004) (discussing cases).

[73] *See also DirecTV, Inc. v. Treworgy*, 373 F.3d 1124, 1128 (11th Cir. 2004) (relying on *Flowers*); *DIRECTV Inc. v. Robson*, 420 F.3d 532, 539 (5th Cir. 2005) (relying in part on *Treworgy*); *In re DIRECTV, Inc.*, 2004 U.S. Dist. LEXIS 24263 at *25-26 (relying on *Treworgy*); *Luis v. Zang*, 2013 U.S. Dist. LEXIS 29288 at *27-28 (S.D. Ohio Mar. 5, 2013) (citing cases relying on *Treworgy*).

[74] Defendants do not dispute that Plaintiffs sufficiently allege the elements of a cause of action under Section 2512(1), and cannot raise those arguments for the first time in their Reply. *See Liberal v. Estrada*, 632 F.3d 1064, 1072 n.6 (9th Cir. 2011).

[75] Although there is no case law of which Plaintiffs are aware construing the "normal course of the business" clause of Section 2512(2)—nor do Defendants cite any—several cases including *In re: Google Inc. Gmail Litigation*, 2013 WL 5423918 *1 (N.D. Cal. Sept. 26, 2013), decided by this Court shortly before Defendants filed their motion to dismiss, construe an analogous provision of the ECPA. Specifically, the "ordinary course of business" exception to the definition of "device" in effect provides that the interception activities described in Section 2511 are not unlawful if made with certain telephonic and telegraphic devices. *See Gmail Litigation*, 2013 WL 5423918 at *7. As the Court found, the exception is narrowly construed, and can only refer to "legitimate" business interests of a company. *See id.* at *8. Any broader reading would render the statutory provision "superfluous." *Id.* at *9. Thus, "there must be some nexus between the need to engage in the alleged [unlawful activity] and the subscriber's ultimate business, that is, the ability to provide the underlying service or good." *Id.* at *11. Google's interceptions of Plaintiffs' emails for advertising purposes were not instrumental to nor incidental to the provision of email services. *Id.*

38

the customization, marketing, design and implementation to <u>facilitate human rights abuses</u> alleged here, is not and cannot be in Cisco's ordinary course of business.

## VII.    The Individual Defendants Are Liable For Plaintiffs' Claims

Contrary to Defendants' assertions, Plaintiffs' allegations against individual Defendants are not "conclusory" or "generic", MtD at 42-44, but contain particularized facts to plausibly show liability.  For instance, Defendant Chambers met with Jiang Zemin—the chief architect of the persecution of Falun Gong—on several occasions, and, according to experts, discussed the *douzheng* objective of the Golden Shield. SAC ¶¶197-99. The designs developed in San Jose specifically to persecute and suppress Falun Gong were authorized, ratified and directed by CEO Chambers. *Id.* ¶208. Moreover, Chambers had access not only to media and governmental reports that the Golden Shield furthered human rights abuses, *id.* ¶¶158-65, 168; but also shareholder resolutions *id.* ¶¶166, 174; due diligence reports, *id.* ¶168; and company responses to accusations, *id.* ¶177. *See Jones v. City and County of San Francisco*, 976 F.Supp. 896, 906 (N.D. Cal. 1997) ("Defendants had actual and constructive knowledge of every significant deficiency [...] as evinced by newspaper accounts, grand jury reports, defendants' own written correspondence, and the repeated proposal of bond measures to finance improvements.").  As the former Vice President of Cisco China, Defendant Cheung supervised, managed, supported, furthered and ratified Cisco China's direct involvement in the marketing/implementation of the anti-Falun Gong features of the apparatus.  Cheung characterized as a major selling point of the Golden Shield apparatus its capacity to ensure "social stability," which Chinese security uses as a code word for suppressing groups like Falun Gong. SAC ¶¶ 63, 215. Cheung also attended Golden Shield presentations where he received reports describing the *douzheng* purpose of the apparatus. *Id.* ¶¶210, 216. *See also id.* ¶¶88, 107, 212 (Cheung touting "customized solutions" provided to Anhui public security after the latter called the Golden Shield a major means of subjecting Falun Gong to forced ideological conversion). In addition, by information and belief, Chambers recorded material for and Cheung participated in the Shanghai Trade Show where Cisco showed Security officers how its technology could "stop" Falun Gong. *Id.* ¶201.  Defendants ignore these and other allegations when they try to compare the case with, for example, *F.T.C. v. Swish Marketing*, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) (only a single allegation mentions the CEO); *Mamani v. Berzain*, 654 F.3d 1148, 1156 (11th Cir. 2011) (finding no ATS tort pleaded at all). Defendants' citations to *Drummond I* and *II* are also

39

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

inapposite.  *See supra* n.40. Rather, the particularized facts alleged plausibly support liability. *Hilao v. Estate of Marcos,* 103 F.3d 767, 777 (9th Cir. 1996) ("Under international law, responsibility for [*jus cogens* violations] extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.") (citation omitted); *Krauch*, 8 T.W.C. at 1154-55 (Nuremberg case holding accountable CFO who knew of illegal business dealing and "was in a position to influence policy," yet "expressly or impliedly authorized and approved it").

**VIII.  The Case Is Justiciable**

### A.    The Act of State Doctrine Does Not Bar Adjudication of this Suit

The act of state doctrine is no bar to this litigation, which does not require this court to judge any official act of a foreign sovereign. As Defendants admit, the court <u>must</u> answer affirmatively whether there is such an act before applying this doctrine. MtD at 46 (citing *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.,* 130 F.3d 1342, 1346 (9th Cir. 1997)). The burden is on Defendants to prove that the conduct was a public, official act. *Dunhill*, 425 U.S. at 694 (requiring a "public act"); *Sabbatino*, 376 U.S. at 401; *Marcos*, 978 F.2d at 496, 498 n.10 ("public act of the sovereign"); *Kirkpatrick*, 493 U.S. at 406; *Kadic*, 70 F.3d at 250 ("officially approved policy of a state").

#### 1.    This Case Does Not Require Judgment on an Official Act of State

First, "*jus cogens* norms are exempt from the [act of state] doctrine, since they constitute norms 'from which no derogation is permitted.'" *Sarei*, 671 F.3d at 757 (vacated on other grounds) (quoting *Siderman de Blake v. the Republic of Argentina*, 865 F.2d 699, 714 (9th Cir. 1992)). Acts that violate *jus cogens* norms cannot, by definition, be official.[76]  Plaintiffs' ATS claims here allege violations of *jus cogens* norms.[77]

---

[76] *Doe v. Qi*, 349 F.Supp.2d 1258 (2004), cited by Defendants, depended on the proposition that "the act of state doctrine is not rendered inapposite simply because international law or *jus cogens* norms are violated." 349 F.Supp.2d at 1292. This is a flat misstatement of Ninth Circuit law. *Qi* is also unavailing for additional reasons. *Qi* involved a claim for damages against foreign officials who "continue in their significant positions in the PRC." *Id.* The court permitted declaratory relief but not damages that would have run against the foreign state. *Id.* In contrast the remedy here would run against private persons in the United States only. And while the State Department submitted a statement urging against adjudication in *Qi*, *id.* at 1270-71, in the years since, the State Department, Congress, and other government entities have uniformly condemned the CCP's crackdown and human rights violations against Falun Gong.

[77] Plaintiffs allege seven causes of action for aiding and abetting violations of recognized *jus cogens* norms: torture (SAC ¶¶381-90); crimes against humanity (*id.* ¶¶404-08); forced labor (*id.* ¶¶397-99); extrajudicial execution (*id.* ¶¶409-12); forced disappearance (*id.* ¶¶413-16); prolonged and arbitrary detention (*id.* ¶¶400-03); and cruel inhuman and degrading treatment (*id.* ¶¶391-96). Each has been recognized as a *jus cogens* norm. For torture, forced labor, and extrajudicial execution, *see Siderman*, 865 F.2d at 717 (concluding freedom from torture is a *jus cogens* norm, along with "slavery, murder or causing the disappearance of individuals, [and] prolonged arbitrary detention"); *Doe v. Unocal*, 395 F.3d at 945 (vacated on other grounds) (torture, murder and forced labor are *jus cogens* norms); *Hilao v. Estate of Marcos*, 103 F.3d 767, 777 (9th Cir. 1996) (recognizing torture as a *jus cogens* norm); *In re Ferdinand Marcos Human Rights Litig.* 25 F.3d 1467, 1471-72 (9th Cir. 1994) (holding that acts of torture, execution, and disappearance are violations of *jus cogens*

40

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

Second, Plaintiffs allege that the acts of torture, crimes against humanity, and arbitrary arrest and detention were committed *ultra vires*. SAC ¶¶12, 18, 20, 28, 34, 48-50, 106, 111, 120, 125, 129. *Ultra vires* acts, such as torture, contrary to the law and policy of the PRC and unratified by it, are not acts of a foreign sovereign. *Kadic*, 70 F. 3d at 250; *Filártiga*, 630 F.2d at 889; *Trajano*, 978 F.2d at 498 n.10; *Siderman*, 965 F.2d at 713; *see also Estate of Marcos*, 978 F.2d at 496 (Ninth Circuit holding that murders "by military intelligence personnel who were acting under direction [of the head of military intelligence], pursuant to martial law declared by" the president were not acts of state); *Galu v. Swissair: Swiss Air Transport Co.*, 873 F.2d 650, 651 (2d Cir. 1989). Defendants' own purported PRC law expert admits that such acts are contrary to Chinese law. Chu Decl. at ¶¶36-39. The PRC has "categorically denied" the "alleged violations of human rights", while stating "any such violations would be contrary to Chinese law." *Liu Qi*, 349 F.Supp.2d at 1306; *see also* CHINA'S THIRD PERIODIC REPORT TO THE UN COMMITTEE AGAINST TORTURE, ADDENDUM, CAT/C/39/Add.2, arts. 4, 10, 11 (Jan. 5, 2000). No high level PRC state official has ever publicly endorsed or ratified the alleged human rights abuses against Falun Gong adherents. *See* SAC ¶¶35-46. Thus, the acts alleged are not official acts under either international or state law. *See Bowoto v. Chevron Corp.*, 2007 WL 2349345, at *7–9 (N.D. Cal. 2007).[78] Also, CCP acts are distinct from those of the PRC. *See infra*.

## 2. *Sabbatino* Does Not Require Dismissal on Act of State Grounds

Even where alleged acts are not the *jus cogens* and *ultra vires* acts alleged here, the burden of proving the applicability of the act of state doctrine rests on Defendants. *See Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989). In *Banco Nacional de Cuba v. Sabbatino*, the Supreme Court set out a three-factor balancing test: "1) [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it; 2) [T]he less

---

norms). For crimes against humanity, *see Sarei*, 671 F.3d at 757 (vacated on other grounds) (declining to dismiss crimes against humanity claim on act of state grounds as a *jus cogens* violation). For forced labor, *see Unocal*, 395 F.3d at 945; *In re World War II Era Japanese Forced Labor Litig.*, 164 F.Supp.2d 1160, 1178 (N.D. Cal. 2001). For arbitrary arrest and detention, and cruel inhuman and degrading treatment, *see Restatement (Third) of Foreign Relations Law* § 702 cmt. n (1987) (relied on by *Siderman*, 865 F.2d at 714). Importantly, claims for arbitrary arrest and detention concern abuses carried out in the Reeducation Through Labor ("RTL") system, which is outside of the criminal justice system and has been now dissolved precisely due to its extralegal nature and nonconformance with international due process norms.

[78] *Lizarbe v. Rondon* applied similar reasoning, finding that "[a]ll the acts complained of here are illegal under Peruvian law, and most importantly, the Peruvian Government has presented a letter to the Court in effect denying the alleged acts were Peruvian acts of state." 642 F.Supp.2d 473, 488-89 (D. Md. 2009) *aff'd in part, appeal dismissed in part* 402 F. App'x 834 (4th Cir. 2010). Similarly here, the alleged acts are illegal under Chinese law, and even Defendant's Chinese lawyer has attested that the acts were not official acts of state. The PRC has also previously presented materials to U.S. courts <u>denying</u> that the human rights abuses against Falun Gong adherents were acts of state. *See, e.g., Doe v. Qi*, 349 F.Supp.2d 1258 (2004).

41

important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches; 3) The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence" 376 U.S. 398, 428 (1964). The Ninth Circuit added a fourth factor: "[if] the foreign state was acting in the public interest." *Liu*, 892 F.2d at 1432.

All of these factors weigh against application of the doctrine in this case. First, cognizable ATS claims are based on binding international law norms under the stringent requirements in *Sosa v. Alverez-Machain*, 542 U.S. 692 (2004). Further, the claims alleged meet the higher standard set for binding *jus cogens* norms. *See supra* n.77. Second, this case will not upset any foreign policy goals of the political branches. *See infra* § VIII.B (both Executive and Legislative branches condemn human rights abuses against Falun Gong and restrictions on internet freedom). Third, there is no "continued existence" of state authority, because that authority never existed for the alleged acts. Low-level security officers committed the alleged abuses under coercion by one particular CCP faction.[79]  The CCP hierarchy directs these tactics in the form of quid pro quo favors and requests. Extralegal CCP entities, not part of the PRC state, transmit case-by-case operating methods.[80]  *See* SAC ¶¶38, 40-41. Even official delegation of state authority would not have allowed *jus cogens* violations.

*A fortiori*, courts have interpreted the third factor to require a continuous relationship between current policies and those Defendants claim existed at the time the acts were committed.[81] The third factor therefore weighs against any act of state issue, as current leaders of the PRC, headed by President Xi

---

[79] The CCP and the PRC state are organizationally and functionally distinct under PRC law. CCP members are not government officials by virtue of their CCP membership, and the PRC has had many non-CCP state officials, including a former head of state, vice president, and minister-level officials. This distinction is alleged in the SAC, and is basic information as to which judicial notice is proper.  For example, the court could take notice of the PRC Constitution of 1982.

[80] The influence of CCP hardliners in China is similar in some respects to that of the Mafia in Sicily. While neither has state authority, both exert extensive influence over officials, especially at the grass roots level. *See, e.g.* Bih-Jaw Lin, *The Aftermath of the 1989 Tiananmen Crisis in Mainland China*, at 50-51 (Westview Press, 1992) (comparison of CCP and Mafia organization); Michael S. Duke, *Blooming and Contending: Chinese Literature in the Post-Mao Era*, at 102 (Indiana University Press, 1985) ("[T]he chief results of the Cultural Revolution turned out to be [...] a Maoist Communist Party that operated like nothing so much as a Mafia style gang.").

[81] In *Bigio v. Coca-Cola Co.*, for example, even though the regime in power was in many ways continuous with that which had committed the acts in question, "resolution of this case by United States courts would not likely ... embarrass or hinder the executive [... because the] government that was now in power was far removed in time and circumstance [... and] had apparently repudiated the acts in question." 239 F.3d 440 (2d Cir. 2000). The court in *Wiwa v. Royal Dutch Petroleum Co.* similarly found that the Nigerian government would likely "repudiate" the acts of the previous regime, and that the litigation "'would more likely be consonant, than at odds, with the present position of the government.'" 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) (citing *Bigio*, 239 F.3d at 453.)  In any event, any argument that the PRC might be embarrassed by this litigation would be irrelevant: "The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments." *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Intern.*, 493 U.S. 400, 409 (1990).

42

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Jinping and Premier Li Keqiang, has not endorsed any act alleged here. Both have officially called for rule of law and constitutional government, as chief concerns and a self-imposed revolution. Even where state officials colluded in the commission of the extralegal acts here, current PRC government authorities repudiate such behavior in official statements and policies.

In fact, political changes in the PRC amount to a regime change, such that *any* state character of violations alleged is irrelevant to the current government. Plaintiffs allege that former CCP Secretary General Jiang Zemin used personal influence to direct certain CCP entities, including the PLAC and a new "610 Office," to carry out abuses. SAC ¶¶40-41. Other leaders opposed the crackdown. Jiang Zemin stepped down from office in 2002, while his "hardliner" cohorts continued to manage the crackdown. In March 2012, the CCP expelled and criminally convicted Jiang's key factional ally Bo Xilai, and a large-scale purge of Jiang's other factional allies commenced. Jiang's fellow architects of the crackdown, particularly Zhou Yongkang who directly oversaw it from 2007-2012, were investigated for corruption and abuse of power. The CCP apparatus that managed the crackdown on Falun Gong is now in decline. *See, e.g.,* FINANCIAL TIMES, *Net closes on former China security chief,* October 11, 2013; SOUTH CHINA MORNING POST, *Former security chief Zhou Yongkang under house arrest,* December 11, 2013.

The Falun Gong crackdown while not eliminated has in part been reversed or halted, resulting in the release of many detained Falun Gong adherents and the slowdown or halting of new arrests. The public security apparatus has been restructured to increase rule of law protections, greatly diminish the influence of PLAC and the 610 Office, and eliminate forms of detention most commonly applied to Falun Gong. The RTL system has been abolished because "it lacks a legal basis and goes against the criminal law and the constitution." *See, e.g.,* THE NATION, *Is China relaxing its stance on Tibet and Falungong?,* October 9, 2013; THE DIPLOMAT, *China's New State Security Committee,* November 25, 2013; "Reeducation without labor", GLOBAL TIMES, December 4, 2013.

Plaintiffs' claims survive the Ninth Circuit's fourth factor, as torture and the other conduct alleged in this case cannot be "in the public interest." Indeed, Defendants acknowledge that torture is contrary to PRC law. MtD at 4. *See also, e.g., Unocal,* 395 F.3d at 960 (vacated on other grounds) (holding that "it would be difficult to contend" that violations of international human rights are in the "public interest").

Nothing in Defendants' motion suggests a contrary conclusion. The SAC is not based on claims of the right to free speech, but alleges recognized *jus cogens* norms. MtD at 47 n.36. For the above stated reasons, the act of state doctrine is not implicated here.

### B.     This Case Presents No Political Question[82]

The Supreme Court has enunciated six independent factors required to determine whether a case presents a non-justiciable political question.[83]  Defendants invoked only the second, third, fourth, and sixth factors; however, none of the six is met. Accordingly, this Court should exercise the "virtually unflagging obligation" of its congressionally mandated jurisdiction over Plaintiffs' claims. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) Defendants' political question argument rests on a flawed premise: that because federal regulations govern the *export* of Cisco's products, any claims alleging violations of international and state *tort* law necessarily invoke a political question.  *See* MtD at 44-46.  In short, as Defendants admit, *see* MtD at 1, the SAC alleges no violation of federal export or trade regulations and resolution of Plaintiffs' tort claims does not require the Court to adjudicate or examine U.S. trade policies. Moreover, Defendants cite no federal regulation immunizing exporters of technology from state and international tort law.[84] Indeed, none of Plaintiffs' tort claims requires the Court to judge foreign policy decisions – no more than a court need review federal regulatory statutes that govern domestic companies sued for domestic torts.[85] The irrelevance of any export regulations to Plaintiffs' claims is illustrated by *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983), in which defendant invoked the

---

[82] As an initial matter, nothing in *Kiobel*'s holding on extraterritoriality grounds implicated the political question doctrine—an issue not before, nor decided by, the *Kiobel* Court.  The doctrines of extraterritoriality and political question do not overlap in elements or in policy, and Defendants' specious conflation of these doctrines is unsupported by a single case in which the presumption against extraterritorial application of domestic statutes has been the basis of a finding that a case is a non-justiciable political question.

[83] The six factors are: "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Vieth v. Jubelirer*, 541 U.S. 267, 277-278 (2004) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

[84] The only such regulation cited by Defendants is the 2000 legislation permanently normalizing U.S. trade relations with China, Pub. L. No. 106-286, 114 Stat. 880 (2000). Although that legislation is silent as to the civil liability of U.S. exporters to China for non-export violations, it does specifically note that "Congress deplores violations by the [PRC] of human rights, religious freedoms, and worker rights . . ., including the banning of the Falun Gong spiritual movement, denial in many cases, particularly politically sensitive ones, of effective representation by counsel and public trials, extrajudicial killings and torture, . . . [and] perpetuation of 'reeducation through labor'." Pub. L. No. 106-286 at 202 (codified at 22 U.S.C. § 6901).

[85] *See, e.g., McMahon v. General Dynamics Corp.*, 933 F.Supp. 2d 682, 694-695 (D.N.J. 2013) (manufacturing defect tort claims brought by serviceman against weapons manufacturer for injuries sustained during test firing were not barred by political question doctrine because plaintiff's claims did not require review of Army policies or decisions; such claims were a "routine issue of tort, and civilian, tort law"); *Lake-Allen v. Johnson & Johnson, L.P.*, 2009 U.S. Dist. LEXIS 64860 at *6-8 (D. Ut. July 29, 2009) (court dismissed only strict liability claims and allowed design defect claims to go forward despite defendants' argument that "FDA-approved prescription drugs cannot be defective in design").

political question, asserting that the U.S. government authorized it to export the technology at issue. *Id.* at 1047. The Ninth Circuit found "no support" for any dismissal on these grounds, as the challenged activity (marketing tactics) in that case were "neither authorized nor directed by any branch of Government." Rather, "[t]he mere fact that the challenged conduct occurred in a regulated industry does not alone alter its private commercial character." *Id.* (emphasis added). Similarly here, the political question doctrine does not permit dismissal of Plaintiffs' human rights claims merely because the challenged conduct arises in the context of exports to the PRC.

### 1. Plaintiffs' Claims Are Constitutionally Committed to the Judiciary

Although this is the most important factor, *see Vieth*, 541 U.S. 267, 278 (2004), Defendants do not invoke the first *Baker* factor here, thereby conceding it does not apply.[86] The political question doctrine simply does not permit dismissal of claims that do not require the Court to resolve issues relating to the content of any U.S. foreign policy. *See Baker v. Carr*, 369 U.S. 186, 211 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance"); *see also Alperin v. Vatican Bank*, 410 F.3d 532, 548 (9th Cir. 2005) (declining to dismiss property claims of Holocaust survivors although they arose in a "politically charged" wartime context). When plaintiffs' claims "do[] not challenge the wisdom or legality of any governmental act or decision," but rather "seek to restrain and recover damages" from a private commercial entity for allegedly tortious activities, as here, there is "no support for characterizing [plaintiffs'] claims as political questions." *Northrop Corp.*, 705 F.2d at1047.[87] Disposition of this case does not require the court to assess or even address the wisdom of Congress's and the Executive's export regulations, which are not implicated in any element of any cause of action pled in the SAC.[88]

---

[86] However, because cases cited in the footnotes appear to implicate the first factor (*see* MtD 45, n.33 and 34), Plaintiffs address it here.
[87] It is for Congress and the Executive to determine whether to permit trade with the PRC and what restrictions on that trade, if any, apply. *See, e.g., United States v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990); *United States v. Spawr Optical Research Inc.*, 864 F.2d 1467 (9th Cir. 1988).
[88] *Cf. Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (2007) (challenged sales to Israeli military were "financed by the executive branch pursuant to a congressionally enacted program" and therefore would have required judicial review of U.S. decision to grant military aid to Israel); *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 411-412 (marine's negligence claim against private contractor at U.S. military camp in Iraq raised political question not because contractor was "acting under orders of the military," but because the court would have had to inquire into the propriety of military decisions, such as whether to install power to the affected area, in order to address contractor's contributory negligence defense); *In re Nazi Era Cases Against German Defendants Litig.*, 196 F. App'x 93, 98 (3d Cir. 2006) (Nazi-era claims were nonjusticiable under the fourth *Baker* factor "because of the Executive Branch's longstanding foreign policy interest that issues

45

### 2.    Ample Standards Exist to Adjudicate Plaintiffs' Claims

Just as resolution of Plaintiffs' tort claims is constitutionally committed to the judiciary, so too are the courts "capable of granting relief in a reasoned fashion" as required by the second factor. *Alperin*, 410 F.3d at 553.  Defendants assert that the complexities of a class action would implicate the second *Baker* factor.  *See* MtD at 46.  However, the second prong of the *Baker* test looks only to whether adjudication of Plaintiffs' claims would require extra-judicial rules of decision which are not available to the federal courts; even the management of class actions is well-within judicial purview. *See Alperin,* 410 F.3d at 553-554 (citing the Manual for Complex Litigation); *Vieth*, 541 U.S. at 278 (second *Baker* factor looks to whether court may reach a ruling that is "principled, rational, and based upon reasoned distinctions.").  Here, in order to resolve Plaintiffs' tort claims implicating international law, U.S. courts look to a variety of acknowledged and long-recognized sources. *See The Paquete Habana*, 175 U.S. 677, 700 (1900); Restatement (Third) of Foreign Relations Law of the United States §§ 102(1), 103(2).  Common law rules of decision also would be applied to the state tort claims.[89]

### 3.    No Initial Policy Determination Regarding Trade Is Implicated

The "initial policy determination of a kind clearly for nonjudicial discretion" that Defendants claim has already been made is the decision to permit "companies like Cisco" to sell "internet infrastructure components" to the PRC. *See* MtD at 44-45. However, whether or not Cisco complied with federal trade regulations is neither dispositive nor "inextricable" from Plaintiffs' claims. *See Baker*, 369 U.S. at 217. Rather, Plaintiffs allege that Defendants proximately caused harm due to their intentional customization of products to aid and abet and facilitate the human rights abuses by the CCP in violation of international law. Were Plaintiffs to prevail, U.S. trade policy with the PRC would be unaffected, because Defendants have not cited any policy of the political branches that permits exporters to implement, customize and design their products to intentionally cause harm abroad and/or facilitate gross human rights abuses.

---

relating to World War II and Nazi-era claims *be resolved through intergovernmental negotiation*" rather than private litigation) (emphasis added).As Defendants admit, *Lizarbe v. Rondon*, 642 F. Supp. 2d 473 (D. Md. 2009), also cited by Defendants in footnote 33, actually makes Plaintiffs' point: there, "there [was] no basis for connecting [the defendant's conduct] to any policy decision of the U.S." *See* MtD at 45 n.33.

[89] *See, e.g., Ashcraft v. King*, 228 Cal.App.3d 604, 611 (1991) ("A battery is any intentional, unlawful and harmful contact by one person with the person of another"); *Lowry v. Standard Oil Co. of California*, 63 Cal.App.2d 1, 6-7 (1944) ("an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another"); CACI No. 1400 (Judicial Council of California civil jury instructions setting forth essential factual elements of false imprisonment).

46

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

In any event, adjudication of Plaintiffs' *tort* claims is commensurate with existing U.S. policy. Export of items "to countries of particular concern for religious freedom," such as the PRC, where the Executive determines those items "are being used or are intended for use directly and in significant measure to carry out particularly severe violations of religious freedom" are prohibited. *See* 22 U.S.C. § 6461(a).[90] The United States also has in place China-related restrictions in order to prevent the "rounding up, imprisoning and torturing dissident groups in China"[91] and promote the observance of human rights. *See* 15 C.F.R. 742.7. Contrary to Defendants' assertions, Congress and the Commerce Department strongly recognize the dangers of exporting software and technology products to the PRC and are in the process of drafting an amendment to the Commerce Control List restricting such exports.[92] Again, Plaintiffs do not allege any violation of federal export statutes, but there is no support for Defendants' contention that the political branches struck a "balance," *see* MtD at 45, when passing trade legislation that authorizes the commission of torts in violation of international and domestic law,[93] or that the government's interests are contrary to the adjudication of Plaintiffs' claims.[94]

---

[90] The congressionally enacted licensing regulations require a "complete and detailed description of the end-use intended" of the exported material in order to, among other things, prevent repression and human rights abuses. *See* SNAP-R V1.2 Exporter User Manual, U.S. Department of Commerce, Bureau of Industry and Security, Office of the Chief Information Officer, at 5-30, 31 (describing export license application requirements), *available at* http://www.bis.doc.gov/ index.php/licensing/simplified-network-application-process-redesign-snap-r. The end use of Defendants' Golden Shield China exports is to surveil, apprehend, ideologically convert and in other ways repress Plaintiffs and the class they represent. *See* SAC ¶¶75-86, 96-98; SOF § C. To the extent that Defendants sought licensing for such exports without disclosing these intended end uses, they failed to comply with U.S. human rights export policy and, if they had, their licensing application would have been denied.

[91] Quote from Tom Lantos, who helped draft the Tiananmen Sanctions, in *Businessweek*, *Helping Big Brother Go High Tech*, Sept. 17, 2006, *available at* http://www.businessweek.com/stories/ 2006-09-17/helping-big-brother-go-high-tech.

[92] *See* U.S. Department of Commerce Bureau of Industry and Industry ("BIS"), 2010 Report on Foreign Policy-Based Export Controls *available at* http://www.bis.doc.gov/index.php/forms-documents/doc_ view/651-bis-foreign-policy-report-2010 (noting that the Bureau of Industry and Security—the office within Commerce responsible for "[a]dvanc[ing] U.S. national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system," according to the BIS internet home page—is "drafting a proposed rule to be used as a second phase of this crime control review to address more complex policy issues, such as . . . integrated data systems," and in large part to address the need to "apply[] broad-based end-user/end-use controls to the PRC for basic technology that can be used to provide surveillance, tracking and identification of individuals.").

[93] Domestic legislation is presumed as a matter of law not to contradict or override international law. *See Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118, 2 Cranch. 64 (1804) (federal law must be construed to be consistent, not in conflict, with international law, and "can never be construed to . . . affect neutral commerce . . . further than is warranted by" international law).

[94] There is substantial evidence in the public record that Congress expressly intended that international human rights law be adhered to by U.S. exporters. *Cf.* Section 6(a), Export Administration Act ("EAA"), 50 U.S.C. Appx § 2405 (allowing the President to "prohibit or curtail the exportation of any goods, technology, or other information subject to the jurisdiction of the United States or exported by any person subject to the jurisdiction of the United States, to the extent necessary to further significantly the foreign policy of the

47

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

4.      The Claims Do Not Affect the Nation's Unified Voice in Foreign Affairs

Courts often consider the fourth, fifth, and sixth tests together, because they are in essence prudential considerations. *See Wang v. Masaitis*, 416 F.3d 992, 996 (9th Cir. 2005). The fourth factor asks the Court to consider "whether it would be impossible for the courts to resolve the [claims] without expressing a lack of respect for the political branches." *Alperin*, 410 F.3d at 555. The fifth and sixth factors both question the wisdom of judicial intervention where the political branches have already expressed their views. *See Vieth*, 541 U.S. at 278. The natural starting point for this inquiry is typically the opinion of the political branches. *See Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004); *Alperin*, 410 F.3d at 556. Tellingly, the Executive has not intervened in this case to express its view. In fact, there is ample evidence that U.S. policy expressed by both political branches favors the adjudication of claims against Cisco for torts in violation of international law involving its exports. A Senate Judiciary subcommittee has explicitly pressed Defendants on the precise issue raised by this case – the "troubling" question of whether its exports to the PRC facilitated human rights violations. *See Global Internet Freedom: Corporate Responsibility and the Rule of Law*, Hearing Before the Subcomm. on Human Rights and the Law of the U.S. Sen. Comm. on the Judiciary, 110th Cong., S. Hrg. 110-643 (May 20, 2008), Statement of Hon. Tom Coburn (specifically raising concerns regarding Cisco's operations in the PRC), Statement of Hon. Richard J. Durbin (noting that certain U.S. technology companies had "fallen short of the mark"). The Department of State has been equally vocal in its position that U.S. businesses must comply with international human rights law, and recently co-sponsored a resolution at the UN Human Rights Council adopting in full the Guiding Principles on Business and Human Rights. Gen. Statement by Daniel Baer, Deputy Assistant. Sec'y of State for Democracy, Human Rights and Labor and text of Res. 17/4 (June 16, 2011), *available at* http://geneva.usmission.gov/2011/06/16/humanrightsandtransnationalcorps/.[95]

As none of the *Baker* factors are met, there is no basis to abdicate Article III jurisdiction.

C.      Foreign Affairs Preemption Does Not Apply

Finally, Defendants assert that foreign affairs preemption principles apply, without any indication

_____

United States or to fulfill its declared international obligations . . . .").
[95] *See also* Remarks on Internet Freedom by Hillary Rodham Clinton, Secretary of State (Jan. 21, 2010), *available at* http://www.state.gov/secretary/rm/2010/01/135519.htm (exhorting U.S. companies to take up their "shared responsibility to help safeguard free expression").

48

of how. MtD at 49-50. Confusingly, Defendants never specified whether their argument is based on conflict or field preemption.[96] The cases they cite—*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *Zschernig v. Miller*, 389 U.S. 429 (1968)—illustrate the two forms of preemption respectively. Defendants object to the "application of California's state tort law," an area of traditional state competence, and thus seem to invoke conflict preemption. If so, "state law must give way where . . . there is evidence of clear conflict between the policies adopted by" the federal government and the state. *Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396, 402-408, 409-410, 421-423 (2003) (Holocaust-era insurance claims addressed via federal mechanism could not be supplanted by state law directed at insurance providers); *Crosby*, 530 U.S. at 367-370, 376-377 (state law barring certain business with Myanmar conflicted with federal sanctions and limited President's "economic and diplomatic leverage" as directed by Congress.).

Here, California has taken no action remotely similar to the legislative acts in *Garamendi* and *Crosby*. Nor could the adjudication of Plaintiffs' tort claims concerning a private company's alleged complicity in human rights abuses conceivably conflict with the federal export scheme to the PRC.  *See supra* § VIII.B;[97] *see also Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1166-67 (9th Cir. 2011) (construing *Wyeth v. Levine*, 555 U.S. 555 (2009): "respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state law causes of action.'"). So long as application of the state and international laws at issue does not conflict with the existing federal scheme, then there is no preemptive conflict between state and federal law.  *See Garamendi*, 539 U.S. at 420-421. Plaintiffs' tort law claims do not prohibit the export of software and technology by Cisco to China, but merely enforce a private right of action by victims when such technology is intentionally designed, developed and implemented to harm them. Thus, claims here are not preempted.

>        **D.**    **International Comity Does Not Militate in Favor of Dismissal**

---

[96] The starting point for modern foreign affairs preemption analysis is *Garamendi's* oft-cited footnote 11: "If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, <u>field preemption</u> might be the appropriate doctrine. . . . Where, however, a State has acted within what Justice Harlan called its 'traditional competence,' but in a way that affects foreign relations, it might make good sense to require a <u>conflict,</u> of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted." *Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396, 420 n.11 (2003) (emphasis added).

[97] Defendants also assert that their business activities are outside of the scope of the Tiananmen Act. MtD at 6-7. Thus, even if the Tiananmen Act were to bar private tort suits, which it does not (*see* Pub. L. No. 101-246, 104 Stat. 15 (1990)), such a bar would not apply to Defendants.

49

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 5:11-cv-02449-EJD-PSGx

1    "No conflict exists, for [the purposes of international comity], where a person subject to regulation

2    by two states can comply with the laws of both." *Hartford Fire Inc. Co. v. California*, 509 U.S. 764, 799 (1993);

3    *In re South African Apartheid Litig.*, 617 F.Supp.2d at 285 ("The absence of a conflict…is fatal."). Defendants

4    point to no law of the PRC obligating them to aid and abet or otherwise assist in the torture and other

5    human rights violations suffered by Plaintiffs. Indeed, to do so would be illegal under the law of the PRC.

6    *See supra* § VIII.A.1. Even if there were a conflict, "the decision to dismiss depends on the degree of

7    legitimate offense to the foreign sovereign." *In re South African Apartheid Litig.*, 617 F.Supp.2d at 282. Since

8    there is no evidence that amicable working relations will be offended by the adjudication of this case, and

9    as the United States has consistently condemned the treatment of Falun Gong in the PRC, dismissal on

10   international comity grounds would be inappropriate. Finally, "the doctrine…is discretionary," and

11   "[w]hen a court dismisses on the ground of comity, it should ordinarily consider whether an adequate

12   forum exists in the objecting nation." *Id.*; *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178-79 (declining to exercise

13   discretion on comity grounds in an ATS action); *cf. Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227,

14   1239 (11th Cir. 2004) (abstaining on comity grounds where U.S. and Germany established exclusive forum

15   for Nazi-era reparations).  No PRC forum exists where this action might be adjudicated.  *See supra* SOF § I;

16   SAC ¶¶235, 246, 291. Thus, even if the doctrine of international comity came into play in this case, the

17   court should in its discretion allow the action to be decided in this forum.

## CONCLUSION

19   For the foregoing reasons, Plaintiffs respectfully submit that the Motion to Dismiss the Second

20   Amended Complaint should be denied.

Dated:  December 19, 2013                    Respectfully submitted,
                                             By: /s/ Terri E. Marsh
                                             Terri E. Marsh (Lead Counsel)
                                             HUMAN RIGHTS LAW FOUNDATION

                                             By:   /s/ K. Lee Crawford-Boyd
                                             K. Lee Crawford-Boyd
                                             SCHWARCZ, RIMBERG, BOYD & RADER, LLP
                                             Attorneys for Plaintiffs