QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kathleen M. Sullivan (CA Bar No. 242261)
  kathleensullivan@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood City, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

  Faith E. Gay (*pro hac vice*)
  faithgay@quinnemanuel.com
  Isaac Nesser (*pro hac vice*)
  isaacnesser@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Attorneys for the Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Doe IX, Liu Guifu, Wang Weiyu, and those individuals similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Cisco Systems, Inc., John Chambers, Fredy Cheung, and Does 1-100, <br><br> Defendants. | Case No. 5:11-cv-02449-EJD <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)** <br><br> Hearing date: March 21, 2014 <br><br> Time: 9:00 a.m. <br><br> Action Filed: May 19, 2011 <br> Judge: Hon. Edward J. Davila <br> Dept: Courtroom 4, 5th Floor |

# **TABLE OF CONTENTS**

ARGUMENT ........................................................................................................ 1

I. THE ATS AND TVPA CLAIMS SHOULD BE DISMISSED ................................. 1

    A. The ATS Claims Allege Purely Extraterritorial Conduct ........................ 1

    B. The ATS And TVPA Claims Do Not Support Aiding And Abetting Liability ........ 5

        1. Aiding And Abetting Liability Is Unavailable Under The TVPA ............... 5

        2. Aiding And Abetting Liability Is Unavailable Under The ATS ................. 5

        3. The Allegations Do Not Support Aiding and Abetting Liability ............. 6

        4. The Allegations Do Not Support Other Forms Of Secondary Liability ....... 9

    C. The ATS Does Not Provide A Basis For Liability Against Corporations ............. 10

    D. The Claims Do Not Allege Acts By Cisco Under Color Of State Law ................. 11

    E. Several Of The ATS Claims Are Otherwise Defective ........................................ 12

II. THE STATE-LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED .......... 14

    A. The Claims Should Be Dismissed For Lack Of Federal Jurisdiction ..................... 14

    B. California Tort Law Does Not Apply Extraterritorially .......................................... 14

    C. The State-Law Claims Are Untimely ..................................................................... 15

    D. The State-Law Allegations Do Not Support Aiding And Abetting Liability ......... 17

    E. The State-Law Claims Fail To Allege Causation .................................................... 18

III. THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED ............. 18

    A. The UCL Does Not Apply Extraterritorially .......................................................... 18

    B. The Allegations Of Lost Income Are Too Attenuated ........................................... 19

IV. THE ECPA CLAIM SHOULD BE DISMISSED ...................................................... 19

    A. The ECPA Does Not Apply Extraterritorially ....................................................... 20

    B. There Is No Private Right of Action Under ECPA § 2512 ..................................... 20

    C. The Allegations Concern Exempted "Normal Course of Business" Activity ......... 21

V. THE CLAIMS AGAINST CISCO EXECUTIVES SHOULD BE DISMISSED .............. 21

VI. THE SAC SHOULD BE DISMISSED AS NONJUSTICIABLE ................................. 22

    A. Political Question and Foreign Affairs Preemption ................................................ 22

B.     Act Of State .................................................................................................. 23

C.     International Comity ...................................................................................... 24

CONCLUSION ................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Adams v. Paul*,
904 P.2d 1205 (Cal. 1995) ...............................................................................................17

*Adhikari v. Daoud & Partners*,
No. 09-cv-1237, 2013 WL 4511354 (S.D. Tex. Aug. 23, 2013), *on reconsideration*, 2014 WL
198305 (S.D. Tex. Jan. 15, 2014) ........................................................................................2

*Ahmed v. Magan*,
No. 10-cv-00342, 2013 WL 4479077 (S.D. Ohio Aug. 20, 2013) ...........................................2

*Al Shimari v. CACI Int'l, Inc.*,
951 F. Supp. 2d 857 (E.D. Va. 2013) ...............................................................................1, 2

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
416 F.3d 1242 (11th Cir. 2005) ......................................................................................6, 13

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005) ...........................................................................................23

*Austin B. v. Escondido Union Sch. Dist.*,
57 Cal. Rptr. 3d 454 (Cal. Ct. App. 2007) ..........................................................................17

*Aziz v. Alcolac, Inc.*,
658 F.3d 388 (4th Cir. 2011) .............................................................................................6

*Balintulo v. Daimler AG*,
727 F.3d 174 (2d Cir. 2013) ...........................................................................................1, 2

*Bao Ge v. Li Peng*,
201 F. Supp. 2d 14 (D.D.C. 2000),
*aff'd sub nom. Bao v. Li*, 35 Fed. App'x 1 (D.C. Cir. 2002) ..................................................12

*Berger v. Hanlon*,
129 F.3d 505 (9th Cir. 1997), *vacated*, 526 U.S. 808 (1999) ..................................................12

*Bowoto v. Chevron Corp.*,
621 F.3d 1116 (9th Cir. 2010) ............................................................................................5
557 F. Supp. 2d 1080 (N.D. Cal. 2008) ..............................................................................13

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) .......................................................................................................12

*Cabello v. Fernandez-Larios*,
402 F.3d 1148 (11th Cir. 2005) ......................................................................................6, 13

*Casey v. U.S. Bank Nat'l Ass'n*,
26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005) ..........................................................................17

*Central Bank of Dover, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) .................................................................................................5

*Chen Gang v. Zhao Zhizhen*,
   No. 04-cv-1146, 2013 WL 5313411 (D. Conn. Sept. 20, 2013) ................................2

*In re Chiquita Brands International, Inc.*,
   792 F. Supp. 2d 1301 (S.D. Fla. 2011).................................................................15

*Clothesrigger, Inc., v. GTE Corp.*,
   236 Cal. Rptr. 605 (Cal. Ct. App. 1987) ..............................................................19

*Cooper v. Tokyo Elec. Power Co., Inc.*,
   No. 12CV3032, 2013 WL 6875866 (S.D. Cal. Nov. 26, 2013) ................................24

*Corrie v. Caterpillar, Inc.*,
   403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd*, 503 F.3d 974 (9th Cir. 2007) ......5

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ...........................................................................................25

*DIRECTV, Inc. v. Gallagher*,
   No. 03-2474, 2004 U.S. Dist. LEXIS 28008 (D.N.J. Apr. 29, 2004) ......................21

*DIRECTV, Inc. v. Robson*,
   420 F.3d 532 (5th Cir. 2005) ................................................................................21

*DirecTV, Inc. v. Treworgy*,
   373 F.3d 1124 (11th Cir. 2004) ............................................................................21

*DSPT Int'l, Inc. v. Nahum*,
   No. CV-060308, 2007 WL 5282563 (C.D. Cal. Aug. 16, 2007) ............................10

*Doe v. Nestle, S.A.*,
   748 F. Supp. 2d 1057 (C.D. Cal. 2010),
   *vacated sub nom. Doe I v. Nestle USA, Inc.*, 738 F.3d 1048 (9th Cir. 2013)..........13

*Doe v. Qi*,
   349 F. Supp. 2d 1258 (N.D. Cal. 2004) .................................................13, 23, 25

*Doe v. Saravia*,
   348 F. Supp. 2d 1112 (E.D. Cal. 2004) ................................................................16

*Doe I v. Nestle USA, Inc.*,
   738 F.3d 1048 (9th Cir. 2013).......................................................6, 8, 10, 13

*Doe VIII v. Exxon Mobil Corp.*,
   527 Fed. App'x 7 (D.C. Cir. 2013) .....................................................................2, 5
   654 F.3d 11 (D.C. Cir. 2011) .................................................................................5

*Deirmenjian v. Deutsche Bank AG*,
   No. 10-56359, 2013 WL 6407025 (9th Cir. Dec. 9, 2013) ....................................15

*EMC Corp. v. Sha*,
   No. 13-CV-0118 EJD, 2013 WL 4399025 (N.D. Cal. Aug. 13, 2013) ....................17

*Enahoro v. Abubakar*,
   408 F.3d 877 (7th Cir. 2005) ................................................................................................. 10

*European Community v. RJR Nabisco, Inc.*,
   No. 02–cv–5771, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ................................................. 3

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ................................................................................................. 17

*Fontenberry v. MV Transp., Inc.*,
   No. 12-CV-01996, 2013 WL 6182587 (E.D. Cal. Nov. 25, 2013) .......................................... 19

*Giraldo v. Drummond Co.*,
   No. 09-cv-1041, 2013 WL 3873960 (N.D. Ala. July 25, 2013) ............................................... 2

*Hartford Fire Insurance Co. v. California*,
   509 U.S. 764 (1993) ............................................................................................................... 24

*Hilao v. Estate of Marcos*,
   103 F.3d 767 (9th Cir. 1996) ........................................................................................ 6, 9, 16

*Jackson v. Metropolitan Edison Co.*,
   419 U.S. 345 (1974) ............................................................................................................... 12

*Jane Doe I v. Wal-Mart Stores, Inc.*,
   No. CV 05-7307, 2007 WL 5975664 (C.D. Cal. Mar. 30, 2007),
   *aff'd*, 572 F.3d 677 (9th Cir. 2009) ....................................................................................... 19

*Kaplan v. Cent. Bank of Islamic Republic of Iran*,
   -- F. Supp. 2d --, No. 10-cv-483, 2013 WL 4427943 (D.D.C. Aug. 20, 2013) ...................... 14

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013) .............................................................. 1, 2, 3, 4, 5, 10, 23, 25
   621 F.3d 111 (2d Cir. 2010) .................................................................................................. 10

*Kwikset Corp. v. Sup. Ct.*,
   246 P.3d 877 (Cal. 2011) ....................................................................................................... 19

*Liu v. Republic of China*,
   892 F.2d 1419 (9th Cir. 1989) ............................................................................................... 24

*Liu Bo Shan v. China Const. Bank Corp.*,
   421 Fed App'x 89 (2d Cir. 2011) ......................................................................................... 8, 9

*Luis v. Zang*,
   No. 11-CV-884, 2013 WL 811816 (S.D. Ohio Mar. 5, 2013) ............................................... 21

*Mamani v. Berzain*,
   654 F.3d 1148 (11th Cir. 2011) ............................................................................................. 13

*Mastafa v. Chevron Corp.*,
   759 F. Supp. 2d 297 (S.D.N.Y. 2010) ..................................................................................... 5

*In re Maxwell Commc'n Corp.*,
   93 F.3d 1036 (2d Cir. 1996) ................................................................................................... 24

*McDonald v. Antelope Valley Cmty. Coll. Dist.*,
   194 P.3d 1026 (Cal. 2008) ...................................................................................16

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
   404 F. Supp. 2d 1214 (E.D. Cal. 2005) .................................................................18

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
   871 F. Supp. 2d 933 (N.D. Cal. 2012) ....................................................................3

*Morrison v. Nat'l Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ........................................................................................2, 3

*Mujica v. Occidental Petroleum Corp.*,
   381 F. Supp. 2d 1164 (C.D. Cal. 2005) .................................................10, 11, 13

*Myers v. Trendwest Resorts, Inc.*,
   56 Cal. Rptr. 3d 501 (Cal. Ct. App. 2007) ..........................................................10

*Parks v. Eastwood Ins. Servs., Inc.*,
   No. CV 02-507, 2002 WL 34370244 (C.D. Cal. July 29, 2002) .........................19

*Presbyterian Church Of Sudan v. Talisman Energy, Inc.*,
   582 F.3d 244 (2d Cir. 2009) ...........................................................................6, 9, 23

*Ringgold-Lockhart v. County of L.A.*,
   No. 11-56973, 2014 WL 92509 (9th Cir. Jan. 10, 2014) .....................................14

*Roe v. Bridgestone Corp.*,
   492 F. Supp. 2d 988 (S.D. Ind. 2007) .......................................................13, 14, 15

*Romero v. Drummond Co., Inc.*,
   552 F.3d 1303 (11th Cir. 2008) ............................................................................15

*Sarei v. Rio Tinto PLC.*,
   221 F. Supp. 2d 1116 (C.D. Cal. 2002) ..................................................................9

*Sexual Minorities Uganda v. Lively*,
   No. 12-cv-30051, 2013 WL 4130756 (D. Mass. Aug. 14, 2013) ..........................3

*Sinaltrainal v. Coca-Cola Co.*,
   578 F.3d 1252 (11th Cir. 2009) ............................................................................11

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ...........................................................................5, 13, 23, 25

*In re South African Apartheid Litigation*,
   617 F. Supp. 2d 228 (S.D.N.Y. 2009) ....................................................................8

*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952) ...............................................................................................3

*Sullivan v. Oracle Corp.*,
   254 P.3d 237 (Cal. 2011) ......................................................................................19

Case No. 5:11-cv-02449-EJD

REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Telegraphers v. Ry. Express Agency*,
321 U.S. 342 (1944) ............................................................................................17

*Tucci v. Club Mediterranee, S.A.*,
107 Cal. Rptr. 2d 401 (Cal. Ct. App. 2001) ........................................................15

*Ungaro-Benages v. Dresdner Bank AG*,
379 F.3d 1227 (11th Cir. 2004) ......................................................................24, 25

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966) ............................................................................................14

*Weisskopf v. United Jewish Appeal—Fed'n of Jewish Philanthropies of N.Y., Inc.*,
889 F. Supp. 2d 912 (S.D. Tex. 2012) ..................................................................5

*Wershba v. Apple Computer, Inc.*,
110 Cal. Rptr. 2d 145 (Cal. Ct. App. 1999) ........................................................19

*Yeager v. Bowlin*,
495 Fed. App'x 780 (9th Cir. 2012) ....................................................................16


**Statutes**

Cal. Bus. & Pro. Code § 17200 .......................................................................................19

Cal. Bus. & Pro. Code § 17500 .......................................................................................19

18 U.S.C. § 2512 ......................................................................................................20, 21

Fed. R. Civ. P. 44.1 .........................................................................................................15


**Other Authorities**

Judgment, *Prosecutor v. Perišić*, Case No. IT-04-81-A, Appeals Chamber of the International
Criminal Tribunal for the former Yugoslavia (Feb. 28, 2013) ....................................8

3 Witkin, California Procedure § 694 (5th ed. 2008) .......................................................16

1

**ARGUMENT**

2

**I.      THE ATS AND TVPA CLAIMS SHOULD BE DISMISSED**

3          As Defendants made clear in the Motion to Dismiss the Second Amended Complaint

4   ("SAC") (Dkt. 117; "Mot."), the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum*

5   *Co.*, 133 S. Ct. 1659 (2013), fundamentally altered the landscape for ATS litigation, foreclosing

6   suits like this one for alleged human rights violations on foreign soil.   In their Corrected

7   Opposition (Dkt. 125; "Opp."), Plaintiffs fail to accept the decision in *Kiobel*, seeking instead to

8   relitigate or circumvent its holdings.  But these arguments fail; the ATS cannot apply post-*Kiobel*

9   to extraterritorial conduct like the Chinese authorities' commission of human rights violations in

10  China, as the many post-*Kiobel* decisions canvassed in the Motion make clear.  Nor do Plaintiffs

11  fare better in trying to connect Defendants' supposed *domestic* conduct to the Chinese

12  government's actions.   The production and export of lawful and useful products like Cisco's

13  routers, switches, and networking equipment provides no basis for alleging any connection

14  between Cisco and its executives and the Chinese authorities' alleged torture and other heinous

15  conduct against Plaintiffs.  Nor do unsupported allegations that Cisco customized those products

16  for use in enforcement of Chinese law provide any basis to infer Defendants' connection to such

17  conduct.   This Court should dismiss the ATS allegations for these reasons, and for the other

18  independent grounds the Motion sets forth for dismissing both the ATS and TVPA claims.

19         **A.      The ATS Claims Allege Purely Extraterritorial Conduct**

20         Plaintiffs' attempts to circumvent the U.S. Supreme Court's decision in *Kiobel* are

21  unavailing.  *First*, *Kiobel* itself refutes Plaintiffs' erroneous contention (Opp. 8-10) that Cisco's

22  U.S. nationality is alone sufficient to avoid application of *Kiobel*'s bar on the application of the

23  ATS to extraterritorial conduct.  *Kiobel* itself specifically noted that "mere corporate presence" in

24  the United States does not "suffice[]" to displace the presumption against application of the ATS

25  to extraterritorial conduct.  133 S. Ct. at 1669.  All subsequent relevant authority is in accord.  *See*

26  *Balintulo v. Daimler AG*, 727 F.3d 174, 189 (2d Cir. 2013) (rejecting suggestion that "ATS still

27  reaches extraterritorial conduct when the defendant is an American national"); *Al Shimari v. CACI*

28  *Int'l, Inc.*, 951 F. Supp. 2d 857, 868 (E.D. Va. 2013) (holding that *Kiobel* required dismissal of

claims against a U.S. military contractor in connection with alleged injuries in Iraq); *Adhikari v. Daoud & Partners*, No. 09-cv-1237, 2013 WL 4511354, at *7 (S.D. Tex. Aug. 23, 2013), *on reconsideration*, 2014 WL 198305 (S.D. Tex. Jan. 15, 2014) (same as to defendant that was a "U.S. national" corporation); *Giraldo v. Drummond Co.*, No. 09-cv-1041, 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013) (same); *see also Doe VIII v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (vacating ATS judgment against U.S.-based defendant).  Plaintiffs are incorrect to argue (Opp. 9) that *Kiobel* "tracks closely the recommendation of the United States" in its *Kiobel* amicus brief that the nationality of the defendant may play a decisive role, for *Kiobel* *rejected* that argument, 133 S. Ct. at 1669, and looked instead to the location of the *conduct*. Plaintiffs are likewise mistaken to rely (Opp. 9-10) on historical materials that the Supreme Court specifically considered and rejected in *Kiobel*, *see* 133 S. Ct. at 1667-68 (noting that Attorney General Bradford's 1795 opinion may be best understood as suggesting that U.S. nationals were subject to the *treaty* clause of the ATS rather than the law of nations clause, and in any event finding the opinion ambiguous).  And Plaintiffs misplace reliance (Opp. 8) on *Ahmed v. Magan*, for there, "defendant . . . waived any merits argument he may have raised based on the *Kiobel* decision." No. 10-cv-00342, 2013 WL 4479077, at *1-2 (S.D. Ohio Aug. 20, 2013).

*Second*, Plaintiffs are wrong to suggest (Opp. 10-12) that they allege sufficient domestic conduct to survive dismissal.  To begin with, *Kiobel*'s analysis turns centrally on the location of not just any conduct but rather the specific *tortious conduct* at issue, which here is China, where all the human rights violations are alleged to have taken place.  This is clear from the multiple cases cited in the Motion.  *See* Mot. 11-15 (citing *Balintulo*, *Al Shimari*, *Chen Gang v. Zhao Zhizhen*, No. 04-cv-1146, 2013 WL 5313411 (D. Conn. Sept. 20, 2013)).[1]  It is also clear from *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), which held that, in analyzing whether U.S. law is being applied extraterritorially, the relevant activities are those that are the

---

[1]   Unable to counter these decisions, Plaintiffs note various procedural distinctions, but they are immaterial.  For instance, the persuasive force of *Chen Gang* is not affected by the pending motion to amend there, and it is irrelevant that *Balintulo* was issued in a mandamus context.  Opp. 12-13.  As to *Al Shimari*'s lengthy analysis, Plaintiffs do not respond other than to note (Opp. 14) that plaintiffs there argued Iraq was equivalent to U.S. territory.  Nor do Plaintiffs address *Adhikari* or *Giraldo,* which they concede involved domestic conduct and defendants.  *See* Mot. 11 n.7; Opp. 14.

1   "focus of congressional concern"—here, the *international law violations*, all of which occurred in

2   China.   Mot. 16-17 & n.8.   Contrary to Plaintiffs' argument (Opp. 16), *Morrison* and cases

3   decided pursuant to *Morrison* are fully applicable here, for *Kiobel* expressly adopted *Morrison*'s

4   "presumption against extraterritorial application" and held that "the principles underlying the

5   canon . . . similarly constrain courts considering causes of action that may be brought under the

6   ATS."   *See Kiobel*, 133 S. Ct. at 1664.   None of the decisions cited by Plaintiffs (Opp. 11-12)

7   undermines the decisions cited in the Motion.[2]   The sole ATS decision that Plaintiffs cite allowing

8   ATS claims to proceed based on U.S. conduct, *Sexual Minorities Uganda v. Lively*, No. 12–cv–

9   30051, 2013 WL 4130756 (D. Mass. Aug. 14, 2013), is wholly inapposite.   It involves claims

10   against the operator of "a kind of 'Homophobia Central' in Springfield, Massachusetts" whose

11   enterprise was to direct, from American soil, hate crimes against gay people and groups in

12   Uganda.   *See id.* at *2.   Any comparison to Cisco's global marketing of lawful and useful

13   networking equipment and services under San Jose supervision is absurd and offensive.

14       Even if U.S. conduct by a U.S. corporation could in some cases trigger ATS liability for

15   human rights violations on foreign soil where that conduct was closely connected to those

16   violations, the SAC comes nowhere close to alleging any such connection.   The SAC alleges that

17   Chinese authorities, acting *in China*, used Golden Shield technology that had been marketed,

18   designed, and implemented *in China* to identify Chinese residents who were practicing Falun

19   Gong *in China* in violation of Chinese law.   While the SAC alleges that Plaintiffs were among

20   those practitioners and were later injured by Chinese authorities, it alleges no conduct *in San Jose*

21   that was designed to, aimed at, or even likely to cause such injuries.   To the contrary, multiple

22   SAC paragraphs allege that it was Cisco's *Chinese* employees who "design[ed]," "develop[ed],"

[2]   *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952), a Lanham Act case decided before *Morrison* tightened the extraterritoriality analysis, involved domestic conduct and effects.   *Id.* at 286 (defendant "bought component[s] . . . in the United States, [and his] spurious [goods] filtered . . . into this country; his competing goods could well reflect adversely on [plaintiff's U.S.] trade reputation").   Moreover, the "nerve center" test applied in *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 942 (N.D. Cal. 2012) and *European Community v. RJR Nabisco, Inc.*, No. 02–cv–5771, 2011 WL 843957, at *6 (E.D.N.Y. Mar. 8, 2011), was *not* a measure of extraterritoriality, but merely a method to determine the *location* of the RICO enterprises at issue, necessary because the "focus of Congressional concern" in enacting RICO was to regulate domestic RICO enterprises.   *European Community*, 2011 WL 843957, at *5. Also, the RICO claims in *European Community* were dismissed as extraterritorial.   *Id.* at *7.

"implement[ed]," "marketed" "manufactured," and "entered into [sale] agreement[s]," concerning the Golden Shield (Mot. 15 (quoting SAC)). Indeed, in the First Amended Complaint (Dkt. 61; "FAC"), Plaintiffs had (pre-*Kiobel*) named as defendants two Cisco employees located *in China*, where they allegedly "*directly* participated in . . . and controlled" the alleged wrongdoing. FAC ¶¶ 31, 34 (emphasis added). At the same time, the SAC alleges that the most that Cisco did from San Jose was to exercise generic "direction," "supervi[sion]," and "approval" of the acts of Cisco's Chinese employees (Mot. 16 (quoting SAC ¶¶ 75, 97(c), 129)).

Just as there is a disconnect between the SAC's allegations about Cisco's domestic activities on the one hand and the actions of its Chinese employees on the other, so there is a disconnect between the SAC's allegations about the Golden Shield on the one hand and the alleged human rights violations against Falun Gong practitioners on the other. The Golden Shield is undisputedly a general tool for law enforcement that is not specific to Falun Gong; the SAC itself alleges that "[t]he Golden Shield … does perform some standard crime control police functions," even if it represents a leap over prior approaches in "scale, complexity, intelligence, and technological sophistication." SAC ¶ 2. Plaintiffs do not dispute that many Chinese citizens were *lawfully* identified or apprehended using the Golden Shield for violations of Chinese laws unrelated to those involving Falun Gong. Thus, when the SAC alleges that the Golden Shield is used to "find, track, and suppress Falun Gong believers," it describes nothing more or less than ordinary crime control by Chinese authorities.[3]

In sum, the SAC alleges at most that Cisco's San Jose headquarters provided general supervision and oversight to Cisco's employees in China, who in turn marketed, sold, implemented, and serviced technology products that assisted with the "identification [and] apprehension" (Opp. 4) of individuals engaged in practices illegal under Chinese law. Nothing in the SAC alleges a causal connection between such alleged "design[]" activities in San Jose, Golden Shield marketing in China for purposes of enabling Chinese crime control, and the heinous

---

[3]   Defendants' unopposed expert declaration establishes the now unrebutted facts that, *inter alia*, the practice of Falun Gong is prohibited under Chinese law and subject to specified penalties. Decl. of John (Hejun) Chu In Supp. Of Defs.' Mot. To Dismiss, Aug. 4, 2011 (Dkt. 118) ¶¶ 12-35. Plaintiffs do not challenge those conclusions and elected not to submit their own expert report.

1   acts Chinese authorities are alleged to have committed against Plaintiffs.  *Id.*  Lacking any

2   substantial connection to Cisco's domestic conduct, the ATS claims should be dismissed as purely

3   extraterritorial.

4          **B.      The ATS And TVPA Claims Do Not Support Aiding And Abetting Liability**

5          Even if the ATS claims survive *Kiobel*, they and the TVPA claims fail for the independent

6   reason that they allege secondary liability that is unavailable and/or insufficiently pleaded.

7                 **1.      Aiding And Abetting Liability Is Unavailable Under The TVPA**

8          In *Bowoto v. Chevron Corp.*, the Ninth Circuit held that the TVPA "does not contemplate"

9   aiding and abetting liability, reasoning that the text of the TVPA "limits liability to *an individual*

10  *who subjects another to torture*"—*i.e.*, the primary wrongdoer only.  621 F.3d 1116, 1128 (9th

11  Cir. 2010) (alteration and citations omitted).  Plaintiffs mistakenly argue that the above-quoted

12  passage was merely a "ruling against corporate liability."  Opp. 18.  That is wrong.  Plaintiffs'

13  reading, if correct, would render superfluous the very next sentence of *Bowoto*, which holds in the

14  alternative that, "[e]ven assuming the TVPA permits some form of vicarious liability, the text

15  limits such liability to . . . natural persons."  621 F.3d at 1128.[4]  The law of this Circuit thus

16  precludes aiding and abetting liability under the TVPA and the TVPA claim should be dismissed.

17                 **2.      Aiding And Abetting Liability Is Unavailable Under The ATS**

18         Defendants' Motion argued that *Central Bank of Dover, N.A. v. First Interstate Bank of*

19  *Denver, N.A.*, 511 U.S. 164 (1994), as amplified by *Sosa*'s and *Kiobel*'s limits on the ATS's reach,

20  makes clear that ATS aiding and abetting claims are impermissible absent express statutory

21  authorization.  Mot. 18-19.  Plaintiffs' Opposition does not substantively address that argument,

22  and instead cites the same contrary cases Defendants identified.  Opp. 17-18.  This Court should

23  hold that those cases were wrongly decided, in anticipation that the Ninth Circuit will reach the

---

24  

25  [4]   Also, Plaintiffs' assertion (Opp. 18) that TVPA aiding and abetting liability is "well
    established" ignores the well-reasoned decisions to the contrary, including the most recent circuit
26  decision to have considered the question, *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 58 (D.C.
    Cir. 2011), *vacated on other grounds*, 527 Fed. App'x 7 (D.C. Cir. 2013).  *See also, e.g.,*
27  *Weisskopf v. United Jewish Appeal—Fed'n of Jewish Philanthropies of N.Y., Inc.*, 889 F. Supp. 2d
    912, 924 (S.D. Tex. 2012) (TVPA "does not permit liability for aiding and abetting"); *Mastafa v.*
28  *Chevron Corp.*, 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010) (same); *Corrie v. Caterpillar, Inc.*, 403
    F. Supp. 2d 1019, 1027 (W.D. Wash. 2005), *aff'd*, 503 F.3d 974 (9th Cir. 2007) (same).

1    same conclusion.[5]

2            **3.      The Allegations Do Not Support Aiding and Abetting Liability**

3            As an independent basis for dismissal, the ATS and TVPA claims should be dismissed

4    because the SAC fails to allege facts that plausibly create subject matter jurisdiction or state a

5    claim for aiding-and-abetting liability.  Mot. 22-24.  Plaintiffs fail to allege either the *mens rea* or

6    *actus reus* required for aiding-and-abetting liability here.  While *Doe I v. Nestle USA, Inc.*, 738

7    F.3d 1048 (9th Cir. 2013), which was decided after Defendants filed the Motion here, held that the

8    plaintiff need not "allege specific intent in order to satisfy the applicable purpose *mens rea*

9    standard" for aiding and abetting, *id.* at 1049, that decision was issued over a dissent, *see id.* at

10   1050 (Rawlinson, J., dissenting); is inconsistent with the decisions of the Second and Fourth

11   Circuits, *see Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir.

12   2009); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 400-01 (4th Cir. 2011); and is the subject of a pending

13   petition for rehearing en banc as to which the Ninth Circuit directed full briefing just one day after

14   defendant's request (*Doe I v. Nestle USA, Inc.*, No. 10-56739, Dkt. 104 (Jan. 10, 2014)).  In view

15   of those ongoing proceedings in the Ninth Circuit, if this Court does not dismiss Plaintiffs' claims

16   based on lack of *alleged mens rea*, it should hold this case so as to await further guidance from the

17   Ninth Circuit concerning the applicable standard.  The same is true as to the governing *actus reus*

18   standard, a disputed issue that the Ninth Circuit in *Nestle* declined to resolve, instead directing

19   further briefing in the district court in view of recent developments in international law.  *Nestle*

20   *USA, Inc.*, 738 F.3d at 1049.  As with *mens rea*, unless this Court dismisses Plaintiffs' claims for

21   lack of *actus reus*, the prudent course would be to await further guidance from the Ninth Circuit

22   before proceeding.

23           In any event, Plaintiffs' secondary liability claims fail even if the lenient *Nestle* standard

24   should survive.  *First*, as to *mens rea*, Plaintiffs argue (Opp. 21) that Cisco "knew" that Chinese

25

26   [5]  Several of Plaintiffs' citations are in any event incorrect.  For example, the Ninth Circuit did *not*
     address the availability of aiding and abetting liability in *Hilao v. Estate of Marcos*, which states
27   that the issue was not presented on appeal.  103 F.3d 767, 776 (9th Cir. 1996).  *See infra* at 9 &
     n.6.  *See also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir.
28   2005) and *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (addressing only
     "conspiracies and accomplice liability," not aiding and abetting).

authorities would use the Golden Shield to facilitate violence, but that argument is unsupported by any factual allegation in the SAC.  For instance, Plaintiffs argue (*id.*) that Defendants "customized, marketed, designed, tested, and implemented the Golden Shield knowing and intending that it be used for the unlawful ideological conversion through torture and other human rights abuses against Falun Gong practitioners."  But alleged customization, marketing, design, testing, and implementation of a system useful in identifying and apprehending individuals acting in violation of Chinese law does not support an inference of "knowledge" of acts of violence that violate Chinese law.  Nor does Cisco's purported knowledge that Chinese authorities viewed Falun Gong as an activity in violation of Chinese law support any plausible inference of knowledge of torture and other human rights abuses.

The same is true as to Plaintiffs' argument (Opp. 21) that Cisco's "knowledge" can be inferred from allegations that its employees "repeatedly aligned themselves with and affirmed to Chinese security forces their purpose and intent to aid in the perpetration of the ideological conversion through torture and other alleged abuses against Falun Gong."  The five SAC paragraphs that the Plaintiffs summarily cite in support of this conclusion at most allege that Cisco assisted in crime-control activities, and come nowhere close to asserting a plausible inference that Cisco knew of human rights abuses:  Paragraph 41, for example, says nothing at all about Cisco, or about violence, and is equally consistent with efforts to combat criminal activity; Paragraph 57 likewise says nothing at all about Cisco, and merely alleges that unspecified "Chinese buyers" were concerned with whether the technology at issue could combat criminal activity; Paragraph 66 criticizes a Cisco employee for referring to Falun Gong adherents as "despicable," but such an allegation cannot support an inference that Cisco knew of *torture*; Paragraph 67 merely appears to criticize Cisco for "displaying ideological orthodoxy"; and Paragraph 182 again rests on the premise that Cisco's assistance in "eliminating" criminals and crime supports an inference that Cisco knew (or intended) that this would be accomplished by means of torture and crimes against humanity.

*Second*, as an independent basis for dismissal of the aiding and abetting claims, Plaintiffs' contention that they satisfy the *actus reus* requirement is belied by the recent international law

decision *Prosecutor v. Perišić*, cited by the Ninth Circuit in *Nestle*, 738 F.3d at 1049, in which the Appeals Chamber of the International Criminal Tribunal for the former Yugoslavia ("Appeals Chamber") reversed a finding of liability, holding that there had been no showing that the defendant, a senior officer in the Yugoslav Army, had carried out "acts … *specifically directed* towards assisting the crimes of principal perpetrators [a different military body]," as necessary to support aiding and abetting liability. Case No. IT-04-81-A, Judgment (Feb. 28, 2013), ¶ 18 (emphasis added). In so holding, the Appeals Chamber emphasized that "specific direction" is required in order to "establish[] a culpable link between assistance provided by an accused individual and the crimes of principal perpetrators." *Id*. ¶ 37. Merely providing "general assistance which could be used for both lawful and unlawful activities will not be sufficient, alone, to prove that … aid was specifically directed to crimes of principal perpetrators." *Id*. ¶ 44. Rather, "a *direct link* between the aid provided by an accused individual and the relevant crimes committed by principal perpetrators is necessary." *Id*. (emphasis added). Applying this standard, the Appeals Chamber rejected liability in *Perišić*, holding that: (a) the military unit that the defendant had assisted was not "an organisation whose sole and exclusive purpose was the commission of crimes," *id.* ¶ 52; (b) the "provision of military equipment, logistical support, and military training," was "not … incompatible with lawful military operations," *id.* ¶¶ 62, 65; and (c) the "secondment of personnel" had not been authorized "in order to specifically assist … criminal acts," *id.* ¶¶ 62, 63. Likewise here, the entities with which Cisco transacted were not "organi[z]ation[s] whose sole and exclusive purpose was the commission of crimes"; Cisco's transactions with those authorities were "not … incompatible with lawful [activities]" and Cisco's acts were not authorized "in order to specifically assist … criminal acts."

In opposition, Plaintiffs rely on *In re South African Apartheid Litigation*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009), as purported support for a finding of *actus reus*. That is unavailing:

> In [the *Apartheid*] case, plaintiffs alleged that certain defendants "provided information about anti-apartheid activists to the [military], facilitated arrests, provided information to be used by interrogators, and even participated in interrogations" as part of a systematic campaign to identify and torture anti-apartheid leaders. Even assuming such allegations would qualify as "substantial assistance" . . . they are qualitatively different from the alleged support in this case: that the Bank contacted the police and provided false evidence.

REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed App'x 89, 95 (2d Cir. 2011) (citation omitted). The same is true here.  There is no allegation here that Cisco participated in any act of violence or took any step beyond selling equipment and services to Chinese authorities.  Indeed, Plaintiffs' allegations here are much weaker than even those deemed insufficient in *Liu Bo Shan*, where the defendant actually provided "false evidence" to police.  In the absence of "specific direction" by Cisco of the Chinese authorities at issue, it is irrelevant whether the Golden Shield was the "means by which" any injuries were "enabled" or whether it was "indispensable" to that result.  Opp. 4, 23-24.  As for Plaintiffs' remaining arguments, the notion that Cisco's legal sales of legitimate crime control equipment were somehow "specifically directed" at enabling *torture* (versus ordinary crime control) is unsupported by any allegation in the SAC.  *See supra* at 4-5.  The ATS and TVPA claims should be dismissed for this reason as well.

### 4.  The Allegations Do Not Support Other Forms Of Secondary Liability

Plaintiffs argue that, even if their aiding and abetting claims fail, they may proceed on the basis of other forms of secondary liability.  Not so.  *First*, Plaintiffs are incorrect to argue that the Ninth Circuit "has held that conspiracy liability is . . . available under the ATS."  Opp. 24 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996)).  In fact, the Ninth Circuit in *Marcos* specifically noted that that issue had not been presented on appeal.[6]

*Second*, as for the substance of the conspiracy and criminal enterprise claims. Plaintiffs have failed to allege adequate *mens rea* for the same reasons discussed above.  *See* Mot. 25 (citing *Talisman*, 582 F.3d at 260).  Likewise, the SAC allegations that Plaintiffs cite in support of the purported existence of an "agreement" and "overt acts" only prove Defendants' point:  Each of the cited allegations (Opp. 25) involves an agreement to provide technology and related services in support of law enforcement activities; none suggests Defendants' "agreement" to physically injure the Plaintiffs, or any "overt acts" by Defendants to accomplish that result.

---

[6]  *See Marcos*, 103 F.3d at 776 ("The district court instructed the jury that it could find the Estate liable if it found either that (1) Marcos directed, ordered, *conspired with*, or aided [wrongdoing] . . . or (2) if Marcos knew of such conduct . . . .  *The Estate challenges the latter basis for liability* . . . .") (emphasis added); *see also Sarei v. Rio Tinto PLC*., 221 F. Supp. 2d 1116, 1143 (C.D. Cal. 2002) (*Marcos* "did not focus on, or discuss, . . . use of the phrase 'directed, ordered, conspired with or aided,' most probably because the Estate did not challenge it on appeal").

1        *Third*, Plaintiffs wrongly suggest that Defendants "do not contest agency liability or

2   ratification," and have "conced[ed] those points."  Opp. 25.  Although it is not clear which agency

3   or ratification theories Plaintiffs are referring to (none is cited in Plaintiffs' brief or asserted as part

4   of the SAC's causes of action), agency liability and ratification are species of "direct liability,"[7]

5   which Defendants explicitly addressed in their motion (and as to which Plaintiffs did not respond).

6   *See* Mot. 25 n.15.  In any event, Plaintiffs did not allege and cannot plausibly suggest that the

7   Chinese government and its law enforcement officers acted as agents of, or otherwise on behalf of,

8   Cisco and its executives, as required on an agency or ratification theory.

9       **C.**     **The ATS Does Not Provide A Basis For Liability Against Corporations**

10        Even if this Court held that the ATS claims survive *Kiobel* and properly assert secondary

11   liability, the claims against Cisco should be dismissed for the independent reason that the ATS

12   does not provide jurisdiction for claims against corporations.  Mot. 25 (citing, *inter alia*, *Kiobel v.*

13   *Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct.

14   1659 (2013)).  Although a panel of the Ninth Circuit has recently held in one sentence that

15   corporations may be liable under the ATS, *Nestle USA, Inc.*, 738 F.3d 1048, the Circuit waited

16   only one day before directing a response to appellants' petition for rehearing en banc, which is

17   now being briefed.  *Nestle*, No. 10-56739, Dkt. 104 (Jan. 10, 2014).  Particularly because the

18   Second Circuit and at least one district court in this Circuit have held that corporate liability is

19   barred under the ATS—an issue as to which the Supreme Court granted certiorari in *Kiobel* before

20   resolving that appeal on alternative grounds—this Court should defer a ruling on corporate

21   liability under the ATS, including the extent to which the TVPA displaces such liability, pending

22   further Ninth Circuit proceedings in *Nestle*.[8]

23

---

24   [7]   *See Myers v. Trendwest Resorts, Inc.*, 56 Cal. Rptr. 3d 501, 518 (Cal. Ct. App. 2007) (discussing "direct liability based on the theory of . . . agency"); *DSPT Int'l, Inc. v. Nahum*, No.

25   CV-060308, 2007 WL 5282563, at *2 n.3 (C.D. Cal. Aug. 16, 2007) (narrowing "direct liability claim . . . to two possible theories: ostensible partnership and ratification").

26   [8]   In response to Defendants' argument that the ATS claims against Cisco should be dismissed as displaced by the TVPA insofar as they allege torture and cruel, inhuman, and degrading treatment

27   ("CIDT") (Mot. 27 (citing *Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005)), Plaintiffs' only argument is that the TVPA was "meant to enhance the remedies available under the ATS" (Opp.

28   28).  But as made clear in one of the cases Plaintiffs cite, the nature of the "enhance[ment]" was specific and limited:  "Congress intended the TVPA to enhance the [ATS] remedy . . . in an

**D.      The Claims Do Not Allege Acts By Cisco Under Color Of State Law**

As an independent basis for dismissal, Plaintiffs' TVPA and ATS claims (with the arguable exception of the ATS claim for crimes against humanity) should be dismissed for failure to allege state action.  In opposition, Plaintiffs concede the state action requirement applies (Opp. 29 n.51), but allege that it has been satisfied here by virtue of Cisco's alleged sale of Golden Shield equipment to the Chinese government.  That is incorrect.

*First*, Plaintiffs fail to reconcile their contention that the SAC alleges state action with their contention that the SAC does *not* involve state action.  Specifically, in opposing application of the act of state doctrine, Plaintiffs argue that "the acts alleged [in the SAC] are *not* official acts under either international or state law" (Opp. 41), that "the acts were *not* official acts of state" (*id.* at 41 n.78), and that the acts were taken by "[e]xtralegal CCP entities" rather than the Chinese state (*id.* at 42) (all emphases added); *see also* Opp. 42 nn. 79-80.  Plaintiffs cannot have it both ways:  If the SAC does not involve state action for purposes of the act-of-state doctrine (which Defendants do not concede), then it cannot involve state action for purposes of the TVPA and ATS.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1266 (11th Cir. 2009) (dismissing ATS and TVPA claims for lack of state action where the complaint alleged that wrongful acts were taken by "paramilitary security forces" that were allegedly associated with, but not a part of, the Colombian state).  The ATS and TVPA claims should be dismissed on this basis alone.

*Second*, to the extent the SAC alleges wrongful acts by the Chinese state (contrary to Plaintiffs' contention), it does not allege that those acts were taken jointly with Defendants as required to support ATS or TVPA liability.  The SAC paragraphs on which Plaintiffs focus (Opp. 29 n.55) are revealing:  Not one alleges that Defendants knew about or assisted with any particular act of violence; and not one alleges that Defendants knew about or had even heard the names of

---

important respect: while the [ATS] provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens . . . ."  *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1178 n.13 (C.D. Cal. 2005) (citations and emphasis omitted).  U.S. citizens cannot assert CIDT claims, or claims against corporations, under the TVPA.  Thus, Plaintiffs' argument that those claims are actionable by aliens under the ATS demands the paradoxical result that in passing the TVPA, Congress granted U.S. citizens *less* protection than is available to aliens.  At minimum, that the TVPA limits liability to torture (not CIDT) and to persons (not corporations) is a data point concerning Congress's understanding of international law as actionable through the ATS.

any of the Plaintiffs.  Rather, the most that can be gleaned from the SAC, on even the most generous reading, is that Defendants sold internet equipment and services to Chinese customers with knowledge that these transactions would enable their customers to better enforce Chinese law.  Those commercial transactions with Chinese customers, many steps removed from the alleged acts of violence, are a far cry from the kinds of "joint action" required to "qualify [Defendants] as . . . state actor[s]" (Opp. 29) under applicable case law.

Indeed, Plaintiffs cite no case at all in which the wrongful acts of a state were imputed to a private entity that had upstream transactions with the state.  To the contrary, in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974), cited by Plaintiffs, the Supreme Court held that there had been *no* state action even as to alleged wrongdoing by a power company that enjoyed a state-regulated partial monopoly.  In two other cases cited by Plaintiffs, state action was found where the private actor *actually committed* the alleged violation—not analogous to the facts here, where the alleged wrongdoing was committed by the state, many steps removed from Plaintiffs.  *Berger v. Hanlon*, 129 F.3d 505, 515 (9th Cir. 1997), *vacated*, 526 U.S. 808 (1999); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724 (1961).  The only case cited by Plaintiffs involving wrongdoing committed by the government itself is *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 21-22 (D.D.C. 2000), *aff'd sub nom. Bao v. Li*, 35 Fed. App'x 1 (D.C. Cir. 2002), but that case actually supports Defendants.  In *Bao*, prisoners in Chinese labor camps sued Adidas and others for profiting from the plaintiffs' manufacture of Adidas soccer balls while in prison.  The court held that there was no state action and dismissed, observing that "Plaintiffs . . . do not allege that Adidas had a direct role in either plaintiffs' incarceration or their treatment while in prison."  201 F. Supp. 2d at 22.  The requirement of a private actor's "direct role" in acts of incarceration or mistreatment by a state actor is dispositive of Plaintiffs' claims here as well.

### E.    Several Of The ATS Claims Are Otherwise Defective

Apart from all the foregoing defects, the SAC does not allege actionable claims for (a) cruel, inhuman, and degrading treatment ("CIDT"), (b) forced labor, or (c) crimes against humanity ("CAH").  Mot. 28-31.  Plaintiffs' Opposition does not change that conclusion.

***CIDT***.  Plaintiffs concede that the sole federal appellate court to have addressed the issue

1    since *Sosa* concluded that CIDT claims are not actionable under the ATS.  Mot. 28-29 (citing

2    *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005)).  Without

3    acknowledging *Aldana*, Plaintiffs rely on four district court decisions, none of which contends

4    with *Sosa*'s requirement of universal acceptance and specific definition, or is otherwise

5    persuasive.[9]  Opp. 27.  The CIDT claims should be dismissed.

6         ***Forced Labor***.  Plaintiffs concede that forced labor while in prison is not actionable.  Their

7    sole argument is that the three Plaintiffs with forced labor claims were imprisoned without due

8    process.  Opp. 27.  That argument, if accepted, would give every U.S. prisoner an international

9    law claim for forced labor based on a mere allegation of due process violations.  *Sosa* properly

10   rejected that possibility.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 736 (2004) (rejecting any "cause

11   of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the

12   jurisdiction in which it took place").

13        ***CAH***.  Plaintiffs concede there was no "systematic" wrongdoing here, and instead defend

14   their CAH claim based on a purportedly "widespread . . . attack against [a] civilian population."

15   Mot. 30; *see* Opp. 28.  The SAC contradicts that argument:  If the "civilian population" is the 70 -

16   100 million Falun Gong participants alleged in the SAC, a "widespread attack" would have

17   involved more than the "many thousands" individuals who allegedly were injured over many

18   years.  *See* SAC ¶¶ 48, 366; Opp. 28.  At most, the SAC alleges independent acts of police

19   misconduct, incident to the enforcement of Chinese laws banning Falun Gong.  As *Mamani v.*

20   *Berzain*, 654 F.3d 1148, 1156 (11th Cir. 2011), made clear, the existence of CAH must be

21   assessed against the background and scale of law enforcement activities.  *Cabello v. Fernandez-*

22   *Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005), cited by Plaintiffs (Opp. 28), confirms the same

23   conclusion, and counsels dismissal here.

---

24
25   [9]   *Doe v. Qi*, 349 F. Supp. 2d 1258, 1232-24 (N.D. Cal. 2004), was criticized in *Roe v.*
     *Bridgestone Corp.*, 492 F. Supp. 2d 988, 1023 (S.D. Ind. 2007), for relying on authority that *Sosa*
26   held  "could not be used to support a claim under the ATS."  *Doe v. Nestle, S.A.*, 748 F. Supp. 2d
     1057, 1077 (C.D. Cal. 2010), was vacated by the Ninth Circuit, 738 F.3d 1048, without discussion
27   of CIDT.  *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1093 (N.D. Cal. 2008), noted that
     "[t]here is no widespread consensus regarding the elements of [CIDT]."  And *Mujica*, 381 F.
28   Supp. 2d at 1183, *dismissed* CIDT claims to prevent "foreign plaintiffs [from] litigat[ing] claims
     in U.S. courts that bear a strong resemblance to intentional infliction of emotional distress."

## II.     THE STATE-LAW PERSONAL INJURY CLAIMS SHOULD BE DISMISSED

### A.     The Claims Should Be Dismissed For Lack Of Federal Jurisdiction

Defendants' motion demonstrated that the state-law claims should be dismissed for lack of subject matter jurisdiction because the SAC does not allege (a) original jurisdiction or facts demonstrating complete diversity, or (b) an actionable federal question under the ATS, TVPA, or ECPA.  Mot. 31.  Plaintiffs address these issues in a footnote, which concedes that the SAC does not allege complete diversity and requests leave to address the issue by way of an unspecified amendment in yet a *fourth* complaint.  Opp. 30 n.57.  That request should be denied.  Nor should this Court accept Plaintiffs' invitation to exercise supplemental jurisdiction:  the Supreme Court has instructed that "state claims should be dismissed" where federal jurisdiction is otherwise absent, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)—a holding that is particularly relevant at this early stage, prior to any discovery or other proceedings.[10]

### B.     California Tort Law Does Not Apply Extraterritorially

Even if this Court had jurisdiction over Plaintiffs' state-law claims, each of those claims should be dismissed nonetheless because they rest on extraterritorial conduct and injuries that are beyond the scope of California tort law.  In opposition, Plaintiffs *concede* that California tort law does not apply extraterritorially; they merely argue that the "The Presumption [A]gainst Extraterritoriality Does Not Apply" on the facts at issue here, because in their view the SAC alleges acts (though no injury) in California.  Opp. 30.  As a threshold matter, by conceding the prohibition against extraterritorial application of California tort law, Plaintiffs admit that a decision by this Court dismissing the ATS claims on grounds of extraterritoriality—required for the reasons discussed in Section I(A) above—would also doom the SAC's state-law claims.  That was the holding as to parallel ATS and state-law claims in *Roe v. Bridgestone Corp.*, 492 F. Supp.

---

[10]     *See Ringgold-Lockhart v. County of L.A.*, No. 11-56973, 2014 WL 92509, at *1 (9th Cir. Jan. 10, 2014) (unpublished) ("Because the federal claims were properly dismissed at an early stage of the proceedings, in this case it would be abuse of discretion . . . to exercise jurisdiction over the remaining state-law claims."); *Kaplan v. Cent. Bank of Islamic Republic of Iran*, -- F. Supp. 2d --, No. 10-cv-483, 2013 WL 4427943, at *17 (D.D.C. Aug. 20, 2013) (dismissing ATS claims as extraterritorial even though wrongdoing affected some Americans, and declining to exercise supplemental jurisdiction over remaining Israeli-law tort claims, holding that "[p]rinciples of comity indicate that these claims under Israeli law are best addressed by Israeli courts").

1    2d 988, 1024 (S.D. Ind. 2007), and as to similar sets of claims in *In re Chiquita Brands*

2    *International, Inc.*, 792 F. Supp. 2d 1301, 1355 (S.D. Fla. 2011), and *Romero v. Drummond Co.,*

3    *Inc.*, 552 F.3d 1303, 1318 (11th Cir. 2008), as discussed in Defendants' motion (at 32-33).

4    Plaintiffs fail to contend with those cases or their application here, merely calling them "tenuous"

5    and lacking in "reasoning." Opp. 31.

6         Likewise, Plaintiffs cannot identify any basis on which this Court might exercise

7    prudential standing as to the alleged injuries at issue. Plaintiffs argue, in a footnote, that

8    California's interest in regulating activity within its borders suffices to bring the SAC's tort claims

9    within this State's zone of interests. Opp. 31 n.58. But that argument ignores that all of the

10   alleged injuries and relevant conduct occurred in China, at the hands of Chinese authorities. Even

11   were that not so, California's choice of law rules recognize that *China*, not California, has the

12   greater interest in adjudicating alleged torts that occurred within China's borders, particularly

13   where, as here the torts were committed by Chinese authorities and law enforcement personnel.[11]

14        **C.     The State-Law Claims Are Untimely**

15        As an independent basis for dismissal of the state-law claims, Defendants' motion showed

16   that each of the claims[12] was filed outside the applicable one- or two-year statute of limitation.

17   Mot. 33-34. In their Opposition, Plaintiffs concede that those one- and two-year limitations

18   periods apply to their claims, and also concede that each of the state-law claims asserted by each

19   of the Plaintiffs was filed outside of those periods. Opp. 33.[13] Plaintiffs' sole argument is thus a

---

[11]    Plaintiffs miss the mark in attempting to distinguish California's governmental interest test from the lex loci test applied in *Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008). Opp. 31; *see Tucci v. Club Mediterranee, S.A.*, 107 Cal. Rptr. 2d 401, 411 (Cal. Ct. App. 2001) ("[The place of injury has a] legitimate interest in seeing that its law determines the consequences of actions within its borders causing injury to people there and its interest in predictably and finally limiting liability predominate and would be significantly undermined if its laws were not applied. Our Supreme Court and the Ninth Circuit have both [applied] the law of the foreign jurisdiction where the conduct occurred causing injury there.") (citations omitted); *Deirmenjian v. Deutsche Bank AG*, No. 10-56359, 2013 WL 6407025, at *3 (9th Cir. Dec. 9, 2013) ("Turkey's interests in applying its laws to conduct that occurred within its borders, in dissuading forum shopping, and in regulating suits against companies doing business there predominate over California's interests.").

[12]    Plaintiffs have waived reliance on Chinese law by conceding that the SAC does not purport to assert claims under Chinese law and that they have failed to file a notice of reliance upon foreign law pursuant to Fed. R. Civ. P. 44.1. *See* Mot. 33 n.21; Opp. 32 n.60.

[13]    Defendants' motion demonstrated that two years is also the longest statute of limitation period under Chinese law, and Plaintiffs do not disagree. *See* Mot. 33 n.22; Opp. 32. Plaintiffs' vague

---

1    flawed request for "equitable tolling." *Id.*

2          To begin with, Plaintiffs cannot escape the federal equitable tolling doctrine, which

3    restricts tolling to cases of impossibility, by relying on "*California's* equitable tolling doctrine."

4    *See* Opp. 33 n.63 (emphasis added) (arguing that federal doctrine is "inapplicable").  California's

5    equitable tolling doctrine, quoted in Plaintiffs' brief as purportedly controlling here, is not a

6    generalized tolling doctrine but rather a specific doctrine limited in its application to situations in

7    which "an injured person has several legal remedies and, reasonably and in good faith, pursues

8    one."  *Yeager v. Bowlin*, 495 Fed. App'x 780, 782 (9th Cir. 2012) (quoting *McDonald v. Antelope*

9    *Valley Cmty. Coll. Dist.*, 194 P.3d 1026, 1031 (Cal. 2008)).  Thus, in *Yeager*, the Ninth Circuit

10   affirmed statute of limitations dismissal and denied equitable tolling under California law,

11   because, as here, plaintiff "[did] not point to any evidence" that he was pursuing an alternate

12   remedy while the statute of limitations was running.  *Id.*  There is no generic California tolling

13   principle comparable to the federal "equitable tolling" doctrine that Plaintiffs disclaim; California

14   sets forth its tolling rules by statute.  *See* 3 Witkin, California Procedure § 694, p. 914 (5th ed.

15   2008) (listing statutory tolls).  Thus, if California tolling rules apply, as Plaintiffs contend, then the

16   state-law claims should be dismissed because Plaintiffs have not identified a statutory toll.[14]

17         Even under federal law, there is no basis for an equitable toll.  Although Plaintiffs cite two

18   ATS cases (Opp. 33),  cases tolling international law claims do not justify tolling the short 1- and

19   2-year limitation periods that California's legislature has adopted as to ordinary tort claims for

20   assault, battery, and the like.  More important, the claims in Plaintiffs' cases were filed against

21   members of oppressive regimes *after the regimes fell*.[15]  Bringing suit *while the regime was*

22   *standing* would have contradicted any argument for a toll based on the "impossibility" of suing

23   ─────────────────────
     citation to purported tolling principles under Chinese law is inapposite because Plaintiffs have
24   waived reliance on Chinese law (*see* Mot. 33 n.21) and have not demonstrated whether, how, or
     why Chinese tolling principles would apply here (Opp. 32-33).

25   [14]    Plaintiffs appear to concede that the *only* toll applicable to the assault and battery claims of
     Does I, III, IV, and IX is California's two-year statutory toll for imprisonment.  Opp. 34 n.65.
26   Although Plaintiffs concede that this statutory toll would at most save claims that accrued after
     May 2007 (*id.*), the SAC does not allege any injuries after that date.  *See* Mot. 34 & n.24.
27   Moreover, the limitations period as to Doe IX is measured from August 4, 2013, when he was
     added as a Plaintiff—not May 2011 when this action commenced.  *See* Mot. 34 n.23.
     [15]    *See Hilao*, 103 F.3d at 773 (claims tolled until Ferdinand Marcos left office); *Doe v. Saravia*,
28   348 F. Supp. 2d 1112, 1147-48 (E.D. Cal. 2004) (claims tolled until El Salvadorian regime fell).

due to fear of reprisals.  Yet Plaintiffs here seek to do just that—arguing that it was "impossible" to sue during the limitations period because the PRC regime was in place, but ignoring that they actually did so.  Opp. 34 n.64.  Tolling is impermissible in this context.

Finally, Plaintiffs wrongly argue that there is no "policy interest" in adhering to California's limitations periods.  Opp. 34.  The opposite is true.  Statutes of limitation are "favored in the law, 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"  *Adams v. Paul*, 904 P.2d 1205, 1211 (Cal. 1995) (quoting *Telegraphers v. Ry. Express Agency* 321 U.S. 342, 348-349 (1944)).  Those policy interests are particularly relevant here because the SAC implicates the actions and intent of many Chinese witnesses over many years.  Statutes of limitation are designed to ensure fairness to defendants in just such situations.

### D.    The State-Law Allegations Do Not Support Aiding And Abetting Liability

Even if this Court were to reach the substance of Plaintiffs' allegations, Plaintiffs' state-law aiding and abetting claims should be dismissed for the independent reason that they fail to allege an "intent of facilitating the commission of th[e] tort" at issue.  Mot. 36 (quoting *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 407 (Cal. Ct. App. 2005) (emphasis omitted)).  In opposition, Plaintiffs argue that the SAC alleges "knowledge," which in their view is sufficient to state a claim.  Opp. 34-35.  That is mistaken.  In *Casey* and subsequent cases, California courts have made clear that generic "knowledge" of possible wrongdoing is insufficient.  Rather, it is "[e]ssential" that "the defendant had actual knowledge of the *specific primary wrong* with which he substantially assisted."  *EMC Corp. v. Sha*, No. 13-CV-0118 EJD, 2013 WL 4399025, at *5 (N.D. Cal. Aug. 13, 2013) (emphasis added) (citations and quotation marks omitted).  A "vague suspicion of wrongdoing," or generalized knowledge of "wrongful or illegal conduct" does not suffice.  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 n.4 (9th Cir. 2006) (citation and quotation marks omitted).  Likewise, "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting."  *Austin B. v. Escondido Union Sch. Dist.*, 57 Cal. Rptr. 3d 454, 469 (Cal. Ct. App. 2007).  The SAC's allegations do not and cannot satisfy that standard for the reasons discussed in Section I(B) above.  Far from having knowledge

1   and intent to facilitate a "specific primary wrong" (*i.e.*, the twelve Plaintiffs' alleged injuries), the

2   SAC nowhere even alleges that Cisco knew of the Plaintiffs or their alleged injuries.

3       **E.       The State-Law Claims Fail To Allege Causation**

4           Defendants' Motion showed that the state-law claims should be dismissed because the

5   SAC does not allege that Defendants or the Golden Shield actually or proximately caused

6   Plaintiffs' injuries.  Mot. 37-38.  As Defendants explained (Mot. 37), the SAC at most alleges that

7   the Golden Shield helped identify individuals violating China's laws—not that it caused physical

8   injuries allegedly inflicted in some cases years later by people many steps removed from those

9   with access to the Golden Shield.  Plaintiffs' Opposition admits that, for nine of the twelve

10  Plaintiffs, the Golden Shield was *not even the sole method* by which government authorities

11  identified them.[16]  As to these nine Plaintiffs, the Golden Shield was but one among many tools

12  that the Chinese police used to enforce Chinese law, and for this reason alone did not actionably

13  cause injury.  The remaining three Plaintiffs' claims fare no better, because other than alleging that

14  the Golden Shield was used to identify these Plaintiffs, the SAC does not allege that the Golden

15  Shield—described as a system of hardware and software—was a cause of, or "indispensable to,

16  the infliction of *subsequent* harms including, battery, assault, and false imprisonment."  Opp. 36

17  (emphasis added).  Plaintiffs' claims should be dismissed on this basis.

18  **III.    THE UNFAIR BUSINESS PRACTICES CLAIM SHOULD BE DISMISSED**

19      **A.       The UCL Does Not Apply Extraterritorially**

20          As Defendants' Motion established, the UCL claim should be dismissed because "'none of

21  the alleged misconduct or injuries occurred in California.'"  Mot. 38 (quoting *Meridian Project

22  Sys., Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005)).  In opposition,

23  Plaintiffs concede that the UCL does not apply extraterritorially, and ignore the cases cited in

24  Defendants' motion.  Instead, Plaintiffs argue that their UCL claim should survive because, in

25  their view, the alleged "acts of unfair competition took place *within* California."  Opp. 36

---

26  [16]  *Compare* Pls.' Opp. to Defs.' Mot. to Dismiss SAC at 35-36 & n.69, Dkt. 123 (Dec. 19, 2013),
27  *with* Pls.' Corrected Opp. to Defs.' Mot. to Dismiss SAC at 35-36 & n.69, Dkt. 125-1 (Dec. 24,
    2013) ("three plaintiffs … identified via the Golden Shield", and nine "identified solely (or
28  essentially) via the Golden Shield"); *see also, e.g.*, SAC ¶ 334 ("The Golden Shield was used to
    assemble information about [Liu Guifu] *following* her initial arrest.") (emphasis added).

---

1    (emphasis in original).   That mischaracterizes the SAC, which alleges no relevant conduct in

2    California (*see* Section I(A) above), and in particular alleges no *acts of unfair competition* in

3    California.   Moreover, of the three cases on which Plaintiffs rely, two have been expressly

4    distinguished by the California Supreme Court as involving a false advertising statute not at issue

5    here,[17] and the third involved both conduct and injuries in California.[18]  Opp. 36 & n.70.

6         **B.      The Allegations Of Lost Income Are Too Attenuated**

7         The UCL claim also should be dismissed for the independent reason that there is no

8    cognizable relationship between Cisco's alleged acts and Plaintiffs' alleged lost income.  *See* Mot.

9    38.   The SAC fails to allege that Cisco's acts, or the Golden Shield, caused Plaintiffs' alleged

10   *physical injuries*—much less that Cisco obtained an "unfair competitive advantage over its

11   competitors" that deprived Plaintiffs of income.  SAC ¶ 455.  Plaintiffs, who are not consumers or

12   competitors of Cisco, lack standing to recover purported lost wages through the UCL.   *See*

13   *Kwikset Corp. v. Sup. Ct.*, 246 P.3d 877, 881, 883 (Cal. 2011) (UCL's purpose "is to protect both

14   consumers and competitors" and Proposition 64 "eliminate[d] standing for those who have not

15   engaged in any business dealings with would-be defendants") (quotation marks omitted); *Jane*

16   *Doe I v. Wal-Mart Stores, Inc.*, No. CV 05-7307, 2007 WL 5975664, at *6 (C.D. Cal. Mar. 30,

17   2007), *aff'd*, 572 F.3d 677 (9th Cir. 2009) (no case supporting "injury in fact when the plaintiff is

18   not a consumer").

19   **IV.    THE ECPA CLAIM SHOULD BE DISMISSED**

20        Defendants' Motion showed that Plaintiffs' ECPA claim should be dismissed for the three

21   independent reasons:  (a) the ECPA does not apply extraterritorially, (b) there is no private right of

22   action, and (c) the allegations concern exempted ordinary business activity.  Mot. 39.  Plaintiffs'

---

23   [17]    Specifically, the California Supreme Court rejected *Wershba v. Apple Computer, Inc.*, 110 Cal.

24   Rptr. 2d 145, 160 (Cal. Ct. App. 1999) and *Clothesrigger, Inc., v. GTE Corp.*, 236 Cal. Rptr. 605, 610 (Cal. Ct. App. 1987) as support for the extraterritorial application of the UCL, holding those

25   cases "inapposite because they dealt with California Business & Professions Code section 17500, not section 17200, which specifically makes the dissemination of fraudulent or misleading

26   advertising an unlawful act under the UCL." *Fontenberry v. MV Transp., Inc.*, No. 12-CV-01996, 2013 WL 6182587, at *4 n.4 (E.D. Cal. Nov. 25, 2013) (citing *Sullivan v. Oracle Corp.*, 254 P.3d

27   237, 248 n.10 (Cal. 2011)).  Plaintiffs' reliance on *Wershba* and *Clothesrigger* therefore fails.  *See* Opp. 36 (conceding that Plaintiffs' claims arise under Section 17200, not Section 17500).
     [18]   *Parks v. Eastwood Ins. Servs., Inc.*, No. CV 02–507, 2002 WL 34370244, at *2 (C.D. Cal. July

28   29, 2002) ("wrongdoing [injured] . . . Californian Solicitors … [and] occurred in California …").

1  opposition does nothing to undermine these conclusions.

2  **A.  The ECPA Does Not Apply Extraterritorially**

3  Plaintiffs concede that the ECPA does not apply extraterritorially.  Opp. 37.  They instead

4  argue, *first*, that the location of their purported injuries is irrelevant to extraterritoriality.  That is

5  wrong:  The locus of injury is crucial, and indeed the SAC's ninth cause of action explicitly

6  alleges that the ECPA claim is based on alleged injuries in China, where "Plaintiffs' electronic,

7  wire and/or oral communications were intercepted, disclosed, and intentionally used."  SAC ¶ 421.

8  Having pleaded an ECPA claim in terms of Chinese interception and injury, Plaintiffs cannot

9  argue that they "do not plead . . . the [ECPA] claim of interception."  Opp. 37.

10  *Second*, Plaintiffs argue that the SAC alleges "relevant marketing, design and some

11  manufacturing . . . in California."  *Id.*  That is equally flawed.  Section 2512 of the ECPA extends

12  liability to a person who "*manufactures, assembles, possesses, or sells*," certain devices.

13  Apparently recognizing this requirement, the Complaint and First Amended Complaint both

14  alleged that Cisco had "manufactured, assembled, possessed, and sold" the devices at issue.

15  Compl. (Dkt. 1) ¶ 277; FAC ¶ 304.  The SAC, by contrast, makes no such allegation.  Instead,

16  Plaintiffs studiously *deleted* those allegations from the SAC, and substituted the allegation that

17  Defendants "*designed, implemented, optimized, serviced, and made available* to Public Security

18  and Party officers the components and integrated systems required to create and operate the

19  Golden Shield."  SAC ¶ 418 (emphasis added).  The change is a concession that the devices at

20  issue were, at most, "manufactured, assembled, possessed, and sold" *in China*, in a manner not

21  actionable under the ECPA.[19]

22  **B.  There Is No Private Right of Action Under ECPA § 2512**

23  Defendants' Motion established that Plaintiffs' ECPA claim should be dismissed for the

24  independent reason that Section 2512 of the ECPA has been held to lack a private right of action

---

25  [19]  Although Plaintiffs weakly state that they allege "some manufacturing . . . in California"
26  (Opp. 37), the SAC at most alleges that, on "information and belief, San Jose manufactured key
   components of the Golden Shield in the [U.S.], such as Integrated circuit chips that function in the
27  same manner as the Central Processing Unit of a computer, i.e., its 'brain.'"  SAC ¶ 126.  A
   computer chip is not a "device … primarily useful for the purpose of the surreptitious
   interception" of electronic communications.  ECPA § 2512.  Also, the SAC alleges the Golden
28  Shield was "construct[ed] and implement[ed] in China."  SAC ¶ 107; *see also id.* ¶¶ 151, 205.

1   by (a) every Circuit to have considered the issue, (b) the majority of district courts to have

2   considered the issue, and (c) the most recent court to have considered the issue. Mot. 40. In

3   opposition, Plaintiffs pronounce (Opp. 38) that this is "no longer the majority view," but cite

4   nothing in support of that characterization other than a decade-old assessment contained in an

5   often-criticized unpublished district court decision that was issued *before* the Fifth and Eleventh

6   Circuit decisions on which Defendants rely.[20]  A more recent assessment of the "majority view"

7   was delivered just last year:  "Cases that hold to the contrary [*i.e.*, that private plaintiffs may sue

8   for violations of ECPA § 2512] represent a minority view…." *Luis v. Zang*, No. 11-CV-884, 2013

9   WL 811816, at *8 n.5 (S.D. Ohio Mar. 5, 2013).  This Court should so hold as well.

10          **C.      The Allegations Concern Exempted "Normal Course of Business" Activity**

11          Plaintiffs' acknowledgement that "normal course of business" activity is exempt from

12  ECPA (Opp. 38) also disposes of their claim:  It is difficult to conceive of activity closer to

13  Cisco's "normal course of business" than the sale of technology products.  As discussed *infra* 22-

14  23 & n.23, Plaintiffs' argument threatens to convert into crimes the same commercial activities

15  that the U.S. political branches have repeatedly permitted.[21]

16  **V.     THE CLAIMS AGAINST CISCO EXECUTIVES SHOULD BE DISMISSED**

17          Plaintiffs' Opposition confirms that their attempt to tar Cisco's high-level executives with

18  liability is a mere public relations ploy.  Contrary to Plaintiffs' protests (Opp. 39), the three

19  allegations Plaintiffs highlight are wholly "conclusory" and "generic":  (1) that Cisco's CEO met

20  with the President of China "where he explained how Cisco could help Jiang control the Internet

21  through advanced information security networks and technology" (SAC ¶ 197);[22] (2) that, as CEO,

22

23  [20]  *Compare DIRECTV, Inc. v. Gallagher*, No. 03-2474, 2004 U.S. Dist. LEXIS 28008, *16-19
    (D.N.J. Apr. 29, 2004), *with DirecTV, Inc. v. Treworgy*, 373 F.3d 1124, 1128-29 (11th Cir. 2004)
24  and *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 539 (5th Cir. 2005).
    [21]  Plaintiffs theorize, by analogy to other ECPA provisions, that an activity might constitute
25  "normal course of business" if there is a "nexus between the need to engage in the . . . [disputed
    activity] and the subscriber's ultimate business. . . ."  Opp. 38 n.75 (bracketed text supplied)
26  (quotation marks omitted).  That test would require dismissal of the ECPA claim here, due to the
    nexus between Cisco's fundamental "need to engage" in the design and sale of networking
27  equipment and its "ultimate business."
    [22]  The SAC alleges that "according to at least one expert, the *douzheng* objective of the Golden
28  Shield apparatus was discussed at these meetings."  SAC ¶ 199.  This apparently is not a fact that
    Plaintiffs know, or even know "on information and belief," but rather is the speculation of "at least

1   he "authorized, ratified and directed," the activities of his company; and (3) that he "had access" to

2   newspaper articles and shareholder resolutions concerning Falun Gong, and Cisco's "responses"

3   thereto.  Opp. 39.  Similarly as to Defendant Cheung, the most Plaintiffs can muster is that he

4   "supervised, managed, supported, furthered and ratified" acts taken by "Cisco China[,]" and

5   allegedly recognized that the Golden Shield could "stop" those who were practicing Falun Gong

6   in violation of Chinese law, and thereby enhance "social stability."  *Id.*  To describe these

7   arguments is to rebut them.  The claims against Cisco's executives should be dismissed.

8   **VI.   THE SAC SHOULD BE DISMISSED AS NONJUSTICIABLE**

9       If not dismissed on other grounds, the SAC should be dismissed as nonjusticiable, for

10  reasons set forth in Defendants' Motion.  Mot. 44.  Plaintiffs' Opposition confirms that

11  conclusion.

12      **A.      Political Question and Foreign Affairs Preemption**

13      Plaintiffs' objections to the political question doctrine and foreign affairs preemption are

14  mistaken.  *First*, Plaintiffs argue that "none of Plaintiffs' *tort claims* requires the Court to judge

15  foreign policy decisions."  Opp. 44 (emphasis added).  At the threshold, this focus on "tort claims"

16  mischaracterizes the SAC, which not only asserts ordinary "tort claims" but also, predominantly,

17  international law claims associated with the human rights issues that this nation's political

18  branches have addressed.  *See* Mot. 44.  In any event, Plaintiffs' argument would apparently

19  extend liability to *any* person or entity who sells crime-control equipment to Chinese authorities

20  after having seen newspaper reports concerning purported human rights abuses in China.  *See*

21  SAC ¶ 161 (alleging knowledge based in part on "*Associated Press* reports") (italics in original).

22  Such open-ended liability for engaging in trade with China is what the political branches rejected

23  when, in direct response to the human rights concerns raised by Plaintiffs, they decided to

24  regulate, not ban, sales of crime control equipment to Chinese authorities.[23]  Although Plaintiffs

25

26  one" unnamed individual with unspecified "expert[ise]," which even Plaintiffs have not adopted.
    Such allegations cannot survive *Iqbal* and *Twombly*.

27  [23]   Plaintiffs cite various political materials that actually support *Defendants'* argument.  *See, e.g.*,
    Opp. 47-48 n.94 (citing legislation that permits but does not require the President to ban certain

28  goods, and which the President has not banned); *id.* 47 n.92 (four-year-old suggestion that the
    Commerce Department was "drafting" a "proposed rule" that has not been issued).

"do not allege any violation of federal export statutes" (Opp. 47), sustaining their claims would effectively permit Plaintiffs, as "private parties to impose embargos or international sanctions through civil actions in United States courts," *Talisman*, 582 F.3d at 264, in a manner that "imping[es] on the discretion of the [political branches] in managing foreign affairs," *Sosa*, 542 U.S. at 727.

*Second*, as to the political question doctrine, Plaintiffs assert that there are "judicially discoverable and manageable standards" for resolving their claims.  Opp. 46.  Yet other than citing the Manual for Complex Litigation and the like, Plaintiffs do not identify the "standards" or explain how this Court could *apply* them in a manner "capable of granting relief in a reasoned fashion" (Opp. 46 (quoting *Alperin v. Vatican Bank*, 410 F.3d 532, 553 (9th Cir. 2005)), particularly as to the SAC's request that this Court second-guess Chinese authorities' acts and provide relief, including ongoing injunctive relief, to Plaintiffs and "many thousands" of others.

*Third*, also as to the political question doctrine, Plaintiffs rely on the Executive Branch's failure to intervene here, to date, as evidence that this case does not interfere with the nation's foreign policy.  Such an inference-from-silence should be rejected, particularly in light of the Executive Branch's statement of interest urging against adjudication of *Doe v. Qi*, a case that concerned Falun Gong practitioners' ATS/TVPA claims seeking relief from the same alleged policies at issue here.  *See* Mot. 47-48.  Moreover, Plaintiffs disregard *Kiobel*, which dispensed with the need for case-specific Executive Branch submissions by holding that "the danger of unwarranted judicial interference in the conduct of foreign policy," particularly as to ATS claims concerning "conduct within the territory of another sovereign," would be avoided by declining to apply the ATS extraterritorially in the first place.  133 S. Ct. at 1664-65, 1669.

## B.    Act Of State

Plaintiffs' arguments concerning the act of state doctrine are also unpersuasive.  *First*, Plaintiffs argue that the alleged acts of violence were not acts of state because they were done *ultra vires* and in violation of international law.  Opp. 40-41.  That is a red herring.  Whether or not the alleged *violence* was *ultra vires*, it is impossible to adjudicate Plaintiffs' claims without second-guessing the formal public acts taken by the sovereign state of China as to its legislative,

1    executive, and judicial response to Falun Gong—including the passage of laws banning Falun

2    Gong; the apprehension and punishment of Plaintiffs for violating those laws; and the conception

3    and construction of the Golden Shield.[24]

4         *Second*, Plaintiffs' arguments concerning the act of state "factors" are without merit.  In

5    *Liu v. Republic of China*, on which Plaintiffs rely heavily, the Ninth Circuit held that the act of

6    state doctrine "is a flexible one designed to prevent judicial pronouncements on the legality of the

7    acts of foreign states which could embarrass the Executive Branch in the conduct of foreign

8    affairs," and that "[t]he 'touchstone' or 'crucial element' is the potential for interference with our

9    foreign relations."  892 F.2d 1419, 1432 (9th Cir. 1989) (citations omitted).  As discussed above, it

10   is not this Court's role to pronounce upon the legality of the Chinese government's acts within its

11   own borders in response to Falun Gong and Plaintiffs' unlawful acts.  As to Plaintiffs' other

12   arguments (Opp. 41-43), (1) the factual and legal issues associated with extending secondary

13   liability to a U.S. corporation and its executives in the circumstances here are not the subject of

14   settled "consensus," and (2) the notion that China experienced "regime change" last year is false,

15   and contradicts Plaintiffs' contention that the purported Falun Gong "crackdown" is ongoing.

16   Likewise, Plaintiffs' contention that violations were committed by PRC "[s]ecurity officers" (Opp.

17   29), and that the SAC alleges "state action" (*id.*), are dispositive of Plaintiffs' attempt to attribute

18   all wrongdoing to the CCP (Opp. 42).

19        **C.    International Comity**

20        Plaintiffs' opposition (Opp. 50) to the international comity doctrine is also mistaken.  *First*,

21   the doctrine does not require a "conflict" between the laws of two states:  Plaintiffs' authority,

22   *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993), discussed a canon of statutory

23   construction—not the discretionary abstention doctrine at issue here.[25]  *Second*, as Plaintiffs

24

---

25   [24]  *Accord Cooper v. Tokyo Elec. Power Co., Inc.*, No. 12CV3032, 2013 WL 6875866, at *4 (S.D.

26   Cal. Nov. 26, 2013) (political question dismissal where impossible to "establish that [corporation]
     actually or proximately caused . . . injuries without delving into the 'factual basis and rationale'
     for purely discretionary judgments made by military commanders") (citation omitted).

27   [25]  *See In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996) ("'[I]nternational
     comity' may describe two distinct doctrines:  as a canon of construction, it might shorten the

28   reach of a statute; second, it may be viewed as a discretionary act of deference…."); *Ungaro-*

---

1  concede, no authority requires an adequate foreign forum as a necessary element of comity. *Third*,

2  in arguing that there is "no evidence" that adjudication would entangle this Court in international

3  relations (Opp. 50), Plaintiffs ignore the statement submitted by the People's Republic of China in

4  *Qi*, which expressly objected to the adjudication of "'Falun Gong' . . . lawsuits" in U.S. courts, on

5  the basis that they "would cause immeasurable interferences to the normal exchanges and

6  cooperation between China and the United States." Mot. 48. The salience of international comity

7  considerations to ATS and TVPA cases such as this one, already emphasized twice in *Sosa* and

8  *Kiobel*, was highlighted yet again in *Daimler AG v. Bauman*, which criticized the "Ninth Circuit

9  [for] . . . pa[ying] little heed to the risks to international comity in its expansive view of general

10  jurisdiction," in the context of ATS/TVPA claims against a corporation. 134 S. Ct 746, 763

11  (2014) (foreign corporation cannot be sued for foreign conduct by foreign plaintiffs in a U.S. state

12  where it is not "at home"). The Supreme Court's focus on comity there is equally applicable here.

## CONCLUSION

14  The Second Amended Complaint should be dismissed with prejudice in its entirety.

15  DATED:   New York, New York          QUINN EMANUEL URQUHART &
         February 10, 2014                SULLIVAN, LLP

17

18  By:   /s/ Kathleen M. Sullivan
         Kathleen M. Sullivan
         Faith E. Gay
19       Isaac Nesser

20  51 Madison Avenue, 22d Floor,
    New York, New York  10010-1601
21  (212) 849-7000

22  *Attorneys for the Defendants*

23

24

25

26

27

---

28  *Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004) (under the "abstention doctrine[, a] federal court has jurisdiction but defers . . . .").

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's ECF System.

Dated:  February 10, 2014

                                                            /s/ Yelena Konanova
                                                        Yelena Konanova