QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kathleen M. Sullivan (CA Bar No. 242261)
  kathleensullivan@quinnnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood City, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

  Faith E. Gay (*pro hac vice*)
  faithgay@quinnemanuel.com
  Isaac Nesser (*pro hac vice*)
  isaacnesser@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Attorneys for the Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Doe IX, Liu Guifu, Wang Weiyu, and those individuals similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>Cisco Systems, Inc., John Chambers, Fredy Cheung, and Does 1-100,<br><br>        Defendants. | Case No. 5:11-cv-02449-EJD<br><br>**DEFENDANTS' OPPOSITION AND RESPONSE TO BRIEF OF AMICI CURIAE PROFESSORS OF LEGAL HISTORY**<br><br>Hearing date: March 21, 2014<br><br>Time: 9:00 a.m.<br><br>Action Filed: May 19, 2011<br>Judge: Hon. Edward J. Davila<br>Dept: Courtroom 4, 5th Floor |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 2

I.    *AMICI*'S ARGUMENTS ARE FORECLOSED BY *KIOBEL*'S CONCLUSION
      THAT THE FIRST CONGRESS DID NOT INTEND THE ATS TO APPLY TO
      LAW OF NATIONS VIOLATIONS ON FOREIGN SOIL .................................... 2

II.   ALLOWING THE COMPLAINT HERE TO PROCEED WOULD FRUSTRATE
      THE FRAMERS' INTENT THAT THE ATS BE USED TO AVOID, NOT
      FOMENT, INTERNATIONAL CONFLICT ....................................................... 7

III.  THE FOUNDERS INTENDED THE POLITICAL BRANCHES, NOT THE
      JUDICIARY, TO DECIDE FOREIGN RELATIONS QUESTIONS SUCH AS
      THOSE PRESENTED HERE ...................................................................... 12

      A.    The Political Branches Are Entrusted To Resolve Political Questions .................. 12

      B.    Plaintiffs' Claims Are Precluded By The Act Of State Doctrine ........................... 14

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

## Cases

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................12, 13, 14

*Bolchos v. Darrel*,
3 F. Cas. 810 (No. 1,607) (D.S.C. 1795) ...................................................................4

*Doe v. Qi*,
349 F. Supp. 2d 1258 (N.D. Cal. 2004) ....................................................................15

*Doe VIII v. Exxon Mobil Corp.*,
654 F.3d 11 (D.C. Cir. 2011) ........................................................................5, 10, 11

*EEOC v. Arabian American Oil Co.*,
499 U.S. 244, 248 (1991) ..........................................................................................3

*Goldwater v. Carter*,
444 U.S. 996 (1979) .................................................................................................12

*Henfield's Case*,
11 F. Cas. 1099 (No. 6,360) (D. Pa. 1793) ..............................................................10

*Kiobel v. Royal Dutch Petroleum Co.*,
133 S. Ct. 1659 (2013) .................................................................................. *passim*

*Liu v. Republic of China*,
892 F.2d 1419 (9th Cir. 1989) ..................................................................................14

*Morrison v. Nat'l Australia Bank Ltd.*,
130 S. Ct. 2869, 2883 (2010) .....................................................................................1

*Mostyn v. Fabrigas*,
1 Cowp. 161, 98 E.R. 1021 (1774) .............................................................................4

*Moxon v. The Fanny*,
17 F. Cas. 942 (No. 9,895) (D. Pa. 1793) ..................................................................4

*Oetjen v. Central Leather Co.*,
246 U.S. 297 (1918) .................................................................................................13

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*,
582 F.3d 1083 (9th Cir. 2009) ..................................................................................14

*Respublica v. De Longchamps*,
1. U.S. (1 Dall.) 111 (O.T. Phila. 1784) .....................................................................9

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .............................................................................8, 9, 10, 12, 13, 14

*Talisman Energy Inc. v. Republic of the Sudan*,
    582 F.3d 244 (2d Cir. 2009) ...................................................................13

*United States v. The La Jeune Eugenie*,
    26 F. Cas. 832, 847 (No. 15,551) (D. Mass. 1822) ...............................7

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
    493 U.S. 400 (1990) ...............................................................................14

## Statutes, Regulations and Treaties

28 U.S.C. § 1350 ...........................................................................................1, 6

Definitive Treaty of Peace, U.S.-Gr. Brit., Sept. 3, 1783, 8 Stat. 80 .................6

Revisions to the Commerce Control List to Update and Clarify Crime Control License
    Requirements, 75 Fed. Reg. 41078-01 (July 15, 2010)...........................13

Tiananmen Square Sanctions Act, Pub. L. No. 101-246, § 901(b)(3) (1990)......................13

Tiananmen Square Sanctions Act, Pub. L. No. 101-246, § 902(a)(4) (1990).......................13

## Other Authorities

William Blackstone,
    *Commentaries on the Laws of England* (1769) ...................................4, 10

*Breach of Neutrality*,
    1 U.S. Op. Att'y Gen. 57 (1795) ..............................................................5

Brief of *Amici Curiae* Washington Legal Foundation and Allied Educational Foundation
    in Support of Respondents on Reargument, *Kiobel v. Royal Dutch Petroleum Co.*, 133
    S. Ct. 1659 (2013) (No. 10-1491) (filed Aug. 8, 2012), *available at* 2012 WL
    3245484 ...................................................................................................3

Brief for the United States as *Amicus Curiae* in Support of Petitioners, *Am. Isuzu Motors,
    Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) (No. 07-919), *available at* 2008 WL 408389.............13

Brief on Reargument of Professors of Legal History and Federal Jurisdiction, Martin S.
    Flaherty and John V. Orth, as *Amici Curiae* in Support of Petitioners, *Kiobel v. Royal
    Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) (filed June 12, 2012),
    *available at* 2012 WL 2312826...........................................................3, 11

William R. Casto,
    *The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the
    Law of Nations*, 18 Conn. L. Rev. 467 (1986) ......................................4

The Federalist No. 3 (John Jay) ..........................................................................9

The Federalist No. 78 (Alexander Hamilton)......................................................12

*Journals of the Continental Congress* (G. Hunt ed. 1912)...............................9

1   *Journal of the Constitutional Convention* (E. Scott ed. 1893) ........................................9

2   *The Records of the Federal Convention of 1787* (Max Farrand ed. 1911) ........................9

3   John M. Rogers,
4       *The Alien Tort Statute and How Individuals "Violate" International Law*, 21 Vand. J. Transnat'l L. 47 (1988) ........................................................................................9

5   Supplemental Brief of *Amici Curiae* BP America, Caterpillar, Conoco Phillips, General
6       Electric, Honeywell, International Business Machines, and Monsanto in Support of
        Respondents, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-
        1491) (filed Aug. 8, 2012), *available at* 2012 WL 3276506 ........................................3
7

8   Supplemental Brief of *Amicus Curiae* The Cato Institute in Support of Respondents,
        *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) (filed
9       Aug. 8, 2012), *available at* 2012 WL 3245486 ........................................................3

10  Supplemental Brief of *Amici Curiae* Professors of Legal History William R. Casto,
        Charles Donahue, Robert W. Gordon, Nasser Hussain, Stanley N. Katz, Michael
11      Lobban, Jenny S. Martinez, James Oldham, and Anne-Marie Slaughter in Support of
        Petitioners, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-
12      1491) (filed June 13, 2012), *available at* 2012 WL 2165337 ....................................2-3

13  Supplemental Brief for Professors of International Law, Foreign Relations Law and
        Federal Jurisdiction as *Amici Curiae* in Support of Respondents, *Kiobel v. Royal
14      Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) (filed Aug. 8, 2012),
        *available at* 2012 WL 3276505.....................................................................................3

15  Emmerich de Vattel,
16      *The Law of Nations* (J. Chitty ed. 1883) (1758) ..................................................8, 10

17

18

19

20

21

22

23

24

25

26

27

28

1

**PRELIMINARY STATEMENT**

2          Pursuant to this Court's order granting leave to do so (Dkt. 127), Defendants respectfully

3    submit this opposition and response to the Brief of *Amici Curiae* Professors of Legal History

4    William R. Casto, Martin S. Flaherty, Nasser Hussain, Stanley N. Katz, and Jenny S. Martinez in

5    Support of Plaintiffs (Dkt. 128).  *Amici* assert that the Founders intended for the Alien Tort Statute

6    ("ATS"), 28 U.S.C. § 1350, to reach violations of the law of nations committed by U.S. citizens

7    even if those violations occur on foreign soil.  (Dkt. 128 at 1.)  Their premise, however, is

8    foreclosed by the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct.

9    1659 (2013), which held—without distinguishing between cases involving foreign and U.S.

10   defendants—that "the presumption against extraterritoriality applies to claims under the ATS" and

11   that "relief [under the ATS] for violations of the law of nations occurring outside the United States

12   is barred."  *Id.* at 1669 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2883

13   (2010)).

14          The Supreme Court exhaustively reviewed the text, history and purpose of the ATS in

15   *Kiobel*, and found, contrary to *Amici*'s argument, that nothing in the historical materials

16   overcomes the presumption against extraterritorial application of U.S. law to alleged violations of

17   the law of nations occurring outside the United States.  However distinguished *Amici* are as

18   scholars in their academic fields, their arguments cannot override the Supreme Court's own

19   historical analysis and conclusions.  Defendants accordingly urge the Court to disregard *Amici*'s

20   brief in deciding the pending motion to dismiss.

21          If the Court does reach the substance of *Amici*'s historical arguments, then, contrary to

22   *Amici*'s suggestions, those arguments favor dismissal of the Second Amended Complaint

23   ("SAC").  Defendants have no quarrel with *Amici*'s suggestion that "the Founders' intent in

24   enacting the ATS [was] to address international comity concerns and avoid conflicts with other

25   nations."  (Dkt. 128 at 1.)  Defendants dispute, however, that any such purpose is served by ATS

26   allegations like Plaintiffs' here.  Providing a federal forum for violations of the law of nation that

27   occur *in U.S. territory* may help to avert incidents of international strife that could even lead to

28   war; that is the lesson of the famous Marbois incident in Philadelphia that formed a backdrop to

enactment of the ATS.   But allowing ATS claims concerning incidents *within a foreign sovereign's borders* increases rather than decreases the danger of international friction.   This is especially so where, as here, it is alleged that a U.S. citizen *aided and abetted a foreign sovereign* in committing human rights violations against its own citizens within its own sovereign borders.   Such allegations, if allowed to proceed, would place a U.S. federal court in charge of judging foreign acts of state, thus *fomenting*, not avoiding international conflict.   Not a single historical example in *Amici*'s brief involves such an aiding and abetting allegation.   Moreover, to the extent that diplomatic strife arose from any international law violation taking place within foreign territory, the First Congress intended that the Nation's political branches, and not the judiciary, resolve any such disputes.

This Court should therefore recognize that, contrary to *Amici*'s arguments, the ATS does not reach alleged violations of the law of nations occurring within foreign sovereign territory— even in a case against a U.S. defendant.   All of the relevant historical materials support the conclusion that such interference by U.S. courts would increase, not decrease, international conflict, and thus frustrate the purpose of the ATS.

## ARGUMENT

**I.   *AMICI*'S ARGUMENTS ARE FORECLOSED BY *KIOBEL*'S CONCLUSION THAT THE FIRST CONGRESS DID NOT INTEND THE ATS TO APPLY TO LAW OF NATIONS VIOLATIONS ON FOREIGN SOIL**

In *Kiobel*, the Supreme Court considered at length the text, structure and history of the ATS, and concluded that there was no contemporaneous evidence that the First Congress intended that statute to overcome the presumption against the extraterritorial application of U.S. law.   The Court specifically considered numerous historical materials concerning the backdrop to the enactment of ATS, including many of the same historical materials that *Amici* recount here.[1]   The

---

[1]   The reargument in *Kiobel* attracted 30 *amicus* briefs in support of petitioners and 14 in support of respondents (plus 6 in support of neither party).   Many contained extensive historical materials.   Indeed, each *Amicus* here also submitted an *amicus* brief in *Kiobel*, offering many of the same arguments presented in *Amici*'s brief.   *See* Supplemental Brief of *Amici Curiae* Professors of Legal History William R. Casto, Charles Donahue, Robert W. Gordon, Nasser Hussain, Stanley N. Katz, Michael Lobban, Jenny S. Martinez, James Oldham, and Anne-Marie
(*footnote continued*)

1    Court specifically found that nothing in that history indicated any congressional intent to apply the

2    ATS to extraterritorial conduct.  *Amici* should not be permitted to revisit and relitigate those same

3    historical materials here in the face of the Supreme Court's own review of the relevant history and

4    conclusion that all relevant history from the framing period points against the extraterritorial

5    application of the ATS.

6         As *Kiobel* reiterated, the presumption against extraterritoriality provides that, "'[w]hen a

7    statute gives no clear indication of an extraterritorial application, it has none,'" and reflects the

8    premise that "'United States law governs domestically but does not rule the world.'"  *Kiobel*, 133

9    S. Ct. at 1664 (citations omitted).  As the Court further explained in *Kiobel*, the presumption

10   *against* applying U.S. law to conduct occurring within a foreign sovereign's territory "'serves to

11   protect against unintended clashes between our laws and those of other nations which could result

12   in international discord.'"  *Id.* (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248

13   (1991)).  And as the Court concluded in *Kiobel*, "[t]he principles underlying the presumption

14   against extraterritoriality … constrain courts exercising their power under the ATS," *id.* at 1665,

15   and nothing in the text, history or purpose of that statute rebuts the presumption, *id.* at 1665-69.

16        ***Text.***  The Supreme Court began its historical analysis by stating that "nothing in the text

17   of the statute suggests that Congress intended causes of action recognized under [the ATS] to have

18   _____

19   Slaughter in Support of Petitioners, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013)
     (No. 10-1491) (filed June 13, 2012), *available at* 2012 WL 2165337; Brief on Reargument of

20   Professors of Legal History and Federal Jurisdiction, Martin S. Flaherty and John V. Orth, as
     *Amici Curiae* in Support of Petitioners, *id.* (filed June 12, 2012), *available at* 2012 WL 2312826.

21   In addition, numerous *amicus* briefs were filed offering historical arguments in support of
     Respondent Royal Dutch Petroleum Co. and the conclusion the Court ultimately reached in

22   *Kiobel*.  *See, e.g.*, Supplemental Brief of *Amici Curiae* BP America, Caterpillar, Conoco Phillips,
     General Electric, Honeywell, International Business Machines, and Monsanto in Support of

23   Respondents, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491) (filed
     Aug. 8, 2012), *available at* 2012 WL 3276506; Supplemental Brief for Professors of International

24   Law, Foreign Relations Law and Federal Jurisdiction as *Amici Curiae* in Support of Respondents,
     *id.* (filed Aug. 8, 2012), *available at* 2012 WL 3276505; Supplemental Brief of *Amicus Curiae*

25   The Cato Institute in Support of Respondents, *id.* (filed Aug. 8, 2012), *available at* 2012 WL
     3245486; Brief of *Amici Curiae* Washington Legal Foundation and Allied Educational Foundation

26   in Support of Respondents on Reargument, *id.* (filed Aug. 8, 2012), *available at* 2012 WL
     3245484.

27

28

extraterritorial reach"—including the use of the word "tort."  *Id.* at 1665.  The Court specifically rejected the *Kiobel* petitioners' reliance on eighteenth-century precedents like *Mostyn v. Fabrigas*, 1 Cowp. 161, 177, 98 E.R. 1021 (1774) (cited by *Amici*, Dkt. 128 at 12), that had allowed suits for foreign conduct where the law of the place of the conduct was applied under the so-called "transitory tort doctrine."  133 S. Ct. at 1665-66.  *Amici*'s reliance on such cases (Dkt. 128 at 11-13 (citing various cases where English subjects were supposedly liable in English courts for actions abroad)) is similarly unavailing.  *Kiobel* held that transitory-tort cases are quite different from law-of-nations cases under the ATS; thus, the fact that the "transitory tort doctrine" might permit adjudication of foreign torts under the law of the place of injury does not support a federal court's authority "to recognize a cause of action under U.S. law to enforce a norm of international law"—the relevant issue under the ATS.  *Id.* at 1666 (concluding that "[t]he reference to 'tort' does not demonstrate that the First Congress 'necessarily meant' for those causes of action to reach conduct in the territory of a foreign sovereign").

   ***Contemporaneous history:  Marbois.***  *Kiobel* next considered at length "the historical background against which the ATS was enacted," and found that it did *not* "overcome the presumption against application to conduct in the territory of another sovereign."  *Id.* at 1666; *see id.* at 1666-68.  The Court noted that, of the three principal offenses against the law of nations identified by Blackstone and thus familiar to the framing generation, two (violation of safe conducts and infringement of the rights of ambassadors) "have no necessary extraterritorial application," but rather applied historically to conduct *within* the forum nation.  *Id.* at 1666.  The Court further observed that all notorious examples involving the rights of ambassadors contemporaneous with passages of the ATS "involved conduct within the Union"—not conduct abroad.  *Id.* (noting the Marbois incident in Philadelphia and a 1787 incident where a New York police officer arrested a servant within the Dutch ambassador's house) (citing [*Amicus* William R.] Casto, *The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations*, 18 Conn. L. Rev. 467, 494 (1986)); *see also id.* at 1667 (citing *Bolchos v. Darrel*, 3 F. Cas. 810 (No. 1,607) (D.S.C. 1795) (wrongful seizure of slaves from a vessel while in port in the United States); *Moxon v. The Fanny*, 17 F. Cas. 942 (No. 9,895) (D. Pa. 1793); (wrongful seizure

in United States territorial waters)).  The Court concluded that these historical examples "provide no support for the proposition that Congress expected causes of action to be brought under the statute for violations of the law of nations occurring abroad." *Kiobel*, 133 S. Ct. at 1667.  As to the third paradigmatic law of nations violation at the time of the founding (piracy), the Court noted that it "typically occurs on the high seas, beyond the territorial jurisdiction of the United States or any other country," concluding that the existence of a cause of action against pirates is "not … a sufficient basis for concluding that other causes of action under the ATS reach conduct that does occur within the territory of another sovereign." *Id.*

**Contemporaneous history:  Bradford.**  While *Amici* rely at length (*see* Dkt. 128 at 13-15) upon on a 1795 opinion by Attorney General William Bradford, *Breach of Neutrality*, 1 U.S. Op. Att'y Gen. 57 (1795), for the proposition that the framing generation contemplated ATS actions directed at law of nations violations that take place on foreign soil, the Supreme Court specifically rejected the *Kiobel* petitioners' reliance on that opinion.  *Kiobel* concluded that "Attorney General Bradford's opinion defies a definitive reading and we need not adopt one here. Whatever its precise meaning, it deals with U.S. citizens who, by participating in an attack taking place both *on the high seas* and on a foreign shore, *violated a treaty* between the United States and Great Britain." 133 S. Ct. at 1668 (emphases added).  On any interpretation of the Bradford opinion, the Supreme Court suggested, it cannot provide contemporaneous support for the view that the ATS extends to law of nations violations within foreign sovereign borders.

*First*, to the extent that Bradford was locating the American attack on the British outpost in Sierra Leone "on the high seas," it did not involve conduct that occurred on foreign soil or territorial waters.  In his opinion, Bradford stated that "crimes committed *on the high seas are* within the jurisdiction of the district and circuit courts of the United States ….  But there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a *civil* suit in the courts of the United States." 1 Op. Att'y Gen. at 58-59.  *See Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 80-81 (D.C. Cir. 2011) (Kavanaugh, J., dissenting in part) (reviewing Bradford opinion and concluding that, "[w]hen the Bradford opinion finally mentions

1   the ATS, it is focused on acts 'committed on the high seas,' not on acts that occurred in a foreign

2   country").

3          *Second*, to the extent that Bradford was identifying the attack as a violation of a "treaty,"

4   he was not referring to a *law of nations* violation on foreign soil.  The ATS has two separate

5   clauses, a "law of nations" clause and a "treaty" clause; it provides jurisdiction for a tort

6   "committed in violation of the law of nations *or* a treaty of the United States."  28 U.S.C. § 1350

7   (emphasis added).  The treaty in question in the Bradford opinion was not just any treaty—it was

8   the historic 1783 treaty between the United States and Great Britain that ended the Revolutionary

9   War.  And that treaty was expressly extraterritorial, providing that "[t]here shall be a firm and

10  perpetual peace between his Britannic Majesty and the said [United] States, and between the

11  subjects of the one and the citizens of the other, wherefore *all hostilities, both by sea and land*,

12  shall from hence-forth cease."  Definitive Treaty of Peace, U.S.-Gr. Brit., art. VII, Sept. 3, 1783, 8

13  Stat. 80 (emphasis added).  The "all hostilities" language plainly applies to attack and plunder

14  upon the "sea and land" of a British colony such as Sierra Leone.  *Amici* nowhere even mention

15  the 1783 peace treaty—an essential historical data point—in their discussion of the Bradford

16  opinion.

17         In sum, the Supreme Court concluded that the Bradford opinion lacks "definitive" meaning

18  and cannot "suffice[] to counter the weighty concerns underlying the presumption against

19  extraterritoriality."  *Kiobel*, 133 S. Ct. at 1668.  *Amici* thus may not now be heard to argue that the

20  Bradford opinion "clearly indicated that [Bradford] viewed the ATS as one way for foreigners to

21  sue U.S. nationals in U.S. courts for extraterritorial law of nations violations."  (Dkt. 128 at 15.)

22         ***Purpose.***  Finally, in *Kiobel*, after surveying the historical landscape, the Supreme Court

23  concluded that, at the time of the enactment of the ATS, the fledgling United States "was …

24  embarrassed by its potential inability to provide judicial relief to foreign officials injured in the

25  United States," as in the Marbois incident (*see* Dkt. 128 at 9; *infra* Part II), and therefore provided

26  a federal "forum for adjudicating such incidents."  133 S. Ct. at 1668 (citations omitted).  But the

27  Court went on to state that "[n]othing about this historical context suggests that Congress also

28  intended federal common law under the ATS to provide a cause of action for conduct occurring in

1   the territory of another sovereign." *Id.* at 1668-69.  And quoting Justice Story's famous remark

2   that "[n]o nation has ever yet pretended to be the *custos morum* of the whole world," *United States*

3   *v. The La Jeune Eugenie*, 26 F. Cas. 832, 847 (No. 15,551) (D. Mass. 1822), the Court concluded

4   that there was no evidence (and, in fact, found it "implausible") that "the First Congress wanted

5   their fledgling Republic—struggling to receive international recognition—to be the first" nation to

6   pioneer "the enforcement of international norms" through the judicial creation of federal common

7   law.  *Kiobel*, 133 S. Ct. at 1668.  Thus the Supreme Court considered the same history *Amici* have

8   considered, but came to the contrary (and governing) conclusion.

9           For all these reasons, *Amici*'s historical arguments are foreclosed by *Kiobel*'s own

10  historical analysis concerning the Founders' intentions in enacting the ATS.  Defendants therefore

11  respectfully oppose consideration of the brief in connection with the pending motion to dismiss.

12  **II.     ALLOWING THE COMPLAINT HERE TO PROCEED WOULD FRUSTRATE
13          THE FRAMERS' INTENT THAT THE ATS BE USED TO AVOID, NOT
            FOMENT, INTERNATIONAL CONFLICT**

14          If the Court does consider the  merits of *Amici*'s historical arguments, then the very

15  purpose they identify as central to the ATS's enactment—"to address international comity

16  concerns and avoid conflicts with other nations" (Dkt. 128 at 1)—points in favor of *dismissal* of

17  the SAC.  *Amici*'s historical examples of violations triggering such concerns include a

18  Frenchman's assault on French diplomat Marbois in a diplomatic residence in Philadelphia (Dkt.

19  128 at 9-10); an Englishman's suit against the East India Company for the taking of his ship on the

20  high seas (*id.* at 11); and U.S. citizens' attack on British colonial outposts in Sierra Leone (*id.* at

21  14).  *Amici* also cite the historical evolution of criminal prohibitions for piracy on the high seas

22  (*id.* at 18-19) and slave trading (*id.* at 19-20).  Not a single one of these examples bears the

23  slightest resemblance to the ATS allegations in this case, which all involve Cisco's (and its

24  executives') supposed aiding and abetting (through the sale of ordinary networking equipment) of

25  *the Chinese government's law of nations violations against its own citizens in China*.  On *Amici*'s

26  own theory, such allegations (which Amici never specifically discuss in their brief) turn the ATS

27  on its head, for they increase and foment international conflict rather than avoid it.

28

1    As Defendants and *Amici* agree, the ATS was enacted to help prevent the friction with

2  other nations that could arise from commission of violations of the law of nations.  The Framers

3  provided the jurisdiction of the federal courts for a "narrow set of violations of the law of nations

4  … threatening serious consequences in international affairs[] that was probably on minds of the

5  men who drafted the ATS."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004).  As *Sosa*

6  explained, those offenses in the minds of the framing generation were "violation of safe conducts,

7  infringement of the rights of ambassadors, and piracy."  *Id.* (citing 4 William Blackstone,

8  *Commentaries on the Laws of England* 68 (1769) ("Blackstone")).

9    In the late eighteenth century, when the United States was still a fledgling nation, acts such

10  as offenses against ambassadors and infringement of safe conducts could easily result in "serious

11  consequences in international affairs."  *Id.*  A failure by the U.S. to provide a mechanism of

12  redress for these limited acts could thus increase diplomatic conflict or even "rise to an issue of

13  war."  *Id.* (citing Emmerich de Vattel, *The Law of Nations*, bk. IV at 463-64 (J. Chitty ed. 1883)

14  (1758) ("Vattel")).  Blackstone, for example, recognized that infringements of safe conducts could

15  cause international conflict, writing that such offenses:

16          are breaches of the public faith, without the preservation of which
          there can be no intercourse or commerce between one nation and
17          another: *and such offences may, according to the writers upon the
          law of nations, be a just ground of a national war*; since it is not in
18          the power of the foreign prince to cause justice to be done to his
          subjects by the very individual delinquent, but he must require it of
19          the whole community.

20  4 Blackstone at 68-69 (emphasis added).  Vattel similarly acknowledged each nation's

21  responsibility to address mistreatment of foreigners within their borders, stating that, once a

22  sovereign admits foreigners, "he engages to protect them as his own subjects, and to afford them

23  perfect security, as far as depends on him."  Vattel, bk. II at 154.  This responsibility extended to

24  injuries privately inflicted on foreigners within the host country, because that nation "ought not to

25  suffer his subjects to molest the subjects of others, or to do them an injury, much less to give open,

26  audacious offence to foreign powers."  *Id.*, bk. II at 145.

27    As the Court noted in *Kiobel*, the Marbois incident illustrated the risk that failure to redress

28  law of nations violations in an adequate forum would provoke international affront and retaliation:

"the assault led the French Minister Plenipotentiary to lodge a formal protest with the Continental Congress and threaten to leave the country unless an adequate remedy were provided." 133 S. Ct. at 1666 (citing *Respublica v. De Longschamps*, 1. U.S. (1 Dall.) 111 (O.T. Phila. 1784); *Sosa*, 542 U.S. at 716-17 & n. 11)). Such incidents, which occurred on U.S. soil, concerned the Founders, but "[t]he Continental Congress was hamstrung by its inability to 'cause infractions of treaties, or of the law of nations to be punished.'" *Sosa*, 542 U.S. at 716 (quoting J. Madison, *Journal of the Constitutional Convention* 60 (E. Scott ed. 1893)). The Continental Congress first passed a resolution asking states to "provide expeditious, exemplary and adequate punishment" for "the violation of safe conducts or passports, … of hostility against such as are in amity … with the United States [a form of safe-conduct violation], … infractions of the immunities of ambassadors and other public ministers … [and] infractions of treaties and conventions to which the United States are a party." 21 *Journals of the Continental Congress* 1136-37 (G. Hunt ed. 1912). This precursor to the ATS confirms Congress's focus on providing a mechanism to reduce the chance that domestic conduct would cause foreign conflicts. *See Sosa*, 542 U.S. at 724. Later, during the Federal Convention of 1787, James Madison and Edmund Rudolph noted that the States' inability to prevent violations of the law of nations under the Articles of Confederation might provoke war. *See* 1 *The Records of the Federal Convention of 1787*, at 247, 27, 33 (Max Farrand ed. 1911). As John Jay explained, "[i]t is of high importance to the peace of America that she observe the laws of nations." The Federalist No. 3 (John Jay).

Thus, the Founders recognized the necessity of providing redress for *conduct in the United States* that violated the law of nations, such as violation of safe conducts or passports. To this end, the First Congress eventually enacted the ATS as part of the first Judiciary Act in 1789, in order "to grant federal jurisdiction over cases in which an individual has committed a tortious act in the United States which, if unredressed, would result in international legal responsibility on the part of the United States." John M. Rogers, *The Alien Tort Statute and How Individuals "Violate" International Law*, 21 Vand. J. Transnat'l L. 47, 47 (1988). None of this historical record, however, displays any concern as to redressing conduct that occurred in foreign sovereign

1    territory; rather, Congress's focus was limited to addressing the three Blackstone categories of

2    cases and providing proper redress for future Marbois-like incidents.

3        By contrast, permitting U.S. federal courts to assume ATS jurisdiction for acts occurring

4    on foreign soil would serve to *increase*, not decrease, international conflict, contradicting the

5    central purpose of the ATS.  As Vattel recognized, "[i]t is an evident consequence of the liberty

6    and independence of nations, that all have a right to be governed as they think proper, and that no

7    state has the smallest right to interfere in the government of another."  Vattel, bk. II at 154-55; *see*

8    *also Henfield's Case*, 11 F. Cas. 1099, 1103 (No. 6,360) (D. Pa. 1793) (Jay, J.) ("It is to be

9    remembered, that every nation is, and ought to be, perfectly and absolutely sovereign within its

10   own dominions, to the entire exclusion of all foreign power, interference and jurisdiction ….");

11   Vattel, bk. II at 155 ("It does not, then, belong to any foreign power to take cognisance of the

12   administration of [another] sovereign, to set himself up for a judge of his conduct, and to oblige

13   him to alter it.  If he loads his subjects with taxes, and if he treats them with severity, the nation

14   alone is concerned in the business; and no other is called upon to oblige him to amend his conduct

15   and follow more wise and equitable maxims."); *id.* at 156 ("After having established the position

16   that foreign nations have no right to interfere in the government of an independent state, it is not

17   difficult to prove that the latter has a right to oppose such interference. …  [A] sovereign has a

18   right to treat those as enemies who attempt to interfere in his domestic affairs ….").

19       *Kiobel* further noted that "[r]ecent experience bears … out" that extension of the ATS to

20   conduct on foreign soil would generate, rather than avoid, diplomatic strife.  133 S. Ct. at 1669

21   (citing *Doe VIII*, 654 F.3d at 77-78 (Kavanaugh, J., dissenting in part) (listing recent objections to

22   extraterritorial applications of the ATS by Canada, Germany, Indonesia, Papua New Guinea,

23   South Africa, Switzerland, and the United Kingdom));  *see also Sosa*, 542 U.S. at 728 (cautioning

24   against "rais[ing] risks of adverse foreign policy consequences"); *id.* at 761-62 (Breyer, J.,

25   concurring in part and in the judgment) (highlighting the "comity concerns" raised by American

26

27

28

DEFENDANTS' RESPONSE TO BRIEF OF AMICI CURIAE PROFESSORS OF LEGAL HISTORY

courts exercising "universal jurisdiction" over conduct occurring elsewhere).[2] As Judge Kavanaugh of the D.C. Circuit recently summarized:

> The First Congress was, for good reason, primarily concerned about torts against aliens that occurred within the United States and on the high seas. Extending the ATS to conduct that occurs in foreign countries not only violates the presumption against extraterritoriality, but runs counter to the ATS's broad purpose of avoiding conflict with foreign nations. Applying the bedrock presumption against extraterritoriality would alleviate the serious discord with foreign nations that has arisen in recent years as courts have extended the ATS to conduct occurring in foreign lands.

*Doe VIII*, 654 F.3d at 54 (Kavanaugh, J., dissenting in part); *see also Kiobel*, 133 S. Ct. at 1664 (noting that "the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS," where it falls to judges to fashion federal-common-law causes of action to enforce international law norms).

Because the Founders conceived of applying the ATS to a very limited set of violations of the law of nations that occurred in U.S. territory (or on the high seas), for the purpose of reducing international friction, *Amici* can offer no historical support for Plaintiffs' ATS allegations in this case. Those allegations are all addressed ultimately to a foreign sovereign's alleged acts against its own citizens on its own soil—with the alleged U.S. conduct merely consisting of supposed complicity or conspiracy with that foreign sovereign. For the reasons Defendants have set forth in their motion to dismiss the SAC and reply in support of that motion, such allegations are diametrically opposed to the purpose of the ATS as supported by the historical record, for any adjudication of such claims (even if they had any plausible basis, which they do not), would foment, not avoid, international conflict and affront.

---

[2] For a more thorough recounting of the history of the enactment of the ATS, Defendants respectfully direct the Court to the Supplemental Brief for Professors of International Law, Foreign Relations Law and Federal Jurisdiction as *Amici Curiae* in Support of Respondents, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491), *available at* 2012 WL 3276505. *See supra* n.1.

III.   **THE FOUNDERS INTENDED THE POLITICAL BRANCHES, NOT THE JUDICIARY, TO DECIDE FOREIGN RELATIONS QUESTIONS SUCH AS THOSE PRESENTED HERE**

The question of whether an ATS claim exists for a violation of the law of nations that occurred within foreign sovereign territory—especially a claim that a U.S. national has supposedly aided and abetted a foreign government's human rights violations—implicates questions of foreign relations among sovereign nations that the architects of our Constitution (the same generation that enacted the ATS) deemed most properly addressed by the political branches of the U.S. government, not the judiciary.  *Amici*, while purporting to review founding-era history, ignore the fundamental principles of separation of powers that animated Article III and the Judiciary Act of 1789 that first implemented the judicial power set forth therein.   *See Sosa*, 542 U.S. at 727 ("the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs"); *see also Kiobel*, 133 S. Ct. at 1664 (quoting *Sosa*); *Goldwater v. Carter*, 444 U.S. 996, 1005-06, 1002 (1979) (Rehnquist, J., concurring in the judgment, joined by Burger, C.J., and Stewart  and Stevens, J.J.) (warning of the "disruption among the three coequal branches of Government" that results from "[a]n Art. III court's resolution of a question that is 'political' in character"—in that case, "conduct of our country's foreign relations"); The Federalist No. 78 (Alexander Hamilton) (emphasizing the importance that "the judiciary remain[] truly distinct from both the legislature and the Executive").

### A.   The Political Branches Are Entrusted To Resolve Political Questions

The Supreme Court has long recognized as nonjusticiable political questions those matters that trench upon "the respect due coordinate branches of government" and the need for the Nation to speak with one voice in "foreign relations." *Baker v. Carr*, 369 U.S. 186, 217, 211 (1962).  In the circumstances presented in this case, the Legislative and Executive branches have expressly enacted U.S. export laws and laws governing sales to China designed to strike a balance between the Nation's policy of economic and political engagement with China and concerns about China's

1    respect for human rights.[3]   Plaintiffs, however, ask the Court to resolve matters posing "the

2    impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial

3    discretion" and "the impossibility of a court's undertaking independent resolution without

4    expressing lack of the respect due coordinate branches of government."  *Baker*, 369 U.S. at 217.

5         The judicial branch should seek to avoid, whenever possible, disputes that might "imperil

6    the amicable relations between governments and vex the peace of nations."  *Oetjen v. Central*

7    *Leather Co.*, 246 U.S. 297, 304 (1918).  To this end, the Executive Branch has made numerous

8    arguments against expansion of the ATS to suits alleging that U.S. corporations were aiding and

9    abetting human rights violations by foreign governments, and urged concern for the "serious

10   risks" such suits entail "to the United States' relations with foreign states and to the political

11   Branches' ability to conduct the Nation's foreign policy."  Brief for the United States as *Amicus*

12   *Curiae* in Support of Petitioners, *Am. Isuzu Motors, Inc. v. Ntsebeza* at 18, 553 U.S. 1028 (2008)

13   (No. 07-919), *available at* 2008 WL 408389; *see also Sosa*, 542 U.S. at 728 (noting the "risks of

14   adverse foreign policy consequences" in ATS suits).

15        As relevant to this case, the political branches of the U.S. government have developed and

16   implemented detailed laws and regulations that govern the circumstances in which, in view of

17   human rights concerns, U.S. corporations may sell crime control technology to the Government of

18   China.  In so doing, the political branches have adopted a balanced approach to Chinese foreign

19   policy by restricting the sale of certain crime control technologies to China while permitting the

20   unrestricted sale of other products.   Sustaining Plaintiffs' claims would effectively permit

21   Plaintiffs, as "private parties to impose embargos or international sanctions through civil actions in

22   United States courts," *Talisman Energy Inc. v. Republic of the Sudan*, 582 F.3d 244, 264 (2d Cir.

---

23        [3]   *See* Tiananmen Square Sanctions Act, Pub. L. No. 101-246, § 901(b)(3) at 81 (1990) ("it is
24   essential that the United States speak in a bipartisan and unified voice in response to the events in
     the People's Republic of China"); *id.* § 902(a)(4) at 83 (ban on export of specified crime control or
25   detection instruments or equipment to China in absence of an express report by the President to
     the Congress stating either that the PRC had made progress on political reform or that the ban was
26   operating against the United States' national interest); Revisions to the Commerce Control List to
     Update and Clarify Crime Control License Requirements, 75 Fed. Reg. 41078-01, 41078 (July 15,
27   2010) (executive branch expressly determining that it would not add software and technology to
     list of banned export items).

28

2009), in a manner that "imping[es] on the discretion of the [political branches] in managing foreign affairs," *Sosa*, 542 U.S. at 727. *See also Baker*, 369 U.S. at 217 (judiciary's avoidance of political questions prevents "potentiality of embarrassment from multifarious pronouncements by various departments on one question"). Indeed, *Kiobel* expressly warned of "the danger of unwarranted judicial interference in the conduct of foreign policy" as to ATS claims concerning "conduct within the territory of another sovereign." 133 S. Ct. at 1664-65, 1669; *see also Sosa* 524 U.S. at 727 (recognizing as "collateral consequences" of "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs"). *Amici*'s broad pronouncement that the ATS "provide[s] jurisdiction over a subject's violations wherever they occu[r]" (Dkt. 128 at 10) makes no attempt to account for these countervailing political interests.

**B.    Plaintiffs' Claims Are Precluded By The Act Of State Doctrine**

Like the political question doctrine, the act of state doctrine "precludes courts from evaluating the validity of actions that a foreign government has taken within its own borders." *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1088 (9th Cir. 2009) (citing *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 409 (1990)). It "reflects the concern that the judiciary, by questioning the validity of sovereign acts taken by foreign states, may interfere with the executive branch's conduct of American foreign policy." *Id.* at 1089 (citing *W.S. Kirkpatrick & Co.*, 493 U.S. at 404).

Here, it is impossible to adjudicate Plaintiffs' claims without second-guessing the formal public acts taken by the sovereign state of China as to its legislative, executive, and judicial response to Falun Gong—including the passage of laws banning Falun Gong; the apprehension and punishment of Plaintiffs for violating those laws; and the conception and construction of the Golden Shield. As the Ninth Circuit has recognized, the act of state doctrine is "designed to prevent judicial pronouncements on the legality of the acts of foreign states which could embarrass the Executive Branch in the conduct of foreign affairs," and that "[t]he 'touchstone' or 'crucial element' is the potential for interference with our foreign relations." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989) (citations omitted). In *Doe v. Qi*, a court in this District considered a letter that the PRC submitted through the U.S. Department of State, stating:

1
2
3
4

> If the U.S. courts should entertain the "Falun Gong" trumped-up lawsuits, they would send a wrong signal to the "Falun Gong" cult organization and embolden it to initiate more such false, unwarranted lawsuits. In that case, it would cause immeasurable interferences to the normal exchanges and cooperation between China and the United States in all fields, and severely undermine the common interests of the two countries.

5   349 F. Supp. 2d 1258, 1300 (N.D. Cal. 2004) (quoting Statement of PRC).   Adjudication of

6   Plaintiffs' ATS allegations, which all concern Cisco's and its executives' supposed facilitation of

7   the Chinese government's treatment of its own citizens, will necessarily drag this court into

8   assessing the merits of the sovereign acts of the PRC in responding to Falun Gong.

9        The act of state doctrine, which is rooted in historical separation of powers principles that

10   again are unacknowledged by *Amici*, contradicts *Amici*'s position that the ATS "provide[s]

11   jurisdiction over a subject's violations wherever they occu[r]."  (Dkt. 128 at 10).  None of *Amici*'s

12   examples involves a similar challenge to a foreign government's enforcement of its own law with

13   respect to its own citizens within its own borders, and thus their historical arguments, even if not

14   foreclosed by *Kiobel*, cannot assist in deciding the pending motion to dismiss.

15                                        **<u>CONCLUSION</u>**

16        The Supreme Court has already determined that "[n]othing" about the "historical context"

17   surrounding the enactment of the ATS suggests that the First Congress intended for jurisdiction to

18   be conferred "for conduct occurring in the territory of another sovereign."  *Kiobel*, 133 S. Ct. at

19   1668-69.  This Court should reject *Amici*'s attempt to revisit and relitigate that binding conclusion.

20

21   DATED:   New York, New York            QUINN EMANUEL URQUHART &
22            February 17, 2014                SULLIVAN, LLP

23
                                            By:   /s/ Kathleen M. Sullivan
24                                               Kathleen M. Sullivan
                                                 Faith E. Gay
25                                               Isaac Nesser

26                                           51 Madison Avenue, 22d Floor,
                                             New York, New York  10010-1601
27                                           (212) 849-7000

28                                           *Attorneys for the Defendants*

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that all counsel of record who are deemed to

3

have consented to electronic service are being served with a copy of this document via

4

the Court's ECF System.

5

Dated:  February 17, 2014

6

_/s/ Todd Anten_____
Todd Anten

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28