KATHRYN LEE CRAWFORD-BOYD, ESQ. (SBN 189496)
    lboyd@srbr-law.com
RAJIKA L. SHAH, ESQ. (SBN 232994)
    rshah@srbr-law.com
**SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
6310 San Vicente Boulevard, Suite 360
Los Angeles, California  90048
Phone: (323) 302-9488, Fax: (323) 931-4990

TERRI MARSH, ESQ. (*pro hac vice*)
    terri.marsh@hrlf.net
JORDAN S. BERMAN, ESQ. (*pro hac vice*)
    jsberman@gmail.com
**HUMAN RIGHTS LAW FOUNDATION**
1615 L Street NW, Suite 1100
Washington, D.C.  20036
Phone: (202) 697-3858, Fax: (323) 931-4990

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, DOE IX, LIU Guifu, WANG Weiyu, and those individual similarly situated,<br><br>               Plaintiffs,<br><br>      vs.<br><br>CISCO SYSTEMS, INC., John CHAMBERS, Fredy CHEUNG, and DOES 1-100,<br><br>          Defendants. | Case No. 5:11-cv-02449-EJD-PSGx<br>Assigned to the Hon.  Edward J. Davila, U.S.D.J.<br><br>**PLAINTIFFS' STATEMENT OF RECENT DECISION PURSUANT TO LOCAL CIVIL RULE 7-3(d)(2)**<br><br>Action Filed: May 19, 2011<br>FAC Filed: Sept. 2, 2011<br>SAC Filed: Sept. 18, 2013<br><br>Hearing Date: March 21, 2014<br>Time: 9:00 a.m.<br>Dept: Courtroom 4, 5th Floor |

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' STATEMENT OF RECENT DECISION PURSUANT TO LOCAL CIVIL RULE 7-3(d)(2)

CASE NO. 5:11-cv-02449-EJD-PSGx

1

**STATEMENT OF RECENT DECISION**

2      Pursuant to Local Civil Rule 7-3(d)(2), Plaintiffs respectfully bring to the Court's

3   attention two recent opinions by the Appeals Chamber for the International Criminal Tribunal for

4   the Former Yugoslavia ("ICTY"): *Prosecutor v. Šainović,* Case No. IT-05-87-A, Appellate

5   Judgment, ICTY (Jan. 23, 2014) and *Prosecutor v. Đorđević,* Case No. IT-05-87/1-A, Appellate

6   Judgment, ICTY (Jan. 27, 2014).   These opinions are relevant to and were published after the

7   filing of Plaintiffs' opposition to Defendant's motion to dismiss the Second Amended Complaint

8   on December 19, 2013.  Due to the length of the decisions (*Šainović* is over 800 pages, and

9   *Đorđević* is over 400 pages), Plaintiffs have attached hereto as Exhibits A and B true and correct

10  copies of the relevant portions: *Šainović* ¶¶ 604-664, 1605-1651, and *Đorđević* ¶¶ 904-929.

11  The full *Šainović* judgment is available from the ICTY website at

12  <http://www.icty.org/x/cases/milutinovic/acjug/en/140123.pdf>, and the full *Đorđević* judgment

13  is available from the ICTY website

14  at <http://www.icty.org/x/cases/djordjevic/acjug/en/140127.pdf>.

15  Dated:  March 5, 2014                Respectfully Submitted,

16                                       SCHWARCZ, RIMBERG, BOYD & RADER, LLP

17                                       By:      /s/ Kathryn Lee Boyd[1]

18                                                Kathryn Lee Boyd

19                                       HUMAN RIGHTS LAW FOUNDATION

20                                       By:      /s/ Terri E. Marsh

21                                                Terri E. Marsh, Esq. (*pro hac vice*)

22                                       Attorneys for Plaintiffs DOE I, DOE II, Ivy HE,
                                         DOE III, DOE IV, DOE V, DOE VI, ROE VII,
23                                       Charles LEE, ROE VIII, DOE IX, LIU Guifu,
                                         WANG Weiyu, and those individuals similarly
24                                       situated

25

26

27

---

28  [1]  I have obtained the consent of the other signatory to electronically sign this Motion on her
    behalf.

1

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

PLAINTIFFS' STATEMENT OF RECENT DECISION PURSUANT TO LOCAL CIVIL RULE 7-3(d)(2)
Case No. 5:11-cv-02449-EJD-PSGx

# EXHIBIT A

**UNITED**
**NATIONS**



| | International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991 | Case No. | IT-05-87-A |
|---|---|---|---|
| | | Date: | 23 January 2014 |
| | | Original: | English |

### IN THE APPEALS CHAMBER

Before:               **Judge Liu Daqun, Presiding**
                      **Judge Mehmet Güney**
                      **Judge Fausto Pocar**
                      **Judge Arlette Ramaroson**
                      **Judge Bakhtiyar Tuzmukhamedov**

Registrar:            **Mr. John Hocking**

Judgement of:         **23 January 2014**

### PROSECUTOR

v.

### NIKOLA ŠAINOVIĆ
### NEBOJŠA PAVKOVIĆ
### VLADIMIR LAZAREVIĆ
### SRETEN LUKIĆ

---

*PUBLIC*

---

### JUDGEMENT

---

**The Office of the Prosecutor:**

Mr. Peter Kremer QC assisted by
Ms. Elena Martin Salgado and Ms. Virginie Monchy re: Mr. Nikola Šainović;
Mr. Aditya Menon and Mr. Todd Schneider re: Mr. Nebojša Pavković;
Mr. Mathias Marcussen re: Mr. Vladimir Lazarević;
Ms. Daniela Kravetz and Mr. Kyle Wood re: Mr. Sreten Lukić;
Ms. Michelle Jarvis and Mr. Nema Milaninia re: Prosecution Appeal

**Counsel for the Defence:**

Mr. Toma Fila and Mr. Vladimir Petrović for Mr. Nikola Šainović
Mr. John Ackerman and Mr. Aleksandar Aleksić for Mr. Nebojša Pavković
Mr. Mihajlo Bakrač and Mr. Đuro Čepić for Mr. Vladimir Lazarević
Mr. Branko Lukić and Mr. Dragan Ivetić for Mr. Sreten Lukić

**Exhibit A**
**1**

# CONTENTS

I. INTRODUCTION ............................................................................................................. 1

A. BACKGROUND ............................................................................................................ 1
B. THE APPEALS ............................................................................................................ 5
C. APPEAL HEARING ...................................................................................................... 6

## II. STANDARD OF REVIEW ....................................................................................... 7

## III. ALLEGED ERRORS IN RELATION TO FAIR TRIAL ............................... 11

A. INTRODUCTION ......................................................................................................... 11
B. ALLEGED VIOLATION OF THE RIGHT TO HAVE ADEQUATE TIME AND FACILITIES FOR THE
PREPARATION OF THE DEFENCE ............................................................................... 12
   1. Alleged deficiencies in the decisions concerning joinder ................................. 13
      (a) Background ............................................................................................... 13
      (b) Submissions of the parties ......................................................................... 14
         (i) Pavković's appeal ................................................................................ 14
         (ii) Lukić's appeal .................................................................................... 15
      (c) Analysis .................................................................................................... 15
   2. Alleged error in scheduling the commencement of the trial ............................. 18
      (a) Background ............................................................................................... 18
      (b) Processing disclosed material ..................................................................... 19
         (i) Submissions of the parties ................................................................... 19
            a. Pavković's appeal ............................................................................ 19
            b. Lukić's appeal ................................................................................ 20
         (ii) Analysis ............................................................................................. 22
      (c) Reliance on crimes that took place in 1998 ................................................. 25
         (i) Submissions of the parties ................................................................... 25
         (ii) Analysis ............................................................................................. 26
      (d) Late assignment of counsel ........................................................................ 28
         (i) Late assignment of Pavković's counsel ................................................ 28
         (ii) Late assignment of Lukić's co-counsel ............................................... 28
            a. Submissions of the parties ............................................................... 28
            b. Analysis .......................................................................................... 29
      (e) Refusal to adjourn the trial during the absence of Pavković's lead counsel ......... 30
         (i) Background ......................................................................................... 30
         (ii) Submissions of the parties ................................................................. 31
         (iii) Analysis ........................................................................................... 31
      (f) Production of documents pursuant to Rule 54 *bis* of the Rules ..................... 33
         (i) Submissions of the parties ................................................................... 33
         (ii) Analysis ............................................................................................. 34
   3. Length of court sessions ................................................................................. 35
      (a) Submissions of the parties ......................................................................... 35
         (i) Pavković's appeal ............................................................................... 35
         (ii) Lukić's appeal .................................................................................... 36
      (b) Analysis .................................................................................................... 38
   4. Alleged prejudice caused by lack of translation resources .............................. 42
      (a) Submissions of the parties ......................................................................... 42
      (b) Analysis .................................................................................................... 43
   5. Conclusion ...................................................................................................... 46
C. ALLEGED VIOLATION OF THE PRINCIPLE OF EQUALITY OF ARMS ............................. 47
   1. Alleged difficulties in visiting crime sites in Kosovo ....................................... 47
   2. Time allocated for the presentation of Lukić's case ....................................... 48
      (a) Submissions of the parties ......................................................................... 48
      (b) Analysis .................................................................................................... 49

**Exhibit A
2**

3. Method of time-keeping...................................................................................52
   (a) Submissions of the parties..................................................................52
   (b) Analysis................................................................................................53
4. Alleged violation of Lukić's right to file replies to motions ................................55
   (a) Submissions of the parties..................................................................55
   (b) Analysis................................................................................................55
5. Errors concerning the admission of evidence by the Trial Chamber.....................56
   (a) Errors concerning the admission into evidence of Lukić's interview with the Prosecution ........ 56
      (i) Submissions of the parties ........................................................57
      (ii) Analysis ..................................................................................58
   (b) Errors concerning the non-admission of evidence ..............................60
      (i) Submissions of the parties ........................................................60
      (ii) Analysis ..................................................................................61
6. Alleged violation of Lukić's right to examine and cross-examine witnesses.......................63
   (a) Submissions of the parties..................................................................63
   (b) Analysis................................................................................................64
D. ALLEGED VIOLATION OF LUKIĆ'S RIGHT TO BE TRIED BEFORE AN IMPARTIAL TRIBUNAL ..........66
1. Submissions of the parties ..................................................................................66
2. Discussion ..........................................................................................................67
   (a) Applicable law......................................................................................67
   (b) Analysis................................................................................................69
      (i) Judge Bonomy's previous involvement in the *S. Milošević* case ......................................69
      (ii) Judge Bonomy's prior work in advocating the speeding-up of trials in Scotland and the Tribunal's completion strategy ..............................................................69
      (iii) Statements made by Judge Bonomy during trial ............................................70
         a. Cross-examination of Emin Kabashi ..............................................70
         b. Cross-examination of Danica Marinković and Miroslav Mijatović..............................................71
         c. Direct examination of Ljubivoje Joksić..............................................72
         d. Hearing of 4 March 2008 ..........................................................73
         e. Lukić's Closing Arguments........................................................74
      (iv) Trial Chamber's remark concerning the translation of evidence....................................75
   (c) Conclusion............................................................................................76
E. ALLEGED LACK OF REASONED OPINION ..............................................................76
F. CONCLUSION ...................................................................................................76

**IV. ALLEGED ERRORS IN RELATION TO THE INDICTMENT ..........................77**

A. ŠAINOVIĆ'S APPEAL ..........................................................................................77
1. Submissions of the parties ..................................................................................77
2. Analysis...............................................................................................................78
B. LAZAREVIĆ'S APPEAL ........................................................................................80
1. Submissions of the parties ..................................................................................80
2. Analysis...............................................................................................................81
C. LUKIĆ'S APPEAL ..............................................................................................83
1. Submissions of the parties ..................................................................................83
2. Analysis...............................................................................................................85
D. PROSECUTION'S APPEAL ....................................................................................86
1. Submissions of the parties ..................................................................................87
   (a) Prosecution's submissions....................................................................87
   (b) Submissions in response ......................................................................89
   (c) Submissions in reply ............................................................................90
2. Analysis...............................................................................................................91
E. TUŠILJE/TUSHILA...............................................................................................94

**Exhibit A**

**3**

**V. ALLEGED ERRORS CONCERNING THE *MENS REA CHAPEAU* REQUIREMENT OF ARTICLE 5 OF THE STATUTE** ....................................................................96

A. INTRODUCTION ........................................................................................................96
B. WHETHER THE *MENS REA CHAPEAU* REQUIREMENT OF ARTICLE 5 OF THE STATUTE COULD BE SATISFIED BY AN INDIVIDUAL TAKING THE RISK THAT HIS ACTS COMPRISE PART OF THE ATTACK AGAINST THE CIVILIAN POPULATION .............................................................97
C. WHETHER IN ESTABLISHING THAT CRIMES AGAINST HUMANITY HAD BEEN COMMITTED, THE TRIAL CHAMBER SUFFICIENTLY IDENTIFIED THE CATEGORY OF PERSONS WHO SATISFIED THE *MENS REA CHAPEAU* REQUIREMENT OF ARTICLE 5 OF THE STATUTE ...........................98
D. WHETHER AN "INTERMEDIARY PERPETRATOR" COULD SATISFY THE *MENS REA CHAPEAU* REQUIREMENT OF ARTICLE 5 OF THE STATUTE .............................................100
E. CONCLUSION ........................................................................................................102

**VI. UNDERLYING CRIMES** ....................................................................................103

A. INTRODUCTION ......................................................................................................103
B. ALLEGED ERRORS RELATING TO CONVICTIONS AND ACQUITTALS FOR DEPORTATION AND OTHER INHUMANE ACTS (FORCIBLE TRANSFER) ................................................104
1. Dečani/Deçan ...................................................................................................104
(a) Submissions of the parties ..........................................................................105
(b) Analysis ......................................................................................................106
2. Kosovska Mitrovica/Mitrovica .......................................................................110
(a) Submissions of the parties ..........................................................................110
(b) Analysis ......................................................................................................111
3. Prizren .............................................................................................................115
(a) Prosecution's appeal regarding Dušanovo/Dushanova .............................116
(i) Submissions of the parties ....................................................................116
(ii) Analysis ...............................................................................................117
(b) Lazarević's appeal regarding Pirane/Pirana ............................................122
(i) Submissions of the parties ....................................................................122
(ii) Analysis ...............................................................................................123
(c) Lukić's appeal regarding Prizren municipality in general .......................126
(i) Submissions of the parties ....................................................................126
(ii) Analysis ...............................................................................................127
4. Uroševac/Ferizaj .............................................................................................129
(a) Prosecution's appeal .................................................................................130
(i) Submissions of the parties ....................................................................130
(ii) Analysis ...............................................................................................131
a. Sojevo/Sojeva .....................................................................................133
b. Staro Selo/Fshat i Vjetër .....................................................................135
c. Mirosavlje/Mirosala ............................................................................137
d. Conclusion ...........................................................................................139
(b) Lukić's appeal ...........................................................................................139
(i) Submissions of the parties ....................................................................139
(ii) Analysis ...............................................................................................140
5. Đakovica/Gjakova ...........................................................................................141
(a) Đakovica/Gjakova town ............................................................................141
(i) Submissions of the parties ....................................................................142
(ii) Analysis ...............................................................................................144
(b) Reka/Caragoj valley ..................................................................................146
(i) Submissions of the parties ....................................................................147
(ii) Analysis ...............................................................................................150
a. Aims of the Reka/Caragoj valley operation .......................................150
b. The VJ's involvement .........................................................................153
6. Gnjilane/Gjilan ...............................................................................................158
(a) Lazarević's appeal ....................................................................................159

**Exhibit A**

**4**

(i) Žegra/Zhegra and Vladovo/Lladova .................................................... 159
    a. Submissions of the parties ............................................................ 159
    b. Analysis ....................................................................................... 160
(ii) Prilepnica/Përlepnica ...................................................................... 161
    a. Submissions of the parties ............................................................ 161
    b. Analysis ....................................................................................... 162
(b) Lukić's appeal .................................................................................. 163
  (i) Submissions of the parties ................................................................ 163
  (ii) Analysis ......................................................................................... 165
    a. General challenges ....................................................................... 165
    b. Challenges concerning specific villages........................................ 166
7. Kačanik/Kaçanik .................................................................................... 168
  (a) Lazarević's appeal ........................................................................... 169
    (i) Kotlina/Kotllina ............................................................................. 169
      a. Submissions of the parties ............................................................ 169
      b. Analysis ....................................................................................... 171
    (ii) Dubrava/Lisnaja............................................................................. 173
      a. Submissions of the parties ............................................................ 173
      b. Analysis ....................................................................................... 174
    (iii) Kačanik/Kaçanik town .................................................................. 175
      a. Submissions of the parties ............................................................ 176
      b. Analysis ....................................................................................... 176
  (b) Lukić's appeal ................................................................................. 178
8. Orahovac/Rahovec ................................................................................. 178
  (a) Submissions of the parties ............................................................... 179
  (b) Analysis .......................................................................................... 180
9. Peć/Peja ................................................................................................. 184
  (a) Submissions of the parties ............................................................... 185
  (b) Analysis .......................................................................................... 186
10. Priština/Prishtina ................................................................................. 189
  (a) Submissions of the parties ............................................................... 190
  (b) Analysis .......................................................................................... 192
    (i) Presence and involvement of the VJ ................................................. 192
    (ii) NATO bombing and KLA attacks .................................................... 194
11. Srbica/Skenderaj ................................................................................. 195
  (a) Turićevac/Turiçec ............................................................................ 196
    (i) Submissions of the parties .............................................................. 196
    (ii) Analysis ....................................................................................... 197
  (b) Ćirez/Qirez ..................................................................................... 199
    (i) Submissions of the parties .............................................................. 199
    (ii) Analysis ....................................................................................... 201
  (c) Izbica/Izbicë ................................................................................... 202
    (i) Submissions of the parties .............................................................. 203
    (ii) Analysis ....................................................................................... 204
  (d) Conclusion ..................................................................................... 205
12. Overall pattern of events .......................................................................205
  (a) Submissions of the parties ............................................................... 206
  (b) Analysis .......................................................................................... 207
C. ALLEGED ERRORS RELATING TO CONVICTIONS FOR MURDER ...........................208
  1. General challenges ...............................................................................208
    (a) The OMPF List.............................................................................. 208
      (i) Submissions of the parties .............................................................. 208
      (ii) Analysis ....................................................................................... 209
    (b) Victim identification ...................................................................... 210
      (i) Submissions of the parties .............................................................. 210
      (ii) Analysis ....................................................................................... 211

**Exhibit A**

**5**

2. Đakovica/Gjakova ........................................................................................211
   (a) Submissions of the parties ...............................................................212
   (b) Analysis ...........................................................................................214
3. Srbica/Skenderaj .......................................................................................218
   (a) Submissions of the parties ...............................................................219
   (b) Analysis ...........................................................................................220
4. Orahovac/Rahovec ....................................................................................222
   (a) Mala Kruša/Krusha e Vogël .............................................................222
      (i) Submissions of the parties ..........................................................222
      (ii) Analysis ....................................................................................223
   (b) Bela Crkva/Bellacërka .....................................................................223
      (i) Submissions of the parties ..........................................................223
      (ii) Analysis ....................................................................................224
   (c) Conclusion .......................................................................................225
5. Conclusion ...............................................................................................225
D. WHETHER THE RAPES COMMITTED IN PRIŠTINA/PRISHTINA IN EARLY APRIL AND IN LATE
   MAY 1999 CONSTITUTED PERSECUTION .......................................................226
1. Submissions of the parties ........................................................................226
2. Analysis ...................................................................................................228
   (a) Rape of K31 .....................................................................................229
   (b) Rape of K14 .....................................................................................231
   (c) Rape of K62 .....................................................................................234
3. Conclusion ...............................................................................................236

VII. JOINT CRIMINAL ENTERPRISE ...............................................................237

A. INTRODUCTION ..........................................................................................237
B. THE EXISTENCE OF A COMMON PLAN, DESIGN, OR PURPOSE ..........................238
1. Introduction .............................................................................................238
2. Components of the common purpose and its temporal scope .........................239
3. Factors from which the Trial Chamber inferred the existence of the common purpose ......242
   (a) Discernible pattern of forcible displacement .....................................243
      (i) Causes of the displacement .........................................................244
      (ii) Use of the NATO bombing as an opportunity to launch an attack ...............249
      (iii) Target of the attack ..................................................................250
      (iv) Use of Kosovo Albanians to deter the NATO bombing .................252
      (v) Conclusion ................................................................................253
   (b) Seizure of IDs ..................................................................................253
      (i) Confiscation of IDs as a common practice ....................................254
      (ii) Whether the common purpose could be inferred from the seizure of IDs ......259
      (iii) Conclusion ..............................................................................261
   (c) Conclusion .......................................................................................261
4. Evidence militating against the existence of a common purpose .....................262
   (a) Evidence undermining the existence of a common purpose .................262
   (b) Orders to prevent the departure of Kosovo Albanians .......................264
   (c) Conclusion .......................................................................................266
5. Conclusion ...............................................................................................266
C. ALLEGED ERRORS IN THE TRIAL CHAMBER'S FINDINGS ON THE JOINT COMMAND ...............266
1. Existence of the Joint Command in 1998 ....................................................268
   (a) Introduction .....................................................................................268
   (b) Reliability of Đaković's Notes and the minutes of the meeting of 29 October 1998 .........269
      (i) Đaković's Notes ..........................................................................269
         a. Submissions of the parties .......................................................271
         b. Analysis ................................................................................272
      (ii) Minutes of the meeting at Beli Dvor in Belgrade on 29 October 1998 .........275
         a. Submissions of the parties .......................................................275

**Exhibit A**

**6**

b. Analysis ............................................................................................ 276
(c) Nature of the Joint Command ................................................................. 278
(i) Submissions of the parties ................................................................... 278
(ii) Analysis ............................................................................................. 280
(d) Reason for the creation of the Joint Command ...................................... 283
(i) Submissions of the parties ................................................................... 283
(ii) Analysis ............................................................................................. 284
(e) The Joint Command and the Working Group ......................................... 287
(i) Submissions of the parties ................................................................... 288
(ii) Analysis ............................................................................................. 288
2. Authority of the Joint Command in 1998 ................................................... 289
(a) Introduction ........................................................................................... 289
(b) Preliminary matters ............................................................................... 291
(i) Submissions of the parties ................................................................... 291
(ii) Analysis ............................................................................................. 292
(c) Alleged errors in the assessment of evidence ......................................... 293
(i) Meetings of the Joint Command .......................................................... 293
a. Submissions of the parties ................................................................. 293
b. Analysis ............................................................................................ 294
(ii) Samardžić's order of 30 July 1998 and the role of the 3rd Army Forward Command Post ... 297
(iii) Request by the Joint Command to the VJ for use of helicopters .................................... 299
(iv) Request by the Joint Command to the VJ for the formation and deployment of various
units ..................................................................................................... 301
(v) Request by the Joint Command to the VJ for the formation of rapid-intervention forces ...... 303
(vi) Joint Command's decision to launch the third stage of the Plan for Combating
Terrorism ............................................................................................. 306
a. Submissions of the parties ................................................................. 306
b. Analysis ............................................................................................ 308
(vii) Instructions of the Joint Command for the defence of populated areas and six
operative reports of the Joint Command ............................................... 310
(viii) Two decisions of the Priština Corps referring to the Joint Command ......................... 311
(ix) The Joint Command and the MUP ..................................................... 313
(d) Conclusion ............................................................................................. 315
3. Existence and authority of the Joint Command in late 1998 and 1999 ............................. 315
(a) Introduction ........................................................................................... 315
(b) Preliminary matters ............................................................................... 317
(i) Submissions of the parties ................................................................... 317
(ii) Analysis ............................................................................................. 318
(c) Alleged errors in the assessment of evidence ......................................... 319
(i) The Joint Command, the TEC, and the Commission for Cooperation with the KVM –
change of situation in late 1998 ............................................................ 319
(ii) Evidence of witnesses who testified that the Joint Command meetings ceased in
October 1998 and that the Joint Command did not exist thereafter ........................ 321
(iii) 16 orders with the heading of "Joint Command" and the effect of the term "Joint
Command" ............................................................................................ 323
a. Submissions of the parties ................................................................. 323
b. Analysis ............................................................................................ 325
(iv) Combat reports of 25 and 29 April 1999 ............................................ 328
(v) Pavković's public announcement in 2001 ............................................ 330
(vi) Ojdanić's suggestions to Pavković on 17 April 1999 ........................... 331
(vii) Pavković's report to the Supreme Command Staff dated 25 May 1999 ..................... 332
(viii) Meeting at the Grand Hotel in Priština/Prishtina on 1 June 1999 ............................ 334
a. Submissions of the parties ................................................................. 334
b. Analysis ............................................................................................ 335
(ix) The Joint Command as part of the coordination system ....................... 337
a. Submissions of the parties ................................................................. 337

Exhibit A
7

b. Analysis ............................................................................................... 338
(x) The MUP's involvement in planning and ordering joint operations in 1999 ................. 339
(d) Conclusion ............................................................................................... 340
4. Conclusion ............................................................................................... 340
D. ALLEGED ERRORS IN RELATION TO ŠAINOVIĆ'S PARTICIPATION IN THE JCE ........................... 340
1. Introduction ............................................................................................... 340
2. Alleged errors in relation to Šainović's contribution to the common purpose ................... 341
(a) Šainović's relationship with Milošević ............................................................ 342
(i) The source of Šainović's authority ............................................................... 342
a. Submissions of the parties ..................................................................... 343
b. Analysis ............................................................................................... 345
(ii) Šainović's participation at the Rambouillet conference ...................................... 348
a. Submissions of the parties ..................................................................... 348
b. Analysis ............................................................................................... 349
(b) Šainović's leading role during Joint Command meetings in 1998 ............................ 350
(i) Reasons for sending Šainović to Kosovo and Minić's role during Joint Command
meetings ............................................................................................... 351
(ii) Šainović's statements during Joint Command meetings .................................... 354
(iii) UK Embassy telegram and Dimitrijević's evidence ......................................... 357
(iv) Conclusion ............................................................................................... 359
(c) Meetings in Belgrade in 1998 discussing the Plan for Combating Terrorism ............. 359
(d) Šainović's authority as Chairman of the Commission for Cooperation with the KVM ...... 360
(i) Šainović's appointment as Chairman of the Commission for Cooperation with the KVM ... 361
(ii) Šainović's involvement in various incidents .................................................. 363
(iii) Conclusion ............................................................................................... 367
(e) Šainović's dealings with Rugova ................................................................... 367
(i) Submissions of the parties ......................................................................... 367
(ii) Analysis ............................................................................................... 368
(f) Šainović's participation in meetings in April and May 1999 ............................... 369
(i) MUP Staff meeting of 4 April 1999 ............................................................... 370
(ii) Meeting of 13 April 1999 with Zlatomir Pešić ............................................... 371
(iii) Meeting of 4 May 1999 with Milošević and MUP Staff meeting of 7 May 1999 ......... 373
(iv) Meeting with Milošević on 17 May 1999 ...................................................... 375
(g) Joint Command meeting on 1 June 1999 ........................................................ 376
(h) Šainović's ability to issue instructions, make proposals, and give suggestions.................. 381
(i) Alleged errors in finding that Šainović was the "political coordinator" of the forces in
Kosovo ............................................................................................... 382
(i) Submissions of the parties ......................................................................... 383
(ii) Analysis ............................................................................................... 386
(j) Alleged error of law in the evaluation of evidence regarding Šainović's authority ............. 389
(k) Alleged errors in finding that Šainović's contribution to the common purpose was
significant............................................................................................... 390
3. Alleged errors in finding that Šainović had the intent to forcibly displace part of the
Kosovo Albanian population.............................................................................393
(a) Alleged error of law with respect to Šainović's *mens rea* .................................. 394
(b) Šainović's state of mind in relation to Kosovo and Kosovo Albanians........................... 395
(c) Šainović's knowledge of the commission of crimes in 1998................................. 399
(i) Submissions of the parties ......................................................................... 399
(ii) Analysis ............................................................................................... 401
(d) Šainović's knowledge of the commission of crimes in 1999................................. 403
(i) Submissions of the parties ......................................................................... 404
(ii) Analysis ............................................................................................... 407
(e) Whether Šainović's efforts to prevent and punish crimes were genuine ............................ 411
(i) Submissions of the parties ......................................................................... 412
(ii) Analysis ............................................................................................... 413
4. Allegations of bias and "double standards" in the evaluation of the evidence.................... 416

**Exhibit A**

**8**

5. Alleged errors in relation to Šainović's responsibility under JCE III.................................418
  (a) Introduction ................................................................................................................418
  (b) Alleged error in finding that the commission of murder of Kosovo Albanians was
    foreseeable to Šainović and that he willingly took that risk ...............................420
    (i) Submissions of the parties ..................................................................................421
    (ii) Analysis ...............................................................................................................423
    (iii) Conclusion ..........................................................................................................429
  (c) Alleged error in finding that the commission of persecution through destruction of or damage
    to religious property was foreseeable to Šainović and that he willingly took that risk ...........430
    (i) Submissions of the parties ..................................................................................431
    (ii) Analysis ...............................................................................................................431
    (iii) Conclusion ..........................................................................................................433
E. ALLEGED ERRORS IN RELATION TO PAVKOVIĆ'S PARTICIPATION IN THE JCE............................433
  1. Introduction.........................................................................................................................433
  2. Alleged errors in finding that Pavković participated in the JCE ..........................................434
    (a) Introduction ................................................................................................................434
    (b) Credibility of witness Aleksandar Dimitrijević .................................................................435
    (c) Pavković's relationship with Milošević ............................................................................437
    (i) Pavković's promotions .........................................................................................438
      a. Manner in which Pavković was promoted ......................................................438
        i. Submissions of the parties ...........................................................................439
        ii. Analysis......................................................................................................440
      b. Tension between Pavković and Samardžić ......................................................443
        i. Exchange between Pavković and Samardžić concerning the implementation of the
          second stage of the Plan for Combating Terrorism ...................................443
        ii. Samardžić's order of 7 August 1998........................................................447
        iii. Samardžić's favourable evaluation of Pavković.......................................448
        iv. Samardžić's control over Pavković and the Priština Corps .....................449
        v. Whether Samardžić was sidelined..............................................................450
      c. Conclusion .......................................................................................................451
    (ii) Whether Pavković by-passed the VJ chain of command in 1998....................451
      a. Submissions of the parties ...............................................................................452
      b. Analysis............................................................................................................454
    (iii) Pavković's deployment of a VJ unit in contravention of Ojdanić's order in early 1999 .....459
      a. Submissions of the parties ...............................................................................459
      b. Analysis............................................................................................................460
    (iv) Pavković's private meetings with Milošević .................................................462
      a. Submissions of the parties ...............................................................................462
      b. Analysis............................................................................................................464
    (d) Pavković's engagement in disarming the Kosovo Albanian population and arming the non-
    Albanian population in Kosovo and his deployment of troops in Kosovo in breach of the
    October Agreements .......................................................................................................467
    (i) Submissions of the parties ..................................................................................468
    (ii) Analysis ...............................................................................................................470
    (e) Pavković's knowledge of criminal activity by VJ and MUP members, his reactions
    thereto, and his continuous orders for joint operations.........................................................472
    (i) Pavković's knowledge of the use of excessive and indiscriminate force in 1998 ...........472
      a. Submissions of the parties ...............................................................................473
      b. Analysis............................................................................................................476
    (ii) Whether Pavković minimised the criminal activity of his subordinates in 1998 ...........480
      a. Submissions of the parties ...............................................................................480
      b. Analysis............................................................................................................481
    (iii) Pavković's knowledge of the forcible displacement and commission of other crimes in
    1999...............................................................................................................................483
    (iv) Whether Pavković under-reported crimes in 1999 ......................................................485
      a. Submissions of the parties ...............................................................................486

b. Analysis ................................................................................................... 489
(v) Pavković's failure to take effective measures to prevent and punish crimes.................. 493
 a. Submissions of the parties ..................................................................... 493
 b. Analysis ................................................................................................ 495
(vi) Alleged errors in requiring that a commander not only punish crimes but also
 immediately cease combat activities ......................................................... 500
(vii) Pavković's orders for the VJ's engagement in 1999 and the absence of his
 involvement in the concealment of bodies ................................................. 502
(f) Conclusion .................................................................................................... 503
3. Link between Pavković and the principal perpetrators ......................................... 504
(a) Introduction .................................................................................................. 504
(b) Submissions of the parties............................................................................. 504
(c) Analysis ....................................................................................................... 506
(d) Conclusion ................................................................................................... 509
4. Alleged errors in relation to Pavković's responsibility under JCE III............................. 509
(a) Introduction .................................................................................................. 509
(b) Submissions of the parties............................................................................. 512
(c) Analysis ....................................................................................................... 514
(d) Conclusion ................................................................................................... 517
F. ALLEGED ERRORS IN RELATION TO LUKIĆ'S PARTICIPATION IN THE JCE.................................. 517
1. Introduction .......................................................................................................... 517
2. Alleged errors with regard to the MUP structure.................................................... 518
(a) The Trial Chamber's evaluation of the evidence of witness Branislav Simonović ............ 519
(b) MUP Staff authority over the MUP forces in Kosovo ....................................... 521
 (i) Submissions of the parties ...................................................................... 522
 (ii) Analysis ................................................................................................ 523
(c) Presence and activity of paramilitaries in Kosovo ........................................... 525
 (i) Submissions of the parties ...................................................................... 526
 (ii) Analysis ................................................................................................ 528
(d) Summarily dismissed submissions................................................................... 530
(e) Conclusion ................................................................................................... 531
3. The role of the MUP Staff in planning and coordinating joint operations of the MUP and
 the VJ.............................................................................................................. 531
(a) Coordination in planning joint VJ and MUP operations in 1998......................... 531
(b) Meetings held in 1999 and the elaboration of large-scale plans ........................ 534
(c) Coordination in planning joint VJ and MUP operations in 1999......................... 537
 (i) The 16 "Joint Command" orders ............................................................. 538
 (ii) Stefanović's testimony........................................................................... 540
 (iii) MUP orders for the execution of joint operations ........................................ 542
 (iv) Conclusion .......................................................................................... 543
(d) Summarily dismissed submissions................................................................... 544
(e) Conclusion ................................................................................................... 544
4. Lukić's role as Head of the MUP Staff .................................................................. 544
(a) Introduction .................................................................................................. 544
(b) Lukić's appointment as Head of the MUP Staff ............................................... 545
(c) Lukić's authority over MUP forces in Kosovo .................................................. 546
 (i) Lukić's powers....................................................................................... 546
  a. Submissions of the parties ................................................................. 546
  b. Analysis .......................................................................................... 548
 (ii) Instructions to the MUP units issued by Lukić................................................ 550
 (iii) Lukić's *de facto* authority to require the conduct of investigations ............................. 552
 (iv) Summarily dismissed submissions ......................................................... 555
(d) Lukić's presence and role during MUP Staff meetings ....................................... 555
 (i) Submissions of the parties ...................................................................... 555
 (ii) Analysis ................................................................................................ 556

**Exhibit A**
**10**

(e) Reporting of the SUPs to the MUP Staff and Lukić's role in reporting to the MUP in
    Belgrade ........................................................................................................................... 558
    (i) Submissions of the parties ...................................................................................... 558
    (ii) Analysis .................................................................................................................. 560
    (iii) Summarily dismissed submissions ....................................................................... 562
(f) Lukić's role as the "bridge" between the policy-makers in Belgrade and the commanders
    of MUP units in Kosovo .................................................................................................... 562
(g) Lukić's participation in high-level meetings ...................................................................... 564
    (i) Meeting of 30 May 1998 ......................................................................................... 565
    (ii) Joint Command meetings in 1998 ......................................................................... 566
    (iii) Meeting of 27 November 1998 .............................................................................. 568
    (iv) Summarily dismissed submissions ....................................................................... 568
(h) Lukić's interaction with international observers .............................................................. 569
(i) Lukić's involvement in planning and coordinating anti-terrorist actions ......................... 571
(j) Lukić's involvement in the arming of the RPOs and the disarming of the Kosovo Albanian
    population ......................................................................................................................... 574
(k) Confiscation and destruction of identity documents ........................................................ 577
(l) Conclusion ........................................................................................................................ 577
5. Lukić's intent to forcibly displace part of the Kosovo Albanian population ...................... 577
(a) Alleged errors of law in relation to Lukić's *mens rea* ..................................................... 578
(b) Lukić's knowledge of crimes in 1998 ................................................................................ 579
    (i) Information received during Joint Command meetings ........................................... 579
    (ii) Information received from international representatives .......................................... 581
    (iii) The Trial Chamber's reliance on knowledge of crimes in 1998 in inferring Lukić's
        intent ..................................................................................................................... 584
    (iv) Conclusion ............................................................................................................. 585
(c) Lukić's knowledge of crimes in 1999 ................................................................................ 585
    (i) The Trial Chamber's evaluation of evidence in relation to meetings attended by Lukić ....... 586
        a. Meeting of 4 May 1999 ..................................................................................... 586
        b. Meeting of 7 May 1999 ..................................................................................... 587
    (ii) The Trial Chamber's evaluation of documentary evidence ................................... 588
        a. Instructions of 15 February 1999 ...................................................................... 588
        b. Report of 3 April 1999 ....................................................................................... 589
    (iii) Knowledge of crimes committed in Prizren municipality ...................................... 590
    (iv) Lukić's awareness of the discovery of bodies in Izbica/Izbicë and Pusto Selo/Pastasella ... 591
    (v) Conclusion .............................................................................................................. 593
(d) Measures addressing the commission of crimes .............................................................. 593
(e) Lukić's voluntary participation in the common purpose .................................................... 596
(f) Summarily dismissed submissions .................................................................................... 597
(g) Conclusion ........................................................................................................................ 598
6. Alleged "double standards" in the evaluation of the evidence .......................................... 598
7. Lukić's responsibility for crimes committed by the MUP and the VJ ................................ 600
8. Alleged errors in relation to Lukić's responsibility under JCE III ...................................... 602
(a) Introduction ....................................................................................................................... 602
(b) Alleged error in finding that the commission of murder of Kosovo Albanians was
    foreseeable to Lukić and that he willingly took that risk .................................................... 604
    (i) Submissions of the parties ...................................................................................... 604
    (ii) Analysis .................................................................................................................. 605
    (iii) Conclusion ............................................................................................................. 609
(c) Alleged error in finding that destruction to or damage of religious property was
    foreseeable to Lukić and that he willingly took that risk .................................................... 610
    (i) Submissions of the parties ...................................................................................... 610
    (ii) Analysis .................................................................................................................. 611
    (iii) Conclusion ............................................................................................................. 613

G. PROSECUTION'S APPEAL AS TO ALLEGED ERRORS CONCERNING THE *MENS REA* FOR JCE III IN
    RELATION TO PERSECUTION THROUGH SEXUAL ASSAULTS..................................................613
1. Introduction ......................................................................................................................613
2. Alleged error of law in relation to the *mens rea* for JCE III.................................................614
    (a) Submissions of the parties..........................................................................................614
    (b) Analysis.....................................................................................................................615
3. Whether the *mens rea* for JCE III was met with respect to Šainović and Lukić for
    persecution through sexual assaults .................................................................................617
    (a) Submissions of the parties..........................................................................................617
        (i) Prosecution's appeal ..............................................................................................617
        (ii) Šainović's response ...............................................................................................619
        (iii) Lukić's response ...................................................................................................621
        (iv) Prosecution's reply ...............................................................................................623
    (b) Analysis.....................................................................................................................623
        (i) Whether the *mens rea* for JCE III was met with respect to Šainović for persecution
            through sexual assaults ...........................................................................................624
        (ii) Whether the *mens rea* for JCE III was met with respect to Lukić for persecution
            through sexual assaults ...........................................................................................628
4. Whether the *mens rea* for JCE III was met with respect to Pavković for persecution
    through sexual assaults committed in Priština/Prishtina ...................................................633
    (a) Submissions of the parties..........................................................................................633
    (b) Analysis.....................................................................................................................634
5. Conclusion .......................................................................................................................639

VIII. AIDING AND ABETTING ...............................................................................................640

A. INTRODUCTION .................................................................................................................640
B. ALLEGED ERRORS IN FINDING THAT LAZAREVIĆ AIDED AND ABETTED DEPORTATION AND
    FORCIBLE TRANSFER........................................................................................................640
1. Introduction ......................................................................................................................640
2. Alleged errors in relation to the existence of the common plan ..........................................641
3. Alleged errors in finding that Lazarević provided practical assistance, encouragement, and
    moral support to the VJ forces engaging in forcible displacement ......................................643
    (a) Preliminary issue – specific direction ..........................................................................643
    (b) Lazarević's involvement in joint operations in 1998........................................................668
    (c) Lazarević's involvement in joint operations in 1999 ........................................................668
        (i) Submissions of the parties.......................................................................................669
        (ii) Analysis ................................................................................................................671
    (d) Lazarević's involvement in incorporating volunteers into the Priština Corps...................674
    (e) Lazarević's failure to take adequate measures to ensure investigations of crimes by VJ
        members ....................................................................................................................674
        (i) Submissions of the parties.......................................................................................675
        (ii) Analysis ................................................................................................................676
    (f) Lazarević's inspection of VJ units.................................................................................680
        (i) Submissions of the parties.......................................................................................681
        (ii) Analysis ................................................................................................................681
    (g) Impact of the Appeals Chamber's findings....................................................................683
4. Alleged errors in finding that Lazarević fulfilled the *mens rea* of aiding and abetting.......684
    (a) Alleged errors in finding that Lazarević was aware that forcible displacement was likely to
        occur in 1999 .............................................................................................................685
        (i) Submissions of the parties.......................................................................................686
        (ii) Analysis ................................................................................................................687
    (b) Alleged errors in finding that Lazarević knew of the campaign of forcible displacement ........691
        (i) Lazarević's presence in Priština/Prishtina in 1999 .....................................................691
        (ii) Lazarević's knowledge of crimes committed in 1999 ..................................................693
            a. Reports on the commission of crimes sent by subordinate units...................................693

xi

Exhibit A
12

      b. Lazarević's awareness that the operation in the Reka/Caragoj valley involved forcible displacement ............................................................................................................. 696
      c. Diković's warning .................................................................................................. 697
      d. Drewienkiewicz's press statement ....................................................................... 698
      e. Alleged error in finding that orders for forcible displacement were given orally ......... 699
      f. Alleged error in finding that Lazarević's attempt to prevent the mistreatment of Kosovo Albanians showed knowledge of forcible displacement ............................... 700
      g. Reports from subordinate units on measures in relation to the civilian population ..... 702
    (iii) Conclusion .................................................................................................................... 705
  (c) Lazarević's orders for the protection of civilians.................................................................. 705
  (d) Whether Lazarević knew that his conduct assisted forcible displacement ......................... 707
  (e) Conclusion.......................................................................................................................... 708
  5. Conclusion ................................................................................................................................ 708
C. ALLEGED ERRORS IN ACQUITTING LAZAREVIĆ OF AIDING AND ABETTING MURDER ................. 709
  1. Introduction.............................................................................................................................. 709
  2. Whether the Trial Chamber applied the correct legal standard for the *mens rea* of aiding and abetting ............................................................................................................................ 710
    (a) Submissions of the parties................................................................................................. 710
    (b) Analysis............................................................................................................................. 711
  3. Whether the Trial Chamber erred in fact in finding that the mental element of aiding and abetting murder had not been established with respect to Lazarević ............................... 712
    (a) Submissions of the parties................................................................................................. 712
    (b) Analysis............................................................................................................................. 714

**IX. SENTENCING** ...........................................................................................................................**719**
  A. INTRODUCTION .............................................................................................................................. 719
  B. ŠAINOVIĆ'S APPEAL ...................................................................................................................... 720
    1. Alleged errors in assessing aggravating factors ...................................................................... 720
    2. Alleged errors in assessing mitigating factors ........................................................................ 721
  C. PAVKOVIĆ'S APPEAL ..................................................................................................................... 724
    1. Alleged errors in assessing aggravating factor ....................................................................... 724
    2. Alleged errors in assessing mitigating factors ........................................................................ 726
  D. LAZAREVIĆ'S APPEAL .................................................................................................................... 727
    1. Alleged errors in the assessment of gravity ............................................................................ 727
    2. Alleged errors in assessing mitigating factors ........................................................................ 727
  E. LUKIĆ'S APPEAL ............................................................................................................................ 728
    1. Alleged errors in assessing aggravating factor ....................................................................... 728
    2. Alleged errors in assessing mitigating factors ........................................................................ 729
    3. Alleged failure to properly consider sentencing practices in the FRY .................................... 731
  F. PROSECUTION'S APPEAL ................................................................................................................. 732
  G. COMMON APPEAL ON THE FAILURE TO INDIVIDUALISE SENTENCES ............................................. 734
  H. CONCLUSION ................................................................................................................................. 736
  I. IMPACT OF THE APPEALS CHAMBER'S FINDINGS ON SENTENCES ................................................. 736

**X. DISPOSITION** ...........................................................................................................................**739**

**XI. PARTIALLY DISSENTING OPINION AND  DECLARATION OF JUDGE LIU** ........**744**

**XII. OPINION DISSIDENTE DU JUGE RAMAROSON**..........................................................**753**

**XIII. DISSENTING OPINION OF JUDGE TUZMUKHAMEDOV** .......................................**759**

**XIV. ANNEX A – PROCEDURAL HISTORY** ..........................................................................**777**
  A. COMPOSITION OF THE APPEALS CHAMBER ................................................................................... 777
  B. NOTICES OF APPEAL...................................................................................................................... 777
  C. APPEAL BRIEFS ............................................................................................................................. 779
    1. Prosecution's appeal ............................................................................................................... 779

Exhibit A
13

2. Defence appeals ...................................................................................................779
   (a) Šainović's appeal........................................................................................780
   (b) Pavković's appeal .......................................................................................780
   (c) Lazarević's appeal ......................................................................................781
   (d) Lukić's appeal ............................................................................................781
D. OJDANIĆ ...............................................................................................................782
E. DECISIONS PURSUANT TO RULE 115 OF THE RULES ..............................................783
F. PROVISIONAL RELEASE ...........................................................................................784
  1. Šainović...............................................................................................................784
  2. Pavković..............................................................................................................784
  3. Lazarević.............................................................................................................784
  4. Lukić ..................................................................................................................785
G. OTHER PRE-APPEAL DECISIONS AND ORDERS.......................................................786
H. STATUS CONFERENCES ...........................................................................................787
I. APPEAL HEARING ...................................................................................................787

**XV. ANNEX B: CITED MATERIALS AND DEFINED TERMS.............................................788**

A. JURISPRUDENCE .....................................................................................................788
  1. Tribunal..............................................................................................................788
  2. ICTR ..................................................................................................................793
  3. Special Court for Sierra Leone ..........................................................................796
  4. European Court of Human Rights......................................................................796
  5. Human Rights Committee...................................................................................797
  6. Post-WWII cases...............................................................................................797
  7. Other Jurisdictions ............................................................................................799
B. DEFINED TERMS AND ABBREVIATIONS...................................................................802

Case No. IT-05-87-A

23 January 2014
**Exhibit A**
**14**

B.  **The existence of a common plan, design, or purpose**

1.  Introduction

604.   The Trial Chamber found that it was "established beyond reasonable doubt that there was a common purpose" shared by the members of the JCE "during the time of the crimes alleged in the Indictment that amounted to or invovled the commission of those crimes under the Statute".[1983] It further found that the common purpose of the JCE was to forcibly displace the Kosovo Albanian population both within and outside Kosovo "[t]hrough a widespread *and* systematic campaign of terror and violence".[1984] The Trial Chamber considered that the members of the JCE "were aware that it was unrealistic to expect to be able to displace each and every Kosovo Albanian from Kosovo, so the common purpose was to displace a number of them sufficient to tip the demographic balance" to ensure continued control over Kosovo.[1985] The Trial Chamber reached this conclusion on the basis of circumstantial evidence derived from a number of factors.[1986]

605.   Šainović, Pavković, and Lukić submit that the Trial Chamber erred in concluding that the existence of the common purpose was proven beyond reasonable doubt and raise various challenges to the Trial Chamber's assessment of the evidence.[1987] In addition to challenging the Trial Chamber's findings concerning the respective factors from which it inferred the existence of the common purpose and the evidence allegedly militating against the existence of the common purpose, they appear to argue that the Trial Chamber could not be satisfied that the existence of the common purpose was the only reasonable inference available from the evidence in the trial record.[1988] Pavković also raises arguments concerning the components of the common purpose.

---

[1982]   Moreover, having overturned the Trial Chamber's conclusion that the sexual assaults committed in Priština/Prishtina on 1 April and in late May 1999 did not constitute persecution (*supra*, sub-section VI.D.), the Appeals Chamber will consider the Prosecution's arguments that Šainović, Pavković, and Lukić should be convicted of these sexual assaults (Prosecution's Appeal Brief, para. 104 (Prosecution's ground 4); Appeal Hearing, 12 Mar 2013, AT. 357).

[1983]   Trial Judgement, vol. 3, para. 96.

[1984]   Trial Judgement, vol. 3, para. 95 (emphasis in original).

[1985]   Trial Judgement, vol. 3, para. 95.

[1986]   Trial Judgement, vol. 3, paras 30-88, 90-92, 94-95. See also *infra*, paras 606, 612.

[1987]   Šainović's Appeal Brief, paras 411-486, 504-505 (sub-grounds 6(1)-(11)); Pavković's Appeal Brief, paras 24-26, 42-70, 75-80, 166, 183, 185, 217-221 (sub-grounds 1(A) in part, 1(B), 1(C), grounds 3 in part, 6 in part); Lukić's Appeal Brief, paras 84-88, 148, 150-152, 157-161, 194-196, 200-221, 225-233, 234-246, 260, 265-268, 359-396, 402-407, 451-452, 504-515, 519-551 (sub-grounds D(1), D(4) in part, D(6), H in part, I(1), I(2), I(3), I(4) in part, O in part, O(1), O(1)(a), O(1)(c), O(1)(d) in part, O(1)(e) in part, O(2) in part, O(3)). See also Lukić's Appeal Brief, paras 77-82 (sub-ground D in part).

[1988]   Šainović's Appeal Brief, paras 444-445, read together with *ibid.*, paras 413-443; Pavković's Appeal Brief, paras 25-26; Lukić's Appeal Brief, paras 202, 359. With regard to Šainović's contention that "[t]he Prosecution should have proven the circumstantial evidence beyond reasonable doubt" (Šainović's Appeal Brief, para. 445; *contra* Prosecution's Response Brief (Šainović), para. 294), the Appeals Chamber notes that it is not "circumstantial evidence", but "the facts forming the elements of the crime or the form of responsibility alleged against the accused [and] the facts which are indispensable for entering a conviction", that need to be proven beyond reasonable doubt. The proof of such facts may

Case No. IT-05-87-A

23 January 2014

**Exhibit A**

**15**

## 2.   Components of the common purpose and its temporal scope

606.    In inferring the existence of the common purpose, the Trial Chamber relied, *inter alia*, on the following factors: (i) the discernible pattern of forcible displacement of Kosovo Albanians committed by the forces of the FRY and Serbia in spring 1999;[1989] (ii) the routine seizure and the destruction of Kosovo Albanians' identity documents ("IDs") by the forces of the FRY and Serbia in the course of their displacement in spring 1999;[1990] (iii) the abuse of power by the FRY and Serbian authorities prior to 1998 in an attempt to "adversely affect the socio-economic circumstances of the Kosovo Albanian majority";[1991] (iv) the discriminatory arming of the non-Albanian population in Kosovo and disarming of the Kosovo Albanian population in 1998 and early 1999;[1992] (v) the use of the period of diplomatic negotiations by the FRY and Serbian authorities to bring additional forces into Kosovo in breach of the Holbrooke-Milošević Agreement and other associated Agreements (collectively, "October Agreements") in late 1998 and early 1999;[1993] (vi) Slobodan Milošević's decision at the end of 1998 to replace Momčilo Perišić with Ojdanić as Chief of the VJ General Staff, and to replace Dušan Samardžić with Pavković as Commander of the 3rd Army;[1994] and (vii) the clandestine operation in spring 1999 to conceal hundreds of bodies of victims of crimes from international representatives and/or NATO ground forces, by transferring them from Kosovo to Serbia proper.[1995] On this basis, the Trial Chamber concluded that the common purpose was "established beyond reasonable doubt […] during the time of the crimes alleged in the Indictment that amounted to or involved the commission of those crimes under the Statute".[1996]

607.    Pavković submits that the date on which the common plan or purpose arose is an element of JCE liability and must be proven beyond reasonable doubt.[1997] According to Pavković, there is no evidence that members of the JCE "got together and formulated the plan to expel Kosovo Albanians in October 1998, the time when it is alleged that the JCE began."[1998] He adds that the Trial Chamber was thus "left to search for evidence" that the plan materialised no later than that date, but

---

be based on circumstantial evidence (*Ntagerura et al.* Appeal Judgement, para. 174. See also *Halilović* Appeal Judgement, para. 129; *Blagojević and Jokić* Appeal Judgement, para. 226; *Galić* Appeal Judgement, para. 218).
[1989] Trial Judgement, vol. 3, paras 41-46. See also *ibid.*, vol. 3, para. 94.
[1990] Trial Judgement, vol. 3, paras 30-40.
[1991] Trial Judgement, vol. 3, para. 48. See also *ibid.*, vol. 3, para. 47.
[1992] Trial Judgement, vol. 3, paras 49-72. See also *ibid.*, vol. 1, paras 764-766, 775, 787.
[1993] Trial Judgement, vol. 3, paras 73-76. See also *ibid.*, vol. 1, paras 934-943, 962-983, 988-989.
[1994] Trial Judgement, vol. 3, paras 77-85.
[1995] Trial Judgement, vol. 3, paras 86-88.
[1996] Trial Judgement, vol. 3, para. 96.
[1997] Pavković's Appeal Brief, para. 26.
[1998] Pavković's Appeal Brief, para. 26, referring to Indictment, para. 20 and also arguing that not interpreting the date as a material element would deprive an accused of notice and an opportunity to defend. See also Appeal Hearing, 12 Mar 2013, AT. 311-312.

23 January 2014

Exhibit A
16

that the plan was not proven beyond reasonable doubt.[1999] He also maintains that there must be "a real plan emanating from a real agreement" and that such a plan "does not materialize out of thin air or out of events on the ground".[2000] According to him, "a real agreement" in this context means that the evidence must show that every JCE member "had the same goal in mind" and that "they agreed with each other about what they were doing".[2001]

608.    The Prosecution responds that a common plan or purpose of a JCE need not be previously arranged or formulated and may be inferred from the totality of circumstances and evidence relating to the commission of crimes.[2002] Further, it contends that Pavković misinterprets the law as requiring an agreement in addition to a common plan.[2003] Moreover, the Prosecution submits that the Trial Chamber's findings and its approach to the evidence in the Trial Judgement demonstrate that it accepted that the common purpose "had crystallized" and "had come into existence" no later than October 1998 as pleaded in the Indictment.[2004]

609.    At the outset, the Appeals Chamber observes that Pavković misconstrues the law of JCE liability. The Appeals Chamber recalls that JCE liability requires "the existence of a common purpose which amounts to, or involves, the commission of a crime" and that the common purpose need not be previously arranged or formulated; it may materialise extemporaneously.[2005] Thus, while the existence of a common purpose at the time of the crimes is one of the elements of JCE liability, the date of its formation is not.[2006] In the instant case, the Trial Chamber found that "it has been established beyond reasonable doubt that there was a common purpose during the time of the crimes alleged in the Indictment that amounted to or involved the commission of those crimes under the Statute".[2007] Consequently, Pavković's argument in this regard is dismissed.

610.    As noted above, the Trial Chamber concluded that "it has been established beyond reasonable doubt that there was a common purpose *during the time of the crimes alleged in the Indictment that amounted to or involved the commission of those crimes under the Statute*".[2008] In this regard, the Appeals Chamber observes that the Trial Chamber made findings of the commission

---

[1999] Pavković's Appeal Brief, para. 26. See also *ibid.*, paras 49-50; Appeal Hearing, 12 Mar 2013, AT. 312.
[2000] Pavković's Appeal Brief, para. 25.
[2001] Appeal Hearing, 12 Mar 2013, AT. 338.
[2002] Prosecution's Response Brief (Pavković), para. 16.
[2003] Prosecution's Response Brief (Pavković), paras 8-9, also arguing that Pavković had proper notice of the temporal scope of the JCE.
[2004] Appeal Hearing, 11 Mar 2013, AT. 219; *ibid.*, 12 Mar 2013, AT. 360. See also *ibid.*, 11 Mar 2013, AT. 220-221, 244, 248, referring to Trial Judgement, vol. 3, paras 68, 72, 76, 85, 92, 778.
[2005] *Brđanin* Appeal Judgement, para. 418. See also *Stakić* Appeal Judgement, para. 64; *Tadić* Appeal Judgement, para. 227(ii). See also *Vasiljević* Appeal Judgement, paras 100, 109.
[2006] See *Brđanin* Appeal Judgement, paras 364, 418; *Stakić* Appeal Judgement, para. 64; *Kvočka et al.* Appeal Judgement, para. 81; *Vasiljević* Appeal Judgement, para. 100; *Tadić* Appeal Judgement, para. 227.
[2007] Trial Judgement, vol. 3, para. 96.
[2008] Trial Judgement, vol. 3, para. 96 (emphasis added).

**Exhibit A**
**17**

of crimes charged in the Indictment in relation to events starting from 24 March until the end of May 1999.[2009] Therefore, the Appeals Chamber understands the Trial Chamber's finding on the existence of the common purpose to be related to the period of the occurrence of those crimes as found by the Trial Chamber. Contrary to the Prosecution's submissions, there is no other finding in the Trial Judgement on the temporal scope of the existence of the common purpose, let alone whether the common purpose existed beyond reasonable doubt prior to this period. In this regard, the Prosecution refers to findings in the Trial Judgement in relation to events prior to this period,[2010] such as: (i) the process of arming of the non-Albanian population in Kosovo and disarming of the Kosovo Albanian population in 1998 and early 1999;[2011] (ii) the use of the period of diplomatic negotiations by the FRY and Serbian authorities to bring additional forces into Kosovo allegedly in breach of the October Agreements in late 1998 and early 1999;[2012] and (iii) Milošević's decision at the end of 1998 to replace Perišić with Ojdanić as Chief of the VJ General Staff, and to replace Samardžić with Pavković as Commander of the 3rd Army.[2013] However, the Appeals Chamber does not consider that those findings can be interpreted as amounting to a finding that the common purpose existed beyond reasonable doubt at the time of the occurrence of these events. Those

---

[2009] Trial Judgement, vol. 2, paras 1179-1262, read together with *ibid.*, vol. 1, para. 1209. The Appeals Chamber notes that, with two exceptions, all of the dates of the events described in the Indictment in the context of the charged underlying crimes fell in the period between 24 March and the end of May 1999. The two exceptions are the event in the village of Kotlina/Kotllina in Kačanik/Kaçanik municipality in the beginning of March 1999 (Indictment, paras 72(k)(i), 73) and an incident in Račak/Reçek in Štimlje/Shtime municipality in January 1999 (Indictment, para. 75(a)). While the Trial Chamber made some findings with regard to the allegations on the event in the village of Kotlina/Kotllina in the beginning of March 1999 (Trial Judgement, vol. 2, paras 1067, 1253, read together with *ibid.*, vol. 2, paras 1018-1020, 1027, 1029-1030), the Appeals Chamber has understood the Trial Chamber to have not considered those findings to be relevant to its conclusions on the commission of crimes charged in this location. Rather, the Appeals Chamber has understood the Trial Chamber to have considered relevant only findings concerning events in the same location as of 24 March 1999 (see *supra*, sub-section VI.B.7.(a)(i); *ibid.*, vol. 2, paras 1067, 1253, read together with *ibid.*, vol. 2, paras 1156, 1170, 1178). Further, with regard to the allegations concerning the incident in Račak/Reçek in January 1999, the Trial Chamber disallowed the evidence to be led, made no finding thereon in the Trial Judgement, and subsequently declared that no charge was outstanding against the accused in this case before the Tribunal (see *supra*, fn. 19).

[2010] Appeal Hearing, 11 Mar 2013, AT. 219-221.

[2011] Appeal Hearing, 11 Mar 2013, AT. 220-221, referring to Trial Judgement, vol. 3, paras 68, 72, 92, read together with *ibid.*, vol. 1, paras 764-766, 775, 787; *ibid.*, vol. 3, paras 57-58, 69-71. In particular, the Prosecution quoted the Trial Chamber's finding that the process of arming and disarming in 1998 and early 1999 was "designed to render the Kosovo Albanian population vulnerable to the forces of the FRY and Serbia, while at the same time empowering the non-Albanian population" (*ibid.*, vol. 3, para. 72). See also *infra*, fn. 2012.

[2012] Appeal Hearing, 11 Mar 2013, AT. 220-221, referring to Trial Judgement, vol. 3, paras 76, 92, read together with *ibid.*, vol. 1, paras 934-943, 962-983, 988-989; *ibid.*, vol. 3, para. 75. In particular, the Prosecution quoted the Trial Chamber's finding that while the failure of the diplomatic negotiations was the responsibility of all the participants, the FRY and Serbian authorities "made use of the period of the negotiations" to bring additional forces into Kosovo in late 1998 and early 1999 in breach of the October Agreements, "thus placing [themselves] in the position in the spring of 1999 to be able to mount a widespread attack upon the Kosovo Albanian civilian population" (*ibid.*, vol. 3, para. 76). The Prosecution further quoted the Trial Chamber's finding that through the process of arming and disarming and by moving additional forces to Kosovo, the JCE members "prepared [...] to deal a heavy blow to the KLA and to displace [...] enough Kosovo Albanians to change the ethnic balance in Kosovo" (*ibid.*, vol. 3, para. 92).

[2013] Appeal Hearing, 11 Mar 2013, AT. 220, referring to Trial Judgement, vol. 3, paras 85, 778, read together with *ibid.*, vol. 3, paras 80, 83. In particular the Prosecution quoted the Trial Chamber's findings that: (i) Milošević appointed Ojdanić the Chief of the VJ General Staff and promoted Pavković to the 3rd Army Commander at the end of 1998 "in order to facilitate the implementation of the common purpose" (*ibid.*, vol. 3, para. 85); and (ii) Pavković's promotion at the end of 1998 was a reward "from Milošević to Pavković for his participation in the [JCE]"(*ibid.*, vol. 3, para. 778).

Exhibit A
18

findings are merely part of a number of factors considered by the Trial Chamber to infer the existence of the common purpose. Only based on all factors, and particularly its findings concerning the pattern of the crimes,[2014] the Trial Chamber reached the conclusion that the common purpose existed "*beyond reasonable doubt* […] during the time of the crimes".[2015] The Appeals Chamber thus finds the Prosecution's submissions in this regard unpersuasive.

611. As to Pavković's contention that there must be "a real plan emanating from a real agreement"[2016] in the sense that all JCE members "agreed with each other about what they were doing" with "the same goal in mind"[2017] and that such a plan "does not materialize […] out of events on the ground",[2018] the Appeal Chamber recalls that JCE liability requires the existence of "a common plan, design or purpose" amounting to, or involving the commission of a crime.[2019] Such a common plan, design, or purpose may "be inferred from the facts",[2020] including events on the ground.[2021] Pavković has failed to demonstrate that the Trial Chamber erred in this respect. Accordingly, his argument is dismissed.

3. Factors from which the Trial Chamber inferred the existence of the common purpose

612. Šainović, Pavković, and Lukić challenge the Trial Chamber's assessment of evidence concerning the factors from which it inferred the existence of the common purpose. The Appeals Chamber recalls that the factors relied upon by the Trial Chamber include: (i) the discernible pattern of forcible displacement of Kosovo Albanians committed by the forces of the FRY and Serbia in spring 1999;[2022] (ii) the routine seizure and the destruction of Kosovo Albanians' IDs by the forces of the FRY and Serbia in the course of their displacement in spring 1999;[2023] (iii) the abuse of power by the FRY and Serbian authorities prior to 1998 in an attempt to "adversely affect the socio-economic circumstances of the Kosovo Albanian majority";[2024] (iv) the discriminatory arming of

---

[2014] Trial Judgement, vol. 3, paras 41-46. See also *ibid.*, vol. 3, para. 17.

[2015] Trial Judgement, vol. 3, para. 96 (emphasis added).

[2016] Pavković's Appeal Brief, para. 25.

[2017] Appeal Hearing, 12 Mar 2013, AT. 338.

[2018] Pavković's Appeal Brief, para. 25. In this regard, the Appeals Chamber notes that Pavković does not challenge the Trial Chamber's statements that the Prosecution was required to prove that "the accused and at least one other person […] came to an express or implied agreement that a particular crime or underlying offence would be committed" (Trial Judgement, vol. 1, para. 101) and that "the common purpose need not be previously arranged or formulated, but may materialise spontaneously" (*ibid.*, vol. 1, para. 102). See also Appeal Hearing, 12 Mar 2013, AT. 339.

[2019] *Tadić* Appeal Judgement, para. 227(ii) (emphasis omitted). See also *Krajišnik* Appeal Judgement, paras 184-185; *Brđanin* Appeal Judgement, paras 364, 418; *Stakić* Appeal Judgement, para. 64; *Kvočka et al.* Appeal Judgement, paras 81, 96, 117; *Vasiljević* Appeal Judgement, para. 100.

[2020] *Vasiljević* Appeal Judgement, para. 100; *Tadić* Appeal Judgement, para. 227(ii).

[2021] See, *e.g.*, *Martić* Trial Judgement, paras 442-445 (affirmed by *Martić* Appeal Judgement, paras 92-116); *Krajišnik* Trial Judgement, para. 1097 (affirmed by *Krajišnik* Appeal Judgement, paras 192, 605-647). See also Trial Judgement, vol. 1, para. 102.

[2022] Trial Judgement, vol. 3, paras 41-46. See also *ibid.*, vol. 3, para. 94.

[2023] Trial Judgement, vol. 3, paras 30-40.

[2024] Trial Judgement, vol. 3, para. 48. See also *ibid.*, vol. 3, para. 47.

Exhibit A
19

the non-Albanian population in Kosovo and disarming of the Kosovo Albanian population in 1998 and early 1999;[2025] (v) the use of the period of diplomatic negotiations by the FRY and Serbian authorities to bring additional forces into Kosovo in breach of the October Agreements in late 1998 and early 1999;[2026] (vi) Slobodan Milošević's decision at the end of 1998 to replace Momčilo Perišić with Ojdanić as Chief of the VJ General Staff and to replace Dušan Samardžić with Pavković as Commander of the 3rd Army;[2027] and (vii) the clandestine operation in spring 1999 to conceal hundreds of bodies of victims of crimes from international representatives and/or NATO ground forces, by transferring them from Kosovo to Serbia proper.[2028]

613.    The Trial Chamber found that "the most compelling evidence of a common plan, design, or purpose is that which pertains to the pattern of crimes in 1999"[2029] and that "the confiscation and destruction of identity documents is some of the strongest evidence in the case going to show that the events of spring 1999 in Kosovo were part of a common purpose".[2030] The Appeals Chamber will accordingly first address the arguments of Šainović, Pavković, and Lukić concerning the Trial Chamber's assessment of evidence on the pattern of forcible displacement and the confiscation of IDs.

(a)    Discernible pattern of forcible displacement

614.    Referring to its findings on the events on the ground, the Trial Chamber found that upon the commencement of the NATO bombing on 24 March 1999, the forces of the FRY and Serbia launched a broad campaign of violence against the Kosovo Albanian civilian population, "using the bombing as a window of opportunity to do this."[2031] The Trial Chamber further found that the deliberate actions of the forces of the FRY and Serbia during this campaign "caused the departure of at least 700,000 Kosovo Albanians from Kosovo in the short period of time between the end of March and the beginning of June 1999."[2032] In reaching this conclusion, the Trial Chamber also found that "although the NATO bombing and the activities of the KLA were factors in the complicated situation on the ground, they were not the cause of over 700,000 people moving *en masse* both within Kosovo and then across the border" during this short time period.[2033]

---

[2025] Trial Judgement, vol. 3, paras 49-72. See also *ibid.*, vol. 1, paras 764-766, 775, 787.
[2026] Trial Judgement, vol. 3, paras 73-76. See also *ibid.*, vol. 1, paras 934-943, 962-983, 988-989.
[2027] Trial Judgement, vol. 3, paras 77-85.
[2028] Trial Judgement, vol. 3, paras 86-88.
[2029] Trial Judgement, vol. 3, para. 17.
[2030] Trial Judgement, vol. 3, para. 40.
[2031] Trial Judgement, vol. 3, para. 41, read together with *ibid.*, vol. 2, para. 1178; *ibid.*, vol. 3, para. 92.
[2032] Trial Judgement, vol. 2, para. 1178. See also *ibid.*, vol. 2, para. 1156; *ibid.*, vol. 3, paras 41-42.
[2033] Trial Judgement, vol. 3, para. 45. See also *ibid.*, vol. 2, paras 1156, 1175-1177.

23 January 2014
**Exhibit A
20**

615.    Furthermore, the Trial Chamber found that crimes committed by the forces of the FRY and Serbia in Kosovo during this period follow a clearly discernible pattern of forcible displacement[2034] and that "[t]hese crimes were not committed in a random and un-orchestrated manner, but rather according to a common purpose."[2035] This eventually led the Trial Chamber to conclude that the common purpose was to forcibly displace a number of Kosovo Albanians both within and outside Kosovo through a widespread and systematic campaign of terror and violence.[2036]

### (i)   Causes of the displacement

616.    Šainović, Pavković, and Lukić submit that in its analysis of the overall pattern of events, the Trial Chamber erred in concluding that the reason for the departure of Kosovo Albanians from Kosovo was the deliberate actions by the FRY and Serbian forces.[2037] They assert that the Trial Chamber violated the principle of *in dubio pro reo* since there were a number of other reasonable explanations for the flight of the population from Kosovo.[2038] They argue that civilians left due to: (i) the NATO bombing, which caused civilian casualties and devastation as well as a shortage of basic necessities;[2039] and (ii) the fear of fighting between the KLA and the FRY and Serbian forces.[2040] In addition, Lukić submits that civilians left due to instructions and orders by the KLA,[2041] or in order to avoid forced mobilisation by the KLA[2042] or retaliation from the KLA for being "Serbian collaborators".[2043] Lukić also asserts that the causes of the exodus included the creation of an "artificial humanitarian catastrophe" through an agreement between NATO and the KLA,[2044] and propaganda of non-FRY and Serbian media and NATO.[2045] Furthermore, Šainović and Lukić submit that, while the Trial Chamber acknowledged some of these factors, it failed to

---

[2034] Trial Judgement, vol. 3, paras 41, 46, 94. See also *ibid.*, vol. 3, para. 44.
[2035] Trial Judgement, vol. 3, para. 46.
[2036] Trial Judgement, vol. 3, para. 95.
[2037] Šainović's Appeal Brief, paras 428-429; Pavković's Appeal Brief, para. 53; Lukić's Appeal Brief, paras 201-221, 241, 362.
[2038] Lukić's Appeal Brief, paras 202-219, 240, 246, 363, 405; Lukić's Reply Brief, para. 70; Šainović's Appeal Brief, paras 428-430; Pavković's Appeal Brief, para. 53. Lukić also avers that even some of the Prosecution witnesses, who are Kosovo Albanians, testified that they had left their homes for reasons other than being evicted by the security forces (Lukić's Appeal Brief, paras 205, 242). See also Appeal Hearing, 14 Mar 2013, AT. 567-569.
[2039] Lukić's Appeal Brief, paras 207-208, 216-218, 235-239, 243(e)(f)(g), 363, 393; Šainović's Appeal Brief, paras 428-429, 431, 463-465; Pavković's Appeal Brief, paras 53, 55, referring to Karol John Drewienkiewicz, Exh. P2542. See also Lukić's Appeal Brief, para. 388. See also Appeal Hearing, 11 Mar 2013, AT. 169-170, 12 Mar 2013, AT. 314-318.
[2040] Lukić's Appeal Brief, paras 209, 243(d), 363; Pavković's Appeal Brief, paras 53, 55-56; Šainović's Appeal Brief, paras 428, 430, referring to Peć/Peja and Ðakovica/Gjakova and other parts of Kosovo as locations of such fighting.
[2041] Lukić's Appeal Brief, paras 200, 210, 212, 228(b)(c), 233, 243(a)(e), 363, 378-379, 394, in particular, asserting that the KLA caused the movement of civilians in order "to hide among them and escape from encirclement", and that witness Joksić prepared a list of villages which were abandoned due to KLA actions (Ljubivoje Joksić, Exh. 6D1491, paras 52-53; Exh. 6D775; Exh. 6D776). See also Lukić's Reply Brief, paras 71-73.
[2042] Lukić's Appeal Brief, paras 214, 243(b), 363. See also Pavković's argument during the appeal hearing in this regard (Appeal Hearing, 12 Mar 2013, AT. 315).
[2043] Lukić's Appeal Brief, para. 215. See also *ibid.*, paras 243(c), 363.
[2044] Lukić's Appeal Brief, paras 219, 243(c), 363. See also *ibid.*, paras 161, 213.
[2045] Lukić's Appeal Brief, paras 211, 243(e).

**Exhibit A**
**21**

assess how many people left as a result of each specific reason and attributed the departure of 700,000 Kosovo Albanians solely to the actions of the FRY and Serbian forces.[2046]

617.    According to Lukić, the Trial Chamber also erred in concluding that the NATO bombing was not the primary reason for the mass displacement of civilians based on evidence that people did not leave Belgrade and other parts of the FRY which were also bombed by NATO.[2047] He submits that the Trial Chamber failed to consider that, in those parts of the FRY, there was no KLA which forced the civilians to leave.[2048] In addition, Šainović and Lukić argue that the Trial Chamber erred when it assessed the impact of the NATO bombing in relation to each individual municipality in Kosovo, instead of the whole of Kosovo and the FRY.[2049] Lukić adds that the fact that there was no mass departure of civilians prior to the NATO air campaign suggests that it was the cause of their departure.[2050]

618.    Šainović and Lukić also contend that in finding the pattern of forcible displacement, the Trial Chamber erred in "almost exclusively" relying on the testimony of Kosovo Albanians and argue that in light of the unnatural consistency of their accounts on their forcible displacement by VJ and MUP forces, the Trial Chamber should have found them unreliable.[2051]

619.    The Prosecution responds that on the basis of evidence regarding the specific offences committed throughout Kosovo at the relevant time, the Trial Chamber reasonably identified an overall pattern of crimes committed by the FRY and Serbian forces and found this to be the most compelling evidence of the existence of the common criminal purpose.[2052] The Prosecution further argues that the Trial Chamber reasonably found that the FRY and Serbian forces' campaign of terror and violence caused the displacement of at least 700,000 Kosovo Albanians in about two

---

[2046] Šainović's Appeal Brief, paras 428-429, referring to Trial Judgement, vol. 2, paras 1175, 1178; Lukić's Appeal Brief, paras 386, 405, referring to Trial Judgement, vol. 3, paras 45-46, 95.
[2047] Lukić's Appeal Brief, para. 161, referring to Trial Judgement, vol. 2, para. 1176.
[2048] Lukić's Appeal Brief, para. 161.
[2049] Šainović's Appeal Brief, paras 463-465, also claiming that the NATO bombing transformed a limited conflict in Kosovo to a general conflict in the whole of the FRY; Lukić's Appeal Brief, paras 158-159, 234-238.
[2050] Lukić's Appeal Brief, para. 239, referring to Trial Judgement, vol. 2, para. 1177.
[2051] Šainović's Appeal Brief, paras 432-435; Lukić's Appeal Brief, paras 160, 241, 364, 402, referring to the Trial Judgement, vol. 1, para. 55, where the Trial Chamber found that Kosovo Albanian witnesses' consistent denial of the KLA's presence seemed to "border upon the irrational". See also Lukić's Appeal Brief, paras 160, 206, 242, arguing that some of the Kosovo Albanian witnesses changed their testimony under KLA pressure and that the Trial Chamber should have rather relied upon the testimony of Defence witnesses who were VJ and MUP officers and presented "their direct knowledge based on conversations with Albanians" according to which the latter were leaving due to the NATO bombing and the KLA. During the appeal hearing, Pavković also contested the reliability of the testimony of Kosovo Albanian witnesses concerning the reason for their departure (Appeal Hearing, 12 Mar 2013, AT. 317, 374-375).
[2052] Prosecution's Response Brief (Šainović), paras 262-265; Prosecution's Response Brief (Lukić), para. 177, referring, inter alia, to Trial Judgement, vol. 3, paras 17, 46. See also Prosecution's Response Brief (Pavković), paras 16, 23. See also Appeal Hearing, 11 Mar 2013, AT. 216, 221-228.

Case No. IT-05-87-A                                                23 January 2014
**Exhibit A
22**

months,[2053] and that none of the other possible explanations for the displacement affected its finding regarding the main cause for the displacement.[2054] Moreover, the Prosecution submits that few Kosovo Albanians left Kosovo for reasons unrelated to VJ and MUP actions and that the exact number of such individuals was irrelevant.[2055] Finally, the Prosecution submits that the Trial Chamber carefully assessed the credibility of the Kosovo Albanian witnesses and extensively relied on other corroborating evidence.[2056]

620.   The Appeals Chamber observes that the Trial Chamber carefully evaluated the evidence concerning the causes of the Kosovo Albanians' displacement. In particular, the Trial Chamber was mindful of the fact that there was a continuing conflict between the KLA and the forces of the FRY and Serbia and that the flood of Kosovo Albanians *en masse* across the borders began at the same time as the NATO bombing.[2057] Moreover, the Trial Chamber noted witness testimony referring to reasons for their movement other than the conduct of the forces of the FRY and Serbia[2058] as well as the evidence relevant to KLA activity and the NATO bombing, including its overall effect with regard to Kosovo and the FRY.[2059] The Trial Chamber acknowledged that "in some parts of Kosovo, […] people may have left their homes for different reasons, such as instructions from the KLA, the desire to avoid being present while combat between the KLA and forces of the FRY and

---

[2053] Prosecution's Response Brief (Šainović), paras 274-275; Prosecution's Response Brief (Lukić), paras 169, 173, referring, *inter alia*, to Trial Judgement, vol. 2, para. 1178, *ibid.*, vol. 3, para. 45. See also Appeal Hearing, 14 Mar 2013, AT. 549-551.

[2054] Prosecution's Response Brief (Šainović), paras 276-277, 316-318; Prosecution's Response Brief (Pavković), para. 22; Prosecution's Response Brief (Lukić), paras 160, 169-171, 173-175, 179. The Prosecution also argues that Lukić merely repeats his submission at trial (Prosecution's Response Brief (Lukić): paras 169-171, 173, 175-176).

[2055] Prosecution's Response Brief (Šainović), para. 277.

[2056] Prosecution's Response Brief (Šainović), paras 266-268; Prosecution's Response Brief (Lukić), paras 172, 178, referring, *inter alia*, to Trial Judgement, vol. 1, para. 50, *ibid.*, vol. 2, para. 1175.

[2057] Trial Judgement, vol. 2, para. 1177.

[2058] Trial Judgement, vol. 2, paras 1152-1155, 1174, and references therein (as reasons for the flight of the civilians from Kosovo, these witnesses referred, *inter alia*, to: (i) the fear of fighting between the FRY and Serbian forces on the one hand, and the KLA and NATO on the other hand; (ii) fear of forcible mobilisation by the KLA; (iii) fear of NATO bombing; (iv) KLA pressure on Kosovo Albanians to create an image of a humanitarian catastrophe; and (v) KLA leaflets calling upon Kosovo Albanians to leave). See also *e.g.*, Trial Judgement, vol. 2, paras 31-33, 84, 156, 190, 198, 227, 244, 278-286, 300, 532-533, 554-555, 640, 665-666, 672, 725, 757-758, 804-805, 820, 835, 865-866, 869, 886-887, 907, 914-915, 941-942, 967, 1102. See also *supra*, section VI. Furthermore, the Appeals Chamber observes that the Trial Chamber duly considered the testimony of the Prosecution witnesses which, according to Lukić (Lukić's Appeal Brief, paras 205, 242), mentioned reasons other than the conduct of the FRY and Serbian forces (Trial Judgement, vol. 2, paras 52-53, 647, 756-758, 822, 979, 984, 993, 1003).

[2059] The Trial Chamber's examination of this evidence with regard to the individual municipalities is set out in *e.g.*, Trial Judgement, vol. 2, paras 31-33, 57, 69, 104-115, 118-120, 143, 147, 153, 156, 158, 165, 174-177, 190, 230, 245-259, 276, 278-279, 282, 285-286, 294, 296, 316, 473-477, 497, 524-528, 531, 554-555, 561, 567-570, 574, 596-600, 623, 628, 646, 657, 670-672, 677, 679, 697, 725-726, 728, 748-752, 756-758, 796-797, 814-815, 834-837, 869, 886-887, 896-897, 899, 914-916, 941-942, 958, 960, 967, 973, 1009-1013, 1020, 1067, 1074, 1120, 1132, 1152-1155. See also *supra*, section VI. Regarding the overall effect of the NATO bombing with regard to the territory of Kosovo as well as Serbia and Montenegro, and damage and destruction to numerous targets therein, including buildings and objects forming part of the Serbian civilian infrastructure, see Trial Judgement, vol. 1, paras 1209-1214; *ibid.*, vol. 2, para. 1176. This demonstrates that Šainović's and Lukić's arguments that the Trial Chamber omitted to consider the overall impact of the NATO bombing (Šainović's Appeal Brief, paras 463-465; Lukić's Appeal Brief, paras 158-159, 234-238) are without merit.

**Exhibit A
23**

Serbia was taking place, or indeed the fact that NATO was bombing targets close to where they lived."[2060]

621.    However, the Trial Chamber also observed that none of the Kosovo Albanian witnesses cited the NATO bombing as a reason for their departure[2061] and that, while NATO bombs struck targets across the FRY, people did not leave other parts of the FRY, including Belgrade, in the large numbers in which people left Kosovo.[2062] The Trial Chamber further considered the evidence establishing that in only two locations people moved as a result of KLA action[2063] and noted that, while displaced Kosovo Albanians remained within Kosovo when the armed conflict between the KLA and the forces of the FRY and Serbia intensified in 1998, the massive flight of people across the borders began only on 24 March 1999.[2064] In addition, the Trial Chamber took into account that the KLA forces were small in contrast to the large number of VJ and MUP personnel deployed to Kosovo between March and June 1999.[2065] Furthermore, there was a significant body of evidence showing the commission of numerous crimes by the forces of the FRY and Serbia in 13 municipalities of Kosovo during the relevant period.[2066] This, as found by the Trial Chamber, included "[t]he consistent eye-witness accounts of the systematic terrorisation of Kosovo Albanian civilians by the forces of the FRY and Serbia, their removal from their homes, and the looting and deliberate destruction of their property".[2067]

---

[2060] Trial Judgement, vol. 2, para. 1175.
[2061] Trial Judgement, vol. 2, para. 1175, wherein the Trial Chamber further stated that it gave "little weight to anonymous hearsay from VJ and MUP officers about the reasons for the departure of Kosovo Albanians from their homes" and noted that displaced Kosovo Albanians might have been reluctant to give the real reasons to these officers wearing uniforms. Lukić's argument that the Trial Chamber should have relied upon this evidence given by VJ and MUP officers rather than Kosovo Albanian witnesses (Lukić's Appeal Brief, para. 160; supra, fn. 2051) is dismissed as it does not show any error in the Trial Chamber's evaluation of contradicting evidence, which should not be lightly disturbed by the Appeals Chamber (see Galić Appeal Judgement, para. 300).
[2062] Trial Judgement, vol. 2, para. 1176, referring to Spasoje Smiljanić, 17 Sep 2007, T. 15776-15777. Lukić's argument that the Trial Chamber failed to take into account the absence of the KLA in Belgrade and other parts of the FRY excluding Kosovo (Lukić's Appeal Brief, para. 161) is without merit, since this argument ignores the Trial Chamber's finding that only in two locations the movement of the Kosovo Albanians was a consequence of actions of the KLA (Trial Judgement, vol. 2, para. 1175).
[2063] Trial Judgement, vol. 2, para. 1175, specifying that those locations were in Vučitrn/Vushtrria municipality and in Suva Reka/Suhareka municipality. See also Trial Judgement, vol. 2, paras 524-525, 554-555, 749, 757-758, 796, and reference therein; supra, section VI.
[2064] Trial Judgement, vol. 2, para. 1177.
[2065] Trial Judgement, vol. 2, para. 1177, also finding that the KLA did not have the kinds of heavy equipment to which the state forces had access.
[2066] Trial Judgement, vol. 2, paras 1156, 1178; ibid., vol. 3, paras 41, 46. See also ibid., vol. 2, paras 1-1149, 1157-1174. See also supra, section VI. During the appeal hearing, Pavković contested the Trial Chamber's reliance on the testimony of former VJ soldiers, K90, K73, and K54 who described the expulsion of Kosovo Albanians from their homes during the NATO air campaign (Appeal Hearing, 12 Mar 2013, AT. 323-325, referring to Trial Judgement, vol. 2, para. 1172). The Appeals Chamber, however, dismisses his argument as he merely presented his own interpretation of the testimony without showing any error on the part of the Trial Chamber. With regard to K90's testimony, see also supra, sub-section VI.B.5.(b)(ii)a.; infra, sub-section VII.B.3.(a)(iv).
[2067] Trial Judgement, vol. 2, para. 1178. See also ibid., vol. 2, para. 1156.

**Exhibit A
24**

622.    Consequently, the Trial Chamber concluded that there was a broad campaign of violence against the Kosovo Albanian civilian population and that it was the deliberate actions of the forces of the FRY and Serbia during this campaign that caused the departure of at least 700,000 Kosovo Albanians from Kosovo between the end of March and the beginning of June 1999.[2068] In so doing, the Trial Chamber rejected the arguments by the Defence that the primary reasons for their mass movement were the NATO bombing, the actions of the KLA, and the combat between the KLA and the FRY and Serbian forces.[2069] According to the Trial Chamber, these were "factors in the complicated situation on the ground", but "not the cause of over 700,000 people moving *en masse* both within Kosovo and then across the border."[2070] Most of the contentions of Šainović, Pavković, and Lukić merely repeat the alternative reasons for the Kosovo Albanians' flight and fail to demonstrate any error in the Trial Chamber's findings. These submissions are accordingly dismissed. In light of the overwhelming evidence demonstrating a clearly discernible pattern of forcible displacement committed in Kosovo by the forces of the FRY and Serbia, the Appeals Chamber also finds that Šainović and Lukić have failed to substantiate why it would have been necessary to establish the number of people who left for each specific possible reason.

623.    Šainović's and Lukić's contentions that the Trial Chamber almost exclusively relied on the witness testimony of Kosovo Albanians in making a finding on the overall pattern of events[2071] are misconceived, since the Trial Chamber relied not only on this testimony, but also on other evidence.[2072] Furthermore, while the Trial Chamber found the consistent denial of Kosovo Albanian witnesses as to the KLA activity in their areas of residence untrustworthy,[2073] it reasonably considered that this did not render these witnesses wholly unreliable.[2074] It was within the Trial

---

[2068] Trial Judgement, vol. 2, para. 1178. See also *ibid.*, vol. 2, para. 1156; *ibid.*, vol. 3, para. 42. See also *supra*, sub-section VI.B.12.
[2069] Trial Judgement, vol. 2, paras 1175-1177. See also *ibid.*, vol. 3, paras 42, 45. The Appeals Chamber further notes that the Trial Chamber did not find many of the witnesses who asserted these alternative reasons to be entirely reliable, and rejected parts of their testimony concerning the alternative reasons (see *e.g.*, Trial Judgement, vol. 2, paras 83-84, 89, 244, 285, 468, 725, 826, 833, 894, 915, 956). The Appeals Chamber has confirmed a number of the Trial Chamber's findings on the credibility of these witnesses (see *supra*, section VI.).
[2070] Trial Judgement, vol. 3, para. 45. See also *ibid.*, vol. 3, para. 42.
[2071] Šainović's Appeal Brief, para. 432; Lukić's Appeal Brief, paras 160, 241, 364, 402.
[2072] Such evidence includes that provided by former VJ and MUP members (*e.g.*, Trial Judgement, vol. 2, paras 74, 82, 145, 152-155, 163, 226, 228-237, 398-401, 469-470, 498, 536-537, 547, 831, 997, 1172-1174; *ibid.*, vol. 3, para. 43), foreign journalists (*e.g.*, *ibid.*, vol. 2, paras 423-429, 805, 848-850, 858), and expert witnesses (*e.g.*, *ibid.*, vol. 2, paras 42, 137, 161, 509, 523, 609, 611-612, 615-618, 621, 1149) as well as various documentary evidence (*e.g.*, *ibid.*, vol. 2, paras 56-57, 216, 248).
[2073] Trial Judgement, vol. 1, para. 55.
[2074] In this regard, the Appeals Chamber recalls that it is not unreasonable for a trial chamber to accept certain parts of a witness's testimony and reject others (see *Boškoski and Tarčulovski* Appeal Judgement, para. 59; *Krajišnik* Appeal Judgement, para. 354; *Blagojević and Jokić* Appeal Judgement, para. 82; *Kupreškić et al.* Appeal Judgement, para. 333; *Muvunyi II* Appeal Judgement, para. 26). For the same reasons, the Appeals Chamber dismisses Lukić's general submission that the Trial Chamber erred in law by finding some witnesses reliable on certain issues and not on others, and by accepting parts of their testimony while rejecting others (Lukić's Appeal Brief, paras 77, 80, 82, referring to Trial Judgement, vol. 1, paras 50, 53, 64, and describing several characteristics witnesses allegedly exhibited which—he purports—categorically render a witness's evidence unreliable: inconsistency, bias (specifically, "evident hatred"),

Case No. IT-05-87-A

23 January 2014
**Exhibit A
25**

Chamber's discretion[2075] to find that the consistency in their testimony about their experiences of expulsion and ensuing crimes, which was corroborated by other evidence, supports its conclusion that there was a pattern of forcible displacement.[2076] The arguments raised by Šainović and Lukić in this regard are therefore dismissed.[2077]

624.    For the foregoing reasons, the Appeals Chamber dismisses the submissions of Šainović, Pavković, and Lukić with regard to the causes underlying the displacement of Kosovo Albanians.

### (ii)   Use of the NATO bombing as an opportunity to launch an attack

625.    Šainović argues that the Trial Chamber erroneously found that the FRY and Serbian forces used the start of the NATO bombing campaign "as an opportunity to launch a widespread and systematic attack on villages", leading to the flight of people from both these and neighbouring villages.[2078] Šainović contends that this finding is implausible considering that the war with NATO created the most unfavourable circumstances for the FRY and Serbia to implement the alleged

---

and exaggeration; *contra* Prosecution's Response Brief (Lukić), paras 92-94). Lukić also asserts that the Trial Chamber unjustifiably blamed the Defence for lack of preparation during the Prosecution case and for the resulting failure to ask Prosecution witnesses about contradictions that Defence witnesses brought to light in the Defence case (Lukić's Appeal Brief, paras 78-79, referring to Trial Judgement, vol. 1, para. 52; *contra* Prosecution's Response Brief (Lukić), para. 95). Lukić's argument in this regard is neither substantiated nor identifies a finding to his detriment based on this consideration by the Trial Chamber and, accordingly, is dismissed.

[2075] *Kupreškić et al.* Appeal Judgement, paras 31-32; *Nahimana et al.* Appeal Judgement, para. 194, and references therein; *Bikindi* Appeal Judgement, para. 116.

[2076] See Trial Judgement, vol. 2, para. 1175, stating:

> The Kosovo Albanian witnesses, who testified about their own expulsion and that of many others from Kosovo, came from a broad cross-section of that community, generally with no connection to one another beyond their victimisation, and it is inconceivable that they could or would all have concocted such detailed and consistent accounts of the events that they experienced and witnessed.

[2077] Lukić also claims that Kosovo Albanian witnesses changed their testimony under pressure by the KLA, referring to Hyseni's and Fazliji's testimonies as examples (Lukić's Appeal Brief, paras 206, 242, referring to Bedri Hyseni, 11 Sep 2006, T. 3110, Shaban Fazliji, 11 Apr 2008, T. 25227-25228 (private session)). However, Hyseni's testimony does not indicate any such pressure. Fazliji's testimony has no link with witness evidence about the crimes on the ground.

[2078] Šainović's Appeal Brief, paras 422, 462, referring to Trial Judgement, vol. 3, para. 41. Lukić also challenges this finding, understanding it to mean that the FRY and Serbia provoked the NATO bombing in order to proceed with the expulsion of the Kosovo Albanians (Lukić's Appeal Brief, paras 196, 202, 390; *contra* Prosecution's Response Brief (Lukić), para. 167. See also Pavković's Appeal Brief, para. 44). This argument is a misconstruction of the Trial Judgement and is therefore dismissed. The Trial Chamber did not find that the FRY and Serbia provoked the NATO bombing, but found that the bombing provided the FRY and Serbian forces with an opportunity to launch a widespread and systematic attack and displace Kosovo Albanians (Trial Judgement, vol. 3, paras 41, 92).

**Exhibit A**
**26**

common plan.[2079] The Prosecution responds that the Trial Chamber reasonably found that the JCE members used the NATO campaign as an opportunity to implement the common purpose.[2080]

626.    The Appeals Chamber recalls the Trial Chamber's finding that the FRY and Serbian forces used the NATO bombing as an opportunity to initiate a widespread and systematic attack aimed at the expulsion of Kosovo Albanians,[2081] as "this could all be done with plausible deniability because it could be blamed not only upon the KLA, but upon NATO as well".[2082] By arguing that the NATO bombing and the ensuing conflict between NATO and the FRY and Serbian forces created the "most unfavourable" circumstances for the FRY and Serbia to implement the common purpose, Šainović has failed to refer to any evidence supporting his contention.[2083] His argument is thus dismissed as unsubstantiated.

    (iii)  <u>Target of the attack</u>

627.    Šainović and Lukić contest the Trial Chamber's finding that the objective of the widespread and systematic attack launched by the FRY and Serbian forces was the "villages".[2084] Šainović avers that the evidence shows that the VJ and the MUP legitimately targeted the KLA forces, which had assumed positions in various villages, amidst the civilian population.[2085] Lukić argues that the KLA did not comply with the laws or customs of war and abused civilians by intermingling with civilians and using them as shields.[2086] He maintains that the Trial Chamber improperly expanded

---

[2079] Šainović's Appeal Brief, para. 423. See also Appeal Hearing, 11 Mar 2013, AT. 169. Šainović also argues that it was unreasonable for the Trial Chamber to reach this conclusion, without making any finding as to why the NATO campaign was initiated (Šainović's Appeal Brief, paras 460-462; *contra* Prosecution's Response Brief (Šainović), paras 313-315). This argument is dismissed as it misrepresents the Trial Judgement. The Trial Chamber found that international negotiators decided to abandon the negotiations and resort to the NATO air campaign because they were faced with the FRY and Serbian authorities' persistent intransigence on an international presence (see Trial Judgement, vol. 1, paras 312-409, 1206-1207).

[2080] Prosecution's Response Brief (Šainović), paras 269-270, also asserting that Šainović's argument in this regard merely repeats his trial submission and should be summarily dismissed.

[2081] Trial Judgement, vol. 3, paras 41, 92.

[2082] Trial Judgement, vol. 3, para. 92. See also *ibid.*, vol. 3 para. 41.

[2083] During the appeal hearing, Pavković also argued that the NATO bombing would have been the worst time for the expulsion of Kosovo Albanians as NATO surveillance aircrafts were observing everything that was happening on the ground during the bombing, without referring to any evidence supporting this assertion (Appeal Hearing, 12 Mar 2013, AT. 280). His argument is thus dismissed as unfounded and speculative. Regarding the effect of the NATO bombing in the territory of Kosovo as well as Serbia and Montenegro, see *supra*, para. 620.

[2084] Šainović's Appeal Brief, para. 424. See also Lukić's Appeal Brief, para. 260.

[2085] Šainović's Appeal Brief, paras 424-427, referring to Vladimir Lazarević, 8 Nov 2007, T. 17917, Exh. P1966, Exh. P1968, Exh. P1969, Exh. P1970, Exh. P1990, Exh. P2808, Exh. 3D690, Exh. 5D245, Exh. 5D249.

[2086] Lukić's Appeal Brief, paras 200, 226-228, 233. Lukić's arguments that the Trial Chamber erred in finding that an armed conflict existed "with the KLA, which was a terrorist organization" (Lukić's Appeal Brief, para. 159) and that the KLA was "an organized armed force that fought by legally acceptable means that complied with the laws or customs of war" (Lukić's Appeal Brief, paras 225-226; *contra* Prosecution's Response Brief (Lukić), para. 196) misrepresent the Trial Judgement. The Trial Chamber found the KLA to be an organised armed group (Trial Judgement, vol. 1, paras 840-841). However, the Trial Chamber did not make any findings as to whether the KLA complied with the laws or customs of war or whether it was a "terrorist" group (Trial Judgement, vol. 1, paras 795, 840-841), since it was immaterial for the determination of the organised nature of the KLA and the existence of an armed conflict (Trial Judgement, vol. 1, para. 791, correctly setting out the law in this regard). The Appeals Chamber does not see any error in this approach. Lukić's submissions in this regard are therefore dismissed.

Case No. IT-05-87-A

23 January 2014

Exhibit A
27

the definition of "civilian" to include KLA members who engaged in combat wearing civilian clothes and that if the definition of "civilian" in international humanitarian law excluding "combatants or fighters *hors de combat*" had been properly applied, the presence of a large number of soldiers or combatants would have deprived the population of the civilian character.[2087]

628.    The Prosecution submits that the Trial Chamber correctly found that the FRY and Serbian authorities conducted "an orchestrated, widespread and systematic campaign of terror and violence against the Kosovo Albanian civilian population" and not simply legitimate operations against the KLA.[2088] The Prosecution adds that, having discussed evidence related to KLA activity and set forth the correct law that the population need only be predominantly civilian, the Trial Chamber carefully considered whether the VJ and the MUP were legitimately combating the KLA in each of the relevant locations.[2089]

629.    The Appeals Chamber notes that the Trial Chamber carefully considered whether the VJ and the MUP were engaged in legitimate combat against the KLA in each of the relevant locations and took into account the KLA's presence and activities.[2090] It also examined evidence showing that in several instances the KLA intermingled with civilians.[2091] As a result, in some instances the Trial Chamber did not find that an attack on the civilian population or criminal acts were established, since it could not exclude the possibility that the concerned acts were part of legitimate operations against the KLA.[2092] In other instances, the Trial Chamber found that although the FRY and Serbian forces targeted the KLA, they simultaneously attacked Kosovo Albanian civilians in the area in a systematic manner.[2093] Based on the specific findings with respect to each of the 13 municipalities, the Trial Chamber concluded that the FRY and Serbian forces conducted a broad campaign of violence directed against the Kosovo Albanian civilian population.[2094] The general assertions of Šainović and Lukić that the VJ and the MUP targeted the KLA intermingling with civilians fall short of establishing any error in the Trial Chamber's specific analysis as to each location, which was the basis for its overall conclusion. For the same reason, Lukić's general claim that the Trial

---

[2087] Lukić's Appeal Brief, paras 229-232, referring to *Blaškić* Appeal Judgement, para. 115, *Galić* Appeal Judgement, para. 50, *Mrkšić et al.* Trial Judgement, para. 461, Article 50 of Additional Protocol to the Geneva Conventions of 12 August 1949, Relating to the Protection of Victims of International Armed Conflicts (Protocol I), Geneva, 8 June 1977 ("Additional Protocol I").
[2088] Prosecution's Response Brief (Šainović), paras 271-273, referring to Trial Judgement, vol. 2, paras 1156, 1178, *ibid.*, vol. 3, para. 95.
[2089] Prosecution's Response Brief (Šainović), paras 272-273, and references therein; Prosecution's Response Brief (Lukić), para. 197, referring to Trial Judgement, vol. 1, paras 145-146, 797-820, *ibid.*, vol. 2, paras 1179-1262.
[2090] See *e.g.*, Trial Judgement, vol. 2, paras 57, 69, 109-115, 147, 165, 174-177, 230, 245-259, 276, 278, 285, 294, 296, 316, 473-477, 497, 524-528, 561, 567-570, 574, 596-600, 623, 646, 657, 677, 679, 697, 726, 728, 748-752, 796-797, 814-815, 896-897, 899, 916, 958, 960, 1009-1013, 1020, 1067, 1074, 1102, 1120, 1132.
[2091] See *e.g.*, Trial Judgement, vol. 2, paras 294, 477, 734, 759, 767, 797. See also *ibid.*, vol. 1, paras 828, 837-838.
[2092] See *e.g.*, Trial Judgement, vol. 2, paras 147, 552-555, 1258.
[2093] Trial Judgement, vol. 2, paras 230, 259, 671-675, 679, 795-797, 1067, 1199, 1206, 1219.
[2094] Trial Judgement, vol. 2, paras 1156, 1178.

Case No. IT-05-87-A                                                                        23 January 2014

**Exhibit A**
**28**

Chamber improperly expanded the definition of "civilian" is unsubstantiated. The Appeals Chamber thus dismisses the arguments of Šainović and Lukić in this regard.

(iv)   Use of Kosovo Albanians to deter the NATO bombing

630.    Pavković and Lukić argue that Merita Deda, K90, and Momir Stojanović provided evidence demonstrating the VJ's attempt to prevent Kosovo Albanians from leaving their villages and contest the Trial Chamber's finding that such evidence does not undermine the general pattern of displacement.[2095] Pavković also avers that the evidence shows the non-existence of a plan to expel Kosovo Albanians.[2096] More specifically, Pavković and Lukić submit that: (i) Deda testified that she and her convoy were ordered back to their villages by VJ soldiers on 28 April 1999;[2097] (ii) K90 testified that it was decided at the command level of the VJ not to remove some Kosovo Albanians from areas in which the VJ was operating because that would have left the VJ without the protection of surrounding civilians and thus vulnerable to NATO attacks;[2098] (iii) K90 further clarified in court that his commander "never ordered the expulsion of villagers" to Albania and that the population was not relocated until the shelling of cluster bombs by NATO around mid-April 1999; [2099] and (iv) Stojanović provided corroborating testimony that there was no organised plan of expulsion since the presence of civilians was a deterrent to the NATO bombing.[2100] The Prosecution responds that the fact that some Kosovo Albanians were instructed to go back to their villages does not undermine the existence of a JCE to forcibly displace Kosovo Albanians.[2101]

631.    The Appeals Chamber observes that the Trial Chamber carefully assessed the testimony of Deda, K90, and Stojanović in this regard[2102] and concluded that this evidence did not undermine the general pattern of displacement.[2103] Moreover, the evidence that *some* Kosovo Albanians were ordered back to their villages and used as protection against NATO attacks is in keeping with the Trial Chamber's finding that the common purpose was not to displace every Kosovo Albanian from Kosovo, but to displace a sufficient number to tip the demographic balance of the region.[2104]

---

[2095] Pavković's Appeal Brief, paras 57-58; Lukić's Appeal Brief, paras 403-404.
[2096] Pavković's Appeal Brief, para. 58.
[2097] Pavković's Appeal Brief, para. 57, referring to Exh. P2233, p. 4, Trial Judgement, vol. 3, para. 44.
[2098] Pavković's Appeal Brief, paras 57-58; Lukić's Appeal Brief, para. 404, referring to Trial Judgement, vol. 3, para. 44.
[2099] Pavković's Appeal Brief, para. 57; Lukić's Appeal Brief, para. 403, referring to K90, 29 Jan 2007, T. 9273.
[2100] Pavković's Appeal Brief, para. 58, referring to Trial Judgement, vol. 3, para. 44.
[2101] Prosecution's Response Brief (Pavković), para. 24.
[2102] Trial Judgement, vol. 3, para. 44. See also Merita Deda, Exh. P2233, p. 4.
[2103] Trial Judgement, vol. 3, para. 44, rejecting Lazarević's argument to the contrary.
[2104] Trial Judgement, vol. 3, para. 95. In relation to this finding, Šainović, Pavković, and Lukić argue that the ethnic balance in Kosovo was eventually unchanged as 100,000 Serbs, almost half of the Serb population in Kosovo, had also left Kosovo as a result of the NATO campaign, which actually tipped the demographic balance to the detriment of the Serbs (Šainović's Appeal Brief, para. 431; Pavković's Appeal Brief, para. 54; Lukić's Appeal Brief, paras 244, 386-388; *contra* Prosecution's Response Brief (Šainović), paras 278-279). The Appeals Chamber dismisses this argument as

Case No. IT-05-87-A

23 January 2014
**Exhibit A**
**29**

632.    Furthermore, the assertion of Pavković and Lukić that K90 stated that his commander never ordered the expulsion of villagers to Albania, takes his testimony out of context. As noted by the Trial Chamber, K90 testified that he was ordered to direct the people towards Đakovica/Gjakova [town] and that civilians were not directed towards Albania until after cluster bombs were dropped by NATO, but disagreed with the proposition that the villagers were removed because of the NATO bombing.[2105] The Trial Chamber also noted that while K90 described the removal of Kosovo Albanians to Đakovica/Gjakova town as "relocation", he also stated that "[i]f [you're] clearing up a village, you're expelling these people."[2106] Moreover, Pavković has failed to demonstrate that the Trial Chamber erred in its assessment of Stojanović's evidence. The Trial Chamber was entitled to partly rely on his testimony as corroboration for the use of some civilians as protection against NATO attacks, while placing little weight on other parts of his evidence in which he denied having heard of any plan to expel Kosovo Albanians from the area.[2107]

633.    Accordingly, the Appeals Chamber dismisses the submissions of Pavković and Lukić concerning the non-expulsion of Kosovo Albanians as protection from the NATO bombing.

### (v)   Conclusion

634.    Šainović, Pavković, and Lukić have failed to show any error in the Trial Chamber's findings regarding the discernible pattern of forcible displacement and its reliance upon this pattern in inferring a common purpose. The Appeals Chamber therefore dismisses all of their arguments in this regard.

### (b)   Seizure of IDs

635.    The Trial Chamber found that the forces of the FRY and Serbia systematically confiscated the IDs of Kosovo Albanians in the course of their displacement.[2108] Noting that a number of Kosovo Albanian witnesses had their IDs confiscated or witnessed other Kosovo Albanians having their IDs seized "at the borders and, on occasion, as they were being expelled from their homes", it found that "this was a common practice, carried out primarily by members of the police."[2109] The

---

irrelevant, since the existence of a common purpose can be established regardless of whether the political goal of the JCE has materialised as a result of the execution of the common purpose. Šainović's argument that had there been a common purpose to change the ethnic balance, the perpetrators of the crimes would not have allowed the Serbs to leave (Šainović's Appeal Brief, para. 431) is also dismissed as unsubstantiated.
[2105] Trial Judgement, vol. 3, fn. 84, referring to K90, 29 Jan 2007, T. 9273, ibid., 30 Jan 2007, T. 9407-9408.
[2106] Trial Judgement, vol. 3, para. 43, referring to K90, 29 Jan 2007, T. 9271-9272, 9297-9298, 9302-9303, 9331, K90, Exh. P2652, paras 40-45. See also supra, sub-section VI.B.5.(b)(ii)a.
[2107] Trial Judgement, vol. 3, para. 44, referring to Momir Stojanović, 6 Dec 2007, T. 19732. See also infra, sub-section VII.B.4.(a) where the Appeals Chamber affirms the Trial Chamber's finding dismissing the testimony of witnesses categorically denying the existence of a plan to expel Kosovo Albanians.
[2108] Trial Judgement, vol. 3, para. 40. See also ibid., vol. 3, paras 34, 38.
[2109] Trial Judgement, vol. 3, para. 38.

**Exhibit A**
**30**

Trial Chamber further found that many of the confiscated IDs were destroyed and concluded that "the confiscation and destruction of [IDs] is some of the strongest evidence in the case going to show that the events of spring 1999 in Kosovo were part of a common purpose."[2110]

636.   Šainović, Pavković, and Lukić contest the Trial Chamber's finding that the confiscation and destruction of IDs is "some of the strongest evidence" showing that "the events of spring 1999 in Kosovo were part of a common purpose."[2111] They submit that the Trial Chamber failed to explain the relevance of the seizure of IDs and how it contributed to the execution of the common purpose to alter the ethnic balance.[2112] In particular, Šainović, Pavković, and Lukić challenge the Trial Chamber's findings concerning the scope and manner in which IDs were confiscated and argue that in any event, the seizure of IDs could not have contributed to the execution of the common purpose, given that it did not cause the loss of citizenship or make Kosovo Albanians' return to Kosovo difficult. The Appeals Chamber will address these arguments in turn.

     (i)   Confiscation of IDs as a common practice

637.   Šainović, Pavković, and Lukić challenge the Trial Chamber's finding that seizure of IDs "was a common practice."[2113] In particular, Šainović submits that had a common plan to forcibly displace the Kosovo Albanian population existed, it would have entailed a systematic seizure of IDs everywhere in Kosovo and not merely at border crossings.[2114] Šainović also contends that the evidence shows that IDs were not seized from everyone and that cases of seizure of IDs, if any, were "isolated incidents".[2115] Lukić asserts that although 62 Kosovo Albanian witnesses testified before the Trial Chamber, it noted only the testimony of 26 Kosovo Albanians who gave evidence of the confiscation of IDs at the border.[2116] Lukić also points to two border crossings where no witness stated that his or her ID was confiscated[2117] and challenges the Trial Chamber's reliance on the testimony of Hamide Fondaj and Sadije Sadiku describing ID confiscation at another border crossing.[2118] Pavković contends that, as the exact percentage of Kosovo Albanians whose IDs were confiscated is unknown, there was no basis for the Trial Chamber to conclude that a "vast majority"

---

[2110] Trial Judgement, vol. 3, para. 40.
[2111] Trial Judgement, vol. 3, para. 40; Šainović's Appeal Brief, para. 421; Pavković's Appeal Brief, para. 51; Lukić's Appeal Brief, para. 504.
[2112] Šainović's Appeal Brief, para. 413; Pavković's Appeal Brief, para. 65; Lukić's Appeal Brief, para. 504, referring to Trial Judgement, vol. 3, para. 40.
[2113] Lukić's Appeal Brief, para. 505, referring to Trial Judgement, vol. 3, para. 38. The Appeals Chamber understands Šainović and Pavković to also challenge this finding from the context of their arguments (see Šainović's Appeal Brief, paras 418, 420; Pavković's Appeal Brief, paras 51, 59-62). See also Pavković's Reply Brief, para. 10.
[2114] Šainović's Appeal Brief, paras 418, 420.
[2115] Šainović's Appeal Brief, paras 418, 420.
[2116] Lukić's Appeal Brief, para. 507.
[2117] Lukić's Appeal Brief, para. 510, referring to the Ðeneral Janković/Hani i Elezit and Globočica/Glloboçica border crossings.
[2118] Lukić's Appeal Brief, paras 508, 515, referring to the Vrbnica/Verbnica (Morina) border crossing.

Exhibit A
31

of Kosovo Albanians were subject to this practice.[2119] He adds that certain Kosovo Albanian witnesses might have "enhanced their testimony in an anti-Serb manner."[2120]

638. In addition, Šainović argues that MUP officials denied the existence of any order to seize IDs[2121] and refers to Krsman Jelić's evidence that VJ unit commanders prohibited the inspection of IDs.[2122] Lukić adds that there is no evidence that he issued any order, instruction or recommendation, or expressed support for the confiscation or destruction of IDs.[2123]

639. The Prosecution responds that the Trial Chamber "reasonably concluded that confiscating and destroying [IDs] of Kosovo Albanians was a 'common practice'" of the FRY and Serbian forces during the NATO campaign.[2124] Contrary to Šainović's argument that these were only "isolated incidents", the Prosecution maintains that the fact that IDs were not confiscated in a few instances does not render the practice isolated.[2125] In response to Pavković, the Prosecution argues that the Trial Chamber did not need to find that the vast majority of the forcibly displaced Kosovo Albanians were subject to ID confiscation.[2126] The Prosecution adds that Lukić's argument about the number of witnesses who testified on ID confiscation is undeveloped and that he also misinterprets the Trial Chamber's findings and the evidence.[2127]

640. With regard to orders to seize Kosovo Albanians' IDs, the Prosecution contends that Šainović fails to show any error in the Trial Chamber's decision not to rely on the evidence of MUP officials denying such orders.[2128] Concerning Jelić's evidence that VJ units were not authorized to check IDs, the Prosecution responds that the Trial Chamber found Jelić unreliable and that, at any rate, it would not contradict its finding that primarily police forces confiscated IDs.[2129]

---

[2119] Pavković's Appeal Brief, para. 62. See also Appeal Hearing, 12 Mar 2013, AT. 373-374. In support of this contention, Pavković refers to witness testimony allegedly showing that only a small percentage of Kosovo Albanians was required to leave IDs at the Ćafa Prušit/Qafa e Prushit border crossing (Pavković's Appeal Brief, para. 61). He also asserts that the Trial Chamber treated Kosovo Albanian witnesses who testified to the seizure of their IDs as if they were representative of the whole Kosovo Albanian population (*ibid.*, paras 59-60). See also Lukić's Appeal Brief, para. 512.
[2120] Pavković's Appeal Brief, para. 60, arguing that negotiations on the status of Kosovo were ongoing during the trial.
[2121] Šainović's Appeal Brief, para. 417.
[2122] Šainović's Appeal Brief, para. 419, referring to Krsman Jelić, 26 Nov 2007, T. 19023.
[2123] Lukić's Appeal Brief, para. 517.
[2124] Prosecution's Response Brief (Šainović), para. 282. See also Prosecution's Response Brief (Pavković), paras 25-26; Prosecution's Response Brief (Lukić), para. 180.
[2125] Prosecution's Response Brief (Šainović), paras 284-285, also arguing that his argument was reasonably rejected at trial and referring, *inter alia*, to Pavković's Closing Brief, para. 359.
[2126] Prosecution's Response Brief (Pavković), para. 26. The Prosecution further submits that the Trial Chamber carefully considered the evidence of Kosovo Albanian witnesses while taking into account possible bias towards the KLA (Prosecution's Response Brief (Pavković), para. 25).
[2127] Prosecution's Response Brief (Lukić), paras 184-185, referring, *inter alia*, to Trial Judgement, vol. 2, para. 531, *ibid.*, vol. 3, para. 35, fn. 64.
[2128] Prosecution's Response Brief (Šainović), para. 283.
[2129] Prosecution's Response Brief (Šainović), para. 286.

**Exhibit A**
**32**

641.    The Appeals Chamber finds that a reasonable trier of fact could have concluded that the only reasonable inference was that the confiscation of IDs was a common practice.[2130] The Trial Chamber reached this conclusion based, *inter alia*, on the testimony of Kosovo Albanian witnesses who gave evidence of the confiscation of IDs belonging to them and other Kosovo Albanians along the border or in convoy on their way to the border as well as in various other locations, including villages, towns, and fields in different municipalities.[2131] The Trial Chamber further relied on evidence of witnesses from the FRY and Serbian forces describing ID confiscation.[2132] The Trial Chamber also considered the evidence of a number of witnesses depicting the organised manner in which large numbers of IDs were confiscated.[2133] Furthermore, in reaching its conclusion, the Trial Chamber took into account that IDs were not confiscated from all Kosovo Albanians. It observed that "[a] few of [the] witnesses [in convoys to the border] were not subject to confiscation of their identification, but the majority testified to [ID] confiscation at the border by the forces of the FRY and Serbia."[2134]

642.    Šainović's and Lukić's arguments concerning Kosovo Albanian witnesses who did not testify to ID confiscation or who testified that they were not subject to it[2135] are mere attempts to

---

[2130] Trial Judgement, vol. 3, para. 38.

[2131] Regarding ID confiscation at the border or on the way to the border (for instance, at or *en route* to the Vrbnica/Vërbnica (Morina) border crossing to Albania; the Ćafa Prušit/Qafa e Prushit border crossing to Albania; Ðeneral Janković/Hani i Elezit adjacent to the border with Macedonia; and Miratovac close to the border with Macedonia), see Trial Judgement, vol. 2, paras 28-29, 67, 75, 139, 147, 184, 208, 225, 266-268, 275, 277, 281, 285, 375, 457, 514-515, 530-531, 717, 724, 782, 860, 930, and references therein; *ibid.*, vol. 3, paras 32-33, 35, and references therein. Other locations in which IDs were confiscated include a field in Dečani/Deçan municipality, a house in the village of Korenica/Korenicë in Ðakovica/Gjakova municipality, sites in and around houses in Dušanovo/Dushanova in Prizren municipality (see *ibid.*, vol. 2, para. 269), the forest near Celina in Orahovac/Rahovec municipality, a railway bridge in Bela Crkva/Bellacërka in Orahovac/Rahovec municipality, the woods in Mala Kruša/Krusha e Vogël municipality, a meadow in Srbica/Skenderaj municipality, and a house in Priština/Prishtina town in Priština/Prishtina municipality (see *ibid.*, vol. 2, paras 60, 273, 276, 323, 351, 410, 656, 673, 842, and references therein; *ibid.*, vol. 3, paras 35-36, and references therein).

[2132] See Trial Judgement, vol. 3, paras 32, 34, 39, and references therein. In addition, see *ibid.*, vol. 3, para. 39, referring to the testimony of a former KVM observer, Richard Ciaglinski, who saw a very large pile of Kosovo Albanians' documents, including IDs and passports, being burned at the MUP office in Priština/Prishtina (Richard Ciaglinski, 17 Nov 2006, T. 6848-6850; *ibid.*, 21 Nov 2006, T. 6983-6987; Richard Ciaglinski, Exh. P2489, T. 3210-3211).

[2133] For instance, the Trial Chamber noted that: (i) at Vrbnica/Vërbnica (Morina) border crossing, four witnesses reported that the confiscated IDs were thrown into a box or basket, and described the quantity of IDs there as "'a heap', 'a hill', or 'a pile'" (Trial Judgement, vol. 3, para. 33, and references therein); and (ii) at Ćafa Prušit/Qafa e Prushit border crossing, witnesses testified that there was a box where the MUP threw the confiscated IDs (Trial Judgement, vol. 3, para. 33, and references therein). The Appeals Chamber further recalls that the Trial Chamber specifically cited some witnesses' descriptions of confiscation of IDs, which show that not only the witnesses but also others who were with them in the respective convoys or groups were almost all subject to the confiscation of IDs (Trial Judgement, vol. 3, para. 32, fn. 47, citing Sabit Kadriu, Exh. P2377, p. 20, Rahim Latifi, Exh. P2381, p. 3, Martin Pnishi, Exh. P2236, 4 Apr 2000, p. 4, Mehmet Mazrekaj, 3 Nov 2006, T. 5813, 5838).

[2134] Trial Judgement, vol. 3, para. 32.

[2135] Šainović's Appeal Brief, para. 418; Lukić's Appeal Brief, para. 507. See also Lukić's Appeal Brief, para. 510, concerning two border crossings about which no witness mentioned confiscation of his or her ID. The Appeals Chamber notes that while Bala, as Lukić points out, did not testify to the confiscation of her own ID, she mentioned that at one of the two border-crossings in question (Ðeneral Janković/Hani i Elezit) she saw Serb forces demanding IDs from male Kosovo Albanians and tearing them up and heard from many other Kosovo Albanian men in her convoy that their IDs had been confiscated (see Trial Judgement, vol. 2, para. 860; *ibid.*, vol. 3, para. 32, referring to Nazlie Bala, 23 Aug 2006, T. 2173, 2191-2192, Nazlie Bala, Exh. P2262, p. 8).

Exhibit A
33

introduce their own interpretation of the evidence without showing any error in the Trial Chamber's assessment of the totality of the evidence in this regard. Nor do Lukić's challenges to the Trial Chamber's reliance on the testimony of Fondaj and Sadiku regarding ID confiscation demonstrate any error on the part of the Trial Chamber.[2136] Šainović's submission stressing the fact that IDs had not been seized "everywhere"[2137] is also unpersuasive, since consistent practice of ID confiscation mainly at border crossings and *en route* to the border can still suggest the existence of a common practice.

643.    Furthermore, in light of the evidence showing a consistent pattern of the confiscation of IDs as recounted above, the Appeals Chamber is not persuaded by Pavković's argument that there was no basis for the Trial Chamber to conclude that a "vast majority" of Kosovo Albanians were subject to this practice.[2138] While the evidence did not establish the percentage of people whose IDs had been confiscated, it provided a sufficient basis for the Trial Chamber to reasonably conclude that the confiscation was a common practice.

644.    Neither is the Appeals Chamber persuaded by Pavković's argument that certain Kosovo Albanian witnesses might have "enhanced their testimony in an anti-Serb manner" as the Trial Chamber itself expressed its reservations as to the denial of Kosovo Albanian witnesses regarding the KLA's activity or presence.[2139] Given that a trial chamber can reasonably accept certain parts of a witness's testimony and reject others,[2140] Pavković has failed to show that it was unreasonable for

---

[2136] According to Lukić, the Trial Chamber's observation that "at the Vrbnica/Verbnica (Morina) border crossing, witnesses reported the burning of Kosovo Albanian identity documents after their confiscation by the forces of the FRY and Serbia" is based on a misinterpretation of the evidence of Fondaj, who in fact stated that the police had properly treated her group (Lukić's Appeal Brief, para. 515, referring to Hamide Fondaj, Exh. P2283, p. 5). However, this finding was based on the evidence of Popaj and Sadiku, who were eye-witnesses to the confiscation and destruction of documents including IDs and passports (Trial Judgement, vol. 3, para. 35. fn. 64, referring to Sabri Popaj, Exh. P2446, p. 12, Sadije Sadiku, 18 Aug 2006, T. 1903), and Fondaj's evidence that while she and her group were not subject to ID confiscation at the border crossing (Trial Judgement, vol. 3, para. 32, referring to Hamide Fondaj, Exh. P2283, p. 5), "[t]hose people in the convoy who crossed two hours later were beaten and all their ID cards were taken away and burnt" (Trial Judgement, vol. 3, para. 35, fn. 64, referring to Hamide Fondaj, Exh. P2283, p. 5). Lukić also asserts that Sadiku, who stated that her documents were taken at the border crossing, was never issued any passport by the Serbian Government and therefore that her documents could not have been seized in 1999 (Lukić's Appeal Brief, para. 508, referring to Exh. 6D1324, Petar Dujković, 28 Feb 2008, T. 23355-23356). This submission is unsupported by the evidence to which Lukić refers and does not contradict her testimony that she and others in her convoy were stopped by the border police at a checkpoint and forced to give their "IDs, passports, whatever [they] had on [them]", which were subsequently burned (Sadije Sadiku, 18 Aug 2006, T. 1903; Sadije Sadiku, Exh. P2256, para. 38). Consequently, Lukić neither shows a misinterpretation by the Trial Chamber of Fondaj's evidence nor demonstrates why its finding does not stand on the basis of Popaj's and Sadiku's eye-witness accounts and the portion of Fondaj's evidence as to what she later learned.

[2137] Šainović's Appeal Brief, paras 418, 420.

[2138] Pavković's Appeal Brief, para. 62.

[2139] Pavković's Appeal Brief, paras 59-60, referring, *inter alia*, to Trial Judgement, vol. 1, para. 55.

[2140] See *Boškoski and Tarčulovski* Appeal Judgement, para. 59; *Krajišnik* Appeal Judgement, para. 354; *Blagojević and Jokić* Appeal Judgement, para. 82; *Kupreškić et al.* Appeal Judgement, para. 333; *Muvunyi II* Appeal Judgement, para. 26.

Exhibit A
34

the Trial Chamber to rely on the evidence of Kosovo Albanian witnesses concerning ID confiscation.

645.    Šainović's submission that MUP officials denied the existence of orders to seize IDs[2141] is a mere assertion that the Trial Chamber failed to give sufficient weight to certain pieces of evidence without showing any error in its evaluation of the relevant evidence. The Trial Chamber was aware of the testimony of Nebojša Ognjenović and Petar Dujković, both police personnel, who denied receiving orders or ordering anyone to seize IDs from Kosovo Albanians crossing the border.[2142] However, it did not rely on their evidence in light of the overwhelming evidence of the extensive seizure of IDs[2143] as well as other witness testimony referring to orders within the VJ and the MUP to confiscate or destroy Kosovo Albanians' IDs.[2144] Furthermore, Lukić's submission that there is no evidence that he issued orders for ID confiscation[2145] does not demonstrate why the Trial Chamber's finding cannot stand on the basis of other evidence.

646.    Moreover, with regard to Jelić's evidence that VJ unit commanders prohibited the inspection of IDs,[2146] the Appeals Chamber recalls that the Trial Chamber identified several indicia diminishing Jelić's credibility and doubted the reliability of his testimony where it clashed with that of other witnesses.[2147] Given that there was evidence which conflicted with Jelić's testimony,[2148] the Trial Chamber was consistent in declining to rely on his evidence in this respect. Šainović has failed to demonstrate any error in its assessment of his evidence.

647.    Consequently, Šainović, Pavković, and Lukić have failed to demonstrate that the Trial Chamber was unreasonable in concluding that a common practice of ID confiscation existed.

---

[2141] Šainović's Appeal Brief, para. 417, read together with *ibid.*, paras 418-420.
[2142] Trial Judgement, vol. 3, para. 37, and references therein. As for these witnesses' affiliations, see Trial Judgement, vol. 2, paras 280, 284.
[2143] See Trial Judgement, vol. 3, paras 37-38. The Appeals Chamber also recalls that the Trial Chamber did not consider Ognjenović to be generally credible (Trial Judgement, vol. 2, para. 244).
[2144] Trial Judgement, vol. 3, paras 34, 39, wherein the Trial Chamber refers to the evidence of K89, a VJ soldier in Đakovica/Gjakova, who was told by his commanding officer to tear apart Kosovo Albanians' IDs (K89, 24 Jan 2007, T. 9124; *ibid.*, 25 Jan 2007, 9154-9156, 9201), and the evidence of K54, a VJ soldier, who was informed by a colleague that the police were under orders to confiscate IDs of Kosovo Albanians at one border crossing (K54, 26 Feb 2007, T. 10520). Regarding K89's evidence, see also *infra*, para. 651.
[2145] Lukić's Appeal Brief, para. 517.
[2146] Šainović's Appeal Brief, para. 419, referring to Krsman Jelić, 26 Nov 2007, T. 19023.
[2147] Trial Judgement, vol. 2, para. 956, stating that: (i) Jelić frequently changed his own testimony when confronted with contradictory evidence; (ii) Jelić denied allegations with general statements, which were subsequently shown to be wrong; and (iii) Jelić's general explanations were often not credible. See also *supra*, para. 359.
[2148] See *supra*, para. 645.

**Exhibit A**
**35**

(ii)   Whether the common purpose could be inferred from the seizure of IDs

648.   Šainović, Pavković, and Lukić assert that the seizure of IDs could not have contributed to the implementation of the common purpose, and thus could not have been part of it,[2149] since Kosovo Albanian citizens of the FRY whose IDs were seized did not lose their citizenship as a result,[2150] nor did they encounter any problems on their return to Kosovo.[2151] Šainović also contends that the Trial Chamber's conclusion regarding the seizure of IDs in the context of the common purpose contradicts its finding in relation to Milutinović's decree concerning IDs, namely, that the loss of IDs did not simultaneously mean the loss of citizenship.[2152] In addition, Lukić argues that passports, rather than IDs, were required to cross the state border to return to Kosovo.[2153] In the same context, Pavković contends that when rejecting his assertion that there was no plan to confiscate IDs, the Trial Chamber erroneously relied upon the evidence of K89.[2154]

649.   In response, the Prosecution maintains that the confiscation and destruction of IDs as part of the forcible displacement of Kosovo Albanians was not "a legal procedural matter ruled by the laws of FRY/Serbia", but rather "violent conduct which took place during the criminal execution of the JCE."[2155] It submits that the Trial Chamber reasonably found that although ethnic Albanian citizens of the FRY did not lose their citizenship by deprivation of their IDs, without IDs it would be more difficult for forcibly displaced Kosovo Albanians to prove their identity and citizenship and thus to return.[2156] According to the Prosecution, it is irrelevant whether the seizure and destruction of the IDs implied the loss of citizenship.[2157] Furthermore, the Prosecution asserts that Lukić merely repeats his submission at trial that passports, and not IDs, were needed to cross the state border.[2158] With respect to Pavković's contention regarding K89's evidence, the Prosecution submits that the Trial Chamber properly accepted this evidence.[2159]

650.   As to the legal effect of the seizure of IDs, the Appeals Chamber recalls that the Trial Chamber was cognisant of the relevant legislation and decrees concerning IDs and citizenship,

---

[2149] Pavković's Appeal Brief, paras 63, 65-68; Šainović's Appeal Brief, para. 416; Lukić's Appeal Brief, para. 504.
[2150] Lukić's Appeal Brief, para. 514; Pavković's Appeal Brief, para. 67, referring to Trial Judgement, vol. 3, para. 172. See also Šainović's Appeal Brief, para. 421.
[2151] Lukić's Appeal Brief, para. 504; Šainović's Appeal Brief, paras 416, 420; Pavković's Appeal Brief, paras 67-68, referring to Trial Judgement, vol. 3, para. 172. See also Pavković's Appeal Brief, para. 63, referring to the Constitution of the FRY and the Law on Yugoslav Citizenship. Šainović and Lukić further argue that because records were kept, lost IDs could have been easily re-issued (Šainović's Appeal Brief, paras 414-416; Lukić's Appeal Brief, paras 506, 509).
[2152] Šainović's Appeal Brief, para. 421, referring to Trial Judgement, vol. 3, para. 164.
[2153] Lukić's Appeal Brief, para. 513.
[2154] Pavković's Appeal Brief, para. 64, referring to Trial Judgement, vol. 3, para. 34.
[2155] Prosecution's Response Brief (Pavković), para. 26 (internal reference omitted).
[2156] Prosecution's Response Brief (Šainović), para. 287; Prosecution's Response Brief (Lukić), para. 182, referring to Trial Judgement, vol. 3, paras 166, 172.
[2157] Prosecution's Response Brief (Lukić), para. 182. See also Prosecution's Response Brief (Šainović), para. 288.
[2158] Prosecution's Response Brief (Lukić), para. 183, requesting summary dismissal of this argument.
[2159] Prosecution's Response Brief (Pavković), para. 27, referring to Trial Judgement, vol. 3, para. 34.

Exhibit A
36

including Milutinović's Decree on Identity Cards During the State of War,[2160] as well as the testimony of an expert witness, Branislav Simonović, referring to the FRY Constitution.[2161] Having examined this evidence, the Trial Chamber acknowledged that "the Kosovo Albanian citizens of the FRY whose [IDs] were seized did not lose their citizenship as a result"[2162] and that it "received no evidence of Kosovo Albanians encountering problems on their return to Kosovo because of the loss of the [IDs]."[2163] Nonetheless, the Trial Chamber also found, on the basis of the evidence, that "proving identity and thus citizenship would be easier for a person in possession of a Yugoslav identity document".[2164]

651.    In any event, given that the Trial Chamber found that ID confiscation was conducted in the context of a broad campaign of violence against Kosovo Albanians, against the background of a clear pattern of their forcible displacement,[2165] and in light of its finding on the extensive scale of ID confiscation as a common practice,[2166] the Appeals Chamber is of the view that it was not unreasonable for the Trial Chamber to consider the seizure of IDs – irrespective of its legal consequences – as circumstantial evidence from which the existence of a common purpose could be inferred. In particular, the Trial Chamber rejected Pavković's argument that the ID confiscation was not part of a plan in light of the testimony of VJ soldier K89 that his commanding officer told him that "not a single Albanian ear was to remain in Kosovo and that their identification papers were to be torn, so as to prevent them from coming back."[2167] Furthermore, the Trial Chamber considered

---

[2160] Trial Judgement, vol. 3, para. 164, referring, *inter alia*, to Exh. 1D226, Exh. P993.
[2161] Trial Judgement, vol. 3, para. 166, referring, *inter alia*, to Branislav Simonović, 17 Apr 2008, T. 25635-25636, 25639-25642, Exh. 6D668, p. 44.
[2162] Trial Judgement, vol. 3, para. 172. See also *ibid.*, vol. 3, para. 164.
[2163] Trial Judgement, vol. 3, para. 172. The Trial Chamber was also aware of the evidence that IDs were of no use at the state border crossings (Trial Judgement, vol. 3, para. 166, referring to Exh. 6D668, p. 44). Lukić's argument that passports, not IDs, were required to cross the state border merely repeats his contention at trial (Lukić's Closing Brief, para. 210) without showing any error on the part of the Trial Chamber and is therefore dismissed.
[2164] Trial Judgement, vol. 3, para. 172. See also *ibid.*, vol. 3, para. 166, referring to Branislav Simonović, 17 Apr 2008, T. 25638-25639. Šainović's and Lukić's arguments that lost IDs could have been easily re-issued since records were kept (Šainović's Appeal Brief, paras 414-416; Lukić's Appeal Brief, paras 506, 509) ignore the Trial Chamber's evaluation of the relevant evidence in this regard and merely seek to substitute it with their own evaluation. The Appeals Chamber notes that the Trial Chamber conducted the analysis on the legal effect of the seizure of IDs in the section of the Trial Judgement concerning Milutinović's individual criminal responsibility (see Trial Judgement, vol. 3, paras 161-173).
[2165] Trial Judgement, vol. 2, paras 1156, 1177-1178; *ibid.*, vol. 3, paras 40-46. See also *supra*, sub-section VII.B.3.(a).
[2166] See *e.g.* Trial Judgement, vol. 3, paras 32-36, in particular, para. 34. See also *supra*, sub-section VII.B.3.(b)(i).
[2167] Trial Judgement, vol. 3, para. 34, referring to K89, 24 Jan 2007, T. 9124. The Appeals Chamber finds Pavković's submission that K89 would not have received such an instruction since his mortar unit, being in charge of long-range weapons, would not have encountered civilians (Pavković's Appeal Brief, para. 64), to be speculative and unsupported by any evidence. Pavković's suggestion that the instruction referred to terrorists rather than to Kosovo Albanian civilians since it was given on 25 March 1999, allegedly before there were any refugees (Pavković's Appeal Brief, para. 64) is also speculative. While K89 stated that he did not know whether his commanding officer meant terrorists or other persons (K89, 25 Jan 2007, T. 9179. See also *ibid.*, 25 Jan 2007, T. 9180-9183, 9200-9203), the Trial Chamber reasonably relied on K89's testimony in light of his own account that he subsequently saw VJ members confiscating and destroying IDs of women, children and elderly people in a large column in Đakovica/Gjakova (Trial Judgement, vol. 3, paras 34, 39, referring to K89, 24 Jan 2007, T. 9124, *ibid.*, 25 Jan 2007, T. 9154-9156, 9201) as well as the other ample evidence showing the extensive seizure and destruction of IDs, as discussed above.

Case No. IT-05-87-A                                                                 23 January 2014

**Exhibit A**
**37**

evidence of derogatory comments and violence by police and army members while seizing IDs as well as evidence of the extensive destruction of confiscated IDs.[2168] Such evidence includes: (i) the testimony of a Kosovo Albanian witness that "[Kosovo Albanians who had reached the Albanian border] were told by the policemen that the reason for [the confiscation of IDs] was that they did not need [the IDs] anymore because they would never come back to Kosovo and would live in Albania";[2169] (ii) the evidence of other Kosovo Albanian witnesses that the Serbian and FRY forces who took away their IDs tore them up and told them to leave Kosovo;[2170] and (iii) the testimony of various witnesses referring to the burning of piles of confiscated IDs.[2171] The Appeals Chamber thus finds that Šainović, Pavković, and Lukić have failed to show how the apparent absence of legal consequences of the seizure of IDs would render the Trial Chamber's inference of a common purpose based on the evidence described above erroneous.[2172]

(iii)  Conclusion

652.   In light of the above, Šainović, Pavković, and Lukić have not demonstrated that the Trial Chamber erred in finding that the seizure of Kosovo Albanian's IDs was a common practice and that this practice, combined with the destruction of many of the confiscated IDs, indicated that "the events of spring 1999 in Kosovo were part of a common purpose."[2173] Therefore, their arguments concerning the seizure of IDs are dismissed.

(c)  Conclusion

653.   Šainović, Pavković, and Lukić have failed to demonstrate that the Trial Chamber erred in its assessment of the evidence regarding the pattern of forcible displacement of Kosovo Albanians and the confiscation of their IDs. As noted above, while the Trial Chamber inferred the existence of a common purpose from several factors, it placed the most weight on these two factors.[2174]

---

[2168] Trial Judgement, vol. 2, paras 273, 351, 457, 530, 842; *ibid.*, vol. 3, paras 34-36, 39.
[2169] Trial Judgement, vol. 2, para. 457, referring to Ali Hoti, 27 Sep 2006, T. 4157.
[2170] See, *e.g.*, Trial Judgement, vol. 2, paras 28-29, 194, 273, 276, 351, 514, 530, 842; *ibid.*, vol. 3, para. 36, and references therein.
[2171] Trial Judgement, vol. 3, paras 35-36, 39, and references therein.
[2172] The Appeals Chamber also dismisses Lukić's argument that none of the Kosovo Albanian witnesses stated that they were searched by policemen when they said that they did not have their IDs (Lukić's Appeal Brief, para. 512; *contra* Prosecution's Response Brief (Lukić), para. 185), as he ignores the Trial Chamber's relevant findings. His assertion that the confiscated documents could have been invalid IDs issued by the KLA (Lukić's Appeal Brief, para. 511, referring to Exh. 6D665; *contra* Prosecution's Response Brief (Lukić), para. 183) is also dismissed, as he merely repeats his submission at trial (Lukić's Closing Brief, paras 213-214) without showing any error on the part of the Trial Chamber.
[2173] Trial Judgement, vol. 3, para. 40. See also *ibid.*, vol. 3, para. 38.
[2174] Trial Judgement, vol. 3, paras 17, 30-46.

23 January 2014
Exhibit A
38

654.    As Šainović, Pavković, and Lukić assert, these two factors are indeed circumstantial.[2175] Yet, in view of the magnitude of forcible displacement committed in an orchestrated manner and showing a discernible pattern as well as the extensive seizure and destruction of IDs during the forcible displacement, the Appeals Chamber is satisfied that the evidence regarding these two factors is sufficient for a reasonable trier of fact to find that the only reasonable inference is that a common purpose to forcibly displace a number of Kosovo Albanians existed.[2176] Consequently, it is not necessary for the Appeals Chamber to address the arguments raised by Šainović, Pavković, and Lukić asserting errors in the Trial Chamber's findings on the remaining factors, since such errors, even if established, would not have any impact upon the Trial Chamber's conclusion as to the existence of the common purpose.

### 4.   Evidence militating against the existence of a common purpose

655.    In addition to the challenges addressed above, Šainović, Pavković, and Lukić advance arguments pointing to evidence allegedly militating against the finding that a common purpose existed and argue that the Trial Chamber erred in its assessment of this evidence. The Appeals Chamber now turns to address their arguments in this regard.[2177]

(a)    Evidence undermining the existence of a common purpose

656.    Šainović, Pavković, and Lukić argue that the Trial Chamber erroneously dismissed evidence showing that a common purpose did not exist.[2178] Šainović and Lukić aver that a number of witnesses denied ever hearing about a plan or the intention to expel Kosovo Albanians in order to alter the ethnic balance in Kosovo.[2179] Lukić and Pavković further contest the Trial Chamber's finding on the reliability of these witnesses and submit that it failed to refer to any evidence in

---

[2175] Šainović's Appeal Brief, paras 444-445; Pavković's Appeal Brief, paras 25-26; Lukić's Appeal Brief, paras 202, 359.
[2176] Trial Judgement, vol. 3, paras 95-96.
[2177] The Appeals Chamber summarily dismisses Pavković's unfounded argument that the Kosovo Albanians' ill-preparation for travel when they fled does not show any advanced planning or coordination (Pavković's Appeal Brief, para. 56) as well as Lukić's speculative and unsubstantiated arguments that, since the territorial integrity of Serbia was guaranteed by its Constitution and other international legal instruments, it would not have been necessary to try to ensure continued control over Kosovo by criminal means (Lukić's Appeal Brief, paras 381-384; *contra* Prosecution's Response Brief (Lukić), para. 164) and that, as the international community closely observed the entire situation in the FRY and Serbia, if a plan of expulsion existed, it would have been known (Lukić's Appeal Brief, para. 196; *contra* Prosecution's Response Brief (Lukić), para. 163). Pavković's same argument during the appeal hearing pointing to the close observation by the international community is also dismissed as unsubstantiated (Appeal Hearing, 12 Mar 2013, AT. 279-280). Pavković's submission that at a meeting on 29 October 1998 he made a statement that the plan was not to kill or expel all the Kosovo Albanians but rather to destroy terrorist forces (Pavković's Appeal Brief, paras 182-183, referring to Exh. P2166, p. 3) is also dismissed, as he has failed to demonstrate how his statement undermines the Trial Chamber's finding of the existence of a common purpose to forcibly displace the Kosovo Albanian population at the time of the crimes alleged in the Indictment.
[2178] Šainović's Appeal Brief, para. 446, referring to Šainović's Closing Brief, paras 872-874; Lukić's Appeal Brief, paras 360, 395. See also Pavković's Appeal Brief, para. 49.

Case No. IT-05-87-A                                                                                    23 January 2014
**Exhibit A**
**39**

support of its finding.[2180] In addition, Šainović, Pavković, and Lukić argue that neither documentary evidence nor "insider" witness testimony mentions the formation or existence of a plan to expel Kosovo Albanians.[2181] In particular, Šainović and Pavković maintain that none of the reports from the intelligence service or records of secret meetings contain any indication of such a plan despite their confidential nature.[2182]

657.   The Prosecution responds that the submissions of Šainović and Lukić regarding witnesses who denied the existence of a plan to expel Kosovo Albanians are unfounded and merely repeat their arguments at trial.[2183] It submits that Šainović fails to show any error in the Trial Chamber's assessment of the evidence or credibility of these witnesses.[2184] In response to Šainović and Pavković, the Prosecution also argues that based on a solid body of evidence, the Trial Chamber properly concluded that there was a common purpose notwithstanding the lack of documentary evidence mentioning a JCE to forcibly displace Kosovo Albanians.[2185]

658.   The Appeals Chamber observes that the Trial Chamber accorded little weight to testimony that there was no common plan to displace the Kosovo Albanian population, since it found that these witnesses either had a motive to lie or were only able to provide speculative information.[2186] In reaching this finding, the Trial Chamber made specific reference to paragraphs of the Defence Closing Briefs which enumerated the evidence of various witnesses on this point.[2187] It is thus clear that the Trial Chamber observed and considered various factors in assessing the credibility of these witnesses and their evidence, including their demeanour in court, their affiliations and other individual circumstances as well as inconsistencies with other evidence.[2188] Given that a trial

---

[2179] Šainović's Appeal Brief, para. 446, referring to Šainović's Closing Brief, paras 872-874; Lukić's Appeal Brief, paras 194, 265-266, 359, 369-376, and references therein.

[2180] Lukić's Appeal Brief, para. 395; Pavković's Appeal Brief, para. 49, referring to Trial Judgement, vol. 3, para. 93.

[2181] Lukić's Appeal Brief, para. 359. See also Pavković's Appeal Brief, paras 26, 49-50; Šainović's Appeal Brief, para. 446.

[2182] Pavković's Appeal Brief, paras 48-49; Šainović's Appeal Brief, para. 446. The secret meetings, to which they refer, include meetings of the Collegium of the VJ General Staff, daily briefings of Ojdanić, meetings of the MUP Staff, and meetings of the Joint Command.

[2183] Prosecution's Response Brief (Šainović), para. 302; Prosecution's Response Brief (Lukić), paras 163, 168.

[2184] Prosecution's Response Brief (Šainović), para. 304.

[2185] Prosecution's Response Brief (Šainović), paras 261-262, 295, 303, 305; Prosecution's Response Brief (Pavković), paras 16, 20, referring to Trial Judgement, vol. 3, paras 40, 45-46, 48, 72, 76, 85, 87-88, 688-690.

[2186] Trial Judgement, vol. 3, para. 93, agreeing with the Prosecution's submission at trial (Prosecution Closing Arguments, 20 Aug 2008, T. 26900-26901).

[2187] Trial Judgement, vol. 3, para. 93, referring, *inter alia*, to Ojdanić's Closing Brief, paras 13-21, Lazarević's Closing Brief, para. 502, Lukić's Closing Brief, paras 379-390.

[2188] See *Nahimana et al.* Appeal Judgement, para. 194. The Appeals Chamber also recalls that the majority of the concerned witnesses were "[s]enior officials of the government, political parties, the army, and the police, who were used to participating actively in the routine work of their organisations" and that regarding this type of witnesses, the Trial Chamber made an observation that they "often tended to rely for their answers upon the terms of a document as sacrosanct", which "seemed at times to be a reassuring refuge from having to address the stark realities of the conduct of forces that ought to have been subject to a regime of discipline" (Trial Judgement, vol. 1, para. 54). Lukić challenges this particular observation by the Trial Chamber, arguing that it targeted Defence witnesses in particular and was an erroneous conclusion based on the Trial Chamber's unfamiliarity with the law governing certain institutions (Lukić's

Exhibit A
40

chamber has a broad discretion in weighing the contradicting evidence of different witnesses[2189] and is not required to refer to the testimony of every witness on the trial record,[2190] the Appeals Chamber finds that Šainović, Pavković, and Lukić have failed to show an error in the Trial Chamber's dismissal of the evidence of those witnesses who maintained that there was no common plan. Furthermore, the alleged absence of documentary evidence and insider witness testimony indicating a common purpose to expel Kosovo Albanians does not in and of itself render erroneous the Trial Chamber's finding that such a common purpose existed. By merely pointing out the lack of such evidence, they have failed to demonstrate why the Trial Chamber's finding based on the other evidence should not stand. Their arguments in this respect are also dismissed.

(b)  Orders to prevent the departure of Kosovo Albanians

659.   Lukić submits that the Trial Chamber erred in finding that the existence of some orders directing the police to prevent the departure of civilians from Kosovo does not create doubt as to the existence of the common purpose and its execution by the VJ and MUP forces.[2191] He asserts that the Trial Chamber disregarded evidence showing that such orders were implemented and that Kosovo Albanians were provided with humanitarian aid and protection and urged to return to their homes.[2192] He also argues that the Trial Chamber adopted an inconsistent approach by both finding that these orders were systematically violated and relying on them in Milutinović's favour to conclude that his decrees may not have been issued to encourage the expulsion of Kosovo Albanians, but to control their whereabouts.[2193] The Prosecution responds that the Trial Chamber considered and reasonably rejected Lukić's argument concerning the orders to prevent the departure of civilians.[2194]

660.   The Appeals Chamber finds that a reasonable trier of fact could have concluded that orders directing the police to prevent the departure of civilians from Kosovo while the mass exodus was

---

Appeal Brief, para. 81; *contra* Prosecution's Response Brief (Lukić), para. 93). His argument in this regard is unsubstantiated and, accordingly, dismissed.

[2189] *Galić* Appeal Judgement, para. 300; *Kupreškić et al.* Appeal Judgement, paras 31-32; *Nahimana et al.* Appeal Judgement, para. 194; *Bikindi* Appeal Judgement, para. 116.

[2190] *Kvočka et al.* Appeal Judgement, para. 23.

[2191] Lukić's Appeal Brief, para. 391, referring to Trial Judgement, vol. 3, para. 92.

[2192] Lukić's Appeal Brief, para. 391, and references therein. See also Lukić's Appeal Brief, paras 195, 220, 245, 266, 360, 365, 377, and references therein. Lukić's assertions that as almost all of the civilians who had left in 1998 returned to their homes, it was not possible to envisage that they would not return in 1999 (Lukić's Appeal Brief, paras 195, 366) and that the Trial Chamber held that the crimes of forcible transfer and deportation required the "intent that the victims be displaced permanently" (Lukić's Appeal Brief, paras 365, 380), misconstrue the Trial Judgement. The Trial Chamber rather correctly found that a lack of genuine choice may be inferred "from threatening and intimidating acts that are calculated to deprive the civilian population of exercising its free will" and that "offences of deportation and forcible transfer *do not* require intent that the victims be displaced permanently" (Trial Judgement, vol. 1, paras 165, 167 (emphasis added)). His arguments based on his misrepresentation of the Trial Judgement are therefore dismissed.

[2193] Lukić's Appeal Brief, para. 396, referring to Trial Judgement, vol. 3, paras 92, 173.

[2194] Prosecution's Response Brief (Lukić), para. 165, referring to Trial Judgement, vol. 3, para. 92.

Exhibit A
41

already underway do not create doubt as to the existence of the common purpose and its execution by VJ and MUP forces, as such orders were systematically violated.[2195] The Appeals Chamber is not persuaded by Lukić's contention that the Trial Chamber disregarded the evidence suggesting that such orders were implemented. Some evidence referred to by Lukić shows that some Kosovo Albanians were ordered to return to where they had come from, while others were not allowed to return and ordered to go to another location.[2196] This evidence does not contradict the Trial Chamber's finding that the common purpose was to displace a sufficient number of Kosovo Albanians to change the demographic balance, rather than to displace each and every one of them.[2197] Evidence suggesting that the FRY and Serbian authorities provided humanitarian aid and protection for Kosovo Albanians, and that MUP forces urged them to return to their homes[2198] did not raise doubt as to the mass expulsion of Kosovo Albanians, since there was overwhelming evidence demonstrating the organised manner in which Kosovo Albanians were forcibly displaced and the inhumane conditions to which those displaced were subjected.[2199]

661.    Moreover, the Appeals Chamber is not persuaded by Lukić's argument concerning the Trial Chamber's finding that Milutinović's decrees on IDs, residence, and restriction of certain rights and Lukić's order to prevent civilians from leaving their place of residence may have been issued to control the whereabouts of Kosovo Albanians, rather than to encourage expulsions.[2200] In itself, this finding does not contradict the Trial Chamber's conclusion on the basis of other evidence that a common purpose to forcibly displace Kosovo Albanians existed.

---

[2195] Trial Judgement, vol. 3, para. 92.
[2196] Lizane Malaj, 10 Aug 2006, T. 1352-1354; Sadije Sadiku, Exh. P2252, p. 4. Lukić's citation of Ilić's testimony is incorrect. Furthermore, some evidence referred to by Lukić is irrelevant to the implementation of orders for prevention of Kosovo Albanians' departure (Shaban Fazliji, Exh. 6D1629, paras 16-18, 21, describing the suffering of Kosovo Albanians caused by the KLA's conduct; Duško Adamović, 8 Apr 2008, T. 24958-24959, explaining combat actions with which he was tasked, and which he executed), or merely shows that such orders were issued, but fails to demonstrate their implementation (Dragan Živaljević, 3 Apr 2008, T. 24863-24864; Exh. 6D666; Exh. 5D1418; Exh. 6D778; Exh. 6D269; Exh. 6D770).
[2197] Trial Judgement, vol. 3, para. 95.
[2198] Lukić refers to Ljubivoje Joksić, 11 Feb 2008, T. 22051-22052, Milivoje Mihajlović, Exh. 6D1530, paras 36-37, Miloš Vjonović, Exh. 6D1532, paras 40, 43-45, Branislav Debeljković, Exh. 6D1533, paras 44-46, Radovan Paponjak, Exh. 6D1603, paras 54-56, 88, 90-91, Momir Pantić, Exh. 6D1604, paras 34-38, Dragan Živaljević, Exh. 6D1606, paras 19-20, 38-39, Duško Adamović, Exh. 6D1613, paras 47-48, Nebojša Bogunović, Exh. 6D1614, paras 68-70, 85-87, Radovan Zlatković, Exh. 6D1627, paras 38, 46, Exh. 6D2, Exh. 6D1631, paras 49-50, 55-56, 58, 63, Bozidar Filić, 7 Mar 2008, T. 23935, ibid., 10 Mar 2008, T. 24012, Petar Damjanac, 6 Mar 2008, T. 23755-23757, Zoran Andelković, 30 Aug 2007, T. 14675, Dragan Milenković, 22 Feb 2008, T. 23101, Miroslav Mijatović, Exh. 6D1492, para. 43, Exh. 1D32, Exh. 2D16, Exh. 2D217, pp. 5-6 (see Lukić's Appeal Brief, paras 195, 220, 245, 266, 360, 365, 377, 391). The citations of Vučurević's and Bogosavljević's evidence provided by Lukić (Lukić's Appeal Brief, paras 266, 391) are incorrect. Exh. 2D182 referred to by Lukić (Lukić's Appeal Brief, para. 360) contains no relevant information.
[2199] Trial Judgement, vol. 2. See in particular, ibid., vol. 2, paras 838-873, 887-888. See also the Appeals Chamber's analysis regarding the challenges to the Trial Chamber's findings on the overall pattern of events (supra, sub-section VII.B.3.(a)).
[2200] Trial Judgement, vol. 3, para. 173.

**Exhibit A
42**

662.    Accordingly, Lukić's submissions regarding the Trial Chamber's findings on orders to prevent the departure of Kosovo Albanians are dissmised.[2201]

(c)   Conclusion

663.    For the foregoing reasons, Šainović, Pavković, and Lukić fail to demonstrate any error in the Trial Chamber's assessment of the evidence allegedly militating against the existence of a common purpose to displace a number of Kosovo Albanians. The Appeals Chamber dismisses their arguments in this regard.

5.   Conclusion

664.    On the basis of its findings on several factors, the Trial Chamber concluded that a common purpose to forcibly displace a number of Kosovo Albanians within and outside Kosovo existed during the time of the commission of the crimes alleged in the Indictment.[2202] The Appeals Chamber has found that among these factors, the evidence regarding the routine seizure and the destruction of IDs and the pattern of forcible displacement is sufficient for a reasonable trier of fact to find that the only reasonable inference is that there existed a common purpose as found by the Trial Chamber. In addition, as shown above, Šainović, Pavković, and Lukić have not demonstrated any error in the Trial Chamber's assessment of the evidence allegedly militating against the existence of a common purpose. Consequently, the Appeals Chamber is satisfied that the evidence in the trial record could lead a reasonable trier of fact to find that the only reasonable inference was that a common purpose to forcibly displace a number of Kosovo Albanians within and outside Kosovo existed during the time of the commission of the crimes alleged in the Indictment. Šainović, Pavković, and Lukić have failed to demonstrate that the Trial Chamber erred in reaching this conclusion. Thus, the Appeals Chamber dismisses their arguments with regard to the existence of the common purpose in their entirety.[2203]

## C.   Alleged errors in the Trial Chamber's findings on the Joint Command

665.    The Trial Chamber found that, in 1998 and 1999, according to the FRY Constitution and relevant legislation, the FRY President and the Supreme Defence Council ("SDC") exercised

---

[2201] For the same reasons, the Appeals Chamber finds no merit in Pavković's argument during the appeal hearing that the announcements of the FRY government and the VJ General Staff as well as some VJ reports (Exh. 4D510; Exh. 2D301; Exh. 3D753; Exh. 4D511; Exh. 5D885) show that the FRY and Serbian authorities, including the VJ, attempted to prevent the departure of Kosovo Albanians and that this militates against the existence of the common purpose to expel Kosovo Albanians (Appeal Hearing, 12 Mar 2013, AT. 304, 313-314, 316).
[2202] Trial Judgement, vol. 3, paras 95-96.
[2203] Šainović's sub-grounds 6(1)-(11); Pavković's sub-grounds 1(A) in part, 1(B), 1(C), and grounds 3 in part, 6 in part; Lukić's sub-grounds D in part, D(1), D(4) in part, D(6), ground H in part, and sub-grounds I(1), I(2), I(3), I(4) in part, O in part, O(1), O(1)(a), O(1)(c), O(1)(d) in part, O(1)(e) in part, O(2) in part, O(3).

Case No. IT-05-87-A                                          23 January 2014

**Exhibit A**
**43**

# VIII.   AIDING AND ABETTING

## A.   Introduction

1605.   The Trial Chamber found that Lazarević provided practical assistance, encouragement, and moral support to the VJ forces engaging in the deportation and forcible transfer of the Kosovo Albanian population in coordinated action with the MUP.[5270] The Trial Chamber accordingly convicted Lazarević pursuant to Article 7(1) of the Statute for aiding and abetting the crimes of deportation and other inhumane acts (forcible transfer) as crimes against humanity.[5271]

1606.   Lazarević claims that the Trial Chamber erred in holding him criminally responsible for aiding and abetting deportation and forcible transfer.[5272] In addition, the Prosecution submits that the Trial Chamber erred in acquitting Lazarević of aiding and abetting murder as a violation of the laws or customs of war and murder and persecution as crimes against humanity.[5273] The Appeals Chamber will address the parties' submissions in turn.

## B.   Alleged errors in finding that Lazarević aided and abetted deportation and forcible transfer

### 1.   Introduction

1607.   Lazarević held numerous positions in the JNA and the VJ.[5274] In January 1998, he was appointed Chief of Staff of the Priština Corps and, on 25 December 1998, he was appointed Commander of the Priština Corps.[5275] He remained in this position until 28 December 1999 when he was appointed Chief of Staff of the 3rd Army and subsequently became Commander of the 3rd Army on 13 March 2000.[5276]

1608.   The Trial Chamber convicted Lazarević pursuant to Article 7(1) of the Statute for aiding and abetting the crimes of deportation and other inhumane acts (forcible transfer) as crimes against humanity under Article 5 of the Statute committed by the VJ in coordinated action with the MUP throughout Kosovo between 24 March and 25 May 1999.[5277]

---

[5270] Trial Judgement, vol. 3, para. 925.
[5271] Trial Judgement, vol. 3, paras 930, 935, 1211.
[5272] Lazarević's grounds 2-3.
[5273] Prosecution's ground 2.
[5274] Trial Judgement, vol. 3, para. 791.
[5275] Trial Judgement, vol. 3, para. 791.
[5276] Trial Judgement, vol. 3, para. 791.
[5277] Trial Judgement, vol. 3, paras 930, 935, 1211. The first crimes for which Lazarević was convicted occurred on 24 March 1999, *inter alia*, in Priština/Prishtina town (see Trial Judgement, vol. 2, paras 885-888, 1240-1243) and Kotlina/Kotllina (see *ibid.*, vol. 2, paras 1067, 1253-1255). The last crime for which Lazarević was convicted occurred

**Exhibit A**
**44**

1609.  Lazarević challenges the Trial Chamber's findings that he fulfilled the *actus reus* and *mens rea* of aiding and abetting forcible displacement.[5278]

2.  <u>Alleged errors in relation to the existence of the common plan</u>

1610.  Lazarević challenges the Trial Chamber's conclusion that a JCE existed, the common purpose of which was to ensure continued control by the FRY and Serbian authorities over Kosovo through a campaign of forcible displacement of the Kosovo Albanian population.[5279] In this regard, Lazarević contests the Trial Chamber's factual findings that: (i) it was common practice for the FRY and Serbian forces to confiscate and destroy identity documents of Kosovo Albanians in the course of their displacement;[5280] (ii) a discernible pattern of crimes committed by the FRY and Serbian forces existed;[5281] (iii) the arming of the non-Albanian population and the disarming of the Kosovo Albanian population were carried out on ethnic grounds;[5282] and (iv) the authorities of the FRY and Serbia brought additional forces into Kosovo in breach of the October Agreements.[5283] Lazarević further argues that it was unreasonable for the Trial Chamber to conclude that he: (i) knew about and assisted in the confiscation of identity documents of Kosovo Albanians;[5284] (ii) was aware that the arming of the non-Albanian population and the disarming of the Kosovo Albanian population were carried out on ethnic grounds[5285] and "participated or in any other way contributed to the arming of [the] non-Albanian population";[5286] and (iii) aided and abetted the violation of the October Agreements by the VJ.[5287] Lazarević further submits that it was not proved that he "intend[ed] to contribute to the implementation" of the common plan.[5288]

1611.  In response, the Prosecution avers that Lazarević's submissions warrant summary dismissal as his conviction for aiding and abetting does not rely on the Trial Chamber's factual findings in

---

on 25 May 1999 in Dubrava/Lisnaja (see *ibid.*, vol. 2, paras 1148, 1259-1261). The Trial Chamber acquitted Lazarević of crimes of forcible displacement carried out by the MUP without the participation of the VJ and of charges under Articles 7(1) and 7(3) of the Statute in relation to murder as a crime against humanity and a violation of the laws or customs of war and persecution through murder, sexual assaults, and wanton destruction of religious and cultural property (see *ibid.*, vol. 3, paras 928, 932-933).
[5278] Lazarević's Notice of Appeal, paras 49-113.
[5279] Lazarević's Appeal Brief, para. 385.
[5280] Lazarević's Appeal Brief, paras 276-281, referring, *inter alia*, to Trial Judgement, vol. 3, paras 38, 40.
[5281] Lazarević's Appeal Brief, paras 283-295, referring, *inter alia*, to Trial Judgement, vol. 3, paras 41, 43. See also Trial Judgement, vol. 3, para. 46.
[5282] Lazarević's Appeal Brief, paras 296-301, 303-310, 312-320, 322-345, referring, *inter alia*, to Trial Judgement, vol. 3, paras 54, 56, 57, 68, 72.
[5283] Lazarević's Appeal Brief, paras 346-384, referring to Trial Judgement, vol. 3, paras 75-76.
[5284] Lazarević's Appeal Brief, para. 282.
[5285] Lazarević's Appeal Brief, para. 311.
[5286] Lazarević's Appeal Brief, paras 302, 321.
[5287] Lazarević's Appeal Brief, para. 384.
[5288] Lazarević's Appeal Brief, paras 446-447. In support of his assertion, Lazarević refers to evidence that he was an exemplary commander (*ibid.*, paras 448-452, referring to Dušan Lončar, 1 Dec 2006, T. 7687, K73, 14 Sep 2006, T. 3415 (closed session), Exh. P2004). See also Lazarević's Appeal Brief, para. 586, referring to Vladimir Lazarević, 12 Nov 2007, T. 18129.

relation to the JCE.[5289] It further argues that Lazarević merely repeats his trial submissions without showing any error.[5290]

1612.   In reply, Lazarević submits that his challenges to the Trial Chamber's findings in relation to the common plan are advanced only for "reasons of cautiousness" to reiterate that no plan to expel the Kosovo Albanians with the purpose of changing the ethnic balance of Kosovo existed and that he thus could not have been aware of such a plan.[5291]

1613.   The Appeals Chamber recalls that Lazarević was acquitted of JCE liability.[5292] He was convicted instead for aiding and abetting the crimes of deportation and forcible transfer.[5293] Given the Trial Chamber's findings, the Appeals Chamber considers that the Trial Chamber's discussion of evidence on the existence of the common plan[5294] is irrelevant to Lazarević's conviction for aiding and abetting. Moreover, contrary to Lazarević's assertion,[5295] in finding that his acts and omissions had a substantial effect upon the commission of the crimes by VJ members, the Trial Chamber made no reference to his purported awareness or assistance regarding the confiscation of identity documents of Kosovo Albanians, the arming of the non-Albanian population, and the disarming of the Kosovo Albanian population, or the violations of the October Agreements.[5296] For the same reasons, Lazarević's assertion that he did not intend to contribute to the common purpose is misguided.

1614.   In light of the foregoing, the Appeals Chamber dismisses the second ground of Lazarević's appeal and sub-ground 3(c) in relevant part.

---

[5289] Prosecution's Response Brief (Lazarević), paras 219-220.
[5290] Prosecution's Response Brief (Lazarević), para. 221.
[5291] Lazarević's Reply Brief, para. 109.
[5292] Trial Judgement, vol. 3, para. 919.
[5293] Trial Judgement, vol. 3, paras 925-927, 930.
[5294] Trial Judgement, vol. 3, paras 30-40 (the seizure of identity documents of Kosovo Albanians), 41-46 (the discernible pattern of forcible displacement), 49-72 (the arming of the non-Albanian and the disarming of the Kosovo Albanian populations), 73-76 (the breaches of the October Agreements by the FRY and Serbian forces).
[5295] See Lazarević's Appeal Brief, paras 282, 302, 311, 321, 384.
[5296] See Trial Judgement, vol. 3, paras 922-927.

**Exhibit A
46**

3.   Alleged errors in finding that Lazarević provided practical assistance, encouragement, and moral support to the VJ forces engaging in forcible displacement

1615.   The Trial Chamber found that Lazarević voluntarily provided practical assistance, encouragement, and moral support to the VJ forces involved in the forcible displacement of Kosovo Albanians in coordinated action with the MUP.[5297] The Trial Chamber noted that, as the Commander of the Priština Corps, Lazarević significantly participated in the planning and execution of the joint operations conducted by the VJ and that his orders provided authorisation within the VJ chain of command for the VJ to operate in the crime sites where forcible displacement took place.[5298] It also considered that "Lazarević's presence in the field, inspecting VJ units that were involved in the commission of crimes against Kosovo Albanians, was expressly noted to improve the morale of soldiers",[5299] and that he "knew that his failure to take adequate measures to secure the proper investigation of serious crimes committed by the VJ enabled the forces to continue their campaign of terror, violence, and displacement."[5300] The Trial Chamber concluded that Lazarević's:

> acts and omissions provided a substantial contribution to the commission of the crimes that the Chamber has found to have been committed by VJ members […] as they provided assistance in terms of soldiers on the ground to carry out the acts, the organisation and equipping of VJ units, and the provision of weaponry, including tanks, to assist these acts. Furthermore, Lazarević's acts and omissions provided encouragement and moral support by granting authorisation within the VJ chain of command for the VJ to continue to operate in Kosovo, despite the occurrence of these crimes by VJ members.[5301]

1616.   Lazarević contends that the Trial Chamber erred in finding that, through his acts and omissions, he provided practical assistance, encouragement, and moral support to members of the VJ who were involved in the commission of deportation and forcible transfer and that his conduct had a substantial effect upon the commission of these crimes.[5302] The Appeals Chamber will address his submissions in turn.

(a)   Preliminary issue – specific direction

1617.   Lazarević submits that the Trial Chamber erred in failing to determine whether his alleged acts and omissions were specifically directed to assist the commission of deportation and forcible

---

[5297] Trial Judgement, vol. 3, paras 925-927.
[5298] Trial Judgement, vol. 3, para. 925.
[5299] Trial Judgement, vol. 3, para. 925.
[5300] Trial Judgement, vol. 3, para. 925.
[5301] Trial Judgement, vol. 3, para. 926.
[5302] Lazarević's Appeal Brief, paras 575, 599-601, 607-608, referring to Trial Judgement, vol. 3, paras 925, 927.

Case No. IT-05-87-A

23 January 2014

**Exhibit A**
**47**

transfer and thus in concluding that he aided and abetted these crimes.[5303] He argues that, in accordance with the Tribunal's prevailing jurisprudence, specific direction is a required element of the *actus reus* of aiding and abetting liability.[5304] The Prosecution disputes this interpretation of the jurisprudence. It argues that specific direction is not an essential ingredient of the *actus reus* of aiding and abetting liability and that there are cogent reasons for the Appeals Chamber to depart from the recent *Perišić* Appeal Judgement in this regard. According to the Prosecution, the *Perišić* Appeal Judgement incorrectly interprets the established jurisprudence on the elements of aiding and abetting liability.[5305] The Appeals Chamber, Judge Tuzmukhamedov dissenting, will address the issue of specific direction raised by the parties before turning to Lazarević's other challenges to the Trial Chamber's findings that he provided practical assistance, encouragement, or moral support to the VJ members responsible for committing the crimes in question.[5306]

1618.   In the *Perišić* Appeal Judgement, the Appeals Chamber, by majority, held that "specific direction remains an element of the *actus reus* of aiding and abetting liability" and that "no conviction for aiding and abetting may be entered if the element of specific direction is not established beyond reasonable doubt".[5307] In support of this conclusion, the Appeals Chamber relied on the *Tadić* Appeal Judgement, which described the *actus reus* of aiding and abetting liability as "acts *specifically directed* to assist, encourage or lend moral support to the perpetration of a certain specific crime".[5308] It observed that "many subsequent Tribunal and ICTR appeal judgements explicitly referred to 'specific direction' in enumerating the elements of aiding and abetting".[5309]

1619.   By contrast, in the *Mrkšić and Šljivančanin* Appeal Judgement, the Appeals Chamber had held that "'specific direction' is *not* an essential ingredient of the *actus reus* of aiding and abetting."[5310] This holding was confirmed by the Appeals Chamber in the *Lukić and Lukić* Appeal Judgement, stating that "[in] *Mrkšić and Šljivančanin*, the Appeals Chamber has clarified 'that

---

[5303] Appeal Hearing, 13 Mar 2013, AT. 402-403. In this regard, Lazarević submits that the evidence demonstrates that his conduct was directed at the legitimate efforts to defend against the KLA and the NATO campaign, as opposed to directed at the commission of crimes (see *ibid.*, 13 Mar 2013, AT. 403-416, 418-420).
[5304] Appeal Hearing, 13 Mar 2013, AT. 402-403, 415-416, 418-420. See also *ibid.*, 13 Mar 2013, AT. 471-473.
[5305] Appeal Hearing, 13 Mar 2013, AT. 440-460. The Prosecution thus submits that the Appeals Chamber should reiterate that specific direction is not a distinct requirement of aiding and abetting liability, or that if it is involved in the *actus reus* of aiding and abetting, it is inherently included within the element of substantial effect (*ibid.*, 13 Mar 2013, AT. 460).
[5306] Judge Tuzmukhamedov dissents from the discussion of the issue of specific direction in this section in its entirety.
[5307] *Perišić* Appeal Judgement, para. 36.
[5308] *Perišić* Appeal Judgement, para. 26, quoting *Tadić* Appeal Judgement, para. 229 (emphasis added).
[5309] *Perišić* Appeal Judgement, para. 28. See also *ibid.*, paras 29-35.
[5310] *Mrkšić and Šljivančanin* Appeal Judgement, para. 159 (emphasis added), referring to *Blagojević and Jokić* Appeal Judgement, para. 189.

Exhibit A
48

'specific direction' is not an essential ingredient of the *actus reus* of aiding and abetting' and finds that there is no 'cogent reason' to depart from this jurisprudence."[5311]

1620.   The *Perišić* Appeal Judgement found that the *Mrkšić and Šljivančanin* Appeal Judgement was ambiguous[5312] on the matter of specific direction and did not reflect "an intention to depart from the settled precedent established by the *Tadić* Appeal Judgement".[5313] It considered that the *Mrkšić and Šljivančanin* Appeal Judgement merely made "passing reference to specific direction"[5314] and concluded that, since the *Mrkšić and Šljivančanin* Appeal Judgement did not state cogent reasons for departing from earlier precedent, it neither attempted nor intended to depart from settled jurisprudence.[5315] The *Perišić* Appeal Judgement further found that the *Lukić and Lukić* Appeal Judgement confirmed that the *Mrkšić and Šljivančanin* Appeal Judgement is not antithetical in its approach to specific direction.[5316]

1621.   The Appeals Chamber, Judge Tuzmukhamedov dissenting, considers that in effect, the interpretation given in the *Perišić* Appeal Judgement would appear to be at odds not only with a plain reading of the *Mrkšić and Šljivančanin* Appeal Judgement, which states that specific direction is not an "essential ingredient" of aiding and abetting liability,[5317] but also with the *Lukić and Lukić*

---

[5311] *Lukić and Lukić* Appeal Judgement, para. 424 (internal references omitted). This holding was adopted by majority.

[5312] *Perišić* Appeal Judgement, para. 36.

[5313] *Perišić* Appeal Judgement, para. 32. See also *ibid*., paras 33-35.

[5314] See *Perišić* Appeal Judgement, para. 34.

[5315] *Perišić* Appeal Judgement, para. 34. In support of its conclusion on specific direction, the *Perišić* Appeal Judgement also considered that the *Mrkšić and Šljivančanin* Appeal Judgement: (i) relied on a section of the *Blagojević and Jokić* Appeal Judgement which held that a finding of specific direction may be implicit; and (ii) found that specific direction was "not an essential ingredient" of the *actus reus* of aiding and abetting liability in the context of considering the *mens rea* of aiding and abetting liability. As a result, the *Perišić* Appeal Judgement concluded that the *Mrkšić and Šljivančanin* Appeal Judgement did not intend to depart from the "precedent established by the *Tadić* Appeal Judgement" (see *ibid.*, para. 32).

[5316] *Perišić* Appeal Judgement, para. 35. In support of its conclusion the *Perišić* Appeal Judgement also considered that the *Lukić and Lukić* Appeal Judgement: (i) approvingly quoted the *Blagojević and Jokić* Appeal Judgement's conclusion that a finding of specific direction can be implicit in an analysis of substantial contribution; and (ii) found that there were no cogent reasons to deviate from the holding of the *Mrkšić and Šljivančanin* Appeal Judgement with respect to specific direction. As a result, the *Perišić* Appeal Judgement concluded that "[t]he *Lukić and Lukić* Appeal Judgement thus confirms that the *Blagojević and Jokić* and *Mrkšić and Šljivančanin* Appeal Judgements are not antithetical in their approach to specific direction" (see *ibid.*, para. 35).

[5317] The Appeals Chamber observes that the *Mrkšić and Šljivančanin* Appeal Judgement cited a section of the *Blagojević and Jokić* Appeal Judgement which stated that a finding of specific direction "will often be implicit in the finding that the accused has provided practical assistance to the principal perpetrator which had a substantial effect on the commission of a crime" (see *Blagojević and Jokić* Appeal Judgement, para. 189). However, for the reasons set out below, the Appeals Chamber considers that the *Mrkšić and Šljivančanin* Appeal Judgement did not depart from the *Blagojević and Jokić* Appeal Judgement (see *infra*, paras 1625, 1650). Moreover, the Appeals Chamber does not agree with the proposition in the *Perišić* Appeal Judgement that the issue of specific direction was merely considered in passing in the *Mrkšić and Šljivančanin* Appeal Judgement. The Appeals Chamber further considers that the *Perišić* Appeal Judgement placed undue emphasis on the fact that in the *Mrkšić and Šljivančanin* Appeal Judgement specific direction was discussed in a section that also addressed the *mens rea* of aiding and abetting. In this regard, the Appeals Chamber notes that the *Mrkšić and Šljivančanin* Appeal Judgement clearly considered specific direction in the context of the *actus reus* of aiding and abetting liability. Significantly, it stated that: "specific direction is *not* an essential ingredient of the *actus reus* of aiding and abetting" (see *Mrkšić and Šljivančanin* Appeal Judgement, para. 159 (emphasis added)). Finally, the Appeals Chamber considers that the *Mrkšić and Šljivančanin* Appeal Judgement did not

Exhibit A
49

Appeal Judgement, which confirmed this holding.[5318] In this respect, the Appeals Chamber considers that when interpreting a particular judgement, primary consideration should be given to positions expressly taken and clearly set out in the judgement concerned. It is not clear that this approach was adopted in the *Perišić* Appeal Judgement with respect to the issue of specific direction as expressed in the *Mrkšić and Šljivančanin* and *Lukić and Lukić* Appeal Judgements. It would thus be more appropriate to conclude that the *Mrkšić and Šljivančanin* Appeal Judgement and the *Lukić and Lukić* Appeal Judgement, on one hand, and the *Perišić* Appeal Judgement, on the other hand, diverge on the issue of specific direction.

1622. The Appeals Chamber recalls that where it is faced with previous decisions that are conflicting, it is obliged to determine which decision it will follow, or whether to depart from both decisions for cogent reasons in the interests of justice.[5319] In view of the divergence between the *Mrkšić and Šljivančanin* and *Lukić and Lukić* Appeal Judgements, on one hand, and the *Perišić* Appeal Judgement, on the other hand, the Appeals Chamber, Judge Tuzmukhamedov dissenting, will determine the correct approach.[5320] In so doing, mindful of its duty to act in the interests of legal certainty and predictability while ensuring that justice is done in all cases,[5321] the Appeals Chamber will consider the jurisprudence of the Tribunal and the ICTR as well as customary international law to ascertain where the law stands on the issue of specific direction.

1623. Turning first to the jurisprudence of the Tribunal and the ICTR, the Appeals Chamber recalls that the *Tadić* Appeal Judgement held that an "aider and abettor carries out acts specifically

---

state cogent reasons for departing from earlier precedent because, for the reasons set out below, that precedent did not clearly establish a specific direction requirement. Judge Tuzmukhamedov dissents from the reasoning in this footnote.

[5318] *Lukić and Lukić* Appeal Judgement, para. 424. The Appeals Chamber does not agree with the proposition in the *Perišić* Appeal Judgement that the *Lukić and Lukić* Appeal Judgement confirmed that the *Mrkšić and Šljivančanin* Appeal Judgement is not antithetical in its approach to specific direction.

[5319] *Aleksovski* Appeal Judgement, para. 111.

[5320] The Appeals Chamber, Judge Tuzmukhamedov dissenting, further considers that the issue at hand concerns the constituent elements of aiding and abetting liability and that its significance warrants the intervention by the Appeals Chamber. In this regard, the Appeals Chamber also recalls that the issue was raised by the parties (Appeal Hearing, 13 Mar 2013, AT. 402-416, 418-420, 440-460). In addition, the Appeals Chamber notes in this context that the Trial Chamber found that Lazarević, as the Priština Corps Commander, was present in Kosovo and regularly inspected his troops in the field throughout the period during which the campaign of forcible displacements was carried out (see Trial Judgement, vol. 3, paras 924-925). However, the Trial Chamber did not find that he was physically present at the crime sites during the commission of the crimes by members of the VJ. Consequently, the Appeals Chamber, Judge Tuzmukhamedov dissenting, considers that if it were to adopt the ruling of the *Perišić* Appeal Judgement requiring "explicit consideration of specific direction" in cases where the aider and abettor is "remote" (see *Perišić* Appeal Judgement, paras 38-39), it would be necessary to examine whether Lazarević's assistance was remote as to require explicit consideration of specific direction. This is a matter disputed by the parties (Appeal Hearing, 13 Mar 2013, AT. 402, 418-420, 461-470). Therefore, the Appeals Chamber, Judge Tuzmukhamedov dissenting, considers that the discussion as to whether the Appeals Chamber should follow the *Perišić* Appeal Judgement with respect to the issue of specific direction cannot be circumvented in determining the outcome of the present case. The Appeals Chamber further considers that even if the application of the ruling of the *Perišić* Appeal Judgement would not ultimately invalidate the Trial Judgement, it may "hear appeals in which a party has raised a legal issue that would not lead to the invalidation of the trial judgement but that is nevertheless of general significance to the Tribunal's jurisprudence", so long as such issues have a *nexus* with the case at hand (see *supra*, para. 19), and references therein; *Prosecutor v. Radoslav Brdanin*, Case No. IT-99-36-A, Decision on Motion to Dismiss Ground 1 of the Prosecutor's Appeal, 5 May 2005, p. 3).

Case No. IT-05-87-A                                                      23 January 2014

**Exhibit A**
**50**

directed to assist, encourage or lend moral support to the perpetration of a certain specific crime".[5322] This delineation of accessorial liability appears in the context of contrasting JCE liability with that of aiding and abetting.[5323] Consequently, the *Tadić* Appeal Judgement, which focused on JCE liability, does not purport to be a comprehensive statement of aiding and abetting liability.[5324] The Appeals Chamber, Judge Tuzmukhamedov dissenting, therefore considers that the analysis of the previous case law conducted in the *Perišić* Appeal Judgement relied on the flawed premise that the *Tadić* Appeal Judgement established a precedent with respect to specific direction. As noted in the *Perišić* Appeal Judgement, subsequent appeal judgements have referred to specific direction, often repeating verbatim the language used in the *Tadić* Appeal Judgement.[5325] However, a number of appeal judgements have not mentioned specific direction when examining the elements of the *actus reus* of aiding and abetting liability.[5326] Moreover, the *Čelebići* Appeal Judgement explicitly endorsed a definition of aiding and abetting liability that neither refers to specific direction nor contains equivalent language.[5327]

1624.   The Appeals Chamber observes that the *Čelebići* Appeal Judgement was not alone in its endorsement of a trial judgement that defined the *actus reus* of aiding and abetting liability without

---

[5321] See *Aleksovski* Appeal Judgement, paras 101-106, 111.

[5322] *Tadić* Appeal Judgement, para. 229.

[5323] See *Aleksovski* Appeal Judgement, para. 163. See also *Tadić* Appeal Judgement, para. 229. See also *Blagojević and Jokić* Appeal Judgement para. 186, referring to *Aleksovski* Appeal Judgement, para. 163.

[5324] See *Aleksovski* Appeal Judgement, para. 163.

[5325] See *Perišić* Appeal Judgement, para. 28, fn. 70. See also *Blagojević and Jokić* Appeal Judgement, para. 127; *Kvočka et al.* Appeal Judgement, para. 89; *Blaškić* Appeal Judgement, para. 45; *Vasiljević* Appeal Judgement, para. 102; *Krnojelac* Appeal Judgement, para. 33; *Kupreškić et al.* Appeal Judgement, para. 254; *Aleksovski* Appeal Judgement, para. 163; *Kalimanzira* Appeal Judgement, para. 74; *Muvunyi I* Appeal Judgement, para. 79; *Seromba* Appeal Judgement, para. 139; *Muhimana* Appeal Judgement, para. 189; *Ntagerura et al.* Appeal Judgement, para. 370; *Ntakirutimana* Appeal Judgement, para. 530. The *Ntawukulilyayo* and *Rukundo* Appeal Judgements refer to acts that are "specifically aimed" towards the relevant crimes (see *Ntawukulilyayo* Appeal Judgement, para. 214; *Rukundo* Appeal Judgement, para. 52). See also *Nahimana et al.* Appeal Judgement, para. 482. By contrast, the *Simić* Appeal Judgement states that "the *actus reus* of aiding and abetting consists of acts *directed* to assist, encourage or lend moral support to the perpetration of a specific crime" (see *Simić* Appeal Judgement, para. 85 (emphasis added)). No mention is made of a "*specific* direction requirement". *Contra Perišić* Appeal Judgement, para. 27 ("the *actus reus* of aiding and abetting requires a closer link between the assistance provided and particular criminal activities: assistance must be 'specifically' – rather than 'in some way' – directed towards relevant crimes"). Likewise, the *Orić* Appeal Judgement provides that "omission must be *directed* to assist, encourage or lend moral support to the perpetration of a crime and have a substantial effect upon the perpetration of the crime (*actus reus*)" (see *Orić* Appeal Judgement, para. 43 (emphasis added)).

[5326] See, *e.g.*, *Gotovina and Markač* Appeal Judgement, para. 127 (stating that "for an individual to be held liable for aiding and abetting, he must have substantially contributed to a crime and must have known that the acts he performed assisted the principal perpetrator's crime"); *Brđanin* Appeal Judgement, para. 151 (stating that "in the case of aiding and abetting, the issue is whether, *inter alia*, the acts of the aider and abettor had a substantial effect on the commission of the crime of the principal offender"); *Krstić* Appeal Judgement, para. 137 (containing no explicit mention of specific direction); *Karera* Appeal Judgement, para. 321 (holding that the "*actus reus* of aiding and abetting liability is constituted by acts or omissions that assist, further, or lend moral support to the perpetration of a specific crime, and which substantially contribute to the perpetration of the crime").

[5327] See *Čelebići* Appeal Judgement, para. 352, citing with approval *Čelebići* Trial Judgement, para. 327 (defining aiding and abetting as including "all acts of assistance that lend encouragement and support to the perpetration of an offence and which are accompanied by the requisite *mens rea*. Subject to the caveat that it be found to have contributed to, or have had an effect on, the commission of the crime, the relevant act of assistance may be removed both in time and place from the actual commission of the offence").

Exhibit A
51

reference to specific direction.[5328] The *Blaškić* Appeal Judgement explicitly found that the *Blaškić* Trial Judgement "was correct" in holding that "the *actus reus* of aiding and abetting 'consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime.'"[5329] In so doing, the *Blaškić* Appeal Judgement noted that the *Blaškić* Trial Judgement followed the *Furundžija* Trial Judgement,[5330] which pronounced this definition based on an analysis of customary international law.[5331] Although the *Blaškić* Appeal Judgement also referred to the *Tadić* Appeal Judgement's formulation of aiding and abetting liability, the fact that the *Blaškić* Appeal Judgement ultimately relied upon and applied a statement of applicable law that excluded any reference to specific direction strongly suggests that it did not consider specific direction to be an element of aiding and abetting liability.[5332]

1625.   After having examined the jurisprudence of the Tribunal, the *Blagojević and Jokić* Appeal Judgement subsequently confirmed that specific direction is not an element of the *actus reus* of aiding and abetting liability. While the *Blagojević and Jokić* Appeal Judgement stated that "the *Tadić* definition has not been explicitly departed from", it noted that "specific direction has not always been included as an element of the *actus reus* of aiding and abetting" and considered that "this may be explained by the fact that such a finding will often be implicit in the finding that the accused has provided practical assistance to the principal perpetrator which had a substantial effect on the commission of the crime."[5333] It thus merely observed that specific direction can be at times, though not necessarily always, factually implicit in a finding of substantial contribution. In so doing, and in light of the *Čelebići* and *Blaškić* precedents, it considered that specific direction is not an element of the *actus reus* of aiding and abetting, while the substantial contribution of the aider and abettor is.[5334] Such interpretation is consonant with the fact that, prior to the *Perišić* Appeal Judgement, no independent specific direction requirement was applied by the Appeals Chamber to

---

[5328] See, by contrast, *Perišić* Appeal Judgement, para. 31.

[5329] *Blaškić* Appeal Judgement, para. 46, quoting *Blaškić* Trial Judgement, para. 283, in turn quoting *Furundžija* Trial Judgement, para. 249.

[5330] *Blaškić* Appeal Judgement, para. 46, quoting *Blaškić* Trial Judgement, para. 283, in turn quoting *Furundžija* Trial Judgement, para. 249.

[5331] *Furundžija* Trial Judgement, paras 234-235, 249.

[5332] Moreover, the Appeals Chamber notes that the *Blaškić* Appeal Judgement was not the only case to follow this approach. For example, the *Krnojelac* Appeal Judgement cited the *Tadić* Appeal Judgement formulation of the *actus reus* of aiding and abetting liability but proceeded to specify that "by his acts or omissions, the aider and abettor must assist, encourage or lend moral support to the principal perpetrator of the crime and this support must have a substantial effect upon the perpetration of the crime" (see *Krnojelac* Appeal Judgement, paras 33, 37). Likewise, the *Nahimana et al.* Appeal Judgement, having first cited the *Tadić* language, then proceeded to find that, to convict a defendant of aiding and abetting the commission of a crime, "it is sufficient to prove that the defendant's acts or omissions substantially contributed to the commission of the crime by the principal perpetrator" (see *Nahimana et al.* Appeal Judgement, paras 482, 672). See also *Kvočka et al.* Appeal Judgement, paras 89-90; *Kalimanzira* Appeal Judgement, para. 74.

[5333] *Blagojević and Jokić* Appeal Judgement, para. 189.

[5334] The Appeals Chamber notes that the *Blagojević and Jokić* Appeal Judgement indeed focused on the "principal question" of whether Jokić's conduct had a substantial effect on the perpetration of the crime (see *Blagojević and Jokić* Appeal Judgement, paras 191, 193-194).

Exhibit A
52

the facts of any case before it.[5335] By contrast, the substantial contribution of the accused has consistently been an element of the *actus reus* of aiding and abetting liability.[5336]

1626.   The Appeals Chamber further observes that the definition of the *actus reus* of aiding and abetting as "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime"[5337] reflects customary international law. As noted above, the *Blaškić* Appeal Judgement approved of this definition without inclusion of specific direction, noting that this standard was initially adopted in the *Furundžija* Trial Judgement.[5338] The *Furundžija* Trial Judgement elicited this definition from an analysis of customary international law.[5339] Nevertheless, in order to dispel any doubt in this regard, the Appeals Chamber will re-examine customary international law concerning the elements of aiding and abetting liability.

1627.   The Appeals Chamber first turns to examine the jurisprudence which dealt with crimes committed during the Second World War (collectively, "post WWII cases") and which the Appeals Chamber considers instructive for the purpose of identifying the elements of aiding and abetting liability.[5340] The Appeals Chamber observes that in none of these relevant cases "specific direction" was required as a distinct element. Rather, they focused on: (i) the degree of each defendant's contribution to a crime, demonstrated through the role he played in, and the impact he exerted on,

---

[5335] In this regard, the Appeals Chamber notes that specific direction was only ever explicitly addressed in two cases. In the *Vasiljević* Appeal Judgement, it was mentioned in the context of the substantial contribution of Vasiljević's acts (see *Vasiljević* Appeal Judgement, paras 134-135). Significantly, the *Vasiljević* Appeal Judgement found that, "in preventing the men from escaping on the way to the river bank and during the shooting, the Appellant's actions had a 'substantial effect upon the perpetration of the crime'" before concluding that "the acts of the Appellant were specifically directed to assist the perpetration of the murders and the inhumane acts and his support had a substantial effect upon the perpetration of the crimes." In the *Kupreškić et al.* case, the Appeals Chamber stated: "Still, mere presence outside the Hotel Vitez cannot be said to amount to an act specifically directed towards assisting, encouraging or lending moral support to the offence of persecution" (*Kupreškić et al.* Appeal Judgement, para. 283). The Appeals Chamber notes that neither of these appeal judgements engaged in any analysis with respect to the application of specific direction to the facts at issue.

[5336] See, *e.g.*, *Ntawukulilyayo* Appeal Judgement, para. 216 ("The Appeals Chamber considers that it was reasonable for the Trial Chamber to conclude that Ntawukulilyayo substantially contributed to the Kabuye hill killings by encouraging Tutsis to seek refuge there and then providing reinforcements to those attempting to kill them. These acts alone suffice to constitute the *actus reus* of aiding and abetting"); *Rukundo* Appeal Judgement, para. 52 ("there is no requirement of a cause-effect relationship between the conduct of the aider and abettor and the commission of the crime nor that such conduct served as a condition precedent to the commission of the crime. It is sufficient for the aider and abettor's assistance or encouragement to have had a substantial effect on the realisation of that crime, the establishment of which is a 'fact-based inquiry'. The Appeals Chamber is satisfied that the Trial Chamber's findings on Rukundo's role in the attacks, as set out above, demonstrate that his acts substantially contributed to the commission of the crimes").

[5337] *Blaškić* Appeal Judgement, para. 46, quoting *Blaškić* Trial Judgement, para. 283, in turn quoting *Furundžija* Trial Judgement, para. 249.

[5338] *Blaškić* Appeal Judgement, para. 46, quoting *Blaškić* Trial Judgement, para. 283, in turn quoting *Furundžija* Trial Judgement, para. 249.

[5339] *Furundžija* Trial Judgement, paras 191-249, in particular, *ibid.*, paras 234-235, 249.

[5340] Some of these cases clearly concern accessorial or aiding and abetting liability. However, there are also cases in which, in light of the limited reasoning and discussion (including in terms of legal characterization of conduct and *mens rea*), it is difficult to ascertain with certainty under what form of liability the accused was held responsible. The Appeals Chamber has nonetheless considered such cases when there is some indication that aiding and abetting liability might have been applied. In so doing, the Appeals Chamber was mindful of the legal instruments applied in different courts

Case No. IT-05-87-A

23 January 2014
**Exhibit A**
53

the commission of the crime; and (ii) whether the defendant knew that his acts contributed to the commission of the crime.

1628.   In the *Zyklon B* case before a British military court,[5341] three members of a private firm were charged with knowingly supplying poison gas, mainly "Zyklon B", used for the extermination of allied nationals interned in concentration camps.[5342] Among the three, the owner and the second-in-command of the firm were found guilty, following the Judge Advocate's instruction that the court must examine: (i) whether "[a]llied nationals had been gassed by means of Zyklon B"; (ii) whether "this gas had been supplied by [the firm]; and (iii) whether "the accused knew that the gas was to be used for the purpose of killing human beings."[5343] The firm's first gassing technician, who was in a subordinate position, was acquitted, following the Judge Advocate's instruction that the court must consider whether he "was in a position either to influence the transfer of gas to Auschwitz or to prevent it."[5344] The analysis therefore focused on whether each defendant had influence over the supply of the gas and knew of the unlawful use of the gas despite the stated lawful purposes, such as disinfecting buildings.[5345] Whether the defendants specifically directed the supply of the gas to the extermination was not a basis for the convictions.[5346]

1629.   In the *Schonfeld* case heard by a British military court,[5347] four defendants were found guilty of being "concerned in the killing of" three airmen of the allied forces.[5348] In light of the factual circumstances in this case, the Judge Advocate provided, *inter alia*, an overview of aiding and abetting liability in English law, noting that a party is an aider and abettor if he is "actually or

---

and tribunals, including the Charter of the International Military Tribunal of 8 August 1945 ("IMT Charter"), Control Council Law No. 10, and the British Royal Warrant of 14 June 1945 as well as national legislation.
[5341] The Zyklon B Case, Trial of Bruno Tesch and Two Others, British Military Court, Hamburg, 1-8 March 1946, in *Law Reports of Trials of War Criminals: Selected and Prepared by the United Nations War Crimes Commission* (London: His Majesty's Stationery Office, 1947-1949) ("UNWCC Law Reports"), vol. I, pp. 93-103 ("*Zyklon B* case").
[5342] *Zyklon B* case, pp. 93-94.
[5343] *Zyklon B* case, pp. 101-102.
[5344] *Zyklon B* case, p. 102, also recording the Judge Advocate's instruction that if the defendant were not in such a position, he could not be found guilty even though he had knowledge of the unlawful use of the gas.
[5345] *Zyklon B* case, pp. 94-102. See also *Furundžija* Trial Judgement, paras 222-223, 238.
[5346] The *Perišić* Appeal Judgement held that "the provision of general assistance which could be used for both lawful and unlawful activities will not be sufficient, alone, to prove that this aid was specifically directed to crimes of principal perpetrators" and that "[i]n such circumstances, in order to enter a conviction, evidence establishing a direct link between the aid provided by an accused individual and the relevant crimes committed by principal perpetrators is necessary" (*Perišić* Appeal Judgement, para. 44). In support of this finding, the *Perišić* Appeal Judgement referred to the *Zyklon B* case, stating that the court in this case found "two defendants guilty […], despite arguments that the gas was to be used for lawful purposes, after reviewing evidence that defendants arranged for S.S. units to be trained in using this gas to kill humans in confined spaces" (*Perišić* Appeal Judgement, fn. 115). However, although there was evidence concerning the provision of such training for S.S. units, this pertained only to one of the two convicted defendants. This and the Judge Advocate's instructions described above clearly indicate that the evidence concerning the provision of such training was not dispositive of the case (*Zyklon B* case, pp. 95-98, 101-102).
[5347] Trial of Franz Schonfeld and Nine Others, British Military Court, Essen, 11-26 June 1946, in UNWCC Law Reports, vol. XI, pp. 64-73 ("*Schonfeld* case").

Case No. IT-05-87-A

23 January 2014
**Exhibit A**
**54**

constructively present when the felony is committed"[5349] and that there must be "participation in the act" although it is not necessary to prove that he "actually aided in the commission of the offence".[5350] The Judge Advocate further explained:

> [I]f [a party] watched for his companions in order to prevent surprise, or remained at a convenient distance in order to favour their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, he was, in contemplation of law, present, aiding and abetting.[5351]

These examples mentioned by the Judge Advocate suggest that the accused's presence in the vicinity (moral encouragement as opposed to tangible support) could constitute the *actus reus* of aiding and abetting liability if it has the effect of giving additional confidence to the principal perpetrator, and that the purpose of the accused's act, together with the principal perpetrator's knowledge thereof, *could* be considered as potentially relevant evidence in this evaluation.[5352]

1630.   In the *Rohde* case heard by a British military court,[5353] six defendants were found guilty of being "concerned in the killing of" British prisoners who were executed by lethal injection without any trial and then cremated. The convicted included the person who lit the oven at the crematorium after the killing.[5354] The Judge Advocate explained that for an accused to be "concerned in a killing" it was not necessary that he must have actually been present.[5355] The Judge Advocate further stated that if a lookout standing half a mile away from the actual murder took part with another "man with the knowledge that that other man was going to put the killing into effect then he was just as guilty as the person who fired the shot or delivered the blow."[5356] Thus, the convictions were based on each accused's contribution demonstrated through his role – including in carrying out *ex post facto* cremation – and knowledge of the crime, *i.e.* the unlawful killing.[5357]

---

[5348] *Schonfeld* case, pp. 64-65, 67-68, noting that one of the four convicted defendants actually shot the airmen. The remaining six defendants were acquitted. The court did not specify the modes of liability based on which it entered the convictions and acquittals.
[5349] *Schonfeld* case, p. 69.
[5350] *Schonfeld* case, p. 70.
[5351] *Schonfeld* case, p. 70.
[5352] See also *Furundžija* Trial Judgement, paras 200-202, 239.
[5353] Trial of Werner Rohde and Eight Others, British Military Court, Wuppertal, Germany, 29 May – 1 June 1946, in UNWCC Law Reports, vol. V, pp. 54-59 ("*Rohde* case").
[5354] *Rohde* case, pp. 54-55, noting that this cremator was sentenced to five years of imprisonment, while the "Kommandant" of the detention camp where the prisoners were detained and the medical officer, who gave at least one injection, were sentenced to life imprisonment and death, respectively.
[5355] *Rohde* case, p. 56.
[5356] *Rohde* case, p. 56.
[5357] *Rohde* case, pp. 54-56, 58. See also similar analysis conducted by other British military courts, focusing on the effect of each accused's contribution demonstrated through his role and knowledge of the unlawful killing at issue, in: Trial of Karl Adam Golkel and Thirteen Others, British Military Court, Wuppertal, Germany, 15-21 May 1946, in UNWCC Law Reports, vol. V, pp. 45-53; The Almelo Trial, Trial of Otto Sandrock and Three Others, British Military Court, Almelo, Holland, 24-26 November 1945, in UNWCC Law Reports, vol. I, pp. 35-45. The United States Military Commission also conducted similar analysis in: The Jaluit Atoll Case, Trial of Rear-Admiral Nisuke Masuda and Four Others of the Imperial Japanese Navy, Unites States Military Commission, Marshall Islands, 7-13 December 1945, in

**Exhibit A**
**55**

1631.   In the *Stalag Luft III* case heard by a British military court,[5358] 18 defendants were convicted of "being concerned in the killing" of British prisoners of war, who were unlawfully executed by shooting.[5359] In light of the factual circumstances in this case, the Judge Advocate stated that "if people are all present, aiding and abetting one another to carry out a crime they knew was going to be committed, they are taking their respective parts in carrying it out, whether it be to shoot or whether it is to keep off other people or act as an escort […], they are all in law equally guilty of committing that offence".[5360] In explaining the term "concerned in the killing", he further stated:

> I do not think that the prosecution can ask you to consider a case of a minor official who was concerned with some administrative matter. What they had in mind is that the persons concerned must have been part of the machine doing some duty, *carrying out some performance which went on directly to achieve the killing, that it had some real bearing on the killing, would not have been so effective or been done so expeditiously if that person had not contributed his willing aid.*[5361]

This suggests that, in addition to the knowledge of a defendant, the important question to be asked was whether the concerned act "had some real bearing on the killing", *i.e.* had a substantial effect on the killing, and that this is what the Judge Advocate meant when he used the expression "performance which went on directly to achieve the killing". This observation is further supported by the court's focus on: (i) what part each defendant played in the shooting of the prisoners, which showed the degree of his contribution to the commission of the crimes; and (ii) whether it was a knowing participation.[5362]

1632.   In the *Holstein* and *Wagner* cases before French military tribunals,[5363] the accused who were found guilty as accomplices were considered to fall within one of the following two categories pursuant to Article 60 of the then French Penal Code: (i) "[t]hose who have furnished arms, instruments or any other means which have served in the action [constituting a crime or delict] knowing that they would serve this purpose"; and (ii) "[t]hose who knowingly aided or assisted the

UNWCC Law Reports, vol. I, pp. 71-80 (see, in particular, the analysis concerning the defendant Tasaki). With regard to the *Rohde* case, see also *Furundžija* Trial Judgement, paras 203-204, except for the statement in footnote 226 that "two defendants appear to have been convicted without proof of knowledge", which the Appeals Chamber finds to be incorrect.
[5358] Trial of Max Wielen and 17 Others, the Stalag Luft III Case, British Military Court, Hamburg, Germany, 1 July – 3 September 1947, in UNWCC Law Reports, vol. XI, pp. 31-52 ("*Stalag Luft III* case").
[5359] *Stalag Luft III* case, pp. 31-32, 34-35, 44-46. Of the 18 defendants, those who gave orders for the execution, fired shots, or acted as guards and escorts were sentenced to death, while two defendants, Denkmann and Struve, who acted as drivers with the task to "keep the road clear of curious passers-by" were sentenced to ten years of imprisonment (see *Stalag Luft III* case, pp. 40-46).
[5360] *Stalag Luft III* case, pp. 43-44, recording that the Judge Advocate also noted that "their individual responsibility with regard to punishment may vary."
[5361] *Stalag Luft III* case, p. 46 (emphasis added).
[5362] *Stalag Luft III* case, pp. 40-44, 51. With regard to the knowledge, the court examined whether the defendants knew that the victims were prisoners of war, and even if not, whether they knew that the execution was unlawful due to the lack of meaningful trials (see *ibid.*, pp. 40, 51). See also *Furundžija* Trial Judgement, fn. 226.
[5363] Trial of Franz Holstein and 23 Others, Permanent Military Tribunal at Dijon, 3 February 1947, in UNWCC Law Reports, vol. VIII, pp. 22-33 ("*Holstein* case"); Trial of Lobert Wagner, Gauleiter and Head of the Civil Government of Alsace during the Occupation and Six Others, Permanent Military Tribunal at Strasbourg, 23 April – 3 May 1946, and Court of Appeal, 24 July 1946, in UNWCC Law Reports, vol. III, pp. 23-55 ("*Wagner* case").

Case No. IT-05-87-A

23 January 2014
**Exhibit A**
**56**

perpetrator or perpetrators of the action in the facts which have prepared or facilitated or in those which have consumated [*sic*] the action".[5364] The record does not indicate that the tribunals additionally examined whether the accused specifically directed their acts to the crimes.[5365]

1633.  In the *Pig-cart parade* case heard by the German supreme court in the British occupied zone,[5366] the accused L, G, and S were found guilty of a crime against humanity under Control Council Law No. 10[5367] for having participated in a parade in which two political opponents of the Nazi party were exposed to public humiliation in a pig truck. The accused P was acquitted.[5368] The court found that L, G, and S *caused* in part what the two victims suffered: (i) L got hold of the pig truck; (ii) G led the marching band and accompanied the demonstration; and (iii) S accompanied the pig truck wearing his uniform and carrying a rifle.[5369] It found that the three accused were old Nazi officials and that it was inconceivable that they were not at least aware of the risk of people being assaulted by a system of violence and injustice and accepted such an outcome by reconciling themselves with it (*dolus eventualis*). The court also held that more is not required in respect of the mental elements.[5370] Regarding the accused P, the court found that he followed the parade merely as spectator in civilian clothes. It found that, accordingly, it was neither proved that he became part of the cause nor that he possessed the *mens rea* meeting the standard of *dolus eventualis*.[5371]

---

[5364] *Holstein* case, pp. 32-33, providing an English translation of Article 60 of the then French Penal Code. See also *ibid.*, pp. 23-26, 31; *Wagner* case, pp. 24, 30-32, 41-42, read together with *ibid.*, p. 49. See also UNWCC Law Reports, vol. III, p. 94, which provides a similar translation of this provision of the then French Penal Code.

[5365] See also Trial of Gustav Becker, Wilhelm Weber and 18 Others, Permanent Military Tribunal at Lyon, 17 July 1947, in UNWCC Law Reports, vol. VII, pp. 67-73, which contains analysis of jurisprudence on "forms of complicity", including "aid[ing] and assist[ing]", in illegal arrests and deportation through denunciation of individuals which resulted in their arrest, detention, and death. It was noted: "A decision was made [in the United Nations War Crimes Commission] to the effect that denunciation did not in itself, constitute a war crime. The offence is committed only if, by giving information, the informer becomes a party to, or accomplice in, a war crime recognized as such in international law. This condition is fulfilled if circumstances constituting complicity are present, e.g., if the informer knew that his action would lead to the commission of a war crime and either intended to bring about this consequence or was recklessly indifferent with regard to it. This decision was applied by the War Crimes Commission in numerous instances." See *ibid.*, pp. 70-71, also referring to two other judgements of French military tribunals in this regard.

[5366] Strafsenat, Urteil vom 14. Dezember 1948 gegen L. und andere, StS 37/48 in Entscheidungen des Obersten Gerichtshofs für die Britische Zone. Entscheidungen in Strafsachen, Vol. I (1949), pp. 229-234 ("*Pig-cart parade* case").

[5367] Article II(2) of Control Council Law No. 10 provided, in relevant part, that "[a]ny person [...] is deemed to have committed a crime as defined in paragraph 1 of this Article, if he was (a) a principal or (b) was an accessory to the commission of any such crime or ordered or abetted the same or (c) took a consenting part therein or (d) was connected with plans or enterprises involving its commission or (e) was a member of any organization or group connected with the commission of any such crime".

[5368] *Pig-cart parade* case, pp. 230-232, 234. Interpreting Article II(2) of Control Council Law No. 10, the court stated that, for a finding of guilt with regard to a crime against humanity under Control Council Law No. 10, it was not necessary to determine the form of liability under German criminal law (see *Pig-cart parade* case, p. 231). The court did, however, apply aiding and abetting liability for the remaining crimes charged under German criminal law.

[5369] *Pig-cart parade* case, p. 232.

[5370] *Pig-cart parade* case, p. 232.

[5371] *Pig-cart parade* case, p. 234, also finding that P's conduct could not even with certainty be construed as objective and subjective consent and furthermore that silent consent that does not contribute to causing the offence would by no means meet the requirements for criminal liability. See also *Furundžija* Trial Judgement, para. 208.

23 January 2014
**Exhibit A**
**57**

Therefore, the convictions and acquittal were based on whether the defendants contributed to the commission of the crime and whether the *mens rea* met the *dolus eventualis* standard.[5372]

1634.   In the *Roechling* case,[5373] dealt with by French military tribunals under Control Council Law No. 10, Hermann Roechling, General Director of his family-owned steel firm, was found guilty of having committed war crimes involving economic spoliation of the occupied countries.[5374] Ernst Roechling, who acted as the firm's representative in France, was found guilty as an accessory to these actions by Hermann Roechling. In its analysis the appellate tribunal focused on the importance of Ernst Roechling's role in the economic plunder and spoliation in France as well as his knowledge of the significance of his own role and of Hermann Roechling's activities. As a result, it overturned Ernst Roechling's acquittal entered by the tribunal of first instance.[5375] In addition, the appellate tribunal upheld the convictions of two members of the Directorate of the firm[5376] as "coauthors or accomplices" to Hermann Roechling's acts in relation to the deportation

---

[5372] The Appeals Chamber is of the view that the *Hechingen Deportation* case before German courts cited in the *Furundžia* Trial Judgement is not informative for the present analysis (see *Furundžija* Trial Judgement, paras 224-225). The court of first instance convicted the accused based on aiding and abetting liability. However, the court of appeal applied a different *mens rea* standard required for a principal (Täter) rather than for an aider or abettor (Gehilfe), interpreting Article II(2) of Control Council Law No. 10 as not distinguishing between perpetration (Täterschaft) and accessoryship/complicity (Teilnahme) (see Landgericht Hechingen, 28.6.1947, KLs 23/47 and Oberlandesgericht Tübingen, 20.1.1948, Ss 54/47, decision on appeal reported in Justiz und NS-Verbrechen, vol. I, pp. 469-502, in particular, p. 498). As a result, the court of appeal quashed the convictions of some of the defendants (see *ibid.*, p. 499). The Appeals Chamber considers that Article II(2) of Control Council Law No. 10 *does* distinguish various forms of liability. The *Synagogue* case before a German court cited in the *Furundžija* Trial Judgement is also not instructive for the purpose of identifying elements of aiding and abetting liability (see *Furundžija* Trial Judgement, paras 205-207), as this case addresses "Mittäterschaft", namely the liability of a co-perpetrator (Mittäter), as opposed to "Beihilfe", namely the liability of an aider and abettor (Gehilfe) (see Strafsenat, Urteil vom 10. August 1948 gegen K. und A., STS 18/48 in Entscheidungen des Obersten Gerichtshofs für die Britische Zone. Entscheidungen in Strafsachen, vol. I (1949), pp. 53-56).

[5373] The Roechling Case – Indictment, Judgment, and Judgment on Appeal, dated on 25 November 1947, 30 June 1948, and 25 January 1949, respectively, in *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10, Nuernberg, October 1946 – April 1949* (Washington, D.C.: U.S. Government Printing Office, 1949-1953) ("Trials before NMTs"), vol. XIV, pp. 1061-1143 ("*Roechling* case").

[5374] *Roechling* case, pp. 1111, 1113, 1140.

[5375] *Roechling* case, p. 1119-1124, 1140. See, in particular, *ibid.*, p. 1119 ("[Ernst Roechling] was fully aware of the significance of his own role and of Hermann's activities. […]. The role which [Ernst Roechling] played in the enslavement of the French industry and in its systematic spoliation, was of great importance."), p. 1120 ("[Ernst Roechling] was well aware of the fact that Hermann Roechling had set himself the task of increasing the war potential of the Reich, and that he assisted him voluntarily in this task in France"). With regard to his specific acts, see, *e.g.*, *ibid.*, p. 1120 ("It was Ernst Roechling who, as a result of his personal relations to the French Ministers […], was able to effect this robbery"), p. 1123 ("It cannot be assumed that the administrator of a company (and Ernst Roechling held this office in the Société de Crédits et d'Investissements; he was indeed, together with Kreuter, its founder) which was formed for the purpose of committing criminal acts and whose activity consisted thereof, should be absolved of criminal responsibility because he played no specific part. He could only escape this responsibility by proving that he was only a *pro forma* administrator, had been deceived as to the true purpose of the company, and had known nothing of its operations. No such excuse [has] been put forward. […] Ernst Roechling's role in the operation of the so-called Lorsar purchasing office is of decisive importance, for he was the delegated administrator of this company. Its criminal character was discussed in connection with the statements on the acts with which Hermann Roechling was charged. Thus, Ernst Roechling is an accessory to the war crimes proved against Hermann Roechling."). *Compare with* the findings of the tribunal of first instance in *ibid.*, pp. 1090-1091. Also *compare with* the findings on Hans Lothar Von Gemmingen-Hornberg and Albert Maier in *ibid.*, pp. 1124-1125, 1142.

[5376] *Roechling* case, pp. 1133, 1139. These two were Hans Lothar Von Gemmingen-Hornberg, president of the Directorate of the firm, and Wilhelm Rodenhauser, director in charge of manpower.

and employment of persons and prisoners of war and the ill-treatment inflicted upon them.[5377] In reaching these conclusions, the appellate tribunal held:

> Hermann Roechling and the other accused members of the Directorate of the [firm] are not accused of having ordered this horrible treatment, but of having permitted it; and indeed supported it, and in addition, of not having done their utmost to put an end to these abuses. In adopting this attitude they permitted the continued existence and further development of this inhuman situation and thus, particularly through this tolerance, participated in the maltreatment within the meaning of Law No. 10.[5378]

The appellate tribunal's analysis thereby focused on the positions and powers of the above-mentioned three defendants which provided them with sufficient authority to intervene and improve the treatment of the deported workers who were subject to the terrible conditions that were known or must have been known to these defendants.[5379] Accordingly, the Appeals Chamber observes that, in the *Roechling* case, the essential consideration in determining accessorial or accomplice liability was the impact that each defendant could exert on the principal's offences as well as their awareness thereof.

1635.   Applying Control Council Law No. 10, the US military tribunals in Nuremberg also similarly focused on: (i) the degree of each defendant's contribution to the commission of the crimes, evinced through the part each defendant played and the effect of his conduct on the crimes; and (ii) the knowledge that each defendant had.

1636.   For instance, in the *Einsatzgruppen* case,[5380] the tribunal acquitted defendant Ruehl, a member of a Sonderkommando of Einsatzgruppe D, of war crimes and crimes against humanity finding that, while he "had knowledge of some of the illegal operations of" this Sonderkommando,[5381] he did not take part in any "executive operation nor did his low rank place him automatically into a position where his lack of objection in any way contributed to the success of any executive operation."[5382] Additionally, in relation to defendant Graf, a member of Einsatzkommando 6, the tribunal held that while he knew of some of the executions, "more than

---

[5377] *Roechling* case, pp. 1096, 1140-1142.
[5378] *Roechling* case, p. 1136.
[5379] *Roechling* case, pp. 1134, 1136-1137. In particular, the appellate tribunal rejected the assertion of Von Gemmingen-Hornberg and Rodenhauser that the material conditions of the workers were dependent on the "German Labour Front" and disciplinary matters on the "Gestapo" and found that, despite having sufficient authority, these two defendants failed to intervene in order to improve the conditions of the workers disciplined and detained in a camp (see *ibid.*, pp. 1136-1137). In contrast, the appellate tribunal confirmed the acquittals of Ernst Roechling and Albert Maier with respect to the deportation and ill-treatment of the workers, stating that "[a]s a result of the positions they held, [they] were not connected with manpower matters, and their conduct can therefore not be considered as participation in these abuses" (see *ibid.*, p. 1136).
[5380] *United States of America v. Otto Ohlendorf et al.*, Military Tribunal II-A, Opinion and Judgment, 8-9 April 1948, in Trials before NMTs, vol. IV ("*Einsatzgruppen* case").
[5381] *Einsatzgruppen* case, p. 580.
[5382] *Einsatzgruppen* case, p. 581.The tribunal also found that "it was not established beyond reasonable doubt that he was in a position to control, prevent, or modify the severity of [the program of his Sonderkommando]" (see *ibid.*, p. 580).

Case No. IT-05-87-A

23 January 2014

**Exhibit A**
**59**

mere knowledge of illegality of crime is required in order to establish guilt".[5383] The tribunal further opined that "[s]ince there is no evidence in the record that Graf was at any time in a position to protest against the illegal actions of others, he cannot be found guilty as an accessory [to crimes against humanity and war crimes]."[5384] In contrast, with respect to defendant Klingelhoefer, who was in charge of various units and later an interpreter with Einsatzgruppe B, the tribunal held that, even if his functions had been limited to that of an interpreter, "it would not exonerate him from guilt because in locating, evaluating and turning over lists of Communist party functionaries to the executive department of his organization he was aware that the people listed would be executed when found" and that, "[i]n this function, therefore, he served as an accessory to the crime."[5385] The tribunal also convicted defendant Fendler, who served in Einsatzgruppe C and was not alleged to have personally conducted executions.[5386] The tribunal found that he knew that executions were taking place and failed to do anything about it, although as the second highest ranking officer in the *Kommando* his views could have been heard.[5387]

1637.   As the *Furundžija* trial chamber observed, the above findings in the *Einsatzgruppen* case indicate that "knowledge of the criminal activities of the organisation combined with a role in that organisation was not sufficient".[5388] Rather, in addition, "the defendants' acts in carrying out their duties had to have a substantial effect on the commission of the offence for responsibility to ensue."[5389] The Appeals Chamber concurs with this observation.

1638.   The *Flick* case[5390] further supports this conclusion. In this case, the tribunal found defendants Flick and Steinbrinck guilty of contributing large sums to the financing of the SS.[5391] In reaching this conclusion, the tribunal first opined that:

---

[5383] *Einsatzgruppen* case, p. 585, also finding that "in view of his various absences from the Kommando it cannot be assumed that his membership in the organization of itself proves his presence at and knowledge of any particular executive operation, without there being proof of that fact."
[5384] *Einsatzgruppen* case, p. 585 also finding that "[s]ince there is no proof that he personally participated in any of the executions or their planning, he may not be held as a principal."
[5385] *Einsatzgruppen* case, p. 569. In finding Klingelhoefer guilty, the tribunal also considered that he was not a mere interpreter but "an active leader and commander" who supervised executions and had the requisite knowledge (see *ibid.*).
[5386] *Einsatzgruppen* case, p. 571.
[5387] *Einsatzgruppen* case, p. 572. The tribunal concluded that while the evidence did not conclusively establish that Fendler "was guilty of planning the killing of people or ordering their death", it did show that he took a "consenting part in the criminal activities" (*ibid.*, p. 573). See also the tribunals' findings on defendant Seibert, who was found to have "participated as a principal as well as an accessory in [the operations of Einsatzgruppe D] which violated international law" (*ibid.*, pp. 536-539) as well as defendant von Radetzky, who was found to have taken "a consenting part" in the executions of Jews (*ibid.*, pp. 576-578).
[5388] *Furundžija* Trial Judgement, para. 221.
[5389] *Furundžija* Trial Judgement, para. 221. See also *ibid.*, paras 217-220.
[5390] *United States of America v. Friedrich Flick et al.*, Opinion and Judgment, 22 December 1947, in Trials before NMTs, vol. VI ("*Flick* case").
[5391] *Flick* case, p. 1222-1223, read together with *ibid.*, pp. 1190. 1216, concerning the relevant count.

> One who knowingly by his influence and money contributes to the support [of an organisation which on a large scale is responsible for war crimes and crimes against humanity] must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes.[5392]

1639.   The tribunal found that Steinbrinck could not have remained wholly ignorant of the criminal activities of the SS under the administration of Himmler.[5393] It further found that Flick and Steinbrinck became members of the Himmler Circle of Friends[5394] and that members of the Circle were called upon to contribute money to Himmler and were informed that the money was "to be spent for some of [Himmler's] cultural hobbies and for emergencies for which he had no appropriations."[5395] Flick and Steinbrinck each had to contribute annually 100,000 Reichsmarks and, through a special fund of a bank, this money went into a second bank account upon which Himmler's personal adjutant drew checks. The tribunal held that none of the defendants knew of the "specific purpose" of the checks.[5396] It further held:

> Nor did the prosecution show that any part of the money was directly used for the criminal activities of the SS. It is reasonably clear that some of the funds were used purely for cultural purposes. But during the war and particularly after the beginning of the Russian campaign we cannot believe that there was much cultural activity in Germany. A hundred thousand Reichsmarks even to a wealthy man was not then a trifling but a substantial contribution. Ten times that sum annually was placed in the hands of Himmler, the Reich Leader SS, for his personal use and was continued year after year without a thought on [the part of the defendants], according to their testimony, that any portion of it might be used by him to maintain the organization of which he was the head. It is a strain upon credulity to believe that he needed or spent annually a million Reichsmarks solely for cultural purposes or that members of the Circle could reasonably believe that he did.
>
> […] It remains clear from the evidence that each of them gave to Himmler, the Reich Leader SS, a blank check. His criminal organization was maintained and we have no doubt that some of this money went to its maintenance. It seems to be immaterial whether it was spent on salaries or for lethal gas.[5397]

1640.   The convictions were therefore based on the defendants' substantial contribution to and knowledge of criminal activities. It was not additionally required that the contribution be specifically directed to criminal activities.

1641.   This approach was also taken in the *Justice* case.[5398] The tribunal found that defendant Rothenberger, president of the District Court of Appeals in Hamburg and later Under Secretary in

---

[5392] *Flick* case, p. 1217.
[5393] *Flick* case, p. 1217
[5394] *Flick* case, pp. 1217-1218, also finding that while there was no evidence that during the meetings of the Circle the criminal activities of the SS were discussed, the defendants were aware that Himmler was Reich Leader SS.
[5395] *Flick* case, p. 1219.
[5396] *Flick* case, p. 1220.
[5397] *Flick* case, pp. 1220-1221.
[5398] *United States of America v. Josef Altstoetter et al.*, Military Tribunal III, Opinion and Judgment, 3-4 December 1947, in Trials before NMTs, vol. III ("*Justice* case").

Case No. IT-05-87-A

23 January 2014

Exhibit A

61

the Ministry of Justice, was "instrumental" in denying Jews their fair trial rights.[5399] The tribunal found that, while this appeared to be a "small matter compared to the extermination of Jews by the millions under other procedures", it was "nevertheless a part of the government-organized plan for the persecution of the Jews, not only by murder and imprisonment but by depriving them of the means of livelihood and of equal rights in the courts of law."[5400] The tribunal further found that Rothenberger must have known that the inmates of the Mauthausen concentration camp were there either without trial, following acquittal, or after the expiration of their term of imprisonment.[5401] Thus he was aware of the system of "protective custody"[5402] but did not object to it. The tribunal found Rothenberger guilty of:

> taking a minor but consenting part in the Night and Fog program. He aided and abetted in the program of racial persecution, and notwithstanding his many protestations to the contrary he materially contributed toward the prostitution of the Ministry of Justice and the courts and their subordination to the arbitrary will of Hitler, the Party minions, and the police. He participated in the corruption and pervasion of the judicial system.[5403]

1642.  The Appeals Chamber further observes that, with regard to other defendants in the *Justice* case[5404] as well as in other cases heard by the US military tribunals under Control Council Law No. 10,[5405] "specific direction" was not required as an element of any form of accessorial liability.

---

[5399] *Justice* case, p. 1118. More specifically, the tribunal found that Rothenberger: (i) used his influence over judges to protect party members who had been charged or convicted of crimes; (ii) participated in securing the enactment of a discriminatory law against Jews; and (iii) enforced the law, and, before its enactment, acted upon his own initiative and without legal authority in denying Jews right to proceed in civil litigation without advancement of costs (*ibid.*, pp. 1110-1114). The tribunal also found that he "used his influence towards achieving discriminatory action favorable to high party officials and unfavorable to Poles and Jews" (see *ibid.*, p. 1118).

[5400] *Justice* case, p. 1114.

[5401] *Justice* case, p. 1116. The tribunal also found that he "thought concentration camps wrong but concluded that they were not objectionable if third degree methods did not become a habit" (*ibid.*, p. 1118).

[5402] *Justice* case, pp. 1116-1117. According to the tribunal, in Hitler's decree of Night and Fog, "civilians of occupied counties accused of alleged crimes in resistance activities against German occupying forces were spirited away for secret trial by special courts of the Ministry of Justice within the Reich […]. If the accused was acquitted, or if convicted, after serving his sentence, he was handed over to Gestapo for 'protective custody' for the duration of the war. These proceedings resulted in the torture, ill treatment, and murder of thousands of persons" (*ibid.*, pp. 1031-1032).

[5403] *Justice* case, p. 1118.

[5404] *E.g.*, concerning defendant Klemm, see *Justice* case, pp. 1093-1095, 1099, 1107; defendant Lautz, see *ibid.*, pp. 1120, 1123, 1127-1128; defendant Mettgenberg, see *ibid.*, pp. 1129-1130, 1132; defendant Joel, see *ibid.*, pp. 1137-1138, 1140, 1142; defendant Rothaug, see *ibid.*, see pp. 1143-1144, 1146-1156.

[5405] *United States of America v. Carl Krauch et al.*, Opinion and Judgment of the United States Military Tribunal VI, 29-30 July 1948, in Trials before NMTs, vol. VIII ("*Farben* case") – Concerning defendant Schmitz, see *Farben* case, p. 1155, in which the tribunal found him guilty under count two as he "was in a position to influence policy and effectively to alter the course of events" and "bore a responsibility for, and knew of, Farben's program to take part in the spoliation of the French dyestuffs industry, and, with this knowledge, expressly and impliedly authorized and approved it", read together with *ibid.*, p. 1153; In the *Farben* case, the tribunal found the defendants not guilty of the commission of war crimes and crimes against humanity by supplying poison gas "Cyclon-B" which was used in the extermination of inmates in concentration camps. The tribunal found that the evidence was insufficient to establish that they knew that the gas was to be used for criminal purposes (see *ibid.*, pp. 1168-1169). This is consistent with the *Zyklon B* case in which the British military court found two defendants guilty since it found, based on the evidence particular to this case, they knew of the unlawful use of poison gas "Zyklon B" and had influence over the supply of the gas (see *Zyklon B* case, pp. 94-102). *United States of America v. Ernst von Weizsaecker et al.*, Military Tribunal IV, Judgment, 11-13 April 1949, in Trials before NMTs, vol. XIV ("*Ministries* case") – Concerning defendants von Weizsaecker and Woermann, see *Ministries* case, pp. 478, 492, 496-499, 506-507, 528, 693-694, in which the tribunal,

Exhibit A
62

*inter alia*: (i) examined "whether they knew of the program [of the mass deportation of Jews to the East] and whether in any substantial manner they aided, abetted, or implemented it" and acquitted them in this regard, *inter alia*, due to the lack of knowledge; (ii) found them guilty in relation to the deportation of Jews from France to Auschwitz, since they knew of the fate of the Jews who came into the hands of the SS and Gestapo, and despite their knowledge and respective duty, neither of them raised any objection to the deportation; (iii) acquitted them in relation to the deportation of the Croatian Jews, as they did not "substantially participate" and therefore did not aid the campaign; and (iv) found the defendants not guilty of the charges relating to persecution of the church, as they "were not the originators of the unlawful policy", "had no power in themselves to change it", "had no part in implementing it or executing it", and "were both in principle and in deed against it"; defendant Berger, see *ibid.*, pp. 547-548, in which the tribunal found him guilty of crimes against humanity as "a conscious participant in the concentration camp program" because he furnished the exterior guards for the concentration camps and knew of the atrocities committed in these camps; defendant Dietrich, see *ibid.*, pp. 575-576; defendant von Erdmannsdorf, see, *ibid.*, pp. 577-578, in which the tribunal found that he knew of the crimes against humanity committed against the Jews and the persecution of the churches, but found him not guilty because he "had little or no influence" as deputy chief of the Political Division of the Foreign Office; defendant Keppler, see *ibid.*, pp. 584-586; defendant Kehrl, see *ibid.*, pp. 588-589; defendant Puhl, see *ibid.*, pp. 620-621, in which the tribunal found that he: (i) was the managing director and vice president of the Reich Bank, exercising all the powers of the president of the bank when the latter was absent; and (ii) knew that what was to be received and disposed of by the bank was stolen property and loot, including dental gold and wedding rings, taken from the inmates of concentration camps. The tribunal found that he had no part in the actual extermination of the Jews, but he "was a consenting participant in part of the execution of the entire plan, although his participation was not a major one"; defendant Rasche, see *ibid.*, pp. 621-622, 784, in which, in relation to the loans made by the Dresdner Bank to Reich spoliation agencies as well as various SS enterprises which employed slave labour and were engaged in the resettlement program, the tribunal found that Rasche, spokesman of the board of directors of the Bank, knew the purpose for which the loans were sought and how the money was to be used. However, the tribunal acquitted him of the charges stating that "[l]oans or sale of commodities to be used in an unlawful enterprise […] can hardly be said to be a crime." With regard to the bank's contributions (*i.e.* donations, as opposed to loans) to a fund placed at Himmler's personal disposal, the tribunal concluded that the evidence did not show that Rasche knew that any part of the fund was intended to be or was ever used by Himmler for any unlawful purposes; defendant Stuckart, see *ibid.*, pp. 645-646; defendant Schwerin von Krosigk, see *ibid.*, pp. 672, 676-680, in which the tribunal found that as Minister of Finance, he "was fully aware that measures to which he put his name and programs in which he played a part were contrary and abhorrent to what he […] knew to be right". The tribunal found him criminally responsible as he "actively and consciously participated in the crimes", *i.e.* the confiscation of Jewish property. By contrast, the tribunal found: "As Minister of Finance the defendant furnished the means by which the concentration camps were purchased, constructed, and maintained, but it is clear that he neither originated nor planned these matters […]. They were Reich funds […] and he had no discretion with respect to their disposition. His act in distributing them for these purposes was actually clerical, and we cannot charge him with criminal responsibility in this matter"; defendant Lammers, see *ibid.*, pp. 701, 706, 708-715, in which the tribunal found him guilty of taking part in plunder and spoliation, as he knew of acts of spoliation and gave "vital and extremely important assistance […] in translating into law the various programs"; defendant Koerner, see *ibid.*, pp. 826-828, 832; defendant Pleiger, see *ibid.*, pp. 832-833, 843-844. *United States of America v. Oswald Pohl et al.*, Opinion and Judgment of the United States Military Tribunal II, 3 November 1947, in Trials before NMTs, vol. V ("*Pohl* case") – This case dealt with officials of the Economic and Administrative Main Office ("WVHA") of the SS and the Action Reinhardt involving the confiscation of property from concentration camp inmates. Concerning defendant Pohl, see *Pohl* case, pp. 988-989, in which the tribunal found: "The fact that Pohl [head of the WVHA] himself did not actually transport the stolen goods to the Reich or did not himself remove the gold from the teeth of the dead inmates, does not exculpate him. This was a broad criminal program, requiring the cooperation of many persons, and Pohl's part was to conserve and account for the loot. Having knowledge of the illegal purposes of the action and of the crimes which accompanied it, his active participation even in the after-phases of the action make him *particeps criminis* in the whole affair"; defendant Frank, see *ibid.*, pp. 993-995, 997, in which the tribunal held that he "must conclusively be convicted of knowledge of and active and direct participation in the slave labor program". In relation to Frank's alleged responsibility for the extermination of Jews in the concentration camps and Action Reinhardt, the tribunal held: "Assuming that Frank ultimately heard of the extermination measures, […] [a]ny participation of Frank's was *post facto* participation and was confined entirely to the distribution of property previously seized by others. Unquestionably this makes him a participant in the criminal conversion of the chattels, but not in the murders which preceded the confiscation. We therefore cannot find […] that the defendant Frank is in law guilty of the murders of the Jews in the concentration camps, but we do find that he was guilty of participating and taking a consenting part in the wholesale looting"; defendant Fanslau, see *ibid.*, pp. 998-999; defendant Hans Loerner, see *ibid.*, pp. 999-1001, in which the tribunal found that, as chief of the office of budgets dealing, *inter alia*, with the financing and payrolls of SS personnel at concentration camps, he had "vital and important functions within the structure of the WVHA in connection with its administration of the concentration camps", "was more than a mere bookkeeper", "exercised discretion and judgment and made important decisions, many of which related directly to the procurement and operation of concentration camps." "By reason of his direct and intimate association with this program", the

The same holds true in the findings of the International Military Tribunal.[5406] The criteria employed in these cases were rather whether the defendants substantially and knowingly contributed to relevant crimes.

1643.   The Appeals Chamber now turns to national law on the elements of aiding and abetting liability. At the outset, the Appeals Chamber recalls that under the doctrine of general principles of law recognised by nations, national legislation and case law may be relied upon as a source of international principles or rules in limited situations. Such reliance, however, is permissible only where it is shown that most, if not all, countries accept and adopt the same approach to the notion at issue.[5407] More specifically, it would be necessary to show that the major legal systems of the world take the same approach to that notion.[5408]

1644.   Having conducted a review of national law, the Appeals Chamber considers that this is not the case with respect to the notion of "specific direction". Specifically, in light of the variation among national jurisdictions with respect to aiding and abetting liability, the Appeals Chamber

tribunal found him guilty of war crimes and crimes against humanity"; defendant Vogt, see *ibid.*, pp. 1002-1004, in which the tribunal observed that, to establish that he "took a consenting part in and was connected with" a crime, "something more than having knowledge of" a crime is required and that "[t]here is "an element of positive conduct implicit in the word 'consent'". The tribunal added that "[i]n the case of a person who had power or authority to either start or stop a criminal act, knowledge of the fact coupled with silence could be interpreted as consent." It acquitted Vogt on the ground, *inter alia*, that as chief of the office of audits in the WVHA, "[h]is sole task was to inspect and analyze the records (which others had made) of past transactions" and that he did not furnish men, money, materials, or victims for the concentration camps, and had no role in determining what the inmates should wear, how hard they should work, or how they should be treated. The tribunal also found other than being aware of the existence of concentration camps, Vogt had no knowledge of what the inmates ate, wore, how they worked or were treated; defendant Georg Loerner, see *ibid.*, pp. 1004-1105, 1007-1008; defendant Kiefer, see *ibid.*, pp. 1020-1023; defendant Pook, see *ibid.*, pp. 1036-1040.

[5406] Trial of the Major War Criminals before the International Military Tribunal, Nuremberg, 14 November 1945-1 October 1946 ("IMT Judgement"). See, in particular, its findings concerning defendant von Schirach in *ibid.*, pp. 317, 319-320; defendant Speer in *ibid.*, pp. 330-332; defendant Funk in *ibid.*, pp. 304-307. According to Article 6 (a) to (c) of the IMT Charter, the following crimes were within the jurisdiction of the IMT: crimes against peace, war crimes, and crimes against humanity. Article 6(a) of the IMT Charter articulated "participation in a Common Plan or Conspiracy" to wage a war of aggression as a punishable act. Article 6 of the IMT Charter further provided that "[l]eaders, organizers, instigators and accomplices participating in the formulation or execution of a Common Plan or Conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan." The indictment charged not only the conspiracy or common plan to commit aggressive war but also to commit war crimes and crimes against humanity. However, the IMT concluded that as the IMT Charter "does not define as a separate crime any conspiracy except the one to commit acts of aggressive war", it would "disregard the charges [...] that the defendants conspired to commit [war crimes and crimes against humanity], and [would] consider only the common plan to prepare, initiate, and wage aggressive war" (see IMT Judgement, p. 226). Accordingly, it appears that its findings on individual criminal responsibility in relation to war crimes and crimes against humanity relied on other forms of responsibility than conspiracy or common plan liability, such as possibly in some cases accomplice liability. Article 5 of the Charter of the International Military Tribunal for the Far East ("IMTFE") of 19 January 1946 mirrors Article 6 of the IMT Charter. In light of the nature of the charges against the IMTFE defendants (see, in particular, count 54) as well as the limited reasoning provided in the judgement of the IMTFE, it is unclear, if not unlikely, that the mode of liability of aiding and abetting was necessarily considered or applied in these cases. See generally International Military Tribunal for the Far East, Judgment of 12 November 1948, in R. John Pritchard ed., *The Tokyo Major War Crimes Trial: The Records of the International Military Tribunal for the Far East with an Authoritative Commentary and Comprehensive Guide* (New York: The Edwin Mellen Press, 1998), vol. 103, pp. 49,770-49,851.

[5407] See *Tadić* Appeal Judgement, para. 225. See also *Taylor* Appeal Judgement, paras 429, 447.

[5408] See *Tadić* Appeal Judgement, para. 225.

Case No. IT-05-87-A

23 January 2014

**Exhibit A**
**64**

considers that no clear common principle in this respect can be gleaned from the major legal systems of the world. As a common basis, for aiding and abetting liability to arise, national legislation and the jurisprudence of domestic courts require the provision of assistance or support which facilitates the commission of a crime. However, national jurisdictions conceptualise the link between the acts of assistance and the crime in the context of *actus reus* and the required degree of *mens rea* in various different ways in accordance with principles in their respective legal systems.[5409]

---

[5409] Article 13(VI) of the Federal Criminal Code of **Mexico** provides that a participant in the offence is a person who "wilfully" [*dolosamente*] aids or abets another person in the commission of that offence. The Supreme Court of Justice has held that the accomplice "is an efficient assistant aware of the plans and conduct of the material perpetrator, instigator or necessary co-perpetrator (the accomplice's intervention is required for the commission of the crime), who contributes to the crime by means of the previous or simultaneous use of means for its commission, but who does not have control over the crime" (*Suprema Corte de Justicia de la Nación, Tesis* CXXI/2007, vol. XXV, June 2007, p. 208; and *Contradicción de Tesis* 414/2010, vol. VIII, May 2012, p. 975). Section 107 of the **Indian** Penal Code stipulates that a person abets, *inter alia*, by "intentionally aid[ing], by any act or illegal omission". The Penal Code further explains that "[w]hoever, either prior to or at the time of the commission of an act, does anything in order to facilitate the commission of that act, and thereby facilitate the commission thereof, is said to aid the doing of that act" (Indian Penal Code, Section 107, Explanation 2). Moreover, in order to constitute abetment by aiding within the meaning of Section 107 of the Indian Penal Code, the abettor must be shown to have intentionally aided the commission of the offence (Ratanlal Ranchhoddas and Dhirajlal Keshavlal Thakore, *The Indian Penal Code: Act XLV of 1860: with exhaustive notes, comments, case-law references, State Amendments along with Schedule of Classification of Offences and Forms as prescribed under Code of Criminal Procedure, 1973*, 28th Edition (New Delhi: Wadhwa and Company, 1997), p. 136). The Penal Codes of **Singapore** and **Malaysia** contain provisions mirroring Section 107 of the Indian Penal Code (see Singaporean Penal Code, Section 107; Malaysian Penal Code, Section 107). Article 29 of the Criminal Code of **Cambodia** defines an accomplice as "the person who intentionally facilitates the attempt or the realization of a felony or a misdemeanor by providing his/her help or assistance". According to Article 56 of the Penal Code of **Indonesia**, an accomplice is a person who either deliberately aids the commission of the crime or deliberately provides opportunity, means or information for its commission. Article 20 of the Penal Code of **Vietnam** identifies "helpers" as those "who create spiritual or material conditions for the commission of crimes." Article 17 of the Penal Code of **Laos** recognises "accomplices" as those "who have intentionally assisted in the offence, or who have previously agreed to hide the offender, to hide instruments and tools of the offence, to efface traces of the offence or to conceal any proceeds from the offence." The High Court of **Hong Kong** has confirmed that: "the fact that a person was voluntarily and purposely present witnessing the commission of a crime, and offered no opposition to it, though he might reasonably be expected to prevent and had the power so to do, or at least to express his dissent, might, under some circumstances, afford cogent evidence upon which a jury would be justified in finding that he wilfully encouraged and so aided and abetted. […]. To find a person guilty as an aider and abettor it is not only necessary to prove that he was present while the offence is committed, that he knew an offence was being committed and that his presence, in fact, gave encouragement to the perpetrators but it must be proved that he intended to give that encouragement, that he <u>wilfully</u> encouraged." (*R. v. Lam Kit* [1988] 1 HKC 679, pp. 2-3 (emphasis in the original)). Article 66(1)(b) of the Crimes Act 1961 of **New Zealand** provides that a person is a party to and guilty of an offence if that person "does or omits an act for the purpose of aiding any person to commit the offence". The Supreme Court of New Zealand has held that aiding and abetting requires that "the secondary party intentionally helped or encouraged the principal offender with knowledge of the essential matters constituting the offence, including the principal's *mens rea*" (*Mahana Makarini Edmonds v. R* [2011] NZSC 159, para. 22). In **South Africa**, accomplice liability requires that the person has "intentionally furthered or assisted in the commission of the crime". In this regard, *dolus eventual is* would suffice. In addition, "the accused must also know or foresee the possibility that his or her conduct is unlawful" (Jonathan Burchell and John Milton, *Principles of Criminal Law*, 3[rd] Edition (Juta and Company Ltd., 2005), pp. 604-605. See also *ibid.*, pp. 600-603). In *Tladi v. S*, the Free State High Court has held that the accomplice's "assistance may be of a negligible nature but what is required is that it must be proven that there was adequate assistance" (*Tladi v. S* [2005] ZAFSHC 143, p. 3).

1645.  For instance, in some civil law countries, such as France,[5410] Belgium,[5411] and Algeria,[5412]

---

[5410] Article 121-7 of the **French** Penal Code provides that "the person who knowingly, by aiding and abetting, facilitates its preparation or commission" is an "accomplice to a felony or a misdemeanour". (« *est complice d'un crime ou d'un délit la personne qui sciemment, par aide ou assistance, en a facilité la préparation ou la consommation.* »). (English translation is available at: http://www.legifrance.gouv.fr/.) More specifically, for an accused to be convicted as an accomplice to a criminal offence by aiding and abetting (*aide ou assistance*), it must be established that: (i) the act of aiding and abetting happened before or at the same time as the perpetration of the criminal act (Arrêt de la chambre criminelle de la Cour de cassation ("Crim."), 23 July 1927: Recueil Sirey, 1929. 1. 73) and was a positive act (which could be moral encouragement through the presence) rather than a simple inaction or omission (Crim., 21 October 1948: Bulletin des arrêt de la chambre criminelle de la Cour de cassation ("Bull. crim."), nº 242, 27 December 1960 and *ibid.*, nº 624 ; Crim., 26 March 1992: Droit pénal Dalloz 1992. 194); and (ii) the accomplice aided or abetted the principal perpetrator with the awareness of the assistance he provided in the commission of the offence by the principal perpetrator (« *De même, la question de complicité par aide ou assistance doit préciser que l'aide ou l'assistance a été prêtée avec connaissance.* » Crim., 19 March 1986: Bull. crim., nº 112; « *La complicité par aide et assistance prévue par l'al. 1er de l'art. 121-7 C. pén. n'est punissable que si cette aide a été apportée sciemment à l'auteur principal dans les faits qui ont facilité la préparation ou la consommation de l'infraction.* » Crim., 19 June 2001: Bull. crim., nº 148; Droit pénal Dalloz 2001. 111; « *L'élément intentionnel du délit de complicité exige seulement que son auteur ait eu conscience de l'aide apportée à l'action principale.* » Crim., 1 October 1984: Gazette du Palais 1985, Sommaires 96; « *Est complice d'un crime ou d'un délit la personne qui sciemment, par aide ou assistance, en a facilité la préparation ou la consommation; ne peut servir de base à une condamnation une question qui laisse incertain le point de savoir si l'aide ou l'assistance ont été prêtées en connaissance de cause.* » Crim., 28 June 1995: Bull. crim., nº 241; Droit pénal Dalloz 1995. 274). See also Crim., 17 May 1962: Bull. crim., nº 200; Recueil Dalloz 1962. 473.

[5411] Article 67 of the **Belgian** Penal Code provides that: (i) those who procured the weapons, instruments or any other means that served for a crime, knowing that they would be so used; or (ii) those who aided or assisted, with awareness, the perpetrator(s) of a crime in its preparation or commission, shall be punishable as accomplices to the crime. (« *Seront punis comme complices d'un crime ou d'un délit: …ceux qui auront procuré des armes, des instruments, ou tout autre moyen qui a servi au crime ou au délit, sachant qu'ils devaient y servir; ceux qui, hors le cas prévu par le § 3 de l'article 66, auront, avec connaissance, aidé ou assisté l'auteur ou les auteurs du crime ou du délit dans les faits qui l'ont préparé ou facilité, ou dans ceux qui l'ont consommé.* »). The Belgian Court of Cassation held : « *Afin de constater que les demandeurs ont commis les faits en tant que complices, il est requis mais il suffit qu'il soit établi qu'ils ont coopéré sciemment à la commission de l'infraction, de la manière prévue par la loi.* » Arrêt de la Cour de cassation de Belgique (Cass.), 28 September 2010, AR P.10.0099.N, Pasicrisie belge (Pas.), 2010, nº 554. See also Christine Hennau and Jacques Verhaegen, *Droit pénal general*, 3rd Edition (Bruxelles: Bruylant, 2003), pp. 278-286, explaining that, to establish the aiding and abetting liability, the following elements have to be fulfilled: (i) the material realisation of the principal offence or its attempt; (ii) direct or indirect, but certain causation between the act of assistance and the commission of the principal offence or its attempt (in the sense that the offence belongs to the logical sequence of the assistance provided); and (iii) "intention coupable (*dolus*)", *i.e. mens rea*, to participate in the commission of the principal offence, in the sense that the aider or abettor was aware of the essential elements of the crime and was willing, or at least accepted that the crime be committed. Moreover, in **Luxembourg**, Article 67 of Luxembourgian Penal Code mirrors Article 67 of the Belgian Penal Code. The Luxembourgian Court of Cassation held that, for Article 67 to apply, the law requires that the supplier of instruments for a crime should have known that in providing them, they were to be used for the specific crime charged, this special knowledge forming the criminal link between the accomplice and the perpetrator. (« *…pour que l'Article 67 soit applicable,…la loi exige qu'il ait su, en les fournissant, qu'ils devaient server au crime déterminé qui fait l'objet de l'accusation, cette connaissance spéciale formant le lien criminel qui unit le complice à l'auteur.* ») See Dean Spielmann and Alphonse Spielmann, *Droit pénal général Luxembourgeois*, 2nd Edition (Bruxelles: Bruylant, 2004), p. 350, quoting la Cour Supérieure de Justice (Cour d'appel siégeant en matière correctionnelle), 24 March 1986, nº 7/86 VI, and Tribunal d'arrondissement de Luxembourg, 26 November 1987, nº 1678/86, cités dans Pasicrisie luxembourgeoise, XXVII, (Sommaires), 93, nº 18.

[5412] In **Algeria**, Article 42 of the Algerian Penal Code provides that those who knowingly aided by all means or assisted the perpetrator(s) of a criminal offence in its preparation or commission, without directly participating in that offence, shall be considered as accomplices to the criminal offence (« *Sont considérés comme complices d'une infraction ceux qui, sans participation directe à cette infraction, ont, avec connaissance, aidé par tous moyens ou assisté l'auteur ou les auteurs de l'action dans les faits qui l'ont préparée ou facilitée, ou qui l'ont consommée.* »). Article 43 of the same code further provides that accomplices are those who, being aware of their criminal conduct, usually provided housing, place of retreat or meeting for one or more criminals engaged in robbery or violence against the security of the State, the public peace, the people or the properties (« *Est assimilé au complice celui qui, connaissant leur conduite criminelle, a habituellement fourni logement, lieu de retraite ou de réunions à un ou plusieurs malfaiteurs exerçant des brigandages ou des violences contre la sûreté de l'Etat, la paix publique, les personnes ou les propriétés.* »). There are also a number of other countries whose Penal Codes contain provisions which closely resemble the above mentioned provisions of the French, Belgian, and Algerian Penal Codes and thereby provide the equivalent definition of aiding and

Exhibit A
66

it is required that the aider or abettor provided assistance to the principal perpetrator and thereby facilitated the commission of the crime by that principal perpetrator, with the awareness that his act would provide assistance to the commission of the crime. In other countries of civil law tradition, such as Germany,[5413] Bulgaria,[5414] China,[5415] and Japan,[5416] it is required that the aider and abettor, by providing assistance, facilitated the commission of the crime by the principal perpetrator. In addition, it must be established that he did so with the *dolus*, which is often translated in English as

abetting liability. See **Moroccan** Penal Code, Article 129; **Senegalese** Penal Code, Articles 46-47; **Tunisian** Penal Code, Article 32; **Madagascan** Penal Code, Articles 60-61; **Mauritanian** Penal Code, Articles 54-55; **Burundian** Penal Code, Article 38; Penal Code of the **Democratic Republic of Congo**, Article 22; **Malian** Penal Code, Article 24.

[5413] In **Germany**, any person who intentionally assists another in the intentional commission of an unlawful act shall be punished as an aider (Art. 27 (I) of the German Criminal Code reads: "*Als Gehilfe wird bestraft, wer vorsätzlich einem anderen zu dessen vorsätzlich begangener rechtswidriger Haupttat Hilfe geleistet hat*"). The assistance does not need to be *conditio sine qua non* for the commission of the crime; it is sufficient that the act of the aider and abettor has facilitated it. (Tröndle/Fischer, Strafgesetzbuch und Nebengesetze, 53. Auflage, München 2006, § 27, Anm. 2 c with references) As to the *mens rea*, it is required that the aider and abettor was at least aware of the risk of the commission of the crime and accepts such an outcome by reconciling himself with it (*dolus eventualis*). An exception from the *dolus eventualis* requirement has been found in cases of so-called "professional" or "neutral" acts, where it has been held that if the acts of the principal are exclusively targeted toward committing a crime and the person providing assistance knows this *with certainty* (*positiv weiß*), the person will be punished as aider and abettor. (Tröndle/Fischer, Strafgesetzbuch und Nebengesetze, 53. Auflage, München 2006, § 27, Anm. 2 b with references; BGH NStZ 2001, 364).

[5414] Article 20(4) of the Criminal Code of **Bulgaria** provides that the aider is a person who has "intentionally facilitated the commission of a crime through advice, explanations, promises to render assistance after the act, removal of obstacles, supply of means or in any other way." The *actus reus* of aiding involves the creation of conditions which to a certain degree facilitate the commission of the crime (Aleksandar Stoynov, *Criminal Law: General Part* (Sofia: Ciela, 1999), p. 316). The *mens rea* of aiding requires that the aider foresee the commission of the crime and its consequences and is aware that his conduct facilitates the perpetrator. In terms of volition, the aider either aims at or agrees with the facilitation and with the commission of the crime, either wanting or accepting its consequences (*ibid.*, p. 317).

[5415] In **China**, Article 27 of the Penal Code of the People's Republic of China provides that "an accomplice refers to any person who plays a secondary or auxiliary role in a joint crime." (English translation available at http://www.npc.gov.cn/englishnpc/Law/2007-12/13/content_1384075.htm). In both criminal law theories and jurisprudence, there exist a more specific category of actors that are named as aiders and abettors, which refer to those who with intent (*dolus*) provide aid or assistance to the principal perpetrator and facilitate his commission of the crime. To establish the liability of an aider and abettor, it is required that: (i) the accused was aware of the fact that he was aiding and abetting others in a crime, and intentionally created a more convenient condition for others' commission of the crime or took the risk of the creation of such a condition; and (ii) the act of aiding and abetting was distinguishable from the act of perpetration and facilitated the perpetration of the crime. With respect to the *mens rea*, it is not required that the accused have any specific criminal intent or any intention pursuing the perpetration of the crime. With regard to the *actus reus*, tangible and intangible assistance and physical and moral support can all constitute aiding and abetting, as long as they contributed physically or mentally to the crime to a certain extent (Chen Xingliang, ed., *Xingfa Zonglun Jingshi*, (Beijing: People's Court Press, 2010), pp. 524-527).

[5416] In **Japan**, Article 62(1) of the Japanese Penal Code provides that "[a] person who aids a principal is an accessory." The Japanese Supreme Court held that "[t]he term 'accessory' as set forth in Article 62, paragraph (1) of the Penal Code refers to a person who aids another person by any tangible or intangible means with the intent ["ishi" in the Japanese original] of collaborating in such other person's commission of a crime, thereby facilitating the person's crime." (2011 (A) No. 2249, decision of the Third Petty Bench of the Supreme Court of 15 April 2013, Keishu vol. 67, No. 4, referring to 1949 (Re) No. 1506, judgment of the Second Petty Bench of the Supreme Court of 1 October 1949, Keishu Vol. 3, No. 10, at 1629). See also Shigemitsu Dando, *Keiho koyo soron*, 3rd Edition, (Tokyo: Sobunsha, 1990), pp. 412-415 (English translation: Shigemitsu Dando, *The Criminal Law of Japan: The General Part*, Publication of the Comparative Criminal Law Project, vol. 19 (Littleton, Colorado: Rothman, 1997), pp. 248-250), explaining based on the jurisprudence of Japanese courts, *inter alia*, that acts of aiding are not acts of perpetration, but make it easier for a principal to perpetrate an offence, that aiding by omission could be also punishable, and that an aider must have the intent to aid the principal's offence based on the awareness (which may be at the level of *dolus eventualis*) of the principal's perpetration of the offence. See further Atsushi Yamaguchi, *Keiho (Criminal Law)*, 2nd Edition (Tokyo: Yuhikaku, 2011), pp. 160-161; Masahide Maeda, *Keiho soron kogi (Criminal Law: The General Part)*, 3rd Edition, (Tokyo: University of Tokyo Press, 1998), pp. 434-439 and the jurisprudence cited therein. English translations of the

Exhibit A
67

"intent" and encompasses either purpose, knowledge with certainty (*dolus directus*), or the awareness and acceptance of the likelihood that the crime could be committed and that his act could facilitate the commission of the crime (*dolus eventualis*). *Dolus eventualis* is the minimum requirement. In some common law countries, such as Australia and Canada, the aider and abettor must have both intent and knowledge, while the required amount of assistance in order for liability to arise, for the most part, is relatively low.[5417] In contrast, while English law also requires both intent and knowledge, the aider and abettor must make an essential contribution to the commission of the crime.[5418] As to the United States, while there is a Model Penal Code, its approach to

---

Penal Code and the case of 1 October 1949 quoted above are available at: http://www.japaneselawtranslation.go.jp/ and http://www.courts.go.jp/english/judgments/index.html, respectively.

[5417] In **Australia** in order for liability to attach the accused "must have in fact aided, abetted, counselled or procured" the commission of an offence which was committed and "must have intended that: (a) his or her conduct would aid, abet, counsel or procure the commission of any offence (including its fault elements) of the type the other person committed; or (b) his or her conduct would aid, abet, counsel or procure the commission of an offence and have been reckless about the commission of the offence (including its fault elements) that the other person in fact committed" (see Criminal Code Act 1995, Part 2. 4, Division 11.2). In relation to the *actus reus*, the accused "is in some way linked in purpose with the person actually committing the crime, and is by his words or conduct doing something to bring about, or rendering more likely, such commission" (*R. v. Russell* [1933] VLR 59, p. 67). Both knowledge of the essential facts of the principal offence and participation intentionally aimed at the commission of the act which constitutes that offence are required to render a person liable as an aider and abettor (see *Giorgianni v. R.* [1985], 156 CLR 473, pp. 500, 503-507; see also *ibid.*, p. 482). In **Canada**, a person who "does or omits to do anything for the purpose of aiding any person to commit" an offence is considered a party to that offence (see Criminal Code, RSC 1985, c. C-46, Article 21(1)(b)). The "*actus reus* of aiding or abetting is doing (or, in some circumstances, omitting to do) something that assists or encourages the perpetrator to commit the offence" (*R. v. Briscoe* [2010] 1 S.C.R. 411, para. 14). The Supreme Court of Canada has held that the *mens rea* requirement reflected in the word "purpose" includes both "intent" and "knowledge". For the "intent" component, it has interpreted "purpose" to mean "intention" to assist the perpetrator in the commission of the crime, rather than "desire" that the offence be successfully committed. (*R. v. Briscoe* [2010] 1 S.C.R. 411, paras 16-17; see also *R. v. Hibbert* [1995] 2 S.C.R. 973, paras 31-32, 35-36, 40). In relation to the "knowledge" component, the Supreme Court has held that "in order to have the intention to assist in the commission of an offence, the aider must know that the perpetrator intends to commit the crime, although he or she need not know precisely how it will be committed" (*R. v. Briscoe* [2010] 1 S.C.R. 411, para. 17). Reference to "purpose" is found also in Section 20(1) of the Criminal Code of **Ghana** which stipulates that: "Every person who, directly or indirectly, instigates, commands, counsels, procures, solicits, or in any manner purposely aids, facilitates, encourages, or promotes, whether by his act or presence or otherwise, and every person who does any act for the purpose of aiding, facilitating, encouraging or promoting the commission of a crime by any other person, whether known or unknown, certain or uncertain, is guilty of abetting that crime, and of abetting the other person in respect of that crime." Article 31 of the **Israeli** Penal Code defines an aider as a person who "before or during the commission of an offence, acted in order to allow, facilitate or secure the said commission, or to prevent the apprehension of its perpetrator, the discovery of the offence or its loot, or in order to contribute in any other way to the creation of conditions for the commission of the crime". The Supreme Court of Israel has held that the *actus reus* of aiding consists of an act or omission that may assist, allow, facilitate or secure the realisation of the principal offence. There is no requirement that the assistance would be effective, that it would constitute a *conditio sine qua non* in relation to the principal offence, or that the commission of the latter was completed (Criminal Appeal 320/99, *Plonit v. The State of Israel*, PD 55(3) 22, paras 15-16). In relation to the *mens rea*, the aider must be aware of the essential elements of the principal offence and that his acts assist or otherwise allow the conditions for the commission of that offence (*ibid.*, para. 17). In addition, the aider must have the purpose to assist the principal perpetrator. The latter requirement will be satisfied also if the aider is aware that his conduct would, in high probability, constitute an assisting contribution to the principal perpetrator (*ibid.*, paras 19-20).

[5418] In **England**, in *National Coal Board v. Gamble*, Devlin J stated: "A person who supplies the instrument for a crime or anything essential to its commission aids in the commission of it; and if he does so knowingly and with intent to aid, he abets it as well and is therefore guilty of aiding and abetting. [...] Another way of putting the point is to say that aiding and abetting is a crime that requires proof of mens rea, that is to say, of intention to aid as well as of knowledge of the circumstances, and that proof of the intent involves proof of a positive act of assistance voluntarily done." (*National Coal Board v. Gamble* [1959] 1 Q.B.11, p. 20; see also *Maxwell v. Director of Public Prosecutions for Northern Ireland* [1979] 68 Cr. App. R. 128, pp. 140-141; *R. v. Bryce* [2004] 2 Cr.App.R. 35, paras 42-45, 71, 75.

Case No. IT-05-87-A

23 January 2014

**Exhibit A**
**68**

accomplice liability is not uniformly adopted throughout the country. Consequently, states vary with respect to the applicable theories of accomplice liability, especially in relation to the relevant *mens rea* standard.[5419] In Iran, the Islamic Penal Code requires that the accessory commit a positive act by which he knowingly and intentionally facilitates the commission of the crime.[5420]

1646.   The survey of the above mentioned countries suffices for the Appeals Chamber to discern that requiring "specific direction" for aiding and abetting liability is not a general, uniform practice in national jurisdictions.

1647.   Finally, the Appeals Chamber briefly examines international instruments. The Draft Code of Crimes against the Peace and Security of Mankind adopted by the International Law Commission ("ILC") in 1996 ("ILC Draft Code") is not binding, but "is an authoritative instrument, parts of which may constitute evidence of customary international law, clarify customary rules, or, at the very least, 'be indicative of the legal views of eminently qualified publicists representing the major legal systems of the world.'"[5421] Article 2(3)(d) of the ILC Draft Code provides that "[a]n individual shall be responsible for a crime set out in [the ILC Draft Code] if that individual [...]

See also *R. v Bryce*, para. 81 where the Court held that "all that is necessary in the secondary party is the foresight of the real possibility that an offence will be committed by the person to whom the accessory's acts of assistance are directed").

[5419] See Candace Courteau, "The Mental Element Required for Accomplice Liability: A Topic Note", *Louisiana Law Review*, vol. 59 (Fall 1998), pp. 333-334, and references therein. The **United States** Model Penal Code defines an accomplice as a person who, "with the purpose of promoting or facilitating the commission of the offense": (i) solicits another person to commit an offence; (ii) aids, agrees or attempts to aid another person in planning or committing it; or (iii) having a legal duty to prevent it, fails to make proper effort so to do" (U.S. Model Penal Code, §2.06(3)). While accomplice liability may be established through any act of facilitating a crime, the Model Penal Code "requires that the actor [...] have as his conscious objective the bringing about of conduct [...] [which is] criminal" (U.S. Model Penal Code and Commentaries, pp. 310, 314, 318, fn. 58). With respect to U.S. federal law and practice, for aiding and abetting liability, generally the government must prove that the accused: (i) had the specific intent to facilitate the commission of a crime by another; (ii) had the requisite intent of the underlying substantive offence; and (iii) assisted or participated in the commission of the underlying substantive offence (see, *e.g.*, *United States v. Delgado*, 357 F.3d 1061, 1065-1066 (9th Cir. 2004); *United States v. Lucas*, 67 F.3d 956, 959 (D.C. Cir. 1995); *United States v. Gaskins*, 849 F.2d 454, 457, 459 (9th Cir. 1988); see also 18 U.S.C. §2(a)). Regarding the *actus reus*, it must be established that the accused assisted or participated in some way to the commission of the underlying offence (see, *e.g.*, *United States v. Landerman*, 109 F.3d 1053, 1068 n.22 (5th Cir. 1997); United States v. *Leos-Quijada*, 107 F.3d 786, 794 (10th Cir. 1997); *United States v. McKneely*, 69 F.3d 1067, 1072 (10th Cir.1995)). With respect to the *mens rea*, the "purposive attitude" standard (*i.e.*, the accomplice must have the intent that the underlying offence be committed) is the prevailing approach of U.S. federal courts (see, *e.g.*, *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) ("In order to aid and abet another to commit a crime it is necessary that a defendant in 'some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'"); *United States v. Woods*, 148 F.3d 843, 847, 849-850 (7th Cir. 1998); *United States v. Bancalari*, 110 F.3d 1425, 1429 (9th Cir. 1997); *United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995); *United States v. Williamson*, 53 F.3d 1500, 1515 (10th Cir. 1995); *United States v. Roach*, 28 F.3d 729, 736-737 (8th Cir. 1991); *United States v. Peoni*, 100 F.2d 401, 402 (2nd Cir. 1938)). For claims brought under the U.S. Alien Tort Statute, it has been held that aiding and abetting liability attaches only where an accused carries out "acts specifically directed to assist, encourage, or lend moral support to the perpetration of a certain specific crime, which have a substantial effect on the perpetration of the crime" and acts "with a purpose" to promote or facilitate the commission of the crime (see, *e.g.*, *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011); *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 154, 158 (2nd Cir. 2010); *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244, 253, 259 (2nd Cir. 2009)).

[5420] Kevin Jon Heller and Markus D. Dubber, eds., *The Handbook of Comparative Criminal Law* (Stanford: Stanford University Press, 2011), p. 330.

Exhibit A
69

*knowingly* aids, abets or otherwise assists, *directly and substantially*, in the commission of such a crime, including providing the means for its commission."[5422] Regarding the *actus reus* requirement, the Commentary of the ILC explains that, for aiding and abetting liability to arise, an individual must "provide the kind of assistance which contributes directly and substantially to the commission of the crime."[5423] The Commentary further notes that "[t]hus, the form of participation of an accomplice must entail assistance which facilitates the commission of a crime in some significant way."[5424] As correctly noted in the *Furundžija* Trial Judgement, this conforms with the post WWII cases which demonstrate that "the relationship between the acts of the accomplice and of the principal must be such that the acts of the accomplice make a significant difference to the commission of the criminal act by the principal."[5425]

1648.   Article 25(3)(c) of the ICC Statute, adopted in 1998, provides that "a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court if that person […] [f]or the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission". The phrase "directly and substantially" in the ILC Draft Code is not included in this provision, while the phrase "[f]or the purpose of facilitating the commission of such a crime" has been added. This has led some scholars to consider that, compared to the ILC Draft Code, the ICC Statute may have lowered the threshold of the *actus reus* requirement,[5426] while apparently adopting a higher *mens rea* standard.[5427] However, how the chambers of the International Criminal Court ("ICC") interpret Article 25(3)(c) of the ICC Statute and define the elements of the mode of liability under this article remains to be seen. Moreover, while the ICC Statute may be in many areas regarded as indicative of customary rules, in some areas it creates new law or modifies

---

[5421] *Krstić* Appeal Judgement, fn. 20, quoting *Furundžija* Trial Judgement, para. 227.
[5422] Emphasis added.
[5423] Report of the International Law Commission on the Work of its Forty-Eight Session, 6 May – 26 July 1996, UN Doc. A/51/10, p. 21.
[5424] Report of the International Law Commission on the Work of its Forty-Eight Session, 6 May – 26 July 1996, UN Doc. A/51/10, p. 21.
[5425] *Furundžija* Trial Judgement, para. 233. The trial chamber in the *Furundžija* case further found "the use of the term 'direct' [in the Commentary of the ILC to the Draft Code] in qualifying the proximity of the assistance and the principal act to be misleading as it may imply that assistance needs to be tangible, or to have a causal effect on the crime" (*Furundžija* Trial Judgement, para. 232).
[5426] William A. Schabas, *An Introduction to the International Criminal Court*, 4th Edition (Cambridge: Cambridge University Press, 2011), p. 228. See also *Furundžija* Trial Judgement, para. 231.
[5427] Albin Eser, "Individual Criminal Responsibility", in Antonio Cassese, Paola Gaeta, and John R.W.D. Jones, eds., *The Rome Statute of the International Criminal Court: A Commentary*, vol. I (Oxford: Oxford University Press, 2002), pp. 800-801; Kai Ambos, "Individual Criminal Responsibility", in Otto Triffterer ed., Commentary on the Rome Statute on the International Criminal Court: Observers' Notes, Article by Article, 2nd Edition (Baden-Baden: Nomos Verlagsgesellschaft, 2008), pp. 754-755, 757.

**Exhibit A
70**

existing law.[5428] The adoption of an international treaty, by itself, does not necessarily prove that states consider the content of that treaty to express customary international law.[5429]

1649.   Based on the foregoing, the Appeals Chamber, Judge Tuzmukhamedov dissenting, comes to the compelling conclusion that "specific direction" is not an element of aiding and abetting liability under customary international law. Rather, as correctly stated in the *Furundžija* Trial Judgement and confirmed by the *Blaškić* Appeal Judgement, under customary international law, the *actus reus* of aiding and abetting "consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime."[5430] The required *mens rea* is "the knowledge that these acts assist the commission of the offense".[5431] The Appeals Chamber reaffirms the position taken by the *Blaškić* Appeal Judgement in this regard.

1650.   Accordingly, the Appeals Chamber confirms that the *Mrkšić and Šljivančanin* and *Lukić and Lukić* Appeal Judgements stated the prevailing law in holding that "'specific direction' is not an essential ingredient of the *actus reus* of aiding and abetting",[5432] accurately reflecting customary international law and the legal standard that has been constantly and consistently applied in determining aiding and abetting liability.[5433] Consequently, the Appeals Chamber, Judge Tuzmukhamedov dissenting, unequivocally rejects the approach adopted in the *Perišić* Appeal Judgement as it is in direct and material conflict with the prevailing jurisprudence on the *actus reus* of aiding and abetting liability and with customary international law in this regard.[5434]

1651.   In light of the foregoing, the Appeals Chamber finds that in assessing the *actus reus* of aiding and abetting, the Trial Chamber was not required to determine whether Lazarević's acts were

---

[5428] *Furundžija* Trial Judgement, para. 227. See also *Tadić* Appeal Judgement, para. 223. Pre-Trial Chamber I of the ICC has also recognised that the ICC Statute might not in all aspects reflect customary international law. See *The Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui*, Case No. ICC-01/04-01/07, Decision on the Confirmation of Charges, 30 September 2008, para. 508. See also *Taylor* Appeal Judgement, paras 435, 451.

[5429] See James Crawford, *Brownlie's Principles of Public International Law*, 8th Edition (Oxford: Oxford University Press, 2012), p. 21. *Cf. Galić* Appeal Judgement, paras 84-85. Moreover, customary international law has to be assessed as of the time of the commission of the offence (See *Prosecutor v. Milan Milutinović et al.*, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction – Joint Criminal Enterprise, 21 May 2003, para. 21).

[5430] *Blaškić* Appeal Judgement, para. 46, quoting *Blaškić* Trial Judgement, para. 283, in turn quoting *Furundžija* Trial Judgement, para. 249. See also *Taylor* Appeal Judgement, paras 471-481.

[5431] *Blaškić* Appeal Judgement, para. 46, quoting *Blaškić* Trial Judgement, para. 283, in turn quoting *Furundžija* Trial Judgement, para. 249. See also *Taylor* Appeal Judgement, para. 484.

[5432] *Mrkšić and Šljivančanin* Appeal Judgement, para. 159. In these circumstances, the *Mrkšić and Šljivančanin* Appeal Judgement was not required to provide cogent reasons as there was no departure from the prevailing jurisprudence. See also *Lukić and Lukić* Appeal Judgement, para. 424.

[5433] The Appeals Chamber notes that during the interval between the rendering of the *Mrkšić and Šljivančanin* Appeal Judgement and the *Perišić* Appeal Judgement, three ICTR appeal judgements mention specific direction in passing, but do not consider it to be a required element of this mode of liability. See *Ntawukulilyayo* Appeal Judgement, paras 214, 216; *Rukundo* Appeal Judgement, para. 52; *Kalimanzira* Appeal Judgement, paras 74, 79. See also *supra*, fn. 5336. Significantly, the *Lukić and Lukić* Appeal Judgement explicitly states: "In *Mrkšić and Šljivančanin*, the Appeals Chamber has *clarified* that 'specific direction' is not an essential ingredient of the *actus reus* of aiding and abetting and finds that there is no 'cogent reason' to depart from this jurisprudence" (see *Lukić and Lukić* Appeal Judgement, para. 424 (internal quotation marks and references omitted, emphasis added)).

Case No. IT-05-87-A

23 January 2014

**Exhibit A**

**71**

specifically directed to assist, encourage or lend moral support to the commission of the crimes by the VJ and thus dismisses Lazarević's arguments to the contrary.

(b)   Lazarević's involvement in joint operations in 1998

1652.   Lazarević challenges the Trial Chamber's finding that he contributed to the implementation of joint operations conducted by the MUP and the VJ in the border area between Kosovo and Albania during the second half of 1998 by ordering the engagement of units in the sector of Slup/Sllup and Vokša/Voksh villages on 14 August 1998 and by monitoring the action which took place on 15 August 1998.[5435]

1653.   The Prosecution responds that Lazarević's arguments should be summarily dismissed since the alleged errors concern factual findings on which his conviction does not rely.[5436]

1654.   The Appeals Chamber notes that Lazarević was neither charged with nor convicted of crimes committed in Kosovo in 1998. Nor did the Trial Chamber rely on its factual findings on Lazarević's involvement in the Slup/Sllup and Vokša/Voksh operation in 1998 to find that he aided and abetted the commission of crimes by VJ members in Kosovo in 1999.[5437] Lazarević's challenges thus pertain to factual findings that have no bearing on his conviction. The Appeals Chamber therefore dismisses sub-ground 3(a) of his appeal.

(c)   Lazarević's involvement in joint operations in 1999

1655.   In concluding that Lazarević voluntarily provided practical assistance, encouragement, and moral support to the VJ forces engaging in the forcible displacement of Kosovo Albanians, the Trial Chamber specifically considered Lazarević's involvement in joint operations of the MUP and the VJ in 1999.[5438] In particular, the Trial Chamber found that two large-scale plans, *Grom* 3 and *Grom* 4, were prepared by the VJ at the beginning of 1999.[5439] The Trial Chamber further found that Lazarević implemented these plans by, *inter alia*, issuing the *Grom* 3 and *Grom* 4 orders on 7 February and 6 April 1999, respectively,[5440] which sent the VJ into Kosovo.[5441] The Trial Chamber concluded that several joint operations were carried out in late March through the end of

---

[5434] See also *supra*, paras 1621-1622. See *Aleksovski* Appeal Judgement, para. 111.
[5435] Lazarević's Appeal Brief, paras 386, 398-400, referring, *inter alia*, to Trial Judgement, vol. 3, paras 802-803. Lazarević further argues that the coordination and cooperation between the VJ and MUP in 1998 was legitimate and was approved by the higher command (Lazarević's Appeal Brief, paras 387-397, 401-403). See also Lazarević's Reply Brief, paras 118-120.
[5436] Prosecution's Response Brief (Lazarević), paras 240-241.
[5437] See Trial Judgement, vol. 3, paras 922-927.
[5438] Trial Judgement, vol. 3, paras 822-829.
[5439] Trial Judgement, vol. 3, paras 823, 826.
[5440] Trial Judgement, vol. 3, paras 824, 826, referring to Vladimir Lazarević, 8 Nov 2007, T. 17905, Exh. 5D175.
[5441] Trial Judgement, vol. 3, para. 925.

23 January 2014
**Exhibit A
72**

EXHIBIT B

# UNITED
# NATIONS



| | International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991 | Case No.: | IT-05-87/1-A |
|---|---|---|---|
| | | Date: | 27 January 2014 |
| | | Original: | English |

## IN THE APPEALS CHAMBER

**Before:**      **Judge Carmel Agius, Presiding**
                  **Judge Patrick Robinson**
                  **Judge Mehmet Güney**
                  **Judge Khalida Rachid Khan**
                  **Judge Bakhtiyar Tuzmukhamedov**

**Registrar:**      **Mr. John Hocking**

**Judgement of:**      **27 January 2014**


### PROSECUTOR

#### v.

### VLASTIMIR ĐORĐEVIĆ

---

### JUDGEMENT

---

**The Office of the Prosecutor:**

Ms. Daniela Kravetz
Mr. Kyle Wood
Ms. Priya Gopalan
Ms. Saeeda Verrall

**Counsel for the Accused:**

Mr. Dragoljub Đorđević
Mr. Veljko Đurđić
Mr. Russell Hopkins
Ms. Marie O'Leary

**Exhibit B
1**

**Exhibit B
2**

I. INTRODUCTION ...................................................................................................1

  A. BACKGROUND ............................................................................................ 1
  B. APPEALS ................................................................................................... 3
    1. Đorđević Appeal ............................................................................... 3
    2. Prosecution Appeal ........................................................................... 4
    3. Appeal Hearing ................................................................................. 5

II. STANDARD OF APPELLATE REVIEW ..........................................................6

III. "COGENT REASONS" FOR THE APPEALS CHAMBER TO DEPART FROM ITS
    JURISPRUDENCE .............................................................................................11

  A. INTRODUCTION ......................................................................................... 11
  B. APPLICABLE LAW ..................................................................................... 11
  C. ĐORĐEVIĆ'S SECOND GROUND OF APPEAL: EXISTENCE OF JOINT CRIMINAL ENTERPRISE
    LIABILITY IN CUSTOMARY INTERNATIONAL LAW ................................................. 12
    1. Introduction ..................................................................................... 12
    2. Alleged erroneous application of the law and weight attached to post-World War II
      jurisprudence in the *Tadić* Appeal Judgement ........................................ 13
      (a) Arguments of the parties ............................................................. 13
      (b) Analysis ................................................................................... 15
        a. Alleged failure of the Appeals Chamber to consider the approach taken in the IMT
          Judgement and IMT Charter ................................................... 15
        b. Alleged misinterpretation of the ICC Statute ............................. 17
        c. Post-World War II jurisprudence ............................................ 20
    3. Existence of cogent reasons to depart from the third category of joint criminal enterprise
      jurisprudence .................................................................................. 23
      (a) Arguments of the parties ............................................................. 23
      (b) Analysis ................................................................................... 24
    4. Alleged errors concerning the nature of joint criminal enterprise liability ............ 26
      (a) Arguments of the parties ............................................................. 26
      (b) Analysis ................................................................................... 27
    5. Conclusion ..................................................................................... 28
  D. ĐORĐEVIĆ'S SIXTH GROUND OF APPEAL, IN PART: ALLEGED ERRORS WITH RESPECT TO
    ATTRIBUTING PERPETRATORS' CRIMES TO JOINT CRIMINAL ENTERPRISE MEMBERS ................. 28
    1. Introduction ..................................................................................... 28
    2. Alleged contradiction between the *Brđanin* Appeal Judgement and the *Stakić* Appeal
      Judgement ...................................................................................... 28
      (a) Arguments of the parties ............................................................. 28
      (b) Analysis ................................................................................... 29
    3. Alleged error in relying on the *Martić* Appeal Judgement and the *Krajišnik* Appeal
      Judgement ...................................................................................... 31
      (a) Arguments of the parties ............................................................. 31
      (b) Analysis ................................................................................... 32
    4. Conclusion ..................................................................................... 33
  E. ĐORĐEVIĆ'S EIGHTH GROUND OF APPEAL: LIABILITY FOR SPECIFIC INTENT CRIMES PURSUANT
    TO THE THIRD CATEGORY OF JOINT CRIMINAL ENTERPRISE ...................................... 34
    1. Arguments of the parties .................................................................... 34
    2. Analysis ......................................................................................... 36
    3. Conclusion ..................................................................................... 38
  F. CONCLUSION ............................................................................................ 39

IV. ĐORĐEVIĆ'S FIRST GROUND OF APPEAL: ALLEGED ERRORS WITH
    REGARD TO THE EXISTENCE OF THE JCE .................................................40

  A. INTRODUCTION ......................................................................................... 40

i

Exhibit B
3

   B. Breach of the October Agreements ...................................................................41
      1. Arguments of the parties ...............................................................................41
      2. Analysis .........................................................................................................42
   C. Nature of the KLA threat ................................................................................43
      1. Arguments of the parties ...............................................................................43
      2. Analysis .........................................................................................................44
   D. The Nature of the NATO threat .....................................................................46
      1. Arguments of the parties ...............................................................................46
      2. Analysis .........................................................................................................46
   E. Combined effect of Đorđević's challenges ...................................................46
      1. Arguments of the parties ...............................................................................46
      2. Analysis .........................................................................................................47

V. ĐORĐEVIĆ'S THIRD GROUND OF APPEAL: ALLEGED ERRORS CONCERNING
   THE NATURE, COMMENCEMENT, DURATION, AND MEMBERS OF THE JCE ...50

   A. Introduction.....................................................................................................50
   B. Nature of the common plan ..............................................................................51
      1. Arguments of the parties ...............................................................................51
      2. Analysis .........................................................................................................52
   C. Commencement and duration of the JCE .........................................................54
      1. Arguments of the parties ...............................................................................54
      2. Analysis .........................................................................................................54
   D. Members of the JCE .........................................................................................55
      1. Arguments of the parties ...............................................................................55
      2. Analysis .........................................................................................................55
   E. Conclusion.......................................................................................................57

VI. ĐORĐEVIĆ'S FOURTH GROUND OF APPEAL: ALLEGED ERRORS
   CONCERNING THE PLURALITY OF PERSONS ...................................................58

   A. Arguments of the parties .................................................................................58
   B. Analysis ...........................................................................................................60

VII. ĐORĐEVIĆ'S FIFTH GROUND OF APPEAL: ALLEGED ERRORS
   CONCERNING THE COMMON PURPOSE .........................................................64

   A. Arguments of the parties .................................................................................64
   B. Analysis ...........................................................................................................65
   C. Conclusion.......................................................................................................69

VIII. ĐORĐEVIĆ'S SIXTH GROUND OF APPEAL, IN PART: ALLEGED ERRORS
   WITH RESPECT TO ATTRIBUTING PERPETRATORS' CRIMES TO JCE
   MEMBERS ......................................................................................................70

   A. Introduction.....................................................................................................70
   B. Arguments of the parties .................................................................................70
   C. Analysis ...........................................................................................................71
   D. Conclusion.......................................................................................................75

IX. ĐORĐEVIĆ'S SEVENTH GROUND OF APPEAL: ALLEGED ERRORS WITH
   RESPECT TO THE FINDING THAT MURDER AND PERSECUTIONS FELL
   WITHIN THE JCE ...........................................................................................76

   A. Introduction.....................................................................................................76
   B. Alleged error in concluding that the crime of murder was part of the JCE............77
      1. Arguments of the parties ...............................................................................77
      2. Analysis .........................................................................................................78
   C. Alleged error in concluding that the crime of persecutions was part of the JCE...85

Exhibit B
4

    1. Arguments of the parties .................................................................................. 85
    2. Analysis ........................................................................................................... 86
  D. CONCLUSION .................................................................................................... 90

**X. ĐORĐEVIĆ'S NINTH GROUND OF APPEAL: ALLEGED ERRORS CONCERNING ĐORĐEVIĆ'S PARTICIPATION IN THE JCE .................................................. 91**

  A. SUB-GROUND 9(A): ALLEGED ERRORS IN RELATION TO THE TRIAL CHAMBER'S ASSESSMENT OF THE STRUCTURE OF THE MUP AND ĐORĐEVIĆ'S ROLE ...................................... 92
    1. Introduction ..................................................................................................... 92
    2. The Ministerial Staff and Đorđević's role ........................................................ 93
      (a) Introduction .............................................................................................. 93
      (b) Arguments of the parties ......................................................................... 95
      (c) Analysis .................................................................................................... 97
    3. Đorđević's role in the events in Kosovo in 1998 and 1999 .............................. 101
      (a) Introduction ............................................................................................ 101
      (b) Arguments of the parties ....................................................................... 102
      (c) Analysis .................................................................................................. 103
    4. Authority over the PJP and the SAJ ............................................................... 105
      (a) Arguments of the parties ....................................................................... 105
      (b) Analysis .................................................................................................. 106
    5. The reporting system within the MUP ............................................................ 107
      (a) Arguments of the parties ....................................................................... 107
      (b) Analysis .................................................................................................. 108
    6. Areas of responsibility of the Assistant Ministers .......................................... 111
      (a) Introduction ............................................................................................ 111
      (b) Arguments of the parties ....................................................................... 111
      (c) Analysis .................................................................................................. 113
    7. The Ministerial Collegium ............................................................................. 117
      (a) Introduction ............................................................................................ 117
      (b) Arguments of the parties ....................................................................... 117
      (c) Analysis .................................................................................................. 118
    8. The October Agreements ............................................................................... 120
      (a) Introduction ............................................................................................ 120
      (b) Arguments of the parties ....................................................................... 120
      (c) Analysis .................................................................................................. 120
    9. Conclusion .................................................................................................... 122
  B. SUB-GROUND 9(B): ALLEGED ERRORS IN RELATION TO THE TRIAL CHAMBER'S ASSESSMENT OF THE JOINT COMMAND AND ĐORĐEVIĆ'S PARTICIPATION THEREIN ................................... 122
    1. Introduction ................................................................................................... 122
    2. Arguments of the parties ............................................................................... 122
    3. Analysis ........................................................................................................ 124
    4. Conclusion .................................................................................................... 128
  C. SUB-GROUND 9(C): ALLEGED ERRORS IN RELATION TO ĐORĐEVIĆ'S ACTIONS IN 1998 AS A BASIS FOR JOINT CRIMINAL ENTERPRISE LIABILITY FOR CRIMES COMMITTED IN 1999 ............ 128
    1. Introduction ................................................................................................... 128
    2. Arguments of the parties ............................................................................... 128
    3. Analysis ........................................................................................................ 129
    4. Conclusion .................................................................................................... 131
  D. SUB-GROUND 9(D): ALLEGED ERRORS IN RELATION TO ARMING LOCAL SERBIANS AND DISARMING KOSOVO ALBANIANS ................................................................... 131
    1. Introduction ................................................................................................... 131
    2. Analysis ........................................................................................................ 132
      (a) Alleged error in finding that the disarming of Kosovo Albanian villages and arming of the Serbian civilian population were related to the JCE ...................................... 132
        a. Arguments of the parties .................................................................... 132

iii

**Exhibit B
5**

b. Analysis ........................................................................................................ 133
(b) Alleged error in relying on the disarming of Kosovo Albanian villages and the arming of
the Serbian civilian population as relevant to Đorđević's participation in the JCE .......... 135
a. Introduction .............................................................................................. 135
b. Arguments of the parties .......................................................................... 136
c. Analysis .................................................................................................... 137
3. Conclusion ...................................................................................................... 141
E. SUB-GROUND 9(E): ALLEGED ERRORS IN RELATION TO THE RAČAK/RAÇAK INCIDENT AND
ĐORĐEVIĆ'S ROLE THEREIN ......................................................................... 141
1. Introduction ................................................................................................... 141
2. Alleged error in relying on the Račak/Raçak operation to establish Đorđević's role in
furthering the JCE .......................................................................................... 142
(a) Arguments of the parties .............................................................................. 142
(b) Analysis ....................................................................................................... 143
3. Alleged error in concluding that 45 Kosovo Albanian civilians were killed in
Račak/Raçak on 15 January 1999 .................................................................. 145
(a) Arguments of the parties .............................................................................. 145
(b) Analysis ....................................................................................................... 146
4. Alleged error in finding that there was a "staged scene" and that Đorđević had a role in
the concealment of the excessive use of force during the Račak/Raçak operation .......... 147
(a) Introduction ................................................................................................. 147
(b) Arguments of the parties .............................................................................. 148
(c) Analysis ....................................................................................................... 148
5. Conclusion ...................................................................................................... 151
F. SUB-GROUND 9(F): ALLEGED ERRORS IN RELATION TO ĐORĐEVIĆ'S ROLE IN RELATION TO THE
CRIMES COMMITTED BY THE PARAMILITARIES IN KOSOVO .............................. 152
1. Introduction ................................................................................................... 152
2. Alleged errors relating to Đorđević's responsibility for the deployment of the Scorpions . 153
(a) Arguments of the parties .............................................................................. 153
(b) Analysis ....................................................................................................... 154
3. Alleged error in finding that Đorđević was responsible for other paramilitaries operating
in Kosovo ....................................................................................................... 159
(a) Introduction ................................................................................................. 159
(b) Arguments of the parties .............................................................................. 160
(c) Analysis ....................................................................................................... 161
4. Conclusion ...................................................................................................... 163
G. SUB-GROUND 9(G): ALLEGED ERRORS IN RELATION TO ĐORĐEVIĆ'S ROLE IN THE
CONCEALMENT OF CRIMES ........................................................................... 163
1. Introduction ................................................................................................... 163
2. Alleged error in concluding that the concealment of bodies contributed to the JCE .......... 164
(a) Arguments of the parties .............................................................................. 164
(b) Analysis ....................................................................................................... 165
3. Alleged errors with respect to the Working Group Notes .................................... 169
(a) Introduction ................................................................................................. 169
(b) Reliability of the Working Group Notes ........................................................ 170
a. Arguments of the parties ........................................................................... 170
b. Analysis .................................................................................................... 171
(c) Alleged error in relying on the Working Group Notes .................................... 172
a. Arguments of the parties ........................................................................... 172
b. Analysis .................................................................................................... 173
c. Conclusion ................................................................................................ 176
4. Đorđević's role in the concealment of bodies ..................................................... 176
(a) Introduction ................................................................................................. 176
(b) Alleged error in finding that Đorđević participated in the reburial of bodies of Kosovo
Albanians found in a refrigerated truck in the Danube River ............................ 177

**Exhibit B
6**

a. Introduction ........................................................................................ 177
b. Arguments of the parties .................................................................... 177
c. Analysis .............................................................................................. 178
(c) Petrovo Selo PJP Centre ....................................................................... 181
a. Introduction ........................................................................................ 181
b. Arguments of the parties .................................................................... 181
c. Analysis .............................................................................................. 182
(d) Lake Perućac ......................................................................................... 184
a. Introduction ........................................................................................ 184
b. Arguments of the parties .................................................................... 184
c. Analysis .............................................................................................. 186
(e) Conclusion ............................................................................................ 188
5. Alleged error in the assessment of Đorđević's role in the concealment of the bodies ........ 188
(a) Arguments of the parties ....................................................................... 188
(b) Analysis ................................................................................................. 189
6. Conclusion .................................................................................................... 191
H. SUB-GROUND 9(H): ALLEGED ERRORS IN RELATION TO ĐORĐEVIĆ'S FAILURE TO TAKE
MEASURES TO ENSURE THE INVESTIGATION OF CRIMES ........................................ 191
1. Introduction ................................................................................................. 191
2. Arguments of the parties ............................................................................. 192
3. Analysis ........................................................................................................ 194
(a) Alleged errors regarding the pattern of lack of reporting and investigation of crimes
committed by Serbian forces .................................................................. 194
(b) Alleged errors regarding the duty to investigate ................................. 197
(c) Alleged errors regarding the contribution to the JCE ......................... 199
4. Conclusion .................................................................................................... 200
I. CONCLUSION ....................................................................................................... 200

**XI. ĐORĐEVIĆ'S TENTH GROUND OF APPEAL: ERRORS OF LAW AND FACT
WHEN FINDING THAT ĐORĐEVIĆ SHARED THE NECESSARY INTENT FOR
LIABILITY UNDER JOINT CRIMINAL ENTERPRISE .............................. 202**

A. INTRODUCTION ................................................................................................... 202
B. ALLEGED ERROR IN FAILING TO MAKE THE NECESSARY FINDINGS OR IN MAKING
IMPERMISSIBLY VAGUE FINDINGS ...................................................................... 203
1. Arguments of the parties ............................................................................. 203
2. Analysis ........................................................................................................ 204
C. ALLEGED ERRORS IN THE ASSESSMENT OF ĐORĐEVIĆ'S *MENS REA* ................ 207
1. Alleged failure to consider parts of Đorđević's own testimony at trial .......... 208
(a) Arguments of the parties ....................................................................... 208
(b) Analysis ................................................................................................. 209
2. Alleged errors in assessing Đorđević's knowledge ................................... 210
(a) Introduction ........................................................................................... 210
(b) Arguments of the parties ....................................................................... 210
(c) Analysis ................................................................................................. 211
a. Lack of reporting ................................................................................ 211
b. Orders issued by Đorđević ................................................................. 212
c. Serbian media and international reports ............................................. 213
(d) Conclusion ............................................................................................ 215
3. Alleged errors in finding that Đorđević's actions showed that he possessed the requisite
intent ............................................................................................................ 215
(a) Introduction ........................................................................................... 215
(b) Arguments of the parties ....................................................................... 215
(c) Analysis ................................................................................................. 217
D. CONCLUSION ...................................................................................................... 219

**Exhibit B**
**7**

XII. ĐORĐEVIĆ'S TWELFTH GROUND OF APPEAL: DEFINITION OF CIVILIAN....220

  A. INTRODUCTION..................................................................................................220
  B. ARGUMENTS OF THE PARTIES ...........................................................................220
  C. ANALYSIS ........................................................................................................222
  D. CONCLUSION ....................................................................................................227

XIII. ĐORĐEVIĆ'S THIRTEENTH GROUND OF APPEAL: ALLEGED ERROR WITH
    REGARD TO THE CRIME OF DEPORTATION ..............................................228

  A. INTRODUCTION..................................................................................................228
  B. ARGUMENTS OF THE PARTIES ...........................................................................228
  C. ANALYSIS ........................................................................................................230
  D. CONCLUSION ....................................................................................................234

XIV. ĐORĐEVIĆ'S FOURTEENTH GROUND OF APPEAL: ALLEGED ERRORS
    CONCERNING THE *MENS REA* FOR MURDER ..........................................235

  A. ARGUMENTS OF THE PARTIES ...........................................................................235
  B. ANALYSIS ........................................................................................................236
  C. CONCLUSION ....................................................................................................239

XV. ĐORĐEVIĆ'S FIFTEENTH GROUND OF APPEAL IN PART: ALLEGED ERRORS
    CONCERNING DESTRUCTION OF RELIGIOUS OR CULTURALLY
    SIGNIFICANT PROPERTY ..............................................................................240

  A. INTRODUCTION..................................................................................................240
  B. *MENS REA* FOR PERSECUTIONS THROUGH WANTON DESTRUCTION........................240
    1. Arguments of the parties...........................................................................240
    2. Analysis .....................................................................................................242
  C. EQUAL GRAVITY ...............................................................................................244
    1. Arguments of the parties...........................................................................244
    2. Analysis .....................................................................................................244
  D. CONCLUSION ....................................................................................................246

XVI. ĐORĐEVIĆ'S SIXTEENTH GROUND OF APPEAL: ALLEGED CONVICTIONS
    BASED ON CRIMES NOT PLEADED IN THE INDICTMENT .......................247

  A. ARGUMENTS OF THE PARTIES ...........................................................................247
  B. ANALYSIS ........................................................................................................248
    1. Introduction...............................................................................................248
    2. Deportation and other inhumane acts (forcible transfer) as crimes against humanity........252
      (a) Prizren municipality .............................................................................252
        a. Dušanovo/Dushanovë...........................................................................252
        b. Srbica/Sërbica....................................................................................253
        c. Landovica/Landovicë ..........................................................................254
      (b) Srbica/Skenderaj municipality.............................................................255
        a. Kladernica/Klladërnicë........................................................................256
        b. Brocna/Burojë and Tušilje/Tushilë .....................................................258
      (c) Đakovica/Gjakovë municipality............................................................259
      (d) Suva Reka/Suharekë municipality ........................................................260
        a. Suva Reka/Suharekë town ..................................................................260
        b. Pecane/Peqan ....................................................................................262
      (e) Gnjilane/Gjilan municipality..................................................................263
      (f) Uroševac/Ferizaj municipality................................................................264
      (g) Orahovac/Rahovec municipality............................................................265
      (h) Peć/Pejë municipality............................................................................266
      (i) Dečani/Deçan municipality....................................................................268
    3. Murder as a violation of the laws or customs of war and as a crime against humanity ......268

**Exhibit B**

**8**

(a) Đakovica/Gjakovë town in Đakovica/Gjakovë municipality............................................ 269
(b) Podujevo/Podujevë town in Podujevo/Podujevë municipality .......................................... 270
(c) Mala Kruša/Krusë-e-Vogël in Orahovac/Rahovec municipality ...................................... 271
(d) Suva Reka/Suharekë town in Suva Reka/Suharekë municipality ...................................... 273
4. Persecutions .....................................................................................................................274
(a) Alleged errors in entering convictions for persecutions in relation to locations that were
    not charged in the Indictment ......................................................................................... 275
(b) Alleged error in convicting for persecutions by way of the murder in Pusto
    Selo/Pastasellë, in Orahovac/Rahovec municipality ....................................................... 276
(c) Alleged error in adding murders to Count 5 ................................................................... 277
(d) Alleged error in entering convictions for persecutions through forcible transfer ............... 278
C. CONCLUSION ....................................................................................................................280

XVII. ĐORĐEVIĆ'S SEVENTEENTH AND PART OF FIFTEENTH GROUNDS OF
    APPEAL: CRIMES OF DEPORTATION, OTHER INHUMANE ACTS (FORCIBLE
    TRANSFER), MURDER, AND PERSECUTIONS IN RELATION TO A NUMBER OF
    CRIME SITES ...............................................................................................................282

A. INTRODUCTION..............................................................................................................282
B. ANALYSIS ......................................................................................................................283
1. Alleged errors in relation to the crimes of deportation and other inhumane acts (forcible
    transfer) as crimes against humanity ...............................................................................284
(a) Belanica/Bellanicë in Suva Reka/Suharekë municipality ................................................ 285
(b) Vata/Vataj in Kačanik/Kaçanik municipality ................................................................. 286
(c) Leocina/Leçine in Srbica/Skenderaj municipality .......................................................... 288
(d) Guska/Guskë in Đakovica/Gjakovë municipality ........................................................... 289
(e) Prilepnica/Prëlepnicë in Gnjilane/Gjilan municipality.................................................... 290
(f) Nosalje/Nosaljë in Gnjilane/Gjilan municipality............................................................ 292
2. Murder as a violation of the laws or customs of war and as a crime against humanity ......293
(a) Mala Kruša/Krusë-e-Vogël Orahovac/Rahovec municipality ........................................... 295
    a. 25 March 1999 ............................................................................................................ 295
    b. 26 March 1999 ............................................................................................................ 295
(b) Suva Reka/Suharekë town in Suva Reka/Suharekë municipality ...................................... 296
(c) Meja/Mejë in Đakovica/Gjakovë municipality ............................................................... 299
(d) Vučitrn/Vushtrri municipality....................................................................................... 301
(e) Kotlina/Kotlinë in Kačanik/Kaçanik municipality.......................................................... 302
(f) Vata/Vataj in Kačanik/Kaçanik municipality ................................................................. 304
3. Persecutions as a crime against humanity .........................................................................305
(a) Celina/Celinë and Bela Crkva/Bellacërkë mosques in Orahovac/Rahovec municipality and
    the mosque in Rogovo/Rogovë in Đakovica/Gjakovë municipality.................................. 306
(b) Mosque in Landovica/Landovicë in Prizren municipality ................................................ 309
(c) Hadum Mosque and adjoining library in Đakovica/Gjakovë town.................................... 311
(d) Mosque in Vlaštica/Lashticë in Gnjilane/Gjilan municipality.......................................... 312
C. CONCLUSION ....................................................................................................................314

XVIII. ĐORĐEVIĆ'S EIGHTEENTH GROUND OF APPEAL: ALLEGED ERRORS OF
    LAW WHEN ENTERING MULTIPLE CONVICTIONS .............................................315

A. ALLEGED ERRORS OF LAW WHEN ENTERING CONVICTIONS UNDER JOINT CRIMINAL ENTERPRISE
    AND AIDING AND ABETTING ...........................................................................................315
1. Arguments of the parties................................................................................................315
2. Analysis .......................................................................................................................318
B. ALLEGED ERRORS OF LAW WHEN ENTERING MULTIPLE CONVICTIONS UNDER ARTICLE 5 OF THE
    STATUTE .....................................................................................................................320
1. Arguments of the parties................................................................................................321
2. Analysis .......................................................................................................................322

**Exhibit B
9**

## XIX. PROSECUTION'S FIRST GROUND OF APPEAL: RESPONSIBILITY FOR PERSECUTIONS THROUGH SEXUAL ASSAULT ........................................................324

A. INTRODUCTION...................................................................................................324
B. ALLEGED ERRORS IN FINDINGS ON SEXUAL ASSAULT ..........................................325
   1. Introduction....................................................................................................325
   2. Definition and elements of sexual assault.......................................................325
   3. Kosovo Albanian girl in a convoy in Priština/Prishtinë municipality ...............327
      (a) Arguments of the parties .........................................................................328
      (b) Analysis...................................................................................................328
   4. Two young Kosovo Albanian women in Beleg....................................................331
      (a) Arguments of the parties .........................................................................331
      (b) Analysis...................................................................................................332
C. ALLEGED ERRORS REGARDING FINDINGS ON PERSECUTIONS THROUGH SEXUAL ASSAULT........336
   1. Introduction....................................................................................................336
   2. Alleged error of law in the evaluation of relevant evidence in assessing the discriminatory intent regarding the rapes of Witness K20 and Witness K14 ...........................................336
      (a) Introduction ............................................................................................336
      (b) Arguments of the parties .........................................................................337
      (c) Analysis ..................................................................................................338
   3. Whether the sexual assaults constituted persecutions.......................................340
      (a) Arguments of the parties .........................................................................340
      (b) Analysis...................................................................................................342
         a. Discriminatory intent...............................................................................342
            i. Introduction .................................................................................342
            ii. Witness K20 and the other two young Kosovo Albanian women in Beleg..............344
            iii. Witness K14.................................................................................347
            iv. Kosovo Albanian girl in a convoy in Priština/Prishtinë municipality....................348
         b. *Chapeau* requirements and equal gravity .................................................350
      (c) Conclusion..............................................................................................351
D. ĐORĐEVIĆ'S RESPONSIBILITY.............................................................................351
   1. Introduction....................................................................................................351
   2. Legal issues raised by Đorđević ......................................................................352
      (a) *Mens rea* standard for crimes under the third category of joint criminal enterprise ...........352
         a. Arguments of the parties......................................................................352
         b. Analysis................................................................................................352
      (b) Link between the JCE and the direct perpetrators of the foreseeable crimes ....................353
         a. Arguments of the parties......................................................................353
         b. Analysis................................................................................................354
   3. Đorđević's alleged responsibility for persecutions through sexual assaults under the third category of joint criminal enterprise ...............................................355
      (a) Arguments of the parties .........................................................................355
      (b) Analysis...................................................................................................357
E. CONCLUSION ....................................................................................................361

## XX. SENTENCING .......................................................................................................362

A. INTRODUCTION...................................................................................................362
B. APPLICABLE LAW AND STANDARD OF REVIEW .....................................................362
C. ĐORĐEVIĆ'S NINETEENTH GROUND OF APPEAL: ALLEGED ERRORS IN RELATION TO SENTENCING .......................................................................................................363
   1. Alleged errors in considering Đorđević's position of authority as an aggravating factor ...363
      (a) Arguments of the parties .........................................................................363
      (b) Analysis...................................................................................................364
   2. Alleged failure to consider mitigating factors ..................................................366
      (a) Arguments of the parties .........................................................................366
      (b) Analysis...................................................................................................367

**Exhibit B
10**

3. Alleged error in assessing Đorđević's role in comparison to those sentenced in the *Milutinović et al.* case..................................................................................368
  (a) Arguments of the parties ......................................................................368
  (b) Analysis................................................................................................369
4. Alleged error in relation to the sentencing practices of the FRY ........................370
  (a) Arguments of the parties ......................................................................370
  (b) Analysis................................................................................................370
5. Conclusion ...........................................................................................................371
D. PROSECUTION'S SECOND GROUND OF APPEAL: ĐORĐEVIĆ'S SENTENCE OF 27 YEARS IS MANIFESTLY INADEQUATE......................................................................................372
1. Arguments of the parties ......................................................................................372
2. Analysis ...............................................................................................................374
3. Conclusion ...........................................................................................................376
E. IMPACT OF THE APPEALS CHAMBER'S FINDINGS ON ĐORĐEVIĆ'S SENTENCE ..........377

**XXI. DISPOSITION ...........................................................................................................379**

**XXII. PARTIALLY DISSENTING AND SEPARATE OPINION OF JUDGE MEHMET GÜNEY .................................................................................................................382**

1. The Killing of 281 Kosovo Albanians during Operation Reka ...........................382
2. New Convictions on Appeal related to the Crime of Persecution through Sexual Assaults383
3. Cumulative Convictions Regarding Article 5.......................................................384
4. Other JCE Members...............................................................................................384

**XXIII. DISSENTING OPINION OF JUDGE TUZMUKHAMEDOV .....................................387**

A. INTRODUCTION........................................................................................................387
B. ĐORĐEVIĆ'S CONTRIBUTION TO THE COMMON PLAN .............................................387
1. Deployment of paramilitaries ...............................................................................387
  (a) General observations: contribution to a common plan by deploying non-JCE members.... 388
  (b) Đorđević's involvement in the deployment of paramilitary units other than the Scorpions 389
  (c) Đorđević's involvement in the deployment of the Scorpions ...........................391
  (d) Conclusion .......................................................................................... 393
2. The Račak/Raçak incident .....................................................................................393
3. Concealment of crimes .........................................................................................397
C. UNDERLYING CRIMES ...............................................................................................397
1. Murder ..................................................................................................................397
  (a) Introduction ........................................................................................397
  (b) Observations on the applicable law ....................................................398
  (c) Bela Crkva/Bellacërkë (Orahovac/Rahovec municipality) ...............400
  (d) Mala Kruša/Krusë-e-Vogel (Orahovac/Rahovec municipality)........401
  (e) Operation Reka (Đakovica/Gjakovë municipality)............................402
  (f) Vučitrn/Vushtrri municipality ............................................................405
2. Destruction of the Mosque in Landovica/Landovicë (Persecutions)....................406
D. ĐORĐEVIĆ'S RESPONSIBILITY FOR PERSECUTIONS THROUGH SEXUAL ASSAULTS ....408

**XXIV. ANNEX A – PROCEDURAL HISTORY ...............................................................414**

A. APPEAL PROCEEDINGS..............................................................................................414
1. Composition of the Appeals Chamber..................................................................414
2. Notices of Appeal .................................................................................................414
3. Briefs.....................................................................................................................414
4. Other Decisions and Orders..................................................................................415
5. Status Conferences................................................................................................416
6. Appeal Hearing .....................................................................................................416

Case No.: IT-05-87/1-A

27 January 2014

**Exhibit B
11**

**XXV. ANNEX B – GLOSSARY**................................................................**417**

  A. JURISPRUDENCE ..........................................................................................417
    1. ICTY ...............................................................................................417
    2. ICTR ..............................................................................................423
    3. Decisions related to crimes committed during World War II.............................426
    4. ICC................................................................................................427
    5. STL ...............................................................................................427
    6. ECCC .............................................................................................427
    7. ICJ ................................................................................................427
    8. European Commission of Human Rights ..................................................427
    9. National jurisdictions ...........................................................................427
      (a) Australia ....................................................................................427
      (b) Israel........................................................................................428
  B. OTHER AUTHORITIES ...................................................................................428
    1. Publications.......................................................................................428
    2. Other documents ................................................................................428
  C. LIST OF DESIGNATED TERMS AND ABBREVIATIONS ................................................429

27 January 2014

**Exhibit B**
**12**

2. Legal issues raised by Đorđević

(a) *Mens rea* standard for crimes under the third category of joint criminal enterprise

a. Arguments of the parties

904.   Đorđević submits that the Prosecution suggests an incorrect standard for criminal liability under the third category of joint criminal enterprise.[2684] He contends that the Prosecution applies an overly expansive standard in arguing that he was aware that sexual assaults "might" be committed.[2685] Instead, Đorđević submits that the requisite *mens rea* for the third category of joint criminal enterprise liability requires that the possibility that a crime could be committed is "sufficiently substantial as to be foreseeable to an accused".[2686]

905.   The Prosecution replies that Đorđević misstates the foreseeability standard for the third category of joint criminal enterprise liability, and attempts to raise the standard from possibility to substantial possibility.[2687]

b. Analysis

906.   The Appeals Chamber recalls that under the third category of joint criminal enterprise, an accused can be held responsible for a crime outside the common purpose if, under the circumstances of the case: (i) it was foreseeable that such a crime might be perpetrated by one or more of the persons used by him (or by any other member of the joint criminal enterprise) in order to carry out the *actus reus* of the crimes forming part of the common purpose; and (ii) the accused

---

[2684] Đorđević Response Brief, paras 37, 39-40. See also Đorđević Response Brief, paras 49, 53.
[2685] Đorđević Response Brief, paras 39-40, referring to Prosecution Appeal Brief, para. 42, *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, para. 18. See also Đorđević Response Brief, para. 49. Đorđević reiterates his general objections to the third category of joint criminal enterprise as a mode of liability applied by the Tribunal, arguing that it is not supported by customary international law (Đorđević Response Brief, para. 41; see also Đorđević Appeal Brief, paras 68-71). Đorđević also repeats his challenge to the application of the third category of joint criminal enterprise to specific intent crimes (Đorđević Response Brief, para. 38; see also Đorđević Appeal Brief, para. 155). The Appeals Chamber has dismissed these arguments under his second and eighth ground of appeal and therefore will not address them here (see *supra*, Sections III. C. III. E.
[2686] Đorđević Response Brief, para. 39, referring to *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, para. 18.
[2687] Prosecution Reply Brief, paras 13-15. According to the Prosecution, such an elevated standard is closer to the "probability" standard or the "substantially likely to occur" standard which have previously been rejected by the Appeals Chamber (Prosecution Reply Brief, para. 14, referring to *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, paras 15-18, *Blaškić* Appeal Judgement, para. 33).

Case No.: IT-05-87/1-A                                                            27 January 2014

**Exhibit B
13**

willingly took that risk (*i.e.* the accused participated in the joint criminal enterprise with the awareness that such crime was a possible consequence thereof).[2688]

907.    The Appeals Chamber recalls that the *mens rea* standard for the third category of joint criminal enterprise liability does not require awareness of a "probability" that a crime would be committed.[2689] Rather, liability under the third category of joint criminal enterprise may attach where an accused is aware that the perpetration of a crime is a *possible* consequence of the implementation of the common purpose.[2690] However, the Appeals Chamber recalls that the "possibility standard":

> is not satisfied by implausibly remote scenarios. Plotted on a spectrum of likelihood, the JCE III *mens rea* standard does not require an understanding that a deviatory crime would *probably* be committed; it does, however, require that a crime could be committed is sufficiently substantial as to be foreseeable to an accused.[2691]

908.    The Appeals Chamber will therefore apply this standard when determining whether Đorđević is liable for the crime of persecutions through sexual assaults pursuant to the third category of joint criminal enterprise.

(b)    Link between the JCE and the direct perpetrators of the foreseeable crimes

a.    Arguments of the parties

909.    Đorđević submits that, in order for a crime to be imputable to him pursuant to the third category of joint criminal enterprise liability, it must be proven that one of the members of the JCE used the physical perpetrator(s) to commit the foreseeable crimes in furtherance of the common plan.[2692]

910.    The Prosecution submits that Đorđević's argument that the physical perpetrators were not used *in order to commit sexual assaults* misunderstands the Prosecution's appeal.[2693] It argues that

---

[2688] *Brdanin* Appeal Judgement, paras 365, 411; *Kvočka et al.* Appeal Judgement, para. 83; *Blaškić* Appeal Judgement, para. 33; *Vasiljević* Appeal Judgement, para. 101; *Tadić* Appeal Judgement, para. 228.

[2689] *Šainović et al.* Appeal Judgement, paras 1061, 1272, 1525, 1557-1558; *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, para. 18. See also *Brdanin* Appeal Judgement, paras 365, 411; *Kvočka et al.* Appeal Judgement, para. 83; *Blaškić* Appeal Judgement, para. 33; *Vasiljević* Appeal Judgement, para. 101; *Tadić* Appeal Judgement, para. 228.

[2690] *Brdanin* Appeal Judgement, paras 365, 411; *Kvočka et al.* Appeal Judgement, para. 83; *Blaškić* Appeal Judgement, para. 33; *Vasiljević* Appeal Judgement, para. 101; *Tadić* Appeal Judgement, para. 228.

[2691] *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, para. 18 (emphasis in original). See *Šainović et al.* Appeal Judgement, paras 1081, 1538, 1575.

[2692] Đorđević Response Brief, paras 42-45, referring to *Brdanin* Appeal Judgement, para. 413, *Limaj et al.* Appeal Judgement, paras 119-120, *Tadić* Appeal Judgement, para. 220.

[2693] Prosecution Reply Brief, para. 20.

Case No.: IT-05-87/1-A                                        27 January 2014

**Exhibit B
14**

Đorđević wrongly suggests that the Tribunal's jurisprudence requires that a member of a joint criminal enterprise use a perpetrator *in order to* commit a third category of joint criminal enterprise crime.[2694]

b.   Analysis

911.    The Appeals Chamber recalls that under the third category of joint criminal enterprise, an accused may incur criminal responsibility for crimes committed by non-members of the joint criminal enterprise.[2695] It has been established that in such circumstances:

> the accused may be found responsible provided that he participated in the common criminal purpose with the requisite intent and that, in the circumstances of the case, (i) it was foreseeable that such a crime might be perpetrated by one or more of the persons used by him (or by any other member of the JCE) in order to carry out the *actus reus* of the crimes forming part of the common purpose; and (ii) the accused willingly took that risk. The Appeals Chamber thus held that members of a JCE could be held liable for crimes committed by principal perpetrators who were not members of the JCE provided that it had been shown that the crimes could be imputed to at least one member of the JCE and that this member, when using a principal perpetrator, acted in accordance with the common plan.[2696]

912.    On this basis, the Appeals Chamber rejects Đorđević's argument that persecutions through sexual assaults cannot be imputed to him as a natural and foreseeable consequence of the JCE for lack of showing that one of the JCE members used the direct perpetrators to commit the sexual assaults in furtherance of the JCE.[2697] In the case of crimes carried out by non-members of a joint criminal enterprise, it must be shown that one or more joint criminal enterprise members (in furtherance of the joint criminal enterprise) used the non-member to commit the *actus reus* of the crimes forming part of the common purpose.[2698] Should the non-members used by one or more members of the joint criminal enterprise commit crimes outside the common purpose, these crimes may also be imputed to members of the joint criminal enterprise, provided they were a natural and foreseeable consequence of the joint criminal enterprise.[2699] In such circumstances, the necessary link has been established and members of the joint criminal enterprise may incur liability, pursuant to the third category of joint criminal enterprise, for the perpetration of such extended crimes.[2700]

---

[2694] Prosecution Reply Brief, paras 20-22.
[2695] *Martić* Appeal Judgement, para. 168; *Brdanin* Appeal Judgement, paras 411, 431.
[2696] *Martić* Appeal Judgement, para. 168 (citations omitted). See also *Krajišnik* Appeal Judgement, para. 225; *Brdanin* Appeal Judgement, paras 365, 411, 413, 430.
[2697] See Đorđević Response Brief, paras 42-45.
[2698] *Brdanin* Appeal Judgement, paras 410, 413. See also *Martić* Appeal Judgement, para. 168; *Krajišnik* Appeal Judgement, para. 225.
[2699] *Martić* Appeal Judgement, para. 168; *Brdanin* Appeal Judgement, para. 411.
[2700] *Martić* Appeal Judgement, para. 168; *Brdanin* Appeal Judgement, para. 411.

Case No.: IT-05-87/1-A                                                    27 January 2014

**Exhibit B 15**

913.     In the instant case, the Prosecution requests the Appeals Chamber to convict Đorđević for the crime of persecutions through sexual assaults under the third category of joint criminal enterprise.[2701] It does not allege that the sexual assaults were part of the common plan. Therefore, the Prosecution is not required to prove that one of the JCE members used the perpetrators in order to commit persecutions through sexual assaults. Rather, it must be shown that these crimes were committed by a person who was used by one of the JCE members to carry out the *actus reus* of crimes that *were* part of the common purpose. Whether this requirement is fulfilled will be addressed in the following section.[2702]

### 3.   Đorđević's alleged responsibility for persecutions through sexual assaults under the third category of joint criminal enterprise

(a)   Arguments of the parties

914.     The Prosecution submits that Đorđević should be convicted for persecutions through sexual assaults as sexual assaults were a natural and foreseeable consequence of the JCE, Đorđević was aware of this, and he willingly accepted this risk when he participated in the JCE and furthered its common purpose.[2703]

915.     The Prosecution submits that it was foreseeable that crimes that were not part of the common purpose, including sexual assaults, might be committed in the context of the campaign of terror and extreme violence by the Serbian forces against the Kosovo Albanian population.[2704] It further argues that it need not be established that sexual crimes were prevalent in order to be a natural and foreseeable consequence of the common purpose.[2705] Further, the Prosecution contends that it is a matter of common knowledge and a historical fact that women suffer sexual assaults during such violent, persecutory campaigns.[2706]

---

[2701] Prosecution Appeal Brief, paras 42-56. The Appeals Chamber notes that the Indictment does include persecutions through sexual assault among the crimes that were part of the JCE (Indictment, Count 5, paras 21, 27, 72, 76-77).

[2702] See *infra*, para. 927.

[2703] See Prosecution Appeal Brief, paras 42-55; Appeal Hearing, 13 May 2013, AT. 178, 184-188, 201.

[2704] Prosecution Appeal Brief, paras 42-43, 45-46; Prosecution Reply Brief, paras 13-15; Appeal Hearing, 13 May 2013, AT. 185, 187-188, 201-202. The Prosecution argues that the Tribunal's case law confirms the relevance of these factors in assessing the foreseeability of crimes (Appeal Hearing, 13 May 2013, AT. 187, referring to *Krstić* Trial Judgement, para. 616, *Krstić* Appeal Judgement, para. 149, *Kvočka* Trial Judgement, para. 327, *Stakić* Appeal Judgement, paras 93, 95; *Stanišić and Župljanin* Trial Judgement, vol. 2, paras 525-526, 776). Furthermore, it submits that the Trial Chamber relied on these same factors when it made its alternative finding that murder was a natural and foreseeable consequence of the JCE (Appeal Hearing, 13 May 2013, AT. 187-188, referring to Trial Judgement paras 2139, 2141, 2145).

[2705] Appeal Hearing, 13 May 2013, AT. 177.

[2706] Prosecution Appeal Brief, para. 44.

Case No.: IT-05-87/1-A                                                      27 January 2014

**Exhibit B
16**

916.    Regarding whether the sexual assaults were foreseeable to Đorđević, the Prosecution submits that he was a crucial member of the JCE.[2707] It further contends that he was aware of the massive displacement of civilians, as well as killings and other violent crimes against Kosovo Albanians committed during the course of the Serbian forces' campaign as a result of his position of authority, his direct involvement in operations and presence on the ground, and reports from various sources.[2708] According to the Prosecution, Đorđević was aware of the commission of such violence against Kosovo Albanians as early as 1998 and remained well-informed in 1999.[2709] The Prosecution submits that given these circumstances, Đorđević was aware of the possibility that, during this persecutory campaign, Kosovo Albanian women might be sexually assaulted.[2710] It contends that he willingly took that risk when, with such awareness, he participated in the JCE.[2711]

917.    Đorđević responds that the sexual assaults were not foreseeable to him.[2712] He contends that notice of the commission of general crimes in 1998 does not establish foreseeability on his part that sexual assaults in particular were a "sufficiently substantial possibility".[2713] Đorđević also submits that there is no evidence that, during the relevant time period, he was informed of the ordering or occurrence of sexual assaults, which would have made him aware of the possibility that these crimes would occur.[2714]

918.    In reply to Đorđević's argument that notice of general crimes was not sufficient to make him aware of the possible perpetration of sexual assaults, the Prosecution submits that the Appeals Chamber has never held that crimes are foreseeable to an accused only if he knows of prior, similar

---

[2707]  Prosecution Appeal Brief, para. 42.
[2708]  Prosecution Appeal Brief, paras 44, 47-50, 53; Appeal Hearing, 13 May 2013, AT. 185-186.
[2709]  Prosecution Appeal Brief, paras 47-53; Appeal Hearing, 13 May 2013, AT. 186.
[2710]  Prosecution Appeal Brief, paras 44, 46, 51; Prosecution Reply Brief, paras 13-15; Appeal Hearing, 13 May 2013, AT. 185-186. The Prosecution adds that for sexual assaults to be foreseeable to Đorđević, it is not required that he had prior knowledge of the same types acts previously being committed (Appeal Hearing, 13 May 2013, AT. 202).
[2711]  Prosecution Appeal Brief, paras 7, 42, 46, 52, 55; Appeal Hearing, 13 May 2013, AT. 188.
[2712]  Đorđević Response Brief, paras 36, 46-52, 54; Appeal Hearing, 13 May 2013, AT. 196, 198. He argues that the cases referenced by the Prosecution to support a finding of foreseeability must be distinguished from the current case since they are camp cases or relate to the specific situation of Srebrenica (Appeal Hearing, 13 May 2013, AT. 196-197).
[2713]  Đorđević Response Brief, para. 46. See also Đorđević Response Brief, para. 47. Đorđević further submits that "general knowledge of the potential for crime in war is not sufficient to meet the specific intent test of persecutory intent" (Đorđević Response Brief, para. 46).
[2714]  Đorđević Response Brief, para. 50; Appeal Hearing, 13 May 2013, AT. 198-199. He argues that "[r]ape is a possibility in all wars and, indeed, in peacetime too such that isolated incidents of sexual assault do not on their own establish that repeat rapes are a substantial possibility" (Đorđević Response Brief, para. 50 (citations omitted); see also Appeal Hearing, 13 May 2013, AT. 196). Đorđević further submits that neither of the sexual assaults at issue were "sanctioned, approved, allowed or even known by superior officers" but rather "took place in secretive or highly irregular circumstances", and thus were not foreseeable (Đorđević Response Brief, para. 51).

Case No.: IT-05-87/1-A                                          27 January 2014

**Exhibit B
17**

crimes.[2715] The Prosecution further replies that the elements of the third category of joint criminal enterprise are satisfied as the sexual assaults were perpetrated by members of the Serbian forces who were controlled and used by the JCE members in the implementation of the common plan.[2716]

(b)   Analysis

919.   The Appeals Chamber recalls that the third category of joint criminal enterprise entails responsibility for crimes committed beyond the common purpose but which are nevertheless a natural and foreseeable consequence of that common purpose.[2717] The Appeals Chamber further recalls that where the alleged foreseeable crime is a specific intent crime such as persecutions, it must be established that it was foreseeable to the accused that the crime might be committed,[2718] though it need not be shown that the accused possessed specific intent.[2719]

920.   In order to assess the foreseeability of sexual assaults, the Appeals Chamber will first consider the overall context in which these acts occurred. It will then address the evidence relevant to the determination of whether it was foreseeable to Đorđević, in particular, that sexual assaults were a possible consequence of the implementation of the JCE.

921.   The Trial Chamber found that a common plan existed among the leadership of the FRY and Serbia aimed at modifying the ethnic balance in Kosovo.[2720] It further found that: "[a] core element of the common plan was the creation of an atmosphere of violence and fear or terror among the Kosovo Albanian population such that they would be driven, by their fear, to leave […] Kosovo."[2721] Typically, Serbian forces shelled the area of a village and/or fired at houses causing the population to flee and then entered the village on foot, setting houses on fire, damaging property, looting, killing residents, forcibly expelling people from their homes, and threatening and physically harassing the population.[2722] In some cases, in addition to killing large numbers of men and boys, women were also targeted and killed with the intent to instil fear among the Kosovo

---

[2715] Prosecution Reply Brief, para. 16; Appeal Hearing, 13 May 2013, AT. 185, referring to *Krstić* Trial Judgement, paras 616-617, *Krstić* Appeal Judgement, para. 149, *Kvočka* Trial Judgement, para. 327; *Kvočka* Appeal Judgement, para. 86. See also Prosecution Reply Brief, paras 17-18.

[2716] Prosecution Reply Brief, paras 21, 23.

[2717] *Kvočka et al.* Appeal Judgement, para. 83; *Tadić* Appeal Judgement, para. 204.

[2718] *Šainović et al.* Appeal Judgement, para. 1456; *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, para. 18. See also *Brđanin* Appeal Decision of 19 March 2004, paras 5-6.

[2719] *Šainović et al.* Appeal Judgement, para. 1456; *Brđanin* Appeal Decision of 19 March 2004, paras 5-6. See also *supra*, Section III. E.

[2720] Trial Judgement, paras 2007, 2126-2130.

[2721] Trial Judgement, para. 2143. See also Trial Judgement, paras 2007, 2035, 2152.

Case No.: IT-05-87/1-A                                                         27 January 2014

**Exhibit B 18**

Albanian population and to force them to leave.[2723] Forced from their homes and fearing for their lives and welfare, massive columns or convoys of displaced Kosovo Albanians left their towns and villages and headed to Albania or FYROM, often directed and escorted by Serbian forces, who continued to intimidate and abuse them.[2724] In these circumstances, the Appeals Chamber considers that Kosovo Albanians were left highly vulnerable, lacking protection, and exposed to abuse and mistreatment by members of the Serbian forces.

922.    The Appeals Chamber notes that, Kosovo Albanian men were frequently separated from the women and children.[2725] On several occasions, after being separated, the men were then killed by Serbian forces.[2726] In some instances, women and children were detained by Serbian forces separately from the men prior to their forced displacement.[2727] The Appeals Chamber considers that, separated from their male relatives, Kosovo Albanian women were rendered especially vulnerable to being targeted and subjected to violence by Serbian forces on the basis of their ethnicity, including violence of a sexual nature as one of the most degrading and humiliating forms.[2728] Defenceless Kosovo Albanian civilians were confronted with Serbian forces, who knew that they could act with near impunity. The Appeals Chamber has no doubt that in such an environment, sexual assaults were a natural and foreseeable consequence.

923.    To be held liable for persecutions through sexual assaults pursuant to the third category of joint criminal enterprise, the sexual assaults, however, must have been foreseeable to Đorđević in particular.[2729] The Trial Chamber found that, as "one of the most senior MUP officials, he had detailed knowledge of events on the ground and played a key role in coordinating the work of the

---

[2722] See Trial Judgement, paras 1617-1624, 1626-1674, 1676-1679, 2027, 2029. See also Trial Judgement, paras 2133-2137.

[2723] See Trial Judgement, paras 1636, 1652, 2137, 2139-2140. See also Trial Judgement, paras 2143-2145.

[2724] Trial Judgement, paras 1626, 1633, 1646, 1649, 1652, 1656, 1657, 1659, 1668, 1677, 2030-2031.

[2725] Trial Judgement, paras 1617, 1619, 1624, 1630, 1634, 1643, 1656, 1669, 1678-1679, 2028. See also Trial Judgement, paras 2136-2137.

[2726] Trial Judgement, paras 1617-1620, 1630, 1643, 1656, 1669, 2028. See also Trial Judgement, paras 2136-2137; *supra*, paras 770, 772.

[2727] See Trial Judgement, paras 1149, 1153.

[2728] The Appeals Chamber also notes the evidence of Witness K20 that, when she was taken by the members of the Serbian forces, she "knew what was going to happen […] as [she] had heard that the Serbs were raping the Kosovar girls and women" (Exhibits P1279 (confidential), pp 4-5; P1280, pp 4-5). It further notes Witness K14's evidence that the man carrying knives and dressed in camouflage trousers who took the Kosovo Albanian girl "was known for doing these kinds of things" (Exhibit P1325 (confidential), p.4); that she heard from others that "they took more women out" from the convoy (Exhibit P1325 (confidential), p.4); and that, when, on the evening of her own rape, Witness K14 told a friend what happened to her, she confided in Witness K14 that "the same thing had happened to her. […] [S]he was raped by four men and that she was brought back after two days" (Exhibit P1325 (confidential), pp 6-7).

[2729] See *Karadžić* Appeal Decision on Third Category of Joint Criminal Enterprise Foreseeability of 25 June 2009, para. 18; *Brdanin* Appeal Decision of 19 March 2004, para. 6. See also *Brdanin* Appeal Judgement, para. 365; *Stakić* Appeal Judgement, para. 65; *Kvočka et al.* Appeal Judgement, para. 86.

Case No.: IT-05-87/1-A                                        27 January 2014

**Exhibit B
19**

MUP forces in Kosovo in 1998 and 1999".[2730] In particular, the Trial Chamber noted that Đorđević: (i) was a member of the Joint Command and of the MUP Collegium and regularly attended meetings of these bodies as well as MUP Staff meetings; (ii) had direct and immediate contact with Lukić, Head of the MUP Staff, and several SUP chiefs in Kosovo; (iii) participated as part of the Serbian delegation in international negotiations, and (iv) was present on the ground in Kosovo in 1998 and 1999, including during VJ and MUP operations.[2731]

924.    Through his role and involvement in the operations in Kosovo, Đorđević was well informed not only of the conduct of operations and overall security situation on the ground in Kosovo, but also of the commission of serious crimes, such as looting, torching of houses, excessive use of force, and murder (including of women and children) by Serbian forces during the course of operations in both 1998 and 1999.[2732] Moreover, with the knowledge that some units had committed violent crimes against Kosovo Albanian civilians in 1998 and 1999, and that such crimes had gone unpunished, Đorđević authorised the redeployment of some of the same units in 1999 into the volatile situation.[2733]

925.    The Trial Chamber found that Đorđević shared the intent of the JCE with the common purpose to change the ethnic balance of Kosovo.[2734] It found that as a member of the JCE, he was fully aware that this common purpose was to be achieved by creating an atmosphere of terror and fear to induce the Kosovo Albanians to leave, including by subjecting them to persecutions through a variety of means.[2735] Furthermore, the Trial Chamber found that he was aware of the massive displacement of Kosovo Albanian civilians on the basis that he witnessed thousands of displaced persons in 1998 and that he received regular MUP reports throughout March to June 1999 that reported on the increasing numbers of Kosovo Albanians crossing the borders from Kosovo into Albania or FYROM.[2736] He also knew about the humanitarian situation as well as killings and other violent crimes against Kosovo Albanians through other sources, including the media.[2737]

926.    Under these circumstances, the Appeals Chamber finds that it was foreseeable to Đorđević that crimes of a sexual nature might be committed. The Appeals Chamber recalls that thousands of

---

[2730] Trial Judgement, para. 2154.
[2731] Trial Judgement, paras 1897-1898, 1900-1903, 1916-1917, 1919, 1925, 1985-1998, 2154, 2158, 2162, 2178.
[2732] See Trial Judgement, paras 1900-1907, 1918, 1920-1924, 1957-1958, 1961, 1963, 1981, 1985-1995, 2154-2158. See also Trial Judgement, paras 2178-2184.
[2733] Trial Judgement, paras 1258, 2155, 2179-2180, 2185. See also *supra*, paras 355-357, 360-362.
[2734] See Trial Judgement, para. 2158. See also Trial Judgement, paras 1999, 2128, 2130, 2154-2157, 2193; *supra*, Chapter XI.
[2735] Trial Judgement, paras 2127-2128, 2130, 2135-2137, 2143, 2151-2152, 2158.
[2736] Trial Judgement, paras 1903, 1990, 2178, 2182. See *supra*, paras 247-252, 489-492.

Case No.: IT-05-87/1-A                                          27 January 2014

**Exhibit B
20**

Kosovo Albanian civilians were being forcibly displaced and mistreated on a massive scale by Serbian forces who could act with near impunity, and that women were frequently separated from the men and thereby rendered especially vulnerable. The Appeals Chamber, Judge Tuzmukhamedov dissenting, finds that in such environment, the possibility that sexual assaults might be committed was sufficiently substantial as to be foreseeable to Đorđević and that he willingly took the risk when he participated in the JCE. The Appeals Chamber, Judge Tuzmukhamedov dissenting, is further satisfied that, in light of his knowledge of the persecutory nature of the campaign, it was also foreseeable to Đorđević that such sexual assaults might be carried out with discriminatory intent.

927.    The Appeals Chamber has found that the Trial Chamber did not err in concluding that Serbian forces were used by members of the JCE to implement the *actus reus* of crimes that were within the common purpose of the JCE.[2738] These same Serbian forces sexually assaulted Witness K20, the other two young women in Beleg, and Witness K14.[2739] With regard to the girl in the convoy, the Appeals Chamber notes that the identity of one the perpetrators, *i.e.* the man carrying knives and dressed in green camouflage trousers, is unclear.[2740] However, his identity is less relevant since it has been found that the other man who sexually assaulted her was a policeman and thus a member of the Serbian forces.[2741] Therefore, the Appeals Chamber, Judge Tuzmukhamedov dissenting, is satisfied that the required link between the crimes and Đorđević as a member of the JCE has been established. Under these circumstances, the Appeals Chamber finds that these crimes can be imputed to Đorđević.

928.    Finally, in light of the above finding, the Appeals Chamber recalls that, contrary to Đorđević's contention,[2742] the Appeals Chamber may enter new convictions at the appellate stage. Article 25(2) of the Statute provides that the Appeals Chamber "may affirm, reverse or revise the decisions taken by the Trial Chambers". Moreover, the Appeals Chamber has exercised its

---

[2737] Trial Judgement, paras 1996-1998, 2183. See *supra*, paras 497-501.
[2738] See *supra*, para. 171.
[2739] See *supra*, paras 866-869; Trial Judgement, paras 1150-1151, 1791, 1793.
[2740] The man was identified as "carrying knives and […] dressed in a black sleeveless shirt and green camouflage trousers. He had a shaved head tied with a scarf and three earrings in one ear." (Trial Judgement, para. 832). Elsewhere the Trial Chamber found that "[t]here were also other men among the Serbian forces [standing along the road to Priština/Prishtinë where the convoy passed], who were dressed in green trousers, had bandannas on their shaved heads and wore knives. Evidence considered elsewhere in this Judgement, indicates that such dress is consistent with some Serbian paramilitary units, but the evidence is not sufficient to enable a positive finding about the identify of these troops" (Trial Judgement, para. 824).
[2741] See *supra*, para. 859. See also Trial Judgement, paras 832, 1792.
[2742] Đorđević Reponse Brief, para. 4.

Case No.: IT-05-87/1-A                                    27 January 2014

**Exhibit B
21**

discretionary authority to enter new convictions on several occasions[2743] and Đorđević has not offered any cogent reasons to depart from this practice.[2744]

### E.  Conclusion

929.    The Appeals Chamber has found that: (i) the Trial Chamber erred in finding that the sexual assaults of the Kosovo Albanian girl in a convoy and two young Kosovo Albanian women in Beleg were not established;[2745] (ii) the Trial Chamber erred in finding that the sexual assaults of Witness K20 and Witness K14 were not carried out with discriminatory intent;[2746] (iii) the sexual assaults of Witness K20, the other two women in Beleg, Witness K14, and the girl in a convoy were in fact carried out with such intent and amount to persecutions as a crime against humanity,[2747] and (iv) these acts were foreseeable to Đorđević and that he willingly took this risk when he participated in the JCE.[2748] In light of the foregoing, the Appeals Chamber, Judge Tuzmukhamedov dissenting, finds that Đorđević is responsible for persecutions through sexual assaults as a crime against humanity pursuant to the third category of joint criminal enterprise and enters a conviction thereon. Therefore, the Appeals Chamber grants the Prosecution's first ground of appeal in full. The impact of this finding, as well as the remainder of the Prosecution's first ground of appeal, will be addressed separately in Chapter XX.[2749]

---

[2743] See *e.g. Mrkšić and Šljivančanin* Appeal Judgement, para. 103, p. 169; *Krnojelac* Appeal Judgement, paras 172, 180, 188, 207, 247, p. 114; *Setako* Appeal Judgement, paras 262, 301; *Gacumbitsi* Appeal Judgement, paras 124, 207.

[2744] Đorđević submits that his right to appeal his conviction would be violated if the Appeals Chamber were to enter new convictions against him, referring in support to the Dissenting Opinion of Judge Pocar to the *Šljivančanin* Review Judgement (Đorđević Response Brief, para. 4). Đorđević does not raise any arguments that have not been considered before (see *e.g. Mrkšić and Šljivančanin* Appeal Judgement (compare majority opinion, para. 103, p. 169, with Partially Dissenting Opinion of Judge Pocar, para. 2); *Setako* Appeal Judgement (compare majority opinion, para. 262, p. 85 with Partially Dissenting Opinion of Judge Pocar, para. 2). The Appeals Chamber further recalls that dissenting opinions are not binding upon it (see *supra*, para. 841).

[2745] See *supra*, paras 859, 869.

[2746] See *supra*, paras 877-878, 892, 895.

[2747] See *supra*, paras 892-893, 895, 897, 901.

[2748] See *supra*, paras 926-927.

[2749] See *infra*, Chapter XX.

Case No.: IT-05-87/1-A                                    27 January 2014

**Exhibit B
22**