```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5

       DOE I, DOE II, IVY HE, DOE III,   )  C-11-02449 EJD
 6     DOE IV, DOE V, DOE VI, ROE VII,    )
       CHARLES LEE, ROW VIII, DOE IX,     )  SAN JOSE, CALIFORNIA
 7     LIU GUIFU, WANG WEIYU, AND         )
       THOSE INDIVIDUALS SIMILARLY        )  MARCH 21, 2014
 8     SITUATED,                          )
                                          )  PAGES 1-85
 9                   PLAINTIFFS,          )
                                          )
10             VS.                        )
                                          )
11     CISCO SYSTEMS, INC., JOHN          )
       CHAMBERS, FREDY CHEUNG, AND        )
12     DOES 1-100,                        )
                                          )
13                   DEFENDANTS.          )
       _____)

14
                      TRANSCRIPT OF PROCEEDINGS
15            BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
16

17     A P P E A R A N C E S:

18     FOR THE PLAINTIFFS:    HUMAN RIGHTS LAW FOUNDATION
                              BY:  TERRI MARSH
19                            1615 L STREET NW, SUITE 1100
                              WASHINGTON, D.C.  20036
20

21               APPEARANCES CONTINUED ON NEXT PAGE

22

23     OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                   CERTIFICATE NUMBER 9595
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
```

1

2       APPEARANCES (CONTINUED)

3       FOR THE PLAINTIFFS:      SCHWARCZ, RIMBERG, BOYD & RADER
                                 BY:  KATHRYN LEE CRAWFORD-BOYD
4                                6319 SAN VINCENTE BOULEVARD, SUITE 360
                                 LOS ANGELES, CALIFORNIA  90048
5
        ALSO PRESENT:            KEN SUN
6

7       FOR THE DEFENDANT:       QUINN, EMANUEL, URQUHART & SULLIVAN
                                 BY:  KATHLEEN M. SULLIVAN
8                                555 TWIN DOLPHIN DRIVE, 5TH FLOOR
                                 REDWOOD CITY, CALIFORNIA  94065
9
        ALSO PRESENT:            GREG FARANO
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      SAN JOSE, CALIFORNIA                   MARCH 21, 2014

 2                      P R O C E E D I N G S

 3        (COURT CONVENED AT 9:10 A.M.)

 4           THE CLERK:  CALLING CASE NUMBER 11-2449, DOE, ET AL,

 5      VERSUS CISCO SYSTEMS, ON FOR MOTION TO DISMISS THE SECOND

 6      AMENDED COMPLAINT.

 7           COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 8           MS. SULLIVAN:  GOOD MORNING, YOUR HONOR.

 9      KATHLEEN SULLIVAN FROM QUINN, EMANUEL HERE ON BEHALF OF CISCO.

10      AND WITH ME TODAY IS GREG FARANO, IN-HOUSE COUNSEL AT CISCO.

11           THE COURT:  THANK YOU.  GOOD MORNING.

12           MS. SULLIVAN:  GOOD MORNING.

13           MS. MARSH:  GOOD MORNING, YOUR HONOR.  TERRI MARSH,

14      I'M WITH THE HUMAN RIGHTS LAW FOUNDATION ON BEHALF OF

15      PLAINTIFFS.  AND --

16           MS. BOYD:  LEE CRAWFORD BOYD, ALSO ON BEHALF OF

17      PLAINTIFFS.

18           MR. SUN:  KEN SUN, ALSO ON BEHALF OF PLAINTIFFS.

19           THE COURT:  THANK YOU.  GOOD MORNING, EVERYONE, AND

20      THANK YOU FOR YOUR PATIENCE AND THANK YOU FOR BRINGING THIS

21      INTERESTING CASE BEFORE US THIS MORNING.

22           THIS IS CISCO'S MOTION TO DISMISS THE MATTER, 12(B)(6) AND

23      12(B)(1) I THINK ARE THE STATED GROUNDS, AND WHAT I'D LIKE TO

24      OFFER YOU IS AN OPPORTUNITY TO, IF YOU WISH, TO MAKE A BRIEF

25      OPENING STATEMENT, BOTH SIDES, IF THERE'S ANYTHING YOU WANT TO
```

1     PRESENT BY VIRTUE OF AN OPENING STATEMENT, BRIEF OPENING

2     STATEMENT OR REMARKS.

3          I SHOULD TELL YOU THAT BECAUSE YOU'RE THE MOVING PARTY,

4     YOU'LL HAVE THE LAST WORD AT THE END OF THE DAY.

5          BUT IF EITHER SIDE WOULD LIKE TO MAKE SOME BRIEF OPENING

6     COMMENTS, I'M HAPPY TO RECEIVE THOSE.

7          YOU'RE THE MOVING PARTY, MS. SULLIVAN.

8          MS. SULLIVAN:  GOOD MORNING, YOUR HONOR.  AS THE

9     MOVING PARTY, CISCO AND MR. CHAMBERS AND MR. CHEUNG WOULD BE

10    GRATEFUL FOR THE OPPORTUNITY TO GO FIRST.

11         THE COURT:  SURE.  GO RIGHT AHEAD.  IF YOU COULD COME

12    FORWARD.  THANK YOU.

13         MS. SULLIVAN:  YES.  GOOD MORNING, YOUR HONOR, AND

14    MAY IT PLEASE THE COURT.

15         OUR MOTION FOR DISMISSAL HAS NUMEROUS INDEPENDENT GROUNDS.

16    IN OTHER WORDS, WE THINK YOU SHOULD DISMISS THE ENTIRE

17    COMPLAINT WITH PREJUDICE ON NUMEROUS GROUNDS, BUT I'D LIKE TO

18    HIGHLIGHT WHAT I THINK ARE THE SIMPLEST WAYS TO GET THERE.

19         FIRST, THIS IS A CASE THAT ALLEGES HUMAN RIGHTS VIOLATIONS

20    BY CHINESE GOVERNMENT ACTORS IN CHINA AGAINST CHINESE NATIONALS

21    IN CHINESE PRISONS, DETENTION CENTERS, AND LABOR CAMPS IN

22    CHINA.

23         SO THE FIRST KEY POINT I'D LIKE TO MAKE, YOUR HONOR, IS

24    THIS IS THE ESSENCE OF AN ALLEGATION OF EXTRATERRITORIAL HUMAN

25    RIGHTS VIOLATIONS, AND THE SUPREME COURT DEFINITIVELY RULED IN

1    THE KIOBEL DECISION LAST TERM THAT THE ALIEN TORT STATUTE

2    SHOULD NO LONGER BE USED TO TRY TO GO AFTER CORPORATIONS THAT

3    DO BUSINESS ABROAD FOR EXTRATERRITORIAL CONDUCT, AND THAT'S

4    REALLY NOT IN DISPUTE.

5         SO WHAT PLAINTIFFS HAVE DONE IN THEIR SECOND AMENDED

6    COMPLAINT IS TO TRY TO CONJURE SOME CONDUCT IN CALIFORNIA, IN

7    SAN JOSE, OUT OF CISCO HEADQUARTERS THAT THEY THINK CONSTITUTES

8    THE HUMAN RIGHTS VIOLATION.

9         BUT WITH RESPECT, YOUR HONOR, WE THINK THAT THERE IS

10   NOTHING IN THE COMPLAINT THAT ALLEGES A HUMAN RIGHTS VIOLATION

11   IN VIOLATION OF INTERNATIONAL LAW PLAUSIBLY IN SAN JOSE,

12   CALIFORNIA.

13        AND THE KEY TO THAT, YOUR HONOR, IS THAT NO MATTER HOW

14   MANY VERY LENGTHY AND ARTICULATE PARAGRAPHS YOU FIND IN THIS

15   COMPLAINT ABOUT THE SUPPOSED SAN JOSE CONDUCT, THE ALLEGED

16   SAN JOSE CONDUCT -- ALL OF WHICH, OF COURSE, WE DISPUTE

17   FACTUALLY -- BUT EVEN IF YOU TAKE IT AS TRUE, YOUR HONOR,

18   THERE'S A FUNDAMENTAL DISCONNECT BETWEEN THE CALIFORNIA CONDUCT

19   THAT'S ALLEGED AND THE INTERNATIONAL LAW VIOLATIONS THAT ARE

20   ALLEGED.

21        NOW, IF YOU GO BACK TO THE ACTUAL COUNTS OF THE COMPLAINT,

22   THE REQUESTS FOR RELIEF, THEY'RE ALL ABOUT INTERNATIONAL LAW

23   VIOLATIONS IN CHINA, TORTURE, CRIMES AGAINST HUMANITY, CRUEL,

24   INHUMAN, AND DEGRADING TREATMENT, ARBITRARY DETENTION.

25        THE INTERNATIONAL LAW VIOLATIONS ARE INDISPUTABLY ALL IN

```
1     CHINA AT THE HANDS OF CHINESE ACTORS.

2          AND, YOUR HONOR, CISCO HAS NO DESIRE TO MINIMIZE THE

3     HARDSHIPS ALLEGED TO HAVE OCCURRED TO THESE PLAINTIFFS OR THE

4     HEINOUSNESS OF THE ACTS.

5          WHAT WE ARE SAYING IS IT HAS NOTHING TO DO WITH CISCO AND

6     NOTHING TO DO WITH CALIFORNIA.

7          AND LET ME TRY TO SIMPLIFY OUR LENGTHY BRIEFING, YOUR

8     HONOR.  YOU'VE BEEN VERY PATIENT WITH BOTH SIDES IN THE

9     BRIEFING.

10         THE KEY ABOUT THE ALLEGATIONS IN THE COMPLAINT IS THAT THE

11    CALIFORNIA ACTIVITY HAS NOTHING TO DO WITH TORTURE, DETENTION,

12    ARREST, OR ACTIVITIES IN VIOLATION OF CHINESE LAW OVER IN

13    CHINA.

14         IT'S ABOUT DESIGN.  THE ALLEGATIONS ARE ALL ABOUT DESIGN,

15    HIGH LEVEL DESIGN, HIGH LEVEL MARKETING, HIGH LEVEL SYSTEMS

16    CONSTRUCTION.

17         AND THE FUNDAMENTAL DISCONNECT IS NO MATTER HOW MANY

18    PARAGRAPHS THERE ARE IN THE COMPLAINT ABOUT DESIGN AND

19    CUSTOMIZED DESIGN -- AND OF COURSE WHEN YOU'RE CREATING

20    NETWORKS, AS CISCO HAS ALL OVER THE GLOBE, OF COURSE YOU

21    CUSTOMIZE IT FOR YOUR CUSTOMERS.  IF YOU'RE SELLING TO THE

22    SAN JOSE POLICE, THEY MAY NEED A DIFFERENT NETWORK THAN THE

23    FBI, WHO MAY NEED A DIFFERENT NETWORK THAN PEOPLE WHO CONNECT

24    TO INTERPOL.  OF COURSE YOU CUSTOMIZE FOR YOUR PURCHASER, EVEN

25    IF THEY'RE PUBLIC SECURITY OFFICIALS.
```

```
 1              BUT ALL OF THAT ALLEGATION ABOUT CUSTOMIZATION DOESN'T GET
 2    YOU TO THE INTERNATIONAL LAW VIOLATIONS.  THERE IS A
 3    FUNDAMENTAL DISCONNECT AT THE CORE OF THIS COMPLAINT BETWEEN,
 4    ON THE ONE HAND, ALLEGATIONS ABOUT SAN JOSE ACTIVITY,
 5    MARKETING, DESIGNING, CUSTOMIZATION ON THE ONE HAND, AND
 6    TORTURE, DETENTION, CRUEL AND INHUMAN AND DEGRADING TREATMENT
 7    OVER SOMEWHERE IN UNIDENTIFIED CHINESE PRISONS AND LABOR CAMPS
 8    BY UNIDENTIFIED CHINESE ACTORS.
 9              THE COURT:  AND THOSE TWO EVENTS WOULD REMAIN
10    DISCONNECTED, THERE'S NO FACTS THAT YOU CAN THINK OF, NOT IN
11    OUR CASE BUT PERHAPS OTHERS, THAT WOULD ALLOW A NEXUS SUCH THAT
12    THEY COULD BE CONNECTED?
13              MS. SULLIVAN:  IN THESE ALLEGATIONS, YOUR HONOR, THEY
14    ARE ABSOLUTELY NOT CONNECTED.  YOU GET TO A DISCONNECT.  YOU
15    GET TO A DISCONNECT UNDER THE FEDERAL CLAIMS AND THE STATE
16    CLAIMS BECAUSE, OF COURSE, YOU NEED CAUSATION FOR CALIFORNIA
17    TORTS HERE.
18              AND THERE'S NO CAUSATION BETWEEN A SYSTEM THAT WOULD HELP
19    CHINESE OFFICIALS -- AND I'LL USE THE WORDS FROM THE COMPLAINT.
20    THE RELEVANT VERBS GO LIKE THIS:  THE PLAINTIFFS ALLEGE THAT
21    THE SYSTEM, THE GOLDEN SHIELD -- AND BY THE WAY, YOUR HONOR, I
22    JUST WANT TO BE SO CLEAR:  THE GOLDEN SHIELD, AS PLAINTIFFS
23    ADMIT IN PARAGRAPH 2 OF THE COMPLAINT, IS A GENERAL CRIME
24    CONTROL TECHNOLOGY.
25              PARAGRAPH 2 OF THE COMPLAINT, THE GOLDEN SHIELD APPARATUS
```

```
 1     IS NOT AN ORDINARY CRIME CONTROL APPARATUS, AS PLAINTIFFS

 2     ALLEGE, BUT IT DOES PERFORM SOME STANDARD CRIME CONTROL FOR

 3     POLICE OFFICERS.

 4          CISCO'S MARKETING TO PUBLIC SECURITY ACTORS IN CHINA FOR

 5     APPREHENSION OF CRIMINALS.

 6          FALUN GONG IS OUTLAWED IN CHINA.

 7          WE IN THE UNITED STATES CAN'T COMPREHEND THE KIND OF

 8     RESTRICTIONS ON FREEDOM OF SPEECH AND FREEDOM OF RELIGION THAT

 9     OPERATE, BUT IT'S A SOVEREIGN PREROGATIVE OF ANOTHER NATION

10     THAT HAS DIFFERENT CRIMINAL LAW, AND WE'VE PROVIDED YOU

11     UNREBUTTED EXPERT TESTIMONY THAT THAT IS CHINESE LAW.

12          BUT, YOUR HONOR, THIS CASE GOES LIKE THIS:  HAVING

13     ADMITTED THAT THIS IS A GENERAL CRIME CONTROL APPARATUS, THE

14     PLAINTIFFS ALLEGE THAT IT WAS USED TO IDENTIFY, LOCATE, LOG,

15     PROFILE, TRACK, MONITOR, INVESTIGATE, SURVEIL.

16          OKAY.  SO FAR WE'RE IN NETWORK WORLD.  WE'RE IN

17     INFORMATION SYSTEMS.  THAT'S WHAT INFORMATION SYSTEMS DO.  THEY

18     ENABLE THE TRANSFER OF INFORMATION FROM THE SQUAD CAR TO THE

19     STATION TO THE CAPTAIN TO THE PROSECUTOR.  THAT'S WHAT NETWORKS

20     ENABLE.  IT'S COMMUNICATION AND SURVEILLANCE AND KNOWLEDGE.

21          BUT THE DISCONNECT COMES WHEN PLAINTIFFS THEN SAY, AND

22     THIS HELPED LEAD TO APPREHEND -- THE CHINESE OFFICIALS WERE

23     THEN ABLE TO APPREHEND, DETAIN, INTERROGATE, AND TORTURE.

24          THERE'S NOTHING ABOUT THE ALLEGATIONS IN THE COMPLAINT

25     THAT CREATE A FACTUALLY PLAUSIBLE BASIS TO SUPPOSE THAT THE
```

1    NETWORK CONSTRUCTION IS -- HAS A CAUSAL NEXUS TO THE TORTURE,

2    DETENTION, AND ALLEGED HEINOUS ACTIVITIES.

3         THAT'S THE CORE OF OUR ARGUMENT, THE ABSOLUTE CORE, CAUSAL

4    NEXUS.

5         THE COURT:  YOUR CLIENT CREATED THIS DATABASE,

6    WHATEVER IT IS THAT MAKES IT, AND IT'S A GENERIC -- AS YOU SAY,

7    IT'S A GENERIC TOOL THAT'S SPECIFICALLY DESIGNED FOR LAW

8    ENFORCEMENT PURPOSES AND IT IS WHAT IT IS, AND IT'S A

9    STANDALONE, AND WHATEVER SOMEBODY ELSE DOES WITH IT, THAT'S NOT

10   CISCO'S BUSINESS AND IT SHOULDN'T BE THE COURT'S BUSINESS.

11        MS. SULLIVAN:  THAT'S EXACTLY RIGHT, YOUR HONOR.  WE

12   BELIEVE EVERY WORD OF WHAT YOU JUST SAID.

13        NOW, I ANTICIPATE THAT THE PLAINTIFFS WILL SAY, OH, NO,

14   NO, IT WASN'T GENERIC, IT WAS CUSTOMIZED.

15        THE COURT:  I WAS GOING TO ASK YOU ABOUT THAT.

16        MS. SULLIVAN:  BUT, YOUR HONOR, EVEN IF IT'S

17   CUSTOMIZED -- LET'S SAY IT HAS TO BE CUSTOMIZED.  IT HAS TO BE

18   IN MANDARIN, OR IT HAS TO BE FOR POLICE APPLICATIONS AS OPPOSED

19   TO UNIVERSITY APPLICATIONS.  IF YOU'RE SELLING IT TO THE

20   POLICE, IT HAS TO BE CUSTOMIZED FOR WHAT THEIR ACTIVITY IS.

21        THE COURT:  AND I THINK WHAT YOUR COLLEAGUES OPPOSITE

22   WOULD SUGGEST IS THEY CUSTOMIZED IT SO THAT, WITH KNOWLEDGE AND

23   SCIENTER, IF YOU WILL, KNOWLEDGE CERTAINLY THAT THE CHINESE

24   GOVERNMENT WAS USING IT TO DO THESE THINGS THAT YOU TALKED

25   ABOUT EARLIER, THE TORTURE, THE APPREHENSION, AND THAT CISCO

1      CONTINUED IN THEIR, IN THEIR BUSINESS CONVERSATIONS WITH THE

2      CHINESE GOVERNMENT TO REFINE, IMPROVE, ENHANCE THE ABILITIES OF

3      THIS GOLDEN SHIELD PRODUCT TO SEEK OUT AND DO ALL THESE

4      TERRIBLE THINGS TO THESE PEOPLE.

5              MS. SULLIVAN:  SO, YOUR HONOR --

6              THE COURT:  DOES THAT MEAN ANYTHING?

7              MS. SULLIVAN:  YOU'RE RIGHT THAT THAT'S WHAT THEY

8      ARGUE.  I WANT TO STOP TOWARD THE END OF YOUR QUESTION AND SAY

9      THE "IN ORDER TO" CLAUSE DOESN'T FOLLOW.

10             ANYTHING YOU DO TO CUSTOMIZE CHINESE LAW ENFORCEMENT

11     OFFICIALS' ABILITY TO DETECT AND APPREHEND PEOPLE WHO VIOLATE

12     THEIR CHINESE CRIMINAL LAWS, ALL RIGHT, BURGLARS, THIEVES,

13     PEOPLE WHO COMMIT CRIMES, INCLUDING CRIMES SUCH AS

14     PARTICIPATING IN A, AN ORGANIZATION THAT CHINESE CRIMINAL LAW

15     OUTLAWS, YOU'RE CUSTOMIZING FOR THAT SET OF NORMAL LAW

16     ENFORCEMENT ACTIVITIES.

17             AND CISCO'S ENTITLED TO BELIEVE THAT WHEN IT'S SELLING TO

18     LAW ENFORCEMENT AGENCIES, THEY WILL FOLLOW CHINESE LAW, WHICH

19     BANS TORTURE.  WE HAVE THE UNREBUTTED EXPERT DECLARATION OF

20     JOHN CHU, PLAINTIFFS DIDN'T CHOOSE TO PUT IN ANY EXPERT

21     TESTIMONY, THAT TORTURE IS ILLEGAL IN CHINA.

22             WE'RE ENTITLED TO THINK -- WHEN WE'RE SELLING TO CHINESE

23     LAW ENFORCEMENT OFFICIALS FOR LAWFUL LAW ENFORCEMENT PURPOSES,

24     THERE'S NO REASON TO SUPPOSE THAT OUR TECHNOLOGY IS GOING TO BE

25     USED FOR THE HEINOUS ACTIVITIES THAT ARE ALLEGED HERE.  SO

1    THAT'S THE DISCONNECT.

2            THE COURT:  IF IT'S DISCOVERED THAT THAT'S WHAT'S

3    HAPPENING, DOES THAT CHANGE THINGS?

4            MS. SULLIVAN:  NOT -- YOUR HONOR, WITH RESPECT, NO.

5    TO SELL FOR -- IF WE'RE SELLING FOR THE LAWFUL PURPOSE OF LAW

6    ENFORCEMENT AND CHINA IMPRISONS -- IT'S A VERY LARGE COUNTRY.

7    ITS PRISON POPULATION IS TENS OF MILLIONS IN COMPARISON TO THE,

8    YOU KNOW, THE THOUSANDS OF ALLEGED CLASS MEMBERS HERE.

9            SO IF THERE'S A USEFUL, LAWFUL, INNOCENT PURPOSE FOR THIS

10   TECHNOLOGY, THE FACT THAT YOU MAY LEARN THAT CHINESE OFFICIALS

11   ARE ENGAGED IN WHAT WE THINK ARE HEINOUS ACTIVITIES, THAT

12   KNOWLEDGE ALONE DOES NOT CREATE AIDING AND ABETTING THE CHINESE

13   GOVERNMENT HERE.  IT DOESN'T CREATE AIDING AND ABETTING THE

14   CHINESE GOVERNMENT HERE.

15           NOW, WE'RE GOING TO HAVE A DEBATE HERE ABOUT WHAT'S

16   REQUIRED FOR AIDING AND ABETTING.

17           WE THINK THE PROPER MENS REA STANDARD IS PURPOSE.  THAT'S

18   WHAT THE SECOND CIRCUIT AND THE NINTH CIRCUIT HAVE HELD --

19   SORRY -- THE SECOND CIRCUIT AND THE FOURTH CIRCUIT HAVE HELD.

20           OF COURSE THE NINTH CIRCUIT JUST WEIGHED IN DIFFERENTLY IN

21   DOE V. NESTLE, AND THAT'S EN BANC.

22           THE COURT:  WE'LL SEE WHAT HAPPENS.

23           MS. SULLIVAN:  WE'LL SEE WHAT HAPPENS.

24           AND SO, YOUR HONOR, WE THINK IF THERE'S ANY UNCERTAINTY

25   ABOUT WHAT THE MENS REA STANDARD IS IN THIS CASE, THE PROPER

1    COURSE WOULD BE TO WAIT AND SEE WHAT HAPPENS IN DOE V. NESTLE.

2         BUT EVEN IF THE STANDARD IS KNOWLEDGE, YOUR HONOR, JUST

3    BECAUSE THERE ARE NEWSPAPER ARTICLES OUT THERE, THAT'S NOT

4    ENOUGH TO ALLEGE CISCO COMMITTED THESE TERRIBLE HUMAN RIGHTS

5    VIOLATIONS.

6         YOU WOULD HAVE TO KNOW SPECIFICALLY, WHEN YOU SELL A

7    LAWFUL CRIME CONTROL TECHNOLOGY, THAT SOME ACTOR, IN VIOLATION

8    OF CHINESE LAW, IN SOME PRISON IS GOING TO TORTURE THE PEOPLE

9    WHO HAVE BEEN APPREHENDED.

10        THE COURT:  AT SOME POINT -- PARDON ME FOR

11   INTERRUPTING.  AT SOME POINT DOES THAT BECOME COMMON KNOWLEDGE

12   IF WE READ IT, WE HEAR IT ON THE NEWS, WE READ ABOUT IT, AND I

13   THINK THE PLAINTIFFS HAVE ALLEGED IN THEIR PLEADINGS THAT THIS

14   IS ONGOING AND IT SHOULD BE AT LEAST -- CISCO SHOULD KNOW THIS,

15   IT'S COMMON KNOWLEDGE THAT THIS OCCURS, ET CETERA, THAT TYPE OF

16   ARGUMENT.

17        THEY FURTHER SEEM TO ARGUE THAT OVER THE COURSE OF THEIR

18   BUSINESS RELATIONSHIP WITH THE CHINESE GOVERNMENT, AS I SAID

19   EARLIER, THEY -- AND I'M NOT SURE ABOUT THE SPECIFICITY OF THIS

20   AND I'D LIKE TO ASK YOU, AND I'LL CERTAINLY ASK THEM ABOUT IT,

21   ARE THEY SPECIFIC ENOUGH PURSUANT TO THE AZIZ AND TALISMAN

22   CASES FOR THAT SPECIFICITY IN AIDING AND ABETTING?

23        ARE THEY SPECIFIC ENOUGH TO WHERE, IN THEIR PLEADINGS, IN

24   THEIR COMPLAINT WHERE THEY SAY THIS BUSINESS RELATIONSHIP

25   CONTINUED, IT MATURED, THE PRODUCT MATURED, IT CAME REFINED

```
 1        SUCH THAT I GUESS THEY COULD USE IT IN A MOBILE APPLICATION OR

 2        SOMETHING LIKE THAT.

 3             IS THAT -- IT SEEMS TO INFER THAT THERE IS AN INCREASED

 4        KNOWLEDGE OF THE USE OF THE PRODUCT, GOLDEN SHIELD, BY THE

 5        CHINESE GOVERNMENT AND THAT CISCO NATURALLY KNEW ABOUT IT

 6        BECAUSE THEY KNEW OF THE CHINESE GOVERNMENT'S NEEDS,

 7        REQUIREMENTS, AND REQUESTS.  AND SO THEY, LIKE ANY GOOD

 8        MARKETER, WOULD MAKE THEIR PRODUCT TO SIT.

 9             SO ISN'T THAT ENOUGH?

10             MS. SULLIVAN:  NO, YOUR HONOR.

11             THE COURT:  NO?

12             MS. SULLIVAN:  I -- I INVITE YOU TO READ THE

13        COMPLAINT WITH THE CARE THAT WE'VE OBVIOUSLY READ IT OVER AND

14        OVER AGAIN, AND YOU WILL FIND, EVEN READING THE COMPLAINT IN

15        THE LIGHT MOST FAVORABLE TO THE ALLEGATIONS, THERE IS NOTHING

16        SPECIFIC IN HERE ABOUT CISCO OR ITS EXECUTIVES' KNOWLEDGE THAT

17        ITS TECHNOLOGY WAS GOING TO SUBSTANTIALLY ASSIST TORTURE.

18             THERE IS A CONCLUSORY, A SET OF CONCLUSORY ALLEGATIONS

19        THAT SOMEHOW SAN JOSE ACTIVITY WAS DONE WITH PURPOSE AND

20        KNOWLEDGE TO BRING ABOUT TORTURE AND PERSECUTION.

21             THERE IS NOT A SINGLE FACTUAL ALLEGATION TO SUPPORT THAT,

22        SO YOU GET TO IQBAL/TWOMBLY DISMISSAL IF YOU GET THAT FAR.

23             WE THINK YOU CAN STOP EARLIER AND JUST SAY THAT THIS IS

24        ALL EXTRATERRITORIAL, THE CALIFORNIA CONDUCT ISN'T ENOUGH.

25             BUT EVEN IF YOU FOCUS ON THE CALIFORNIA CONDUCT, IT
```

1   DOESN'T SATISFY THE REQUIREMENT OF SPECIFIC FACTUAL SUPPORT FOR

2   THE CONCLUSORY ALLEGATIONS ABOUT TORTURE.

3        BUT A SECOND ANSWER, YOUR HONOR, OF COURSE THEY ALLEGE

4   THAT THERE WERE GENERAL NEWSPAPER ARTICLES.  THAT'S NOT

5   SPECIFIC ENOUGH FOR KNOWLEDGE.  IT'S NOT -- IT'S CERTAINLY NOT

6   SPECIFIC ENOUGH FOR PURPOSE.

7        BUT, YOUR HONOR, OUR FALLBACK ARGUMENT, AND THIS IS THE

8   ONE THAT JUDGE MESSITTE EMBRACED IN ANOTHER ACTION IN THE

9   DISTRICT OF MARYLAND BROUGHT BY CHINESE DISSIDENTS AGAINST

10  CISCO --

11            THE COURT:  THE DAOBIN CASE.

12            MS. SULLIVAN:  SORRY?  THE DAOBIN CASE, EXACTLY, YOUR

13   HONOR, AND YOU'RE FAMILIAR WITH THAT.  WE SENT IT TO YOU AS

14   SUPPLEMENTAL AUTHORITY.  IT'S 2014 WEST LAW 769095 DECIDED LAST

15   MONTH IN THE DISTRICT OF MARYLAND.

16        AND THERE, YOUR HONOR, VERY -- JUDGE MESSITTE WRESTLED

17  WITH A SIMILAR QUESTION TO WHAT YOUR HONOR IS WRESTLING WITH

18  HERE, AND HE SAID SUPPOSE CISCO DID KNOW ABOUT THESE

19  ALLEGATIONS ABOUT THE CHINESE GOVERNMENT.  THERE'S A POLITICAL

20  QUESTION PROBLEM, AND AN ACT OF STATE PROBLEM, WITH A FEDERAL

21  DISTRICT COURT DECIDING THAT CISCO IS GOING TO BE LIABLE IN A

22  PRIVATE RIGHT OF ACTION TO PLAINTIFFS FOR SELLING PRODUCTS AND

23  SERVICES THAT WERE LAWFUL UNDER U.S. EXPORT REGULATIONS.

24        AND IT'S VERY INTERESTING, YOUR HONOR, IN THE BRIEFING,

25  PLAINTIFFS HAVE CONCEDED THAT CISCO'S EXPORTS ARE NOT IN

1       VIOLATION OF U.S. EXPORT REGULATIONS.  JUDGE MESSITTE IN HIS

2       OPINION DISCUSSES THOSE REGULATIONS AT LENGTH.

3              AND YOUR HONOR, IT'S NOT JUST THAT THOSE REGULATIONS ARE

4       SILENT AND DON'T ADDRESS THE ISSUE.  WE HAD A CRISIS IN THIS

5       NATION ABOUT HOW TO APPROACH CHINA IN LIGHT OF ITS HUMAN RIGHTS

6       POLICIES AFTER TIANANMEN SQUARE, AND CONGRESS ADOPTED AND THE

7       CONGRESS DEPARTMENT EXECUTED VERY SPECIFIC APPROACHES TO HOW WE

8       CAN SELL THINGS TO CHINA, AND THOSE EXPORT REGULATIONS SAY SOME

9       PRODUCTS CAN'T BE SHIPPED, BATONS, BRASS KNUCKLES, HANDCUFFS,

10      THINGS THAT COULD GO TO CERTAIN KINDS OF VIOLENT PURPOSES.

11             BUT SOFTWARE, AND TECHNOLOGY ESPECIALLY, EXPRESSLY WERE

12      NOT REACHED BY THOSE EXPORT CONTROLS, AND THEY'RE SUBJECT TO

13      BEING RECONSIDERED, BUT SO LONG AS THE POLITICAL BRANCHS HAVE

14      MADE A CONSIDERED JUDGMENT THAT WHAT CISCO IS EXPORTING TO

15      CHINA -- WHICH WE BELIEVE IS ABSOLUTELY, AS YOUR HONOR SAID

16      BEFORE, A GENERIC, USEFUL PRODUCT, THE SAME AS CISCO SHIPS TO

17      ALL THE COUNTRIES AROUND THE GLOBE AND CUSTOMIZES TO ITS

18      CUSTOMERS IN THE SAME WAYS AROUND THE GLOBE -- YOU, WITH

19      RESPECT, AS A FEDERAL JUDGE ARE NOT WELL POSITIONED TO SAY THAT

20      SOMETHING IS A HUMAN RIGHTS VIOLATION THAT'S EXPRESSLY

21      PERMITTED BY THE POLITICAL BRANCHES.

22             THERE'S A POLITICAL QUESTION PROBLEM OF THE THREE BRANCHES

23      SPEAKING WITH A DIFFERENT VOICE.  IF YOU -- IT'S NECESSARILY

24      SHOWING SOME QUESTION ABOUT WHAT THE POLITICAL BRANCHES HAVE

25      DECIDED, AND I HAVE TO SAY, JUDGE MESSITTE IN HIS DECISION, AS

1    YOU KNOW, ALSO SAID THERE'S AN ACT OF STATE PROBLEM.

2         REMEMBER HERE, NOBODY HERE IS SAYING CISCO COMMITTED ANY

3    OF THESE VIOLATIONS.  PLAINTIFFS HAVE NEVER GONE SO FAR AS TO

4    SAY CISCO IS COMMITTING TORTURE IN CHINESE PRISONS, AND THAT

5    WOULD BE ABSURD, AS WELL AS OFFENSIVE, AND THEY DON'T ALLEGE

6    IT.

7         BUT WHAT THEY DO ALLEGE IS THAT CISCO WAS AIDING AND

8    ABETTING THE CHINESE GOVERNMENT.

9         YOU CAN'T HAVE AIDING AND ABETTING THE CHINESE GOVERNMENT

10   WITHOUT DECIDING THAT THE CHINESE GOVERNMENT WAS ENGAGED IN

11   HUMAN RIGHTS VIOLATIONS, AND THAT'S WHERE THE ACT OF STATE

12   PROBLEM COMES IN.  YOU HAVE TO BE JUDGING WHAT THE CHINESE

13   GOVERNMENT IS DOING IN ORDER TO SAY THAT WE WERE AIDING AND

14   ABETTING IT.

15            THE COURT:  AND THAT'S WHAT THE GOOD MARYLAND JUDGE

16   DID.

17            MS. SULLIVAN:  THAT'S WHAT HE DID, YOUR HONOR.  HE

18   GAVE THREE ALTERNATIVE GROUNDS.  HE SAID, FIRST, THERE'S A

19   POLITICAL QUESTION PROBLEM.  GIVEN THE EXPORT REGULATIONS AND

20   CISCO'S LAWFULNESS UNDER THOSE REGULATIONS, HE CANNOT

21   INTERFERE.

22        HE SAID, SECOND, ACTS OF STATE, HE'D HAVE TO JUDGE THE

23   ACTIONS OF CHINESE GOVERNMENT.

24        AND HE SAID, THIRD, THERE IS NO ALLEGATION, NO PLAUSIBLE

25   ALLEGATION OF A PURPOSE ON CISCO OR ITS EXECUTIVES' PART TO AID

1    AND ABET TORTURE AND DETENTION.

2         SO HE ALSO REACHED THE DISCONNECT QUESTION YOU AND I WERE

3    TALKING ABOUT EARLIER, AND IF I MIGHT, I JUST WANT TO READ YOU

4    HIS KEY SENTENCE ON THAT WHERE HE SAYS "NO FACTS PLED IN THAT

5    COMPLAINT CONNECT CISCO'S LEGITIMATE BUSINESS ACTIONS TO THE

6    GOLDEN SHIELD; THENCE, TO THE COMMUNIST PARTIES' ALLEGED

7    DETENTION, PERSECUTION, AND TORTURE OF PLAINTIFFS."

8         IT'S THE "THENCE," THAT'S WHERE THAT LEAP IS, THAT

9    INEXTRICABLE LEAP IN THIS COMPLAINT IS TO GO FROM INFORMATION

10   SYSTEMS TO TORTURE, AND THERE'S NOT A SINGLE PLAUSIBLE FACT IN

11   HERE THAT'S ALLEGED TO SUGGEST THAT THAT LEAP CAN BE CROSSED.

12        HE SAID IT A SECOND WAY.  HE SAID "PLAINTIFFS ALLEGE THAT

13   THIS TECHNOLOGY WAS SOMEHOW CUSTOMIZED FOR COMMUNIST OFFICIALS

14   FOR USE IN NEFARIOUS WAYS.  BUT IN THAT COMPLAINT, THEY HAVE

15   SIMPLY FAILED TO INDICATE WITH ANY LOGIC WHAT IT MEANS TO

16   CUSTOMIZE TECHNOLOGY THAT WOULD PERMIT THE SORT OF HUMAN RIGHTS

17   VIOLATIONS ALLEGED HERE, SUCH AS TORTURE."

18        HOW ARE YOU CUSTOMIZING A TECHNOLOGY TO BRING ABOUT

19   TORTURE?

20        SO HE HAD THREE ALTERNATIVE GROUNDS, YOUR HONOR.  WITH

21   RESPECT, WE THINK THEY ALL APPLY HERE.

22        THE ONLY DIFFERENCE IS THE PURPOSE STANDARD IS SETTLED IN

23   THE FOURTH CIRCUIT.

24        BUT THE LEAP THAT I'M DESCRIBING IS A LEAP WHETHER THE

25   STANDARD IS PURPOSE OR KNOWLEDGE BECAUSE IT'S A LEAP ABOUT

```
 1    CAUSATION, WHICH IS A SEPARATE ELEMENT FOR ANY TORT.

 2              THE COURT:  SO I HAVE -- I HAVE A QUESTION ABOUT -- I

 3    READ THOSE QUOTES FROM THE OPINION, FROM THE ORDER AS WELL, AND

 4    I THOUGHT THOSE ARE IN SECTION, I THINK IT'S IN SECTION 11 OF

 5    HIS OPINION, AND I THOUGHT, WELL, ARE THE PLEADINGS HERE ANY

 6    DIFFERENT THAN THE PLEADINGS IN THE MARYLAND CASE?

 7         BECAUSE HE DOES SEEM TO INDICATE THAT -- HE DOES TALK

 8    ABOUT HIS CASE FAILED TO MEET THAT AZIZ/TALISMAN STANDARD OF

 9    PLAUSIBILITY.

10              MS. SULLIVAN:  THAT'S RIGHT, YOUR HONOR.

11              THE COURT:  AND I GUESS MY QUESTION IS, IS THIS CASE

12    PLED DIFFERENTLY SUCH THAT IT COULD?

13              MS. SULLIVAN:  YOUR HONOR, IT IS PLED DIFFERENTLY,

14    BUT THE DIFFERENCES ARE NOT MATERIAL AND SHOULD NOT LEAD TO A

15    DIFFERENT OUTCOME HERE.

16         PLAINTIFFS HERE HAVE ADDED A GREAT MANY MORE PARAGRAPHS OF

17    TECHNICAL DETAIL ABOUT WHAT CUSTOMIZATION MEANS.  WELL, IT

18    MEANS YOU HAVE DATABASES, IT MEANS YOU HAVE ELECTRONIC ALERTS,

19    AND IT MEANS YOU CAN FIND ELECTRONIC SIGNATURES.

20         BUT NONE OF THAT MATTERS, YOUR HONOR, BECAUSE ALL OF THAT

21    EXTRA DETAIL ABOUT CUSTOMIZATION HERE IS ALL ON ONE SIDE OF THE

22    BIG LEAP.  IT'S ALL ON THE INFORMATION SIDE.

23         IT CAN'T, NO MATTER HOW LONG IT GETS, GET YOU OVER TO THE

24    TORTURE SIDE.  THERE'S NOTHING IN HERE THAT SUGGESTS THAT

25    THIS --
```

1          NOW, YOUR HONOR, LET'S CONTRAST IT WITH A SIMPLE CASE.  IF

2     THERE WERE A COMPANY OPERATING ON U.S. SOIL TO MAKE TORTURE

3     IMPLEMENTS, AND THAT WAS ITS ONLY BUSINESS, AND IT ONLY

4     EXPORTED THEM, AND THE ONLY USE OF THOSE PRODUCTS WAS THE

5     NON-INNOCENT PURPOSE OF BEING USED FOR THE TORTURE OF PEOPLE

6     ABROAD IN VIOLATION OF HUMAN RIGHTS, THAT WOULD BE AN ENTIRELY

7     DIFFERENT CASE.

8          BUT -- BECAUSE THAT WOULD BE ABOUT CUSTOMIZING SOMETHING

9     FOR TORTURE.

10         THAT IS NOT THIS CASE.  THE CUSTOMIZATION ALLEGED HERE IS

11    ALL ABOUT CUSTOMIZING FOR INFORMATION SOPHISTICATION.

12         AND OF COURSE IT'S THE SAME -- OF COURSE THERE'S

13    INFORMATION SOPHISTICATION HERE.  YOU HAVE TO DETECT HACKERS.

14    YOU HAVE TO DETECT VIRUSES.  YOU HAVE TO ENABLE THE SECURITY

15    APPARATUS OF THE STATE -- WHETHER IN CHINA OR UNDER AMERICAN

16    LAW, WE HAVE A GREAT DEAL OF SOPHISTICATED DEVICES AND SOFTWARE

17    FOR ENABLING GOVERNMENT ACCESS TO PRIVATELY CONVEYED

18    INFORMATION.

19         CUSTOMIZING INFORMATION TECHNOLOGY AND NETWORKING

20    CAPABILITY, NO MATTER HOW MANY PARAGRAPHS YOU HAVE ABOUT IT,

21    DOESN'T GET YOU TO CUSTOMIZING FOR TORTURE.

22         THAT'S THE SIMPLE POINT I'M TRYING TO MAKE, YOUR HONOR.

23    IF YOU AGREE WITH US ON THAT, ALL THE COUNTS FALL BECAUSE THE

24    STATE LAW COUNTS FALL FOR LACK OF AIDING AND ABETTING

25    PLAUSIBILITY AS WELL.

1      SO, YOUR HONOR, I FOCUS ON THOSE.  WE THINK YOU CAN

2   DISMISS THE ECPA CLAIMS VERY EASILY BECAUSE THERE'S NO

3   EXTRATERRITORIAL APPLICATION OF THE ELECTRONIC COMMUNICATIONS

4   PRIVACY ACT, AND BECAUSE THERE'S NO PRIVATE RIGHT OF ACTION

5   UNDER THE MANUFACTURING CLAUSE THAT THE PLAINTIFFS ASSERT.

6      I'LL LEAVE IT TO THE BRIEFS ON THAT, BUT YOU CAN EASILY

7   DISMISS THE ECPA CLAIMS.

8      WE THINK YOU CAN ALSO EASILY DISMISS THE STATE UCL CLAIMS,

9   UNFAIR COMPETITION LAW CLAIMS, BECAUSE THERE'S NO COMPETITOR OR

10  CONSUMER HERE BEFORE YOU.  THERE'S THIS ATTENUATED ALLEGATION

11  OF LOST INCOME TO THE PLAINTIFFS, BUT IT'S NOT COVERED BY

12  CALIFORNIA LAW, SO WE THINK YOU CAN GET RID OF THOSE CLAIMS

13  VERY EASILY.

14      WE THINK YOU CAN GET RID OF THE CLAIMS AGAINST THE

15  INDIVIDUAL EXECUTIVES BECAUSE THOSE ARE SO THIN AS TO BE JUST

16  ABOUT HIGH LEVEL SUPERVISION, DIRECTION, MEETINGS WITH FOREIGN

17  OFFICIALS.  THERE'S NO "THERE" THERE, AND SO WE THINK YOU CAN

18  DISMISS ALL OF THOSE EASILY.

19      BUT AT THE CORE, THOSE ATS ALLEGATIONS, THOSE TVPA

20  ALLEGATIONS, AND THOSE STATE LAW TORT ALLEGATIONS, WE THINK THE

21  TWO KEY PRINCIPLES ARE NO PLAUSIBLE ALLEGATION OF AIDING AND

22  ABETTING TORTURE AND CRIMES AGAINST HUMANITY, AND NO --

23  SORRY -- CAUSAL DISCONNECT.

24      AND EVEN IF YOU THOUGHT THERE WERE PLAUSIBILITY TO IT, YOU

25  SHOULDN'T GO THERE BECAUSE THE POLITICAL QUESTION DOCTRINE AND

```
 1        THE ACT OF STATE DOCTRINE COUNSEL THAT THE COURTS SHOULD NOT,

 2   A, STAND UP TO THE POLITICAL BRANCHES WHEN THEY HAVE EXPRESSLY

 3   LICENSED AN ACTIVITY IN THE EXPORT REGIME; AND SECOND,

 4   SHOULDN'T BE JUDGING THE SOVEREIGN ACTS OF THE PEOPLE'S

 5   REPUBLIC OF CHINA.

 6        YOUR HONOR, THERE ARE A NUMBER OF OTHER DETAILED ARGUMENTS

 7   I CAN GIVE YOU, BUT PERHAPS I SHOULD LET THE OTHER SIDE SPEAK

 8   FOR A WHILE BECAUSE I'VE BEEN UP FOR QUITE SOME TIME.

 9        THE COURT:  NO, IT'S QUITE ALL RIGHT, BUT I DO WANT

10   TO ASK YOU SOME QUESTIONS ABOUT THE KIOBEL CASE.  YOU HAVE SOME

11   FAMILIARITY WITH THAT CASE.

12        MS. SULLIVAN:  I CERTAINLY DO, YOUR HONOR.  I HAD

13   THE -- THE SUPREME COURT MADE ME ARGUE IT TWICE.

14        THE COURT:  YES.  AND I'M CURIOUS ABOUT YOUR THOUGHTS

15   ABOUT JUSTICE KENNEDY'S OPINION, AS WELL AS JUSTICE BREYER'S

16   AND HIS COLLEAGUES' CONCURRING OPINIONS.

17        IT ALMOST SEEMED LIKE -- WHEN I READ THAT, IT ALMOST

18   SEEMED LIKE -- PARDON ME FOR BEING INDELICATE -- BUT AFTER

19   READING THAT, I THOUGHT, WELL, IS JUSTICE BREYER'S FOOT IN THE

20   DOOR?

21        MS. SULLIVAN:  WELL, YOUR HONOR, WE KNOW THAT THAT

22   PHRASE, "KEEPING THE DOOR AJAR," WHICH JUSTICE SOUTER USED IN

23   SOSA, IS WHERE WE'VE BEEN AT WITH THE ATS FOR A LONG TIME.

24        SO I THINK THE DOOR WAS CLOSED ALMOST SHUT ON

25   EXTRATERRITORIAL ATS CLAIMS.  I THINK ALL THAT THE KENNEDY
```

1    CONCURRENCE AND THE BREYER CONCURRENCE AND THE JUDGMENT DO IS

2    SUGGEST THERE MAY BE SOME CASE, MAYBE LIKE THE FLORIDA CASE

3    ITSELF IN WHICH WE BEGAN THE ATS REVIVAL BACK IN THE '80S WHERE

4    SOMEONE WHO'S BEEN TORTURED ABROAD BY A FOREIGN OFFICIAL HAS TO

5    RUN INTO THAT PERSON ON THE STREET HERE IN THE UNITED STATES.

6    MAYBE THERE SHOULD BE AN ATS SUIT IN THAT CASE SO YOU DON'T

7    GIVE SAFE HARBOR TO A TORTURER WHO'S FLED TO THE UNITED STATES.

8    THAT WOULD BE MORE LIKE THE IDEA OF THE U.S. NOT SIDING WITH

9    INTERNATIONAL LAW VIOLATIONS.

10        I THINK -- AND THAT WAS SOMETHING THAT CAME UP AT THE ORAL

11   ARGUMENT, THE QUESTION OF WHETHER THERE MIGHT BE AN EXCEPTION

12   FOR WHETHER -- YOU KNOW, YOU CAN GO AFTER EXTRATERRITORIAL

13   CONDUCT IF NOW THE PERPETRATOR IS IN THE U.S. SEEKING SAFE

14   HARBOR.

15        SO I THINK THAT MAY BE ONE OF THE THINGS, THE CONCERNS

16   THEY HAD IN MIND.

17        BUT THERE'S NOTHING TO SUGGEST THAT JUSTICE KENNEDY, WHO

18   JOINED FULLY IN THE MAJORITY OPINION, PROVIDED A COURT FOR IT.

19   THIS IS NOT A PLURALITY OPINION.  IT WAS AN OPINION OF THIS

20   COURT SAYING THE PRESUMPTION AGAINST EXTRATERRITORIALITY IS

21   VERY STRONG, EVEN FOR THE ATS, AND ITS MERE CORPORATE PRESENCE

22   IS NOT ENOUGH.

23        JUSTICE KENNEDY JOINED IN THAT IMPORTANT PHRASE FROM

24   KIOBEL.  MERE CORPORATE PRESENCE IS NOT ENOUGH.

25        I WOULD SUBMIT TO YOUR HONOR THAT WHAT MY LEARNED

1    ADVERSARIES ARE DOING IN THIS CASE ARE TRYING TO TAKE MERE

2    CORPORATE PRESENCE AND THE FACT THAT AN AMERICAN COMPANY SITS

3    HERE IN THE VALLEY CREATING A TECHNOLOGY THAT HAS HELPED

4    REVOLUTIONIZE COMMUNICATION AROUND THE WORLD AND SAYING THAT

5    CORPORATE PRESENCE HERE IS ENOUGH TO VIOLATE -- TO CONNECT YOU

6    TO HEINOUS ACTIVITY BY CHINESE ACTORS OFF IN CHINA THAT THERE'S

7    NO ALLEGATION ANYBODY AT CISCO KNEW ABOUT SPECIFICALLY.

8         AND YOUR HONOR, I SUBMIT THAT IF THIS CASE CAN GO FORWARD,

9    THEN WHY COULDN'T EVERY HIGH-TECH COMPANY IN THE VALLEY THAT

10   SELLS EQUIPMENT IN CHINA -- WHICH IS A VERY IMPORTANT MARKET

11   FOR THE UNITED STATES, REGULATED BY THE COMMERCE DEPARTMENT FOR

12   HUMAN RIGHTS CONCERNS -- WHY COULDN'T EVERY COMPANY IN THE

13   VALLEY THAT SELLS COMPUTERS, CHIPS, ANY NUMBER OF USEFUL

14   PRODUCTS, CUSTOMIZED FOR MANDARIN, CUSTOMIZED FOR FIELD OF USE,

15   BE SUBJECT TO THESE SAME KIND OF SUITS?

16        KIOBEL WAS ABOUT CLOSING THE DOOR TO THESE SUITS AGAINST

17   CORPORATIONS.

18        AND I UNDERSTAND THE FRUSTRATION OF COMMITTED HUMAN RIGHTS

19   ACTIVISTS.  THEY SEE FOREIGN GOVERNMENTS WHO THEY THINK ARE

20   ENGAGED IN HUMAN RIGHTS VIOLATIONS.

21        YOU CAN'T GO AFTER THE GOVERNMENT BECAUSE THEY HAVE

22   SOVEREIGN IMMUNITY.  SO THEY TRY TO FOCUS THE ATTENTION ON THE

23   PROBLEM BY SUING COMPANIES THAT DO BUSINESS ABROAD.

24        BUT HERE, JUST LIKE IN EVERY OTHER POST-KIOBEL CASE -- AND

25   IF YOU WANT TO JUST LOOK AT THE TEA LEAVES, THERE'S BEEN A

1    THEORY OF THE CASE THAT'S POST-KIOBEL THAT READ IT THE WAY I'M

2    SUGGESTING YOU SHOULD READ IT, YOUR HONOR, WHICH IS MERE

3    CORPORATE PRESENCE ISN'T ENOUGH.

4         ALL OF THE FOREIGN-CUBE CASES, OF COURSE, HAVE BEEN

5    DISMISSED, ALL OF THE FOREIGN DEFENDANT CASES.  AND I KNOW MY

6    ADVERSARY WILL SAY, OH, WELL, THIS IS A U.S. COMPANY.

7         BUT WE'VE CITED TO YOUR HONOR A NUMBER OF U.S. COMPANY

8    CASES THAT HAVE ALSO BEEN DISMISSED FOR EXTRATERRITORIAL

9    CONDUCT REASONS POST-KIOBEL.  THE DRUMMOND CASE,

10   D-R-U-M-M-O-N-D, THE DAOUD CASE, D-A-O-U-D CASE, AND THE CACI

11   CASE, C-A-C-I.  THESE ARE ALL DISTRICT COURT CASES THAT WE'VE

12   CITED TO YOUR HONOR, I WON'T BELABOR THEM, THEY'RE IN OUR

13   BRIEFS, BUT U.S. CORPORATIONS SUED FOR ATS HAVE, POST-KIOBEL,

14   BEEN DISMISSED IN ALL OF THE CASES THAT HAVE CONSIDERED IT.

15        THERE ARE FEW EXCEPTIONS, YOUR HONOR, WHICH I'M SURE MY

16   COLLEAGUES MAY DISCUSS AND I'LL BE HAPPY TO REBUT THEM.

17        BUT IF A U.S. COMPANY IS ALLEGED TO HAVE DONE SOMETHING

18   ABROAD, WHAT KIOBEL TEACHES US IS THAT WHAT MATTERS IS NOT THE

19   NATIONALITY OF THE COMPANY, WHETHER IT'S U.S. OR FOREIGN, BUT

20   THE LOCATION OF THE TORT.

21        AND THIS IS AN ALLEGATION, A SET OF ALLEGATIONS THAT'S ALL

22   ABOUT A CHINESE LOCATION FOR THE TORT.

23        SO, YOUR HONOR, WITH RESPECT, I THINK THAT IF

24   JUSTICE BREYER AND JUSTICE KENNEDY LEFT A FOOT IN THE DOOR, IT

25   WAS NOT FOR THIS KIND OF CASE.  IT WAS PERHAPS FOR A SAFE

```
1    HARBOR TO A MURDER CASE.

2         THEY DIDN'T REACH THAT.  RESPECTFULLY, THE TVPA COVERS

3    THAT.  YOU DON'T NEED TO HAVE A FLORIDA ATS CASE AGAIN BECAUSE

4    THE TVPA COVERS A SUIT BY AN INDIVIDUAL AGAINST AN INDIVIDUAL

5    WHO HAS COMMITTED TORTURE.

6         AND BY THE WAY, YOUR HONOR, ON MY LIST OF EASY DISMISSALS

7    HERE, I WOULD ADD THE TVPA AIDING AND ABETTING CLAIMS AGAINST

8    THE CISCO EXECUTIVES.  IT'S OFFENSIVE, FRANKLY, TO ALLEGE THAT

9    THE CEO OF CISCO IS ENGAGED IN AIDING AND ABETTING TORTURE.

10        BUT PUTTING ASIDE JUST THE BASE LEVEL OFFENSE THERE, YOU

11   CAN'T HAVE AIDING AND ABETTING UNDER THE TVPA.  THE NINTH

12   CIRCUIT HAS SPOKEN ON THAT IN THE BOWOTO CASE, B-O-W-O-T-O, AND

13   THAT'S JUST SETTLED IN THE CIRCUIT, UNLIKE SOME OTHER THINGS

14   THAT ARE STILL AT ISSUE.

15        SO, YOUR HONOR, THE DOOR MAY BE OPENED.  I'M NOT QUITE

16   SURE TO WHAT.

17        BUT THE ONE THING I KNOW IT'S CLOSED TO IS THIS CASE, AND

18   WITH RESPECT, WE BELIEVE YOUR HONOR SHOULD DISMISS IT IN ITS

19   ENTIRETY.

20            THE COURT:  WELL, THAT WAS A QUESTION I HAD ABOUT

21   KIOBEL -- IS THAT HOW IT'S PRONOUNCED?

22            MS. SULLIVAN:  WE THINK IT'S KIOBEL, YOUR HONOR, BUT

23   IT'S PRONOUNCED MANY DIFFERENT WAYS.

24            THE COURT:  KIOBEL.  IT SEEMS LIKE, POST-KIOBEL, DOES

25   THAT JUST COMPLETELY ELIMINATE THE ATS?  WHAT USE IS THE ATS
```

```
1        NOW?  IS IT JUST -- WHEN WAS IT, 1789, IS THAT THE GENESIS?
2                MS. SULLIVAN:  IT WAS, YOUR HONOR, AND IT'S NEVER
3        BEEN AMENDED.
4            SO, YOUR HONOR, OF COURSE THE ATS IS STILL AVAILABLE FOR
5        INTERNATIONAL LAW VIOLATIONS ON U.S. SOIL, AND THAT'S WHY
6        CONGRESS ENACTED IT.  YOU KNOW THE HISTORY.  IT WAS ABOUT
7        MAKING SURE THAT IF A FRENCH AMBASSADOR IS ASSAULTED BY ANOTHER
8        FRENCHMAN ON THE STREETS OF PHILADELPHIA, HE COULD GO TO
9        FEDERAL COURT, RATHER THAN TO STATE COURT, BECAUSE IT WAS
10       IMPORTANT FOR THE U.S. TO AVOID A WAR WITH FRANCE BY PROVIDING
11       A FEDERAL FORM OF REDRESS AGAINST THIS VIOLATION OF
12       INTERNATIONAL LAW.
13           SO INTERNATIONAL LAW VIOLATIONS THAT ACTUALLY TAKE PLACE
14       ON U.S. SOIL COULD STILL BE ACTIONABLE.
15           AND SECOND, YOUR HONOR, TO THE EXTENT PIRACY IS STILL ONE
16       OF THE ORIGINALLY CONTEMPLATED ACTIVITIES, THAT'S SOMETHING
17       THAT WOULD PROVIDE ATS REDRESS.  OF COURSE THERE'S A LOT OF
18       OTHER WAYS, INCLUDING INTERNATIONAL CRIMINAL JURISDICTION, TO
19       GO AFTER PIRACY.
20           SO THAT'S A --
21               THE COURT:  I THINK THAT'S SOMETHING JUSTICE BREYER
22       SUGGESTED.  HE SAID, WHO ARE TODAY'S PIRATES?
23               MS. SULLIVAN:  WELL, EXACTLY.  BUT PIRATES --
24       AMERICAN SOIL AND THE HIGH SEAS ARE ONE THING.
25           THE CORE POINT ABOUT KIOBEL IS ONCE YOU GO INSIDE THE
```

1   SOVEREIGN TERRITORY OF ANOTHER NATION, THAT'S NOT WHERE THE ATS

2   SHOULD GO WITH A PRIVATE RIGHT OF ACTION.

3         WHEN CONGRESS WANTS TO EXTEND JURISDICTION TO CONDUCT

4   INSIDE A FOREIGN NATION, IT TELLS US SO.  IT TOLD US SO IN THE

5   TVPA.  THE TORTURE VICTIM PROTECTION ACT CAN APPLY TO

6   EXTRATERRITORIAL CONDUCT.  THERE ARE ALSO ANTITERRORISM

7   PROVISIONS, ANTI-TRAFFICKING PROVISIONS OF OUR LAW THAT

8   EXPRESSLY REACH INTO A FOREIGN COUNTRY.

9         BUT THE POINT OF THOSE STATUTES IS CONGRESS HAS MADE THAT

10  DECISION AND THE PRESIDENT HAS SIGNED IT.  AND IT'S NOT A, A

11  FEDERAL COURT EXERCISING THE SOLEMN AUTHORITY OF THE FEDERAL

12  JUDICIARY TO CREATE FEDERAL COMMON LAW THAT'S DOING IT.  IT'S

13  THE POLITICAL BRANCHES.

14        SO THAT'S -- I WOULD SUGGEST THAT THE HISTORY SINCE THE

15  FRAMING IS THAT WHEN CONGRESS WANTS TO EXTEND INTERNATIONAL LAW

16  PROTECTIONS TO CONDUCT IN A FOREIGN COUNTRY, IT TELLS US SO.

17  TVPA, ANTI-TERRORISM ACT, ANTI-TRAFFICKING ACT.

18        BUT IT'S NEVER SAID THAT THE ATS EXTENDS ABROAD.

19        SO THE WAY I READ THE END OF THE COURT'S OPINION IN KIOBEL

20  WHEN IT SAID YOU'D HAVE TO SHOW THAT SOMETHING TOUCHES AND

21  CONCERNS THE UNITED STATES --

22          THE COURT:  THAT WAS MY NEXT QUESTION.  I WANTED YOU

23  TO TALK ABOUT TOUCHING AND CONCERNING.

24          MS. SULLIVAN:  TOUCHING AND CONCERNING, EXACTLY, YOUR

25  HONOR.

1          WELL, I BELIEVE THAT THE PROPER READING OF THAT PHRASE IS

2     THAT ONLY CONGRESS CAN OVERCOME THE PRESUMPTION.  IF CONGRESS

3     WANTS TO AMEND THE ATS AND SAY, WE'RE NOW CREATING A PRIVATE

4     RIGHT OF ACTION SO THAT HUMAN RIGHTS ACTIVISTS CAN SUE IN U.S.

5     COURTS FOR CHINESE CONDUCT, CONGRESS CAN OVERCOME THAT.

6          WHAT I THINK WAS LEFT OPEN WAS THAT MAYBE THERE COULD BE

7     SOME DOMESTIC HUMAN RIGHTS VIOLATIONS THAT STILL VIOLATE THE

8     ATS.

9          SO WE HAD OUR AMBASSADOR IN PHILADELPHIA.  THAT'S A

10    DOMESTIC INTERNATIONAL LAW VIOLATION.

11         WE NOW HAVE A MUCH BROADER NOTION OF INTERNATIONAL LAW

12    VIOLATIONS POST-NUREMBURG.  WE NOW HAVE THE NOTION THAT HUMAN

13    RIGHTS PROTECTED POST-NUREMBERG ARE PART OF INTERNATIONAL LAW.

14         AND SO LET'S ACCEPT INTERNATIONAL LAW GOT BIGGER.  IF

15    SOMEONE IS VIOLATING INTERNATIONAL RIGHTS IN THE UNITED STATES,

16    MAYBE THAT'S COVERED.

17         WHAT I'M ARGUING TO YOUR HONOR IS THAT THE DOMESTIC

18    ALLEGATIONS IN THIS COMPLAINT FALL SO FAR SHORT OF AN

19    INTERNATIONAL LAW VIOLATION -- FIRST OF ALL, I DON'T EVEN THINK

20    THE AIDING AND ABETTING IS COVERED BY THE ATS.  THAT'S A DEBATE

21    THAT HASN'T BEEN FINALLY SETTLED.  IT'S BEEN ACCEPTED BY SOME

22    CIRCUITS THAT YOU CAN HAVE AN AIDING AND ABETTING CAUSE OF

23    ACTION.

24         BUT WE KNOW FROM CENTRAL BANK THAT'S CITED IN OUR BRIEFS

25    THAT THE SUPREME COURT THINKS THAT WE SHOULDN'T ATTRIBUTE TO

1    CONGRESS THE INTENT TO CREATE PRIVATE CAUSES OF ACTION UNLESS

2    IT'S EXPLICIT.  NO PRIVATE RIGHTS OF ACTION FOR SECURITIES

3    FRAUD, AIDING AND ABETTING, AND SO FORTH.

4         BUT EVEN ACCEPTING THAT YOU CAN HAVE AIDING AND ABETTING

5    LIABILITY, IT'S JUST NOT PLED HERE, YOUR HONOR.  IT'S NOT EVEN

6    CLOSE.

7         SO THAT'S REALLY THE ARGUMENT.  YOU CAN STILL HAVE ATS

8    APPLYING TO HOME GROWN INTERNATIONAL LAW VIOLATIONS.  MY HYPO

9    BEFORE, WHICH IS A DISTANT -- WHICH SO FAR FROM THIS CASE --

10   BUT IF YOU WERE RUNNING AN INTERNATIONAL TORTURE OPERATION FROM

11   U.S. SOIL, MAYBE YOU COVER THAT.

12        BUT, YOUR HONOR --

13            THE COURT:  WOULD THAT TOUCH AND CONCERN?

14            MS. SULLIVAN:  I DON'T CONCEDE THAT IT WOULD, BECAUSE

15   I THINK YOU'D HAVE TO HEAR IT FROM CONGRESS.

16            THE COURT:  I SEE.

17            MS. SULLIVAN:  BUT I DO THINK IF THERE'S ANY CATEGORY

18   THAT COULD POSSIBLY STILL BE LEFT OPEN PERTAINING TO FOREIGN

19   ACTIVITY, IT WOULD HAVE TO BE THAT THE, THE TORT FEASORS ARE IN

20   THE UNITED STATES.

21        AND CISCO --

22            THE COURT:  THE TORT FEASORS MEANING?

23            MS. SULLIVAN:  THE TORTURERS.

24            THE COURT:  I SEE.  NOT THE PRODUCERS OF THE

25   IMPLEMENTS OF TORTURE?

1          MS. SULLIVAN:  I DON'T WANT TO CONCEDE THAT THAT,

2     THAT THAT COULD BE RIGHT.

3          BUT AT LEAST YOU COULD -- IF YOU WANTED TO SAY THAT THIS

4     IS NOT -- THIS IS NOT THAT CASE.  IF YOU WANT TO SAY THERE

5     MIGHT BE A CASE SOME DAY -- AND THE UGANDA CASE FROM

6     MASSACHUSETTS IS A LITTLE BIT LIKE THAT.  THE SUPREME --

7     JUDGE PONSOR LEFT OPEN THE IDEA THAT THERE MIGHT BE A SUIT

8     AGAINST A GUY WHO'S RUNNING, OUT OF SPRINGFIELD, MASSACHUSETTS,

9     A LET'S TORTURE GAY PEOPLE IN UGANDA OPERATION.  THAT'S ALL HE

10    DOES.  HE'S RUNNING WHAT THE JUDGE CALLED HOMOPHOBIA CENTRAL

11    OUT OF WEST SPRINGFIELD IN ORDER TO GO AFTER GAY PEOPLE AND GAY

12    ACTIVISTS --

13          THE COURT:  THAT'S THE SEXUAL MINORITIES --

14          MS. SULLIVAN:  THE SEXUAL MINORITIES CASE, EXACTLY,

15    YOUR HONOR.

16          WE'LL SEE WHAT THE FIRST CIRCUIT THINKS OF THAT CASE.  AS

17    I UNDERSTAND IT, THERE WAS A PETITION FOR INTERLOCUTORY REVIEW

18    THAT WAS DENIED IN THAT CASE AND A PETITION FOR MANDAMUS THAT

19    MAY BE PENDING.  SO WE DON'T KNOW IF THE FIRST CIRCUIT WILL

20    AGREE WITH HIM.

21          BUT YOUR HONOR, AT LEAST THERE THE ALLEGATIONS ARE THAT A

22    PERSON IS DOING SOMETHING THAT'S DIRECTED AT TORTURE AND

23    NOTHING BUT TORTURE.

24          IF YOU HOLD THAT CREATING NETWORKING EQUIPMENT AND

25    SERVICES, THE SAME ROUTERS AND THE SWITCHES THAT ARE ENABLING

1      EVERYBODY IN THIS COURTROOM TO CONNECT ACROSS THE INTERNET

2      TODAY, IF YOU HOLD THAT THAT TECHNOLOGY, BECAUSE IT'S

3      CUSTOMIZED FOR POLICE USE, IS SOMEHOW SPECIFICALLY DIRECTED AT

4      TORTURE, LIKE THE SEXUAL MINORITIES CASE, I SUBMIT THERE'S THE

5      DANGER THAT IT WOULD TAKE THE VALLEY DOWN WITH IT.

6          THAT IS -- THESE TECHNOLOGIES HAVE REVOLUTIONIZED THE

7      WORLD FOR GOOD, WE WOULD SAY, IN ENABLING PEOPLE TO CONNECT AND

8      HUMAN RIGHTS ACTIVISTS TO CONNECT AND PEOPLE TO HAVE FREEDOM

9      THROUGH COMMUNICATION.

10         BUT YOU CAN'T EQUATE WHAT IS PLEADED IN THIS COMPLAINT

11     WITH WHAT CISCO DID, YOU CAN'T EVEN REMOTELY COMPARE IT TO

12     ACTIVITIES THAT ARE DIRECTED AT HUMAN RIGHTS VIOLATIONS, AND

13     THAT I THINK IS THE KEY, YOUR HONOR.

14         AND THAT GIVES YOU SEVERAL DIFFERENT WAYS TO GO:  SAY THAT

15     THE DOMESTIC CONDUCT IS NOT SUFFICIENTLY SPECIFIC TO REALLY BE

16     IN THE UNITED STATES.

17         SECOND, THE DOMESTIC CONDUCT IS NOT SPECIFIC ENOUGH TO

18     MAKE OUT AIDING AND ABETTING BECAUSE IT DOESN'T SHOW KNOWLEDGE

19     OF SPECIAL ACTIVITIES, GENERAL NEWS ARTICLES ARE NOT ENOUGH,

20     AND THERE'S A CAUSAL DISCONNECT BETWEEN CUSTOMIZING FOR

21     INFORMATION AND CUSTOMIZING FOR TORTURE.

22         THIRD, EVEN IF YOU HAVE DOUBTS ON THOSE TWO PRINCIPLES,

23     DISMISS FOR LACK OF JURISDICTION ON POLITICAL QUESTION AND ACT

24     OF STATE GROUNDS.

25         AND WE THINK ANY OR ALL OF THOSE GIVE YOU MORE THAN

1    SUFFICIENT BASIS TO DISMISS IN THE ENTIRETY, AND ONCE THE

2    FEDERAL CLAIMS GO, WE WOULD RESPECT ACTUALLY SUGGEST THAT YOU

3    NOT RETAIN SUPPLEMENTAL JURISDICTION OVER THE STATE CLAIMS

4    WHICH WE THINK ARE INDEPENDENTLY VOID FOR A HOST OF REASONS,

5    INCLUDING THEY'RE ALL TIME BARRED, AND PLAINTIFFS HAVE CONCEDED

6    THAT THEY ARE OUTSIDE THE STATUTE OF LIMITATIONS.  THEY JUST

7    ASK YOU FOR EQUITABLE TOLLING.

8         UNDER CALIFORNIA LAW, THAT'S STATUTORY.  THEY HAVEN'T PLED

9    THE STATUTORY BASIS.

10        UNDER FEDERAL LAW, WE DON'T THINK THERE'S ANY BASIS FOR

11   TOLLING BECAUSE PLAINTIFFS SAY, WELL, THEY COULDN'T HAVE SUED

12   EARLIER BECAUSE THEY WERE AFRAID OF RETRIBUTION.  BUT THEY'RE

13   STILL AFRAID OF RETRIBUTION.  THEY'VE MOSTLY SUED NOT IN THEIR

14   OWN NAMES, SUED ANONYMOUSLY.  SO THAT'S NOT A BASIS FOR

15   EQUITABLE TOLLING.

16        SO, YOUR HONOR, THE FEDERAL CLAIMS SHOULD GO, THE STATE

17   CLAIMS SHOULD GO AS WELL FOR NUMEROUS INDEPENDENT REASONS, AND

18   WE THINK AT THE END OF THE DAY, IT'S VERY IMPORTANT FOR THIS

19   COURT, SITTING HERE IN THE VALLEY WHERE MANY TECHNOLOGIES ARE

20   MADE FOR USEFUL PURPOSES, BUT SOLD TO GOVERNMENTS AROUND THE

21   WORLD, INCLUDING ONES THAT THE U.S. SAYS WE MAY LAWFULLY SELL

22   TO, EVEN IF WE HAVE DOUBTS ABOUT THEIR HUMAN RIGHTS RECORD, IT

23   WOULD CREATE A KIND OF INVITATION TO BRING MORE SUITS LIKE

24   THIS, WHICH WE DON'T THINK ARE AN APPROPRIATE WAY TO GO ABOUT

25   THE NOBLE GOAL OF HUMAN RIGHTS PROTECTION.

```
 1              THE COURT:  THANK YOU VERY MUCH.

 2              MS. SULLIVAN:  THANK YOU, YOUR HONOR.

 3              THE COURT:  MS. MARSH?

 4              MS. MARSH:  GOOD MORNING, YOUR HONOR.  TERRI MARSH ON

 5      BEHALF OF PLAINTIFFS.

 6          I'M GOING TO BE HANDLING EVERYTHING EXCEPT THE POLITICAL

 7      QUESTION AND THE STATE CLAIMS.  THAT WILL BE HANDLED BY

 8      MS. BOYD.

 9              THE COURT:  THAT'S FINE.

10              MS. MARSH:  THANK YOU, YOUR HONOR.

11          I'D LIKE TO JUST BEGIN BY GOING BACK TO MAY 2008.  I WAS

12      AT A CONGRESSIONAL HEARING -- I WAS AT A CONGRESSIONAL HEARING,

13      SENATOR DURBIN WAS THERE, AND THEY WERE ASKING QUESTIONS OF

14      CISCO AND SOME OF THE OTHER TECH COMPANIES, AND THE MAIN

15      QUESTION WAS, "ARE YOU SENDING OPPRESSIVE TECHNOLOGY TO CHINA?"

16          AND THE ANSWER WAS, "NO.  WE SELL THE SAME EQUIPMENT

17      EVERYWHERE.  IT'S ALL GENERIC."

18          AND IT WAS AT THE END OF THAT HEARING THAT I WAS

19      APPROACHED, AS A LAWYER, AND ASKED IF I WOULD LOOK INTO THE

20      CASE TO SEE IF THERE WAS ANYTHING THAT I COULD DO WITH IT

21      LEGALLY.

22          AND I DIDN'T FILE THE CASE UNTIL MAY 2011 BECAUSE, QUITE

23      HONESTLY, I WASN'T GOING TO FILE A CASE IF THERE WAS NO CASE TO

24      FILE.

25          AND IN THE BEGINNING, I DIDN'T EVEN KNOW WHAT A ROUTER
```

1    WAS.  I MEAN, HONESTLY, THEY'D SAY, "IT'S ON YOUR DESK," AND

2    I'M LIKE "THE MODEM?  THE ROUTER?"  I WAS VERY CONFUSED.

3         AND THE POINT IS THAT THE -- WELL, THAT THE CASE WOULD NOT

4    HAVE BEEN FILED IF I DIDN'T THINK THERE WAS REASON TO FILE IT.

5         BUT ALSO, THAT THE CASE HAS A FOCUS, I MEAN, A CLEAR

6    FOCUS, AND THE FOCUS IS THE SUBSET OF THE GOLDEN SHIELD, WHICH

7    ARE THE INTEGRATED, CUSTOMIZED ANTI-FALUN GONG SYSTEMS THAT ARE

8    DEVOTED EXCLUSIVELY AND TOTALLY TO THE TORTURE AND PERSECUTION

9    OF FALUN GONG.

10        SO IF YOU LOOK AT PARAGRAPH 5 -- AND MAYBE I DIDN'T

11   EXPRESS IT CLEARLY ENOUGH -- BUT IN PARAGRAPH 5 OF THE

12   COMPLAINT, I SAID THAT THE GOLDEN SHIELD COMPRISES THE

13   ANTI-FALUN GONG SYSTEM, WHICH I CALLED AN ORWELLIAN SYSTEM OF

14   CONTROL, AN ORWELLIAN SYSTEM, OR A GARGANTUAN SYSTEM, TARGETED

15   AGAINST FALUN GONG.

16        AND THE REST OF THE COMPLAINT -- IT'S KIND OF LIKE IF YOU

17   THINK OF A SPOTLIGHT, SO YOU HAVE THIS BIG APPARATUS, THE

18   GOLDEN SHIELD, AND IT DOES A LOT OF THINGS.  IT HAS TRACKING,

19   IT HAS IMMIGRATION, IT'S A BIG APPARATUS.  OKAY.

20        SO I DIDN'T FOCUS ON THE WHOLE APPARATUS.  I FOCUSSED ONLY

21   ON THE SUBSET, THE ANTI-FALUN GONG SYSTEMS.  AND SO THE

22   COMPLAINT LOOKS AT THOSE SYSTEMS.  IT LOOKS AT THE HISTORY OF

23   THE CAMPAIGN, WHICH IS THIS DOUZHENG PERSECUTORY CAMPAIGN

24   AGAINST FALUN GONG IN CHINA, AND I'VE TRIED TO PUT THAT IN

25   CONTEXT OF WHAT IS GOING ON IN CHINA SINCE THE BEGINNING OF THE

```
 1        CHINESE COMMUNIST PARTY SHOWING THAT IT'S A POLITICAL CAMPAIGN,

 2        IT'S NOT A LEGAL CAMPAIGN, THE LAW IS NOT QUITE CONNECTED TO

 3        IT, AND THAT'S PARAGRAPHS 27 TO 47.

 4            AND THEN I LOOK AT -- OR WE LOOK AT HOW THE DESIGNS AND

 5        HOW THE IMPLEMENTATION AND THE VERIFICATION AND THE

 6        OPTIMIZATION AND THE TRAINING AND CUSTOMER SUPPORT ADDRESS THE

 7        SPECIFIC ANTI-FALUN GONG SYSTEMS AND THE HARMS ALLEGED.

 8            SO, FOR EXAMPLE, WE HAVE HIGH LEVEL DESIGNS, AND WE'D BE

 9        HAPPY TO SHOW THEM TO YOU.  I MEAN, WE REALIZE WE'RE NOT THERE

10        AT THIS POINT, BUT WE WOULD BE HAPPY TO SHOW THEM TO YOU, TO

11        HAVE A HEARING ABOUT THAT ISSUE.

12            WE HAVE HIGH LEVEL DESIGNS THAT ILLUSTRATE HOW TO

13        IDEALOGICALLY CONVERT, THROUGH MENTAL TORTURE, FALUN GONG.

14            FOR EXAMPLE, IN ONE DESIGN YOU HAVE AN INTERNET

15        SURVEILLANCE SYSTEM, WHICH IS LIKE THE EYES AND EARS OF THE

16        GOLDEN SHIELD, IT GATHERS INFORMATION, AND THE PURPOSE OF THAT

17        SYSTEM, ACCORDING TO A CISCO SLIDE, IS TO DOUZHENG FALUN GONG,

18        WHICH MEANS -- DOUZHENG MEANS TO PERSECUTE, TORTURE.

19                THE COURT:  DO YOU HAVE THE SPELLING OF THAT TERM FOR

20        OUR REPORTER?

21                MS. MARSH:  I'LL GIVE YOU THE ENGLISH VERSION.  IT'S

22        DOUZHENG.  IT'S D-O-U-Z-H-E-N-G.

23                THE COURT:  THANK YOU.

24                MS. MARSH:  AND SO THE INTERNET SURVEILLANCE SYSTEM

25        THAT'S THE EYES AND EARS OF THE -- THAT GATHERS AND COLLECTS
```

```
 1        INFORMATION HAS ITS PURPOSE TO DOUZHENG FALUN GONG, AND OTHER
 2     HOSTILE ELEMENTS, IN CHINA WHICH PROBABLY INCLUDE UYGHURS AND
 3     TIBETANS, AND THAT SYSTEM IS CONNECTED TO AN INFORMATION
 4     PLATFORM, WHICH I'VE BEEN CALLING A DYNAMIC INFORMATION
 5     MANAGEMENT SYSTEM.  IT HAS FALUN GONG DATABASES IN IT.  IT HAS
 6     PROFILED THE INFORMATION IN THE DATABASES ABOUT FALUN GONG, AND
 7     THAT INFORMATION THAT'S STORED THERE IS THEN CONNECTED TO THE
 8     PLACES WHERE THE CHINESE SECURITY ARE SITUATED, SUCH AS
 9     OFFICE 610 -- IT'S PAINFUL FOR ME TO TALK ABOUT THIS -- IT'S
10     OFFICE 610 BUREAU SITE WHERE THEY TORTURE FALUN GONG, AND ONE
11     OF THE 610 OFFICERS IS GOING TO BE A WITNESS IN THIS CASE.
12        SO THE SECURITY AT THESE SITES, ONE IS 610, IT'S CONNECTED
13     TO THE 610 SITE.
14        IT'S ALSO CONNECTED TO POLICE PSYCHIATRIC HOSPITALS, SO
15     YOU THINK ABOUT WHAT EXACTLY THAT IS, AND OTHER SUCH PLACES.
16        AND THAT IS CONNECTED TO THE INFORMATION.  SO YOU HAVE THE
17     INTERNET SURVEILLANCE SYSTEM, WHICH IS THERE TO DOUZHENG
18     FALUN GONG, TO PERSECUTE AND TORTURE, CONNECTED IN THE SAME
19     SLIDE TO THE INFORMATION SYSTEM THAT HAS ALL THE INFORMATION
20     ABOUT FALUN GONG, WHICH IS CONNECTED TO THE SITES OF TORTURE.
21        SO IF SOMEBODY AT THE 610 SITE HAS A PRACTITIONER THERE
22     AND WANTS THAT PRACTITIONER TO STOP PRACTICING FALUN GONG AND
23     TO SAY, "I RENOUNCE THE RELIGION," AND TO HELP THEM CATCH OTHER
24     PEOPLE, AND MAYBE EVEN ON TELEVISION SAY ABOUT WHAT THE
25     RELIGION IS, IF HE WANTS TO DO THAT, HE HAS A DATABASE AND YOU
```

1    CAN GO INTO THAT DATABASE AND YOU CAN LOOK AND GET INFORMATION

2    ABOUT THIS PERSON, LIKE DOES HE HAVE AN ELDERLY PARENT WHO'S ON

3    DIALYSIS?  DOES HE HAVE A YOUNG BABY?  DOES HE HAVE A SON WHO'S

4    IN SCHOOL?  WAS HE ARRESTED BEFORE, MAYBE HIS SPINE WAS BROKEN,

5    CAN WE THREATEN TO BEAT HIS SPINE?

6         THAT INFORMATION IS IN THERE, IN THAT SYSTEM SO THAT THE

7    POLICE CAN IDEALOGICALLY CONVERT FALUN GONG THROUGH MENTAL

8    TORTURE.  THAT'S WHAT WE HAVE IN THE SLIDES THAT'S VERY DIRECT.

9         NOW, IN ADDITION TO THAT, THERE ARE THESE FUNCTIONS, LIKE

10   THE IDENTIFICATION SYSTEM, WHICH WE HAVE LOTS OF SLIDES ON, AND

11   SO WE HAVE ALL SORTS OF CONNECTIONS BETWEEN CISCO SOFTWARE AND

12   FALUN GONG INFORMATION CENTERS AND IDENTIFICATION CENTERS.

13        SO THAT THE -- SO WE HAVE SYSTEMS THAT ARE ANTI-FALUN GONG

14   THAT ALLOW FALUN GONG TO BE IDENTIFIED, THAT ALLOW FALUN GONG

15   TO BE APPREHENDED, WHICH IS WHAT CISCO'S ATTORNEY IS REFERRING

16   TO.

17        THERE ARE OTHER SYSTEMS, LIKE THE IDENTIFICATION SYSTEM,

18   WHICH IS HUGE, AND THE APPREHENSION SYSTEM, AND THEN THE

19   IDEALOGICAL CONVERSION SYSTEM THROUGH MENTAL TORTURE WHICH I

20   JUST DESCRIBED.

21        BUT THOSE SYSTEMS ARE INDISPENSABLE TO THE PHYSICAL

22   TORTURE, THE DISAPPEARANCE, AND THE EXTRAJUDICIAL KILLING THAT

23   HAPPENS BECAUSE YOU'VE GOT TO PUT THEM SOMEWHERE.

24        AND THAT'S WHAT I WAS DESCRIBING IN THE BEGINNING OF THE

25   COMPLAINT WHEN I TALKED ABOUT THE DOUZHENG PERSECUTORY

```
 1    CAMPAIGNS, BECAUSE WHAT THE PARTY HAS BEEN DOING SINCE THE VERY
 2    BEGINNING IS TARGETING GROUPS, WHETHER IT'S THE LANDLORDS OR
 3    IT'S THE INTELLECTUAL LEFT, THEY EVEN HAD A CAMPAIGN AGAINST
 4    JUDGES AND LAWYERS, THEY TARGET GROUPS, AND WHEN THEY TARGET A
 5    GROUP, THEY USE THAT WORD, DOUZHENG, THAT GROUP THEN BECOMES,
 6    LIKE, EVERYBODY STAYS AWAY FROM THE GROUP, AND THOSE PEOPLE ARE
 7    ISOLATED, THEY'RE PARADED THROUGH THE STREETS IN VERY
 8    HUMILIATING WAYS, THEY'RE PUT ON STAGES IN VERY HUMILIATING
 9    WAYS, AND THEY'RE PUT IN PLACES WHICH NOW BECOME DETENTION
10    CENTERS LATER IN TIME WHERE THEY ARE TOLD THAT THEY HAVE TO
11    PUBLICLY SAY, "BEING A LANDLORD IS A BAD THING, I RENOUNCE IT.
12    I'M A BAD PERSON."  OR "BEING A MEMBER OF THE TIBETAN RELIGION
13    IS A BAD THING AND I RENOUNCE IT."
14        THERE'S EVEN A QUOTE IN AN ARTICLE THAT SOMEBODY
15    INTERVIEWED A TIBETAN AND HE SAID, "OH, YEAH, THE MINUTE THEY
16    GET ME, I JUST START CONFESSING BECAUSE I DON'T WANT TO GO
17    THROUGH IT.  I JUST CONFESS.  IT'S SCARY."
18        SO WHAT'S GOING ON WITH FALUN GONG IS PART OF SOMETHING
19    THAT'S BEEN GOING ON IN CHINA FOR A VERY LONG TIME, BUT IT'S
20    NOW HIGH TECH.
21        AND THE CASE ISN'T ABOUT ORDINARY ROUTINE POLICE
22    OPERATIONS.  I'M SURE THERE'S ORDINARY CRIME IN CHINA.  I DON'T
23    DOUBT THAT.  IT'S EVERYWHERE.
24        BUT THAT'S JUST NOT IN THE COMPLAINT AND THAT'S NOT WHAT
25    WE'RE TALKING ABOUT.
```

```
1            AND IT'S NOT ABOUT ROUTINE COMMERCIAL ACTIVITIES.

2            AND AS FAR AS THE MENS REA, I JUST WANTED TO SAY SOMETHING

3     ABOUT THAT, BECAUSE CISCO'S DESIGNS FACILITATE ALL OF THE

4     THINGS THAT I JUST SAID, AND SO THEY ARE INTENDING THOSE ACTS.

5     I MEAN, THOSE ARE THE ACTS THEY INTEND.  THEY INTEND TO MAKE

6     THE DESIGN AND THE DESIGN DOES FACILITATE IDEALOGICAL

7     CONVERSION.

8            THE COURT:  THAT WAS A QUESTION I HAD FOR

9     MS. SULLIVAN ABOUT THE MENS REA, AS YOU SUGGEST.

10           MS. MARSH:  YES.

11           THE COURT:  AND WHAT -- WHAT IS IT, IN YOUR

12    COMPLAINT, THAT SHOULD CONVINCE ME, FOR PURPOSES OF THIS

13    MOTION, THAT THE MENS REA HAS BEEN USED SUFFICIENTLY TO PROVE

14    THAT?

15           MS. MARSH:  YEAH, RIGHT.  WELL, WELL WITHOUT

16    REVIEWING THE STANDARD, THE STANDARD IN THE NINTH CIRCUIT IS

17    EITHER KNOWLEDGE OR SECONDARY PURPOSE AT THIS POINT.  IT COULD

18    CHANGE.

19           SO FOR KNOWLEDGE -- I JUST HAVE A LIST -- PARAGRAPHS 166,

20    174, AND 178 DISCUSS THE CISCO SHAREHOLDERS WHO'VE RAISED THESE

21    CONCERNS AT SHAREHOLDER MEETINGS IN 2002, 2003, 2005 TO 2008

22    AND 2010.  SO THEY'VE HEARD THAT.

23           THERE ARE NUMEROUS CISCO INTERNAL FILES AND MARKETING

24    MATERIALS THAT WE HAVE THAT MENTION THE ANTI-FALUN GONG

25    APPARATUS AND THE DOUZHENG CAMPAIGN, AND THAT'S PARAGRAPHS 59
```

1    TO 62, 64 TO 68, AND 175.

2         CISCO'S DIRECTOR OF CORPORATE AFFAIRS, TERRY ALBERSTEIN,

3    ADDRESSED THE ISSUE IN A CONVERSATION WITH REBECCA MACKINNON,

4    WHICH IS IN A BLOG -- WELL, NO.  THAT CONVERSATION I THINK --

5    I'M NOT SURE IF THIS WAS IN A BLOG OR IF IT WAS IN THE TAIPEI

6    TIMES, BUT THERE WAS THIS CONVERSATION BACK AND FORTH IN WHICH

7    HE WAS ASKED, "ARE YOU -- ARE THESE IMPLEMENTS FACILITATING

8    TORTURE?"  AND HE'S SAYING NO.

9         SO HE'S BEING ASKED, SO HE KNOWS THAT IT'S A QUESTION TO

10   THINK ABOUT.

11        ETHAN GUTMANN PUBLISHED A BOOK IN 2004 IN WHICH HE

12   BASICALLY DEMONSTRATED -- HE WAS IN CHINA, HE WENT TO THE

13   SHANGHAI TRADE SHOW, HE WORKED WITH THE TECH COMPANIES, HE'S

14   VERY KNOWLEDGEABLE, AND HE SPOKE TO ONE OF CISCO'S ENGINEERS AT

15   THE TECH -- AT THE SHANGHAI TRADE SHOW AT THE CISCO BOOTH AND

16   THE PERSON WAS SAYING TO HIM, "YOU KNOW, BY THE WAY, THIS CAN

17   DO A LOT MORE THAN U.S. CRIME CONTROL.  WE CAN EVEN ACCESS

18   THEIR WEBSITE, WE CAN FIGURE OUT IF THEY'VE BEEN ONLINE, WE CAN

19   DO ALL THIS STUFF."

20        NOW, THIS IS 2014, SO IT'S -- YOU KNOW, THIS IS

21   COMMONPLACE TO US.

22        BUT BACK IN 1999, 2000, 2001, 2002, WE DIDN'T HAVE ALL

23   THIS HIGH TECH EQUIPMENT.  IT WAS NOVEL.  IT WAS NEW.

24        AND EVERYBODY, ACCORDING TO ETHAN GUTMANN, WHO WERE VYING

25   FOR THE CONTRACT, FOR THE GOLDEN SHIELD CONTRACT IN CHINA WERE

1    ASKED, CAN IT STOP FALUN GONG?  NOT, CAN IT SAVE ME MONEY?

2         AND ACCORDING TO ETHAN GUTMANN, WHO'S ALSO ONE OF OUR

3    WITNESSES, EVERYONE IN THE SECURITY TECH BUSINESS IN CHINA KNEW

4    THAT THE GOLDEN SHIELD WAS TO FACILITATE TORTURE AGAINST

5    FALUN GONG AND THEY CERTAINLY KNEW THAT FALUN GONG WERE BEING

6    TORTURED.

7         THE COURT:  SO THAT WAS IN CHINA.  BUT CAN YOU -- CAN

8    YOU POINT TO SOMETHING IN THE COMPLAINT THAT SUGGESTS THAT

9    CISCO --

10        MS. MARSH:  WELL, THE SHAREHOLDERS ARE IN THE U.S.,

11   SO THE SHAREHOLDERS IN SAN JOSE ARE IN THE U.S., SAN JOSE, AND

12   SO THERE ARE AT LEAST SIX SHAREHOLDER REQUESTS FOR

13   INVESTIGATION AND THEY KEPT SAYING, "NO, WE'RE NOT DOING THIS.

14   NO, WE'RE NOT DOING THIS."

15        SO WE HAVEN'T -- WELL, LET ME SKIP TO --

16        THE COURT:  I'M SORRY.  CISCO DENIED THIS PURSUANT TO

17   QUESTIONS BY SHAREHOLDERS?

18        MS. MARSH:  RIGHT.  CISCO HAS BEEN DENYING THIS EVER

19   SINCE IT'S BEEN RAISED.  CISCO BASICALLY IS, IS DISAGREEING

20   WITH THE ALLEGATIONS IN OUR COMPLAINT.

21        IT'S MUCH CLOSER TO THE DAOBIN CASE ACTUALLY, THE

22   COMPLAINT THAT THEY'RE ANSWERING.  THEY'RE NOT REALLY, TO ME,

23   RESPONDING TO OUR COMPLAINT VERY MUCH AT ALL.

24        SO TERRY ALBERSTEIN IS IN SAN JOSE.  CISCO SHAREHOLDERS

25   ARE IN SAN JOSE.  CONGRESSIONAL HEARINGS WERE HELD IN 2006 AND

```
1        2008.  THAT WAS IN THE UNITED STATES.

2             CISCO WAS PUT ON NOTICE, THROUGH ALL THESE BLOG ARTICLES

3        THAT ARE VERY, VERY PROMINENT IN THE UNITED STATES -- I MEAN,

4        THERE'S THE BERKMAN SCHOOL AT HARVARD AND THERE'S A GENTLEMAN

5        THERE WHO'S AN EXPERT AND HE'S BEEN -- HE'S BEEN TALKING ABOUT

6        IT A LOT.  HE QINGLIAN HAS, GREG WALTON, AND ONE OF THE

7        INTERNAL FILES THAT WE HAVE ACTUALLY MENTIONED GREG WALTON'S

8        BOOKS, SO THEY WERE CLEARLY READING IT AND CLEARLY INTERESTED

9        IN WHAT OTHER PEOPLE WERE SAYING.

10            THEY ALSO HAD -- THEY ALSO HAD THE KNOWLEDGE OF WHAT THE

11       SLIDES WERE DOING.  I MEAN, THEY KNEW THAT THERE WERE

12       FALUN GONG DATABASES AND THERE WERE THESE PLACES THAT LOOKED

13       LIKE TORTURE SITES AND THERE'S THE INTERNET SURVEILLANCE

14       SYSTEM, AND SO WHAT'S THAT?  I MEAN, WHAT IS THAT FOR?

15            THEY'RE ALSO USING THE LANGUAGE OF THE PARTY IN A LOT OF

16       THEIR MARKETING MATERIALS CALLING FALUN GONG A THREAT.  THERE'S

17       AN ENTIRE POWERPOINT THAT'S DEVOTED TO THREATS WHICH ARE

18       SUPPOSEDLY VIRUSES, EXCEPT THE ENTIRE POWERPOINT IS ABOUT

19       FALUN GONG.  WELL, NOT THE WHOLE THING, BUT QUITE A FEW SLIDES

20       ARE ABOUT FALUN GONG.

21            THE COURT:  SO IS THIS YOUR BEST ARGUMENT AS TO

22       SUPPORTING --

23            MS. MARSH:  THE KNOWLEDGE?

24            THE COURT:  -- THE AIDING --

25            MS. MARSH:  WELL, NO, NO, NO, NO, NO, NO.  NOT AT
```

1      ALL, NO.  I MEAN, THAT WAS JUST KNOWLEDGE.  I THINK KNOWLEDGE

2      IS A NO BRAINER.  NO.

3           I MEAN, I THINK -- WHAT I WAS TRYING TO SORT OF DO IS SAY,

4      OKAY, SO THIS IS WHAT THEY DID.  THEY FURTHERED THE IDEALOGICAL

5      CONVERSION THROUGH TORTURE DIRECTLY, THROUGH MENTAL TORTURE

6      DIRECTLY, AND THEN WHAT THEY DID -- THE OTHER SYSTEMS, THE

7      IDENTIFICATION AND OTHER SYSTEMS WERE INDISPENSABLE TO THE

8      OTHER CRIMES.

9           THEY KNEW WHAT THEY WERE DOING.  SO THEY DID THIS KNOWING

10     WHAT THEY WERE DOING.

11          SO THEN MY NEXT POINT IS, IS THAT THEY'RE INTENTIONALLY

12     DOING WHAT THEY'RE DOING.  I MEAN, THE ACTS, LIKE I'M WALKING

13     TO THAT TABLE, I'M INTENTIONALLY WALKING, THEY'RE INTENTIONALLY

14     CREATING THESE DESIGNS AND THEY'RE DOING IT AWARE OF THE LIKELY

15     CONSEQUENCES AND THAT, TO ME, IS SECONDARY PURPOSE.

16          I MEAN, IF YOU SORT OF LOOK AT -- AND I HAVE MORE TO SHOW

17     THAT, A LOT MORE.  THE -- I DIDN'T BRING THAT UP.  THERE'S --

18     THE STANDARD IS IN OUR BRIEFS, IN OUR FILINGS, THAT IF YOU LOOK

19     AT THIS COURT, THIS COURT HAS, HAS OPTED FOR KNOWLEDGE.

20          IF YOU LOOK AT -- I'M PUTTING NESTLE ASIDE FOR A MINUTE.

21     IF YOU LOOK AT CUSTOMARY INTERNATIONAL LAW SOURCES, IT ALSO

22     SEEMS TO PREFER KNOWLEDGE.

23          BUT WHEN A COURT DOES MENTION PURPOSE, LIKE SAREI MENTIONS

24     PURPOSE IN THE VACATED DECISION, WHAT THEY'RE DESCRIBING, AS

25     FAR AS I CAN TELL, IS SECONDARY PURPOSE.  IT'S NOT MALICE.

1          IT'S NOT LIKE, "OH, I DON'T LIKE FALUN GONG, SO I REALLY WANT

2          TO GET THEM."  IT'S JUST, "OH, WE CAN MAKE A LOT OF MONEY.  I

3          CAN MAKE A LOT OF MONEY DOING THIS."

4              IT'S SECONDARY PURPOSE.  SO THE PURPOSE IS TO MAKE MONEY,

5          AND IN ORDER TO MAKE MONEY, WE HAVE TO MEET WHAT THEY WANT,

6          WHICH IS TO DOUZHENG FALUN GONG.  SO IT'S SECONDARY PURPOSE.

7                  AND WE HAVE, IN THE COMPLAINT, WE HAVE PLANNING FROM THE

8          VERY BEGINNING, PLANS CALLING FOR THE FACILITATION OF

9          EXTRALEGAL ABUSES, PARAGRAPHS 65 AND 70 HAVE TO DO WITH

10         PLANNING, MARKETING, THAT THEY ACTIVELY SOLICITED THE BUSINESS.

11             ACCORDING TO THE 610 OFFICERS WORKING WITH US, THERE WERE

12         BROCHURES AT A BEIJING TRADE SHOW IN WHICH THEY SAID THEY COULD

13         DOUZHENG FALUN GONG.  AND I DON'T HAVE THE BROCHURE, SO THAT'S

14         WHY I'M DESCRIBING IT.

15             BUT MARKETING IN ORDER TO MEET CHINESE SECURITY OBJECTIVES

16         TO DOUZHENG FALUN GONG, THAT'S 58 TO 61, 62 TO 65, 58 TO 60 --

17         SORRY, I'M REPEATING -- 64, 60 TO 62, 66 TO 67, 188, 59, 185.

18         THAT'S MARKETING.

19             DESIGNS, HOW THEY -- THEY SPECIFICALLY CUSTOMIZED THE

20         DESIGNS TO FACILITATE THE MENTAL TORTURE IS 80 TO 86, AND HOW

21         THEY CUSTOMIZED THROUGH THE OTHER PHASES, WHICH IS THE

22         IMPLEMENTATION AND TESTING, THE VERIFICATION, THE TRAINING AND

23         SO ON, THAT'S PARAGRAPHS 97 TO 101 IN THE COMPLAINT.

24             PARAGRAPH 98I AND J TALKS ABOUT THE DYNAMIC INFORMATION

25         SYSTEM AND WHAT IT DOES AND HOW IT FACILITATES THE

1     TRANSFORMATION PROCESS.

2          THERE'S A LOT MORE HERE.  I THINK I SHOULD STOP.  BUT

3     THERE'S A LOT OF PARAGRAPHS THAT DEAL WITH THAT.

4          AND I THINK THAT IF THE STANDARD WERE TO CHANGE TO

5     SPECIFIC INTENT, THEN I WOULD ASK FOR LEAVE TO FILE SOMETHING

6     BECAUSE WE DEFINITELY -- WE HAVE SOME INFORMATION AND WE CAN

7     CERTAINLY GET MORE INFORMATION ON THAT.

8          SO AS FAR AS MENS REA GOES, I DO THINK THAT WE MEET THE

9     NESTLE STANDARD, THE STANDARD THAT THIS COURT HAS ADOPTED, THE

10    STANDARD UNDER CUSTOMARY AND INTERNATIONAL LAW, AND EVEN THE

11    ROME STATUTE, WHICH IS I DON'T THINK CUSTOMARY, INTERNATIONAL,

12    OR STANDARD, TO ME BASED ON ARTICLES BY DOUG CASSELL AND OTHERS

13    SEEMS TO BE SECONDARY PURPOSE, WHICH IS THAT YOU INTEND THE ACT

14    FULLY AWARE OF THE LIKELY CONSEQUENCES.

15         SO JUST -- DO YOU WANT ME TO GO ON OR DID YOU WANT TO ASK

16    ME QUESTIONS?  I CAN GO ON FOREVER.

17              THE COURT:  NO, NO.  WE DON'T HAVE THAT MUCH TIME.

18         BUT I'LL GIVE YOU AS MUCH TIME AS YOU NEED.

19              MS. MARSH:  OH REALLY?  OH, THANK YOU.

20              THE COURT:  BUT I DO -- WERE YOU GOING TO SPEAK TO

21    THESE OTHER ISSUES, THE KIOBEL ISSUES?

22              MS. MARSH:  YES, EXACTLY.

23              THE COURT:  OKAY, SURE.

24              MS. MARSH:  SO I WAS GOING TO START WITH THE ACT OF

25    STATE AND I WAS JUST GOING TO SAY A COUPLE THINGS ABOUT THAT

```
1        AND THEN GO TO KIOBEL.

2           OKAY.  BASICALLY UNDER THE ACT OF STATE, UNDER THE

3    SIDERMAN S-I-D-E-R-M-A-N DE BLAKE V. -- AND I DON'T HAVE THE

4    REST OF THE CITE HERE, SORRY, I'M SURE IT'S EASILY -- YEAH.

5           SO UNDER THAT, UNDER THAT NINTH CIRCUIT CASE, JUS COGENS

6    NORMS ARE EXEMPT FROM THE ACTS OF STATE AND MANY, IF NOT MOST,

7    OF THE ATS CLAIMS ARE JUS COGENS NORMS, TORTURE, AND SO ON.

8           ALSO, ULTRA VIRES ACTS, SUCH AS -- ULTRA VIRES IS U-L-T --

9    SORRY -- ACTS SUCH AS TORTURE ARE CONTRARY TO THE LAW AND

10   POLICY OF CHINA, AS CHINA HAS MADE CLEAR IN ITS SUBMISSIONS TO

11   THIS COURT IN THE DOE VS. QUI CASE, "WE DON'T TORTURE ANYBODY,

12   IT'S NOT OUR POLICY TO TORTURE ANYBODY, WE'RE NOT INVOLVED IN

13   TORTURE."

14          AND SO ACCORDING TO THE MARCUS CASES, THE NINTH CIRCUIT

15   LINE OF MARCUS CASES, THEN THOSE ARE NOT ACTS OF A FOREIGN

16   SOVEREIGN.  THEY'RE ULTRA VIRES AND THEY'RE AGAINST POLICY AND

17   LAW OF THE CHINESE STATE.

18          CISCO HAS THE BURDEN, I WOULD SAY, WHEN THE ACT OF STATE

19   IS NOT MET, THE TEST ARTICULATED IN BOWOTO, WHICH IS THAT THERE

20   HAS TO BE A LOW LEVEL OFFICIAL ACTING PURSUANT TO AN ORDER TO

21   TORTURE, AND THAT ORDER HAS TO ORIGINATE FROM SOMEBODY TO BIND

22   THE STATE.  AND THEY HAVEN'T SUGGESTED WHO ISSUED THAT ORDER,

23   WHERE THAT ORDER IS, AND THAT'S BECAUSE THERE IS NO ORDER.

24          AND THAT'S BOWOTO, 2007 WEST LAW 2349345 AT 4.

25          THERE'S ALSO THE FACT THAT -- AND THIS IS IN THE COMPLAINT
```

```
 1        IN PARAGRAPHS 27 TO 47 -- THE FACT THAT THE PARTY IS NOT THE

 2   STATE, AND THAT'S A REALLY IMPORTANT POINT BECAUSE IT'S THE

 3   CHINESE COMMUNIST PARTY THAT RUNS THE DOUZHENG CAMPAIGNS IN

 4   CHINA.  I MEAN, THAT'S SORT OF LIKE THEIR JOB, AND THAT WAY THE

 5   STATE HAS A LITTLE BIT CLEANER HANDS, ALTHOUGH THERE ARE SOME

 6   STATE OFFICIALS WHO DO ULTRA VIRES PARTICIPATE, WITHOUT A

 7   DOUBT, THERE'S NO QUESTION.

 8        BUT IT'S THE CHINESE COMMUNIST PARTY THAT RUNS THE

 9   CAMPAIGN, AND THE CHINESE COMMUNIST PARTY IS NOT THE STATE.  I

10   HAVE AN EXPERT AFFIDAVIT IN ANOTHER CASE BY ANDREW NATHAN TO

11   THAT EFFECT, THAT THE TWO ARE ORGANIZATIONALLY AND FUNCTIONALLY

12   DISTINCT AND THAT WHEN THE UNITED STATES DEALS WITH CHINA, THEY

13   DON'T DEAL WITH THE PARTIES AND THEY DON'T DEAL WITH THE

14   INDIVIDUALS BECAUSE OF THEIR PARTY STATUS.  THEY DEAL WITH THEM

15   BASED ON THEIR ROLE IN THE GOVERNMENT.

16        AND THEY'RE JUST DIFFERENT -- THE CONSTITUTION TALKS ABOUT

17   THE CHINESE COMMUNIST PARTY AS ONE OF THE POLITICAL PARTIES,

18   AND IT'S OBLIGED TO FOLLOW THE CONSTITUTION, WHICH IT CLEARLY

19   DOESN'T DO.

20             THE COURT:  AND THAT DISTINCTION IS RELEVANT TO YOUR

21   LAWSUIT AND THIS MOTION BECAUSE?

22             MS. MARSH:  WHAT I'M SAYING IS THAT THE ACT OF STATE

23   DEFENSE DOESN'T APPLY, FIRST BECAUSE OF THE JUS COGENS NORM, SO

24   THAT TAKES IT OUT; SECONDLY, BECAUSE THE ACTS ARE ULTRA VIRES,

25   AND YOU HAVE THE MARCUS CASES; AND THEN THE BOWOTO TEST IS NOT
```

1    MET.

2         AND THEN THE PARTY IS NOT THE STATE AND THE PARTY IS

3    RUNNING THE PERSECUTION, AND THAT'S WHY WE'RE FOCUSSING ON A

4    SLICE OF CHINA, WHICH HAS TO DO WITH THE ANTI-FALUN GONG GOLDEN

5    SHIELD SYSTEMS, AND IT HAS TO DO WITH THE PARTY'S PERSECUTORY

6    CAMPAIGNS AGAINST FALUN GONG, IN THIS CASE, ALTHOUGH THEY DO

7    THE SAME THING TO TIBETANS AND UYGHURS AND MANY OTHERS,

8    LAWYERS, SOME OF MY FRIENDS ACTUALLY.

9         IN ADDITION TO THAT, THE THREE, THE THREE FACTOR BIGGER

10   TEST IS NOT IMPLICATED HERE BECAUSE THE CLAIMS MEET THE SOSA

11   NORMS, WHICH ARE INTERNATIONAL, BINDING NORMS, AND IN FACT, THE

12   CLAIMS MEET THE JUS COGENS NORMS, WHICH ARE EVEN HIGHER, SO

13   THEY MEET THE BINDING INTERNATIONAL NORM TEST.

14        THEY DON'T UPSET FOREIGN POLICY GOALS OF POLITICAL

15   BRANCHES BECAUSE BOTH THE EXECUTIVE AND LEGISLATIVE HAVE

16   CONDEMNED OPENLY THE HUMAN RIGHTS USES AGAINST FALUN GONG, AND

17   ALSO RESTRICTIONS ON INTERNET FREEDOM.

18            THE REPORTER:  CAN YOU USE THE MICROPHONE, PLEASE?

19            MS. MARSH:  OH, YEAH.  YEAH, THAT CHANGES IT.

20        THE HARD LINE PARTY MEMBERS ALSO WHO STARTED THE CAMPAIGN,

21   AND THAT'S BO XILAI AND ZHOU YONGKANG, AND QUITE A FEW OTHERS,

22   ARE NOW BEING ARRESTED, JAILED.  BO XILAI IS IN JAIL FOR

23   CORRUPTION.  ZHOU YONGKANG IS UNDER HOUSE ARREST AND AWAITING

24   SANCTIONS.

25        AND WHAT'S HAPPENED IS THE, THE -- IT'S KIND OF LIKE A

```
 1     SPLIT IN THE GOVERNMENT, SO WHAT'S HAPPENING IS THAT THE HARD

 2     LINERS ARE LOSING CONTROL AND THE HARD LINERS ARE THE ONES

 3     WHO'VE BEEN PROMULGATING THESE CAMPAIGNS AGAINST DISSIDENTS,

 4     AND NOT JUST FALUN GONG, ACTUALLY, AND THEY'RE HARD LINE PARTY

 5     MEMBERS.

 6          SO I WOULDN'T SAY THAT THE GOVERNMENT IS NO LONGER IN

 7     EXISTENCE.  I WOULD SAY THAT THE POLICY IS GRADUALLY BEING

 8     EASED, AND MANY FALUN GONG WERE RELEASED FROM -- WELL, THEY

 9     CLOSED DOWN THE RTL SYSTEM, THAT'S THE RE-EDUCATION THROUGH

10     LABOR SYSTEM, SO MANY FALUN GONG HAVE BEEN RELEASED.

11          AND I WOULD JUST ADD ON THAT NOTE THAT I DIDN'T INCLUDE

12     ANYBODY UNDER THE ARBITRARY ARREST AND DETENTION CLAIM WHO WENT

13     THROUGH THE CRIMINAL JUSTICE SYSTEM.  I AVOIDED THAT JUST TO

14     MAKE THE CASE EASIER.  WE HAVE TO LOOK AT THE CRIMINAL JUSTICE

15     SYSTEM AND FIGURE OUT IF THEY SHOULD HAVE ARRESTED THEM, OR

16     SHOULDN'T THEY?  DOES THIS LAW MEAN THIS?  DOESN'T IT?  THERE'S

17     CHINESE LAWYERS WHO SAY THERE'S NO LAW BANNING FALUN GONG,

18     THERE ARE OTHERS WHO SAY THERE ARE, AND SO WHY EVEN LOOK AT IT?

19          SO I LEFT THEM OUT.

20          NONE OF THE PEOPLE WHO ENTERED THE CRIMINAL JUSTICE SYSTEM

21     ARE COMPLAINING ABOUT ARBITRARY ARREST AND DETENTION OR FORCED

22     LABOR.

23          THE ONLY PEOPLE COMPLAINING OF THAT ARE THE FEW PLAINTIFFS

24     THAT WENT THROUGH THE RE-EDUCATION THROUGH LABOR SYSTEM, WHICH

25     MEANS YOU GET A NOTICE IN THE MAIL, APPEAR, AND THEN YOU APPEAR
```

1        AND THERE'S A COUPLE PEOPLE AND THEY TELL YOU WHERE TO GO.

2              THAT'S IT.  IT'S NOT LIKE, YOU KNOW, YOU HAVE A LAWYER AND

3        A JUDGE AND SO ON AND SO FORTH.

4              SO JUST TO GO BACK TO THE ACT OF STATE THOUGH.  SO IT'S

5        NOT THAT THE GOVERNMENT IS NO LONGER IN EXISTENCE, BUT THE

6        POLICY AND THE PEOPLE BEHIND IT ARE VANISHING, WHICH I THINK IS

7        A GOOD THING.

8              AND THEN ALSO TORTURE IS NOT IN THE PUBLIC INTEREST, WHICH

9        I THINK IS PART OF THE NINTH CIRCUIT TEST.

10              DID YOU WANT TO ASK ME QUESTIONS ABOUT THAT?

11                   THE COURT:  NO.  I DO WANT TO HEAR ABOUT THE --

12                   MS. MARSH:  KIOBEL?

13                   THE COURT:  YES.

14                   MS. MARSH:  YES, OKAY.  I'M SORRY THAT THE EXPERTS

15        COULDN'T BE HERE TODAY.  THE -- WHO WROTE THE SUBMISSION,

16        BECAUSE CERTAINLY THEY KNOW A LOT MORE ABOUT WHAT VATTEL WAS

17        SAYING AND THE EARLY FOUNDING FATHERS WERE SAYING THAN I DO,

18        BUT LET ME DO THE BEST I CAN WITH KIOBEL.

19              THE KIOBEL HOLDING WAS NARROW, VERY NARROW AS FAR AS I CAN

20        SEE.  IT APPLIED TO THE CONTEXT OF A FOREIGN-CUBED CASE,

21        FOREIGN DEFENDANTS, FOREIGN ACTS, TOTALLY FOREIGN ACTS, FOREIGN

22        PLAINTIFFS.

23              CISCO IS IN THE COURT'S BACKYARD, AND I KNOW THAT BECAUSE

24        I FLEW IN AND I HAD TO DRIVE HERE YESTERDAY AND THERE WAS CISCO

25        RIGHT THERE.  CISCO IS HERE.  THIS CASE IS ANYTHING BUT KIOBEL.

1    AND KIOBEL SET OUT A TEST TO APPLY TO THE FACTS OF AN ATS

2    CLAIM ARISING OUT OF OSTENSIBLY EXTRATERRITORIAL ACTS, AND THAT

3    TEST, WHICH IS THE TOUCH AND CONCERN TEST, IS NOT THE

4    PRESUMPTION.

5        SO THERE'S A PRESUMPTION, AND THE MORRISON CASE GAVE --

6    PROVIDED THE PRINCIPLES THAT GAVE RISE TO THE PRESUMPTION,

7    WITHOUT A DOUBT.  SO MORRISON GAVE RISE TO THE PRINCIPLES

8    UNDERLYING THE PRESUMPTION, BUT THE PRESUMPTION IS NOT ITS

9    DISPLACEMENT, AND THERE IS A TOUCH AND CONCERN TEST, AND I'VE

10   READ THE CASE AGAIN AND AGAIN, I DON'T KNOW HOW YOU CAN SORT OF

11   READ THAT TEST AS REQUIRING CONGRESSIONAL ACTION.

12       NOW, THERE'S -- AT THIS POINT, THERE'S NO HARD AND FAST

13   RULE.  I MEAN, IT'S EARLY.

14       BUT I THINK THAT THERE ARE SOME INSTANCES FOR PRECEDENCE

15   AND GUIDEPOSTS, AND I THINK SMUG IS VERY HELPFUL, AND THE

16   DEFENDANT IN SMUG OBVIOUSLY DID -- YOU KNOW, WAS INVOLVED IN

17   THESE, THE SUPPRESSION OF THE LBGT COMMUNITY, BUT HE WAS ALSO A

18   PASTOR AND A FAMILY LOVING PASTOR AND HE WOULD CHARACTERIZE

19   HIMSELF AS DUAL PURPOSE, IF YOU WANT TO LOOK AT IT THAT WAY, "I

20   AM A PASTOR AND I RUN A CONGREGATION AND I HELP PEOPLE REACH

21   OUT TO JESUS" AND SO ON AND SO FORTH, AND PERHAPS EVEN

22   LEGITIMATELY.  I DON'T KNOW.

23           THE COURT:  THIS IS THE SEXUAL MINORITIES UGANDA CASE

24    YOU'RE SPEAKING OF?

25           MS. MARSH:  EXACTLY.  EXACTLY.

```
 1           SO SIMILARLY, CISCO HAS HELPED WITH THE CRIME CONTROL
 2      SYSTEM.  MAYBE THAT'S GOOD.
 3           BUT THEY'VE ALSO FACILITATED THE ANTI-FALUN GONG SYSTEM
 4      THAT FACILITATES AND ENABLES AND PERSECUTES --
 5              THE COURT:  SO WHAT IS THE -- WHAT'S YOUR STRONGEST
 6      CASE FOR THE TOUCH AND CONCERN?
 7              MS. MARSH:  WELL, I THINK THAT THE SMUG CASE IS
 8      PROBABLY RIGHT NOW THE STRONGEST CASE AS A PRECEDENT CASE.
 9           I THINK THERE WILL BE MORE CASES COMING.  I THINK
10      EVERYBODY IS -- YOU KNOW, WHAT'S HAPPENING IS PEOPLE ARE
11      AMENDING COMPLAINTS.  IN FACT, WE'RE AMENDING A COMPLAINT IN
12      ANOTHER CASE THAT IS MOVING ALONG PRETTY FAVORABLY RIGHT NOW.
13           I THINK A GUIDEPOST CASE COULD BE THE BULOVA V. STEELE
14      CASE, BUT I THINK THAT'S A CASE WHERE THE COURT FOCUSES MORE ON
15      WHERE THE ESSENTIAL STEPS OCCURRED LEADING TO THE INJURY RATHER
16      THAN WHERE THE LOCUS OF THE INJURY WAS.
17              HOWEVER, I THINK IN THIS CASE YOU ALSO HAVE -- THE
18      ESSENTIAL STEPS ARE -- I MEAN, IT -- BUT FOR SAN JOSE'S HIGH
19      LEVEL DESIGNS AND OVERSIGHT IMPLEMENTATION, THIS COULDN'T HAVE
20      HAPPENED.
21              THE COURT:  SO ARE YOU SAYING THAT THE BRAIN TRUST,
22      THE INGENUITY --
23              MS. MARSH:  IT'S ABSOLUTELY IN SAN JOSE.
24              THE COURT:  THAT'S ENOUGH?  THAT'S SUFFICIENT?
25              MS. MARSH:  NO.  I'M SAYING THAT THAT MAKES IT
```

```
1        SIMILAR TO THE BULOVA, BUT I'M NOT FINISHED BECAUSE THAT'S NOT

2    SUFFICIENT.

3        SO THE BRAIN IS IN SAN JOSE WITHOUT A DOUBT, AND THAT'S

4    WHY CHINA HAD TO HAVE ALL THESE TRADE SHOWS AND REACH OUT TO

5    THE WEST.

6        BUT SOME INJURY IN THIS CASE ALSO OCCURRED IN THE U.S.

7        CISCO TOOK -- THERE WERE A LOT OF U.S. COMPANIES THAT WERE

8    COMPETING FOR THE MARKET, THE SECURITY MARKET IN CHINA, AND

9    CISCO BASICALLY WON THE CONTRACTS BECAUSE THEY WERE WILLING, IN

10   MY OPINION, TO FACILITATE WHAT CHINA WANTED, WHICH IS THE

11   DOUZHENG OF FALUN GONG.

12       AND THE APPARATUS THAT THEY DESIGNED HAS DATABASES THAT

13   INCLUDE U.S. FALUN GONG, AND THERE'S THOUSANDS OF PEOPLE WHO

14   PRACTICE FALUN GONG IN THIS COUNTRY AND ALL -- AND PEOPLE WOULD

15   BE SURPRISED -- PEOPLE DON'T USUALLY WALK UP TO YOU IN THE

16   STREET AND SAY, "HEY, I PRACTICE JUDAISM."  "OH, NO, I'M A

17   BAPTIST."  YOU KNOW, YOU KIND OF LEAVE THAT ALONE.

18       THERE'S QUITE A FEW PEOPLE IN THIS COUNTRY WHO PRACTICE

19   FALUN GONG WHO SIMPLY CAN'T GO TO CHINA, CAN'T DO BUSINESS IN

20   CHINA, AND LIVE HERE KNOWING THAT THEY'RE IN THAT DATABASE.

21       I THINK THAT THE, THE TESTS THAT ARE PROVIDED BY THE

22   DEFENDANT, TO ME, ARE NOT MERITORIOUS BECAUSE THE FOCUS TEST,

23   WHICH COMES FROM MORRISON, WHICH I DON'T THINK IS RELEVANT TO

24   THE TOUCH AND CONCERN TEST -- I MEAN, YOU COULD USE IT, BUT

25   IT'S NOT -- IT DOESN'T HAVE TO BE USED.  IT'S NOT NECESSARY.
```

```
 1              THAT TEST IS ONLY MENTIONED BY ALITO'S TWO-PERSON
 2     CONCURRENCE.  NO ONE ELSE TALKED ABOUT THE FOCUS TEST.
 3              AND THEN THERE'S THIS OTHER TEST, THAT IT'S THE THEORY
 4     THAT THE COMPANY MUST BE BUILT EXCLUSIVELY FOR TORTURE.  IN
 5     SOME WAYS WE MEET THAT TEST BECAUSE IF WE JUST LOOK AT THE
 6     ANTI-FALUN GONG SYSTEM, THAT WAS DEVELOPED EXCLUSIVELY TO
 7     TORTURE AND PERSECUTE FALUN GONG.
 8              HOWEVER, ANY COMPANY UNDER THAT TEST COULD BECOME TORTURE
 9     INCORPORATED, ANY COMPANY, AND THEN THEY COULD OPERATE A
10     DAYCARE CENTER FOR CHILDREN, AND SO THEN THEY'RE DUAL PURPOSE.
11              SO TO ME, TO REQUIRE THAT A COMPANY BE SET UP JUST TO DO
12     SOMETHING EVIL, AND IF IT DOES ANYTHING ELSE, IT CAN DO
13     WHATEVER IT WANTS WITH IMMUNITY, I DON'T THINK THAT'S A HELPFUL
14     TEST.
15              I DON'T KNOW IF YOU WANT ME TO KEEP GOING OR IF YOU HAVE
16     QUESTIONS OR --
17                   THE COURT:  NO, NO.
18                   MS. MARSH:  OKAY.  SO I CAN TALK ABOUT -- I CAN TALK
19      ABOUT FREDY CHEUNG, HE'S ONE OF THE INDIVIDUAL DEFENDANTS.
20                   THE COURT:  WELL --
21                   MS. MARSH:  OH, DID YOU WANT ME TO -- I'M SORRY.
22                   THE COURT:  I HAD THAT QUESTION ABOUT THE TOUCH AND
23      CONCERN.
24                   MS. MARSH:  OKAY.
25                   THE COURT:  MAYBE YOU COULD TALK TO ME A LITTLE BIT
```

1    ABOUT THE DAOBIN CASE --

2              MS. MARSH:  OKAY.

3              THE COURT:  -- AND THE POLITICAL QUESTION ISSUE.

4              MS. MARSH:  WELL, SO THAT'S -- SO MS. --

5              THE COURT:  YOUR COLLEAGUE IS GOING TO TALK ABOUT

6    THAT?

7              MS. MARSH:  WHAT I CAN SAY ABOUT THE DAOBIN CASE IS

8    BASICALLY THEY ASKED ME, BEFORE I FILED THIS CASE, IF I WOULD

9    INCLUDE THEIR PLAINTIFFS IN THIS CASE, SO I REVIEWED THEIR CASE

10   AND I REVIEWED WHAT THEY HAD AND I REVIEWED THE EVIDENCE AND I

11   DECLINED BECAUSE THEY'RE TOO DIFFERENT.  THEY'RE JUST APPLES

12   AND ORANGES, TOTALLY DIFFERENT.  THERE'S NO ANTI-FALUN GONG

13   SYSTEM THAT WE KNOW ABOUT FOR THE DISSIDENTS.  THERE MAY BE

14   ONE.  I MEAN, YOU KNOW, I DON'T KNOW.  BUT WE DON'T HAVE

15   EVIDENCE FOR THAT AT ALL.

16        SO OUR ENTIRE CASE IS ABOUT THE ANTI-FALUN GONG SYSTEMS

17   THAT SUPPRESS FALUN GONG.  I DON'T HAVE THAT FOR THAT CASE, SO

18   I JUST COULDN'T POSSIBLY HAVE INCLUDED THAT IN THIS CASE.

19        THEY -- SO WHAT HAPPENED WAS THAT -- AGAIN, I'M VERY

20   INVOLVED IN THE, WITH OTHER DISSIDENT GROUPS IN CHINA AND I

21   THINK THAT WHAT THEY'RE DOING WITH THE JOURNALISTS AND THE

22   LAWYERS AND TIBETANS AND UYGHURS IS WRONG.

23        IT'S JUST THAT THE INFORMATION THAT I HAVE AND THE

24   POWERPOINTS THAT WE HAVE, LIKE, 39 OF THESE -- WE HAVE A LOT OF

25   INFORMATION -- ARE ALL ABOUT THIS FALUN GONG SYSTEM.

1          SO WHAT HAPPENED IS WE FILED OUR CASE IN MAY AND THEN THEY

2     FILED THEIR CASE I THINK A MONTH OR TWO LATER AND THEY KIND OF

3     COPIED OUR COMPLAINT PRETTY MUCH.

4          AND THEN THE CASES STARTED TO MOVE IN THE REVERSE, BECAUSE

5     AFTER KIOBEL, THEIR CASE WENT FIRST.  SO THEY DIDN'T HAVE OUR

6     AMENDED COMPLAINT TO RELY ON, SO THEY AMENDED WITH MUCH LESS.

7          AND THERE, THERE JUST -- I DON'T SEE EVIDENCE IN THEIR

8     COMPLAINT AS TO HOW THE TECHNOLOGY FACILITATES DIRECTLY

9     IDEALOGICAL CONVERSION THROUGH MENTAL TORTURE OR IS

10    INDISPENSABLE TO THE PHYSICAL TORTURE AND THE EXILE.  I JUST

11    DON'T SEE THAT IN THAT COMPLAINT.  I DON'T THINK IT'S THERE.

12         AND AS I SAID, THEY'RE MISSING THIS APPARATUS.

13         THEY ALSO DO NOT REALLY UNDERSTAND, AS FAR AS I CAN TELL,

14    THE RELATIONSHIP BETWEEN THE PARTY AND THE STATE.

15              THE COURT:  OKAY.  THEY DON'T TOUCH ON THAT, AS YOU

16    DID?

17              MS. MARSH:  NOT AT ALL.

18              THE COURT:  OKAY.

19              MS. MARSH:  SO AGAIN, IT'S JUST TWO DIFFERENT CASES.

20    AND IN FACT, JOHN BELLINGER OF LAWFARE SAID THE FALUN GONG CASE

21    WAS DISMISSED.  HE SAID THE MARYLAND CASE, YOU KNOW, FILED BY

22    FALUN GONG WAS DISMISSED, AND I STARTED GETTING PHONE CALLS,

23    YOU KNOW, FROM CHINA, FROM EVERYWHERE, "WHY DIDN'T YOU TELL US

24    YOUR CASE WAS DISMISSED?"

25         SO I THINK THERE'S BEEN CERTAINLY A LOT OF CONFUSION AS TO

```
 1        WHICH CASE IS WHICH.

 2             BUT THAT CASE IS NOT ABOUT FALUN GONG.  IT'S JOURNALISTS

 3        AND POLITICAL DISSIDENTS.

 4             THE COURT:  OKAY.

 5             MS. MARSH:  SO THE CASES ARE JUST VERY, VERY

 6        DIFFERENT AND THE ALLEGATIONS ARE DIFFERENT, AND WHETHER OR NOT

 7        THEY MEET TWOMBLY, I THINK THERE'S SOME REAL SERIOUS

 8        IQBAL/TWOMBLY PROBLEMS IN THE OTHER CASE.

 9             THE COURT:  YOUR COLLEAGUE OPPOSITE SUGGESTS THE SAME

10        IN THIS CASE.

11             MS. MARSH:  RIGHT.  I DON'T AGREE WITH THAT AT ALL.

12        I THINK THAT WE HAVE -- OKAY.  SO WE HAVE 90 -- I THINK WE

13        HAVE, LIKE, 90 PAGES AND A LOT OF ALLEGATIONS AND EVERY SINGLE

14        ALLEGATION WE HAVE ANNOTATED.

15             SO WE HAVE -- AND THIS IS DR. KEN SUN OVER THERE WHO'S

16        DONE THAT FOR US.  HE READS CHINESE AND HE UNDERSTANDS

17        TECHNOLOGY BETTER THAN I EVER WILL.

18             SO HE'S ANNOTATED THE ENTIRE COMPLAINT, AND I THINK IT'S A

19        THOUSAND PAGES, THE ANNOTATIONS, BECAUSE I WANTED HIM TO PRINT

20        IT FOR ME.

21             AND THAT'S WHY I SAID THAT, YOU KNOW, WE WOULD BE HAPPY TO

22        SHOW YOU SOME OF THE POWERPOINTS.  WE WOULD BE HAPPY TO HAVE A

23        HEARING ON IT.

24             BUT OBVIOUSLY WE COULDN'T INTRODUCE THAT EVIDENCE, SO WE

25        SAID AS MUCH AS WE COULD WITHOUT SAYING, YOU KNOW, THIS
```

```
 1        POWERPOINT, THIS PARAGRAPH, BLAH, BLAH, BLAH.  I MEAN, THAT'S
 2     JUST --
 3              THE COURT:  OKAY.
 4              MS. MARSH:  YEAH.
 5              THE COURT:  YOU KNOW, I'D LIKE TO HEAR ABOUT THE
 6     POLITICAL QUESTION.  I'M CURIOUS ABOUT THAT.
 7              MS. MARSH:  SO WOULD YOU LIKE MS. BOYD --
 8              THE COURT:  SURE.  THANK YOU.  THANK YOU FOR YOUR
 9     ASSISTANCE.
10              MS. MARSH:  THANK YOU.
11              MS. BOYD:  GOOD MORNING, YOUR HONOR.
12              THE COURT:  GOOD MORNING.
13              MS. BOYD:  LEE BOYD, ALSO CO-COUNSEL.  I'M
14     REPRESENTING THE PLAINTIFFS.
15          I DID WANT TO ADDRESS THE POLITICAL QUESTION DOCTRINE, BUT
16     I THINK IT'S IMPORTANT TO HIGHLIGHT, AS A BACKDROP TO THAT,
17     THAT MS. MARSH HAS -- SOME OF THE POINTS I THINK SHE MADE TO
18     SET THE RECORD STRAIGHT.
19          THIS -- THIS -- THESE ALLEGATIONS ARE NOT THE DAOBIN
20     ALLEGATIONS.  THEY DEAL WITH, AS THE COMPLAINT SETS OUT, A
21     SPECIFIC ANTI-FALUN GONG SUBSET OF THE GOLDEN SHIELD THAT --
22     WHOSE SOLE PURPOSE WAS TO ENABLE, AS THE ONLY MEANS TO DO SO,
23     ENABLE THE AUTHORITIES, THE PUBLIC SECURITY AND THE CCP, TO
24     FALSELY IMPRISON AND TORTURE THE FALUN GONG, TO ERADICATE THEM.
25     DOUZHENG, I'M NOT A CHINESE EXPERT, BUT ANOTHER WAY SAID IN
```

1      CHINESE.

2           AND THIS ALLEGATION -- THIS COMPLAINT IS NOT THE COMPLAINT

3      THAT HAS BEEN TOUTED BY MS. SULLIVAN AND CISCO SYSTEMS.  THIS

4      COMPLAINT IS NOT ABOUT GENERIC ROUTERS BEING SIGNED OFF ON BY

5      COMMERCE DEPARTMENT.

6           IN FACT, I WOULD JUST POINT OUT THAT WHILE CISCO DOESN'T

7      EVEN ATTEMPT TO ARGUE THAT THE FIRST BAKER V. CARR SULLIVAN --

8      BAKER V. CARR TEST HAS BEEN IMPLICATED, THAT THESE CLAIMS ARE

9      NOT, AS A MATTER OF CONSTITUTIONAL TEST, ASSIGNED TO THE

10     POLITICAL BRANCHES.

11          WHAT THEY HAVE IMPLICATED, WITHOUT STATING, IS THAT

12     SOMEHOW THE EXECUTIVE OF COMMERCE DEPARTMENT HAS SIGNED OFF ON

13     THESE HIGH LEVEL DESIGNS, AND I THINK THE COMPLAINT, WHILE IT'S

14     MANY, MANY PAGES LONG WITH A LOT OF TECHNICAL DETAIL, COMES

15     DOWN TO THE HIGH LEVEL DESIGNS, WHICH I HAD THE OPPORTUNITY TO

16     SEE LAST NIGHT, AND IT'S BONE CHILLING.  THE DESIGNS, WHICH I

17     DON'T UNDERSTAND TECHNOLOGY, BUT I CAN UNDERSTAND A FLOW CHART,

18     STATE THE PURPOSE OF THIS DESIGN IS TO FACILITATE

19     ANTI-FALUN GONG ERADICATION.  THEY STATE THAT.

20          NOW, THOSE DESIGNS WERE DEVELOPED NOT IN CHINA, BUT BY

21     CISCO SYSTEMS.

22          AND HOW DO I KNOW THAT?  BECAUSE WHEN I LOOK ON THE

23     POWERPOINT DESIGNS THAT ARE DATED 2005, IT SAYS CISCO, INC.  IT

24     DOESN'T SAY CISCO CHINA.  IT SAYS CISCO, INC.

25          SO THOSE ARE THE EVIDENCE BEHIND THESE ALLEGATIONS, SO IT

1    MEETS PLAUSIBILITY WITHOUT ACTUALLY PUTTING OUR CASE FORWARD IN

2    A SUMMARY JUDGMENT MOTION.  IT MEETS THE PLAUSIBILITY OF

3    IQBAL/TWOMBLY.

4         AND BY THE WAY, IN THE MOTION TO DISMISS, THAT WASN'T EVEN

5    MENTIONED.  THAT CAME UP IN THE REPLY.

6         I DON'T THINK THERE'S ANY SERIOUS QUESTION THAT THE

7    PLAUSIBLE CONNECTION -- AND I UNDERSTAND THE JUDGE, YOUR HONOR

8    TO HAVE BEEN CONCERNED ABOUT THE NEXUS.

9         HERE'S THE NEXUS.  THE NEXUS IS THAT CISCO SYSTEMS, WITH

10   ITS POWER HOUSE AND ITS BRAIN CENTER HERE IN SAN JOSE, IN YOUR

11   BACK YARD, WAS ASKED TO DEVELOP SOME WAY TO ERADICATE

12   FALUN GONG.

13        NOW, INTERESTINGLY, FALUN GONG IS THE CHURCH OR THE

14   RELIGION OR THE PRACTICE -- AND I DON'T WANT TO STEP OUT OF

15   LINE IN UNDERSTANDING THAT RELIGION -- BUT IT IS A TYPE OF

16   RELIGIOUS FREEDOM OF EXPRESSION.  IT IS AN INTERNET-BASED

17   RELIGION.

18        WITHOUT TECHNOLOGY, THERE IS NO WAY TO FIND THESE PEOPLE.

19   OH, I SUPPOSE THERE COULD BE A, MAYBE, AS IN THE STASI EAST

20   GERMANY, SOME NEIGHBORS THAT RAT OUT THEIR FALUN GONG

21   NEIGHBORS.

22        BUT THE WAY TO ERADICATE THE RELIGION IS NOT ON A

23   PIECE-BY-PIECE SORT OF EAST GERMANY WAY OF RATTING OUT

24   SYMPATHIZERS TO THE LEFT.  IT'S THROUGH THE INTERNET, THROUGH

25   THIS SYSTEM WHICH IS SO VAST AND ITS -- WHILE ITS SOLE PURPOSE

```
 1     MAY HAVE SOME LEGITIMATE, AND NO DOUBT DOES, CRIME CONTROL

 2     GENERIC, MS. SULLIVAN HAS NEVER STATED, NO ONE AT CISCO HAS

 3     EVER STATED THAT COMMERCE SIGNED OFF ON THESE DESIGNS WHICH

 4     WERE UPLOADED OR SENT IN SOME WAY OR EXPORTED TO CHINA.

 5          SO YOUR HONOR DOESN'T HAVE TO, IN REVIEWING THESE CLAIMS,

 6     STEP ON THE TOES OF A COMMERCE, DEPARTMENT OF COMMERCE DECISION

 7     BECAUSE THIS GOVERNMENT HAS SPOKEN IN ONE VOICE UNDOUBTEDLY

 8     THAT TECHNOLOGY COMPANIES ARE NOT TO FACILITATE THE HUMAN

 9     RIGHTS ABUSES ANYWHERE IN THIS WORLD, IN CHINA, AND WE HAVE

10     AMPLE EVIDENCE OF THAT BEFORE CONGRESS IN THE SENATOR DURBIN

11     HEARINGS, THAT THE CONCERN OF CONGRESS HERE WAS THAT THESE

12     TECHNOLOGIES NOT BE USED TO FACILITATE HUMAN RIGHTS ABUSES,

13     INTERNATIONAL LAW NORMS.

14          IT'S IRRELEVANT THAT CHINESE LAW MAKES FALUN GONG ILLEGAL.

15     I DON'T KNOW IF IT DOES, AND I WOULD SUBMIT THAT WE HAVE NOT IN

16     ANY WAY PREJUDICED OUR ABILITY TO BRING IN, IF IT BECOMES

17     RELEVANT, CHINESE LAW THROUGH 44.1.  THAT'S NOT REQUIRED TO BE

18     PUT FORTH IN PLEADINGS.

19          BUT IN THE EVENT THAT THAT BECOMES RELEVANT, YOUR HONOR,

20     TO CHOICE OF LAW QUESTIONS AND STATE LAW, THIS CASE HAS BEEN

21     ABOUT THE VIOLATION OF INTERNATIONAL LAW NORMS, AND IT HAS BEEN

22     ABOUT THE AIDING AND ABETTING BY SAN JOSE HERE AS THE BRAIN

23     TRUST THAT -- WITHOUT WHICH THESE MEMBERS OF THIS CHURCH AND

24     THIS RELIGION COULD NOT BE ROUNDED UP, COULD NOT BE TORTURED

25     AND BASICALLY ERADICATED AS SOME TYPE OF ETHNO GENOCIDE
```

```
 1          CAMPAIGN, AND THAT IS WHAT THIS COMPLAINT HAS ALLEGED.

 2              THE NEXUS HAS BEEN SHOWN AND COULD BE PROVEN WITH THE

 3      ACTUAL DOCUMENTS FROM CISCO SYSTEMS THAT SAYS CISCO HERE, AND

 4      YOU SEE FALUN GONG CENTERS ALL AROUND CHINA, AND YOU SEE HOW

 5      THEY'RE CONNECTED THROUGH TECHNOLOGY.

 6              AND DR. KEN SUN, PHYSICS AND TECHNOLOGY EXPERT, ALSO

 7      RECENT GRADUATE OF YALE LAW SCHOOL SO NOW A LAWYER, CAN

 8      DECONSTRUCT WHAT'S BEEN -- WHAT THESE SYSTEMS SHOW, AND THOSE

 9      WERE WHAT THIS COMPLAINT ALLEGES WERE UPLOADED OR EXPORTED IN

10      SOME WAY, AND NO DEPARTMENT OF COMMERCE, NO CONGRESS HAS

11      BLESSED THAT EXPORT AND IT HASN'T BEEN STATED THAT THEY HAVE

12      DONE.

13              THE COURT:  SO --

14          MS. BOYD:  SO THERE IS NO CONFLICT BETWEEN THE

15      JUDICIARY RULING ON WHAT THIS COMPANY, U.S. COMPANY HAS DONE TO

16      FACILITATE CRIMES AGAINST HUMANITY, FORCED LABOR, OR STATE LAW

17      ASSAULT AND BATTERY.

18              THE COURT:  ARE YOU SUGGESTING THAT CISCO'S DONE THIS

19      SURREPTITIOUSLY WITHOUT THE GOVERNMENT'S KNOWLEDGE?

20          MS. BOYD:  I'M NOT SURE THAT -- THEY HAVE NEVER

21      STATED THAT THE ACTUAL DESIGNS ARE SUBJECT TO ANY COMMERCE, SO

22      I CAN'T SAY FOR SURE THAT THEY WOULD HAVE BEEN REQUIRED TO

23      LICENSE THESE DESIGNS, THE DESIGNS.

24              WE'RE NOT TALKING ROUTERS AND SWITCHES.  WE'RE TALKING

25      ABOUT THE CUSTOMIZED DESIGN OF THE TECHNOLOGY, WHICH IS AT SUCH
```

1   A HIGH LEVEL, I COULD NOT BEGIN TO ARTICULATE WHAT THE DESIGN

2   DID.

3          BUT IT WAS ONE OF A KIND AND IT WAS MARKETED --

4              THE COURT:  SO ASSUMING -- LET ME JUST ASSUME FOR A

5   MOMENT THAT YOU'RE ACCURATE, THAT CISCO DESIGNED A SYSTEM THAT

6   WAS TO FERRET OUT -- TO REACH A CERTAIN GROUP OF INDIVIDUALS

7   FOR BAD PURPOSES, ILLEGAL PURPOSES, AND THAT THERE WAS TORTURE

8   INVOLVED AND ALL THESE OTHER THINGS, AND CISCO KNEW ABOUT THAT

9   BECAUSE OF THEIR CONTINUED BUSINESS RELATIONSHIP WITH THE

10  PURCHASER IN CHINA AND THEY REFINED THE PRODUCT AND THEY

11  RECEIVED PROMPTS, "WE NEED TO DO BETTER, YOU NEED TO IMPROVE

12  THIS, THIS VERSION OF 2.0 AND 2.3" AND ALL OF THAT.

13         SO ASSUMING THAT'S ALL TRUE, WHAT DOES THAT MEAN FOR YOUR

14  CASE?

15             MS. BOYD:  IF THAT'S ALL TRUE, THEN YOU CAN

16  ADJUDICATE THE CLAIMS.  THOSE -- THAT'S A FACTUAL LAW QUESTION,

17  WHICH IS THAT IF INDEED CISCO KNEW WHAT THEY WERE DOING AND

18  THEY BORE OUT JUST ON THE PIECE OF PAPER, THE SLIDES THAT I'VE

19  SEEN, OR THE POWERPOINT SLIDES, THEY BEAR OUT THAT THEY USE

20  ANTI-FALUN GONG, THEY USE TERMS LIKE DOUZHENG ON THE CISCO

21  POWERPOINT, THAT THESE ENGINEERS HERE WITH ADVANCED -- I

22  BELIEVE IT'S THE ADVANCED SYSTEMS TEAM WERE GIVEN A COMMISSION,

23  WHICH IS TO COME UP WITH SOMETHING THAT WOULD SATISFY THE

24  OBJECTIVES OF THE CCP, WHICH WERE TO ERADICATE FALUN GONG, COME

25  UP WITH SOMETHING THAT CAN FIND THESE PEOPLE ON THE INTERNET,

1     CAN FIND OUT INFORMATION ABOUT THEM TO ASSIST IN THE MENTAL

2     TORTURE, AS MS. MARSH SAID, TO ASSIST IN NEVER -- IN CONVERTING

3     THEM BACK TO WHATEVER CHINA WISHED THEM TO THINK.

4          AND SO THAT MEANS YOU CAN ADJUDICATE THESE CLAIMS.

5          WHAT IS NOT BEFORE THIS COURT IS WHETHER OR NOT THESE WERE

6     LICENSED, BECAUSE THEY'VE NEVER SAID THAT THEY WERE, THESE

7     DESIGNS.

8          WHAT THEY'VE SAID WAS "WE EXPORTED ROUTERS AND SWITCHES."

9          BUT THAT'S NOT WHAT THIS CASE IS ABOUT, GENERIC ROUTERS

10    AND SWITCHES.  AND THAT'S WHAT THE DAOBIN JUDGE FOCUSSED ON.

11    THERE'S GENERIC PRODUCTS THAT ARE SUBJECT TO EXPORT

12    REGULATIONS.

13         BUT YOUR HONOR, I WOULD LIKE TO CITE ONCE AGAIN AND POINT

14    OUT THE CASES, SUCH AS NORTHROP AND KOOHI THAT SAID -- IN THIS

15    NINTH CIRCUIT THAT SAID MERELY BECAUSE A CLAIM INVOLVES

16    PRODUCTS THAT ARE REGULATED -- AND, YOUR HONOR, THIS HAPPENS

17    EVERY DAY IN THIS COURT, WE HAVE A REGULATED EXPORT MARKET FOR

18    AUTOMOBILES, FOR EXAMPLE -- THAT DOES NOT IMMUNIZE A DEFENDANT,

19    MERELY BECAUSE THEIR PRODUCTS ARE REGULATED, FROM TORT

20    INTERNATIONAL LAW AND CONTRACT CLAIMS AND LIABILITY, BECAUSE

21    THE REGULATIONS ARE, IN THE CASE OF INTERNATIONAL LAW

22    VIOLATIONS UNDER THE CHARMING BETSY PRINCIPLE, WE ARE TO ASSUME

23    AND PRESUME THAT THEY'RE RECONCILED WITH INTERNATIONAL LAW

24    NORMS, THAT IT IS EXPECTED THAT WHILE THEY ARE REGULATED

25    INDUSTRY AND THEY CAN EXPORT THEIR PRODUCTS, THAT THEY WILL

1    STILL BE LIABLE FOR HARM CAUSED BY THOSE PRODUCTS, BY DEFECTS

2    IN THOSE PRODUCTS, FOR EXAMPLE, THE AUTO INDUSTRY, FOR

3    CUSTOMIZATION IN THIS CASE OF THEIR PRODUCTS TO FACILITATE

4    TORTURE AND ASSAULT AND BATTERY.

5        AND THAT IS NOT BEFORE THIS COURT.  THERE HAS BEEN NO

6    EVIDENCE, MERELY INTIMATIONS, THAT SOMEHOW COMMERCE HAS BLESSED

7    THE HIGH LEVEL DESIGNS THAT ARE ALLEGED HERE.

8        AND YOUR HONOR, WE'RE NOT HERE TO PROVE THOSE, ALTHOUGH I

9    THINK JUST BY SEEING THE SLIDES, I WAS -- MY BLOOD WAS CHILLED.

10   BUT WE COULD PROVE THEM.

11       WHAT THE COMPLAINT HAS ALLEGED, THOUGH, SHOULD PASS MUSTER

12   THAT WE HAVE ALLEGED SPECIFIC AIDING AND ABETTING.  WHETHER

13   IT'S UNDER MS. SULLIVAN'S OWN TEST, WHICH HAS NOT BEEN ADOPTED,

14   WHICH IS THE SOLE PURPOSE OF THE U.S. CONDUCT, FOR EXAMPLE, THE

15   PASTOR WHOSE SOLE PURPOSE WAS TO ERADICATE LGBT PRACTICES IN

16   UGANDA, WE EVEN MEET THAT TEST.

17       BUT THAT'S THE WRONG TEST.  THE TOUCH AND CONCERN TEST IS

18   WE HAVE A U.S. COMPANY, CALIFORNIA HAS EVERY RIGHT TO REGULATE

19   THAT COMPANY, AND CALIFORNIA HAS EVERY RIGHT TO APPLY ITS TORT

20   LAW TO THE COMPANY.

21       AND I WILL GET TO THE STATE LAW CLAIMS.

22       INTERNATIONAL LAW APPLIES TO THAT COMPANY, AND THEY HAVE

23   TO ABIDE BY ALL OF THOSE INTERSTITIAL LAWS, EVEN IF THEY'RE

24   REGULATED, EVEN IF THEY PASS REGULATION.

25       AND I ASSUME THAT AUTOMOBILES PASS REGULATIONS, BUT THEY

1       ARE STILL HELD TO TORT VIOLATIONS CAUSED BY THOSE AUTOMOBILES,

2       WHICH IS JUST AN ANALOGY THAT -- AND NORTHROP SAYS THAT.

3              AND, QUITE FRANKLY, CORRIE SAYS THAT.  CORRIE VERSUS

4       CATERPILLAR IS A GREAT CASE BECAUSE IT'S SO DISTINGUISHABLE,

5       AND THEY RELY ON IT.  CISCO DOES RELY ON IT QUITE A BIT.

6              IN THAT CASE, THE UNITED STATES GOVERNMENT FUNDED THE

7       BULLDOZERS.  THEY FUNDED THE BULLDOZERS.  THEY MADE THE

8       DECISION, "WE'RE SENDING THESE TO IDF AND TO THE ISRAELI

9       GOVERNMENT.  THAT IS OUR DECISION."  AND THE ENTIRE CLAIMS WERE

10      BASED ON WHETHER THOSE BULLDOZERS SHOULD HAVE BEEN SOLD, THE

11      FUNDING PROGRAM.

12             THAT'S NOT OUR CASE.  OUR CASE IS NOT THAT THE U.S.

13      GOVERNMENT SIGNED OFF ON THESE DESIGNS.  WE HAVE NO EVIDENCE

14      THAT THE U.S. GOVERNMENT FUNDED OR SIGNED OFF ON THESE

15      ANTI-FALUN GONG DESIGNS.  WE HAVE NO EVIDENCE OF THAT.

16             IT'S BEEN INTIMATED THAT SOMEHOW THEY'VE PASSED MUSTER,

17      BUT THAT'S NOT BEFORE THIS COURT.  THERE'S NO EVIDENCE OF THAT.

18             AND THE EVIDENCE THAT YOU CAN TAKE JUDICIAL NOTICE OF ARE

19      THE COUNTLESS ONE VOICE OF THE EXECUTIVE AND CONGRESS SAYING

20      THAT TECHNOLOGY COMPANIES ARE TO NOT BE EXPORTING ANYTHING THAT

21      FACILITATES REPRESSION.

22             IN FACT, THE OPPOSITE.  SENATOR AND FORMER SECRETARY OF

23      STATE CLINTON HAS STATED THE TECHNOLOGY SHOULD BE USED TO AID

24      IN THE FREEDOM OF EXPRESSION AND RELIGIOUS FREEDOM.

25             THERE'S NO EVIDENCE AT ALL.

1          SO THE <u>BAKER</u> TEST HERE THAT IS IMPLICATED IS NOT THAT

2     SOMEHOW THESE CLAIMS ARE, HAVE BEEN TEXTUALLY COMMITTED, FOR

3     EXAMPLE, FOREIGN AFFAIRS HAVE BEEN TEXTUALLY COMMITTED TO THE

4     POLITICAL BRANCHES.  THAT'S NOT WHERE WE ARE.

5          BUT SOMEHOW THAT THESE CLAIMS ARE GOING TO STEP ON THE

6     TOES, THAT YOUR HONOR, IN ADJUDICATING THEM, IS GOING TO COME

7     OUT WITH A DIFFERENT PRONOUNCEMENT THAN WHAT HAS BEEN BLESSED

8     BY COMMERCE, THAT'S NOT BEFORE THIS COURT.  IT'S BEEN

9     INTIMATED, BUT NEVER STATED.

10         AND I WOULD -- I WOULD CHALLENGE RIGHT NOW THAT IF THESE

11    DESIGNS THAT WE HAVE IN OUR POSSESSION HAVE SOMEHOW PASSED

12    THROUGH COMMERCE AND BEEN BLESSED AS A PERMIT, THEN THEY NEED

13    TO SAY SO.

14         BUT THEY NEVER HAVE AND THEY NEVER WILL BECAUSE IT NEVER

15    HAPPENED AND THAT'S NOT BEFORE THE COURT IN ADJUDICATING THE

16    CLAIMS.

17         SO THE NEXUS IS HERE AND HAS BEEN, HAS BEEN WELL

18    ESTABLISHED BY -- YOU KNOW, AND MS. SULLIVAN MENTIONS THE

19    TECHNICAL DETAIL.

20         WELL, THAT'S CRITICAL HERE.  THE TECHNICAL DETAIL IN OUR

21    COMPLAINT AS OPPOSED TO <u>DAOBIN</u> IS CRITICAL BECAUSE THE

22    TECHNICAL DETAIL IS THE NEXUS.  WITHOUT THAT TECHNICAL DETAIL

23    THAT CAME OUT OF SAN JOSE, OR CAME OUT OF CISCO HERE IN THIS

24    TOWN, WITHOUT IT, THE FALUN GONG WOULD BE PRACTICING PEACEFULLY

25    ON THE INTERNET.  THAT'S WHAT'S BEEN ALLEGED.

```
1            AND THEY'RE NOT.  THEY'RE BEING ROUNDED UP AND THEY'RE

2      BEING TORTURED.

3            AND THE FACT THAT CISCO NETWORKED TORTURE CENTERS, WITH

4      KNOWLEDGE -- AND THAT'S ALLEGED -- WITH KNOWLEDGE OF WHERE THEY

5      WERE GOING, BECAUSE YOU CAN SEE THE TORTURE CENTERS ON THE

6      DESIGN, YOU CAN SEE THEM, THEY'RE ACTUALLY STATED --

7                  THE COURT:  LET ME ASK YOU, DO YOU FEEL THAT

8      YOU'RE -- YOU HAVE PLED SUFFICIENTLY FOR IQBAL/TWOMBLY

9      PURPOSES?  YOU HAVE THOSE SPECIFICS?

10           I THINK THAT THE GOOD JUDGE FROM MARYLAND TALKS ABOUT WHY

11     HIS CASE DID NOT SPEAK TO IT -- AND THIS AGAIN GOES TO AIDING

12     AND ABETTING I SUPPOSE -- BUT DO YOU THINK YOU HAVE, YOUR

13     PLEADING HAVE CITED WITH SPECIFICITY SUFFICIENTLY TO GET BY

14     IQBAL AND TWOMBLY AS TO THOSE ISSUES?

15                 MS. BOYD:  YES, YOUR HONOR, I DO, AND THAT'S WHY I

16     SAID THE TECHNICAL DETAIL IS SO CRITICAL.  THAT WAS NOT PRESENT

17     IN THE DAOBIN CASE, BUT IT IS HERE.

18           AND I'LL JUST GO TO MY NOTES ON NEXUS AND THE TECHNICAL

19     DETAIL, WHICH IS IMPORTANT FOR, FOR REACHING PLAUSIBILITY,

20     WHICH IS ONE OF THE FIRST THINGS THAT MS. SULLIVAN MENTIONED,

21     THE PLAUSIBILITY OF THIS HAPPENING IS -- HAS BEEN WELL PLED

22     HERE.

23           NOW, IF IT HAS BEEN INARTFULLY PLED, I WOULD RESPECTFULLY

24     REQUEST TO ATTACH A DESIGN AS AN EXHIBIT TO THE COMPLAINT,

25     WHICH PERHAPS MAYBE WE SHOULD HAVE DONE, SO THAT YOU CAN SEE
```

1    FOR YOURSELF, EVEN WITHOUT TECHNICAL EXPERTISE, WE CAN SEE THAT

2    THIS WAS -- THIS WAS WRITTEN UP BY CISCO, AND I'M LOOKING AT --

3    I REALLY FOCUS ON PARAGRAPHS 80 TO 86.  THIS WAS A FIRST OF A

4    KIND RECOMMENDED -- FIRST OF A KIND TECHNOLOGY THAT SAN JOSE

5    CISCO RECOMMENDED IN RESPONSE TO THE OBJECTIVES GIVEN TO THEM

6    BY THE CHINESE AUTHORITIES, SPECIFICALLY, TO BRING ABOUT HARMS

7    ALLEGED IN THIS ACT, INCLUDING INFORMATION CENTERS FEATURING

8    CONFIDENTIAL FALUN GONG DATABASES WITH SECURE CONNECTIONS TO

9    THE EXTRALEGAL OFFICE 610.

10        I'M GOING TO CITE PARAGRAPHS 80 TO 86, 97 TO 101 FOR THE

11   LAW CLERKS SITTING OVER IN THE JURY BOX TO GO BACK AND LOOK AT

12   THAT.

13        YES, YOUR HONOR, THAT MEETS THE STANDARD.

14        AND IF THAT'S NOT ENOUGH, WE'LL ATTACH AN EXHIBIT TO A

15   FOURTH AMENDED COMPLAINT WHICH COULD BE DONE.

16        BUT WE'RE NOT HERE FOR THAT BECAUSE THESE ARE PLEADING

17   STANDARDS.

18        AND YOUR HONOR, HAVING SORT OF EXHAUSTED WHAT I WANTED TO

19   SAY ON, ON THE POLITICAL QUESTION DOCTRINE, I DO WANT TO HAVE A

20   FEW MORE MINUTES TO TOUCH ON STATE LAW MATTERS AND THE ECPA

21   FEDERAL CLAIM BECAUSE I THINK THEY'RE IMPORTANT HERE AND

22   MS. SULLIVAN DID TOUCH ON THOSE.

23        BUT IF THERE'S ANY OTHER QUESTIONS ABOUT THE POLITICAL

24   QUESTION?

25        OUR POINT HERE IS THAT THE ARTICLE III JURISDICTION OF

```
1        THIS COURT IS NOT, EVEN BY CISCO, OVER THESE CLAIMS IS NOT

2     CHALLENGED.

3              THE COURT:  OKAY.

4              MS. BOYD:  AND TO THE QUESTION OF WHETHER THERE WILL

5      BE MULTIFARIOUS PRONOUNCEMENTS, THERE'S NO EVIDENCE IN THIS

6      RECORD OR IN THIS PLEADING THAT THERE WOULD BE.

7              AND WHETHER OR NOT THERE WOULD BE AN EMBARRASSMENT, I DO

8      THINK IT'S IMPORTANT TO NOTE THAT IN THESE VERY HIGHLY

9      POLITICIZED CASES, NOT POLITICAL QUESTIONS, BUT POLITICIZED

10     CASES, OUR GOVERNMENT HAS NEVER BEEN SHY ABOUT SENDING OVER A

11     STATEMENT OF INTEREST OR MAKING THEIR VIEWS KNOWN.

12             THAT HAS NOT BEEN DONE IN THIS CASE, AND I HAVE NO DOUBT

13     THAT THEY'RE WELL AWARE OF WHAT'S GOING ON AS MS. SULLIVAN HAS,

14     AND CISCO HAS, QUITE A FEW TIES TO WASHINGTON OF THEIR OWN.

15             SO THERE HAS BEEN NO STATEMENT OF INTEREST GIVING YOUR

16     HONOR ANY INDICATION THAT THIS WOULD BE SOME SORT OF

17     EMBARRASSMENT OR THAT THERE WOULD BE SOME RETICENCE ON THE PART

18     OF THE STATE DEPARTMENT OR COMMERCE OR CONGRESS FOR THE COURT

19     TO ADJUDICATE THE CLAIMS WHICH ARE WELL WITHIN ARTICLE III

20     JURISDICTION, AND DIVERSITY JURISDICTION YOUR HONOR, BECAUSE ON

21     THE FACE OF THE COMPLAINT, WE CAN CLAIM DIVERSITY JURISDICTION

22     WOULD EXIST, AS WELL AS FEDERAL QUESTION UNDER THE ATS, WHICH I

23     BELIEVE MS. MARSH HAS COVERED.

24             AND WHILE THERE MAY BE QUESTIONS OF THE STANDARD BEFORE

25     THE NINTH CIRCUIT IN THE NESTLE CASE, I WOULD SUBMIT THAT EVEN
```

1    UNDER THE MOST RIGOROUS STANDARD THAT KIOBEL HAS LEFT OPEN --

2    AND THE DOOR IS OPEN, AND MS. SULLIVAN WOULD SAY IT'S NOT, BUT

3    WOULDN'T SAY IT'S BEEN CLOSED COMPLETELY BECAUSE SHE HADN'T

4    STATED THAT IN PUBLIC AND SHE HADN'T STATED THAT HERE -- AND IN

5    FACT, CISCO HAS NOT EVEN STATED THAT SMUG WAS WRONGLY DECIDED.

6         BUT WITHIN WHAT IS LEFT OVER, WE EVEN MEET THE STRICTEST

7    STANDARDS IN THIS CASE.

8         SO THIS IS THE CASE TO WALK THROUGH THAT DOOR THAT'S BEEN

9    LEFT AJAR.  THIS IS THE CASE.  CISCO IS HERE, NOT ABROAD.  THE

10   DESIGNS WERE HERE, NOT ABROAD.

11        THE FACT THAT IT WAS AN AIDER AND ABETTOR OF LIABILITY,

12   WAS, ONE, DONE WITH NOT ONLY KNOWLEDGE OF WHAT WAS GOING ON,

13   BUT SPECIFIC INTENT, AND I WOULD PROVE THAT BY SHOWING YOU THE

14   SLIDES.  WHEN YOU USE THE WORDS "FALUN GONG" AND "DOUZHENG" IN

15   THOSE SLIDES, THAT'S SPECIFIC INTENT.

16        THEY KNEW EXACTLY WHAT THEY WERE DOING, AND THEY INTENDED

17   IT, BECAUSE IF THEY HADN'T INTENDED IT, CCP WOULD HAVE NO

18   BUSINESS WITH CISCO.  THEY WOULD HAVE GONE ELSEWHERE.  THAT'S

19   WHAT THEIR PURPOSE WAS AND CISCO KNEW THAT.

20        SO THAT BEING SAID, JUST TO, TO GO OVER THE STATE LAW

21   CLAIMS, ASSAULT AND BATTERY, FALSE IMPRISONMENT, YOUR HONOR, I

22   WOULD WANT TO FOCUS ON THOSE.

23        THESE ARE NOT THE SAME STANDARD.  EVEN IF THIS COURT WERE

24   TO FIND THAT THE KIOBEL STANDARD HAS NOT BEEN MET, THAT IS NOT

25   THE STANDARD FOR CALIFORNIA, AND WE'RE IN CALIFORNIA HERE ON

```
 1          STATE LAW CLAIMS.

 2               THE STANDARD FOR EXTRATERRITORIALITY IS FAR LOOSER IN

 3          CALIFORNIA AND REALLY LOOKS TO THE CONTACTS WITH CALIFORNIA,

 4          AND THOSE CONTACTS HAVE BEEN WELL ESTABLISHED IN THIS

 5          COMPLAINT.

 6               AND SO THE KNOWLEDGE STANDARD, WHILE IT MAY BE IN QUESTION

 7          THAT THE NINTH CIRCUIT AND FEDERAL, UNDER ATS IS NOT UNDER

 8          STATE LAW, IS NOT CHALLENGED, THAT THEY KNEW WHAT THEY WERE

 9          DOING AND THAT THEY AIDED, THAT THEY GAVE SUBSTANTIAL

10          ASSISTANCE FROM CALIFORNIA.

11               AGAIN, THIS IS NOT A CASE WHERE HUMAN RIGHTS ACTIVISTS ARE

12          FRUSTRATED WITH WHAT GOES ON IN CHINA.  UNDOUBTEDLY WE ARE.  I

13          THINK THE COUNTRY AND EVEN THE PRESIDENT HIMSELF IS FRUSTRATED.

14               THIS IS A CASE ABOUT BEING FRUSTRATED WITH THE ACTIONS OF

15          CISCO HERE IN CALIFORNIA.  THIS IS A CASE ABOUT WHAT THEY HAVE

16          DONE THROUGH THEIR HIGH-TECH, CUTTING EDGE TECHNOLOGY TO

17          ERADICATE AND TO PARTICIPATE IN THE ERADICATION OF FALUN GONG

18          IN CHINA.

19               THIS IS -- IF THERE WAS EVER A HOME GROWN CASE, AS

20          MS. SULLIVAN STATED, IT'S THIS ONE.  WE ARE LITERALLY IN

21          CISCO'S BACKYARD.

22               IF THAT TAKES THE VALLEY DOWN, QUOTE UNQUOTE, IN THE

23          PARADE OF HORRIBLES THAT MS. SULLIVAN MENTIONED, THEN WE WOULD

24          BE VERY SHOCKED TO KNOW THAT ALL THE TECHNOLOGY COMPANIES HAVE

25          PARTICIPATED IN THESE KINDS OF DESIGNS, HAVE EXPORTED OR
```

1    UPLOADED OR PITCHED, AS YOU WOULD HAVE IT, THESE KIND OF

2    TORTURE FACILITATING DESIGNS WITH THE UNDERSTANDING THAT THEY

3    HAD ONE PURPOSE ONLY, NO GENERIC PURPOSE, NO COTTITIAN, DAILY,

4    INTERNET SURVEILLANCE PURPOSE FOR LAW ENFORCEMENT, BUT FOR ONE

5    PURPOSE, AS THEY SAY IN THEIR OWN SLIDES, TO ERADICATE THE

6    FALUN GONG, IN PARTICULAR WHO PRACTICE THEIR PEACEFUL RELIGION

7    ON THE INTERNET WHERE CISCO SYSTEMS LIVES IN THE WORLD OF

8    TECHNOLOGY.

9           AS FAR AS THE ECPA CLAIM, WE DO -- WE DO BELIEVE THERE'S

10   A -- THERE IS A FEDERAL CLAIM HERE THAT ARISES UNDER THE ECPA.

11          THE NINTH CIRCUIT HASN'T RULED ON THE PRIVATE RIGHT OF

12   ACTION.

13          BUT YOUR HONOR, I WOULD -- I WOULD GO BACK TO THE STATUTE

14   ITSELF, AND IN THE CENTRAL DISTRICT OF CALIFORNIA WHERE I HAIL

15   FROM, THAT COURT HAS FOUND, JUDGE PREGERSON ACTUALLY, HAS FOUND

16   THAT THE 2520 RECOVERY OF CIVIL DAMAGES SECTION OF THE ECPA

17   STATES ANY PERSON, INTO THE -- IN VIOLATION OF THIS CHAPTER --

18   AND THE CHAPTER THEN IS SET FORTH AT 18 U.S.C. 2510, AND WE

19   HAVE ALLEGED THAT THIS CHAPTER HAS BEEN, HAS BEEN VIOLATED BY

20   THE SELLING -- AND CISCO TRIES TO SAY IN THEIR REPLY WE DIDN'T

21   ALLEGE THAT IT WAS SOLD.  WELL, CISCO OPERATES FOR PROFIT AND

22   WE MENTIONED THE WORD SELLING I DON'T KNOW HOW MANY TIMES, BUT

23   THESE PRODUCTS ARE SOLD, AND SO THEY FIT WELL WITHIN THE 2512

24   SECTION OF THE ECPA.

25          IF THERE'S A VIOLATION OF THIS CHAPTER IN SELLING THAT

```
 1        TECHNOLOGY FOR KNOWING -- KNOWING, AND THAT'S THE STANDARD -- A

 2        REASON TO KNOW THAT THE DESIGN OF THE DEVICE RENDERED IT

 3        PRIMARILY USEFUL FOR THE PURPOSE OF SURREPTITIOUS INTERCEPTION

 4        OF WIRE, THEN THERE IS A CIVIL DAMAGES PRIVATE RIGHT OF ACTION.

 5             THE SUGGESTION IN THE THIRD PRONG OF THE ECPA TEST THAT

 6        THIS WAS SOMEHOW ORDINARY COURSE OF BUSINESS ACTIVITY, THESE

 7        DESIGNS, I WOULD INVITE YOUR HONOR TO TAKE A LOOK AT THOSE

 8        SLIDES.

 9             THERE IS NO -- THERE IS NO PEDESTRIAN PURPOSE AS EVIDENCED

10        BY WHAT CISCO CAME UP WITH IN THEIR EXPERTISE, THE BEST IN THE

11        WORLD, TO GET THAT CONTRACT AND MAKE MONEY.

12                  THE COURT:  THANK YOU, MS. BOYD.

13                  MS. BOYD:  THANK YOU.

14                  THE COURT:  YOU'RE WELCOME.

15        MS. SULLIVAN.

16                  MS. SULLIVAN:  MAY I BE HEARD, YOUR HONOR?

17                  THE COURT:  YES.

18                  MS. SULLIVAN:  IS THE COURT REPORTER DOING OKAY?  NO

19        NEED FOR A BREAK?

20                  THE REPORTER:  I'M GOOD.  THANK YOU.

21                  MS. SULLIVAN:  KATHLEEN SULLIVAN FOR THE CISCO

22        DEFENDANTS, YOUR HONOR.

23             I'D LIKE TO BEGIN BY REMINDING US, AS YOUR HONOR SAID AT

24        THE OUTSET, WE'RE HERE ON A MOTION TO DISMISS A COMPLAINT.

25             I'VE JUST HEARD NEARLY AN HOUR OF TESTIMONY FROM MY
```

1    LEARNED COLLEAGUES, MS. MARSH AND MS. BOYD, AS TO WHAT THEY'D

2    SEEN AND CERTAIN EXPERTS AND CERTAIN POWERPOINTS.

3         I'VE CHECKED THE COMPLAINT.  THERE'S ONLY THREE ALLUSIONS

4    TO A POWERPOINT, NONE OF WHICH -- NONE OF THOSE ALLEGATIONS

5    CONCERNING ANY POWERPOINT CONTAINED ANY OF THE THINGS YOU'VE

6    JUST HEARD TESTIMONY ABOUT AND THAT'S COMPLETELY IMPROPER IN

7    CONNECTION WITH A MOTION TO DISMISS.

8         SO I'M TRYING TO FOCUS MY REMARKS ON THE FEW ASPECTS OF

9    THE PRESENTATION YOU JUST HEARD THAT AREN'T AN ATTEMPT TO

10   INTRODUCE IMPROPER TESTIMONY ABOUT EVIDENCE THAT'S OBVIOUSLY

11   NOT BEFORE THE COURT ON A MOTION TO DISMISS.

12        SO LET ME BEGIN BY STARTING WITH THE MOST IMPORTANT POINT,

13   WHICH IS DO THE PLEADINGS, WHICH ARE OUR FOCUS, SAY ANYTHING,

14   MUCH LESS ANYTHING PLAUSIBLE, ABOUT WHAT MS. MARSH AND MS. BOYD

15   TALKED ABOUT TODAY, CISCO'S SUPPOSED INTENT TO ERADICATE

16   FALUN GONG.

17        AND THEY DO NOT, YOUR HONOR.  YOU HEARD THAT WORD

18   "ERADICATE" SIX OR SEVEN TIMES FROM THEM, AND THROUGH THE

19   MIRACLE OF TECHNOLOGY, NO DOUBT USING CISCO ROUTERS AND

20   SWITCHES, WE CHECKED THE COMPLAINT, AND THE WORD "ERADICATE"

21   APPEARS EXACTLY ONCE IN THE COMPLAINT, AND IT'S ATTRIBUTED TO A

22   CHINESE COMMUNIST PARTY OFFICIAL.

23        THERE'S NOT A WORD IN THE COMPLAINT ABOUT CISCO OR ITS

24   EXECUTIVES HAVING KNOWLEDGE, MUCH LESS INTENT, ABOUT THE

25   ERADICATION OF ANYONE.

```
 1              AND THE REASON FOR THAT IS IT WOULD BE ABSURD.  NO ONE

 2     DOING BUSINESS AT CISCO COULD HAVE AN INTENT TO AID AND ABET

 3     THE ERADICATION OF ANYONE.  IT'S OFFENSIVE, BUT IT'S NOT

 4     ALLEGED.

 5              WHAT IS ALLEGED IN THE COMPLAINT, YOUR HONOR, IS THAT

 6     THERE WAS A CUSTOMIZATION OF INFORMATION TECHNOLOGY.  TO BE

 7     SPECIFIC, WHAT CISCO SELLS IS NOT -- IT'S EQUIPMENT, IT'S

 8     ROUTERS, IT'S SWITCHES, IT'S HARDWARE.  IT'S PHYSICAL ASPECTS

 9     THAT MAKE THE INTERNET POSSIBLE.

10              NOW, I WANT TO BE VERY CLEAR, YOUR HONOR.  CISCO ADAMANTLY

11     DENIES THAT WE CUSTOMIZED -- TO BE CLEAR, WE AGREE WITH THE

12     JUDGE IN THE DAOBIN COMPLAINT THAT WHAT WE SELL ARE GENERIC

13     PRODUCTS THAT ARE NOT CUSTOMIZED.

14              BUT I'M SAYING EVEN IF YOU TAKE THEIR CUSTOMIZATION

15     ALLEGATIONS AS TRUE, THEY ARE ALLEGATIONS ABOUT CUSTOMIZING

16     INFORMATION VEHICLES, THE VEHICLES FOR THE EXCHANGE OF

17     INFORMATION, NOT ALLEGATIONS ABOUT CUSTOMIZING ANYTHING FOR

18     TORTURE, MUCH LESS ERADICATION.

19              NOW, JUST TO TAKE A SIMPLE EXAMPLE, YOUR HONOR, EVEN IF

20     ONE SUPPOSED THAT YOU CUSTOMIZED AMERICAN LAW ENFORCEMENT

21     TECHNOLOGY TO APPREHEND MEMBERS OF ORGANIZED CRIME, IT WOULDN'T

22     MEAN THAT BY SO CUSTOMIZING THE APPREHENSION TECHNOLOGY, YOU

23     WERE SEEKING TO HAVE PEOPLE KILLED IN PRISON.  IT DOESN'T

24     FOLLOW.

25              THERE'S A DISCONNECT BETWEEN THE ALLEGATIONS HERE THAT ARE
```

1   ABOUT TORTURE, FORCED LABOR, AND DETENTION IN CHINESE PRISONS

2   THAT IS ALLEGED TO BE DONE BY CHINESE ACTORS AND ANYTHING TO DO

3   WITH THE ALLEGED CUSTOMIZATION HERE.

4       SO I WANT TO BE CLEAR.  WE DENY THAT ANYTHING'S

5   CUSTOMIZED.  IT'S ALL GENERIC.  CISCO SELLS THE SAME PRODUCT

6   AROUND THE GLOBE TO A GLOBAL STANDARD.

7       WE WOULD PROVE THAT IF WE HAD TO, BUT WE SHOULDN'T HAVE TO

8   BECAUSE THIS COMPLAINT MUST BE DISMISSED.  THERE ARE NO

9   ALLEGATIONS HERE WITH A CAUSAL NEXUS TO THE CONDUCT.

10      SECOND, YOUR HONOR, FOLLOWING ON THAT POINT, IF I MAY,

11  YOUR HONOR ASKED, WHAT'S THE KIOBEL TEST?  AND WE HAD AN

12  ARGUMENT ABOUT WHETHER THE DOOR IS AJAR OR CLOSED.

13      TO BE CLEAR, YOUR HONOR, I DO THINK THE PROPER READING OF

14  KIOBEL IS THE DOOR IS CLOSED TO SUITS ALLEGING INTERNATIONAL

15  HUMAN RIGHTS VIOLATIONS ABROAD.

16      AND I THINK THE REASON IS I THINK THAT THE LOCUS OF THE

17  CONDUCT TEST IS CLEAR FROM THE OPINION OF THE COURT IN KIOBEL.

18      IT'S NOT JUST THE JUSTICE ALITO CONCURRENCE THAT TALKS

19  ABOUT THE IMPORTANCE OF THE LOCUS OF THE CONDUCT.  IT'S THE

20  DECISION ITSELF.

21      AND I WOULD RESPECTFULLY REFER YOUR HONOR TO THE SECOND

22  CIRCUIT DECISION IN BALINTULO WHERE JUDGE CABRANES WROTE FOR

23  THE COURT THAT HIS READING OF KIOBEL FINDS THAT THE MAJORITY

24  FRAMED THE QUESTION IN TERMS OF THE LOCUS OF THE CONDUCT,

25  WITHIN THE FOREIGN SOVEREIGN, NO FEWER THAN THREE TIMES IN THE

1      QUESTIONS AND, AS HE SAYS, THE COURT REPEATED THE SAME

2   LANGUAGE, FOCUSSING SOLELY ON THE LOCATION OF THE RELEVANT

3   CONDUCT OR VIOLATION AT LEAST EIGHT MORE TIMES IN OTHER PARTS

4   OF ITS OPINION.

5      SO IT'S THE MAJORITY ITSELF, NOT JUSTICE ALITO'S

6   CONCURRENCE, THAT SAYS LET'S LOOK TO WHERE THE INTERNATIONAL

7   LAW VIOLATION TOOK PLACE, AND HERE THAT WAS CHINA, CHINA,

8   CHINA.

9      SO, YOUR HONOR, YOU HAVE BALINTULO.

10      BUT YOU ASKED, WELL, WHAT COULD TOUCH AND CONCERN THE

11   UNITED STATES.

12      AND MS. MARSH, TO MY AMAZEMENT, RAISED THE BULOVA CASE,

13   WHICH IS LONG PRE-MORRISON.  MORRISON, OF COURSE, IS A CASE

14   THAT SAYS IF THE STOCK IS TRADED ON THE AUSTRALIAN EXCHANGE AND

15   WE'RE TALKING ABOUT SECURITIES FRAUD, WHERE THE INTERESTS OF

16   THE STATUTE IS SECURITIES FRAUD, CONGRESS'S INTEREST IS IN THE

17   SECURITIES FRAUD.

18      IT DOESN'T MATTER THAT ALL KINDS OF FRAUDULENT CONDUCT

19   HAPPENED IN FLORIDA.  THE CONDUCT THAT THE STATUTE IS CONCERNED

20   WITH HAPPENED ABROAD.

21      NOW, HERE, EVEN IF YOU FILL IN THE ATS WITH LOTS OF

22   FEDERAL COMMON LAW AND INTERNATIONAL LAW -- BY THE WAY, WE

23   DON'T THINK YOU CAN HERE BECAUSE -- WHICH I'LL JUST GET TO IN A

24   MINUTE WHY YOU CAN'T FILL THIS IN WITH INTERNATIONAL LAW -- BUT

25   JUST THE CONDUCT THAT THE ATS HAS FOCUSSED ON IS THE

```
1          INTERNATIONAL LAW VIOLATION.  THAT'S IN CHINA.

2              AFTER MORRISON, THE CONDUCT IN CHINA DOESN'T TOUCH AND

3      CONCERN WHAT'S IN THE UNITED STATES, AND WHAT IS ALLEGED IN THE

4      UNITED STATES HAS NOTHING TO DO WITH TORTURE.

5              YOU CAN LAWFULLY CREATE A SYSTEM THAT ENABLES THE POLICE,

6      JUST LIKE YOU CAN IMAGINE AMERICAN POLICE, LAWFULLY USING

7      INTERNET TECHNOLOGY TO EXCHANGE INFORMATION ABOUT CRIMINAL

8      RECORDS AND ABOUT WHAT THE PRISONER IN YOUR CUSTODY MIGHT HAVE

9      DONE.

10             THAT'S ALL COMPLETELY CONSISTENT WITH LAWFUL CONDUCT, AND

11     THAT'S WHAT'S ALLEGED IN THE CALIFORNIA ACTIVITY.

12             SO I'VE TRIED TO COVER MENS REA.  I'VE TRIED TO COVER

13     TOUCH AND CONCERN.

14             YOUR HONOR, IF I COULD TURN NEXT TO POLITICAL QUESTION?

15             NOW, POLITICAL QUESTION, MY COLLEAGUES SPENT A LOT OF TIME

16     SAYING THE UNITED STATES GOVERNMENT DID NOT SPECIFICALLY REVIEW

17     AND APPROVE THESE DESIGNS.

18             NOW, FIRST OF ALL, WE DON'T SELL DESIGNS.  WE SELL

19     PRODUCTS, ROUTERS AND SWITCHES.  WE DON'T SELL THE DESIGNS.

20             BUT THAT'S NOT THE TEST FOR A POLITICAL QUESTION.

21     NORTHROP DOESN'T HOLD THAT.  THERE'S NO POLITICAL QUESTION

22     DOCTRINE IN THE NINTH CIRCUIT FOR REGULATED INDUSTRY.  THERE'S

23     NO REASON TO THINK POLITICAL QUESTION ISN'T THE SAME IN THE

24     NINTH CIRCUIT AS IT IS IN THE FOURTH.

25             AND THE TEST IS NOT WHETHER THE GOVERNMENT DIRECTED THE
```

1    CONDUCT, BUT WHETHER THERE WOULD BE A CONFLICT BETWEEN A

2    JUDICIAL RULING AND A POLICY OF THE UNITED STATES.

3            AND THE CURRENT POLICY OF THE UNITED STATES, WITH RESPECT

4    TO EXPORTS TO CHINA, AS REFLECTED IN THE TIANANMEN SQUARE ACT,

5    THE MOST FAVORED NATIONS STATUTE THAT FOLLOWED, WE NOW HAVE A

6    SERIES OF ADMINISTRATIONS BLESSING TRADE WITH CHINA,

7    NOTWITHSTANDING KNOWLEDGE AND CONCERN ABOUT HUMAN RIGHTS

8    ABUSES.

9            THE U.S. POLICY UNDER THOSE TWO ACTS, PLUS THE COMMERCE

10   CLAUSE REGULATIONS, IS TO ALLOW ALL SHIPMENTS TO CHINA THAT

11   AREN'T PROSCRIBED.

12           AND YOUR HONOR, HERE I'D RESPECTFULLY REFER YOU TO THE

13   DAOBIN DECISION, D-A-O-B-I-N, IN WHICH JUDGE MESSITTE REVIEWS

14   THOSE STATUTES.  HE DOES SO AT THE SECTION OF HIS OPINION

15   CONCERNING POLITICAL QUESTION, AND IT'S CLEAR THAT THE

16   UNITED STATES' POLITICAL BRANCHES HAVE BLESSED ALL TRADE WITH

17   CHINA THAT'S NOT FORBIDDEN.  IT'S CARVED THINGS OUT OF THE

18   DEFAULT IN WHICH TRADE IS ALLOWED.

19           SO I DON'T THINK THE U.S. BLESSING THE CONDUCT IS THE

20   REQUIRED TEST.

21           CONFLICT WITH FOREIGN POLICY WOULD EXIST EVEN IF THAT --

22   IF THERE WERE NO BLESSING.

23           BUT THERE IS A BLESSING HERE BECAUSE THE DEFAULT IS TRADE

24   IS ALLOWED UNTIL IT'S FORBIDDEN.

25           THAT'S ON POLITICAL QUESTION, YOUR HONOR.

1        AND FINALLY LET ME JUST SAY A FEW WORDS ABOUT THE NORMS AT

2    STAKE, ALL RIGHT?  IF WE GO BACK TO WHERE MS. MARSH SAID, WELL,

3    WE'VE PLEADED ALL OUR SOSA NORMS, IN OTHER WORDS, THE ATS

4    VIOLATIONS HERE SUPPOSEDLY ARE UNDER INTERNATIONAL LAW

5    RESPECTING THREE MAIN CATEGORIES, RIGHT, CRUEL, INHUMAN AND

6    DEGRADING TREATMENT, FORCED LABOR, AND CRIMES AGAINST HUMANITY.

7        NOW, CRUEL AND INHUMAN AND DEGRADING TREATMENT CLAIMS ARE

8    NOT ACTIONABLE UNDER THE ATS.  THEY'RE NOT SPECIFIC ENOUGH.

9    THE ONLY APPELLATE COURT TO EVER RULE ON THIS IS ALDANA, AND

10   THAT'S AN ELEVENTH CIRCUIT DECISION IN 2005 CITED IN OUR

11   BRIEFS.

12       CRUEL, INHUMAN AND DEGRADING TREATMENT SIMPLY IS NOT

13   ACTIONABLE UNDER SOSA IF YOU GET THAT FAR.

14       SECOND, FORCED LABOR.  WELL, THE 13TH AMENDMENT PERMITS

15   FORCED LABOR WHILE YOU'RE IN PRISON.  SO DOES INTERNATIONAL

16   LAW.

17       AND SOSA SAID THAT YOU'RE NOT GOING TO TURN EVERY

18   DETENTION BY EVERY COUNTRY THAT YOU SAY WAS AGAINST DUE PROCESS

19   INTO AN INTERNATIONAL LAW VIOLATION.  SO THAT'S OUT, TOO.

20       CRIMES AGAINST HUMANITY IS THE ONE THAT MIGHT BE LEFT,

21   EXCEPT THEY HAVEN'T ALLEGED THAT EITHER, BECAUSE CRIMES AGAINST

22   HUMANITY IS A CHARGE THAT REQUIRES A SYSTEMATIC, WORLD

23   WIDESPREAD ATTACK ON AN ENTIRE CIVILIAN POPULATION.

24       THAT'S NOT ALLEGED HERE.

25       YOUR HONOR, I WANT TO GET FINALLY TO SOMETHING VERY

1    IMPORTANT THAT YOU HEARD MS. MARSH SAY, SORT OF ECHOED BY

2    MS. BOYD, BUT MS. MARSH SPENT QUITE A BIT OF TIME TELLING YOU

3    THIS CASE ISN'T ABOUT THE CHINESE GOVERNMENT.  PAY NO ATTENTION

4    TO THE ACT OF STATE DOCTRINE, SHE SAYS, BECAUSE THAT APPLIES TO

5    THE GOVERNMENT AND WE'RE JUST ALLEGING THAT THE PARTY, THE

6    COMMUNIST, CHINESE COMMUNIST PARTY, A PRIVATE ACTOR, DID ALL

7    THESE BAD THINGS.

8         WELL, I SUBMIT THAT'S NOT TRUE.  THE CASE IS ABOUT THE

9    CONDUCT OF THE CHINESE GOVERNMENT AS A SOVEREIGN IN OUTLAWING

10   FALUN GONG, NOT FOR THE PURPOSE OF ERADICATION OR TORTURE, BUT

11   FOR THE PURPOSE OF JUST LAWFUL PENAL MEANS.

12        SO WE SHOULD WIN ON ACT OF STATE.

13        BUT IF YOU BELIEVE MS. MARSH AND YOU SAY, OH, IT'S NOT THE

14   CHINESE GOVERNMENT, IT'S JUST THE PARTY, THEN YOU STILL HAVE TO

15   DISMISS BECAUSE ALL THEIR ATS CLAIMS GO AWAY AND THEIR TVPA

16   CLAIMS GO AWAY.

17        AND WHY IS THAT, YOUR HONOR?  THEY ALL REQUIRE STATE

18   ACTION.  TVPA EXPRESSLY -- TORTURE VICTIM PROTECTION ACT

19   EXPRESSLY REQUIRES THAT THE ACTIVITY ALLEGED BE UNDER COLOR OF

20   STATE LAW.

21        AND AS YOUR HONOR WELL KNOWS, THE ATS CLAIMS HAVE ALL BEEN

22   INTERPRETED KIND OF THE SAME WAY AS 1983 CLAIMS.  THERE HAS TO

23   BE ACTION UNDER COLOR OF STATE LAW.  THERE HAS TO BE STATE

24   ACTION.

25        SO YOU CAN PICK EITHER OUR ANSWER, WHICH IS YOU'RE BARRED

1     FROM JUDGING THE OFFICIAL CONDUCT OF THE PEOPLE'S REPUBLIC OF

2     CHINA OUT OF THE ACT OF STATE DOCTRINE, OR IF YOU SAY, WELL,

3     I'M NOT BARRED BY ACT OF STATE BECAUSE IT WAS THE PARTY, YOU'RE

4     STILL REQUIRED TO DISMISS BECAUSE THEN THE STATE ACTION GOES

5     AWAY AND THERE'S NO MORE ATS CLAIM THAT'S LEFT HERE, WITH THE

6     EXCEPTION OF CRIMES AGAINST HUMANITY, THAT DOESN'T REQUIRE

7     STATE ACTION, BUT THEY HAVEN'T PLED IT.

8          THIS IS NOT -- THE VERY SUGGESTION THAT THIS IS A CASE

9     ABOUT A WIDESPREAD ATTACK ON A CIVILIAN POPULATION THROUGH

10    SWITCHES AND ROUTERS IS OFFENSIVE AND ABSURD.

11         SO, YOUR HONOR, I THINK THAT, JUST TO GO BACK TO THE

12    BEGINNING, I THINK YOU WERE CORRECT IN YOUR QUESTIONS TO FOCUS

13    US ON THE CORE OF THE CASE, WHICH IS, HAS THIS COMPLAINT

14    ADEQUATELY PLEADED -- AND WE'RE IN THE WORLD OF THE COMPLAINT,

15    NOT THE WORLD OF ALL THESE -- THERE WAS SO MUCH TANTALIZING

16    HINTS OF POSSIBLE EVIDENCE FLOATING AROUND MY COLLEAGUES'

17    PRESENTATION THAT IT WAS, IT WAS AS IF WE WERE IN A PREVIEW TO

18    SOMETHING THAT -- MY QUESTION IS, WHY WASN'T IT IN THE

19    COMPLAINT?

20         ALMOST NOTHING YOU HEARD ABOUT THE SUPPOSED EVIDENCE IS

21    ALLEGED IN THE COMPLAINT, AND WHERE YOU FIND IT -- AND YOU'RE

22    NOT GOING TO FIND ANY ALLEGATIONS ABOUT CISCO BEING LINKED TO

23    ERADICATION OR TORTURE.  YOU'LL FIND CISCO LINKED TO

24    CUSTOMIZATION OF TECHNOLOGY FOR INFORMATION EXCHANGE.

25         IN THEIR COMPLAINT, IF YOU FOCUS ON THE COMPLAINT,

```
1     ANYTHING THAT'S SAID ABOUT CALIFORNIA IS EITHER, A, GENERIC,

2     IT'S ABOUT SUPERVISION, MANAGEMENT, RATIFICATION, CONTROL,

3     BRAIN, NERVE CENTER; OR IT'S CONCLUSORY.

4          IF YOU FIND ANYTHING IN PARAGRAPHS -- MS. BOYD'S REFERRED

5     YOU AND THE LAW CLERKS TO PARAGRAPHS 80 TO 86 AND 97 TO 101.

6          I'VE BEEN THROUGH THEM WITH A FINE TOOTH COMB AND THERE'S

7     NO FACTS THERE WHATSOEVER TO SATISFY IQBAL/TWOMBLY TO GET YOU

8     TO MENS REA OF KNOWLEDGE, MUCH LESS PURPOSE TO CONNECT YOU OVER

9     TO THE TORTURE.

10          SO THE KEY TO THE CASE, YOUR HONOR, THE KEY TO THE CASE IS

11    THE BIG DISCONNECT THAT RUNS DOWN THE MIDDLE OF EVERY SINGLE

12    CLAIM HERE, BETWEEN THE SUPPOSED CONDUCT OF CISCO WITH RESPECT

13    TO CREATING THE VERY TECHNOLOGY I SUBMIT THAT ENABLES

14    FALUN GONG TO OPERATE -- WE'VE BEEN TOLD THEY'RE AN INTERNET

15    RELIGION, COULDN'T EXIST WITHOUT CISCO'S PRODUCTS, CISCO'S

16    PRODUCTS ARE HELPING PEOPLE ALL THROUGHOUT CHINA ENGAGE IN ALL

17    KINDS OF USES OVER THE INTERNET -- AND ENABLING THE POLICE TO

18    DO THEIR LAWFUL FUNCTION, JUST LIKE WE MIGHT ENABLE THE POLICE

19    TO DO THEIR LAWFUL FUNCTIONS THROUGH TECHNOLOGY HERE.

20          THERE IS NOTHING IN THIS COMPLAINT THAT GETS YOU ACROSS

21    THE LEAP TO MENS REA OR ACT OR CAUSATION WITH RESPECT TO THE

22    ACTIVITIES IN CHINESE PRISONS THAT YOU WOULD NEED TO TO SUSTAIN

23    THE COMPLAINT.

24          SO, YOUR HONOR, YOU'VE BEEN VERY PATIENT WITH US, YOU'VE

25    LISTENED TO A LOT OF WORDS TODAY, BUT IF I COULD JUST CLOSE BY
```

1    SAYING THIS INCENDIARY AND INFLAMMATORY RHETORIC IS VERY

2    DIFFICULT TO LISTEN TO FOR SOMEONE REPRESENTING A COMPANY THAT

3    IS ALL ABOUT THE GOOD THAT INFORMATION CAN DO.

4         BUT IF YOU READ THE COMPLAINT ITSELF, THERE'S NO "THERE"

5    THERE.  IT'S ALL ABOUT CHINA.

6         TO THE EXTENT IT'S ABOUT CALIFORNIA, THERE'S INSUFFICIENT

7    ALLEGATIONS UNDER IQBAL AND TWOMBLY TO GET YOU ANYWHERE CLOSE

8    TO THE STANDARD, EVEN IF THE CIRCUIT APPROVES THE ADOBE/NESTLE

9    PANEL OPINION.

10        WE RESPECTFULLY SUBMIT YOU DISMISS EITHER FOR FAILURE TO

11   STATE A CLAIM OR, YOUR HONOR, ON POLITICAL QUESTION AND ACT OF

12   STATE GROUNDS.

13        IF YOU DISAGREE WITH US ON ACT OF STATE, DISMISS BECAUSE

14   THERE'S NO STATE ACTION.

15        I'M SORRY, YOUR HONOR, I'VE BEEN TALKING A GREAT DEAL AT

16   YOU.  WERE THERE ANY FURTHER QUESTIONS FOR CISCO?

17             THE COURT:  I HAVE NONE.  THANK YOU VERY MUCH.

18             MS. SULLIVAN:  THANK YOU, YOUR HONOR.

19             THE COURT:  LET ME THANK BOTH SIDES FOR YOUR HELP.

20   THIS WAS VERY HELPFUL AND I APPRECIATE YOUR PLEADINGS.  THEY'RE

21   VERY THOROUGH AND COMPLETE AND, AGAIN, THEY WERE HELPFUL.

22        THE MATTER IS UNDER SUBMISSION.  THANK YOU VERY MUCH.

23             MS. MARSH:  THANK YOU, YOUR HONOR.

24             MS. SULLIVAN:  THANK YOU, YOUR HONOR.

25        (THE PROCEEDINGS WERE CONCLUDED AT 11:04 A.M.)

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____

17    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595

18         DATED:  APRIL 2, 2014

19

20

21

22

23

24

25