United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DOE I, DOE II, IVY HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, CHARLES LEE, ROE VIII, LIU GUIFU, and those individuals similarly situated,

Plaintiffs,

v.

CISCO SYSTEMS, INC., et al.

Defendants.

Case No. 5:11-CV-02449-EJD

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

**[Re: Docket Item No. 117]**

Presently before the Court is Defendant Cisco Systems, Inc. ("Cisco"), John Chambers ("Chambers"), and Fredy Cheung's ("Cheung") (collectively, "Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint. See Docket Item No. 117.

**I. BACKGROUND**

Plaintiffs are U.S. and Chinese citizens and practitioners of Falun Gong, a religious practice. See Second Amended Complaint ("SAC"), Docket Item No. 113 ¶ 1. Doe I, II, III, IV, V, VI, Roe VII, Roe VIII, and Doe IX are residents of China; Ivy He is a resident of Canada; Charles Lee is a U.S. citizen; and Liu Guifu and Wang Weiyu reside in the U.S. Id. ¶¶ 8-21. All of the Plaintiffs were persecuted in China for their adherence to Falun Gong. Id. ¶ 226. The abuses they allege include false imprisonment, torture, assault, and battery. Id. ¶ 6.

Defendant Cisco is multinational corporation incorporated in California with its principal place of business in San Jose, California. Id. ¶ 22. The company manufactures routers, switches, and related hardware that comprise the basic architecture of internet networking.[1] Defendant John Chambers ("Chambers") is a resident of California, who is and at all relevant times has been the Chief Executive Officer of Cisco. Chambers directs and supervises Cisco's operations in China, and has played an essential role in establishing Cisco's presence in China. Id. ¶ 23. Defendant Fredy Cheung, who also goes by his Chinese (Mandarin) name Zhang Sihua, directly oversaw much of Cisco's work on Public Security-related projects in China, as the Vice-President of Cisco China and in other managerial and strategic roles. Id. ¶ 24.

The essence of Plaintiffs' claims, as outlined in the Second Amended Complaint's detailed presentation of allegations, is that Defendants knew of and assisted in the facilitation of human rights abuses against Plaintiffs by Chinese actors in China. Plaintiffs allege that Defendant Cisco and its alter ego or agent, Cisco China Networking Technologies, Ltd. ("Cisco China"), aided and abetted and conspired with the Chinese Communist Party ("the Party") and Public Security officers by providing them with substantial assistance through the creation of a customized security system, knowing and intending that they would use such assistance in the commission of human rights abuses against Falun Gong members.

Falun Gong is a religion developed in China around 1992 and has millions of adherents. Id. ¶¶ 27-28. Since the late 1990s, adherents of the religion have been subject to human rights abuses in China, especially at the hands of the Party. Id. ¶¶ 29, 37-38, 41-46. The Falun Gong religion is specifically tied to internet use – including visiting specific websites, downloading material, and disseminating that religious material in person and online. Id. ¶ 3.

---

[1] See Global Internet Freedom: Corp. Resp. & the Rule of Law, Hearing Before the Subcomm. on Human Rights & the Law of the U.S. Sen. Comm. on the Judiciary, 110th Cong., written statement at 1 (May 20, 2008) (statement of Mark Chandler, Sr. V.P. and Gen. Counsel, Cisco Sys., Inc.). The testimony was specifically referred to in the FAC (Dkt. No. 62 ¶ 106). See Inlandboatmens Union of Pac.v. Dutra Grp., 279 F.3d 1075, 1083 (9th Cir. 2002) (proper to "consider a document outside the complaint when deciding a motion to dismiss if the complaint specifically refers to the document and if its authenticity is not questioned").

Plaintiffs maintain that Cisco knowingly, purposefully and intentionally designed, implemented and helped to maintain the Golden Shield system in collaboration with the Party and Public Security officers in regions across China, under the direction and control of Defendants in San Jose. According to Plaintiffs, Cisco knew and intended that the apparatus would be utilized by Party and Public Security officers to eavesdrop, tap, and intercept the communications of Falun Gong believers; surveil, detect, monitor, and track their online communication; apprehend, interrogate, ideologically convert and in other ways torture, arbitrarily arrest, and detain them because of their religious beliefs, with the specific purpose of suppressing Falun Gong believers through the perpetration of these and other human rights abuses against them.

In the 1990s, Chinese security and the Party proposed creating a surveillance and internal security network known as the Golden Shield and sought the assistance of Western technology companies. Id. ¶¶ 53, 55. Cisco, as one company seeking entry into the Chinese security market, met with Party leaders and set up a Cisco Public Security marketing team to ascertain and help Cisco meet Chinese security objectives. Id. ¶¶ 58-59. Plaintiffs claim that these efforts were directed from Cisco's headquarters in San Jose, California, in communication with Cisco subsidiaries in China. Id. ¶¶ 62, 64, 74. Cisco's plans for expansion in China required it to develop reciprocal-benefit relationships ("guanxi") with influential Party leaders, public security officers, Chinese engineers, system integrators, experts, and others who could help Cisco develop a stronghold in the security technology market in China. Plaintiffs allege that these relationships in China required accumulating a high level of familiarity with, and providing extensive support to, the persecutory purpose of the Golden Shield apparatus. Id. ¶ 69. Cisco was selected to design the Golden Shield, which was complete by 2001 and became operational in almost every province in China by June 2003. Id. ¶¶ 74, 110. Plaintiffs state that the Golden Shield is not an ordinary crime control system, but differs in scale, complexity, intelligence, and technological sophistication; the designs include individual features customized and designed specifically to find, track, and suppress Falun Gong integrated with dual or multi-purpose features specifically to enable the suppression of the religious group. Id. ¶¶ 2, 81.

Plaintiffs allege that Cisco designed the Golden Shield with the primary goal of creating an online surveillance system to enable and facilitate the suppression of dissident activity in China, specifically the activity of the Falun Gong. Id. ¶ 125. Plaintiffs claim that the system could not have been designed without Cisco's knowledge of the repressive purposes of the databases. Id. ¶ 87. According to Plaintiffs, the anti-Falun Gong objectives were outlined in Cisco internal reports and files and in hundreds of reports or announcements publicly and conspicuously displayed by Communist Party agents throughout China. Id. ¶ 88. Plaintiffs allege that Cisco internal files include reports that acknowledge and pledge to satisfy anti-Falun Gong purposes of the Golden Shield, including numerous use of the term "douzheng," which Plaintiffs explain as the Party's persecutory campaigns against internal and external enemies that use torture, and this term was also used in Cisco's marketing material. Id. ¶¶ 61, 64-65. Plaintiffs allege that Cisco's success in China stemmed from considerable involvement of the San Jose headquarters office, which orchestrated planning, preparation, marketing, design, implementation, operation and optimization phases, along with Cisco China and other agents and/or alter egos. Id. ¶¶ 126-49. Plaintiffs maintain that Defendants in San Jose deliberately entered into collaboration with the Party and Chinese security officials with knowledge of the widespread campaign to persecute the Falun Gong. Id. ¶¶ 150, 158.

To show that Defendants in San Jose had knowledge of the human rights violations against Falun Gong members in China, Plaintiffs point out that numerous Cisco shareholder resolutions identified concerns regarding potential human rights abuses arising from Cisco network technology solutions, especially in China, and Cisco's Golden Shield files include several court and prosecutorial reports identifying the "douzheng" of Falun Gong and other "hostile elements." Id. ¶¶ 174-75. Plaintiffs point to Defendant Chambers' meetings with Jiang Zemin, former Party General Secretary and President of China, as evidence of knowledge and intent. Plaintiffs allege that according to at least one expert, the "douzheng" objective of the Golden Shield apparatus was discussed at these meetings. Id. ¶¶ 197-99, 207. Plaintiffs also maintain that at all relevant times, Defendant Cheung knew of the campaign of torture and persecution of Falun Gong practitioners in China, was in a position to influence Cisco's tortious conduct during the development of the

Golden Shield, and nevertheless purposefully authorized, participated in, and ratified Cisco's participation in the Golden Shield project. Id. ¶ 219. According to one or more experts, Defendant Cheung discussed "douzheng" objectives of the Golden Shield with several high-level executives from Cisco's San Jose office and its branch office in Asia, he was aware of shareholder concerns, and either attended or directed employees who attended several technology trade shows and conferences where Cisco showed mid-level security officers how to "stop" Falun Gong. Id. ¶¶ 212, 217-18.

Plaintiffs contend that without the Golden Shield, Chinese officers would not have been able to coordinate large-scale investigations, obtain sensitive information, locate, track, apprehend, interrogate, torture and persecute Falun Gong members from anywhere in China. Id. ¶ 106. According to Plaintiffs, the Golden Shield provided the means by which all the Plaintiffs were tracked, detained, and tortured. Id. ¶ 225.

Plaintiffs filed their original Class Action Complaint on May 19, 2011. See Docket Item No. 1. An Amended Complaint ("FAC") was filed on September 2, 2011. See Docket Item Nos. 61, 62. Defendants filed a Motion to Dismiss the FAC. On November 9, 2011 this Court terminated that motion in light of Kiobel v. Royal Dutch Petroleum, 133 S. Ct. 1659 (2013), which at the time was being argued before the United States Supreme Court, reasoning that the Court's decision would affect Defendants' Motion to Dismiss. See Docket Item No. 79. After the Supreme Court issued an opinion in Kiobel, Plaintiffs filed their Second Amended Complaint ("SAC") on September 18, 2013. See Docket Item No. 113. Defendants filed a Motion to Dismiss on November 4, 2013 (Dkt. No. 117), Plaintiffs filed an opposition (see Docket Item No. 123), and Defendants filed a reply brief (see Docket Item No. 131). An Amicus Curiae Brief was filed on January 29, 2014. See Docket Item No. 128. A hearing on Defendants' Motion to Dismiss was held in this Court on March 21, 2014. See Docket Item No. 141. This Court denied a motion to file an additional Amicus Curiae Brief after the hearing. See Docket Item No. 152.

The SAC asserts federal jurisdiction pursuant to the Alien Tort Statute, ("ATS"), 28 U.S.C. § 1350; the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity); and 28 U.S.C. § 1367 (supplemental jurisdiction).

Plaintiffs allege the following causes of action in the SAC: (1) torture under the ATS, 28 U.S.C. § 1350, (2) torture under the TVPA, 28 U.S.C. § 1350, (3) cruel, inhuman, or degrading treatment under the ATS, (4) forced labor under the ATS, (5) prolonged and arbitrary detention under the ATS, (6) crimes against humanity under the ATS, (7) extrajudicial killings under the ATS, (8) enforced disappearance under the ATS, (9) violation of the Electronic Communication Privacy Act ("ECPA"), 18 U.S.C. § 2512(1), (10) battery, (11) assault, (12) false imprisonment, and (13) violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 et seq. Plaintiffs seek compensatory and punitive damages, injunctive relief enjoining Defendants from future unlawful activity, and costs of suit and attorney's fees.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Twombly, 550 U.S. at 556-57.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). The court must generally accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1988). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). But "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

**III. DISCUSSION**

Defendants move to dismiss Plaintiffs' SAC, contending that the SAC fails to state a cognizable claim under the ATS or state laws and must be dismissed.

**A. Alien Tort Statute**

Defendants argue that the ATS does not permit claims "seeking relief for violations of the law of nations occurring outside the United States." Kiobel, 133 S. Ct. at 1669. Defendants argue that the ATS does not apply to extraterritorial acts such as the ones alleged here, which occurred in China at the hands of Chinese actors, and therefore the ATS claims must be dismissed. Plaintiffs, on the other hand, contend that the ATS does permit claims for conduct occurring outside the United States.

The ATS provides that district courts "shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. To establish jurisdiction under the ATS, a plaintiff must allege facts "sufficient to establish that: (1) they are aliens; (2) they are suing for a tort; and (3) the tort in question has been committed in violation of the law of nations or a treaty of the United States." Mwani v. Bin Laden, 947 F. Supp. 2d 1, 3 (D.D.C. 2013).

In the recent Kiobel case, the Supreme Court held that the ATS could not provide jurisdiction for foreign plaintiffs seeking redress in United States courts for conduct by foreign companies that occurred on foreign soil, because the presumption against extraterritorial application of federal law was not overcome by the text or history of the ATS. 133 S. Ct. 1659. Kiobel thus articulated a presumption against extraterritoriality, but also noted that the presumption may be overcome where "the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption." Id. at 1669. Kiobel, a case with foreign defendant, plaintiff, and exclusively foreign conduct, left open the question of how the presumption against extraterritoriality would apply to a case with a different set of facts. The Court decided that mere corporate presence in the United States was not enough to overcome the presumption because it did not meet the "touch and concern" test.

After Kiobel, it is not clear what circumstances will "touch and concern the territory of the United States" in such a way that is sufficient to overcome the presumption against extraterritoriality, as the Supreme Court did not outline a specific test to apply.[2] Many courts have since dismissed ATS claims for purely extraterritorial conduct. See Daimler AG v. Bauman, 134 S. Ct. 746, 750-51, 762-63 (2014) (ATS claims based on conduct "occurring entirely outside the United States" were rendered "infirm" by Kiobel); Mamani v. Berzain, 2014 WL 2069491 (S.D. Fl. May 20, 2014) (dismissing ATS claims because all relevant action took place in Bolivia); Ben-Haim v. Neeman, 543 Fed. Appx. 152, 155 (3d Cir. 2013) (affirming dismissal of ATS claims because alleged tortious conduct "took place in Israel") (per curiam); Kaplan v. Cent. Bank of Islamic Republic of Iran, 961 F. Supp. 2d 185, 205 (D.D.C. 2013) (barring ATS claims based on "actions that took place in Israel and Lebanon"); Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 71 (D.D.C. 2013) (dismissing ATS claims where alleged tortious conduct "occurred entirely within the sovereign territory of Iran"); Chen Gang v. Zhao Zhizhen, No. 04–cv–1146–RNC, 2013 WL 5313411, at *3 (D. Conn. Sept. 20, 2013) (dismissing ATS case as "paradigmatic 'foreign cubed' case" involving "foreign defendant, foreign plaintiff, and exclusively foreign conduct," because parties were present in China and all relevant conduct occurred in China); Tymoshenko v. Firtash, No. 11-cv-2794 (KMW), 2013 WL 4564646, at *4 (S.D.N.Y. Aug. 28, 2013) (dismissing ATS claims as "impermissibly extraterritorial" where plaintiffs were foreigners, defendant was foreign corporation, and alleged tortious conduct occurred on foreign soil); Muntslag v. Beerens, No. 12-cv-07168 (TPG), 2013 WL 4519669, at *3 (S.D.N.Y. Aug. 26, 2013) ("Simply put, the conduct plaintiff alleges clearly occurred overseas and it is therefore not covered by the ATS."); Adhikari v. Daoud & Partners, No. 09-cv-1237, 2013 WL 4511354, at *7 (S.D. Tex. Aug. 23, 2013) ("Since all relevant conduct by [the defendants] occurred outside of the United States, summary judgment on Plaintiffs' ATS claim must be granted for [the defendants]."); Hua Chen v. Honghui Shi, No. 09-cv-8920 (RJS), 2013 WL 3963735, at *7 (S.D.N.Y. Aug. 1, 2013)

---

[2] In a concurring opinion, Justice Kennedy noted that "the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute." Kiobel, 133 S. Ct. at 1669 (Kennedy, J., concurring). Similarly, Justices Alito and Thomas pointed out that the Court's opinion "leaves much unanswered . . . ." Id. (Alito, J., concurring).

**United States District Court**
For the Northern District of California

(dismissing ATS claims brought by members of Falun Gong movement residing in United States against Chinese government official because "all of the abuses took place in China").

Some courts, however, have interpreted the Supreme Court's holding to allow ATS claims against defendants whose conduct was central to the alleged violations of the law of nations abroad where such action "touched and concerned" the United States either because it occurred domestically, was planned or directed domestically, or because it was directed at the United States. See Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304 (D. Mass. 2013) (the court did not dismiss ATS claims against an American citizen who allegedly violated the law of nations through acts committed in Uganda but directed and planned from the United States); Jian Zhang v. Baidu.com Inc., 293 F.R.D. 508 (S.D.N.Y. 2013) (web censorship in the United States sufficed to show that ATS claims were not premised solely on conduct abroad); and Mwani v. Bin Laden, 947 F. Supp. 2d 1 (D.D.C. 2013) (court found an exception to the presumption against extraterritoriality even though the complaint was against foreign defendants for injuring foreign plaintiffs in a foreign territory because the attack took place against a United States Embassy abroad and was plotted in part in the United States).

Unlike in Kiobel, which was a "foreign cubed" case (foreign plaintiffs, foreign defendant, and foreign conduct), Plaintiffs here bring their claim against an American corporation and individuals. As noted in Kiobel, this in and of itself is not enough to touch and concern the United States with sufficient force for the ATS to apply. 133 S. Ct. at 1669 (". . . it would reach too far to say that mere corporate presence suffices."). Instead, Plaintiffs argue that Defendants' acts in San Jose are sufficient to displace the presumption against extraterritorial application of the ATS.

The Court does not find a sufficient nexus between the Defendants' actions and the alleged violations committed by Chinese actors on Chinese soil to meet the "touch and concern" test. Plaintiffs have properly pled that Defendants customized, marketed, designed, and implemented the Golden Shield system for use by Chinese law enforcement. However, Plaintiffs have not shown that those actions by Defendants allow the Court to apply the ATS in this case for the alleged violations committed in China.

Unlike the cases cited above where courts have found that defendants' actions did touch and concern the United States with sufficient force, Plaintiffs have not shown that the alleged human rights abuses committed against them in China, including torture and forced conversion, were planned, directed, or committed in the United States or directed against the United States. See Sexual Minorities Uganda, 960 F. Supp. 2d 304; Jian Zhang, 293 F.R.D. 508; Mwani, 947 F. Supp. 2d 1. The SAC is lacking in a showing of the nexus between acts committed by Defendants in the United States and the alleged violations that ultimately took place in China.[3] While the SAC alleges that Defendants knew about the violations perpetrated against Plaintiffs in China, and planned the Golden Shield system with the knowledge of those violations, the SAC does not make a sufficient showing that those violations touch and concern the United States. Plaintiffs have failed to establish that Defendants directed, planned, or committed the violations that occurred in China. Allegations of meetings with Party members, shareholders' complaints, and acknowledgment that the system was to be used to "stop" or apprehend Falun Gong still do not establish Defendants' planning, direction, or participation in the human rights abuses committed against Plaintiffs. Therefore, there is not a sufficient showing that those violations "touch and concern" the United States with "sufficient force."

In conclusion, Defendants' creation of the Golden Shield system, even as specifically customized for Chinese authorities and even if directed and planned from San Jose, does not show that human rights abuses perpetrated in China against Plaintiffs touch and concern the United States with sufficient force to overcome the ATS's presumption against extraterritorial application. The domestic conduct of the Defendants is not, as set forth by Justices Alito and Thomas, "sufficient to violate an international law norm." Kiobel, 133 S. Ct. at 1670 (Alito, J., concurring).

[3] In Daobin v. Cisco Sys., Inc., 2014 WL 769095 (D. Md. Feb. 24, 2014), a case with similar facts to the case before this Court, the District Court of Maryland decided a case brought by foreign Plaintiffs against Cisco for human rights abuses occurring in China. While that court noted that it assumed that the presumption against extraterritoriality did not bar the case, it did not go as far as to decide that issue. Instead, the court dismissed the case for lack of personal jurisdiction over Cisco's CEO and because the federal claims against Cisco were deemed nonjusticiable and failed to plausibly allege the requisite mens rea and actus reus elements for secondary liability.

United States District Court
For the Northern District of California

As articulated by other courts, to overcome the presumption against extraterritoriality, a stronger showing is needed that tortious acts were planned, directed, or executed in the United States.

**B. Aiding and Abetting Liability**

**1. Aiding and Abetting Liability under the TVPA**

Defendants argue that in the Ninth Circuit, aiding and abetting claims may not be asserted under the TVPA. Defendants rely on Bowoto v. Chevron Corp., 621 F.3d 1116 (9th Cir. 2010), where the court found that the TVPA "limits liability to an individual who subjects another to torture," and interpret the decision to indicate that only the primary wrongdoer can be held liable because the court goes on to say that, "[e]ven assuming the TVPA permits some form of vicarious liability, the text limits such liability to . . . natural persons." Id. at 1128 (internal quotations omitted). Plaintiffs contend that this case was a ruling only against corporate liability, not against vicarious liability.

In light of the Ninth Circuit's wording in the case, this Court finds that the Ninth Circuit intended that claims for vicarious liability, including aiding and abetting, cannot be brought under the TVPA.

**2. Aiding and Abetting Liability under the ATS**

Defendants argue that while some courts have held that aiding and abetting liability is available under the ATS, this Court should refrain from deciding this issue and instead anticipate that the Ninth Circuit will resolve the issue in favor of Defendants.[4] This Court is unwilling to do so, as this would set a dangerous precedent of allowing parties to ask the district courts to wait to issue decisions, hoping a more favorable decision will be handed down from a circuit court in the interim.

---

[4] At the time the Motion to Dismiss was filed, the Ninth Circuit had twice held that aiding and abetting claims were available under the ATS, but one decision was vacated by an en banc decision and another was vacated by the Supreme Court and remanded on the basis of Kiobel. Sarei v. Rio Tinto, PLC, 456 F.3d 1069, 1078 (9th Cir. 2006), vacated by 499 F.3d 923 (9th Cir. 2007); Sarei v. Rio Tinto, PLC, 671 F.3d 736, 748-49 (9th Cir. 2011), cert. granted and judgment vacated by 133 S. Ct. 1995 (2013). After the Supreme Court remanded the case, the Ninth Circuit summarily affirmed the district court's dismissal with prejudice of ATS claims. 722 F.3d 1109, 1110 (9th Cir. 2013).

United States District Court
For the Northern District of California

A number of circuit courts have accepted aiding and abetting liability under the ATS. See Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 260 (2d. Cir. 2007); Romero v. Drummond Co., 552 F.3d 1303, 1315 (11th Cir. 2008). In light of these decisions, and the fact that the Ninth Circuit has not ruled otherwise, this Court finds that Plaintiffs may bring claims for aiding and abetting under the ATS.

**3. Standard for Aiding and Abetting**

Defendants argue that to support a claim for aiding and abetting under international law, a plaintiff must allege that a defendant (1) carried out acts that had a substantial effect on the perpetration of a specific crime (actus reus) and (2) acted with the specific intent (i.e., for the purpose) of substantially assisting the commission of that specific crime (mens rea). See Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir. 2009) ("a defendant may be held liable . . . for aiding and abetting . . . when the defendant (1) provides practical assistance . . . which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime"); Aziz v. Alcolac, Inc., 658 F.3d 388, 400-01 (4th Cir. 2011) ("the ATS imposes liability for aiding and abetting . . . only if the attendant conduct is purposeful."). However, the Ninth Circuit has found that a district court erred in requiring plaintiffs to allege specific intent to satisfy the applicable purpose mens rea standard. Doe I v. Nestle, S.A., 748 F. Supp. 2d 1057, 1087-88 (C.D. Cal. 2010), vacated by 738 F.3d 1048 (9th Cir. 2013). Defendants acknowledge this decision, but ask the Court to hold this case to await further guidance from the Ninth Circuit concerning the applicable standard. As of yet, the Ninth Circuit has not issued any guidance concerning the standard to be used. As such, the Court applies the more lenient standard identified by the Ninth Circuit in Nestle, which does not require the allegation of specific intent for mens rea.[5]

Even applying this standard, the Court does not find that Plaintiffs have sufficiently alleged that Defendants are liable under the ATS for aiding and abetting the alleged violations. As discussed supra, the allegations in the SAC do not show that Defendants' conduct had a substantial

[5] The Ninth Circuit has previously articulated a preference for a knowledge standard for aiding and abetting. Doe v. Unocal, 395 F.3d 932, 951 (9th Cir. 2002), vacated by 395 F.3d 978 (9th Cir. 2003).

United States District Court
For the Northern District of California

effect on the perpetration of alleged violations against Plaintiffs nor that they knew that their product would be used beyond its security purpose – the apprehension of individuals suspected of violating Chinese law through identifying, locating, profiling, tracking, monitoring, investigating, and surveillance of such individuals – to commit the alleged violations of torture and forced conversion. Even if Defendants knew that the Golden Shield was used by Chinese authorities to apprehend individuals, including Plaintiffs, there is no showing that Defendants also knew that Plaintiffs might then be tortured or forcibly converted. The customization, marketing, design, testing, and implementation of the Golden Shield system is not enough to support an inference of knowledge on the part of Defendants that torture or other human rights abuses would be committed against Plaintiffs. The product produced by Defendants – even as specifically customized – can be used for many crime-control purposes in China without permitting torture or other human rights abuses. The conclusory allegations and inferences of knowledge pled in the SAC do not sufficiently show that Defendants had knowledge of the violations.

**C. State Law Claims**

As all of Plaintiffs' federal law claims are being dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, including the claim arising under the UCL. See 28 U.S.C. § 1367 (c)(3).

**D. ECPA Claim**

Plaintiffs state that their ECPA claim is based on section 2512(1) of the ECPA, which prohibits the sending through the mail or interstate commerce of, or the manufacture, assembly, possession, or sale of device that renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications. Defendants claim that even if the allegations are actionable under the ECPA, they fall under the exception in section 2512(2), for acts by a provider of wire or electronic communication service "in the normal course of business of providing that wire or electronic communication service." Defendants' business is the manufacture, assembly, and sale of wire or electronic communication service and it created the Golden Shield system as part of its normal course of business in China. The SAC does not sufficiently plead that the customization, marketing, design, and implementation of the system was

United States District Court
For the Northern District of California

specifically to facilitate human rights abuses, as Plaintiffs argue in their opposition. Therefore, even if the ECPA applies, Defendants would be exempt.

## IV. CONCLUSION

The Court has determined that the claims brought under the ATS will be dismissed because the actions alleged do not meet the Kiobel standard. Further, claims for aiding and abetting will be dismissed because Plaintiffs fail to allege the required mens rea and actus reus on the part of Defendants. All state law claims will be dismissed for lack of federal jurisdiction and the ECPA claim will be dismissed because even if applied, Defendants would be exempt. For all the reasons discussed above, Defendants' Motion to Dismiss will be GRANTED with prejudice as to all of Plaintiffs' federal claims and GRANTED without prejudice as to Plaintiffs' state law claims.

**IT IS SO ORDERED**

Dated: September 5, 2014



EDWARD J. DAVILA
United States District Judge