KATHRYN LEE BOYD, ESQ. (SBN 189496)
        lboyd@srbr-law.com
RAJIKA L. SHAH, ESQ. (SBN 232994)
        rshah@srbr-law.com
**SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
6310 San Vicente Boulevard, Suite 360
Los Angeles, California 90048
Phone: (323) 302-9488
Fax: (323) 931-4990

TERRI MARSH, ESQ. (*pro hac vice*)
        terri.marsh.hrlf@gmail.com
BRIAN PIERCE, ESQ. (*pro hac vice*)
        bjpierce@gmail.com
**HUMAN RIGHTS LAW FOUNDATION**
1615 L Street, NW, Suite 1100
Washington, D.C. 20036
Phone: (202) 697-3858
Fax: (202) 355-6701

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA,
### SAN JOSE DIVISION

| | |
|---|---|
| DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, DOE IX, LIU Guifu,  WANG Weiyu, and those individual similarly situated,<br><br>              Plaintiffs,<br><br>       vs.<br><br>CISCO SYSTEMS, INC., John CHAMBERS, Fredy CHEUNG, and DOES 1-100,<br><br>              Defendants. | Case No. 5:11-cv-02449-EJD-PSGx<br>Assigned to the Honorable Edward J. Davila, U.S.D.J.<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR RECONSIDERATION**<br><br>*[Proposed Order filed concurrently herewith]*<br><br>**[Fed. R. Civ. P. 59(e) and 60(b)(6)]**<br><br>Hearing Date: March 5, 2014<br>Time: 9:00 a.m.<br>Courtroom: 4, 5th Floor<br><br>Action Filed: May 19, 2011<br>SAC Filed: Sept. 18, 2013 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on March 5, 2015[1] at 9:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Judge Davila, in Courtroom 4 of the United States District Court for the Northern District of California, San Jose Division, located at the Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, California 95113, Plaintiffs Doe 1, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Doe IX, Liu Guifu and Wang Weiyu and those individuals similarly situated ("Plaintiffs"), will and hereby do move this Court to reconsider its Order Granting Defendants' Motion to Dismiss, filed on and dated September 5, 2014 (the "Order"), and to enter an order denying the Motion to Dismiss.

This motion is made pursuant to Fed R. Civ. P. 59(e), or in the alternative, pursuant to Rule 60(b)(6), on the grounds that the Order failed to consider the Second Amended Complaint's ("SAC") allegations in light of the Ninth Circuit's guidance in *Doe v. Nestle USA, Inc.*, ___ F.3d ___, 2014 WL 4358453 (9th Cir. Sept. 4, 2014) ("*Nestle* II"), regarding aiding and abetting liability under the Alien Tort Statute ("ATS") and the extraterritorial reach of the ATS, which were central to this Court's dismissal of Plaintiffs' claims. *Nestle II,* which was issued only one day prior to the Court's filing of the Order, replaced the Ninth Circuit's previous one-page opinion in the case issued on December 19, 2013 ("*Nestle* I") – on which the Court relied in reaching its decision here – with a revised opinion containing extensive analysis of the very issues on which this Court based its Order. Had this Court followed the Ninth Circuit's in-depth and directly on point analysis in *Nestle* II regarding (1) the pertinent standards to establish liability for aiding and abetting violations of international law, and (2) conduct sufficient to overcome the presumption against extraterritorial application of the ATS in the wake of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013), Plaintiffs respectfully submit that this Court would have found Plaintiffs' allegations sufficient to satisfy

---

[1] Pursuant to this Court's Standing Order Regarding Case Management in Civil Cases, counsel have conferred with opposing counsel to determine that the hearing date will not cause undue prejudice.

1

their pleading burden and to deny Defendants' motion to dismiss.

By this motion, Plaintiffs request that the Court reconsider its Order, and enter an order denying Defendants' Motion to Dismiss. The motion is based upon this Notice, the attached Memorandum in support, the files and records in this action, and any further evidence and argument that the Court may receive at or before the hearing.

In addition, pursuant to Local Rule 7-1(b), Plaintiffs hereby request that this motion be heard without oral argument.


Dated:  October 3, 2013                    Respectfully Submitted,

By: ____/s/ Terri E. Marsh_____
     Terri E. Marsh
     HUMAN RIGHTS LAW FOUNDATION

By: ____/s/ K. Lee Crawford-Boyd_[2]_____
     K. Lee Crawford-Boyd (Co-counsel)
     SCHWARCZ, RIMBERG, BOYD & RADER, LLP
     Attorneys for Plaintiffs: DOE I, DOE II, Ivy HE, DOE III,
     DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII,
     DOE IX, LIU Guifu, and  WANG Weiyu.

---

[2] I have obtained the other signatory's concurrence in the filing of this document.

1

2

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARDS …………................................................................ 1

ARGUMENT …………................................................................................ 2

I.  *NESTLE* II REQUIRES RECONSIDERATION OF THIS COURT'S APPLICATION
   OF THE STANDARD FOR AIDING AND ABETTING LIABILITY UNDER THE
   ATS …………................................................................................................ 2

   A.  In Light of Nestle II, Plaintiffs' Allegations Meet the Mens Rea Requirements
       for Aiding and Abetting Liability Under the ATS ................................. 3

       1.  In light of Nestle II, Plaintiffs' allegations establish that Defendants acted
           with knowledge ........................................................................... 3

           a.  Defendants gained firsthand knowledge through Golden Shield
               designs which make the use of torture explicit. ..................... 4

           b.  Plaintiffs allege extensive reporting on the widespread torture and
               persecution of Falun Gong in China, and the essential role of the
               Golden Shield in facilitating this torture and persecution ..................... 6

           c.  Defendants gained firsthand knowledge by maintaining a long-term
               presence in China involving intimate business dealings with the
               Chinese Communist Party and Ministry of Public Security. ................... 8

       2.  In light of Nestle II, the Court should find that knowledge is sufficient
           to establish the requisite mens rea. ............................................. 10

       3.  In light of Nestle II, Plaintiffs' allegations also establish that Defendants
           acted purposefully..................................................................... 11

   B.  In Light of Nestle II, Plaintiffs' Allegations Meet the Actus Reus
       Requirements for Aiding and Abetting Liability Under the ATS. ....................... 15

II.  NESTLE II REQUIRES RECONSIDERATION OF THIS COURT'S APPROACH
    TO EXTRATERRITORIALITY …………................................................ 18

III.  BECAUSE THE PLAINTIFFS ADEQUATELY ALLEGE AIDING
     AND ABETTING, THE COURT MUST ALSO RECONSIDER THE
     PLAINTIFFS' ECPA CLAIMS …………................................................ 20

CONCLUSION …………................................................................ 20

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

<u>U.S. CASES</u>

3

*Al-Shimari v. CACI Premier Technology*,

4
    758 F.3d 516 (4th Cir. 2014) …………………...……………………………18, 19

5

*Aziz v. Alcolac, Inc.*,

6
    658 F.3d 388 (4th Cir. 2011) …………………………………………...…10, 14

7

*Brooks v. Wash. Mut. Bank*,
    2013 WL 30064 (N.D. Cal. Jan. 2, 2013) …………………………………………2

8

*Doe v. Exxon Mobil Corp.*,

9
    654 F.3d 11 (D.C. Cir. 2011) ……………………………..………………..……10

10
    527 F. App'x. 7 (D.C. Cir. 2013) …………………………..………………..……10

11

*Doe v. Nestle USA, Inc.*,
    ___ F.3d ___, 2014 WL 4358453 (9th Cir. Sept. 4, 2014) …………………………*passim*

12

*Kaplan v. Cent. Bank of Islamic Republic of Iran*,

13
    2013 WL 4427943 (D.D.C. Aug. 20, 2013) …………………………….…………18

14

*Khulumani v. Barclay Nat'l Bank Ltd.*,

15
    504 F.3d 254 (2d Cir. 2007) …………………………………………...….………10

16

*Kiobel v. Royal Dutch Petroleum Co.*,

17
    569 U.S. ____, 133 S.Ct. 1659 (2013) …………………………………..………..1, 18

18

*Marketquest Group, Inc. v. BIC Corp.*,

19
    2014 WL 3726610 (S.D. Cal. July 25, 2014) ………..………………………………..2

20

*Mohammadi v. Islamic Republic of Iran*,
    2013 WL 2370594 (D.D.C. May 31, 2013) …………………………………………18

21

*Mwani v. Bin Laden*,

22
    2013 WL 2325166 (D.D.C. May 29, 2013) …………………………………………18

23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ………..……………………………………10, 14

24

*Morrison v. Nat'l Australia Bank Ltd.*,

25
    130 S. Ct. 2869 (2010) …………………….………………………………..……..18

26

*Sexual Minorities Uganda v. Lively*,

27
    2013 WL 4130756 (D. Mass. Aug. 14, 2013) …………………………………18

28

i

1

**TABLE OF AUTHORITIES (cont'd)**

2

Page(s)

3

*Zimmerman v. City of Oakland*,
       255 F.3d 734 (9th Cir. 2001)   ……………………………………….………2

4

INTERNATIONAL CASES

5

6

*The Flick Case*,
       6 Trials of War Criminals 1194   ……………………………………….………10

7

*The Ministries Case*,
       14 Trials of War Criminals 622   ……..……………………………………10

8

9

*Prosecutor v. Blagojevic*,
       No. IT-02-60-A, (ICTY, May 9, 2007)   …………………………………...……..10

10

*Prosecutor v. Kayishema*,
       No. ICTR-95-1-T, (ICTR, May 21, 1999)   …………………………….……..10

11

12

*Prosecutor v. Taylor*,
       Case No. SCSL-03-01-A, (SCSL Sept. 26, 2013)   …………………..…………… 15

13

14

*The Zyklon B Case*,
       1 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93 (1946)   …….……….....…………10

15

16

OTHER INSTRUMENTS

17

28 U.S.C. § 2512(2)   ………………………………………………….…………20

18

Rome Statute of the International Criminal Court, Article 25(3)(c)
       37 I.L.M. 999 (1998)   …………………………………………….…………10

19

20

Fed. R. App. P. 4(a)(4)(A)   …………………………………………….…………2

21

Fed. R. Civ. P. 59(e)   …………………………………………….…....…………1, 2

22

Fed. R. Civ. P. 60(b)   …………………………………………….…....…………2

23

Fed. R. Civ. P. 60(b)(6)   …………………………………………….…....…………1, 2

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Pursuant to Fed. R. Civ. P. Rule 59(e) and, in the alternative, 60(b), Plaintiffs Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Doe IX, Liu Guifu and Wang Weiyu, and those individuals similarly situated (collectively, "Plaintiffs"), respectfully request that the Court reconsider and amend its order and decision dismissing Plaintiffs' Alien Tort Statute ("ATS") and Electronic Communications Privacy Act ("ECPA") claims with prejudice, and declining to exercise supplemental jurisdiction over Plaintiffs' California state law claims and accordingly dismissing them without prejudice. In its order, dated September 5, 2014 (Docket Entry ("DE") 153) (the "Order"), this Court did not consider the Ninth Circuit's recently reissued opinion in *Doe v. Nestle USA, Inc.*, ___ F.3d ___, 2014 WL 4358453 (9th Cir. Sept. 4, 2014) ("*Nestle* II"), which was issued only one day prior to the Order. The Ninth Circuit withdrew its earlier, one-page opinion issued on December 19, 2013 ("*Nestle* I") – on which the Court relied in reaching its decision here – replacing it in its entirety with a revised opinion containing extensive analysis of the very issues on which this Court based its Order. Had this Court followed the Ninth Circuit's in-depth and directly on point analysis in *Nestle* II regarding (1) the pertinent standards to establish liability for aiding and abetting violations of international law; and (2) conduct sufficient to overcome the presumption against extraterritorial application of the ATS in the wake of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013), Plaintiffs respectfully submit that this Court would have found Plaintiffs' allegations sufficient to satisfy their pleading burden and to deny Defendants' motion to dismiss.

Accordingly, Plaintiffs respectfully bring this motion to alter or amend the Order, or in the alternative for relief from the judgment.

### LEGAL STANDARDS

This motion is made pursuant to Fed R. Civ. P. 59(e), or in the alternative, pursuant to Rule 60(b)(6), on the grounds that the Order failed to consider the Second Amended Complaint's ("SAC") allegations in light of the Ninth Circuit's guidance in *Nestle* II regarding aiding and abetting liability under the ATS and the extraterritorial reach of the ATS, which were central to

this Court's dismissal of Plaintiffs' claims. "Where a ruling has resulted in final judgment, a motion for reconsideration may be construed either as a motion to alter or amend judgment pursuant to FRCP 59(e), or as a motion for relief from judgment pursuant to FRCP 60(b)." *Brooks v. Wash. Mut. Bank*, 2013 WL 30064, *1 (N.D. Cal. Jan. 2, 2013). "The standard for relief under Rule 60(b) overlaps in part with the standard under Rule 59(e)." *Marketquest Group, Inc. v. BIC Corp*., 2014 WL 3726610, *4 (S.D. Cal. July 25, 2014).

A court may grant a motion to alter or amend under Rule 59(e) if "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). Under Rule 60(b), the court may relieve a party from an order in specified circumstances, or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

Further, this motion is timely pursuant to either Fed. R. Civ. P. 59(e) or 60(b)(6), because it was filed within 28 days of the Court's entry of Judgment. *See* DE 154 (Judgment entered September 5, 2014); *see also Marketquest Group, Inc*., 2014 WL 3726610 at *4 ("A motion is treated as a motion to alter or amend judgment under Rule 59(e) if it is filed within twenty-eight days of entry of judgment; otherwise, it is treated as a Rule 60(b) motion for relief from a judgment or order.").[3]

## ARGUMENT

**I.     *NESTLE* II REQUIRES RECONSIDERATION OF THIS COURT'S APPLICATION OF THE STANDARD FOR AIDING AND ABETTING LIABILITY UNDER THE ATS.**

Plaintiffs sufficiently allege aiding and abetting liability under the ATS in light of *Nestle* II, because the *Nestle* II analysis makes clear that Plaintiffs' allegations meet both (1) the relevant *mens rea* requirements, and (2) the relevant *actus reus* requirements.

---

[3] In addition, if a party timely files a motion in the district court pursuant to Fed. R. Civ. P. 59(e) or 60(b) (within 28 days after judgment is entered), "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(A).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.  In Light of *Nestle* II, Plaintiffs' Allegations Meet the *Mens Rea* Requirements for Aiding and Abetting Liability Under the ATS.

In light of *Nestle* II, Plaintiffs' allegations meet the *mens rea* requirements for aiding and abetting liability. First, *Nestle* II makes clear that Plaintiffs easily establish knowledge. Second, the *Nestle* II analysis militates in favor of applying a knowledge standard for aiding and abetting liability. Third, even if the Court holds that purpose is required, Plaintiffs' allegations are sufficient to meet this standard in light of *Nestle* II.

### 1.  In light of *Nestle* II, Plaintiffs' allegations establish that Defendants acted with knowledge.

Applying the knowledge standard, this Court held that "[e]ven if Defendants knew that the Golden Shield was used by Chinese authorities to apprehend individuals, including Plaintiffs, there is no showing that Defendants also knew that Plaintiffs might then be tortured or forcibly converted." DE 13. However, the Ninth Circuit's reasoning in *Nestle* II makes clear that Plaintiffs' allegations here are sufficient to support an inference that Defendants knew that its work on the Golden Shield, and especially its "gargantuan system of Falun Gong specific features," SAC ¶ 5, would not only be used to apprehend Plaintiffs but also to facilitate torture and other abuses suffered by them.

In *Nestle* II, plaintiffs alleged that the defendants aided and abetted child slavery by providing assistance to Ivorian farmers. *See* Slip Op. at 8. The Ninth Circuit dispatched the "knowledge" requirement with an ease and brevity that indicates knowledge is not likely to be a substantial hurdle to establishing liability in most ATS cases. *Nestle* II's application of the "knowledge" requirement is dealt with in full in the "Background" section of the opinion with this language:

> The defendants are well aware of the child slavery problem in the Ivory Coast. They acquired this knowledge firsthand through their numerous visits to Ivorian farms. Additionally, the defendants knew of the child slave labor problems in the Ivorian cocoa sector due to the many reports issued by domestic and international organizations.

Slip Op. at 8. Accordingly, the Ninth Circuit relied on two independent bases to establish that the defendants acted knowingly: (1) the defendants' firsthand knowledge gained through numerous

- 3 -

visits to Ivorian farms, and (2) the existence of widespread reports on the practice of child slavery in the Ivory Coast. As such, Plaintiffs' allegations here are sufficient to establish Defendants' knowledge, because (1) Defendants gained firsthand knowledge through Golden Shield designs making the use of torture explicit; (2) Plaintiffs allege widespread reporting on the torture of Falun Gong and the essential role of the Golden Shield in facilitating that torture; and (3) Defendants gained firsthand knowledge through their long-term presence in China involving intimate business dealings with the Chinese Communist Party and Ministry of Public Security.

### a. Defendants gained firsthand knowledge through Golden Shield designs which make the use of torture explicit.

The plaintiffs in *Nestle* alleged that defendants gained firsthand knowledge of the underlying abuses by visiting Ivorian farms several times per year. *See Nestle* II, Slip Op. at 8. Similarly, Plaintiffs here allege that Defendants gained firsthand knowledge that the Golden Shield would be used to facilitate the torture of Falun Gong through Defendants' designs and other documents making the use of torture explicit.

Plaintiffs allege that San Jose Defendants' Golden Shield designs integrated several Falun Gong-specific features "specifically to give Chinese security access to the sensitive information to facilitate the *zhuanhua* (forced conversion through torture) of Falun Gong believers based on their individual social and economic circumstances, and the amount of leverage that can be exercised against them through threats against family members, fellow adherents, and others." SAC ¶ 85. "*Zhuanhua*" is a Chinese term meaning "forced conversion through torture." SAC ¶ 85. The terms "*zhuanhua*," "forced conversion," "ideological conversion," and "torture" are used throughout Plaintiffs' allegations in connection with Defendants' mental state and conduct. *See* SAC ¶¶ 9, 19, 32, 78, 79, 83-85, 88-91, 98-101, 106, 111, 117, 119, 122-124, 127, 131, 171, 193, 279, 281, 299, 302, 315, 318, 327, 342.[4] San Jose Defendants' designs integrated Falun Gong-

---

[4] Similarly, Plaintiffs cite the definition of the term "*douzheng*" as "the term of art used to describe persecutory campaigns comprising persecution and torture", SAC ¶ 61, "against internal and external enemies…conducted outside the authority of the state and without the constraint of legal due process or any form of objective hearing or state regulation" SAC ¶ 31. The term has historically been applied to a number of violent persecutory campaigns, including "various 'Strike Hard Campaigns' of the 1990s" such as the campaign against Falun Gong. SAC ¶ 34. This term is also used throughout Plaintiffs' allegations in connection with San Jose Defendants' mental state

specific databases with "public security command and dispatch centers, intelligence and

information analysis centers, mobile and front line police technology," "police stations, police

detention centers, black jails, public security mental hospitals, rehabilitation clinics, 'love and

care' rehabilitation centers, labor camps, and other facilities," so that these locations could

"access the profiled information stored in the apparatus and use it to forcibly convert" Falun

Gong practitioners. SAC ¶¶ 86, 98(g)-(h). Defendants' designs explicitly designate "the Falun

Gong specific 610 Office…along with repeated mention of the vast system of detention centers,

such as re-education through labor camps, public security hospitals and even mental hospitals,

jails and ad hoc detention facilities devoted to ideological conversion through torture." SAC ¶ 78.

Defendants designed and implemented features for the "storing of forced conversion sessions in

information systems readily available for continual use and reuse against the same individual"

and for "sharing of effective forced conversion sessions with other security to enable them to

learn how best to force the Falun Gong adherent to renounce his religious belief." SAC ¶ 98(i)-(j).

San Jose Defendants designed and implemented "a dynamic information management system that

could keep up with the believers' changes in life style, thoughts, moods, susceptibility to threats,

and other factors which had to be recorded meticulously in order to ensure successful *zhuanhua*."

SAC ¶ 100. The need to "constantly obtain, update, and cross-reference information about

individual Falun Gong adherents throughout this entire 'lifetime' in the system was closely and

conspicuously tied to many forms of human rights abuses." *Id*. This "lifetime" information

system for each Falun Gong adherent "required the integration of their initial identification, and

every subsequent piece of data associated with them [including] each and every interrogation,

each and every forced conversion, torture/forced conversion, and further incarceration, release,

medical 'treatment'…death resulting from torture and other abuses, notes of security officers

handling their case, and a wealth of other information." SAC ¶ 101.

  These designs, developed by the Defendants in San Jose, make explicit the need to

analyze and gather sensitive information on Falun Gong practitioners and distribute it to 610

---

and conduct. *See* SAC ¶¶ 61, 62, 64, 65, 67, 71, 83, 108, 117, 121, 127, 129, 175, 179, 185, 187, 190, 193, 199, 203, 205, 209, 212, 216, 431, 440, 450, 454.

1   office locations, psychiatric hospitals, detention centers and other locations where torture was

2   carried out, for the purpose of using this information during interrogations and forced conversion

3   (torture) sessions. Defendants thus necessarily had firsthand knowledge that Falun Gong

4   practitioners were tortured through the use of the Golden Shield.

5       **b. Plaintiffs allege extensive reporting on the widespread torture and persecution of Falun Gong in China, and the essential role of the Golden Shield in facilitating this torture and persecution.**

6

7   Plaintiffs cited numerous public reports – from the U.S. State Department, the U.S.

8   Congressional-Executive Commission on China, the U.S. Commission on International Religious

9   Freedom, the United Nations, independent international human rights organizations, and both

10   Western and Chinese major media outlets – documenting the widespread torture and persecution

11   of apprehended individuals in China, especially Falun Gong practitioners, from at least 1999

12   onwards. SAC ¶¶ 48-50, 159-65, 167, 173.

13   This Court conceded that Plaintiffs' allegations show that Defendants knew that the

14   Golden Shield would be used for "its security purpose – the apprehension of individuals

15   suspected of violating Chinese law through identifying, locating, profiling, tracking, monitoring,

16   investigating, and surveillance of such individuals." DE 13. *Nestle* II makes clear that a

17   defendant's knowledge of underlying human rights abuses can be sufficiently established by a

18   plaintiff's allegations of widespread reporting on those abuses. Slip Op. at 8. Therefore, based

19   upon the widespread reporting that China tortures individuals whom it apprehends, if the

20   Defendants knew they were substantially assisting the apprehension of individuals in China, they

21   also knew they were substantially assisting the torture of many of those individuals.

22   Even if these reports alone were not sufficient, Plaintiffs allege that reporting on the

23   subject was not limited merely to the fact that apprehended Falun Gong practitioners are tortured,

24   but was also specifically focused on the role played by the Golden Shield in facilitating this

25   persecution and torture, including:

26   • **U.S. Department of State, the United Nations, Independent Human Rights**

27   **Organizations, and Western Media Outlets**: "The use of the Golden Shield apparatus to

28   further the persecutory campaign against Falun Gong…has been reported widely in western

- 6 -

media outlets since 1999, and has been documented and universally condemned, beginning in 1999, by the U.S. Department of State, the United Nations, and a number of international human rights organizations..." SAC ¶ 51.

- **Defendants' Internal Reports**: The fact that Falun Gong practitioners were being tortured through the Golden Shield apparatus was documented in numerous reports directly received by high-level managers and directors of Defendant Cisco Systems, Inc. ("Cisco"), in which the persecutory "purpose of the Golden Shield network was clearly stated." *See* SAC ¶¶ 65, 210, 216. Cisco's Public Security sales team was "tasked with accessing and sharing with company superiors all public security information about the Golden Shield, including public security related reports emphasizing the '*zhuanhua*' purpose of the databases…" SAC ¶ 91. This team also communicated announcements by Communist Party media and local government websites which reiterated "Communist Party orders to use the Golden Shield to suppress Falun Gong," including reports stating the "need for Falun Gong databases, which would enable the categorization of Falun Gong believers according to their susceptibility to forced conversion tactics and thus to 'solve the problem of [their] forced conversion…easily.'" *See* SAC ¶ 88-90, 116-124. Defendants' own reports "confirm that local security officers…used the Golden Shield as the means to identify, capture and forcibly convert Falun Gong adherents." SAC ¶ 112.

- **Shareholder Resolutions and Public Demonstrations**: Defendants also received reports in the form of several Cisco shareholder resolutions presented to Cisco's Board of Directors, including Defendant Chambers, between 2002 and 2010, identifying concerns regarding human rights abuses and demanding an investigation into Cisco's complicity in these abuses. In each instance, the Board of Directors issued a statement recommending that shareholders reject the proposed investigations. *See* SAC ¶¶ 166, 174, 217. Beginning in 2003-2004, "physical demonstrations, including exhibitions depicting how Falun Gong believers were subjected to torture in China, were conducted outside Cisco's offices in San Jose by members of the United States Falun Gong community." SAC ¶ 167; *see also* SAC ¶ 177 (Cisco's Senior Director of Corporate Communications, Terry Alberstein, wrote a letter in 2005

- 7 -

1    published in the *Taipei Times* directly responding to allegations that Cisco contributed to

2    human rights abuses in China through its work on the Golden Shield).

3    Defendants therefore knew of the widespread torture and persecution of Falun Gong practitioners

4    in China, and that the Golden Shield was used to facilitate this campaign.

> **c.   Defendants gained firsthand knowledge by maintaining a long-term presence in China involving intimate business dealings with the Chinese Communist Party and Ministry of Public Security.**

7         The Defendants' firsthand knowledge of the torture and persecution of Falun Gong can

8    also be inferred, in light of *Nestle* II, through Plaintiffs' numerous allegations demonstrating that

9    the Defendants maintained a long-term presence in China, including numerous visits by high-

10   level Cisco executives and the establishment of intimate relationships with high-ranking Chinese

11   Communist Party and Public Security perpetrators of the crackdown on Falun Gong. Specifically,

12   Plaintiffs allege:

13   • **Firsthand Visits to China**: Defendants sent its San Jose "Advanced Services Team" to

14   project sites in China, which implemented and optimized features enabling Chinese security

15   "to access the profiled information stored in the apparatus and use it to forcibly

16   convert…Falun Gong." *See* SAC ¶¶ 85, 86, 97(b), 145, 146. Defendant Chambers and other

17   Cisco executives frequently visited China and met with high-ranking officials and key

18   perpetrators of the Falun Gong crackdown, including then-President and Party General

19   Secretary Jiang Zemin, in order to cultivate and maintain personal relationships. *See* SAC ¶¶

20   59, 69, 133, 196-203.

21   • **Visits to Online Training Sessions**: Defendants hosted and visited online training sessions,

22   in which Defendants "offered Cisco-developed software to facilitate the suppression of Falun

23   Gong believers," describing Falun Gong believers as "viruses" and "despicable." *See* SAC ¶¶

24   66, 97(b), 194.

25   • **Long-Term Presence in China**: Cisco has operated "extensively in China since 1994," with

26   direct oversight from San Jose headquarters. SAC ¶ 168. Defendants in San Jose developed

27   "reciprocal-benefit relationships ('*guanxi*') with highly influential Party leaders, public

28   security officers," and others to "help Cisco develop and maintain a stronghold in the

lucrative security technology market in China," requiring "a high level of familiarity with, and providing extensive support to, the persecutory purpose of the Golden Shield apparatus." SAC ¶ 58. In 1998, Cisco began operating in China through a subsidiary in order to accumulate "social capital for the U.S. company through their well-established relationships with high-ranking members of the Party," which required "the promise to meet the anti-Falun Gong objectives of the Golden Shield project." SAC ¶ 137. Cisco also operated through the China Research and Development Center ("CRDC") beginning in 2004, which was established "to manufacture Cisco products in China including Golden Shield parts and other technology used to '*douzheng*' Falun Gong in China." SAC ¶¶ 204, 205. Defendants distributed marketing materials "at trade shows across China," demonstrating "their intention to meet the persecutory objectives of the apparatus." SAC ¶ 70.

- **Due Diligence and Continual Assessments of the Chinese Market**: Defendants "conducted continual assessments of their investments in the Chinese market;" performed "due diligence reports" on "the intended and actual use of Cisco technology in China" and on "shareholder inquiries about the persecutory uses of the apparatus"; and "conducted careful review of types of Internet and other activity the Golden Shield was developed to identify and repress, including Falun Gong specific components and features." SAC ¶¶ 129, 130, 168.

When viewed through the lens of *Nestle* II, which relied on publicly available reports and firsthand knowledge gained through defendants' visits, it is implausible that similar publicly available reports, together with firsthand knowledge gained through San Jose Defendants' design and implementation of the Golden Shield and Defendants' long-term presence in China, did not give rise to Defendants' awareness that China violently and illegally persecutes Falun Gong practitioners, and that the Golden Shield was intended to be used, and was in fact used, to carry out this violent and illegal persecution.

### 2. In light of *Nestle* II, the Court should find that knowledge is sufficient to establish the requisite *mens rea*.

In the Order, this Court acknowledged the uncertain state of the law in the Ninth Circuit regarding the requisite *mens rea* standard to meet aiding and abetting liability under international

1    law, and accordingly applied "the more lenient standard identified…in [*Nestle* I], which does not

2    require the allegation of specific intent for <u>*mens rea*</u>." DE 12. However, the Ninth Circuit in

3    *Nestle* II, while declining to decide "whether a purpose or knowledge standard applies to aiding

4    and abetting ATS claims" (Slip Op. at 22), found that a knowledge standard "dates back to the

5    Nuremberg tribunals," (Slip Op. at 20 (citing *The Zyklon B Case*, 1 LAW REPORTS OF TRIALS OF

6    WAR CRIMINALS 93 (1946); *The Flick Case*, 6 Trials of War Criminals (T.W.C.) 1194, 1216-17,

7    1220-21; *The Ministries Case*, 14 T.W.C. 622)), and "has been embraced by contemporary

8    international criminal tribunals," which "consistently apply" a knowledge standard. *Nestle* II, Slip

9    Op. at 20 (citing *Prosecutor v. Blagojevic*, No. IT-02-60-A, ¶ 127 (ICTY, May 9, 2007);

10   *Prosecutor v. Kayishema*, No. ICTR-95-1-T, ¶ 205 (ICTR, May 21, 1999); *Khulumani v. Barclay*

11   *Nat'l Bank Ltd.*, 504 F.3d 254, 277-79 (2d Cir. 2007) (Katzmann, J., concurring); *Doe v. Exxon*

12   *Mobil Corp.*, 654 F.3d 11, 33-34 (D.C. Cir. 2011) *vacated on other grounds by* 527 F. App'x. 7

13   (D.C. Cir. 2013)).

14        The Ninth Circuit declined to articulate a standard because plaintiffs' allegations there

15   satisfied the purpose standard (*Nestle* II, Slip Op. at 22), and because two sister circuits have held

16   in favor of a purpose standard. Slip Op. at 21 (citing *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 399-400

17   (4th Cir. 2011); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d

18   Cir. 2009) ("*Talisman*")). But the Ninth Circuit found that these circuits reached this conclusion

19   only because they took the language of Article 25(3)(c) of the Rome Statute of the International

20   Criminal Court, 37 I.L.M. 999 (1998), which contains the word "purpose," "at face value,"

21   (*Nestle*, Slip Op. at 22), implying that a more complete analysis of the Rome Statute would lead

22   to the opposite conclusion, as was argued here in Plaintiffs' Opposition Brief. *See* DE 123 at 18-

23   19.

24        As such, the Court should, considering the Ninth Circuit's analysis in *Nestle* II favoring a

25   knowledge standard in conjunction with Plaintiffs' Opposition Brief, conclude that a knowledge

26   standard applies, thus concluding its *mens rea* analysis.

27

28

1

    **3.   In light of *Nestle* II, Plaintiffs' allegations also establish that Defendants acted purposefully.**

2

      If the Court instead finds that purpose is required, the Ninth Circuit's reasoning in *Nestle*

3

II militates in favor of finding that Plaintiffs' allegations meet such a standard.

4

      In concluding that the defendants in *Nestle* acted purposefully, the Ninth Circuit looked to

5

the defendants' profit motive to infer that they intentionally supported the use of child slavery

6

because it was the cheapest form of labor available. *See* Slip Op. at 22. The defendants "have not

7

merely profited by doing business with known human rights violators;" rather, they had a "plan to

8

benefit from the use of child slave labor." *Id*. at 23. Here, Defendants had the same "myopic focus

9

on profit over human welfare" as the defendants in *Nestle* (Slip Op. at 26). Just as the *Nestle*

10

defendants "intended to pursue all options available to reduce their cost for purchasing cocoa"

11

and thereby increase their profits (Slip Op. at 22), San Jose Defendants here intended to pursue all

12

options available not only to gain access to the lucrative and growing Chinese market, but to

13

continue to support this market in order to maintain their competitive edge and increase their

14

return. The Golden Shield market is described as "lucrative" throughout Plaintiffs' allegations,

15

SAC ¶¶ 55, 58, 126, 187, including the allegation that Defendants' San Jose internal files

16

"acknowledged that the purpose of the Golden Shield was to *douzheng* Falun Gong and described

17

this goal as a lucrative business opportunity for the company." SAC ¶ 187. Since 1994, Defendant

18

Chambers and other Cisco executives "consistently claimed [China's] market as one of the

19

company's key targets for future expansion." SAC ¶ 168. Western technology companies,

20

including Cisco, knew that the "most important goal" of the Golden Shield was the persecution of

21

Falun Gong, and that "gaining a threshold in the Chinese security market required the design,

22

development, and promotion of technology specifically tailored for this purpose." SAC ¶ 56. San

23

Jose Defendants created a marketing campaign "to win contracts to design and develop the

24

Golden Shield," SAC ¶ 72, and the "anti-Falun Gong purpose of the apparatus…played a

25

significant role" in this marketing campaign. SAC ¶ 58; *and see generally* SAC ¶¶ 58-74. San

26

Jose Defendants "expressed willingness to meet the stated purpose of the Golden Shield

27

apparatus, i.e., to *douzheng* Falun Gong through identification, tracking, interrogation and

28

ideological conversion," which "result[ed] in Cisco being awarded Golden Shield contracts." SAC ¶ 193. Based on its "overwhelmingly effective marketing campaign," Cisco was selected "on successive occasions to design and implement many Golden Shield components marketed as part of the Cisco 'life cycle,'" including several anti-Falun Gong features. SAC ¶ 74. San Jose Defendants "authorized the creation of the China Research and Development Center ('CRDC') in China…to avoid US export controls and gain a more competitive edge in the Chinese technology market." SAC ¶ 205. By 2007, Defendants in San Jose had managed the implementation of a three-tiered Golden Shield network in several Chinese provinces, SAC ¶ 107, thereby "cement[ing] Cisco's place as one of the top foreign technology providers in the Chinese market and further incentiviz[ing] Cisco to provide more and more effective solutions." SAC ¶ 108. Thus, the allegations are clear that San Jose Defendants specifically designed the Golden Shield to facilitate torture in order to gain access to one of the largest markets in the world, cement and maintain Cisco's status as the world's leading networking company, and turn a tremendous profit – regardless of the consequences for Plaintiffs and the millions of others targeted for persecution in China. Accord *Nestle* II, Slip Op. at 22.

The Ninth Circuit in *Nestle* II further supports its finding of purpose with allegations that "defendants had enough control over the Ivorian cocoa market that they could have stopped or limited the use of child slave labor by their suppliers." Slip Op. at 23. "[A]long with other large multinational companies, the defendants effectively control the production of Ivorian cocoa." *Id.* at 8. The defendants "did not use their control to stop the use of child slavery…but instead offered support that facilitated it." *Id.* at 23-24.

Here, Plaintiffs similarly allege facts indicating that Defendants, along with other large multinational companies, were in a position to control the design and implementation of the "gargantuan system of Falun Gong specific features" to which the Chinese Communist Party may not otherwise have had access and which were essential to the widespread campaign of torture and persecution. For example, Plaintiffs allege that the Chinese Communist Party and Chinese security sought out companies like Cisco because "Chinese engineers did not have the expertise to develop these technologies," SAC ¶ 55; that "Cisco recommended the use of many of these

- 12 -

first-of-a-kind features," which were "developed specifically to aid Chinese security officers" in the "interrogation" and "torture" of Falun Gong and which Party officers "could not have envisioned based on their lack of expertise; even technical experts in China lacked the experience, training, or resources to develop these cutting edge innovative solutions," SAC ¶ 76; that Defendants "also recommended to Chinese security more advanced features for the Golden Shield…[including] networked apparatus tasked with identification, profiling, high-level tracking, interrogating and forcibly converting through torture," SAC ¶ 181; and that "[w]ithout the information collected and assembled through the Golden Shield, it would not have been possible to carry out the human rights and other violations against [Plaintiffs] in the same manner, or at all." SAC ¶ 225, *see also* SAC ¶ 106 ("Without Cisco's networked technology…Public Security and Office 610 officers would not have been able to obtain sensitive information from almost anywhere in China such as home and work addresses, purchases, financial information, contact with other Falun Gong members, past Falun Gong activities, IP addresses, and family information (used for interrogation and forced conversion practices/purposes).").

Thus, while the level of control Defendants had over the Chinese market is not identical to the *Nestle* defendants in the Ivory Coast (due simply to the fact that the two cases involve markets for different goods), San Jose Defendants here still made the same legally relevant *purposeful choice*: although defendants in *Nestle* had the power to choose a form of labor other than child slave labor but chose child slave labor anyway, Defendants here had the power to withhold or limit the unprecedented technological innovations that enabled the widespread torture of Plaintiffs but chose instead to create and provide China with continued access to them. If, in *Nestle* II, "the defendants' failure to stop or limit child slavery supports the inference that they intended to keep that system in place" (Slip Op. at 24), then here, the Defendants' outright provision of torture-facilitating Golden Shield technology supports the inference that they intended to keep the widespread and violent campaign of torture in place.

The San Jose Defendants' plan to benefit from China's widespread persecution of Falun Gong practitioners "distinguishes this case from other ATS decisions where the purpose standard was not met." *Nestle* II, Slip Op. at 23 (citing *Talisman*, 582 F.3d at 262; *Aziz*, 658 F.3d at 394,

- 13 -

401). In *Talisman*, the underlying human rights atrocities carried out by the Sudanese military "ran contrary to the defendant's goals in the area, and even forced the defendant to abandon its operations." *Nestle* II, Slip Op. at 23 (citing *Talisman*, 582 F.3d at 262). Similarly, in *Aziz*, "plaintiffs alleged that the defendants sold chemicals knowing they would be used to murder Kurds in northern Iraq, but failed to allege that the defendants had anything to gain from the use of chemical weapons." *Nestle* II, Slip Op. at 23 (citing *Aziz*, 658 F.3d at 394, 401). Indeed, the plaintiffs in *Aziz* made only a "sole reference" to the defendant's intentional conduct: the defendant placed a chemical "into the stream of international commerce with the purpose of facilitating the use of said chemical in the manufacture of chemical weapons to be used, among other things, against the Kurdish population in northern Iraq." *Aziz*, 658 F.3d at 401. The court there found this allegation "cursory" and "untethered to any supporting facts." *Id*. Plaintiffs here, by contrast, nowhere allege that the torture and persecution of Falun Gong ran contrary to Defendants' goals or that Defendants were forced to abandon their operations as a result of these atrocities, as in *Talisman*. Further, where plaintiffs in *Aziz* alleged that the defendant engaged in an arms-length business transaction – the placement of a non-customized product into the stream of commerce – and simply labeled this behavior "purposeful" without further support for such a claim, Plaintiffs here, as discussed above, allege numerous facts showing that San Jose Defendants went well beyond an arms-length business transaction by planning, designing, constructing, and maintaining a massive, unprecedented, long-term technological project with customized anti-Falun Gong systems and features which were specifically directed to enable, among other things, torture through the identification, analysis, storage, and distribution of sensitive information used to interrogate and forcibly convert Falun Gong practitioners.

Therefore, if this Court finds that purpose is a required element for establishing aiding and abetting liability, it should follow the guidance provided by *Nestle* II and find that Plaintiffs have sufficiently alleged that San Jose Defendants acted purposefully.

**B.   In Light of *Nestle* II, Plaintiffs' Allegations Meet the *Actus Reus* Requirements for Aiding and Abetting Liability Under the ATS.**

*Nestle* II confirms that the required *actus reus* "is providing assistance or other forms of

- 14 -

support to the commission of a crime," and that the assistance must be at least "substantial." Slip Op. at 26. The Ninth Circuit stops short, however, of endorsing the disputed "additional requirement that the assistance must be specifically directed towards the commission of the crime," concluding instead, after surveying numerous international criminal cases, that "there is widespread substantive agreement" that *actus reus* "is established by assistance that has a substantial effect on the crimes, not the particular manner in which such assistance is provided." *Id*. at 26-27 (quoting *Prosecutor v. Taylor*, Case No. SCSL-03-01-A, ¶ 481 (SCSL Sept. 26, 2013)). Thus, "[w]hat appears to have emerged is that there is less focus on specific direction and more of an emphasis on the existence of a causal link between the defendants and the commission of the crime." *Nestle* II, Slip Op. at 27. The Ninth Circuit remanded to allow the *Nestle* plaintiffs to amend their complaint in light of its discussion of the international cases.

This Court determined that "the allegations in the SAC do not show that Defendants' conduct had a substantial effect on the perpetration of alleged violations against Plaintiffs." DE 12-13. While the Court did not elaborate further on this point, it should reconsider its conclusion in light of the guidance provided by *Nestle* II.

Under *Nestle* II, Plaintiffs' allegations must demonstrate a "causal link" between Defendant's design and implementation of the Golden Shield and the torture and other abuses suffered by the Plaintiffs, regardless of the "particular manner" in which Defendants provided their assistance. Such a causal link is established by Plaintiffs' allegations detailing the use by Chinese security officials of San Jose Defendants' Golden Shield technology to carry out mental and physical torture of Falun Gong detainees:

- **Identification and analysis of sensitive information used to torture Plaintiffs**: San Jose Defendants provided technology to identify, log, and analyze sensitive information used by Chinese security officials during the interrogation, torture and forced ideological conversion of Plaintiffs, including "home and work addresses, purchases, financial information, contact with other Falun Gong members, past Falun Gong activities, IP addresses, and family information," SAC ¶ 106, "online ID numbers; physical locations; history of engagement in Falun Gong activities or association with the religion; history of detention and efforts at

forced conversion through torture; and 'surveillance levels,' indicating the degree of difficulty likely to be involved in the forced conversion process, with advice as to how to convert Falun Gong believers based on this and other typologies," SAC ¶ 122, as well as "biometric data," SAC ¶ 131. San Jose Defendants provided "maintenance of a dynamic information management system that could keep up with the believers' changes in life style, thoughts, moods, susceptibility to threats, and other factors which had to be recorded meticulously to ensure successful" ideological conversion. SAC ¶ 100. San Jose Defendants provided technology to analyze this data, including a "library of 'signatures,' i.e., carefully analyzed patterns of Falun Gong Internet activity," SAC ¶ 80, identified by Cisco's Ironport software product, which was marketed as the "only product capable of recognizing over 90% of Falun Gong pictorial information," and which "required Cisco's extensive and long-term identification and analysis of Internet activity unique to Falun Gong practitioners." SAC ¶ 97(c). "[W]ith the approval of Defendants in San Jose, Cisco intentionally incorporated the Falun Gong-specific signatures into security software upgrades at regular intervals to ensure Falun Gong activities and individuals were identified, blocked, tracked and suppressed." *Id*.

- **Storage of this sensitive information in specific Falun Gong databases**: Defendants provided Falun Gong databases which enabled "the categorization of Falun Gong believers according to their susceptibility to forced conversion tactics," and which stored "sensitive information about Falun Gong practitioners who have been previously detained and/or apprehended, thereby enabling Chinese security officers to use the information to interrogate, forcibly convert and torture practitioners in part based on their previous encounters with Chinese security." SAC ¶¶ 88, 111. Defendants "ensured that the apparatus could handle the exact types of data that the Golden Shield would compile, store and make available to Chinese security." SAC ¶ 131. Communist Party reports detail the ways this technology allows them to "solve the problem [of transformation] easily" by "creating a detailed, highly effective, flexible and free-flowing information database" with "family composition, contact information, information of their sons and daughters, where they live etc." SAC ¶ 89.

- **Integration of Falun Gong databases with other systems**: Defendants integrated Falun Gong databases with "public security command and dispatch centers, intelligence and information analysis centers, mobile and front line police technology," "police stations, police detention centers, black jails, public security mental hospitals, rehabilitation clinics, 'love and care' rehabilitation centers, labor camps, and other facilities." SAC ¶ 98(g)-(h). These secure connections to databases allowed "for thorough cross-checking of names, affiliations, political behavior, family history, and 'footprints.'" SAC ¶ 68. Defendants integrated Falun Gong databases with information systems, notification systems, and Cisco security software "not only to enable the identification and tracking of Falun Gong, but also and specifically to give Chinese security access to the sensitive information to facilitate the *zhuanhua*…of Falun Gong believers based on their individual social and economic circumstances, and the amount of leverage that can be exercised against them through threats against family members, fellow adherents, and others." SAC ¶ 85.

This type of sensitive information was in fact essential to the specific instances of torture suffered by individual Plaintiffs. SAC ¶¶ 237, 247, 256, 269, 273, 289, 292, 313.

Thus, there is a strong, specifically alleged causal link between the actions of the Defendants and the abuses suffered by the Plaintiffs. In light of *Nestle* II, the Court should therefore reconsider its conclusion that the Defendants' conduct did not have a substantial effect on the perpetration of the torture and other abuses suffered by Plaintiffs.

## II.   *NESTLE* II REQUIRES RECONSIDERATION OF THIS COURT'S APPROACH TO EXTRATERRITORIALITY.

*Nestle* II rejected the approach to extraterritoriality in ATS claims put forth by Justices Alito and Thomas in their *Kiobel* concurrence (133 S.Ct. at 1669), which urges the adoption of the "focus" test from *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), to determine whether ATS claims sufficiently "touch and concern" the United States. *See Nestle* II, Slip Op. at 30-31. Under this test, the presumption against extraterritoriality is rebutted only if the event or relationship that was the focus of congressional concern is in the United States. *See id*. at 30 (discussing *Morrison*, 561 U.S. at 266). Thus, Justices Alito and Thomas argued "a putative

- 17 -

ATS cause of action will fall within the scope of the presumption against

extraterritoriality…unless *the domestic conduct is sufficient to violate an international law norm*

that satisfies *Sosa*'s requirements..." *Kiobel*, 133 S.Ct. at 1670 (emphasis added).

      The Ninth Circuit found the Alito-Thomas concurrence unpersuasive in *Nestle* II,

however, determining that the focus test "cannot sensibly be applied to ATS claims." Instead, the

Ninth Circuit deemed the majority's "touch and concern" language to be a "new…test for

determining when it is permissible for an ATS claim to seek the extraterritorial application of

federal law." *Nestle* II, Slip Op. at 29, 30; *see also Al-Shimari v. CACI Premier Technology*, 758

F.3d 516, 528-531 (4th Cir. 2014) (stating that "We disagree with the defendants' argument,

which essentially advances the view expressed by Justices Alito and Thomas" and instead

requiring "a fact-based analysis" of factors such as the citizenship of the corporation, the

citizenship of the individual agents and employees, the contractual relationship with the United

States, the U.S. defendants' tacit approval of the underlying violations, and the United States'

interest in regulating the conduct).[5]

      The Ninth Circuit remanded to allow plaintiffs to amend in light of *Kiobel*, noting that

"we are unable to conclude that amendment would be futile, because *unlike the claims at issue in*

*[Kiobel], the plaintiffs contend that part of the conduct underlying their claims occurred within*

*the United States.*" *Nestle* II, Slip Op. at 31 (emphasis added). Although the Ninth Circuit

declined to determine the issue, it is clear that domestic acts which merely *aid and abet* the

underlying violations may be sufficient to "touch and concern" the United States – even if all of

the acts constituting the underlying violations occurred abroad. *See Nestle* II, Slip Op. at 7-8

(conduct violating the international law norm against child slavery all occurred in Ivory Coast).

      This Court, however, appears to have followed the Alito-Thomas approach. DE at 10

---

[5] A fact-based analysis has also been advanced in the wake of *Kiobel* by a number of district courts. *See Kaplan v. Cent. Bank of Islamic Republic of Iran*, 2013 WL 4427943 (D.D.C. Aug. 20, 2013) (applying factors-based test); *Sexual Minorities Uganda v. Lively*, 2013 WL 4130756 (D. Mass. Aug. 14, 2013) (applying factors-based test and denying motion to dismiss based on U.S. conduct and residence); *Mwani v. Bin Laden*, 2013 WL 2325166 (D.D.C. May 29, 2013) (applying factors-based test and denying motion to dismiss based on U.S. conduct and interests); *Mohammadi v. Islamic Republic of Iran*, 2013 WL 2370594, *14–15 (D.D.C. May 31, 2013) (applying factors-based test).

1    ("The domestic conduct of the Defendants is not, as set forth by Justices Alito and Thomas,

2    'sufficient to violate an international law norm'" because the international law violations

3    themselves (e.g., torture) were not "planned or directed" domestically).[6] In light of the Ninth

4    Circuit's rejection of this approach, this Court should reconsider this matter and find that

5    Plaintiffs' claims do sufficiently "touch and concern" the United States under *Kiobel*. While

6    *Nestle* II does not set forth a specific "touch and concern" test, this Court could look to the fact-

7    based analysis put forth in *Al-Shamari* 758 F.3d at 530-31, in which a number of factors weigh in

8    favor of a finding that the Plaintiffs' claims touch and concern the United States: Cisco is a U.S.

9    corporation, SAC ¶ 22; managers and employees who are American citizens directed and planned

10   the Golden Shield project from San Jose headquarters, SAC ¶¶ 126-35; and the United States has

11   an interest in regulating the conduct, as evidenced by U.S. condemnations of the persecution of

12   Falun Gong in China, SAC ¶¶ 48, 51, 164, 173, and by U.S. export controls on crime-control

13   products sold to China, SAC ¶ 205. Plaintiffs further allege that San Jose Defendants gave tacit

14   approval to the abuses by marketing and designing the Golden Shield, including designs enabling

15   "Chinese security at public security psychiatric hospitals, public security hospitals, 610 office

16   locations, to access…profiled information…and use it to forcibly convert…Falun Gong," SAC ¶

17   86. In addition, implementation of the project was assigned to an "Advanced Services

18   Team…offered by San Jose Defendants," SAC ¶ 145, and San Jose headquarters "controlled all

19   decision-making and related management over the project." SAC ¶ 108.

20          As such, Plaintiffs' claims sufficiently "touch and concern" the United States.

21

22

23   ─────────────────

24   [6] Although "planning or directing" is not required in light of *Nestle* II, it remains the case that by
     integrating Falun Gong databases with "public security command and dispatch centers,

25   intelligence and information analysis centers, mobile and front line police technology," "police
     stations, police detention centers, black jails, public security mental hospitals, rehabilitation

26   clinics, 'love and care' rehabilitation centers, labor camps, and other facilities," SAC ¶ 98(g)-(h),
     "not only to enable the identification and tracking of Falun Gong, but also and specifically to give

27   Chinese security access to the sensitive information to facilitate the *zhuanhua*…of Falun Gong
     believers," SAC ¶ 85, Defendants in effect "planned" an entire system for carrying out acts of

28   torture.

- 19 -

III.   **BECAUSE THE PLAINTIFFS ADEQUATELY ALLEGE AIDING AND ABETTING, THE COURT MUST ALSO RECONSIDER THE PLAINTIFFS' ECPA CLAIMS.**

This Court determined that Defendants are exempt under section 2512(2) the ECPA because its "business is the manufacture, assembly, and sale of wire or electronic communication service and it created the Golden Shield system as part of its normal course of business in China." DE 153 at 13. However, because Plaintiffs' allegations are sufficient to establish that Defendants aided and abetted torture and other serious human rights violations for all the reasons stated herein, it cannot possibly be the case that Defendants were acting in the normal course of business. As such, this matter merits reconsideration as well.

### CONCLUSION

Because the Court's previous Order dismissing Plaintiffs' claims declined to consider the Ninth Circuit's decision in *Nestle* II and is inconsistent with it for all the reasons stated herein, Plaintiffs respectfully request that the Court reconsider its previous Order and alter or amend its decision to allow Plaintiffs' claims to go forward.

Pursuant to Local Rule 7-1(b), Plaintiffs further request that this motion be heard without oral argument.

Dated: October 3, 2014                    Respectfully Submitted,

By: ____/s/ Terri E. Marsh_____
Terri E. Marsh
HUMAN RIGHTS LAW FOUNDATION


By: ____/s/ K. Lee Crawford-Boyd_____
K. Lee Crawford-Boyd
SCHWARCZ, RIMBERG, BOYD & RADER, LLP
Attorneys for Plaintiffs

- 20 -