QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Kathleen M. Sullivan (CA Bar No. 242261)
   kathleensullivan@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood City, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

   Faith E. Gay (*pro hac vice*)
   faithgay@quinnemanuel.com
   Isaac Nesser (*pro hac vice*)
   isaacnesser@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Attorneys for the Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| Doe I, Doe II, Ivy He, Doe III, Doe IV, Doe V, Doe VI, Roe VII, Charles Lee, Roe VIII, Doe IX, Liu Guifu, Wang Weiyu, and those individuals similarly situated,<br><br>         Plaintiffs,<br><br>   v.<br><br>Cisco Systems, Inc., John Chambers, Fredy Cheung, and Does 1-100,<br><br>         Defendants. | Case No. 5:11-cv-02449-EJD<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION**<br><br>Action Filed: May 19, 2011<br>Judge: Hon. Edward J. Davila<br><br>Hearing Date: March 5, 2015<br>Time: 9:00 a.m.<br>Courtroom: 4, 5th Floor |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................................... 1

ARGUMENT ...................................................................................................................................... 2

I.    Plaintiffs' Motion Fails To Meet The Stringent Standard For Reconsideration ................... 2

II.    Reconsideration Should Be Denied Because *Nestle II* Did Not Change The Law As To Any Of This Court's Multiple Independent Bases For Dismissal ................................. 4

    A.    *Nestle II* Did Not Change The Prohibition Against Extraterritorial Application Of The ATS ............................................................................................... 4

    B.    *Nestle II* Did Not Change The ATS's *Actus Reus* Requirement ............................... 7

    C.    *Nestle II* Did Not Change The ATS's *Mens Rea* Requirement ................................. 9

    D.    *Nestle II* Did Not Discuss Or Change The ECPA ..................................................... 14

CONCLUSION ................................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aziz v. Alcolac, Inc.*,
    658 F.3d 388 (4th Cir. 2011)...........................................................................................12

*Carranza v. Lewis*,
    No. 12-cv-01169, 2012 WL 3627790 (N.D. Cal. Aug. 21, 2012) .......................................2, 3, 4

*In re Celera Corp. Secs. Litig.*,
    No. 10-cv-02604, 2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) .................................................3

*Doe I v. Nestle USA, Inc.*,
    766 F.3d 1013 (9th Cir. 2014)............................................................................................. *passim*

*Doe I v. Nestle, S.A.*,
    748 F. Supp. 2d 1057 (C.D. Cal. 2010)...........................................................................10

*Kiobel v. Royal Dutch Petroleum*,
    133 S. Ct. 1659 (2013)  ...............................................................................................1, 4, 5, 6

*McDowell v. Calderon,*
    197 F.3d 1253 (9th Cir. 1999)..............................................................................................3

*McNeal v. Rush*,
    No. 11-cv-02798, 2012 WL 5350342 (N.D. Cal. Oct. 29, 2012)................................................3

*Presbyterian Church of Sudan v. Talisman Energy*,
    582 F.3d 244 (2d Cir. 2009) ...........................................................................................12

*Pyramid Lake Paiute Tribe of Indians v. Hodel*,
    882 F.2d 364 (9th Cir. 1989)..............................................................................................3

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ..........................................................................................................6

*Twentieth Century–Fox Film Corp. v. Dunnahoo*,
    637 F.2d 1338 (9th Cir. 1981)..............................................................................................2

**PRELIMINARY STATEMENT**

This Court's September 5, 2014 decision (the "Decision") held that the Alien Tort Statute ("ATS") claims alleged in Plaintiffs' Second Amended Complaint (the "SAC") fail for the independent reasons that: (1) they allege extraterritorial conduct occurring in China that does not "touch and concern" the United States as required for an ATS cause of action under *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659, 1669 (2013); (2) they fail to allege conduct with a "substantial effect" on the alleged violations, as required to support the *actus reus* for ATS aiding and abetting liability; and (3) they fail to allege facts sufficient to satisfy the applicable *mens rea* requirement for ATS aiding and abetting liability.  Contrary to Plaintiffs' arguments in their Motion for Reconsideration (Dkt. 155), the Ninth Circuit's recent decision *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014) ("*Nestle II*") provides no basis for reconsideration of those holdings, or for the Decision's dismissal of Plaintiffs' Electronic Communications Privacy Act ("ECPA") claim:

*First*, the Ninth Circuit in *Nestle II* explicitly held that it was not changing the law as to any of the issues upon which this Court premised its dismissal of Plaintiffs' ATS claims.  As to the prohibition against extraterritorial application of the ATS, *Nestle II* "decline[d] to resolve" disputes concerning the applicable standard under *Kiobel*, stating that "it would be imprudent" to announce new law on that issue.  *Nestle II*, 766 F.3d at 1027, 1028.  As to the *actus reus* requirement for ATS aiding and abetting claims, *Nestle II* again announced no holding:  "[W]e decline to adopt an *actus reus* standard for aiding and abetting liability under the ATS."  *Id.* at 1026.   And as to the *mens rea* requirement for ATS aiding and abetting claims, the Ninth Circuit likewise declined to rule:  "[W]e need not decide whether a purpose or knowledge standard applies to aiding and abetting ATS claims."  *Id.* at 1024.  Because *Nestle II* expressly declined to make new law on any of the issues Plaintiffs identify in their motion, reconsideration should be denied.

*Second*, because the Decision's extraterritoriality, *actus reus*, and *mens rea* holdings were each an independent basis on which to dismiss the ATS claims, *Nestle II* would need to have changed the law in Plaintiffs' favor on *all three* issues in order to warrant reconsideration of the

Decision's dismissal of the ATS claims. Because *Nestle II* did not change the law on *any* of the three issues, there is no basis at all for reconsideration.

*Third*, even setting aside all the foregoing, Plaintiffs' motion misconstrues both *Nestle II* and this Court's Decision, such that all of their remaining arguments as to extraterritoriality, *actus reus*, and *mens rea* are mistaken even on their merits. This Court has already considered the precise SAC allegations that Plaintiffs again press here. *Nestle II*, which involved a defendant that allegedly exerted direct control over the use of child labor on cocoa plantations in the Ivory Coast and allegedly had a direct monetary incentive to maximize the use of such child labor through its purely private commercial transactions, is not comparable to Cisco, which (a) had no control over sovereign Chinese government authorities' use of their own networking infrastructure, and (b) stood to gain nothing if unnamed Chinese law enforcement authorities, many steps removed from Cisco's sales contacts, later used that infrastructure to pursue illegal activities.

*Finally*, there is no basis for reconsideration of this Court's dismissal of Plaintiffs' ECPA claim, because Plaintiffs' argument on this score (a) depends on obtaining reconsideration of its ATS claims, which Plaintiffs cannot do for the reasons discussed above, (b) rests on *Nestle II*, which did not address or discuss the ECPA, and (c) would not suffice to reinstate the ECPA claim in any event, due to Defendants' other arguments for dismissal of that claim.

The extraordinary relief of reconsideration should be denied.

## ARGUMENT

### I. PLAINTIFFS' MOTION FAILS TO MEET THE STRINGENT STANDARD FOR RECONSIDERATION

Plaintiffs' motion should be denied as a threshold matter because Plaintiffs make no attempt to satisfy the demanding standard applicable to motions for reconsideration, which "should not be frequently made or freely granted," and "are not a substitute for appeal or a means of attacking some perceived error of the court." *Carranza v. Lewis*, No. 12-cv-01169, 2012 WL 3627790, at *1 (N.D. Cal. Aug. 21, 2012) (Davila, J.) (citing *Twentieth Century–Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981)). As courts have explained, a motion for

1  reconsideration under Rule 59(e) "'should not be granted, absent highly unusual circumstances,
2  unless the district court is presented with newly discovered evidence, committed clear error, or if
3  there is an intervening change in the law.'" *Carranza*, 2012 WL3627790, at *1 (quoting
4  *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc)); *see also Pyramid Lake*
5  *Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (reconsideration requires
6  "an intervening change of controlling law, the availability of new evidence, or the need to correct
7  a clear error or prevent manifest injustice") (citation omitted).   Likewise, Rule 60(b)(6) "requires
8  a showing that the grounds justifying relief are extraordinary; mere dissatisfaction with the court's
9  order or belief that the court is wrong in its decision are not adequate grounds for relief."  *Id*. at
10 *2 (quoting *Twentieth Century–Fox Film*, 637 F.2d at 1341).

11     As to both Rule 59 and Rule 60, "a district court does not commit clear error warranting
12 reconsideration when the question before it is a debatable one."  *McNeal v. Rush*, No. 11-cv-
13 02798, 2012 WL 5350342, at *2 (N.D. Cal. Oct. 29, 2012) (Davila, J.) (citing *McDowell*, 197 F.3d
14 at 1256).   Indeed, even where clear legal error has been demonstrated (as it cannot be here),
15 reconsideration is warranted only as to "legal arguments [that] would … have been dispositive of
16 the issue"—*i.e*., not where (as here) there were alternative grounds upon which the Court could
17 have reached the same conclusion.  *In re Celera Corp. Secs. Litig*., No. 10-cv-02604, 2013 WL
18 4726097, at *2 (N.D. Cal. Sept. 3, 2013) (Davila, J.).   The same is true as to factual errors.  *Id*.
19 at *3 (even though court's presentation of facts could have been clearer, because a "more complete
20 understanding of the facts would not have changed the outcome, leave to file a reconsideration
21 motion on this ground is denied").

22     Plaintiffs' motion cannot satisfy the foregoing test.   As demonstrated in Section II below,
23 *Nestle II* did not change the applicable law in any relevant respect.   Moreover, because the
24 Decision was based on three independent grounds, even a change of law as to one or two of them
25 would "would [not be] dispositive of the issue," as required to support reconsideration.  *In re*
26 *Celera*, 2013 WL 4726097, at *2.   Far from relying on any dispositive change in law, Plaintiffs'
27 motion—which devotes multiple pages to bare repetition of SAC paragraphs that Plaintiffs
28 previously presented in their opposition to the motion to dismiss, and which this Court considered

-3-   Case No. 5:11-cv-02449-EJD
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION

and rejected as a plausible basis for ATS liability—is in reality a disguised "means of attacking some perceived error of the court" (*Carranza*, 2012 WL 3627790, at *1), and ultimately little more than an expression of Plaintiffs' "dissatisfaction" (*id.* at *2) with the Court's resolution of contested issues.  This is no basis for the "extraordinary" and "highly unusual" relief of reconsideration.   *Id.* at *1-2.

## II.   RECONSIDERATION SHOULD BE DENIED BECAUSE *NESTLE II* DID NOT CHANGE THE LAW AS TO ANY OF THIS COURT'S MULTIPLE INDEPENDENT BASES FOR DISMISSAL

### A.   *Nestle II* Did Not Change The Prohibition Against Extraterritorial Application Of The ATS

As the first of three independent bases for dismissal of Plaintiffs' ATS claims, the Decision held that the claims are barred by *Kiobel* because they "seek[] relief for violations of the law of nations occurring outside the United States."   133 S. Ct. at 1669; Decision at 9-10.   Specifically, based upon a careful review of the SAC's particular allegations, the Decision held that there is no "sufficient nexus between the Defendants' actions and the alleged violations committed by Chinese actors on Chinese soil [as necessary] to meet [*Kiobel*'s] 'touch and concern' test" (Decision at 9); that "Plaintiffs have not shown that the alleged human rights abuses committed against them in China … were planned, directed, or committed in the United States or directed against the United States" (*id.* at 10); that "[a]llegations of meetings with Party members, shareholders' complaints, and acknowledgment that the [Golden Shield] system was to be used to 'stop' or apprehend Falun Gong still do not establish Defendants' planning, direction, or participation in the human rights abuses committed against Plaintiffs" (*id.*); and that "Defendants' creation of the Golden Shield system, even as specifically customized for Chinese authorities and even if directed and planned from San Jose, does not show that human rights abuses perpetrated in China against Plaintiffs touch and concern the United States with sufficient force to overcome the ATS's presumption against extraterritorial application" (*id.*).

Nothing in *Nestle II* supports reconsideration of the foregoing holdings.

*First*, *Nestle II* did not work any change in the extraterritoriality analysis.   To the contrary, *Nestle II* expressly declined to render *any holding* as to that issue, stating "[w]e decline

to resolve the extraterritoriality issue," and that "it would be imprudent to attempt to apply and refine the touch and concern test" on the record presented. *Nestle II*, 766 F.3d at 1027, 1028; *see also* Dkt. 155 at 18 (conceding that "the Ninth Circuit [in *Nestle II*] declined to determine" the scope of the touch and concern test). Rather than relying on any purportedly new Ninth Circuit standard, Plaintiffs' reconsideration motion is actually a thinly disguised request that this Court adopt a standard recently articulated by the *Fourth* Circuit. *See* Dkt. 155 at 19 ("While *Nestle II* does not set forth a specific 'touch and concern' test, this Court could look to the fact-based analysis put forth in *Al-Shamari*, 758 F.3d at 530-31 …."). But decisions issued outside this jurisdiction are not grounds for reconsideration here.[1] Because *Nestle II* expressly declined to construe the "touch and concern" test, and instead left that question for another day, there has been no change of law in this Circuit supporting reconsideration.

*Second*, Plaintiffs wrongly contend that the Decision was based on Justice Alito's *Kiobel* concurrence, and that *Nestle II* rejected reliance on that concurrence. To begin with, as indicated above, *Nestle II* expressly declined to construe *Kiobel*'s "touch and concern" requirement—certainly it neither endorsed nor rejected Justice Alito's gloss on that requirement. Yet even if *Nestle II* could be construed as rejecting Justice Alito's concurrence (which it cannot), there would be no implication here because the Decision did not adopt or apply Justice Alito's test. Far from dismissing Plaintiffs' ATS claims for failure to allege domestic conduct that was itself sufficient to violate international law (as Justice Alito's concurrence would require, and as Plaintiffs contend the Decision held, s*ee* Dkt. 155 at 17-18), the Decision actually suggested that ATS jurisdiction can exist not only if the alleged international law violation *itself* "[o]ccurred domestically," *but also* if the international law violation "was planned or directed domestically, or … was directed at the United States." Decision at 9; *see also* Decision at 11 (ATS claim potentially permissible

---

[1] In any event, the "fact based analysis" that Plaintiffs advocate here (Dkt. 155 at 9) is no different from the "fact-sensitive test" that Plaintiffs advocated in their opposition to the motion to dismiss (Dkt. 125-1 at 7-8), which this Court considered as part of its Decision. Likewise, the SAC paragraphs cited in Plaintiffs' reconsideration motion are essentially the same as the SAC paragraphs Plaintiffs cited in their opposition ot the motion to dismiss. *Compare* Dkt. 155 at 19 (citing *inter alia* SAC ¶¶ 86, 108, 126-35, and 145 in opposition to *Kiobel* dismissal), *with* Dkt. 125 at 3, 11, 12 (citing same paragraphs in support of same argument).

based on showing "that tortious acts were planned [or] directed … in the United States," even if they were executed elsewhere). That is a far cry from Justice Alito's test.[2] In other words, the Decision did not dismiss Plaintiffs' ATS claims on the basis that the alleged domestic conduct was itself insufficient to violate international law, as Plaintiffs posit. It instead explained that the domestic conduct did not have a "sufficient nexus" to the alleged international law violations. Decision at 9. That is little different from test Plaintiffs advocate in their reconsideration brief, and hence not grounds for reconsideration. *See* Dkt. 155 at 18 ("Although the Ninth Circuit declined to determine the issue, it is clear that domestic acts which merely *aid and abet* the underlying violations may be sufficient to 'touch and concern' the United States—even if all of the acts constituting the underlying violations occurred abroad.").

*Third*, any discussion of *Kiobel*'s "touch and concern" standard in *Nestle II* would in any event be irrelevant, because *Nestle II* did not implicate the justiciability issues presented here. In *Kiobel*, the Supreme Court recognized that one reason to apply the presumption against extraterritorial application of U.S. law to ATS suits is that such suits necessarily intrude upon the political branches' conduct of foreign affairs and on considerations of international comity, implicating related considerations under the political question and act of state doctrines. 133 S. Ct. at 1664; *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 761 (2004) (important for courts to ask "whether the exercise of jurisdiction under the ATS is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement") (Breyer, J, concurring). As discussed in Defendants' motion to dismiss, the SAC implicates these issues directly, by alleging transactions, law enforcement activity, and legislative acts of Chinese government authorities, with which Cisco transacted against the backdrop of (and in compliance with) legislation passed by the U.S. Congress and

---

[2] Far from adopting Justice Alito's concurrence as if it were the holding of *Kiobel*, the Decision quoted Justice Alito's observation that the majority decision "le[ft] much unanswered," and Justice Kennedy's similar observation that the majority had been "careful to leave open a number of significant questions." Decision at 8 n.2 (quoting *Kiobel*, 133 S. Ct. at 1669). The Decision thus took into account Plaintiffs' argument, expressed in their opposition to the motion to dismiss, that Justice Alito's concurrence is merely a "minority test" that "conflicts with *Sosa*." Dkt. 125-1 at 16.

regulations issued by the U.S. executive branch for the express purpose of balancing the Nation's policy of economic and political engagement with China against concerns about China's respect for civil and human rights. *Nestle II*, by contrast, concerned alleged commercial transactions between private entities. This is yet another reason why *Nestle II* does not warrant reconsideration.

Accordingly, there is no basis for reconsidering the Decision's holding that the ATS claims must be dismissed for lack of a sufficient connection to the United States. Because that holding was not only proper but also sufficient on its own to deny Plaintiffs' ATS claims in their entirety, the remainder of Plaintiffs' reconsideration motion can be denied without further inquiry.

### B.  *Nestle II* Did Not Change The ATS's *Actus Reus* Requirement

Even if the Decision's holding as to extraterritoriality were mistaken (it was not), the Decision also dismissed Plaintiffs' ATS claims for the second and independent reason that the SAC fails to adequately allege conduct with a "substantial effect" on the alleged violations, as required to support the *actus reus* of aiding and abetting liability. There is no basis for reconsideration of that holding.

*First*, *Nestle II* did not change the law as to the ATS's *actus reus* standard. To the contrary, it expressly announced *no holding* on that issue:  "[W]e decline to adopt an *actus reus* standard for aiding and abetting liability under the ATS."  *Nestle II*, 766 F.3d at 1026.  Plaintiffs concede this point. *See* Dkt. 155 at 14-15 (no argument that *Nestle II* changed the relevant standard). Because *Nestle II* did not change the relevant law, there is no basis for reconsideration. Plaintiffs' motion should be denied on this basis alone.

*Second*, even taking account of dicta, *Nestle II* in no way suggests that the *actus reus* standard employed in the Decision was mistaken. In fact, the "substantial effect" test for *actus reus*, which this Court employed in the Decision at *Plaintiffs' own request* in their opposition ot the motion to dismiss, is the *most lenient* standard discussed in *Nestle II* as potentially being appropriate. *Compare* Decision at 12-13 ("the allegations in the SAC do not show that Defendants' conduct had a *substantial effect* on the perpetration of alleged violations against Plaintiffs"), *and* Dkt. 125-1 at 20 (*actus reus* requires "practical assistance … [that] has a

*substantial effect* on the perpetration of the crime"), *with Nestle II*, 766 F.3d at 1026 (discussing parties' agreement that "*actus reus* … is [at minimum] providing assistance or other forms of support to the commission of a crime … [which is] … *substantial*") (all emphases added). Plaintiffs may not seek reconsideration of the "substantial effect" *actus reus* standard employed in the Decision when (a) it was Plaintiffs themselves who suggested that standard, and (b) *Nestle II* made clear that that standard is the *minimum* the Ninth Circuit might be prepared to accept. Indeed, far from endorsing a change of law in *Plaintiffs'* favor, *Nestle II* actually suggested that the "substantial effect" standard employed in the Decision might have been too lenient, because it did not "impose[] the additional requirement that the assistance must be *specifically directed* towards the commission of the [alleged] crime," *Nestle II*, 766 F.3d at 1026 (emphasis added); *id.* at 1026-27 (remanding to district court for further proceedings as a predicate to adopting a holding as to whether "specific direction" is required), as Defendants had advocated in their motion to dismiss, *see* Dkt. 119-1 at 20 (advocating the "specific direction" requirement).  Nothing in *Nestle II* suggests a change of law in Plaintiffs' favor.

*Third*, although *Nestle II* expressly declined to adopt any holding as to the *actus reus* requirement—"we decline to adopt an *actus reus* standard," 766 F.3d at 1026—its dicta concerning a "causal link" between alleged acts and injuries is of no help to Plaintiffs.  As the Decision recognized, the Plaintiffs' alleged physical injuries here were at most "caused" by the Chinese law enforcement personnel who inflicted them—not by networking equipment that at most assisted Chinese authorities in identifying and "apprehen[ding] … individuals suspected of violating Chinese law," and who other unnamed individuals injured at some unspecified point thereafter.  Decision at 13.  The litany of SAC allegations that Plaintiffs have copied and pasted into their reconsideration motion is therefore irrelevant because it at most demonstrates a causal link between the Golden Shield and the lawful apprehension of individuals suspected of violating Chinese law—not a causal link between the Golden Shield and any of Plaintiffs' physical injuries. Indeed, the SAC paragraphs Plaintiffs now cite are essentially the same paragraphs that Plaintiffs cited in opposition to the motion to dismiss, and that this Court held were insufficient to allege *actus reus*.  *Compare* Dkt. 155 at 15-17 (citing *inter alia* SAC ¶¶ 68, 80, 85, 88, 89, 97(c), 98(g)-

1  (h), 100, 106, and 131 as support for purported sufficiency of *actus reus* allegations), *with* Dkt.
2  125-1 at 23-24 (citing the same paragraphs in support of the same argument).

3  There is thus no basis for reconsideration of this Court's holding that the ATS claims must
4  be dismissed for failure to allege *actus reus*—a fact that itself suffices to deny Plaintiffs' entire
5  motion.

6  **C.    *Nestle II* Did Not Change The ATS's *Mens Rea* Requirement**

7  Even were there any merit in Plaintiffs' arguments concerning this Court's
8  extraterritoriality and *actus reus* holdings (there is not), reconsideration would still be
9  inappropriate because the Decision dismissed Plaintiffs' ATS claims for the third and independent
10 reason that the SAC fails to allege facts sufficient to satisfy the applicable *mens rea* requirement.
11 As the Decision explained, Plaintiffs failed entirely to allege the Defendants' knowledge or
12 purpose to commit human rights violations.  Rather, the SAC at most alleged knowledge or a
13 purpose to assist Chinese law enforcement authorities in apprehending suspected criminals:

> [T]he allegations in the SAC do not show that [Defendants] … knew that their product would be used beyond its security purpose—the apprehension of individuals suspected of violating Chinese law through identifying, locating, profiling, tracking, monitoring, investigating, and surveillance of such individuals—to commit the alleged violations of torture and forced conversion.
>
> Even if Defendants knew that the Golden Shield was used by Chinese authorities to apprehend individuals, including Plaintiffs, there is no showing that Defendants also knew that Plaintiffs might then be tortured or forcibly converted.  The customization, marketing, design, testing, and implementation of the Golden Shield system is not enough to support an inference of knowledge on the part of Defendants that torture or other human rights abuses would be committed against Plaintiffs.  The product produced by Defendants—even as specifically customized—can be used for many crime-control purposes in China without permitting torture or other human rights abuses.  The conclusory allegations and inferences of knowledge pled in the SAC do not sufficiently show that Defendants had knowledge of the violations.

Decision at 12-13.  *Nestle II* provides no basis on which to reconsider the Court's determination.

*First*, *Nestle II* explicitly declined to announce any new holding on the question of whether a "purpose" or "knowledge" *mens rea* standard should apply to ATS claims:  "[W]e need not decide whether a purpose or knowledge standard applies to aiding and abetting ATS claims." *Nestle II*, 766 F.3d at 1024; *see* Dkt. 155 at 10 (conceding that "[t]he Ninth Circuit [in *Nestle II*] declined to articulate a [*mens rea*] standard").  Indeed, far from adopting the more lenient

1  "knowledge" standard that Plaintiffs' reconsideration motion argues is somehow compelled by
2  *Nestle II* (*see* Dkt. 155 at 9-10), *Nestle II* actually did precisely the opposite:  It held the
3  complaint's allegations sufficient under the *purpose* standard; vacated *Nestle I* in which the same
4  panel of the Ninth Circuit had adopted a "knowledge" standard; and reserved the resolution of the
5  purpose/knowledge question for another day.   Notably, this Court relied on *Nestle I* as binding
6  authority that permitted Plaintiffs to prevail based solely on a mens rea of "knowledge"—a
7  holding that the Ninth Circuit has now expressly repudiated.   *See* Decision at 12 ("[T]the Ninth
8  Circuit has found that a district court erred in requiring plaintiffs to allege specific intent to satisfy
9  the applicable purpose *mens rea* standard.   *Doe I v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1087-88
10 (C.D. Cal. 2010), *vacated by* 738 F.3d 1048 (9th Cir. 2013) ….   As such, the Court applies the
11 more lenient standard identified by the Ninth Circuit in *Nestle [I]*, which does not require the
12 allegation of specific intent for *mens rea*.").   Accordingly, if *Nestle II* suggests any basis for
13 reconsideration at all, it is not to *reinstate* Plaintiffs' ATS claims, but rather to reconfirm *dismissal*
14 of those claims, which come nowhere close to satisfying the heightened "purpose" standard that
15 *Nestle II* suggests might apply when that question is ultimately resolved.

16         *Second*, far from stating new law, *Nestle II* merely applied existing law to the *Nestle*
17 complaint in a manner that is not controlling here.   Plaintiffs' argument amounts to the
18 contention that, since the Ninth Circuit accepted, for purposes of a motion to dismiss, that
19 defendants in *Nestle II* allegedly had "first-hand knowledge" and were aware of "widespread
20 reports" that their conduct was causing human rights violations, then the same must be true of the
21 Defendants here.   Dkt. 155 at 3-4.   But that argument is plainly inconsistent with the Decision,
22 which considered the SAC's particular allegations and explicitly held that they at most alleged
23 knowledge that the Golden Shield was being lawfully used to enforce Chinese law.   The holding
24 in *Nestle II* does not and cannot change that holding, which was based on this Court's careful
25 assessment of the specific allegations of Plaintiffs' 85-page, 459-paragraph Complaint.   Indeed,
26 the SAC allegations that Plaintiffs reproduce in their motion for reconsideration are essentially the
27 same allegations that Plaintiffs cited in opposition to the motion to dismiss, and which this Court
28 has already rejected as a predicate for a finding of *mens rea* as to human rights violations.

1  *Compare* Dkt. 155 at 3-13 (citing *inter alia* SAC ¶¶ 58-68, 70, 76, 78, 85-86, 88-91, 159-165, 97-98, 100-101, 166-167, 173-174, 177, 187, 194, 196-203, 204-205, 217 as purported support for Defendants' knowledge of torture), *with* Dkt. 125-1 at 4-6, 21 (citing same SAC paragraphs in support of same conclusion).

*Third*, there is likewise no basis for Plaintiffs to assert that *Nestle II* compels denial of dismissal on a *mens rea* standard of "purpose."  As discussed above, *Nestle II* at most applied law to the factual allegations in plaintiffs' complaint there in a manner that does not undermine this Court's careful analysis of the factual allegations contained in Plaintiffs' SAC here.  But even setting that aside, Plaintiffs' argument turns entirely on the notion that a "purpose" by Defendants to aid and abet torture can be inferred from their purported "profit motive."  Dkt. 155 at 11.  This, like Plaintiffs' other factual arguments based on *Nestle II*, is disproven by a comparison of the sharp distinctions between the allegations there and those here, which demonstrate why *Nestle II* is not "controlling law" sufficient to support reconsideration:

- **Defendants here had "nothing to gain" from human rights violations**. Whereas the complaint in *Nestle II* alleged that defendants *directly benefited* from child labor, and profited in *direct proportion* to the amount of child laborers who were employed due to their reduced cost—allegations that the Ninth Circuit accepted as true for purposes concluding that plaintiffs' had sufficiently alleged defendants' knowledge and intent to utilize child labor on a motion to dismiss—Defendants here had no profit motive associated with torture, and "nothing to gain from the violations of international law."  *Nestle II*, 766 F.3d at 1024.  Such a direct benefit was necessary to the Ninth Circuit's decision, which recognized that "[d]oing business with child slave owners, however morally reprehensible that may be, does not by itself demonstrate a purpose to support child slavery."  *Id.* at 1025.  Here, even assuming that all the allegations of the SAC were true (which they are not), Defendants would earn the same profit if the Golden Shield was used lawfully to apprehend suspected criminals as they would if the Golden Shield was used lawfully to apprehend suspected criminals who other law enforcement officers later tortured.  Certainly, there is no allegation in the SAC to suggest the type of direct correlation between human rights violations and profit as the Ninth Circuit held had been alleged in *Nestle II*.  *Id*. at

1024 ("Driven by the goal to reduce costs in any way possible, the defendants allegedly supported the use of child slavery, the cheapest form of labor available. These allegations explain how the use of child slavery benefitted the defendants and furthered their operational goals in the Ivory Coast, and therefore … support the inference that the defendants acted with the purpose to facilitate child slavery."). Thus, unlike the factual allegations in *Nestle II*, and like those in *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244 (2d Cir. 2009) and *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011), which the Ninth Circuit expressly distinguished as *not* sufficient under the ATS, Defendants here at most "merely profited by doing business with" alleged human rights violators, but did not seek "to accomplish their own goals by supporting violations of international law," and "did not in any way benefit from the [alleged] underlying human rights atrocities." *Nestle II*, 766 F.3d at 1024.[3]

- **Defendants had no control over the individuals who committed alleged human rights violations.** Whereas the defendants in *Nestle II* were alleged to have had "control over the Ivory Coast cocoa market," such that the Ninth Circuit accepted, for purposes of a motion to dismiss, that they "could have stopped or limited the use of child slave labor by their suppliers"— an inference the Ninth Circuit deemed significant in inferring purpose and knowledge at the pleading stage, 766 F.3d at 1024-25[4]—here the nature of the control relationship was precisely reversed: Cisco and its employees had no ability to dictate to Chinese government authorities the manner in which they could use networking equipment after purchase, or the individuals who could use it. Much less did Cisco have the ability to monitor the Chinese police, judiciary, and

---

[3] *See also Nestle II*, 766 F.3d at 1024 (distinguishing *Talisman* and *Aziz* because "[i]n *Talisman* … the defendant did not in any way benefit from the underlying human rights atrocities carried out by the Sudanese military … [and] in *Aziz*, the plaintiffs alleged that the defendants sold chemicals knowing they would be used to murder Kurds in northern Iraq, but failed to allege that the defendants had anything to gain from the use of chemical weapons.").

[4] The Ninth Circuit discussed plaintiffs' alleged control over the cocoa market at length, accepting at the motion to dismiss stage complaint allegations that defendants "maintain and protect a steady supply of cocoa by forming exclusive buyer/seller relationships with Ivorian farms," are "largely in charge of the work of buying and selling cocoa, and import most of the Ivory Coast's cocoa harvest into the United States," and have such "economic leverage" that they "*effectively control the production of Ivorian cocoa.*" *Nestle II*, 766 F.3d at 1017 (emphasis added).

1  prison system on an ongoing basis so as to ensure that they used the Golden Shield only to
2  lawfully apprehend suspected criminals, or to confirm that the untold numbers of unnamed
3  authorities with access to the Golden Shield, spread among a population of billions, did not later
4  engage in acts of police brutality or torture in individual cases.  *Cf. Nestle II*, 766 F.3d at 1024
5  (recognizing that *Talisman* and *Aziz*, which also involved sales to government authorities, had
6  been properly dismissed for failure to satisfy the *mens rea* standard).

7  • **Defendants were many steps removed from any human rights violations, both
8  in terms of the number of intervening parties and the amount of time elapsed.**  Whereas the
9  Ninth Circuit accepted, on a motion to dismiss, that the defendants in *Nestle II* were allegedly
10  committing human rights abuses on an ongoing basis by profiting from child laborers employed
11  by suppliers on the ground in the Ivory Coast, here the SAC affirmatively alleges that there were
12  multiple steps between Cisco's arms'-length sale of general networking infrastructure to entities
13  who then sold that equipment to Chinese law enforcement authorities, and the commission by
14  *other* Chinese authorities of alleged human rights abuses, often years later.   In this respect, for
15  nine of the twelve Plaintiffs, the SAC admits that the Golden Shield was *not* the sole method by
16  which government authorities identified them, but rather was merely one among many tools to
17  which Chinese law enforcement authorities had access.[5]   That is, the Golden Shield was not even
18  allegedly the mechanism by which these Plaintiffs were *apprehended*, much less the mechanism
19  by which they were allegedly tortured many steps later, and many steps removed from any
20  involvement by Defendants.   *See also* Dkt. 125-1 at 36 (alleging in conclusory fashion that that
21  the Golden Shield was "indispensable to the infliction of *subsequent harms*" inflicted by unnamed
22  Chinese authorities) (emphasis added).

23       In short, *Nestle II* involved the very different situation of a defendant alleged to have
24  directly controlled the employment of child laborers on an ongoing basis, and to have allegedly

---

[5]  *Compare* Dkt. 123 at 35-36 & n.69, *with* Dkt. 125-1 at 35-36 & n.69 ("three plaintiffs … identified via the Golden Shield," and nine "identified solely (or essentially) via the Golden Shield"); *see also, e.g.*, SAC ¶ 334 ("The Golden Shield was used to assemble information about [Liu Guifu] *following her initial arrest*.") (emphasis added).

profited from those child laborers in direct proportion to their numbers. None of that is or could be alleged here. *Nestle II* provides no basis for reconsideration, whether as a matter of law or fact.

### D.  *Nestle II* Did Not Discuss Or Change The ECPA

The Decision dismissed Plaintiffs' claim under the Electronic Communications Privacy Act ("ECPA"), holding that, "even if the ECPA applies, Defendants would be exempt" from suit under that statute because the challenged activity "fall[s] under the exception in [ECPA] Section 2512(2), for acts by a provider of wire or communications service 'in the normal course of business of providing that wire or electronic communication service.'" Decision at 13; *see id.* (holding that Cisco's "business is the manufacture, assembly, and sale of wire or electronic communication service and it created the Golden Shield system as part of its normal course of business in China"). As their sole argument in support of reconsideration of that holding, Plaintiffs contend that if the ATS claims are reinstated on an aiding and abetting theory, then the ECPA claim must also be reinstated. *See* Dkt. 155 at 20.

Reconsideration on the ECPA claim should be denied. *First*, because Plaintiffs' arguments seeking reconsideration of the ATS dismissal fail for all the reasons discussed in Sections II(A), (B), and (C) above, their derivative argument seeking reconsideration of the ECPA dismissal on the same basis also fails. *Second*, because *Nestle II* did not discuss ECPA *at all*, there has been no change of law or fact that could warrant reconsideration of this Court's decision to dismiss the ECPA claim. Plaintiffs are merely pressing for a different decision based on the same law and the same facts—*per se* insufficient for reconsideration under either Rule 59 or 60. *Third*, even if the Court accepted Plaintiffs' argument and reconsidered application of the ECPA's "normal course of business exception," that holding alone would not result in reinstatement of the ECPA claim—it would at most require this Court to resolve the two other independent arguments that Defendants advanced in support of dismissal of the ECPA claim, which the Court did not reach in the Decision. *See* Dkt. 119-1 at 39-42 (urging dismissal because the ECPA does not apply extraterritorially and because there is no private right of action under ECPA § 2512).

**CONCLUSION**

Plaintiffs' motion for reconsideration should be denied.

DATED:   New York, New York
         October 31, 2014

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

By: /s/ Kathleen M. Sullivan
    Kathleen M. Sullivan

555 Twin Dolphin Drive, 5th Floor
Redwood City, California 94065
Telephone:   (650) 801-5000
Facsimile:   (650) 801-5100
kathleensullivan@quinnemanuel.com

   Faith E. Gay
   Isaac Nesser
51 Madison Avenue, 22nd Floor
New York, New York   10010-1601
Telephone: (212) 849-7000
Facsimile: (212) 8849-7400
faithgay@quinnemanuel.com
isaacnesser@quinnemanuel.com

*Attorneys for the Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's ECF System.

Dated:   October 31, 2014

/s/ Todd Anten
Todd Anten