KATHRYN LEE BOYD, ESQ. (SBN 189496)
    lboyd@srbr-law.com
RAJIKA L. SHAH, ESQ. (SBN 232994)
    rshah@srbr-law.com
**SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
6310 San Vicente Boulevard, Suite 360
Los Angeles, California 90048
Phone: (323) 302-9488
Fax: (323) 931-4990

TERRI MARSH, ESQ. (*pro hac vice*)
    terri.marsh.hrlf@gmail.com
BRIAN PIERCE, ESQ. (*pro hac vice*)
    bjpierce@gmail.com
**HUMAN RIGHTS LAW FOUNDATION**
1615 L Street, NW, Suite 1100
Washington, D.C. 20036
Phone: (202) 697-3858
Fax: (202) 355-6701

Attorneys for PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA,**
**SAN JOSE DIVISION**

| | |
|---|---|
| DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI, ROE VII, Charles LEE, ROE VIII, DOE IX, LIU Guifu, WANG Weiyu, and those individual similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CISCO SYSTEMS, INC., John CHAMBERS, Fredy CHEUNG, and DOES 1-100,<br><br>Defendants. | Case No. 5:11-cv-02449-EJD-PSGx<br>Assigned to the Honorable Edward J. Davila, U.S.D.J.<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION**<br><br>Hearing Date: March 5, 2014<br>Time: 9:00 a.m.<br>Courtroom: 4, 5th Floor<br><br>Action Filed: May 19, 2011<br>SAC Filed: Sept. 18, 2013 |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ………..................................................................................................................... 1

I.    PLAINTIFFS' MOTION MEETS THE STANDARD FOR RECONSIDERATION ….2

II.   *NESTLE II* WARRANTS RECONSIDERATION OF THIS COURT'S ENTIRE AIDING AND ABETTING ANALYSIS .................................................................. ….3

    A.   *Nestle II's Mens Rea* Analysis Warrants Reconsideration Here............................. 4

    B.   *Nestle II's Actus Reus* Analysis to Warrants Reconsideraration Here.................... 8

III.  *NESTLE II'S* EXTRATERRITORIALITY ANALYSIS WARRANTS RECONSIDERATION HERE ………................................................................... 12

IV.  *NESTLE II* WARRANTS RECONSIDERATION OF THE COURT'S ECPA ANALYSIS ………..................................................................................................... 14

CONCLUSION ………...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

U.S. CASES

*389 Orange St. Partners v. Arnold*,
  179 F.3d 656 (9th Cir. 1999)……………………………………………………………..1

*Al-Shimari v. CACI Premier Technology*,
  758 F.3d 516 (4th Cir. 2014) ………………………………………………………..14

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) …………………………………………………………..6

*Carranza v. Lewis,*
  2012 WL 3627790 (N.D. Cal. Aug. 20, 2012) …………………………………………3

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
  492 U.S. 573 (1989) …………………………………………………..…….…………2

*Doe v. Nestle USA, Inc.*,
  766 F.3d 1013 (9th Cir. 2014) ……………………………………………………*passim*

*Henderson v. Beatty*,
  2009 WL 913659 (E.D. Mo. Mar. 31, 2009) …..………….....…………………………..2

*In re Celera Corp. Secs. Litig.,*
  2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) …....…………………………………….3

*In re: Google Inc. Gmail Litigation*,
  2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ………………………………………15

*Johnson v. Cullen*,
  2011 WL 2149313 (N.D. Cal. June 1, 2011) ………………………………..2, 3, 4, 10, 15

*Lee v. Coughlin*,
  914 F. Supp. 1004 (S.D.N.Y. 1996) ……………………………………….……………2

*Lopez v. Am. Express Bank, FSB*,
  2010 WL 3637755 (C.D. Cal. Sept. 17, 2010) …..……………………………………..2

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. ___, 133 S.Ct. 1659 (2013) …………………………………..………1, 12, 13

*McNeal v. Rush,*
  2012 WL 5350342 (N.D. Cal. Oct. 29, 2012) ………………………………………….3

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ………..……………………..…………1-2, 4, 10, 15

## **TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Mujica v. AirScan Inc.*,
 ___ F.3d ___, 2014 WL 5839817 (9th Cir. Nov. 12, 2014) ………………..…………….. 14

*Phelps v. Alameida*,
 569 F.3d 1120 (9th Cir. 2009) ……………………………………………………………….1

*PNC Bank, Nat'l Assoc. v. Prime Lending, Inc.*,
 2013 WL 943564 (E.D. Wa. Mar. 11, 2013) …………………………..……………1, 2, 7

*Presbyterian Church of Sudan v. Talisman Energy*,
 582 F.3d 244 (2d Cir. 2009) ……………………………………….…..……………………..7

*Sexual Minorities Uganda v. Lively*,
 2013 WL 4130756 (D. Mass. Aug. 14, 2013) ……………………………….12, 13, 14, 15

*Tyler B. v. San Antonio Elementary School Dist.*,
 253 F. Supp. 2d 1111 (N. D. Cal. 2003) ……………………………..…..2, 3, 4, 10, 15

### INTERNATIONAL CASES

*Prosecutor v. Brđanin*,
 No. IT-99-36-T, (ICTY Sept. 1, 2004) …………………………...…………..…………10

*Prosecutor v. Blagojević and Jokić*,
 No. IT-02-60-A, (ICTY May 9, 2007) …………………………..………………..11, 12

*Prosecutor v. Brima et al.*
 No. SCSL-2004-16-A, (SCSL Feb. 22, 2008) …………………..……………………10

*Prosecutor v. Furundžija*,
 No. IT-95-17/1-T (ICTY Dec. 10, 1998) …………………………...……………10

*Prosecutor v. Perišić*,
 No. IT-04-81-A, (ICTY Feb. 28, 2013)…………………….…………………………….8

*Prosecutor v. Rukundo*,
 No. ICTR-2001-70-A (ICTR Oct. 20, 2010) ……………………………………..11

*Prosecutor v. Simić*,
 No. IT-95-9-A, (ICTY Nov. 28, 2006) ….………………………………………………7, 10

*Prosecutor v. Taylor*,
 No. SCSL-03-01-A, (SCSL Sept. 26, 2013) …………..…………………….7, 8, 10, 12

# TABLE OF AUTHORITIES (continued)

**Page(s)**

### OTHER INSTRUMENTS

Fed. R. Civ. P. 59……………………………………………………………………………...………..3

Fed. R. Civ. P. 60……………………………………………………………………………...………..3

N.D. Cal. Local Rule 7-9(c) ……………………………………………………………………………15

Rome Statute of the International Criminal Court, Article 25(3)(c)
    37 I.L.M. 999 (1998) ………………………………………………………….…………..11

Statute of the International Criminal Tribunal for Rwanda, Art. 3(h),
    U.N. S/RES/955 (Nov. 8, 1994) ……………………………………………….……………11

Statute of the International Criminal Tribunal for the Former Yugoslavia, Art. 5(h),
    U.N. S/RES/827 (May 25, 1993)…………………………………………….……………..11

### SECONDARY SOURCES

Antonin Scalia, "The Rule of Law as a Law of Rules,"
    56 U. Chi. L. Rev. 1175 (1989) …………………………………………….…………..2

# INTRODUCTION

Defendants argue that the binding precedent handed down by the Ninth Circuit in *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014) ("*Nestle II*"), should in no way affect this Court's dismissal of Plaintiffs' claims despite *Nestle II*'s in-depth and controlling analysis of all of the central grounds upon which this Court based its decision. They are mistaken. First, Defendants narrowly construe the grounds for reconsideration in the face of a broad array of directly contradictory precedent. Second, their analyses of both the *mens rea* and *actus reus* portions of *Nestle II* misplace their focus on irrelevant holdings while ignoring the controlling holdings and analysis which undergird Plaintiffs' Motion. Third, they mischaracterize the extraterritoriality analyses contained in this Court's Order, *Nestle II*, and *Kiobel v. Royal Dutch Petroleum*, 133. S. Ct. 1659 (2013), and attempt to bring before this Court a number of entirely irrelevant arguments which have no basis in either this Court's decision or *Nestle II*. None of these arguments have merit, and Plaintiffs respectfully submit that reconsideration is plainly warranted here.

# ARGUMENT

## I.  PLAINTIFFS' MOTION MEETS THE STANDARD FOR RECONSIDERATION.

Reconsideration is appropriate when "the district court . . . committed clear error, or if there is an intervening change in the controlling law." *PNC Bank, Nat'l Assoc. v. Prime Lending, Inc.*, 2013 WL 943564 *3-*4 (E.D. Wa. March 11, 2013) (citing *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999)). A "grand reservoir of equitable power," reconsideration is warranted "whenever such action is appropriate to accomplish justice." *See Phelps v. Alameida*, 569 F.3d 1120, 1135 (9th Cir. 2009).

Defendants argue that "*Nestle II* did not change the applicable law in any relevant respect" because *Nestle II* did not make determinative holdings on whether a knowledge or purpose standard applies to *mens rea* for aiding and abetting human rights violations, did not adopt a new standard for *actus reus* beyond the existing "substantial effect" test, and did not determine whether the claims were impermissibly extraterritorial. Opp. at 3, 4-5, 7, 9. That position is untenable under long-standing common law principles that "lower courts [are] bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis.'" *See Miller v.*

- 1 -

*Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (citing Antonin Scalia, "The Rule of Law as a Law of Rules," 56 U. Chi. L. Rev. 1175, 1177 (1989)); *see also County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) ("[T]he principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.") (Kennedy, J., concurring in part and dissenting in part). Contrary to Defendants' position that "Plaintiffs' motion cannot satisfy the foregoing test" (Opp. at 3), numerous courts have readily held that reconsideration is warranted when, as here, an intervening higher court decision affects the analysis applied in the decision under reconsideration, or even has only the potential to affect the analysis. *See, e.g., Tyler B. v. San Antonio Elementary School Dist*., 253 F. Supp. 2d 1111, 1115 (N. D. Cal. 2003) (in § 1983 case held on the facts not subject to exhaustion requirement, reconsideration warranted "to give closer scrutiny to" a Ninth Circuit ruling discussing exhaustion that was issued after briefing on underlying motion was complete but court failed to consider); *Johnson v. Cullen*, 2011 WL 2149313 *2-*3 (N.D. Cal. June 1, 2011) (reconsidering decision granting evidentiary hearing in light of recent Supreme Court decision that arguably did not change the law but discussed factors in determining when to set evidentiary hearing); *Lopez v. Am. Express Bank, FSB*, 2010 WL 3637755 *3 (C.D. Cal. Sept. 17, 2010) ("Supreme Court's grant of certiorari in AT&T Mobility constitute[d] a material difference in fact and law, potential change in controlling law, and justifiable reason to reconsider" order): *PNC Bank, Nat'l Assoc.* 2013 WL 943564 *6 (reconsideration "plainly warranted" in case applying Ohio law where Ohio Supreme Court vacated previous opinion and issued new opinion clarifying its previous analysis and "which materially affect[ed] the validity of the Court's decision"); *Lee v. Coughlin*, 914 F. Supp. 1004,1005 (S.D.N.Y. 1996) (Sotomayor, J.) (moving party "entitled to reconsideration or reargument on the ground that he did not have an opportunity to address the implications of" Supreme Court case that "raises a new and developing question of law and fact"); *Henderson v. Beatty*, 2009 WL 913659 *3-*4 (E.D. Mo. Mar. 31, 2009) (reconsideration granted when "same Missouri appellate court that issued the opinion" relied on by district court "recently issued another opinion that further explains the [original] opinion").[1]

---

[1] Even though Defendants chose to rely almost exclusively on reconsideration decisions authored

In fact, *Nestle II*'s *analysis* is controlling and has worked a change in the law meriting reconsideration of the Court's conclusions – that knowledge and purpose for *mens rea* were established on facts similar to those here; that a "causal link" between Defendants' actions and the international law violations is sufficient to establish *actus reus*; and rejecting the approach urged in the Alito-Thomas concurrence in *Kiobel*. *Nestle II* significantly expanded upon the *Nestle I* decision cited by the Court and is inconsistent with this Court's aiding and abetting and extraterritoriality analyses in its Order, and therefore reconsideration is warranted. *See Tyler B.* 253 F. Supp. 2d at 1115; *Johnson*, 2011 WL 2149313 *2-*3.

Moreover, Defendants' contention that the Court's conclusions regarding *mens rea*, *actus reus*, and extraterritoriality of Plaintiffs' claims are "three independent grounds" for dismissal and therefore reconsideration of even one "would not be dispositive" (Opp. at 3) is plainly wrong; the analyses were explicitly interdependent and must all be reconsidered in light of the Ninth Circuit's new, controlling guidance in *Nestle II*. *See* Order at 12-13 (discussing *actus reus* and referring to earlier discussions of both *mens rea* and extraterritoriality).

## II. *NESTLE II* WARRANTS RECONSIDERATION OF THIS COURT'S ENTIRE AIDING AND ABETTING ANALYSIS.

In the Motion, Plaintiffs argued that *Nestle II* represents a change in the law so fundamental as to mandate revisiting the decision of this Court. Defendants contend that *Nestle II* is either insignificant or wrong or both. Their position lacks merit for the following reasons.

### A. *Nestle II*'s *Mens Rea* Analysis Warrants Reconsideration Here.

Defendants argue the Court is not obligated to reconsider its *mens rea* analysis because

---

by the district court assigned to this case, none have the requisite factual underpinnings to be even remotely analogous to this case – where the Ninth Circuit's guidance in *Nestle II* is dispositive as to all of the grounds on which this Court granted Defendants' motion to dismiss. *See* Opp. at 3-4 (relying on *Carranza v. Lewis,* 2012 WL 3627790 (N.D. Cal. Aug. 20, 2012) (denial of motion to reconsider in habeas proceeding where *no* new facts or law were presented to challenge court's previous factual determination relating to the prisoner's status as a gang associate); *McNeal v. Rush,* 2012 WL 5350342 (N.D. Cal. Oct. 29, 2012) (denial of motion to reconsider where plaintiff claimed he would have prevailed on a motion if the court not had not declined to permit additional time to file a supplemental opposition); *In re Celera Corp. Secs. Litig.,* 2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) (denial of a N.D. Cal. Civil Local Rule 7-9(b) motion to reconsider a pre-judgment interlocutory order – *not* a Rule 59 or 60 motion – where defendant's challenge to the court's interpretation of a securities statute would not have been dispositive to the issue)).

- 3 -

this Court "has already rejected" "the SAC allegations that Plaintiffs reproduce in their motion for reconsideration[, which] are essentially the same allegations . . . Plaintiffs cited in opposition to the motion to dismiss." Opp. at 10. To the extent Plaintiffs "reproduced" allegations discussed in the opposition to the motion to dismiss, they did so *after* and *because* the Ninth Circuit handed down intervening binding precedent in *Nestle II*, applying a starkly different approach to the issues from the one this Court followed. Defendants' arguments to the contrary fail.

*First,* Defendants wrongly argue that this Court need not reconsider its conclusion that knowledge was not established because *Nestle II* did not address the *entirely distinct* question of "whether a 'purpose' or 'knowledge' standard should apply to ATS claims." Opp. at 9. But this aspect of the Ninth Circuit's decision has no bearing on its conclusion that knowledge was established by allegations similar to those presented here.[2] *See Miller*, 335 F.3d at 900; *see also Tyler B.* 253 F. Supp. 2d at 1115; *Johnson*, 2011 WL 2149313 *2-*3.

*Second*, Defendants' argument that "*Nestle II* merely applied existing law . . . in a manner that is not controlling here" is inapposite. Defendants' contention that this Court found that Plaintiffs "at most alleged knowledge that the Golden Shield was being lawfully used to enforce Chinese law" (Opp. at 10-11) – without citation – is simply wrong. In fact, this Court held only that "[t]he customization, marketing, design, testing, and implementation of the Golden Shield system is not enough to support an inference of knowledge on the part of Defendants that torture or other human rights abuses would be committed against Plaintiffs." Order at 13. In so doing, however, the Court failed to consider, *inter alia,* that Plaintiffs' detailed allegations are virtually identical to allegations found sufficient to establish knowledge in *Nestle II* – the SAC alleges, for example, that "many reports issued by domestic and international organizations" (766 F.3d at 1017)[3] state that the Golden Shield caused and enabled the torture of Falun Gong. SAC ¶¶ 48-51,

---

[2] Defendants' contention that *Nestle II* "expressly repudiated" a knowledge standard contradicts the immediately preceding sentence in their own brief, which accurately states that *Nestle II* simply "reserved the resolution of the purpose/knowledge question for another day." Opp. at 10.

[3] *Nestle II* found that knowledge is established where a plaintiff has alleged *either* widespread reports documenting the defendant's role in the violations, *or* facts demonstrating the defendant's firsthand knowledge of the violations. 766 F.3d at 1017. Defendants apparently concede, or at least do not rebut, that such allegations constitute *independent* bases for establishing knowledge. *See* Opp. at 10 ("…[D]efendants in *Nestle II* allegedly had 'first-hand knowledge' *and* were aware of 'widespread reports'…" (emphasis added)).

159-65, 167, 173. Indeed, Plaintiffs here go even further than the *Nestle II* plaintiffs by offering reports documenting Defendants' complicity in human rights violations which were delivered directly to Defendants in San Jose by the Defendants' *own sales team* and *shareholders*. SAC ¶¶ 88-91, 112, 116-21, 166-67, 174-78, 210, 216-17.

Plaintiffs also allege that Defendants in San Jose had firsthand knowledge that the Golden Shield furthered torture, thus meeting *Nestle II*'s other independent basis for establishing knowledge. 766 F.3d at 1017 (defendants "acquired . . . knowledge firsthand through their numerous visits to Ivorian farms"). The key perpetrators of the human rights abuses told Defendants in San Jose firsthand that the primary purpose of the Golden Shield was the persecution and torture of Falun Gong. SAC ¶¶ 53-57. Defendants in San Jose acknowledged and marketed themselves as capable of achieving this purpose (SAC ¶¶ 58-74, 210, 216), and integrated Golden Shield features with torture sites in order to do so. SAC ¶¶ 78, 86, 98(g)-(h). *See also* Mot. at 9. Defendants thus have no tenable argument that the plaintiffs' allegations in *Nestle II* establish knowledge but the Plaintiffs' allegations here do not.

*Third*, Defendants wrongly contend that *Nestle II*'s analysis of purpose "at most applied law to the factual allegations . . . in a manner that does not undermine" this Court's analysis.[4] *Nestle II* held that a defendant's unlawful purpose has been established when she "place[s] increased revenues before basic human welfare, and intend[s] to pursue all options available to" make money from the underlying violations, or was in a position to "have stopped or limited" the underlying violations. 766 F.3d at 1024-25. These holdings control the outcome here, because Plaintiffs set forth substantially similar allegations. The "sharp distinctions" which Defendants attempt to draw are, in fact, ephemeral:

---

[4] *Nestle II*'s purpose analysis need not – indeed, cannot – control this Court's purpose analysis in order to provide grounds for reconsideration, because this Court *never set forth* a purpose analysis, having found that knowledge was not sufficiently alleged. Thus, if the Court finds that knowledge has been established for the reasons stated above, this Court may then consider, *for the first time*, a purpose requirement. If the Court finds that purpose is required to establish *mens rea*, the Court should of course look to *Nestle II* as well as any other relevant precedent. For the reasons stated in Plaintiffs' Motion at 9-10 – which Defendants do not rebut – *Nestle II* militates in favor of applying a knowledge standard. Nevertheless, if the Court finds that purpose is required, *Nestle II*'s purpose analysis is controlling for the reasons stated herein.

- 5 -

- ***All* of Defendants' profit was contingent on their furtherance of human rights violations.** Just as the defendants in *Nestle II* "placed revenues before basic human welfare, and intended to pursue all options available" to make money from the underlying violations (766 F.3d at 1024), Defendants here "expressed willingness to meet the" persecutory goal of the Golden Shield "in a manner intended to and which did result in Cisco being awarded Golden Shield contracts." SAC ¶ 193. "[G]aining a stronghold in the Chinese security market *required* the design, development, and promotion of technology specifically tailored for this [persecutory] purpose." SAC ¶ 56 (emphasis added). Defendants met this requirement in order to capitalize on what they repeatedly identified as a lucrative business opportunity (SAC ¶¶ 55, 58, 126, 187), heedless of the consequences for the millions of Falun Gong practitioners in China, thus "plac[ing] increased revenues before basic human welfare." *Nestle II*, 766 F.3d at 1026. Thus, Defendants' unsupported and counterfactual claim that they "would earn the same profit if the Golden Shield was used lawfully" (Opp. at 11) is plainly incorrect. Defendants would have earned zero profit had they not designed the Golden Shield to facilitate torture, because they would not have been awarded the contract. The entire transaction was driven by the Golden Shield's persecutory purpose, such that Defendants' profit motive dovetailed perfectly and completely with this purpose. Thus, far from having "nothing to gain" from human rights violations (Opp. at 11-12), Defendants, like those in *Nestle II*, were "driven by the goal to [increase profits] in any way possible." 766 F.3d at 1026. Defendants cannot rely on *Aziz* and *Talisman* to whitewash this uncomfortable reality. Cf. Opp. at 12; *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 (4th Cir. 2011) (cursory allegation that defendant placed a non-customized product into the stream of commerce); *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244, 262 (2d Cir. 2009) (defendant did not benefit or profit from human rights abuses).

- **Defendants were in a position to constrain the underlying human rights violations, but instead chose to further them.** *Nestle II* further held that allegations showing a defendant was in a position to "have stopped or limited" the underlying violations "further supported" (but were not required for)[5] an inference of purpose. 766 F.3d at 1024-25. This analysis is controlling.

---

[5] Under customary international law, "it is not necessary…to establish whether [the accused] had

- 6 -

1  Defendants' parade of absurdities detailing that it "had no ability to dictate to Chinese . . .
2  authorities" the way the Golden Shield was used has no bearing on the clear allegation that
3  Defendants could have chosen not to provide its cutting-edge, unprecedented technology in the
4  first place. *See* SAC ¶¶ 55, 76, 106, 181, 225.

5  • **Defendants' conduct is proximately connected to the underlying human rights**
6  **violations.** Defendants' argument that purpose is not established here because they were "many
7  steps removed from the human rights violations" (Opp. at 13) has no basis in *Nestle II*'s analysis,
8  gives no citation to *Nestle II*, and is therefore irrelevant to this Motion.[6] Even if it were a pertinent
9  factor on reconsideration, the defendants in *Nestle II* were themselves quite "removed" from the
10 human rights violations: they simply hired suppliers who in turn employed child slaves on farms
11 in West Africa. They did not enslave anyone. Nevertheless, the Ninth Circuit found the
12 allegations that their conduct was purposeful to be adequate to state a claim. 766 F.3d at 1017.

13     Further, Defendants flagrantly misconstrue Plaintiffs' allegations when they argue that
14 "the Golden Shield was not even allegedly the mechanism by which [some] Plaintiffs were
15 apprehended, much less the mechanism by which they were allegedly tortured." Opp. at 13.
16 Plaintiffs' well-pled allegations show – and can be supported in part by proffering the eyewitness
17 testimony of a defecting 610 officer who used the Golden Shield to carry out acts of torture (SAC
18 ¶ 115) – that the Golden Shield was indispensable to acts of torture perpetrated against each and
19 every named Plaintiff. SAC ¶¶ 233, 237, 247, 260, 269, 279-80, 289, 295, 302, 313, 319, 327,
20 343, 356.[7] Similar allegations demonstrate the Golden Shield's indispensable role in the
21 identification and apprehension of each and every named Plaintiff. SAC ¶¶ 227, 235, 241, 250-
22 53, 264, 268, 277-78, 286-88, 294-95, 298, 301-02, 306, 311-12, 315, 319, 322-23, 334, 347-51.[8]

---

23 any power to control those who committed the offences." *Prosecutor v. Taylor*, Case No. SCSL-
24 03-01-A, Appeals Chamber Judgment (Sept. 26, 2013) (quoting *Prosecutor v. Simić*, Case No. IT-95-9-A, Appeals Chamber Judgment, ¶ 116 (Nov. 28, 2006)).
25 [6] *See PNC Bank, Nat'l Assoc.*, 2013 WL 943564 *3-*4 (setting forth circumstances when reconsideration is appropriate).
26 [7] During Plaintiff Wang Weiyu's detention, for example, security officials threatened his wife and used her anonymous Internet communication with overseas Falun Gong believers to force Wang
27 to renounce his belief in Falun Gong. This information could only have been collected, profiled, and accessed by security officers via the Golden Shield. SAC ¶ 356.
28 [8] Documents related to Doe IX's detention, for example, indicate that Chinese security used the Golden Shield to monitor her use of the software Dongtaiwang, which allows users to evade

- 7 -

Defendants' arguments are therefore unpersuasive. Plaintiffs have sufficiently alleged, for purposes of a motion to dismiss, that Defendants acted with the purpose of furthering a widespread campaign of torture and persecution. Under *Nestle II*, these allegations are sufficient to withstand a motion to dismiss and to proceed to trial.

### B.  *Nestle II*'s *Actus Reus* Analysis Warrants Reconsideration Here.

Defendants' argument that *Nestle II* does not control this Court's *actus reus* analysis is unpersuasive, because the argument relies on irrelevant holdings, fails to grasp customary international law, and rampantly mischaracterizes Plaintiffs' allegations.

*First*, Defendants betray a fundamental misunderstanding when they refer to *Nestle II*'s controlling analysis of customary international law as "dicta" and instead narrowly focus on the fact that the Ninth Circuit did not adopt a particular *actus reus* standard. Opp. at 7 (citing *Nestle II*, 766 F.3d at 1026). "Customary international law…provides the legal standard for aiding and abetting ATS claims." *Nestle II*, 766 F.3d at 1023 (citing *Sarei*, 671 F.3d at 765-66). There is international consensus reflecting "widespread substantive agreement" that the required *actus reus* element of aiding and abetting "is less focus[ed] on specific direction and [places] more of an emphasis on the existence of a causal link between the defendants and the commission of the crime." *Nestle II*, 766 F.3d at 1026. Far from "dicta," this holding is a direction to lower courts to look to customary international law to apply a developing *actus reus* standard to the facts of a given case. The Ninth Circuit made its meaning even more clear by highlighting two recent decisions by international tribunals, *Prosecutor v. Perišić*, Case No. IT-04-81-A, Appeals Chamber Judgment (Feb. 28, 2013), and *Prosecutor v. Taylor*, Case No. SCSL-03-01-A, Appeals Chamber Judgment (Sept. 26, 2013). Thus, while the Ninth Circuit declined to adopt a particular *actus reus* standard (*Nestle II*, 766 F.3d at 1026), it directed lower courts to look to relevant sources of customary international law to develop such a standard in the cases presented to them.

---

normal Internet controls, and to track her IP address such that even her anonymous Internet activity was logged. Doe IX's Internet use at her workplace, including the use of multiple, unconnected devices, was tracked to her specific identity. Her website visits were tracked in extreme detail, to the level of every individual "click" she made online. This terrifying level of repression would have been impossible without the high-level anti-Falun Gong functionalities of the Golden Shield. SAC ¶ 319.

- 8 -

1  This guidance is controlling law, not dicta.

2  Further, *Nestle II*'s *mens rea* analysis (766 F.3d at 1023-26) also warrants reconsideration
3  of the *actus reus* analysis here because this Court's *actus reus* and *mens rea* analyses were
4  entirely interrelated. Order at 12-13. This Court did not treat the *mens rea* and *actus reus*
5  requirements as islands unto themselves. Rather, the finding of one affected the establishment of
6  the other. Far from analyzing these requirements in isolation, this Court addressed the issues
7  together and embedded its "substantial effect" holding into an analysis focusing predominantly on
8  the issue of "knowledge." Order at 12-13. The Court's conclusion that Defendants did not
9  *substantially assist* the violations is logically contingent upon the premise that the Defendants did
10 not *know* their products would be used to torture Falun Gong practitioners, because they *could*
11 (under the Court's reading of Plaintiffs' allegations) have been used for other purposes. Order at
12 13 ("The product produced by Defendants…can be used for many crime-control purposes in
13 China without permitting torture or other human rights abuses."). But under *Nestle II*, that
14 Defendants knew the products would be used for torture is a legitimate inference, open to the
15 finder of fact. 766 F.3d at 1017; *and see supra* at 4-5). Therefore, if, as Plaintiffs allege,
16 Defendants provided these products *with this specific purpose in mind*, that is ample basis to
17 support the conclusion by the finder of fact that Defendants substantially assisted a campaign of
18 torture. For this reason, *Nestle II* materially affects the Court's analysis of substantial assistance
19 in a manner requiring reconsideration.

20 *Second*, Defendants' contention that both the Ninth Circuit and this Court applied the
21 same "substantial effect" *actus reus* standard (Opp. at 7-8) ignores the starkly different manner in
22 which the two courts applied this standard to the facts of the respective cases. *Nestle II*'s "causal
23 link" analysis provides guidance to lower courts applying the "substantial effect" standard (766
24 F.3d at 1026), which was nowhere considered by this Court. Such new guidance changes the law
25 sufficiently to merit reconsideration. *See Miller*, 335 F.3d at 900; *see also Tyler B.* 253 F. Supp.
26 2d at 1115; *Johnson*, 2011 WL 2149313 *2-*3.

27 *Third*, Defendants offer the unsupported contention that there is no sufficient "causal link"
28 between Defendants' conduct and Plaintiffs' injuries. Opp. at 8. But this is belied by even a

- 9 -

cursory reading of the SAC. It is also fundamentally inconsistent with customary international law, as developed in such international cases as *Taylor*, which the Ninth Circuit directs lower courts to follow as the proper source of guidance in cases like this one. *Nestle II*, 766 F.3d at 1026. The *Taylor* tribunal, after conducting a comprehensive review of customary international law, held that *actus reus* is established "where the accused provided assistance, encouragement or moral support…and thereby had a substantial effect on the commission of the crime." *Taylor*, ¶ 364. It may be found "where the accused participated in any or all stages of the crime." *Taylor*, ¶ 367. An "infinite variety" of acts and conduct may have the required substantial effect, regardless of whether they were undertaken "at a time and place removed from the" crime. *Id.* at ¶¶ 369-70.

In particular, *actus reus* was found in *Taylor* where the aider and abettor's assistance "supported, sustained, and enhanced" the principal perpetrator's "capacity to undertake its Operational Strategy," and where this assistance was "critical" to enabling this strategy. *Id*. at ¶ 371. Here, Defendants' design and implementation of the Golden Shield similarly "supported, sustained, and enhanced" the principal perpetrators' plan to torture Falun Gong practitioners (SAC ¶¶ 75-124), and Defendants' assistance was critical to enabling this plan. *See* SAC ¶¶ 9-21, 223-356 (detailing the Golden Shield's indispensable role in the abuses suffered by Plaintiffs); SAC ¶ 225 (noting that the Golden Shield was critical to the widespread nature of the violations).

*Taylor* further cited a variety of cases for the proposition that providing support to a "system" of violations is sufficient to establish *actus reus*, even when the accused did not provide "assistance to the physical actor that is then used in the commission of the crime" itself. *Taylor*, ¶¶ 371-76 (citing *Prosecutor v. Brima et al*, Case No. SCSL-2004-16-A, Appeals Chamber Judgment, ¶ 305 (Feb. 22, 2008); *Prosecutor v. Brđanin*, Case No. IT-99-36-T, Trial Judgment, ¶ 1073 (Sept. 1, 2004); *Prosecutor v. Simić*, Case No. IT-95-9-A, Appeals Chamber Judgment, ¶ 116 (Nov. 28, 2006)).[9] Thus, "identifying a victim as a member of the targeted group" and "working together with the police . . . to maintain a system of unlawful arrests and detention" have been found to have had a substantial effect on violations. *Taylor*, ¶ 369 (citing *Prosecutor v.*

---

[9] *See also Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Trial Judgment, ¶ 209 (Dec. 10, 1998) (participation in a crime is substantial if "the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed.").

- 10 -

*Blagojević and Jokić*, Case No. IT-02-60-A, Appeal Judgment, ¶ 134 (May 9, 2007); *Prosecutor v. Rukundo*, Case No. ICTR-2001-70-A, Appeal Judgment, ¶ 176 (Oct. 20, 2010)).

Defendants urge the Court to look at their conduct in isolation, such that certain of their acts may – conceivably, hypothetically – have furthered only legitimate, lawful purposes. Opp. at 8-9. But Defendants' acts were, like those in *Taylor*, constituent elements critical to what they knew to be a widespread system of violent and unlawful persecution. *See* SAC ¶¶ 31-52 (describing history, context, and pervasiveness of China's anti-Falun Gong campaign); *Taylor*, ¶¶ 369-76. These constituent elements include:

- **Direct facilitation of torture**: Defendants customized features directly facilitating torture. SAC ¶¶ 88-90, 98(h)-(j), 100-01, 111, 114, 131. Defendants make no attempt to rebut or distinguish these allegations anywhere in their response.

- **Unlawful[10] identification and apprehension to further torture**: Defendants collaborated with Chinese security officials (SAC ¶¶ 58, 102, 137, 146, 153-57) to implement features making it "possible for security officers to coordinate large-scale investigations, locate, track, [and] apprehend . . . Falun Gong members from anywhere in China without having to search each and every home and office for evidence." SAC ¶ 106. Putting in place technology to automatically carry out nation-wide identifications of Falun Gong practitioners in large numbers is not meaningfully distinct from – indeed, it is actually much worse than – "identifying a victim as a member of the targeted group," which has been found to have had a substantial effect on the underlying violations. *Taylor*, ¶ 369 (citing *Blagojević and Jokić*, ¶ 134).

- **Providing moral support and encouragement to China's system of persecution**: Defendants pledged to satisfy the "*douzheng*" and "social stability" purposes of the Golden

---

[10] Whether the identification and apprehension of individuals is unlawful is dependent, of course, on whether these acts aid and abet the commission of crimes, and thus Defendants' assertion that their conduct is linked only to "the lawful apprehension of individuals suspected of violating Chinese law" (Opp. at 8) is a classic example of begging the question. In fact, this "lawful apprehension" of Falun Gong practitioners as a result of their peaceful religious beliefs constitutes a crime against humanity. *See, e.g.,* Rome Statute of the International Criminal Court, art. 7(1), 37 I.L.M. 999 (1998) (defining "persecution against any identifiable group or collectivity on…religious…grounds" as a crime against humanity); ICTY Statute Art. 5(h), U.N. S/RES/827 (May 25, 1993) (defining "persecutions on…religious grounds" as a crime against humanity); ICTR Statute, Art. 3(h), U.N. S/RES/955 (Nov. 8, 1994) (same).

Shield, even characterizing Falun Gong practitioners as "viruses" and "despicable," mirroring Party propaganda. *See, e.g.*, SAC ¶¶ 61-67.

For these reasons, *Nestle II* requires reconsideration of this Court's *actus reus* analysis.

### III. *NESTLE II*'S EXTRATERRITORIALITY ANALYSIS WARRANTS RECONSIDERATION HERE.

This Court concluded that Plaintiffs' claims do not "touch and concern" the United States as required by *Kiobel v. Royal Dutch Petroleum*, 133. S. Ct. 1659 (2013), to overcome the presumption against extraterritoriality. This conclusion relied in part on Justice Alito's concurring opinion in *Kiobel*, 133 S. Ct. at 1670, (Order at 10) and in part on a requirement drawn from dicta contained in *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013), that the underlying abuses must be "planned or directed" from the United States in order to meet the "touch and concern" requirement. Order at 9. Because *Nestle II* cannot be read to apply either of these approaches, it mandates reconsideration here. Defendants' arguments to the contrary fail.

*First*, Defendants wrongly contend that *Nestle II* "neither endorsed nor rejected Justice Alito's" approach to *Kiobel*'s "touch and concern" requirement. Opp. at 5. Instead, *Nestle II* quite plainly stated that the "focus" test which Justice Alito's opinion advocates (*Kiobel*, 133 S. Ct. at 1070) "cannot sensibly be applied to ATS claims." *Nestle II*, 766 F.3d at 1028. Defendants compound their error by asserting that this Court did not dismiss Plaintiffs' claims "for failure to allege domestic conduct that was itself sufficient to violate international law," as Justice Alito's approach would require. Opp. at 5. In fact, this Court held precisely that: "The domestic conduct of the Defendants is not, as set forth by Justices Alito and Thomas, 'sufficient to violate an international norm.'" Order at 10 (quoting *Kiobel*, 133 S. Ct. at 1070 (Alito, J., concurring)). Thus, this ground must be reconsidered in light of *Nestle II*'s controlling analysis.

*Second*, while it is true that this Court, drawing from dicta in *Sexual Minorities Uganda*, 960 F. Supp. 2d 304,[11] additionally considered whether Defendants "planned or directed" the

---

[11] The court in *Sexual Minorities Uganda*, in looking to answer the "relevant question" of "whether Plaintiff has alleged that substantial practical assistance was afforded to the commission of the crime…from the United States," 960 F. Supp. 2d at 323 (internal quotes omitted), considered in part allegations showing that the defendant "plann[ed] and manag[ed] a campaign of repression" from the United States. *Id*. at 322. Thus, while the facts in that case happened to

underlying violations from the United States, such a requirement nevertheless cannot be applied under *Nestle II*.[12] In *Nestle II*, the Ninth Circuit remanded the case to allow plaintiffs there to amend their complaint, "unable to conclude that amendment would be futile, because . . . plaintiffs contend that part of the conduct underlying their claims occurred within the United States." 766 F.3d at 1028. But it is notable that amendment would have been futile in that case if the Ninth Circuit had in mind a "planning or direction" requirement such as that put forth by this Court. Defendants in *Nestle II* "do not own cocoa farms themselves;" rather, they "are largely in charge of the work of buying and selling cocoa" through exclusive buyer/seller agreements with intermediate suppliers. 766 F.3d at 1017. None of plaintiffs' allegations suggest that the defendants dictated, planned, or directed a policy of child slavery. Instead, the defendants chose to buy cocoa from a country where child slavery was common, knowing it would cut their costs, then passively permitted this system of child slavery to persist. Plaintiffs' amendment of their claims in *Nestle* may well clarify the degree to which the defendants' decisions were made in the United States, but it is not likely to alter the basic facts. Thus, if the Ninth Circuit had intended to apply a "planning or directing" requirement, it would have simply dismissed the case outright.[13]

---

include planning and management, nowhere did that court require such facts in order for the claims to "touch and concern" the United States.

[12] Defendants mischaracterize this "planning or directing" requirement as "little different" from what the Ninth Circuit suggested in *Nestle II* would be sufficient. Opp. at 6. In fact, it is much more similar to Justice Alito's minority approach, which would require that the domestic conduct itself be sufficient to violate an international norm. *Kiobel*, 133 S. Ct. at 1070. This Court's "planning or directing" analysis would require not just that Defendants in the United States planned or directed *acts which had a substantial effect* on the underlying violations, but that Defendants in the United States planned or directed *the underlying violations themselves*. *See* Order at 10 ("Plaintiffs have failed to establish that Defendants directed, planned, or committed *the violations*…" (emphasis added)).

[13] *Nestle II*'s refusal to adopt either Justice Alito's minority approach or a "planning or direction" requirement is further supported by the Ninth Circuit's recent decision in *Mujica v. Airscan, Inc.*, __ F.3d __, 2014 WL 5839817 (9th Cir. Nov. 12, 2014). The plaintiffs' claims in that case were found not to "touch and concern" the United States because the plaintiffs there merely "speculate that some of [Defendants'] conduct, such as the making of the contract between the two Defendants, could have occurred in the United States." Slip Op. at 25. "Plaintiffs have, at most, 'suggested' to the court that the contract '*might* have been executed within our borders.'" *Id*. at 26, n. 6 (emphasis in original). This speculation, apparently focused on a single contract between defendants, is in no way comparable to Plaintiffs' non-speculative allegations that Defendants carried out the alleged torts to a substantial degree in the United States through their San Jose-based orchestration of the marketing, design, implementation, and optimization of the Golden Shield, for the purpose of persecuting Falun Gong. SAC ¶¶ 126-35. Indeed, the Ninth Circuit was clear that it would consider *any* United States conduct "relevant" to plaintiffs' claims in a "touch and concern" analysis: "It may well be . . . that a defendant's U.S. citizenship or corporate status

1    Far from a "thinly disguised request that this Court adopt a standard recently articulated
2    by the Fourth Circuit" (Opp. at 5), Plaintiffs readily acknowledge that in the absence of a clear
3    test applied by *Nestle II*, the Court here is free to apply *any* test consistent with *Nestle II*'s
4    analysis. The Court *could* apply the fact-based test set forth in *Al-Shamari v. CACI Premier
5    Technology*, 758 F.3d 516, 528-31 (4th Cir. 2014), or the "aid and abet" test applied in *Sexual
6    Minorities Uganda*, 960 F. Supp. 2d at 323 ("The relevant question…is whether Plaintiff has
7    alleged that substantial practical assistance was afforded to the commission of the crime…from
8    the United States."). For the reasons set forth in Plaintiff's Motion at 18, Plaintiffs' claims meet
9    the *Al-Shamari* test. Because Defendants "orchestrated the marketing, design, implementation and
10   optimization phases" of the Golden Shield, including its torture-facilitating features, from their
11   San Jose headquarters (SAC ¶¶ 95, 102, 108, 129, *and see generally* SAC ¶¶ 126-35 (detailing
12   San Jose headquarters' substantial contribution)), Plaintiffs' claims also meet the *Sexual
13   Minorities Uganda* test. The essential point is that the Court must reconsider its analysis in a
14   manner consistent with *Nestle II*.

*Third*, Defendants re-introduce, out of left field, arguments regarding the political question and act of state doctrines (Opp. at 6-7), which played no part in either this Court's decision or *Nestle II*. They are irrelevant to Plaintiffs' Motion. *See* L.R. 7-9(c) (prohibiting repeat of oral or written argument in motion for reconsideration and authorizing sanctions for violation).

*Nestle II* therefore requires reconsideration of this Court's extraterritoriality analysis.

### IV. *NESTLE II* WARRANTS RECONSIDERATION OF THE COURT'S ECPA ANALYSIS.

Finally, Defendants' arguments regarding reconsideration of Plaintiffs' Electronic Communications Privacy Act ("ECPA") claim are meritless. It is irrelevant that *Nestle II* "did not discuss ECPA *at all*" (Opp. at 14 (emphasis original)). Reconsideration of Plaintiffs' ECPA claim is appropriate because the Order explicitly predicated dismissal of that claim on the Court's

---

is one factor that, in conjunction with other factors, can establish a sufficient connection . . . to satisfy *Kiobel*." Slip Op. at 29; *see also id*. at 32 ("in all of the post-*Kiobel* cases in which courts have permitted ATS claims against U.S. defendants to go forward, the plaintiffs have alleged that at least some of the conduct relevant to their claims occurred in the United States.").

- 14 -

finding that Plaintiffs did not sufficiently allege that Defendants acted "specifically to facilitate human rights abuses" (Order at 13-14) – a finding that depends on the Court's pre-*Nestle II* aiding and abetting analysis, and which therefore, in light of *Nestle II*, cannot stand. *See Miller*, 335 F.3d at 900; *see also Tyler B.* 253 F. Supp. 2d at 1115; *Johnson*, 2011 WL 2149313 *2-*3. Thus, Defendants were not acting in the "normal course of business" and do not fall within that statutory exception to the ECPA. *See In re: Google Inc. Gmail Litigation*, 2013 WL 5423918 *7-*11 (N.D. Cal. Sept. 26, 2013). Defendants' last-ditch argument that such a change in ruling would require resolution of "the two other independent arguments that Defendants advanced in support of dismissal of the ECPA claim" is an inadmissible attempt to reargue points made in the motion to dismiss. *See* L.R. 7-9(c) (prohibiting repeat of oral or written argument in motion for reconsideration and authorizing sanctions for violation). Thus, reconsideration of the Court's ECPA analysis is warranted.

## CONCLUSION

For the reasons stated here and in the Motion, Plaintiffs' Motion for Reconsideration should be granted. Pursuant to Local Rule 7-1(b), Plaintiffs request it be heard without oral argument.

Dated: November 14, 2014                Respectfully Submitted,

                                        By: ___/s/ Terri E. Marsh_____
                                            Terri E. Marsh
                                            HUMAN RIGHTS LAW FOUNDATION

                                        By: ___/s/ K. Lee Crawford-Boyd[14]_____
                                            K. Lee Crawford-Boyd
                                            SCHWARCZ, RIMBERG, BOYD & RADER, LLP
                                            Attorneys for Plaintiffs

---

[14] I have obtained the other signatory's consent to file this document.